O56DMenC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

           v.                          23 Cr. 00490 (SHS)

ROBERT MENENDEZ, et al.

                                           Conference
                 Defendants.

------------------------------x

                                      New York, N.Y.
                                      May 6, 2024
                                      11:00 a.m.

Before:

                       HON. SIDNEY H. STEIN,

                                   U.S. District Judge

                       APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
PAUL M. MONTELEONI
ELI MARK
LARA E. POMERANTZ
DANIEL C. RICHENTHAL
CHRISTINA A. CLARK
    Assistant United States Attorneys

ADAM FEE
AVI WEITZMAN
    Attorneys for Defendant Robert Menendez.

LAWRENCE S. LUSTBERG
ANNE M. COLLART
RICARDO SOLANO, JR.
    Attorneys for Defendant Wael Hana.

O56DMenC

1    APPEARANCES, Continued:

2    CESAR DE CASTRO
     SETH H. AGATA
3    SHANNON M. MCMANUS
          Attorneys for Defendant Fred Daibes.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Case called.)

2          THE DEPUTY CLERK:  All counsel please state your names

3     for the record.

4          MR. MONTELEONI:  Good morning, your Honor.  Paul

5     Monteleoni for the government.  With me at counsel table are my

6     colleagues Dan Richenthal, Eli Mark, Lara Pomerantz, as well as

7     Christina Clark, a trial attorney from the National Security

8     Division of the Department of Justice.

9          THE COURT:  Good morning.

10         MR. FEE:  Good morning, your Honor.  For Senator

11    Menendez, Adam Fee and Avi Weitzman to my left.

12         Your Honor, we have conferred with the defendant, and

13    he has agreed to waive his appearance.  We have discussed

14    everything that may happen in morning, and he's comfortable

15    with that.

16         THE COURT:  Good morning.

17         MR. LUSTBERG:  Good morning, your Honor.  Laurence S.

18    Lustberg from Gibbons, PC, on behalf of Wael Hana.  With me at

19    counsel table are my partners, Ricardo Solano and Anne Collart.

20         We also have consulted with your client, who knowingly

21    and voluntarily waived his appearance today.

22         THE COURT:  Good morning.  I accept the waivers from

23    both of your clients.

24         MR. DE CASTRO:  Good morning, your Honor.  Cesar De

25    Castro, Seth Agata and Shannon McMahon for Fred Daibes, who

O56DMenC

1    also waived his appearance today, and we have discussed it with

2    him.

3              THE COURT:  I accept that waiver.

4              Please be seated.

5              We have a full agenda.  Let me begin with the in

6    limines and I'll go in order according to the ECF filings.  I

7    have views and conclusions on many of them, but I'll hear

8    argument on a few.

9              First let's do ECF 291, which is the government's

10   motions to preclude certain evidence.  Item number one is

11   uncontested, so it's dismissed as moot.  That's seeking a

12   preclusion of evidence that the charges are vindictive,

13   selective, politically motivated or brought for improper

14   purposes.

15             The second one is seeking preclusion that the

16   Senator's conduct should have been handled other than through

17   criminal prosecution, that the prosecution would have negative

18   consequences.  That's largely uncontested.  He's not going to

19   argue that the conduct should have been handled in some other

20   way, but there's one aspect of that I want to discuss with the

21   parties and that's whether evidence should be permitted on

22   whether he was warned by the government about the actions of

23   the Egyptian authorities trying to make him aware or actions

24   leading to his being an agent, however you want to phrase it.

25             The argument it seems to me for allowing it is that it

O56DMenC

1    goes to his scienter.  Sort of a weak argument, but I see it

2    theoretically.  That is, because he wasn't warned, he didn't

3    realize that he was becoming an agent or at risk of being an

4    agent or was an agent, and the argument on the other side is to

5    relevance -- there's clearly no duty of the authorities to warn

6    somebody that the Egyptian authorities were taking steps to

7    make him an agent.

8            So I see it both ways, but let's hear argument.  It's

9    the government's motion.

10           MR. RICHENTHAL:  Your Honor, our view I think is

11   pretty simple.  If the defense wishes to argue, for example, in

12   summation, that the jury has heard no evidence that

13   Mr. Menendez was warned that what he was doing was illegal and,

14   therefore, the jury should conclude that we haven't met our

15   burden, I don't expect we would object, but that's very

16   different from seeking to elicit affirmatively that, for

17   example, the Federal Bureau of Investigation in theory could

18   have warned him and chose not to, because that evidence doesn't

19   go to our lack of proof, or alleged lack of proof.  That

20   evidence can only be reasonably understood by a lay jury as a

21   suggestion that the FBI, or the DOJ more generally, should have

22   warned him, and that gets into charging policies, that gets

23   into counter-intelligence matters, that has no relevance in our

24   judgment.  But even if it had a modicum of relevance, it would

25   turn this trial, which is about the defendant's guilt, into

O56DMenC

```
1    something else, the choice by the government that he's here

2    instead of warned off of the conduct.  Under Rule 403, that

3    simply should not be permitted.

4            THE COURT:  All right.  Mr. Fee or Mr. Weitzman.

5            MR. FEE:  Your Honor, that was the argument presented

6    in the papers.  I won't repeat the other side of it.  But this

7    is an argument case.  The government's case relies on

8    inference.  The Court characterized it as weak.  I think it is

9    an argument that the jury could be persuaded by, of course it's

10   not at the core, that the Senator did not know, did not have

11   any belief that what he was doing was wrong --

12           THE COURT:  Well, you can argue that.

13           MR. FEE:  We will argue that, but, your Honor, we are

14   thinking of a very -- a question or two or three to an FBI

15   agent eliciting the fact that they did not attempt to warn

16   Senator Menendez at any point that they believed he was

17   engaging with foreign intelligence agents.  And, your Honor,

18   the government's proof, the chronology of it is going to have

19   the FBI encountering sources who are dealing with people the

20   government says are Egyptian foreign agents.

21           THE COURT:  I understand that, but the jury should not

22   be led to believe or should not have evidence on the basis of

23   which it could conclude that the government had an affirmative

24   obligation here.

25           MR. FEE:  Your Honor, we are not going to make that
```

O56DMenC

1    argument.  The jury is told all the time to consider arguments

2    as they are expressed and not for any other proper purpose.  We

3    are not going to make the argument that they had an obligation

4    to warn him.  We are going to -- we would like to argue and

5    think the jury should hear the argument that it suggests, the

6    Governor -- the Senator had no warning and no intention to do

7    anything that would violate the law.

8            MR. RICHENTHAL:  I'm happy to respond further.

9            THE COURT:  Go ahead.

10           MR. RICHENTHAL:  Again, the jury will know he wasn't

11   warned because there will be no evidence of a warning.  What

12   we're talking about here is whether an agent should be

13   cross-examined --

14           THE COURT:  I understand.  I'm going to exclude it.

15   The argument can be made that, jury, you've heard no evidence

16   that there was any warning.  I think to have questioning of

17   agents as to why they -- that they didn't allow the jury to

18   draw the inference that they should have, I think that the

19   probative value is very low, and it's substantially outweighed

20   by danger of confusing the issues and misreading the jury.  So

21   I'm going to exclude that under 403 ruling.

22           All right, the third motion by the government is

23   evidence of, punishment should be precluded.  I'm not sure why

24   the government even made that motion, but of course the

25   defendants don't object.  It's uncontested.  So that's

O56DMenC

1    dismissed as moot.  There will be no evidence in this trial of

2    punishment.  That's solely for the Court, and all the parties

3    know that.

4          The fourth motion is to preclude evidence regarding

5    the Senator's prior federal criminal case.  Everyone agrees,

6    absent his testifying, that it's not going to come in.  It's a

7    different issue if and when he decides to take the stand, if he

8    does.  So right now I'll dismiss that as moot.

9          The fifth motion is to preclude evidence regarding

10   whether the government has met its discovery obligations.

11   Again, I'm not quite sure why the government bothered to make

12   that.  There's no opposition to it.  I certainly wouldn't allow

13   any such argument.  So that's dismissed as moot.

14         Sixth is preclusion whether the government has -- of

15   evidence of whether the government has brought unrelated cases.

16   That's not contested, also dismissed as moot.

17         The seventh is evidence or argument to preclude

18   evidence or argument regarding whether the charges are vague.

19   Once again, I don't know what the government brought that

20   argument -- what he can argue is that it's a legal issue, it's

21   not for argument, and that's already been raised in the prior

22   motions here, so I'm dismissing that as moot.

23         Number eight is to preclude evidence or argument

24   whether others engaged in similar conduct.  The Senator wants

25   to show that senators often meet with foreign officials, join

O56DMenC

1    on position papers, and advocate for laws.  I mean, I have no

2    objection to that.  If that's where it goes, I mean, that's

3    fine.  I don't think there's any argument here.

4              Sir.

5              MR. RICHENTHAL:  So I think I would phrase it that the

6    line here may be more dotted than solid, but here's where we

7    see the line.  Between the types of things your Honor just

8    mentioned of which Senator Menendez had contemporaneous

9    knowledge and the types of things your Honor just mentioned of

10   which he --

11             THE COURT:  Wait.  Wait.  Wait.  You're saying he

12   knows that Senator so and so and Senator so and so joined with

13   him on this resolution, or he joined with Senator so and so and

14   so and so on this resolution?  Is that what you're saying?

15             MR. RICHENTHAL:  Exactly.

16             THE COURT:  That's not an issue.

17             MR. RICHENTHAL:  Agreed.  That's perfectly admissible.

18   That's our point.  Our concern based on some of the statements

19   in prior papers by the defendant is that -- and, frankly, also

20   based on page seven of their brief in opposition to our motion

21   in limine is that they may intend to introduce evidence about

22   the actions of other senators of which the defendant had no

23   contemporaneous knowledge at all, in which case our view is

24   it's irrelevant and confusing to the jury.

25             In other words, in hindsight, perhaps based on

O56DMenC

1    discovery, they've learned that other people did similar

2    things.  Well, that's not relevant to an issue in front of the

3    jury.  For the jury, the jury should know what the defendant

4    knew at the time, and that may include trips he went on with

5    other people, it may include conduct engaged in by other

6    people, but it shouldn't be conduct engaged in by other people

7    of which he had no knowledge at the time he engaged in the

8    charged conduct.

9           THE COURT:  Well, how is that line drawn?

10          MR. RICHENTHAL:  I think, your Honor, can police it in

11   realtime, but let me just give you an example.  Let's assume

12   for the sake of argument the defendant either on direct or

13   cross-examination, that is either his case or our case, would

14   like to put in information about a trip that Mr. Menendez was

15   on or contemporaneously aware of.  That would seem to go to his

16   mental state, at least in theory.

17          But let's assume something else.  Let's assume on

18   cross-examination, for example, the defendant's staff -- or the

19   defendant's lawyers try to put in evidence of a trip that the

20   defendant had no knowledge of, maybe even was years earlier or

21   years later.  At the point we would say there's no connection

22   with defendant's contemporaneous mental state.

23          THE COURT:  I understand.

24          Mr. Fee.

25          MR. FEE:  Your Honor, I'm not sure what the government

O56DMenC

```
1    is envisioning.  I will say this.  If the government is arguing

2    an inference, like they will hear that the fact that an

3    intelligence individual met with Senator Menendez on this trip,

4    it is perfectly appropriate to offer evidence through a

5    staffer, through an ambassador, through another Senator that

6    they regularly meet with intelligence officials on these exact

7    same sort of trips --

8               THE COURT:  That's not an issue.  Go ahead.

9               MR. FEE:  If you mean that's not an issue, you're okay

10   with that, your Honor, I think we're done.

11              THE COURT:  All right.

12              MR. FEE:  Your Honor, I have one issue about one of

13   the moot motions.

14              THE COURT:  Yes.

15              MR. FEE:  It's government's motion four, the prior

16   criminal prosecution.

17              THE COURT:  Yes.

18              MR. FEE:  We raised it in our papers.  I do think it's

19   important for the Senator to understand that he considers his

20   testimony --

21              THE COURT:  It's not -- I'm sorry.

22              MR. FEE:  No.  Please go ahead, your Honor.

23              THE COURT:  I shouldn't interrupt you.

24              MR. FEE:  No.  No.

25              THE COURT:  Go ahead, please.
```

O56DMenC

1          MR. FEE:  I think maybe you were about to say, the

2     government -- it's a semantic difference.  In their motion they

3     said they might inquire about it if he chooses to testify.

4     That's not okay.  If he opens the door and he does testify and

5     talks about it, obviously they can inquire about it.  But the

6     first thing, we want to make sure the government is not taking

7     that position, that the fact that the Senator is taking the

8     stand somehow opens the door in and of itself.

9          THE COURT:  I don't think it's something we have to

10     worry about at this point.  It's highly premature.

11          MR. FEE:  Thank you, your Honor.

12          MR. RICHENTHAL:  Can I go back briefly to the other

13     Senator's point?

14          THE COURT:  Yes.

15          MR. RICHENTHAL:  Again, I may be taking too liberally

16     what's written on page seven of their brief, but they write

17     "the defendant intends only to argue he lacked criminal intent

18     and evidence that many other senators lawfully took the same

19     actions as Senator Menendez meeting with foreign governments in

20     the matter advocating for the same position the foreign

21     government urged may make inference of no criminal intent more

22     plausible."

23          That sentence is devoid of any connection in date or

24     otherwise to the defendant's contemporaneous knowledge.  That's

25     exactly the point I'm trying to make.  It may be your Honor

O56DMenC

1    can't rule in advance, but we think there is a line here

2    between the evidence of which he had current knowledge,

3    knowledge of the time he acted, and evidence of which he did

4    not.  And we think that the general inquiry of whether senators

5    at some point unbeknownst to him --

6          THE COURT:  Understood, and you have attuned me to

7    that difference.  Thank you.  I don't think there's any need

8    for a ruling at this point.

9          All right.  Nine, government seeks to preclude

10   evidence as to whether the charged acts were good for the

11   public.  I'm not quite sure what that argument is.  It seems to

12   me the Senator should be able to adduce from however he's going

13   to adduce it that one of the reasons he was doing things was he

14   thought it was in the public interest.

15         Does the government have any objection to that?

16         MR. RICHENTHAL:  No.  I agree 100 percent with what

17   your Honor just said.  Our concern is the similar concern we

18   raised a minute ago, that devoid of his contemporaneous intent,

19   the defendant may argue that, in hindsight, the actions were

20   allegedly good for the United States or not harmful for the

21   United States.

22         THE COURT:  Again, I can't rule in the abstract.  I

23   understand that position.

24         Mr. Fee, I assume there's no issue here.

25         MR. FEE:  All good, your Honor.

O56DMenC

1          THE COURT:  All right.  Ten, the government requests a

2     preclusion of defendant's prior good acts to show propensity to

3     not commit crimes.  I mean that, just the way it's phrased,

4     answers the question.  I think everyone agrees the Senator can

5     introduce evidence of his record as Senator on relevant issues.

6     He's going to.  That's part and parcel of what the trial is

7     about.

8          In regard to Mr. Daibes, he argues he wants to put in

9     the fact that he's a habitual gift giver.  It seems to me that

10    can come in.  However -- I mean, if it's admissible, I don't

11    have any objection to that.  I assume the government doesn't

12    either.  That's my ruling there.

13         MR. RICHENTHAL:  I agree with everything your Honor

14    just said.  I would just note, I think this is something I keep

15    saying, your Honor used the word "relevant" in describing the

16    prior good acts.  We agree, not all acts would be relevant to

17    these charges.  Acts towards Egypt, for example, probably are.

18    Acts unrelated to Egypt or Qatar probably are not.  That was

19    exactly our concern.

20         THE COURT:  Okay.  401, irrelevant evidence does not

21    come in.

22         All right.  Eleven, the government seeks to preclude

23    evidence of the defendants' -- all of the defendants' family

24    background, age, health or other personal characteristics.

25    Highly premature.  There's no need for me to rule on that now.

O56DMenC

1  If and when someone takes the stand, we'll see.  That is ECF

2  291.

3          Let's turn to ECF 290.  Menendez's motion to preclude

4  speculative evidence and testimony.  First motion there is the

5  Senator seeks to preclude speculative testimony regarding items

6  of value seized from the Menendez home.  Apparently,

7  Mr. Menendez says that the -- he concedes that the evidence of

8  the gold and the specific money that has allegedly fingerprint

9  or DNA evidence tying it to these defendants can come in, but

10  the cash or I think there may be a gold bar, I'm not sure, of

11  the 11 where there's no -- that they can't track the number on

12  the bar to Daibes or Hana, that shouldn't come in.  That

13  doesn't make sense here.

14          The cash and gold bars found in the Menendez house,

15  all of it is admissible here.  All the cash and the gold was

16  all stashed in the same way -- standard is the wrong word, was

17  kept in the same manner.  It was kept throughout the house in

18  similar fashion, stuffed in pockets, in a safe, in jackets, and

19  apparently some of the money was withdrawn $10,000 at a time

20  from -- $10,000 at a time.

21          It's a permissible inference that all the money and

22  the gold was part of the alleged scheme.  The defendants will

23  have an argument, should they choose to make it, that goes to

24  the weight of that evidence in regard to the gold and the cash

25  that doesn't have its fingerprints or DNA on it, that is of

1    Daibes or Hana or Daibes' driver.  It goes to the weight, not

2    the admissibility.  I do find that the probative value

3    substantially outweighs any prejudice here and I am allowing it

4    in.

5          The second motion by Menendez is to preclude evidence

6    regarding high end watches.  I must say that I originally was

7    thinking that if all we had was the text, how about one of

8    these, that makes sense to preclude it as overly speculative.

9    I have no idea -- I would have had no idea about what "one of

10   these" means.  But the government has proffered in its papers

11   that that message itself, how about one of these, with pictures

12   of high end watches, paragraph 58 in the indictment, the

13   government has proffered that it was sent via an encrypted app

14   and sent two days before Daibes sent Menendez a link tracking a

15   Menendez resolution that supported Qatar and shortly after a

16   dinner with the Qatari officials and immediately before Daibes

17   gave Menendez a one carat kilogram gold bar.

18         On the basis of that good faith proffer, I am allowing

19   that evidence.  The probative value is not outweighed by a

20   danger of unfair prejudice.  It's highly probative, and there's

21   very little danger of unfair prejudice or confusing the issues.

22   So under 403, I am allowing that evidence in.  I'm not

23   precluding the evidence of the high end watches.

24         MR. FEE:  Your Honor.

25         THE COURT:  Sure.

O56DMenC

```
 1              MR. FEE:  I hear the ruling and have nothing further
 2     to say about that.  It spurs one additional issue in my mind I
 3     did want to flag just to perhaps promote economy at the trial.
 4     The government has begun to use the phrase "encrypted messaging
 5     app" regularly.  I fear we're going to hear it in the opening
 6     and in argument.  I will make the point that all messaging apps
 7     these days are encrypted, and if the government does that, I do
 8     feel we would be obliged to ask witnesses on the stand if they
 9     use these same apps.  But there is essentially no messaging
10     that is not encrypted.
11              So I think the Court should be aware if they're
12     permitted to make that point and make that argument, the
13     defense will be required to meet it to some degree.
14              THE COURT:  Yes, sir.  Go ahead.
15              MR. RICHENTHAL:  I'm not sure it's technically true
16     they're all equally encrypted, but that aside --
17              THE COURT:  I must say I don't know.
18              MR. RICHENTHAL:  But that aside, whether an individual
19     human being, lay witness uses an app is plainly not appropriate
20     to be crossing the witness.  If the defense wants to elicit
21     testimony, for example, from a technical expert, of which we're
22     calling one, about how the app works, I don't think we'd object
23     to that, but individual's use of apps, I don't see the
24     relevance of that at all.
25              THE COURT:  I think an individual may know or have a
```

O56DMenC

1    belief as to whether the app he or she was using was encrypted,

2    whatever that means.

3         MR. RICHENTHAL:  Maybe.  It begins to seem like expert

4    testimony to me.  Again, we are calling a technical expert.  I

5    don't think there will be any dispute what apps are and are not

6    encrypted.  What I'm resisting is the idea that lay witnesses

7    should be cross-examined as to what apps they use.

8         MR. FEE:  The point, your Honor, is different than

9    that.  I don't want to ask anybody technical questions.  I

10   believe the argument the government will make is the fact that

11   facially innocent messages like, "hey, I'll see you there; I'll

12   meet you at the cafe," were sent on an encrypting messaging app

13   by itself supports the inference that these were communications

14   in furtherance of a crime.

15        I would submit and believe that everyone at that table

16   and almost every witness they call has these same apps on their

17   phone and uses them.  So that would be the sort of questioning

18   we would be obliged to do with limited --

19        THE COURT:  I don't think I need to rule on it at this

20   point.

21        MR. FEE:  I agree, sir.  Thank you, your Honor.

22        THE COURT:  Number three, this is by Menendez to

23   preclude speculative testimony regarding the reasons the Qatari

24   Investment Co. invested in Daibes owned -- in real estate

25   projects that Daibes owned.  I'm not sure what this motion is.

1    Clearly, the reasons why the Qatari Investment Company invested

2    in the owned real estate is relevant here.  I think the motion

3    is to preclude inadmissible evidence.  If that's the motion,

4    that motion would be granted for everything.  Inadmissible

5    evidence can't come in.  So what's that motion?

6         MR. FEE:  Your Honor, I don't know if I need to

7    formally withdraw this -- this was before we saw the 3500 and

8    realized that witnesses were saying the opposite from Heritage,

9    the Qatari Investment Company that was not connected.  So I

10   have nothing further to say about your Honor's observation.

11   Thank you.

12        THE COURT:  Fine.  Now, that makes me think about the

13   pending Rule 15 motion which I'm working on.  I'm not inclined

14   to grant it.  I need to think more about it.  But it seems to

15   me that to the extent what's at issue is the four bullet points

16   set forth in the Menendez motion -- do you know the bullet

17   points I'm talking about -- that could be the subject of

18   stipulation by the parties, obviating the need for the Rule 15

19   element, although the exact words of those bullet points I

20   would assume are not acceptable to the government, but it does

21   seem to me a fair ground for the parties to resolve that by way

22   of stipulation.

23        Government?

24        MR. RICHENTHAL:  We're certainly open in good faith

25   considering any stipulation.  I will say our view of the bullet

1    points if your Honor is referring to document 360 at page two

2    is that they're not factually accurate and not what the

3    witnesses we believe would say.  But we're certainly open to

4    considering in good faith anything the defense presents.

5          Frankly, even if we think it's inadmissible, we'll

6    gladly sign the stipulation and argue about it -- that's been

7    our position since the beginning.

8          MR. FEE:  You heard him agree to admit inadmissible

9    evidence, your Honor.  But yes, we're open to a stipulation.

10          THE COURT:  All right.  But do that --

11          MR. FEE:  Fast.

12          THE COURT:  Focus on that now.  That's right, because

13    the parties deserve a position on the Rule 15.

14          MR. FEE:  Yes, sir.

15          THE COURT:  The very late Rule 15 which the defendants

16    have said the parties will oppose the motion.  If you can

17    resolve it by stipulation, do so.

18          Next one.  Request by Menendez to preclude testimony

19    regarding why IS EG Halal received the contracts from the

20    Egyptian Government.  I mean, certainly why is relevant.  The

21    parties seem to disagree as to whether or not they have

22    admissible evidence.  All I can tell you is I'm not going to

23    admit speculation, but if there are text messages that fall

24    within the Rules of Evidence, it seems to me it comes in, it's

25    relevant.  What's the issue here?  I don't see an issue.

1          MR. FEE:  Your Honor, you're right you can rule on

2     this as it comes.  We have seen the 3500 --

3          THE COURT:  The ruling would be on the basis of the

4     Rules of Evidence.

5          MR. FEE:  Understood.

6          THE COURT:  What I'm saying is the subject is relevant

7     under 401 and 402, and I don't see a Rule 403 issue.

8          MR. FEE:  Agreed.  The 403 issue has really become a

9     401 issue as well.  We have seen evidence and witness

10    interviews of USDA officials guessing at the reasons why IS EG

11    Halal got this contract.

12         THE COURT:  Guesses aren't permitted.

13         MR. FEE:  I understand, your Honor.  Just flagging it

14    might be in some of the text messages the government may offer,

15    emails, and the like.

16         THE COURT:  All right.  That's ECF 290.

17         Let's go to ECF 292, which is Menendez's three motions

18    in limine to exclude evidence and testimony regarding campaign

19    donations and Senate financial disclosure forms.  The first one

20    is to preclude evidence and testimony regarding campaign

21    donations.  I'm going to allow them in.  It shows the

22    development of the relationship of trust and confidence among

23    the co-conspirators.  I'm talking about it looks like

24    fund-raisers' contributions from Uribe and Daibes.

25         The government isn't arguing it's part of the quid pro

quo, and the government I don't think can argue that.  I'll
give a limited instruction under 403 if the parties want, but
under 403 there's certainly probative value substantially
outweighs any danger or prejudice here, so it comes in to show
the development of the relationship with trust and confidence
among the co-conspirators.

Number two -- there's only two motions here.  Number
two is to preclude evidence and testimony regarding Senate
financial disclosure forms.  In the indictment it states that
Menendez did not disclose their Mercedes, the cash, the gold,
the Grand Prix tickets.  That's paragraph 67.  But he's not
charged with a violation of Senate financial disclosure form
rules.  I'm going to allow it in.  It's part of the crime
itself.  That is, his failure to disclose things of value
received from co-conspirators seeking to issue officials acts.
It's evidence of consciousness of guilt, and, as I say, it's an
act in furtherance of the scheme.

There's no 403 issue here.  It's highly probative of
his consciousness of guilt.  Again, if the parties want, I'll
make it clear that he's not charged with violating Senate
disclosure forms rules.

All right.  That handle ECF 292.  Let's go on to ECF
293.  Menendez's motion to preclude the government's noticed
404(b) evidence.  First motion under that, the government
should be precluded from offering evidence of any prior

O56DMenC

1  criminal charges.  I've taken care of that.  Dismissed as moot.

2          Second, the government should be precluded from

3  offering evidence of Menendez's alleged financial needs.

4  That's also raised by Mr. Hana in ECF 289.  This goes to the

5  financial circumstances and spending habits of Menendez and

6  Hana.

7          My ruling is that it's inextricably intertwined with

8  the evidence of the charged crimes.  It goes to motive,

9  knowledge, and intent under 404(b), and there's no 403 issue

10  here.  Now, meaning its probative value is not substantially

11  outweighed by the danger of unfair prejudice.  You're confusing

12  the issues.  The -- I'll start that again.  Mr. Menendez's

13  alleged desire for the car, the gold, and so forth, goes to

14  motive, and the lifestyle that he had before and after is

15  relevant here especially -- not especially, it's also relevant

16  for Hana, that his life before getting the monopoly and after

17  goes to his motive as well, his knowledge and intent.

18          So under 403, I am allowing evidence of -- here it's

19  called lifestyle.  I don't like that term -- but his spending

20  habits and financial circumstances can be relevant and we'll

21  get to that when we get to the expert witnesses.  I'm still --

22  I'm getting a paper tomorrow on that, and then you'll have a

23  decision shortly thereafter as to the financial expert.

24          That having been said, I'm certainly not going to

25  allow things in like one case I saw there were hundreds of

1    photographs of assets.  That's not what we're talking about.

2    But to the extent it's relevant, what they were purchasing can

3    come in, and that, as I say, goes for Mr. Hana on ECF 289, as

4    well as Mr. Menendez on ECF 293.

5         Third motion on 293, the government should be

6    precluded from offering evidence regarding omitting things of

7    value on Menendez's tax returns.  I am allowing that in.  It's

8    evidence of consciousness of guilt.  There are lots and lots of

9    cases on that.  I'll give a limiting instruction if the parties

10   want it to make sure the jury knows he's not charged with any

11   tax fraud here, but under the 403 balancing test, I'm not going

12   to exclude relevant evidence, because I find its probative

13   value is not outweighed -- I'm sorry, its probative value is

14   substantially outweighed by any risk of prejudice.  So I'm

15   allowing that in.

16        Number four, the government -- Menendez is saying the

17   government should be precluded from offering evidence regarding

18   Fusion Diagnostics, Inc.  Now, Fusion is the company that paid

19   Mrs. Menendez, and apparently there were household gifts and

20   services rendered as well, or at least that's what the

21   allegations are, in exchange for the Senator seeking to

22   influence municipal officials to grant municipal contracts to

23   Fusion and authorizations to do COVID-19 testing.

24        My conclusion is that's part and parcel of the charged

25   offenses.  It's relevant to motive and intent.  It's relevant

O56DMenC

1 to common scheme or plan, because the use of another entity,

2 that is, IS EG Halal, in terms of the Egyptian issue, and the

3 SIBC, Nadine's company, in terms of the Fusion issue, is the

4 common scheme or plan.  It also goes to absence of mistake or

5 accident.  So, again, I'll give a limiting instruction if the

6 parties want, but I'm admitting it under 403.

7    Now let's go to Hana's motion in limine.  I've already

8 dealt with the --

9    MR. FEE:  Your Honor, I'm sorry.

10    THE COURT:  Yes, sir.

11    MR. FEE:  On the Fusion ruling, well understood, just

12 to flag, the defense may need to put on a witness or more

13 depending how the government intends to prove those Fusion

14 allegations, because there is significant *Brady* that I think is

15 the reason why it wasn't charged and we think the jury would

16 need to hear it, because essentially the government's

17 description --

18    THE COURT:  What do you mean?  Be specific.

19    MR. FEE:  I will, your Honor.  They say the

20 government's theory and the reason underlying the ruling based

21 on the government's proffer is Senator Menendez made a call to

22 a city official saying, "use this COVID testing firm, Fusion,"

23 and that there was some sort of pressure or influence.  They

24 spoke to those city officials, the government, and they denied

25 that there was any influence.  In fact, they said it didn't

O56DMenC

1     matter whether or not Menendez called.  We were letting anybody

2     at that time show up and do our testing.  So I don't know how

3     the government plans to prove this, but we think to undermine

4     the purposes for which you have admitted it, we would need to

5     call at least that witness and perhaps others.

6                 THE COURT:  Government.

7                 MR. RICHENTHAL:  I think this depends on if the proof

8     comes in.  If it's admitted, for example, to show that

9     Ms. Menendez's company was used a certain way that has no

10    relationship whatsoever to whether state officials felt

11    pressured by Mr. Menendez, I don't think it's right per your

12    Honor's decision.  We've heard your Honor's decision.  We've

13    heard Mr. Fee's remarks without commenting on the facts to

14    which he alludes.  Let's see how the evidence comes in.

15                THE COURT:  Well, it strikes me that this is not a

16    significant part of the government's case.  You may avoid a

17    problem, but obviously the government will put its proof on.

18                Okay.  Hana's motions in limine.  I handled the first

19    one.  Second one, you request the government to be precluded

20    from introducing evidence that Hana was not registered as an

21    agent of a foreign principal.  He's not charged with not being

22    registered.  He's arguing it's irrelevant and prejudicial.  It

23    seems to me that that's right.

24                Let me hear the government.  I mean, he's not being

25    charged with failure to register.  What's the relevance?

O56DMenC

1    Government?

2            MR. RICHENTHAL:  No, he's not, but our view is it goes

3    to at least two things:  First, it goes to his consciousness of

4    guilt, that is, desire to conceal the actions he's undertaking

5    as an intermediary between the Egyptian Government and

6    Mr. Menendez.

7            THE COURT:  That assumes he's required to be an agent.

8            MR. RICHENTHAL:  Not necessarily.  It assumes he may

9    believe he's required to be an agent.  What's in his head,

10   rather than that the proof --

11           THE COURT:  Fair enough.

12           MR. RICHENTHAL:  Second, part of what's going to

13   happen in this case, we believe -- that's what we anticipate

14   we'll see is the jury needs to understand the distinction, as

15   is relevant here with respect to Egypt and -- between

16   registered kind of overt lobbyists, for lack of a better

17   phrase, and for lack of a better phrase again, sort of secret

18   quasi-lobbyists.

19           THE COURT:  I understand that.

20           MR. RICHENTHAL:  And for the jury to understand that,

21   our view is they need to understand there is a public database

22   with respect to those registered under FARA and a public

23   database with respect to those registered under the Lobbying

24   Disclosure Act, that, in fact, there were lobbyists for Egypt

25   at the contemporaneous time, and that the people that Mr.

O56DMenC

1    Menendez was liaising with, giving information through and

2    getting directions from were not those people.

3            To place that in front of the jury we think the jury

4    needs to understand in general, not terribly detailed, the

5    regime I just described, but the people --

6            THE COURT:  But nobody's disagreeing with that.  Go

7    ahead.

8            MR. RICHENTHAL:  But one of the people I just

9    mentioned, that is, that I call an intermediary, is Mr. Hana.

10            THE COURT:  Right.

11            MR. RICHENTHAL:  So the jury would have to know

12    Mr. Hana does not appear in those databases, that he was not a

13    registered lobbyist.

14            THE COURT:  You can adduce that.  Go ahead.

15            MR. RICHENTHAL:  And he was not a registered agent.

16            THE COURT:  You can adduce, I mean, whatever those

17    forms show.  Go ahead.

18            MR. RICHENTHAL:  If we can adduce that Mr. Hana, as

19    relevant to this motion, was not a registered agent or

20    lobbyist, then I think your Honor, and maybe I'm

21    misunderstanding, has actually denied Mr. Hana's motion.  That

22    is what we intend to adduce.  We're not going to prove he had

23    to register.  We would like to prove he did not register.  That

24    is, he did not appear in his --

25            THE COURT:  You can -- Mr. Fee, it seems to me the

O56DMenC

1   government can --

2           MR. FEE:  It's the better one, your Honor.

3           MR. LUSTBERG:  This is mine.

4           THE COURT:  Oh, yes.  Sorry.

5           MR. LUSTBERG:  But maybe he'll have a better answer.

6           THE COURT:  Mr. Lustberg.

7           MR. LUSTBERG:  Yes.

8           THE COURT:  It seems to me the government should be

9   able to produce lists of registered agents, and if Hana isn't

10  on it, Hana isn't on it.

11          MR. LUSTBERG:  Your Honor, the key and I think we're

12  starting to reach an agreement here, is that they can't argue

13  that he should have registered.  If they want to point out that

14  he did not register, that's much less prejudicial.

15          THE COURT:  I think everyone understands.

16          Yes.  Government.

17          MR. RICHENTHAL:  Yes.  He's not charged with that

18  offense.  We're not going to argue he committed that offense.

19  Absolutely.

20          THE COURT:  All right.

21          MR. LUSTBERG:  That's what we want.

22          THE COURT:  Excellent.  Thank you.

23          Those are the in limines, and you have my statement on

24  the stipulation for the Rule 15.  Let's handle some other

25  things.

O56DMenC

1          I have the agreed statement of the case, which I'll

2    read to the venire.  I thank you for it.

3          I want an agreed upon jury verdict form, if the

4    parties are able to agree upon a jury verdict form.  I want it

5    presented to me by Friday.

6          I want a list of witnesses from each side.  I want it

7    presented to me by Friday as well.

8          I want a list of attorneys, government agents,

9    paralegals who will be sitting at counsel table for each party

10   by Friday as well, because I'm going to read all that to the

11   venire.

12         I want a list of places from each party.  When I say

13   each party, the defendants should submit one and the government

14   can submit one.

15         List of places that I need to find out if the venire

16   has had any particular involvement with.  It's fairly standard.

17         The way I work, gentlemen and lady, is that on each

18   witness, there's only one attorney, okay?  I don't expect to be

19   double teamed, and I don't expect every witness is double

20   teamed.  One attorney per party on each witness.

21         I expect evidentiary issues to be brought up before or

22   after the jury leaves.  I don't want to waste jury time with

23   sidebars.  So to the extent you know evidentiary issues will

24   arise, and men and women of good faith will know in almost all

25   instances that, bring it to my attention so that we're not

O56DMenC

1    wasting jury time.  I want an absolute minimum of sidebars.  No

2    sidebars are the best, but an absolute minimum.

3         If there's an objection to a question, normally I'll

4    know what it is.  Sometimes I'm not sure, I want to hear what

5    the basis is, I'll say "basis."  To the extent you can, give me

6    one word, 403, 803(3), whatever it might be, because I don't

7    want to take time to have a sidebar.  Presumably the light will

8    go off and I'll understand what the issue is.

9         I need the defendants to divide up cross-examination

10   so that there's no substantive repetition.  I shouldn't say

11   substantive.  So that there's no material repetition.  In other

12   words, Mr. Weitzman will handle one area of cross-examination.

13   Mr. Lustberg another area.  Mr. De Castro another area.  Get

14   together with that, so that we're not wasting everybody's time.

15        What's the estimate at this point, now that

16   everything's been refined, where things have been refined,

17   government, for the length of trial?

18        MR. MONTELEONI:  Yes, your Honor.  This is something

19   we wanted to raise with you.  Unfortunately, we're thinking the

20   estimated length of trial is likely to be somewhat higher than

21   we were hoping, possibly by one or two weeks, because although

22   there has been progress with stipulations, there have still

23   been no stipulations that have been signed, and a number of

24   these authenticity stipulations could necessitate calling a

25   number of custodians.

1              I will say --

2              THE COURT:  There should be no authenticity issues

3    unless there's a genuine authenticity issue.  Parties should be

4    able to resolve authenticity issues by stipulation.

5              MR. MONTELEONI:  Yes, your Honor.  We --

6              THE COURT:  Everybody will agree with that but that

7    may not happen.  I want it to happen.

8              MR. MONTELEONI:  We do, too, and we've been working

9    with defense counsel.  We understand at least one defense

10   counsel has a problem with some of the standard language in the

11   stipulation about the stipulation itself being admissible, and

12   so we're --

13             THE COURT:  The stipulation of authenticity is always

14   admissible.  It says on it that you're admitting the

15   stipulation and the underlying documents to which the

16   stipulation of authenticity applies.

17             MR. MONTELEONI:  I can't speak to why the defense

18   counsel has developed this concern.  Obviously, for

19   authenticity, we're proposing stipulations for some documents

20   that the defense is going to argue are not admissible, whether

21   to knock out a need for a witness, if they're admissible on

22   other grounds -- we think they want to change the language of

23   the stipulation some way.  They sent over a proposal to address

24   this concern, which we've never really encountered as a concern

25   before, last night and we're going to see if we can accommodate

O56DMenC

1    it.

2         We don't think this should stand in the way, but to be

3    clear, we've proposed -- starting April 24 we've proposed a

4    long series of stipulations.  They principally concern

5    authenticity, and the ones that are outstanding are really

6    about this and --

7         THE COURT:  About authenticity.

8         MR. MONTELEONI:  Yes.  There are ones that they object

9    to that are arguably more substantive that we understand,

10   that's fine, we'll just call the witness, but there's a number

11   of outstanding ones that absolutely go to authenticity,

12   including, for example, a 33-page stipulation that recounts the

13   authenticity of materials extracted from 31 different

14   electronic accounts and devices, which we sent to them shortly

15   after providing exhibits.  We have heard some encouraging

16   noises on that one, but they've asked for more information last

17   night.  We're going to provide it to them, but we don't know if

18   it will satisfy them.  We hope it does.  If it doesn't, we're

19   going to be offering evidence subject to connection and calling

20   perhaps a large number of FBI custodians at the end of our

21   case.

22        THE COURT:  All right.  All I can say now is let's

23   avoid that to the extent possible.  I'm not going to force an

24   authenticity stipulation.  If there are real issues of

25   authenticity, somebody should call a witness, but normally

O56DMenC

1    these are handled by authenticity.

2           There are going to be -- I mean, we're calling upon

3    the good citizens of the State of New York to sit here for what

4    was four to six weeks, and to the extent it's longer, it's

5    going to be even more difficult to get people, and that's a

6    concern.  I've called in a panel on the basis of four to six

7    weeks.

8           You have my views.  Unless there's a serious issue of

9    authenticity, it should be stipulated to.  It's not addressed

10   to you.  It's addressed to the lawyers.

11          Mr. Fee.

12          MR. FEE:  Your Honor, just to be --

13          THE COURT:  I assume you don't disagree with what I

14   have said.

15          MR. FEE:  Well, I disagree -- this was an awfully

16   abridged summary.  We have no problems with authenticity stips.

17   You just heard him refer to a 33-page stip.  It's a fact stip,

18   your Honor.  It described how they extracted evidence.  We have

19   no issue with authenticity stips.  Every single one of the

20   stipulations proposed to us contain things well beyond

21   authenticity, and a number of errors.  There's 42 of them.  I

22   think we've gotten back to them --

23          THE COURT:  Forty-two what?

24          MR. FEE:  Stipulations.  We've gotten back to them

25   with nearly half.  We're dealing with all this at the same time

O56DMenC

1    as trial preparation.  We are working very hard, your Honor.  I

2    don't think there's going to be any authenticity dispute at

3    all.

4            THE COURT:  All right.

5            MR. MONTELEONI:  Your Honor, may I just add one thing?

6            THE COURT:  Yes.

7            MR. MONTELEONI:  We have been working with them, and

8    I'm not -- I mean, I am hopeful that we will reach these

9    agreements.  There have been some positions that they've taken

10   where -- for some documents, where we are calling a witness

11   they don't want to stipulate to the authenticity of the

12   document, because they're going to want us to actually ask the

13   witness about it on the stand even if we otherwise wouldn't

14   have done that.  We're trying to work through that.  It's

15   potentially going to be, again, something where we'll have to

16   introduce evidence subject to connection and potentially ask

17   witnesses more questions than we would need to before the jury.

18           We're going to try.  We certainly are trying in good

19   faith.

20           THE COURT:  All right.  Do so.

21           MR. FEE:  I'm sorry, your Honor.  What was the

22   estimate they offered?

23           THE COURT:  Four to six.

24           MR. FEE:  Four to six.  Okay.

25           MR. MONTELEONI:  Yes, if the stipulations are worked

1  out, then that's our view.

2  THE COURT:  Okay.  Well, I'm going to give an honest

3  estimate to the panel, so you'll let me know.

4  MR. MONTELEONI:  I think at this point we should have

5  to say five to seven or potentially more.  If we have a lot of

6  signatures in the next few days, then maybe we can revise that

7  back down.

8  THE COURT:  That may need a bigger panel.  I would

9  hate to run out of venire men and women and have to call in a

10  second panel, which would itself delay things.

11  All right.  We'll take it as it comes.  Try to work

12  out those stipulations so that I can say in good faith four to

13  six weeks.  I'll add, one never knows with trials.  It could be

14  shorter. It could be longer.  But I do need to give them a good

15  faith basis for an estimate.

16  Sir.

17  MR. FEE:  Just for accuracy, your Honor, I assume

18  that's the government's estimate.  We would estimate one to two

19  weeks for the defendants' case.

20  THE COURT:  All right.  I intend to, especially in

21  light of this discussion, impanel six alternates.  Now, my

22  reading of Rule 24 is as follows:  Twelve seated jurors, six

23  seated alternates, six government peremptory challenges, ten

24  defense challenge.  You'll share the challenges amongst the

25  defense.  When six alternates are chosen, the government gets

O56DMenC

1    three additional peremptory challenges, and the defense gets

2    three additional peremptory challenges.  That's 24(c)(4)(C).

3    That's a total of 40 jurors, as I read it.  If anyone

4    interprets Rule 24 differently, let me know.

5           That means, out of the array that I'm calling in, we

6    can't start picking until we have 40 jurors who are not

7    disqualified or excused.  Be aware of that at all times.

8           Who's doing the opening for the government, and how

9    long is the estimate?  I don't demand that you stick to a time

10    estimate, but I want a good faith basis.

11           MR. LUSTBERG:  Judge, just before you get to that, let

12    me make this application, as I've typically done and I think

13    others have in cases of this magnitude, that the Court expand

14    the ten and six from Rule 24 to 12, just giving two more

15    peremptories to the defense so that each of us gets four, since

16    there are three of us, and then the government could get one or

17    two more, too, if they wish to even it up.  It would only add a

18    few more jurors but allow us sufficient peremptories among each

19    of the three of us for that protection to be meaningful.

20           THE COURT:  I see no need for that.  You've been

21    working cooperatively up to now.

22           MR. LUSTBERG:  Judge, along those lines, working

23    cooperatively, this is a conspiracy case, and we would ask the

24    Court, as things proceed, to be able to consult among ourselves

25    with respect to jury strikes not in front of the jury panel.

O56DMenC

1          THE COURT:  Yes.

2          MR. LUSTBERG:  Okay.  Thank you.

3          THE COURT:  Is the application for you to talk amongst

4     yourselves?

5          MR. LUSTBERG:  Talk amongst ourselves without the jury

6     watching that interaction.

7          THE COURT:  Oh, no.  I understand that.  Yes, of

8     course.

9          Who's doing the opening for the government and how

10    long is the estimate?

11         MR. MONTELEONI:  Lara Pomerantz will be giving the

12    government's opening, and the opening will be no more than 45

13    minutes.

14         THE COURT:  Defense, who's doing it, and in what order

15    and how long?

16         MR. WEITZMAN:  Your Honor, I will be delivering the

17    defendant's opening on behalf of Senator Menendez.  I expect to

18    be about an hour.

19         THE COURT:  You're first up?  The defense have decided

20    that?

21         MR. WEITZMAN:  We haven't discussed it.

22         THE COURT:  All right.  You'll let me know.

23         MR. WEITZMAN:  Yes.

24         THE COURT:  Right now Mr. Weitzman is first up.

25         MR. LUSTBERG:  Your Honor, I will be doing the defense

O56DMenC

1    opening for Mr. Hana, and we expect it to be a half hour.

2              MR. DE CASTRO:  Hi.  For Mr. Daibes, Mr. De Castro

3    will do it, and I'm thinking 20 minutes, 20 to 30.

4              THE COURT:  Here's how I intend to pick this jury.  I

5    can fit 102 members of the venire here.  It's considerably more

6    than I normally do, but it will help cut down repetitive

7    questioning.  That's 18 in this group.  That's six rows of

8    eight each on the right, and six rows of six each on the right.

9    That means that people who are not involved in trial will be in

10   the back row.  All the others will be at the beginning at least

11   occupied by members of the venire.

12             One of the -- I'll explain, I'll read the agreed upon

13   statement and explain some basic things, and at some point very

14   close in I will ask that those who cannot sit for whatever time

15   I feel is appropriate, either four to six weeks, or five to

16   seven weeks, for a substantial reason, to raise their hands.

17   At that point, I'll ask those who have not raised their hands,

18   in other words, who can sit for the appointed time, to go to

19   another courtroom that we have.  That's so they don't have to

20   sit here while I question each and every juror who feels he or

21   she cannot sit.

22             So they'll go to another courtroom and we'll have a

23   CSO or -- probably CSO there.  Then I will go one by one and

24   find out what the reasons are that they can't sit.  That will

25   take a considerable period of time.  I then will excuse those

O56DMenC

who I feel cannot sit.  I'll ask the parties if they have any

additional people that they want me to excuse.

        To make it simple, when everyone comes in, my deputy

will read their names out, and they'll sit in order.  And we

have index cards with a number, so from then on I'll refer to

them by the number.  It just makes it a lot easier.  And

they'll hold up the number, so they don't have to be concerned

about remembering.

        My clerks will try to make sure that the people sit in

the number in which they're called, because sometimes if

somebody's close in, they may sit before the person with the

lower number.  But we'll get it straight or we'll certainly try

to.  I'll refer to everybody by their numbers.

        After those who cannot sit for the period of time of

the trial are excused, we'll bring the other people back, and

I'll do the general questioning.  Then at some point I will do

the individual questioning.

        At the end, I'll ask if the parties -- we'll go to

sidebar.  I'll ask if the parties have any additional questions

that they feel I should be asking or any follow-up and we'll

handle it that way.  I'll give the parties time to order their

pre-empts outside the hearing of the jury, and then we'll go to

sidebar and we'll pick the jury.

        Normally I can do that around lunchtime, either before

or after lunch.  I think this is going to probably take a day,

1    if not more.  I mean, that's my estimate.  We'll see.  You

2    should be prepared for your openings on Monday, but I don't

3    know if we can get to it.  That's mechanically how I intend to

4    do it.

5              Are the parties working on the stipulations that were

6    discussed in regard to the classified information?

7              MR. RICHENTHAL:  They've been signed, your Honor.

8              THE COURT:  Each.  Each of the two.

9              MR. RICHENTHAL:  Mr. Mark can provide more detail.

10   One has been signed.  One we anticipate being signed soon.  If

11   the Court would like more information --

12             THE COURT:  No.  That's accurate.  Get those to me.

13             MR. RICHENTHAL:  We don't anticipate that being an

14   issue, your Honor.  The parties work together well.

15             THE COURT:  Okay.  That's everything I have.

16             Is there anything anyone else has?

17             MR. MONTELEONI:  Yes, your Honor.  We've been engaging

18   with defense on several issues.  We've not really been able to

19   reach agreement on some matters, such as when parties are going

20   to exchange opening slides.  We think it would be helpful if

21   anyone who is using a visual in their openings would exchange

22   them a day in advance or --

23             THE COURT:  I'm sorry.  I thought I had addressed that

24   the last time.  If you're using demonstratives, yes, I want the

25   other side to have them in advance, not that morning.

1          MR. MONTELEONI:  Thank you, your Honor.

2          THE COURT:  I want everybody to go to Mother's Day

3    celebrations as well to the extent possible.

4          MR. MONTELEONI:  Thank you.

5          One or two other things.  We've, on several occasions,

6    raised with the defense providing copies of the materials that

7    they've obtained through their subpoenas.  We've done this for

8    months.  We've recently understood that some witnesses have

9    actually gotten subpoenas and produced materials that we have

10   not gotten from the defense.  We don't understand why that's

11   the case.  And in one case, it was a production from a

12   subpoena, and in another case, it was a subpoena to the Senate.

13   The subpoena was withdrawn and the documents were provided

14   voluntarily, but we think that that also counts as related to

15   the subpoena and we would request that they be provided.

16         And in the context of Senate documents in particular,

17   those can be very relevant to an issue that we raised in

18   connection with the notice issue, which is the possibility of

19   waiver of speech or debate protections, which we want to be

20   very clear we think it's very possible that defense counsel

21   will introduce evidence of the Senator's legislative acts, and

22   if he does so, we anticipate --

23         THE COURT:  He votes -- for example, votes, and

24   speeches on the floor, is that what you're talking about?

25         MR. MONTELEONI:  Well, yes, but also the Court ruled

O56DMenC

1    that holds and the lifting of holds with respect to FMS and

2    FMF, the military aid we described in the indictment, were also

3    legislative acts.  We think it's very possible that the Senator

4    will be intending to introduce evidence of that, and we want to

5    be very clear that if that happens, we intend to seek

6    permission to ourselves offer evidence of the subjects of his

7    conduct with respect to holds, with respect to lifting of holds

8    and the like, because that is a waiver for all the reasons that

9    we put forth in our notice letter.

10          But, regardless, even beyond that, which hasn't

11   arrived yet, we still don't have these subpoena returns that

12   the defense has been collecting and has not provided to us.

13          THE COURT:  The agreement of the parties is to provide

14   the subpoena returns?

15          MR. MONTELEONI:  We haven't really gotten an agreement

16   from the defense, but we've been -- oh, sorry, there's also

17   been a -- I should say that there's also been an order that the

18   Court issued for defense exhibits, and only one defendant has

19   identified their exhibits by the April 26 deadline.  The other

20   two, they haven't identified anything by the deadline, and they

21   haven't identified anything after either.

22          I understand if -- you know, they're saying, well,

23   they're -- you know, they're dealing with a volume of material

24   that we provided, but really the deadline was April 26 and we

25   haven't gotten anything.  So we would ask that the defense, in

1    fact, designate to us their exhibits, so that we can prepare

2    for trial and produce the materials that they've obtained in

3    response to their subpoenas.

4            THE COURT:  Mr. Fee.

5            MR. FEE:  I have a solution, your Honor.  If we were

6    told the witnesses they expect to call in the next two weeks,

7    it sure would help us focus on what amongst the 50 witnesses on

8    the witness list and the 10,000 exhibits that might be coming

9    in through those witnesses, and then we can figure out what

10   non-impeachment exhibits we might have.  Frankly, I don't think

11   there's very many, but that would be really helpful, your

12   Honor.

13           MR. MONTELEONI:  Your Honor, the April 26 deadline was

14   set for the defense's case, not for the first two weeks of the

15   defense's cases.

16           THE COURT:  Yes.

17           MR. MONTELEONI:  And Rule 17 requires them to be

18   providing these materials, and we don't understand why we even

19   have to raise this, why they're not just complying with that.

20           MR. FEE:  That order didn't apply to the defense's

21   case, your Honor.  Your Honor, as a practical matter, we can

22   only identify the things we have identified.  We're working

23   through a ton of stuff.  We have disclosed what are the

24   exhibits we intend to submit now.

25           Your Honor, this is not an argument.  There's a

O56DMenC

1  50-witness list.  We don't even know, most of those witnesses,

2  what they will testify about, because they're just FBI

3  witnesses.  So we are doing the best we can.  I would ask -- I

4  think this is something we need to address, of greater

5  importance, the government needs to identify the witnesses it

6  intends to call at some point before the trial starts, because

7  it will be a mess if -- we would like to get them on the Friday

8  before.  Here are the witnesses we expect to call this week.

9  Obviously they can make adjustments.  Here are the witnesses we

10  expect we'll call on Monday and Tuesday.  We'll update you on

11  the sequence the rest of the week, and so on throughout this

12  trial.

13          THE COURT:  This all ought to be done by agreement.

14          MR. FEE:  I agree, your Honor.

15          THE COURT:  Government, they're entitled to some

16  advance notice of who the witnesses are going to be.

17          MR. MONTELEONI:  Absolutely, and we've been

18  negotiating.  We've sent forth a proposal.  We sent them a

19  proposal earlier -- I'm sorry, last week now.  A few days ago

20  on May 1st was the most recent version.  We haven't heard back

21  from them.  We think that the Friday before, a whole week, is

22  -- that's really not very realistic with the logistics of how

23  the trial works and what we're arranging.

24          We certainly are intending to tell them as we get

25  close to the witnesses who is coming up.  We want to tee up any

O56DMenC

1   evidentiary issues, also.  So we have a proposal.  They've I
2   think just, you know -- they have a different view.
3             THE COURT:  What's the proposal?
4             MR. MONTELEONI:  Well, our proposal is we will let
5   them know at the end of the trial day the witnesses -- yes.
6             MR. FEE:  The night before, your Honor.
7             MR. MONTELEONI:  The next witnesses anticipated in
8   order, and the exhibits that we expect to be introduced by 7:00
9   PM.
10            THE COURT:  So what -- the witnesses for what, the
11  next day?
12            MR. MONTELEONI:  For the next day.
13            MR. FEE:  It will be a train wreck, your Honor.
14            MR. MONTELEONI:  Your Honor, I also would say we also
15  do intend to work in good faith to provide them with
16  information earlier, but we don't like the idea of a
17  requirement that we are going to held to have violated if --
18  because things change all the time, especially some witnesses
19  are coming from out of the country and we have multiple
20  different crosses, the length of which is going to be very
21  difficult to anticipate.
22            So, you know, we are open to doing somewhat more in
23  advance of this -- we've also I can say, as the Court knows,
24  shared draft summary charts now almost two weeks in advance of
25  trial, which covers a very large portion of our exhibits.  So

O56DMenC

1    we're not trying to hide the ball here.  We're just trying to

2    avoid a commitment that's not going to be very realistic for

3    how trial progression is going to progress.

4            THE COURT:  Normally, again, these are things that the

5    parties handle themselves.  I understand that there are issues,

6    and you should let them know if there are issues, if this

7    person is coming from abroad and so forth.  Give them two days

8    at a minimum of witnesses, all right, with the relevant

9    proviso, to the extent you can do more that will engender good

10   will on the part of the other side, okay, but let's not be too

11   -- give them a couple of days.

12           MR. FEE:  Your Honor, I would ask to make that a

13   longer period.  They are going to hold us to that two days.

14   They are telling witnesses now when they're going to show up.

15   We can see it in the 3500.  We've all tried long cases in this

16   district.  Two days in a case of this length will make your job

17   and the jury's experience much, much worse.

18           We are not going to say, oh, Mr. Monteleoni, you

19   didn't tell us about this witness, preclude.  We understand

20   things happen.  We're all trial lawyers.  Two days is not

21   enough.

22           THE COURT:  Right now two days.  We'll see if it's not

23   enough.  I need the parties to start working together.

24           MR. MONTELEONI:  Thank you, your Honor.  But we still

25   have not received their subpoena responses and our --

O56DMenC

1        MR. FEE:  They don't get our subpoena --

2        THE COURT:  Let him finish.

3        MR. FEE:  Sorry, your Honor.

4        MR. MONTELEONI:  These are materials that are called

5   for by Rule 17.  We haven't gotten them.  We request they be

6   directed to provide them to us.

7        MR. FEE:  Your Honor, we'll comply with the Rule 17

8   obligation.  They don't get everything we get in response to a

9   subpoena.  We're working on it, your Honor.  There's a lot

10  going on.

11       THE COURT:  Well, there's a lot going on for

12  everybody.  Do it.

13       MR. FEE:  Thank you, your Honor.

14       THE COURT:  Anything else?

15       MR. MONTELEONI:  This doesn't require immediate

16  action, but as regards how the trial examination is going to

17  proceed, we should note that a number of our witnesses, as

18  you'll see on Friday when we submit the lists, are identified

19  with an adverse party, either because they have employment

20  relationships with the defendants or they are I guess in this

21  case former counsel for the defendants, so there may be

22  examination by leading questions under Rule 611 as a result of

23  that.

24       THE COURT:  You're telling me --

25       MR. MONTELEONI:  Letting you know it's going to be a

O56DMenC

1   little unusual.

2           THE COURT:  You're telling me that you will be calling

3   adverse witnesses.

4           MR. MONTELEONI:  Yes.  A number of our witnesses will

5   be adverse.

6           THE COURT:  I understand what the rules are.

7           MR. FEE:  Two quick points, your Honor.  The list of

8   witnesses I believe was the word you used, obviously, for the

9   defense, we're not required to list those witnesses.  We don't

10  know who the witnesses are going to be.

11          THE COURT:  Exhibits --

12          MR. FEE:  Lists of name and places for the disclosure

13  in trial, a list of names and places that are likely to come up

14  at trial.

15          THE COURT:  That's what I started with, yes.

16          MR. FEE:  Got it.  Second, your Honor, I don't think

17  this is an issue -- we are submitting a short reply on the Rule

18  15 briefing today, and I'd ask you to hold off on ruling until

19  you have a chance to read that reply.

20          THE COURT:  Well, you heard I want the parties to be

21  able to stipulate --

22          MR. FEE:  I agree, your Honor.  We're working on that.

23          THE COURT:  I'm not going to decide it today.

24          MR. FEE:  Thank you, your Honor.

25          THE COURT:  All right.

O56DMenC

1            MR. MONTELEONI:  One thing, I'm not sure I totally

2      understood what Mr. Fee said.  We do need the names for voir

3      dire of people they might call, whether or not they are going

4      to call them.

5            THE COURT:  Yes.  Absolutely.  I don't want somebody

6      showing up as a witness who wasn't on that list of possible

7      witnesses absent something extraordinary.

8            MR. FEE:  That's right, your Honor.

9            THE COURT:  Thank you all.  I appreciate it.

10            MR. FEE:  Thank you, your Honor.

11            (Adjourned)