

June 30, 2024

**VIA ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *United States v. Robert Menendez, et al.,* S4 23 Cr. 490 (SHS)

Dear Judge Stein:

    Senator Menendez respectfully writes in the above-captioned matter in response to the government's June 29, 2024 letter regarding summary charts marked as DXs 1302, 1303, 1304, and 1305 and certain underlying defense exhibits.  We understand that the other defendants intend to respond separately regarding entries they proposed to DXs 1302, 1303, and 1304, as indicated below.

I.   **The Defense Summary Charts**

    The government offered three main summary exhibits during its case-in-chief: GXs 1302, 1303, and 1304.  These summary exhibits contained 97 pages, 58 pages, and 23 pages, respectively.  To aid the jury's evaluation of the voluminous evidence, the defendants interposed entries in the government's summary charts.  The alternative of creating separate charts would have required significant duplication of entries between the government and defense charts and would have forced the jury to wade through and attempt to align competing charts.  Senator Menendez believes adding entries to GXs 1302, 1303, and 1304 in a color (yellow) that clearly denotes the defendants' entries is the most efficient means of presenting defense summary charts.

    The defendants sent drafts of DXs 1302, 1303, and 1304 on Monday, June 24, over a week before the defendants intend to call their summary chart witness.  The government's claims that the defense failed to meet and confer are false.  The government has peppered the defense with many emails noting their objections, and we attempted to respond timely after the court day or the following day.[1]  We also had numerous oral discussions with the prosecutors throughout the court day regarding their objections.  Based on those discussion, it was clear we reached an

---

[1] For example, AUSA Clark emailed a list of objections on Thursday, June 27, 2024 at 8:43 pm that flatly ignored the Court's ruling and demanded that we withdraw dozens of line entries from DX 1302 and 1303.  We responded on Friday, June 28, 2024, at 10:57 am, disagreeing with the government's position, but offering to consider any redactions the government wanted to propose.  We received no such proposed redactions.

impasse given the government's overly broad reading of the Court's prior rulings. In short, the parties met and conferred, and the government's claims that we refused to do so are simply false. As is the government's claim that the defense's production of DX 1305 is somehow belated. We address that specific claim in Section VI below.

**II.     The Court's Ruling on June 27, 2024 Permits The Evidence Regarding Nadine Arslanian That Is Included In Summary Charts DX 1302 and 1303**

The Court's ruling on June 27, 2024 expressly permits "evidence that there was an issue with a boyfriend concerning physical safety." Trial Tr. 5537. As the Court acknowledged, this evidence is crucial to explain *why* Arslanian shared her location with Senator Menendez and why Senator Menendez notified Arslanian when her location sharing application was no longer working—the "Find My iPhone issue." Trial Tr. 5537. While proscribing the use of gratuitous descriptions of abuse, such as "hospitalizations" and "assaults," the Court explicitly permitted an "explanation" for Arslanian's second cell phone, which the government referred to as the "007 phone." Trial Tr. 5538. The entries to which the government objects fall squarely within these permissible bounds, and Senator Menendez has offered to redact portions the government believes cross that line. Moreover, none of these messages are offered for the truth of the matter asserted, but rather to explain both Arslanian's and Senator Menendez's respective state of mind, and to provide necessary context to Senator Menendez's statements and conduct.

- DX 1303, lines 25-32, 25-5 (May 21, 2018). Senator Menendez agrees to redact from DX 616 all descriptions of the ex-boyfriend's physical abuse. As redacted, DX 616 shows only that there was an "issue" with the ex-boyfriend "concerning physical safety" but provides no "inflammatory" or "emotionally fraught" detail regarding the ex-boyfriend's behavior. Similarly, Arslanian's subsequent text message to Senator Menendez provides no description of the abuse: "I'm waiting for the police to reach the Judge. The report is done. I will text you all info. I love you." (Citing DX 1933-3). The text message provides crucial context regarding Senator Menendez's state of mind—specifically his understanding that Arslanian was concerned for her safety, which explains why he was tracking her location, evidence that the government has emphasized throughout its own summary charts.

- DX 1303, line 26-58 (June 13, 2018). The Defense agrees to redact from DX 1933-5 references to the ex-boyfriend physically injuring Arslanian. As redacted, Senator Menendez's message to Arslanian reads as follows: "I worry about your safety and well-being. ~~[Ex-Boyfriend] is a violent man, who has delivered injuries to you that have affected your health and which you are still living with today~~…I am also concerned that he will manipulate you into conversations with him directly or through others that he will use. Unfortunately that happened before and you were not strong enough to say no to your friends who call or text on his behalf I respect that this is very hard, has an emotional toll on you based on whatever affection you had/have for him and that you think it will all go away. I wish it would. My disappointment, however, does not change my love for you. You are the love of my life and hopefully

2

- we can live in peace and happiness the rest of our lives." (Citing DX 1933-5). None of this is unfairly prejudicial, and the Court has already ruled as to its clear probative value.

- <u>DX 1302, line 0 (August 8, 2017)</u>. The 2017 email from the ex-boyfriend to Arslanian with the subject line "RULES" does not veer into evidence of "hospitalization" or "beating up." It shows the ex-boyfriend's demand to know each and every move Arslanian made: "EVERYTIME YOU LEAVE YOUR HOUSE, LET ME KNOW…IF YOU ARE MEETING UP WITH ANYONE, BE SPECIFIC." (Citing DX 1821). This email provides permissible background regarding the emotional abuse and fear instilled in Arslanian by her ex-boyfriend, including that her daily communications and movements were being tracked.

- <u>DX 1303, lines 65-1, 65-2 (October 21, 2018)</u>. The government claims Senator Menendez was participating in a scheme with Arslanian from at least March 2018. Contemporaneous evidence shows that Senator Menendez and Arslanian were not even dating during parts of 2018, which seriously undermines the inference the government is asking the jury to draw. For example, in GX 1303, the government includes a series of messages in October 2018 in supposed furtherance of the New Jersey State Prosecution scheme, including messages from Uribe to Hana on October 13 and October 25 about protecting Uribe's "daughter" Anna. *See, e.g.*, GX E102-1 (Uribe: "Tell him I will not allowed [sic] the interview."; Uribe: "You never told me what your friend said."). The government is asking the jury to infer that the "friend" is Senator Menendez. It's not. And the jury should be given the additional context of lines 65-1, 65-2, and 65-4 of Senator Menendez's break up with Arslanian to rebut the government's false inferences. The text message at lines 65-1 and 65-2 also provide permissible context for Senator Menendez's belief that Arslanian was concerned for her safety.

- <u>DX 1302, line 75-3 (April 4, 2018)</u>. The text message from Arslanian to Hana stating "[Ex-Boyfriend] filed missing report and broke into my house" does not cite to the corresponding breaking-and-entering police report Arslanian filed against the ex-boyfriend. Instead, the message provides permissible context and explanation regarding Arslanian's subsequent use of a second cell phone. It does not refer to any acts of violence against Arslanian and is not inflammatory.

- <u>DX 1303, line 4-15 (March 23, 2018)</u>. On March 23, 2018, Arslanian sent the following message to Hana: "I am going to enterprise I have to rent a car for a day. I can't go see the senator in this car he will in a second run the plates and see it's registered to [Ex-Boyfriend]." (Citing DX 1928-1.) The text message provides no prejudicial or inflammatory details regarding the ex-boyfriend's abuse. Instead, the message provides context regarding the nature of Arslanian and Senator Menendez's relationship during what the government alleges was the initial stages of the

3

conspiracy—namely, that Arslanian was hiding certain information from Menendez—and directly contradict the government's assertion that Senator Menendez was aware of Arslanian's activities.

- DX 1302, line 345-3; DX 1303, line 78-5 (December 4, 2018). The government claims Arslanian obtained a new phone in December 2018 in furtherance of the alleged conspiracy. That is simply untrue. This December 4, 2018 text message offers a clear explanation for why Arslanian obtained the second cell phone: her belief that "[Ex-Boyfriend] is not stopping the spoofing." (Citing DX 617). Because Arslanian's use of "spoofing" is not commonly understood, the remainder of the message is necessary to convey Arslanian's meaning: "two people in the office have gotten a text supposedly from me that [Ex-Boyfriend] and I are getting married in August." (Citing DX 617). This shows that, by spoofing, Arslanian means that her ex-boyfriend is able to break mirror her phone or use her number to pretend to be her.

In sum, the government's objections squarely ignore the Court's ruling permitting this non-inflammatory evidence. Nor should the government be heard to object on grounds of cumulativeness given the thousands of lines used in its summary charts, which the government claimed, repeatedly, that nearly every line is somehow "critical" to the government's case. *See, e.g.,* Trial Tr. 1020, 1027, 1042, 1067, 1278, 2289, 2292, and 2301. The relationship between Arslanian and Senator Menendez is at the core of the government's case. Nothing offered by the defense here is remotely cumulative.

### III.    Defense Exhibit 1302

#### A.    Nadine's work for IS EG Halal should not be precluded as hearsay

Senator Menendez understands that counsel for Hana intends to respond separately regarding the lines and underlying exhibits referenced in this section of the government's letter, which response Menendez incorporates herein (lines 1104-1 through 1104-18, 1120-1 through 1120-2, 1121-2 through 1121-5, Hana-190, and Hana-192).

#### B.    Miscellaneous line entries should not be precluded pursuant to Rules 403, 802, and/or 901

- Lines 1208-1 and 1208-2 (citing DX 820). At issue are two emails between Senate staffers regarding a meeting with an Egyptian official. Contrary to the government's assertions, these emails are not being offered for the truth and are relevant. They provide critical context as to the meeting with Abbas Kamel (which the government alleges was in furtherance of a criminal scheme) and reflect Senator Menendez's state of mind that this meeting was in furtherance of U.S. interests. The fact that Ms. Arkin already testified about the meetings does not render the documents cumulative. If that

4

were the case, we would have had little need for most of the government's lengthy summary charts.

- Line 1159-1 (citing DX 487). The article cited in line 1159-1 is not being offered for the truth that President Trump said Egypt would blow up the GERD dam, or even that Ethiopia was unhappy that President Trump purportedly made such remarks. Rather, Senator Menendez offers the article to demonstrate that the media was covering the GERD issue and that leaders of all stripes stated publicly that, if not resolved, the GERD issue could lead to armed conflict. Again, that is not offered for the truth of the matter asserted, but to explain that
Senator Menendez's similar concerns were not aberrational and were in line with U.S. interests (classic state-of-mind evidence). The government is asking the jury to infer that Senator Menendez prepared the GERD letter to benefit Egypt. Contemporaneous public reporting regarding the GERD issue provides important context for the jury and allows the jury to weigh the government's preferred inference against the more likely—and true—inference that Senator Menendez prepared the GERD letter to forestall a conflict that would have been detrimental to U.S. interests in the region.

- Line 498-1 (citing DX 1003). This evidence is relevant to counter the misleading impression created by GX 1302 that Senator Menendez was helping Arslanian prepare a resume for a position at IS EG Halal. (GX 1302 lines 487-498). Again, the government's inference is demonstrably false. The text message at line 498-1 goes to Arslanian's state of mind that she needed a resume for a position on a non-profit board (not for ISEG Halal).

- Lines 1260-1, 1260-2 (citing Hana-202). Senator Menendez understands that Hana intends to respond to the government's objections to these entries.

- Lines 2-4 through 2-6 (citing Hana A101-100). Senator Menendez understands that Hana does not intend to respond to the government's objections to these entries. Senator Menendez similarly takes no position with respect to these entries.

- Lines 637-1, 1198-1 (citing Hana-013, Hana-013-T, and Hana-191, 191-T). Senator Menendez understands that Hana intends to respond to the government's objections to these entries.

IV.    **Defense Exhibit 1303**

    A.    **Exhibits offered to impeach Jose Uribe's credibility are admissible[2]**

---

[2] The government claims that impeachment evidence should not inserted in a summary chart because it "suggests that the evidence can be relied upon more broadly than the limited purpose for which it should be considered." ECF

5

- Line 0 (Dec. 11, 2011). Senator Menendez understands that Hana intends to respond to the government's objections to this entry.

- Lines 34-1, 36-2, 36-3, 65-5, 496-1, 1075-1, 1142-28, 1142-29, 1142-43, 1142-47, 1142-48, 1142-51, 1143-1 (various dates). Uribe offered colorful (and false) testimony regarding an interaction with Senator Menendez in which Senator Menendez purportedly used the word "culito," of which "culo" is a variant, during a conversation at a restaurant. *See, e.g.*, Trial Tr. 3152. Uribe testified that, nearly one year after relevant events, Senator Menendez told Uribe at a restaurant, "I saved your ass twice. Not once, but twice," using "culito," the Spanish word for "ass." Trial Tr. 3152, 3513. These line entries demonstrate that it was Uribe that repeatedly uses the crass term "culito" or its variant "culo," not Senator Menendez. It therefore is relevant context to, and impeachment of, Uribe's testimony.

- Line 1142-49 (May 19, 2021). Senator Menendez understands that Hana intends to respond to the government's objections to this entry.

### B. Evidence of Menendez's prior specific acts is admissible

The evidence of Senator Menendez's other interactions with Attorney General Grewal, during the time frame of the alleged conspiracy, is probative evidence as to Senator Menendez's state of mind. Specifically, the government claims that Senator Menendez called Attorney General Grewal on January 29, 2019 in furtherance of an alleged conspiracy to interfere in Elvis Parra's prosecution, and did so in exchange for a bribe (a Mercedes Benz car to his girlfriend at the time). The government further alleges that the phone call violated AG Grewal's (unstated) protocol wherein a Senator should not contact the Attorney General about criminal cases. Evidence of other calls with Senator Menendez and AG Grewal regarding criminal and constituent issues is thus necessary context to undermine the inference the government advances that Senator Menendez would only be making a call on behalf of Uribe in exchange for a bribe. This evidence is not offered for the truth of the matter, but both as to Senator Menendez's state of mind (calling AG Grewal is in the normal course permitted) and to rebut the inference that a Senator would only call the State Attorney General on behalf of a constituent in a criminal case in exchange for a bribe.

- DX 103 Line 101-1 (January 9, 2019). The email Senator Menendez received on January 9, 2019 with the subject title, "AG Grewal call re Dr. Richard Roberts & anti-Semitism in Jackson" is not an impermissible "good act" evidence, nor is it hearsay. (Citing DX 2165). This evidence is offered to show Senator Menendez's state of mind that approximately one week before the Senator called the Attorney General on behalf of Uribe, he was reminded to call Grewal pursuant to an unrelated matter regarding

---

488 at 10. A summary chart does not inform the jury what inferences to draw or how to weigh evidence. A limiting instruction would easily resolve the government's concern.

other minority constituents.

- <u>DX 1142-21 through 1142-27 (June 4, 2020)</u>.  Despite having elicited testimony that Senator Menendez's 2019 interactions with AG Grewal concerning Uribe were aberrational, the government now objects to evidence of the Senator's continued interactions with Grewal concerning other matters impacting New Jersey constituents as barred under Rule 404 and 405.  The routine nature of the interactions between Senator Menendez and Grewal, however, is necessary to show Senator Menendez's state of mind regarding why he would call AG Grewal on behalf of Latino truck drivers, and to rebut Grewal's testimony that the call was "unprecedented" and shocked Grewal.  Trial Tr. at 2705-2707, 2777.

C. **Evidence of Arslanian's ex-boyfriend's statements regarding the provision of a kickback to Arslanian**

- <u>DX 1303 Line 25-19 (May 20, 2018)</u>.  The government elicited testimony from Uribe that his April 4, 2018 text message to Hana, "the deal is to kill and stop all investigation" referred to *Senator Menendez* killing and stopping the Parra and Peguero matters.  (Citing GX C116-1).  This is false, and Senator Menendez must be permitted to rebut Uribe's and the government's accusations.  The jury should be permitted to (correctly) infer that Uribe's text message referred to Arslanian's ex-boyfriend, a criminal defense lawyer, killing and stopping investigations.  Moreover, Arslanian's and Hana's solicitation of the ex-boyfriend's legal services for Parra's case and her belief that she was in line to receive payment if *the ex-boyfriend* stopped the investigation is relevant to Arslanian's state of mind, as well as Hana's, and to impeach Uribe.  These communications do not confuse any issue.  They strike at the heart of the government's false narrative that the person Arslanian, Uribe, and Hana hoped could "stop and kill" the investigation in April and May 2018 was Senator Menendez, when the contemporaneous evidence suggests it was her ex-boyfriend.  We do not object to redactions of these exhibits and any alleged payments to be made to Arslanian as a referral fee.

- <u>DX 1303 Line 36-4 and 36-5 (Sept. 28, 2018)</u>.  The government repeatedly elicited testimony from Uribe regarding his desire to protect his "daughter" Ana Peguero from unwarranted harassment by investigators working on behalf of the New Jersey Attorney General Office of the Insurance Fraud Prosecutor.  *See, e.g.*, Trial Tr. 3460:10–18.

    > Q. And when you are referring to peace, Mr. Uribe, just so I am clear, your concern was you testified your Ana being harassed by this unfair investigation; correct?
    > A. Yes.

7

> Q. And I believe you testified, and correct me if I am wrong, you were concerned about Ana actually being charged and convicted of a crime because you thought Ana had not committed a crime, right?
> A. Yes.

Contemporaneous communications between Uribe and Peguero, including the messages at lines 36-4 and 36-5, go to Uribe and Peguero's state of mind and impeach Uribe's testimony that he did not believe that Peguero (or Uribe) had done anything wrong. The government's effort to protect Uribe's credibility by claiming that the probative value of the evidence is outweighed by is unfair prejudice "that could inflame the jury suggesting that Uribe negatively ran his business" is remarkable, to say the least. Uribe repeatedly lied to the jury about his true reasons for wanting to kill the investigation— because it would inevitably blow back and expose Uribe's own continued fraudulent conduct—and this evidence proves his true state of mind and motives for wanting to kill the investigation.

- <u>DX 1303 Lines 36-1 and 74-1</u>.  Senator Menendez understands that Hana intends to respond to the government's objections to these entries.

## V.     **Defense Exhibit 1304**

### A.     **Contemporaneous statements concerning Qatar by other members of the Senate Foreign Relations Committee, the Executive Branch, and non-governmental organizations provide relevant context**

The government has offered no direct evidence of either a *quid* or a *quo* with respect to Senator Menendez's August 2021 press statements concerning Qatar: no offer by anyone of anything of value—let alone anything provided to Senator Menendez—and no agreement by Senator Menendez to take any action. Instead, the government asks the jury to infer that Senator Menendez made statements favorable to Qatar as the *quo* to some unspecified *quid*. The government's lengthy GX 1304 summary chart does so, in part, by excluding key context for Senator Menendez's statements, in the apparent hope that the jury will conclude that Senator Menendez acted illegally and thus his conduct must have been in exchange for a bribe. Senator Menendez instead seeks to expose the government's false narrative as to the events of July through September 2021 by offering important context based on relatively few contemporaneous tweets and press releases by other members of the Senate Foreign Relations Committee ("SFRC"), the Biden Administration, and the World Food Program. These documents are not offered for their truth, but for context and as state of mind evidence to show that Senator Menendez, like many other Senators and public officials, were thankful for Qatar's supportive assistance.

8

- Lines 116-2 through 116-4 (documents relevant to Senator Menendez's August 2, 2021 statement concerning Qatar's contribution to humanitarian assistance for Yemen).[3]  The government included on its summary chart at GX 1304 line 117 a screenshot of a tweet by then Chairman of the House Foreign Affairs Committee Representative Gregory Meeks thanking Qatar for "its contribution to WFP."  Row 116-3 provides context for Row 117, including explaining that WFP is the World Food Program.  Rows 116-2 and 116-4 offer tweets and press statements by members of the SFRC—Senators Chris Murphy (D-CT), Chris Coons (D-DE), and Todd Young (R-Ind.) —that preceded Senator Menendez's August 2 statement.  Row 116-2 is particularly relevant for the notion—not offered for the truth, but rather that it was said publicly—that members of the SFRC lobbied the Qatari government to make a donation to the World Food Program to address the humanitarian crisis in Yemen.  These three additional rows are highly relevant to the jury's assessment of the government's circumstantial evidence and hardly cumulative, especially in light of the government's 342 row summary chart GX 1304.  Moreover, they place helpful context to explain the true meaning of line 125 of GX 1304, where Sheikh Al Thani says "At last" in response to Menendez's press release.  Far from shilling for Qatar for a bribe, Senator Menendez was late to the party of thanking Qatar.

- Lines 132-4 and 132-10 (documents relevant Senator Menendez's August 20, 2021 statement concerning Qatar's assistance with the evacuation from Afghanistan).  The government objects to two rows Senator Menendez seeks to offer relating to his August 20 statement concerning Qatar.  Line 132-4 is an article issued on August 19 regarding a meeting between Secretary of Defense Lloyd J. Austin III and Qatari government officials at the Pentagon in Washington, D.C.  The Defense Department statement relays Secretary Austin's appreciation for Qatar's "ongoing support for the safety of American citizens and personnel as we're pushing hard to get people out of the country" and for hosting U.S. forces in Qatar (at Al Udeid airbase).  The next morning, Senator Menendez emailed SFRC staffers Sarah Arkin and Juan Pachon suggesting that "[w]e should put a statement out thanking Qatar for their action in allowing us to take Afghanistan refugees to the base and what they did with the Afghan dreamers."  GX 8F-30.  The fact that Qatari officials were in Washington, D.C. meeting with senior Biden Administration officials and discussing the same topics as Senator Menendez's August 20 statement is highly relevant context for the jury to consider in assessing the inference the government is asking the jury to draw.  Similarly, line 132-10 is a tweet by SFRC member Senator Coons issued within hours of Senator Menendez's statement in which Senator Coons offers a nearly identical thank you to Qatar for "extending safe passage" to Afghan refugees seeking resettlement in the United States.  The fact that another member of the SFRC issued a similar statement within hours of Senator Menendez's August 20, 2021 statement is likewise relevant context, and undermines

---

[3] The government's letter motion also objects to line 115-2, which does not exist on Ex. C. Senator Menendez believes this cite to be an error and is therefore not responding herein.

any inference that a bribe was needed or given in order to issue the supportive statement of Qatar. These two rows are hardly cumulative.

- Lines 140-2, 140-3, and 141 (documents relevant to Senate Resolution 390). The government introduced Senate Resolution 390 into the case. It did so, once again, without providing the jury any context, perhaps hoping that the jury would question the motive of the unidentified proponents of the resolution and the members of the SFRC who would consider the resolution. The jury needs to understand the events of August and September 2021 to evaluate the government's narrative. For example, on September 7, three weeks before Senator-2 introduced Senate Resolution 390, Secretary Austin and Secretary of State Blinken traveled to Qatar to express their appreciation for Qatar's assistance with the evacuation of Afghanistan. *See* line 140-2. On September 9, the National Security Council Spokesperson issued a statement regarding Qatar Airways' role in facilitating the rescue of American citizens and lawful permanent residents stranded in Afghanistan. *See* line 140-3. Then, on September 14, Secretary Blinken testified before the SFRC concerning the U.S. withdrawal from Afghanistan. Less than two weeks later, Senator-2 introduced Senate Resolution 390 "expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge." *See* line 163-1. The important context lines 140-2, 140-3, and 141 provide is neither cumulative nor prejudicial.

### B. Evidence concerning Daibes Enterprises' negotiations with Heritage Advisors Ltd.

The government seeks to exclude two general categories of documents relating to Heritage. Both are clearly admissible.

- Line 186-1 (a document concerning Heritage's engagement of Greenberg Traurig). The government complains that injecting lawyers into the argument has minimal probative value and is highly prejudicial. The argument makes no sense. And in any event, it is the government, not Senator Menendez, who injected Greenberg Traurig into the mix: line 245 of the government's summary chart is an email from Greenberg Traurig partner Robert Ivanhoe to Heritage personnel forwarding financial models for the potential real estate deal with Daibes Enterprises. Senator Menendez offers line 186-1 (citing DX 1823 and DX 1823A) to explain who Robert Ivanhoe and his colleague Kristin Lonergan are and when they began representing Heritage on the Edgewater real estate deal.

- Lines 329-2 and 342-14 (Heritage's investment memoranda). When seeking the admission of internal Heritage communications—e.g., rows 124-126 of GX 1304—the government argued that the jury could infer that Daibes and Senator Menendez were "aware of [Heritage's] general disposition," Trial Tr. 4082, even where there was no evidence of Heritage communicating that disposition to Daibes or Senator Menendez.

10

Lines 329-2 and 342-14 reflect Heritage's state of mind at key points during negotiations with Daibes and his agents. But unlike lines 124–126, the jury need not infer that Daibes was aware of Heritage's "general disposition" with respect to these documents. There is ample evidence that Heritage, Daibes, and Daibes' agents *actually* communicated on or within days of Heritage preparing these documents—e.g., lines 330, 331, 331-1, and 342-15. Moreover, the government apparently intends to argue that the May 23, 2022 Letter of Intent between Daibes Enterprises and Heritage was the culmination of a conspiracy between Daibes and Senator Menendez to seek to induce Heritage to invest in a joint venture with Daibes. No surprise, then, that the lengthy summary chart ends six days after the Letter of Intent. Lines 329-2 and 342-14 belie the government's false narrative. They reflect Heritage's belief that its venture with Daibes Enterprises was not nearly a done deal as of May 2022 (the deal did not close for another seven months as reflected on line 342-17). Heritage's state of mind addresses an important misimpression from the government's summary chart, that Daibes sought to induce a private investment company based in the United Kingdom to invest in a real estate project in New Jersey by bribing Senator Menendez to make statements favorable to the Qataris nine months earlier, in August 2021. Excluding this evidence would deprive Senator Menendez of a necessary defense to evidence the government itself offered in its case in chief.

### C.     Evidence of plea negotiations are crucial context for Daibes' final plea deal

The contention that the defense "should not be permitted" to offer evidence of plea negotiations between Daibes' Counsel and the United States Attorney's Office for the District of New Jersey ("USAO DNJ") is plainly wrong. The government itself acknowledged the relevance of Daibes' plea negotiations when it argued during an April 17, 2024 hearing that "the timing of the plea negotiations, which is not readily available, actually aligns with the timing of the delivery of bribes and the actions of Menendez in a way that's going to be very important." April 17, 2024 Hearing Tr. 12:14–18. The government should not now be permitted to intentionally leave the jury with the misimpression that Daibes' counsel sat on their hands and then a favorable plea offer miraculously fell from the sky due to outside influence.

Second, the government complains that the defense is offering exhibits after the government "has rested" and after the government insisted on a stipulation that it drafted. This is nonsensical. Defendants are permitted to put on a defense, and indeed, the government repeatedly objected to evidence offered in the government's case, stating that the evidence should be offered in the defense case. Nor does the fact that this is evidence beyond what the government included in its own stipulation preclude the defense from offering this evidence. The defense highlighted this evidence during the stipulation process and the government was unwilling to stipulate to these facts. The defense didn't lie in wait or hide them from the government. The government bears the burden of its decision to refuse to stipulate, and the defense should now be permitted to offer this evidence. Nor is the government correct that the defense seeks to suggest the government excluded evidence of plea negotiations. These two exhibits are offered to show the existence of plea negotiations (not their truth) and that Mr.

11

Daibes' final plea deal was the result of robust plea negotiations, not any intervention from Senator Menendez—the misimpression the government would prefer to leave the jury with.

Third, it is hardly cumulative or a waste of time to present to the jury seven rows in a summary chart.

> **D. The miscellaneous line items to which the government objects do not contain inadmissible hearsay, are not confusing, and should not be precluded under Rules 403 and 802**

- <u>Line 198-1 (Dec. 14, 2021)</u>. On December 14, 2021, Senator Menendez fell and injured his shoulder while rushing to a vote on the Senate floor; the injury required surgery on December 31, 2021. There is some evidence of these events in the record, but the evidence is incomplete. Worse, the government has included three lines in its summary exhibit GX 1304 regarding a recliner chair allegedly gifted to Senator Menendez, presumably hoping to show that Daibes provided this chair as a bribe. *See* lines 214, 216, 218. The entries at lines 212 through 215 reference Senator Menendez's inability to sleep and a reference to Senator Menendez's shoulder. Without the context of Senator Menendez's injury, GX 1304 leaves the misimpression that the recliner chair was provided in exchange for some action Senator Menendez purportedly took to benefit Daibes, rather than by a friend of thirty years seeking to alleviate Senator Menendez's severe discomfort. The evidence clearly goes to Daibes' and Senator Menendez's state of mind and is important context for the government's misleading evidence.

- <u>Line 216-1 (Dec. 29, 2021)</u>. As discussed above, the government claims that Daibes caused a recliner chair to be provided to Arslanian. In line 216-1, Arslanian texted an individual in part: "I bought him a medical reclining chair from G&D in Englewood." This is permissible context, and goes to state of mind evidence as to whether the recliner was a bribe, a gift, or a purchase from Arslanian. It is within the province of the jury to determine how and why the recliner chair was provided to Arslanian.

- <u>Lines 263-1 to 263-2 (Mar. 29, 2022)</u>. On March 29, 2022, Senator Menendez exchanged text messages with a close friend regarding a purported three hour lunch between that friend and Arslanian. Senator Menendez's friend is a world-renowned coin collector and connoisseur, and the text conversation occurred two days before the government alleges Arslanian sold gold to Vasken Khorozian. Lines 263-1 to 263-2 are not offered for the truth that such a lunch occurred. Rather, the entries show Senator Menendez's state of mind, that he understood Arslanian was meeting with his friend who is a renowned coin collector in order to sell gold for the purpose of paying down her mortgage.

12

- Line 326-4 (May 12, 2022). Evidence that Arslanian received a wire transfer is not intended to engender sympathy, and is not intended to prove that the $5,920 she received was "family aid." The fact that Arslanian's cousin sent Arslanian a wire is itself relevant to show her sources of income in the days immediately before and after Arslanian allegedly made payments towards her mortgage. *See* lines 326-2 and 328-1.

- Line 328-3 (May 20, 2022). The government's case-in-chief left the misimpression that Senator Menendez did not attend Philip Sellinger's investiture for some nefarious reason, and Sellinger's testimony leaves the misimpression that Senator Menendez did not attend because he was upset with Sellinger. Beyond context for what was publicly reported about Senator Menendez's location in May 2022, the press release impeaches Sellinger's testimony. Further, while the government claims the actual investiture was "months later," Sellinger testified that he did not invite Senator Menendez to the actual investiture. *See* Trial Tr. 3841 at 4-6 ("THE COURT: Are you testifying that you did not invite him to attend the September investiture?" "THE WITNESS: Correct"). The press release is on its face a business record of the U.S. Embassy in Switzerland and Liechtenstein.

- Line 330-1 (May 23, 2022). Senator Menendez agrees to remove this entry and replace it with Senator Menendez's admitted cell site location records showing that his phone was in Switzerland on May 23, 2022. (GX 9A-202).

- Lines 331-2 to 331-3 (May 24, 2022). Senator Menendez intends to offer lines 331-2 and 331-3 not for their truth, but rather to show Heritage and its principal's state of mind regarding potential leverage over negotiations between Heritage and Daibes. As stated above, the government successfully argued that the jury could infer that Daibes and Senator Menendez were "aware of [Heritage's] general disposition." Trial Tr. 4082. A Heritage employee and a Heritage agent exchanged the WhatsApp messages at 331-2 and 331-3 the day after Heritage signed a Letter of Intent with Daibes Enterprises and at the outset of a seven month period of intense negotiations ultimately leading to an agreement between Daibes Enterprises and Heritage. Moreover, these messages provide a relevant counterpoint for the jury to consider in evaluating the inference that the government is asking the jury to draw: Daibes and Senator Menendez believed Heritage—a private investment company based in London, England that invests the money of one of the many thousands of members of the Qatari ruling family—would agree to invest tens to hundreds-of-millions of dollars in a joint venture with Daibes Enterprises if Senator Menendez made public statements favorable to Qatar.

   E.    **Miscellaneous line entries are relevant**

- Lines 14-1 to 14-3 (Dec. 9, 2020). The government left a misimpression (from the testimony of Michael Soliman, who lacked adequate foundation) that Senator

13

Menendez only considered two candidates for the U.S. Attorney position. These lines concern Senator Menendez's interviews with other candidates for that position. Senator Menendez is not offering excerpts of his calendar to prove that these interviews occurred, but just that they had been scheduled and communicated to Senator Menendez, and thus relevant to Senator Menendez's state of mind with respect to candidates for U.S. Attorney for the District of New Jersey.

- <u>Lines 180-4 (Oct. 24, 2021) and 180-5 (Oct. 25, 2021)</u>. The government offered evidence of Arslanian's communication with Daibes regarding donuts, leaving the misimpression that donuts were code for gold (GX 1304 at line 182: "this very, very sick friend was so looking forward to a glazed donut today."). Lines 180-4 and 180-5 are plainly relevant. They directly contradict the government's false narrative by showing that Arslanian did not want to eat glazed donuts because she had a stomach bug. Lines 180-4 and 180-5 are also admissible statements of then existing mental, emotional, or physical condition under Federal Rule of Evidence 803(3) and/or describe "past or present symptoms or sensations," "their inception," or "their general cause," and are thus admissible under FRE 803(4).

- <u>Lines 244-1 (Feb. 11, 2022) and 246-1 (Feb. 23, 2022)</u>. The government included in GX 1304 Arslanian's communications with a real estate agent regarding homes for sale. Lines 244-1 and 246-1 are checks hiring an architect and engineer to renovate Arslanian's home. These checks are not offered for the fact that a certain amount was paid to certain companies, but instead to show that Senator Menendez wrote these checks, which goes to his state of mind belief regarding Arslanian's home renovation and search process—an issue that the government has put into controversy.

## VI. <u>Defense Exhibit 1305</u>

Months into a trial involving the government's production of tens of thousands of exhibits, with summary charts containing thousands of entries, and dozens of discovery productions well into trial (we received USAO production 63 on June 24, 2024), the government's complaint regarding the timeliness of DX 1305 rings hollow. The government produced numerous summary charts well into its case-in-chief and merely days before a summary witness was due to testify to them. For example, on June 8, 2024, the government produced GX 1335 for the first time: a summary chart consisting of over 2,000 rows of financial information from over 260 underlying sources that took an FBI Agent three full-time weeks of work to put together, and would have taken the Defense weeks to verify and review. *See* Testimony of Isabella Fuchs, 6.26.2024 Trial Tr. at 4928:13-15 ("I worked on this exclusively for three weeks, every day, so I would say it took approximately 120 hours."). Despite its production of GX 1335 on June 8, the government notified the Defense that it would be putting on a witness to testify about this exhibit on June 13, 2024. The Defense did not complain or raise this issue with the Court. And despite its obligations, the government continued to produce multiple, extensive summary charts well into the trial, even disclosing to the Defense five

summary charts (GX 1338–1342 offered through Agent Rafferty) for the first time between June 17 and June 20, just days before it initially planned to rest its case.

Moreover, the government has always taken the position that summary charts need not be produced at the same time as the party's exhibits. For example, in an April 24, 2024 email, AUSA Monteleoni wrote: "Regarding summary charts, they are not in our experience typically turned over with the initial production of government exhibits (which would often be infeasible, because they summarize government exhibits that must first be prepared), and we have always intended . . . to provide them a reasonable time before we intend to use them, rather than with our initial exhibit production." Indeed, in a May 1, 2024 email, the government proposed that the parties "attempt[] in good faith to share any proposed summary chart . . . at least two days before it will be sought to be introduced." There was never any agreement requiring the parties to provide summary charts at an earlier date than their ability to create and deliver such charts timely, in good faith.

That's precisely what Senator Menendez has done with respect to GX 1305. In contrast to many of the government's summary charts in this case, DX 1305 is a short, 48-row chart, consisting of excerpts taken from underlying exhibits that are, on average, less than three pages in length. The majority of the documents cited in the summary exhibit are documents that were disclosed to the government on June 15 and June 21 (at least eleven days before a summary witness would begin testimony related to them) and were the subject of a "Senate Office" stipulation the Defense sent to the government on June 22, 2024 and which the government signed on June 28, 2024. While the Defense had initially planned to bring a witness to testify regarding each exhibit (as was disclosed on the Defense's witness list), the summary chart was created in order to permit a more efficient presentation of the evidence to streamline the Defense case as suggested by this Court. But regardless of the form of the presentation of this evidence, it is indisputable that the government had timely notice that the Defense would present these exhibits in its case and has plenty of time to review them.

Simply put, DX 1305 was disclosed in good faith pursuant to the parties' agreement, and is a simplified presentation of specific exhibits that the government has had for days. The government has introduced dozens of summary charts throughout trial (by our count, over 40 summary charts). Permitting the Defense to put on one more—a total of just eight—is fair and equitable.

The government next argues that this summary chart and its underlying exhibits are inadmissible under Rules 404(b) and 405(b) and 403. *See* ECF No. 489 at 18. To be clear, much of the government's argument related to DX 1305 is an improper attempt to revisit a motion *in limine* that has already been decided by this Court. In response to the government's Motion *in limine* to preclude the very same evidence that is the subject of DX 1305 (ECF No. 291 at 17-19), the Court held, "I think everyone agrees the Senator can introduce evidence of his record as [a] Senator on relevant issues. He's going to. That's part and parcel of what the trial is about." *See* May 26, 2024 Pretrial Conf. Tr. at 14. Indeed, this evidence is integral to Senator Menendez's defense and necessary to rebut specific evidence elicited by the government in this

trial. Throughout its case, the government has left the jury with the impression that the Senator's actions in this case were aberrational, and that he had no reason to take such actions unless he were being bribed. Among other things, the government elicited specific testimony that a Senator cannot advocate on behalf of a constituent with any federal agency or related to any judicial process, that it is out of the ordinary for a Senator to attend private meetings with foreign officials, and that inviting private constituents to meetings with foreign officials is improper. *See, e.g.*, Trial Tr. 2404:10-2405:16 (eliciting testimony regarding GX 10C-1 about what constituent services Senator Menendez can and cannot perform); Trial Tr. 2023:2-25 (eliciting testimony that constituent services performed by a Senator must align with the interests of the United States); Trial Tr. 2705:13-2707:5, 2777:14-22 (eliciting testimony that it is highly aberrational for a Senator to contact the New Jersey Attorney General regarding criminal matters); Trial Tr. 4831:5-4832:3 (eliciting testimony that it is uncommon for the Senator to personally get involved with constituent services); Trial Tr. 4841:1-18 (eliciting testimony that it is atypical for private individuals to be invited to meetings with foreign officials).

  Senator Menendez must be permitted to rebut these misimpressions by introducing evidence of his record as a Senator on the issues relevant to the charged conduct in this case. This is not character evidence, as the government incorrectly argues, but evidence of the Senator's state of mind in engaging in the charged conduct. Indeed, the evidence presented in DX 1305 demonstrates that Senator Menendez routinely takes actions on behalf of constituents—including reaching out to executive agencies, the Department of Justice and other prosecutors—because he believes that is his duty as a Senator, not because he has been bribed to do so. Evidence that Senator Menendez has been a staunch advocate for his constituents, small businesses, and minorities throughout his career as a Senator is highly probative. It directly rebuts the perception left by the government that the Senator must have contacted the USDA, the New Jersey Attorney General, met with foreign officials of Egypt, and invited private individuals to meetings with Egypt *because* he was bribed to do so. To preclude the defense's rebuttal to these false claims would improperly deprive Senator Menendez of a defense in this case. Such evidence is necessary to prove a lack of criminal intent in taking the actions charged in this case. *See United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015) (quoting *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952)) (stating that "no events or actions which bear even remotely on [a defendant's lack of criminal intent] should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh its relevance").

  For example, while the government has argued that the Senator's call to the New Jersey Attorney General regarding a case prosecuting Latino truckers must have been taken as part of a corrupt *quid pro quo*, the exhibits in DX 1305 demonstrate that the Senator routinely advocates on behalf of the Latino community in legal matters when he feels discrimination is involved—including writing letters to the President of the United States and the White House Chief of Staff, and making phone calls to executive officials (including the Vice President of the United States) as part of such advocacy. *See, e.g.*, DX 2080 (writing a letter to President Obama regarding a lawsuit brought against the USDA by Hispanic farmers); DX 2126 (letter from Senator Menendez following-up on a phone call he made to the Senior Advisor to the President about concerns with the way the Department of Justice and USDA are handling a specific

discrimination lawsuit); DX 2049 (letter from Senator Menendez to Joe Biden regarding the Senator's phone call to Biden expressing concerns over treatment of Hispanic farmers and discrimination lawsuit). Such evidence directly undercuts the government's theory that the charged conduct was done with corrupt intent.

  Similarly, evidence in DX 1305 is needed to undermine the government's false assertion that Senator Menendez's meetings with foreign officials and private constituents were atypical. Senator Menendez has a record of regularly meeting with foreign officials and invited private constituents to do so as well. The fact that he did so here is not proof of criminal intent, contrary to what the government has asked the jury to infer.

  Moreover, evidence of the many requests that Senator Menendez receives from his constituents for similar actions undermines the government's theory that Senator Menendez believes a bribe was involved when he received a request from his girlfriend, fiancé, or wife to help a friend.

  The government's two cited cases are inapposite. Senator Menendez does not seek to offer the evidence summarized in DX 1305 to prove his character or that he acted in accordance with that character on a particular occasion, but for the purpose of rebutting the government's claims of a criminal state of mind. *See United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (excluding certain evidence of prior good acts pursuant to 404 (b)(1), which prohibits evidence used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character"); *see United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (excluding certain evidence of prior acts "used to 'prove the character of a person in order to show action in conformity therewith'").

  And despite knowing that the Defense would present this exact type of evidence well before this trial even began, the government now resorts to empty threats that such constituent services evidence will leave the government "little choice but to respond to this chart . . . by placing the events in context and/or offering evidence of actions that Menendez did not take" and "might also need to revisit whether it seeks to offer evidence of Menendez's prior criminal matter." *See* ECF No. 291 at 19. This is troubling for a number of reasons. The government has presented seven weeks of testimony aimed to establish that specific actions taken by Senator Menendez were taken as part of a corrupt *quid pro quo*. Evidence introduced by the defense to negate the inference of corrupt intent does not now open the door to unidentified and unnoticed "evidence of actions that Menendez did not take." *See id*. Nor does it open the door to improper 404(b) evidence of the Senator's prior criminal case (in which there was no conviction), which had nothing to do with the matters at issue in DX 1305. The Court should not let the government's empty and illogical threats of a rebuttal case preclude critical defense evidence.

  Lastly, the government's allegation that "[a]ll or almost all of the exhibits in the chart are inadmissible hearsay" is incorrect. *See id*. at 18–19. The exhibits contained in DX 1305 are not being offered for the truth, but to show Senator Menendez's state of mind. They are offered to show that Senator Menendez took certain actions and has a state of mind of helping constituents—*i.e.,* sent letters to government officials and/or agencies on behalf of his

17

constituents and minorities, made statements regarding discrimination against minorities, and released press releases regarding his work for minority communities and small businesses—not for the truth of the statements contained in these documents.  Moreover, if the government has specific 403 concerns regarding statements contained in these exhibits, the Defense is happy to consider proposed redactions, but the government has not proposed any.  And in any event, many of the documents are clearly business records under Fed. R. Evid. 803(6).  For example, DX 2134 and DX 1018 are documents titled "weekly reports," prepared by Senator Menendez's staff and e-mailed weekly as part of the Office's regular practice.  Similarly, DX 2053, 2165, 2166, 2168, 2170, 2171 are examples of memoranda routinely prepared by staff of the Office of Senator Menendez as part of a regular practice.  We will obtain a certificate from a custodian should the government challenge that obvious inference.

In sum, DX 1305 is permissible evidence offered to directly rebut evidence presented by the government in its case-in-chief and is the very type of evidence that the government has known the Defense will present long before the beginning of this trial.  The government's motion to preclude DX 1305 is nothing more than an improper attempt to limit Senator Menendez's ability to defend himself and it must be denied.

Respectfully submitted,

/s/ *Adam Fee*
Adam Fee
Avi Weitzman

*Attorneys for Defendant Robert Menendez*