O5K3MEN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           23 Cr. 490 (SHS)

5    ROBERT MENENDEZ, et al.,

6              Defendants.
                                            Trial
7    ------------------------------x

8                                           New York, N.Y.
                                            May 20, 2024
9                                           10:00 a.m.

10   Before:

11
                         HON. SIDNEY H. STEIN,
12
                                            District Judge
13                                          -and a Jury-

14                            APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  PAUL M. MONTELEONI
17        DANIEL C. RICHENTHAL
          ELI J. MARK
18        LARA E. POMERANTZ
          CATHERINE E. GHOSH
19        Assistant United States Attorneys
          -and-
20        CHRISTINA A. CLARK
          National Security Division
21

22

23

24

25

O5K3MEN1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         RITA FISHMAN
6

GIBBONS, P.C.
7        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
8        ANNE M. COLLART
         CHRISTINA LaBRUNO
9        RICARDO SOLANO, Jr.
         ANDREW J. MARINO
10       ELENA CICOGNANI
         JESSICA L. GUARRACINO
11

CESAR DE CASTRO
12   SETH H. AGATA
SHANNON M. McMANUS
13       Attorneys for Defendant Daibes

14

15

Marwan Abdel-Raman, Interpreter (Arabic)
16   Rodina Mikhail, Interpreter (Arabic)

17

18

19

20

21

22

23

24

25

O5K3MEN1

1          (Trial resumed; jury not present)

2          THE COURT:  All the lawyers and all defendants are

3   present.

4          The sink in the jury deliberation room was apparently

5   left open over some point over the weekend so the carpet was

6   soaked.  So, the jury is now is going to another jury

7   deliberation room.

8          There are two matters I wanted to -- Mr. Fee, sit

9   down.

10          MR. FEE:  I'm sorry, sir.

11          THE COURT:  There are two matters I want to discuss

12   and I'm not pleased with either matter, so we've got to change

13   the ways the parties are dealing with each other here.

14          First of all, on Sunday, starting at 4:30 in the

15   afternoon, and then at 11 p.m. Sunday night, and then at

16   11:12 p.m. Sunday night, and then at 1 a.m. this morning,

17   documents filed were filed by the parties.  I'm not assigning

18   blame here, but that's no way to operate this trial.  The

19   parties are entitled to my considered consideration of motions

20   that are put before me.  And I simply am unable to do that when

21   three documents come in between 11 and 1 in the morning.  All

22   right?  I happened to be here yesterday, but not at 11 p.m. at

23   night.

24          The parties have to find a way of working together so

25   that doesn't happen.  I simply cannot do my job if I get

O5K3MEN1

1    motions that need immediate attention at 1 a.m. in the morning.

2              If the parties can't figure out a way to deal with it,

3    I'll impose some rules where they can deal with it so they will

4    deal with it.

5              Second matter which I'm not too pleased.  As part of

6    the point about nothing last minute, the issue here about that

7    summary witness, it looks like the parties started dealing with

8    the summary chart three weeks ago.  Yet a few hours ago, I get

9    the last word on a debate about that summary chart.  That's

10   just a specific of what I'm talking about.

11             Now, I cannot deal with the specific objections to the

12   500-plus exhibits in that summary chart in a few hours.  I

13   can't and I'm not going to.  I don't know if the parties are

14   engaging in games here.  If so, they should stop.

15             I don't want any party's order of proof disrupted.

16   The government claims that its order of proof is going to be

17   disrupted to the extent that that summary witness cannot go on

18   today or early tomorrow morning.  I just cannot see my way to

19   dealing with a number of exhibits -- disputes about exhibits on

20   a 500-plus exhibit summary chart.

21             So I'm going to have to deal with that.  I'll read the

22   materials tonight, and have to deal with that tomorrow after

23   trial.

24             Government, can you put in other people or deal with

25   it in some way?  I want to keep this trial moving.  We have to

1    end at 4 today for a personal issue dealing with one of the

2    lawyers.  By the way, what I want to do, assuming there is

3    another lawyer on that team who can be here, I want to read

4    into the record today after 4, we'll end at 4, my decision on

5    precluding Dr. Rosenbaum.  I've already given you my decision

6    but this is a fuller opinion.  So, that's what I want to do it

7    at 4 o'clock.

8              Government, I asked you a question.

9              MR. MONTELEONI:  Yes, your Honor.  We can fill

10   tomorrow with someone other than the summary witness.

11             THE COURT:  Done.  Then we'll have argument on it

12   right after the trial tomorrow.  And again, a summary chart,

13   which normally goes in without too much objection, when your

14   discussions started three weeks ago, you just can't have a

15   frenzied flurry of documentation hours before court.

16             The next item which I'm not too pleased is the defense

17   motion to preclude what I'll call the love e-mail.  That's

18   B201-10, I believe it's 404-1.  You know what that is.  It has

19   a love and heart emojis and the core of it is "Tell Will I am

20   going to sign off this sale to Egypt today."  And then it goes

21   on.

22             Witness number 1, first of all, I don't need oral

23   argument on that.  You've had documents submissions back and

24   forth.  Just as importantly, this issue was decided in -- not

25   on the specific one.  In my opinion, in my denying of the

1    defense motion for a mistrial on the opening.  And I'm not

2    going to preclude the introduction of B201-10.

3           Witness 1 can basically say what the government says

4    he's going to say.  He can explain the context giving rise to

5    Mr. Menendez's ability to influence aid to Egypt in the

6    relevant time period.  I'm not going to allow any evidence that

7    Mr. Menendez actually approved a sale or released a hold on a

8    sale.  He can testify to the amounts by the United States of

9    military aid, including foreign military financing and foreign

10   military sales.  He can testify to the powers and

11   responsibilities of the Senate Foreign Relations Committee, of

12   the chairman of that committee, and of Congress itself.

13          He cannot testify, and the government indicates he's

14   not going to, I want to reiterate, he cannot testify to holds

15   that other named senators placed on military aid to Egypt or

16   other named senators signed off on aid to Egypt.  There cannot

17   be testimony, as I've said, of a hold or of release of a hold

18   by the senator.  That should be clear.

19          So I'm admitting GX B201-10 over objection.

20          In that motion, I think the defense is pushing too

21   hard.  I couldn't have been clearer, I believe, in my decision

22   on speech or debate and in the decision denying the motion for

23   a mistrial.

24          Mr. Fee, this is a promise, as again it starts off

25   with lots of heart emojis and I believe it's the senator saying

1    love, and there is a heart emoji and exclamation points.  "Tell

2    Will I am going to sign off this sale to Egypt today."  Then he

3    talks about the specifics.

4            That is a promise to undertake a legislative act.  The

5    legislative act is the signing off on the hold, that is placing

6    a hold or signing off on a hold, releasing a hold.  That's the

7    legislative act.  This 404-1, which is the same as B201-10, is

8    a promise.  Mr. Fee argues that 404-1 is evidence of a

9    legislative act and is precluded.  Well, it's certainly not

10   precluded by my opinion.

11           The defense opted not take an interlocutory appeal

12   from that opinion.  That's their decision, that's okay.  If

13   there is a conviction, I have no idea what this jury will do,

14   we're a long way from that.  If there is a conviction, the

15   defense will have the opportunity to appeal it.  They didn't

16   appeal it now.  So what I decided there is the law of the case

17   and the parties are bound by it.

18           The defense cites *Helstoski* for the proposition that

19   there is "no doubt evidence of a legislative act may not be

20   introduced by the government in a presentation under" the

21   bribery statute.  And referring to *U.S. v. Johnson*, 383 U.S.

22   169 (1966); *U.S. v. Brewster*, 408 U.S. 501 (1972).

23           And I thought about that because they said "no doubt

24   evidence of a legislative act may not be introduced."  So I was

25   thinking that that may be more expansive than what's precluded

1    in my opinion.

2              But I looked at those cases, and in each case, it was

3    a past legislative act that was at issue.  In *Johnson*, the

4    speech given in the House of Representatives was the basis of

5    the criminal charge.  In *Helstoski*, what was at issue was also

6    past legislative acts.  Speech and debate clause "precludes any

7    showing of how a legislator acted, voted or decided.  Promises

8    by a member to perform an act in the future are not legislative

9    acts."  "Tell Will I am going to sign off this sale to Egypt

10   today" is a promise.

11             I'm not sure how I can be clearer.  If the defense is

12   going to raise this issue time and time and time again, the

13   trial is going to be completely bogged down.  I can't be more

14   explicit.  Promises to perform acts are not legislative acts.

15             Who is the government going to call?  Where do you

16   stand?

17             MR. MARK:  Your Honor.

18             THE COURT:  Ms. Blakely, line the jury up please.

19             MR. MARK:  May I ask -- Mr. Tate is on direct

20   examination.  There is one issue that the parties wanted to

21   raise to the Court.

22             THE COURT:  Go ahead.

23             MR. MARK:  There is some feedback.

24             THE COURT:  There is one additional item the parties

25   want to raise.  Go ahead.

1          MR. MARK:  Thank you.  On Friday, there were a couple

2     of issues that your Honor avoided taking sidebar on.  One of

3     them got resolved, one of them didn't just because the press of

4     time.  And that relates to some testimony I am going to proffer

5     to your Honor that I understand the defense intends to object

6     to.

7          Which is that Mr. Tate, while he was in the embassy,

8     was trained on countersurveillance techniques, as all State

9     Department or as many people in embassy are.  And he observed

10    certain surveillance towards the end of his tour in Egypt,

11    particularly around the time that the halal issue came up.  He

12    is going to detail the nature of the surveillance that he

13    observed, both at his home and out on the street.  And that

14    this increased in frequency.

15          THE COURT:  I don't understand.  Who is surveilling

16    whom?  What did he say?  What's the nature of the surveillance?

17          MR. MARK:  Yes.  So at his home, he is going to detail

18    two particular incidents that when he was away for the weekend

19    he returned, and his home smelled like smoke and there was a

20    cigarette butt left in the toilet.  Looks like they intended

21    for him to see that there was people in his home.

22          The other instance is a time when he was away for the

23    weekend and he returned and electronics he had out on a table

24    were no longer on the table.  They were on the ground.  Another

25    sort of, appeared to him, intentional show that people had been

O5K3MEN1

1    at his home.

2              He's also going to testify that when he was out on the

3    street, he would notice people watching him and following him

4    as he went about from place to place.

5              THE COURT:  What's the purpose of this?

6              MR. MARK:  The purpose is to show, to suggest that

7    intelligence was particularly focused on Mr. Tate at the time

8    that the halal issue was of particular relevance, and the U.S.

9    government was pushing on that issue.

10             THE COURT:  Wait just a moment.  I understand you're

11   telling me the relevance is the surveillance was at the time of

12   the halal issue.

13             MR. MARK:  Exactly.

14             THE COURT:  What about the United States pushing on

15   that issue?  What does that mean?

16             MR. MARK:  The frequency of the surveillance that

17   Mr. Tate noticed increased during his tour at the time that the

18   U.S. government was pushing on the IS EG Halal issue.  I'm

19   talking about pushing on that meaning when that matter about IS

20   EG Halal becoming a sole certifier had become a matter of

21   dispute, and Mr. Tate, as he testified, was one of the lead

22   individuals pushing back against the Egyptian decision makers

23   on that.

24             THE COURT:  I understand.  He never saw these

25   individuals.  This is an assumption on his part.

O5K3MEN1

1          MR. MARK:  So at the home, he didn't see who the

2    people were.  When he was out on the street, he did observe,

3    personally observe those people.  Obviously --

4          THE COURT:  He doesn't know what they were or what

5    issue they were connected to.

6          MR. MARK:  That's correct.

7          THE COURT:  I take it, Mr. Fee, it is your objection.

8          MR. FEE:  You got it.  It is an assumption.

9          THE COURT:  Objection granted.  I'm excluding that

10   because its probative value is substantially outweighed by a

11   danger of unfair prejudice, confusing the issues, and

12   misleading the jury.  I mean, I assume he was involved in lots

13   of different issues.

14         Very nice argument, Mr. Fee.

15         MR. FEE:  Thank you, your Honor.

16         THE COURT:  Let's bring this jury.

17         MR. MARK:  I am going to ask Mr. Tate to take this.

18         THE COURT:  Yes, please.

19         Mr. De Castro, when you leave at 4, I want you to talk

20   to your client to make sure it's okay with him that you leave.

21   I take it you are going to have another member of your team who

22   has entered a notice of appearance here on behalf of Mr. Daibes

23   to be present.

24         MR. DE CASTRO:  Yes, judge.  Two.

25         THE COURT:  Pardon me?

O5K3MEN1

1           MR. DE CASTRO:  Two other lawyers.

2           THE COURT:  All right.  Parties have to work together

3   better.  This is going to be, this is a long haul on this case.

4   Work together.  Play together.

5           Good morning, sir.

6           THE WITNESS:  Good morning, your Honor.

7           THE COURT:  How much longer do you have on direct,

8   sir?

9           MR. MARK:  Less than 15 minutes, your Honor.  Or

10  approximately I'd say 15 minutes.

11          THE COURT:  Cross?

12          MR. LUSTBERG:  I'm going first and I would say a half

13  hour or so.

14          THE COURT:  All right.  Let's keep moving.  As I said

15  the jury, has to come from another location because of the rug

16  which is consumed.

17          MR. MARK:  Your Honor, can I run to the restroom?

18          THE COURT:  Sure.  Anyone can use the facilities if

19  they need to.

20          (Pause)

21          THE COURT:  Have the jury come in.

22          (Continued on next page)

23

24

25

O5K3MEN1                           Tate - Direct

1          (Jury present)

2          THE COURT:  Ladies and gentlemen of the jury, thank

3     you for being here.  I hope you had a relaxing weekend.  You

4     saw that there was an accident in and the rugs were soaked.

5     That's never happened before.  I just don't know what it was.

6     But, they're taking steps to clean it up, and I appreciate

7     everyone's patience and forbearance.

8          The last hour, I've been working with the parties on

9     legal matters.  Sometimes legal matters come up.  As you know,

10    those are not for the jury.  It's factual issues that are for

11    the jury.  So, I asked that you stay in the jury deliberation

12    room while we were working through those matters.

13         We will now continue with the direct examination of

14    Mr. Tate by Mr. Mark.

15         Mr. Tate I remind you, sir, that once again you remain

16    under oath.  You understand that, correct?

17         THE WITNESS:  Yes, your Honor.

18     JAMES BRET TATE,

19         called as a witness by the Government,

20         having been previously sworn, testified as follows:

21    DIRECT EXAMINATION (Continued)

22    BY MR. MARK:

23    Q.  Mr. Tate, on Friday, you had testified a fair bit about IS

24    EG Halal.  Right?

25    A.  Yes, sir.

O5K3MEN1                      Tate - Direct

1   Q.  And that IS EG Halal had attained a monopoly over halal

2   certifications for Egypt in approximately April 2019?

3   A.  That's correct.

4   Q.  At the end of the afternoon on Friday, I believe you had

5   just started testifying about a cable you'd prepared regarding

6   IS EG Halal in June 2019, right?

7   A.  Yes, sir.

8   Q.  Can you remind the jury what a cable is.

9   A.  A cable is a diplomatic communication.  It is how the

10  embassy transmit information about situations we see on the

11  ground to headquarters in Washington.

12  Q.  You used the term diplomatic communication.  What do you

13  mean by that?

14  A.   In this instance, it is a report essentially about the

15  situation on the ground that is sent via proprietary channels

16  to the State Department and other actors in Washington.

17  Q.   Is this a secure communication?

18  A.   It is a secure communication.

19  Q.   When you're talking it being a secure communication, what

20  is the purpose of that communication being secure?

21  A.   Well, we know that many communication are surveilled.  This

22  uses a proprietary government owned communication line, so

23  we're able to send it without being -- without it being seen by

24  any other countries or any other actors.

25  Q.   In your experience, from working at multiple U.S.

O5K3MEN1                         Tate - Direct

1    embassies, are embassies targets of surveillance by foreign

2    intelligence services?

3                MR. FEE:  Objection.

4                MR. MARK:  This is a different matter, your Honor.

5                MR. FEE:  Objection.

6                THE COURT:  Sustained.

7    Q.  Now, you had testified on Friday that the total number and

8    nationality of staff at the U.S. embassy are not public.  Is

9    that right?

10   A.  Yes, sir, that's correct.

11   Q.  And you had testified about certain concerns about making

12   that information public; is that right?

13   A.  Yes, sir, that's correct.

14   Q.  What are some of those concerns?

15   A.  The concerns I mentioned before, we could be targets of

16   terrorist, we could be targets for foreign surveillance, we

17   could be targeted for influence.

18   Q.  When you talked about being targets of foreign service or

19   influence --

20               MR. FEE:  Objection, your Honor.

21               THE COURT:  I'll allow it.

22   A.  "Surveillance" was the word I used.  Targets of

23   surveillance.

24   Q.  Could you explain what you mean by targets of surveillance?

25   A.  Certainly.  Frequently, U.S. diplomats and U.S. employees

 1    overseas are targeted by the host country government or other

 2    governments.  We will frequently see that -- we will often see

 3    diplomats whose phones are tapped, who have people following

 4    them, whose homes are visited.  Things like this.

 5    Q.  And I believe on Friday you testified that the total number

 6    of staff, either American or local, would be, quote, one piece

 7    of information that could be aggregated to other information to

 8    identify those people.

 9         Could you explain what you meant by that testimony?

10    A.  Yeah, absolutely.  So if, just for an example, if we know

11    there are 100 embassy employees, and we know that the U.S.

12    government has, I don't know, two apartment buildings, one that

13    houses 50 people and one that houses 40 people, if someone knew

14    that the total number was 100, they would know there were 10

15    people missing, and they would know what the universe of

16    employees was.  They would know what the total number of

17    targets were.

18    Q.  So, could you piece that out.  So how is that piece of

19    information, just the total number, how could that be relevant?

20    A.  Well, again, if a foreign entity knows that there are 50 in

21    one building, 40 in another that means, there are 10 they need

22    to look for.  That means that there are 10 additional targets

23    for surveillance or for whatever.

24    Q.  And at this time, at the U.S. embassy in Cairo, that total

25    information was not public information?

1    A.  That's correct.

2    Q.  Mr. Tate, you testified that you are a diplomat.  Right?

3    A.  Yes, sir, that's correct.

4    Q.  And are you familiar with the related word diplomacy?

5    A.  Yes, sir.

6    Q.  What does diplomacy mean?

7    A.  I mean, in this context, diplomacy is maintenance of the

8    relationship between the U.S. government and a foreign power.

9    The Egyptian government.

10   Q.  What is the role of the Legislative Branch with regards to

11   diplomacy?

12           MR. FEE:  Objection.

13           THE COURT:  I'll allow it.

14   A.  The Legislative Branch may advise diplomats, may advise our

15   diplomatic corps.  Though, generally, diplomacy in the United

16   States is handled by the Executive Branch.

17   Q.  Are you familiar with the term "congressional inquiry"?

18   A.  Yes, sir, I am.

19   Q.  What is a congressional inquiry?

20   A.  A congressional inquiry would be where a member of Congress

21   or a committee in Congress asks for additional information on a

22   specific topic from the Executive Branch.

23   Q.  From your experience at the United States Department of

24   Agriculture, how, if at all, can a congressional inquiry affect

25   how the USDA carries out its mission?

1  A.  Certainly.

2          MR. FEE:  Objection, your Honor.

3          THE COURT:  Just a moment.  Sustained as to form.

4  Q.  So, Mr. Tate, from your time serving at the USDA, have you

5  become familiar with any congressional inquiries?

6  A.  I have.

7  Q.  From your time at USDA, do you understand how a

8  congressional inquiry could affect the department's ability to

9  carry out its mission?

10  A.  Yes.

11          MR. FEE:  Objection, your Honor.  Relevance.

12          THE COURT:  Just a moment.

13          What impact, if any, is there on the Department of

14  State as a result of a congressional inquiry?

15          THE WITNESS:  For me?  Yes, your Honor.

16          The impact would be, I mean, generally agencies would

17  want to limit congressional inquiries because they create extra

18  work.  But they also impact could impact funding.  Congress

19  controls the funds, they can impact agencies' ability to

20  implement programming.

21          THE COURT:  Next question.

22  Q.  And I know that question was just focused on the Department

23  of State.  But, does that apply to the Department of

24  Agriculture as well?

25  A.  Yes, Mr. Mark, that's correct.

O5K3MEN1                        Tate - Direct

1    Q.  Thank you.  Now, returning to the cable we've talked about

2    before.

3              MR. MARK:  Mr. Hamill, could you show for the witness

4    only what has been marked for identification as Government

5    Exhibit 8B-18.

6    Q.  Mr. Tate, do you recognize this document?

7    A.  Yes, sir.

8    Q.  What is it?

9    A.  This is a cable I drafted in Cairo.

10   Q.  What did it concern?

11   A.  The subject is "Egyptian decision on halal beef

12   certification creating confusion may increase prices."

13             MR. MARK:  The government offers Government Exhibit

14   8B-18.

15             MR. LUSTBERG:  No objection.

16             THE COURT:  Admitted.

17             (Government's Exhibit 8B-18 received in evidence)

18             MR. MARK:  Mr. Hamill, can you publish this exhibit.

19   Q.  Mr. Tate, could you just look at the -- if we can take a

20   look at the bottom of this document.  What is the date of this

21   cable?

22   A.  June 3, 2019.

23   Q.  And who does it list it's from?

24   A.  This is from SMART Core.  SMART Core is simply the cable

25   system.  This "from" address simply indicates that this was

1    communicated via the State Department's internal cable system.

2    Q.  At the bottom to does list it's from AmEmbassy Cairo?

3    A.  The formal "from" lists the embassy in Cairo.

4    Q.  In general, Mr. Hamill, can we go to the next page.  Can

5    you summarize what this cable described.

6    A.  Certainly.  This cable just describes the situation where,

7    that we discussed on Friday, where following an audit to the

8    United States, all U.S. companies certifying for halal were

9    removed by the Egyptian government and replaced by a single

10   certifier.  It goes on to discuss how we arrived to that

11   situation, and our concerns about the impacts on markets.

12   Q.  If we go to the end of this cable.  The fourth page.  Do

13   you see there is a section titled "post advocacy"?

14   A.  Yes, sir.

15   Q.  What does that refer to there?

16   A.  Post advocacy simply explains the steps that the U.S.

17   embassy took on behalf of the U.S. firms.

18   Q.  Here it refers to a June 2nd meeting between the chargé

19   d'affaires and the Egyptian Ministry of Agriculture.  Is that

20   the meeting you had testified to on Friday?

21   A.  Yes, sir, that's correct.

22   Q.  Now, after that June 2nd, 2019, meeting, were there any

23   further steps you wanted to take related to Egypt's halal

24   certification policy?

25   A.  Yes, sir.

O5K3MEN1                          Tate - Direct

1    Q.   What were those steps?

2    A.   I had hoped to do an economic analysis to see how the

3    change in certification impacted the price for consumers.  How

4    much it increased the purchase price at the store.

5         MR. MARK:  Mr. Hamill, you can take that down.

6    Q.   And when you talk about an economic analysis, what is that?

7    A.   We knew that the prices had to increase because the cost

8    the companies were paying increased.

9         THE COURT:  Are you talking about the price to

10   Egyptian consumers?  Is that correct?

11        THE WITNESS:  Yes, your Honor.  That's correct.

12   A.   We knew the prices had to increase because the companies

13   had to pay more money, but we didn't know how much.  So what we

14   had hoped to do was survey the prices in Egypt, watch how they

15   increased, and then identify how much of that was related to

16   the certification change and how much was other factors.

17        THE COURT:  Why was one of your concerns the price

18   that Egyptian consumers would have to pay?

19        THE WITNESS:  Well, your Honor, I think there are two

20   answers to that question.

21        The interest from the U.S. government's perspective is

22   that increased prices decreases demand.  So as prices went up,

23   we would sell less product.  The second answer is this was a

24   source of food for consumers with very meager means, and so,

25   sort of from a humanitarian perspective, it was in their

O5K3MEN1                          Tate - Direct

1    interest for the prices to be lower.

2              THE COURT:  Thank you.

3    Q.  Thank you, Mr. Tate.  You had wanted to take conduct this

4    the econometric analysis.  Did you take that step?

5    A.  I did not.

6    Q.  Why not?

7    A.  We were asked from Washington to not make any more noise

8    about this issue.  To let the dust settle.

9    Q.  And who communicated to you that Washington wanted to let

10   the dust settle on this issue?

11   A.  My immediate supervisor Ali Abdi communicated that to me.

12   Q.  What was your understanding about why -- about what Ali

13   Abdi communicated to you about why the dust should settle on

14   this issue?

15             MR. FEE:  Objection.  Hearsay.

16             THE COURT:  Sustained.

17   Q.  When Mr. Abdi communicated to you that dust should settle,

18   what did he say to you?

19             MR. FEE:  Objection.  Hearsay.

20             THE COURT:  Sustained.

21   Q.  You mentioned you didn't take any additional steps here,

22   right?

23   A.  That's correct.

24   Q.  What was your understanding about why you should not

25   take -- why you did not take additional steps here?

O5K3MEN1                         Tate - Direct

1           MR. FEE:  Objection.  Hearsay.

2           MR. MARK:  This is his understanding.

3           MR. FEE:  Objection.  Hearsay.

4           THE COURT:  Sustained.

5           You had an understanding.  Was it based solely on your

6    conversation with Mr. Abdi?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  Sustained.

9    Q.  When Mr. Abdi communicated to you to let the dust settle,

10   was this is after the June 2 meeting with the Egyptian Ministry

11   of Agriculture that you testified about?

12          THE COURT:  What year?

13   Q.  Of 2019?

14   A.  I believe that's correct.

15   Q.  When did your tour in Cairo come to an end?

16   A.  In late August 2019.

17   Q.  After you left Cairo, did you ever deal with IS EG Halal

18   again in the course of your work?

19   A.  I did.

20   Q.  How so?

21   A.  When I was posted, when I was posted to Washington

22   following Cairo, I served as a senior trade advisor.  Senior

23   trade advisor for the Western Hemisphere.  In that position, I

24   learned that IS EG Halal had gained the certification approval

25   for both Brazil and Uruguay.

O5K3MEN1                      Tate - Direct

1  Q.  Can you explain what you mean by the certification

2  approval?

3  A.   Certainly.  Similar to what had happened in the U.S., IS EG

4  had been named the sole certifier for all beef, poultry, beef

5  and poultry coming from Brazil and Uruguay going to Egypt.

6           MR. MARK:  Your Honor, I note your Honor likes to

7  avoid sidebars.  I'm right at the end here, if I might be

8  briefly heard for a second on the one matter.

9           THE COURT:  Yes.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2          MR. MARK:  I'm ready to end my direct examination.

3    What I intended to elicit from Mr. Tate was the fact that he

4    was communicated to let the dust settle because of a

5    congressional inquiry, and I think that's directly relevant to

6    understand the consequence of Mr. Menendez's outreach, which,

7    once again, he said was not an official act, didn't have any

8    effect, and clearly it did and it got communicated down to

9    Mr. Tate.  Not to prove the communication there.  It is to

10   prove the effect on the ultimate U.S. government officials

11   here.  And it is not to prove the truth of what was being

12   communicated there.

13         Mr. McKinney will testify.  Mr. McKinney will talk

14   about what his direct interactions were Mr. Menendez.  This is

15   to prove the effect of that.

16         MR. FEE:  Your Honor, it is for the truth that a

17   Congress member reached out.  It is quadruple hearsay disguised

18   as understanding.

19         THE COURT:  I'm going to allow it.

20         MR. FEE:  The effect is only relevant if you take the

21   truth that it was a Congressperson.  The fact that it was a

22   Congressperson, went through four other people before it

23   reached Mr. Tate.  It is for the truth.

24         MR. LUSTBERG:  If I may add one thing to that.  Which

25   is Mr. Tate's state of mind is really not relevant.  What

1    they're clearly using this to try to get in the hearsay.  They

2    are going to have Mr. McKinney on the stand.  They can ask him

3    Mr. Tate's state of mind.

4              THE COURT:  You are going to have McKinney?

5              MR. MARK:  We are.

6              MR. RICHENTHAL:  The fact that Mr. Menendez reached

7    out is not disputed.  What is highly disputed, which is why we

8    want to elicit this, is whether that had any effect on the

9    United States Department of Agriculture on the ground in Egypt.

10   Mr. Tate is the man on the ground in Egypt.  It had an effect.

11   And the fact Mr. Menendez reached out is literally not in

12   dispute.  What the defense is a trying, respectfully, is to

13   block us from showing there was any effect in Egypt at all.

14             THE COURT:  Go ahead.

15             MR. FEE:  The rules of hearsay still apply.

16   Mr. McKinney can testify to certain things.  This is hearsay.

17   It is offered for the truth of the fact that it was a

18   Congressperson.  And it truly went through four different

19   people.

20             THE COURT:  That's not in issue.

21             MR. FEE:  It doesn't matter it's not disputed.  It is

22   hearsay and it is going to be contorted by this witness to mean

23   something more than it is.  Mr. McKinney wants to talk about

24   his conversation with Mr. Menendez and what he did after --

25             THE COURT:  I'm going to preclude it.

O5K3MEN1                          Tate - Direct

1           MR. FEE:  Thank you, your Honor.

2           (Continued on next page)

O5K3MEN1                        Tate - Cross

1                  (In open court)

2                  THE COURT:  For the record, the basis of the ruling is

3       hearsay.  Proceed.

4                  MR. MARK:  Thank you, your Honor.

5       Q.  Mr. Tate, we had discussed that your tour in Egypt came to

6       an end approximately when?

7       A.  It was late August 2019.

8       Q.  And when did the conversation that you had with Mr. Abdi

9       happen, approximately when he told you to let things, let the

10      dust settle here?

11      A.  I don't remember the exact date, but it must have been in

12      June.

13                 THE COURT:  What year?

14                 THE WITNESS:  2019.

15      Q.  And as a result of that conversation, did you let the dust

16      settle on this matter?

17      A.  I did.

18                 MR. MARK:  No further questions, your Honor.

19                 THE COURT:  Is there any cross examination of this

20      witness?

21                 MR. LUSTBERG:  Yes, your Honor.

22                 THE COURT:  Mr. Lustberg.

23                 MR. LUSTBERG:  Thank you, your Honor.  I'll start.

24      CROSS-EXAMINATION

25      BY MR. LUSTBERG:

O5K3MEN1                          Tate - Cross

Q.  Good morning, Mr. Tate.

A.  Good morning, sir.

Q.  I have a question for you.  Which is in deciding which company and how many companies will become a halal certifier for Egypt, it's Egypt that decides that, correct?

A.  Egypt does make those decisions, yes.

Q.  And the United States can have its opinion heard, as it did here, but at the end of the day, it's Egypt that makes that decision; isn't that true?

A.  The decision must be made in line with Egypt's international commitments under the WTO.  But yes, they make the decision.

Q.  And Egypt makes the decision both in terms of how many certifiers there will be, and who, whether it's one or more, those certifiers are; is that correct?

A.  Egypt makes the decision, yes.

Q.  Thank you.  And the U.S., you've testified, was concerned that if there were only one certifier, that that would be a monopoly and that would drive up prices for Egyptian consumers; is that correct?

A.  That was one of our concerns, yes, sir.

Q.  That's because as you said, on direct examination, the U.S. is generally opposed to monopolies, right?

A.  I think it's fair to say that the U.S. generally opposes monopolies, correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5K3MEN1                          Tate - Cross

1    Q.   But again, the choice was Egypt's as to whether it would or

2    would not permit a monopoly in this situation; is that correct?

3    A.   The decision to determine which certifiers may or may not

4    certify halal beef belonged to the Egyptian government, yes.

5    Q.   What I asked you was Egypt also made the decision that it

6    was going to allow a single certifier in this case, correct?

7    A.   That was a decision they communicated to us in April.

8    Q.   And it was communicated, you had a specific conversation I

9    think you testified at the Frankfurt Airport with Ms. Mehrez,

10   I'm sorry, my pronunciation of the names may not be as good as

11   yours.  She said she wanted a single certifier for Egypt,

12   correct?

13   A.   Dr. Mehrez said that a single certifier would be better for

14   Egypt.

15   Q.   Now, Egypt made the decision to proceed with a single

16   certifier in this case even though the United States protested;

17   am I right?

18   A.   Egypt ultimately did make that decision, yes.

19   Q.   What I asked you was, they did that even in the face of

20   opposition from the United States, correct?

21   A.   They did not change course because of opposition from the

22   United States.

23   Q.   And just to be specific, it started, if I'm not mistaken,

24   with you.  You attempted to talk Dr. Ahmed Abdel Kareem, who if

25   I recall correctly, he was the head of the Egyptian delegation

1    that came to the United States for the audit, correct?

2    A.  He was the head of the delegation and he joined at the end

3    of the audit, yes.

4    Q.  You attempted to talk him out of proceeding with a single

5    certifier, correct?

6    A.  I think the first time anyone mentioned a single certifier

7    to me was Dr. Mehrez, and I advocated against that.  And then

8    in the subsequent meeting we had with the Egyptian government

9    on April 11, we again advocated that Egypt allow for multiple

10   certifiers.

11   Q.  And at that meeting, the -- am I right that Dr. Ahmed was

12   at that meeting on April 11?

13   A.  Yes, sir.  He was at that meeting.

14   Q.  And at that meeting he in fact indicated to you that he was

15   concerned with the existing U.S. halal certifiers, correct?

16   A.  He had a number of concerns that he had enumerated

17   throughout -- in that meeting and at other times, yes.

18   Q.  Just to answer the question I asked.  He expressed

19   concerns, yes or no, and if you can't answer it yes or no just

20   let us know, that he said that he was concerned with U.S. -- he

21   was, quote, he was concerned with U.S. halal certifiers.  Do

22   you remember?

23   A.  Sir, to be perfectly clear, the answer to that is yes.

24   But, his concerns were not a consistent set of concerns.  They

25   varied according to the meeting and according to the date.

O5K3MEN1                          Tate - Cross

1   Q.  Let me just to be clear on this.  If I could show you

2   what's in evidence as Government Exhibit C104-B.  And going to

3   the third paragraph.

4           By the way, you remember this exhibit, right?

5   A.  Yes, sir.

6   Q.  And this is a letter from Ali Abdi who was your boss,

7   right?

8   A.  Yes, sir.

9   Q.  And at the end of the third paragraph it says, does it not,

10  he was -- and just interrupt myself.  Referring to Dr. Ahmed

11  Abdel Kareem.  He was, however, concerned with U.S. halal

12  certifiers.  Right?

13  A.  Yes, sir.  That's what the letter says, correct.

14  Q.  Thank you.  And as you mentioned -- you can take that down.

15  As you mentioned, you yourself attempted to talk Dr. Mehrez

16  and, just Dr. Mehrez was the Deputy Minister of Agriculture for

17  Egypt, correct?

18  A.  Yes, sir.  The vice minister or deputy minister.  She was

19  the number 2.

20  Q.  You attempted on your own to talk her out of the position

21  that a single certifier was appropriate when you ran into her

22  at the Lufthansa lounge in the Frankfurt Airport, correct?

23  A.   In that encounter in the Frankfurt Airport, she was

24  suggesting a single certifier, and I did advocate that was not

25  in the best interest of neither Egypt nor the United States.

1    Q.  And she disputed?

2    A.  She did not respond to the substance of my points, but

3    continued to make her point that Egypt needed a single

4    certifier.

5    Q.  Then, you testified that the undersecretary of agriculture

6    Mr. McKinney also raised this issue with Dr. Mehrez.  Is that

7    correct?

8    A.  Yes, sir, that's correct.

9    Q.  And again it was to no avail.  Egypt maintained its

10   position that a single certifier was appropriate, right?

11   A.  Egypt did not change their position, that's correct.

12   Q.  And then, you and your boss, Mr. Ali Abdi, raised it with

13   the general organization for import export control, which you

14   referred to as GOEIC I think.  And you argued there, too, it

15   would violate Egypt's obligations, but GOEIC at that time

16   deferred to the Egyptian Ministry of Agriculture, correct?

17   A.  That's correct.  GOEIC was one of several engagements we

18   had with the government of Egypt.

19   Q.  Again, those did not serve to change Egypt's mind, right?

20   A.  Egypt ultimately did not change their position, correct.

21   Q.  And then ultimately, and the last step of this process at

22   even higher levels, the chargé d'affaires himself, which was

23   acting embassador Thomas Goldberger I think his name was?

24   A.  Yes, sir, that's correct.

25   Q.  He raised it with the agricultural minister himself, right?

```
 1   A.  Yes, sir, the chargé d'affaires raised it with the Ministry
 2   of Agriculture.
 3   Q.  Egypt didn't change its position; am I right?
 4   A.  That's correct.
 5   Q.  Now, Egypt wanted one instead of many certifiers; am I
 6   right?
 7            MR. MARK:  Objection.
 8            THE COURT:  I'll allow it.
 9   A.  I'm sorry.  Can you repeat the question?
10   Q.  Sure.  They wanted one, not many certifiers.  That's what
11   Egypt wanted?
12   A.  Egypt ultimately chose a single certifier.  I couldn't tell
13   what you they wanted.
14   Q.  I want to go back and I'll talk some more about the audit.
15   During the audit, according to your testimony, some certifiers
16   were insisting on a transverse cut in order to slaughter
17   animals and others were okay with a lateral cut.
18            Do you remember your testimony on that?
19   A.  That was not exactly my testimony.
20   Q.  Okay.  So if you could clarify.  Because what I thought you
21   said was that this was an issue that arose, and that I think
22   your testimony was that some were okay with a lateral cut, and
23   some were okay with a transverse cut, right?
24   A.  My testimony was -- "insisting" was not in my testimony.
25   The halal certifiers operating in the United States often do
```

1    lateral or transverse, depending on the needs of the company.

2    The Egyptian auditors saw both lateral and transverse.  They

3    were unhappy with the transverse, to which the halal certifiers

4    said no problem, we'll do lateral, and they demonstrated both.

5    Q.  So, the Egyptian auditors wanted it to be done in a

6    uniformed way one way or the other.

7    A.  No, sir.  The Egyptian auditors want it to go this way, not

8    this way.

9    Q.  They wanted it always to do that?

10   A.  Yes, sir.

11   Q.  Uniformly that way, correct?

12   A.  For product going to Egypt, yes, sir.

13   Q.  Thank you.  So, you mentioned in your testimony that IS EG

14   Halal was not an Islamic organization.  Do you remember that

15   testimony?

16   A.  I don't remember the exact instance, but I think that's a

17   reasonable -- that was our understanding at the time, correct.

18   Q.  And it was Egypt's right, wasn't it, to decide not to use

19   an Islamic or Muslim organization if it wanted to; isn't that

20   true?

21   A.  I mean, Egypt is free to choose the certifier they like.

22   Though generally, halal certifiers are associated with Islamic

23   centers.

24   Q.  I understand you want to tell me generally.  But my

25   question had to do --

1          THE COURT:  The jury will disregard.  What the lawyers

2     say is not evidence.  Disregard the comments of the lawyers.

3          MR. LUSTBERG:  I'm sorry, Judge.  I'll refrain from

4     comments.  I would ask that the Court direct the witness to

5     answer the questions though.

6          THE COURT:  Move on.

7     Q.  So my question was, Egypt, notwithstanding that halal

8     certifiers are generally Islamic or Muslim, it was Egypt's

9     right to insist upon or to determine that the certifier it was

10    going to authorize was not a Muslim, but was in fact a Coptic

11    Christian.  Isn't that true?

12    A.  Egypt can choose a certifier that -- that they like.

13    Q.  It was also Egypt's choice to use a certifier that did not

14    have prior experience, that is, let's call it, a start-up

15    organization, which is what IS EG Halal was, correct?

16    A.  Egypt is able to choose the certifier they want.

17    Q.  And in fact, during your position, if I recall correctly,

18    at the time, was that you believed that the number of

19    certifiers should be increased from the two that were there to

20    as many as eight, right?

21    A.  So my job is to advocate for the interests of U.S.

22    businesses.  There were eight U.S. businesses interested in

23    doing this work.  So, I of course would advocate for all eight

24    of them.

25    Q.  Some of those other ones were new start-up type

1    organizations as well, right?

2    A.  Not to the best of my knowledge, no.

3    Q.  So, you don't know that some of them had not been involved

4    previously in certification?

5    A.  I believe seven had been previously certifying.  And only

6    IS EG had not been previously certifying.

7    Q.  Okay.  You testified on direct examination that, if I

8    recall correctly, when it comes to the audit, that the audit

9    was divided into two teams.  Correct?

10   A.  Yes, sir.

11   Q.  And those two teams each visited with four certifiers,

12   correct?

13   A.  No, sir.

14   Q.  Well, how was the work divided?

15   A.  No problem.  No problem.

16       We were divided into two teams but that was independent of

17   the certifiers.  On the road, across middle America, we met

18   with four certifiers.  And then back in Washington, we met with

19   four more certifiers.  But they weren't divided by team.

20   Q.  So, your team met with four certifiers, right?

21   A.  Yes, sir.

22   Q.  And those four -- with regard to those four certifiers I

23   think you testified, tell me if I'm wrong, that with regard to

24   two of them, you went to their plants, but with two of them you

25   only went to the central offices.  Was that correct?

O5K3MEN1                        Tate - Cross

1    A.  That's correct, yes.

2    Q.  And with the two that you went to the central offices,

3    explain why didn't you go to their plants?

4    A.  Fair enough.  The first one we visited, the plants were not

5    close to Chicago.  Their office was in Chicago and the plant

6    was not close to Chicago.  So we weren't able to see them in

7    operation.  It didn't fit the schedule, basically.

8            The second one we saw on the road, their plants were

9    also far from where we met them.  I believe we met them in

10   Colorado.  But the plants they were operating in were also far

11   away, so we weren't able to see them operating in plants.

12   Q.  With regard to those, you went to their office, right?

13   A.  Yes, sir.

14   Q.  But, it's your testimony that they did have plants you

15   could have gone to see.  You just chose not to do that because

16   of the distance?

17   A.  The scheduling didn't work; that's right.

18   Q.  You testified I believe that at some point along the way,

19   after the trip to the United States, that Egyptian officials, I

20   don't remember which meeting, you probably will, raised with

21   you the idea that some of the certifiers that were under

22   consideration that had been rejected by Egypt were new

23   companies.  Correct?

24   A.  They were new to Egypt.  Not new to the halal industry, but

25   new to Egypt.

1    Q.  I see.  And I think the response that you gave to that

2    concern or that you or Mr. Abdi or whomever gave to that was

3    that small companies could grow and add capacity, right?

4    A.  Right.  There were -- if we think about the universe of the

5    eight halal certifiers, two were large and already certifying

6    for Egypt, two were small and already certifying for Egypt.  IS

7    EG was new.  And then the three remaining, two were small, one

8    was large.  So our response was indeed the two small ones could

9    increase capacity.

10   Q.  Because companies grow and develop capacity.  That's

11   something they do, right?

12   A.  Of course.

13   Q.  Are you aware that's something IS EG Halal has done in the

14   years since?

15   A.  I understand that IS EG Halal has expanded their capacity,

16   yes.

17   Q.  You just testified this morning you are aware that they

18   received contracts or the sole certifier contracts for Uruguay

19   and Brazil, correct?

20   A.  That's correct.  That was my testimony.

21   Q.  Are you aware of the other countries to which they've

22   grown?

23   A.  I know they are operating in other countries.  I have not

24   worked specifically on those countries, but I understand that

25   New Zealand, Dubai.

O5K3MEN1                              Tate - Cross

1   Q.   India?

2   A.   I did not know that.

3   Q.   I wanted to follow up on one thing you said a few minutes

4   ago.  You said that your job was to essentially promote U.S.

5   businesses, correct?

6   A.   Well, the embassy overall advocates for U.S. commercial and

7   economic interests, so supporting U.S. businesses is part of

8   our job, yes.

9   Q.   And in particular with regard to this particular project,

10  the IS EG -- I'm sorry.  The halal certification audit and so

11  forth, your goal was to increase the number of U.S. businesses

12  that would be involved in that certification process, correct?

13  A.   We wanted all U.S. businesses with interests in this market

14  to have the opportunity to apply to be certifiers, so we wanted

15  to support them in their endeavors to gain this business, yes.

16  Q.   And in that regard, you work hand in hand I believe you

17  said, and correct me if I have this wrong, with the U.S. Meat

18  Export Federation, which I think you referred to as USMEF,

19  right?

20  A.   We do work closely with USMEF.  But more closely on the

21  beef export side than the halal certification side.

22  Q.   Explain if you will what the importance of USMEF is to the

23  work that you do.

24  A.   I mean, U.S. Meat Export Federation is the association that

25  represents U.S. beef exporters.  U.S. beef exports are the

O5K3MEN1                          Tate - Cross

exact companies we are trying to support.  We are trying to

promote U.S. beef exports.  So, of course they are a natural

partner for us.

Q.  Would it be fair to say the concerns of USMEF are important

to you as you help formulate U.S. government policy in this

area?

A.  Yes, of course.

Q.  So, during your direct examination, you were asked a number

of questions about Mr. Hana's relationships with Dr. Ahmed

Abdel Kareem.  Right?

A.  Yes, sir.

Q.  And in particular, you noted that they seemed to be

friends, right?

A.  They did seem to have a friendly relationship, yes.

Q.  They dined together and had coffee together and spent time

together I think you said; is that right?

A.  Yes, sir, that's correct.

Q.  And in fact on March 29, 2019, when you were meeting with

the other halal certifiers, or candidates to be halal

certifiers, you had to go downstairs in the hotel and you found

them having lunch together, correct?

A.  That's correct.  He was having lunch during our scheduled

meetings, yes.

Q.  And your concern, am I correct about this, is that IS EG

Halal got the contract it got as a result of its contacts with

O5K3MEN1                         Tate - Cross

1    people like Dr. Ahmed Abdel Kareem, right?

2    A.   My concern was that IS EG had in some way influenced the

3    Egyptian officials to give them the contract.

4    Q.   But, you emphasized they had these -- there seemed to be

5    this relationship between Mr. Hana and Dr. Ahmed, right?

6    A.   There certainly was a relationship that had formed, yes.

7    Q.   And it's your testimony, isn't it, that you think that that

8    relationship had something to do -- and tell me if I have this

9    wrong -- with IS EG getting that contract, right?

10   A.   I suspected, I thought, that IS EG had built a relationship

11   with Egyptian officials in order to gain the business.

12   Q.   So they had built a relationship with the Egyptian

13   officials.  So, again, just to make sure I understand your

14   testimony, your testimony is that you think that IS EG Halal

15   got the contract in part because of its relationship with

16   Egyptian officials, correct?

17   A.   I believe that Mr. Hana, IS EG Halal, built a relationship

18   with Egyptian officials in order to gain this business.

19   Q.   So, do you have any idea whether Mr. Hana knew Dr. Ahmed

20   before those meetings that day?

21   A.   It was my understanding they had not met, though I don't

22   know that.

23   Q.   Let's talk a little bit more about the audit.

24        The audit was something that Egypt had asked to be done,

25   correct?

O5K3MEN1                              Tate - Cross

1    A.  Yes, sir, that's correct.

2    Q.  And that had been -- if you don't know, fine.  It had been

3    the first audit at that point that was done by Egypt here in

4    the United States for 5 years or so, right?

5    A.  I don't know the date.  It was the first in a number of

6    years, though I don't know how many years.

7              MR. LUSTBERG:  Your Honor, I'd like to just approach

8    the witness to attempt to refresh his recollection with respect

9    to that issue.

10             THE COURT:  All right.

11             MR. LUSTBERG:  Thank you.

12             THE COURT:  Mr. Tate, what Mr. Lustberg is going to do

13   is show you a document.

14             THE WITNESS:  Yes, your Honor.

15             THE COURT:  And he is going to ask whether that

16   refreshes your recollection in regard to when the last time an

17   audit had been done.

18             THE WITNESS:  Okay.

19             THE COURT:  The answer to his question on your part is

20   going to be either yes or no.  It refreshes it or it doesn't

21   refresh your recollection.

22             The example I always use is anybody can show anything,

23   whatever they want to refresh the recollection.  He could show

24   you a banana.  The issue is not what's on that piece of paper.

25   What's on that piece of paper may be true, may not be true.

O5K3MEN1                    Tate - Cross

 1   That's not the issue.

 2          The issue is whether looking at that, looking at the

 3   banana, looking at the piece of paper, gives you a new

 4   recollection of how long it had been since there had been an

 5   audit, that's all.

 6          THE WITNESS:  Okay.

 7          MR. LUSTBERG:  Thank you, your Honor.

 8   Q.  Directing your attention to the second paragraph.

 9          THE COURT:  Read it to yourself.

10          Reading that banana, does it refresh your recollection

11   as to when the last time an audit had been done?

12          Yes or no?

13          THE WITNESS:  Yes, your Honor.

14          THE COURT:  What is that refreshed recollection?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  What is your refreshed recollection?

17          THE WITNESS:  My refreshed recollection is that it had

18   been approximately 5 years.

19   BY MR. LUSTBERG:

20   Q.  So we talked a little bit earlier today about the fact you

21   began your part of the audit, I think you said in Chicago, and

22   then went -- I think you used the phrase across the country,

23   right?

24   A.  That's right.  We actually started in Washington and flew

25   to Chicago, and then across the country, correct.

O5K3MEN1                         Tate - Cross

1    Q.  One of the things you testified on direct examination is
2    that during the course of that, you got an opportunity to
3    observe the business practices of the certifier candidates or
4    existing certifiers that you were watching, correct?
5    A.  Yes, sir, that's correct.
6    Q.  And that you thought that they were satisfactory, right?
7    A.  They seemed to be, yes.
8    Q.  So, when you made the judgment that they were satisfactory,
9    what was that based on?
10   A.  Yeah, that's a reasonable question.
11   Q.  Thank you.
12   A.  It was based upon the fact that they had documents, they
13   could show that they -- they could show evidence of their work,
14   they had records, they had offices, they had presentations in
15   many cases where they showed -- the ones we couldn't visit in
16   plants -- where they showed videos of their operations in
17   plants.  These sorts of things.
18   Q.  So, let me ask you this.  Have you been trained in the
19   requirements of halal?
20   A.  I'm not an Islamic scholar, no.
21   Q.  Whether you are an Islamic scholar, do you know what the
22   requirements of halal slaughter are?
23   A.  I know the basic requirements of halal slaughter, but I am
24   not an expert in that specific area.
25   Q.  Do you know, for example, what animals are allowed to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5K3MEN1                          Tate - Cross

1    slaughtered, can be halal and what aren't?

2    A.  Yes, sir.

3    Q.  Which ones are and which ones aren't?

4    A.  Well, in general, all things halal, except for the ones

5    that are listed as not being halal.  Birds of prey, scavengers,

6    pigs are all not halal, for example.

7    Q.  And how about the way in which the slaughter is supposed to

8    take place?  Is that something you are aware of?

9    A.  I am aware that there are different, different

10   understandings of what is acceptable under halal.

11   Q.  Okay.  So, can you shed any light?

12   A.  Of course, of course.  Some halal experts say that the cuts

13   must be made here and here.  Others say the cut could be made

14   here.  That is a point of debate among halal experts.

15            THE COURT:  The witness is identifying different cuts

16   in the neck I believe.

17            THE WITNESS:  Yes, sir, that's correct.

18   Q.  Any other aspects of halal slaughter which you have an

19   understanding based upon your experience or your training?

20   A.  I'm sorry, I don't understand the question.

21   Q.  Sure.  You talked about the cuts to the neck.  Are there

22   any other aspects of the halal slaughter process that either

23   makes something acceptable or unacceptable under the sharia law

24   that governs?

25   A.  There are other elements, yes.  Dead animals are not

O5K3MEN1                        Tate - Cross

1    eligible to be halal, for example.  The animals have to be

2    prayed over before they can be slaughtered halal.

3    Q.  And how did you learn this?

4    A.  From my work in Cairo, and in the preparatory work and

5    training I did before going to Cairo.

6    Q.  So, and you say your work and preparatory training, what

7    training was that?

8    A.  So I worked for a period of time in Washington, D.C. before

9    I went to Cairo.  And in preparation for going to Cairo, I

10   worked in the policy section that oversaw halal or oversaw beef

11   products including the halal people.  So that was the training

12   I got in Washington before going overseas.

13   Q.  So I want to make sure I understand.  You felt that as a

14   result of that training, which you learned, presumably, you

15   tell me, by reading things and talking to people, that you

16   would understand the basics of halal; is that correct?

17   A.  I understood the basics of halal, yes.  Again, I'm not an

18   Islamic expert.  Just the basics.

19   Q.  Again, you learned it by working hard to study and be

20   prepared to undertake your position, correct?

21   A.  Yes, sir.

22   Q.  At the audit, there were a couple of problems that were

23   identified by the Egyptian officials, correct?  One would have

24   been -- you talked about the transverse versus lateral cut.

25   You remember that?

O5K3MEN1                          Tate - Cross

1    A.  Yes, sir.

2    Q.  And I think your testimony was that that was identified as

3    a problem, and the certifiers said, well, we can adjust our

4    practices, right?

5    A.  To be clear, on both of those points, the audit team had --

6    that I was with, only had concerns after Dr. Ahmed arrived.

7    Prior to his arrival, I did not hear any concerns.  And the

8    halal certifiers demonstrated both transverse and lateral cuts.

9    The Egyptian officials were not okay with the up and down cut.

10   They wanted to see across the neck, to which the certifiers

11   said no problem.

12   Q.  And your testimony is that that was a problem that was

13   identified by Dr. Ahmed, correct?

14   A.  That's correct.

15   Q.  And Dr. Ahmed, in addition to being the head of the

16   Egyptian delegation for this audit -- is that right, first of

17   all?

18   A.  Yes.  That's correct.

19   Q.  And he also had a position in Egypt, he was the head of the

20   veterinary services?

21   A.  Veterinary section, the section that managed animals and

22   animal products in Egypt.

23   Q.  In addition that adjudges halal qualifications, right?

24   A.  They would judge -- that's a tricky question.

25   Q.  I didn't ask it well.  That was very poorly worded.

1        Is the head of veterinary services, does that person have a
2   particular role with regard to whether halal requirements are
3   being met?
4   A.  That person would ensure that a halal certificate
5   accompanied the product.
6   Q.  And in fact that's the highest -- he is a high-level
7   government official doing that, correct?
8   A.  That's correct.
9   Q.  And so, that issue was one of the issues that was
10  identified by that high-level official.  And the other --
11  correct me if I'm wrong -- was the question of whether the
12  animals had been stunned before being slaughtered, correct?
13  A.  It wasn't necessarily a question of whether they had been
14  stunned.  The Egyptian authorities had already approved
15  stunning.  The question was whether there were instances where
16  the stunning actually killed the animal.  That was their
17  concern.
18  Q.  They were concerned about the time between stunning and
19  slaughter in some cases?
20  A.  That's correct.
21  Q.  That was in fact indicated during the time of your audit,
22  right?  You heard that issue?
23  A.  Yes, sir, that issue we did hear, yes.
24  Q.  Did you go to a plant or ever see slaughter connected by a
25  potential certifier called Amana of New York?

O5K3MEN1                        Tate - Cross

1   A.  I did not see slaughter done by Amana of New York.  They

2   were among the companies we could not visit in the plant.

3           THE COURT:  Because of scheduling?

4           THE WITNESS:  Yes, sir, that's correct.

5   Q.  Did you know where you could go watch Amana's work if you

6   had wanted to?

7   A.  I don't know the answer to that question.

8   Q.  In response to Judge Stein's question, you said that you

9   didn't get to see them because of scheduling, and I'm wondering

10  whether it was considered and you thought about why you

11  couldn't get to where they were if you knew where they were?

12  A.  I knew they were based in New York and New Jersey, and we

13  were going to Chicago.

14  Q.  You testified that among the concerns that you had with

15  regard to the idea of having a single certifier, which was what

16  Egypt determined to do, was that there would be price increases

17  in Egypt, correct?

18  A.  Yes, sir, the price increase was a concern.

19  Q.  Yes.  And you've answered now the Court a couple times when

20  it's asked price increases on the Egyptians consumers, right?

21  A.  That's correct.

22  Q.  And by the way, just with regard to I think one of the

23  things you testified was that one of the ways in which those

24  prices were increased was that a 23-ton I think you said

25  container would now cost -- the cost would be $5,000 now,

O5K3MEN1                          Tate - Cross

1    right, under the IS EG Halal contract?

2    A.  Our calculation was that the price of certification of a

3    container under the IS EG Halal contract would increase to

4    5,000.  I believe $5,060 or something like this.

5    Q.  Are you aware of that $5,000, and if you're not, you're

6    not, of that $5,000, it was typically made some part to IS EG

7    Halal and some part to Egypt?

8               THE COURT:  I'm not sure what you mean, sir.  I don't

9    understand the question.

10   Q.  Let me ask this question.  Are you aware of what the

11   contractual relationship was that ended up, that ended up being

12   between IS EG Halal and Egypt?

13   A.  I'm not aware of IS EG's contracts with Egypt, no.

14   Q.  So you don't know of that $5,000, for example, how much

15   went to IS EG Halal and how much went to Egypt?

16   A.  I do know that after IS EG gained the monopoly on

17   certification, that companies started having to pay an

18   increased fee.  I know that part of that money went to an

19   office in Egypt and part went to the U.S. company.  I don't

20   know the division.  But I do know that was a new procedure that

21   did not exist prior to this.

22   Q.  The other concern that you had in addition to increased

23   prices was that there would be disruptions in trade between the

24   U.S. and Egypt in terms of beef and beef liver in particular,

25   correct?

O5K3MEN1                          Tate - Cross

1   A.  Yes, sir.

2             (Continued on next page)

O5kWmen2                          Tate - Cross

1   Q.  And that either because of -- well, what was the specific

2   concern that you had with regard to disruptions of trade?

3   A.  Specifically, we didn't believe IS EG Halal had the

4   capacity to have inspectors in the hundred -- well, scores of

5   plants across the United States, and if there were no

6   inspectors there, there's no one to inspect the slaughter,

7   there's no one to inspect slaughters, there's no one to issue

8   the certificate.  If there's no certificate, the product can't

9   move.

10  Q.  But as it turned out, you're aware, aren't you, that IS EG

11  worked with the slaughterhouses in the U.S. and got pretty

12  quickly up to speed, and so there weren't any disruptions of

13  trade as a result of the transition?  Isn't that true?

14          MR. MARK:  Objection.  Assumes a fact.

15          THE COURT:  I'll see if he knows.

16  A.  I do not agree with your characterization, sir.

17  Q.  What part of my characterization do you not agree with?

18  A.  The fact that there was no trade disruption.  That is not

19  entirely correct.

20          THE COURT:  Was there a disruption in trade after IS

21  EG Halal received the monopoly certification ability?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  What was that disruption?

24          THE WITNESS:  U.S. exporters, for a time, withheld

25  shipments until they understood the certification requirements.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O5kWmen2                          Tate - Cross

1    Small companies, we understood, were not shipping for a number

2    of weeks in order to avoid the uncertainty.  They couldn't

3    afford to have a cargo stranded in port in Egypt, and so they

4    withheld until there was clarity in the process.

5              MR. LUSTBERG:  OK.  I'd like to just show you a couple

6    of exhibits that are already in evidence.  If we could look at

7    Government Exhibit 8B-7.  Let me get the one that I was looking

8    at here.  Sorry.

9              Actually, let me just go to a different exhibit.

10   Let's go to exhibit 8B-36, which is in evidence.

11             Actually, one more time.

12             You testified -- let me just lay a little foundation

13   for this, under -- let's look at exhibit 8B-21.

14   Q.  And 8B-21, do you have that in front of you?

15   A.  Yes, sir.

16   Q.  And you've seen this before, right; you were copied on

17   this?

18   A.  Yes, sir.

19   Q.  OK.  This includes a letter from IS EG Halal to the

20   ministry, and the question was asked -- and this is a State

21   Department cable, right?

22   A.  No, sir.  This is an email.

23   Q.  And it goes to USMEF and asks that USMEF check with plants

24   about the claim that all companies have agreed to comply with

25   Egyptian standard and regulation for halal.  See that?

O5kWmen2                         Tate - Cross

1    A.  Yes, sir.

2    Q.  Do you know if USMEF did, in fact, check?

3    A.  I believe they did.

4    Q.  OK.  So now let me show you 8B-36.  And see in the middle

5    there, and this is in evidence, an email from Travis Arp.  Who

6    is Travis Arp?

7    A.  Travis Arp was the director, trade director of USMEF.

8    Q.  And this is Mr. Arp responding, correct, to the request

9    that he check with the various suppliers?  Correct?

10   A.  Yes, sir.

11   Q.  And he says Ali -- that refers to Mr. Abdi, right?

12   A.  Yes, sir.

13   Q.  "I've done some outreach to the packers and exporters on

14   this yesterday and today and none seem too concerned about the

15   letter.  They actually appreciated IS EG being proactive on

16   this so as not to interrupt their business."  Do you see that?

17   A.  Yes, sir.

18   Q.  OK.  And so my question to you is when he says that IS EG

19   was proactive, did you have a sense of what that meant?

20   A.  I understand this to mean that IS EG was reaching out to

21   companies and facilitating certificates so the product would

22   flow.

23   Q.  OK.  And so the product would flow so there would not be

24   the disruption of trade that was one of the things you were

25   concerned about, right?

O5kWmen2                          Tate - Cross

1    A.  Yes, sir.  I will flag that this email is a full six weeks

2    after the audit ended.

3    Q.  I understand.

4              THE COURT:  I'm sorry.  I didn't hear that.  Full six

5    weeks after?

6              THE WITNESS:  After the audit.  After we believe the

7    problem began, this is a full six weeks later.

8    BY MR. LUSTBERG:

9    Q.  So it's a full six weeks later, and the email's dated May

10   14, right?

11   A.  Yes, sir.

12   Q.  But in fact, you know that the contract went into effect --

13   that is, IS EG took over the process of being sole certifier --

14   as of May 1, right?

15   A.  Yes, sir.

16   Q.  Right.  So this is just written a couple weeks later?

17   A.  But, if I may?  Companies knew that the certification

18   process was changing since early April.  There were concerns

19   since early April even though the contract didn't begin until

20   May.

21   Q.  Didn't you testify that the final decision about, that

22   there was going to be a single certifier wasn't made until, I

23   think it was April 23rd or 24th?

24   A.  The official communication came April 23, yes.

25   Q.  And IS EG began the process as the sole certifier around

O5kWmen2                                Tate - Cross

1    May 1, right?

2    A.  I've already said.

3    Q.  OK.  And certainly you're not saying that there was a

4    slowdown before IS EG began the process; your concern was that

5    there would be a slowdown in shipments once they started,

6    right?

7    A.  I actually believe there was a slowdown when plants began

8    to understand that their existing certifiers were going to be

9    delisted, and that would have been in April.

10   Q.  OK.  And can you quantify that, how much of a slowdown

11   there was; do you know?

12   A.  I do not know that.

13   Q.  Well, what was the slowdown?  What happened?

14   A.  Again, as I mentioned earlier small plants held shipments

15   until they had clarity.

16   Q.  OK.  But you trust USMEF, right, to have recorded correctly

17   that by April 14, things seemed to be going well?  Right?

18   A.  You mean May 14.

19   Q.  I'm sorry.  May 14.  Thank you.

20   A.  I believe that Travis Arp and the plants he spoke with on

21   May 14 thought things were going fine, yes.

22   Q.  Well, he says more than that.  He says:  "I would say the

23   general feeling is that they are leery of the ISEF" -- I think

24   that's a typo and meant to be IS EG -- "but has not slowed down

25   their exports to a large degree, so they are following along to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5kWmen2                           Tate - Cross

1    keep the product moving at this point."  Do you see that?

2    A.  Yes, sir.

3    Q.  So would you agree that by the middle of May the product

4    was moving at that point?

5    A.  Yes.  But I also note that he said they have not slowed

6    down to a large degree, which indicates to me they slowed down

7    some.

8    Q.  But you don't know how much?

9    A.  No, sir.

10   Q.  And USMEF seemed basically satisfied with the way things

11   were going, right?

12   A.  USMEF was uncomfortable with the way things were going, but

13   their priority was to maintain market access.

14   Q.  And at this point, by May 14, they're -- they were

15   following along to keep the product moving at this point, and

16   so the product was moving at that point, right?

17   A.  To a large degree.

18            MR. MARK:  Asked and answered.

19            THE COURT:  All right.  He said to a large extent.

20            MR. LUSTBERG:  I'll move on.

21   Q.  And actually, have you filed -- I'm sorry.  You left, your

22   last day was the end of, there in Egypt was at the end of

23   August of 2018?

24   A.  Yes, sir.  That's correct -- 2019.

25   Q.  And exports, you're aware, actually have increased since

O5kWmen2                        Tate - Cross

1    that time; are you aware of that?

2              MR. MARK:  Objection.

3              MR. LUSTBERG:  He's aware.

4              THE COURT:  I don't know whether he's aware or not.

5    Are you aware?

6    A.  I'm aware that exports of U.S. beef to Egypt are up and

7    down based on price.  I don't know what they currently are.

8              MR. LUSTBERG:  OK.  Let me show you a document that

9    you looked at just a little bit earlier today, Government

10   Exhibit 8B-18.  And I'm going to, if we could, I'd like to go

11   to paragraph 9.

12   Q.  Mr. Mark asked you about post advocacy.  And he asked you,

13   this had to do with a meeting that occurred on June 2, 2019,

14   between the *chargé d'affaires* and the Egyptian minister of

15   agriculture, correct?

16   A.  Yes, sir.

17   Q.  And it says here, Dr. Abu Steit -- that's the minister of

18   agriculture for Egypt?

19   A.  Yes, sir.

20   Q.  Like a cabinet-level official?

21   A.  Yes, sir.

22   Q.  In Egypt?

23   A.  Uh-huh.

24   Q.  Played down the market impacts, noting that beef imports to

25   date increased over the previous year.  Do you see that?

O5kWmen2                          Tate - Cross

1    A.  Yes, sir.

2    Q.  Do you know whether that was true?

3    A.  I do know that was the assertion the Egyptian government

4    made.  However, I can also tell you that Dr. Abu Steit could

5    not have had data to back that up.  He could not have known

6    that at the time.

7    Q.  You're saying that the Egyptian minister of agriculture was

8    not telling the truth at that point?

9    A.  No, sir.  What I'm saying is that there would have been a

10   data lag, and those data would not have been available --

11   year-to-date 2019 data would not have been available on June 2.

12   They would have had data through possibly December of 2022 --

13   pardon me, 2018, the previous year.

14   Q.  So when it says Dr. Abu Steit played down the market

15   impacts, noting that beef imports to date increased over the

16   previous year, you're saying that when he said to date, he

17   didn't really mean to date and he said the previous year, he

18   didn't really mean the previous year because he was talking

19   about the previous year?  Is that what you're saying?

20   A.  No, sir.  I'm saying this cable reflects what Dr. Abu Steit

21   stated to me in the meeting, to myself and the *chargé*.  What I

22   do know is there is a data lag of at least six months.

23           THE COURT:  I'm sorry.  Just to be clear, did you say

24   a data lag?

25           THE WITNESS:  Yes, your Honor.  Data lag.

O5kWmen2                          Tate - Cross

1   A.  I know that he would not have had 2019 trade data on June

2   2.

3   Q.  Did you point that out to him at the meeting?

4   A.  I did not.

5   Q.  Did you tell him what you understood to be the actual data

6   as of that time?

7   A.  I did not -- we indicated that we had concerns about market

8   impacts and about market closure, though we did not get into

9   the specifics of the data.

10          THE COURT:  Have you ever told a cabinet minister of

11  another country that he didn't know what he was talking about?

12          THE WITNESS:  No, your Honor, I have not.

13  BY MR. LUSTBERG:

14  Q.  Well, let's talk about that, because the deputy minister --

15  that's Dr. Mehrez, right?

16  A.  Yes, sir.

17  Q.  And you certainly told her what you thought when you met

18  her at the Frankfurt airport, didn't you?

19  A.  I told her that a monopoly was not good for Egypt, it was

20  not good for the U.S.

21  Q.  In fact, you told her you thought she was wrong when she

22  thought that a sole-source contract was the best way to go,

23  right; you told her she was wrong about that?

24  A.  Not in those words, no, sir.  That's not what I said.  I

25  advocated for U.S. business interests.

O5kWmen2                         Tate - Cross

1    Q.  You didn't tell her that you disagreed with that?

2    A.  I told her that a monopoly would not be good for Egypt or

3    the United States.

4    Q.  Notwithstanding what she said?

5    A.  Pardon me?

6    Q.  Notwithstanding that that's what she thought, that she

7    thought it would be better to have a sole source --

8            MR. MARK:  Objection as to what she thought.

9            THE COURT:  Sustained.

10           MR. LUSTBERG:  Your Honor, I have nothing further of

11   this witness at this time.

12           THE COURT:  All right.  Thank you.

13           Anyone else?

14           MR. FEE:  Yes, your Honor.

15           THE COURT:  How long, sir?

16           MR. FEE:  45 minutes.

17           THE COURT:  Proceed.

18           MR. FEE:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. FEE:

21   Q.  Good morning --

22   A.  Good morning.

23   Q.  -- Mr. Tate.

24       To be efficient, I'm going to try to ask you yes-or-no

25   questions.  OK?  And if you can't answer yes or no, you just

```
 1   let me know, Mr. Tate.
 2   A.  Yes, sir.
 3           MR. FEE:  Let's go to what's been admitted into
 4   evidence for everyone as Government Exhibit 8B-33.
 5   Q.  These are the business cards from your meetings that you
 6   gave to the prosecutors in this case, right?
 7   A.  Yes, sir.  That's correct.
 8   Q.  But you gave to the government more than just these three
 9   business cards, is that right?
10           MR. MARK:  Objection.
11           MR. FEE:  There was an objection.
12           THE COURT:  Yes.  I'm trying to understand the
13   question.  Just a moment.
14           Oh, sustained.
15   BY MR. FEE:
16   Q.  Mr. Tate, you also gave the government a business card for
17   Amana of New York, correct?
18           MR. MARK:  Objection.
19           THE COURT:  Sustained.
20   BY MR. FEE:
21   Q.  You recall testifying in your testimony on Friday and again
22   here today about a company called Amana of New York, correct?
23   A.  That's correct.
24   Q.  And you said a few things.  You said it was Amana from this
25   area.  Do you remember testifying to that on Friday?
```

O5kWmen2                        Tate - Cross

1    A.  That's correct.

2    Q.  And then the prosecutor asked you to say what this area

3    was, and you said it was based in New Jersey -- or you didn't

4    remember if it was based in New Jersey and operated in New York

5    or if they were based in New York and operated in New Jersey,

6    but they were in the New York-New Jersey metro area.  Do you

7    recall giving that testimony?

8    A.  I think that was my testimony, yes.

9    Q.  And then today, you said Amana was in New Jersey and New

10   York, just a few minutes ago, with Mr. Lustberg.  Do you recall

11   that?

12   A.  To be clear --

13   Q.  I'm going to ask you to answer yes or no.

14          MR. MARK:  Objection.

15          THE COURT:  Don't interrupt him.  He was answering.

16   Your direction to this witness was to only answer yes or no and

17   when he can't do that he'll tell you that he can't do that.

18   Right now I'm going to let him answer.

19          MR. FEE:  Thank you, your Honor.

20   A.  To be clear, I didn't change my initial testimony.  Amana

21   of New York, I understand, operates in New Jersey and is based

22   in New York or vice versa, but they're in the New York-New

23   Jersey metro area.

24   Q.  Got it.

25          So you know, obviously, New Jersey has a lot of other

O5kWmen2                      Tate - Cross

1   businesses operating in it, other than Amana, right?

2   A.  I know there are businesses in New Jersey, yes.

3   Q.  That was an easy one.  And that one of the senator's, one

4   of the elected official's main jobs is to serve the

5   constituents of his or her own state, you're aware of that,

6   correct?

7            MR. MARK:  Objection.

8            THE COURT:  Rephrase it.

9   BY MR. FEE:

10  Q.  You're aware of something called constituent service, Mr.

11  Tate?

12  A.  I'm aware that members of Congress provide services to

13  constituents.

14  Q.  And a constituent means it's somebody who I represent,

15  correct?

16  A.  I believe so.

17  Q.  And you know that IS EG, Mr. Hana's company, is based in

18  New Jersey, correct?

19  A.  I know that their mailing address is Fort Lee, New Jersey.

20  Q.  In other words, you know that they're based in New Jersey,

21  correct?

22  A.  Yes.

23           MR. MARK:  Objection.

24           THE COURT:  He answered.

25  BY MR. FEE:

 1   Q.  And I just want to be clear --

 2              THE COURT:  What else are you aware of, if anything,

 3   that IS EG Halal has in New Jersey?

 4              THE WITNESS:  I don't know what they have in New

 5   Jersey.

 6              THE COURT:  All right.

 7   BY MR. FEE:

 8   Q.  I just want to be clear.  You met with the prosecutors

 9   several times before you testified here today, correct?

10   A.  Yes, that's right.

11   Q.  And they asked you questions about whether Amana was in New

12   Jersey or New York, is that correct?

13   A.  They asked me -- that's right.

14   Q.  And you told them you thought it was in New Jersey or New

15   York, right?

16   A.  Told them the same as I told you.

17   Q.  And the testimony today and on Friday was intended to

18   suggest somehow that Amana might be doing work --

19              THE COURT:  Sustained.

20   BY MR. FEE:

21   Q.  -- in New Jersey?

22              MR. MARK:  Objection.

23              THE COURT:  Sustained, Mr. Fee.  Just ask him what the

24   testimony was.

25              Proceed.

O5kWmen2                    Tate - Cross

1    BY MR. FEE:

2    Q.  Mr. Tate, your belief, sitting here today, is that Amana

3    may be doing work in New Jersey; that's your understanding?

4                MR. MARK:  Objection.

5                THE COURT:  Sustained.

6    BY MR. FEE:

7    Q.  And you understand that Senator Menendez is a senator from

8    New Jersey, correct?

9    A.  Yes.

10   Q.  And if Amana was doing work in New Jersey, it would be a

11   constituent of Senator Menendez, correct?

12               MR. MARK:  Objection.

13               THE COURT:  I'll allow that.

14   A.  If Amana is based in New Jersey, then they would be a

15   constituent, yes.

16   Q.  Got it.

17       And IS EG Halal is in New Jersey so that is a constituent

18   of Senator Menendez, right?

19               MR. MARK:  Objection.  Asked and answered.

20               THE COURT:  I'll allow it to speed things along.

21   A.  As I mentioned, I understand that IS EG has an office in

22   New Jersey.

23   Q.  And that would make them a constituent of Senator Menendez,

24   correct?

25               THE COURT:  Let's move on.

O5kWmen2                         Tate - Cross

1          MR. FEE:  Thank you, your Honor.

2          THE COURT:  The question has been answered.

3          MR. FEE:  Thank you, your Honor.

4          Can we please show the witness and the attorneys

5    what's been marked as Defendant's Exhibit 378, please.

6    Q.  Mr. Tate, do you recognize these?

7    A.  Yes, sir.

8    Q.  Do you recognize these as items you collected during your

9    meetings in Washington, D.C. and then provided to the U.S.

10   government?

11   A.  Not only in Washington, D.C. but throughout the audit.

12   Q.  During the events you testified about in your testimony

13   here in court, correct; that's when you collected these

14   business cards?

15   A.  These are from the audit in the last week in March 2019.

16          MR. FEE:  Your Honor, we would offer defense exhibit

17   378.

18          MR. MARK:  No objection.

19          THE COURT:  Admitted.

20          (Defendants' Exhibit 378 received in evidence)

21          MR. FEE:  Let's put that up.  Let's focus on -- there

22   we go.

23   Q.  Do you see that says Amana Halal of New York?

24   A.  Yes, sir.

25   Q.  And you see it says Mahmoud El Sayad with an -- it says

O5kWmen2                              Tate - Cross

```
 1   CEO, Brooklyn, New York?  You see that, right?
 2   A.  Yes, sir.
 3   Q.  You didn't reach out to Mr. El Sayad and ask him, before
 4   you testified, where his business operated, did you?
 5           MR. MARK:  Objection.
 6           THE COURT:  I'll allow it.
 7   A.  I have not spoken to Mr. Sayad since 2019.
 8   Q.  Did you review this business card before you came in to
 9   court to testify about Amana of New York?
10   A.  I reviewed this about a month ago.
11   Q.  And you saw that it said Amana of New York, Mahmoud El
12   Sayad, Brooklyn, New York, 718; you all saw that when you
13   reviewed it?
14   A.  Yes, sir.
15   Q.  Are you aware that Amana has never had an office in New
16   Jersey, operated in New Jersey, or been a New Jersey
17   corporation, Mr. Tate?
18           MR. MARK:  Objection.
19           THE COURT:  Sustained.
20   BY MR. FEE:
21   Q.  Did you look up or did anyone show to you the New York
22   State certificate of incorporation for Amana of New York?
23           MR. MARK:  Objection.
24           THE COURT:  Sustained.
25   BY MR. FEE:
```

O5kWmen2                          Tate - Cross

1   Q.  By the way, all the companies that were --

2            MR. FEE:  You can put that down.

3   Q.  -- that were producing the beef, that were, like, killing

4   animals, all those companies were based in the Midwest or the

5   West, right?

6   A.  During the audit or all of those in the United States?

7   Q.  The ones you have testified about in this courtroom that

8   you went and visited, those companies were in the West and the

9   Midwest, correct?

10  A.  The plants that we visited were in the West or in the

11  Midwest, yes.

12  Q.  So not in New Jersey?

13  A.  We did not visit any plants in New Jersey.

14  Q.  Not in western New Jersey.

15       And so now that you see Amana's in New York, all the other

16  companies that sought certification --

17            MR. MARK:  Objection.

18            THE COURT:  Let me hear the question and then let me

19  sustain it.

20  BY MR. FEE:

21  Q.  All the other companies that sought certification, all the

22  other companies that wanted to be halal certifiers were not

23  based in New Jersey, correct?

24            THE COURT:  Sustained.

25  BY MR. FEE:

O5kWmen2                          Tate - Cross

1    Q.  On Friday, do you remember being asked these questions and

2    giving these answers:

3    "Q.  And you said you believed, if I remember correctly, that

4    the firm," referring to Amana of New York, "only certified for

5    Egypt so they're basically out of business now.  What did you

6    mean by the firm only certified for Egypt?"

7         Do you remember that question, Mr. Tate?

8    A.  I do.

9    Q.  And then do you remember giving this answer:  "So, that

10   halal certifier was only certifying products going to Egypt, so

11   when Egypt delisted four certifiers and gave the business to IS

12   EG, then this company, Amana Halal, suddenly had no more

13   clients.  They were out of business entirely."

14        Do you remember that answer, Mr. Tate?

15   A.  I remember saying that, yes.

16   Q.  And then here's one more question and one more answer:

17   "Q.  And is this sort of one of the examples of the impact on

18   U.S. business of the decision to go with a monopoly?

19   "A.  That's correct."

20        Do you remember that question and giving that answer, Mr.

21   Tate?

22   A.  I do.

23   Q.  Just so I understand it, your testimony here is that Amana

24   of New York was working as a certifier of halal meat for Egypt

25   and then was put out of business for that work when IS EG

O5kWmen2                          Tate - Cross

1    became the single certifier, is that correct?

2    A.  That was my understanding of the situation in 2019.

3    Q.  Got you.

4        But again, that's not actually accurate, correct?

5             MR. MARK:  Objection.

6             THE COURT:  I'll sustain the objection at this point.

7             What do you want to know?

8    BY MR. FEE:

9    Q.  Are you aware that Amana's CEO had told the prosecutors --

10            MR. MARK:  Objection.

11            THE COURT:  Sustained.

12   BY MR. FEE:

13   Q.  Are you aware that Amana's CEO --

14            MR. MARK:  Objection.

15   BY MR. FEE:

16   Q.  Are you aware that Amana's CEO, Mahmoud El Sayad, has said

17   that he was --

18            MR. MARK:  Objection.

19            THE COURT:  Sustained.

20            MR. FEE:  I didn't finish the question, your Honor.

21            THE COURT:  There's enough to sustain it.

22   BY MR. FEE:

23   Q.  Mr. Tate, isn't it correct that Amana never certified a

24   single piece of beef for Egypt and was coming to those meetings

25   in D.C. in the hope of becoming a certifier?

O5kWmen2                          Tate - Cross

1   A.  That was not my understanding.

2   Q.  And no one on the prosecution team during the preps --

3            MR. MARK:  Objection.

4   BY MR. FEE:

5   Q.  -- informed you that they had spoken to Amana's CEO?

6            MR. RICHENTHAL:  Your Honor, can we have a sidebar?

7            THE COURT:  Sustained.

8            No.

9            Mr. Fee, you can't interject into your questions

10  assumptions about what went on between this witness and the

11  government.  You've done this before.  You know the basics.

12  You can't quote from those interview notes lest the jury think

13  that this witness can substantiate what's there.

14           I'm tempted to ask where's the beef, but I won't ask

15  the question.  Let's proceed.  I direct that you --

16           MR. FEE:  Well, I'm not --

17           THE COURT:  But I haven't asked the question.  I'm

18  serious, sir.

19           MR. FEE:  I know.  I understand, your Honor.

20           THE COURT:  I'm trying to interject a little humor,

21  but you've done this before.  Let's get on the straight and

22  narrow.

23           MR. FEE:  I understand, your Honor.

24  Q.  Is it your understanding sitting here today, Mr. Tate, that

25  Amana of New York had actually done halal certification work

O5kWmen2                              Tate - Cross

1   for the government of Egypt?

2                MR. MARK:  Asked and answered.

3                THE COURT:  I will allow that question.

4                Go ahead.

5   A.  My understanding and my last discussion with Amana Halal in

6   2019 was that they had certified for Egypt.

7   Q.  But you did not visit Amana Halal with -- when you visited

8   the other certifiers in the field, correct?

9                MR. MARK:  Asked and answered.

10               THE COURT:  True.  Sustained.

11  BY MR. FEE:

12  Q.  The only time you interacted with Amana of New York was at

13  the hotel in Washington, correct?

14               THE COURT:  I'll allow that.

15  A.  That's correct.  Amana was one of the companies that we met

16  at the hotel in New York -- I mean, excuse me, in Washington.

17  Q.  Got you.

18       You also testified that there were four existing halal

19  certifiers for Egypt at the time IS EG Halal entered the

20  picture, is that correct?

21  A.  That was my testimony, yes.

22  Q.  Got it.

23       And you conveyed information about your meetings and the

24  number of certifiers to your superiors in the U.S. Department

25  of Agriculture, including Mr. Abdi -- including Mr. Abdi,

O5kWmen2                            Tate - Cross

1    correct?

2    A.  I'm sorry.  What specifically was the question?

3    Q.  You conveyed the information you gathered during the audits

4    and meetings with certifiers to Mr. Abdi, correct?

5    A.  I shared my notes from the audit with Mr. Abdi, yes.

6    Q.  And did you share, or do you have the understanding that

7    that same information was shared with Undersecretary Ted

8    McKinney?

9    A.  Parts of that information were likely shared with the

10   undersecretary, though I wouldn't know.  I wouldn't know the

11   details.

12            MR. FEE:  Got it.

13            Let's put up what's been admitted as Government

14   Exhibit 8B-20.

15   Q.  OK.  So if we just focus in, it says attached, and you

16   testified about this with the government, correct, Mr. Tate?

17   A.  Yes, sir.

18            MR. MARK:  Objection to the characterization.

19            MR. FEE:  I'm sorry?

20            THE COURT:  Yes.  Sustained.  He didn't testify about

21   it with the government -- oh, you meant -- did you mean on

22   direct?

23            MR. FEE:  Yeah, that's what I meant.

24            THE COURT:  OK.

25   BY MR. FEE:

O5kWmen2                          Tate - Cross

Q.  The first sentence says, "attached is a copy of

Undersecretary McKinney's letter to Deputy Minister Mehrez

regarding" this stuff, basically -- U.S.-based halal certifiers

and the appointment of a new organization.  Do you see that?

A.  I do see that, yeah.

          MR. FEE:  Let's go to the attachment in the first

paragraph.

          Do we have it?  It should be the same exhibit, the

next page.  So this is just a letter forwarding it, and then if

we go to the next page, that's the actual letter.

Q.  You testified that this was the letter from Undersecretary

Ted McKinney to Dr. Mona Mehrez on the Egypt side, is that

right?

A.  That is correct.

          MR. FEE:  And if we could just focus in on this first

paragraph.

Q.  And it says, "I am deeply concerned that the Egyptian

ministry of agriculture has suspended or terminated all seven

of the existing U.S.-based halal certifiers that were

authorized to certify U.S. beef shipments."

     That's not accurate, right, Mr. Tate?

A.  On its face, this suggests that there were seven existing

certifiers, which was not correct.  There were four.

          MR. FEE:  OK.  You can put that down.

          Sorry.  Keep up the exhibit.  Just zoom out.  I

O5kWmen2                    Tate - Cross

1    apologize.  I spoke unclearly.  Not clearly.

2    Q.  And then this is dated May 10 of 2019.  Do you see that,

3    Mr. Tate?

4    A.  Yes, sir.

5          MR. FEE:  And then if you go down to the last full

6    paragraph, beginning, "I respectfully request," if you could

7    zoom in on that, Mr. Kelly.

8    Q.  He says, "Effective immediately, please reinstate the seven

9    U.S. halal certifiers."  That's not accurate either, right, Mr.

10   Tate?

11   A.  Again, if we're talking about reinstating, there were four

12   operating, so seven would not be correct.

13   Q.  And in fact, Mr. McKinney's letter was actually

14   inconsistent with the GAIN report that you had authored,

15   correct, on this point, on the seven versus four?

16   A.  My testimony, my reporting said that there were four

17   existing certifiers.

18         MR. FEE:  Right, right.  And Mr. McKinney actually

19   repeated this, if we could go to Government Exhibit 8B-35,

20   please.

21   Q.  And then at the bottom here, this is an email from Ted

22   McKinney to the email address ambassador@egyptembassy.net.

23   Whose email address is that, Mr. Tate?

24   A.  I assume that to be the Egyptian ambassador for the United

25   States.

O5kWmen2                        Tate - Cross

```
 1   Q.  Got it.  And he says it again, beginning with the sentence
 2   "effective; Egyptian authorities delisted the seven halal
 3   certifiers that U.S. beef exporters traditionally relied on."
 4        Again, that is not accurate either?
 5   A.  Again, as I've stated, there were four certifiers that I
 6   understood operated in Egypt.
 7   Q.  Were you aware at the time that Mr. McKinney was saying
 8   things that were not accurate about the delisting of halal
 9   certifiers?
10            MR. MARK:  Objection, your Honor.
11            THE COURT:  Just a moment.
12            Sustained.
13   BY MR. FEE:
14   Q.  Mr. Tate, in your understanding, to say that there were
15   seven certifiers that needed to be reinstated versus four is a
16   change in policy from what you proposed in the GAIN report,
17   correct?
18            MR. MARK:  Objection.
19            THE COURT:  I'll allow it.
20   A.  My understanding, based on this letter and my own knowledge
21   of the certification system, is that Mr. McKinney misunderstood
22   how many certifiers were operating previously in Egypt.
23   Q.  I understand.  My question to you is when he said -- when
24   Mr. McKinney asked the agriculture folks in the Egyptian
25   government to reinstate seven certifiers, that was not
```

O5kWmen2                          Tate - Cross

1  consistent with your recommendations in the GAIN report,

2  correct?

3  A.  My recommendation was that we have as many as possible.

4  Four had been there before.  There were eight companies

5  interested.

6  Q.  So it was not consistent with the GAIN report, you would

7  agree?

8          THE COURT:  Sustained.  The government was rising to

9  object.

10         MR. FEE:  All right.  Let's move on.

11 Q.  Do you recall testifying when asked questions by the

12 prosecutor on Friday -- on Friday, I think -- about the U.S.

13 government's stance on certain issues?  Do you recall that, Mr.

14 Tate?

15 A.  Yes, sir.

16 Q.  You testified about the nature of the U.S. government's

17 concerns about halal certification practices in Egypt.  Do you

18 remember that testimony?

19 A.  I believe so.

20 Q.  And then you also said, you testified about the U.S.

21 government taking a position on Egypt having a sole halal

22 certifier.  Remember that?

23 A.  OK.  I remember discussing these things, yes.

24 Q.  And you also said and were asked by Mr. Lustberg some

25 questions about the U.S. government opposing monopolies.

1    Remember that?

2    A.  Yes.

3    Q.  But you, in fact, worked for just one department within the

4    U.S. government, isn't that right?

5    A.  I do, but at the embassy, we had met with the other

6    agencies, so multiple agencies, multiple departments were

7    involved in that decision.

8    Q.  You met with U.S.D.A., State, intelligence agencies.

9    Anyone else?

10   A.  Law enforcement.

11   Q.  Law enforcement, meaning the FBI?

12   A.  Uh-huh.

13   Q.  Those are all parts of the executive branch, right?

14   A.  That's correct.

15   Q.  And so the U.S. Department of Agriculture is what you work

16   for, right?

17   A.  That's correct.

18   Q.  And so you work for an agency -- in fact, all those other

19   agencies -- to implement the president's policies, correct?

20   A.  That's correct.  The executive branch implements policies.

21   Q.  So your boss is the president?

22   A.  Correct.

23   Q.  Your boss is not the U.S. Congress?

24   A.  Also correct.

25   Q.  And you are aware, sir, after a long career in government,

O5kWmen2                           Tate - Cross

1    that the president and Congress disagree about foreign policy

2    priorities sometimes?

3    A.  I do -- I do agree that they're not always aligned on

4    foreign policy priorities.

5    Q.  There is disagreement in Washington, D.C. sometimes, Mr.

6    Tate?

7    A.  That is an accurate statement.

8    Q.  So the executive branch, which is what you're in, and the

9    legislative branch, fair to say, do not speak with a singular

10   voice on foreign policy at all times, correct?

11               MR. MARK:  Objection.  Vague.

12               THE COURT:  I'll allow it.

13               You may answer.

14   A.  Repeat the question?  I'm sorry.

15   Q.  Sure.  The executive branch and the legislative branch do

16   not speak with a singular voice on foreign policy at all times,

17   correct?

18   A.  Yes, that would be correct.

19   Q.  And in fact, the legislative branch has its own distinct

20   foreign policy role outlined in the U.S. Constitution; you're

21   aware of that, Mr. Tate?

22               MR. MARK:  Objection.

23               THE COURT:  Yes.  Sustained.

24   BY MR. FEE:

25   Q.  And in fact, would it be most accurate to say that in your

O5kWmen2                        Tate - Cross

1    job you speak for the positions of the U.S. Department of

2    Agriculture and not the U.S. government generally?

3    A.  I don't know that that's a correct characterization.  My

4    position is with the U.S. Department of Agriculture, though at

5    the embassy when the ambassador approves or makes a policy,

6    he's a representative of the president, so that would be an

7    executive branch decision.

8    Q.  You, you alone, when you're doing your job out there, speak

9    for the U.S. Department of Agriculture; you alone?

10   A.  I alone speak for the U.S. Department of Agriculture.

11   Q.  And when you testified -- well, the GAIN report that you

12   testified about in your direct examination, you would agree

13   that that report on IS EG was not official U.S. government

14   policy, correct?

15   A.  That report was designed to provide companies with

16   information about how to do business in Egypt.  It was not a

17   statement of U.S. government policy.

18   Q.  So you would agree that it was not official U.S. government

19   policy?

20           THE COURT:  He just said that.

21           Next.

22           MR. FEE:  Thank you, your Honor.

23   Q.  In fact, that GAIN report was written by one person -- you,

24   right?

25   A.  Myself and my staff, yes.

O5kWmen2                              Tate - Cross

1   Q.   And it was approved by one person -- your supervisor,

2   Mr. Ali Abdi, correct?

3   A.   That's correct.

4   Q.   So that's not the ambassador's report, that's not the

5   chargé's report, that's not the president's report; that's you,

6   your staff and Mr. Abdi, correct?

7            MR. MARK:  Objection.  Asked and answered.

8            THE COURT:  I'll allow it.

9   A.   So, the report, again, was designed to provide information

10  to the U.S. industry.  It was a report I wrote with my staff

11  and Mr. Abdi approved.

12  Q.   So if a Congressperson wanted to learn more about the

13  report you wrote, he had to reach -- he or she would have to

14  reach out to the U.S.D.A., correct?

15           MR. MARK:  Objection.

16           THE COURT:  Sustained.

17  BY MR. FEE:

18  Q.   Would any other component of government beyond the U.S.D.A.

19  be able to answer questions about the GAIN report you actually

20  wrote about IS EG Halal?

21           MR. MARK:  Objection.

22           THE COURT:  Sustained.

23  BY MR. FEE:

24  Q.   All right.  Let's talk briefly, you testified and talked to

25  Mr. Lustberg --

O5kWmen2                          Tate - Cross

 1              THE COURT:  If somebody had questions about the GAIN
 2    report, theoretically, where would that person go to have those
 3    questions answered?
 4              THE WITNESS:  The reports are all public.  If someone
 5    had specific questions, they could reach out to the author, of
 6    course, or the supervisor.
 7              THE COURT:  That's you or Mr. Abdi?
 8              THE WITNESS:  Correct.
 9              THE COURT:  All right.
10    BY MR. FEE:
11    Q.  You testified on direct and with Mr. Lustberg about what
12    could happen from an economics perspective with IS EG Halal
13    becoming the sole certifier.  Do you remember testifying about
14    that?
15    A.  We did discuss impacts, yes.
16    Q.  Yes.  And then I just want to make sure I understand.  You
17    left Egypt in August 2019 for a different job?
18    A.  That's correct.
19    Q.  And in terms of the economic impact of IS EG Halal, I
20    believe you testified you don't have any kind of economic
21    analysis or document that actually showed what happened, is
22    that correct?
23    A.  My testimony was that we were asked to stop reporting on it
24    and that I did not complete the econometric analysis I wanted
25    to do.

O5kWmen2                          Tate - Cross

1    Q.  Right.  So you don't have the analysis written down, fair

2    to say?

3    A.  There was not an analysis.  That's correct.

4              MR. FEE:  It wasn't done.

5              THE COURT:  Next.

6    BY MR. FEE:

7    Q.  You're aware of something that the U.S.D.A. publishes every

8    year called the U.S.D.A. Foreign Agricultural Service United

9    States agricultural export yearbook; are you familiar with

10   that, Mr. Tate?

11   A.  I am, yes.

12   Q.  And that yearbook tracks exports to the U.S.'s top 17

13   trading partners each year.  Do you know that?

14   A.  Yes, sir.

15             MR. FEE:  All right.  I'm going to show you DX761,

16   just to the witness and counsel, please.  We can just scroll

17   through it.

18   Q.  Mr. Tate, have you had a chance to look at that?

19   A.  I'm looking at one page of it.  What would you like me to

20   look at it?

21             MR. FEE:  Actually, may I approach, your Honor, and

22   hand him a document?

23             THE COURT:  Yes.

24             MR. FEE:  You can stay seated.

25             THE WITNESS:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5kWmen2                          Tate - Cross

1   BY MR. FEE:

2   Q.  Just take a look through it and let me know when you're

3   done.

4   A.  Is there anything in particular you'd like me to look at?

5   Q.  No, no.  I just want to ask you if you recognize it to be

6   the 2022 agricultural export yearbook.

7   A.  That would appear to be, yes.

8             MR. FEE:  Your Honor, we would offer DX761.

9             MR. MARK:  Your Honor, we object.  This is a 75-page

10  document that we just received as notice from the defendants

11  that they want to offer it with this witness.  I haven't had a

12  chance to fully review this, but we object.

13            THE COURT:  All right.  We'll take a look at it over

14  lunch.

15            MR. FEE:  Got it.  I'll keep moving, your Honor.

16  Q.  Sir, are you familiar -- are you aware that in 2018, prior

17  to IS EG Halal getting this contract from the Egyptian

18  government, the yearbook reported that there were $66 million

19  of beef and beef products exported to Egypt?

20  A.  I did not know what the yearbook reported, though the

21  number sounds accurate.

22  Q.  OK.  Well, how about the number in 2022 as $94 million of

23  beef and beef product exports exported to Egypt from the United

24  States; are you familiar with that?

25            MR. MARK:  Objection.  Relevance.

O5kWmen2                              Tate - Cross

1          THE COURT:  I'll allow it, if he knows.

2     A.  As I testified earlier, volumes increase and decrease by

3     price.  I'm also -- so I believe you're correct.  I don't know

4     the exact number, but I also believe if we look at 2015 or '16,

5     we'll see that they're high, low, high.  So you'll see these

6     curves over time based on price.

7     Q.  Understanding there are curves, I think you said it does

8     sound accurate, that there was a $28 million increase in the

9     value of beef exports from the U.S. to Egypt between 2018 and

10    2022.  Is that correct?

11    A.  I believe that when I was in Egypt in 2018 and '19

12    shipments were around 60 million -- sorry, 60,000.  It would

13    not surprise me they increased because a few years prior to

14    that they had also been high.  So based on price, they're high,

15    they're low, they're high, they're low.

16    Q.  Got it.

17    A.  It sounds positive.

18    Q.  Got it.

19         You testified about hearing from others at some point that

20    Senator Menendez had actually reached out to U.S.D.A.

21    Undersecretary McKinney about IS EG Halal.  Do you remember

22    giving that testimony during your direct examination?

23    A.  I believe so, yes.

24    Q.  And just to be clear, you, Mr. Tate, never spoke to Senator

25    Menendez about IS EG Halal or any of the other issues you've

O5kWmen2                         Tate - Cross

1    discussed during your testimony, correct?

2    A.   The senator and I have never discussed this.

3    Q.   And in fact, you only learned of Senator Menendez's

4    outreach because of emails that you were either copied on or

5    were forwarded to you that referenced Menendez, Senator

6    Menendez calling Mr. McKinney, is that correct?

7    A.   That's not correct.

8    Q.   You also had others discuss it with you?  I'm sorry.

9    A.   That is correct.  We had phone calls from Washington where

10   it was discussed.

11             MR. FEE:  Got it.  Let's look at Government Exhibit 8

12   B-44, which is in evidence.

13             I'm sorry.  I think it's on the next page.

14             The next, go one page forward.  Or is this the only

15   page?

16             OK.  I'm sorry.  This is it.

17   Q.   This is an email from Ali Abdi to Clay Hamilton, and in

18   this email, Mr. Abdi says --

19             MR. FEE:  If you can focus in on the top email,

20   Mr. Kelly.  I'm sorry.  I just want to focus on the second

21   email.

22   Q.   So your understanding is that the senator reached out to

23   ask whether an article about the GAIN report was accurate, is

24   that correct?

25             MR. MARK:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5kWmen2                          Tate - Cross

1           THE COURT:  Is that your understanding?

2    A.  That was not my understanding.

3    Q.  The GAIN report was publicized in an article in Alborsaa

4    was your testimony, correct?

5    A.  That is correct.

6    Q.  And then this email from Mr. Abdi talks about that Alborsaa

7    article, correct?

8    A.  This email talks about an article.  I'm not sure if this is

9    Alborsaa.

10   Q.  So you don't know if Abdi is referring to Alborsaa or

11   something else, correct?

12   A.  That's correct.  I don't -- I don't know that.

13   Q.  All right.  Let me just focus you on the second sentence,

14   beginning "our report."  Do you see here that Mr. Abdi says,

15   "Our report mentioned no criticism of Egypt unlike the Arabic

16   title of this article suggests?"  Do you see that, Mr. Tate?

17   A.  I do, yeah.

18   Q.  And your understanding of that is that Mr. Abdi is drawing

19   a distinction, a correction of the Arabic-language article that

20   he's discussing; is that correct?

21   A.  That's right.  I believe -- I believe -- that Mr. Abdi was

22   simply, yeah, drawing a distinction between our reporting and

23   the article he was looking at.

24   Q.  Right.  So the article in Arabic said something that

25   actually you don't think -- Mr. Abdi didn't think accurately

1    characterized the GAIN report?  Is that your understanding of

2    this?

3              MR. MARK:  Objection as to what Mr. Abdi thought.

4              MR. FEE:  I'm asking for his understanding of the

5    email reflecting Mr. Abdi's thoughts.

6              THE COURT:  Rephrase it.

7              MR. FEE:  Sure.

8    Q.  Mr. Tate, your understanding of what Mr. Abdi says here is

9    that he was noting an inaccuracy in the Arabic-language title

10   of the article, is that fair to say?

11   A.  Yeah, that's fair to say.

12             MR. FEE:  All right.  We can put that down.

13             Let's go to Government Exhibit 8B-14, which is also in

14   evidence.

15             Your Honor, I have about 15 more minutes.  Do you want

16   to take the break now?

17             THE COURT:  No.

18             MR. FEE:  And let's focus on the middle email, where

19   it's Clay Hamilton telling Mr. Abdi keep us posted if you hear

20   anything from the Hill, Senator Menendez.

21   Q.  Do you see that, Mr. Tate?

22   A.  Yes, sir.

23   Q.  And you testified that "the Hill" was a term used to refer

24   basically to any member of Congress -- within the halls of the

25   U.S.D.A., that term was used to refer to any member of

1  Congress, right?

2  A.  That's correct.

3  Q.  Because members of Congress or their staff sometimes reach

4  out to the U.S.D.A. for information or to advocate or something

5  else, is that correct?

6  A.  Members of Congress and their staff do reach out to

7  U.S.D.A., that's correct.

8  Q.  Got it.

9      And that might be to get information or to advocate on a

10 certain issue or for other reasons, right, Mr. Tate?

11 A.  I don't have direct knowledge of it, but yes, that sounds

12 correct.

13 Q.  And in fact, there's an entire section or division of the

14 U.S.D.A. called legislative affairs or the office of

15 congressional relations.  Are you aware of that division?

16 A.  I'm aware of that, yes.

17 Q.  And their job -- their job -- they're devoted solely to

18 interact with members of Congress and their staffs, correct?

19 A.  I'm not aware of their exact job, but that sounds correct.

20      MR. FEE:  Gotcha.  Let's look again on 8B-14, the same

21 email.  Zoom out.

22 Q.  It says, "Ted may take to him later.  "Do you see that in

23 this email?

24 A.  Yes, sir.

25 Q.  Ted, referring to undersecretary McKinney?

O5kWmen2                          Tate - Cross

1    A.   That's correct.

2    Q.   May talk to Senator Menendez later?

3    A.   Yes, sir.  That's correct.

4    Q.   And so Ted McKinney, as you understood this email, was

5    going to engage with Senator Menendez about the issue that had

6    been raised regarding IS EG halal, correct?

7    A.   I understood from this email that Undersecretary McKinney

8    was going to respond to the senator.

9             MR. FEE:  Got it.

10            Let's go to the second page of 8B-14 -- it's on the

11   first page.  Sorry.

12            You can put this down, actually.

13   Q.   Mr. Tate, the information you testified about here

14   regarding your concerns about IS EG Halal and the potential

15   economic impacts, you personally never shared that with Senator

16   Menendez, correct?

17   A.   I've never spoken to the senator about this.

18   Q.   Understanding you didn't speak to him, you were not present

19   in any meetings or on any phone calls or video Zooms or Teams,

20   whatever, where you or others shared these concerns with

21   Senator Menendez directly, correct?

22   A.   I have not been in any meetings with the senator on this

23   topic.

24            MR. FEE:  Thank you.  Last topic.

25   Q.   You testified about your security concerns about

O5kWmen2                          Tate - Cross

1  information about embassy staff being released to the public.

2  I'm sure you remember that, right, Mr. Tate?

3  A.  I do.

4  Q.  I'm going to again ask you if you remember questions being

5  asked and answers being given:

6  "  Is the total number of people who work at the Cairo embassy

7  public?

8  "A.  Absolutely not.

9  "Is the total number of American staff at the Cairo embassy

10  public?

11  "A.  Absolutely not.

12  "What about the total number of local staff who work at the

13  U.S. embassy in Cairo?

14  "It is not.

15  "Is information about who works at an embassy sensitive

16  information?

17  "A.  It is very sensitive.

18  "Why is it sensitive?

19  "A.  They're American diplomats, and American interests are

20  targeted overseas by opponents of the United States so

21  protecting our personnel is important."

22      Do you recall having those questions put to you and giving

23  those answers on Friday, Mr. Tate?

24  A.  I do, yeah.

25  Q.  And then the judge asked you, "How does making the numbers

O5kWmen2                          Tate - Cross

1    public increase the likelihood of embassy staff being targets?"

2    And you said:  That's a fair question.  It was one piece of

3    information that could be aggregated."

4         Do you recall that, Mr. Tate?

5    A.  Yes, sir.

6    Q.  Have you ever reviewed the indictment in this case?

7    A.  I have seen parts of it, but --

8    Q.  Have you read reporting about this case?

9            MR. MARK:  Objection.

10           THE COURT:  We'll see where it goes.

11   A.  I have read the newspaper.

12   Q.  So are you aware that the government has alleged --

13           MR. MARK:  Objection.

14   BY MR. FEE:

15   Q.  -- that Senator Menendez endangered embassy personnel by

16   disclosing to his wife and Will Hana the number of --

17           MR. MARK:  Objection.

18   BY MR. FEE:

19   Q.  -- U.S. and foreign employees at the embassy?

20           THE COURT:  Sustained.

21   BY MR. FEE:

22   Q.  When you met with the government to prepare for this

23   testimony, did you review the questions that I just recited

24   about embassy staff numbers being public?

25           MR. MARK:  Objection.

1          THE COURT:  I'll allow that question.

2     A.  The exact question, no.  The government did ask if the

3     numbers were public or not.

4     Q.  To put it another way, you were expecting that subject to

5     come up during your testimony in court, correct?

6          THE COURT:  Sustained.

7          MR. MARK:  Objection.

8          MR. FEE:  I want to ask a little bit more about that

9     subject.  Not your prep, but that subject, but let me just

10    clarify.

11    Q.  You work for the U.S. Department of Agriculture -- well, in

12    Egypt you worked as an agriculture *attaché*, correct?

13    A.  That's correct.

14    Q.  You are not and you have never been a member of a

15    government agency called the Diplomatic Security Service,

16    correct?

17    A.  I am not a member of the Diplomatic Security Service,

18    that's correct.

19    Q.  You are familiar with the Diplomatic Security Service, or

20    DSS, though, right?

21    A.  Yes.

22         THE COURT:  I take it, sir -- well, perhaps I

23    shouldn't take it.  Is everyone who is posted overseas on

24    behalf of the U.S.D.A. or the United States Department of State

25    given instructions about security and how to comport themselves

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O5kWmen2                        Tate - Cross

1    overseas?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  All right.

4    BY MR. FEE:

5    Q.  But it's not your job, Mr. Tate; it's DSS's job to protect

6    diplomats, embassies and embassy staff, correct?

7    A.  The regional security office in the embassy is in charge of

8    embassy security.

9    Q.  And in your experience, those people do a great job --

10   regional security office, DSS, they do a good job protecting

11   people, right?

12             MR. MARK:  Objection.

13             THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  So, you are aware the names of every Senate-confirmed

16   foreign service officer, like yourself, is in the public

17   legislative record, correct?

18   A.  Yes.

19   Q.  And you're also aware, I'm sure, that the U.S.D.A. Foreign

20   Agricultural Service appoints new foreign service officers

21   pretty regularly?

22   A.  Yes.

23   Q.  And that those appointments are often accompanied with a

24   press release and photos of the U.S.D.A. Foreign Agricultural

25   Service officers, correct?

O5kWmen2                              Tate - Cross

1    A.  I do not know that.

2    Q.  OK.  And it's also true that a part of your job as an

3    *attaché* was to engage with the public by going to events and

4    meeting with government officials in the host country, correct?

5    A.  That's part of my job, yes.

6             MR. FEE:  I'm going to show you, just the witness and

7    the lawyers, DX449.

8             Take a look at that.  Don't say anything yet.  Let me

9    show you DX445.  And we can scroll through the pages here.

10            Stop on that one.

11            And let's go to 446.  And scroll.

12            Stop there.

13   Q.  Mr. Tate, would it be fair to say that 449 is a fair and

14   accurate depiction of Mr. Abdi, and then 445 and 446 contain

15   photographs of fair and accurate depictions of you and others?

16   A.  That's correct.

17            MR. FEE:  Your Honor, we would offer those three

18   exhibits.

19            MR. MARK:  Objection.  Your Honor, beyond that we're

20   just receiving these right now as nonimpeachment exhibits, we

21   also object because these are all sorts of long articles.  They

22   relate to different times, different places, and they're

23   irrelevant here.

24            MR. FEE:  Your Honor, they're impeachment exhibits.

25   Let's just go with 449 -- that's the only one we'll offer --

1    just a photo and some text on the bottom.

2            THE COURT:  Any objection to 449?

3            MR. MARK:  Objection.  This is irrelevant even from

4    the title at the bottom.

5            THE COURT:  All right.  We'll take it up during the

6    lunch break.

7            Move on.

8            MR. FEE:  Yes, your Honor.

9    Q.  So you would agree that if the State Department published

10   the numbers of embassy personnel in Cairo on the State

11   Department website, that would be public, correct?

12           MR. MARK:  Objection.

13           THE COURT:  No.  I'll allow that.

14   A.  If something was on the website, it would be public, yes.

15   Q.  You would also agree that if it was published on the State

16   Department's public website, where anybody could Google it, the

17   information about the numbers of staff in Cairo would not be

18   sensitive information as you had testified, correct?

19           MR. MARK:  Objection.

20           THE COURT:  If he understands that term, he can answer

21   it.

22   A.  I don't think I understand the question.

23   Q.  OK.  You used the term "sensitive" during direct

24   examination.  You called the information about the numbers of

25   staff in Cairo sensitive.  Do you remember that?

O5kWmen2                           Tate - Cross

1    A.   Yes.

2    Q.   And sensitive, for U.S. government purposes, has a

3    definition under the law, right?

4    A.   Uh-huh.

5    Q.   And you understand that that definition is information that

6    is not classified but that requires protection from public

7    disclosure for other reasons, correct?

8              MR. MARK:   Objection.

9              THE COURT:   I'll see if he knows it.

10   A.   That would be sensitive but unclassified information,

11   marked as sensitive -- as SBU, sensitive but unclassified.

12   Q.   And you referred to the numbers of embassy staff as

13   sensitive during your direct testimony, correct?

14             MR. MARK:   Objection.

15             THE COURT:   He can answer.

16   A.   I said the word "sensitive," yes.

17   Q.   I'm sorry.  I just want to make sure I understand.  You

18   were referring to the information about the numbers of staff at

19   the embassy as sensitive during your direct examination,

20   correct?

21   A.   To be clear here, I did not say they were classified as

22   sensitive -- as SBU.  I said that was sensitive information.

23   Q.   So are we using little-S sensitive or sensitive as defined

24   by the U.S. government?

25             MR. MARK:   Objection.

O5kWmen2                          Tate - Cross

```
 1   BY MR. FEE:
 2   Q.  I just want to understand what you mean when you called it
 3   sensitive.  I'll ask that question.
 4   A.  I'm sorry?
 5           THE COURT:  You can answer.
 6   BY MR. FEE:
 7   Q.  What did you mean when you described the information about
 8   embassy staff as sensitive?
 9   A.  I meant it was sensitive and that it could endanger embassy
10   personnel.
11   Q.  OK.  That was it.
12       Are you familiar with something called the State
13   Department's office of inspector general?
14   A.  Yes.
15   Q.  And also known as the OIG?
16   A.  Yes.
17   Q.  And the State Department OIG conducts audits and
18   investigations to make sure that State Department staff is
19   following the rules, right?
20   A.  I don't know what they do.
21   Q.  You don't know -- what does OIG do; do you have any
22   understanding?
23   A.  I don't know -- I don't know what the State Department's
24   OIG does.
25   Q.  OK.  Are you aware that the State Department OIG releases
```

O5kWmen2                        Tate - Cross

1    reports?

2              MR. MARK:  Objection.

3              MR. FEE:  Excuse me, your Honor.

4    BY MR. FEE:

5    Q.  -- releases reports publicly?

6              THE COURT:  Sustained.  He said he doesn't know what

7    they do.

8              MR. FEE:  I'm not asking what they do, your Honor.

9    I'm asking if he's aware that those reports by State Department

10   OIG are released publicly.

11             THE COURT:  All right.  I'll allow it.

12   A.  I don't know what they do.

13   Q.  I'm sorry?

14   A.  I don't know.

15   Q.  And when you were answering questions during direct about

16   the sensitivity and the nonpublic nature of the numbers of

17   embassy staff, you were not referring to any documents,

18   correct?

19   A.  No.

20   Q.  You were just testifying about your own beliefs and

21   understanding about the nature of that information, correct?

22   A.  Not my own beliefs and understanding, but rather based on

23   the security training that we were given before going overseas.

24   Q.  Got it.  Got it.

25        And you certainly did not do any independent investigation

O5kWmen2                              Tate - Cross

1    before you came here to testify to confirm whether your

2    understanding from your training was correct, right?

3    A.  I did not research this specific topic, no.  We received

4    training before going overseas about information that should be

5    protected.  That was included in the information we should

6    protect.

7    Q.  And so you did not, say, Google State Department reports

8    embassy Cairo?

9    A.  I did not Google that.

10             MR. MARK:  Objection.

11   BY MR. FEE:

12   Q.  And are you aware that the State Department office of

13   inspector general has actually released three reports that

14   discloses the number of embassy staff in Cairo publicly?

15             MR. MARK:  Objection.

16             THE COURT:  Sustained.

17             MR. FEE:  Let me show you defense exhibit 711 and

18   70 -- you just put up 77.  Why don't I hand up physical copies.

19             May I approach, your Honor?

20             THE COURT:  Yes.

21             MR. FEE:  Two documents, 766 and 711, and handing a

22   copy to the government and to Mr. Tate.  And then here's 711.

23             THE WITNESS:  Thanks.

24             MR. FEE:  Your Honor, may I approach and hand copies

25   to your deputy as well?

O5kWmen2                              Tate - Cross

1              THE COURT:  Yes.

2              MR. FEE:  Thank you.

3              THE COURT:  Sir.

4              MR. FEE:  He's still reviewing it, your Honor.

5         Let me know when you're done reviewing the items.

6              THE WITNESS:  OK.

7              MR. FEE:  Your Honor, I can note that we intend to

8    offer this under Rule 803(8).

9              MR. MARK:  Objection, your Honor.

10             THE COURT:  All right.  Ladies and gentlemen, you

11   asked my deputy if we could go through right to lunch this

12   morning, and I've tried to do that.  It's 12:30 now.  Let me

13   handle this issue with the parties.  Come back at 1:40.  All

14   right?

15             Be here by 1:40.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O5kWmen2

```
 1                    (Jury not present)
 2              THE COURT:  If you would step down, sir, and out, I'd
 3    appreciate it.  Wait outside.
 4              THE WITNESS:  Should I take these with me?
 5              THE COURT:  Yes.
 6              THE WITNESS:  This?
 7              THE COURT:  Yes.
 8              THE WITNESS:  Thank you.
 9                    (Witness not present)
10              MR. FEE:  Your Honor, do we want him to take the
11    exhibit?  It's fine with me.
12              THE COURT:  You asked him to review it.
13              MR. FEE:  Yes, he can take it.
14              THE COURT:  I was going to let him review it.
15              MR. FEE:  All good.
16              THE COURT:  You asked.
17              MR. FEE:  Yes, yes.
18              THE COURT:  You may be seated in the courtroom.
19              What's the relevance of this, Mr. Fee?  Where are you
20    going with this?
21              MR. FEE:  Your Honor, he's still in the courtroom.
22              THE COURT:  Just a moment, sir.
23              MR. FEE:  Your Honor, I just said the witness is still
24    in the courtroom.
25              THE COURT:  Thank you.
```

O5kWmen2

1          Where are you going with this?  What's the point of
2     766 here?
3               MR. FEE:  Impeachment, your Honor.
4               THE COURT:  How?  I want to know what the relevance
5     is.
6               MR. FEE:  I'm going to tell you, your Honor.  He
7     testified, I think, 20 questions and answers that the
8     information about the numbers of embassy staff in Cairo --
9               THE COURT:  Is sensitive.
10              MR. FEE:  -- and nonpublic.  He said it absolutely was
11    not public.
12              THE COURT:  He said it was nonpublic?
13              MR. FEE:  Five times.
14              THE COURT:  Go ahead.
15              MR. FEE:  Your Honor, this is available on the State
16    Department website.
17              THE COURT:  How does 766 show the number?
18              MR. FEE:  I can tell you, your Honor.
19              THE COURT:  What I have here is a one-page document,
20    and it's entitled audit of the process to prepare residences
21    for new tenants at U.S. embassy Cairo, Egypt.  I don't see that
22    it lists --
23              MR. FEE:  I'm sorry, your Honor.  There's two exhibits
24    there.  766 is the website from which you download it.  We just
25    wanted to show you could do it last night.  711 is from the

O5kWmen2

1    actual report of the OIG, and if you go to page 3 of the

2    report, it directly impeaches the testimony.

3            THE COURT:  What are you pointing me to?

4            MR. FEE:  Page 3, the sensitive -- the last sentence,

5    "Beginning in FY2021, the embassy employed 1,100 locally

6    employed staff with 429 staff under the supervision of the

7    management section."  It elsewhere in this report talks about

8    the number of direct hires, meaning U.S. hires, and it's

9    public, your Honor.

10            THE COURT:  Where does it say the U.S. hires?

11            MR. FEE:  I gave my report to the witness.  I think

12    it's on page 2.

13            Justin, could you go to page 2.  The second paragraph

14    there -- on page 1.  I'm sorry.  It's the second paragraph

15    under background.  It says, according to embassy Cairo

16    officials, there were 223 U.S. direct-hire staff working at the

17    embassy.  It's Cairo.  It's unclassified.  It's totally public.

18            And appendix B, your Honor, even lists the residences

19    where embassy staff live.  It's entirely inconsistent --

20            THE COURT:  All right.  I got the idea.

21            Government.

22            MR. RICHENTHAL:  It's not inconsistent for two very

23    simple reasons.

24            One, this is literally four years later.  This

25    report's from March 2022.  The witness hadn't lived in Cairo

O5kWmen2

for years at that point.  The witness was talking about his

understanding at the time, in 2018, when Mr. Menendez provided

this information; and two, the report is historical.  That is,

it's talking about what the numbers were earlier in time.  To

be precise, the report's issued in March 2022.  It's talking

about the numbers at the end of fiscal year 2021.  This is

beyond the scope of the witness's testimony, but I think your

Honor can understand, when the government issues reports like

this, which were marked unclassified at the time, there's a

process to ensure that data is either sufficiently scaled or

sufficiently general such that it can be made public.

        To be clear, I don't have personal knowledge of this

exact report.  I don't want to overstep what I'm saying, but

that is the general process.  That is not inconsistent with the

witness saying that at the time he was posted in Cairo, years

earlier, contemporaneous information, meaning then-accurate

information, was sensitive.  There's no inconsistency here.

This witness also does not work for the Department of State,

does not work for the office of inspector general and may not

even know what I'm talking about when I talk about the process,

which opens up a whole hornet's nest we're going to have now to

explore with the jury.  It's not impeachment and should be

precluded under 403.

        THE COURT:  Well, it is impeachment except to the

extent you're raising the timing point --

O5kWmen2

1          MR. FEE:  Your Honor, I'm sorry.

2          THE COURT:  Just a moment.

3          MR. FEE:  Yes, your Honor.

4          THE COURT:  -- because he did testify that the

5    information of local hires and U.S. personnel was sensitive.

6    So it is impeachment to that extent.

7          MR. RICHENTHAL:  In general, sure.  I agree with that.

8    But the question is, is it actually impeaching of what he said.

9     My understanding of what he said is when he was posted in

10   Cairo, which is years before, his understanding is the

11   information is sensitive.  That years later a different part of

12   a different agency chose to issue historical information is not

13   materially inconsistent with that testimony.

14         THE COURT:  All right.

15         Mr. Fee.

16         MR. FEE:  I'm sorry, your Honor.

17         Mr. Richenthal's recollection is wrong.  Mr. Mark --

18   and I was surprised -- elicited from Mr. Tate, without

19   reference to any particular time period, that the information

20   about embassy staff anywhere in the world should not be public,

21   100 percent absolutely not.  And by the way, your Honor, I

22   would also add, I haven't gotten to it yet, there is a 2016

23   report and a 2009 report about Cairo.  These reports come out

24   every six or seven years with the same exact information.  To

25   the extent he's saying it's such a grave security risk, it is

O5kWmen2

1    directly --

2              THE COURT:  Were you going to introduce the 2016?

3              MR. FEE:  I was just going to do this report, your

4    Honor, because he testified to the general principle that it is

5    sensitive and cannot be disclosed.  He actually was asked it

6    without context, without connection to Egypt, and there are

7    hundreds of these reports about embassies everywhere in the

8    world on Google.

9              THE COURT:  No, but they may indeed all have the time

10   lag in them.

11             MR. FEE:  And that's fine, your Honor.  The time lag

12   for this one is 2021, and his testimony was not one or two

13   questions about your understanding located in time and place.

14   The government went into detail about the nature of the

15   concerns, how it could affect and risk the lives due to

16   "terrorism" -- he actually said that word -- of embassy staff.

17             This is impeachment material, your Honor.  It's

18   important impeachment given the time the government spent

19   eliciting this from a Department of Agriculture witness, your

20   Honor.  If he doesn't know enough, he shouldn't have been

21   testifying about it, and this is the risk he now faces.  This

22   is publicly available classic 803(8), under the Supreme Court

23   precedent in *Beechnut*, your Honor.

24             THE COURT:  They're not saying it's not 803(8).

25             MR. FEE:  Good.

O5kWmen2

1          THE COURT:  They're saying that it's materially

2     different because there's a time lag.

3          Go ahead.

4          MR. RICHENTHAL:  I wanted to make one other note as

5     well.

6          In addition to the time lag, this information, from

7     what I can tell, and I'm just seeing this for the first time,

8     this 74-page report we were not given notice of, also does not

9     appear to contain nationalities of personnel.  The witness

10    testified the nationalities are particularly important because

11    they could give you information about who to surveil.  I don't

12    see anything in here.  I've actually tried to.

13         THE COURT:  Yes, but it does talk about locally

14    employed.  Certainly there's an inference that can be drawn

15    from that.

16         MR. RICHENTHAL:  I agree.  I'm not familiar enough to

17    distinguish between locally employed and nationality.  I think

18    there may well be a difference there.  But I agree with you;

19    that phrase is in the report.  I think the time issue is the

20    bigger issue, but I do want to flag that nationality is not in

21    here as well.

22         THE COURT:  But here's the problem with the time

23    issue.  This report, 711, is dated March 2022 and is dealing

24    with fiscal year 2021.  So in other words, I would assume

25    fiscal year 2021 ends in September of 2021, and this report

O5kWmen2

1    apparently is dated March of 2022.

2            MR. RICHENTHAL:  I think the executive branch's fiscal

3    year does end either September or October.  I believe that's

4    right.

5            THE COURT:  So we're talking about hardly any time lag

6    at all.

7            MR. RICHENTHAL:  We'd be talking about a few months,

8    if I'm understanding the Court's --

9            THE COURT:  Yes.  I'm going to allow it in for limited

10   questions.  Limited questions.  It does come in under 803(8).

11   I don't think the government is arguing about that.  But you

12   can establish what this says, and then you can also ask about

13   the time lag or the government on redirect can ask about the

14   time lag.

15           Is there anything else we need to deal with at this

16   point?

17           MR. FEE:  Not from us, your Honor.

18           THE COURT:  Mr. Fee, in the beginning of your cross,

19   which elicited a flurry of objections from the government, you

20   were clearly misusing the 3500 material, and you knew that when

21   you were talking about "didn't you tell the government

22   previously blah, blah, blah, blah, blah."  That's not the way

23   to do it and you know it, sir.  I think that was a bit too far.

24           All right.  Government, anything?

25           MR. RICHENTHAL:  Your Honor, maybe this will play

O5kWmen2

1    itself out, but given this issue, we're going to need some time

2    over lunch to prepare our redirect.  So we would ask the

3    Court's indulgence, if we don't otherwise have time, to let us

4    pursue redirect after lunch, if we otherwise finish before

5    lunch.

6            THE COURT:  I let them go for lunch.

7            MR. RICHENTHAL:  I stand corrected.

8            THE COURT:  All right.  I'll see everyone an hour from

9    now.

10           In terms of the summary witness that we're going to

11   deal with tomorrow, the government should, and the defense

12   should, continue to go through some of the specific objections.

13   As I understand the midnight express submissions, the parties

14   have been able to narrow some of their differences.

15           All right.  Thank you.

16           (Luncheon recess)

17

18

19

20

21

22

23

24

25

O5K3MEN3

                              AFTERNOON SESSION

1                                 1:50 p.m.

2          (In open court; jury not present)

3          THE COURT:  The jurors are all here.  I understand the

4   government -- please be seated.  I understand the government

5   wants to speak with me.

6          MR. RICHENTHAL:  Yes.  So, over lunch we were able to

7   look at some of the OIG reports at issue.  And let me start

8   with what we propose and then I'll explain why.  What --

9          THE COURT:  Have you spoken to the other side as to

10  what you propose?

11         MR. RICHENTHAL:  We haven't had an opportunity to do

12  it yet.  We're happy to do it right now.

13         THE COURT:  Do it right now.

14         (Counsel conferring)

15         MR. RICHENTHAL:  I think we have what I would describe

16  as an agreement in part.

17         Our proposal was that they cross without putting the

18  exhibit into evidence.  And the reason is it is 74 pages in one

19  case, and talking about petty change, talking about other

20  alleged issues.

21         THE COURT:  What are you talking about?

22         MR. RICHENTHAL:  It is DX I believe 711.

23         THE COURT:  You're telling me there is a lot of

24  extraneous stuff here.


O5K3MEN3

                              AFTERNOON SESSION

1                                 1:50 p.m.

2          (In open court; jury not present)

3          THE COURT:  The jurors are all here.  I understand the

4   government -- please be seated.  I understand the government

5   wants to speak with me.

6          MR. RICHENTHAL:  Yes.  So, over lunch we were able to

7   look at some of the OIG reports at issue.  And let me start

8   with what we propose and then I'll explain why.  What --

9          THE COURT:  Have you spoken to the other side as to

10  what you propose?

11         MR. RICHENTHAL:  We haven't had an opportunity to do

12  it yet.  We're happy to do it right now.

13         THE COURT:  Do it right now.

14         (Counsel conferring)

15         MR. RICHENTHAL:  I think we have what I would describe

16  as an agreement in part.

17         Our proposal was that they cross without putting the

18  exhibit into evidence.  And the reason is it is 74 pages in one

19  case, and talking about petty change, talking about other

20  alleged issues.

21         THE COURT:  What are you talking about?

22         MR. RICHENTHAL:  It is DX I believe 711.

23         THE COURT:  You're telling me there is a lot of

24  extraneous stuff here.

O5K3MEN3

1              MR. RICHENTHAL:  It is an OIG report.  It is talking

2     about petty cash and management issues.  It is not frankly so

3     complimentary of certain folks at the embassy on matters having

4     nothing to do with this case.

5              What we think is the easiest to do this is the defense

6     cross-examines Mr. Tate without literally putting in the

7     document.  Our back-up proposal, if the Court doesn't like our

8     principal proposal is --

9              THE COURT:  But he may not know what's in this report

10    and what's not.

11             MR. RICHENTHAL:  I don't think he's ever seen it

12    before.  So I think that's right.  But, my understanding and

13    maybe I misheard, is Mr. Fee intends to literally offer the

14    74-page report into evidence.  And our concern is that puts in

15    front of the jury --

16             THE COURT:  Lots of irrelevant stuff.

17             MR. RICHENTHAL:  And frankly, not so nice stuff about

18    some folks at the embassy.

19             THE COURT:  That's not relevant.

20             MR. RICHENTHAL:  Correct, your Honor.

21             THE COURT:  Go ahead.

22             MR. RICHENTHAL:  So we would propose that the

23    cross-examination be done without putting the actual report

24    into evidence.

25             The second reason I'm saying this, besides the fact

O5K3MEN3

1    the report contains all kind of irrelevant things, is we just

2    learned of this and I'll tell you, I can proffer to the Court,

3    it doesn't like it was issued in March 2022.  It looks like

4    it's dated March 2022, but in fact it was issued in

5    September 2022 or later.  That is, there was a time lag between

6    the date on the report and its issuance.

7         We don't have a problem under the Court's ruling with

8    Mr. Tate being cross-examined on what may have been public and

9    what may not have been public, but this document is terribly

10   confusing, it doesn't look like it came out publicly in

11   March 2022.  The witness doesn't know that.  And if the jury

12   sees it, it will be much more difficult for us to unring that

13   bell.

14        THE COURT:  I understand.  But what is it that Mr. Fee

15   can adduces from this witness if he hasn't seen it.

16        MR. RICHENTHAL:  Whether the witness was aware that at

17   some point, the United States Department of State Office of

18   Inspector General publicly issued some numbers.  The witness

19   may have been aware --

20        THE COURT:  What those numbers were.  Not 223.  But

21   they're numbers of local employees.

22        MR. RICHENTHAL:  Right.  I think Mr. Tate could be

23   asked under the Court's ruling were you aware of whether OIG

24   put a report out dated --

25        THE COURT:  Mr. Fee, have you thought about this

O5K3MEN3

1    issue?

2         MR. FEE:  I need to put in the document to perfect the

3    impeachment.  My questions are not evidence.  We already know

4    Mr. Tate doesn't know these numbers.  That's why it's

5    impeachment.

6         I'm happy to redact everything else outside of the

7    numbers and the maps showing the locations of the embassy staff

8    residences from that exhibit.  I'm happy to do that.  But the

9    exhibit has to go in to perfect the impeachment.  That's the

10   whole point of impeachment.

11        MR. RICHENTHAL:  We may just have a disagreement,

12   which is perfectly reasonable, but about what impeachment

13   means.  If Mr. Tate is literally unaware of this report's

14   existence, point one, never mind when it became public, point

15   two, he's not impeached by the report.  He either is aware of

16   it or he's not aware of it.  I believe he's already said he is

17   not aware of it.

18        THE COURT:  He is impeached by it to the extent he

19   said this information was sensitive, non-public.  I think he

20   also may have said unclassified.  Sensitive but unclassified.

21   I think he said that.  Indeed it seems to me to that extent, it

22   is impeaching his testimony.

23        MR. RICHENTHAL:  I think the devil is in the details.

24   If we're right, and we've just begun to investigate this, this

25   report wasn't even public until fall of 2022 concerning numbers

O5K3MEN3

in fall of 2021.  Mr. Tate leaves Cairo in 2019.

          THE COURT:  This is what I'm going to do.  I'm not
going to put it in now.  It seems to me that the more logical
person to question this about would be McKinney.

          Is McKinney with State or is he with Agriculture?

          MR. RICHENTHAL:  He's with Agriculture, but I can
proffer to the Court we do intend to call at least one witness
from the U.S. Department of State who just left his post in
embassy Cairo.  I have no idea whether this witness knows
anything about this either, because OIG is a separate and
independent body.

          MR. FEE:  The evidence should go in.  It is admissible
under 803(8).  I'm happy to redact anything that is not
relevant.

          THE COURT:  Where is the map?

          MR. FEE:  Page 2, your Honor.  And your Honor, this
classic impeachment.  This is how it works.

          THE COURT:  I said it is impeachment.  You don't have
to --

          MR. FEE:  Thank you, your Honor.  All I want in and
the jury should get to see it, is that map, on page 2.

          THE COURT:  Just a moment.

          MR. FEE:  Oh, yes.

          MR. RICHENTHAL:  I'm happy to speak about the map.
Mr. Tate didn't testify to my knowledge about any maps, any

1    residential location, the number thereof or anything of the

2    sort.  He can't be impeached on something he didn't talk about.

3            MR. FEE:  Your Honor --

4            THE COURT:  Let me read what accompanies the map.  I

5    don't see a reference in the text to figure 2.  Does anyone see

6    it?  I see figure 1 reference here.  Figure 2 shows the

7    location of the embassy, the residential properties, and the

8    warehouse.

9            No, the map isn't relevant.  It talks about two

10   warehouses that store furniture, equipment, and supplies.  It

11   doesn't have any of the residences.

12           MR. FEE:  Look at the first sentence.  Embassy Cairo

13   residential properties are spread out geographically.  Some are

14   in downtown, some near the embassy, that's what those flags

15   represent.

16           Mr. Tate was asked by Mr. Mark why this information

17   was so important to keep non-public.  He said that the risk it

18   posed was you could isolate the numbers of staff and locate

19   where they are.  He actually testified about this, your Honor.

20           MR. RICHENTHAL:  It's thankful we have a transcript

21   because he didn't say a word about residential locations.  He

22   talked about numbers and nationalities and how that could lead

23   to be targets of surveillance.

24           THE COURT:  I'm cutting out figure 2.

25           What is it that you want on page -- is it page 1, sir?

O5K3MEN3

1              MR. FEE:  It's page 1, your Honor.  The paragraph that

2    begins according -- really just the sentence "According to

3    embassy Cairo officials, there are 223 direct-hire staff

4    working at the embassy as of February 2021."

5              THE COURT:  That's what you want in?

6              MR. FEE:  On page 3, it refers to locally employed

7    staff.

8              THE COURT:  Where?

9              MR. FEE:  On page 3, the bottom, the only full

10   paragraph on the page.

11             THE COURT:  I see it.  That has the numbers.  I'll let

12   that paragraph come in and the first sentence on page 1,

13   "According to embassy Cairo officials, there were 223

14   direct-hire staff working at the embassy representing various

15   U.S. government agencies as of February 2021."

16             That's my ruling.  Those come in.

17             MR. FEE:  Then, your Honor --

18             THE COURT:  What?

19             MR. FEE:  We advised the government after the colloquy

20   with the Court that we also intended to offer the 2016 report,

21   given that the government raised this timing problem that will

22   be subject of the redirect.  So there is a similar report, and

23   I can point out really two things that we want to put in from

24   there, that was published some point after 2016, and we have

25   the internet archive page showing that it was available for

O5K3MEN3

1    public download in April of 2018.

2           It's just to address the point that they are going to

3    make, because it is again, the government asked Mr. Tate two

4    things.  At first they asked him without context to time or

5    place is this non-public.  He said yes.  And then they also

6    elicited from him --

7           THE COURT:  Was this during the time he was in Egypt?

8           MR. FEE:  It's before and after.  So the government is

9    going to make the argument this is timing.  And we think it is

10   relevant to address that argument, that both in 2021, and in

11   2016, in 2018, you could get these numbers publicly.

12          THE COURT:  All right.  Government?

13          MR. RICHENTHAL:  So couple things.  First, it's good

14   we do this as a team.  My colleague reminds me he thinks

15   Mr. Tate may have actually used the word residence.  I want to

16   make sure I didn't misspeak.  It doesn't change our argument

17   about the map.  It is possible Mr. Tate did use that word.

18          With respect to the 2016 document, we have the same

19   issue, but I think is even more marked.  What I mean is this.

20   Document's dated 2016.  We don't know when it became public.

21   It looks like maybe in 2018.  And it's talking about

22   information before 2016.  So there is this huge --

23          THE COURT:  What is it talking about?

24          MR. RICHENTHAL:  Similar idea, similar numbers.

25          THE COURT:  Fiscal year what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5K3MEN3

1          MR. RICHENTHAL:  It's 2016 dated talking about fiscal

2   year 2015.  But it didn't come out for years later.

3          THE COURT:  Where do you get the idea in each of these

4   it didn't come out until years later if it's dated whatever it

5   is dated?

6          MR. RICHENTHAL:  Two ways.  First, when we had better

7   access to the internet and we were able through Google to

8   discern -- I can't guarantee it's perfect -- to discern it

9   looks like the March 2022 report didn't hit the internet in

10  2022.  It refers to an issuance date and a closed date.  The

11  latter date is subsequent to the issuance date.  We believe --

12  we don't know for sure -- the report was issued in 2022,

13  March 2022, there was some process to verify and talk to

14  people, and then it became public no earlier than

15  September 2022.  That is some six months later.

16         We don't know for sure.  This is one of our concerns

17  about the document going in evidence versus the cross with

18  respect to Mr. Tate's knowledge.

19         With respect to the 2016 document, it appears a

20  similar thing happened.  It appears there was a time lag

21  between the issuance of the non-public form and the issuance in

22  public form.  We know that for similar reasons, it is

23  internet-based reasons, but we also know it because the top of

24  the report it says "sensitive but unclassified" struck through.

25  Our understanding is it was originally issued in non-public

1    form, and thereafter some authority made the determination

2    after the passage of time that those words could be struck and

3    it could be issued publicly.  We have not been able to figure

4    out precisely when it was issued publicly.

5         MR. FEE:  We have verified using the thing the

6    government uses to verify when websites are available publicly.

7    It's called a Wayback Machine.  The internet archive.  We have

8    a stipulation in this case attesting to its accuracy.  The

9    internet archive says the 2016 report was available in

10   April 2018, which is exactly when Mr. Tate's more specific

11   testimony related to.  Full stop.

12        THE COURT:  I'll allow 2016, but just the excerpts

13   we're talking about.  And we'll see what he knows.  And I'm

14   allowing it on the representation of Mr. Fee that there is an

15   archive system that says when it was available.

16        Let's move forward.  Bring this jury in.  So you're

17   going to close up, Mr. Fee?  You are going to close up with

18   some questions now?

19        MR. FEE:  Yes, your Honor.

20        THE COURT:  Mr. De Castro?

21        MR. DE CASTRO:  No questions, your Honor.

22        THE COURT:  You'll tell the jury that.  I'll call upon

23   you.  We'll end at 4 today, at which point I'll put in the

24   record in fuller measure my decision precluding Dr. Rosenbaum.

25   And Mr. De Castro, you spoke with your client that's perfectly

O5K3MEN3

```
 1    all right, correct?

 2              MR. DE CASTRO:  Yes, it is.

 3              THE COURT:  For you not to be here.  Instead there

 4    will be two other lawyers who have entered notice of appearance

 5    on behalf of Mr. Daibes who will participate.

 6              MR. FEE:  Your Honor, I know we discussed the portions

 7    relevant.  Am I able to put in the first page of 711 and 748

 8    just to the show what it is?  Otherwise the jury might not have

 9    any context.

10              THE COURT:  I think that's fair.

11              MR. FEE:  Thank you, your Honor.

12              (Jury present)

13              MR. RICHENTHAL:  Can we approach very briefly on 748?

14              (At the sidebar)

15              MR. RICHENTHAL:  This is DX 748.  The reason I'm

16    showing it, when Mr. Fee said he wanted the first page we

17    thought he meant the cover.  There is all sorts of extraneous

18    irrelevant information.

19              THE COURT:  Actually, I thought --

20              MR. FEE:  711.

21              THE COURT:  I thought he was referring to 711.

22              MR. RICHENTHAL:  We don't have any objection to that

23    but 748, unlike 711 --

24              MR. FEE:  I won't show the front cover.

25              (Continued on next page)
```

1                    (In open court)

2                    THE COURT:  Ladies and gentlemen we are going to end

3       at 4 today and we'll pick it up tomorrow at 10.  Proceed.

4       BY MR. FEE:

5       Q.  Welcome, back Mr. Tate.

6                    MR. FEE:  At this time I would offer --

7                    THE COURT:  We'll go until 5 tomorrow.

8                    MR. FEE:  I would offer Defendant's Exhibit 711, 748,

9       and 771.  771 is the archive and subject to the discussion with

10      the government about redactions.

11                   THE COURT:  Granted with the objection noted.

12      Proceed.

13                   (Defendant's Exhibit 711, 748, 771 received in

14      evidence)

15                   MR. FEE:  If we can please put up to show everyone and

16      Mr. Tate the front cover of 711, Defendant's Exhibit 711.

17      Q.  Mr. Tate, you see this is titled Office of Inspector

18      General, United States Department of State March 2022.

19                   You see that, Mr. Tate?

20      A.  Yes, sir.

21      Q.  It says, "Audit of the process to prepare residences for

22      new tenants at U.S. embassy Cairo, Egypt."

23                   Do you see that?

24      A.  Yes, sir.

25                   MR. FEE:  If we can go to page 1 and focus please only

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5K3MEN3                        Tate - Cross

1   on the text in the paragraph beginning "according to embassy

2   Cairo officials," Mr. Kelly.  Perfect.

3   Q.  So this is from page 1 of the report, Mr. Tate.  And if you

4   can just follow along.  It says, "According to embassy Cairo

5   officials, there were 223 U.S. direct-hire staff working at the

6   embassy representing various U.S. government agencies as of

7   February 2021."

8       Now, Mr. Tate, you were not at the Cairo embassy in

9   February 2021, correct?

10  A.  Correct.

11  Q.  The term direct, U.S. direct-hire staff, does that describe

12  people at the embassy?

13          THE COURT:  What is U.S. direct-hire staff?

14          THE WITNESS:  U.S. direct-hire staff are U.S. citizens

15  working at the embassy.

16  Q.  Like you?

17  A.  Yes.

18          MR. FEE:  Let's go to again, just focusing, Mr. Kelly,

19  on the one full paragraph at the bottom of page 3 of the

20  report, please.

21  Q.  Just before I read this.  Locally employed staff, Mr. Tate,

22  do you understand what that phrase describes?

23  A.  Yes, I do.

24  Q.  What does that mean?

25  A.  Locally employed staff are nationals of the host country.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    So in the case of Egypt, they are Egyptians that work at the

2    embassy.

3    Q.  Got it.  So this OIG report says that locally employed or

4    LE staff support the embassy in all aspects of its operations,

5    then it lists some of the things they do.  Then you see

6    Mr. Tate it says in fiscal year 2021, the embassy employed

7    1,100 locally employed staff, and then it notes a particular

8    number under the supervision of a particular section.

9              Do you see that, Mr. Tate?

10   A.  Yes, sir, I do.

11             MR. FEE:  Let's put that down, Mr. Kelly.  Let's go to

12   actually, don't put up the front page.  Defense Exhibit 748,

13   page 2, please focusing on the first full paragraph on the

14   page.

15   Q.  So, Mr. Tate, were you aware -- just that first one.  That

16   there was another OIG report issued in 2016 about the embassy

17   in Cairo?

18   A.  No, I did not know that.

19   Q.  Do you have any understanding of whether any sort of report

20   disclosing number of staff at the U.S. embassies in Cairo was

21   publicly available in 2018, Mr. Tate?

22   A.  Do I know if the report was publicly available?

23   Q.  Do you have any knowledge of any such report being public

24   in 2018, that disclosed the number of embassy staff?

25   A.  I do not.

1    Q.  So this is from page 2 of the 2016 report, Mr. Tate.  If I

2    could just focus your attention.  Embassy Cairo has 2100 total

3    staff members including staffing for the consulate general in

4    Alexandria.

5            Is that another office of the State Department?

6    A.  Yes, that's correct.

7    Q.  And an authorized 384 U.S. direct-hire positions.

8            So that's that phrase again, direct hire?

9    A.  Note those are position, not employees.

10   Q.  You are ahead of me.  Look at the last sentence:  "At the

11   time of the inspection, approximately 280 U.S. direct-hire

12   positions were filled."

13           So they're speaking your language, Mr. Tate.

14   A.  Very good.

15           MR. FEE:  If we could go to the 2016 report appendix

16   B.  You can show the full page here, Mr. Kelly.  Same exhibit,

17   appendix B if you're able to.

18           THE COURT:  Proceed.

19   Q.  Mr. Tate, while we work on that.  When you entered Egypt in

20   connection with your role as an attache in Cairo, did you

21   travel on what's called a diplomatic passport?

22   A.  Yes, I did.

23   Q.  What is a diplomatic passport?

24   A.  A U.S. passport that's given to diplomats posted overseas.

25   Q.  It has your name and identifying details on the passport?

O5K3MEN3                          Tate - Cross

1    A.   Yes.

2    Q.   And for Egyptian authorities, you presented it to them when

3    you arrived in Cairo, and it had your true name, and the fact

4    that you were a U.S. diplomat, correct?

5    A.   That's correct.

6    Q.   During your time in Cairo, did you become familiar with

7    some of the locally employed staff at the embassy?

8    A.   Yes, of course.

9    Q.   Local Egyptians?

10   A.   Yes.

11   Q.   Did you have any understanding whether the local Egyptians

12   were filing taxes or other notices with the Egyptian government

13   indicating that they were employed at the U.S. embassy?

14   A.   I'm not familiar with what Egyptian citizens have to do

15   with their own government.

16   Q.   Was it your understanding, based on your observations and

17   interactions with the locally employed staff, that the locally

18   employed staff was trying to hide their employment at the U.S.

19   embassy while in Egypt?

20   A.   Frequently, Egyptian staff would not disclose they worked

21   for the U.S. embassy in public.

22   Q.   And they entered and exited the embassy through the front

23   door, Mr. Tate?

24   A.   Yes, they did.

25   Q.   Thank you.

O5K3MEN3                           Tate - Cross

1              Now we have up appendix B, and this is the last thing,

2       your Honor, from the 2016 OIG report, Mr. Tate.  And if you

3       look at the top, it says fiscal year 2014 staffing and funding.

4       And again if we can highlight, Mr. Kelly.

5              Mr. Tate, you see these phrases again, U.S.

6       direct-hire staff, U.S. locally employed staff, and foreign

7       national staff at the top.  See that, Mr. Tate?

8       A.  Yes, sir.

9       Q.  And then I just want to point out --

10             THE COURT:  The difference between U.S. direct-hire

11      and U.S. locally employed.

12             THE WITNESS:  Yes, so in this instance, U.S.

13      direct-hire, these would be diplomats like myself or other

14      agency employees that are posted there.  U.S. locally employed

15      staff in this instance would be family members of those

16      diplomats who are also employed at the embassy in some other

17      capacity.  Foreign national staff, of course, would be the

18      Egyptian staff working there or the non-U.S. citizen staff.

19             MR. FEE:  If we can pull out very quickly to the full

20      page, Mr. Kelly, if you're able to see, you can actually -- I'm

21      sorry, focus, Mr. Kelly, just on the chart.  Just cut out some

22      of the margins please.  The whole chart.

23      Q.  Very briefly, Mr. Tate, you see here this report breaks it

24      down by I would say section.  So you have Department of State,

25      and then you see diplomat and consular programs there,

O5K3MEN3                          Tate - Cross

1    Mr. Tate?

2    A.  Yes.

3    Q.  Diplomatic security.  Marine security guard.  And then

4    under Department of Agriculture, it has your department,

5    Foreign Agricultural Services.  You see that?

6    A.  Yes.

7    Q.  If has Department of Defense, Defense Attache Office.  Do

8    you know what that is?

9    A.  The Defense Attache Office, that's an office that

10   represents the U.S. Department of Defense.

11   Q.  They're stationed in the U.S. embassy?

12   A.  That's correct.

13   Q.  Are you familiar with their responsibility at all, the

14   defense attache?

15   A.  I am.

16   Q.  Could you tell us?

17   A.  Generally they liaise with the, in this case, the Egyptian

18   government.  So they would be the natural partners to the

19   Egyptian military service.

20   Q.  Is that something, the defense attache, that you have found

21   in other embassies around the world where you have visited or

22   worked?

23   A.  Yes.

24   Q.  Turn to number 2.  Page 2 of appendix B, the next page.  We

25   could zoom in on the chart.  And again same numbers, Mr. Tate.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    U.S. direct-hire staff, positions 384, 32 locally employed,

2    foreign nationals, and then total staff just over 2,000.

3             You see that, Mr. Tate?

4    A.  Yes, sir.

5             MR. FEE:  One moment, your Honor.  Nothing further,

6    your Honor.

7             THE COURT:  Thank you.  Mr. De Castro?

8             MR. DE CASTRO:  No questions, your Honor.  Thank you

9    very much.

10            THE COURT:  Government, any redirect?

11            MR. MARK:  Yes.

12            Mr. Hamill, are you able to pull up what was marked as

13   Defense Exhibit 748 and go to page 33 we were just looking at?

14   Thank you very much, Mr. Kelly.

15   REDIRECT EXAMINATION

16   BY MR. MARK:

17   Q.  So, I think we're looking at Defense Exhibit 748 page 33.

18   You see that?

19   A.  Yes, sir.

20            MR. MARK:  Mr. Kelly, can you zoom in to the top

21   section.  Above that, please.

22   Q.  Do you see where it is struck through "sensitive but

23   unclassified"?

24   A.  Yes, sir.

25   Q.  What does that refer to?

1   A.  Well, sensitive but unclassified is the sensitive

2   designation that we discussed earlier.  That means that the

3   information contained here could have -- if it were released,

4   could have negative impacts on the U.S. government.

5   Q.  Are you familiar with when a term like that is struck

6   through, like in the red?

7   A.  Yes.

8   Q.  What does that refer to in your experience?

9   A.  That means that that classification is no longer relevant.

10  Q.  Can there sometimes be a time lag between when the

11  information is sensitive but unclassified but then it's no

12  longer?

13  A.  That's absolutely correct.

14  Q.  Is that the case in your experience at times?

15  A.  Yes, absolutely.

16  Q.  And looking here, do you --

17          THE COURT:  If I understand what you're saying, sir, I

18  don't want to put words in your mouth.  Are you saying that at

19  some point, information that's sensitive but unclassified no

20  longer is sensitive but unclassified?

21          THE WITNESS:  Yes, your Honor.  That's correct.

22          THE COURT:  What happens when it's no longer sensitive

23  but unclassified?  Anything?

24          THE WITNESS:  Then it becomes regular unclassified.

25  So for example, and in this example, if we're talking about the

1   number of staff at an embassy, that information is sensitive

2   today.  But in one year, those staffing numbers are not

3   accurate.  So at that time it's no longer sensitive, which is

4   what we see here.

5          THE COURT:  Let me ask this.  The information I

6   understand is no longer accurate.  But does that necessarily

7   mean it's no longer sensitive?

8          THE WITNESS:  It would depend on the information.  In

9   the case of employee numbers that are constantly changing, it

10  would be less sensitive as it became less accurate over time.

11  If it were different kinds of information, perhaps that

12  wouldn't be the case.

13         THE COURT:  Thank you.

14  BY MR. MARK:

15  Q.  Maybe we can zoom out here a little bit if you are able to

16  see.  Do you see there is a little A at the top where we're

17  seeing U.S. direct-hire staff, U.S. locally employed staff?  Do

18  you see that?

19  A.  I do see it.

20  Q.  Superscript A.  Do you see at the bottom there is an

21  explanation for that superscript A?

22  A.  Yes.

23  Q.  What is that explanation?

24  A.  It says authorized.

25  Q.  Do you know what the word "authorized" would mean in this

1    context?

2    A.  I would expect it to mean in this context those are the

3    number of positions that are authorized by the home agency.

4    Not necessarily the number of people in those positions.

5    Q.  So that the authorized number could vary from the actual

6    number in a particular point in time?

7    A.  Yes, that's correct.

8    Q.  And now looking at the document --

9            THE COURT:  I take it to the extent there is a

10   variance, I assume, correct me if I'm wrong, that the

11   authorized number would be larger than the actually hired

12   number.

13           THE WITNESS:  Generally that would be the case, though

14   not necessarily.  For example, if they're hired for a project

15   and we brought in staff above our authorized number for a year

16   or something.

17   Q.  Do you see what where it says table 1 it says FY 2014

18   staffing?

19           Do you have an understanding of what that refers to?

20   A.  Yes, sir.  That's fiscal year 2014.

21   Q.  And I think this report Mr. Fee proffered was dated

22   April 2016, but public in 2018.  Is that several years between

23   the fiscal year numbers in the appendix and when it might have

24   been public?

25   A.  That's correct.  So in this case 24 months had passed

O5K3MEN3                        Tate - Redirect

1   between those numbers and the release of the report.

2              MR. MARK:  Mr. Kelly, you can take that down.  Thank

3   you for showing that while we had trouble getting that document

4   up.

5   Q.  And I think the document, this one, Defense Exhibit 748 and

6   you also looked at another exhibit, Defense Exhibit 711 on

7   cross-examination with Mr. Fee, right?

8   A.  Yes, sir.  That's correct.

9   Q.  And those indicated they were Department of State OIG

10  reports?

11  A.  That's correct.

12  Q.  Do you work for the Department of State?

13  A.  No, I do not.

14  Q.  You don't work for the Department of State OIG, do you?

15  A.  No, I do not.

16  Q.  And do you have any personal knowledge of how those reports

17  are compiled?

18  A.  I didn't before reading this report.  But in general, no.

19  Q.  Apart from reading the report over the lunch break, do you

20  have any personal knowledge of how reports like this are

21  compiled?

22  A.  No, I don't.

23  Q.  What the process is to put together those reports?

24  A.  No.

25  Q.  What the process is before they might be released publicly?

O5K3MEN3                          Tate - Redirect

 1    A.  I do not.

 2    Q.  And do you have any personal knowledge of whether, for

 3    instance, the date on a report is the date that it's issued

 4    publicly?

 5    A.  I don't.  I would expect it to be posted to the website

 6    after the date on the cover, would be my expectation.

 7    Q.  So some date after, but you don't know how long it might be

 8    after that?

 9    A.  Correct.

10    Q.  You had testified earlier that while you were in Egypt, you

11    understood that at the time the total number of U.S. embassy

12    staff and local staff at the time that you were there was

13    sensitive, right?

14    A.  I believe that to be correct even today.

15    Q.  Could you explain what training you received that led you

16    to that belief?

17             MR. FEE:  Objection.  Asked and answered.

18             THE COURT:  I'll allow it.

19    A.  Yes.  We are given security training prior to going

20    overseas, at the State Department facility in Virginia.  As

21    part of that training is information security training and

22    learning how to control sensitive information and identify

23    sensitive information.

24    Q.  When we were talking about numbers of personnel at the

25    embassy, did that always stay the same or did it change over

1    time?

2    A.   Personnel numbers would absolutely change over time.

3    Q.   The numbers in these reports that Mr. Fee showed you, did

4    those cover the time period that you were stationed in the U.S.

5    embassy Cairo?

6    A.   No.  Well, 711 does not.  The other one I do not know.  I

7    don't have it here.

8    Q.   When did you leave U.S. embassy Cairo?

9    A.   Late August 2019.

10   Q.   So if it covered fiscal year 2021, would that not be the

11   time period you were at U.S. embassy Cairo?

12   A.   Fiscal year 2021 I was not in Cairo.

13   Q.   Changing topics now.  Do you recall being asked a series of

14   questions by Mr. Lustberg on cross-examination about IS EG's

15   operations?

16   A.   Yes, sir.

17   Q.   Whether you were aware that IS EG's operations expanded

18   after your time in Cairo?

19   A.   Yes, sir.

20   Q.   To which countries did you learn they and, expanded?

21   A.   I think as I mention earlier, from my position I knew about

22   expansion into Brazil and Uruguay.

23   Q.   Did you understand that IS EG Halal had a monopoly in the

24   countries they expanded to?

25   A.   I did.

O5K3MEN3                        Tate - Redirect

1    Q.  Did that include Brazil?

2    A.  Yes.

3           MR. MARK:  Mr. Hamill, can we please publish

4    Government Exhibit 8B-36.

5    Q.  Mr. Tate, do you recall being asked a series of questions

6    on cross-examination about this government exhibit?

7    A.  Yes.

8    Q.  And do you recall on cross-examination that Mr. Lustberg

9    showed you a portion of this e-mail where Travis Arp said he

10   had done some outreach to the packers and exporters?

11   A.  Yes.

12   Q.  What did you understand Mr. Arp to be referring to there?

13   A.  Packers in this case are the plants where beef is produced.

14   Exporters are the companies that are exporting.  Sometimes

15   those are the same firms and sometimes they're not.

16   Q.  Did you understand him to mean halal certifier in that

17   comment or no?

18   A.  No.  He did not reach out to the halal certifiers, no.

19   Q.  And Mr. Arp in his position, did he represent the halal

20   certifiers?

21   A.  He represented U.S. beef exporters.  To the extent that

22   halal certifiers were not exporting beef, he would not have

23   represented them.

24   Q.  Do you see that Mr. Arp wrote at the end of his e-mail that

25   he was getting lots of questions as to the status of Halal

1   Transactions and if they can get a back on the approved list?

2   A.  Yes.

3   Q.  What does Halal Transactions there refer to?

4   A.  He's referring to Halal Transactions of Omaha, which is one

5   of the companies that was delisted.

6   Q.  How large was that certifier?

7   A.  Of the ones certifying for Egypt, they were one of the

8   largest.

9   Q.  After the decision to go with IS EG Halal, did they

10  continue to do business for Egypt?

11  A.  Not for Egypt, no.

12  Q.  So they lost that part of their business?

13  A.  That's correct.

14          MR. MARK:  Mr. Hamill, could you please publish

15  Government Exhibit 8B-40.

16  Q.  If I could direct your attention to the bottom e-mail of

17  page 1 now, was this e-mail related to the Halal Transactions

18  of Omaha?

19  A.  Yes.

20  Q.  And do you see where it says that "You'll recall that Halal

21  Transactions of Omaha suspended by the Ministry of Agriculture.

22  They're very upset about this"?

23  A.  Yes.

24          THE COURT:  Who did you take that to mean was upset?

25          THE WITNESS:  The owners of the company.  The owners

1   of Halal Transactions of Omaha.

2   Q.  Had you met the owners of Halal Transactions of Omaha

3   during the course of the audit?

4   A.  I had.

5   Q.  And I think you had been asked questions about your

6   judgment about the Halal Transaction -- or the halal certifiers

7   you met during the audit, and what your assessment was of them

8   on cross-examination?

9   A.  Yes.

10  Q.  And what was your judgment about Halal Transactions of

11  Omaha's operations?

12          MR. FEE:  Objection.

13          THE COURT:  I'll allow it.  That was inquired into.

14  Go ahead.  You may answer.

15  A.  As I mentioned previously, Halal Transactions of Omaha had

16  a central office, they were very forthcoming about their

17  experience in the market, they were very eager to be sure they

18  were meeting the Egyptian certification requirements.

19  Everything, as I mentioned, seemed aboveboard.

20  Q.  I think you also were asked on cross-examination about your

21  assessment about the other halal certifiers you met during the

22  audit.  Do you recall being asked about that?

23  A.  Yes.

24  Q.  And what was your assessment of the other halal certifiers

25  that you met during the audit?

1    A.  Of the ones in operation or all of them in total?

2    Q.  Of all of them.

3    A.  Yeah, I would say in general, all of them, they were all

4    eager to show that they could meet the requirements.  They were

5    eager to show off their businesses.  The larger ones had

6    presentations.  They wanted to show the Egyptians that they

7    knew how to slaughter halal and the different variations, the

8    different variants of it, that they could indeed meet those

9    requirements.

10   Q.  How, if at all, did that compare to IS EG Halal's

11   presentation during that audit?

12   A.  IS EG Halal did not have a presentation.

13   Q.  You were asked during cross-examination about your study of

14   halal before being assigned to Egypt?

15   A.  Yes.

16   Q.  Now, I think you read up and you did some training?

17   A.  That's correct.

18   Q.  As a result of that, did you consider yourself an expert on

19   halal?

20   A.  No, I did not.

21   Q.  Now, when you met with Mr. Hana and IS EG in Washington,

22   D.C., did it appear they had engaged in any study related to

23   halal?

24   A.  It did not appear so.

25   Q.  Did anyone from IS EG Halal express an understanding of

O5K3MEN3                          Tate - Redirect

1   halal during your interactions with them?

2   A.  No.

3           MR. FEE:  Objection, your Honor.

4           THE COURT:  He's answered.

5   Q.  Did it appear --

6           THE COURT:  I'll allow it.  There was testimony on

7   that.

8   Q.  Did it appear from your interactions with Mr. Hana and the

9   other members of IS EG Halal that they knew more than you did

10  or less than you did about halal?

11          MR. FEE:  Objection.

12          THE COURT:  Sustained.

13  Q.  From your interactions with Mr. Hana, and --

14      Now, you were asked questions on cross-examination by

15  Mr. Lustberg about some of the contacts between Mr. Hana and

16  Dr. Ahmed Abdel Kareem.  Do you remember?

17  A.  Yes.

18  Q.  And about the relationship between Mr. Hana and Dr. Ahmed

19  Abdel Kareem.  Do you remember being asked about that?

20  A.  Yes.

21  Q.  And I believe you testified that you had said you were

22  concerned about IS EG -- about Mr. Hana's relationship with

23  Dr. Ahmed Abdel Kareem?

24  A.  That's correct.

25  Q.  And was your concern about IS EG only about Mr. Hana's

1  relationship with Dr. Ahmed Abdel Kareem or did you have other

2  concerns?

3  A.  I had concerns with his relationship with Egyptian

4  officials, which included Dr. Mona Mehrez as well.

5  Q.  So, both Mr. Hana's relationship with Dr. Ahmed Abdel

6  Kareem, also his relationship with Mona Mehrez; is that

7  correct?

8  A.  That's correct, yes.

9  Q.  Did you have concerns with his company apart from their

10  connections with those officials as well?

11  A.  With his company?

12  Q.  Yes.

13  A.  Nothing that comes to mind, but I had no knowledge of his

14  company prior to those initial interactions.

15  Q.  Did Egypt ever communicate that they chose IS EG Halal

16  because Mr. Hana was friends or had known any Egyptian

17  officials prior to the audit?

18  A.  No, the Egyptian authorities never gave us a rationale for

19  choosing IS EG Halal.

20  Q.  You had testified on cross-examination about certain

21  concerns that were expressed by the Egyptian officials during

22  the audit.

23  A.  Yes.

24  Q.  And those concerns expressed by -- I think we talked about

25  Egyptian officials.  Was it primarily one Egyptian official who

O5K3MEN3                         Tate - Redirect

1    expressed concerns?

2    A.   Yeah, generally, Dr. Ahmed was the one that generally

3    communicated the concerns.

4    Q.   And did the concerns expressed by Dr. Ahmed Abdel Kareem

5    generally align with your own observations of the halal

6    certifiers during the audit?

7    A.   No.

8    Q.   For example, you testified that Dr. Ahmed Abdel Kareem

9    raised a concern about stunning and killing of the animal

10   before slaughter?

11   A.   That's correct, yes.

12   Q.   Did you observe that issue during the audit?

13   A.   I did not observe that.

14   Q.   What would you have done if you had seen an issue like

15   that?

16           MR. LUSTBERG:   Objection.

17           THE COURT:   Sustained.

18   Q.   Was that an issue not only for halal, but also a sanitary

19   issue as well?

20   A.   That's correct.  An animal that has already -- is already

21   dead can't be slaughtered for food.  So, I would have had to

22   reported that to the health -- USDA veterinarian in charge of

23   the plant, had that happened.

24   Q.   Did the concerns that were expressed by the Egyptian

25   officials you were dealing with stay the same or they changed?

1    A.  They changed.  They shifted.

2    Q.  Do you recall being asked the a series with of questions on

3    cross-examination about the fee that was being charged by IS EG

4    Halal after they obtained the monopoly?

5    A.  Yes.

6    Q.  I believe you testified that some of that fee went to the

7    United States and some went to Egypt?

8    A.  That's correct.

9    Q.  What office did you understand the fee went to in Egypt?

10   A.  I understand it went to an office operated by a firm called

11   Medi Trade.

12   Q.  What was your understanding of the firm Medi Trade in

13   Egypt?

14   A.  We understood that it was at least partially owned by the

15   government, possibly with linkages to the Egyptian Security

16   Service or intelligence service.

17   Q.  Did the fact that a portion of the fee was being paid to

18   Medi Trade concern you at all?

19   A.  Yes.

20            MR. FEE:  Objection.

21            THE COURT:  Sustained.

22            MR. MARK:  Mr. Hamill, could you publish Government

23   Exhibit 8B-35.

24            MR. FEE:  Your Honor, I would move to strike the

25   answer beginning "possibly."

1                THE COURT:  Last question and the answer will be

2    stricken.  The jury is to disregard it.

3    Q.  From your work in at U.S. embassy Cairo, did you become

4    familiar with a company called Medi Trade?

5    A.  Yes, I did.

6    Q.  How did you become familiar with that company?

7    A.  I became familiar with it when importers reported to us

8    that they were having to pay part of the halal certification

9    fees to an office owned by Medi Trade.

10   Q.  Did you have an understanding of the nature of that

11   company?

12               MR. FEE:  Objection, your Honor.  Foundation.

13               THE COURT:  He's testified to it already.  Next.

14   A.  We did not have clarity on exactly what that company did.

15               MR. FEE:  I'm sorry.

16               THE COURT:  I'm sorry.  I said you testified to it

17   already.  Proceed.  Next question.

18   Q.  You were asked a series of questions on cross-examination

19   about Government Exhibit 8B-35.  Do you recall that, Mr. Tate?

20   A.  Yes.

21   Q.  And being asked about whether Mr. McKinney's e-mail was

22   accurate or not.  Do you remember that?

23   A.  Yes.

24               MR. MARK:  And Mr. Hamill, can we take a look down at

25   the bottom of the e-mail.

1   Q.  And you were directed to the point where it said,

2   "Effective May 1, 2019, Egyptian authorities delisted the seven

3   halal certifiers."  Right?

4   A.  Yes, that's correct.

5   Q.  And when it says delisted seven, how many halal certifiers

6   were there at the time of the audit?

7   A.  There were four operating in Egypt, we understood, and four

8   more that wanted to be added.  So a total of eight.

9   Q.  Was it a goal of the audit to increase the number of halal

10  certifiers so it would be more than the four?

11          THE COURT:  We've been over this.  Next question.

12  A.  Yes.

13  Q.  Apart from that, whether there is seven or four, was

14  everything in this e-mail accurate to your understanding?

15  A.  Yes, with the exception of the seven versus four, that's

16  correct.

17  Q.  What was being communicated to the ambassador in

18  Mr. McKinney's e-mail, was that consistent with what you had

19  been communicating to Egyptian officials in your work?

20  A.  Yes.

21  Q.  Was that consistent with what was being communicated by the

22  chargé d'affaires at the embassy to the Egyptian side during

23  your time in Cairo?

24  A.  Yes.

25  Q.  And when the chargé d'affaires was communicating with the

1    Egyptian side, on whose behalf was he speaking?

2    A.  The chargé d'affaires was the acting ambassador, so he

3    spoke on behalf of the president.

4            MR. MARK:  If I may have just one moment.  No further

5    questions.

6            THE COURT:  Thank you.  You may step down, sir.  You

7    are excused.

8            THE WITNESS:  Thank you, your Honor.

9            (Witness excused)

10           THE COURT:  Next witness for the government.

11           MR. MARK:  The government calls its next witness John

12   Moldovan.

13    JOHN MOLDOVAN,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. MARK:

18   Q.  Mr. Moldovan, how old are you?

19   A.  37.

20   Q.  In what state do you reside?

21   A.  New Jersey.

22   Q.  What languages do you speak?

23   A.  English and Arabic.

24   Q.  Do you have any family of Arab descent?

25   A.  I do.

O5K3MEN3                    Moldovan - Direct

1   Q.  From what country?

2   A.  From Egypt.

3   Q.  What is your educational background?

4   A.  I have an undergraduate degree in business and I have a law

5   degree.

6   Q.  Where did you get your undergraduate and law degree from?

7   A.  Both degrees from Rutgers in Camden.

8   Q.  Are you currently employed?

9   A.  I am.

10  Q.  What do you do for work?

11  A.  I'm an attorney.

12  Q.  Approximately how long have you been an attorney?

13  A.  About 13 years.

14  Q.  Do you work for yourself or work for anyone else?

15  A.  I work for myself.

16  Q.  What is the name of your practice?

17  A.  It's the Moldovan Law Firm.

18  Q.  How many employees do you have?

19  A.  Currently about four.  Anywhere up to 10, depending on the

20  volume of work that we're doing.

21  Q.  How long have you had your own law firm?

22  A.  Since 2017.

23  Q.  What types of cases do you typically handle?

24  A.  Personally I specialize in criminal defense and traffic

25  defense.  Traffic violation defense.

1   Q.  When you talk about criminal defense, are you talking
2   primarily about traffic defense?
3   A.  We do a heavy volume of traffic and DUI offense as a
4   defense attorney, so yeah.
5   Q.  Those are the primary types of cases you're talking about
6   there?
7   A.  Yup.
8           THE COURT:  When you say four to 10 employees, are
9   those largely attorneys or service people?
10          THE WITNESS:  Service people, your Honor.  Staff
11  members.
12          THE COURT:  How many attorneys are there in the firm?
13          THE WITNESS:  I had two full-time this year, Judge,
14  but at the moment, it's just myself.
15          THE COURT:  Thank you.
16  Q.  Are you familiar with a company named IS EG Halal?
17  A.  I am.
18  Q.  How are you familiar with that company?
19  A.  I worked as in-house counsel for them for a period of time
20  during 2019.
21  Q.  Approximately when to when did you work for them in 2019?
22  A.  I think it was somewhere around early summer, late spring
23  of 2019, like around May, and I was only there for about I
24  think like four or five months, maybe six months total.
25  Q.  You mentioned that you had worked as in-house counsel.

O5K3MEN3                      Moldovan - Direct

1    What does that mean?

2    A.  I was just a general attorney for legal matters that the

3    owner had to address.  He would run them by me and formulate a

4    response.

5    Q.  Was your work entirely legal or was it also non-legal, too?

6    A.  I would say it was about 50-50.  I did a lot of

7    administrative functions as well.  Just reviewing

8    communications generally, assisting the owner Mr. Hana with

9    pretty much whatever administrative things he had going on.  We

10   would often discuss those things and try to come up with an

11   appropriate response.

12   Q.  And you mentioned the owner.  Who is the owner?

13   A.  Will Hana.

14   Q.  Who did you report to at the time?

15   A.  Just Mr. Hana.

16   Q.  Do you see Mr. Hana in the courtroom today?

17   A.  It's a big courtroom.  Yes, I do.

18   Q.  Can you please describe where the person you recognize is

19   sitting?

20           MR. SOLANO:  We'd stipulate Mr. Hana is in the

21   courtroom since he has been since the beginning of this trial.

22           THE COURT:  All right.  Is it the gentleman third from

23   the left in the row of which the gentleman stood up?

24           THE WITNESS:  It is.

25           THE COURT:  Thank you.  The witness has identified the

1   defendant.

2   Q.  Mr. Moldovan, when did you first meet Mr. Hana?

3   A.  Again, it was some time around mid-2019.  It was a little

4   bit before, you know, I would say like spring, summertime

5   during that year.

6   Q.  Who introduced you to, Mr. Hana?

7   A.  My best friend at the time.  Rony Daibes.

8          MR. MARK:  Mr. Hamill, can you please show for the

9   witness only what has been marked for identification as

10  Government Exhibit 2A-33.

11  Q.  Mr. Moldovan, do you recognize this exhibit?

12  A.  I do.  Not his best picture but yes, I do.  That's Rony.

13         MR. MARK:  The government offers Government Exhibit

14  2A-33.

15         THE COURT:  Admitted without objection.

16         (Government's Exhibit 2A-33 received in evidence)

17         MR. MARK:  Can you publish this, Mr. Hamill.

18  Q.  You mentioned this is Rony.  What was your relationship --

19  the nature of your relationship with Rony Daibes at the time?

20         THE COURT:  His best friend.  Next.

21  Q.  What sort of activities did you do with your best friend

22  Rony?

23  A.  We did everything together.  We worked out every day.  We

24  did, you know, some business-related things together throughout

25  the day.  And during that period of time in my life, we partied

O5K3MEN3                              Moldovan - Direct

1    every night.

2    Q.  Where were you living at the time that you knew Rony

3    Daibes?

4    A.  I was living in Edgewater.

5    Q.  Where in New Jersey is Edgewater?

6    A.  It's right on the Hudson River, pretty prominent area on

7    the Jersey side.  Referred to as the Gold Coast.

8    Q.  Are you familiar with the building The Alexander?

9    A.  I am.

10   Q.  Were you living in The Alexander building at the time?

11   A.  Yes.

12          MR. MARK:  Mr. Hamill, can you please show for the

13   witness only what has been marked as Government Exhibit 2B-t3.

14   Q.  Do you recognize this exhibit?

15   A.  I do.

16   Q.  What is it?

17   A.  It is The Alexander building.

18          MR. MARK:  Government offers Government Exhibit 2B-3.

19          THE COURT:  Hearing no objection, admitted.

20          (Government's Exhibit 2B-3 received in evidence)

21   Q.  And at the time that you met Mr. Hana, were you living at

22   The Alexander?

23   A.  Yes.

24   Q.  How long did you live there?

25   A.  I lived there for a long time.  About 6 or 7 years I think

1    in total.

2    Q.  Do you still live there now?

3    A.  No.

4    Q.  Directing your attention to 2019 when Rony Daibes

5    introduced you to Mr. Hana.  What was Rony Daibes doing for

6    work at that time?

7    A.  He is an IT wizard.  He can figure out anything IT and

8    computer-related communications.  Internet, all that good

9    stuff.  So he handled all communications related tech for his

10   cousin, who is Mr. Fred Daibes.

11   Q.  Mr. Fred Daibes, did you know him?

12   A.  I did.

13   Q.  How did you know him?

14   A.  Well, like I said, he's Rony's first cousin.  I believe

15   first cousin.  So, naturally, through Rony, I got to meet him.

16   I also had already known about Freddy because everyone in the

17   town of Edgewater knows who Freddy is.

18          He built pretty much I would say the majority of

19   what's on River Road.  And, you know, so he is very-well known.

20   He's like a celebrity in the area.  Everyone knows who he is.

21   Q.  You were just saying -- it's hard to hear -- you said the

22   majority of something.  I couldn't hear what you said after

23   that.

24   A.  I said that he had a lot to do with the development and

25   building of a lot of the real estate on River Road.  A lot of

1  the real estate, like apartment buildings and stuff.

2  Q.  Did that include The Alexander where you lived?

3  A.  It did.

4  Q.  Do you see Fred Daibes in the courtroom today?

5  A.  I do.

6  Q.  Can you please describe where the person you recognize is

7  sitting and describe an item of clothing he's wearing?

8  A.  From my perspective he's in the far rear to the right,

9  wearing a blue tie with a white shirt.

10         THE COURT:  The witness has identified the defendant.

11  Proceed.

12  Q.  Now, after you met Mr. Hana in 2019, what was the nature of

13  your relationship with him that year?

14  A.  I would say we got pretty close as well.  You know, we

15  started hanging out a little bit socially, we started working

16  out in the mornings together, like just doing some light

17  exercises together.  And you know, being an Arab speaking

18  person, there weren't many other people in our age range, so it

19  was just natural that we became friends.

20  Q.  After you became friends, did you go to Mr. Hana's home at

21  all?

22  A.  I did.

23  Q.  Where did he live at the time?

24  A.  He lived in the same building.  Just on a higher floor.

25         THE COURT:  The Alexander?

1        THE WITNESS:  Yes, your Honor.  And with a better

2    view.

3    Q.   Would you socialize with Mr. Hana at the time?

4    A.   We did, we used to have drinks pretty much every day.

5    Q.   At that time in your life, did you drink regularly?

6    A.   I was an alcoholic at the time.

7    Q.   Do you still have a drinking problem?

8    A.   I haven't had a drink in almost 4 years now.

9    Q.   Are you still friends with Mr. Hana?

10   A.   No.

11   Q.   Why are you no longer friends with him?

12   A.   He fired me.

13   Q.   When was the last time you saw Mr. Hana?

14   A.   It was again, late summer of 2019 that he terminated me.

15   Q.   Now, during the time you worked for IS EG Halal, what was

16   the nature of the company's operations?

17   A.   What I understood is they were the sole agency for the

18   country of Egypt to certify meat exports going to the country.

19   Q.   From working at IS EG Halal, were those certifications

20   useful for other countries or only Egypt?

21   A.   It was my understanding that it was just for Egypt.

22   Q.   How much did IS EG Halal charge for a halal certificate in

23   the United States at the time you worked there?

24   A.   1800 a certification or for a certificate, excuse me.  Not

25   certification.

1    Q.  18 per certificate you said?

2    A.  That's correct.

3    Q.  And was the certificate for a certain quantity of beef

4    product?

5    A.  It was per container.  So the per truckload.

6    Q.  So for each truckload or container of product, one

7    certificate would be $1800?

8    A.  Correct.

9    Q.  At the time that you worked for IS EG Halal, how many

10   employees was -- where was its office located?

11   A.  It was in a new office building on River Road that Freddy

12   built.  At 125 River Road.

13   Q.  When you say Freddy built.  Are you referring to Fred

14   Daibes?

15   A.  Sorry, yeah.  I only ever referred to him as Freddy.  But

16   yes Mr. Daibes.

17   Q.  I know we're talking about Rony Daibes and Fred Daibes.

18   You can refer to them however it is comfortable for you.  I'm

19   just asking for clarification for the record.

20   A.  Sure.

21   Q.  When you worked for IS EG Halal, how many employees did the

22   company have at that time?

23   A.  I think only like three or four, including myself.

24   Q.  Where did those employees work?

25   A.  They also worked, from my understanding they also worked in

1   that 125 River Road building.

2   Q.  As far as you knew working for the company, did IS EG Halal

3   have any inspectors that worked at any slaughterhouses?

4               MR. WEITZMAN:  Objection.  Foundation.

5               THE COURT:  Is that an objection?

6               MR. WEITZMAN:  Yes.  Foundation, your Honor.

7               THE COURT:  Sustained.

8               I may have misheard you, sir.  Is your testimony that

9   IS EG Halal headquarters was at 1250 River Road or 125 River

10  Road?

11              THE WITNESS:  It's 125.

12              THE COURT:  Next question.

13  Q.  Did you work at that office at 125 River Road?

14  A.  I did.

15  Q.  You said there were approximately four or so employees when

16  you started?

17  A.  That's right.

18  Q.  While you were working at IS EG Halal, were you familiar

19  with the different employees that worked at that company?

20  A.  Yeah.

21  Q.  Were you familiar with whether there were any employees

22  that were stationed somewhere else, other than 125 River Road?

23  A.  Not that I can think of.

24  Q.  When we talked about halal certificate -- I'll come back to

25  that in a second.

O5K3MEN3                        Moldovan - Direct

1          Now, focusing on the employees you were familiar with.  Are

2     you familiar with someone named Gus Lita?

3     A.  Yes.

4     Q.  How are you familiar with him?

5     A.  He used to work for Will.  Mr. Hana.

6     Q.  What was Mr. Lita's role at IS EG Halal?

7     A.  He was like an operations manager I would say.  I'm not

8     sure what his exact title was, but I know he was somewhere in

9     the higher administration and directly reported to Mr. Hana.

10         MR. MARK:  Mr. Hamill, can you please show for the

11    witness only what has been marked for identification as

12    Government Exhibit 2A-32.

13    Q.  Mr. Moldovan, do you recognize this exhibit?

14    A.  I do.

15    Q.  What is reflected here?

16    A.  That's Gus.

17         MR. MARK:  Government offers Government Exhibit 2A-32.

18         THE COURT:  Admitted without objection.

19         (Government's Exhibit 2A-32 received in evidence)

20    Q.  Are you familiar with someone named Jamela Ma'ali?

21    A.  Yes, I am.

22    Q.  How are you familiar with her?

23    A.  That is Freddy -- Mr. Daibes' secretary.

24    Q.  Did Ms. Ma'ali have any role apart from being Freddy's

25    secretary when you worked at IS EG Halal?

1    A.  I'm sorry.  One more time?

2    Q.  When you worked at IS EG Halal, did Ms. Ma'ali have any

3    role separate from being Freddy, Fred Daibes' secretary?

4    A.  I don't know if it was an official other role, but I know

5    she helped Mr. Hana out with a lot of administrative things

6    like employee onboarding and things like that.

7              MR. MARK:  Mr. Hamill, can we please show for the

8    witness only what has been marked for identification as

9    Government Exhibit 2A-14.

10   Q.  Do you recognize this exhibit?

11   A.  I do.

12   Q.  What's reflected in this Exhibit?

13   A.  That is Jamela.

14             MR. MARK:  The government offers Government Exhibit

15   2A-14.

16             THE COURT:  Admitted without objection.

17             (Government's Exhibit 2A-14 received in evidence)

18             A JUROR:  Your Honor?  It would probably simplify the

19   jury's work if they actually spelled these various names.

20             THE COURT:  Thank you.

21   Q.  We just talked about Gus Lita.  Do you know how to spell

22   Gus Lita's name?

23   A.  I think it's just as you would think it is.  G-U-S.  It

24   might have been with a Z actually.  And then the last name is

25   L-I-T-A.

O5K3MEN3                         Moldovan - Direct

1    Q.   And Jamela Ma'ali, do you know how to spell her name?

2    A.   I think it is J-A-M-E-L-A, last name M-A apostrophe A-L-I,

3    I believe.

4              THE COURT:  I appreciate the question.  And it was

5    very useful.  But in the interest of good order, I am going to

6    ask that if there are any other questions from the jury, that

7    the question be given to my deputy during the break and then

8    we'll handle it.

9              Proceed.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5kWmen4                           Moldovan - Direct

1    BY MR. MARK:

2    Q.   Now, you mentioned that you worked at IS EG Halal's office

3    at 125 River Road.  How often were you at that office?

4    A.   Couldn't have been longer than six months.

5    Q.   And when you worked there, how frequently did you go into

6    the office?

7    A.   Not every single day.  While functioning as Mr. Hana's

8    in-house counsel, I also still had my own practice to operate,

9    which obviously included a lot of court appearances.  So

10   sometimes I wouldn't make it to the office at all.  I couldn't

11   give you an exact number of days per week, though, because it

12   varied every week.

13   Q.   And how often was Mr. Hana in the office when you worked

14   there?

15   A.   I would say most days, almost every day, except for days

16   that he would travel to meetings that he had.

17   Q.   How involved was Mr. Hana as a manager of your work at IS

18   EG Halal?

19   A.   For work specifically related to IS EG, I would say that he

20   was very involved and had -- had constant oversight.

21   Q.   Could you explain what you mean by -- that he had constant

22   oversight?

23   A.   Sure.  Because of the nature of my function for Mr. Hana,

24   it usually required some back-and-forth between us, and you

25   know, some conversation about the topics, so -- he was the boss

```
 1   and so I answered to him.  So I would say that pretty much
 2   everything I did was because I was told to do it or because it
 3   was a function of what he wanted me to do.
 4   Q.  Did that include emails that you wrote?
 5   A.  Oh, definitely, yeah.
 6   Q.  What about text messages that you sent?
 7   A.  If it had to do with a communication on behalf of the
 8   company, it would absolutely have come from his direction.
 9   I -- I never took it upon myself to make any communications on
10   behalf of Mr. Hana without speaking with him or doing it as a
11   result of his direction.
12   Q.  While you worked at IS EG Halal, did you know who the
13   president of Egypt was at the time?
14   A.  I did.
15   Q.  Who what it?
16   A.  President Sisi.
17   Q.  Is President Sisi still the president of Egypt?
18   A.  He is.
19   Q.  Did Mr. Hana ever talk about President Sisi?
20   A.  He mentioned it once -- mentioned him once, or twice.
21   Q.  Did Mr. Hana ever talk about his relationship with the
22   president of Egypt?
23   A.  I don't recall him describing the relationship.  I -- my
24   recollection is that he, you know, he either knew or had met
25   the president at some point in his life.
```

O5kWmen4                          Moldovan - Direct

1    Q.  And was that understanding based on your conversation with

2    Mr. Hana?

3    A.  Yes.

4    Q.  What do you recall about Mr. Hana saying on that matter?

5    A.  I don't remember exactly what it was about the president,

6    just that he knew the president.

7    Q.  How did Mr. Hana carry himself at work?

8            MR. LUSTBERG:  Objection.

9            THE COURT:  Sustained.

10           Just for my own knowledge, sir, I've heard that the

11   president of Egypt, or at least in the papers, is referred to

12   sometimes as El Sisi and sometimes as Sisi.  In Arabic, what is

13   the difference, what does the El mean?

14           THE WITNESS:  It's actually part of the name, Judge,

15   and I may be incorrect -- please correct me if I'm wrong -- I

16   think that it's a part of his legal name.  I'm not sure the

17   abbreviation is something that is legally official.

18           THE COURT:  But I take it since you said Sisi, I take

19   it it's commonly used there.

20           THE WITNESS:  That's right, Judge.

21           THE COURT:  All right.  Be sure to talk into the

22   microphone.

23           THE WITNESS:  I'm trying, your Honor.

24           THE COURT:  I understand.  When you turned to me, you

25   turned your head.  I'm just saying it's helpful.  These are

1    directional mics.

2              Proceed, sir.

3    BY MR. MARK:

4    Q.  Now, we were talking about Mr. Hana and you were talking

5    about him being your manager at work.  How would you describe

6    his management style at work?

7    A.  I would say pretty direct.

8          Can you break that down for me?  I'm not sure what his --

9              THE COURT:  Next question.

10   BY MR. MARK:

11   Q.  How involved was Mr. Hana in the work that you did?

12   A.  Very.  Very involved.  I mean there wasn't anything that I

13   did without his direction or oversight.

14   Q.  And when you worked -- when you worked with Mr. Hana, did

15   he say whether he reported to anyone in connection with his

16   job --

17   A.  He did.

18   Q.  -- at IS EG Halal?

19   A.  He did.

20   Q.  What did Mr. Hana say about that?

21   A.  I believe his direct report was an individual by the name

22   of General Ahmed.

23   Q.  What did Mr. Hana say about General Ahmed?

24   A.  He only mentioned it a few times, but you know, it was

25   generally that that was his direct report and that, you know,

1    his, you know, whole purpose in running the company was to

2    satisfy the standards of the general.  And so when the name

3    came up, it was just in reference to who his supervisor was or

4    who he answered to.

5            THE COURT:  Do you know the full name of General

6    Ahmed?

7            THE WITNESS:  I don't.

8            THE COURT:  All right.

9    BY MR. MARK:

10   Q.  And from talking with Mr. Hana, did you understand for

11   which country General Ahmed served?

12   A.  Yes.

13   Q.  Who --

14   A.  It was for Egypt.

15   Q.  How frequently did Mr. Hana say he spoke with General

16   Ahmed?

17   A.  Every day.

18           THE COURT:  I'm sorry.  Did Mr. Hana every day say he

19   spoke with General Ahmed, or are you saying Mr. Hana said he

20   spoke with General Ahmed every day?

21           THE WITNESS:  Thank you, Judge.  I'll clarify.

22           My understanding was that he had a daily call with

23   General Ahmed, not that he would tell me every day that he was

24   speaking with General Ahmed, just that he had a daily call.

25   Whether or not that call took place, I have no idea.

1    BY MR. MARK:

2    Q.  And what was your understanding based on?

3    A.  I mean there were times -- I'm up before 5 a.m. most days,

4    and you know, some of those mornings that we were both awake, I

5    think he said something along the lines of I have my daily call

6    with General Ahmed, I'll let you know when I'm finished,

7    something along those lines.

8    Q.  And from your conversations with Mr. Hana, what did you

9    understand Mr. Hana that spoke with General Ahmed about?

10   A.  I think it was primarily just the well-being of the company

11   and, you know, the concern of whether or not it's producing

12   revenue, you know, which is a big function of the -- of the

13   company, generate revenue.

14   Q.  And how did this company, IS EG Halal, generate revenue?

15   A.  By issuing certificates that, you know, meats being that

16   are exported to Egypt are halal-certified, which essentially

17   means -- you know, it's an Islamic term.  For people that don't

18   understand what that means, the meat is prayed on a certain

19   way, and only if it was done correctly or procedurally correct

20   would they get a certification or certificate that says it's

21   actually halal.

22   Q.  And from working at IS EG Halal in 2019, did you understand

23   how the process was to issue a halal certificate?

24   A.  No.

25   Q.  Did you understand that IS EG Halal did issue halal

1    certificates during the time that you worked there?

2    A.  Yes.

3    Q.  Now, did you ever meet General Ahmed, who Mr. Hana talked

4    about?

5    A.  No.

6    Q.  Did you ever talk to him directly?  Did you ever talk to

7    General Ahmed directly?

8    A.  No.

9    Q.  Did Mr. Hana ever explain how he knew General Ahmed?

10   A.  No.

11   Q.  From working at IS EG Halal, did you have an understanding

12   of how Mr. Hana obtained the right to certify meat for Egypt?

13   A.  No.

14   Q.  From your conversations with Mr. Hana, what did you

15   understand Mr. Hana to have done for work prior to IS EG Halal?

16   A.  He's -- he wasn't very specific about it, but my

17   understanding was that he had, like, a logistics company and

18   that, you know, he was in the trucking industry, generally

19   speaking.  I'm not sure what, you know, that means exactly, but

20   that's what he said.

21   Q.  Did you understand from your dealings with Mr. Hana what

22   happened to his business in the trucking industry?

23   A.  I think that he said that there was an accident or

24   something along those lines that resulted in a large part of

25   his fleet being destroyed.  I'm not sure how, but -- I think

O5kWmen4                    Moldovan - Direct

1    that's why he moved on from there.

2    Q.  And did you understand from talking to Mr. Hana

3    approximately when he began dealing with the halal business?

4    A.  Yeah.  It was, it was my understanding that when I came on

5    it was a fairly new company, just maybe a couple months old,

6    maybe three months old.  So it was, again, you know, going

7    backwards from that springtime 2019, I think it was early 2019

8    that the company was formed.

9    Q.  OK.  And did you understand from dealing with Mr. Hana, did

10   Rony Daibes have anything to do with the company when you

11   joined?

12   A.  He did.

13   Q.  What did he have to do with the company?

14   A.  He was the IT guy.  Again, he set up, you know, all the IT,

15   internet stuff, website -- not website.  Just IT.  IT, yeah.

16             THE COURT:  Sir, Mr. Mark asked you approximately when

17   did Mr. Hana begin dealing with the halal business, and you

18   said that it was a new company.  But the question was when he

19   began dealing with halal, not necessarily IS EG Halal.  Can you

20   answer that?  Maybe you can, maybe you can't.

21             THE WITNESS:  Thank you, Judge.

22             To clarify, I don't know when Mr. Hana started dealing

23   with halal generally.  I'm just -- does that answer the

24   question?

25             THE COURT:  Yes.  Thank you.  The jury doesn't want a

1    guess.  You don't know.

2              Next.

3    BY MR. MARK:

4    Q.  Did you understand from Mr. Hana that he had any halal

5    businesses before IS EG Halal?

6    A.  I don't know.

7    Q.  Now, when you joined IS EG Halal, how many offices did the

8    entity have?

9              MR. WEITZMAN:  Objection to form.  Foundation.

10             THE COURT:  You object to how many offices did IS EG

11   Halal have?

12             MR. WEITZMAN:  Correct.

13             THE COURT:  I'll allow that.

14             If you know.

15   A.  It was my understanding that there was just one main

16   headquarters, where we were, in Edgewater.  And then, you know,

17   later on, we were expanding, so I mean we were the first

18   headquarters, in Edgewater.

19   Q.  OK.  And you mentioned the word "expanding."  Did you

20   understand that IS EG, or did there come a time when IS EG

21   expanded beyond Edgewater, New Jersey?

22   A.  Yes.

23   Q.  Where did it expand to?

24   A.  Uruguay.

25   Q.  Did you have any role in that expansion to Uruguay?

1    A.  I did.

2    Q.  What role did you play?

3    A.  So, I -- I went with Mr. Hana to the country and

4    essentially, you know, vetted out office space, met with

5    professionals that assisted new companies get acclimated in the

6    country of Uruguay; assisted Mr. Hana finding some living

7    space.  So, very diverse set of objectives, but essentially,

8    the goal was to get set up in Uruguay.

9    Q.  What, if anything, did Mr. Hana say about the reason for

10   the expansion to Uruguay?

11   A.  It was my understanding that because South America is a big

12   exporter of halal products to Egypt, that that would be the

13   next target and that, you know, the company would move to each

14   country in succession or order of, you know, volume of halal

15   meat production or export.

16   Q.  Mr. Moldovan, do you have a binder of exhibits in front of

17   you?

18   A.  I do.

19   Q.  You do.  Could you take a look at what's been previously

20   marked as Government Exhibits 4C1-A, 4C1-G, 4C1-K, 4C1-L and

21   4C1-M.

22   A.  Are we starting with A?

23   Q.  Yeah.

24   A.  OK.

25   Q.  I'm just going to ask you first if you recognize those

1    documents, so it's A, G, K, L and M.

2    A.  OK.

3    Q.  Do you recognize those, one, two, three, four, five

4    exhibits?

5    A.  I do.

6    Q.  What are those exhibits?

7    A.  Do you want me to just go through them one by one or just

8    in general?

9    Q.  In general.

10    A.  They are communications that I made on behalf of IS EG

11    Halal to a firm that we connected with in Uruguay that

12    essentially acts as a liaison between American companies and

13    the country of Uruguay, essentially --

14        THE COURT:  Wait.  You mean businesses in the country

15    of Uruguay, or do you mean the government of Uruguay?

16        THE WITNESS:  Businesses in the country, American

17    businesses getting acclimated in the country of Uruguay.

18        THE COURT:  All right.

19        MR. MARK:  The government offers Government Exhibits

20    4C1-A, 4C1-G, 4C1-K, 4C1-L, 4C1-M.

21        THE COURT:  No objection, admitted.

22        (Government Exhibits 4C1-A, 4C1-G, 4C1-K, 4C1-L, 4C1-M

23    received in evidence)

24        MR. MARK:  Mr. Hamill, could you publish Government

25    Exhibit 4C1-A.

```
1    Q.  Just generally, what does this exhibit concern?

2    A.  This is a -- an email that I wrote on behalf of IS EG

3    thanking a woman by the name of Sylvia Diaz for introducing us

4    to the initial set of information that we needed to get set up

5    in Uruguay.  She sort of gave us, like, a -- almost like a tour

6    of how to maneuver, you know, the laws of the country to get

7    situated and set up as a business.

8    Q.  So was this email setting up IS EG's operations in Uruguay?

9    A.  Yes.

10        MR. MARK:  Let me direct your attention to page 3, so

11   going down the email chain.  And we're at the middle of that

12   email chain, and if we could just zoom in.

13   Q.  What's the date of this email?

14   A.  June 27, 2019.

15   Q.  And who is it from?

16   A.  From Will Hana.

17   Q.  And did you receive this email?

18   A.  I did.

19   Q.  Which is your email address here?

20   A.  My email address is jm@moldovanlegal.com.

21   Q.  And next to your name, I see Sylvia Diaz.  Who was she at

22   that time?

23   A.  She's the individual from the company that I referred to as

24   a liaison earlier, the DCA.com domain.  That was the name of

25   their company, DCA.
```

O5kWmen4                          Moldovan - Direct

1    Q.  And do you see Sami Rizk cc'd on this email?

2    A.  I do.

3    Q.  What did you understand Mr. Rizk's position to be at the

4    time?

5    A.  I understood that he was the owner of a company by the name

6    of Mirasco.

7    Q.  And what do you understand that company, Mirasco, to do?

8    A.  They were a South American meat exporter, I believe, based

9    in Brazil.  Not sure.

10   Q.  All right.

11   A.  Somewhere in South America.

12   Q.  But generally an exporter of meat?

13   A.  Yes.

14   Q.  Did you ever meet Mr. Rizk?

15   A.  No.

16   Q.  And could you please just read the email, beginning with

17   the sentence "I would like"?

18   A.  I'm sorry?  The part starting with what?

19          THE COURT:  "I would like."

20          THE WITNESS:  Thank you.

21   Q.  Start with "I would like."

22   A.  "I would like to introduce our counsel, John Moldovan, who

23   is part of our IS EG legal department and will be representing

24   us in the upcoming opening of our new satellite office in

25   Uruguay.  All correspondences and communications should be done

O5kWmen4                         Moldovan - Direct

1    through our legal counsel and our management team.  Sylvia, we
2    look forward to working with you, and if you can provide us
3    with some information on the cost of forming the corporation
4    and startup of a new company, I appreciate your prompt
5    attention in this matter."
6    Q.  Do you see in the cc line Jamela Maali?
7    A.  I do.
8    Q.  And when this email refers to the management team, who was
9    the management team at IS EG Halal at that time?
10   A.  Essentially it was myself, Mr. Hana and Mr. -- Mr. Lita,
11   and on occasion, Jamela would assist us with administrative
12   things.
13   Q.  Was it your understanding that she was a manager of the
14   company at that time?
15   A.  No.  I think her role was more secretarial, like just
16   getting things in order for us, like, you know -- almost like a
17   project manager, not necessarily an operations manager.
18   Q.  Are you familiar with the term "managing member"?
19   A.  Yes.
20   Q.  What's a managing member?
21   A.  Typically, someone who has a, I would say a material input
22   on the operation of, of any type of company.
23   Q.  And from your work at IS EG Halal, who served that role at
24   the company?
25   A.  As I understood it at the time, Will was the only person

O5kWmen4                          Moldovan - Direct

1    that called the shots, so to speak.  I don't think anyone else,

2    anyone else was allowed to call the shots, so to speak.

3    Q.  Did Ms. Maali serve any role like a managing member would

4    serve?

5    A.  No.

6              MR. MARK:  Mr. Hamill, could we continue up on the

7    email chain to the bottom of page 2.

8              THE WITNESS:  Could I just make one clarification,

9    actually?

10             MR. MARK:  Of course.

11             THE WITNESS:  I think earlier you asked me who wrote

12   that email, and I answered by saying that Will wrote it, but

13   if -- to be fully clear, I wrote the email at Will's direction

14   from his email account.  I don't know if that makes a

15   difference, but --

16             MR. MARK:  No.  I appreciate that clarification.

17   Q.  Just so I'm clear and the jury's clear, Mr. Hana sent the

18   email itself?

19   A.  That's correct.

20   Q.  But the text was written by you?

21   A.  That's correct.

22   Q.  At whose direction did you write that text?

23   A.  At his direction.

24             MR. MARK:  Thank you.

25             We can continue up.

O5kWmen4                          Moldovan - Direct

1   Q.  And now, is this a reply from Sylvia Diaz on June 27, 2019?

2   A.  It is.

3   Q.  Could you just read the first four sentences of Ms. Diaz's

4   reply?

5   A.  Sure.  "Dear Wael, it is a pleasure to be in contact with

6   you.  We can assist you in establishing a new office in

7   Uruguay.  In order to do so, please provide us with the

8   information about the activity to be performed in Uruguay.  It

9   is important to mention that if you are planning to develop

10  activities for the region, Uruguay offers interesting

11  platforms, such as the free trade zone, that should be

12  analyzed."

13  Q.  And did you reply to Ms. Diaz's question?

14  A.  I did.

15  Q.  OK.

16  A.  I believe I did.

17        MR. MARK:  If we could scroll up, Mr. Hamill, please.

18  Q.  Is this a reply from you, Mr. Moldovan?

19  A.  Yes, it is.

20  Q.  And before you sent emails outside the company, did you

21  discuss them with anyone at IS EG Halal?

22  A.  I did.  I don't know if I -- I don't think I ever sent an

23  email on behalf of IS EG without the permission of Mr. Hana,

24  the owner, or under the direct attention of Mr. Hana.  Yeah,

25  so --

1  Q.  And could you take a look at the second paragraph and

2  please read that aloud for the jury?

3  A.  "To answer the questions in the preceding email, the

4  activity to be performed is IS EG Halal Certified Inc. is the

5  exclusively authorized agency by the government of Egypt to

6  certify halal projects for export to Egypt and the Middle East.

7  In a general sense, the office headquarters will be for the

8  purpose of carrying out IS EG Halal's business operations,

9  communications and global relations."

10  Q.  At this time from what countries did you understand IS EG

11  was authorized to certify halal exports?

12  A.  Egypt, as far as I knew.

13           MR. MARK:  OK.  And let's continue on this chain

14  quickly.

15  Q.  And directing your attention to the bottom email on this

16  page, is this Ms. Diaz's response to your email?

17  A.  It appears that way.

18  Q.  And could you please read aloud only the last sentence --

19  well, the second-to-last sentence that Ms. Diaz wrote,

20  beginning with "my question"?

21  A.  "My question regarding the activity to be performed aims

22  not only at having a general knowledge of the activity planned

23  but also to understand if this activity could be performed by a

24  free-zone company."

25  Q.  Did you know what at the time a free-zone company was?

O5kWmen4                          Moldovan - Direct

1    A.  No.

2    Q.  Did you do any research on what was a free-zone company?

3    A.  I believe so, yeah.  Yeah, I mean as a result of this

4    email, yeah, I think I immediately googled it.

5           THE COURT:  That was the research you did; you googled

6    it?

7           THE WITNESS:  That's right.

8           THE COURT:  All right.

9           MR. MARK:  Now, if we can proceed up to the top email

10   in this chain.

11   Q.  And directing your attention to the top, is this your reply

12   to Ms. Diaz's question?

13   A.  Yes, it is.

14   Q.  And is the date here July 1, 2019?

15   A.  It is.

16   Q.  And could you read the portion of your email starting at

17   "we are happy" and then at the end of the next sentence?

18   A.  Sure.  "We are happy to engage your office's services for

19   the purpose of forming a corporation.  Regarding the activities

20   to be performed, as IS EG Halal Certified Inc. is a government

21   agency, we would not have the option of permitting a free-zone

22   company to handle our operations."

23   Q.  When you wrote IS EG Halal Certified Inc. is a government

24   agency, why did you describe it that way?

25   A.  That's what I understood it to be, and you know, that's

1    probably what Mr. Hana told me to say in the response.

2    Q.  OK.  And a government agency, an agency of what government?

3    A.  Egypt.

4            THE COURT:  What was that based on?

5            THE WITNESS:  I'm sorry, Judge?

6            THE COURT:  What was your statement that IS EG Halal

7    Certified Inc. is a government agency, and you now say that was

8    the government of Egypt, what was that belief based on?

9            THE WITNESS:  Thank you, Judge.

10           My belief was based on what Mr. Hana told me about the

11   company.

12   BY MR. MARK:

13   Q.  And had Mr. Hana ever described the company to you as a

14   government agency before this time?

15   A.  Yes.

16   Q.  Now, in connection with establishing an office in Uruguay,

17   did there come a time that you helped set up a bank account for

18   IS EG Halal?

19   A.  Yes.

20   Q.  What did you do to help set up the bank account for IS EG

21   Halal?

22   A.  The bank manager said that Mr. Hana couldn't apply

23   essentially by himself as an individual for a business account.

24   There had to be at least two members opening the account

25   together.

1    Q.  And did you help him in that regard?

2    A.  I did.  For the purposes of getting approved for the bank

3    account, Mr. Hana gave me a 1 percent share in the account.

4              MR. MARK:  OK.  Mr. Hamill, could you publish

5    Government Exhibit 4C1-K.

6    Q.  What's the date of this email, Mr. Moldovan?

7    A.  July 10, 2019.

8    Q.  And what does this email concern?

9    A.  This is an email providing financial statements for the

10   company in support of our application for a bank account.

11   Q.  OK.  And are you familiar with -- what prompted you to

12   provide this financial information to the bank?

13   A.  They asked for it.

14   Q.  OK.  And what did you -- what sort of financial information

15   did you provide to the bank?

16   A.  Frankly, I -- I -- I gave or discussed the question with

17   Mr. Hana, and he essentially told me that his accountant would

18   give me whatever I need to satisfy the, you know, financial

19   documentation request.

20   Q.  And attached to this email, were there financial statements

21   for two months, May 2019 and June 2019?

22   A.  Yes.

23   Q.  And where did you get that financial information from?

24   A.  I don't remember exactly who gave them to me, but it was

25   either Mr. Hana or the accountant.

O5kWmen4                          Moldovan - Direct

1    Q.  And at this point in time, in July 2019, how long had IS EG

2    Halal been operating?

3    A.  Two months, maybe three.

4              MR. MARK:  OK.  And Mr. Hamill, could we turn to page

5    6.

6    Q.  Do you see where it says statement of income, statement of

7    retained earnings for the month ended May 31, 2019?

8    A.  I do.

9    Q.  Was this the first month of IS EG Halal's operations?

10   A.  It appears that way.

11   Q.  And directing your attention to where it says certificate

12   income, what is reflected there?

13   A.  That is the total revenue amount for all certificates that

14   had been issued for that month.

15   Q.  And how much was that for May?

16   A.  311,000 approximately.  $311,400.

17   Q.  Was that only for the first month of operations?

18   A.  That's right.

19   Q.  While you worked at IS EG Halal, did you talk with Mr. Hana

20   about expected growth of the company?

21   A.  Generally speaking, yeah.

22   Q.  Generally, what was the nature of those discussions?

23   A.  Just that the company was profitable and that, you know,

24   Mr. Hana and his, his supervisors were looking to expand into

25   other parts of the world.

O5kWmen4                          Moldovan - Direct

1   Q.  And from those conversations, did you understand that

2   Mr. Hana expected the business was going to grow?

3   A.  Yeah, definitely.

4   Q.  And make more money?

5   A.  Absolutely.

6   Q.  And was the setting up an office in Uruguay like a step in

7   that plan to grow the company?

8   A.  It was.  It was step one.

9        MR. MARK:  OK.  Mr. Hamill, could you publish

10  Government Exhibit 4C1-M.

11  Q.  Mr. Moldovan, what's the subject line of this email?

12  A.  IS EG Halal Certified bank account registration.

13  Q.  And what did this email concern?

14  A.  It concerned getting approved for a bank account in

15  Uruguay.

16  Q.  And could you just read the text of this email?

17  A.  Sure.  It says:  "Another document for your review is a

18  copy of our standard invoice issued to a client for our

19  services.  Thank you."

20  Q.  And were you familiar with invoices for IS EG's services at

21  IS EG Halal?

22  A.  Yes.

23        MR. MARK:  Mr. Hamill, could we go to page 2 of this

24  document.  And can you just scan down.  It looks like it's

25  cutting off the top of this document.

1          Thank you.

2    Q.  Do you see in the middle of the invoice where it says

3    quantity?

4    A.  I do.

5    Q.  What does that refer to?

6    A.  The number of certificates that were issued to this

7    company.

8    Q.  And when it says rate, what does that refer to?

9    A.  The price per certificate.

10   Q.  And when it says amount, what does that refer to?

11   A.  That is the total, total revenue -- or total price, I

12   should say.

13   Q.  And what was the purpose of sending this email with the

14   invoice to the bank at this point in time?

15   A.  To show them that the company had a consistent stream of

16   income and that it was profitable.

17          MR. MARK:  Mr. Hamill, could we go to Government

18   Exhibit 4C1-G.

19          THE COURT:  Go back.

20          MR. MARK:  Sorry.

21          Mr. Hamill, could we go back.

22          THE COURT:  Sir, do you see that logo on the top left?

23   It's in yellow -- right.  Does that say something in Arabic?

24   If so, what does it say?

25          THE WITNESS:  It's written in English, your Honor --

O5kWmen4                          Moldovan - Direct

1    oh, the top part there?  I apologize.

2              THE COURT:  Above IS EG Halal.

3              THE WITNESS:  You did say that, your Honor.  I

4    apologize.  It's definitely not English, and I don't read or

5    write Arabic.

6              THE COURT:  That's fine.  Then you can't answer.

7    BY MR. MARK:

8    Q.  Mr. Moldovan, you speak Arabic conversationally, but you

9    don't read and write the language, is that it?

10   A.  That's correct.

11             MR. MARK:  Mr. Hamill, could we go with 4C1-G.

12   Q.  And what's the date of this email?

13   A.  July 11, 2019.

14   Q.  And what does this email concern?

15   A.  This is an email that we provided to, essentially, attempt

16   to show that we had been in the certification or halal

17   certificate business for, you know, long time.

18   Q.  And how long had the IS EG Halal been in business at this

19   point in time?

20   A.  Just two months.

21   Q.  Now, could you read the first sentence of this email and

22   then stop?

23   A.  "Also for your review, I have attached a few of the

24   certificates of import from Mirasco, one of our major clients."

25   Q.  What's a certificate of import, if you know?

O5kWmen4                          Moldovan - Direct

1    A.  I don't know.  I --

2    Q.  OK.  And could you continue reading this email?

3            THE COURT:  Mr. Mark, you know that once exhibits are

4    admitted, you can argue from their contents to the jury.  So in

5    order to speed things along, there's really no need for all of

6    this reading because you can argue to the jury whatever it is

7    you want to argue from the exhibits.  Obviously, I'm going to

8    allow some of it from each of the parties so you ground the

9    jury in what you're trying to do, but try to cut that down on

10   the admitted exhibits, or you can ask him directly the

11   questions without regard to the exhibit if you want to use

12   testimony.

13           MR. MARK:  Sure.

14           THE COURT:  Let's move it forward.

15           MR. MARK:  I will, your Honor.

16   Q.  Let me just focus your attention on the last -- you wrote,

17   "We have no doubt as to the financial health of our

18   organization as the necessity for these certificates shall

19   exist in perpetuity."  What does in perpetuity refer to there?

20   A.  Frankly, I don't know why I chose that word.  In hindsight,

21   I think it's an inappropriate word, because nothing is forever.

22   Right?  But essentially, the purpose of the statement was to

23   say that it's going to be around for a long time and that there

24   shouldn't be any concern about its sustainability as a company.

25   Q.  Were you trying to indicate that this company was going to

O5kWmen4                          Moldovan - Direct

1  exist for a long time and be very profitable?

2  A.  Correct.

3          MR. MARK:  Mr. Hamill, could we go to Government

4  Exhibit 4C1-L.

5          THE COURT:  Do you think you'll be able to finish with

6  this witness today?

7          MR. MARK:  I don't think so, your Honor.

8          THE COURT:  All right.  Proceed.

9  BY MR. MARK:

10 Q.  Now, in this email, I see a reference that you wrote the

11 fee per container is $1,500 per container certificate?

12 A.  That's right.

13 Q.  What does that refer to there?

14 A.  That was the price that Mr. Hana put on each certificate

15 only for the country of Uruguay.

16 Q.  And was the price different in Uruguay than in the United

17 States?

18 A.  It was $300 cheaper.

19 Q.  So the fee in the United States was more than the fee in

20 Uruguay?

21 A.  Correct.

22 Q.  Now, in connection with attempt -- working to set up an

23 office in Uruguay, did you travel to that country?

24 A.  Yes, I did.

25 Q.  Who did you travel with?

1   A.  It was myself, Mr. Hana and the gentleman we referred to

2   earlier, Mr. Gus Lita.

3   Q.  Do you know Gus Lita's full first name?

4   A.  I don't remember off the top of my head, but it wasn't just

5   Gus.  I think it was Guzman or Gazmend, or something along

6   those lines.  I don't remember the full name.

7   Q.  Apart from working at IS EG Halal, did you know where

8   Mr. Lita had previously worked?

9   A.  No.

10  Q.  And so you mentioned you traveled to Uruguay.  How long

11  were you there for, approximately?

12  A.  I think we were there for about a week, maybe -- maybe a

13  little bit longer than that.

14  Q.  And what did you do generally when you were in Uruguay?

15  A.  We were looking to do a number of things.  Again, we needed

16  to establish a bank account.  We needed to hire employees to

17  work at the actual location there in Uruguay.  We needed to

18  find an office location.  You know, finding, like, an apartment

19  was on that list of objectives for Mr. Hana to stay in when he

20  would be there for the purpose of conducting business there.

21  And that -- I think that was pretty much all we did.

22          MR. MARK:  Mr. Hamill, can you please show to the

23  witness only an exhibit that has been marked for identification

24  Exhibit C104-E.

25  Q.  Do you recognize what's reflected in C104-E, Mr. Moldovan?

O5kWmen4                         Moldovan - Direct

1    A.  I do.

2    Q.  What do you recognize this as?

3    A.  This is the view from the apartment that I believe we chose

4    for Mr. Hana.

5             MR. MARK:  The government offers Government Exhibit

6    C104-E.

7             THE COURT:  Admitted.

8             (Government Exhibit C104-E received in evidence)

9             MR. MARK:  Could you publish that briefly.

10   Q.  You mentioned this was the apartment.  Was there also

11   office space that was selected in Uruguay?

12   A.  Yes.

13   Q.  Now, did IS EG end up setting up an office in Uruguay for,

14   that operated while you were still working at that, for IS EG

15   Halal?

16   A.  We did.

17   Q.  And coming back to the U.S., you said your office was in

18   125 River Road, right?

19   A.  It -- upon meeting Will it was.  It wasn't there before I

20   met Mr. Hana.

21   Q.  After you met Mr. Hana, you moved your office into that

22   building?

23   A.  Correct.

24             THE COURT:  Your law practice as well?

25             THE WITNESS:  That's right.

O5kWmen4                        Moldovan - Direct

```
1    BY MR. MARK:
2    Q.  After you stopped working for IS EG Halal, did your office
3    stay in that building, or did it move?
4    A.  No.  I didn't have an office at that point.
5    Q.  OK.  So when you left, then you lost your office?
6    A.  Correct.
7    Q.  Now, who owned the building at 125 River Road?
8    A.  Freddy.
9    Q.  Did Mr. Hana ever talk about Fred Daibes with you?
10   A.  Yeah, occasionally.
11   Q.  Did he talk about whether he had a personal relationship
12   with Mr. Daibes?
13   A.  Yeah, I think so.  I mean they -- you know, they would -- I
14   mean the three of us would go out together, you know, beyond
15   business.
16   Q.  Are you talking about the three of you, is that you,
17   Mr. Hana and Fred Daibes?
18   A.  That's correct.
19   Q.  Where would you go out apart from business?
20   A.  To give you an example, Freddy took me out on my birthday
21   along with Mr. Hana, you know, just the three of us at a nice
22   steak dinner here in Manhattan.  That's just one example.
23   Q.  And did you observe whether Mr. Hana and Mr. Daibes had a
24   business relationship?
25   A.  I wasn't sure what the extent of their relationship was
```

1    business-wise, but certainly I -- I was there for the

2    possibility of them going into certain real estate investments

3    together.

4              MR. WEITZMAN:  Objection, your Honor.

5              THE COURT:  Yes.  Sustained.

6              I don't know what that means, sir.  You were there for

7    the possibility of them going into certain real estate

8    investments, what do you mean by that?

9              THE WITNESS:  Sure, Judge.  So Freddy is known as a

10   real estate developer, and Mr. Hana wanted to get involved in

11   that, and you know, they would talk about prospecting certain

12   locations from time to time.

13   BY MR. MARK:

14   Q.  And when you said they'd talk about, would Mr. Hana talk

15   with you about that ever?

16   A.  He did.

17   Q.  Were you ever present for conversations with Mr. Daibes

18   about that as well?

19   A.  Once.

20             THE COURT:  Prospecting certain locations for?

21             THE WITNESS:  To build new properties, Judge.

22   BY MR. MARK:

23   Q.  Now, are you familiar with a woman by the name of Nadine

24   Arslanian?

25   A.  I am.

O5kWmen4                      Moldovan - Direct

1    Q.   Have you ever met her?

2    A.   Yes.

3    Q.   How did it come about that you met her?

4    A.   Through Mr. Hana.

5    Q.   Did Mr. Hana ever ask you to do anything for her?

6    A.   He did.

7    Q.   What did he ask you to do for her?

8    A.   He introduced her to me as a new client that needed help

9    with a foreclosure issue.

10   Q.   Did he explain to you what the foreclosure issue was?

11   A.   No, not -- not when he introduced me to Ms. Arslanian, no.

12   She -- she told me what the issue was.

13   Q.   What did Ms. Arslanian tell you was the foreclosure issue?

14   A.   She said that the bank was essentially going to foreclose

15   on her house and essentially that Will was going to pay her

16   outstanding debt.  And by Will, I mean Mr. Hana.

17   Q.   Did you ever come to have a role in any payment for her to

18   avoid foreclosure?

19   A.   I did.

20   Q.   How did that come about?

21   A.   You know, at some point, Mr. Hana had the money that she

22   owed wired to me directly.  I then physically went to the bank

23   to execute a wire transfer to the bank in order to satisfy that

24   debt.

25   Q.   From what account did Mr. Hana wire money to your account?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5kWmen4                      Moldovan - Direct

```
1   A.  From what account did he wire the money from?  I believe --
2   yeah, I believe it was from IS EG or a business account.
3   Q.  And from what account did you prepare this cashier's check
4   from?
5   A.  It was from my personal account.
6   Q.  And who was the check to, the cashier's check to, do you
7   recall?
8           MR. WEITZMAN:  Objection, your Honor.  There was no
9   testimony about a cashier's check.
10          THE COURT:  Sustained.
11  BY MR. MARK:
12  Q.  You said that you received money wired from Mr. Hana's
13  company for this purpose, correct?
14  A.  It was a company.  I'm not -- I don't remember exactly what
15  company it was, so I can't say that it was Will's company or
16  not.  I just remember that it was from a business.
17  Q.  And what did you do after you received this money that was
18  wired?
19  A.  At some point thereafter I was directed to pay the debt, to
20  pay, pay the amount that was sent to me in order to satisfy the
21  outstanding debt to the bank --
22  Q.  And --
23  A.  -- for the property.
24  Q.  -- who directed you to do that?
25  A.  Mr. Hana did.
```

1          MR. MARK:  Mr. Hamill, could you please show for the

2    witness only what has been marked as Government Exhibit B222.

3          THE COURT:  When was this, sir, when you received the

4    money into your account and then satisfied the outstanding debt

5    to the bank?

6          THE WITNESS:  If my memory serves me correctly, Judge,

7    I think it was around July of 2019.

8          THE COURT:  Thank you.

9    BY MR. MARK:

10   Q.  Do you recall approximately how much this debt was at the

11   time?

12   A.  I think when we -- when I was introduced to the foreclosure

13   issue, it was around 17 or 18,000 that was outstanding.  And

14   then at the time -- by the time we actually paid it off, there

15   was some interest that accrued and stuff, so I think it was,

16   like, 23 or 24,000, something in that range.

17   Q.  And do you see, Mr. Moldovan, what's been marked for

18   identification as Government Exhibit B222?

19   A.  I do.

20   Q.  Do you recognize what's reflected in this exhibit?

21   A.  Yes.  These are -- these are text messages that I sent to

22   Nadine Arslanian at that time, yeah.

23         MR. MARK:  Mr. Hamill, could you please show to the

24   witness only exhibits that have been marked for identification

25   as Government Exhibit B222-A, -C, and -D.

O5kWmen4                          Moldovan - Direct

```
 1              THE COURT:  You may have left a 2 out of there.
 2   B222-A?
 3              MR. MARK:  Yeah, three twos.  B222-A, -C and -D.
 4   Q.  Do you recognize these exhibits as well?
 5   A.  Yes.
 6              THE COURT:  Again, I think there was a misstatement
 7   originally.  C, E and C and then it was A, C and D.  What are
 8   you asking?  What three are you asking him to look at?
 9              MR. MARK:  Sorry.  I'm just asking him to look at the
10   screen that showed now B222-A, -C and -D.
11              THE COURT:  OK.
12   BY MR. MARK:
13   Q.  Mr. Moldovan, do you recognize these exhibits that you were
14   just shown?
15   A.  Yes.
16   Q.  What do you recognize them as?
17   A.  These are the documents that were brought to my attention
18   for the purpose of showing me how much was outstanding on the
19   mortgage.
20              MR. MARK:  Now, Mr. Hamill, could you show for the
21   witness only the exhibits that have been marked for
22   identification as exhibits 4C1-D, 4C1-E, 4C1-I, 4C1-J, 4C1-N,
23   and 4C1-R.
24   Q.  Do you recognize these exhibits, Mr. Moldovan?
25   A.  I do.
```

O5kWmen4                        Moldovan - Direct

1    Q.  What do you recognize these exhibits as?

2    A.  These are, you know, essentially documents that were

3    prepared in order to -- essentially, Mr. Hana wanted me to put

4    a loan in place in exchange for delivering the money to

5    Ms. Arslanian, and he wanted a way to track it as a loan, so he

6    had me prepare a promissory note to officiate that.

7            MR. MARK:  Mr. Hamill, could you show one more

8    document in this series to the witness, which has been marked

9    as Government Exhibit D207-A.

10   Q.  Do you recognize this exhibit?

11   A.  Yes.

12   Q.  What do you recognize it as?

13   A.  This is a -- essentially a reinstatement letter from the,

14   from the mortgage company or the -- I should say the loan

15   servicer, which basically says that, you know, you owe

16   $20,216.82, and that would be the amount that needs to be paid

17   in order to reinstate the mortgage as current.

18           MR. MARK:  The government offers Government Exhibits

19   B222, B222-A, -C and -D, Government Exhibits 4C1-D, -E, -I, -J,

20   -N, -R, Government Exhibit D207-A into evidence.

21           THE COURT:  Hearing no objection, admitted, although

22   again, for the record, sometimes you did two 2s and sometimes

23   you did three 2s.  I assume it's always three 2s.

24           MR. MARK:  It's always three 2s, and I'm sorry to the

25   court reporter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5kWmen4                          Moldovan - Direct

1           THE COURT:  All right.  Admitted.

2           (Government Exhibits B222-A, B222-C, B222-D, 4C1-D,

3   4C1-E, 4C1-I, 4C1-J, 4C1-N, 4C1-R and D207-A received in

4   evidence)

5           MR. MARK:  Let's start with Government Exhibit 4C1-I

6   because, thankfully, it doesn't have any twos in it.

7   Q.  What's the date of this email, Mr. Moldovan?

8   A.  June 20, 2019.

9   Q.  And who is this email from and to?

10  A.  It's from myself or, you know, my general email inbox to my

11  general email inbox.

12  Q.  Why would you sometimes send an email to yourself?

13  A.  Anytime I did that it's usually to create a record of

14  something.  Or if I scanned a document on the run, I would

15  often do that from my phone.  If I didn't have time to get to a

16  real copy machine or fax machine, I would just use, like, an

17  app that scans documents into a PDF and then email it to

18  myself.

19  Q.  And just generally, what was attached to this email?

20  A.  This is -- there's two -- or three attachments, actually.

21  I'm just going off of what this says.  It's clearly a lawsuit

22  complaint for mortgage foreclosure and information on how to

23  apply for a mortgage for --

24  Q.  And did you write the subject as Nadine Arslanian here?

25  A.  I did.

1    Q.   Did these documents all relate to Ms. Arslanian?

2    A.   Yes.

3    Q.   And can I direct your attention to page 2?  What's

4    reflected here?

5    A.   This is the foreclosure complaint that Ms. Arslanian, you

6    know, brought to my attention, basically showing that the bank

7    is the plaintiff and that Nadine is the defendant.

8    Q.   Now, if I could direct your attention to page 4.  And

9    what's reflected here?

10   A.   In the caption it states plainly that it's a complaint for

11   mortgage foreclosure.  In the first paragraph it describes who

12   the holder is of the loan or what bank is related to this.  And

13   just names the parties.

14   Q.   OK.  And let me direct your attention to the top of page 5,

15   where it says mortgaged premises.  And what's the -- what does

16   that refer to, where it says mortgaged premises?

17   A.   That's the address of the property in question, which was

18   41 Jane Drive in Englewood Cliffs, New Jersey, and the -- you

19   know, the figure right above it is the amount, total amount of

20   the loan, which was $320,750,000.

21   Q.   That was the total amount of the entire loan that was

22   issued to Ms. Arslanian?

23   A.   That's correct, initially, yes, as a mortgage.

24   Q.   And now if I could direct your attention to the top of page

25   13, do you see towards the top of -- in what's reflected as

O5kWmen4                         Moldovan - Direct

1    paragraph 1, it says the amount due on the debt?

2    A.  Correct.

3    Q.  And what does that refer to in that reference?

4    A.  That is essentially the amount that is left to be paid, the

5    balance of what's owed.

6              THE COURT:  On the mortgage.

7              THE WITNESS:  Correct.

8    BY MR. MARK:

9    Q.  And how much was due as of May 2, 2019?

10   A.  $270,907.20.

11   Q.  Do you see right above that it says serviced by Nationstar

12   Mortgage LLC d/b/a Mr. Cooper?

13   A.  I do.

14   Q.  What, when it says a mortgage serviced by that company,

15   what does that mean?

16   A.  That's who the mortgagee would pay monthly for the

17   mortgage.

18   Q.  And here, this would be who Nadine Arslanian would pay for

19   her mortgage?

20   A.  Correct.

21             THE COURT:  Why don't you wrap it up.

22             MR. MARK:  Well, I can wrap it up.

23             THE COURT:  I mean for now.  It's 4 o'clock.  We're

24   leaving at four.

25             MR. MARK:  This is generally a perfect stopping point

1   for right now.

2            THE COURT:  Ladies and gentlemen, as I said -- I

3   thought I told you last week; I'm sorry -- we're ending at four

4   today and beginning tomorrow at ten.

5            Now, I am informing you, ladies and gentlemen, that we

6   do legal work on this case when you're not here.  When you're

7   here, it's because of factual issues that the parties want to

8   bring out.  But there are also legal issues that need to be

9   taken care of.  For example, I've got legal issues that I've

10  got to set forth for the parties now.  So I don't want you to

11  think that we're taking vacations here.

12           Enjoy the evening.  Do not discuss this case.  Do not

13  read anything or listen to anything about the case.  And I'll

14  see you tomorrow by ten.

15           You've been very timely, and I appreciate it.  And by

16  tomorrow, the carpet should be dry.

17           (Continued on next page)

18

19

20

21

22

23

24

25

O5kWmen4

1              (Jury not present)

2              THE COURT:  You may step down, sir, and I'll see you

3    tomorrow in this courtroom by 10 a.m.

4              THE WITNESS:  Yes, sir.

5              (Witness not present)

6              THE COURT:  All right.  Take a ten-minute break, and

7    we'll reassemble for the opinion regarding Dr. Rosenbaum's

8    testimony.

9              MR. LUSTBERG:  Judge, before you step off and before

10   the jury leaves, do they know that they're off Wednesday,

11   Thursday and Friday?

12             THE COURT:  I certainly hope so.

13             Ms. Blakely, bring the jury back.  Thank you.

14             MR. LUSTBERG:  I know you told the ones that were

15   involved in jury selection, but I wasn't sure about the whole

16   panel.

17             THE COURT:  Thank you.  We may have lost some jurors.

18             You may be seated.

19             (Continued on next page)

20

21

22

23

24

25

O5kWmen4

1              (Jury present)

2              THE COURT:  Ladies and gentlemen, it's been brought to

3    my attention that I may not have informed all of you that we're

4    not having trial on Wednesday, Thursday, Friday of this week.

5    During jury selection, I know I indicated that to some of the

6    jurors when I was talking with the jurors in the jury assembly

7    room.  If I haven't informed the entire jury, I apologize, but

8    we are not going to have trial this week on Wednesday, Thursday

9    and Friday.

10             Thank you.

11             Have a good evening.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O5kWmen4

```
1              (Jury not present)
2              THE COURT:  Ten minutes.
3              (Recess)
4              THE COURT:  All right.  The lawyers and the defendants
5    are present.
6              The government has moved to preclude Dr. Karen
7    Rosenbaum's testimony.  Last week I informed the parties that I
8    was granting that motion to preclude the testimony, and I set
9    forth the reasons in brief.  I will now set them forth in
10   fuller measure.
11             A.  Rule 16(b)(1)(C), expert disclosure notice is
12   deficient in all material respects.
13             First, Menendez's expert disclosure notice is
14   materially deficient pursuant to Federal Rule of Criminal
15   Procedure 16(b)(1)(C).  16(b)(1)(C)(iii) requires the defense
16   to disclose to the government "a complete statement of all
17   opinions that the defendant will elicit from the witness in the
18   defendant's case in chief," as well as "the bases and reasons"
19   for the opinions that the defense will elicit from the expert
20   witness.  This requirement "does not require a verbatim
21   recitation of the testimony the expert will give at trial."
22   Federal Rule of Criminal Procedure 16 advisory notes 2022
23   amendment.  It is, though, designed "to ensure that parties
24   receive adequate information about the content of the witness's
25   testimony and potential impeachment."  Therefore, a "brief
```

O5kWmen4

summary of the proposed testimony" that does not set forth a "full statement of the expert's opinions and reasons for them" is insufficient. *United States v. Dzionara-Norsen,* 2024 WL 191803, at *4 (2d Cir. Jan. 18, 2024). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *United States v. Kwok*, 2024 WL 1773143, at *1 (S.D.N.Y. Apr. 24, 2024), quoting *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). "Where a defendant fails to comply with such disclosure requirements, the court may prohibit him from introducing the evidence at trial." *Dzionara-Norsen*, at *3.

Menendez's brief expert disclosure states that Dr. Rosenbaum will testify that Menendez developed posttraumatic stress disorder ("PTSD") as a result of two specific traumatic events that "the PTSD and lack of treatment resulted in a fear of scarcity for the senator and the development of a longstanding coping mechanism of routinely withdrawing and storing cash in his home." Gov't Mot., ECF 367, Exh. A at 2-3. Menendez's expert disclosure notice sets forth the following "bases and reasons" for Dr. Rosenbaum's conclusions. I set them forth in full:

1. Her "experience and research that demonstrates that such coping mechanisms are a common response to scarcity among trauma victims, especially for those who suffer from

O5kWmen4

1    intergenerational trauma."

2              2.   The "evaluations she conducted of Senator

3    Menendez."

4              3.   Her "review of discovery produced in the case."

5              4.   Her "review of relevant scientific literature."

6         That's all there is in terms of understanding what her

7    research and experience was, what evaluations she conducted or

8    discovery she reviewed, what relevant scientific literature she

9    reviewed.  Those four bases and reasons -- again, I repeat,

10   that's the entirety of it -- are woefully inadequate and

11   insufficient under Rule 16.

12        First, putting forth Dr. Rosenbaum's "experience and

13   research" as a basis for her conclusion provides no meaningful

14   information to the government.  It does not say to the

15   slightest what that experience is and the research in coping

16   mechanisms consisted of.  There isn't even a hint of what the

17   experience and research in coping mechanisms are.

18        To the extent her experience and research are

19   reflected in her curriculum vitae, that document centers on her

20   work on the insanity defense, substance abuse, rape, bulimia

21   and dementia, not PTSD or any coping mechanisms that may arise

22   from PTSD.  Indeed, the provided curriculum vitae is facially

23   devoid of any experience in either PTSD or coping mechanisms.

24        Second, the expert notice provides no detail

25   concerning any evaluations Dr. Rosenbaum completed of Menendez.

O5kWmen4

1    The Rosenbaum expert disclosure is less than a single page of

2    text.  See ECF 367, Exh. A, 2-3, and was not accompanied by any

3    expert report by Rosenbaum that set forth the procedures and

4    conclusions of any evaluations, which is a notable omission.

5    There's no mention of what statements Menendez made that were a

6    basis for her conclusions, what tests were a part of her

7    evaluations of Menendez, how they were administered or what

8    additional records of Menendez she utilized, if any.

9         Third, the expert disclosure notice lacks any specific

10   notice of the "relevant scientific literature" that

11   Dr. Rosenbaum reviewed.  I have no idea what scientific

12   literature she reviewed to reach her conclusions.  We and the

13   government are left in the dark.  The reason these manifold

14   shortcomings matter is because the purpose of Rule 16

15   requirements is to enable the other side -- that is, the

16   government -- to analyze the validity of the expert's opinion,

17   to retain its own expert if the government sees fit, and to

18   prepare for cross-examination of the expert.  This deficient

19   notice frustrates that purpose and prevents the government from

20   being appropriately equipped to rebut Dr. Rosenbaum's

21   testimony.

22        Point one here is the expert disclosure notice is

23   deficient.

24        Point two is that Rule 702 of the Federal Rules of

25   Evidence is not satisfied.  Menendez has failed to make the

O5kWmen4

1    appropriate showing pursuant to Rule 702 of the Federal Rules

2    of Evidence that would permit Dr. Rosenbaum to testify as an

3    expert.  And again, I quote in full here, 702 states that "a

4    witness who is qualified as an expert by knowledge, skill,

5    experience, training or education may testify in the form of an

6    opinion or otherwise if the proponent demonstrates to the Court

7    that it is more likely than not that (a) the expert's

8    scientific, technical or other specialized knowledge will help

9    the trier of fact to understand the evidence or to determine a

10   fact at issue; (b) the testimony is based on sufficient facts

11   or data; (c) the testimony is the product of reliable

12   principles and methods; and (d) the expert opinion reflects a

13   reliable application of the principles and methods to the facts

14   of the case."

15          Menendez has failed to demonstrate that it is "more

16   likely than not" that each of the four conditions of Rule 702

17   is satisfied, and he, therefore, has failed to meet his burden

18   of proof under that rule.  There is nothing -- neither in the

19   expert disclosure notice that I've already described nor in

20   Menendez's response to the government's motion to preclude the

21   expert's testimony -- to support her diagnosis that Menendez's

22   alleged behavior of "withdrawing and storing cash in his home"

23   is a coping mechanism borne out of a "fear of scarcity" that

24   resulted from Menendez's PTSD.  Simply put, he offers nothing

25   in the literature to support that stockpiling cash in one's

O5kWmen4

1    residence is a coping mechanism of PTSD due to

2    "intergenerational trauma."

3         The court is the ultimate gatekeeper of evidence to

4    the portal of 702.  *United States v. Williams*, 506 F.3d 151,

5    160 (2d Cir. 2007), and in that capacity, the court must make

6    "a preliminary assessment of whether the reasoning or

7    methodology underlying the testimony is scientifically valid

8    and whether that reasoning or methodology properly can be

9    applied to the facts at issue."  That's from the seminal case

10   of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579,

11   592-93 (1993).

12        Given the deficiencies above, the court finds that

13   Menendez has not done so here.  He has not met his burden of

14   showing that Dr. Rosenbaum's testimony is the product of

15   reliable principles and methods and that her opinion reflects a

16   reliable application of the principles and methods to the facts

17   of the case.  Although the court recognized that there's some

18   leeway that should be afforded the testimony of psychologists

19   and psychiatrists, the notice reflects absolutely no principle

20   or methodology for applying those principles.

21        I've set forth what major deficiency is in the Rule 16

22   notice, and major deficiency is failure to comply with the

23   requirements of 702 before I can allow the testimony to pass

24   through the gateway of the court under *Daubert*.

25        Reason No. 3 is that her proffered testimony is

O5kWmen4

1    impermissibly based on inadmissible hearsay.  Dr. Rosenbaum's

2    proffered testimony is also being precluded by the court

3    because it is based on inadmissible hearsay.  To be certain, an

4    expert is permitted to rely on hearsay in reaching their

5    conclusions.  *See*, *United States v. Dukagjini*, 326 F.3d 45, 58

6    (2d Cir. 2003); *see also*, Federal Rule of Evidence 703.

7         However, that testimony cannot simply be a vehicle for

8    transmitting wholesale the defendant's version of events.  *See*

9    *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).  That

10   is exactly what's happening here.  At a press conference in

11   Union City eight months ago, on September 25, 2023, in his

12   first public comments following his initial indictment,

13   Mr. Menendez explained that the reason he kept so much cash in

14   his home was "because of the history of his family facing

15   confiscation in Cuba."  *See* Bryan Metzger, Menendez says the

16   cash found in his home was from his personal savings account,

17   which he kept for emergencies due to his family's facing

18   confiscation in Cuba.  *Business Insider,* September 25, 2023, at

19   12:08 p.m.

20        And there are numerous other press accounts based on

21   Mr. Menendez's public statements.  As I say, his explanation

22   was immediately picked up and widely reported, the natural and

23   presumably intended result of a public press conference by a

24   sitting United States Senator.

25        Dr. Rosenbaum's proffered testimony bears a

O5kWmen4

1    startlingly strong resemblance to Mr. Menendez's own

2    description of events and attribution of causes eight months

3    ago.  The expert notice provides no other source for the story

4    and no confirmation of it independently save for Menendez's own

5    words.  Dr. Rosenbaum, were she permitted to testify, would

6    essentially be reciting to the jury the same background,

7    details and conclusions that Menendez will be able to tell the

8    jury himself if he so chooses to testify in his defense, or,

9    for that matter, the testimony of another witness, a lay

10   witness who had firsthand knowledge of the events who could

11   testify to those events if he or she had firsthand knowledge of

12   them.

13          To be sure, Mr. Menendez is under absolutely no

14   obligation whatsoever to testify, but the proposed expert

15   testimony is an effort to transmit the defendant's story to the

16   jury without his deciding to take the stand and be subject to

17   cross-examination while at the same time adding a patina of

18   expert opinion to his lay testimony.  Again, I repeat, he's

19   under absolutely no obligation to testify, but he can't get

20   what would be his testimony to the jury by virtue of this

21   expert's testimony.  That tactic is clearly impermissible.

22   "The expert may not simply transmit that hearsay to the jury.

23   Otherwise, the expert is simply repeating hearsay evidence

24   without applying any expertise whatsoever, a practice that

25   allows the defendant to circumvent the rules prohibiting

O5kWmen4

1    hearsay." *Mejia*, 545 F.3d 197.

2              This issue -- that is, the impermissible hearsay

3    issue -- also implicates Rule 702.  "To the extent the expert

4    merely repeats or recasts the testimony of the defendant in

5    order to arrive at a theory of causation, he is not testifying

6    as an expert witness based on specialized knowledge but rather

7    is acting as a conduit for another witness's testimony in the

8    guise of an expert's opinion."  *Hernandez v. Leichliter*, 2016

9    WL 684038, at *2 (S.D.N.Y. Feb. 18, 2016).  Such evidence is

10   impermissible.  "Nothing in either *Daubert* or the Federal Rules

11   of Evidence requires a district court to admit opinion evidence

12   that has connected two existing data only by the *ipse dixit* of

13   the expert."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146

14   (1997).

15             Here, Dr. Rosenbaum apparently relies heavily upon

16   Menendez's own characterizations to serve as the facts that

17   underlie and drive her conclusion.  That's at least based on

18   the expert disclosure.  This court will not permit Mr. Menendez

19   to use Dr. Rosenbaum as a substitute for his testimony while

20   avoiding cross-examination in this matter, as I've said already

21   in this opinion.

22             The fourth reason for exclusion -- I've already set

23   forth Rule 16(b) deficiencies -- the failure to comply with

24   Rule 702; that is, to meet the strictures of 702 and the fact

25   that it's largely impermissible hearsay.

O5kWmen4

1          The fourth is Rule 403 balancing militates against

2     permitting Dr. Rosenbaum's testimony.  To admit psychiatric

3     evidence of a medical condition -- here, the alleged coping

4     mechanism of storing hundreds of thousands of dollars of cash

5     as a response to PTSD -- to a psychiatrist instead of to the

6     defendant's testimony or the testimony of someone who has

7     firsthand knowledge of the defendant's actions requires a

8     "direct link." *Cromitie v. United States*, 2017 WL 1383982, at

9     *5 (S.D.N.Y. Apr. 27, 2017).  There's no direct linkage here.

10    Dr. Rosenbaum's testimony runs the danger of evoking jury

11    sympathy for Mr. Menendez because he allegedly exhibits PTSD.

12    There is the potential, the real potential, that jurors could

13    believe that because he stored large amounts of cash in his

14    home, the cash found in his home therefore did not come from

15    the bribes.  The probative value of testimony that storing cash

16    is the defendant's coping mechanism as a result of trauma is

17    substantially outweighed by the danger of unfair prejudice,

18    confusing the issues and misleading the jury into thinking the

19    asserted coping mechanism is a defense to the charges against

20    the defendant.  The court does grant the government's motion to

21    preclude Dr. Rosenbaum's testimony in its entirety.

22          All right.  That's my opinion.

23          Have the parties been working on the objections to the

24    summary chart, and if so, has any headway been made?

25          MR. WEITZMAN:  Your Honor, we've spoken to the

O5kWmen4

1    government.  I hope we should make some headway tonight.  We

2    will confer with them.

3            Can I just put one thing on the record with respect to

4    your ruling, your Honor?

5            THE COURT:  Yes, sir.

6            MR. WEITZMAN:  We're not challenging the ruling, but I

7    would like, for appellate purposes, the record to be clear in a

8    couple of respects.  The first is we made a request in our

9    opposition brief to supplement with a more formal expert

10   report, which we are still willing to do.

11           THE COURT:  Literally done right on the eve of trial.

12   No, sir.  The trial was about to begin.

13           MR. WEITZMAN:  Yes, your Honor.

14           THE COURT:  Denied.

15           MR. WEITZMAN:  I understand that.  Just for the

16   record, I'd like the record to be clear.

17           THE COURT:  And the delay that would have been caused

18   by it, no.

19           MR. WEITZMAN:  I'd like the record to be clear that we

20   don't expect our case to begin for five more weeks.  We also

21   made Mr. Menendez available for the government --

22           THE COURT:  You have my ruling.  I understand that.

23   You can supplement that.  You can say anything you want to the

24   Court of Appeals.

25           MR. WEITZMAN:  Yes.

O5kWmen4

1          The second thing is that we did agree to disclose the

2     scientific literature to the government.  We disclosed much of

3     the scientific literature in the opposition brief itself, and

4     we are more than happy to provide it to the government again.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5K3MEN5

1          THE COURT:  Same point, sir.  And to the extent you

2    disclosed any opposition brief, I certainly read the opposition

3    brief.

4          I must say, I myself am a lay witness, but I fail to

5    see coping mechanisms as a result of PTSD.  But, there are

6    larger issues here than that.

7          MR. WEITZMAN:  I understand, your Honor.  That's all I

8    wanted to put on the record.

9          THE COURT:  You have your record.

10         MR. RICHENTHAL:  So the record is complete, this is

11   the first I've ever heard that the defense "made Mr. Menendez

12   available for the government."

13         MR. WEITZMAN:  Your Honor, we attached an e-mail in

14   which we agreed to make him available as long as there are

15   certain conditions we can reach as to the circumstances of that

16   interview.  We absolutely made him available.

17         THE COURT:  All right.

18         MR. RICHENTHAL:  The e-mail speaks for itself.

19         THE COURT:  Yes.  We don't have to debate that at this

20   point.  I'll see everyone at 10 a.m. tomorrow.

21         This jury is excellent.  They seemed to be

22   disappointed that we were ending at 4.  They were really

23   interested in continuing.

24         Thank you.

25         (Adjourned to May 21, 2024, at 10 a.m.)

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    JAMES BRET TATE

 4   Direct By Mr. Mark . . . . . . . . . . . . . 571

 5   Cross By Mr. Lustberg  . . . . . . . . . . . 586

 6   Cross By Mr. Fee . . . . . . . . . . . . . . 620

 7   Redirect By Mr. Mark . . . . . . . . . . . . 689

 8    JOHN MOLDOVAN

 9   Direct By Mr. Mark . . . . . . . . . . . . . 706

10                       GOVERNMENT EXHIBITS

11   Exhibit No.                              Received

12    8B-18   . . . . . . . . . . . . . . . . . 577

13    2A-33   . . . . . . . . . . . . . . . . . 710

14    2B-3   . . . . . . . . . . . . . . . . . . 711

15    2A-32   . . . . . . . . . . . . . . . . . 717

16    2A-14   . . . . . . . . . . . . . . . . . 718

17    4C1-A, 4C1-G, 4C1-K, 4C1-L, 4C1-M  . . . . . 730

18    C104-E   . . . . . . . . . . . . . . . . . 747

19    B222-A, B222-C, B222-D, 4C1-D, 4C1-E, . . . . 755

20         4C1-I, 4C1-J, 4C1-N, 4C1-R and

21         D207-A

22                       DEFENDANT EXHIBITS

23   Exhibit No.                              Received

24    378   . . . . . . . . . . . . . . . . . . 626

25    711, 748, 771   . . . . . . . . . . . . . . 682
```