O5L3MEN1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          23 Cr. 490 (SHS)

5  ROBERT MENENDEZ, et al.,

6            Defendants.
                                         Trial
7  ------------------------------x

8                                        New York, N.Y.
                                         May 21, 2024
9                                        10:15 a.m.

10 Before:

11
                    HON. SIDNEY H. STEIN,
12
                                         District Judge
13                                       -and a Jury-

14                      APPEARANCES

15 DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
   BY:  PAUL M. MONTELEONI
17      DANIEL C. RICHENTHAL
        ELI J. MARK
18      LARA E. POMERANTZ
        CATHERINE E. GHOSH
19      Assistant United States Attorneys
        -and-
20      CHRISTINA A. CLARK
        National Security Division

21

22

23

24

25

O5L3MEN1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4       Attorneys for Defendant Menendez
BY:  ADAM FEE
5       AVI WEITZMAN
        RITA FISHMAN
6

7 GIBBONS, P.C.
        Attorneys for Defendant Hana
8 BY:  LAWRENCE S. LUSTBERG
        ANNE M. COLLART
9       CHRISTINA LaBRUNO
        RICARDO SOLANO, Jr.
10      ANDREW J. MARINO
        ELENA CICOGNANI
11      JESSICA L. GUARRACINO

12

13 CESAR DE CASTRO
SETH H. AGATA
14 SHANNON M. McMANUS
        Attorneys for Defendant Daibes
15

16

Rodina Mikhail, Interpreter (Arabic)
17 Bachar Alhalabi, Interpreter (Arabic)

18

19

20

21

22

23

24

25

O5L3MEN1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Good morning.  Defendants and all counsel |
| 3 | are present.  Please be seated.  Bring the jury in. |
| 4 | How much longer do you have, sir? |
| 5 | MR. MARK:  Approximately 30 to 45 minutes, your Honor. |
| 6 | THE COURT:  All right.  Apparently, the jury is unable |
| 7 | to stay in my robing room.  The leak was so substantial it |
| 8 | leaked into the courtroom or chambers below, so the rugs have |
| 9 | to be picked up, which means jurors have to come from another |
| 10 | jury assembly room.  Please be seated.  We'll wait a few |
| 11 | minutes. |
| 12 | In the future I'll try to lead bringing the jury up so |
| 13 | there isn't this lag in time. |
| 14 | (Pause) |
| 15 | THE COURT:  I'm going to step off the bench so you |
| 16 | don't have to stare at me.  When my deputy brings the jury in, |
| 17 | I'll be right outside. |
| 18 | (Recess) |
| 19 | (Continued on next page) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

O5L3MEN1                      Moldovan - Direct

1             (Jury present)

2             THE COURT:  Mr. Moldovan, I remind you, you remain

3    under oath.  Do you understand that, sir?

4             THE WITNESS:  Yes your Honor.

5             THE COURT:  You may continue with your direct

6    examination.

7     JOHN MOLDOVAN,

8         called as a witness by the Government,

9         having been previously sworn, testified as follows:

10   DIRECT EXAMINATION (Continued)

11   BY MR. MARK:

12   Q.  Good morning, Mr. Moldovan.

13   A.  Good morning.

14   Q.  Yesterday you testified that Mr. Hana fired you from your

15   job at IS EG Halal.  Approximately when was that?

16   A.  About three months after I started.  About three months in.

17            THE COURT:  Around what day would that be?

18            THE WITNESS:  I would imagine it was probably around

19   August.

20   Q.  Of the year 2019?

21   A.  Correct.

22   Q.  What explanation, if any, did Mr. Hana give you about why

23   he fired you?

24   A.  He didn't give me any particular explanation at the time of

25   my termination.  But, three weeks prior to that, there was a

O5L3MEN1                        Moldovan - Direct

situation where one of his employees had expressed an interest

in becoming a lawyer one day and asked me if she could

potentially do some side work for me on her downtime during her

work with IS EG.  And I told her to get it approved by her

supervisor, which was Mr. Hana, and I wouldn't have a problem

with that.

          I think he took that the wrong way and took me as

poaching one of his employees.  So I think that may have had

something to do with it.  He was pretty upset about that.

Q.  You mentioned he was upset.  But did he give you an

explanation for why you ultimately fired you?

A.  No.

Q.  Have you been testifying today and yesterday voluntarily or

did you receive a subpoena?

A.  I received a subpoena.

Q.  Previously did you also receive a grand jury subpoena?

A.  I did.

Q.  What is a grand jury subpoena?

A.  It is essentially a document that says you have to testify

in front of a grand jury, which is a part of the legal process

that determines whether or not there is probable cause in a

criminal action.

Q.  Did you receive a subpoena that also required documents as

well to be produced?

A.  That's correct.

O5L3MEN1                          Moldovan - Direct

1    Q.   Did you initially respond to the grand jury subpoena that

2    you received?

3    A.   No.

4    Q.   Did a court order you to respond?

5    A.   Ultimately, yes.

6    Q.   Did you respond after that court order?

7    A.   I did.

8    Q.   Why did you initially not respond to the grand jury

9    subpoena?

10   A.   Frankly, I wanted nothing to do with this.  As I told you,

11   I had a very good relationship with the Daibes family, and I

12   didn't want a part of any prosecution against him or anyone

13   he's affiliated with.  So I avoided the subpoena.

14   Q.   Now, you testified yesterday that you worked at IS EG, and

15   when you worked there, you performed some legal duties and some

16   administrative duties; is that fair?

17   A.   That's correct.

18   Q.   Did you have any duties while you worked at IS EG with

19   regards to hiring of new employees?

20   A.   I did.

21   Q.   What were those duties?

22   A.   So, specifically, when we took that trip to Uruguay to set

23   up a new office and headquarters in South America, it was my

24   job to vet all applications for employees that would be

25   headquartered in Uruguay.  So, with that process, I reviewed

1    applications, conducted interviews and made recommendations to

2    Mr. Hana.

3              And while in the United States, there was also a

4    period of time where there was a job posting and so I reviewed

5    some applications for jobs locally in the United States as

6    well.

7    Q.  What was the job posting locally in the United States?

8    A.  I believe the posting was for account manager.

9    Q.  What was the role of an account manager at IS EG Halal?

10   A.  Frankly, I only saw account managers do a few things.  I'm

11   not sure what their entire role was.  It was my understanding

12   that they would communicate with the meat companies who were

13   looking for certificates to export to Egypt.  And so, I believe

14   their duties were to make sure that their accounts were up to

15   date and paid and that they didn't have an outstanding balance.

16   And then also, the duty of issuing certificates which were

17   printed in the office.

18   Q.  Did you ever see the certificates that were printed in the

19   office?

20   A.  I never looked at any closely, but I did see what appeared

21   to be certificates being printed on a printer in the office.

22   Q.  From working at IS EG Halal, were you aware of whether the

23   company did any verification to determine whether meat was

24   halal or not before printing a certificate?

25   A.  I remember, you know, I had a conversation or two with

1   Mr. Hana about him and Mr. Gus Lita taking trips to different

2   companies to make sure and to do certifications of the halal

3   certification process.  So, I don't know what they did on those

4   trips or what the process for the certification looked like.

5   But he did mention that to me on more than one occasion.

6   Q.  From your job, were you aware whether IS EG Halal employed

7   any people that blessed meat at any plants?

8   A.  Not that I am aware of.

9   Q.  You had mentioned that Mr. Hana said he and Mr. Lita went

10  out to the plants.  So apart from that, were you aware of

11  whether IS EG employed any people whose job it was to inspect

12  meat at plants?

13  A.  I was not aware of any, no.

14  Q.  Now, focusing on your job at the time at IS EG Halal.  You

15  stated you reported to Mr. Hana, right?

16  A.  That's right.

17  Q.  When you were working with Mr. Hana, what language did you

18  talk with him in?

19  A.  Primarily in English.  But we would have side conversations

20  in Arabic.

21  Q.  From dealing with Mr. Hana at work, what was your

22  understanding about his English language skills?

23  A.  I thought they were really good.  Judging by the level of

24  his accent, which is almost none -- I've been around Arabs and

25  Arab Americans my whole life, so I can usually tell someone's

1  level of proficiency by I guess the level of their accent.  And

2  he barely had any accent.  So, I think he was pretty good with

3  English.  Reading and writing.

4  Q.  Are you familiar with anyone by the name of Andy Aslanian?

5  A.  I am.

6  Q.  Who is he?

7  A.  He is an attorney from the Fort Lee area, not far from

8  Edgewater.

9  Q.  Did you know from Mr. Hana whether Andy Aslanian had any

10 connections to IS EG Halal?

11 A.  Not at the time, no.

12 Q.  When you say not at the time, are you referring to a

13 particular time?

14 A.  While I was working with IS EG.  No one ever told me that

15 Mr. Aslanian had anything to do with IS EG.  Unfortunately, you

16 know -- not unfortunately, I shouldn't say that.  But just

17 reading things after --

18          MR. WEITZMAN:  Objection, your Honor.

19          THE COURT:  Sustained.  Next question.

20 Q.  So, during the course of the time that you were working for

21 Mr. Hana, did you ever prepare any documents related to Andy

22 Aslanian?

23 A.  I did.

24 Q.  What did you prepare?

25 A.  There was a time when Mr. Hana asked me to prepare a

O5L3MEN1                        Moldovan - Direct

1   contract for the sale of his shares in IS EG.

2   Q.  Can you explain what that contract was?

3   A.  It was essentially a purchase agreement, you know, for a

4   number of shares in the company for a price.  And it laid out

5   the terms of the payment, and the price itself and so on.

6   Q.  Who was purchasing the shares in the company and who was

7   selling the shares in IS EG?

8   A.  I think Mr. Hana was the purchaser of the shares back from

9   Mr. Aslanian, because he initially issued them to him at some

10  point in time before I came on to the company.

11          MR. MARK:  Mr. Hamill, can you please show for the

12  witness only the exhibit that has been marked for

13  identification as Government Exhibit 2A-8.

14  Q.  Mr. Moldovan, do you recognize what's reflected in this

15  exhibit?

16  A.  I do.

17  Q.  What is reflected in this exhibit?

18  A.  That is Mr. Aslanian.

19          MR. MARK:  The government offers Government Exhibit

20  2A-8.

21          THE COURT:  Admitted without objection.

22          (Government's Exhibit 2A-8 received in evidence)

23          MR. MARK:  Mr. Hamill, can you briefly publish that.

24  Q.  You just were talking about an agreement for the buyback of

25  shares.  Did you discuss that agreement with anyone else other

O5L3MEN1                     Moldovan - Direct

1    than Mr. Hana?

2    A.  I did.

3    Q.  Who else did you discuss that agreement with?

4    A.  With Mr. Daibes or Freddy as I called him at the time.

5    Q.  What did you discuss about that agreement with Mr. Daibes?

6    A.  He just said, you know, something along the lines of

7    prepare the contract, get it done.  And this was after Mr. Hana

8    had already directed me to do it.  So we can get this sale done

9    essentially.

10   Q.  Did either Mr. Hana or Mr. Daibes explain to you why the

11   agreement needed to be prepared?

12   A.  I don't remember to be honest.

13   Q.  Did you understand whether Mr. Daibes had any role in

14   connection with the buyback of the shares?

15   A.  I don't know what his role was.  You know, but --

16             MR. WEITZMAN:  Objection.  Asked and answered.

17             THE COURT:  I'll allow it.

18             He doesn't know what his role was.  Go ahead.  Next

19   question.

20   Q.  Were you aware from the transaction whether there was

21   anybody who held shares in escrow in connection with it?

22             MR. WEITZMAN:  Objection.  Leading.

23             THE COURT:  Sustained.

24   Q.  Are you familiar with the term "escrow"?

25   A.  I am.

O5L3MEN1                        Moldovan - Direct

1    Q.   What does that term refer to?

2    A.   Similar to a trust account.   It is an account that's for

3    the purpose of holding funds, usually in the process of a real

4    estate transaction or something along those lines, where the

5    money is deposited in some person's account, usually an

6    attorney, and later transferred or wired to whoever the

7    beneficiaries are of the transaction.

8    Q.   Was there any discussion in connection with this contract

9    whether there would be anybody who would play the role or hold

10   anything in escrow?

11   A.   One more time, please?

12   Q.   In connection with this --

13            THE COURT:   Was there a discussion concerning escrow

14   in connection with this purchase agreement you've testified to?

15   Yes or no?

16            THE WITNESS:   I don't remember.

17   Q.   You had mentioned you spoke with Mr. Daibes about the share

18   buyback agreement.   Where did that conversation happen?

19   A.   It wasn't a full discussion.   It was kind of in passing.

20   So Mr. Daibes had the third floor of the building where we all

21   worked at 125 River Road, and Mr. Hana's office was also there,

22   initially on the lower level but ultimately up there on the

23   third level as well.   And so, often when I would be reporting

24   to Mr. Hana, I would just pass Mr. Daibes because he was always

25   kind of floating around the office.   You know.   So, I believe

1  he was walking to his office at the time and he saw me and he

2  said something like get that contract done.  Something along

3  those lines, hurry up and get it done or something.

4  Q.  Where was your office at 125 River Road located?

5  A.  It was on the main, like, base level of the office, floor

6  1.

7  Q.  Apart from this time where you saw Mr. Daibes and he asked

8  you about the contract, did you see Mr. Daibes in the office on

9  other occasions?

10 A.  Yes, I saw him all the time.

11 Q.  Did there ever come a time while you were working with IS

12 EG where you were looking for investors in your law practice?

13 A.  Sure.

14 Q.  Did you discuss that with Mr. Hana?

15 A.  I did.

16 Q.  Did you discuss that with anyone else?

17 A.  I did.

18 Q.  With who else?

19 A.  With Mr. Daibes and his son.

20 Q.  Did they ever decide to provide you any money in connection

21 with your practice?

22 A.  They did.

23 Q.  Did they ultimately invest in your practice?

24 A.  They gave me some startup cash.

25 Q.  What happened as a result of that?

1  A.  Ultimately, nothing.  Nothing happened.  You know, they

2  wanted to partner with me essentially in my firm, and that is

3  very much prohibited by the rules of professional conduct, and

4  so, we never really found a way to navigate that without me

5  being in violation of those rules.  So it never came to

6  fruition.

7  Q.  You testified yesterday that Mr. Hana introduced you to

8  Nadine Arslanian?

9  A.  That's correct.

10  Q.  When did you first meet her?

11  A.  Probably in June of 2019, maybe July.

12  Q.  Approximately how many times did you meet her?

13  A.  It was once or twice.  I think once a full introductory

14  meeting, and then the second time I believe she just, like,

15  handed me some papers that I needed for the foreclosure action.

16  Q.  Apart from meeting her, did you ever speak with her on the

17  phone?

18  A.  I did.

19  Q.  Approximately how many times?

20  A.  Probably two, maybe three times on the phone over verbal

21  conversations.

22          MR. MARK:  Mr. Hamill, can you please show for the

23  witness only the exhibit that has been marked for

24  identification as Government Exhibit 2A-2.

25  Q.  Mr. Moldovan, do you recognize this exhibit?

O5L3MEN1                      Moldovan - Direct

1   A.  Yes.

2   Q.  What's reflected in it?

3   A.  That is Ms. Arslanian.

4            MR. MARK:  The government offers Government Exhibit

5   2A-2.

6            THE COURT:  Admitted without objection.

7            (Government's Exhibit 2A-2 received in evidence)

8   Q.  At the time that you met Nadine, what, if anything, did you

9   understand she did for work?

10  A.  I wasn't sure what she did.  I had no idea.

11  Q.  At the time you met Nadine, what, if anything, did you

12  understand about whether she was in a romantic relationship

13  with anyone?

14  A.  I had no idea about any romantic relationship she was in.

15  Q.  You testified yesterday that Will said that he was going to

16  pay her outstanding debt on her house.  Do you recall

17  testifying about that?

18  A.  That's correct.

19  Q.  When Nadine told you that, did she mention anything about a

20  loan?

21  A.  She did.

22  Q.  Did she mention anything about a promissory note at that

23  time?

24  A.  Initially, no.  When we first started the conversation

25  about the foreclosure and Will, Mr. Hana paying that off, there

1    was no conversation about a promissory note.  That came after

2    the fact.  That was, you know, like a few weeks later, Mr. Hana

3    came to me and sort of out of the blue and said I need you to

4    draw up a promissory note before we send the funds to pay off

5    that mortgage.

6    Q.  What is a promissory note?

7    A.  It is essentially a loan.  It is a document that

8    memorializes a loan and the terms of the loan.

9            THE COURT:  In essence is it a document that says I

10   promise to pay you X amount?

11           THE WITNESS:  That's correct, Judge.

12           THE COURT:  That's why it is called a promissory note;

13   is that correct?

14           THE WITNESS:  Yes, sir.

15   Q.  Did you end up drawing up a promissory note?

16   A.  I did.

17   Q.  Generally, what were the terms of that promissory note?

18   A.  There was an amount that was to be delivered, I think it

19   was somewhere in the range of 20, 22 or $23,000, and there was

20   no interest on the loan, and I think it was like a five-year

21   term that she had on which to pay that amount back in full.

22   Q.  Did you discuss those terms at all with Mr. Hana?

23   A.  I did.

24   Q.  What did you say to him about those terms?

25   A.  Well, essentially I asked him, when he told me to draw up a

1    note, I said, well, what do you want this loan to look like?

2    What's the interest?  What are the terms of payment?  Is she

3    going to make payments monthly, weekly, daily?  Tell me a

4    little bit more about this loan.  So he essentially just said,

5    make it no interest, make it a five-year loan, and don't put a

6    payment schedule.

7    Q.  Did you respond to him when he asked you to do that?

8    A.  I mean, usually when I was ordered to do things in my

9    capacity as counsel for Mr. Hana, I didn't ask questions.  As

10   long as I thought that, you know, the conduct was lawful, I did

11   it.

12           THE COURT:  Why do you say order?  He was your boss,

13   right?

14           THE WITNESS:  That's right, Judge.

15           THE COURT:  Presumably, he told you or asked you to do

16   something.

17           THE WITNESS:  Right.

18           THE COURT:  Okay.

19   Q.  Now, you mentioned that you had helped prepare, you

20   prepared this promissory note.  What did you do with this

21   promissory note after you prepared it?

22   A.  I sent it to Ms. Arslanian.

23           MR. MARK:  Mr. Hamill, could we publish what I believe

24   is already in evidence as Government Exhibit 4C1-D.

25   Q.  Mr. Moldovan, do you recognize this e-mail?

1  A.  I do.

2  Q.  What is it?

3  A.  It is an e-mail from me to Nadine Arslanian copying my

4  general mail inbox where it says Moldovan Legal and copying

5  Mr. Hana.

6  Q.  Do you see where it says "Funds will be disbursed upon your

7  execution of the attached agreement"?

8  A.  I do.

9  Q.  Did you talk with Nadine after you sent this e-mail?

10  A.  I did.

11  Q.  Was that by phone or in person?

12  A.  It was by phone, either verbal or text message

13  communications.

14  Q.  What was discussed with Nadine after you sent this note?

15  A.  She was pretty upset about this.  She responded in a way

16  that made me think she didn't see this coming or didn't expect

17  to be the subject of a loan.  So, she said essentially that she

18  would have to talk to Will and get back to me.

19  Q.  Immediately after sending this note, did you disburse the

20  funds?

21  A.  No.

22  Q.  Why not?

23  A.  I wouldn't have done that until Mr. Hana told me to.

24  Q.  This talks about execution of the attached agreement.  Was

25  the promissory note ever executed, to your understanding?

O5L3MEN1                        Moldovan - Direct

 1  A.  Not that I am aware of.

 2          MR. MARK:  Mr. Hamill, could we publish Government

 3  Exhibit 4C1-J.  Could we just zoom in on the top of this

 4  e-mail.

 5  Q.  What does this e-mail concern?

 6  A.  This is a set of correspondence between me and a woman by

 7  the name of Kristen Lewis, who worked for the loan servicer.

 8  She put me in touch with the firm that was handling the

 9  foreclosure action.  We were asking for the reinstatement

10  amount to be paid on a loan and bring it current.  And so these

11  are the people that are involved in those communications.

12  Q.  When you're talking about reinstatement, what does that

13  word refer to?

14  A.  It refers to the payment to be made to the mortgage company

15  to bring the loan back to current status.  A number of payments

16  were missed, and that's what led to the foreclosure action.

17  And so reinstatement is when you pay that amount off and any

18  other fees and interest, which brings the loan current again.

19          MR. MARK:  Mr. Hamill, can we publish Government

20  Exhibit B222.  And can we go to page 10 of this document.

21  Q.  What is reflected in these messages, Mr. Moldovan?

22  A.  These are text messages between me and Nadine.

23  Q.  Do you see that your name is reflected as John and hers is

24  reflected as Nadine Menendez?

25  A.  I do see that.

O5L3MEN1                        Moldovan - Direct

1    Q.   When you knew Nadine, what was her last name at the time?

2    A.   Arslanian.

3    Q.   And do you see on June 28 you wrote, "Nadine, did you

4    review the note I sent you?"

5    A.   Yes.

6    Q.   And what was that note?  Was that the promissory note we

7    were just looking at?

8    A.   Yes.

9    Q.   Now, if you go down on July 16, could you explain what you

10   wrote to her there in that text message.

11   A.   It says, "Hi Nadine.  I called earlier with no answer.  I

12   am still awaiting your response on the money from Will."

13   Q.   When you wrote "I'm still awaiting your response to the

14   money," what was that referring to?

15   A.   I was just referring to her signing the promissory note.

16   Q.   Meaning you hadn't received the signed promissory note yet

17   at that time?

18   A.   Correct.

19        MR. MARK:  Mr. Hamill, can we go to the next page.

20   Q.   And what's reflected in these text messages here?

21   A.   This is Nadine's text response to me basically saying,

22   "Good morning, I have no idea what response you're waiting

23   for."

24   Q.   And then it looks like you responded to her shortly after

25   in two text messages.  Could you just generally explain what

1  your response was there?

2  A.  Sure.  Naturally, I just wanted to refresh her recollection

3  as to what I was talking about and why I was talking about it.

4  So I responded to her by saying, "Hey Nadine," and laying out

5  the dates of everything.  "On June 27, I sent you a promissory

6  note that Mr. Hana asked me to draft and send you for execution

7  prior to the transfer of funds we discussed."

8          THE COURT:  A little slower.  When people read, they

9  tend to go faster, but the reporter needs to take your words

10  down.

11          THE WITNESS:  Yes, Judge.

12  A.  "I'm not sure if you recall, but we discussed the

13  promissory note over the telephone subsequent to me sending it

14  to you via e-mail.  You were rather upset that he was making

15  you sign any type of instrument, even though I explained that

16  there was no interest -- you said you would have to get back to

17  me but you never did.  As you can see above, I tried to follow

18  up a couple of times, but I assume based upon our conversation,

19  and your lack of a response, that you are no longer interested

20  in receiving the funds."

21  Q.  Do you see you then sent a message just looks like

22  approximately or a little less than two minutes later after

23  that one to Nadine?

24  A.  Yes.

25  Q.  What was the message you sent about two minutes later?

O5L3MEN1                    Moldovan - Direct

1   A.  The message was, "I've been instructed to transfer the
2   funds.  And I am working on that now.  I will let you know as
3   soon as it is complete."
4   Q.  Who instructed you to transfer the funds?
5   A.  Soon after I sent that summary reminder to Nadine, Will
6   came to me and said just send the money.  That was what he told
7   me to do.
8   Q.  After Will told you to just send the money, what did you do
9   next in relation to that?
10  A.  I asked him, I said like, like, right now today?  Or you
11  know, like, is there a timeline for this?  And he said, yeah,
12  right now, go to the bank and do it.  So, you know, I said
13  okay.  Is someone wiring me the money to get to her?  And so he
14  said he'd have the money wired to me.  I gave him my account
15  information, and they wired the money to me that day.  I went
16  to the bank, and then executed a wire transfer to the loan
17  company to reinstate the loan.
18          MR. MARK:  Mr. Hamill, could we publish 4C-1-E what's
19  already in evidence.  We can scroll through that very quickly
20  for Mr. Moldovan's benefit.
21  Q.  If we can focus on the bottom of page 2.  Do you see the
22  date of this e-mail is July 17, 2019?
23  A.  Right.
24  Q.  What does this e-mail concern?
25  A.  So, prior to the time of Will telling me to execute that

1    wire transfer, there was some conversation in the office about

2    potentially buying the note.  Apparently Mr. Daibes was

3    interested in buying the loan itself, so that the repayment

4    could be made to him, and he could be the holder of the

5    mortgage.

6    Q.  When you're talking about buying the loan itself, what loan

7    are you talking about there?

8    A.  Nadine's outstanding mortgage.

9    Q.  So that's the full mortgage on the home itself?

10   A.  That's correct.

11   Q.  When you wrote purchasing the loan from your client at a

12   discount, what does at a discount mean?

13   A.  At a discounted rate, essentially.  He was looking to buy

14   the note for you, you know, less than the loanholder would have

15   to pay to pay it off essentially.

16         MR. MARK:  And now, Mr. Hamill, if we can direct

17   Mr. Moldovan's attention to the top of page 2.

18   Q.  Do you see that the mortgage company said that they don't

19   typically sell the note?

20   A.  That's right.

21   Q.  And generally, how did you respond to that information?

22   A.  Well, so after they said no to the request to buy it at

23   discount, I was instructed essentially by Mr. Daibes or his

24   assistant to send another e-mail asking if he could just buy

25   the note at face value.  So that's what this e-mail is about.

O5L3MEN1                        Moldovan - Direct

1   It's asking, it says East West Funding LLC is the investor and

2   is willing to purchase the instrument at face value.

3   Q.  Were you familiar with the company East West Funding?

4   A.  No.

5   Q.  Did you understand from those instructions whose company

6   East West Funding was?

7   A.  I don't recall.  I believe it was either Mr. Daibes' or

8   Mr. Hana's company.

9   Q.  If we could scroll up on this e-mail.  Generally, how did

10  the mortgage company respond to the offer for the purchase of

11  the note at face value?

12  A.  They again rejected that offer.

13  Q.  After they rejected that offer, did you communicate that

14  information to anyone?

15  A.  I did.

16  Q.  Who did you communicate that to?

17  A.  I sent Freddy's secretary Jamela an e-mail letting her know

18  that they declined it.

19          MR. MARK:  Now, Mr. Hamill, can we publish what's

20  already in evidence as D27-A.

21  Q.  Directing your attention to page 5 of this document.

22  Mr. Moldovan, what's reflected on page 5 here?

23  A.  This is a receipt for a cashier's check in the amount of

24  $23,568.54.

25  Q.  What's a cashier's check?

1    A.  It is when you, essentially, get a check but the check is

2    guaranteed to the person that is receiving it, rather than them

3    waiting for a check to clear.  It's already been cleared by the

4    bank.

5    Q.  What account was this check from?

6    A.  It was from my account.

7    Q.  Who is this check to?

8    A.  To Nationstar Mortgage.  Nationstar Mortgage LLC d/b/a

9    Mr. Cooper.

10   Q.  Was that the mortgage servicer for Nadine's loan at the

11   time?

12   A.  Yes.

13   Q.  Was there a memo in the memo line?

14   A.  There was a memo.  I believe, yes.  The memo line says

15   "Loan auth W Hana IS EG to NA."  And I did that at the

16   instruction of Mr. Hana.

17   Q.  At this point in time, had you received a signed promissory

18   note from either Nadine or Mr. Hana?

19   A.  No.

20   Q.  At this time, had Nadine ever told you she agreed that the

21   money would be a loan?

22   A.  No.

23   Q.  From all of your interactions with Nadine, had she ever

24   said she would agree to repay the money to Mr. Hana?

25   A.  No.

1    Q.  Did there come a time that Mr. Hana asked you to prepare a

2    consulting agreement for anyone?

3    A.  He did.

4    Q.  Who did he ask you to prepare a consulting agreement for?

5    A.  It was for Nadine.

6    Q.  When did Mr. Hana ask you to prepare a consulting agreement

7    for Nadine?

8    A.  It was soon after this whole loan foreclosure repayment, it

9    was probably two or three weeks after that, he said that he was

10   going to give Ms. Arslanian a job with IS EG.  Something

11   related to PR and marketing or something like that.

12   Q.  Prior to that, did you ever understand that Nadine was

13   going to do any work for IS EG Halal?

14   A.  No.

15   Q.  After Mr. Hana asked you to prepare the consulting

16   agreement, did you ever observe Nadine perform any work for IS

17   EG Halal?

18   A.  No, not that I am aware of.

19   Q.  Did you ever observe Nadine preparing any documents?

20   A.  No.

21   Q.  Did you ever observe anyone refer to any work that Nadine

22   did at the company?

23   A.  No.

24        MR. MARK:  Mr. Hamill, can you please show for the

25   witness only the exhibits that have been marked for

O5L3MEN1                        Moldovan - Direct

1   identification as 4C-1-O and 4C-1-P.

2   Q.  Do you recognize these exhibits, Mr. Moldovan?

3   A.  Yes, I do.

4   Q.  What do you recognize them as?

5   A.  These are on the left, appears to be an e-mail from myself

6   to myself to the general inbox, and on the right side is an

7   e-mail from me to Ms. Jamela Maali, Fred's secretary, and

8   copying Mr. Hana.

9           MR. MARK:  Mr. Hamill, can you also show for the

10  witness only exhibits that have been marked for identification

11  as Government Exhibit 4C1-D and 4C1-H.

12  Q.  Mr. Moldovan, do you recognize these exhibits?

13  A.  I can't see the writing on the left side.

14          MR. MARK:  Can we enlarge a little bit for

15  Mr. Moldovan's benefit the one on the left.

16  A.  Thank you.  These are e-mails from me to some individuals

17  that we met with in Uruguay.  I met with all of these people

18  except for the individual with the name Sami Rizk.  I haven't

19  met that person.  And Jamela is just again Freddy's secretary.

20          MR. MARK:  The government offers at this time

21  Government Exhibit 4C1-O, 4C1-P, 4C1-D, and 4C1-H.

22          THE COURT:  Hearing no objection, admitted.

23          (Government's Exhibit 4C1-O, 4C1-P, 4C1-D, 4C1-H

24  received in evidence)

25          MR. MARK:  Mr. Hamill, can we publish Government

1    Exhibit 4C1-O.

2    Q.  What's the date of this e-mail, Mr. Moldovan?

3    A.  August 12, 2019.

4    Q.  What's the subject of this e-mail?

5    A.  Arslanian Consulting K, which is short for contract in law.

6    Q.  Can I direct your attention to the second page which is the

7    attachment.  What's reflected here in this attachment?

8    A.  It is what appears to be a consulting agreement.

9    Q.  Did you draft this agreement?

10   A.  No.

11   Q.  Do you know who did?

12   A.  I'm not sure.

13   Q.  Who did this document indicate were the parties to the

14   agreement?

15   A.  It is an agreement between IS EG Halal with Strategic

16   International Business Consultants with an office at 41 Jane

17   Drive, Englewood Cliffs, New Jersey.

18   Q.  Were you familiar with Strategic International Business

19   Consultants, LLC?

20   A.  No.

21   Q.  When did this agreement say it was made?

22   A.  May 2019.  May 1st, 2019.

23   Q.  How does May 1, 2019, compare to when IS EG Halal started

24   operating?

25   A.  It's I think that was like day one, like first day of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN1                          Moldovan - Direct

1    operation.

2    Q.  Let me direct your attention to page 3.  Do you see where

3    it says term of the agreement?

4    A.  Yes.

5    Q.  What was the term of this agreement?

6    A.  "The term of this agreement shall commence the date hereof

7    and shall continue in the earlier to occur of termination by

8    either party upon 30 days' notice.  Notwithstanding anything to

9    the contrary contained herein, the provisions in section 6 and

10   12 of this agreement shall survive the termination or

11   expiration of this agreement."

12   Q.  What was the compensation listed under this agreement?

13   A.  It was $10,000 per month.

14   Q.  Just because the term was sort of technical.  What was your

15   understanding of what that term was?

16   A.  That was --

17            THE COURT:  You're talking about the length?

18            MR. MARK:  The length of the term.

19            THE COURT:  The length of the contract.

20   A.  So there's no exact termination date of the contract.  It

21   was to exist until essentially someone canceled it.

22   Q.  Let me direct your attention to page 7 of this exhibit.

23   Who did this agreement appear to have been signed by?

24   A.  It was signed by Nadine Arslanian.

25   Q.  Did you ever see a signed version of this agreement?

O5L3MEN1                     Moldovan - Direct

1    A.  Signed by who?

2    Q.  Sorry.  A fully signed version that also included

3    Mr. Hana's signature?

4    A.  No.  Not of this agreement.

5    Q.  What did it list Ms. Arslanian's role at Strategic as?

6    A.  President.

7    Q.  Did you discuss this agreement after you received it with

8    Mr. Hana?

9    A.  I did.

10   Q.  Did you make any changes to the agreement?

11   A.  I did.

12        MR. MARK:  Mr. Hamill, could you publish what's marked

13   as Government Exhibit 4C1-P in evidence.

14   Q.  What's reflected in this e-mail?

15   A.  This is an e-mail to Jamela and copying Will essentially

16   saying that the "pay to" is going to be Strategic International

17   Business Consultants with the address.  The reason for this was

18   to essentially set up payroll for Ms. Arslanian.

19   Q.  There is an attachment here.  What was that attachment?

20   A.  It was the final version of the consulting agreement.

21   Q.  Directing your attention to page 2, please.  What was the

22   date of this consulting agreement?

23   A.  August 12, 2019.

24   Q.  How did this consulting agreement compare to the last one

25   we looked at?

1    A.  Well, the last one just did not appear to be an official

2    agreement.  And so, I just offered to rewrite it in a more

3    official format that I have used in the past.  So I just kind

4    of rewrote it with the terms that Mr. Hana wanted in my own

5    format.

6    Q.  Directing your attention to page 4.  Was this agreement

7    signed?

8    A.  No.

9    Q.  Did you ever see a signed agreement?

10   A.  No.

11   Q.  Do you know whether this agreement was ever signed?

12   A.  No.

13   Q.  Do you know whether IS EG Halal ever paid Strategic

14   International Business Consultants?

15   A.  No.

16   Q.  Was there ever any other time while you worked for Mr. Hana

17   that he asked you to direct someone to pay on an unsigned

18   contract?

19   A.  Not that I can recall.

20   Q.  Was there ever any other time while you worked for Mr. Hana

21   that he asked you to make a payment to anyone on an unsigned

22   loan agreement?

23   A.  Not that I remember.

24            MR. MARK:  May I have one moment, your Honor.

25            THE COURT:  Yes.

1            MR. MARK:  If we could just go back to page 2 of this
2    document, Mr. Hamill.
3    Q.  How did the compensation in this agreement compare to the
4    last version of the agreement that we looked at?
5    A.  You're asking me, right?
6    Q.  Yes.
7    A.  So, you know, the reason I did this is because the last
8    term didn't really call for, like, at what time the payment was
9    to be made.  So I just wanted to make it clear that she wasn't
10   getting paid upfront, she would be getting paid upon the
11   culmination or the end of each month, essentially after her
12   work was performed.  So this way there was a way to account for
13   any work that was done or not done.
14   Q.  Was the fee per month $10,000 the same in both agreements?
15   A.  Yes.
16           MR. MARK:  Mr. Hamill, if we could go just up to the
17   term.
18   Q.  What was the term under this agreement that you prepared?
19   A.  It was a three-month term.
20   Q.  Why did you make the change to a three-month term in this
21   agreement?
22   A.  Well, in the first contract that Nadine prepared, again,
23   there was no term.  And so that kind of concerned me.  I
24   brought that to Mr. Hana's attention and said that, you know,
25   you really should put a term on this so there's a way to review

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  and do performance evaluations if she's going to be working for

2  you.  So, he told me to put in a three-month term for now and

3  have her sign that.

4  Q.  Did Nadine ever sign that?

5  A.  No.

6           MR. MARK:  No further questions.

7           THE COURT:  Any cross?

8           MR. SOLANO:  Yes, your Honor.

9  CROSS-EXAMINATION

10 BY MR. SOLANO:

11 Q.  Good morning, Mr. Moldovan.

12 A.  Good morning.

13 Q.  My name is Ricardo Solano and I represent Mr. Hana.  Will

14 Hana in these proceedings.

15           I want to go back and start with the loan that you

16 talked about and testified yesterday and this morning.

17 A.  Sure.

18 Q.  I just have a couple of follow ups to make sure we

19 understand.  You testified yesterday that Will introduced you

20 to Nadine Arslanian as a new client to help out with the

21 foreclosure issue she was having, correct?

22 A.  That's right.

23 Q.  And at the time, he asked you -- let me back up.

24           Actually, she was in foreclosure and we saw a

25 complaint that was filed against her, correct?

1    A.  Correct.

2    Q.  And you had dealings with the lawyers for the mortgage

3    company, correct?

4    A.  That's right.

5    Q.  And you testified Will asked you to prepare the loan

6    documents that you prepared and the promissory note that we saw

7    earlier today, correct?

8    A.  That's right.

9           MR. SOLANO:  And I want to show, if we can, Mr. Kelly,

10   GX 4C-1-D, which is already in evidence.

11   Q.  And this is the e-mail that you sent to Ms. Arslanian

12   saying, as per Mr. Hana, please see the attached for your

13   review and signature.  The funds will be disbursed upon your

14   execution of the attached agreement, correct?

15   A.  That's right.

16   Q.  And it's dated June 27, 2019, correct?

17   A.  Correct.

18   Q.  And then, if we could take a look and pull up B222.  We

19   could start with the first page.  This is the series of text

20   messages that you and Nadine had regarding this loan and the

21   signing of this promissory agreement, correct?

22   A.  It appears that way.

23   Q.  If we can go down to the first message on this page.

24   Essentially this is Nadine reaching out to you saying I got

25   your message, sorry I haven't gotten back to you.  Thank you

O5L3MEN1                          Moldovan - Cross

1   for following up.  Correct?

2   A.  Correct.

3   Q.  And that's June 22, 2019, correct?

4   A.  Correct.

5   Q.  You testified earlier that the loan agreement came out of

6   the blue weeks later after you first had a discussion with

7   Nadine.  But it was actually one week later that you sent

8   her -- actually five days later you sent her the loan

9   agreement, correct?

10  A.  That's correct.

11  Q.  If we can go to page 8 of this agreement.  I'm sorry page 8

12  of the text messages.  And then you follow up again later that

13  day that Will needs to sign, needs you to sign the note.  And

14  you testified that these text messages Will was insisting that

15  you follow up with Nadine to sign the note, correct?  The

16  promissory note, that is.

17  A.  Correct.

18  Q.  And the government pointed out, if we can go to page 11,

19  that apparently, either she forgot or was ignoring it, but she

20  told you she didn't know what you were talking about.  So you

21  explained to her again that earlier in the week you had sent

22  her or at this point it's been a couple of weeks you had sent

23  her a promissory note and you needed her to sign it, correct?

24  A.  Correct.

25  Q.  And then, you told her the next e-mail that or text message

O5L3MEN1                    Moldovan - Cross

1    that you were going to send it, but you don't actually send it

2    that day, correct?

3    A.  I don't remember when I sent it exactly.

4    Q.  If we could go to page 12, the next page.  This is the next

5    day, July 18.  And she texts you, "Could you please let me know

6    if you completed the transfer yesterday.  Thank you."  So

7    obviously the next day you still had not sent it?

8            THE COURT:  Is that a question?

9            THE WITNESS:  I don't understand the question.

10   Q.  I'm asking you.  So on the next day she's still following

11   up to you to confirm whether you sent the transfer, correct?

12   A.  Whether I sent what?

13   Q.  The wire transfer.

14   A.  Oh.  Right.  Yeah.

15   Q.  If you can go to the next page, page 13.  The last message

16   on the bottom, you tell her now couple days later you are going

17   to send it.  And am I right that you say to her, "This is the

18   amount that he authorized to sends as a personal loan with no

19   interest as the memo," correct?

20   A.  Correct.

21   Q.  That's the memo you ultimately put on the certified check

22   you send to the mortgage company, correct?

23   A.  Correct.

24   Q.  And you testified that you don't have a signed copy of this

25   agreement, correct?

O5L3MEN1                        Moldovan - Cross

1    A.  That's correct.

2    Q.  You left shortly after this IS EG, correct?

3    A.  Correct.

4    Q.  When you left, is it fair to say you took your files, but

5    only the ones you were actively working on, not historic or

6    closed files, correct?

7    A.  That's correct, for the most part.

8    Q.  So standing here today, you have no idea whether this

9    agreement was ever signed?

10   A.  That's right.

11   Q.  Just to put it in context, all this is occurring in July of

12   2019.  So that's 5 years ago.  Correct?

13   A.  Yeah.

14   Q.  I want to talk a little bit about, switching topics we can

15   take this down, about the trip you took to Uruguay.  I think

16   you testified yesterday IS EG was doing very well, and so they

17   were expanding operations to Uruguay at this time and in South

18   America in general, right?

19   A.  Correct.

20   Q.  In fact, you did a lot of work in connection with setting

21   up that satellite office in Uruguay, correct?

22   A.  Correct.

23   Q.  Some of the things quickly I think you said you had various

24   meetings in Uruguay, you set up bank accounts, you hired

25   employees, you vetted the applications, you conducted

1    interviews, you had to find a location.  You did all of that

2    for the Uruguay satellite office, correct?

3    A.  I took part in that, yes.

4    Q.  Including traveling there for about a week or so you said?

5    A.  Right.

6    Q.  And you worked with a company called DCA in helping set

7    that up, correct?

8    A.  That's right.

9    Q.  You worked hard, and I think you testified Mr. Hana,

10   generally you saw him in the office every day, correct, at IS

11   EG in New Jersey?

12   A.  Yeah.

13   Q.  He was a hard worker it's fair to say, correct?

14   A.  Very hard worker.

15   Q.  You said he was very involved and constantly oversight and

16   involved in the company, correct?

17   A.  That's right.

18   Q.  Among the things you did for IS EG, you described some of

19   the legal work.  You also did some administrative things,

20   correct?

21   A.  That's right.

22   Q.  You reviewed the correspondence that went in and out for

23   things like grammar?

24   A.  Yeah, whenever Will would ask me to.

25   Q.  And you drafted a lot of the letters and e-mails and text

O5L3MEN1                        Moldovan - Cross

1   messages that Will sent out, correct?

2   A.  I don't know what you mean by a lot.  But, yeah, I did do

3   that from time to time.

4   Q.  There was a fair number of e-mails, letters, text messages

5   that you would draft on behalf of Mr. Hana, correct?

6   A.  That's correct.

7   Q.  And I think you testified sometimes you would discuss with

8   him how to respond to an e-mail or letter that came in, and you

9   would take directions from Mr. Hana and then draft the

10  response?

11  A.  That's right.

12  Q.  If we can take a look at GX 4C-A, which is in evidence.

13  And I think you testified this is one of the e-mails that you

14  drafted with input from Mr. Hana, correct?

15  A.  Correct.

16  Q.  And I want to focus -- the government yesterday asked you

17  later, asked you about the top e-mail where you said IS EG

18  Halal Certified Inc. is a government agency.  Correct?

19  A.  What was the question?

20  Q.  Yesterday you testified that you had written or the

21  government asked you about this e-mail in which you tell

22  Ms. Diaz who works at DCA, correct?

23  A.  Yes.

24  Q.  You tell her IS EG Halal Certified Inc. is a government

25  agency, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN1                          Moldovan - Cross

A.  Correct.

Q.  I want to turn to the second page of that e-mail and an earlier e-mail you sent to her.  Right there in the middle. And in the second paragraph of this e-mail to Ms. Diaz, sent a couple days earlier, you clarified or you explained to her that IS EG Halal Certified Inc. is the exclusive authorized agency by the government of Egypt to certify halal products for export to Egypt and the Middle East, correct?

A.  That's correct.

Q.  And you understood that that's in fact what IS EG was, correct?

A.  That's correct.

Q.  It was a company in the U.S., a private company, that had been selected by Egypt to certify as halal meat products that were being exported to Egypt, correct?

A.  That's right.

        MR. SOLANO:  We can take this down.  Thank you, Mr. Kelly.

Q.  Yesterday you testified about Mr. Hana taking direction from an individual Ahmed in Egypt.  Do you remember that testimony?

A.  Yes.

Q.  I think you said that you believed there was a daily call, you don't know if it was done every day, but you believe there was a standing daily call that Mr. Hana had?

O5L3MEN1                          Moldovan - Cross

1    A.  Yeah, yeah.

2    Q.  Were you aware that those phone calls were about

3    operational issues, things like shipping problems, problems

4    with certifications, things like that?

5    A.  I don't know.

6             MR. MARK:  Objection.

7             THE COURT:  Sustained.  Do you know what those calls

8    were about, sir?

9             THE WITNESS:  No.

10   Q.  Sitting here today, you have no idea what the substance of

11   those calls were?

12   A.  No.

13   Q.  Just a little bit on the consulting agreement that you

14   testified about just a few minutes ago.  You were shown

15   Government Exhibit 4C1-O.  I don't know that we have to publish

16   it.  But that was the contract, the consulting agreement with

17   Ms. Arslanian's company that was dated May 2019, correct?

18   A.  I don't remember off the top of my head, but I'll take your

19   word for it.

20             (Continued on next page)

21

22

23

24

25

1   BY MR. SOLANO:

2   Q.  The first one that you were shown that had the date of May

3   2019, that was just a draft?

4   A.  Correct.

5   Q.  Correct?

6   A.  Yeah.

7   Q.  And in fact, you said that you rewrote it; you drafted a

8   new one, and the new one that you drafted --

9          MR. SOLANO:  If we could show that one, 4C1-P, pull up

10  the second page.

11  Q.  -- this is the one that you referred to as the final

12  version, correct?

13  A.  Correct.

14  Q.  And this final version is dated August 12 of 2019, correct?

15  A.  Correct.

16  Q.  And it's for a three-month term?

17  A.  Correct.

18  Q.  And you said you raised a concern whether there should be

19  some period of review to see whether the work was getting done,

20  and Mr. Hana suggested OK; he agreed with you, correct?

21  A.  That's correct.

22  Q.  And you put in a three-month term?

23  A.  That's right.  He gave me that term.

24  Q.  And are you aware that the contract was not renewed after

25  that three-month term?

1          MR. MARK:  Objection.

2     A.  I have no idea.

3          THE COURT:  I'll allow it.

4          MR. SOLANO:  Thank you, your Honor.

5          THE COURT:  Remember, ladies and gentlemen, the

6     evidence is not in the lawyer's questions.  It's just the

7     answers.

8     BY MR. SOLANO:

9     Q.  And you left shortly after this August 12 date in this

10    contract, correct?

11    A.  Correct.

12    Q.  Your work for IS EG was based in New Jersey, correct?

13    A.  Correct.

14    Q.  Other than the trip to Uruguay, you never traveled to any

15    other country on behalf of IS EG, correct?

16    A.  That's correct.

17    Q.  You said you didn't observe Ms. Arslanian do any work or

18    prepare documents.  Fair to say that was your observation; you

19    don't know one way or the other whether she did?

20    A.  That's correct.

21    Q.  And I think one of the last things you said was that

22    Mr. Hana had never signed -- or never had you pay money without

23    a signed contract, correct?

24    A.  Can you repeat that for me?

25    Q.  Yeah.  I think one of the things you said, when the

1    government asked you, was that there was no other time when you

2    paid somebody without a signed contract.  Correct?

3    A.  I'm not sure if that's exactly what I said, but I

4    definitely said something along those lines.  I think the

5    message that I was trying to deliver was that I wouldn't do

6    that on my own volition.  It would have been as per the

7    instructions of the owner of the company who was transferring

8    money.

9    Q.  Got it.

10        With respect to Mr. Hana, you testified that there had been

11   some discussion about Mr. Hana investing in your law practice,

12   correct?

13   A.  Correct.

14   Q.  And obviously because of certain issues, ethical issues,

15   that never materialized, correct?

16   A.  Correct.

17   Q.  Mr. Hana did, however, loan you money for you to use to pay

18   some of your expenses related to your law practice, correct?

19   A.  It wasn't a loan, but he did give me money to pay expenses

20   for my practice.

21   Q.  OK.  He never had you sign anything in order for you to get

22   that money, correct?

23   A.  Correct.

24   Q.  And it was a fairly substantial amount, about 8,000 a week,

25   correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2                        Moldovan - Cross

1   A.  I don't remember the exact amount.

2   Q.  Was it in the thousands; do you remember?

3   A.  Yeah, it was definitely in the thousands.

4   Q.  And he gave you that money without signing it.  Have you

5   ever paid it back?

6   A.  No.

7           MR. SOLANO:  I have no further questions, your Honor.

8           THE COURT:  Mr. Weitzman.

9           MR. WEITZMAN:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. WEITZMAN:

12  Q.  Good morning, Mr. Moldovan.  My name is Avi Weitzman, and I

13  represent Senator Menendez.  I'll try to keep this as brief as

14  possible.

15  A.  Good morning.

16  Q.  You met Nadine Arslanian in May of 2019, correct?

17  A.  I don't remember what month it was, but I did meet her

18  sometime --

19  Q.  Mid-2019?

20  A.  Correct.

21  Q.  And you understood that she needed help with a mortgage,

22  correct?

23  A.  That's correct.

24  Q.  And Mr. Hana indicated that he wanted to help her out,

25  right?

1    A.  That's right.

2    Q.  Explained to you that he was very close to Nadine?

3    A.  I don't know if he said they were very close.  He never

4    used those words.

5    Q.  Well, he explained to you that they were like brother and

6    sister, didn't he?

7    A.  No.

8    Q.  You don't recall him saying that she was like a sister to

9    him?

10   A.  No.

11   Q.  You knew that Mr. Hana knew Nadine Arslanian for many

12   years, correct?

13   A.  That's correct.

14   Q.  And Nadine Arslanian speaks Arabic, correct?

15   A.  I was not aware of that.

16   Q.  You never spoke to her in Arabic?

17   A.  No.

18   Q.  In any event, you understood that Mr. Hana wanted to give

19   Nadine a loan, correct?

20   A.  That's right.

21   Q.  And at some point you met her at a restaurant to discuss

22   it?

23   A.  That's correct.

24   Q.  And you recall at that restaurant meeting you were very

25   impressed by her, right?

O5lWmen2                          Moldovan - Cross

1   A.  She's an impressive lady, so probably, yes.

2   Q.  You found, you perceived her to be a very well-connected

3   person, correct?

4   A.  It seemed that way.

5   Q.  And she seemed like a high-level investor, correct?

6   A.  Yes.

7           MR. MARK:  Objection.

8           THE COURT:  Just a moment.

9           What is a high-level investor?

10          THE WITNESS:  Well, she appeared to be very wealthy.

11  She was very well dressed.  I was saying that she appeared to

12  be really well dressed.  She had some very expensive-looking

13  jewelry on, and to me that's usually an indication that she had

14  had some level of success at some point in her career.

15          THE COURT:  I think you also said she had an expensive

16  watch on, is that correct?

17          THE WITNESS:  That's right.

18          THE COURT:  All right.  Thank you.

19  BY MR. WEITZMAN:

20  Q.  You recall that she was name-dropping a lot during that

21  dinner?

22  A.  I do remember her name-dropping.  I just don't remember

23  what names she was dropping.

24  Q.  Were they celebrities, like the Real Housewives; do you

25  recall?

O5lWmen2                          Moldovan - Cross

 1    A.  I don't recall.

 2              MR. MARK:  Objection.

 3              THE COURT:  If he knows.

 4    A.  I don't recall.

 5    Q.  In any event, despite her name-dropping, she never

 6    mentioned her boyfriend being Senator Menendez, correct?

 7    A.  She did not.

 8    Q.  At no point in time in any conversation that you ever had

 9    with her did she mention that she was dating Senator Menendez,

10    correct?

11    A.  She did not.  That's correct.

12    Q.  And at no point in time did Will Hana ever mention that she

13    was dating Senator Menendez, correct?

14    A.  Never.

15    Q.  And nor did Fred Daibes, right?

16    A.  Never.

17    Q.  You understood that Nadine knew Fred Daibes as well, just

18    like she knew Will Hana, correct?

19    A.  That's right.

20    Q.  Now, you'd agree with me that Mr. Hana informed you that it

21    was very important to him that Nadine pay back the loan, right?

22    A.  That's right.

23              MR. MARK:  Objection.

24              THE COURT:  I'll allow that.  It's cross.

25              MR. WEITZMAN:  I'm sorry.  I did not get your answer.

O51Wmen2                         Moldovan - Cross

 1              THE COURT:  He said that's right.

 2   BY MR. WEITZMAN:

 3   Q.  He didn't want to just gift the money to Nadine in that

 4   instance, right?

 5   A.  Yeah.  I mean he seemed adamant about the fact that he

 6   wanted it to be a loan.  I mean he was very aggressive about

 7   that.

 8   Q.  Now, Nadine, as a result of her relationship with Mr. Hana,

 9   wanted the money as a gift, is that fair?

10              MR. MARK:  Objection.

11              THE COURT:  Sustained as to form.

12   BY MR. WEITZMAN:

13   Q.  Did Nadine communicate to you that she was surprised that

14   someone like Mr. Hana would ask a lawyer to draft a promissory

15   note?

16   A.  She didn't.

17   Q.  She --

18   A.  She didn't seem very surprised.

19   Q.  She didn't think that you needed lawyers involved to draft

20   this; that's what she indicated to you?

21              THE COURT:  Sustained.

22   BY MR. WEITZMAN:

23   Q.  In any event, did she indicate to you that as a close

24   friend of Mr. Hana's she didn't think there needed to be a

25   lawyer involved?

O5lWmen2                          Moldovan - Cross

 1              MR. MARK:  Objection.

 2              THE COURT:  Sustained.

 3              Simplify the question, sir.

 4              MR. WEITZMAN:  Yes, your Honor.

 5              THE COURT:  Without the assumptions.

 6              MR. WEITZMAN:  Fair enough.

 7    Q.  Did she tell you that she was very close to Mr. Hana?

 8    A.  I don't know if she used those exact words, but she

 9    definitely made it seem that way.

10    Q.  Did she tell you as a result of that she didn't think a

11    lawyer needed to document the loan?

12              MR. MARK:  Objection.

13              THE COURT:  I'll allow it.

14    A.  She didn't use those exact words, but she definitely

15    delivered that message, that she was very upset that Will had

16    me, a lawyer, draft the promissory note.  She was very offended

17    by that.

18    Q.  Now, you issued a cashier's check -- we you looked at

19    that -- to Nationstar Mortgage, correct?

20    A.  Correct.

21    Q.  And that cashier's check, in the memo line, indicated what

22    Will wanted, which was for this to be a loan, correct?

23    A.  That's correct.

24    Q.  And it was a loan from Will Hana/IS EG to N.A., correct?

25    A.  That's correct.

O5lWmen2                          Moldovan - Cross

1    Q.  And N.A. refers to Nadine Arslanian, right?

2    A.  That's correct.

3    Q.  And we saw as well --

4             MR. WEITZMAN:  Well, actually, let me -- can we put

5    up, Mr. Kelly, DX309 for identification, just for the witness

6    and counsel.

7             Thank you.

8    Q.  Do you recognize this document?

9    A.  Yes.

10   Q.  And is this an email that you sent from yourself to Will

11   Hana on July 19 at approximately 3:38 p.m.?

12   A.  Yes, it is.

13            MR. WEITZMAN:  We offer DX309.

14            THE COURT:  Admitted, without objection.

15            (Defendants' Exhibit 309 received in evidence)

16   BY MR. WEITZMAN:

17   Q.  Sir, after you sent the cashier's check, you emailed a

18   confirmation to Will Hana on July 19, 2019, correct?

19   A.  Yes.

20   Q.  And you said, for your records, Nadine Arslanian wire loan,

21   correct?

22   A.  Yes.

23   Q.  Why did you put that down, Nadine Arslanian wire loan?

24   A.  At the time this was all happening, Will really hammered

25   home the fact that he wanted me to make it clear to her that it

O5lWmen2                        Moldovan - Cross

1    was a loan, and he reminded me at least two or three times to

2    make sure that the word "loan" was used in the memo and that I

3    got a receipt of the transfer in some way, shape or form and to

4    get him a copy of any proof that I memorialized this as a loan.

5            MR. WEITZMAN:  Can we put up Government Exhibit B222,

6    and let's go to page 13.

7    Q.  We saw this in Mr. Solano's examination.  You, in fact,

8    told Nadine that, in the top email, top text, $23,568.54 is the

9    amount --

10           MR. WEITZMAN:  Could we zoom in on that, $23,568.54 --

11   Q.  -- and then in the bottom you said --

12           MR. WEITZMAN:  If we can zoom in on the bottom one.

13   Q.  -- this is the amount he authorized to send as a personal

14   loan with no interest as the memo, correct?

15   A.  That's correct.

16   Q.  Now, Nadine at that point could have said no, I don't want

17   the loan, correct?

18           MR. MARK:  Objection.

19           THE COURT:  Sustained.

20   BY MR. WEITZMAN:

21   Q.  Nadine did not respond to this text message to indicate no,

22   I do not want a loan, correct?

23           THE COURT:  Did Nadine respond to that text message,

24   sir?  Yes or no.

25           THE WITNESS:  No.  Not that I'm aware of.

1    BY MR. WEITZMAN:

2    Q.  You understand, as a lawyer, that there's something called

3    offer and acceptance?

4            MR. MARK:  Objection.

5            THE COURT:  I'll allow it.

6    A.  Yes, I do.

7    Q.  And you understand, as a lawyer, that you can accept --

8    there's an offer and then there's an acceptance, and sometimes

9    acceptance can be manifested by taking the money, correct?

10   A.  That's right.

11           MR. MARK:  Objection.

12           THE COURT:  Sustained.  The jury will disregard the

13   answer.

14   BY MR. WEITZMAN:

15   Q.  Are you aware of something called the statute of frauds?

16           MR. MARK:  Objection.

17           THE COURT:  Sustained.

18           MR. WEITZMAN:  Your Honor, he's a lawyer, testifying.

19           THE COURT:  He's not here as a lawyer.  He's here as a

20   lay witness.

21   BY MR. WEITZMAN:

22   Q.  Are you aware as to whether a promissory note needs to be

23   executed in order for the loan to be effected?

24           MR. MARK:  Objection.

25           THE COURT:  I'll allow that.

O51Wmen2                        Moldovan - Cross

1    A.  Can you repeat the question?

2    Q.  Does a promissory note need to be executed in order for a

3    loan to be effective?

4              THE COURT:  If you know.

5              THE WITNESS:  Sorry, sir?

6              THE COURT:  If you know, answer.

7    A.  I don't know.

8    Q.  Are you aware that under New Jersey law --

9              THE COURT:  Sustained.

10             MR. MARK:  Objection.

11   BY MR. WEITZMAN:

12   Q.  In any event, sir, not all contracts need to be in writing

13   for them to be effective, correct?

14             MR. MARK:  Objection.

15             THE COURT:  Sustained.

16   BY MR. WEITZMAN:

17   Q.  Sir, are you familiar with oral contracts?

18             MR. MARK:  Objection.

19             THE COURT:  I'll allow that.

20   A.  Yes.

21   Q.  And you're familiar that oral contracts can be entered

22   into, correct?

23             MR. MARK:  Objection.

24             THE COURT:  Sustained.

25   BY MR. WEITZMAN:

1    Q.  Sir --

2              THE COURT:  He's not here on the issue of the legality

3    of the particular instrument.  Move on.

4    BY MR. WEITZMAN:

5    Q.  When you communicated with Nadine about the loan, she made

6    it clear to you that she was at risk of foreclosure, correct?

7    A.  Yes.

8    Q.  And she told you that she was very embarrassed by that

9    fact, right?

10   A.  I don't remember.

11   Q.  Well, you understood, sir, that she was embarrassed about

12   being near foreclosure on her property, didn't you?

13             MR. MARK:  Objection.

14             THE COURT:  Did you understand, sir, that that was the

15   source of her embarrassment?

16             THE WITNESS:  Yes.

17   BY MR. WEITZMAN:

18   Q.  And that's because she told you, or she indicated one way

19   or another, correct?

20   A.  I could see it in her face.  I mean she didn't need to tell

21   me.  I could just tell by any time we talked about it, she'd

22   blush about it.  She seemed very embarrassed about the entire

23   situation, about owing money to anyone.

24   Q.  Whenever you spoke or communicated with Nadine, she was the

25   only person, to your knowledge, on the other line, correct?

O5lWmen2                        Moldovan - Cross

```
1    A.  Yeah, correct.

2    Q.  And you never had any contact with Senator Menendez about

3    the loan, correct?

4    A.  No.

5    Q.  You worked with Will Hana for just a matter of months,

6    correct?

7    A.  Correct.

8    Q.  Some part of 2019, early on in the career of IS EG,

9    correct?

10   A.  That's correct.

11   Q.  You were IS EG's lawyer, right?

12   A.  I was.

13   Q.  So your communications with Will Hana were protected by

14   attorney-client privilege?

15            THE COURT:  Sustained.

16   BY MR. WEITZMAN:

17   Q.  Did you understand, sir, that you had a confidential

18   relationship with Will Hana?

19            MR. MARK:  Objection.

20            THE COURT:  Sustained.  He's not here as a lawyer.

21            MR. WEITZMAN:  I know that.

22            THE COURT:  I mean in terms of giving him legal

23   concepts.  Move on.

24            MR. WEITZMAN:  That's not where I'm going, your Honor.

25   I apologize.
```

O5lWmen2                          Moldovan - Cross

1              THE COURT:  Well, that's where you were.  Move on.

2    BY MR. WEITZMAN:

3    Q.  Will Hana never spoke to you about Senator Menendez,

4    correct?

5    A.  That's correct.

6    Q.  He never mentioned Senator Menendez, correct?

7    A.  Never.

8    Q.  He never indicated to you that Senator Menendez had

9    anything to do with forming IS EG, correct?

10   A.  Never.

11   Q.  Or protecting IS EG or anything of the sort?

12   A.  Never mentioned his name once to me.

13   Q.  Now, you're familiar with a company SIBC, right?

14   A.  No, I'm not.

15   Q.  I'm sorry.  You testified about a company called SIBC?

16   A.  I don't remember what the company is.  Can you remind me?

17   Q.  Yes.  Strategic International Business Consultants.

18   A.  Thank you.

19   Q.  Do you remember explaining --

20   A.  Yes, I am familiar.

21   Q.  And are you aware that consultants will sometimes

22   incorporate a company for them to work in for tax and legal

23   purposes?

24              MR. MARK:  Objection.

25              THE COURT:  I'll allow that.

O5lWmen2                          Moldovan - Cross

```
 1    A.  Yes.
 2    Q.  You wouldn't call that a shell company, right?
 3              MR. MARK:  Objection.
 4              THE COURT:  Sustained.
 5    BY MR. WEITZMAN:
 6    Q.  Now, in August of -- I'm sorry.  In August 2019, you
 7    executed or you helped Will Hana draft a consulting agreement
 8    with SIBC, right?
 9    A.  That's correct.
10    Q.  And you left IS EG shortly thereafter, right?
11    A.  Correct.
12    Q.  You never spoke to Will Hana again, right?
13    A.  Correct.
14    Q.  You went on a trip to Uruguay with Will Hana?
15    A.  Correct.
16    Q.  To set up the office, correct?
17    A.  Yes.
18    Q.  How long was that trip?
19    A.  Around a week.  I don't remember exactly how long.
20    Q.  And you worked every day in setting up that office?
21    A.  We did.
22    Q.  It was a lot of work?
23    A.  It was.
24              THE COURT:  He's testified to that.
25              MR. WEITZMAN:  I understand, your Honor.  I'm trying
```

O5lWmen2                        Moldovan - Cross

1    to put the parameters on how much work that was.

2    Q.  Was it many hours each day?

3    A.  Yes.

4    Q.  You needed to find office space and everything else

5    associated with running an office, right?

6    A.  Yeah, it was exhausting.  Our days were long, like, 12-,

7    13-hour-long days.

8    Q.  And sometimes it's more be difficult because Mr. Hana could

9    be indecisive, right?

10   A.  Right.

11   Q.  He wavered a lot on his decisions, right?

12          MR. MARK:  Objection.

13          THE COURT:  Sustained.

14   BY MR. WEITZMAN:

15   Q.  You were paid for this work --

16   A.  Yes.

17   Q.  -- in Uruguay?

18       You deserved to be paid for that work, correct?

19          MR. MARK:  Objection.

20          THE COURT:  Sustained.

21          MR. WEITZMAN:  One moment, your Honor?

22          Nothing further.

23          THE COURT:  Anything, sir?

24          MR. McMANUS:  Yes, your Honor.

25   CROSS-EXAMINATION

O5lWmen2                          Moldovan - Cross

1    BY MR. McMANUS:

2    Q.  Good morning, Mr. Moldovan.

3    A.  Good morning.

4    Q.  My name is Shannon McManus, and I represent Mr. Daibes.

5        You testified on direct examination that Mr. Hana seemed to

6    look up to Mr. Daibes or he seemed to be seeking advice from

7    him?

8    A.  I don't remember my exact statement, but something along

9    those lines.

10   Q.  So, Mr. Daibes is much older than Mr. Hana, correct?

11   A.  That's correct.

12   Q.  Do you know hold Mr. Daibes is?

13   A.  In his mid 60s.

14   Q.  And you're friends with his cousin Rony, correct?

15   A.  Correct.

16   Q.  And Rony's about your age, correct?

17   A.  That's correct.

18   Q.  How old are you again?

19   A.  37.

20   Q.  And you're aware that Mr. Daibes has adult children?

21   A.  Yes.  I'm sorry.  Meaning Mr. Fred Daibes?

22   Q.  Mr. Fred Daibes.  I'm sorry.  Yes.

23       You're aware Mr. Fred Daibes has adult children?

24            MR. MARK:  Objection.

25            THE COURT:  I'll allow that.

1    A.  I'm aware.

2    Q.  Are you aware that he's a grandfather?

3    A.  I am.

4          MR. MARK:  Objection.

5          THE COURT:  Yes.  Sustained to that.

6    BY MR. McMANUS:

7    Q.  You're aware that Mr. Daibes has been in real estate

8    development for a long time, correct?

9    A.  That's correct.

10   Q.  And you're aware that he's been in real estate development

11   for, maybe, 40 years?  Are you aware?

12   A.  I am aware.

13   Q.  And you testified that Freddy, as you called him, is very

14   well-known in Edgewater, is that correct?

15   A.  That's correct.

16   Q.  And people call him Freddy; he doesn't insist on

17   Mr. Daibes, correct?

18   A.  That's correct.

19   Q.  Would you describe him as down-to-earth or approachable?

20   A.  Yeah.

21          MR. MARK:  Objection.

22          THE COURT:  I'll allow it.

23   A.  I would -- I would say, yes, he's very approachable.

24   Q.  I think on direct you testified that he's developed a lot

25   of properties in Edgewater, correct?

O5lWmen2                          Moldovan - Cross

1    A.  That's right.

2    Q.  The Alexander, for instance, The Metropolitan, The St.

3    Moritz, The Grand Cove, are you familiar with those?

4    A.  I am.

5    Q.  And he has many other properties in Edgewater as well,

6    correct?

7    A.  That's right.

8    Q.  And you lived in one of his buildings at some point,

9    correct?

10          THE COURT:  That's what he testified to, sir.  Next.

11   BY MR. McMANUS:

12   Q.  So, the building that you lived in, if you could describe

13   it, had mosaic marble flooring in the lobby?

14   A.  It's the most beautiful building I've ever seen.

15   Q.  I think you said he had a lot of other luxurious buildings

16   in the area as well, correct?

17   A.  That's right.

18   Q.  So, getting to Mr. Hana, you worked with Mr. Hana for under

19   a year, correct; about three months, I think?

20   A.  Right.

21   Q.  And then you just said that you and Rony were the same age.

22   Would you say that Mr. Hana is in your age range as well?

23   A.  Sure.

24   Q.  He was around 35 or so, give or take, when you knew him?

25   A.  Mr. Hana?

1    Q.  Yes.

2    A.  I think he was a couple years older than me, but definitely

3    somewhere right around my age, 37-ish.

4    Q.  And when you were working for him, you wouldn't have

5    described him as an established businessman, correct?

6    A.  Say the question again?

7    Q.  Sure.  His business wasn't established at that point,

8    correct?

9    A.  It was not or it was?

10   Q.  He was not an established businessman, meaning prestige

11   wise, at that point?

12   A.  No, he was not.

13   Q.  And are you aware that the halal business was his first

14   really successful business?

15   A.  Well, frankly, I don't know how well his previous

16   businesses did financially.  I mean, ultimately, I understood

17   that, you know, his previous ventures had failed.  I don't know

18   if he ever made any money on those ventures at any point, but

19   certainly the halal company was much more profitable.

20   Q.  Sure.  So, the halal business, as you understand, was a new

21   area of business for him, correct?

22   A.  Correct.

23   Q.  And he was learning the business when you were there --

24   working hard to learn the business?  Sorry.

25   A.  Frankly, I don't -- I don't know what his level of

O51Wmen2                        Moldovan - Cross

understanding was with respect to halal and the actual halal

certification and what halal is.  I never really -- we never

really talked about that.

Q.  OK.  But he was working hard, in the office every day that

he wasn't traveling, correct?

A.  Yeah.

Q.  And you could tell that he really wanted to make this

business work, right?

            THE COURT:  Sustained.

            MR. MARK:  Objection.

BY MR. McMANUS:

Q.  And he would go to Mr. Daibes for business advice, correct?

A.  That's right.

Q.  And he would go see Mr. Daibes in his office, which was

close by, obviously?

A.  I don't know all the places they, you know, had this type

of relationship, but you know, Mr. Daibes is -- has a mentor

type of way about him.  So, you know, it was kind of like a

constant thing, that he was giving advice.  He's just that type

of guy.

Q.  And then, so I think you testified on direct that you saw

Mr. Daibes quite a bit, correct?

A.  That's right.

Q.  And of course, as you said, you're close with Mr. Daibes's

nephew, and in addition to being a well-known developer, you

O5lWmen2                           Moldovan - Cross

1   would say that Mr. Daibes is also known for his generosity, is

2   that correct?

3            MR. MARK:  Objection.

4            THE COURT:  I'll allow that.

5   A.  Everyone knows him as very generous.

6   Q.  He let Mr. Hana use his conference room whenever he needed

7   to?

8   A.  That's right.

9   Q.  Are you aware of him paying for lunches around the office?

10  A.  That -- that was a regular thing, yeah.

11  Q.  And he even took you out for a steak dinner on your

12  birthday, isn't that correct?

13           THE COURT:  He testified to that.

14           Next.

15  BY MR. McMANUS:

16  Q.  Did Mr. Daibes pay for that steak dinner?

17  A.  He did.  He did a lot for me, not just a steak dinner.  He

18  did a lot of things for me.

19  Q.  Well, you testified that he helped give you cash to start

20  up your law practice?

21  A.  That's right.

22  Q.  And do you remember how much he gave you?

23  A.  In total, I think it was around 25,000.

24  Q.  Did you pay the money back to Mr. Daibes?

25  A.  No.  I asked him if he wanted me to, and he told me that I

```
 1   didn't need to.
 2   Q.  And switching topics a little bit, you mentioned the name
 3   Andy Aslanian, correct?
 4   A.  That's right.
 5   Q.  Did you know that Mr. Daibes had known Mr. Aslanian for
 6   many years?
 7   A.  Yeah, I knew that.
 8   Q.  Would you agree that they're in a similar age range?
 9   A.  I would say that Mr. Aslanian's -- I don't know his age,
10   but he appeared to be much older than Freddy.
11   Q.  The two of them are both much older than Mr. Hana, though,
12   correct?
13   A.  Yeah.
14   Q.  And are you aware that when IS EG Halal was getting
15   started, Mr. Aslanian was helping Mr. Hana get it off the
16   ground?
17   A.  I was not aware of that.
18   Q.  You are aware that Mr. Aslanian did have a percentage share
19   in IS EG Halal, correct?
20   A.  Correct.
21   Q.  And at the same time, you're aware that Mr. Daibes did not
22   have any shares in IS EG Halal, correct?
23               MR. MARK:  Objection.
24               THE COURT:  If he knows.
25   A.  I didn't know one way or the other.
```

O51Wmen2                          Moldovan - Cross

1    Q.  OK.  And at some point, for whatever reason, Mr. Hana

2    wanted Mr. Aslanian's shares in IS EG Halal back, correct?

3    A.  That's right.

4    Q.  And Mr. Aslanian wanted to be paid for his shares in the

5    business, correct?

6    A.  That's right.

7    Q.  And Mr. Hana couldn't afford to just pay him out; they had

8    to work off something to be paid over time, correct?

9    A.  When you say --

10                THE COURT:  Sustained.

11   BY MR. McMANUS:

12   Q.  So Mr. Daibes was a mutual friend of Mr. Hana and

13   Mr. Aslanian, correct?

14   A.  That's right.

15   Q.  And you could be a neutral party to the two of them if they

16   had a disagreement, correct?

17                MR. MARK:  Objection.

18                THE COURT:  Sustained as phrased.

19   BY MR. McMANUS:

20   Q.  So, I'm going to talk a little bit about the office that

21   you were working in.

22        So, it was at 125 River Road --

23                THE COURT:  Already been answered.

24                Go ahead.

25   BY MR. McMANUS:

1   Q.  It was a four-story building?

2   A.  Yeah, I believe so.

3   Q.  And it was full of various tenants, would you say?

4   A.  Yeah.

5   Q.  And you were on the first floor with other tenants,

6   correct?

7   A.  Yes.

8   Q.  And then there's another floor above you also full of

9   tenants?

10  A.  Yeah.

11  Q.  And then if you were to drive up the main ramp of the

12  building, you would find a large shared parking lot space,

13  correct?

14  A.  That's correct.

15  Q.  And then from that -- I think you called it the third floor

16  on direct -- you have a door for IS EG Halal?

17  A.  Right.

18  Q.  And then around back of the parking lot, there's another

19  door for Daibes Enterprises, correct?

20  A.  That's right.

21  Q.  And IS EG Halal, when it was on that third floor, had its

22  own receptionist, correct?

23  A.  I believe so.  I know there was a reception desk.  I can't

24  recall a face that was there, but I believe so.

25  Q.  And then Daibes Enterprises, if you would go in their door,

O5lWmen2                          Moldovan - Cross

```
 1    they had their own receptionist, correct?
 2    A.  That's right.
 3    Q.  And the main floor is primarily Daibes Enterprise space, at
 4    that third floor?
 5    A.  When you say, they occupied a whole space.
 6    Q.  They occupied most of the space?
 7    A.  I don't know what the split was, but you know, I mean I
 8    think it was -- it was a substantial amount of the space on the
 9    floor.
10    Q.  And there's a shared bathroom on that third floor, correct?
11    A.  There is definitely a bathroom.  I don't remember who has
12    access to it and who doesn't.  I don't know if I've ever used
13    that one.
14    Q.  OK.  If you recall, are you aware of the area around where
15    the bathroom would be?
16    A.  I think so, yeah.  Yes, I am.
17    Q.  If you wanted to go back into IS EG's halal space, do you
18    recall if you had to enter a pass code?
19    A.  Enter a what?
20    Q.  Was there a locked door to get back in, if you were in the
21    restroom area to get back --
22              THE COURT:  You're asking whether after he went to the
23    bathroom, which he's not sure he ever used, to get back into IS
24    EG's space there was a door with a pass code; is that what you
25    were asking?
```

1          MR. McMANUS:  That's what I'm asking, Judge.

2          THE COURT:  Were you ever in that space?

3          THE WITNESS:  Yes.

4          THE COURT:  Do you know if the door to IS EG Halal had

5    a pass code?

6          THE WITNESS:  It did.  I don't know if it was a pass

7    code, but I do remember that there was, like, a key code, a fob

8    that opens -- unlocks the door to go in and out.

9    BY MR. McMANUS:

10   Q.  Were you aware if there was something similar if you wanted

11   to get into the Daibes Enterprise space?

12   A.  There was, yes.  The whole building had fobs to get in and

13   out.  You needed one to get into any office space.

14         THE COURT:  Like a swipe card?

15         THE WITNESS:  Exactly.

16         THE COURT:  You have to hold it up to the panel on the

17   door, and it would let you in.

18         THE WITNESS:  Right, beeps green, turns green, and

19   then it opens.

20         THE COURT:  OK.

21   BY MR. McMANUS:

22   Q.  So Daibes Enterprises, would you say, had hundreds of

23   employees in Edgewater?

24   A.  I don't know how many employees in total, but it definitely

25   seemed like there were a lot of employees between all of the

1  different things he was involved in.

2  Q.  And I think you testified that IS EG only had three or four

3  employees in the office, including you, is that correct?

4  A.  In the Edgewater office, that's correct.

5  Q.  And at the time that IS EG Halal was starting up, when you

6  were there, Mr. Daibes allowed one of his employees to work

7  part time for IS EG Halal?

8  A.  I don't know if there was, like, a part time thing or just

9  an as-needed basis.  Jamela was just, like, a very helpful

10  person generally, you know, so if people had questions, she

11  just was kind enough to answer them.  I'm not sure what her

12  actual, like, employee-employer capacity was with IS EG.

13        MR. McMANUS:  Mr. Kelly, would you be able to pull up

14  4C1-P, please, and this is in evidence.

15  Q.  So, on direct examination, the government showed you this

16  email, correct?

17  A.  Correct.

18  Q.  And you said that Jamela was copied here?

19  A.  Correct.

20  Q.  And I think you described her as Fred Daibes's secretary on

21  direct, is that correct?

22  A.  That's correct.

23  Q.  But if you look at her email address, that is her IS EG

24  Halal email address, correct?

25  A.  That's correct.

O51Wmen2                         Moldovan - Cross

1    Q.  So when she was doing work for IS EG Halal, would she use
2    that email address?
3              MR. MARK:  Objection.
4              THE COURT:  If you know.
5    BY MR. McMANUS:
6    Q.  If you know.
7    A.  She would.
8              MR. McMANUS:  Thank you.
9              Mr. Kelly, you can pull that down.  Thank you.
10   Q.  And then Rony Daibes did work for IS EG Halal as well,
11   correct?
12   A.  He did.
13   Q.  And that's because IS EG did not have a full-time in-house
14   IT person?
15   A.  Rony was that person.
16   Q.  But Rony also did work for your law firm, correct?
17   A.  Yeah.  He was -- he was kind of like a Johnny-on-the-spot
18   with anything IT-related for the whole building.
19   Q.  So like a contractor?
20   A.  Yeah.
21   Q.  Now, to your knowledge, IS EG and Daibes Enterprises don't
22   share any bank accounts, do they?
23   A.  Not that I'm aware of.
24   Q.  And I think you said that you're not aware that Fred Daibes
25   had any shares in IS EG Halal?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2                          Moldovan - Cross

```
 1   A.  Not that I'm aware.

 2   Q.  Are you aware that one of Mr. Daibes's businesses extended

 3   a line of credit to IS EG Halal?

 4   A.  Not that --

 5               MR. MARK:  Objection.

 6               THE COURT:  I'll allow it.

 7               You can answer.

 8   A.  Not that I'm aware of.

 9   Q.  So, you mentioned that Mr. Hana introduced you to Nadine

10   Menendez, correct?

11   A.  That's right.

12   Q.  You said that Nadine Menendez had some financial troubles

13   at that time?

14   A.  She did.

15   Q.  And you met with her because she needed help with a loan?

16   A.  That's right.

17   Q.  And at first you had prepared the -- excuse me.

18       At first you had prepared a promissory note, is that

19   correct?

20               THE COURT:  He's testified to this, sir.

21   BY MR. McMANUS:

22   Q.  So, at some point after, somebody asked you to find

23   somebody to purchase Nadine Menendez's loan, correct?

24   A.  Correct.

25   Q.  And that person that you talked to was Jamela, correct?
```

O51Wmen2                          Moldovan - Cross

1   A.  That's right.

2   Q.  And she wasn't doing this in her role as an employee of IS

3   EG, was she?

4              MR. MARK:  Objection.

5              THE COURT:  Sustained.

6   BY MR. McMANUS:

7   Q.  When you emailed Ms. Maali, do you remember what email

8   address you would have used for her?

9   A.  I don't remember.

10  Q.  So, the investment company that you were talking about,

11  East-West Funding, correct?

12  A.  Correct.

13  Q.  And they were looking to purchase Nadine Arslanian's

14  mortgage, correct?

15  A.  Correct.

16  Q.  And so, in essence, East-West Funding is purchasing a

17  financial instrument; would that be accurate?

18  A.  Right.

19  Q.  Buying a loan --

20  A.  Yes.

21  Q.  -- would you say?

22      And would you say that's common practice for investment

23  funds?

24             MR. MARK:  Objection.

25             THE COURT:  Sustained.

1    BY MR. McMANUS:

2    Q.  So, if East-West Funding is purchasing the loan, then they

3    would have a lien on the house; are you aware of that?

4              MR. MARK:  Objection.

5              THE COURT:  Sustained.

6    BY MR. McMANUS:

7    Q.  If Nadine Arslanian did not pay the loan, did you

8    understand that East-West Funding could foreclose on the house?

9              MR. MARK:  Objection.

10             THE COURT:  Sustained.

11             MR. McMANUS:  One moment, your Honor?

12             THE COURT:  Yes.

13             MR. McMANUS:  No further questions.

14             THE COURT:  All right.

15             Any redirect, sir?

16             MR. MARK:  Just very briefly.

17             THE COURT:  Yes.

18   REDIRECT EXAMINATION

19   BY MR. MARK:

20   Q.  Mr. Moldovan, I think when we began cross-examination, you

21   were asked some questions about your communications with some

22   people in Uruguay in connection with setting up an IS EG Halal

23   office in that country?

24   A.  Correct.

25   Q.  And you said that you worked hard on setting up that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2                        Moldovan - Redirect

 1  office, right?

 2  A.  I did.

 3  Q.  Did you send a lot of emails?

 4  A.  I did.

 5  Q.  Have a lot of phone calls?

 6  A.  I did.

 7  Q.  OK.  And you communicated to the people in Uruguay that IS

 8  EG Halal had a connection to the government of Egypt, is that

 9  right?

10  A.  One more time, please?

11  Q.  You communicated to the people in Uruguay that IS EG Halal

12  had a connection to the government of Egypt, is that right?

13  A.  I didn't use those words, but yeah, I delivered that

14  message in some way.

15  Q.  And you delivered that message because that was your

16  understanding from Mr. Hana, right?

17  A.  That's right.

18  Q.  And Mr. Hana told you that he regularly spoke with an

19  Egyptian general in connection with his work at IS EG Halal,

20  right?

21  A.  That's what he told me.

22  Q.  And that he took directions from that Egyptian general,

23  correct?

24  A.  Correct.

25          MR. MARK:  No further questions.

O5lWmen2

```
1              THE COURT:  All right.  Thank you, Mr. Moldovan.  You
2     are excused.  You may step down.
3              (Witness excused)
4              THE COURT:  Ladies and gentlemen, we've been at it for
5     two hours.  Why don't we take a brief midmorning break.
6              I'm going to ask people in the courtroom just to stay
7     for a few moments because the jury isn't using this
8     deliberation room; they've got to use the elevators to go to
9     their other room.
10             Ladies and gentlemen, please.
11             Just wait a few minutes in the courtroom so the jury
12    can take the elevator.
13             (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

O51Wmen2

```
 1                  (Jury not present)
 2                  THE COURT:  You may be seated.
 3                  MR. MARK:  Your Honor, just one point with this
 4      witness.
 5                  On cross-examination from Mr. Weitzman, Mr. Weitzman
 6      asked Mr. Moldovan whether Mr. Hana was indecisive.  I know I
 7      didn't object in time for the answer to come, before
 8      Mr. Moldovan answered, but I think that was vague, a vague
 9      question.  The answer was speculation.  We'd move that that
10      answer be stricken.
11                  MR. WEITZMAN:  Your Honor, it's directly from his
12      3500.  I quote, directly from his 3500.
13                  THE COURT:  I'll allow it.  I don't know what it
14      means.  I'll allow it.
15                  MR. RICHENTHAL:  Relatedly, I thought this might be
16      helpful.  We tried not to object every time, but I wanted to
17      explain why we keep objecting to certain points of questions; I
18      think the Court may already be attuned to this.
19                  All of defense counsel so far continually say "are you
20      aware of that," instead of saying "are you aware of whether."
21      By using the form of formulation, whether the witness says yes
22      or no, a fact or an alleged fact is being put in front of the
23      jury.  We're trying to do this every time, but we would ask the
24      Court to direct defense counsel to say "are you aware of
25      whether."
```

O5lWmen2

1            THE COURT:  That's better form.  I've tried to tell

2    the jury that when I tell them to watch the assumptions in the

3    question, but that's the better form on cross.

4            All right.  Ten minutes.

5            (Recess)

6            THE COURT:  All right.  Bring the jury in.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O51Wmen2                          Paul - Direct

1           (Jury present)

2           THE COURT:  You may be seated in the courtroom.

3           Government, next witness.

4           MR. MONTELEONI:  The government calls Joshua Paul.

5    JOSHUA MANN PAUL,

6         called as a witness by the government,

7         having been duly sworn, testified as follows:

8           THE COURT:  Good afternoon, Mr. Paul, and welcome,

9    sir.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  Your witness.

12          MR. MONTELEONI:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. MONTELEONI:

15   Q.  Good afternoon.

16       How old are you?

17   A.  I'm 46 years old.

18   Q.  Are you currently employed?

19   A.  I'm currently a consultant for a nonprofit and in the

20   process of standing up for a nonprofit.

21   Q.  Was your employment situation the same last year?

22   A.  No.  I was employed last year.

23   Q.  Where were you employed during the first part of last year?

24   A.  Until October of last year, I was employed in the U.S.

25   State Department's Bureau of Political-Military Affairs.

O5lWmen2                              Paul - Direct

1    Q.   When did you start in the Bureau of Political-Military

2    Affairs in the State Department?

3    A.   I started there on April 6, 2012.

4    Q.   What was the title of your position in the Bureau of

5    Political-Military Affairs in the State Department?

6    A.   I was the director of congressional and public affairs.

7    Q.   How long did you hold that title?

8    A.   For 11-1/2 years.

9    Q.   Could you provide the jury with a brief summary of your

10   professional career before joining the State Department in that

11   position?

12   A.   Yes.  Prior to joining the State Department, I had worked

13   for the U.S. Army Staff.  I had worked for the State Department

14   and the Defense Department in Iraq.  I had worked for the

15   office of the secretary of defense, undersecretary of policy.

16   I had also worked for a dual U.S.-U.K. mission in the West

17   Bank.  I've also worked in Steve Israel's office as his

18   military legislative assistant.

19   Q.   Mr. Paul, what is the State Department?

20   A.   So, the State Department is the executive branch agency

21   that is responsible for the conduct of America's foreign

22   relations and its diplomacy.

23   Q.   What is the political-military affairs bureau in the State

24   Department?

25   A.   So, the State Department is organized into a group of

O5lWmen2                              Paul - Direct

multiple bureaus.  Each bureau is responsible for a different
function.  That can be either a geographic region or a -- some
sort of substantive function.  And so the Bureau of
Political-Military Affairs is the part of the State Department,
the organization within the State Department, that is
responsible essentially for what we call America's defense
diplomacy.  This is the overlap between, as it suggests, the
military and foreign policy.

So the Bureau of Political-Military Affairs conducts a wide
variety of tasks.  These include negotiating with countries
around the world to enable agreements that let U.S. forces
deploy overseas with legal protections.  It includes security
assistance, managing the taxpayer grant assistance funds that
enable, that we give to other countries to let them by American
defense articles and training.  And it includes oversight of
all major arms transfers, to the tune of about $180 billion a
year.

MR. MONTELEONI:  Mr. Paul, I'm going to just ask you
if you can make sure to speak slowly in your answers for the
benefit of the court reporter and of the jurors.

Q.  So, you mentioned a number of the functions of the
political-military affairs bureau in the State Department, but
I'd like to ask you, in general terms, what were your duties
and responsibilities as the director of congressional and
public affairs for the political-military affairs bureau?

O5lWmen2                          Paul - Direct

A.   So, as the director of congressional and public affairs, I
was essentially responsible for the bureau's relationships with
Congress, with the media and with American civil society.   In
that role I managed a team that assisted in that job.   I also
was the senior adviser to the assistant secretary, who is the
head of the Bureau of Political-Military Affairs, on all
matters relating to Congress, including strategy, legislation,
member interests.

     I was also the representative of the assistant secretary to
Congress whenever that person was not present.   So it was my
role essentially, with a particular focus on the congressional
piece, to essentially manage the bureau's relationships with
all the Hill, Capitol Hill, and to advise the bureau on how to
conduct its relations with Congress.

Q.   Now, you mentioned security assistance and arms transfers
as among the activities that are within the purview of the
political-military affairs bureau.

     Did you, in your office as director of congressional and
public affairs, have any involvement in those activities?

A.   Yes.   So, extensively so.

     Much of the activities that the State Department conducts,
in terms of both security assistance, which is the funding,
again, that we give to other countries to procure defense
capabilities from the U.S., and in terms of arms transfers, the
actual mechanism for the transfer of arms, many of those

O5lWmen2                        Paul - Direct

1    require congressional notification, which is a process by which

2    we have to inform Congress before we can take certain actions.

3    Of course, the funding I'm talking about is provided by

4    Congress, so there is regular engagement with Congress to

5    provide that funding and, you know, to do so in the way that is

6    most expedient for the State Department, from its perspective.

7    And of course, Congress also writes the laws that dictate, or

8    at least determine in many cases, how that funding can be used

9    and under what circumstances arms transfers may take place.

10   Q.  You mentioned congressional notifications as among the

11   activities that you were involved in in your time in the office

12   of congressional and public affairs.

13       About how familiar with the process of congressional

14   notifications did you become as a result of your position?

15   A.  So, I was there for about 11-1/2 years.  I would say the

16   bureau notifies the Congress, on average, somewhere in the

17   region of 300 notifications a year.  So -- and I was part of

18   the approval process for every one of those notifications.  So

19   I would say I was very familiar with the congressional

20   notification process.

21   Q.  I'm going to ask you some more detailed questions about the

22   congressional notification process, but first I want to ask you

23   some very basic background.

24       First, how many houses of Congress are there?

25   A.  There are two, the U.S. House of Representatives and the

O5lWmen2                        Paul - Direct

1    United States Senate.

2    Q.   In the course of your duties at the State Department, have

3    you heard of the term "congressional committee"?

4    A.   Yes.

5    Q.   What is a congressional committee?

6    A.   So, within each house, the members organize themselves into

7    groups or committees to take certain actions or to conduct

8    certain activities.  For example, there might be a committee on

9    appropriations that decides where Congress is going to send the

10   funds that have been raised with the taxpayer.  There might be

11   committees that oversee certain government functions, and so

12   this is the way Congress organizes itself within each house to

13   do its day-to-day work.

14   Q.   Focusing on the Senate's congressional committees, who sits

15   on those committees?

16   A.   So, the senators sit on the Senate committees.

17   Q.   Are all of the members of the committee equal, or do some

18   hold leadership positions?

19   A.   So, within each committee -- first of all, there is a

20   majority and minority.  So the makeup of each committee

21   reflects in sort of a microcosm the makeup of the broader

22   Senate.  So, for example, if you have a Senate that is a

23   majority of one party and a minority of another, within the 100

24   seats in the Senate, in each committee there will be a majority

25   of that same party and a minority of the party that has fewer

O51Wmen2                          Paul - Direct

1    seats in the Senate.  And so the person who leads, essentially,

2    the committee is the senior member, which we call the chair,

3    chairperson, who is the senior person on the committee for the

4    majority.  And likewise for the minority, the senior person,

5    the senator is the ranking member.  So it's the senator -- the

6    chair on the majority side and the ranking member on the

7    minority side.

8              THE COURT:  If I understand your testimony, sir, and I

9    don't want to put words in your mouth, on each committee, the

10   senior member of the committee who comes from the party that

11   holds the majority of seats in the Senate is the chair of that

12   committee.  Is that correct?

13             THE WITNESS:  That's exactly right, your Honor.

14             THE COURT:  And the senior member that comes from the

15   party that does not hold the majority of seats in the Senate is

16   called the ranking member?

17             THE WITNESS:  That is correct, your Honor.

18             THE COURT:  Thank you.

19   BY MR. MONTELEONI:

20   Q.  In addition to the senators who sit on a Senate committee,

21   does the committee have any employees who are not themselves

22   members of Congress?

23   A.  Yes.  So, both the chair and the ranking member will

24   employ, typically, a professional staff.  These are

25   congressional staffers, experts in their fields, who conduct

O5lWmen2                         Paul - Direct

1    the day-to-day business within the committee, informing the

2    members and doing the work of the committee on a daily basis.

3    Q.  So, you said that both the chair and the ranking member

4    would have a staff.  Is that a shared staff, or are there

5    essentially two separate staffs?

6    A.  It's two separate staffs.  There's a majority staff and a

7    minority staff, and they answer separately to the chair and to

8    ranking member.

9    Q.  Are these referred to as the professional staff of the

10   committees?

11   A.  Correct.

12   Q.  To be clear, who does the staff of the majority party on

13   the committee report to?

14   A.  The staff of the majority committee of the party -- on the

15   committee report to the chair.

16   Q.  Who does the staff of the minority party on the committee

17   report to?

18   A.  To the ranking member.

19   Q.  Have you heard of the senator named Robert Menendez?

20   A.  Yes, I have.

21   Q.  During the time period from early 2018 to September 2023,

22   did Menendez have any leadership positions on any congressional

23   committees?

24   A.  Yes.  At the beginning of that time period, Senator

25   Menendez was the ranking member on the Senate Foreign Relations

O5lWmen2                              Paul - Direct

1    Committee.  This is the committee of the Senate that oversees

2    the activities of the State Department.  And then from January

3    2020 onwards -- no, January 2021 onwards, he was the chair of

4    the committee.

5    Q.  So, you referred to the Senate Foreign Relations Committee

6    as the committee that oversees the State Department.  How is

7    the Senate Foreign Relations Committee commonly referred to

8    within the U.S. government?

9    A.  So, it's commonly referred to by its initials, SFRC.

10   Q.  So, you mentioned that as the parties in the makeup of

11   Congress shifted, Menendez moved from ranking member to chair

12   of the Senate Foreign Relations Committee.  And I apologize if

13   I missed that.  Did you testify as to when that shift happened?

14   A.  If I recall correctly, it would have been January of 2021.

15   Q.  And by the way, in 2016 and 2017, did Menendez hold any

16   leadership positions on the committee?

17   A.  No, but he was on the committee.

18   Q.  Now, have you heard the term "foreign military financing"

19   during the time that you were director of the office of

20   congressional and public affairs?

21   A.  Yes.

22   Q.  And about how regularly did you supervise or participate in

23   activities related to foreign military financing in that

24   position?

25   A.  On an almost daily basis.

O5lWmen2                          Paul - Direct

1    Q.  How is foreign military financing typically referred to in

2    the U.S. government?

3    A.  Again, by its initials, FMF.

4    Q.  What is foreign military financing?

5    A.  So, foreign military financing is U.S. taxpayer funding or

6    money that comes from the U.S. taxpayer that is appropriated by

7    Congress, which means that Congress takes it and provides it

8    to, in this case, the State Department in order to provide

9    America's defense partners with the capability to buy military

10   equipment or training on a grant basis.

11   Q.  When you say on a grant basis, what does that mean?

12   A.  We give it to them.  There's no need to pay it back.  It's

13   not a loan.  We provide countries around the world with FMF to

14   buy American defense equipment.

15   Q.  You said that Congress appropriates the money.  Can you

16   explain what it means for Congress to appropriate funds?

17   A.  So, the U.S. Treasury, on an annual basis, collects our

18   taxes.  It can collect other receipts.  From there, Congress,

19   which, under the Constitution, holds the power of the purse,

20   determines how that money is going to be spent writ large and

21   assigns it to certain departments and agencies and appropriates

22   it into certain accounts from which it then can be drawn down.

23   Q.  So with respect to foreign military financing, who

24   determines the total maximum amount of foreign military

25   financing grant money that could be made available to another

O5lWmen2                          Paul - Direct

1    country in any given year?

2    A.  As a general matter, Congress does.

3    Q.  Does it do that through the appropriations process?

4    A.  Yes, it does that through the appropriations, annual

5    appropriations process.

6    Q.  Once Congress appropriates money for foreign military

7    financing grants, where does that money go?

8    A.  So, that money is then controlled by the State Department,

9    particularly by the Bureau of Political-Military Affairs and,

10   within that bureau, an office called the office of security

11   assistance that is responsible for the management of the FMF

12   program.

13   Q.  Once the State Department receives appropriated funds for

14   the foreign military financing program, what does the State

15   Department do, in general terms?

16   A.  So, it depends on the nature of those funds, who they are

17   going to.  There are some countries for whom a notification to

18   Congress is required.  There are some countries for which there

19   are funds that are earmarked, which is to say Congress says you

20   must give this amount of funds to this country.  And then there

21   are others where there is either no notification that is

22   required or where the State Department goes through a policy

23   process to determine how best to use those funds.

24   Q.  You said that the money goes from Congress as

25   appropriation, it goes from the Treasury to the State

O5lWmen2                    Paul - Direct

1   Department.  What does the State Department do to make those

2   funds available to the foreign nations?

3   A.  So, the funds actually stay in the Treasury until they are

4   obligated by the State Department.  This is where the State

5   Department essentially decides the funds will go to a certain

6   country.

7   Q.  Can you explain, what does the term "obligate" mean

8   exactly?  What does the State Department do to obligate funds?

9   A.  So, it depends on, again, the country in particular, but

10  for most countries a notification to Congress is required.  So

11  the State Department essentially assents to take this funding

12  that Congress has appropriated and make it available to country

13  X for them to then spend it against some sort of defense sales.

14  Q.  So, I'm going to go into the process for doing that in a

15  moment, but just to be clear, to obligate the funds to a

16  country is to make them available to that country?

17  A.  Correct, it's to make them available.

18  Q.  All right.  Now, when a congressional notification is

19  required to make foreign military financing grant money

20  available to a foreign nation, does your office actually draft

21  the congressional notification itself?

22  A.  No.  The notification is drafted by the office of security

23  assistance.

24  Q.  What, if any, role does your office have in the review or

25  the approval of the congressional notifications?

O5lWmen2                          Paul - Direct

1    A.   So, my office was one of those that is in the approval

2    chain.  So all congressional notifications for FMF would have

3    had to have gone through myself or my office in order to be

4    approved and to move forward.

5    Q.   About how much of your time personally was spent on review

6    or approval of congressional notifications for foreign military

7    financing?

8    A.   A significant amount.

9    Q.   During your time in the State Department, what country has

10   been the single largest recipient of foreign military financing

11   grant money from the U.S.?

12   A.   During my time in the State Department, the single largest

13   recipient of grant assistance funding for military financing

14   was Israel.

15   Q.   What country has been the second largest?

16   A.   Egypt.

17   Q.   You mentioned that for some countries, congressional

18   notifications were required before obligating that foreign

19   military financing grant money to the country.

20        Was Egypt among those countries for which a congressional

21   notification was required?

22   A.   Yes, Egypt is a mandatory notification.

23   Q.   During the time that you were in the State Department,

24   approximately how much money did Congress appropriate in total

25   foreign military financing grant money to Egypt every year?

O51Wmen2                          Paul - Direct

1    A.  Approximately $1.3 billion.

2    Q.  On an annual basis?

3    A.  On an annual basis.

4    Q.  What, if any, conditions were placed on that grant money

5    under the law?

6    A.  So, dating back to about 2011, 2012, Congress has directed

7    in the annual Appropriations Act that a certain proportion of

8    the funds to Egypt can only be released conditional on Egypt

9    making progress on certain human rights aspects.  There are

10   more recent examples, that there must be a certification that

11   Egypt is making progress on, for example, the release of

12   political prisoners.  And so that as applies to up to about 300

13   million out of that $1.3 billion.

14   Q.  All right.  You said that since about 2011 or 2012, there

15   have been a series of conditions on up to about 300 million of

16   this money, and those conditions have pertained to subjects

17   such as human rights and release of political prisoners.

18       I want to set that amount of money for a moment, but just

19   so we know what we're setting aside, the government will in

20   your testimony today be calling that conditional grant money.

21   A.  Sure.

22   Q.  All right.

23       So we're going to leave aside the conditional grant money

24   for a moment and come back to that.  First, I want to focus on

25   the rest of the foreign military financing grant money, the

O5lWmen2                          Paul - Direct

portion that doesn't have any of the special conditions on it.

     For purposes of your testimony, are you comfortable
referring to that as just grant money without special
conditions?

A.  Yes.

Q.  By the way, does grant money without special conditions
have any conditions on it at all?

A.  Yes, it does.  All foreign military financing has some
conditions set by Congress, whether that is that it can only be
used for the purposes of defense capabilities, for defense
forces or, for example, that it cannot go to units that are
being credibly alleged to be involved in gross violations of
the human rights.

Q.  So let's assume that all of those general conditions are
going to be satisfied and just talk about the process for
making a grant of the foreign military financing grant money to
Egypt, the kind without the special conditions.  So, in my
questions, just to be clear, not talking about any actual
decision to approve or not approve any specific grant of money
to Egypt, but just about the process for doing so.  Is that all
right?

A.  Yes.

Q.  So after Congress appropriates the total amount foreign
military financing grant money to Egypt and focusing only on
the money without the special conditions, before notifying

O5lWmen2                         Paul - Direct

1   Congress, does the State Department do any review to determine

2   whether or not to actually go ahead and obligate that money?

3   A.  Yes.  I mean there is an annual -- the money is available

4   for up to two years under the way the law is written.  So the

5   State Department has two years to decide to move forward up to

6   the end of the fiscal year following the year in which Congress

7   provided it.  And there is a process of discussion with the

8   government of Egypt, how they intend to spend the money they

9   are getting, you know, what sort of capabilities they require

10  and, again, regular review of is this in line with U.S.

11  policies and that sort of discussion.

12  Q.  And at the end of that review period, what does the State

13  Department typically do?

14  A.  So, typically, the State Department will decide that it

15  wants to obligate that $1.3 billion to Egypt, and it will move

16  forward with a congressional notification.

17  Q.  Now, after the congressional notification is transmitted to

18  Congress, a formal notification, are there any legal

19  restrictions on the State Department immediately making those

20  funds available to Egypt?

21  A.  Yes.  So, the way foreign military financing notifications

22  work is that, by law, by the annual Appropriations Act, it is

23  essentially a 15-day notify and wait.  So you cannot actually

24  obligate the funding; you cannot actually make it available to

25  Egypt until 15 days have passed since you informed Congress

O5lWmen2                        Paul - Direct

1    that you intend to do so.

2    Q.  What's the purpose of that law?

3              THE COURT:  Let me see if I understand this.

4              Congress will appropriate a certain amount of money

5    for foreign military financing, correct?

6              THE WITNESS:  Yes.  Yes, your Honor.

7              THE COURT:  All right.  And will Congress say X amount

8    to Egypt and Y amount to Israel, and so forth?

9              THE WITNESS:  For those specific countries, yes, your

10   Honor.

11             THE COURT:  OK.  And then the State Department knows

12   Congress has said Congress wants the United States to give X

13   amount to Egypt in foreign military financing.  So that's a

14   direction, as it were, to another branch of government from

15   Congress.  What's the next step for the State Department?

16             THE WITNESS:  So, within that $1.3 billion that Egypt

17   gets, your Honor, there is up to 300 million of it that is

18   subject to conditions.

19             THE COURT:  Right.  We're putting that aside.

20             THE WITNESS:  So, for the rest of the $1 billion, the

21   next step is, first of all, to discuss with Egypt how it would

22   like to use it and then to move forward with a notification to

23   Congress that it intends to obligate.

24             THE COURT:  OK.  So the notification is, I take it, an

25   actual document that says we intend to dispense this amount of

O5lWmen2                          Paul - Direct

1    money to Egypt for this purpose; is that what it does?

2            THE WITNESS:  Technically, to Egypt's accounts here in

3    the U.S., but yes, your Honor.

4            THE COURT:  OK.

5            MR. MONTELEONI:  Thank you, your Honor.

6    Q.  So, you testified that after that formal notification

7    document saying that the State Department intends to obligate

8    those funds to Egypt goes out, there's a 15-day waiting period

9    before the State Department can go ahead and actually make

10   those funds available to Egypt.  What's the purpose of that

11   waiting period?

12   A.  So, in theory, that period is for Congress to conduct its

13   oversight of the funding of the State Department and to ask any

14   questions it wants to about the policy and to assure that U.S.

15   taxpayer dollars are being spent in accordance with Congress's

16   intent in the appropriations bill.

17   Q.  And if there are certain members of Congress who have

18   concerns with an obligation of funds to Egypt, what can they do

19   during that waiting period?

20   A.  So, anytime during that 15-day period, certain members of

21   Congress can reach out to the State Department and ask us to

22   what we call hold the obligation of those funding -- of that

23   funding, which is to say to not obligate it even once the 15

24   days have expired.

25   Q.  And can any member of Congress hold foreign military

O5lWmen2                        Paul - Direct

1   financing grant money after a congressional notification?

2   A.  Holds on FMF grant notifications are limited to the chair

3   and ranking of the Senate Foreign Relations Committee and the

4   Senate appropriations subcommittee on foreign operations.

5   That's the parallel committee that appropriates the funds in

6   the first place.

7   Q.  I want to come back to holds and ask a bit more about them

8   in a minute, but first I just want to talk about the rest of

9   the process when there's no holds.  So assuming that the State

10  Department gives its formal notification and intent to make

11  funds available to Egypt and everything goes smoothly and

12  there's no holds, what's the next step after the 15 days?

13  A.  So, the State Department will instruct the Treasury to

14  transfer the money.  In the case of Egypt, it goes to an

15  interest-bearing account at the Federal Reserve Bank of New

16  York from where it is then available for Egypt to draw down

17  against requirements or arms sales.

18  Q.  You said that Egypt has a federal -- an interest-bearing

19  account in its name at the Federal Reserve Bank of New York?

20  A.  That is correct.

21  Q.  Does every foreign country that receives foreign military

22  financing grant money have a bank account like that set up at

23  the Federal Reserve?

24  A.  No.  It is just Egypt and Israel.

25  Q.  All right.  So we've talked about the process for

O5lWmen2                          Paul - Direct

1    transferring this grant money without the special conditions to

2    Egypt's bank account.  I want to come back to this conditional

3    grant money, the approximately $300 million.

4        So in general terms, what types of conditions did the law

5    place on this $300 million or so?

6    A.  So, in recent years there has been one section of that, up

7    to about $90 million, that is subject to a certification that

8    the government of Egypt is making progress in releasing

9    political prisoners.  The rest tends to be conditioned on a

10   broader set of human rights concerns, such as linked to

11   prosecutions of civil society or freedom of speech.  And it's

12   also subject to a national security waiver, which means that

13   the secretary of state has the choice as to whether either the

14   conditions have been met and the money can be provided, or the

15   conditions have not been met but it is important to the

16   national security of the United States that the money be

17   provided, or that the conditions have not been met and there

18   will be no waiver and the money will not be provided.

19   Q.  All right.  You've laid out several different options.  I

20   just want to go over each of them.  You said that there's about

21   $90 million related to the release of political prisoners,

22   which requires a certification.  What does a certification mean

23   in this context?

24   A.  That the secretary of state must certify that something has

25   happened.

1   Q.  So if the secretary of state does not certify that Egypt

2   has made certain progress on the release of political

3   prisoners, can the State Department notify Congress of its

4   intent to obligate that $90 million?

5   A.  No, the State Department cannot move forward on the

6   obligation until that certification has been met.

7   Q.  You also described a set of conditions related to broader

8   human rights concerns, and there, you mentioned the possibility

9   of a national security waiver.  And I believe you also -- did

10  you also mention the possibility of a certification as to that

11  amount of funds too?

12  A.  Right.  So, it's have they met those requirements, or if

13  not, do you want to apply a national security waiver, or if

14  not, then you don't have to obligate the money.

15  Q.  So if the State Department certifies that Egypt had made

16  the specified progress, then is it allowed to notify Congress

17  of its intent to obligate that money?

18  A.  Yes.

19  Q.  If the secretary of state doesn't certify that Egypt has

20  made this progress but makes a waiver because it's in the

21  national security interest of the United States to waive the

22  requirement that it certify it, is it allowed to notify

23  Congress of its intent to obligate that money?

24  A.  Yes.

25  Q.  But if the secretary of state doesn't certify that there's

O51Wmen2                                Paul - Direct

1    been progress --

2              THE COURT:  Slow down a little.

3              MR. MONTELEONI:  Thank you, your Honor.

4    Q.  If the secretary of state doesn't certify that Egypt is

5    making this progress and also doesn't make the determination

6    that it's in an interest of national security to waive that

7    requirement for certification, in that case is the State

8    Department allowed to notify Congress of its intent to obligate

9    those funds?

10   A.  No, it is not.

11   Q.  And during the time that you've been at the State

12   Department, has Egypt always, in fact, received the full amount

13   of the foreign military financing grant money that has been

14   appropriated?

15   A.  No, it has not.

16   Q.  Does that have to do with these certifications and waivers?

17   A.  Precisely.

18   Q.  From your experience as the director of the office of

19   congressional and public affairs, do you have any understanding

20   of what Egypt's position was on the conditions on this

21   conditional grant money?

22   A.  Yes.  I would say Egypt did not like the idea that there

23   were conditions in the first place and certainly did not like

24   when funding was withheld.

25   Q.  And what legislation were these -- what types of

O5lWmen2                          Paul - Direct

1    legislation were these conditions attached to?

2    A.   These are in the annual Appropriations Act.

3    Q.   What committee is responsible for appropriations

4    legislation?

5    A.   The committee on appropriations.

6    Q.   All right.  So you mentioned the idea of a hold on foreign

7    military financing grant money.  What is a hold on this money?

8    A.   So, a hold is where the chair or ranking member of one of

9    the relevant committees or their, you know, appointed

10   representatives, in the form of a professional staff member,

11   directs the State Department in this context not to obligate

12   the funding; that even when the clock runs out, as we say, on

13   those 15 days, that the State Department cannot move forward

14   until that member says go ahead.

15   Q.   So is the chair or the ranking member of the Senate Foreign

16   Relations Committee, is their ability to place a hold on this

17   money written into law?

18   A.   No, there is no legal basis for this, but the State

19   Department will respect their hold.

20   Q.   If it's not written into law, why will the State Department

21   respect a hold placed by the chairman or ranking member of the

22   Senate Foreign Relations Committee?

23   A.   Well, because the chair and the ranking member of the

24   Senate Foreign Relations Committee have an immense amount of

25   influence and sway over the State Department.  That is the

O5lWmen2                         Paul - Direct

1    committee that confirms our leadership in the form of our

2    assistant secretaries, our secretary.  It confirms our

3    ambassadors, the United States ambassadors around the world.

4    It writes the laws that, you know, define what we do, how we

5    operate.  So there are any number of steps that, in theory, a

6    chair or ranking member who would be unhappy with the State

7    Department could take were we to break the hold.

8    Q.   If the chairman or the ranking member of the Senate Foreign

9    Relations Committee wants to place a hold on the State

10   Department's obligation of foreign military financing grant

11   money to Egypt, how do they do it?

12   A.   So, typically, it would be communicated via email from

13   their staff.

14   Q.   So when the staff members communicate these holds via

15   email, whose authority are they exercising?

16   A.   That of the chair or ranking member they work for.

17   Q.   And what will the State Department do when it receives this

18   notification of the hold?

19   A.   It will ensure that everyone is aware not to move forward

20   with the obligation and then start the conversation with

21   Congress about how we can get the hold lifted in order to move

22   forward.

23   Q.   Will the State Department go ahead and just transfer the

24   money to Egypt's bank account if the chair or ranking member of

25   the SFRC is maintaining a hold on it?

1    A.  No.

2    Q.  How does a hold end?

3    A.  So, one of two ways.  Either in the end the member lifts

4    the hold and the State Department could obligate the funding,

5    or we get to the end of that two-year period availability, the

6    funding expires and it's returned to Treasury and can no longer

7    be used by the State Department in foreign military financing.

8    Q.  You mentioned lifting a hold.  Have you ever heard the term

9    "clearing a hold"?

10   A.  Yes, lifting a hold, clearing a hold, signing off.

11   Q.  All meaning the same thing?

12   A.  All the same.

13   Q.  How is that communicated to the State Department that a

14   hold gets lifted?

15   A.  By email, typically.

16   Q.  Again, typically by the staff?

17   A.  Typically by the staff, yes.

18   Q.  Now, we've talked about foreign military financing grant

19   money going to Egypt.  Once Egypt receives the grant money in

20   its bank account, what does it typically spend the money on?

21   A.  So, it spends the money on American defense articles and

22   services typically through a process we call the foreign

23   military sales system, or FMS.

24   Q.  So you've used the term "defense articles and services."

25   What's a defense article?

O51Wmen2                          Paul - Direct

1    A.  So, this is defined by law in the Arms Export Control Act,

2    but these are essentially what you would think of as weapons

3    and associated defense articles, everything from bombs to

4    trucks to cargo aircraft, military cargo aircraft, to fighter

5    jets.

6    Q.  Is ammunition a defense article?

7    A.  Yes.

8    Q.  And you also mentioned services.  What type of services are

9    included in the foreign military sales program?

10   A.  So, that would typically be things like military training.

11   Q.  And now, in general terms, what is Egypt allowed to spend

12   foreign military financing grant money on?

13   A.  In general terms it can procure anything it wishes from

14   the -- from the U.S. government through the foreign military

15   sales system that the U.S. government agrees to.

16   Q.  So you mentioned foreign military sales or, I believe you

17   called it FMS.  What are foreign military sales?

18   A.  So, foreign military sales, or FMS, are

19   government-to-government contracts, where the United States

20   government agrees with a foreign government that we will sell

21   or provide it with a defense capability.  It could be a fleet

22   of fighter jets.  It could just be a couple of dozen rifles or

23   anything in between.

24        So these are government-to-government contracts in which

25   the U.S. government will then turn around to U.S. industry and

O5lWmen2                              Paul - Direct

1   request them to build this capability and will then transfer

2   that capability over to the foreign partner.

3   Q.  So you mentioned the Arms Export Control Act.  What is the

4   Arms Export Control Act?

5   A.  So, the Arms Export Control Act of 1976, or the AECA, is

6   sort of the framing legislation that guides arms transfers in

7   general.

8   Q.  Does the Arms Export Control Act require anything regarding

9   congressional notifications?

10  A.  Yes.

11  Q.  What does the Arms Export Control Act require regarding

12  congressional notifications for sales through the foreign

13  military sales program?

14  A.  So, full foreign military program sales that are above a

15  certain dollar threshold, in terms of their value, the Arms

16  Export Control Act, Section 36(B), requires that Congress be

17  notified before those sales can go forward.

18  Q.  Now, what is the State Department's process for foreign

19  military sales that require this congressional notification?

20  A.  So, this, again, is the Bureau of Political-Military

21  Affairs in the State Department, in this case, the office of

22  regional security and arms transfers, that is in the lead.  The

23  way it works is that the partner country will reach out to the

24  U.S. government with a request for capability.  The Defense

25  Department will definitize that request -- so turn it into an

O5lWmen2                          Paul - Direct

1    actual case that can move forward -- and then hand that over to

2    the State Department for policy and legal review.  The State

3    Department will review the case against U.S. policy, U.S.

4    national interests, U.S. law, as applicable, and if it is a

5    major sale above that notification threshold, will prepare a

6    notification to Congress.

7    Q.  All right.  So you used a number of terms and I want to

8    just break them down.

9          First, what is a case in foreign military sales?

10   A.  So, in this context a case is essentially an arms sale.  It

11   could just be, again, a dozen firearms, but it could also be a

12   fleet of jets with all the training and all the spare parts

13   that accompany them.

14   Q.  So you said that the foreign nation makes a request.  Have

15   you heard the term letter of request?

16   A.  Yes.

17   Q.  What is a letter of request in this context?

18   A.  So, that is the initial written request from the foreign

19   country that says to the United States government we would like

20   X.

21   Q.  How are letters of request typically referred to in the

22   U.S. government?

23   A.  By their initials, LORs.

24   Q.  So you said that when the U.S. government receives a letter

25   of request from a foreign nation, it would definitize that

O5lWmen2                         Paul - Direct

1    request.  In the most general and high-level terms, what does

2    it mean to definitize a request?

3    A.  So, they'll work with the industry to figure out what the

4    actual or approximate cost might be, how long it will take to

5    build, you know, what gadgets or additions need to be added or

6    subtracted, so just to turn it into something that looks a lot

7    more like a contract.

8    Q.  Now, in the context of foreign military sales that require

9    congressional notification, when does the State Department get

10   a case?

11   A.  So, once the department of defense has developed a draft

12   letter of offer and acceptance, which is the contract vehicle

13   that ultimately will go back to the other country, it comes

14   over to the State Department for that policy review.

15   Q.  So once the State Department gets a case, what is this

16   policy review that the State Department does?

17   A.  So, the State Department ultimately has the authority, the

18   approval authority, within the U.S. government on foreign

19   military sales on whether an arms transfer will occur or not,

20   and so before it does so, there is, first of all, a

21   presidential-level policy called the conventional arms transfer

22   policy that lists out a variety of factors that should be

23   considered, such as regional balance of power, U.S. domestic

24   industry impacts, human rights impacts.  And then, as

25   applicable, the State Department will also look at relevant

O5lWmen2                         Paul - Direct

1   laws that might apply to the sale.

2   Q.   If the State Department decides at the end of the policy

3   review that it wants to proceed with a foreign military sales

4   case to sell some type of defense articles to Egypt and that

5   this is of a dollar value that requires congressional

6   notification, what, if any, contact does the State Department

7   have with Congress before the formal notification?

8   A.   So, the notification process for arms sales is different to

9   the notification process we just discussed for security

10  assistance in that the security assistance notification process

11  begins with the notification and then 15 days count forward.

12       For arms transfer, there's actually an informal process

13  before the notification, which is now in called the tiered

14  review process.

15  Q.   So why is this informal review process called the tiered

16  review process?

17  A.   Because it is structured into three tiers, depending on to

18  whom the arms are going, essentially.

19  Q.   And what is the purpose of this tiered review, informal

20  review process?

21  A.   So, it is intended to provide a confidential space for

22  discussion between the executive branch and the Senate Foreign

23  Relations Committee and its counterpart, the House Foreign

24  Affairs Committee, to work through any concerns about sales

25  before they are formally notified to Congress.

O51Wmen2                          Paul - Direct

1    Q.  Why is there a process of working out these concerns before

2    they're formally notified to Congress?

3    A.  Well, because once an arms sale is formally notified to

4    Congress, the only way that Congress can stop it, in practical

5    terms, is through something called a joint resolution of

6    disapproval.  And the way it works in the Senate is that a

7    joint resolution of disapproval has what they call expedited

8    procedures, which means after it sits for ten days, any senator

9    can bring it to the floor of the Senate for debate.

10         And what the State Department doesn't want, because of the

11   optics, because of the impact on relationships, is for a

12   partner country's name to be essentially dragged through the

13   mud in a floor debate on the Senate.  So to make sure that when

14   an armed sale gets formally notified there is as little chance

15   as possible of someone objecting to it and that if they do

16   object to it we know that at least the chair or ranking member

17   of the foreign relations committee, the two most influential

18   actors in the Senate on foreign policy, will have -- will

19   support the arms transfer.

20         So essentially it is to ensure that when the sale goes

21   forward it goes forward as smoothly as possible.

22   Q.  So you described this informal tiered review process as a

23   confidential process.  Is the status of a foreign military

24   sales case during that tiered review process public?

25   A.  It is not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2                         Paul - Direct

1  Q.  Now, how long is this informal tiered review process

2  supposed to take?

3  A.  So, it's supposed to take up to 40 days, in principle.

4  Q.  Is that 40 days for each tier or different amounts of time

5  for different tiers?

6  A.  Different amounts of time for different tiers.

7  Q.  What is the tier that has the shortest amount of time that

8  it's supposed to take?

9  A.  That is tier one, which is for NATO allies, our closest

10 allies across five other countries, and that is 20 days.

11 Q.  And what is the longest amount of time that the process is

12 supposed to take, in the longest tier?

13 A.  That is tier three, which is for all major arms sales to

14 countries in the Middle East other than Israel as well as some

15 long-range missiles, and that is 40 days.

16 Q.  And what's the other tier?

17 A.  Tier two, 30 days, everyone else in the world.

18 Q.  By the way, you mentioned NATO allies.  What are NATO

19 allies?

20 A.  Sorry.  The North Atlantic Treaty Organization was formed

21 in the 1950s and constitutes the U.S., Canada and most European

22 countries in a mutual defense alliance, in which if any of us

23 are attacked the others will come to their defense.

24 Q.  So now which tier is Egypt in?

25 A.  So, Egypt is in tier three.

O5lWmen2                          Paul - Direct

1    Q.   You previously testified that tier three has the longest

2    intended review period, the 40-day period.  Why does tier three

3    have the longest review period?

4    A.   So, for two principal reasons.  The first is that it's

5    generally been the State Department's experience that arms

6    sales to the Middle East are the most controversial when they

7    move forward to Congress but also that there are certain laws

8    that apply specifically to those arms sales.  In particular,

9    Section 36(H) of the Arms Export Control Act requires us to

10   consider Israel's qualitative military edge in the context of

11   every sale to the region.  We must do an analysis, do an

12   assessment of whether or not Israel's ability to defend itself

13   will be impacted by the sale.  And we provide that in

14   classified form to Congress to accompany each such

15   notification.

16   Q.   So you testified that for tier three countries, this

17   informal review process is supposed to take 40 days.  In

18   practice, how long does it usually take?

19   A.   In practice it can take a much longer time.

20   Q.   How is -- why does this process get extended?

21   A.   So -- so, similarly to the security assistance CN process

22   we were talking about, although here it has not yet been

23   notified, the State Department doesn't want to move forward on

24   a case in which there will be a joint resolution of

25   disapproval.  So until we have, particularly on those tier

O5lWmen2                                    Paul - Direct

1    three, those Middle East countries, agreement from all four

2    corners, as it were, by which I mean the chair and ranking

3    member of the Senate Foreign Relations Committee and the House

4    Foreign Affairs Committee, the State Department will negotiate

5    through that period for as long as it takes to get them on

6    board before it moves forward.

7    Q.  All right.  You used a couple of terms I just want to go

8    back to.  I think you said CN for a moment, talked about the

9    security assistance CN.  What's a CN?

10   A.  Congressional notification.

11   Q.  All right.

12       Now, you mentioned the four corners.  Who are the four

13   corners?

14   A.  So, the four corners are the chair and ranking member of

15   the Senate Foreign Relations Committee and the House Foreign

16   Affairs Committee.

17   Q.  Now, will the State Department formally notify a foreign

18   military sale to a tier three country that has not been agreed

19   to by each of the four corners, typically?

20   A.  That would be not typically.

21   Q.  And we've talked about holds in the context of transfers of

22   foreign military financing grant money to foreign countries.

23   Does the concept of holds apply to foreign military sales as

24   well?

25   A.  Yes, but only during this informal notification period.

O5lWmen2                          Paul - Direct

Once the sale is notified and the clock tolls, then the State
Department can move forward and the U.S. government can move
forward with the sale, there is no means to hold an arms sale
case like there is a security assistance case once it has been
formally notified.

Q.  Now, before it's been formally notified, when it's in
informal tier review process, who can place a hold on a foreign
military sale case?

A.  So, it would have to be the chair or the ranking member of
the Senate Foreign Relations Committee or the House Foreign
Affairs Committee through their staff, because typically others
are not even aware that these cases exist.

Q.  And again, in my questions, I'm not asking about any
decisions on any particular foreign military sales case, just
asking about the process.  If the chairman or the ranking
member of the Senate Foreign Relations Committee wants to
approve a foreign military sales case during the tier review
process, what do they do?

A.  So, they would typically either communicate it through
their staff, who would email the State Department, Bureau of
Political-Military Affairs and say OK or clear, or words like
that, or it would be communicated, again, through staff, in a
regular briefing between the executive branch and Congress.

Q.  When the staff members make that communication to the State
Department, whose authority are they exercising?

O5lWmen2                         Paul - Direct

1    A.  It is that of the chair or ranking member for whom they

2    work.

3    Q.  Have you heard the term "sign off" in relation to foreign

4    military sales cases?

5    A.  Yes.

6    Q.  What does it mean to sign off on a foreign military sales

7    case in tier review?

8    A.  To approve it, to OK, to clear.

9    Q.  Now, if a chairman or ranking member of the Senate Foreign

10   Relations Committee just does nothing and doesn't affirmatively

11   sign off on or clear a foreign military sales case, will the

12   State Department take any typically proceed with the sale?

13   A.  No.  The State Department will typically take that as a

14   hold, particularly on tier three cases.

15   Q.  And in addition to just doing nothing, could the chairman

16   or ranking member of the Senate Foreign Relations Committee

17   also affirmatively communicate a hold on a foreign military

18   sales case?

19   A.  Yes.

20   Q.  All right.  And I believe you already testified about this,

21   but can you remind the jury when they would do that if they

22   want to do that?

23   A.  They would do that during the tier review process before

24   full notification.

25   Q.  In the circumstance where the chairman or ranking member

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2                              Paul - Direct

1    wants to affirmatively communicate a hold to the State

2    Department on a foreign military sales case, what do they do?

3    A.  So, they would typically have their staff send an email to

4    the State Department that says, you know, the chair or ranking

5    member places a hold on X sale, whatever it might be.

6    Q.  Is the ability of the chair or ranking member of the Senate

7    Foreign Relations Committee to sign off on or to place a hold

8    on a foreign military sales case written into law?

9    A.  No, it is not.

10   Q.  All right.  If it's not written into law, how would they

11   have that ability?

12   A.  So, this is, this informal process is one that dates back

13   to the 1970s, and again, it's premised on -- the idea that the

14   reason the State Department would respect such a hold, again

15   it's premised on the idea that the chair and the ranking member

16   of the Senate Foreign Relations Committee have immense sway

17   over the State Department.  Again, they confirm our

18   ambassadors, our senior leaders.  They write our laws.  So the

19   State Department is always very, very reluctant to, as we say,

20   blow a hold or to move forward when there's a hold from a chair

21   or ranking member or our committee of jurisdiction.

22            MR. MONTELEONI:  Your Honor, I have more than a few

23   more minutes for this witness.  This might be a good time for a

24   break.

25            THE COURT:  All right.  Let's do it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O51Wmen2                              Paul - Direct

1            Ladies and gentlemen, take an hour for lunch.

2            Once again, in the courtroom, I'm going to ask you to

3    remain for a few moments so the jurors can take the elevators.

4            And ladies and gentlemen of the jury, I'm informed

5    that you'll have your deliberation room back on Tuesday.  All

6    right?

7            Take an hour, please, for lunch.  Enjoy the lunch.

8    Keep an open mind.  Don't watch any news or listen.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5lWmen2

1          (Jury not present)

2          THE COURT:  All right.  You may be seated.

3          You may step down, sir.

4          MR. FEE:  Your Honor, may I just raise one

5     controversial point, nothing about the substance?

6          You should leave, sir.  Not a question for you.

7          (Witness not present)

8          MR. FEE:  I just wanted to note, for obvious reasons

9     relating to speech and debate, Mr. Monteleoni is phrasing most

10    of these questions, many of them in the hypothetical.  I don't

11    know the government's intention.  I just want to be sure we're

12    clear, on cross, we're going to have to do the same and we hope

13    that the government is not going to interpose that sort of

14    objection on cross.

15         MR. MONTELEONI:  I think the questions in a similar

16    form to sort of the type of questions that we posed, unless

17    it's some very far-out hypothetical --

18         THE COURT:  You're going to go through the process.

19         MR. FEE:  That's right.

20         THE COURT:  All right.  What else?

21         MR. FEE:  That's it.

22         THE COURT:  Mr. Richenthal, you were standing.

23         MR. RICHENTHAL:  Only because I thought your Honor was

24    standing.

25         THE COURT:  Well, I am right now.
           (Luncheon recess)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen2

```
 1
 1                          AFTERNOON SESSION

 2                             2:00 p.m.

 3              (In open court; jury present)

 4              THE COURT:  You may continue with your direct

 5   examination of this witness.

 6              MR. MONTELEONI:  Thank you.

 7   BY MR. MONTELEONI:

 8   Q.  Mr. Paul, before the break --

 9              THE COURT:  Gentlemen, if both of you would slow down

10   so the reporter can take down what's being said.

11              MR. MONTELEONI:  Thank you, your Honor.

12   Q.  Mr. Paul, before the break, you testified about holds on

13   foreign military sales.  How long can a hold on a foreign

14   military sale case last?

15   A.  So, a hold on a foreign military sale case during the

16   tiered review period can theoretically last indefinitely.  I've

17   seen them last for years.

18   Q.  If a hold on a foreign military sales case lasts for a very

19   long time, what, if any, impact does that have on whether the

20   sale ultimately goes through?

21   A.  Ultimately, it may kill the sale for a few reasons.  First

22   of all, prices rise over time.  So the costs of, for example, a

23   fighter jet today, if it is held for several years, may

24   increase significantly and make it untenable for the partner.

25   Alternatively, the partner may tire of waiting and turn to
```

1   another country to provide a similar capability.  So, a hold

2   can overtime kill an arms transfer.

3   Q.  So as a practical matter, how much say does the chairman or

4   ranking member of the Senate Foreign Relations Committee have

5   over whether a foreign military sales case to Egypt goes

6   through?

7   A.  For a case --

8           MR. FEE:  Objection.

9           THE COURT:  I'll allow that.  You may answer.

10   A.  Can you repeat the question?

11   Q.  As a practical matter, how much say does the chairman or

12   ranking member of the Senate Foreign Relations Committee have

13   over whether a foreign military sales case to Egypt goes

14   through?

15           THE COURT:  Objection is noted.

16   A.  As a practical matter, the chairman or chair or ranking

17   member of the Senate Foreign Relations Committee has immense

18   influence over whether a sale notified to that committee goes

19   through.

20   Q.  You testified before the break that your office reviewed,

21   that your office was part of the approval chain for,

22   congressional notifications for foreign military financing

23   grant money.

24       What, if any, role did your office have in the review of

25   congressional notifications for foreign military sales cases?

1    A.  The same role.  My office and I in particular was part of

2    the approval for every foreign military sales notification

3    before it went to Congress.

4    Q.  Did you receive copies of each of the congressional

5    notification documents for foreign military sales cases?

6    A.  Yes, I did.

7    Q.  You also testified that before a foreign military sale is

8    formally notified to Congress, it's informally submitted to the

9    State Department for -- so to the Senate Foreign Relations

10   Committee, rather, for tiered review.

11          Did you receive copies of each of the submissions of

12   foreign military sales cases into tiered review?

13   A.  Yes, I did.

14   Q.  Did you receive these through your direct e-mail or through

15   any sort of group e-mail address?

16   A.  Either through my direct e-mail address or through my

17   office distribution e-mail address.

18   Q.  What was your office distribution e-mail address?

19   A.  It is PM-CPA@state.gov.

20   Q.  What is PM-CPA stand for?

21   A.  That is political military affairs, the bureau.  CPA,

22   that's congressional and public affairs, which is my office,

23   @state.gov, which is the State Department.

24   Q.  I'd like to look at an example.

25          MR. MONTELEONI:  Mr. Florczyk, could you please show

O5L3MEN3                          Paul - Direct

1   the witness, the parties, and the Court the document marked for

2   identification as Government Exhibit 8A-2.

3   Q.  Mr. Paul, do you recognize this document?

4   A.  Yes, I do.

5   Q.  What type of document is it?

6   A.  This is an e-mail submitting a potential arms transfer into

7   the tiered review process.

8   Q.  Did you receive this e-mail in the course of your duties as

9   the director of the office of congressional and public affairs

10  for the political and military affairs bureau of the State

11  Department?

12  A.  Yes, I did.

13          MR. MONTELEONI:  We offer Government Exhibit 8A-2 in

14  evidence.

15          THE COURT:  Admitted without objection.

16          (Government's Exhibit 8A-2 received in evidence)

17          MR. MONTELEONI:  Mr. Florczyk, can you please publish

18  for the jury.

19  Q.  Now, Mr. Paul, what is the date of this e-mail?

20  A.  So this e-mail is dated Wednesday, June 20, 2018.

21  Q.  Who is this e-mail from?

22  A.  It is from Charles Comer.

23  Q.  Who is Charles Comer?

24  A.  So Charles, he goes by Ken, Comer, was the foreign military

25  sales team chief in the office of regional securities and arms

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                         Paul - Direct

1    transfers in the bureau of military affairs.  He is the person

2    who day-to-day manages the foreign military sales process.

3    Q.  Is the office for regional security and arms transfer the

4    acronym that's on there in the signature line?

5    A.  Yes, PM-ORSAT.

6    Q.  State Department use a lot of acronyms?

7    A.  Yes.  Y-E-S.

8    Q.  About how commonly did Charles Comer send foreign military

9    sales cases into the tiered review as you've testified this

10   document is?

11   A.  It was almost always, either he or one of the people on his

12   team.

13   Q.  Directing your attention to the "to" line at the top of the

14   page.  And directing your attention to the domains of the

15   first two addressees where their e-mail addresses end with the

16   words foreign.senate.gov.  What does foreign.senate.gov

17   signify?

18   A.  So that indicates that they are professional staff of the

19   Senate Foreign Relations Committee.

20   Q.  Who are these two particular addressees with

21   foreign.Senate.gov e-mail addresses?

22   A.  So these are the Senate Foreign Relations Committee

23   professional staff who would be two of the four horsemen.

24   Q.  Who are the four horsemen?

25   A.  So, for each committee there are two staffers, one for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    majority, for the chair, one for the ranking member, who deal

2    specifically with arms transfers.  And the four of them are

3    known collectively as the four horsemen.

4    Q.  Who do they report to with respect to these foreign

5    military sales and tier review?

6    A.  So they would report to the ranking member or to the chair.

7    Q.  Who are the two recipients in the "to" line with e-mail

8    addresses that end in mail.house.gov?

9    A.  Those are their House Foreign Affairs Committee

10   counterparts.

11   Q.  All together, are these all the horsemen?

12   A.  That's all the horsemen, correct.

13   Q.  What is Mr. Comer communicating to these Senate Foreign

14   Relations Committee and House Foreign Affairs Committee

15   staffers in this e-mail in general terms?

16   A.  So in general terms, he's communicating that the State

17   Department has completed its policy and legal review of a

18   proposed arms transfer.  And that the State Department is

19   putting it into the tiered review process, seeking the approval

20   of the committees in order to formally notify it and move

21   forward with the sale.

22   Q.  Directing your attention to the body of the e-mail.  The

23   second line.  Where it says attached draft certification is

24   provided to you as a Tier 3 40-day review.

25              What does that mean?

O5L3MEN3                          Paul - Direct

1    A.  So this is a sale that is to the government of Egypt.

2    Egypt is a Tier 3 country.  So the committee's at a starting

3    point and in principle have 40 days to review it.

4    Q.  Directing your attention to the next sentence.  Where it

5    says "We anticipate forwarding the case for AECA 36(b)

6    statutory notification after culmination of the review period

7    on 07/30/18."

8         First, what is AECA 36(b) statutory notification?

9    A.  That is Section 36(b) of the Arms Export Control Act, which

10   requires the notification of certain foreign military sales to

11   Congress.

12   Q.  And does this statutory notification that's cited here, is

13   that the official formal notification to Congress that we've

14   been discussing?

15   A.  Yes, that would be when they get to it the formal

16   notification to Congress.

17   Q.  Again, I'm not asking about any particular sale.  But about

18   how common was it for sales to Egypt to actually clear tiered

19   review within the 40-day period that's specified here during

20   the whole time you were in the State Department?

21        MR. FEE:  Objection, your Honor.

22        THE COURT:  I'll allow that.

23   Q.  Sorry.  Again, not asking about any particular sale.  But

24   about how common was it for sales to Egypt to clear within this

25   40-day review period during the time that you were in the State

O5L3MEN3                              Paul - Direct

1    Department?

2    A.  As a general matter, extremely uncommon.

3    Q.  Directing your attention to the subject line.  What does it

4    mean that the subject line reads 18-AE (Egypt) 120mm tank ammo?

5    A.  So 18-AE is the number of the case of the foreign military

6    sales case.  In this case 18 indicates this was in 2018.  Egypt

7    obviously is the country for which the capability was destined.

8    And the defense articles in question in the sale are

9    120-millimeter tank ammunition.

10   Q.  Are there attachments to this e-mail?

11   A.  Yes.  There is the draft formal notification that the State

12   Department would intend to send forward to Congress upon

13   completion of the tiered review.  And a copy of a set of

14   questions and answers that we attach to every transmittal.

15        MR. MONTELEONI:  I'd like to take a look at the draft

16   congressional notification.  Mr. Florczyk, can you please take

17   us to page 2 of the document.  Show us the whole page first.

18   Q.  Mr. Paul, what are we looking at here?

19   A.  This is a draft formal notification to Congress of the sale

20   that was described in the e-mail.  In this case, it is a

21   foreign military sale to the government of Egypt worth

22   $99 million for approximately in total 56,000 rounds of

23   120-millimeter tank ammunition.

24        MR. MONTELEONI:  Mr. Florczyk, could you please expand

25   the top half of the page.

O5L3MEN3                          Paul - Direct

1    Q.  Directing your attention to the first bullet, who is the

2    prospective purchaser here?

3    A.  So that would be the government of Egypt.

4    Q.  Where it says total estimated value.  What does that mean?

5    A.  So that's the top line cost of the sale.

6    Q.  What is the total estimated value in this case?

7    A.  Up to $99 million.

8    Q.  Under the major defense equipment (MDE) heading, what does

9    that mean, first of all?

10   A.  So, major defense equipment is a category of defense

11   articles that discriminates certain weapons from trucks and

12   that sort of thing.  So this describes the major defense

13   equipment included in the sale.

14   Q.  What is, in general terms, the major defense equipment

15   included in the sale in this particular sale?

16   A.  Again, about 56,000 tank rounds.

17   Q.  Is that 46,000 rounds that are described as Tracer -- or

18   actually, there is a lot of descriptions for this first line.

19        What is this 46,000?

20   A.  Right.  This is target practice Tracer rounds, which is a

21   round that when you fire it, you can see a sort of streak of

22   light shooting out the back so you can see where it went.  And

23   then the others are cone stabilized discarding sabot, which is

24   a sabot round is a metal rod round that is a penetrator of

25   armor.

O5L3MEN3                          Paul - Direct

1    Q.  What is the second line item, the 10,000; what does that

2    signify?

3    A.  So, that's a KE.  Kinetic energy.  10,000 kinetic energy

4    rounds.  Those are rounds that explode with a shaped charge

5    that essentially forces a jet of liquid metal through any

6    armor.

7           MR. MONTELEONI:  You can take that down, Mr. Florczyk.

8    Thank you.  You can take down this document entirely.  Thank

9    you.

10   Q.  So, I want to return to a topic that you mentioned before

11   the break.  You mentioned joint resolutions of disapproval.

12   What is a joint resolution of disapproval?

13   A.  So, under the law, if Congress wants to stop an arms sale

14   that it has been notified of from going forward, once that arms

15   sale is formally notified, its only real option within the

16   notification period is to pass a joint resolution of

17   disapproval, saying essentially it disapproves.  It stops the

18   arms sale from going forward.

19   Q.  So you mentioned a notification period.  After Congress is

20   formally notified of a foreign military sales case, can the

21   sale be immediately transacted?

22   A.  No, depending on the countries involved, there is either a

23   15- or a 30-day notify and wait period during which a joint

24   resolution of disapproval can be introduced.

25   Q.  What is the notify and wait period in the case of Egypt?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  It's 30 days.

2   Q.  Now, what does a joint resolution of disapproval need in

3   order to pass?

4   A.  So, in theory, just a simple majority in both the Senate

5   and in the House.  But in the practice, because the fact is

6   that once a sale is notified to Congress, the president

7   supports it, that's inherent in the notification.  It would

8   really need a veto-proof majority to overcome a presidential

9   veto.  So a two-thirds majority of both the House and the

10  Senate would have to oppose the arms sale through a joint

11  resolution of disapproval in order to actually stop it.

12          THE COURT:  No.  But really all it requires is a

13  majority.  Right?

14          THE WITNESS:  So, may I answer that?

15          THE COURT:  Yes.

16          THE WITNESS:  So in theory, your Honor --

17          THE COURT:  You can always answer my question.

18          THE WITNESS:  So --

19          THE COURT:  Decline to do so at your own risk.

20          THE WITNESS:  Noted.

21          In theory it would just need that.  There have been

22  joint resolutions of disapproval that have passed with a

23  majority and been vetoed.

24  Q.  A joint resolution essentially a law?

25  A.  Yes, once it passes.

1    Q.  And subject to the requirements that a law has in order to

2    take legal effect?

3    A.  Yes.

4    Q.  And --

5    A.  It requires the president's signature.

6    Q.  I want to return to one topic, to one topic very briefly.

7    You testified that you knew of a senator named Robert Menendez.

8    I'm not going to ask about any decisions that he did or didn't

9    make on any foreign military financing or foreign military

10   sales, but focusing just on his public statements.

11              During the entire time that you've been in the State

12   Department, have you been aware on his public stance on U.S.

13   military aid to Egypt as communicated through his public

14   statements?

15   A.  Yes, I have.

16   Q.  During that time period, what has his public stance on such

17   aid been?

18   A.  He has always been very concerned about the human rights

19   aspects of the relationship.  And has scrutinized, I would say,

20   in general, publicly, he has been very strong in his concerns

21   about human rights for Egypt.

22   Q.  How long has that public stance gone back?

23   A.  Certainly the whole time I was at the State Department

24   starting in 2012.

25   Q.  Do you have any knowledge of what, if anything, Menendez

O5L3MEN3                        Paul - Cross

1    has privately communicated to anyone outside the U.S.

2    government about his intentions for U.S. military aid to Egypt?

3    A.  I do not.

4           MR. MONTELEONI:  No further questions.

5           THE COURT:  Is there any cross of this witness?

6           MR. FEE:  Yes, your Honor.

7           THE COURT:  Yes, sir.

8    CROSS-EXAMINATION

9    BY MR. FEE:

10   Q.  Hi, Mr. Paul.  How you doing?

11   A.  Thank you.

12   Q.  Thanks for being here today.  You testified about the

13   Senate's role in foreign policy, fair to say with

14   Mr. Monteleoni?

15   A.  I think, yes, in great part.

16   Q.  And specifically you talked about the Senate Foreign

17   Relations Committee or the SFRC, correct?

18   A.  Yes.

19   Q.  In your experience, the goals of senators or congressmen

20   and women are not always the same as the Executive Branch,

21   meaning the president and the State Department, when it comes

22   to foreign policy.  Is that fair to say?

23   A.  Yes, it is.

24   Q.  In fact, in your experience, senators often advocate on

25   behalf of particular constituents of theirs with foreign

1    governments; is that fair to say?

2    A.  Yes, it is.

3    Q.  Those constituents might be, in your experience, businesses

4    in the elected official's home state, for example?

5    A.  Yes.

6    Q.  It might be individuals from their home state who have an

7    issue abroad?

8    A.  Yes.

9    Q.  In fact, again, based on your role, which you did for a

10   long time, members of Congress meet with foreign officials

11   regularly, correct?

12   A.  Yes.

13   Q.  Especially members of Congress who are on the committees

14   you've talked about, Senate Foreign Relations, House Foreign

15   Affairs, Senate Appropriations, and House Appropriations,

16   especially those members will meet regularly with foreign

17   officials, right?

18   A.  I can't quantify that, but it's fair, yes.

19   Q.  It's not unusual in your experience?

20   A.  Correct.

21   Q.  In general, a meeting between an elected official and a

22   foreign official does not require the approval of the State

23   Department, right?

24   A.  I would say it would depend on the nature of the meeting.

25   Q.  So, say if a foreign delegation comes to Washington, D.C.,

O5L3MEN3                        Paul - Cross

1    a bunch of French ministers comes to Washington, D.C., and they

2    want to meet with some senators, some congresspeople, and some

3    folks in the intelligence agencies, the senators and the

4    congresspeople don't need the State Department's permission to

5    take that meeting, correct?

6    A.  No, but it would be typical for them to inform the State

7    Department of it.

8    Q.  So they let you know as a matter of custom, right?

9    A.  Yes.

10   Q.  There is no law, there is no regulation, there is no

11   presidential decree that would require them to get the

12   permission of the State Department to have that meeting,

13   correct?

14   A.  Correct.

15   Q.  In fact, you would agree that in your experience it would

16   have been extremely unusual for a chair or ranking member of

17   one of those four committees to not regularly communicate and

18   meet with foreign officials during their tenure as chair or

19   ranking member?

20           MR. MONTELEONI:  Objection.

21   A.  Yes.

22           THE COURT:  Well, I think there were too many

23   negatives in that.

24           Did you understand the question, sir?

25           THE WITNESS:  I believe I did, but I'm happy to hear

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                         Paul - Cross

1    it again.

2    Q.  Okay.

3             THE COURT:  We can move on.  He believes he

4    understood.

5    Q.  I was going to have to remember it.

6        Again, for a chair to meet with a foreign official, either

7    in Washington, D.C. or abroad, in your experience, is totally

8    consistent with his or her role on that committee, agreed?

9             MR. MONTELEONI:  Objection.

10            THE COURT:  I'll allow it.  You may answer, sir.

11   Q.  Do you want me to repeat it?

12   A.  Yes, please.

13   Q.  Sure.  For a chair of one of those four committees to meet

14   regularly with foreign officials, either in Washington or

15   abroad, is totally consistent with their role in your

16   experience?

17   A.  Yes.

18   Q.  In your career with the State Department, Mr. Paul, did you

19   become familiar with something called CODELs?

20   A.  Yes.

21   Q.  Can you tell us what is a CODEL, please?

22   A.  So, a CODEL, which is C-O-D-E-L, is short for a

23   congressional delegation.  It is a member of Congress or group

24   of members of Congress who travel abroad, typically, and visit

25   in visits organized by the State Department to foreign

O5L3MEN3                          Paul - Cross

1    countries to meet with foreign officials.

2    Q.  Again, in your experience, only based on your experience,

3    to take a CODEL, one of these congressional trips, the senators

4    or congresspeople work with the State Department, correct?

5    A.  Yes.

6    Q.  And what sort of communications would the elected official

7    or his or her staff need to have with the State Department in

8    order to take a CODEL to, let's say, the Netherlands?  What

9    kind of communications would they need to have?

10   A.  Typically, they would communicate their interest in doing

11   so, and then the U.S. embassy in the Netherlands would set up

12   meetings for them, perhaps work with the Defense Department to

13   coordinate transport if needed.  And work back and forth with

14   the congressional staff to get that set up.

15   Q.  One of the --

16         THE COURT:  I gather what you're saying is the

17   arrangements, at least from the standpoint of the

18   congressperson, were handled through that congressperson's

19   staff?

20         THE WITNESS:  Typically, yes.

21   Q.  And it is a dialogue, Mr. Paul, in this circumstance, in

22   the sense that sometimes the member of Congress has requests

23   for people they want to meet with, and sometimes the State

24   Department has requests for people they want the member of

25   Congress to meet with.  Is that fair to say?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                              Paul - Cross

1    A.   Yes.

2    Q.   So they both kind of get to express a preference for who

3    they meet with?

4    A.   They work on the agenda together, yes.

5    Q.   Got it.  Better said.

6         So, part of the primary purpose of these CODELs is for

7    members of Congress to meet with foreign officials abroad,

8    correct?

9    A.   To conduct oversight of State Department activities, and to

10   meet with foreign officials, yes.

11   Q.   Right.  So two things in your experience.  See what's going

12   on at the embassy which is a State Department operation,

13   number 1, and 2, to meet with foreign officials?

14   A.   Yes.

15   Q.   And in your experience, the members of Congress sometimes

16   have meetings with a foreign diplomat or military person, with

17   a bunch of staff around.  Sometimes that happens on a CODEL,

18   right?

19   A.   Yes.

20   Q.   And sometimes on a CODEL, the member of Congress has more

21   of a one-on-one meeting with another foreign official where

22   there isn't a lot of staff around.  Fair to say?

23   A.   Much less common.

24   Q.   Much less common but it happens, right?

25   A.   Yes.

O5L3MEN3                           Paul - Cross

1             THE COURT:  Well, the question said where there isn't
2    a lot of staff around.  How usual is it, if you can say, that a
3    member of Congress has one or more meetings with another
4    foreign official without staff?
5             THE WITNESS:  I would say that's much less common.
6    Very unusual in my opinion.
7             THE COURT:  I gather that's because -- I don't want to
8    put words in your mouth.  Congresspeople are supported by their
9    staff.
10            THE WITNESS:  Correct.
11   Q.  You would agree in your experience that, say, after a long
12   day of meetings, if a member of Congress goes to dinner with a
13   foreign official, they're not going to have staff there, right?
14   A.  I mean --
15   Q.  Necessarily?
16   A.  Typically they would.  It would depend on where, if there
17   is a preexisting relationship or what country it is.  But,
18   typically, members of Congress are accompanied by staff on
19   foreign visits.
20   Q.  But not always for all meetings, Mr. Paul?
21   A.  Correct.
22   Q.  Correct.  Got you.
23            And you would agree, Mr. Paul, in your experience,
24   traditionally, members of Congress visiting foreign countries
25   and foreign officials has been an important component of

O5L3MEN3                           Paul - Cross

1   implementing U.S. foreign policy, correct?

2            MR. MONTELEONI:  Objection.

3            THE COURT:  I'll allow it.  It's cross.

4   A.  I'm trying to understand what you mean by implementing U.S.

5   foreign policy.  It's certainly important from their

6   perspective.  I don't know that the State Department sees it as

7   vital to the implementing of U.S. foreign policy.

8   Q.  That's a good point.  This is politics, Mr. Paul.  So they

9   think it's important and traditionally is a regular part of the

10  members of Congress' jobs you would say?

11  A.  I can't speak exactly for what they might think is

12  important.  But certainly members of Congress enjoy going

13  overseas.

14           THE COURT:  Social aspects to it from your comment.  I

15  assume that's part of what you are saying.

16           THE WITNESS:  Yes, there can be.  Yes.

17  Q.  Just the opposite.  If a group of, in your experience

18  again, in this role, a group of foreign officials will often

19  come to Washington, D.C. to meet with members of Congress?

20  A.  Yes.

21  Q.  And again, in your experience, that is not something for

22  which the members of Congress would necessarily need to get the

23  permission of the State Department, right?

24  A.  Correct.

25  Q.  Again, in your experience, there would be nothing unusual

O5L3MEN3                        Paul - Cross

1   about taking those sorts of meetings for a member of Congress,

2   correct?

3   A.   Correct.

4   Q.   And the role of Congress in your experience, and this was

5   your job, in foreign relations, would you agree it has value

6   for the United States' foreign policy goals?

7              MR. MONTELEONI:  Objection.

8              THE COURT:  Sustained.  I don't understand the

9   question.

10  Q.   Good point.  Could you explain to me your understanding of

11  the role of members of Congress in the United States foreign

12  policy?

13  A.   So, from a constitutional perspective, the role of Congress

14  is through the power of the purse.  They provide the Executive

15  Branch with the funds it requires to execute, for example,

16  foreign policy.  Or through writing specific laws that affect

17  foreign policy, and certainly through confirming ambassadors

18  and that sort of thing.

19      But, otherwise, the role of Congress is very much -- in

20  foreign policy, is very much exerted through the Executive

21  Branch, whether through the congressional notification process,

22  or through its influence on America's diplomacy at the State

23  Department.

24  Q.   So fair to say you just described well the official role of

25  Congress in foreign policy.  Would you agree with that?

O5L3MEN3                          Paul - Cross

1    A.  Yes.

2    Q.  Power over treaties.  That's in the Constitution, correct?

3    A.  Yes.

4    Q.  The power to declare a war is in the Constitution?

5    A.  Yes.

6    Q.  Funding.  That's in the Constitution.

7            Congressional notifications is statutory?

8    A.  Yes.

9    Q.  There is a law that puts Congress in that role, right?

10   A.  Yes, although that's control over Executive Branch actions;

11   not over foreign policy per se.

12   Q.  Thank you.  You would also agree, in your experience, that

13   there is an unofficial role that members of Congress play in

14   engaging with foreign officials, correct?

15   A.  What do you mean by unofficial?

16   Q.  Let me explain.  So on these CODELs, and over the long

17   careers that certain members of Congress may have, they will

18   develop relationships with foreign countries and their

19   officials that are sometimes useful for the United States'

20   foreign policy goals.  Would you agree with that?

21           MR. MONTELEONI:  Objection.

22           THE COURT:  I'll allow it.

23   A.  I think that that is true.  They can sometimes develop

24   relationships that end up being useful for U.S. foreign policy

25   goals.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  You sound a bit hesitant.

2          THE WITNESS:  I'm just trying to determine the

3     difference between the official and the unofficial and it what

4     is in the U.S. interests specifically.

5     Q.  Part of that hesitation, is it that -- you tell me -- is it

6     in your mind that sometimes when the members of Congress are

7     abroad, they're advocating for constituents which you would not

8     characterize necessarily as a U.S. foreign policy goal?

9     A.  For example, yes.

10    Q.  Thank you.  On this -- I think it was your term, this

11    official versus unofficial distinction, I want to talk about

12    the foreign military sale process.  Specifically the steps

13    before any word of that sale gets to one of these congressional

14    committees.

15          So first, the foreign country needs to make a request

16    for something, right?

17    A.  Yes.

18    Q.  And so, excuse me if this is dumb.  But, the foreign

19    country knows that the process is happening, the whole process

20    you described, they know it's happening?

21    A.  Correct.

22    Q.  And the foreign country, I assume, but you tell me, must

23    ask for updates on the process, correct?

24    A.  Yes.

25    Q.  How does that typically happen?

O5L3MEN3                          Paul - Cross

1    A.   They will typically reach out, either through the U.S.

2    embassy office of security cooperation in the country or

3    through their embassy in Washington, D.C. to the State

4    Department or to the Defense Department.

5    Q.   Do they ever use, do foreign countries ever use something

6    called lobbyists or private agents or consultants to reach out

7    on their behalf?

8    A.   Yes, they do.

9    Q.   Can you tell me about that in your experience?

10   A.   So foreign countries may hire American companies or

11   individuals to contact Congress on their behalf to lobby them,

12   to pressure them, on issues of interest to that foreign

13   country.

14   Q.   And again, in your experience, when the State Department

15   gets these sort of requests from a foreign country or somebody

16   working for them, saying, hey, what's going on with our request

17   for all these tanks, what information does the State Department

18   give them in response?

19   A.   So typically, it will tell them where the case is in the

20   process.  And perhaps some broader information about perceived

21   outcomes.  Hey, we think this will take a while longer, another

22   six months, that sort of thing.

23   Q.   Is it true that they may also sometimes offer maybe a

24   prediction, with no certainty, but say this is not looking like

25   you're going to get the request approved by State or the

1    president?  Is that often part or sometimes part of the

2    response, Mr. Paul?

3              MR. MONTELEONI:  Objection.

4              THE COURT:  I'll allow it.

5    A.  It is certainly the case that, I mean, I think -- remember,

6    the State Department are the ones who make the decision, so

7    they would typically know whether or not we are going to

8    approve a sale.  So I think if we were not going to approve a

9    sale, we would simply communicate to the foreign country, very

10   early in the process, I'm sorry, this is probably not the best

11   route for you, why don't you try something else.

12             THE COURT:  You communicate that to the foreign

13   country or to a private lobbyist?

14             THE WITNESS:  To the foreign country.

15   Q.  So that's one, the request.  Two is the defense security

16   cooperation agency works with the U.S. military and the

17   requesting country to define the request?

18   A.  Yes.

19   Q.  And then the request is turned into a letter, a draft

20   letter of offer and acceptance?

21   A.  Yes.

22   Q.  Who writes that letter?

23   A.  The defense security cooperation agency working with what

24   we call the implementing agency, which is the U.S. military

25   service that will have responsibility for delivering the case.

1   Q.   And I think the phrase you used about the requesting

2   country like the foreign country that wants stuff was defense

3   partner; is that right?

4   A.   I may have done.

5   Q.   Can you tell me what that phrase means?

6   A.   That would be any country with whom we have a defense trade

7   relationship.

8   Q.   So, just help me understand.  A defense partner is somebody

9   that the United States, the Executive Branch, views as a

10  partner, a country with whom the United States is working

11  together on their defense?

12  A.   Yes.  I would say it's a bit broader than that, but yes.

13  Q.   Tell me.  You tell me.

14  A.   The defense field partnership can cover a broad range of

15  activities.  There might be some countries with whom we only

16  partner on very specific narrow tasks, and then there might be

17  some who are close partners where we, you know, cooperated

18  across the board.

19  Q.   So, foreign country request, draft letter of offer and

20  acceptance, and then third, that gets submitted formally to the

21  State Department?

22  A.   That comes to the State Department for the policy review

23  and approval.

24  Q.   And then I don't know if this is fourth or just happening

25  in parallel.  The funds also need to be appropriated to fund

1   the request; is that right?

2   A.  Well, that's only if it has been funded with foreign

3   military financing.  Typically countries pay for their own

4   procurements.

5   Q.  Got it.  But Egypt typically is getting foreign military

6   financing?

7   A.  Correct.

8   Q.  And then the State Department reviews the request finally?

9   A.  Yes.  Just to clarify.  The foreign military -- the

10  financing doesn't get attached to the case until after the case

11  has already been approved and moved forward.  So that's almost

12  the final step.

13  Q.  Okay.  It almost makes me happy to be a lawyer to hear

14  about your job, Mr. Paul.

15          MR. MONTELEONI:  Objection.

16          THE COURT:  The jury knows to disregard the comments

17  of the lawyers.

18          MR. FEE:  Disregard my happiness, please.

19  Q.  So --

20          THE COURT:  Mr. Fee, question, answer, question,

21  answer.  Go.

22  Q.  By the time it gets to the congressional notification, the

23  president has to want it, the request to be fulfilled?

24  A.  Yes.

25  Q.  The State Department has to want the request to be filled?

1    A.  Yes.

2    Q.  And then it has to get through maybe some other review

3    steps; is that fair?

4    A.  By the time it gets to congressional notification.

5    Q.  It's already gone through that.

6    A.  Once it's through that, then it's just up to the country to

7    sign the letter of offer and acceptance.

8    Q.  Got it.

9    A.  And pay.

10   Q.  And this can all take a long time; months, years sometimes?

11   A.  Yes.

12   Q.  So, when it finally gets to congressional notification,

13   with respect to the Senate Foreign Relations Committee, unless

14   there is actually one of these informal holds expressed, the

15   State Department just assumes SFRC is signed off; is that

16   correct?

17   A.  No.

18   Q.  Tell me.

19   A.  State Department would need a positive approval,

20   particularly for sales to the Middle East, for Tier 3 cases.

21   Q.  Got it.  So let's talk about what you and Mr. Monteleoni on

22   direct described as holds.  And I think you had used the term

23   informal hold.  Is that right, Mr. Paul?

24   A.  I don't think so.  All the holds are in their own way

25   informal.  There is no legal basis.  But they're all holds.

O5L3MEN3                         Paul - Cross

1   Q.  So that's just what I want to make sure I understand.

2   Meaning there is no legal basis.  There is no law, there is no

3   regulation, there is no written directive from the president

4   that actually requires anyone in the State Department to listen

5   to a member of Congress's hold; is that correct?

6   A.  Yes.

7   Q.  So these are unofficial holds.

8   A.  In that sense, okay.

9           THE COURT:  Does the State Department ever not listen

10  to a member of Congress's hold?

11          THE WITNESS:  Sometimes.  Very, very rarely.

12  Q.  So, you say it's very, very rarely.  You left the State

13  Department when?

14  A.  Last October.

15  Q.  So pretty recently.  In 2019, were you aware of a hold that

16  was ignored?

17  A.  In 2019?

18  Q.  Yes.

19  A.  Yes.

20          MR. MONTELEONI:  Objection.  I didn't do any of this

21  for reasons that Mr. Fee is well aware of.

22          MR. FEE:  He elicited it was excessively uncommon.

23          THE COURT:  No, I did that, sir.  I elicited that

24  here.

25          MR. FEE:  You did not.  That was Mr. Monteleoni.

1          THE COURT:  Did you, sir?

2          MR. MONTELEONI:  There was testimony about that in

3   terms of the process.  But that's quite different from -- I

4   steered clear of specifics.  We could be heard further at

5   sidebar or I could just note my objection.

6          THE COURT:  Let's move on.

7          MR. FEE:  Your Honor, I would like to talk about the

8   subject in the same general terms that Mr. Monteleoni was

9   talking about it.  How about that.

10         THE COURT:  Move away from that year.

11         MR. FEE:  Sure.

12  Q.  Other than 2019, as a general matter, since 2018, has the

13  number of times a hold has been ignored by the State Department

14  or the president has skipped the congressional process entirely

15  increased or decreased?

16  A.  Since when?

17  Q.  Since 2018.

18  A.  The overall trend is downward.

19  Q.  In terms of what?

20         THE COURT:  Which way is down?

21  A.  So, I mean the question was since 2018 but ignoring 2019.

22  Q.  Don't ignore 2019.

23         MR. MONTELEONI:  Can we have a sidebar?  This is

24  getting quite confusing.

25         THE COURT:  Yes.

O5L3MEN3                          Paul - Cross

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

O5L3MEN3                          Paul - Cross

1              (At the sidebar)

2              MR. MONTELEONI:  Your Honor, we steered clear of

3    explaining even in the broadest illustrative terms that there

4    had been one or two holds of sales to different countries that

5    the State Department disregarded in 2019, in an extremely rare

6    incident that caused huge repercussions.  We would have been

7    happy to bring that out to indicate the gravity and severity of

8    the conduct and the amount of influence that the senator

9    wielded.  But based on the objections we've been receiving over

10   the last week and the Court's direction that we steer clear of

11   this, we stopped short of that.  So, I think --

12             THE COURT:  The incident you're talking about is the

13   specifics where a hold was placed by somebody and the State

14   Department ignored it and that was rare?

15             MR. MONTELEONI:  It caused huge fallout.

16             THE COURT:  And you're saying you steered completely

17   clear of the specifics there?

18             MR. MONTELEONI:  Yes.

19             THE COURT:  But apparently you did -- I thought I was

20   the one who used that it was an uncommon event that it

21   happened.  You're saying you did that.

22             MR. MONTELEONI:  Yes, we did bring out it was

23   uncommon, but there it sounds to me like Mr. Fee is attempting

24   to bring out that this type of thing happens, and perhaps this

25   power isn't really all that powerful because it's not based in

O5L3MEN3                        Paul - Cross

1    law and, hey, it happened in 2019.  So, you know, maybe all's

2    fair.

3              What we were prevented from bringing out is that this

4    was a huge incident between the State Department and the

5    Senate, it damaged the relationship tremendously.  It is

6    something they worked years to try to rebuild.

7              For him to bring it out in a way that trivializes it

8    without me being able to ask questions when in fact I believe

9    Senator Menendez was one of those whose holds were blown, and

10   it is not about the Egypt, but it is a waiver if he's going to

11   go into it.  We think that's not appropriate.

12             MR. FEE:  It is a sword and shield.  They elicited

13   more than once there was it was exceedingly uncommon for a hold

14   to be ignored.  We have no choice but to engage on that

15   subject.

16             The truth is, since 2019, there have been two holds

17   ignored by the State Department.  And it will go no further

18   than eliciting that.  And since 2019, four times the president

19   has skipped the congressional process.  This is an increase of

20   600 percent.  They chose to elicit this.  And they're offering

21   it here to the jury.  We must engage.

22             MR. MONTELEONI:  If we are allowed to inquire about

23   the repercussions of that and how damaging that was on the

24   relationship between the State Department and the Senate, then

25   that's fine.

1              MR. FEE:  That's irrelevant.

2              THE COURT:  We'll get into the waiver area here.  Why

3      don't you elicit that there were two holds that were blown.

4              MR. FEE:  I'll ask him whether he was aware of that.

5              THE COURT:  Fine.

6              MR. FEE:  Then I am going to elicit that the president

7      skipped the process.  So there is not about the legislative

8      activity.  He skipped the process four times.

9              MR. MONTELEONI:  Am I going to still be precluded

10     about asking what the repercussions of this were?

11             MR. FEE:  It is irrelevant.

12             THE COURT:  Talk to me.

13             MR. MONTELEONI:  So, the entire reason that there is

14     this leverage, the whole reason that the State Department

15     doesn't go forward with the sales that's determined in the

16     national interest is precisely because they are afraid of the

17     repercussions.  The witness testified about that on direct.

18     That if they were to disregard the views of the chairman or the

19     ranking member, that could have huge implications for

20     confirmations, for their funding, could have a number of

21     implications.  So the repercussions is what gives the power.

22     So for him to bring in that the transgression was undertaken

23     and then preclude us from bringing out the repercussions, in

24     order to trivialize this, is unfair.

25             MR. FEE:  Two points, your Honor.  Everything

1    Mr. Monteleoni just described has already been elicited from

2    this witness about the potential consequences of ignoring the

3    holds.  The second point is, your Honor, the president, both

4    administrations, Trump and Biden, have been ignoring this

5    frequently without any of those repercussions other than

6    criticism.  It has dramatically shifted.  And the jury is now

7    under the misimpression from the government that they are still

8    uncommon.  It is not the case.  And they already elicited from

9    this witness what he thinks would be the consequences.  Full

10   stop.

11          MR. MONTELEONI:  I think if he's talking about some

12   circumvention of process that doesn't involve a legislative

13   act, he can inquire.  I don't think the fact will come out in

14   line with that representation.

15          But when talking about holds, if he's now saying that

16   the witness was wrong when he testified that there would be

17   repercussions, because holds were blown, and then he is going

18   to prevent me from eliciting there were repercussions, that's

19   unfair.  That's telling the jury this witness was wrong when he

20   said there was repercussions because there was no testimony

21   about repercussions when we were forbidden to ask about it.

22          MR. FEE:  I'm not going to ask about repercussions.

23          THE COURT:  What's your question.  What question are

24   you going to ask?

25          MR. FEE:  Are you aware that there were holds ignored

O5L3MEN3                          Paul - Cross

1    in 2019 and 2020.  That's it.  No follow up.

2                MR. MONTELEONI:  The obvious inference from that will

3    be that that was not a big deal.  That this happens.  It is

4    water under the bridge.  It's not a big deal.  And therefore,

5    that --

6                THE COURT:  Why don't you ask whether there were

7    repercussions as a result.

8                MR. FEE:  Absolutely.

9                THE COURT:  Leave it at that.

10               MR. FEE:  Yes, your Honor.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)
 2              MR. FEE:  May I, your Honor?
 3              THE COURT:  Yes, sir.
 4    BY MR. FEE:
 5    Q.  Mr. Paul, are you aware whether there were two
 6    congressional informal holds blown or ignored by the State
 7    Department in 2019 and 2020?
 8    A.  I am aware, yes.
 9    Q.  And to your knowledge, were there any repercussions from
10    the Executive Branch blowing those holds?
11    A.  Yes, massive --
12              THE COURT:  Just yes or no.
13    A.  Yes.
14    Q.  Separately, apart from legislative holds, are you also
15    aware of more recent events where the president has avoided the
16    congressional notification process entirely with respect to
17    military financing or arms sales?
18    A.  Yes.
19    Q.  And do you have any understanding of how many times the
20    president has avoided the legislative process to complete arms
21    sales say in the last 5 years?
22    A.  So under this administration, I am aware of three such
23    incidents, one of which was with the consent of Congress.
24    Q.  Understood.
25    A.  And under the previous administration, as you mentioned, in
```

O5L3MEN3                         Paul - Cross

1   2019 and 2020, there were incidents.

2   Q.  And just only asking about instances where the president

3   avoided the congressional process, so no holds.  Do you have

4   any understanding of how many times the president did that

5   before 2019, so 2018 or earlier if you know?

6   A.  I cannot think of any incidents prior to 2019.

7   Q.  So in that sense, the number of occasions when the

8   Executive Branch is sidestepping or overruling Congress on arms

9   sales has increased dramatically since 2018.  You would agree?

10  A.  No, I wouldn't.

11           MR. MONTELEONI:  Objection.

12  A.  So in 2019, the administration sidestepped Congress's

13  process in 26 cases.  Last year it did it in two.  The year

14  before last it did it in one.  That's why I say there has been

15  a downward trend.

16  Q.  Since '19 there has been a downward trend?

17  A.  Yes.

18           THE COURT:  Move on, sir.

19           MR. FEE:  Yes, sir.

20  Q.  You mentioned something called a joint resolution of

21  disapproval on direct.  You recall that I'm sure.  You said

22  that would require the full Senate to vote on a resolution and

23  you need half the senators to approve it?

24  A.  Initially.

25  Q.  Initially, and then two-thirds to overcome a veto by the

O5L3MEN3                          Paul - Cross

1    president, right?

2    A.  Yes.  After it's come to the House in between the two of

3    those steps.

4    Q.  Just so I understand what we're talking about.  A joint

5    resolution of disapproval, that's the official way for Congress

6    to stop an arms sale, right?

7    A.  Yes.

8    Q.  What was your answer?

9    A.  Yes.

10   Q.  Yes.

11       But obviously, one senator cannot create a joint

12   disapproval resolution, right?

13   A.  One senator can introduce one.

14   Q.  Fair.  One senator can introduce them, but then you need

15   many to vote?

16   A.  On a joint resolution of disapproval?  Yes.

17   Q.  I just want to ask, in your time with the State Department,

18   did you specifically have experience and engagement with

19   foreign -- with arms sales to Egypt?

20   A.  Yes.

21   Q.  Would you describe yourself as having had experience with

22   Egypt's political -- excuse me.  Let me rephrase that.

23       Your experience with how Egypt's involvement in this arms

24   sale process occurs, correct?

25   A.  I'm sorry?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                          Paul - Cross

1   Q.  You're familiar with how Egypt engages in this arms sale

2   process?

3   A.  Yes.

4   Q.  And you're familiar with Egypt as a country?

5   A.  Yes.

6   Q.  I want to ask you some questions based on your knowledge of

7   the country.  It is a large country; you would agree?

8   A.  Yes.

9   Q.  Over 100 million people?

10  A.  Yes.

11  Q.  It is a majority Muslim country?

12  A.  Yes.

13  Q.  And if you know, are you aware whether there is a sizable

14  Coptic Christian population within Egypt?

15  A.  I understand there is.

16  Q.  And does Egypt share any borders that are particularly

17  important or meaningful for U.S. foreign policy?

18             MR. MONTELEONI:  Objection.

19             THE COURT:  Sustained as phrased.

20             What countries border Egypt, sir?

21             THE WITNESS:  The countries that border Egypt are

22  Israel, Sudan, and Libya.

23             THE COURT:  Next.

24  Q.  I want to focus specifically in Israel.  Is it the case

25  that Egypt borders Gaza?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                              Paul - Cross

1    A.  Yes.

2    Q.  Can you explain to the jury why Gaza is important

3    traditionally in U.S. foreign policy?  What makes that border

4    and that area important?

5    A.  So, I mean, there has for many decades been a flashpoint in

6    the area between Israel, Palestine, and other countries in the

7    area.  And I think containing the violence in that region has

8    for a long time been a key goal of U.S. foreign policy in the

9    region.

10   Q.  That circumstance that you just described makes Egypt --

11   you tell me if this phrase is fair to use -- an extremely

12   important defense and security partner in the Middle East for

13   the United States?

14        MR. MONTELEONI:  Objection.

15        THE COURT:  I'll allow that, in your estimation.

16   A.  I think the importance of Egypt to the region, to the U.S.

17   in the region is overestimated, to be honest.

18   Q.  Understood.  Is the part of the focus on Egypt based, well,

19   is it in part based on the security situation with other

20   countries in the Middle East like Israel?

21   A.  The focus on Egypt is very much driven by our focus on

22   Israel, yes.

23   Q.  Understood.  Has the aid to Egypt that you testified about

24   on direct, did that originate in something called the Camp

25   David Accords?

1  A.  Yes.

2  Q.  Can you tell the jury, to the extent you have an

3  understanding, which I'm sure you do, what are the Camp David

4  Accords?

5  A.  In 1978, the United States at Camp David, which is the

6  president's sort of country residence in Maryland, brokered a

7  peace agreement between Egypt and Israel.  As part of that

8  agreement, the two sides agreed to a demilitarized zone along

9  their border, and the U.S. agreed to provide security

10  assistance to both sides to keep the peace and to bring Egypt

11  within our sphere of influence.

12  Q.  So this was a big meeting and agreement coming out of the

13  meeting in 1979?

14  A.  Yes.

15  Q.  And --

16          THE COURT:  Did you say '78?

17          THE WITNESS:  I did say '78.

18          MR. FEE:  Sorry, your Honor.  Thank you.

19  Q.  And I think you testified on direct that sort of in

20  parallel with what you just described about the Camp David

21  Accords, Israel and Egypt are the top two recipients of

22  military aid; is that right?

23  A.  That is correct.

24          THE COURT:  Is that true?  Top two in the world?

25          THE WITNESS:  So, historical United States security

O5L3MEN3                          Paul - Cross

1   assistance, since the 1970s, that is correct.  However, in the

2   last couple of years, in the context of Ukraine, Ukraine is

3   very quickly moving up the list.  But historically it has been

4   Israel and then Egypt.

5   Q.  So that's since 1978 or so?

6   A.  Yes.

7   Q.  That Egypt has been getting I think you said 1.3 billion?

8   A.  Well, it's increased over time.  It hasn't always been 1.3,

9   but that is what they've been getting for the last decade.

10  Q.  Fair to say since the late 1970s, Egypt has received

11  1.3 billion in aid?

12  A.  No.  It's reached 1.3 billion now.  I think it started off

13  in the hundreds of millions.

14  Q.  There have not been any years since then when Egypt was not

15  receiving say over $100 million in military aid?

16          THE COURT:  Let's move on.

17  Q.  I won't make you repeat them.  But you testified on direct

18  about the sort of conditions on aid to Egypt.  You remember

19  that?

20  A.  Yes.

21  Q.  And so it sounded like -- tell me if I'm wrong.  I'll do

22  this briefly.  That there are --

23          THE COURT:  You said human rights conditions, correct?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Next.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                      Paul - Cross

1    Q.   It's more than that though.  There's also any aid -- it's

2    not only that the human rights conditions have to be satisfied

3    that any aid has to fall into one of four categories?

4    A.   So, that is, as I understand it, is a State Department

5    policy position rather than a condition on the assistance.

6    Q.   And the State Department is the one who controls that aid?

7    A.   Yes.

8    Q.   So the four buckets -- I won't ask you to explain them.

9    It's counterterrorism?

10   A.   Yes.

11   Q.   Maritime aid?

12   A.   Yes.

13   Q.   Border security?

14   A.   Yes.

15   Q.   And interoperability of U.S. and Egypt militaries?

16   A.   Yes.

17   Q.   Can you explain what that means, interoperability?

18   A.   Just the ability of the U.S. military and the Egyptian

19   military to talk to each other, in terms of radios, in terms of

20   seeing where each other are, in terms of being able to operate

21   together.

22   Q.   So the bottom line is that it's not as though the State

23   Department can give aid to Egypt just for any old reason.  It's

24   defined.

25   A.   Well, it's defined in terms of what FMF can be provided

O5L3MEN3                           Paul - Cross

1    for.  But those four buckets you just described, I think many

2    would argue cover just about everything.

3    Q.  And so this process over the '70s with all the rules and

4    practices and things you described in your direct, you would

5    agree that there is a very well-established process and

6    well-established restrictions on how military aid and what type

7    of military aid is provided to Egypt.  Fair to say?

8              MR. MONTELEONI:  Vague.

9              THE COURT:  I'll allow it.

10   A.  The conditions in law only have come along in the last

11   12 years or so.  But there is certainly a long process history

12   of providing foreign military financing to Egypt.

13   Q.  Understood.  Understood.  And just I'm wrapping up here.

14   When Egypt uses that money that it gets, the money is actually

15   going back to U.S. defense contractors; is that right?

16   A.  By and large.  So foreign military financing, that's money

17   we give to countries to buy U.S. defense equipment, as it says,

18   buys for the most part defense equipment from the U.S. so it

19   comes back into the U.S. economy.  But, there is the

20   possibility for countries to use that funding directly through

21   something called direct commercial contracting.  And there have

22   been instances in the last decade where Egypt has used that

23   money in Egypt.

24   Q.  And could you characterize the percentage?

25   A.  Very small.

O5L3MEN3                          Paul - Cross

1    Q.  Very small.  Less than 5 percent?

2    A.  Yes.

3    Q.  So, you have testified quite a bit about support to Egypt.

4    But would it be fair to characterize the U.S. relationship with

5    Egypt as complex?

6    A.  Yes.

7    Q.  And you specifically talked about on direct, I'm not sure

8    the word you used, rocky or the poor human rights records of

9    Egypt that it sometimes has?

10   A.  I may have said that.

11   Q.  You can explain to us or expand what you said on direct

12   about this complicated relationship between the United States

13   and Egypt?

14   A.  So, yes, Egypt is, you know, a country with a very mixed

15   human rights record.  It had a dictatorship through until the

16   Arab Spring, the revolutions of 2011, 2012.  At which point the

17   beginnings of a democracy began to emerge.  Egypt elected a

18   president.  The Egyptian military overthrew that president.

19   And since then I think we've been in a position of on the one

20   hand trying to press Egypt to take steps to strengthen its

21   human rights, to release political prisoners, of which it has

22   had tens of thousands of people in jail simply for their

23   politics, for their views, while at the same time trying to

24   maintain the relationship in order to strengthen certainly

25   Israel's southern border and our regional influence and our

O5L3MEN3                        Paul - Cross

1    ability in particular to go through the Suez Canal on an

2    expedited basis.

3    Q.  I'm sure you've been involved in these discussions.  So the

4    based on your involvement, why not just cut Egypt loose?

5              MR. MONTELEONI:  Objection.

6              THE COURT:  Sustained.

7    Q.  Why does the U.S. still provide such large amounts of aid

8    to Egypt?

9              MR. MONTELEONI:  Objection.

10             THE COURT:  I'll allow that.

11             Why is it perceived, to the extent you know, why is it

12   perceived to be in the interest of the United States to provide

13   substantial aid to Egypt in the form of foreign military sales

14   and foreign military financing?

15             THE WITNESS:  Well, your Honor, I think if the

16   original question was why does the U.S. still do it, it is

17   because Congress still mandates it every year in the

18   Appropriations Act.

19   Q.  Congress?

20   A.  Yes.

21   Q.  Meaning there's a law that's passed by Congress to do it?

22   A.  Yes.

23   Q.  And the president, whichever president may be in power, is

24   still playing a role to put that aid to Egypt, correct?

25   A.  So, we still have to make the determinations on the

O5L3MEN3                           Paul - Cross

1    condition of the proportion of the aid that is conditioned,

2    yes.

3    Q.  And you had mentioned on direct that Senator Menendez

4    publicly had been a critic of Egypt, right?

5    A.  Yes.

6    Q.  Do you recall -- you were asked about that, but do you

7    recall the substance of his public criticisms of Egypt?

8    A.  I recall them having to do with Egypt's human rights

9    record, particularly with, if I recall, release of political

10   prisoners and also its track record in a counterterrorism

11   campaign it has been conducting in the Sinai.

12   Q.  Your testimony was you had been at the State Department for

13   12 years, and throughout those 12 years, Senator Menendez you

14   had recognized as a critic of Egypt, correct?

15   A.  Of Egypt's human rights record.

16   Q.  Thank you.  So it may be the case that before you came to

17   the State Department, and started paying closer attention to

18   these issues, there may have been criticism levied by Senator

19   Menendez even longer than 12 years ago?

20            THE COURT:  Sustained.

21   Q.  Don't answer.

22       Can we put up what's been admitted by the government as GX

23   8A-2.

24            THE COURT:  Did you say you were wrapping up, sir?

25            MR. FEE:  Oh, I did.  Can I have 10 more minutes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN3                         Paul - Cross

1   Five more minutes.

2            THE COURT:  Go ahead.

3   Q.  So let's go to page 2.  This, remind me, this is a notice

4   of proposed issuance of letter of offer.  This is like the

5   request -- you tell me what this is.

6   A.  This is a congressional, a draft congressional

7   notification.  So once the congressional notification is

8   approved, and has gone through Congress, then, the United

9   States may offer the letter of offer and acceptance to Egypt or

10  to the country who then countersigns it and then you have a

11  deal.

12  Q.  This is like the thing that's in draft form to go to

13  Congress?

14  A.  Yes.

15  Q.  And you said some of this is for target practice shells and

16  some of them are live shells?

17  A.  That's what it appears to be, yes.

18  Q.  Let's go to the next page.  One more.  Let's focus in

19  starting at the second paragraph.  Just zoom in on that for the

20  rest of the page.

21           So, you see here it says, "This proposed sale will

22  contribute to the foreign policy and national security of the

23  United States by helping to improve the security of a friendly

24  country that continues to be an important strategic partner in

25  the Middle East."

1              Who writes this part?

2   A.   The Office of Regional Security and Arms Transfer in my old

3   bureau.

4   Q.   State Department?

5   A.   Yes, typically.

6   Q.   We can zoom out.  The next paragraph, just zoom in on the

7   whole paragraph, please.  And then this one says Egypt's going

8   to use this stuff to maintain a strategic munitions inventory

9   for its M1A1 tank fleet and in support of operations against

10  militants affiliated with the Islamic State of Iraq and Syria

11  in the Sinai.

12              That's ISIS?

13  A.   That's correct.

14  Q.   Was there still, as of 2018, ISIS active in the Sinai?

15  A.   Yes.

16  Q.   And Egypt was engaged with them, to your knowledge,

17  militarily?

18  A.   Yes.

19  Q.   Oh.  The second to last sentence Egypt intends to use --

20  I'm sorry.  Third to last.  Egypt has been -- no.  I messed

21  that up.

22       This one, sorry.  Two paragraphs lower.  Stay here.  Sorry.

23  This will be quick.  Egypt intends to use this stuff to replace

24  older models.  You see that?  Can you explain to me what that

25  means?  That we're giving them stuff to replace older

O5L3MEN3                              Paul - Cross

1    munitions?

2    A.   Right.   Munitions -- I don't want to speculate, but the

3    fact is that munitions degrade over time or are used over time.

4    So we would provide new capabilities or new munitions to

5    replace munitions that have either been expended or expired.

6    Q.   And Egypt has been a defense partner for so long -- I'll

7    ask you.   Are we often replacing older munitions for Egypt?

8    A.   Egypt has a lot of outdated munitions.

9           MR. FEE:   Let's go to the two paragraphs down.   You

10   can zoom in on the last two U paragraphs, both of them at the

11   same time, please, Mr. Kelly.   Thank you.

12   Q.   Just quickly, it says the prime contractor is General

13   Dynamics and in St. Petersburg, Florida.

14          Does that mean they are going to get paid?

15   A.   Yes.

16   Q.   I see they're based in St. Petersburg, Florida.   Is that an

17   American company?

18   A.   That is an American company.

19   Q.   Multiple trips to Egypt by U.S. government and contractor

20   representatives.

21          Who goes to Egypt to implement this?

22   A.   That would typically either be technical officials who will

23   help with any technical aspects or training or potentially

24   military trainers.

25   Q.   And so are those, based on your knowledge in this process,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    those U.S. government personnel are going to meet with Egyptian

2    military personnel?

3    A.   If they are uniformed U.S. military personnel, they would

4    be meeting with their counterparts in the Egyptian military,

5    yes.

6    Q.   Last question on this, if we can go to the last page of the

7    exhibit.   Question number 5.

8         Are comparable systems available from foreign

9    suppliers?  And answer is yes.  You could buy this stuff from

10   other countries?

11   A.   Yes.

12   Q.   Is that sometimes a reason to supply aid to a country like

13   Egypt?

14   A.   That is a matter of great debate.

15   Q.   Let me ask it this way.  Do some within the U.S. government

16   believe that it is more important to supply aid to Egypt so

17   that they won't get the aid from countries that are not allies

18   like Russia?

19   A.   Yes.

20             MR. MONTELEONI:  Objection.

21             MR. FEE:  Just one moment, your Honor.

22             Thank you, Mr. Paul.  No further questions.

23             MR. LUSTBERG:  No questions.

24             MR. AGATA:  No questions.

25             MR. MONTELEONI:  Brief redirect.

O5L3MEN3                          Paul - Redirect

1   REDIRECT EXAMINATION

2   BY MR. MONTELEONI:

3   Q.  So, Mr. Paul, do you remember being asked questions about

4   when the State Department might be providing information to a

5   purchaser nation about the status of a pending foreign military

6   sales case?

7   A.  Yes.

8   Q.  To be clear, are those government to government contacts

9   that the State Department would then have?

10  A.  Yes, they are.

11  Q.  Do you remember being asked questions about private

12  lobbyists or representatives who might be representing Egypt in

13  connection with the status of a foreign military sales case?

14  A.  Yes.

15  Q.  What, if any, requirements do those private individuals

16  have to register in connection with that work?

17          MR. LUSTBERG:  Objection.  The Court ruled on this

18  issue pretrial.

19          MR. MONTELEONI:  This is directly responsive to the

20  cross, your Honor.

21          THE COURT:  Just a moment.  I'll allow him to answer

22  that.

23  A.  So, a lobbying company or person who is representing a

24  foreign government's interest to any branch of the United

25  States government must register with the United States

1    government as a foreign agent under the Foreign Agents

2    Registration Act.

3    Q.   Do you remember being asked questions about holds being

4    informal and not written into law on cross-examination?

5    A.   Yes.

6    Q.   As a practical matter, about how much influence during the

7    time that you were at the State Department did the chairman or

8    the ranking member of the Senate Foreign Relations Committee

9    have over whether foreign military sale cases go forward?

10             MR. FEE:   Objection.   Specifically to as a practical

11   matter, given the restrictions here, your honor.

12             THE COURT:   Ask it differently.

13             MR. MONTELEONI:   Okay.

14   Q.   About how much influence does the chair or the ranking

15   member of the Senate Foreign Relations Committee have over

16   whether foreign military sales case goes forward?

17   A.   More than any other member of Congress.

18   Q.   Do you remember being asked questions about whether one

19   senator can cause a joint resolution of disapproval to pass and

20   block a foreign military sale?

21   A.   I do.

22   Q.   If that one senator is the chairman or ranking member of

23   the Senate Foreign Relations Committee, what could they do to

24   stop a foreign military sale?

25             MR. FEE:   Objection.   I think we're crossing the line.

1              MR. MONTELEONI:  It is entirely the process.

2              THE COURT:  Just a moment.

3              What can the chairman or ranking member of the Senate

4    Foreign Relations Committee do to stop a foreign military sale?

5              THE WITNESS:  They can hold it during the tiered

6    review process.

7              MR. MONTELEONI:  No further questions.

8              THE COURT:  Thank you.  You may step down, sir.  You

9    are excused.

10             (Witness excused)

11             THE COURT:  Next witness.

12             MR. MARK:  The government calls its next witness

13   Mierna Hanna.

14    MIERNA HANNA,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MARK:

19   Q.  Good afternoon, Ms. Hanna.  What is your educational

20   background?

21   A.  I went to Rutgers Business School.

22             THE COURT:  The microphone is quite directional so

23   bring it down to your face.  Thank you.

24   Q.  You said you went to Rutgers.  Did you get a degree there?

25   A.  Yes.

1   Q.  What degree you get?

2   A.  Business administration.

3   Q.  Do you currently work?

4   A.  Yes.

5   Q.  Where do you work?

6   A.  EG Trade.

7   Q.  What are your responsibilities in that job?

8   A.  I'm the executive assistant to the CEO Mr. Hana as well as

9   the operational manager.

10  Q.  How long have you worked for Mr. Hana?

11  A.  Since March of 2022.

12  Q.  Do you have any familial relationship to Mr. Hana?

13  A.  No.

14  Q.  Are you testifying today voluntarily or have you received a

15  subpoena?

16  A.  I received a subpoena.

17  Q.  Did there come a time while you were working for Mr. Hana

18  that you received a federal grand jury subpoena?

19  A.  Yes.

20  Q.  Who gave you that grand jury subpoena?

21  A.  I don't remember their name.

22  Q.  Was it an FBI agent?

23  A.  Yes.

24          MR. MARK:  Mr. Hamill, will you please show for the

25  witness only what has been marked for identification as

1    Government Exhibit 11C-1.

2    Q.  Ms. Hanna, do you recognize this exhibit?

3    A.  Yes.

4    Q.  Is this the grand jury subpoena that you received?

5    A.  Yes.

6          MR. MARK:  The government offers Government

7    Exhibit 11C-1.

8          MR. FEE:  Object on relevance.  She's testifying here.

9          THE COURT:  At this point I will sustain the

10   objection.  If it becomes relevant, we can admit it later on.

11   Go ahead.

12   Q.  Now, the subpoena that you received, to which entity was it

13   directed?

14   A.  IS EG Halal.

15   Q.  You mentioned that you work at EG Trade.  What is that

16   company?

17   A.  It is an international trading company.

18   Q.  Who is the boss of that company?

19   A.  Mr. Hana is the CEO.

20   Q.  After you received the subpoena from the FBI agent,

21   actually, I should ask you, when did you receive that subpoena?

22   A.  I don't remember the exact date.

23   Q.  Take a look at Government Exhibit 11C-1.  And after you've

24   looked at it, let me know if that refreshes your recollection

25   about when you received the subpoena.

O5L3MEN3                          Hanna - Direct

1   A.  The date on the subpoena is June 16, 2022.

2   Q.  Is that the date that you received the subpoena?

3   A.  I will assume so, yes.  I don't remember the exact date.

4   Q.  Was it approximately June 16, 2022, that you received the

5   subpoena?

6   A.  To the best of my memory, yes.

7   Q.  After you received the subpoena in June 2022, what did you

8   do with it?

9   A.  I took it back to Mr. Hana's office and gave it to him.

10  Q.  After you received the subpoena, did there come a time that

11  Mr. Hana asked you to appraise any items for him?

12  A.  I did inventory for his jewelry and those items were

13  appraised.

14  Q.  What items did Mr. Hana ask you to inventory for him?

15  A.  We inventoried gold bars, watches, jewelry, necklaces,

16  rings.  His whole collection.

17  Q.  When you say we inventoried, who is the "we" that you're

18  referring to?

19  A.  I did the main inventory, and then I had my co-worker

20  Christina write down and take notes as I did the inventory.

21  Q.  What's Christina's full name?

22  A.  Christina Sinisi.

23  Q.  You said she is your co-worker.  For what company does

24  Christina Sinisi work?

25  A.  IS EG Halal.

1   Q.   You said one of the items in the inventory were gold bars?

2   A.   That's correct.

3   Q.   Were the gold bars that were inventoried all of the same

4   size?

5   A.   No.

6   Q.   What sort of sizes and weights were they?

7   A.   There was to the best of my memory, there was three 1-kilo

8   bars and then maybe an inch small little bars.

9   Q.   Some were larger and some were smaller?

10  A.   Correct.

11  Q.   You mentioned that Mr. Hana asked you to do this inventory

12  in order to get these items appraised; is that right?

13  A.   Correct.

14  Q.   Where did Mr. Hana ask you to appraise the items after they

15  were inventoried?

16  A.   Sorry.  One more time?

17  Q.   Do you recall that you after you inventoried the items, the

18  gold, the watches, and the like, that then did you help take

19  them somewhere to get appraised?

20  A.   Yes.  I took them, I inventoried everything and then I took

21  them to a jewelry store where the jeweler went and got them

22  appraised.

23  Q.   To what jewelry store did you take the items?

24  A.   B&B.

25  Q.   Was there a particular jeweler at B&B that you delivered

 1    the items?

 2    A.   Yes.

 3    Q.   Who did you deliver them to?

 4    A.   Benny.

 5    Q.   Do you know Benny's last name?

 6    A.   I actually do not, no.

 7    Q.   When you delivered the items of value, did you deliver them

 8    with anyone else?

 9    A.   I had the company driver take me, but I was by myself when

10    I gave him everything.

11    Q.   When you're talking about the company driver, what company

12    had a driver?

13    A.   IS EG Halal.

14    Q.   What was the name of the company driver?

15    A.   Rae Galan. Raphael Galan.

16    Q.   Did the company have any vehicles?

17    A.   Yes.

18    Q.   What sort of vehicle did Mr. Galan drive?

19    A.   The company vehicle was a Cadillac Escalade.

20    Q.   You mentioned that when you took the items to Benny at B&B

21    to have them appraised, can you explain what it means to have

22    items appraised?

23    A.   We took the items to basically have them be given the

24    market value of today.

25               THE COURT:  You mean of June 2022?

1          THE WITNESS:  Yes, sir.

2  Q.  In order to get the items inventoried, how did you receive

3  them from Mr. Hana?

4  A.  He had come into the office and gave me a suitcase with all

5  the items inside of the suitcase.  I took them into my office,

6  and did the inventory.

7  Q.  Were items ever wrapped or put together with any sort of

8  checks or receipts at times?

9  A.  Yes.

10  Q.  Did Mr. Hana explain to you why certain items had checks or

11  receipts with them?

12  A.  He did not explain why, but it was a habit of his basically

13  to have the receipt around the item that he had paid for.

14  Q.  You said that you delivered these items to B&B to get

15  appraised.  Did you ultimately receive them back from B&B?

16  A.  Yes, sir.

17  Q.  What did you do with the items after receiving them back

18  from B&B jewelry?

19  A.  I had picked them up, taken them back to the office, and

20  redid the inventory to make sure I received everything back.

21  Q.  Did you receive all items back that you delivered to B&B?

22  A.  Yes.

23  Q.  Did Mr. Hana pick them up from you after you got them back?

24  A.  I had given him the suitcase, yes.

25          MR. MARK:  Mr. Hamill, can you please show for the

O5L3MEN3                          Hanna - Direct

1   witness only what has been marked for identification as

2   Government Exhibit 3K-2.

3   Q.  Ms. Hana, do you recognize this exhibit?

4   A.  Yes.

5   Q.  What is it?

6   A.  It is the list of items that was basically for inventory.

7           MR. MARK:  The government offers Government

8   Exhibit 3K-2.

9           THE COURT:  Admitted without objection.

10          (Government's Exhibit 3K-2 received in evidence)

11          MR. MARK:  Mr. Hamill, can you please publish

12  government 3K-2.

13  Q.  Now, Ms. Hanna, whose handwriting is this inventory?

14  A.  Christina Sinisi.

15  Q.  And where did the descriptions for the items in this

16  inventory come from?

17  A.  Myself.

18  Q.  Focusing on the third line of the inventory.  Could you

19  read that line.

20  A.  The third line?

21  Q.  Yes, please.

22  A.  10 gold bars check.

23          MR. MARK:  Mr. Hamill, would you please show for the

24  witness only what has been marked for identification as

25  Government Exhibit 3M-1.

1   Q.  Ms. Hanna, do you recognize this exhibit?

2   A.  Yes.

3   Q.  What is it?

4   A.  It is a picture that I have taken, it was a part of the

5   inventory.  There is 10 small gold bars and one check.

6           MR. MARK:  The government offers Government

7   Exhibit 3M-1 into evidence.

8           THE COURT:  Admitted without objection.

9           (Government's Exhibit 3M-1 received in evidence)

10          MR. MARK:  Mr. Hamill, could you please publish

11  Government Exhibit 3M-1.

12  Q.  Now, Ms. Hanna, you mentioned you took this photograph.

13  What did you use to take this photograph?

14          THE COURT:  A camera.

15  Q.  Was it your phone?

16  A.  Yes.

17  Q.  Is the time at the top of the photo or the screenshot when

18  you took this picture for the inventory?

19  A.  Yes.

20  Q.  Before you took the photograph, was the check and these

21  particular gold bars, were they together?

22  A.  Yes.

23          MR. MARK:  Mr. Hamill, can we zoom in on the item in

24  the top-left-hand corner.

25  Q.  Do you see where it says Asahi on the packaging of the gold

1    bar here?

2    A.  I do.

3          MR. MARK:  Mr. Hamill, can we zoom out.

4    Q.  Ms. Hanna, how many gold bars are in this photograph?

5    A.  10.

6          MR. MARK:  Mr. Hamill, can we zoom in on the check

7    below.

8    Q.  Was this the check from Mr. Hana's account?

9    A.  I believe so.

10   Q.  And how much was this check for?

11   A.  40,810.

12   Q.  Do you see in the memo line where it says the number 22?

13   A.  Yes.

14         MR. MARK:  Mr. Hamill, can we zoom out here.  Could

15   you bring up side by side Government Exhibit 3K-2.

16   Q.  And where on this inventory are the 10 Asahi gold bars

17   reflected?

18   A.  The third line.

19         MR. MARK:  One moment, your Honor.

20         No further questions.

21         THE COURT:  Thank you.  Yes, Ms. Collart.

22   CROSS-EXAMINATION

23   BY MS. COLLART:

24   Q.  Good afternoon, Ms. Hanna.  As you know, my name is Annie

25   and I represent Mr. Hana.  No relation.

O5L3MEN3                          Hanna - Cross

1          You've been working for Mr. Hana for about 2 years

2    now; is that right?

3    A.   Yes.

4    Q.   How did you hear about the position with Mr. Hana?

5    A.   I had gotten a phone call from Bishop David, who he is a

6    bishop from our church for the Northeast Diocese of all our

7    churches.  He gave me a phone call and he had told me that

8    Mr. Hanna was a businessman looking for a secretary and had a

9    job opportunity, and to go ahead and to meet with him and

10   interview with him.

11   Q.   How long have you known Bishop David for?

12   A.   Since I came to America in 2001.

13   Q.   Where did you live prior to moving to the U.S.?

14   A.   Egypt.

15   Q.   You did not know Mr. Hana before the referral from Bishop

16   David; is that correct?

17   A.   That is correct.

18   Q.   You testified on direct that you received a subpoena for IS

19   EG Halal Certified Inc. one day at work around June 2023 and

20   gave it to Mr. Hana, correct?

21   A.   That is correct.

22          MR. MARK:  Your Honor, I think she said June 2022.

23          MS. COLLART:  My apologies.  That's correct.

24   June 2022.

25   Q.   Were you involved in gathering documents or preparing the

O5L3MEN3                        Hanna - Cross

1  response to that subpoena?

2  A.  Yes.

3  Q.  You were directed, weren't you, to work with counsel and

4  respond to that subpoena, correct?

5  A.  That is correct.

6  Q.  No one ever told you to do anything other than turn over

7  everything that was asked for and completely comply, correct?

8  A.  Correct.

9  Q.  Ms. Hanna, I want to look at one of the documents that the

10  government showed you.  It's GX 3K-2.  Mr. Mark pulled out a

11  couple of items in here.  There is a couple of references to

12  gold, at the top I know you referenced 10 gold bars, there's

13  also seven gold coins and someone kilo gold bar references down

14  below.  Do you see where it says that?

15  A.  Yes.

16  Q.  And these are your words that you asked Ms. Sinisi to write

17  down?

18  A.  Yes.

19  Q.  Were these terms that you are familiar with when you were

20  developing the list?

21  A.  Yes.

22  Q.  How are you familiar with these terms?

23  A.  Gold is just a very cultural thing in the Middle East, we

24  grew up, you grew up and gold is just a part of your culture.

25  Kilo is just a word that you -- just a part of your vocabulary.

O5L3MEN3                          Hanna - Cross

1   It's natural.  It is a part of our culture.  It's normal to

2   have gold, talk about gold, buy gold.  It's an investment.

3   Q.  Is gold sometimes also given as gifts as part of your

4   culture?

5   A.  Yeah, when someone gets married, you give her weight in

6   gold.

7   Q.  I did not know that.  Okay.  Mr. Hana has given you gifts;

8   is that correct?

9   A.  That is correct.

10  Q.  What types of gifts has he given to you?

11           MR. MARK:  Objection.  Scope.

12           THE COURT:  Sustained as to scope.  This is cross.

13  Q.  Let me go back for a second and ask a question about what I

14  first started asking you about.  Is it correct that Bishop

15  David in the church that you met him through is part of the

16  Coptic Christian church?

17  A.  That is correct.

18           MS. COLLART:  May I have just a moment?

19           THE COURT:  Yes.

20           MS. COLLART:  No further questions, your Honor.  Thank

21  you.

22           THE COURT:  Mr. De Castro, anything?

23           MR. DE CASTRO:  No, Judge.  Thank you.

24           MR. FEE:  No, your Honor.  Thank you.

25           THE COURT:  Any redirect?

O5L3MEN3                        Hanna - Redirect

1          MR. MARK:  Just very briefly.

2          First, the government offers reoffers Government

3   Exhibit 11C-1.  Obviously obstruction here is charged.

4          MS. COLLART:  Not against Mr. Hana, your Honor.

5          MR. FEE:  Objection and move to strike the comment.

6          THE COURT:  Yes, the jury will disregard the comment.

7   I'll sustain the objection.

8   REDIRECT EXAMINATION

9   BY MR. MARK:

10  Q.  Are you familiar with -- you made a comment that sometimes

11  a gift is given in the weight of gold for a marriage.  Was that

12  a figure of speech?

13  A.  That's a figure of speech, yes, from our culture.

14          MR. MARK:  No further questions.

15          THE COURT:  You may step down.  You are excused.

16          (Witness excused)

17          THE COURT:  Next witness for the government.

18          MR. MARK:  The government calls as its next witness

19  Jamela Maali.

20          THE COURT:  Government, about how long will this

21  witness take?

22          MR. MARK:  I believe this witness will take us through

23  the end of the day, your Honor.

24          THE COURT:  Is the jury all right going right through

25  or would you like a break?  Somebody has already indicated they

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    want a break.  So at 4 o'clock let's take a break.  Quick

2    10-minute break.  I didn't realize that.

3     JAMELA MAALI,

4         called as a witness by the Government,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. MARK:

8    Q.  Good afternoon, Ms. Maali.  What is your educational

9    background?

10   A.  I graduated from high school and then I attended a

11   community college in Orlando, Florida.

12   Q.  Is that where you're originally from?

13   A.  I am.

14        THE COURT:  Move your chair closer to the mic and

15   speak loudly, slowly, and clearly, please.

16   Q.  Where do you work now, Ms. Maali?

17   A.  I currently work for Daibes Enterprises.

18   Q.  What are your responsibilities at your job at Daibes

19   Enterprises?

20   A.  I'm the executive assistant to Fred Daibes, the CEO.

21   Q.  How long have you worked for Mr. Daibes?

22   A.  Directly as his assistant, for the past about 13 years.

23   For the company as a whole, about 15 years.

24   Q.  With regards to being Mr. Daibes' assistant, can you

25   explain generally what your duties and responsibilities are.

1    A.  Make appointments, take phone calls, set his schedules,

2    coffee, lunches, just answering e-mails.  Things of that

3    nature.

4    Q.  What is the nature of your relationship with Mr. Daibes?

5    A.  We've become friendly.  He's become like family, his

6    family, sisters, kids, they've all become my family since I

7    have nobody here.  They've become like my support.

8    Q.  When you mean by nobody here, you mean in New Jersey

9    itself?

10   A.  Correct.

11   Q.  Is that where you live?

12   A.  I currently live in New Jersey, yes.

13   Q.  Are you testifying today voluntarily or have you received a

14   subpoena?

15   A.  I received a subpoena.

16   Q.  From working with Mr. Daibes all these years, have you

17   become generally familiar with his business?

18   A.  Yes.

19   Q.  What type of business is Mr. Daibes in?

20   A.  He's a real estate developer.

21   Q.  What sort of real estate does he develop?

22   A.  Commercial and residential buildings.

23   Q.  Where does he develop those buildings?

24   A.  Mainly in New Jersey.

25   Q.  Is there a particular part of New Jersey that he primarily

1   develops buildings in?

2   A.   Edgewater.

3   Q.   You mentioned that you work for Daibes Enterprises.  Does

4   Daibes Enterprises control any other companies?

5   A.   It does.

6   Q.   Approximately how many companies does Daibes Enterprise

7   control?

8   A.   When you say control, what do you mean?

9   Q.   So, does Daibes Enterprises, in your understanding, have

10  other companies that are underneath it?

11  A.   Yes.

12  Q.   Approximately how many other companies are underneath it?

13  A.   I would say like mainly three.  You have the development

14  aspect, you have a management company, and you have a

15  construction company.

16  Q.   Is Mr. Daibes involved in all three aspects of development

17  in that way?

18  A.   Yes.

19  Q.   Does he own or run those companies with anyone else?

20  A.   His son.

21  Q.   What's his son's name?

22  A.   Joseph Daibes.

23  Q.   Are you familiar with a company named East-West Funding?

24  A.   I am.

25  Q.   How are you familiar with that company East-West Funding?

1    A.  It's one of the entities that they have.  It is a lending

2    company.

3    Q.  When you say it's one of the entities they have.  Who is

4    the "they" you're referring to there?

5    A.  Mr. Daibes and his family.

6    Q.  You mentioned that it is a lending company.  From working

7    with Mr. Daibes, did you understand what sort of lending that

8    company did?

9    A.  They lend money to people or companies that need it.

10   Q.  In working for Mr. Daibes, have you ever written checks

11   from his bank accounts for him?

12   A.  I have.

13   Q.  Have you ever written checks from Mr. Daibes to East-West

14   Funding?

15   A.  I have.

16   Q.  What was the purpose of the checks that you wrote from

17   Mr. Daibes to East-West Funding?

18   A.  They vary.  Just to fund that account so he can give the

19   lending money out.

20   Q.  How large were the checks that you wrote for Mr. Daibes'

21   accounts to East-West Funding?

22   A.  Once again, they vary.  I don't know off the top of my

23   head.

24   Q.  Can you give an approximation for how large some of those

25   checks were?

1    A.  Hundreds of thousands.

2    Q.  From working for Mr. Daibes, what's your understanding of

3    who makes the decisions of what loans to make from East-West

4    Funding?

5    A.  Him.  Himself.

6    Q.  From working with Mr. Daibes, did you observe him to

7    collect any physical items of value?

8            MR. WEITZMAN:  Objection.  Form.

9            THE COURT:  Sustained.

10   Q.  From working with Mr. Daibes, did you observe him to ever

11   collect gold?

12   A.  Yes, I have.

13   Q.  What type of gold did you observe him to collect?

14   A.  Gold bars, gold coins, gold wafers.

15   Q.  Did you ever see where he kept his gold?

16   A.  I did.

17   Q.  Where did he keep his gold?

18   A.  Currently?

19   Q.  Up through approximately 2023.

20   A.

21

22

23

24

25

O5L3MEN3                        Maali - Direct

1

2

3    Q.

4

5

6

7

8

9    Q.  Does Mr. Daibes have a private plane?

10   A.  He does.

11   Q.  What type of plane does he have?

12   A.  I -- I can't remember.

13   Q.  About what size was it?

14   A.  It's like a six passenger private plane.

15   Q.  How long has Mr. Daibes had a private plane?

16   A.  Several years, before I even started working for him.

17   Q.  Does Mr. Daibes employ a driver?

18   A.  He does.

19   Q.  Who is Mr. Daibes' driver?

20   A.  John Pilot.

21   Q.  How long has Mr. Pilot worked for Mr. Daibes?

22   A.  Maybe 5 years, 6 years.

23           MR. MARK:  Mr. Hamill, would you please show for the

24   witness only what has been marked for identification as

25   Government Exhibit 2A-16.

1    Q.  Do you recognize this exhibit?

2    A.  I do.

3    Q.  What do you recognize this as?

4    A.  That's John Pilot.

5          MR. MARK:  The government offers Government Exhibit

6    2A-16.

7          THE COURT:  Admitted without objection.

8          (Government's Exhibit 2A-16 received in evidence)

9          THE COURT:  Was that John or Don?

10         THE WITNESS:  John.

11   Q.  Confusingly, though his last name is Pilot, he is actually

12   the driver, right?

13   A.  Correct.

14   Q.  Now, when did you first meet Wael Hana?

15   A.  I would say 2018.

16   Q.  Where did you first meet Mr. Hana?

17   A.  It was at a fundraiser that we were holding for Senator

18   Menendez.

19   Q.  Do you see Mr. Menendez in the courtroom today?

20   A.  Yes, I do.

21   Q.  Can you please describe what he's wearing?

22         MR. WEITZMAN:  Stipulated, your Honor.

23         THE COURT:  You recognize Mr. Menendez, correct?

24         THE WITNESS:  I do.

25         THE COURT:  Okay.  Fine.  The witness has identified.

1              THE WITNESS:  I can only see his head, so I couldn't

2      tell what you he's wearing.

3              THE COURT:  Does he have gray hair?

4              THE WITNESS:  Yes.

5              THE COURT:  The witness has identified the defendant

6      with the same gray hair as the judge.  Go ahead.

7      Q.  Some of us would like to have gray hair.

8              Now, Ms. Maali, you said you first met Mr. Hana at a

9      fundraiser for Senator Menendez; is that right?

10     A.  Correct.

11     Q.  Who hosted that fundraiser for Mr. Menendez?

12     A.  My boss, Mr. Daibes.

13     Q.  What does it mean to host a fundraiser?

14     A.  They help raise money for the politician that's running for

15     office.

16     Q.  Where was the fundraiser for Mr. Menendez located where you

17     first met Mr. Hana?

18     A.  At Le Jardin.

19     Q.  Who owns -- what is Le Jardin?

20     A.  Le Jardin is a restaurant in Edgewater, New Jersey.

21     Q.  Is it still in operation?

22     A.  No.

23     Q.  But it was at the time in 2018?

24     A.  Correct.

25     Q.  Who owned the restaurant Le Jardin at the time of the

1   fundraiser where you first met Mr. Hana?

2   A.  Mr. Daibes.

3   Q.  Had Mr. Daibes ever hosted a fundraiser for Mr. Menendez

4   before that one?

5   A.  Yes.

6   Q.  Approximately how many?

7   A.  Several.

8           MR. MARK:  Mr. Hamill, would you please show for the

9   witness and the parties and the Court what has been marked for

10  identification as Government Exhibit 3D-4.

11  Q.  Ms. Maali, do you recognize this exhibit?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  That's the invitation we would send out to the people who

15  were invited to the fundraiser.

16          MR. MARK:  Government offers Government Exhibit 3D-4

17  into evidence.

18          THE COURT:  Admitted without objection.

19          (Government's Exhibit 3D-4 received in evidence)

20          MR. MARK:  Mr. Hamill, can you please publish this.

21  Q.  Ms. Maali, did you send out this e-mail invitation in

22  connection with the fundraiser?

23  A.  Yes, I did.

24  Q.  What e-mail address did you use to send it from?

25  A.  Fadsec@Daibes.net.

O5L3MEN3                         Maali - Direct

1    Q.  What does Fadsec refer to here?

2    A.  Fred A. Daibes' administrative assistant or secretary.

3    Q.  Did you attend -- you said you attended this fundraiser at

4    Le Jardin?

5    A.  I did.

6    Q.  About how many people attended the fundraiser?

7    A.  Maybe about 70.

8    Q.  Who introduced you to Mr. Hana at the fundraiser?

9    A.  I don't remember who made the introduction.  But he was

10   with two other individuals.

11   Q.  Who was Mr. Hana with when you met him?

12   A.  Andy Aslanian and Nadine Arslanian.

13   Q.  Despite having similar last names, did you understand them

14   to be related or not?

15   A.  No.

16   Q.  Now focusing on Mr. Hana.  Do you recall when you first had

17   a substantive conversation with him?

18   A.  Yes.

19   Q.  When was that?

20   A.  When I was asked if I would like to do some extra work on

21   the side and work for Mr. Hana.

22   Q.  Who asked you whether you'd like to do some work on the

23   side and work for Mr. Hana?

24   A.  My boss, Mr. Daibes.

25   Q.  When was that conversation?

1    A.  Some time in the spring of 2019.

2    Q.  Where did that conversation occur?

3    A.  At our office in Edgewater.

4    Q.  Where is that office located?

5    A.  125 River Road.

6    Q.  Did Mr. Daibes explain to you what sort of work on the side

7    you could do for Mr. Hana?

8    A.  He was just saying he is starting up a business, if I can

9    help him or if I'd like to help him, to make extra money, that

10   would be good.  But not to let it interfere with my current

11   job.

12              THE COURT:  That is for you to make extra money?

13              THE WITNESS:  Yes.

14   Q.  And did you follow up with Mr. Hana after that

15   conversation?

16   A.  I did.

17   Q.  What did you discuss with Mr. Hana about that?

18   A.  He explained the business, and he asked if I wanted to help

19   him open up the business.  Or start up his business.

20   Q.  What did Mr. Hana explain was the nature of his business?

21   A.  Meat certifying -- halal meat certifying company.

22   Q.  Was that certifying for any particular country?

23   A.  Egypt.

24   Q.  Were you familiar with halal meat before this conversation?

25   A.  I was not.

1          Wait.  Was I familiar with what it is or that it

2    needed to be certified?

3    Q.  Let me break that apart.  Were you familiar with what halal

4    meat was?

5    A.  Yes.

6    Q.  Okay.  Were you familiar with whether that meat needed to

7    be certified before the conversation?

8    A.  No, I did not.

9    Q.  Okay.  And how did you respond to the offer to work for

10   Mr. Hana's company?

11   A.  I agreed.

12   Q.  How long did you work for Mr. Hana?

13   A.  Less than a year.

14   Q.  You mentioned that you did this on top of your other work

15   for Mr. Daibes, right?

16   A.  Correct.

17   Q.  Focusing on your work for the company, was that called IS

18   EG Halal?

19   A.  It was.

20   Q.  Who did you report to when you worked for IS EG Halal?

21   A.  Mr. Hana.

22   Q.  Can you explain what you did in connection with your work

23   for Mr. Hana?

24   A.  Okay.  We had to open up the company, we had to get

25   computers set up, we had to hire new people, figure out how

1  to -- figure out how to get the information from the slaughter

2  homes on to the certificates that get shipped to Egypt.

3  Q.  So, let me sort of break that apart.  From what was the

4  information that you needed from the slaughterhouses?

5  A.  If I can remember correctly, that they had the information

6  of how many pounds or how many pounds of meat, what type of

7  meat it was, what slaughter home it came from.  And we had to

8  transfer that information on to the certificate in order for it

9  to get released into Egypt.

10 Q.  And on to a certificate, was that an IS EG Halal

11 certificate?

12 A.  Correct.

13 Q.  Apart from just transferring information from one form to

14 another, did you do anything else to prepare those

15 certificates?

16 A.  Me myself, personally, no.

17 Q.  Did you understand the company did anything more to then

18 take that information from one form and then transfer it to the

19 halal certificate?

20 A.  I don't understand.

21 Q.  What did you understand the company did with the

22 information that it got from the slaughterhouse?

23 A.  They transferred it on to the certificate, sent it to Egypt

24 so they could release it from the port in Egypt.

25 Q.  Did you understand whether the company IS EG Halal did any

1    verification of whether the meat that was reflected on the

2    certificate was halal or not?

3    A.   That was done by Will.  I didn't have anything to do with

4    it.

5    Q.   How many employees worked at IS EG Halal when you worked

6    there?

7    A.   When I started?  Nobody.  Just Will, myself, and Rony.

8    Q.   When you finished -- when did you finish working for the

9    company approximately?

10   A.   I believe it was early 2020, January 2020.

11   Q.   How many employees did the company have in the United

12   States at that point in time?

13   A.   I don't remember.  Maybe 10.  15.

14            MR. MARK:  You wanted to take a break at 4 o'clock.

15            THE COURT:  Let's take a break.  Let's take 10

16   minutes, ladies and gentlemen.  And this should be the last

17   time you need to go down to that other room, except when you're

18   leaving.

19            (Jury excused)

20            (Continued on next page)

21

22

23

24

25

O5L3MEN3                         Maali - Direct

1                THE COURT:  You may step down, Ms. Maali.

2                All right, ladies and gentlemen, again wait a few

3      minutes here so the jury can go into the elevators and we'll be

4      back in 10 minutes.

5                MR. RICHENTHAL:  We can do this now or later.  If the

6      Court would like, I can explain our basis for admission of the

7      subpoena.  It's not that Mr. Hana's charged with obstruction,

8      he isn't.  But I will wait for the witness to leave, I don't

9      know that it concerns her.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5lWmen4

1          THE COURT:  What's the relevance of it?

2          MR. RICHENTHAL:  So, as I understand the testimony,

3     Mr. Hana receives a federal grand jury subpoena.  Your Honor

4     can look at the grand jury subpoena.  It calls for all kinds of

5     things.  It does not call for gold, and yet soon after

6     receiving the subpoena, which names, among other names, Mr.

7     Menendez's name, Ms. Arslanian's name, Mr. Hana immediately

8     instructs someone go appraise my gold.

9          The jury from that, we'd argue, can infer that

10    Mr. Hana understood when it sought things of value -- and those

11    phrases are in the subpoena -- he contemporaneously, in June of

12    2022, linked that to gold, even though gold is not sought by

13    the subpoena.  Is it the most powerful inference in the world?

14    Probably not, but it's certainly relevant, and that's why it

15    was offered.  We did not want to put this argument in front of

16    the jury.

17         THE COURT:  Let me see the subpoena.

18         MR. RICHENTHAL:  It's Government Exhibit 11C-1, and I

19    think that Mr. Hamill can put it on your Honor's screen.

20         THE COURT:  You may.

21         MR. RICHENTHAL:  Mr. Hamill, can you turn to page 4 of

22    the PDF.

23         MR. MARK:  I have a full copy of the document if you'd

24    like it, your Honor.

25         MR. RICHENTHAL:  Let me know when the Court is ready.

O5lWmen4

1          Would your Honor like me to direct your attention to

2     the line we think is particularly relevant in the rider?

3          THE COURT:  You're talking about materials to be

4     produced?

5          MR. RICHENTHAL:  Yes, your Honor, and paragraph 4 in

6     particular, although I think others are relevant.  But

7     paragraph 4 -- excuse me.  I misspoke.  No.  Paragraph 4.

8          "All records," etc., "relating to any payments,

9     services, acts, favors, loans, or anything of value given by IS

10    EG Halal to U.S. Senator Robert Menendez, Nadine Arslanian,

11    a/k/a Nadine Menendez, and/or Strategic International Business

12    Consultants."

13         THE COURT:  All right.

14         What's the objection?  I didn't realize the relevance.

15    The inference is a rather weak one, but what's the objection?

16         MR. LUSTBERG:  Thank you, your Honor.

17         The Court skipped to materials to be produced on page

18    2.  On page 1, it talks about materials to be preserved.  That

19    includes mention of the specific jeweler at issue here.

20         To be clear, this gets into all kinds of issues about

21    attorney-client privilege and what we may have advised the

22    client to do.  There was zero doubt in our minds when this

23    subpoena came that a thorough inventory should be produced.

24    That has nothing to do with materials that were given to

25    Mr. Menendez, Senator Menendez, although let me just say, your

O5lWmen4

1  Honor, that those were materials, by definition, that were not

2  given to Senator Menendez.  That's why they were there in

3  inventory.

4          THE COURT:  All right.  I'm going to sustain the

5  objection.

6          MR. LUSTBERG:  Thank you, your Honor.

7          THE COURT:  It's an extraordinarily weak inference.

8          Take the document back.

9          (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                THE COURT:  Get the witness on the witness stand,

3      please.

4                Please be seated in the courtroom.

5                Just to inform the courtroom, the reason there was a

6      delay, unfortunately, was one of the elevators bringing the

7      jurors down from the other courtroom got stuck.  There were too

8      many jurors in that elevator, and it was quite some time, but I

9      appreciate the fact my deputy was in that elevator.  Everyone,

10     I think, was OK.  I'm glad that everyone is safe and you're

11     here.

12               Let's proceed.

13               Mr. Mark.

14               MR. MARK:  Thank you, your Honor.

15               Mr. Hamill, could you please publish page 2 of what's

16     already in evidence as Government Exhibit 8B-28.

17     Q.  Ms. Maali, do you recognize this letter?

18     A.  I do.

19     Q.  What does this letter concern?

20     A.  It's a letter that went out to, I believe, slaughter homes

21     identifying IS EG Halal Certified as the authorized entity to

22     certify halal meats into Egypt.

23     Q.  Who drafted this letter?

24     A.  I can't remember.  May have been me.  May have been

25     somebody else.

1    Q.  Did you sign this letter?

2    A.  I did.

3    Q.  At the time you signed this letter, what was your position

4    at IS EG Halal?

5    A.  I was, like, a, an office manager that was kind of

6    overseeing things.

7    Q.  From, like, an office or administrative perspective?

8    A.  Correct.

9    Q.  Do you see where it lists the title under your name as

10   managing member?

11   A.  I do.

12   Q.  Who selected that title for you in this letter?

13   A.  I wouldn't have given that title to myself.

14   Q.  Were you familiar with what that title meant at the time

15   you worked for IS EG Halal?

16   A.  I think at the time I probably assumed that I was just a

17   manager or part of the managing team.

18   Q.  Since working for IS EG Halal, have you become familiar

19   with the term "managing member"?

20   A.  Yup.

21   Q.  Did you serve as IS EG Halal's managing member?

22   A.  I did not.

23   Q.  Who served in that capacity?

24   A.  Mr. Hana.

25   Q.  Did Mr. Hana ever refer to you with any other titles at IS

1   EG Halal?

2   A.  I don't know if it was Mr. Hana that referred to me, but

3   there was an article that stated I was a director.

4   Q.  Did you ever hear Mr. Hana refer to you as the director?

5   A.  I have not.

6   Q.  So, you said you wouldn't have selected the title managing

7   member for yourself.  If you wouldn't have, who did?

8   A.  I'm assuming Mr. Hana.

9   Q.  You said assume.  Who gave you instructions in your job at

10  IS EG Halal?

11  A.  Mr. Hana.

12  Q.  And did you follow his instructions when you worked for

13  him?

14  A.  Yeah, I -- my boss.  I worked.

15  Q.  Do you believe he's the one who instructed you to put

16  managing member on as your title on this letter?

17          MR. LUSTBERG:  Objection, your Honor.  She already

18  said she was only assuming.

19          THE COURT:  Sustained.

20  BY MR. MARK:

21  Q.  Did Mr. Hana ask you to sign this letter?

22  A.  Yes.

23  Q.  Did Mr. Hana ask you to sign any letters that listed your

24  title as managing member?

25  A.  He may have.

1    MR. MARK:  Mr. Hamill, may we publish what's already

2    in evidence as Government Exhibit 8B-21 and go to page 2.

3    Q.  Ms. Maali, this is a multi-page letter.

4    MR. MARK:  Mr. Hamill, you can flip through it just

5    quickly for her.

6    Thank you.

7    Q.  Do you recognize this letter, Ms. Maali?

8    A.  Yes.

9    Q.  And did you sign this letter?

10   A.  I did.

11   Q.  And what was your title listed below your signature here?

12   A.  Managing member.

13   MR. MARK:  Mr. Hamill, if we can zoom out and go to

14   the top of the letter.

15   Q.  What did you understand this letter concerned?

16   A.  This letter was sent to Egypt, listing the slaughterhouses

17   that's -- are going to be sending their meat over.

18   Q.  And do you see that it said, "all companies have agreed to

19   comply with the Egyptian standard rules and regulations for

20   exporting halal products into Egypt" here?

21   A.  I see that.

22   Q.  Do you know whether the information in this letter was

23   accurate or not?

24   A.  I was given those instructions, to write that letter, and

25   Will visited those, so that would be a question that Will can

1    answer.

2    Q.  So Will gave you the instruction --

3    A.  To draft this letter.

4    Q.  -- to draft --

5    A.  Uh-huh.

6    Q.  And do you know what Will did or did not do in order to

7    ensure that those companies complied with Egyptian standard

8    rules and regulations for exporting halal products into Egypt?

9    A.  I do not.

10   Q.  And this letter is directed to Dr. Ahmed Abdel Karim Badie.

11   Do you see that?

12   A.  I do.

13   Q.  Have you ever met Dr. Abdel Kareem?

14   A.  I have not.

15   Q.  Do you know who he was?

16   A.  From reading this, he's the central administration

17   veterinary quarantine and inspection general organization for

18   veterinary services in Egypt.

19   Q.  From your time at IS EG Halal, did you have an

20   understanding from working with Mr. Hana who Dr. Ahmed Abd

21   Karim was?

22   A.  No.

23        MR. MARK:  Mr. Hamill, you can take that down.

24   Q.  Now, you mentioned that you understood or the information

25   in that letter was from Mr. Hana, right?

1   A.  Correct.

2   Q.  And you had said that he took a trip to slaughterhouses?

3   A.  Uh-huh.

4   Q.  Was there anybody else at IS EG Halal who ever took a trip

5   to slaughterhouses apart from Mr. Hana?

6   A.  From my understanding, Gus Lita.

7   Q.  Who is Gus Lita?

8   A.  Gus Lita is a long-time friend of Fred's who also managed

9   Le Jardin.

10  Q.  And that was the restaurant which Mr. Daibes hosted the

11  fund-raiser for Mr. Menendez where you met Mr. Hana?

12  A.  Correct.

13  Q.  Before you met Mr. Hana, did you know Gus Lita?

14  A.  Yes.

15  Q.  And you mentioned that Gus Lita also, you understood, went

16  out to visit some slaughterhouses.  What sort of work did

17  Mr. Lita do for IS EG Halal?

18  A.  I'm not exactly sure.

19  Q.  Approximately how long did Mr. Lita work for IS EG Halal?

20  A.  I don't know.  I couldn't even tell you if he was hired

21  after me or before me.  I mean after me or while I was there.

22  Q.  Does he still work for IS EG Halal?

23  A.  He does not.

24  Q.  Approximately when did he stop working there?

25  A.  Maybe about a year ago, a little longer.

1    Q.  Were you aware of whether any other IS EG Halal employees

2    ever visited any slaughterhouses?

3    A.  Not that I'm aware of.

4    Q.  And from your time working at IS EG Halal, were you ever

5    aware of the company employing inspectors that worked at

6    slaughterhouses?

7    A.  No.  That wasn't part of my realm of work.

8    Q.  And from your time working at IS EG Halal, were you aware

9    of whether the company employed blessers that worked at

10   slaughterhouses?

11   A.  Again, I had nothing to do with that part of the business.

12            MR. MARK:  Now, Mr. Hamill, could you please show for

13   the witness only as well as the parties and the Court what has

14   been marked for identification as Government Exhibit 2B-1.

15   Q.  Ms. Maali, do you recognize what's depicted in this

16   exhibit?

17   A.  That is the office building for IS EG.

18            MR. MARK:  The government offers Government Exhibit

19   2B-1 into evidence.

20            THE COURT:  Admitted without objection.

21            (Government Exhibit 2B-1 received in evidence)

22            MR. MARK:  Mr. Hamill, could you zoom in on the awning

23   in this photograph.

24   Q.  Do you recognize what's -- do you see the, to the right, on

25   the awning it says Medi Trade EG?

O51Wmen4                        Maali - Direct

1    A.  Yes, I do.

2    Q.  Did Mr. Hana ever talk with you about Medi Trade?

3    A.  Not that I can recall.

4    Q.  You don't recall Mr. Hana ever talking with you about Medi

5    Trade as a company?

6            MR. WEITZMAN:  Objection.  Asked and answered.

7    A.  No.

8            THE COURT:  I'll allow the answer.

9    BY MR. MARK:

10   Q.  Now, you testified that you helped hire people for IS EG

11   Halal when you worked there?

12   A.  Correct.

13   Q.  Did you ever help hire any inspectors to work at the

14   slaughterhouses?

15   A.  I did not.

16   Q.  Did you ever work to help hire any blessers to work at the

17   slaughterhouses?

18   A.  I did not.

19           MR. MARK:  Now, Mr. Hamill, could you please show for

20   the witness and the parties and the Court what have been marked

21   for identification as Government Exhibit C506, C511 and C513.

22   Q.  Do you recognize these exhibits as emails?

23   A.  I do.

24   Q.  Do you recognize your email address in these emails?

25   A.  I do.

O5lWmen4                              Maali - Direct

1    Q.  And does the content of these emails concern IS EG Halal

2    business?

3    A.  It does.

4              MR. MARK:  The government offers Government Exhibit

5    C506, C511 and C513 into evidence.

6              THE COURT:  Hearing no objection, admitted.

7              (Government Exhibits C506, C511 and C513 received in

8    evidence)

9              MR. MARK:  And at this time the government also just

10   notes a stipulation between the parties; that is, Government

11   Exhibit 1435, and it provides that documents marked for

12   identification as Government Exhibit C501 through C514 are true

13   and correct copies of records extracted from data files

14   provided by Microsoft Corporation pursuant to a

15   court-authorized search warrant for the contents of an email

16   account with email address will@iseghalal.com.  And the

17   government offers Government Exhibit 1435 into evidence.

18             THE COURT:  Admitted.

19             (Government Exhibits C501 through C514 and 1435

20   received in evidence)

21             MR. MARK:  Mr. Hamill, could you please put up

22   Government Exhibit C506.

23   Q.  And let me direct your attention also to page 2 of this

24   exhibit.  What does this email concern?

25   A.  Looks like wire instructions.

1    Q.  Who is Christine -- in May 2019, who was Christina Impell?

2    A.  A young lady that was hired to do work at IS EG.

3    Q.  And what sort of work did she do at IS EG at the time?

4    A.  She was an account manager.

5    Q.  What did it mean to be an account manager at IS EG?

6    A.  It looks like she was account receivable.

7    Q.  Looks like her title is IS EG Halal account manager, isn't

8    it?

9    A.  Uh-huh.

10   Q.  And what sort of work did she do?

11   A.  She made sure that containers were paid for.

12   Q.  OK.  Talking about containers, containers of beef products?

13   A.  Correct.

14   Q.  And that IS EG Halal was getting paid certificate fees for

15   those containers, is that right?

16   A.  Right.

17   Q.  And do you see where it says, "please see below Medi Trade

18   wire instructions"?

19   A.  I do.

20   Q.  Does that refresh your recollection as to what Medi Trade

21   is?

22   A.  I wasn't part of this email chain until the very end, when

23   I was asked to send further wire instructions.

24   Q.  Do you see where it says for the wire instruction that

25   there's a bank listed there?

O5lWmen4                      Maali - Direct

1    A.   National Bank of Egypt.

2    Q.   And do you see that there's a contact person listed as

3    Shereen Zidan?

4    A.   Uh-huh.

5    Q.   Do you have an understanding from working at IS EG Halal

6    who Ms. Zidan was?

7    A.   Somebody on the other end of IS EG, like the office in

8    Egypt; she worked there.

9            THE COURT:  Just from your tone of voice, are you

10   guessing, or do you know that?  Or are you assuming that?

11           THE WITNESS:  No, I'm not assuming that.

12           THE COURT:  You know --

13           THE WITNESS:  And --

14           THE COURT:  You know she worked for IS EG in Egypt?

15           THE WITNESS:  Correct.

16   BY MR. MARK:

17   Q.   And you knew that from working for Mr. Hana, is that right?

18   A.   Correct.

19           MR. MARK:  Now, Mr. Hamill, could we scroll up the

20   chain.  And we can stop here.

21   Q.   Do you see a reply to Christina Impell's email?

22   A.   Yes, I do.

23   Q.   And do you see this is from a Dr. Elkady at Beefco?

24   A.   Yes.

25   Q.   Were you familiar with Beefco from your time working at IS

O5lWmen4                      Maali - Direct

1    EG Halal?

2    A.   The name sounds familiar.

3    Q.   And how does it sound familiar?

4    A.   I believe it was one of the companies that -- the beef

5    companies that they deal, they dealt with.

6    Q.   And in what way?  Was it an exporter of beef from the U.S.

7    to Egypt?

8    A.   Yeah.

9    Q.   OK.  And do you see that it says:  "We're still working to

10   confirm dividing the payment.  Today we reached an agreement

11   they we pay 1,800 here in the U.S.A. and 3,200 will be paid in

12   Egypt"?

13   A.   I see that.

14   Q.   And did you understand that $1,800 was to be paid in the

15   U.S. to IS EG Halal?

16   A.   Yes.

17   Q.   And then $3,200 was to be paid by the exporter to Egypt at

18   Medi Trade's bank account below?

19   A.   I understand that from this email, yes.

20   Q.   OK.  And $1,800 plus $3,200, is that $5,000?

21   A.   That is.

22   Q.   And continuing up the email chain --

23          MR. MARK:  If we could, Mr. Hamill.

24   Q.   -- is that an email from you?

25   A.   That is.

1   Q.  And did you provide IS EG Halal's wire instructions as

2   attached to this email?

3   A.  I did.

4   Q.  And do you see that you copied several different email

5   accounts?  Do you see one is listed as -- HHHH is the name, and

6   then the email address is hh@iseghalal.com?

7   A.  I do.

8   Q.  Who was that?

9   A.  I don't know.

10  Q.  If you don't know who that is, why did you send this email

11  to that person?

12  A.  Because I'm sure I was told by Will.

13  Q.  Did Mr. Hana ever discuss with you who HHHH was?

14  A.  No, he did not.

15  Q.  And do you see after HHHH there's an email account, and the

16  name is Medi Trade and it says meditrade@iseghalal --

17  A.  Uh-huh.

18  Q.  -- dot-com?

19  A.  Yup.

20  Q.  Did Mr. Hana ever discuss with you that email account?

21  A.  He did not.

22  Q.  Did you have any understanding of what that email account

23  was?

24  A.  No, I did not.

25          MR. MARK:  Now, Mr. Hamill, could you show to the

1  witness and the parties and the Court only what has been marked

2  for identification as Government Exhibit C508.

3  Q.  Do you recognize this email?

4  A.  I do.

5  Q.  Does it relate to IS EG Halal?

6  A.  Yes, it does.

7          MR. MARK:  The government offers C508.

8          THE COURT:  Admitted, without objection.

9          (Government Exhibit C508 received in evidence)

10  BY MR. MARK:

11  Q.  And is this email from you, Ms. Maali?

12  A.  It was.

13  Q.  And who is it directed to?

14  A.  Medi Trade and the HH person and Will Hana.

15  Q.  And who did you write the email to when it says "good

16  morning"?

17  A.  Shereen.

18  Q.  OK.  And on the last email, do we see that there was a

19  contact person listed as Shereen Zidan?

20  A.  Yes, I do.

21  Q.  Is this the same person here?

22  A.  I believe so.

23  Q.  And did you understand that when you sent things to Medi

24  Trade you were sending it to Shereen Zidan?

25  A.  I don't know if I put the correlation together at the time.

1    Q.  You're not sure that the person that was listed as Shereen

2    Zidan is the same person as you were writing this email to?

3    A.  Well, I didn't know if she was Medi Trade or HH.  I was

4    asked to send an email to those email addresses and tell

5    Shereen --

6    Q.  And you were asked to tell Shereen what?

7    A.  That the DHL was sent out and how many certificates were in

8    that DHL package.

9    Q.  Would you send out DHL certificates in your job?

10   A.  Either myself or one of the other staff members.

11   Q.  And were those IS EG Halal certificates?

12   A.  Correct.

13   Q.  And where would you send those IS EG Halal certificates by

14   DHL?

15   A.  To Egypt.

16   Q.  And to whom at Egypt would you send those IS EG Halal

17   certificates?

18   A.  I'm thinking to Shereen, like to attention Shereen.  If I

19   remember correctly, it was Shereen.

20   Q.  And was she somebody who was at Medi Trade?

21            MR. WEITZMAN:  Objection.  Asked and answered three

22   times.

23            THE COURT:  Yes, but there's more information now.

24   A.  I thought it was an IS EG office.

25   Q.  So when you were sending this, you thought it was to an IS

O5lWmen4                          Maali - Direct

1    EG office in Egypt?

2    A.   Correct.

3    Q.   Did you believe from talking with Mr. Hana that IS EG had

4    an office in Egypt?

5    A.   Yes.

6    Q.   Who did you believe worked at that office in Egypt?

7    A.   I didn't ask.

8    Q.   Did Mr. Hana ever tell you?

9    A.   I don't remember having the conversation with him.

10   Q.   Did Mr. Hana ever discuss knowing any Egyptian generals

11   with you?

12   A.   Not that I can recall.

13   Q.   Do you ever remember him talking about any generals at all?

14   A.   Not that I can recall.

15         MR. MARK:   All right.   We'll come back to that.

16   Q.   Now, here, you were sending certificates abroad to Egypt.

17   Did anyone ever have any problems with any of the certificates

18   that you sent to Egypt?

19   A.   I didn't remember, but when you sent -- when you showed me

20   the exhibit before --

21   Q.   You can answer.

22   A.   I'm -- I didn't remember of any issues, and then when we

23   had conversations previously, you showed me an email which

24   refreshed my memory.

25   Q.   OK.   Do you have a memory now that there were certain

1    issues with any certificates?

2    A.  Yeah, I remember the email you sent -- you showed me.

3              MR. MARK:  Let's take a look at Government Exhibit

4    C511.

5    Q.  Do you recognize this email?

6    A.  I do.

7    Q.  And who is this email from?

8    A.  That HHH, hhh360360@gmail.com.

9    Q.  Did you understand while working at IS EG Halal who was at

10   that email account hhh360360@gmail.com?

11   A.  I didn't.

12   Q.  Apart from this email, did you ever exchange emails with

13   that account on other occasions?

14   A.  Yeah.  We just saw them.

15   Q.  So that's a yes?

16   A.  Yes.

17   Q.  OK.  And did you ever ask Mr. Hana who HHH HHH is here?

18   A.  No, I didn't.  I don't remember having a conversation

19   with -- he would tell me who to cc or send an email to.

20   Q.  And what did this email --

21             MR. MARK:  We can zoom out, Mr. Hamill.

22   Q.  What did this email generally concern?

23   A.  What did this email generally concern?

24   Q.  Yeah.

25   A.  It's notifying them that we've sent replacement

1    certificates for ones that were done incorrectly and needed to

2    be amended.

3    Q.  And what was done incorrectly here?

4    A.  I don't -- I don't remember what was done incorrectly on

5    them.

6    Q.  Was it there was just some numbers that were transposed on

7    these certificates?

8    A.  Could have been a number of discrepancies.

9    Q.  Discrepancies on the paperwork that was being sent?

10   A.  Yes.

11           MR. MARK:  Now, Mr. Hamill, could you publish what's

12   already in evidence as Government Exhibit C513.

13   Q.  What's the date of this email?

14   A.  July 15, 2019.

15   Q.  And is this email from you?

16   A.  It is.

17   Q.  And what did this email concern?

18   A.  It's an email to Shereen, telling her that I spoke to

19   Mr. Hana.  He wanted to -- he wanted to release the four halal

20   certificates for a certain company and that Mr. Hana will speak

21   to Mr. Hesham to resolve any issues.

22   Q.  And you see the company's referred to as MF for Import

23   Export Company.  Was that a company exporting beef from the

24   U.S. to Egypt?

25   A.  I'm sorry.  Repeat your question?

1    Q.  Sure.  Do you see it says MF for Import Export Company?

2    A.  Oh, yes.

3    Q.  Was that a company that was exporting beef from the U.S. to

4    Egypt?

5    A.  Yeah.

6    Q.  And do you see at the bottom of the email where it says

7    from meditrade@iseghalal.com; do you see that that says that

8    the email's signed "thank you and best regards, Shereen Zidan"?

9    A.  Where do you see from Medi Trade?

10   Q.  Do you see --

11   A.  Oh, yes.  The email, yes.

12   Q.  OK.  Do you see that?

13   A.  Uh-huh.

14   Q.  All right.

15       And you wrote in this email to Medi Trade, right --

16   A.  Uh-huh.

17   Q.  -- and to Will and with the cc's of those two, one to HHHH

18   and one to HHH HHH, that Mr. Hana says he'll speak to

19   Mr. Hesham and resolve any issues.  Do you see that?

20   A.  Uh-huh.

21   Q.  Who is Mr. Hesham?

22           THE COURT:  You have to say yes or no.

23           THE WITNESS:  Oh, I'm sorry.

24   BY MR. MARK:

25   Q.  Yeah, I know.  I think you just said uh-huh, but was that

1    yes?

2    A.   Yes.

3    Q.   And who is Mr. Hesham?

4    A.   I don't know.

5    Q.   You didn't understand what his position was?

6    A.   I don't.

7    Q.   And why did you write that?

8    A.   Because I'm sure I was asked to by Mr. Hana.

9            MR. MARK:  Your Honor, I know it's 4:55.  I was about

10   to turn to a different topic.  I could continue for five

11   minutes.

12           THE COURT:  Do so.  Five minutes.

13           MR. MARK:  Will do.

14   Q.   Ms. Maali, are you familiar with a person named Nadine

15   Menendez?

16   A.   I am.

17   Q.   How are you familiar with her?

18   A.   She's married to Senator Bob Menendez.

19   Q.   When did you first meet Nadine?

20   A.   The same night I met Will Hana.

21   Q.   That's at the fund-raiser at Le Jardin that Mr. Daibes

22   hosted?

23   A.   Correct.

24   Q.   And did you understand that Nadine was in a relationship

25   with anyone at that time?

1    A.  Not -- I don't believe so.

2    Q.  When did you learn that she was in a relationship with

3    Mr. Menendez?

4    A.  Sometime early 2019, maybe.

5    Q.  And how did you learn that?

6    A.  We had another dinner, but I don't think it was a

7    fund-raiser that night.  I think we just had another dinner.

8    Q.  And who was at that dinner?

9    A.  I can't remember.  I know Fred was there, myself, the

10   senator, Nadine, but I can't remember who else was there.

11   Q.  Do you think it was just the four of you?

12   A.  No.  There was other people there.  I remember the table

13   being a large table, and I just can't remember who was there.

14   Q.  Do you recall, was that at a restaurant?

15   A.  Yes.

16   Q.  What restaurant?

17   A.  It was at Le Jardin.

18   Q.  So this was a dinner with Mr. Daibes and Mr. Menendez;

19   approximately how many times have you dined with both of them?

20   A.  About, maybe about a handful of times.

21   Q.  Sorry.  Maybe about a handful of times you said?

22   A.  Uh-huh.

23            THE COURT:  You have to say yes or no.  You said

24   uh-huh.

25            THE WITNESS:  Oh.  Sorry.

O51Wmen4                         Maali - Direct

1    BY MR. MARK:

2    Q.  Approximately how many times do you think you've met

3    Mr. Menendez?

4    A.  Several.

5    Q.  And from the times that you've met Mr. Menendez, have you

6    observed Mr. Daibes's relationship with Mr. Menendez?

7    A.  I have.

8    Q.  What was it like?

9    A.  They're friends, and from what I've heard from the both of

10   them, they've been friends for well over 30 years.

11            MR. MARK:  Now, Mr. Hamill, could you please show for

12   the witness only what's been marked for identification as

13   Government Exhibit 3D-2.  And the parties.

14   Q.  Ms. Maali, do you recognize your email address in this

15   email?

16   A.  I do.

17   Q.  And do you recognize Fred Daibes's email address in this

18   email?

19   A.  I do.

20   Q.  And did Fred Daibes ever email you documents to ask you to

21   print them out?

22   A.  He has.

23   Q.  And when he would email you documents to print them out,

24   would you do as he requested?

25   A.  Of course.

1          MR. MARK:  The government offers Government Exhibit

2     3D-2 into evidence.

3          THE COURT:  Admitted, without --

4          MR. WEITZMAN:  Objection, your Honor.  Sorry.

5     Objection.

6          THE COURT:  Basis.

7          MR. WEITZMAN:  Relevance.

8          THE COURT:  I'll take it subject to connection.

9          (Government Exhibit 3D-2 received in evidence)

10         MR. MARK:  May we publish?

11         THE COURT:  Yes.

12         MR. MARK:  Mr. Hamill, could you please publish this.

13    Q.  Ms. Maali, here, was this an email that Mr. Daibes sent to

14    you so you could print it out?

15    A.  Correct.

16    Q.  All right.  And do you see that it's a forward of another

17    email?

18    A.  Yes.

19    Q.  And do you see it's a forward of an email from Robert

20    Menendez to Fred Daibes?

21    A.  It is.

22    Q.  And do you see that Mr. Menendez's email account is listed

23    as bobmenendez54@gmail.com?

24    A.  Correct.

25    Q.  And do you see that there's an attachment to this email?

O5lWmen4                         Maali - Direct

1   A.  There is.

2             MR. MARK:  Mr. Hamill, could we go to the attachment.

3   Q.  And do you see that this attachment lists a short title

4   that says, "This act may be cited as the Eastern Mediterranean

5   Security and Energy Partnership Act of 2019"?

6   A.  Yes.

7   Q.  In connection with -- did you have yourself a familiarity

8   with this particular bill?

9   A.  Nope.

10  Q.  Do you know what this bill concerns?

11  A.  I do not.

12  Q.  And this is titled the Eastern Mediterranean Security and

13  Energy Partnership Act.  Was Egypt on the eastern Mediterranean

14  Sea?

15  A.  Could be.  Sorry.  I've been out of school for so long.

16  Show me a map.

17            MR. WEITZMAN:  Objection.  This bill has nothing to do

18  with Egypt, your Honor.  It's entirely misleading.

19            THE COURT:  Just a moment.

20            That was her response.  So far my ruling is the same.

21  I agree that school has nothing to do with it.  That's not your

22  issue.

23            Proceed.

24  BY MR. MARK:

25  Q.  Now, when you worked at IS EG Halal, did you ever write any

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O5lWmen4                              Maali - Direct

1    checks for the company?

2    A.   Yes.

3    Q.   What sort of checks did you write?

4    A.   Several.  I was, like, the accounts payable.

5    Q.   Were you a signatory on the bank account for IS EG Halal?

6    A.   I was.

7    Q.   When you wrote checks, were you instructed to write them?

8    A.   I wasn't able to write any checks without the blessing of

9    Will.

10   Q.   Did you ever write any checks that were for the benefit of

11   Nadine?

12   A.   Nadine herself?  No.  But a business that Nadine was part

13   of.

14   Q.   And what business that Nadine was part of did you write

15   checks to?

16   A.   It's a consulting company, Strategic -- I don't remember.

17   Strategic business something.

18   Q.   Does it sound like Strategic International Business

19   Consultants?

20   A.   Yup.

21        MR. MARK:  The government now is just going to read a

22   portion of the stipulation between the parties, which is --

23   this is from Government Exhibit 1405.

24        THE COURT:  After you read that, is it a logical time

25   to break?

O5lWmen4

1          MR. MARK:  It will be a very logical time to break.

2          THE COURT:  All right.

3          MR. MARK:  "The documents marked for identification as

4     the following government exhibits consist of true and correct

5     copies of account information, statements and other bank

6     records from the following financial institutions; that

7     includes Government Exhibits 5A1001 to 5A1901."

8          And if I just -- I'm going to break right there and

9     make sure that we hit the 5 o'clock hour.

10          THE COURT:  All right.

11          Ladies and gentlemen, you're going to be excused for

12     the weekend.  We'll see you at 9:30 on Monday --

13          JUROR:  Tuesday.

14          THE COURT:  Pardon me?

15          Tuesday.  9:30 on Tuesday.  So there is no court on

16     Wednesday, Thursday, Friday or the following Monday, which is a

17     legal holiday.  I'll see you on Tuesday at 9:30.

18          Enjoy the weekend.  Keep an open mind.  Don't listen

19     to any news.  Don't talk to anyone about this, and don't all

20     get into one elevator.

21          (Continued on next page)

22

23

24

25

O5lWmen4

```
 1              (Jury not present)
 2              THE COURT:  Please be seated.
 3              You may step down and, if you would, step out.
 4              (Witness not present)
 5              MR. WEITZMAN:  Your Honor, on that last exhibit --
 6              THE COURT:  Yes, I wanted to hear.
 7              What's the relevance?  Mr. Mark, what's the relevance?
 8              MR. MARK:  Mr. Monteleoni can address that, your
 9    Honor.
10              MR. MONTELEONI:  I can address that, your Honor.
11              First of all, I should say this is another instance
12    that's happened today from them objecting to exhibits we
13    disclosed to them in advance, which makes us question why we're
14    doing this.
15              THE COURT:  I certainly have a question on the
16    discussion in light of that, the discussion we're going to have
17    about the summary chart.  But go ahead.
18              That's for both parties, actually.
19              MR. MONTELEONI:  Yes, your Honor.
20              So, on the merits of this, this is a draft bill that
21    concerns Egypt.  It's about a --
22              THE COURT:  It doesn't have anything on its face with
23    Egypt.
24              MR. MONTELEONI:  Well, actually, if you look at
25    paragraph 8, it talks about a recent oil discovery in the
```

O5lWmen4

1    waters right outside of Egypt in the eastern Mediterranean.

2    This concerns the establishment of a forum for energy policy

3    that Egypt was quite interested in.

4            The other evidence is going to establish that Daibes,

5    after receiving this from Menendez, forwarded it to Hana who

6    himself, I believe, forwarded it along.  So this is very much

7    part of the conduct.  And we just don't think it's really

8    productive for defense to get the exhibits that we've been

9    disclosing to them in good faith in advance and then make these

10   one-off objections right now in front of witnesses who don't

11   necessarily know all of the connections for the documents that

12   they may have handled.

13           THE COURT:  In other words, what you're saying is you

14   want to hear what the objection is in advance.

15           MR. MONTELEONI:  Yes.  We believed that this was the

16   agreement that we had, that that was why we were doing these

17   disclosures, which we've been doing and they have, frankly,

18   not.

19           MR. WEITZMAN:  First of all, we have been doing

20   disclosures.  We've been providing them with what they call

21   nonimpeachment exhibits (inaudible) --

22           THE COURT:  You think you've largely what?

23           MR. WEITZMAN:  Moved in impeachment exhibits.  That's

24   what we've been doing.  So we are not obligated to turn over

25   impeachment exhibits, not in this case and not in any case I've

O5lWmen4

```
 1   ever tried.
 2              THE COURT:  The agreement was for nonimpeachment,
 3   whatever that is.
 4              MR. WEITZMAN:  Right.  Whatever that is.
 5              THE COURT:  No.  Do you agree with that?  The
 6   agreement was for nonimpeachment.
 7              MR. WEITZMAN:  Correct.
 8              THE COURT:  In your view, have you been doing that?
 9              MR. WEITZMAN:  We have, your Honor.
10              THE COURT:  All right.  Go ahead.
11              MR. WEITZMAN:  The agreement did not identify a time
12   frame or anything with respect to --
13              THE COURT:  Please.  If in good faith they're
14   providing exhibits to you, it seems to me you should let them
15   know in advance whether or not there's going to be an
16   objection.  We're not talking about your having to disclose
17   documents that you wish to use on cross-examination for
18   impeachment.  You're quite correct.  I'm not aware, absent an
19   agreement of the parties, for that type of document to be
20   disclosed.  But I do expect there's some measure of cooperation
21   here.
22              MR. WEITZMAN:  Yes, your Honor.
23              I will say --
24              THE COURT:  In other words, if they've given you the
25   document, let them know if you have an objection so they can
```

O5lWmen4

1    try to work around it or withdraw it or be prepared for the

2    objection.

3            MR. WEITZMAN:  We will do our best, your Honor.

4            I will say we have not objected to most of their

5    documents.  They've been coming in.

6            THE COURT:  I don't think that's the issue, sir.  The

7    issue is not whether or not you have not been objecting to most

8    of the documents.

9            MR. WEITZMAN:  No, but I mean we did receive this

10   document.  I had no clue that they were going to offer it and

11   what it was going to be.  Honestly, your Honor, I saw this, and

12   it's a statute.  I don't think it deals with Egypt.  Frankly,

13   notwithstanding the findings, which is off the coast of Egypt.

14   When you look at the rest of the statute, it talks about

15   cooperation between --

16           THE COURT:  Now, sir, you know it deals with Egypt.  I

17   remember looking at this document, actually.  I take it it's an

18   issue on the chart, although I'm not sure.  And on its face I

19   didn't see the word Egypt.  But now you know what the relevance

20   is, and if you had spoken, if you said you had an objection

21   because you didn't understand what it was and you don't see any

22   relevance, they could have explained that.  You could have then

23   reached an agreement or at least presented it to me in a timely

24   fashion, presumably outside of the hearing of the jury.

25           MR. WEITZMAN:  I do understand that, your Honor, and

O5lWmen4

1    we will endeavor to do our best.

2              THE COURT:  All right.

3              MR. WEITZMAN:  That said, with this exhibit, I don't

4    think it concerns Egypt.  It's about a natural gas finding off

5    the coast of Egypt, in Cyprus, and it's about cooperation

6    between countries other than Egypt.

7              THE COURT:  Mr. Monteleoni, direct me to the part that

8    you say concerns Egypt.

9              MR. MONTELEONI:  Well, so, paragraph 8, in the

10   findings, references the discovery of the gas.  The

11   establishment of the forum is one that was, I think,

12   principally intended to be for negotiation between other

13   countries, but this involved -- I believe Egypt was mediating

14   at this forum and hosting it.

15             THE COURT:  Egypt was what?  Mediating?

16             MR. MONTELEONI:  They were hosting the forum at which

17   other countries were negotiating their own interests.  They

18   were sort of facilitating.

19             We have, we've marked other documents regarding this

20   forum, and we also know that Hana forwarded it to an Egyptian

21   government official after receiving it.

22             THE COURT:  What can you show me in this document that

23   refers, *in haec verba* or tangentially, in some way to Egypt so

24   that I would know it's relevant to this dispute?

25             MR. MONTELEONI:  Well, so, again, I think that

O5lWmen4

```
 1   paragraph 8 of the findings section --
 2           THE COURT:  Wait.  I see limitation on transfers.
 3   Findings is something else.
 4           MR. MONTELEONI:  I believe --
 5           THE COURT:  Findings.  I see.  Just let me read it.
 6           Yes, "the recent discovery of what may be the region's
 7   largest natural gas field off the Egyptian coast...could
 8   represent a significant and positive development for the
 9   eastern Mediterranean and the Middle East."  So I do see the
10   relevance.
11           MR. MONTELEONI:  Geographically, this is -- you know,
12   even if the actual claimants to the energy issues are other
13   countries, this is negotiations between --
14           THE COURT:  Stop.  I see the relevance, sir.
15           MR. MONTELEONI:  Oh, sorry.
16           THE COURT:  Mr. Weitzman.
17           MR. WEITZMAN:  Your Honor, respectfully, I don't.
18           THE COURT:  All right.
19           MR. WEITZMAN:  I understand what you're saying, but
20   when you look at the statement of policy and what's actually
21   implemented, which is section 4, cooperation, and the like,
22   it's all about cooperation between Israel, Cyprus and Greece,
23   and this is a bit misleading, in my view.
24           THE COURT:  I'm accepting it.  The objection to it is
25   overruled.
```

O5lWmen4

1          We have a continuing reason why the parties need to

2     start cooperating.  We're in the second week of this trial.

3     It's going to be torturously long if the parties can't seem to

4     find a *modus vivendi*.

5          I'm going to take a break.  Come back in, let's say,

6     10, 15 minutes.  Everyone can take a break, and then we'll deal

7     with that chart, and somebody can tell me why I received papers

8     on that chart Sunday afternoon and at 1 a.m. Monday morning,

9     when the chart apparently had been given to the defense three

10    weeks earlier.  It's just another example of noncooperation

11    here.

12         Then you can also tell me why the defense submission

13    seems to suggest that there are just a couple of areas of

14    dispute, and the government's submission has, I don't know, 50,

15    60, 70, 100 specific issues, documents.  And the parties can

16    tell me whether they genuinely intend that I go over, let's

17    call it 100-plus exhibits for rulings.  I'll listen to whatever

18    defendants want to tell me.

19         The format of the summary chart seems to me quite

20    appropriate, and there is nothing unusual about it.  The items

21    are certainly voluminous, and it seems to me, under 1006, that

22    the chart can be admitted.  But that doesn't go to each of the

23    items.  I'm very reluctant to go over, as I say, what could be

24    100-plus exhibits.  But they seem to fit into various

25    categories, so I would think the parties, again, with some

O5lWmen4

1    cooperation, could give me the reduction of those disputes.

2              Take 15 minutes.  Think about what I'm saying.  Talk

3    to each other.

4              Also, the defendants have a point in their submission

5    that there are errors.  Well, if they're simple errors, take

6    care of them.  I don't need to be involved if there's a wrong

7    number on a document or a wrong letter or something like that.

8              15 minutes.  I'll also want the government's estimate

9    as to where it is in the trial, if we're ahead of schedule,

10   behind schedule.

11             (Recess)

12             THE COURT:  Please be seated.

13             MR de CASTRO:  Your Honor, I just have one issue

14   that's not related to this -- and I know this might be

15   lengthy -- that if I could raise now I think it might be

16   easier, or after.  It's up to you.

17             THE COURT:  What do you want?

18             MR de CASTRO:  So, in Ms. Maali's testimony, she

19   testified regarding Mr. Daibes's -- where he currently lives

20   and, if you recall, where he stores his, where he stores cash

21   and gold.

22             THE COURT:  Yes.

23             MR de CASTRO:  I think the government intended to

24   elicit it and the question actually comes out up to 2023, but

25   the witness's answer gives us concern for Mr. Daibes.

O51Wmen4

```
 1              THE COURT:  I understand that.  What would you like me

 2    to do?

 3              MR de CASTRO:  I would ask that you either seal or

 4    redact the portion of this transcript that relates to his exact

 5    residence currently at The Alexander and where he kept, that he

 6    kept --

 7              THE COURT:  I think that he lives there may have come

 8    out in the examination of the young lawyer who worked for him.

 9    I'm not sure.

10              MR de CASTRO:  He did not say that.  He didn't

11    identify -- I don't believe he did, but he certainly did not

12    identify the apartment.

13              THE COURT:  What do you want me to seal or redact,

14    redact as needed?

15              MR de CASTRO:  Right.  I don't have actual page

16    numbers right now, but I can look at the real time, which would

17    be page 196 or '7 of the real time.  196, it starts at --

18              THE COURT:  Sir, pull it up, what you want redacted.

19    I don't think there will be any objection.  I was a little

20    concerned when I heard that myself.

21              MR de CASTRO:  Question 22 is where does Mr. Daibes

22    lives -- I'm sorry.  Line 22, question is where does Mr. Daibes

23    live?

24              THE COURT:  Is there any objection to my redacting

25    that from the published record?
```

1          MR. RICHENTHAL:  We're sensitive to this concern, your

2     Honor.  I'm not aware of a policy one way or another on this,

3     but it's certainly something that I think should be protected.

4     I said that to Mr. de Castro when he raised the concern a

5     moment ago.

6          THE COURT:  Mr. Weitzman.

7          MR. WEITZMAN:  No objection, your Honor.

8          MR. LUSTBERG:  No objection, Judge.

9          THE COURT:  All right.

10         Go ahead.

11         MR de CASTRO:  Line 22 is where did Mr. Daibes live?

12     He lives at The Alexander.

13         THE COURT:  Don't put it on the record again.  I will

14     strike where he lives, redact that in the public record.

15         What else?

16         MR de CASTRO:  That's line 23.  And then line 24 is

17     where in the building, and line 25 is the answer to that.

18         THE COURT:  Yes.  I will strike where in the building,

19     not strike, redact where in the building he lives.

20         MR de CASTRO:  Then on page 197 of the real time

21     transcript, line 1 is where in that apartment the gold --

22         THE COURT:  All right.  I will strike the answer to

23     that -- again, redact.  I'll redact the answer to that.

24         Go ahead.

25         MR de CASTRO:  And the next line, four, question 4 is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O5lWmen4

```
 1    same question but cash.
 2              THE COURT:  Same.  Redact where.
 3              MR de CASTRO:  And the next two lines as well talk
 4    about how much cash.
 5              THE COURT:  Yes.  Redact that.
 6              MR de CASTRO:  That's it.
 7              THE COURT:  All right.  Thank you.
 8              Everyone has agreed upon that.
 9              All right.  Where do we stand here, gentlemen?  I have
10    document 406, which is the letter from Mr. Fee and Mr. Weitzman
11    saying basically there are just a few issues here.  Then I have
12    document 409 with its exhibits with, I don't know exactly, but
13    as I say, 100 or something like that of specific exhibits that
14    the parties want rulings on.
15              Let me hear first from Mr. Weitzman.
16              MR. WEITZMAN:  Yes, your Honor.
17              THE COURT:  It's a little hard for me to see,
18    understand what you're objecting to here.  The format of GX1302
19    seems -- actually, the three right-hand columns of GX1032 have
20    the purported positions of the parties.  That's not on the
21    summary chart.  The summary chart is all the columns to the
22    left.
23              MR. WEITZMAN:  Correct, your Honor.
24              THE COURT:  Seems to me the format is quite
25    appropriate.
```

O5lWmen4

1           MR. WEITZMAN:  That's fine, your Honor.  And we've

2     done our best to narrow the disputes.

3           I think in the first instance what we would request is

4     a ruling from your Honor as to four categories of speech and

5     debate violations that we've identified.  Each category has a

6     number of documents, but we can go through the categories real

7     quickly.

8           THE COURT:  Where are you in your letter?

9           MR. WEITZMAN:  The letter doesn't identify the

10    documents.  I'm working off the exhibit that the government

11    submitted or version of that exhibit, 1302, but if you have the

12    summary chart in front of you, I can walk you through which

13    numbered items on the summary chart.

14          THE COURT:  All right.

15          MR. WEITZMAN:  So the first category is documents

16    starting with 83, 107 and 108 -- sorry, line items 83, 107 and

17    108.  And these line items concern an article that indicates

18    that Senator Patrick Leahy is holding up to $300 million in

19    U.S. military aid to Egypt until Cairo helps pay for an injured

20    American tourist's medical bills.

21          It is our view that that article identifies a specific

22    position of a legislator, in violation of the legislator's

23    speech and debate rights, which we can assert because a

24    legislator has not waived those speech and debate rights.

25          MR. MONTELEONI:  Your Honor, former Senator Leahy is

O5lWmen4

 1    the only one with standing to make this objection.  No

 2    objections have been lodged, and to be clear, the relevance of

 3    these portions of it is that this is language that Senator

 4    Menendez lifts from this article and copies into an email along

 5    with some other language that he lifts from a memo that his

 6    staff prepares for him and sends that through Nadine, through

 7    Wael Hana, to Egypt.  He is taking information and briefing

 8    Egypt on it.  The provision of information to Egypt is squarely

 9    not protected under the ruling that the Court issued in a

10    public decision, and he can't simply cloak himself in Senator

11    Leahy's unasserted immunity because the information that he

12    stole was public reporting on Senator Leahy's acts.

13            THE COURT:  As I understand the cases, because the

14    speech and debate clause indeed is designed to protect the

15    legislation -- no, that's wrong, the legislators in regard to

16    core legislative acts, there are cases where the names of other

17    senators are redacted.  I'm going to do that now.  You can do

18    whatever you like, say another senator, but not Senator

19    Menendez.  But we can't invoke Senator Leahy.  That's my

20    ruling.

21            Go ahead.

22            MR. MONTELEONI:  Your Honor, may I ask for one

23    implementing modification?

24            There are references that the defendants make in

25    texting about what that senator's position is in other matters

O5lWmen4

1     that refer to him.  Can we use a pseudonym as part of the

2     redaction so that they can tell that this relates to the same

3     concerns that Menendez --

4          THE COURT:  Fine with me.  We can't use Senator

5     Leahy's name.  Again, work it out.  I don't care whether it's a

6     pseudonym or you say not Senator Menendez.

7          MR. WEITZMAN:  The second category can be found in

8     lines 186, 189 and 190.  And specifically, your Honor, this is,

9     again, a reference to Senator Leahy's, a letter involving

10    Senator Leahy's hold on $300 million.  So it's very similar.

11    It's just a letter rather than --

12         THE COURT:  All right.  Same ruling.

13         Next.

14         MR. WEITZMAN:  Lines 1030, 1031.  There are a couple

15    others, but they all pertain to the same issue.

16         Line 1030 is --

17         THE COURT:  Just let me get it.

18         MR. WEITZMAN:  Yes.

19         THE COURT:  Yes.

20         MR. WEITZMAN:  So the series of line items that we're

21    concerned about --

22         THE COURT:  The first one says "Director, office of

23    Egyptian affairs to State Department Kathryn Kiser, told our

24    DCM today Senator Menendez put a hold, an hold on a billion

25    dollars of U.S. aid to Egypt before the recess."

O5lWmen4

1          MR. WEITZMAN:  Correct, your Honor.

2          THE COURT:  Why isn't that exactly core legislative

3    acts?

4          MR. MONTELEONI:  So, your Honor, this language that

5    you quoted was also in paragraph 35 of the indictment that the

6    Court found did not, in fact, allege any legislative acts,

7    because this is not any proof of what the act was at all, and

8    that's what's required.  In fact --

9          THE COURT:  Just let me look at 35.  My ruling was not

10   a ruling on the admissibility of a particular document.  Let me

11   look at 35.  It was sustaining the allegations, the charges in

12   the indictment.

13         Just a moment.

14         I'm not going to admit a document that has a core

15   legislative act of the defendant in it.

16         MR. MONTELEONI:  Your Honor, may I be heard on this?

17         THE COURT:  Yes.

18         MR. MONTELEONI:  This is actually critical.

19         This is incorrect information that the Egyptian

20   government had that they thought was going on.  What we know

21   from the *Brewster* case, one of the seminal cases that governs

22   this area, is that the evidence of the act itself cannot be

23   introduced, but people's understandings of what those acts are

24   absolutely can be.  And that applies prospectively, as in the

25   tank ammunition text that we were talking about yesterday, as

O51Wmen4

1    in the case of many of the counts in the *Brewster* case.  But it

2    also applies retrospectively.

3              One of the counts in the *Brewster* case of the Supreme

4    Court was a gratuity count, and it involved a charge of illegal

5    payments in exchange as an illegal gratuity for past federal

6    legislative acts by the member of Congress, and the Supreme

7    Court said that's all right because you don't have to prove the

8    acts themselves.  You prove the understandings on which the

9    payments were given and accepted.  And so that applies

10   prospectively and retrospectively.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5L3MEN5

1              THE COURT:  Show me in *Brewster* where you are.

2              MR. MONTELEONI:  That's on 408 U.S. pages 526-527 I

3     believe --

4              THE COURT:  Just a moment.  What pages?

5              MR. MONTELEONI:  526 and 527.

6              THE COURT:  "There is no need for the government to

7     show that appellee fulfilled the alleged illegal bargain;

8     acceptance of the bribe is the violation of the statute."

9     That's clear.  I've said that.  Taking a bribe is no part of

10    the legislative process.

11             I just don't see that where are you pointing me.

12             MR. MONTELEONI:  The Section 201(g) count where that's

13    the old gratuity statute, and they talk about how even though

14    the act was performed, it doesn't matter.  Because if the

15    offense -- the offense relates to the acceptance of anything of

16    value because of any official act performed or to be performed.

17    So it is not just prospective.  They say although the

18    indictment alleges that the bribe was given for an act that was

19    actually performed, it is once again unnecessary to inquire

20    into the act or its motivation.  To sustain a conviction --

21             THE COURT:  Just a moment.  On bribery, you don't have

22    to ask about the act.  The question is whether money was

23    accepted in exchange for doing the act.

24             MR. MONTELEONI:  Exactly, but that requires the

25    understandings of the bribe payer and the bribe recipient.  You

O5L3MEN5

| | |
|---|---|
| 1 | see the next sentence, money that the donor was paying him in |
| 2 | compensation for an official act. |
| 3 | THE COURT:  Just a moment.  That's the requirement of |
| 4 | contemporaneous News knowledge of both parties. |
| 5 | MR. MONTELEONI:  So, and this I think is even clearer |
| 6 | in a Third Circuit case the *McDade* case that cites this precise |
| 7 | language.  And I can provide with you the citation to the |
| 8 | *McDade* case.  28 F.3d 283, 293 of that case. |
| 9 | THE COURT:  Yes. |
| 10 | MR. MONTELEONI:  Citing this precise portion of |
| 11 | *Brewster*. |
| 12 | THE COURT:  What you are showing me in *Brewster* |
| 13 | doesn't address what we're dealing with here. |
| 14 | MR. MONTELEONI:  I think it does because in *Brewster* |
| 15 | that was a grant of certiorari from the district court's grant |
| 16 | of a motion to dismiss.  There was no evidence.  They were |
| 17 | talking about what the allegations were.  But in order to prove |
| 18 | the understandings, right, that this was -- |
| 19 | THE COURT:  You're talking about the contemporaneous |
| 20 | knowledge of the actors. |
| 21 | MR. MONTELEONI:  Yes.  The contemporaneous |
| 22 | understandings of the actors.  So in order to prove that, they |
| 23 | hadn't gotten to that stage in *Brewster* by the time it got to |
| 24 | the Supreme Court, but to prove that, the government would have |
| 25 | had to prove there was some understanding between the bribe |

O5L3MEN5

1    payer and the recipient about an official act, which is the

2    legislative act.  So, talking about the understandings but not

3    the act itself, *Brewster* must have allowed, or else it would

4    have had to dismiss the case.  But that's even clearer in

5    *McDade*.  *McDade* says --

6              THE COURT:  Don't go to *McDade*.  This is being

7    forwarded to Hana and it says the Director of the Office of

8    Egyptian Affairs and the United States State Department told --

9    who is RDCM?

10             MR. MONTELEONI:  The deputy chief of mission in Egypt.

11             THE COURT:  Told RDCM that Menendez put a hold.  Go

12   ahead.  So somebody believes Menendez put a hold.

13             MR. MONTELEONI:  Exactly.  There is an understanding,

14   that understanding is passed to Hana who then the chart says

15   attempts to contact Nadine, fails to do so.  Contacts Daibes,

16   passes this information to Daibes.  Then within a matter of

17   minutes, Daibes contacts Menendez, has a brief phone call with

18   Menendez.  Then Daibes gets back to Hana in a call.

19             THE COURT:  Just a moment.

20             MR. MONTELEONI:  Sorry.

21             THE COURT:  Okay.

22             MR. MONTELEONI:  We got those two defendants are

23   learning this understanding that there is some action

24   happening, no evidence that this is correct, and in fact the

25   information isn't quite correct.  I can tell you what really

1    happened if you want.  This information isn't quite correct.

2    But they're getting an understanding of what's happening, then

3    they're checking with Menendez.  Then Daibes reports back to

4    Hana, and Hana reports back to Helmy at line 1043, a

5    representation from Menendez.  Not true, and he knows nothing

6    about it.  In other words, I'm not putting this hold on your

7    aid.

8            Everything that's happened, all of that evidence is

9    entirely consistent with no actual legislative act having been

10   taken, and in fact, unbeknownst to the people to most of these

11   communicants, no act had been taken.  I can tell what you

12   really happened if you want.  That's the proof that we would be

13   barred from introducing unless they waive.

14           MR. WEITZMAN:  Your Honor.

15           MR. MONTELEONI:  When you're ready, I can.

16           THE COURT:  No.

17           MR. WEITZMAN:  Yes, your Honor.  A few points.  The

18   first is, *Brewster* as Mr. Monteleoni said was a motion to

19   dismiss case in 1972.  The more appropriate case is *Helstoski*

20   from 1979 and the Supreme Court.  In that case the Supreme

21   Court made clear that all references, whether they're on the

22   floor, in e-mails, in text messages or news article, wherever

23   they may be, references to legislative activity are --

24           THE COURT:  *Helstoski* is broader.

25           MR. WEITZMAN:  Correct.  So --

O5L3MEN5

1          THE COURT:  Just a moment.  Let me find my *Helstoski*

2    quote.  I have *Helstoski* here.

3          MR. WEITZMAN:  I'm directing you to 489, the paragraph

4    that begins with "We therefore agree with the court of

5    appeals."

6          THE COURT:  Let me read it.  Again this is same basic

7    point that nobody's contesting it is the taking of the bribe,

8    not the performance.

9          MR. WEITZMAN:  That may be the case, but it says

10   revealing any information about a legislative act.

11         THE COURT:  Where is that language?

12         MR. WEITZMAN:  490.  Right at --

13         THE COURT:  I see it.  What else?

14         MR. WEITZMAN:  Your Honor, whether Mr. Menendez

15   actually placed a hold or not is not the point.  Because if you

16   can circumvent the speech or debate clause merely by saying the

17   opposite of what the legislator does --

18         THE COURT:  I need to give some protection here that a

19   legislator, in terms of core legislative acts, and as I've said

20   in this case, the core legislative act is clearly the hold or

21   releasing the hold.  I don't think it matters that there was

22   mistaken information here.

23         MR. MONTELEONI:  Your Honor, can I be heard on what

24   protection we understand the Court is according.

25         THE COURT:  I was just reading a case last night that

O5L3MEN5

said the import of the speech and debate clause indeed may be

to make it more difficult to subject a legislator to criminal

prosecution.  But the idea is to get the executive out of the

hair of the legislator in terms of core legislative acts.

         MR. MONTELEONI:  That's absolutely right.  And we are

out of their hair in the sense that what we can't put on,

unless there is a waiver, is that Senator Menendez, right after

receiving this inquiry, talked to Sarah Arkin, the staffer of

his who put on the hold, and told her to lift the hold.  That's

what happened.  That was his legislative act and we are

precluding from putting that forward, even though it would be

great evidence.  Obviously.

         What is now being asked is for a broad cloak over any

discussion, however mistaken, however removed from the actual

action.

         THE COURT:  It's not a broad cloak.  It says hold

Kaiser told RDCM that Senator Menendez put a hold.

         MR. MONTELEONI:  That's what someone in the Egyptian

government thought.  That's an understanding which was not

correct.  That was their belief.  It was not his act.  He had

not acted.  He is -- his just not having done anything is what

would be protected at the cost of some of the core most

critical evidence here.  And that's not consistent either with

*Brewster*, with *Helstoski*, which was applying *Brewster*, which

said it is also not consistent with the --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5L3MEN5

1          THE COURT:  Slow down.  Why isn't this evidence of a

2     legislative act?

3          MR. MONTELEONI:  There was no legislative act at this

4     time by Menendez.  There was a sort of an accidental Sarah

5     Arkin did this on her own authority.  There was no legislative

6     act by Menendez.  He is not being protected for anything.

7     There is actually just the beliefs of people who are passing

8     the information through to the bribe payers that there would be

9     a legislative act, which is exactly what *McDade* was talking

10    about.  It says the clause does not prohibit closely related

11    but nevertheless distinct showings such as that a member's

12    promise to perform a legislative act in the future or even that

13    a member was thought to have performed a legislative act in the

14    past, and was paid in exchange for, or because of it.

15          But you can't put on any proof of that, if you can't

16    put on any proof of people discussing legislative acts that

17    they thought that they took.  *McDade* expressly says if it's in

18    the realm of what other people think about what happened, that

19    can be the subject of proof, that's the corrupt agreement.  If

20    it's what actually happened, what we're forbidden from doing

21    about the Menendez's actual lifting of the hold, that is

22    forbidden under *Brewster*, under *Helstoski*, and *McDade*.  This is

23    the line that's consistent with the Court's ruling which is

24    another form of promise, this is a discussion and a promise

25    about what he is doing, it's also about what's he going to do.

O5L3MEN5

1          THE COURT:  It's not a promise.  It's a hold.

2          MR. MONTELEONI:  Sorry.  The other people thinking

3    that's he's done a hold is nothing for him.  That's just other

4    people.  What he is doing, what he's getting protection about,

5    is his actual act that has any actual significance.  That's

6    like the proof of the vote, the proof of the vote, the proof of

7    his conversation with Sarah Arkin where he says you got to lift

8    the hold.  Him telling Fred Daibes to tell Wael Hana to tell

9    the Egyptian government I'm not holding your money.  That's his

10   representation.  That's what he's conveying to the Egyptians.

11   That's what they were frantic about not getting their money's

12   worth, which is why they were contacting him in this way

13   through the halal certification guy they set up.  And that is

14   at the core of the Court's ruling that promising, representing

15   about a legislative act, that is the corrupt agreement that can

16   be prosecuted.

17         THE COURT:  Yes, I don't see that in this.

18         MR. MONTELEONI:  Sorry.  In the fact that the Egyptian

19   government thinks he's done --

20         THE COURT:  No, the representation he put a hold.

21         MR. MONTELEONI:  The representation from him is he

22   didn't put a hold.  The representation at line 1043 is not

23   true, and he doesn't know anything about it.  That is saying

24   I'm denying this report that I'm holding your money.  I don't

25   know anything about that.  And that is obviously a

O5L3MEN5

representation I'm not about to put a hold on your money

tomorrow.  That's a representation you are going to get your

money, which you haven't gotten yet, because it was tied up by

Sarah Arkin acting on her own authority.

MR. WEITZMAN:  If I may just be heard on this for a

second.  Because I think there is some confusion as to whether

there was or was not a hold.

To be clear, I think Mr. Monteleoni now concedes there

was a hold.  It was placed by Sarah Arkin who reports directly

on the SFRC staff to Senator Menendez.  We heard from Josh Paul

today that the staff take direction from senators who report to

them or work as their agents.  The fact that a staffer does

something like that is legislative activity.  No different than

if the senator did it.

So what happens is, the staffer places the hold, Egypt

learns of it, it's directly implicating the chairman's hold

because he's the one under whose authority she places that

hold.  They're questioning about it.  It gets back to the

senator.  According to the government's theory, he says I don't

know anything about it.  Then he says lift the hold.  All of

that implicates his legislative activity.  Whether it is the

staffer or him directly handling it, and the communication

calls into question his legislative activity in the fact that

his staffer, his chief person on Egypt placed the hold.

MR. MONTELEONI:  Everything that just happened would

O5L3MEN5

1   be exactly the same, and the jury has no way of distinguishing

2   that from a context in which there had been no hold in the

3   first place.  That Egypt got it entirely wrong.  You don't even

4   have to get into this agency thing.  It was just a mix up.

5   What *Brewster* says is the fact that the promise was actually

6   performed is irrelevant.  The fact that he did in fact pass the

7   bill doesn't matter, because you don't have to prove that and

8   we're not going to prove that.  We're not going to prove that

9   the hold actually happened.  We are going to prove the corrupt

10  exchange.

11          THE COURT:  *Brewster* says that.  It's in the context

12  of what's necessary for the prosecution there.  What was

13  necessary for the prosecution there was, again, the

14  contemporaneous understanding of the offer and the acceptance.

15  The act didn't have to take place.

16          MR. MONTELEONI:  Which the government would be unable

17  to prove without being able to prove people's discussions about

18  the legislative act.  There is no way that the prosecution team

19  in *Brewster* could put forward evidence of a corrupt agreement

20  to pay Brewster for a vote that he took on postage legislation

21  if all of their discussion about whether there had been postage

22  legislation that they were paying for was precluded.

23          THE COURT:  That may be.  Do you want to respond to

24  that?

25          MR. WEITZMAN:  I have no clue what the evidence was in

O5L3MEN5

*Brewster*.  None of us do because it was dismissed at the motion

to dismiss stage at the indictment.  Your motion to dismiss

didn't make evidentiary rulings.  We are here at the

evidentiary stage.  We now have --

THE COURT:  Did not make evidentiary?

MR. WEITZMAN:  In *Brewster* did not make evidentiary

rulings.  And your motion to dismiss did not make evidentiary

rulings.  That's what we're doing here.  And this, they

started -- they responded to the motion to dismiss with a

promise themselves that they were going to focus on the

promise.  That they were going to prove a promise.  They now

can't do it, and so they want to prove that there must have

been a promise.

THE COURT:  Let me turn to the government.  Is your

position the same -- turn to 1267 Bob had to sign off on this,

I'm sending you an article.

MR. MONTELEONI:  Yes, your Honor.  We actually gave

that some thought.  After conferring with the defense last

night, and one thing that I hadn't told you yet is we decided

to pare back, we don't feel like we have to, but we decided to

do it anyway, to pare back this discussion somewhat.  So that

the article itself is just not going to go into evidence.  The

only thing that would go into evidence is the link.  And not

even a description of what it is, but you can tell from the

link it has something to do with arms sales with respect to

1    Egypt.  Which we believe is evidence coupled with Nadine's text

2    of a promise, but is actually not even sufficient evidence to

3    prove any actual act.

4            So, the current version of the chart that you are

5    working off with the screenshot of the article, where the

6    little blurb describing the article right above, that's not

7    something that we're planning to put forward anymore.  We are

8    just planning to put forward a URL about the subject matter and

9    then Bob had to sign off.

10           THE COURT:  Moving target here.

11           MR. MONTELEONI:  I apologize for the rushed nature of

12   this.  This is not what we wanted.

13           THE COURT:  What are you telling me about this line

14   here 1263.  Now what's now at issue?

15           MR. MONTELEONI:  It will just read text.  Quote --

16           THE COURT:  What line are you talking about, sir?

17           MR. MONTELEONI:  Sorry.  1263 and 1264 would not have

18   the description of the article, they would just read text,

19   quote the URL, and that's it.  No inset picture, no explanatory

20   text.

21           THE COURT:  Would it say links to article titled Biden

22   Administration authorizes 2.5 billion in arms sales to Egypt?

23           MR. MONTELEONI:  No.  It would end, after the

24   quotation ends, it would end with index.HTML end quote and then

25   the citation.

O5L3MEN5

1    THE COURT:  What are you sending?  What's your

2    exhibit.

3    MR. MONTELEONI:  Well, the exhibit is the text message

4    which is just sending the link.  All they texted each other was

5    the link.  If they had texted a picture of the article, we

6    might redact the picture.

7    THE COURT:  I see.

8    MR. WEITZMAN:  Your Honor, it's utterly confusing to

9    the jury to do that with a site that says U.S. sales arms

10    Egypt.  It doesn't cure the problem because the next exchanges

11    have Nadine saying to Bob Menendez wow.  And then Nadine saying

12    to Will Hana, Bob had to sign off on this.  After the tutorial

13    we all received from Josh Paul, there's not going to be any

14    doubt in the jurors' mind as to what that means the chairman of

15    the SFRC to sign off on some form of arms sales to Egypt.

16    That's a retrospective statement as to what the senator did.

17    MR. MONTELEONI:  Your Honor, if I could add some facts

18    to this.  I think we do agree this would be good evidence there

19    was a promise about the arms sales, which is exactly what we

20    can do.  But actually the jury will have substantial doubt

21    about whether Menendez was keeping any of his promises for

22    future or past legislative actions, future or past actions.

23    There is going to be specific evidence that things that he

24    promised to the people who he was receiving bribes from that he

25    did not do.  That he made retrospective statements to them

O5L3MEN5

1    about what he did that were false in order to keep them happy,

2    in order to receive the bribes.  So, the jury's not going to

3    draw the inference because there is some link that's sent and

4    Nadine says that Bob did something that he necessarily did it.

5    But it is going to be very good proof that there was a promise.

6              MR. WEITZMAN:  Your Honor, if the allegation is that

7    Senator Menendez didn't fulfill a promise in some other scheme

8    and therefore the jury won't know what to interpret all of

9    this, I don't understand how that helps the speech and debate

10   issue.

11             The title very clearly says U.S. arms sales Egypt.

12   Bob had to sign off on this.  There couldn't be a more direct

13   link to his legislative activity than this series of exchanges

14   from 1063 to 1072.

15             MR. MONTELEONI:  It would be more direct if it

16   identified what the arms sale was or even that it had gotten to

17   the point where he had to sign off on it, as opposed to Nadine

18   potentially sending a link that related to the subject matter

19   and falsely promising that Bob had signed off on it.  That

20   would be a totally acceptable inference for the jury to draw.

21   And we know from *Brewster* and the other cases that if they're

22   making a promise and that promise happens to be true, it's not

23   a speech or debate violation as long as you don't prove the act

24   itself.  And here we are not introducing the e-mails in which

25   his staff clears on this.  We are not even introducing the news

O5L3MEN5

1    article.

2              THE COURT:  They have her statement Bob had to sign

3    off on this.

4              MR. MONTELEONI:  That's her promise and that's the

5    promise if we --

6              THE COURT:  No, that's past.

7              MR. MONTELEONI:  We know from *Brewster* it can be

8    retrospective.  It is a representation that he did it.  I also

9    think it is --

10             THE COURT:  It's a representation that he did it.

11             MR. MONTELEONI:  Which *Brewster* --

12             THE COURT:  That's core legislative act.

13             MR. MONTELEONI:  No.  Sorry.  The doing it, the

14   communicating doing it to the State Department is the

15   legislative act.  The representation to the bribe payer is

16   definitely not the legislative act.  That's what *Brewster* on

17   the gratuity count says*.  Brewster* on the gratuity count could

18   not have proceeded if there was no proof of what the bribe

19   payer thought what they were paying for and what Brewster was

20   manifesting back to them about what he was doing for that

21   money.  That is just, that's at the core.  That the bribe is

22   not a legislative act.  The corrupt agreement isn't.  And this

23   representation is that's the pro -- that's the corrupt conduct.

24   That's the criminal conduct.  The protected conduct we are just

25   saying nothing about.  And just like in *Brewster*, the fact it

O5L3MEN5

1   had in fact happened in the past does not matter because we

2   don't have to put evidence of it in and we are not putting

3   evidence of it in.

4           MR. WEITZMAN:  All bribery counts are retrospective.

5   They are all in the past.  The question is how you prove it and

6   what evidence you use.  And you can't use evidence of something

7   that occurs in the legislature to prove it.  You can only use

8   the promise.  Bob had to sign off on this is not a promise.  It

9   is a statement as to what Bob Menendez did.  In *Helstoski*, the

10  Court specifically said as to what -- page 490 as to what

11  restrictions --

12          THE COURT:  Just a moment.

13          MR. WEITZMAN:  Yes, your Honor.  As to what

14  restrictions the clause places on the admission of evidence our

15  concern is not what the specificity of the reference, instead

16  our concern is whether there is mention of a legislative act.

17  Here there is clearly mention of a legislative act.  They

18  cannot prove a promise so they're trying to prove it through

19  the backdoor by using speech and debate activity.

20          MR. MONTELEONI:  I think that's exactly wrong because

21  we are proving the promise.  This is the promise.  It is not

22  set forth in explicit terms, as very few criminal promises are.

23  But if this wasn't proof of a promise, it wouldn't even tend to

24  inculpate the senator.

25          MR. WEITZMAN:  It doesn't.

O5L3MEN5

1          MR. MONTELEONI:  I should say, if it was correct that

2     you couldn't make these representations, then not only was

3     *Brewster* wrong, but no gratuity count for a federal legislator

4     could survive and *Brewster*, the Supreme Court in a seminal case

5     explicitly held it could.  That has to require that you can

6     prove the promise about a legislative act.

7          What we're not proving is the act, and it's very clear

8     what we can use to prove the act.  We could use a communication

9     from his staff to the State Department, communication from him

10    to his staff, State Department records about what had happened.

11    That would be proof of the act.  That would show that happened.

12         THE COURT:  How is Bob had to sign off on this a

13    promise?

14         MR. MONTELEONI:  It is a representation in the past.

15    It is actually also prospective because this is a continuing

16    course of conduct, and I think the very clear implication is he

17    is going to keep ongoing, you keep the bribes flowing, and he

18    is going to keep giving you what you want on the military aid.

19    I think there is a number of these things that have both

20    retrospective and prospective components.

21         By saying promise I do mean to include the type of

22    representations that can found in a gratuity prosecution which

23    we know from the Supreme Court is perfectly permissible under

24    the speech or debate clause.

25         If we were to wipe away these let's say even

 
O5L3MEN5

non-forward looking, these backward looking representations,

here we think it is both.  If you wipe that away, you would

have to wipe away all gratuity prosecutions for federal

legislators and that would wipe away all gratuity prosecutions

for federal legislators, and it would also be inconsistent with

*Brewster*, a seminal Supreme Court decision that expressly

addressed this precise challenge to this precise statute.

            THE COURT:  Give me the *Brewster* language again.

            MR. MONTELEONI:  All right.  So it says another count.

            THE COURT:  Where are you?

            MR. MONTELEONI:  526-527.  Another count of the

indictment against appellee.

            THE COURT:  Just a moment.

            MR. MONTELEONI:  It is really 527.

            THE COURT:  Again, I see this as simply establishing

what nobody is contesting, that is, the bribe doesn't actually

have to have taken place.

            MR. MONTELEONI:  Sorry.  In the *Brewster* case the

bribe did take place.  The vote had happened.  Although the

indictment --

            THE COURT:  It is unnecessary to inquire into the act

or its motivation.

            MR. MONTELEONI:  Exactly.  That's just the

situation --

            THE COURT:  Although the indictment alleges that a

1   bribe was given for an act that was actually performed, the act

2   doesn't have to have been performed.

3        MR. MONTELEONI:  Exactly.  And the jury's not going to

4   hear that the act was performed.  But what does have to be

5   shown in the next couple sentences to sustain a conviction, it

6   is necessary to show the corrupt understandings.

7        THE COURT:  Just let me look at that.  That's simply

8   your point on contemporaneous knowledge.

9        MR. MONTELEONI:  Exactly.  They say evidence of the

10  members' knowledge of the alleged bribe payer's illicit reasons

11  for paying money is sufficient to carry the case to the jury.

12       THE COURT:  Let me look at it.  Yes, it seems to me it

13  is all the same simple, if not simplistic, point.

14       MR. MONTELEONI:  Right.  But we couldn't put in that

15  evidence, if any mention of the legislative act between the

16  bribe payer or between the bribe payer and the member was

17  precluded.

18       You couldn't prosecute Brewster if any time anyone

19  mentions postage rate legislation that was precluded.  The

20  whole point we have to prove that the bribe payer thought that

21  he was going to reward Brewster for postage rate legislation,

22  and Brewster agreed to accept the money in that way.  But if

23  there is no discussion of the postage rate legislation that's

24  possible, then the case could not proceed and the Supreme Court

25  should have dismissed it.

O5L3MEN5

```
1           THE COURT:  But I'm precluding any discussion of the
2      hold.  I'm precluding a statement that he put the hold on or
3      took the hold off.
4           MR. MONTELEONI:  But, your Honor, that's the
5      representation is exactly how you prove the knowledge of the
6      corrupt motive.  And again there is also a prospective
7      component.  Let's not forget, every time he is doing this and
8      saying what's he done in the past, in this continued set of
9      conduct, that obviously incentivizes the other side to believe
10      he is going to keep doing it, especially in a conspiracy count.
11      But especially here, in the case of this September FMF scare
12      they hadn't even gotten their money yet.  Egyptians were
13      waiting for their money.  So anything he's saying about this is
14      obviously going to be viewed in the light of what is this going
15      to mean for my money, and it is obviously a representation I am
16      not going to go tell my staff to hold this tomorrow.  You are
17      going to get your money.
18           So, there is, first of all, a forward looking
19      component to it.  But more broadly, this is the proof of the
20      contemporaneous understandings and beliefs between the bribe
21      payer and the bribe recipient which is at the core of the
22      corrupt exchange.  That's the gravamen of the corruption
23      offense, and if that was precluded, there could be no such
24      prosecution.
25           And we know from the Supreme Court that there can --
```

O5L3MEN5

1    and I should say this is very critical evidence in our case,

2    and to go beyond what the Supreme Court has done, what the

3    Third Circuit again has very explicitly said you actually can

4    totally prove this.

5            THE COURT:  In the case --

6            MR. MONTELEONI:  In the *McDade* case which then Judge

7    Alito, I think it is a well-respected, well-cited opinion,

8    applying *Brewster* from 1994.

9            THE COURT:  Just give me the cite.

10           MR. MONTELEONI:  I'll give it again.  28 F.3d 283, 293

11   (3d Cir. 1994).  And it's no surprise that it came after

12   *Helstoski* because it's consistent with *Helstoski*.  What we

13   can't put on, much though we would like to, is the evidence of

14   what he actually did.  But what he's saying about what he did,

15   what people are saying about what he did, who are part of this

16   corrupt exchange, that's how we prove the parts that we're

17   allowed to prove.

18           THE COURT:  I will take a look at the Alito Third

19   Circuit opinion.

20           MR. WEITZMAN:  That case was also a motion to dismiss,

21   not evidentiary rulings.

22           But I would draw your attention, let me be clear about

23   what our position is.  Our position is not that they can't, you

24   know, rely on evidence that shows a conversation that reflects

25   a promise, if there was such a conversation, where a senator

O5L3MEN5

1   says I will sign off on X if you pay me money.  Of course,

2   that's admissible under all the case law.

3           What they can't do is you can't inject the legislative

4   act and say you therefore know that there is a corrupt

5   agreement because he took that legislative act.  And that's

6   what they're trying to do here.

7           I understand this may be more challenging for the

8   government to prove its case.  We've said from the beginning

9   that government cannot prove the case they promised.  The

10   Supreme Court has identified that very problem that says that's

11   not a concern.  In *Helstoski* they say, quote, we do not accept

12   the government's arguments.  Without doubt the exclusion of

13   such evidence will make prosecutions more difficult.

14           THE COURT:  That's what I was referring to earlier.

15           MR. WEITZMAN:  Indeed the speech and debate clause was

16   designed to preclude prosecution of members for legislative

17   acts.  If they had evidence of a promise, and your Honor's

18   ruled about one document or series of documents that your Honor

19   has interpreted as a promise.  We disagree but we stand by your

20   Honor's ruling.  If they had evidence of a promise, they can

21   put it in.  They cannot put in activity that the senator takes

22   in putting a hold, or lifting a hold or someone else asking

23   about a hold that he put on or didn't put on, in an effort to

24   prove a corrupt agreement that we believe never existed.

25           MR. MONTELEONI:  We are not planning on arguing to the

O5L3MEN5

1  jury, we've never presented to the jury and we're not going to

2  present to the jury, you know he promised it because he did it.

3  We are just going to say these are promises.  These are

4  representations.  These are some forward looking, some are

5  backward looking that also have a forward looking component.

6  So Mr. Weitzman is certainly right that we would love to put in

7  evidence of what he did and say, you know, he promised to

8  because he did it.  But we're not doing that.  We are abiding

9  by that restriction.

10      And look, the principle that this is designed to make

11  the government's life harder to an extent, that applies to an

12  extent.  But it is also not designed to make members of

13  Congress super citizens immune from all criminal

14  responsibility.

15      The question is apply the clause according to its

16  terms, according to how it's been construed, which is

17  representations, understandings, contemporaneous knowledge,

18  contemporaneous beliefs, that is no part of the legislative

19  act.  That is the core of the corrupt agreement.  That's what

20  we have to prove.  And the fact that he actually was doing the

21  legislative act does not get in the ways as long as it is not

22  presented to the jury.  And we are not presenting it to the

23  jury.

24      MR. WEITZMAN:  If I can just say --

25      THE COURT:  I think we've taken this as far as we can.

O5L3MEN5

1    I will look at this Third Circuit.  But I must say I don't see

2    how you get around the fact, for example, Bob had to sign off

3    on this as being a core -- the core of the act itself.  You can

4    say the words again and again.  I just don't see a promise

5    here.

6          MR. MONTELEONI:  If that was a State Department

7    representative saying Bob signed off on this, that would be one

8    thing.  But this is a statement given to the gold bar source in

9    a context where clearly I think there was an expectation of

10   further continued things of value that were coming.  I think

11   that it is definitely a representation in, again, in the

12   *Brewster* case, I think if the government had evidence that he

13   said, oh, yeah, I helped you out with postage rate legislation,

14   that would have been all right because that is proof that he

15   received the funds, knowing that they were intended to be an

16   exchange for this postage rate legislation.

17         What they couldn't have done in *Brewster* would prove

18   he actually voted on the postage rate legislation.  Just as we

19   are not going to prove that his staff communicated, that the

20   State Department received, any of these holds, just like we

21   wouldn't prove some vote on the Senate floor.  Those are the

22   things that are protected.

23         The statements about what he did that are used to show

24   his contemporaneous knowledge on the bribe payer's

25   contemporaneous knowledge, that is what these prosecutions are

O5L3MEN5

1    founded on.  For bribery, that is forward looking.  They might

2    be founded on statements that are more explicitly forward

3    looking.  But for a gratuity count, they have been to be

4    founded on retrospective statements, because that's the essence

5    of the gratuity crime.  That is what the Supreme Court upheld.

6          So, it cannot be that just saying that this is about

7    the past, this is about what he did sign off on.  That a

8    representation like that can't be enough because then you

9    couldn't go forward on a gratuity case.  And that count in

10   *Brewster* would have been wrongly decided.

11         THE COURT:  All right.  I can't take it any further.

12   I can look at the Alito opinion.

13         MR. WEITZMAN:  Yes, your Honor.  Thank you.

14         There are a handful of other objections that I'd like

15   to raise with your Honor just to get a ruling.

16         157, your Honor.  This is a line that references in

17   which Nadine informs Will Hana that she's getting her hair

18   highlighted and the senator is going for tooth surgery.

19   They're discussing whether to meet for dinner later.  I'm just

20   not sure how I understand how it's relevant, and if anything,

21   it's confusing and unfairly prejudicial.

22         MR. MONTELEONI:  I can explain the relevance if we are

23   getting to this level of brass tacks.  This is going to be a

24   meeting at which Menendez makes some of the transmission of

25   non-public government information to Egyptian officials through

O5L3MEN5

1    Wael Hana.  And the fact he is willing to have a dinner after

2    having tooth surgery is some measure of circumstantial proof

3    that he was actually in it for the business reasons, not for

4    the fun of having dinner after tooth surgery.  That it wasn't

5    social but really, I mean, this is just how the conspiracy

6    unfolded.  These are the communications that lead up to and

7    help us prove this dinner with this unprotected sharing

8    happens.  And this level of relevance objection is really, I

9    think it is really an attempt to be a little more pointillist

10   toward the government's proof than I think is appropriate.

11            THE COURT:  I'm not sure what pointillist is.  But in

12   this context, I am going to permit it.  801(d)(2)(E).  It also

13   goes to their relationship.  It is the defense that puts the

14   nature of their relationship at issue.  I accept that comes in.

15            MR. WEITZMAN:  The next one is 362-366.

16            THE COURT:  I do know what pointillism is.

17            MR. WEITZMAN:  There is references from Nadine to Will

18   Hana did you cause chaos.

19            THE COURT:  Just a moment.  Background of the

20   relationship.  What does the government want to say?  I don't

21   know what the importance of all of this is.

22            MR. MONTELEONI:  It is background of the relationship

23   and it is part of how a meeting unfolds between Nadine and Hana

24   that Nadine then tells the senator about.  I just had a super

25   40-minute meeting with Will at 383.  In order to prove this

O5L3MEN5

1  without a live witness we're putting in some of the text

2  messages that lead up to that meeting.  And I mean, it's

3  certainly not prejudicial in a case like this to say people are

4  talking about did someone get rowdy the night before.  There is

5  no basis to exclude this.

6          THE COURT:  I'll put it in.  Development of trust and

7  relationship among the co-conspirators.

8          MR. WEITZMAN:  I think it is easy enough to delete the

9  reference to chaos.  It leaves a misimpression, whether it's

10  physical chaos or something else.  It is just unnecessary.  It

11  doesn't, you can absolutely have --

12          THE COURT:  What does it refer to?

13          MR. WEITZMAN:  I have no clue.

14          MR. MONTELEONI:  I think from the context it refers to

15  whether Hana had a good time while he was out the night before.

16  It just shows their relationship, their level of trust, how

17  they talk to each other.  I think there is really not --

18          THE COURT:  I'll let it in next.

19          MR. WEITZMAN:  717 and 718 I think is

20  non-controversial but there's references in a number of these

21  and I want to give you some examples of commentary in the

22  summary chart.

23          THE COURT:  Let me get it.  717.

24          MR. WEITZMAN:  717 and 718 both had references to

25  commentary to whoever the speaker is at the end of the quote.

O5L3MEN5

1    We see this in various places throughout.  To be clear, our

2    view is they can ask the summary witness about the document,

3    they can put it off, they can elicit testimony, but they can't

4    lead the testimony by putting it in a summary chart.  So the

5    references to that type of description throughout should be

6    deleted.

7              THE COURT:  That type of description?

8              MR. WEITZMAN:  Where they make commentary like text a

9    forwarded e-mail, does not indicate how.  Not even sure what

10   that means, but it shouldn't be a summary chart.  That's the

11   prosecutor's testimony.  Not the witness's.

12             THE COURT:  Government, what about that?  It seems to

13   me that's commentary.

14             MR. MONTELEONI:  It is a summary so we don't have to

15   open up every document, and show that where it gets forwarded

16   from a U.S. Meat Export Federation representative to a person

17   with an unknown person with the e-mail address GBT@WT.net, that

18   the fact that the forwarding doesn't indicate how Hana actually

19   got it, is suggestive of some level of consciousness.

20   Basically, someone -- after it got to a particular recipient,

21   someone clearly deleted in the forwarded e-mail who forwarded

22   it to them.  I think that's an obvious inference when you look

23   at the document itself.  And that would be what real commentary

24   would be saying.  Someone deleted this to hide how Hana got it.

25   Really, this is just a more convenient and condensed way of --

O5L3MEN5

1    the whole purpose of a summary chart is to summarize things you

2    don't have to open every document.  So indicating that actually

3    you can't tell from the text to the forwarded e-mail how it

4    made its way to Hana is a convenient reference.

5         MR. WEITZMAN:  Your Honor, it is still a prosecutor's

6    commentary.  If they want to elicit it from the witness they

7    can do so.  The witness shouldn't be putting commentary in a

8    summary chart like that nor should the prosecutors.

9         MR. MONTELEONI:  Your Honor, these charts will be

10   admitted subject to the instruction approved in *Ho* that these

11   are not independent evidence, but they are guides to the jury

12   to inspect the underlying evidence.  And --

13        THE COURT:  Are you seeking the admission of all the

14   underlying evidence?

15        MR. MONTELEONI:  Absolutely.  This is part of why I

16   think a lot of these issues got teed up now, because the chart

17   also has a bunch of exhibits standing behind it.  They will be

18   free to inspect all of this.  If they think that this is an

19   inaccurate summary of the e-mail, that's something the defense

20   can point to and that's something the jury can ascertain for

21   itself.  This is exactly what the Second Circuit approved in

22   *Ho*.  And this is why we have summary charts so we don't have to

23   open every e-mail.

24        THE COURT:  Just a moment.  Both under 1006 and in

25   this case both the chart and the underlying documents are in.

O5L3MEN5

1          MR. MONTELEONI:  That's what we're offering, yes.

2          THE COURT:  I'll allow that.  Those two.  Anything

3    else, sir?

4          MR. WEITZMAN:  727.  There's a reference from Nadine

5    to Senator Menendez and it says he is buying a Rolex now.

6          I don't believe there is any allegation or any proof

7    that that was a bribe, the Rolex, just a reference to Rolex

8    from Nadine to Senator Menendez.  So, it is just not relevant

9    and it is unfairly prejudicial.  And it's not that Senator

10   Menendez is buying one.  It is that Will Hana I believe is the

11   reference, is the suggestion Will Hana is buying one for

12   himself.  As we now know he has a very significant watch

13   collection.  It was put in inventory today.

14         THE COURT:  Government?

15         MR. MONTELEONI:  Yes, so, this is classic

16   relationships between conspirators, conspirators'

17   understandings of each other, in particular this is right after

18   the halal monopoly has been granted, and Hana, who has not had

19   business success up until the halal monopoly, is now in the

20   possession of sufficient funds to begin buying Rolexes.  The

21   fact that the senator was aware of this at the time when Hana

22   was preparing to be offering bribes is incredibly important.

23         THE COURT:  I don't see it as incredibly important,

24   but I also don't see it as a real 403 problem.  So I'm going to

25   allow it in.

O5L3MEN5

| | |
|---|---|
| 1 | MR. WEITZMAN:  Can we get an instruction, can we get a |
| 2 | stipulation or instruction that it wasn't a bribe.  There is no |
| 3 | evidence of that.  It leaves a misimpression.  Let's get a fact |
| 4 | stipulation it is not alleged as a bribe. |
| 5 | MR. MONTELEONI:  Your Honor, we can talk to the |
| 6 | defense but we can't be in a position where every time that we |
| 7 | offer evidence of something that isn't itself an envelope of |
| 8 | cash into someone's hand, that we have to have a stipulation |
| 9 | that it wasn't.  I think the jury's absolutely going to follow |
| 10 | the Court's instructions about what's in evidence and what |
| 11 | isn't and there won't be evidence -- |
| 12 | THE COURT:  I think that's right, here.  What else? |
| 13 | MR. WEITZMAN:  One moment, your Honor. |
| 14 | THE COURT:  I think you're beyond the number you |
| 15 | proposed. |
| 16 | MR. WEITZMAN:  I may have just one more I want to |
| 17 | double check.  I may waive it.  Oh, this is just I can't |
| 18 | understand why they're putting this in 1255-1257.  It's about |
| 19 | the desire for glazed doughnuts. |
| 20 | MR. MONTELEONI:  That proves a meeting.  That proves a |
| 21 | bribe delivery.  That shows that Fred Daibes was at their house |
| 22 | with doughnuts and a kilo of gold. |
| 23 | THE COURT:  On the representation of the government, |
| 24 | I'll allow it in. |
| 25 | MR. WEITZMAN:  Can I ask the basis for that |

O5L3MEN5

1     representation other than the fact --

2              THE COURT:  There is no 403 issue here.

3              MR. MONTELEONI:  We are going to be offering evidence

4     that circumstantially shows -- just the fact it is a meeting

5     itself between the conspirators during the course of the

6     conspiracy, that's like enough.  However, if you look at the

7     history of his first ever in his life --

8              THE COURT:  It has to be a meeting in furtherance of

9     the conspiracy.

10             MR. MONTELEONI:  All right.  But so, right after

11    returning from Egypt and Qatar and during a time when Daibes

12    had a number of matters pending before Menendez that he was

13    hoping for official acts on, Daibes shows up at the house as is

14    shown by the doughnuts texts, and during the time period when

15    he was at the house, or shortly after, Menendez performs the

16    first ever searches in his life for how much is 1 kilo of gold

17    and how much is 1 kilo of gold worth, which are, by the way, at

18    a different time period than Menendez opened on.

19             THE COURT:  It's permitted.  There is no 403 issue

20    here.  I find there is no 403 issue.  All right.

21             What, Mr. Lustberg?

22             MR. LUSTBERG:  We've met and conferred with the

23    government, and only have five quick matters left which I'll be

24    very brief with regard to.  The first is line 180.  Just so you

25    know, we object on the basis strictly of hearsay.  And Judge,

O5L3MEN5

1  if it would be of assistance, this is an e-mail from or text

2  from Mr. O'Brien who was a lobbyist to Egypt.  It has

3  statements that are clearly being introduced for the truth or

4  if they're not, the truth would overwhelm whatever purpose

5  there is.  Relates to what somebody told them.  It seems to me

6  just rank hearsay.

7         THE COURT:  Let me look at it.  You have to talk into

8  the mic, sir.

9         MR. LUSTBERG:  Line 180.

10        THE COURT:  Government?

11        MR. MONTELEONI:  Yes, your Honor.  There's two levels

12  obviously of statements.  There is what Dana Stroul said and

13  what Brett O'Brien said.

14        THE COURT:  Why is it double hearsay?

15        MR. MONTELEONI:  I am going to take both levels at a

16  time.  One at a time.  Dana Stroul, the embedded declarant, is

17  Menendez's agent.  She was a member of the professional staff

18  for the Senate Foreign Relations Committee.  You heard

19  testimony today that she reported in that capacity to him as

20  ranking member of that committee during that time period.  This

21  is obviously within the scope of her duties, so this a classic

22  agency statement.  Brett O'Brien relating that, let me know if

23  I should start addressing that.  So Brett O'Brien relating

24  that.

25        THE COURT:  Let me just think about this Stroul.  You

O5L3MEN5

1    are saying she is an agent for Menendez?

2              MR. MONTELEONI:  Yes, she was at the time.  She will

3    also be testifying but later after this comes in.

4              THE COURT:  Let me take a look.

5              MR. MONTELEONI:  That's one level.  Next level that

6    Brett O'Brien then conveys it is to General Shawky is not

7    offered for the truth at all.  The jury will have heard the

8    truth from the earlier e-mails in this chain where she actually

9    tells Brett O'Brien this information.  So they're going to have

10   heard it two lines before I believe.

11             THE COURT:  Let me take a look.

12             MR. MONTELEONI:  One line before.  So the fact that

13   Brett O'Brien then transmitted it to Major General Shawky who

14   was one of Hana's principal contacts in the Egyptian military

15   during this time period in the course of the scheme, shows the

16   importance that the Egyptian side attached to this.  Brett

17   O'Brien is a registered agent for Egypt.

18             (Continued on next page)

19

20

21

22

23

24

25

O5lWmen6

1      THE COURT:  But how is the jury going to know that

2   it's not for the truth of the matter asserted?

3      MR. MONTELEONI:  I think that it will honestly come

4   very naturally, that they'll have just heard the statement

5   itself, and then I think that his summary of the statement, the

6   next line, is not going to really, you know -- they're going to

7   be, like, oh, he's passing it along.  I don't think they're

8   going to focus on the transmission of the statements.

9      If this really requires a limiting instruction for

10  that particular line we wouldn't have an objection to it.  We

11  don't really think that's necessary, candidly.

12     THE COURT:  Yes, but I think you've overcome the first

13  on the agency.  I'm going to allow it in, and if the other side

14  wants a limiting instruction, they should let me know.

15     Go ahead.  What else do you have?

16     MR. LUSTBERG:  Thank you.

17     Document -- sorry, line 247.  This is an email

18  exchange between Amr Sharaf Elasdoudy -- I'm not going to

19  pronounce the name right, but you can see the "from" -- to Andy

20  Aslanian, and this has to do with getting, something having to

21  do with getting a house in Washington.

22     There's a number of ones we're going to point out now,

23  your Honor, that fall into the category where the government

24  will say this just shows various relationships between people.

25  But they have tons of evidence of various relationships between

O5lWmen6

```
 1    various people, and it's just piling on and it's adding people

 2    who are not charged, who are -- it's just going very far

 3    afield.  This is discussing buying a house.

 4               THE COURT:  All right.  Let me take a look.  It's a

 5    611 objection, seems to me.

 6               Government.

 7               MR. MONTELEONI:  Yes, your Honor.

 8               THE COURT:  It's hard for me to see -- 611, I'm

 9    thinking about it in the context of too much information,

10    meaning it's just more and more and more.  I can order the

11    proof and, if it's a waste of time, cut out some exhibits.  I

12    don't have a good sense of that because I haven't seen all

13    these exhibits, but go ahead.

14               MR. MONTELEONI:  Yes, your Honor.

15               Look, I will say I think that this witness is going to

16    be on the stand for a long time.  We have taken extraordinary

17    pains to make this a highly streamlined and efficient

18    presentation.  I believe, in terms of ground covered, it is

19    going to be at a very fast pace, but if you were going to say,

20    well, is there fat to trim -- first of all, I don't think there

21    is, but this is not it, because this isn't just someone buying

22    a house.  This is actually -- if you'll look back at line 243,

23    this is a proposal for Fred Daibes to go into business with the

24    Egyptian government facilitated by Andy Aslanian.  And as

25    Mr. Daibes's counsel said in opening, there's not an
```

O5lWmen6

overwhelming, overcumulative amount of discussion about

Daibes's involvement in attempting to get money from Egyptian

business ventures, there is evidence of that and this is some

of that evidence, but we're certainly not going to be drowning

the jury in that for a long period of time.

MR de CASTRO:  Judge, that's also one we joined in,

243, that Mr. Monteleoni pointed to.  For Mr. Daibes, our point

is just because it's an Egyptian business venture doesn't mean

it automatically comes into this case.  It's completely

unrelated.

MR. MONTELEONI:  I can respond to that, your Honor.

THE COURT:  Yes.  Go ahead.

MR. MONTELEONI:  This isn't just doing business with

someone who has something to do with Egypt.  This is actually

Andy Aslanian, who is in the mix with Hana and with Nadine from

the very first outreach to Menendez as part of his connection

with the Egyptian government, is actually directing Daibes to

do business with Major General Shawky, the same person who got

the nonpublic information about the lifting of the small arms

ban that we just discussed with Dana Stroul.  This is actually

getting business from some of the same people on the Egyptian

side that the bribe scheme involves.

THE COURT:  No.  If he's here trying to develop

business with Egypt, I'm going to let it in.  I'll let these

two in, 243 and 247.

O5lWmen6

1          MR. LUSTBERG:  Judge, we only have three other things,
2      and two of them go together.
3          THE COURT:  Yes.
4          MR. LUSTBERG:  One is 1201 and the other is 1262.
5      They both regard real estate ventures in which Daibes and Hana
6      are doing things together.
7          THE COURT:  1201 and 1262?
8          MR. LUSTBERG:  Yes, your Honor.
9          THE COURT:  Let me look at them.
10         MR. LUSTBERG:  Yes.
11         THE COURT:  1201.  And what was the other one, sir?
12         MR. LUSTBERG:  I'm sorry.  I apologize.  It was 1262.
13         And your Honor, just so it's clear, I understand the
14     government's argument, which is that this proves the
15     relationship between Mr. Daibes and Mr. Hana, but as the Court
16     has now heard already, and presumably will hear many other
17     times, of course they have a relationship.  These are two real
18     estate transactions that have nothing to do with the
19     allegations of this case other than that they show that the two
20     of them do real estate transactions together.  And at some
21     point it's just -- maybe you want to call it 611 or whatever.
22     Each of these transactions has their own story, and you know,
23     this threatens to require that each of these transactions be
24     explained, and they have nothing to do with the rest of the
25     case.

O5lWmen6

```
1          MR. MONTELEONI:  Your Honor, this is actually
2    incredibly important to an issue that they opened on, which is
3    Daibes's motive to assist in the bribe scheme.  Daibes's
4    counsel, at transcript page 166, said:
5          "You're not really going to hear much about Daibes, I
6    expect, as it relates to Egypt.  The evidence will show that
7    Mr. Daibes has nothing to do with Egypt or the halal business."
8          But actually, these two documents show that, through
9    two real estate joint ventures, he was receiving into his joint
10   ventures millions of dollars from Hana's halal company, which
11   were monopoly profits derived from the scheme.  This is
12   proceeds of the scheme being invested into Daibes's joint
13   ventures to expand his business.  It's part of the scheme.
14         THE COURT:  Mr. Lustberg, if indeed that
15   representation is true, then clearly it's relevant.
16         MR. LUSTBERG:  Well, the government's allegations
17   would just take it to its extreme, that every single dollar
18   that Mr. Hana contributes to any venture after he begins IS EG
19   Halal is relevant.  You know, at some point it's just
20   overstepping.  They have a ton of evidence of Mr. Hana's
21   relationship with Mr. Daibes.  Now they want to get into real
22   estate transactions that, other than the fact that the two of
23   them are investing together, have nothing to do with the case.
24         THE COURT:  No.  But the representation is it was
25   funded from the scheme.
```

O5lWmen6

1    MR. LUSTBERG:  Well, again, their only argument is

2  that it's funded from the scheme because that it comes after

3  Mr. Hana begins, gets the contract.

4    THE COURT:  All right.  I understand.

5    Government.

6    MR. MONTELEONI:  Your Honor, it was funded from the

7  scheme.  Hana was not a millionaire before the scheme.  He got

8  his millions of dollars through charging for printing halal

9  certificates from the scheme.  And this is the only evidence of

10  Daibes receiving --

11    THE COURT:  All right.

12    I'm going to allow these two in.

13    MR. LUSTBERG:  One last thing, your Honor, and this is

14  small.  Among the exhibits, and this actually does not have to

15  do with this chart.  There's another chart where we've agreed

16  to stipulate.  It has to do with phone numbers and email

17  addresses of people.  But there are exhibits underlying it, and

18  one of them is Mr. Hana's mug shot, which I'm holding up.  I'm

19  happy to show it to the Court.

20    Our argument with regard to this is that it's not an

21  attractive picture.

22    THE COURT:  None of them are, sir.

23    MR. LUSTBERG:  I get it, but Mr. Hana has been

24  identified in court.  And the other pictures that have been

25  shown --

O5lWmen6

| | |
|---|---|
| 1 | THE COURT:  What's the objection?  All the mug shots, |
| 2 | if you will, have come in.  It's an accurate representation of |
| 3 | him, I assume. |
| 4 | MR. LUSTBERG:  But it's not necessary.  It's 403. |
| 5 | MR. MONTELEONI:  Your Honor, it's also not a mug shot. |
| 6 | It's a DMV photo, just like many others. |
| 7 | THE COURT:  Well, what's the purpose of it? |
| 8 | MR. MONTELEONI:  Well, to provide a visual reference |
| 9 | for the players.  This is a complicated case. |
| 10 | THE COURT:  We've done it for everybody else.  I'll |
| 11 | allow it in. |
| 12 | Show it to me again, sir.  It's just a regular shot of |
| 13 | the man. |
| 14 | MR. LUSTBERG:  I'll bring it up. |
| 15 | THE COURT:  I'm going to allow it in.  There's nothing |
| 16 | extraordinary about it. |
| 17 | All right.  I need to think about and read that Third |
| 18 | Circuit case. |
| 19 | MR de CASTRO:  Judge, we had a few from the chart. |
| 20 | It's only three, by my count, at this point.  It's late.  I'm |
| 21 | sorry.  We're the last ones. |
| 22 | I just want to note my objection to 303 and 304.  My |
| 23 | understanding from your ruling on 243 is that this would come |
| 24 | in.  These are -- |
| 25 | THE COURT:  303 and 304? |

O5lWmen6

| | |
|---|---|
| 1 | MR de CASTRO:  Yes. |
| 2 | THE COURT:  Let me read them. |
| 3 | 304 is just a forward of it. |
| 4 | MR de CASTRO:  That's right, Judge.  They're both |
| 5 | identical. |
| 6 | THE COURT:  What's the point?  According to this |
| 7 | chart, it's, again, relationships between the coconspirators. |
| 8 | MR de CASTRO:  I'm just noting my objection because I |
| 9 | understand from the Court's ruling on 243 anything with Egypt |
| 10 | in it would be relevant.  I don't know that this is really a |
| 11 | relationship between the parties. |
| 12 | THE COURT:  I don't think anything with Egypt in it is |
| 13 | relevant, but go ahead. |
| 14 | MR de CASTRO:  No, but meaning any investment in real |
| 15 | estate.  That's what this message is about.  Nothing went |
| 16 | forward.  Nothing ever happened from it. |
| 17 | THE COURT:  I'm going to allow it in.  I understand |
| 18 | the objection.  It shows a relationship of trust and confidence |
| 19 | and the interest of Daibes being able to develop it further. |
| 20 | What else? |
| 21 | MR de CASTRO:  919.  It's sort of a series of messages |
| 22 | from 919 through 923.  The government's argument is that this |
| 23 | is relationship between -- |
| 24 | THE COURT:  Just a moment. |
| 25 | Government, why do you want this? |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen6

```
 1              MR. MONTELEONI:  Well, your Honor, again, as a general
 2   matter, it shows the relationships between the conspirators,
 3   but in this case, this is particularly notable because José
 4   Uribe, who the Court will hear from later, was invited to a
 5   meeting by accident because Nadine didn't realize she was
 6   replying to a group text, and both Hana and Uribe sort of
 7   recoil at that.  And in fact, what this is, that this meeting
 8   that Nadine was trying to arrange with Hana and Daibes was
 9   intended to exclude Uribe, is very probative of the nature of
10   the types of meetings that they're having and the sort of who
11   is in the inner circle and who's out.
12              MR de CASTRO:  It's a mistake, and Uribe is part of an
13   entirely different part of this case in which Mr. Daibes is not
14   charged.  And so to inject that in here when it's a mistake,
15   there's no purpose.
16              THE COURT:  What's the mistake?
17              MR de CASTRO:  The mistake is that Uribe is somehow
18   included here.
19              THE COURT:  But what Mr. Monteleoni is saying is it
20   shows that he's on the outs with the other group.
21              MR de CASTRO:  I don't think that's what he's saying,
22   that he's on the outs.  We think this mistakenly put Mr. Uribe
23   into this message when he has nothing to do with it.
24              MR. MONTELEONI:  We're not saying that he's being
25   shunned exactly, but we're saying this was a private meeting
```

O5lWmen6

```
 1    and he was not intended to be included in it.  And you can tell
 2    from the fact that the mistake was including him on the group
 3    text, on the invitation, and Hana's saying what's going on
 4    here.  And Uribe also understands that this is not a type of
 5    meeting or dinner that he feels comfortable at or understands
 6    why he would be a part of.  It shows that Nadine and Hana and
 7    Daibes, who are charged defendants, are part of a circle that
 8    doesn't include Uribe for these things.
 9             THE COURT:  I'll allow it in for relationship
10    purposes.  Same thing, relationship of trust and confidence.
11             MR de CASTRO:  Last one is 991 and 992.
12             THE COURT:  Lots of last ones.
13             MR de CASTRO:  This is my last one.  I said four.
14    This is my fourth.
15             THE COURT:  Yes, sir.
16             MR de CASTRO:  I'm sorry.  Are you asking the
17    government or me?
18             THE COURT:  I'm asking you.
19             MR de CASTRO:  Oh.  So, I don't see the relevance to
20    this, and I suppose the government has an explanation here.  I
21    understand from the chart that they're saying relationship
22    again, but this is about an uncharged -- it looks like a
23    screenshot of a text related to Damian Kasazian, who is not
24    charged in this case -- and it's my understanding this is the
25    only place this person's name will come out -- about
```

O5lWmen6

1  Mr. Daibes's interest in selling his bank, which, I don't know

2  what the relevance of this case is, that Mr. Daibes has a bank

3  and that he was interested or may be interested in selling it.

4            THE COURT:  Government.

5            MR. MONTELEONI:  All right.  So, first of all, you

6  know, the fact that he has a bank is necessarily going to come

7  out otherwise.  The fact that he's selling it is sort of

8  neither here nor there.  The fact that people understand that

9  Nadine and he are in the type of relationship together where if

10 he was going to sell his bank they would include Nadine in that

11 transaction --

12           THE COURT:  Where do you get that from?

13           MR. MONTELEONI:  That's what Damian Kasazian texts.

14 Damian Kasazian texts Nadine and says, hey, if Fred wants to

15 sell his bank, let me know.  He actually says, and I'm not sure

16 that we need to read this whole screenshot, he says I'll figure

17 out a way for us both to get paid.  He's actually going to cut

18 Nadine in on the profits of his bank sale, if it happens.  It

19 doesn't happen.

20           THE COURT:  I'm going to strike this as irrelevant.

21           MR. MONTELEONI:  Well, your Honor, the second one,

22 though, it's necessary to make sense of 992, which is very

23 important.

24           THE COURT:  You're talking about 991 is necessary to

25 make sense of 992; is that what you're telling me?

O5lWmen6

1    MR. MONTELEONI:  Exactly, because 992 is critical.

2    Menendez's knowledge of an involvement in Nadine's formation of

3    this shell company, Strategic International Business

4    Consultants.  And in particular his knowledge of Daibes's role

5    in making payments to that company, which, you know, his name

6    is not on, but he was involved nonetheless, is incredibly

7    important evidence.  And so --

8    THE COURT:  Wait just a moment.  You're trying to get

9    in evidence that Daibes was important in the -- I forget the

10   initials -- for Nadine's consulting company.

11   MR. MONTELEONI:  Well, yes.  He was -- they were --

12   they were expecting checks to initially come from Daibes.

13   Those checks ended up coming from Hana, but the fact that

14   Menendez was, first of all, aware of these checks, as evidenced

15   by the communications with Nadine, and then also that Daibes

16   was considered as a possible source of the checks is incredibly

17   critical evidence.  These are among the central bribes of the

18   case, and so the fact that Menendez is giving --

19   THE COURT:  Wait.  You're talking about the payment to

20   the consulting company.

21   MR. MONTELEONI:  Yes, the three $10,000 checks that

22   are payments to the consulting company.  During this time

23   period they were discussing those checks potentially coming

24   from Daibes, and Menendez is directing Nadine to not only pass

25   along this bank sale text but also to provide the name of the

O5lWmen6

1    company to Daibes, we believe.

2              THE COURT:  Let me read 992 in that context.

3              MR de CASTRO:  And it is in the later texts anyway,

4    right below it.  I don't know why they need it twice.

5              THE COURT:  Where is it in the later text, sir?

6              MR de CASTRO:  Right on 995, has a picture from Nadine

7    to Senator Menendez with Strategic International Business

8    Consultants, a check on it.

9              MR. MONTELEONI:  But that wouldn't explain --

10             THE COURT:  No, I don't think that does it.

11             MR de CASTRO:  And the text before, in 994.

12             THE COURT:  No.  With that insight, because of 992,

13   I'll change my view on 991.  It's more relevant in light of

14   that.  I'm going to allow 991 in.

15             Is that it, sir?

16             MR de CASTRO:  That was my last one.

17             THE COURT:  OK.  I'm going to have to think about the

18   issue.  I'm going to read the Alito Third Circuit opinion, and

19   I'll get back to the parties.  I assume you all will be

20   available if I want to bring you in.

21             I have a couple of other things pending.  One is the

22   sealed motion by the government.  When is that going to become

23   ripe?

24             MR. RICHENTHAL:  It certainly, I think, will not be

25   ripe before next week, possibly even the week after.  We were

O5lWmen6

```
1    intending to file our reply this evening.  I know the Court

2    gave us until noon tomorrow, but we were intending to file our

3    reply this evening.

4              THE COURT:  OK.  Do that.

5              And I have a Rule 17 subpoena issue.  When does that

6    become ripe?  When is Uribe on?

7              MR. MONTELEONI:  Your Honor, several weeks.

8              THE COURT:  All right.

9              MR. MONTELEONI:  And I want to tell you something

10   relevant to scheduling right now if you have a moment.

11             THE COURT:  Only if it's good news, sir.

12             MR. MONTELEONI:  I'm afraid I can't say that.  The bad

13   news is that this chart and the exhibits therein obviously

14   related to the Egypt portion of it, but there are a number of

15   other portions of the case, which involve a number of exhibits.

16   These are exhibits that were cited in the draft summary charts

17   that we provided to the defense on April 28.

18             In order to avoid as rushed a process with getting --

19             THE COURT:  And unacceptable a process.

20             Go ahead.

21             MR. MONTELEONI:  Yes, your Honor.  Thank you.

22             We want to tee this up in a way that there's a more

23   deliberate approach to this.  We've asked the defense to get us

24   their positions on all of those exhibits by this coming Monday,

25   and we think that that will allow sort of several days to be
```

O5lWmen6

1  presenting things to the Court and then some time for the Court

2  to rule, because those next summary witnesses are not going to

3  be going on the next week.

4       THE COURT:  How about after they give you their

5  objections, rather than presenting things for the Court, the

6  parties can talk about the objections?

7       MR. MONTELEONI:  Yes, your Honor.

8       I will say we have been trying to do that.  We made

9  edits even before the versions that you got.  We had further

10  conferences since yesterday.  We absolutely take the Court's

11  point.  We want to tee this up as far in advance and have as

12  little as possible for the Court, as possible.

13       We just want to put on the record, for timing

14  purposes, we are expecting objections by Monday and we will

15  work with the defense to try to narrow them as much as we can.

16       THE COURT:  All right.

17       What else?

18       MR. RICHENTHAL:  On the related point of the process,

19  or maybe lack thereof, I don't want to be backward looking.  I

20  want to be forward looking and try to be as brief as possible.

21  I know we all want to go home to our families.

22       On Saturday, May 11, after extensive negotiations with

23  the defense, we agreed in writing to give, by 7 p.m., three

24  days before any witness hits the stand in the case, the name of

25  the witness and every exhibit we intend to offer.  We did that

O5lWmen6

1    in good faith after extensive back-and-forth -- candidly,

2    painful back-and-forth -- with an understanding that we would

3    get objections to those exhibits timely.  We specifically asked

4    for 24 hours.  We've acted in good faith.  We have virtually

5    gotten no objections from Mr. Menendez's team.

6         THE COURT:  Wait.  The documents that you gave them

7    three days in advance of the witness --

8         MR. RICHENTHAL:  We agreed in writing.

9         THE COURT:  -- for the purpose of lodging objection.

10        MR. RICHENTHAL:  Yes.  We agreed in writing for every

11   witness, the whole trial, we would, by 7 p.m. three days before

12   the witness hits the stand in our case, give them the

13   identification of the witness and every exhibit we intend to

14   offer through the witnesses subject to normal trial strategies

15   and court rulings.  Things change; we got that.  In fact,

16   that's in the agreement.

17        We did that in good faith, asking -- asking -- give us

18   your objections before the witness hits the stand.  We knew

19   this would happen if we didn't get it.  Your Honor has now seen

20   it day after day.  We have no idea what the objections are.  We

21   have no idea what the basis.  It is slowing us down.  That's

22   not really your Honor's concern.  It is slowing them down.  It

23   is interrupting this trial.

24        I did not want to ask for this until this evening.

25   I'm asking for it now.  We are asking the Court to direct that,

O5lWmen6

1    within 24 hours of us giving them exhibits for a witness we get

2    the defense objections.

3         I do not enjoy asking for this, but absent a

4    directive --

5         THE COURT:  Is that the agreement?

6         MR. RICHENTHAL:  We asked for 24 hours.  The agreement

7    did not give a number of hours, but it was part of the

8    negotiations.  We said we're going to give you at 7 p.m. three

9    days before in good faith to work things out.  Did we put in

10   the agreement 24 hours?

11        THE COURT:  That they can work things out because that

12   would require the objections to be set forth.

13        MR. RICHENTHAL:  Yes, your Honor.

14        THE COURT:  Otherwise, there's nothing to be worked

15   out.

16        MR. RICHENTHAL:  Absolutely.  I just want to be

17   candid.  We didn't put the number 24 in the agreement.

18   Frankly, I wish we had.  I'm asking now for the Court to direct

19   that that be done.

20        MR. WEITZMAN:  Your Honor, just two short things.

21        The first is I think the record will show that we

22   objected to a total of one document in four days.  I don't

23   believe we've objected to documents.  More often than not --

24        THE COURT:  I'm not sure I can separate out the

25   defendants for this question, but there certainly was more than

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5lWmen6

1    one objection.

2            MR. WEITZMAN:  Very few, your Honor.  Most documents

3    have come in.

4            THE COURT:  Very few is like very few objections to

5    this chart.  They seem to multiply as we go along.

6            MR. WEITZMAN:  I understand, your Honor.

7            Secondly, there wasn't a discussion or an agreement on

8    objections.  We're happy to try and provide our objections in

9    advance.  Sometimes we don't know whether the document is going

10    to be admitted for a particular purpose, whether it's a hearsay

11    purpose or a nonhearsay purpose, or whatever.  But we will talk

12    to the government.

13            The reason they gave us their documents in advance as

14    part of the exhibits, we understood, was so that we could

15    identify any additional exhibits we would offer as the

16    so-called nonimpeachment exhibits, which we have been doing.

17            THE COURT:  If you're getting the documents in

18    advance, I think they should get your objections in advance, to

19    the extent you can.  I understand.  You might even want to talk

20    with them about whether it's a hearsay purpose or a nonhearsay

21    purpose.

22            MR. WEITZMAN:  Yes, your Honor.  We will do that.

23            MR. RICHENTHAL:  I'm sorry to --

24            THE COURT:  I think there's still, as I've indicated,

25    not before the jury, I think there's still too much

O5lWmen6

|  |  |
|---|---|
| 1 | gamesmanship going on here.  I really haven't seen this degree |
| 2 | of the maneuvering this late in a trial.  I mean it's not late |
| 3 | in the trial but certainly by the time the trial gets going, |
| 4 | people have thought the pretense of the posturing -- |
| 5 | MR. WEITZMAN:  Your Honor, respectfully, we're not |
| 6 | posturing. |
| 7 | THE COURT:  Nobody has to put on the record that they |
| 8 | disagree with my statement. |
| 9 | MR. WEITZMAN:  No, but we've signed almost every |
| 10 | stipulation.  They've given us 30, 40 stipulations. |
| 11 | THE COURT:  If I remember, a week before trial |
| 12 | started, there was a representation of the government -- I |
| 13 | don't know its validity -- that they have been begging for |
| 14 | stipulations and they hadn't been getting them. |
| 15 | MR. WEITZMAN:  They have gotten them. |
| 16 | THE COURT:  By now they've gotten them.  I'm not going |
| 17 | to adjudicate that type of thing any more than I am that I'm |
| 18 | interested in trying to decide, well, you gave them the draft |
| 19 | on this date and then the response came on that date, and then |
| 20 | there was -- that's not something I have to do with adults. |
| 21 | MR. WEITZMAN:  I fully agree with your Honor.  I agree |
| 22 | 100 percent. |
| 23 | THE COURT:  Everybody on your side has been through |
| 24 | this before. |
| 25 | MR. WEITZMAN:  And we really are trying our best to |

O5lWmen6

```
 1   get them responses to their emails, the stipulations, their
 2   exhibits as quickly as possible.  We are inundated with 10,000
 3   exhibits, 50 testifying witnesses and 150 nontestifying
 4   witnesses whose 302s we need to review.  It's been a lot of
 5   work.  We are working really hard, really hard.
 6           THE COURT:  Everybody has been.  Everybody has been.
 7   It's not an issue.
 8           MR. LUSTBERG:  There's one thing that will help.
 9           THE COURT:  I don't think we need these self-serving
10   comments all around.  Everybody has been working hard, sir.
11           MR. LUSTBERG:  One just constructive suggestion that
12   came up during the course of the reviewing of these charts,
13   which is we initially had a set of objections based on hearsay
14   to which the government responded that one of the involved
15   participants was an unindicted coconspirator.  It would be
16   incredibly helpful to us, as we analyze this, to have a list of
17   who the unindicted coconspirators were.  We moved for that as a
18   matter of the bill of particulars.  The Court denied that
19   application.
20           THE COURT:  Go ahead.
21           MR. LUSTBERG:  That's fine.  But now we're not in bill
22   of particulars land, where they have to prove it.  It would
23   really be helpful if we had a sense, if the government would
24   provide us a list of unindicted coconspirators so we can do
25   this analysis and formulate our objections.
```

O5lWmen6

| | |
|---|---|
| 1 | THE COURT:  Government. |
| 2 | MR. MONTELEONI:  Your Honor, we'll confer with them in |
| 3 | good faith about their objections.  We had productive calls |
| 4 | with them about this last night that led to withdrawal of |
| 5 | objections, but there's a big difference between responding to |
| 6 | inquiries about how we see the hearsay status of the document |
| 7 | and enumerating -- |
| 8 | THE COURT:  I'm not about to require that. |
| 9 | What else? |
| 10 | MR. RICHENTHAL:  I would just ask, again, 24 hours of |
| 11 | objections after we give them exhibits.  They're getting them |
| 12 | three days ahead of time.  24 hours thereafter honestly is |
| 13 | facially reasonable.  It will advance this trial materially if |
| 14 | we have those objections. |
| 15 | Mr. Weitzman is a very good advocate, and he's |
| 16 | refusing to respond to my request for 24 hours because he |
| 17 | doesn't want to agree.  That's his right not to agree.  I'm |
| 18 | asking the Court to direct it. |
| 19 | THE COURT:  Mr. Weitzman. |
| 20 | MR. WEITZMAN:  Your Honor, I assure you we will, |
| 21 | whether it's 24 hours or 36 hours, whatever it may be, we'll |
| 22 | let them know if we have objections to particular documents in |
| 23 | advance of a witness. |
| 24 | THE COURT:  I need more than that.  I'm reluctant to |
| 25 | order 24 hours.  It seems to me that if there was an agreement, |

O5lWmen6

1    the government really should have put it in there, but I want
2    you to do it as expeditiously as possible.
3             MR. WEITZMAN:  Yes, your Honor.
4             THE COURT:  And if it's consistently later than 24
5    hours, the government can come back to me.
6             MR. WEITZMAN:  I understand that, your Honor.
7             MR. RICHENTHAL:  And then, second, we are continuing
8    to talk about stipulations, but I do want to note it is not
9    accurate that they've signed all of them.  I'll just give you
10   two.
11            THE COURT:  I don't care.
12            MR. RICHENTHAL:  All right.
13            THE COURT:  I don't care.
14            All right.  Thank you.
15            (Adjourned to May 28, 2024, at 9:30 a.m.)
16
17
18
19
20
21
22
23
24
25

1                     INDEX OF EXAMINATION

2    Examination of:                              Page

3     JOHN MOLDOVAN

4    Direct By Mr. Mark . . . . . . . . . . . . . 779

5    Cross By Mr. Solano  . . . . . . . . . . . . 808

6    Cross By Mr. Weitzman  . . . . . . . . . . . 820

7    Cross By Mr. McManus . . . . . . . . . . . . 835

8    Redirect By Mr. Mark . . . . . . . . . . . . 850

9     JOSHUA MANN PAUL

10   Direct By Mr. Monteleoni . . . . . . . . . . 855

11   Cross By Mr. Fee . . . . . . . . . . . . . . 906

12   Redirect By Mr. Monteleoni . . . . . . . . . 946

13    MIERNA HANNA

14   Direct By Mr. Mark . . . . . . . . . . . . . 948

15   Cross By Ms. Collart . . . . . . . . . . . . 957

16   Redirect By Mr. Mark . . . . . . . . . . . . 961

17    JAMELA MAALI

18   Direct By Mr. Mark . . . . . . . . . . . . . 962

19                    GOVERNMENT EXHIBITS

20   Exhibit No.                               Received

21    2A-8   . . . . . . . . . . . . . . . . . . 785

22    2A-2   . . . . . . . . . . . . . . . . . . 790

23    4C1-O, 4C1-P, 4C1-D, 4C1-H   . . . . . . . 802

24    8A-2   . . . . . . . . . . . . . . . . . . 897

25    3K-2   . . . . . . . . . . . . . . . . . . 955

```
 1    3M-1    . . . . . . . . . . . . . . . . . 956

 2    2A-16   . . . . . . . . . . . . . . . . . 968

 3    3D-4    . . . . . . . . . . . . . . . . . 970

 4    2B-1    . . . . . . . . . . . . . . . . . 986

 5    C506, C511 and C513   . . . . . . . . . . . 988

 6    C501 through C514 and 1435  . . . . . . . . 988

 7    C508    . . . . . . . . . . . . . . . . . 993

 8    3D-2    . . . . . . . . . . . . . . . . . .1002

 9                    DEFENDANT EXHIBITS

10    Exhibit No.                           Received

11    309    . . . . . . . . . . . . . . . . . 826

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```