O643MEN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4             v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ, et al.,

6             Defendants.
                                        Trial
7    ------------------------------x

8                                       New York, N.Y.
                                        June 4, 2024
9                                       9:40 a.m.

10   Before:

11
                      HON. SIDNEY H. STEIN,
12
                                        District Judge
13                                      -and a Jury-

14                      APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  PAUL M. MONTELEONI
17        DANIEL C. RICHENTHAL
          ELI J. MARK
18        LARA E. POMERANTZ
          CATHERINE E. GHOSH
19        Assistant United States Attorneys
          -and-
20        CHRISTINA A. CLARK
          National Security Division

21

22

23

24

25

APPEARANCES CONTINUED

PAUL HASTINGS LLP
Attorneys for Defendant Menendez
BY: ADAM FEE
AVI WEITZMAN
RITA FISHMAN
PAUL GROSS

GIBBONS, P.C.
Attorneys for Defendant Hana
BY: LAWRENCE S. LUSTBERG
ANNE M. COLLART
CHRISTINA LaBRUNO
RICARDO SOLANO, Jr.
ANDREW J. MARINO
ELENA CICOGNANI
JESSICA L. GUARRACINO

CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
Attorneys for Defendant Daibes

Marwan Abdel-Raman, Interpreter (Arabic)
Rodina Mikhail, Interpreter (Arabic)

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  The jurors are here.  I

3    understand the government has an issue.

4           MR. RICHENTHAL:  Two issues.  Ms. Pomerantz will cover

5    the first and I will cover the second.  They both concern as

6    soon as our second witness and then the second issue also

7    concerns a later witness as well.  So I'll turn to

8    Ms. Pomerantz on the first.

9           MS. POMERANTZ:  So we have an issue regarding Federal

10   Rule of Evidence 801(d)(1)(B)(ii) that we wanted to flag for

11   the Court regarding the second witness we plan to call today.

12          THE COURT:  Just a moment.

13          MR. FEE:  Can I be rude and short circuit this,

14   Ms. Pomerantz, we had told her we were going to cross about an

15   issue relating to the witness she's discussing.  On behalf of

16   Senator Menendez, I think -- I know we are not, we are now not

17   going to do that.  I don't know if the other lawyers intend to

18   raise it.

19          THE COURT:  Let's hear it from the others.

20          MR. LUSTBERG:  Thank you, your Honor.  I think this

21   goes to issues of credibility and as I told Ms. Pomerantz

22   yesterday, will not be cross-examining.

23          MR. DE CASTRO:  We're not.

24          THE COURT:  No issue.

25          MS. POMERANTZ:  Very good.

1          THE COURT:  Taken care of.  Second issue.

2          MR. RICHENTHAL:  I would love the second issue to be

3    mooted.  Let's see.

4          Last night at 10:44 p.m. we received 10 exhibits

5    concerning two witnesses for this morning.

6          THE COURT:  What happened to the three-day rule?

7          MR. RICHENTHAL:  Well, your Honor, I wanted to raise

8    two concerns.  The first is that.  If the Court wants to talk

9    about that, I am happy to.  I don't want to delay the jury but

10   yes, I will start with that.

11         THE COURT:  No, let's not talk about three-day rule

12   right now.

13         MR. RICHENTHAL:  Okay.  I'll skip to the substance

14   which was my intention.

15         On the substance we have not had endless time to

16   review it, and we have concerns about two set of exhibits.  One

17   we suspect will come up.

18         THE COURT:  What exhibit, what witness is this?

19         MR. RICHENTHAL:  First exhibit is DX 1100.  1100 we

20   expect may come up on cross-examination of

21   Ms. Williams-Thompson.

22         THE COURT:  What witness number is this?

23         MR. RICHENTHAL:  Number 2.

24         THE COURT:  How long is the first witness?

25         MR. RICHENTHAL:  The direct examination of the first

O643MEN1

1    witness will not be more than 30 minutes.  I can't speak to

2    cross-examination.

3              THE COURT:  Go ahead.  DX 1100, yes.

4              MR. RICHENTHAL:  And we also have a concern about DX

5    86 which is an exhibit we suspect or we've been informed may

6    come up on our third witness so I am happy to take those in

7    order.

8              THE COURT:  Yes, in order.  Second witness first, DX

9    1100.

10             MR. RICHENTHAL:  Ms. Wechsler, can you put 1100 on the

11   screen.  1100 is on screen.  The other witness is not 86.  It

12   is 136.

13             THE COURT:  Go ahead.

14             MR. RICHENTHAL:  So, DX 1100 as we understand it is a

15   65-page document.  It appears to be credit card statements for

16   a period of time for a PAC, that is a Political Action

17   Committee, affiliated with Mr. Menendez called New Millennium.

18   It contains expenses and travel of people other than Mr.

19   Menendez, including Fred Turner.

20             The relevance of this is not apparent to us both

21   generally and in particular with respect to

22   Ms. Williams-Thompson who is literally going to testify simply

23   to surveilling a group of individuals having dinner at a

24   Morton's Steakhouse.

25             We asked the defense last night for the relevance of

1    this.  We were told -- this is a quote -- it's obvious.  And we

2    were given no more information.  It's not obvious to us and it

3    certainly is not obvious why all 65 pages would be relevant.

4            THE COURT:  I fail to see why in the third week of

5    trial the parties aren't dealing with each other on a more

6    courteous and clear and straightforward basis.  Go ahead, sir.

7            MR. RICHENTHAL:  So, we just don't think this is

8    relevant and it doesn't seem relevance for cross-examination of

9    Ms. Williams-Thompson.  She does not work for New Millennium.

10   She's going to testify in sum to surveillance that she

11   performed on May 21, 2019, of five individuals having dinner at

12   a Morton's Steakhouse in Washington, D.C.  One of those

13   individuals is the defendant Robert Menendez.  Another

14   individual is defendant Wael Hana.  And there are three other

15   individuals.  She will testify in sum to what she saw and heard

16   during her surveillance of that dinner.  And she will introduce

17   or I should say she will talk about exhibits.  We intend to

18   introduce both photographs and video of the dinner.

19           THE COURT:  Yes, sir.

20           MR. FEE:  They surveilled -- there is going to be two

21   witnesses this morning who surveilled the dinner at Morton's.

22   The government produced this statement to us.  Senator Menendez

23   paid for his and his then girlfriend's dinner at Morton's on

24   the night of the surveillance.  That's one.  Two.

25           THE COURT:  Just a moment.

O643MEN1

1           MR. FEE:  It's reflected on page 24 of the exhibit.

2           THE COURT:  I take it, government, she's not going to

3    testify who paid for anything.

4           MR. FEE:  She will.  She --

5           THE COURT:  Government, I take it she's not going to

6    testify to who paid for anything.  Is she?

7           MR. RICHENTHAL:  No, she's not.

8           MR. FEE:  It is the opposite.  She is going to testify

9    she never saw them pay a bill and they just left.

10          MR. RICHENTHAL:  That is her memory but we don't

11   intend to elicit it.

12          THE COURT:  That's not an issue.

13          MR. FEE:  I'm entitled to inquire about her

14   observations during their surveillance.  Whether they choose to

15   elicit every single fact she knows or we chose to go into it.

16          THE COURT:  What do you intend to elicit?

17          MR. FEE:  I intend to elicit that she claims to not

18   remember seeing a bill.  And we can show --

19          THE COURT:  Just a moment.

20          MR. FEE:  She didn't see a bill, but he clearly paid.

21   And --

22          THE COURT:  Wait.  You believe she will testify that

23   she doesn't remember seeing a bill but she remembers him

24   paying.

25          MR. FEE:  No.  It's just to show she was unable to

1    observe everything that happened.  She will say that I never

2    saw them pay a bill, they just got up and left.  I'm sure

3    she'll say that.

4              THE COURT:  You intend to adduce that even though the

5    government doesn't.

6              MR. FEE:  Absolutely, your Honor.

7              THE COURT:  Just a moment.  What else?

8              MR. FEE:  Your Honor, this is relevant to the case

9    more broadly, as well as to this particular witness's testimony

10   in this way.  Ms. Williams will testify that she overheard a

11   waiter say to Senator Menendez "do you want the usual."  More

12   broadly, the argument the government will make from this

13   meeting is that was a meeting among co-conspirators.

14   Mr. Menendez, Mr. Hana, an Egyptian diplomat Nader Moussa, and

15   Nadine Arslanian.  This statement produced by the government

16   includes only the references to Mr. Menendez paying on his

17   campaign PAC for his meals at Morton's.

18             THE COURT:  Wait.  That I don't follow.  She will, you

19   say she will testify that she overheard a waiter, hearsay but

20   not for the truth of the matter asserted, I take it, "do you

21   want the usual."  Go ahead.

22             MR. FEE:  So the fact is the senator ate there every

23   other night basically.  This reflects he ate there 250 times

24   with people other than this crew of Mr. Hana and the Egyptian

25   diplomat.  It is relevant to the case.

O643MEN1

1      THE COURT:  How?

2      MR. FEE:  Because the argument is going to be this was

3  a meeting of co-conspirators where they were discussing elicit

4  matters.  That is the inference the government wants the jury

5  to draw.  We want to say you can find Senator Menendez having

6  the same dinner with diplomats and other government officials

7  almost every night of the workweek at Morton's in Washington,

8  D.C.  It is directly relevant to the government's theory.

9      THE COURT:  Just a moment.

10      MR. FEE:  There is one more point, your Honor.

11      THE COURT:  "Do you want the usual" simply means that

12  this is the meal he usually has there.  Nothing more than that.

13      MR. FEE:  That's correct.  It comes up in her

14  testimony that he dines there often.  It is more broadly

15  relevant, I promise you they will argue that this meeting at

16  Morton's was a meeting among criminal conspirators.

17      THE COURT:  I'm sure they will.  There is no other

18  purpose than that.  Or rather, that certainly is a purpose.  I

19  understand that.  But just a moment.

20      MR. FEE:  Sorry, your Honor.

21      THE COURT:  But the fact that he eats there, that he

22  has a usual meal there, therefore the inference that he eats

23  there a lot, says nothing about whether he eats there with

24  these same people a lot.

25      MR. FEE:  That's not correct.  He eats there almost

1    every other day.  And there is no other proof in this case, no

2    other surveillance, no other credit card that he ever dined

3    there again with them.

4           The last point I'll make, your Honor, it is directly

5    relevant to that inference the government want the jury to

6    draw.  The fact is you could have surveilled him at almost any

7    time at Morton's having dinner.

8           THE COURT:  Let me hear from the government.

9           MR. FEE:  Last point.  The Court is permitting us to

10   put on our expert who will testify about his review of

11   financial records.  This will also come in through that expert,

12   Senator Menendez's official campaign PAC.  So every charge he

13   makes on that card is filed publicly.  You can Google it.

14          THE COURT:  Government.

15          MR. RICHENTHAL:  So, taking the last point first, if

16   the defense wants to introduce this exhibit through their own

17   witness, we'll see whether we have an objection at that time.

18   Let's focus on Ms. Williams-Thompson.

19          First, we do not intend to elicit the statement "Sir,

20   do you want your usual" in substance or in those words.  She

21   did say that in prep.  People say all kinds of things in prep.

22   Her testimony is far more narrow.

23          THE COURT:  But what Mr. Fee is saying is she's going

24   to testify to what she saw and heard.  So if that's the scope

25   of direct, which it obviously will be, then Mr. Fee is saying

O643MEN1

 1    what she saw and heard, and elicit this as part of what she saw

 2    and heard.

 3              MR. RICHENTHAL:  It may be right they can elicit she

 4    heard that.  That doesn't mean they can put in months of credit

 5    card bills on unrelated dinners.

 6              THE COURT:  That I understand.  Let's focus

 7    specifically on this charge.

 8              MR. RICHENTHAL:  Well, I have a couple of responses on

 9    this charge.  So first it's not obvious looking at that time

10    that it is actually the same charge.  I'm not an expert on

11    American Express.  The charge is on a different date.

12              THE COURT:  The charge is on a different date?

13              MR. RICHENTHAL:  Yes, sir.  The Morton's dinner I am

14    talking about is May 21, 2019.  I don't think that date is in

15    dispute.  It is documented, there are photographs, etc.  The

16    charge to which I think Mr. Fee is pointing I believe is the

17    second line on PDF page 24 which is May 22, 2019.

18              Now to be clear, as a layperson, I am aware that on

19    occasion charges post after something happens.

20              THE COURT:  I agree.

21              MR. RICHENTHAL:  I don't know for sure this is the

22    same charge.  I literally don't know and the witness doesn't

23    know.  There is no basis in our view for the jury to know one

24    way or another through this witness.  It may be someone, for

25    example, their financial expert may have a proper opinion about

O643MEN1

1    how AmEx does charges and perhaps the jury could draw that

2    inference.  That's our first issue.

3         The second is what this seems to be is evidence that

4    Mr. Menendez allegedly didn't commit crimes on other occasions

5    with other people.  That is, he dined there regularly with

6    other people.  That's what I heard Mr. Fee say.  That's

7    obviously not admissible.  In *Myers*, for example, the Second

8    Circuit didn't admit all the things the defendants talked about

9    on floor of the Congress simply because some things they talked

10   about were criminal.  A defendant cannot defend himself by

11   arguing on other occasions he had, in this case, dinners that

12   aren't alleged to be conspiratorial in nature.

13        THE COURT:  I understand.

14        Mr. Fee.

15        MR. FEE:  Your Honor, the argument they're making is

16   very simple and this is a very simple response that we need

17   these documents to make.  Which is that you know this dinner

18   involved crimes, because of all the evidence we, the

19   government, have put in.  We have all these very highly

20   experienced surveillance people doing this work.  Look at this

21   shady meeting.

22        It is totally fair and appropriate and commonplace to

23   respond by saying this man, our client, is at that same

24   restaurant at that same table 250 nights a year.  There is

25   nothing unusual or atypical about him having a dinner there

1    with a diplomat or a friend.  That's it, your Honor.  This

2    evidence is coming in either way.  It is totally appropriate

3    for us to do so here.

4              THE COURT:  I'm going to exclude it at this point.

5    Sounds like you can bring it in with your expert he goes to

6    Morton's 100 times in 100 days or whatever it may be, and the

7    expense is whatever it is, if that's what you want to

8    establish.  And then on May 22 he paid for this amount, if

9    indeed that's what you established.

10              In terms of this witness, I am going to exclude it at

11   this time under 403 because I do find that the probative value

12   is substantially outweighed by the danger of undue delay, we're

13   not going to go through 65 pages, unfair prejudice, and

14   confusing the issues.

15              Let's get some testimony before this jury.  Bring the

16   jury in.  I'll handle the other issue at a break.

17              What's the other issue?

18              MR. RICHENTHAL:  DX 136 which we anticipate might come

19   up on cross-examination of our third witness Anna Frenzilli.

20              THE COURT:  Yes.  Put it up on the screen so I can see

21   it.  Once this jury comes in we'll take it down.  We'll have a

22   full day of testimony today.

23              MR. WEITZMAN:  Your Honor, we have some things to be

24   heard on with respect to the full day of testimony.  That the

25   government noticed a different witness order last night

O643MEN1

1    including a new witness for the first time that we're finding

2    out about today that was not noticed for this week, despite the

3    three-day rule.  We'd like to make a record on that.  We can do

4    it after this jury goes to the break.

5              THE COURT:  Is that for witness number 1?

6              MR. WEITZMAN:  No.  We will make a record during a

7    break.  But the notion that we are not playing by a three-day

8    rule or two-day rule which is actually for us.

9              THE COURT:  I said I would handle the three-day rule

10   issue later.

11             MR. WEITZMAN:  Thank you, your Honor.

12             THE COURT:  I see 136.  Let's put that away.  Let's

13   have the jury in.  Jury entering.

14             (Jury present)

15             THE COURT:  Thank you for being here in a timely

16   fashion this morning, ladies and gentlemen.  We had some legal

17   matters to take care of but we've taken care of some of them.

18   We now will commence the trial day.

19             Call your next witness, government.

20             (Continued on next page)

21

22

23

24

25

O643MEN1                         Hunter Mills - Direct

1          MR. RICHENTHAL:  The government calls Special Agent

2    Chase Hunter Mills.

3          THE COURT:  Good morning, sir, and welcome.  Please be

4    seated.  Speak loudly, slowly, and clearly.  It is a

5    directional microphone so keep it in front of your face.

6          Your witness, Mr. Richenthal.

7     CHASE HUNTER MILLS,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. RICHENTHAL:

12   Q.  Good morning, Agent Hunter Mills.  Can you hear me okay?

13   A.  Yes, sir.

14   Q.  Where do you work?

15   A.  I am a special agent with the FBI in the Houston Division.

16   Q.  How long have you been working in the Houston Division?

17   A.  Roughly 2 years.

18   Q.  For approximately how long have you worked for the FBI

19   generally?

20   A.  A little over 8 years.

21   Q.  Let's start with the Houston.  What's your role in sum as a

22   Special Agent in the Houston Field Division?

23   A.  I am assigned to the Health Care Fraud Task Force in the

24   Houston Division as a special agent.

25   Q.  You said that you worked with the FBI for eight years, two

1   years in Houston.  What did you prior to working in Houston?

2   A.  Prior to being a special agent, I was an investigative

3   specialist out of the Washington Field Office in Washington,

4   D.C.

5   Q.  What in short is an investigative specialist?

6   A.  An investigative specialist is an individual who conducts

7   discrete surveillance in relation to ongoing federal

8   investigations.

9   Q.  I am going to talk about that in a moment.  But first,

10  approximately how long were you an investigative specialist?

11  A.  Approximately 6 years.

12  Q.  Were you located in Washington, D.C. that entire time?

13  A.  Yes, sir.

14  Q.  Was your work in Washington, D.C. that entire time?

15  A.  And the surroundings area, yes.  Northern Virginia,

16  Maryland, and D.C.

17  Q.  In short, what is an investigative specialist?

18  A.  An investigative specialist conducts discrete surveillance

19  as part of a team to assist in ongoing investigations in the

20  D.C. and surrounding areas.

21  Q.  You've now used the phrase "discrete surveillance."  What

22  is discrete surveillance?

23  A.  Discrete surveillance is a team effort to gather raw

24  intelligence of individuals without them being privy to our

25  presence, so to not kind of have them know we are surveilling.

1    Q.  Is that what you mean by "discrete"?

2    A.  Yes, sir.

3    Q.  What is the purpose, if any, of ensuring you're discrete

4    while performing surveillance?

5    A.  Performing discrete surveillance and someone not knowing

6    you're surveilling, you'll typically get a raw intelligence

7    product.  Someone's behavior that's natural and what they would

8    be doing without.

9    Q.  We'll talk more in a moment.  But in general, what do you

10   mean by surveillance?

11   A.  Following an individual, whether that be on foot or in a

12   vehicle.

13   Q.  Following them to what kinds of locations?

14   A.  It could be just generally out on the street, it could be

15   in restaurants, bars, coffee shops.  Things of that nature.

16   Q.  Approximately how frequently did you perform that kind of

17   surveillance work as an investigative specialist?

18   A.  Roughly five days a week over the course of 6 years.

19   Q.  Without revealing any sensitive techniques, what kind of

20   training, if any, did you undertake to perform such

21   surveillance?

22   A.  To become an investigative specialist you go through a

23   nine-week surveillance course.  The first week is in Quantico,

24   Virginia, and then you go to an offsite for the remainder of

25   the eight weeks to be taught how to perform discrete

1    surveillance in a team environment.

2    Q.  You just said "team environment."  What do you mean by

3    that?

4    A.  Roughly six to eight individuals make up a surveillance

5    team.  You are assigned to a specific team and you perform

6    discrete surveillance with that team.

7    Q.  On a given surveillance, do team members always have the

8    same role or position?

9    A.  No.

10   Q.  What kind of roles or positions are performed by different

11   members of the team?

12   A.  Each team has a team leader who is responsible for the team

13   as an entirety, proper set ups, things like that.  You have an

14   assistant team leader who supports the team leader in their

15   decisions, also partly responsible for setting up the team

16   members.  Then you have team members which will generally

17   perform the discrete surveillance along with the team leader

18   and the assistant team leader.

19          And then some specific roles within the team, you can

20   have a surveillance photography specialist, someone on the team

21   who might have a vehicle more equipped to handle photography or

22   videography, things of that nature.  Specific roles also you

23   might have some individuals that blend better in certain spots,

24   would be put inside of establishments more often than not.

25   Q.  You mentioned a team.  While working on a surveillance, are

1    you physically with the rest of the team members or not?

2    A.  We are all in our own individual vehicles, but within

3    proximity of each other.

4    Q.  Why not be all together?

5    A.  From a strategic standpoint, it makes sense to have more

6    individuals with capability to see things from different angles

7    and different spots.

8    Q.  What kind of investigations or cases in general did you

9    perform surveillance?

10   A.  They would be anything from the --

11            MR. FEE:  Objection.

12            THE COURT:  Just a moment.  I'll allow it.  You may

13   answer.

14            THE WITNESS:  I may answer?

15            THE COURT:  Yes.

16   A.  Could you repeat the question, pleases.

17   Q.  For what kinds of cases or investigations in general did

18   you perform surveillance over the course of your career?

19   A.  Criminal investigations and national security

20   investigations.

21   Q.  What kinds of locations, that is, indoors, outdoors, what

22   kinds of places?

23   A.  Indoors, outsides, it could be inside bars, restaurants,

24   coffee shops, or just out on the street, highways and roads.

25   Q.  You mentioned a few moments ago you tried to remain

O643MEN1                          Hunter Mills - Direct

1    discrete.  Can you describe what steps, if any, to remain

2    discrete?

3              THE COURT:  Slow down in asking questions.

4    Q.  You testified a few moments ago you tried to remain

5    discrete.  Can you explain in general what kinds of steps, if

6    any, you undertook throughout your career to remain discrete?

7    A.  In a mobile platform, discrete would be something we refer

8    to as cover, which is vehicles in between you and the subject

9    vehicle.  That would be a most common way.  You could use

10   different lanes and vantage points to remain in a position of

11   discreteness where someone wouldn't see you.

12             Inside of places, techniques would include cover, so a

13   table between you and the subject wherever they may be inside

14   of the establishment.  Things of that nature.

15   Q.  What about if you were taking photographs?  What steps, if

16   any, would you take to conceal the fact that you were taking

17   photographs?

18   A.  So, the photographers on the team usually were in a van or

19   a larger vehicle of some kind.  The van would be equipped with

20   curtains inside of the vehicle, one that draped on the

21   A-pillars of the vehicle.  So in between the back of the front

22   driver's seat and back of the front passenger seat.  A curtain

23   rod would hang up that would block anybody from being able to

24   look through the windshield and see in the back of the van.

25   The back of the van was equipped with curtains along the

1    passenger side and rear driver's side windows via a velcro

2    system to make light not be able to penetrate into the back of

3    a surveillance platform.  So someone could sit inside of the

4    back of a vehicle and remain undetected or unseen while still

5    being able to see what they wanted to.

6    Q.  I am going to direct your attention to particular evening

7    in a moment.  First, other than the evening you are going to

8    testify about momentarily, did you have any role in the

9    investigation of this matter?

10   A.  No.

11   Q.  Did you have any role in the prosecution of this matter?

12   A.  No.

13   Q.  Directing your attention to that evening.  On May 21, 2019,

14   did you participate in a particular surveillance?

15   A.  Yes, sir.

16   Q.  Where?

17   A.  Washington, D.C.

18   Q.  Where specifically in Washington, D.C., I don't mean the

19   address, but what kind of location?

20   A.  It is a Morton's Steakhouse.

21   Q.  Were you alone or were you with others?

22   A.  Alone in my specific vehicle but with a team of

23   individuals.

24   Q.  Let's take those one at a time.  First, approximately how

25   large was the team to your memory?

O643MEN1                    Hunter Mills - Direct

1   A.  To my memory, we combined two teams that night so I would

2   say it was closer in the range of maybe somewhere between 8 to

3   possibly 12 to 15 individuals.

4   Q.  I believe you said you were alone.  Where were you alone?

5   A.  I was alone in the back of a mobile -- of a van I was

6   utilizing for photography.

7                THE COURT:  Were all eight to 12 or 15 individuals FBI

8   special agents?

9                THE WITNESS:  No, your Honor.  They would have been

10  FBI investigative specialists.

11               THE COURT:  Thank you.  That's separate from a special

12  agent?

13               THE WITNESS:  Yes, your Honor.

14               THE COURT:  Thank you.

15  Q.  I think you said you were in a car or a van.

16  A.  Yes, sir.

17  Q.  What type of car or van?

18  A.  It was a 2016 Dodge Caravan, dark blue.

19  Q.  Did it have the type of curtains or other types of blocking

20  to the outside you testified about a minute or so ago?

21  A.  Yes, sir, it did.

22  Q.  Can you describe them please.

23  A.  So specifically, I was parked with my passenger side of the

24  van facing one of the exits from the Morton's Steakhouse.  I

25  had the curtain rod up on in the front as I described between

O643MEN1                      Hunter Mills - Direct

1    the A-pillars of the front seat and back seat.  And I had my

2    driver's side velcro up behind me as well as my back windshield

3    had its curtain up as well.

4              So I was sitting with my back against the driver's

5    side of the back of my van looking out the passenger side.

6    Q.  Looking out at what?

7    A.  The exit from where the Morton's Steakhouse fed into that

8    lobby.

9    Q.  What was your job in sum that evening?

10   A.  To take photos of individuals that were exiting the

11   Morton's.

12   Q.  To take video as well or only photos?

13   A.  Photos and videos, yes, sir.

14   Q.  Were you holding a camera or was the camera somewhere else?

15   A.  I hung my video camera from what we use -- we call it a

16   gorilla pod.  It has -- I can explain what a gorilla pod is.

17   Q.  Please.

18   A.  It has a flat surface you can screw a video camera or

19   camera on top.  It has maneuverable legs where you can wrap it

20   around an object, a headrest, a handle inside the vehicle.  So

21   for the video camera itself, I mounted it to that gorilla pod

22   and hung it from one of the hand grabs inside the back of the

23   van.  And then I was holding a DSLR camera which captures still

24   photography.

25   Q.  What is a DSLR camera?

O643MEN1                    Hunter Mills - Direct

1  A.  I don't know what the abbreviation stands for, but it is,

2  my understanding, it is a high-performing camera body that

3  takes very clear photos.

4  Q.  I think you testified you were alone in this vehicle?

5  A.  Yes, sir.

6  Q.  Where were the other team members at the time generally?

7  A.  In the surrounding area.

8  Q.  How, if at all, did you communicate with the other team

9  members during the course of the surveillance?

10         THE COURT:  Each of you need to slow down for the

11  interpreter.  The interpreter is asking each of you to slow

12  down.

13  Q.  How, if at all, during the course of the surveillance did

14  you communicate with the other team members?

15  A.  We would typically use an encrypted radio that was inside

16  of the vehicle.

17  Q.  What do you mean by encrypted?

18  A.  It was something our ETs or electronic technicians, and we

19  had a microphone that we would speak into to be able to speak

20  with other team members but it was not able to be heard by

21  others around.

22  Q.  Did there come a time when you saw a group exit the

23  location that you were watching?

24  A.  Yes, sir.

25  Q.  Did you take photographs of that group?

O643MEN1                    Hunter Mills - Direct

1    A.  Yes, sir.

2    Q.  Did you take video of that group?

3    A.  Yes, sir.

4    Q.  Let's take it one at a time.  There is a screen in front of

5    you.  I'd like to ask Ms. Wechsler to scroll through what's

6    been marked for identification as Government Exhibit 1G-8B

7    through 1G-8M as in Matthew.  I am going to ask you just to do

8    it a few seconds at time.  Just look up when you're done and

9    let me know if you recognize those exhibits.

10   A.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.  Yes.

11   Yes.  Yes.

12   Q.  Without describing them as of yet, what in general are

13   these?

14   A.  These are photos and/or video screenshots from where I was

15   positioned that night.

16   Q.  Did you take them?

17   A.  Yes, sir.

18   Q.  Did they fairly and accurately depict what you saw that

19   evening?

20   A.  Yes, sir.

21        MR. RICHENTHAL:  The government offers Government

22   Exhibits 1G-8B through 1G-8M.

23        THE COURT:  Admitted.

24        (Government's Exhibit 1G-8B through 1G-8M received in

25   evidence)

1  Q.  Let's start with 1G-8B as in boy.  So first just to orient

2  ourselves, Agent Mills, what are we looking at here?

3  A.  You are looking at a set of double glass or revolving doors

4  that let out of the main concourse area of the Morton's

5  Steakhouse.

6  Q.  What do you mean by that?

7  A.  The Morton's Steakhouse was located on the second floor, if

8  I recall correctly, and it fed into a mezzanine or lobby area

9  that then fed out to the street.

10  Q.  You said a moment ago that some of these are photographs

11  and some of these are still images or screenshots.  Just taking

12  that, what do you mean by each of those terms?

13  A.  Yes, sir.  So, a photograph would be just that, it was a

14  DSLR camera that was used to take a still photograph at the

15  time.  The term screenshot would refer to a segment of a video

16  that we would pause and take a screenshot of and that would be

17  referred to as a video still.

18  Q.  Looking at these exhibits, are you able to discern which is

19  which?

20  A.  For the most part, yes.

21  Q.  Which is the one we are looking at, is this a camera image

22  or a screenshot or a still from a video?

23  A.  This would be a photograph.

24  Q.  I'm not going to do this for each of them.  Can you just

25  explain what in this image leads you to say this is an actual

O643MEN1                          Hunter Mills - Direct

1   photograph rather than a screenshot from a video?

2   A.  The level of zoom that was used, as well as the lighting

3   conditions would tell me this is a photograph.

4   Q.  Generally speaking in your experience, is a photograph

5   better lighting conditions and better zoom or worse as compared

6   to a video?

7   A.  Better zoom.  The lighting may vary depending on the time

8   of day, things of that nature.  But generally speaking, a

9   photograph is harder to get good light than a video camera is.

10  Q.  We're going to go through these one at a time.  Let me know

11  if when we switch if we go from a camera image to a video

12  still?

13  A.  Yes, sir.

14         MR. RICHENTHAL:  Ms. Wechsler, can you go to 1G-8C.

15  Q.  How many people are in this image, Agent Mills?

16  A.  Two.

17  Q.  Go to the next image that is 8D.

18         How many people do you now see?

19  A.  Three.

20  Q.  Let me pause for a moment.  Are you able to tell the gender

21  of the individuals in this photograph?

22  A.  Yes, sir.

23  Q.  What do they appear to be, sir?

24  A.  I see two males and one female.

25  Q.  Separate from the photograph, do you actually remember

O643MEN1                        Hunter Mills - Direct

1    seeing these --

2              THE COURT:  Slow down.

3    Q.  Separate from the photograph, do you remember any of these

4    individuals from that evening?

5    A.  Yes.

6    Q.  Which ones?

7    A.  The female.

8    Q.  What about her do you remember?

9    A.  In the dark lighting conditions I remember the blonde hair

10   as well as she was wearing some type of fur or tan overcoat.

11   Q.  Can you just direct our attention to where, if anywhere, in

12   the photograph you're referring to that item of clothing?

13   A.  Yes, sir.  In the right of the photograph.

14             THE COURT:  Can you circle it on your screen?  Okay.

15             MR. RICHENTHAL:  Ms. Wechsler, can we go to the next

16   image, please.  For the record, the next image is 8E.

17             THE COURT:  Now you can erase that.  I must say I

18   don't know how you can do it, but I know people can do it.

19   Actually you erase it somehow.

20             MR. FEE:  There is a clear button on the right side.

21             THE WITNESS:  Thank you.

22             MR. RICHENTHAL:  Now Ms. Wechsler, can we go to 8F.

23   Q.  Still the same number of individuals in this photograph,

24   Agent Mills?

25   A.  Yes, sir.

O643MEN1                          Hunter Mills - Direct

1    Q.  Can I direct your attention to the center of the photograph

2    near the woman.

3    A.  Yes.

4    Q.  Do you see what appears to be a third individual?

5    A.  Excuse me.  A what?

6    Q.  Do you see what appears to be a third individual towards

7    the center of the photograph?

8    A.  Yes, sir.

9           MR. RICHENTHAL:  Ms. Wechsler, can we now go to the

10   next image 8G.

11   Q.  What's on our screen now, Agent Mills?

12   A.  This appears to potentially be a screenshot from a still

13   video.

14   Q.  Meaning a screenshot from the video that you took?

15   A.  Yes, sir.

16   Q.  What's depicted in this still image or screenshot?

17   A.  Appears to be three individuals, two males and one female.

18          MR. RICHENTHAL:  Ms. Wechsler, can you now go to the

19   next image 8H.

20   Q.  What do we see in this image?

21   A.  I see four individuals, three male and one female.

22   Q.  A few minutes ago you testified you saw a group exit.  Is

23   this the group you were talking about?

24   A.  Yes, sir.

25          MR. RICHENTHAL:  Ms. Wechsler, can you zoom in on the

1    individuals if possible.  Let's take that back out and go to

2    the next image that is 8J.

3    Q.   What is this image, Agent Mills?

4    A.   Again what appear to be a still from a video with three

5    males, or excuse me, three individuals, two males, one female.

6             MR. RICHENTHAL:  Let's go to 8K, Ms. Wechsler.  Can

7    you zoom in on the right side of the image, please.  Now 8L

8    please as in Larry.  And 8M as in Matthew, last in the set.

9    Can you zoom in on the group, Ms. Wechsler.

10            Can you now put on Agent Mills' screen alone or for

11   counsel and the Court what's been marked for identification as

12   1G-5, please.

13   Q.   Agent Mills, something should come up on your screen.  I'd

14   like you to look up when you're done looking at and let me know

15   if you recognize it.

16   A.   Okay.

17            MR. FEE:  Your Honor, we have no objection to its

18   admission if it would save the time.

19            MR. RICHENTHAL:  I think Mr. Fee just said they have

20   no objection.

21            THE COURT:  No, I know.  I wanted to hear what your

22   position was.  I was waiting to hear.

23            MR. RICHENTHAL:  I was going to ask Mr. Mills if he

24   recognizes this.

25            THE COURT:  You recognize it I take it.

1              THE WITNESS:  Yes, your Honor.

2              THE COURT:  I take it you're moving?

3              MR. RICHENTHAL:  I am.

4              THE COURT:  It's admitted without objection.  Thank

5    you, Mr. Fee.

6              (Government's Exhibit 1G-5 received in evidence)

7    Q.  We are going to ask to play it in a moment, but just first,

8    in short, what is this?

9    A.  This is a video from that night.

10   Q.  This is a video you took?

11   A.  Yes, sir.

12   Q.  Is it a video of the same group?

13   A.  Yes, sir.

14             MR. RICHENTHAL:  Ms. Wechsler, can you hit play,

15   please.

16             (Video playing)

17   Q.  For the record, that video lasted approximately 45 seconds.

18   Did you see these individuals drive away or otherwise leave the

19   area?

20   A.  I saw them walk away from the area, yes.

21   Q.  Do you know how, if at all, they left the area?

22   A.  I do not recall.

23   Q.  Do you know if they left --

24             THE COURT:  There's something on the screen.  Take it

25   down.

O643MEN1                        Hunter Mills - Direct

1   Q.  Do you know whether they left together or left separate?

2   A.  No.

3   Q.  Separate from reviewing these photographs, you testified

4   that you recall seeing the woman; is that correct?

5   A.  Yes, sir.

6   Q.  Do you recall seeing how she and the other people you saw

7   interacted?

8   A.  Yes.

9   Q.  How in general did they appear to get along with you?

10  A.  I would say friendly.

11  Q.  What makes you say that?

12  A.  The proximity and the body language as they were all

13  exiting together would lead me to believe they were friendly

14  with each other.

15          THE COURT:  Mr. Hunter Mills, I take it the lighting

16  of what we just saw is an example of when you said that the

17  video has better lighting than stills.  Is that correct?

18          THE WITNESS:  Yes, sir, the camera does, the video

19  camera does it automatically, whereas the body of a camera

20  requires manual input from the user.

21          THE COURT:  Thank you.

22          MR. RICHENTHAL:  Ms. Wechsler, can you now put up

23  what's in evidence as GX 2A-10.

24  Q.  Agent Mills, do you recognize this man?

25  A.  Yes.

O643MEN1                      Hunter Mills - Cross

1    Q.  From where?

2    A.  The photos from that night.

3              MR. RICHENTHAL:  Ms. Wechsler, can you keep that photo

4    on the screen but also put up one G-8L as in Larry, please.  If

5    you could you zoom in on the first male individual in the

6    photograph.

7    Q.  Agent Mills, is that man to your knowledge the same man?

8    A.  Yes.

9              MR. RICHENTHAL:  No further questions.

10             THE COURT:  Cross.

11             MR. FEE:  Yes, your Honor.  Briefly.

12   CROSS-EXAMINATION

13   BY MR. FEE:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Should I call you Mr. Hunter Mill or Agent Mills?

17   A.  Agent Mills is fine.

18   Q.  You said based on what you saw you thought they were

19   friendly with each other, this group?

20   A.  Yes, sir.

21   Q.  Was that video the full extent of what you observed that

22   night of that group?

23   A.  Of that group, yes, sir.

24   Q.  So based on those interactions is how you got to concluding

25   that they were friendly group?

1    A.  Yes, sir.

2    Q.  Did you see them hug?

3    A.  No.

4    Q.  Did you see them kiss on the cheek, any of them?

5    A.  No.

6    Q.  Just seemed friendly?

7    A.  Yes, sir.

8    Q.  So your job at that time, you're now a special agent, but

9    at that time was focused on surveillance, fair to say?

10   A.  Yes, sir.

11   Q.  And so at that time, for the surveillance of Morton's, in

12   May of 2019, you testified that you were not investigating any

13   crimes, right?

14   A.  Yes, sir.

15   Q.  And so you don't have any idea of why you're conducting

16   your surveillance, right?

17   A.  Correct.

18   Q.  And once you finish the surveillance, you hand off the

19   information to others and they decide what might have

20   evidentiary value, right?

21   A.  Yes, sir.

22   Q.  So when you're doing the work and making the observations,

23   you don't know is this meaningful, is this innocent, is it

24   later going to show up in court.  You have no idea.

25   A.  Yes, sir, correct.

1    Q.  You testified about training and the techniques you used at

2    the time you were working on these surveillance team.  You

3    remember that?

4    A.  Yes, sir.

5    Q.  There is something that you have seen in your work where a

6    subject is engaged in countersurveillance, right?

7    A.  Could you repeat that?

8    Q.  Sure.  Let me ask you more simply.  What is a

9    countersurveillance technique that you have come across in your

10   work?

11           MR. RICHENTHAL:  Objection.  Scope.

12           THE COURT:  I'll allow it.

13   A.  One more time.  I apologize.  Could you repeat that

14   question.

15           THE COURT:  Sir, have you heard the term

16   countersurveillance?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  What is countersurveillance?

19           THE WITNESS:  Countersurveillance generally speaking

20   is surveillance of surveillance.

21   Q.  You did not observe on the night at Morton's anything that

22   indicated to you that any of those folks were engaged in

23   countersurveillance, right?

24   A.  Correct.

25   Q.  Nor did you observe anything that suggested to you, based

1   on your experience, that the subjects of your surveillance were

2   trying to avoid being photographed or observed, right?

3           MR. RICHENTHAL:  Objection.

4           THE COURT:  I'll allow it if he can answer it.

5   A.  Would you remind repeating that question, please.

6   Q.  Of course.  You did not observe on that night at Morton's

7   anything that suggested to you, based on your experience, that

8   any of the subjects of your surveillance were trying to avoid

9   being observed that night.

10  A.  Correct.

11  Q.  You testified about working as part of a team on that

12  night, right?

13  A.  Yes, sir.

14  Q.  And that's how all of these surveillances are done.  There

15  is always one team or more than one team working together,

16  right?

17  A.  For the most part, yes.

18  Q.  Sometimes there's just one team or maybe less than a team?

19  A.  More times than not, it's one team that's doing it.

20  Q.  And you testified that the members of the team, for obvious

21  reasons, are not all in one place, you're spread out, right?

22  A.  Correct.

23  Q.  So sometimes, like on this night, there is people inside

24  the restaurant and there's people like you outside the

25  restaurant, right?

1    A.  Yes, sir.

2    Q.  And there might be people on other occasions posted blocks

3    away from one another but working together, correct?

4    A.  Yes, sir.

5    Q.  And the way a surveillance team communicates with one

6    another at this point in time was through text messages

7    generally, correct?

8    A.  No, sir.  General communication with a surveillance team

9    takes place over a simplex radio channel installed inside of

10   the FBI vehicles.

11   Q.  There is a live radio?

12   A.  Yes, sir.

13   Q.  Meaning you can pick up the radio and talk to someone on

14   your team?

15   A.  Yes, sir.

16   Q.  Is it not also the case that some members of the

17   surveillance team would typically use their cell phones to text

18   when they're not in a position to use a radio?

19   A.  Yes, sir.  That's accurate.

20   Q.  On this night, in fact, there was a running text chain

21   amongst the members of the surveillance team, correct?

22   A.  I don't recall exactly who would have been on a text

23   thread, but the cell phone is an option to use to communicate.

24   It is just typically not the primary method of communication.

25   Q.  But would you agree that if you're, say, inside the

O643MEN1                          Hunter Mills - Cross

1    restaurant, near a subject, you wouldn't want to pick up the

2    radio and speak into it, right?

3    A.   Correct.

4    Q.   You would be more likely in that circumstance to use a text

5    message?

6    A.   Generally speaking, yes.

7    Q.   And generally speaking, the reason you have the radio and

8    you have the text messages is the different members of the

9    surveillance team really need to know what's going on, right?

10   A.   Yes, sir.

11   Q.   It's important for the different members of the team to

12   convey information to the rest of the team, right?

13              MR. RICHENTHAL:  Objection.

14              THE COURT:  Sustained.

15   Q.   Why does the team doing surveillance stay in touch with one

16   another while working on a subject or subjects?

17   A.   Because we are not all in the same proximity location wise.

18   We cannot see at all times what's going on.  So the

19   communication aspect is important for other members of the team

20   who do not have eyes on the subject to know what is going on.

21   Q.   And the important information that is shared among that

22   team are things like, hey, the female is moving from this

23   location to that location, for example, right?

24              MR. RICHENTHAL:  Objection.  Form.

25              THE COURT:  Sustained.

O643MEN1                      Hunter Mills - Cross

1   Q.  What are some of the things that the team shares over radio

2   and text typically, Agent Mills?

3   A.  Movement, turns, departures from establishments, things of

4   that nature.

5   Q.  What is an overhear?

6   A.  An overhear typically occurs during a foot surveillance

7   when you are in proximity to an individual to hear what is

8   being said from their mouth.

9   Q.  Typically, overhears would be shared in some way by radio

10  or text or some other means among the surveillance team,

11  correct?

12          MR. RICHENTHAL:  Objection.  Form.

13          THE COURT:  Sustained as to form.

14          In the normal course, are overhears shared by team

15  members if you can say?

16          THE WITNESS:  Yes, but not in real time.

17  Q.  Are they sometimes shared in real time?

18  A.  In my experience --

19  Q.  Sometimes yes, sometimes no?

20  A.  Sometimes yes, sometimes no.

21  Q.  And then you say not in real time.  Does that mean when

22  they are not, when an overhear is not shared in real time, in

23  your experience, when is it shared?

24  A.  It would be shared at a later time, probably after the foot

25  portion would be over.

1    Q.  Days later?

2              THE COURT:  If I understand it, sir.  If you're

3    surveilling somebody and you hear something that's said, I take

4    it you're not about to repeat that either by taking time to

5    text it or to say it over a radio while you are close enough to

6    have heard that person.  Is that what you are saying?

7              THE WITNESS:  Yes, your Honor.

8    Q.  But would it typically in your experience be shared days

9    later, the overhear that could not be shared in real time?

10   A.  No, sir.

11   Q.  In your experience, when is an overhear shared, if not in

12   real time?

13   A.  I would say within the same day, 100 percent.  For a more

14   specific time frame, I would say within a few hours after the

15   end of the overhear engagement.

16   Q.  What is the reason in your experience that you would

17   100 percent want to share that overhear the same day?

18   A.  Recollection purposes, and you would not share it real time

19   as your Honor said, airtime on the radio would be something,

20   but, yeah, you would not share it real time.  You would after

21   the fact.

22   Q.  And when you're not on foot but say seated inside a

23   location like a restaurant, is it sometimes the case that

24   overhears are shared over text message?

25   A.  Bits and pieces of over shares, yes, sir.

O643MEN1                        Hunter Mills - Cross

1    Q.  And so, turning to that night at Morton's -- by the way,

2    when you first arrived at the location, was that group already

3    inside the restaurant?

4    A.  I do not recall.

5    Q.  When you first arrived at the location, was it dark or

6    still sunlight?

7    A.  I do not recall.

8    Q.  While you were working on the surveillance at Morton's,

9    were you involved in listening to the radio and whatever text

10   message information was being shared by the surveillance team?

11   A.  The radio, yes, sir.

12   Q.  So you were listening to the radio?

13   A.  Yes, sir.

14   Q.  You were getting updates throughout the night on what the

15   members of your surveillance team were doing, right?

16   A.  Yes, sir.

17   Q.  Do you remember being advised or being told by other

18   members of the team that night that Senator Menendez arrived

19   alone to Morton's?

20            MR. RICHENTHAL:  Objection.  Hearsay.

21            MR. FEE:  Not for the truth, your Honor.

22            THE COURT:  I'll allow it.  You may answer, sir.

23   Ladies and gentlemen, this is being given to you not for the

24   truth of what was said, but simply for the fact of whether or

25   not it was said.

1          You may answer.

2    Q.  Were you advised whether Senator Menendez arrived to

3    Morton's that night alone?

4    A.  I do not recall.

5          MR. FEE:  Can we put up just for the witness and the

6    attorneys what's been marked as 3549-001.  And let's go to

7    page 3, Mr. Kelly, and highlight from 6:45 through the end of

8    the 7:30 entry.

9    Q.  Let me give you my version.

10          THE COURT:  Agent Mills, the jury already knows this.

11    But I am going to tell you.  You said that you don't recall

12    whether you were advised whether Senator Menendez arrived at

13    Morton's alone.  Do you remember that you said I don't recall?

14          THE WITNESS:  Correct.

15          THE COURT:  Now, in light of the fact that you don't

16    have a recollection one way or the other, Mr. Fee is allowed to

17    put up on the screen anything at all, and you can look at that.

18    He's asking you to look at it.  But simply because something is

19    put down there doesn't mean it's true.

20          The only issue is whether looking at whatever you're

21    looking at refreshes your recollection.  In other words, yes, I

22    now have a new recollection.  Or no, it doesn't refresh my

23    recollection.

24          So can you answer Mr. Fee's question, does looking at

25    whatever that is, does looking at whatever that is give you a

1    new recollection of whether you were advised that Senator

2    Menendez arrived at Morton's alone that night?  Yes or no.

3    A.  Do you mind if I take time to read this?

4    Q.  Yes.  But when you are done, don't say anything.  Just tell

5    me and I'll ask you the next question.

6    A.  Understood.

7              (Pause)

8              THE COURT:  Do you now have a new recollection of

9    whether or not you were advised that the Senator Menendez

10   entered Morton's alone that night?

11             THE WITNESS:  Yes, your Honor.

12             THE COURT:  What is that refreshed recollection?

13             THE WITNESS:  It appears to be at a 10:55 log that

14   states --

15             MR. RICHENTHAL:  He's describing the exhibit.

16             THE COURT:  Don't, as I told you, whatever that is,

17   you don't have to accept the truth of it.  It's not there for

18   the truth.

19             The example that this jury knows I always give is

20   Mr. Fee could have put up a banana and asked you the same

21   question.  It's not what's on that document.  The question is

22   simply, whether looking at that document, you now realize, yes,

23   I was advised that Senator Menendez entered Morton's alone.  Or

24   for that matter, looking at that document, if it's the case,

25   you can say, no, looking at that document doesn't help me

O643MEN1                        Hunter Mills - Cross

1    recall whether or not I was advised that Senator Menendez

2    arrived alone.

3              THE WITNESS:  I understand.  And I would say it does

4    not help me recall if I was advised.

5              MR. FEE:  Thank you, your Honor.  Thank you, Agent

6    Mills.

7    Q.  And so, your testimony, just so I'm clear, you never

8    actually entered Morton's that night?

9    A.  Correct.

10   Q.  Had you entered it on other occasions?

11   A.  No, sir.

12   Q.  How were you able to describe on direct that it had that

13   elevator that went up to the restaurant, and then you could

14   come down the elevator and exit the street?

15             MR. RICHENTHAL:  Objection.  Misstates.

16             THE COURT:  I'm not sure I remember that testimony.

17   Q.  Do you remember testifying about how you entered the

18   restaurant through an elevator and then came back down and

19   entered out of the lobby, Agent Mills?

20             MR. RICHENTHAL:  Objection.

21             THE COURT:  No.

22             Sir, did you testify, let me ask it this way.  Did you

23   testify about how one entered the restaurant through an

24   elevator?

25             THE WITNESS:  I do not remember using the term

1    elevator, but there was a main ground floor and my recollection

2    tells me that the Morton's was an upper floor.  But I don't

3    know how one would have accessed that upper floor.

4            THE COURT:  All right.  Thank you.

5    Q.  Let's put up what was shown to you on direct as Government

6    Exhibit 1G-8L please in evidence.  Can we zoom in on the group

7    of people.

8            So you took this photo, right?

9    A.  Yes, sir.

10   Q.  And you identified -- I'm circling the face second from the

11   left next to the blonde haired woman.  You identified this man

12   as Ahmed Helmy?

13   A.  I do not know the name.

14   Q.  I'm sorry.  I apologize.  Withdrawn, Agent Mills.

15           You identified that man based on the photo, the other

16   photo, the face, the headshot the prosecutor showed you,

17   correct?

18   A.  Side by side, yes, sir.

19   Q.  Side by side.  Were you informed on the radio during the

20   source of surveillance that man arrived in a vehicle bearing

21   diplomatic license plates issued by the District of Columbia?

22           THE COURT:  Same instruction.  Just because it's

23   there, doesn't make it so one way or the other.

24           MR. FEE:  The third page, Mr. Kelly.

25   Q.  You can focus on the 3549-001.  Focus on the 7:56 entry and

O643MEN1                         Hunter Mills - Cross

1    the 8:01 entry.

2              Again, don't say anything, Agent Mills.  Just let me

3    know when you're done reviewing it.  Does that, as the judge

4    instructed you, does this refresh your recollection that that

5    man you identified arrived in a vehicle bearing diplomatic

6    license plates?

7    A.  No, it does not.

8    Q.  From your other work as an investigation specialist, are

9    you aware of what a diplomatic license plate is?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  A diplomatic license plate is given to individuals under

13   diplomatic status from foreign countries that are here for work

14   with other countries.

15   Q.  So are you aware who issues a diplomatic license plate?

16   A.  Yes, sir.

17   Q.  Who issues it?

18   A.  I believe it is Department of State.

19   Q.  The U.S. Department of State?

20   A.  Yes, sir.

21   Q.  To foreign diplomats?

22   A.  Yes, sir.

23   Q.  So fair to say the U.S. Department of State knows who has

24   those license plates, correct?

25              MR. RICHENTHAL:  Objection.

1     THE COURT:  Sustained.

2  Q.  Let's go back to that picture, I've forgotten what the

3  number is it had an L at the end.  1G-8L.

4     Sir, Agent Mills, sitting here today, you see Senator

5  Menendez sitting at that table, right?

6     THE COURT:  You're talking about the photo?

7  Q.  You see my client Senator Menendez?

8     THE COURT:  Do you see Senator Menendez in the

9  courtroom, sir?

10     THE WITNESS:  Yes, sir, I do.

11  Q.  You did not see him exiting Morton's that night, correct?

12  A.  Correct.

13  Q.  Do you recall being advised on the radio that Senator

14  Menendez left earlier than this group and got into a taxi by

15  himself?

16     MR. RICHENTHAL:  Objection.  Assumes a fact and

17  hearsay.

18     THE COURT:  Just a moment.

19     Do you know whether or not you were advised on the

20  radio that Senator Menendez left before the group in the photo

21  that's up and got into a taxi by himself?  Yes or no.

22     THE WITNESS:  No, sir, I don't recall.

23  Q.  But you would agree that you did not see Senator Menendez

24  in this group at any point exiting the restaurant, correct?

25     THE COURT:  You're talking about the photo that's up?

1          MR. FEE:  Thank you, your Honor.

2    Q.  The group you've discussed and is depicted in the

3    photograph 1G-8L, in that group of four, you personally never

4    observed Senator Menendez that night in this group, correct?

5    A.  Correct.

6          MR. FEE:  Nothing further from us, your Honor.

7          THE COURT:  Thank you.  Anything, sir?

8          MR. LUSTBERG:  Yes.

9    CROSS-EXAMINATION

10   BY MR. LUSTBERG:

11   Q.  Good morning, Agent.

12   A.  Good morning.

13   Q.  Just a couple of questions.  Your mission that night was to

14   take photos and videos of people leaving the restaurant; is

15   that your testimony?

16   A.  Of specific individuals, not everybody coming in and out

17   but of specific individuals, yes, sir.

18   Q.  But again.  The mission was to get them as they were

19   leaving the restaurant, correct?

20   A.  Yes, sir.

21   Q.  And do you recall what time you arrived to perform that

22   surveillance?

23   A.  I do not recall.

24   Q.  Do you remember about what time you left?

25   A.  I do not recall.

1              MR. LUSTBERG:  May I approach?

2              THE COURT:  Yes, sir.

3    Q.  I'd ask you to take a look at the second and third pages of

4    that document, and ask you whether it refreshes your

5    recollection as to when you arrived and when you left.

6              THE COURT:  Same process, sir.  Do you understand

7    that?

8              THE WITNESS:  Yes, sir, I understand.

9              THE COURT:  All right.

10   A.  It does not refresh my recollection of arrival and

11   departure for myself.

12   Q.  So, is it your testimony then, I want to make sure you

13   understand it.  You really have no idea when you arrived?

14             MR. RICHENTHAL:  Objection.

15             THE COURT:  Sustained.

16   Q.  Let me ask this way.  Do you have any idea when you arrived

17   for your surveillance?

18   A.  I have a rough estimate, but I could not say specifically.

19   Q.  What's your rough estimate?

20   A.  Dinnertime.

21   Q.  On the other end, when you left?

22   A.  I do not recall.

23   Q.  Do you have an estimate as to when you took those, the

24   picture that we just have been looking at of the individuals

25   leaving the restaurant?

O643MEN1                        Hunter Mills - Cross

1    A.   Just that it was at nighttime but I have no specific time

2    frame.

3    Q.   And do you have an estimate for about how long you were

4    there?

5    A.   No, sir.

6            THE COURT:  Don't give the jury a guess, don't guess,

7    but if you can estimate, estimate.  Was it more than two hours

8    that you were there if you know?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  More than four hours?

11           THE WITNESS:  I do not know.

12           THE COURT:  So an estimate is between two and four?

13           THE WITNESS:  Yes, sir.

14           MR. LUSTBERG:  Thank you very much, your Honor.

15   Q.   And one last question which is you have, you have no

16   pictures from the individuals when they were inside the

17   restaurant, correct?

18   A.   Correct.

19   Q.   And you obviously have no idea what they were talking about

20   when they were inside the restaurant, is that correct?

21           MR. RICHENTHAL:  Objection.

22           THE COURT:  I'll allow it.

23   A.   Would you remind repeating the question?

24           THE COURT:  You don't know, you have nothing to do

25   with what they were doing inside, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O643MEN1                         Hunter Mills - Redirect

1              THE WITNESS:  Correct.

2   Q.  You didn't overhear any conversations from inside the

3   restaurant, correct?

4   A.  Correct.

5              MR. LUSTBERG:  That's all I have.  Thank you very

6   much.

7              THE COURT:  Of course.  Anything, sir?

8              MR. DE CASTRO:  No questions.

9              THE COURT:  Any redirect?

10  REDIRECT EXAMINATION

11  BY MR. RICHENTHAL:

12  Q.  Agent Mills, do you recall being asked about a diplomatic

13  license plate?

14  A.  On cross, yes, sir.

15  Q.  On cross-examination.  Just to be clear, if someone has a

16  diplomatic license plate, does that mean he's necessarily

17  acting as a diplomat?

18  A.  I do not know.

19  Q.  You were asked some questions about whether the individuals

20  were friendly.  Do you recall those questions?

21  A.  Yes, sir.

22              THE COURT:  And whether they were friendly with each

23  other.

24              MR. RICHENTHAL:  Yes, your Honor.

25              Ms. Wechsler, can we put up 1G-8E as in Edward.  Can

1  you zoom in on the individuals.  1G-8H as in Harold.

2  Q.  Agent Mills, do you see anyone smiling in this photograph?

3  A.  Yes, sir.

4  Q.  One person or more than one person?

5  A.  Two people smiling.

6  Q.  Are they smiling at each other?

7  A.  I can't tell if they're specifically looking at each other

8  but the gaze is opposing each other.

9          MR. RICHENTHAL:  Let's now go to 8K as in Karl.  Can

10  you zoom in on the individuals again.

11  Q.  See anyone else smiling?

12  A.  Yes.

13  Q.  How many people?

14  A.  Three.

15  Q.  Are they together?

16  A.  Yes, sir.

17  Q.  Do they appear to be getting along?

18  A.  Yes, sir.

19          MR. RICHENTHAL:  Let's go to 8L as in Larry.

20  Q.  Same questions.

21  A.  Four people smiling.

22  Q.  At each other?

23  A.  In the group, yes.

24          MR. RICHENTHAL:  Can we go to 1G-5 the video, please.

25  Go to, I don't know, 27 seconds in.

1          MR. FEE:  I think we get it.   Objection.

2          THE COURT:  The jury will disregard Mr. Fee's comment.

3          MR. FEE:  I object.

4          THE COURT:  Mr. Fee, you are instructed not to make

5   comments.  What are you asking, sir?

6          MR. FEE:  I think we get it.

7          Me or him?

8          THE COURT:  Mr. Fee, you stood up.

9          MR. FEE:  I'm objecting to do more of this.

10          THE COURT:  All right.  Sir, what's your question?

11          MR. RICHENTHAL:  Can you go to 27 seconds into the

12   video, Ms. Wechsler.  Can you hit play now.  Stop.

13   Q.  Agent Mills, what do you see these individuals doing?

14   A.  I see them in kind of a dark area on the left side of the

15   screen standing in close proximity to one another.

16   Q.  Do they appear to be getting along?

17   A.  From just this screenshot it would be hard to say, but,

18   yes.

19   Q.  Is this immediately after the photographs that you just

20   showed them in which they were smiling at each other?

21   A.  Yes.

22   Q.  Did I show you more than one photo or just one photo?

23   A.  Multiple.

24          MR. RICHENTHAL:  No further questions.

25          THE COURT:  Thank you.  You are excused, Agent.  You

O643MEN1

1    may step down.

2                (Witness excused)

3                THE COURT:  Next witness for the government.

4                MS. POMERANTZ:  Your Honor, if I can have a moment to

5    confer with defense counsel before calling this next witness.

6                THE COURT:  Yes.

7                (Counsel conferring)

8                MS. POMERANTZ:  Your Honor, there is an issue we would

9    like to raise with you at sidebar, so this might be a good

10   opportunity for the morning break.

11               THE COURT:  No.  Let's handle it right now.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O643MEN1

1          (At the sidebar)

2          MS. POMERANTZ:  Your Honor, I just conferred with

3   Mr. Fee who informed me that he intends to ask the next witness

4   about the lack of text messages regarding the statement "what

5   else can the love of my life do for you" which is what she

6   overheard while conducting surveillance.

7          THE COURT:  Just a moment.  You're telling me we're

8   going to have another investigative specialist who overheard

9   Nadine say to somebody "what else can the love of my life do

10  for you?"

11         MS. POMERANTZ:  That's correct, your Honor.  And she's

12  the investigative specialist who was inside Morton's that

13  evening.  And so, we've raised with Mr. Fee whether he intends

14  to ask her questions similar to what he was asking questions of

15  the prior witness related to text messages that evening.  And I

16  believe --

17         THE COURT:  In other words, did they text back and

18  forth.

19         MS. POMERANTZ:  Right.  And did she text out the

20  specific statement "what else can the love of my life do for

21  you."

22         THE COURT:  And you expect her to say?

23         MS. POMERANTZ:  It's not in those text messages.  So,

24  what I believe, what I believe this is, your Honor, is while he

25  represented earlier that he does not intend to ask about the

1    accident and the effect of her memory, which was the issue I

2    was starting to raise for your Honor.

3         I'll back up.  I raised the prior consistent issue

4    statement because we had conferred with counsel about whether

5    they intended to ask this next witness about an accident that

6    happened.  They represented they didn't.

7         THE COURT:  Actually I don't remember that.  Was that

8    on the record?

9         MS. POMERANTZ:  That was not.  I started to explain

10   the issue and Mr. Fee stood up and said that he did not intend

11   to so the issue is mooted.

12        THE COURT:  Okay.

13        MS. POMERANTZ:  Now, your Honor, I believe that the

14   prior consistent statement issue is renewed as an issue, and I

15   wanted to flag this before the examination happens.  Because to

16   the extent that Mr. Fee or defense counsel intends to ask her

17   about that statement not being in the text messages or

18   otherwise attack her credibility under amended Federal Rule of

19   Evidence 801(d)(1)(B)(ii).

20        THE COURT:  Do you have the 2024 version of this here?

21        MR. LUSTBERG:  I have one.

22        THE COURT:  Go ahead.

23        MS. POMERANTZ:  To the extent they are questioning or

24   trying to attack her credibility that because it wasn't texted

25   out, the statement was not made, or make any other suggestion

1    or line of attacking her credibility, we are permitted under

2    this amended rule to put in her prior consistent statement that

3    is reflected in what's called --

4              THE COURT:  What is her prior consistent statement?

5              MS. POMERANTZ:  That's what I wanted to flag for your

6    Honor.  There is what's called an F.D. 1055.

7              THE COURT:  I've got to let the jury have a break.

8              MS. POMERANTZ:  Thank you, your Honor.

9              (In open court)

10             THE COURT:  Ladies and gentlemen rather than have you

11   wait, why don't we give you your morning break.

12             (Jury excused)

13             THE COURT:  If you're giving me an amended rule, make

14   sure I have the amendment.

15             Who can give me the most current rule?  What I have

16   here is I have the Civil Judicial Procedures and Rules 2024

17   edition.

18             MR. FEE:  Your Honor, may I?

19             THE COURT:  Yes.

20             (Continued on next page)

21

22

23

24

25

O645men2

```
 1              THE COURT:  I have in the criminal code the same
 2   thing.  801(d)(2)(B) should read, or the version I have says:
 3   A statement that meets the following conditions is not hearsay.
 4   The statement is offered against an opposing party and is one
 5   the party manifested --
 6              MS. POMERANTZ:  Your Honor, my apologies.
 7   801(d)(1)(B)(ii).
 8              THE COURT:  Sorry.  (d)(1)(B)(ii)?
 9              MS. POMERANTZ:  Yes.
10              THE COURT:  Let me hand this back.  I just want to
11   look at the advisory committee notes.  Actually, I don't see
12   any advisory committee notes for a recent change.  I guess that
13   doesn't matter as long as we are dealing with the same one.
14              A statement that meets the following conditions is not
15   hearsay:  The declarant testifies and the subject of
16   cross-examination about a prior statement.
17              What is the prior statement?
18              MS. POMERANTZ:  Well, your Honor, we expect that the
19   witness will testify about overhearing Nadine Menendez ask, at
20   a May 2019 dinner, the Morton's surveillance that's been the
21   subject of testimony this morning:  What else can the love of
22   my life do for you?  Your Honor may recall that from the
23   indictment.  There is a prior consistent statement in the form
24   of what is called an FD 1055.  It is a report from the FBI of a
25   surveillance log and within that report it indicates -- and I
```

O645men2

```
1   prepared a redacted version of that report that is intended to

2   be narrowly tailored to reflect the prior consistent statement

3   which it says:  UF said:  What else can the love --

4            THE COURT:  Wait.  UF?

5            MS. POMERANTZ:  Excuse me.  Yes, your Honor.

6   Unidentified female.

7            THE COURT:  Unidentified female.

8            MR. MONTELEONI:  UF said:  What else can the love of

9   my life do for you?  And it refers to the report relating to

10  surveillance on May 21, 2019, and the report is dated May 29,

11  2019.  And as I was mentioning when we were just before your

12  Honor just briefly, that the use of a prior consistent

13  statement is not limited to the rebuttal of a charge or recent

14  fabrication or improper influence or motive under this amended

15  rule.  It is permitted to admit a prior consistent statement

16  when the witness' credibility is attacked.

17           THE COURT:  Let me read it.  I understand it.  A

18  statement that meets the following conditions is not hearsay:

19  The declarant testifies -- this witness will testify, and is

20  subject to cross-examination about a prior statement, and the

21  prior statement is what else, that she overheard Nadine

22  Menendez say, or the unidentified female say:  What else can

23  the love of my life do for you?  OK.  And the statement is

24  consistent with the declarant's testimony, that is, her

25  testimony here will be that she heard the unidentified female
```

O645men2

1    say this; correct?

2              MS. POMERANTZ:  Correct, your Honor.

3              THE COURT:  OK.  Is consistent with the declarant's

4    testimony and is offered.  To rehabilitate the declarant's

5    credibility as a witness when attacked on another ground, and

6    you are saying the purpose of Mr. Fee's cross-examination is to

7    attack this witness' credibility.  Is that your point?

8              MS. POMERANTZ:  Yes, your Honor.  As to this

9    statement, yes, your Honor.

10             THE COURT:  Yes.

11             Mr. Fee, your turn, sir.

12             MR. FEE:  Thank you, your Honor; two points.

13             One, there is some nuance here.  I would not --

14             THE COURT:  I do nuance.  Go ahead.

15             MR. FEE:  More than I do.

16             I would not say that we are attacking her credibility

17   on this statement for the reason that Ms. Pomerantz just

18   summarized.  What we are pointing out through cross is this.

19   She is going to say that she overheard the statement attributed

20   to Nadine Arslanian on May 21st.  That statement was not

21   recorded, so far as the defense is aware, until eight days

22   later.

23             THE COURT:  May 29.

24             MR. FEE:  So we are pointing out that between the 21st

25   and the 29th, her memory, until it was recorded, may have

O645men2

1    failed her.  And so we are not saying she fabricated this in

2    the months since, we are saying in that eight-day period.  So,

3    I think, given that, it is not actually within the confines of

4    this rule because it is not a prior consistent statement that

5    focuses on that eight-day gap.  That is what we are talking

6    about.  If they had --

7                THE COURT:  No, but wait just a moment.

8                MR. FEE:  Yes, sir.

9                THE COURT:  By focusing, by pointing out the eight-day

10   gap, which you are entitled to do and you set it up nicely with

11   the prior witness, isn't that attacking her credibility?

12               MR. FEE:  Your Honor, I'm not exactly sure what she is

13   going to say.  I could imagine this cross being her

14   acknowledging that she did not convey it until days later and

15   acknowledging it is possible she may have not captured the

16   words precisely.  I don't know.  So if it is that scenario, no,

17   I don't think we are attacking credibility.  If she says

18   something like, I heard it, I told my team, I don't know when

19   they wrote it down, that's not my problem, one hundred percent

20   that is what I heard that night; most likely yes, your Honor.

21               THE COURT:  Most likely yes what?

22               MR. FEE:  I am attacking her credibility to some

23   degree but, frankly, I don't expect I'm going to challenge,

24   very much, her account, more just pointing out that the first

25   recorded version of this is made on the 29th, eight days later.

O645men2

1          THE COURT:  OK.

2          MS. POMERANTZ:  Your Honor, the pointing out is only

3   relevant to the extent he is trying to argue that it did occur.

4          THE COURT:  I'm sorry.  I didn't mean to cut you off.

5   Only relevant to the?

6          MS. POMERANTZ:  If it is relevant because he is trying

7   to argue that it didn't occur, that it didn't happen.

8          THE COURT:  I think that's right, but let's see how it

9   goes.  I am inclined, on redirect, to have it come out.

10         MR. FEE:  The last point, your Honor.  There is a

11  double hearsay problem here.  If you found it fits this rule,

12  her statement to the person who made that report would be

13  non-hearsay but she didn't write that report.  So somebody else

14  wrote down those words and I don't think there is a way to

15  overcome that hearsay obstacle, the report itself that

16  Ms. Pomerantz is representing.

17         MS. POMERANTZ:  Your Honor, my understanding is that

18  she would testify that this log includes statements that she

19  conveyed to members of her team or so that it could be

20  memorialized and that she reviewed it to make sure it was

21  accurate and signed off on it.

22         THE COURT:  That takes care of it.  Let's bring the

23  jury in.

24         MS. POMERANTZ:  Your Honor, may I please just use the

25  restroom very quickly?

O645men2

1          THE COURT:  Yes.  Of course.  Everyone may.  Let's
2    take five minutes.
3          MR. WEITZMAN:  Your Honor I know Ms. Pomerantz needs
4    to use the restroom but can I bend your ear for just a minute
5    about the three-day and new witnesses?
6          THE COURT:  Do we need to do that now?  I am trying to
7    get as much in as I can.
8          MR. WEITZMAN:  I think the next witness is going to be
9    up pretty soon.
10          THE COURT:  OK.  Let's let Ms. Pomerantz, or anyone
11    else, go to the ladies room or the mens room and then we will
12    bring in the jury.
13          MS. POMERANTZ:  Thank you, your Honor.
14          THE COURT:  I will hear you, sir, before we need to.
15    I am stepping off the bench.
16          (Recess)
17          THE COURT:  Let's have the government lawyers here.
18          You may be seated in the courtroom.
19          Mr. Weitzman, three-day rule.  What is the issue?
20          MR. WEITZMAN:  Here is the issue, your Honor.  We
21    inquired of the government multiple times over the last few
22    days who their next witness would be today, who their witnesses
23    would be today and they identified, including this weekend,
24    Sara Arkin as the witness.
25          THE COURT:  That is the summary witness?

O645men2

1          MR. WEITZMAN:  Sara Arkin is an SFRC staffer.

2          THE COURT:  All right.

3          MR. WEITZMAN:  Even yesterday after court I had a side

4    conversation and they confirmed that.  Yesterday evening they

5    noticed that they are pulling Sara Arkin, they didn't explain

6    to us the reason why; she was here yesterday, ready to testify,

7    and they identified a different lineup.  Included in the

8    different lineup was a witness, an FBI DNA examiner who they

9    did not identify as a witness for this week.  Now, we are ready

10   to cross-examine that witness at this point.

11         THE COURT:  Who on this list that I have in front of

12   me?

13         MR. WEITZMAN:  Ms. Davis, Charity Davis is the FBI --

14         THE COURT:  Yes.

15         MR. WEITZMAN:  I understand the government --

16         THE COURT:  You are telling me you are ready to

17   cross-examine?

18         MR. WEITZMAN:  We rejiggered everything we were

19   working on in order to prepare our cross of that witness and

20   other witnesses overnight.

21         THE COURT:  All right.

22         MR. WEITZMAN:  The point is --

23         THE COURT:  I do see in this submission of June 3rd,

24   6:35 p.m., that the government -- and it went to all parties,

25   from Mr. Monteleoni, that the government has readjusted their

O645men2

 1    witness order for today.

 2              MR. WEITZMAN:  Right, but last week they identified

 3    the witnesses they planned to call in the first few days of

 4    this week and Ms. Davis was not on that list.

 5              There is a lot of moving pieces.  They have seven

 6    federal prosecutors on their side.

 7              THE COURT:  I don't know where that goes because you

 8    have literally scores of people who have entered appearances

 9    here.

10              MR. WEITZMAN:  We do not, on behalf of --

11              THE COURT:  The defendants.

12              MR. WEITZMAN:  OK, but --

13              THE COURT:  And your team, I think, has 12 or 14

14    people who have entered appearances, I believe.  I'm not sure.

15              MR. WEITZMAN:  No, that is incorrect, your Honor.

16              THE COURT:  OK.

17              MR. WEITZMAN:  Mr. Fee and I have entered appearances.

18    We have a few associates who help us.  We do not have scores of

19    attorneys working on this case.

20              The point being --

21              THE COURT:  You and I don't have to debate it.

22              MR. WEITZMAN:  Right.

23              THE COURT:  I believe I have authorized Wi-Fi so that

24    you can speak back to your offices and have lawyers there

25    working on this but we don't have to debate it.  The defendants

O645men2

```
 1   are well represented and the government is well represented.
 2               MR. WEITZMAN:  Correct, your Honor.  So, when they
 3   adjusted their witnesses --
 4               THE COURT:  Again, I don't think we need to go down
 5   this but I am pretty sure I have signed numerous authorizations
 6   for people on your team to be here with cell phones and lap
 7   tops and so forth.  I may be mistaken.
 8               MR. WEITZMAN:  I am not disputing that, your Honor.
 9   We have had associates here in these two seats, I agree with
10   you.  Your Honor, the point is that --
11               THE COURT:  Again, we don't have to debate it.  I
12   assume you also have associates in the gallery, but let's go
13   forward.
14               MR. WEITZMAN:  I don't believe we do, but in any
15   event --
16               THE COURT:  OK.
17               MR. WEITZMAN:  In any event, your --
18               THE COURT:  This discussion is irrelevant.  Everybody
19   is well represented.  Move forward.
20               MR. WEITZMAN:  I agree, your Honor.
21               The point is they complain that we have only turned
22   over, for example, yesterday, defense exhibits which are
23   exhibits, four or five, from their production to us, some
24   photos that they produced to us, and then we turn it over the
25   night before as potential non-impeachment exhibits when they
```

O645men2

1    adjusted the schedule to only alert us of that.  That's the

2    first issue.

3            THE COURT:  So if I understand it, you are rightfully

4    annoyed that they have changed the schedule around and in light

5    of the changed schedule are presenting you with relevant

6    documents less than three days in advance, right at the last

7    moment.

8            MR. WEITZMAN:  As to one witness.

9            THE COURT:  That's correct.

10           MR. WEITZMAN:  As to one witness it is 18 hours in

11   advance.

12           THE COURT:  Who you are ready to cross.

13           MR. WEITZMAN:  We are now ready to cross.

14           THE COURT:  OK.

15           MR. WEITZMAN:  But there is a second issue, which is

16   we turned over to them defense exhibits.  The rule -- the

17   agreement was they would turn over the government's exhibits,

18   we would turn over defense exhibits, non-impeachment exhibits

19   so that they can object.  What they are doing is they are

20   taking the defense exhibits that we turn over and therefore

21   this morning, supplemented their government's exhibits so that

22   we don't put them in evidence but they put in a defense exhibit

23   in evidence.  And that is also not a good faith exchange.  They

24   should be locked in to their government's exhibits and not

25   adopting the defense exhibits so that they put it in, even

O645men2

1    though --

2                THE COURT:  Does it matter to the jury who puts an

3    exhibit in, whether it is a DX or a GX?

4                MR. WEITZMAN:  I think it does, your Honor.  I frankly

5    do believe that it does matter.  But beyond that, when we gave

6    them the defense exhibits, they objected on grounds of it

7    includes photos of children -- which we can talk about -- and

8    PII, and relevance, and then they offer it themselves.

9                THE COURT:  Fair enough.  Fair enough.  Let me hear

10   from the government.  And I can assure you that the bottom line

11   of this discussion is you have really got to start talking to

12   each other and dealing with each other in good faith and giving

13   each other the maximum advance notice that you can.  That

14   hasn't happened yet.

15               Government?

16               MR. RICHENTHAL:  I could not agree more with every

17   single thing the Court just said.

18               Mr. Weitzman has raised three independent things.  I

19   will try to be as brief as I can to all three.  First,

20   Dr. Davis, that's the DNA expert; second, exhibits produced to

21   us last night, and in particular I believe he just referenced

22   the ones for Ms. Williams-Thompson who is the witness about to

23   take the stand; and third, the proposition we should be locked

24   in.

25               Taking them in order, as to Dr. Davis, Dr. Davis'

O645men2

government's exhibits, which include lab reports and photos, were produced to the defense weeks ago, if not months ago. They were disclosed as expert notice two months ago.  The defense raised no objections at all, and her substantive 3500 was produced literally weeks ago.

In addition, based on the openings, we didn't think they disputed the DNA evidence at all.  We actually didn't anticipate much of any cross-examination.

THE COURT:  Do you now?  Is there going to be substantial cross-examination of her?

MR. FEE:  Yes.

THE COURT:  All right.  There you are.

MR. RICHENTHAL:  That is news to us, that's fine.

It is true we reshuffled our witnesses.  Yes.  Our written agreement with the defense is filled with phrases like "good faith" and "dynamic" and "subject to rulings."  Many things have happened in this trial.  I'm not attributing positive or negative things, I am just saying many things have occurred including defense motions to preclude witnesses which are not yet resolved; including scope of objections we didn't anticipate; including, candidly, much longer crosses than we anticipated.

We met as a team last night.  We had had Dr. Davis in town in case we had the opposite problem, that is, in case we needed to fill the trial day.  It turned out we had the flip

O645men2

1     problem.  There were witnesses who would we couldn't be in a

2     position to call fully because we weren't sure if exhibits or

3     objections were resolved, issues the defense had raised.  We

4     made a decision to reshuffle, made a decision to call the

5     witness which at the time we did not anticipate would be

6     subject to meaningful cross and for whom we produced materials

7     weeks ago.  We promptly advised the defense soon after the

8     trial day, roughly 6:30 p.m. at night, trial day ended a little

9     after 5:00 p.m., and the defense has objected.

10          Trials are dynamic.  Do we wish we identified this

11    earlier?  Of course we do.  But this is what happened and it

12    does not present a problem to the defense.  Indeed, they have

13    said on the record that they are prepared to cross-examine the

14    witness.

15          THE COURT:  That's one.

16          MR. RICHENTHAL:  The second issue they've raised is

17    exhibits.  In particular, I believe that Mr. Weitzman

18    referenced those for Ms. Williams-Thompson who is the

19    surveillance witness who is about to take the stand.  Those

20    exhibits were produced to us at 10:44 p.m. last night.  What

21    Mr. Weitzman did not say is we notified the defense a week ago

22    that Ms. Williams-Thompson would take the stand early this week

23    a week ago.  I have no idea why we got the exhibit last night.

24          Again, I know trials are dynamic.  Our agreement is

25    filled with phrases like "good faith", it really is, but

O645men2

 1    10:44 p.m. for a witness notified a week ago, leaves us

 2    extraordinarily little time to review it.  I can represent to

 3    the Court, this team was up very, very late last night talking

 4    on the phone, reviewing these exhibits, deciding what to do.  I

 5    get it.  That's the stuff of trials.  That wasn't necessary.

 6    And what also wasn't necessary is to bring this before the

 7    Court this morning while the jury is waiting.  We didn't have

 8    to do that except we actually had to do that because we just

 9    got them last night.

10            Those two issues -- Dr. Davis and these exhibits --

11    have no linkage whatsoever.  None.  And there is no excuse for

12    us to be getting exhibits the night before.  We also got five

13    exhibits for the next witness the night before, Ms. Frenzilli.

14            THE COURT:  When did you give notice of Frenzilli?

15            MR. RICHENTHAL:  I don't know the day but it was

16    definitely multiple days ago.

17            THE COURT:  OK.  I have heard enough.  I am telling

18    you what the bottom line is, I have already told you:  You have

19    got to cooperate more.  Mr. Richenthal is correct.  Trials are

20    dynamic, things change, we have seen that already, but

21    nonetheless, within that, you have to work cooperatively.

22            Mr. Weitzman, you do lose me a little, I must say, if

23    indeed you knew about Charity Davis a substantial period of

24    time ago, as well as Williams-Thompson, and were presenting

25    your exhibits just last night.  That really should have been

O645men2

1     done considerably earlier.  The bottom line, though, is start

2     cooperating, avoid all of this extraordinary movement late

3     night.

4              Bring this jury in.

5              MR. WEITZMAN:  Your Honor, just 10 seconds.

6              There are 50 witnesses on the government's witness

7     list.  They have not narrowed that witness list.  We have to

8     take witnesses in the order --

9              THE COURT:  10 seconds are up.  They've told you,

10    apparently, they basically told you when -- that Charity

11    Davis -- well, Williams-Thompson was going to be a witness at

12    least a week ago.  When did you tell them about Charity Davis?

13             MR. RICHENTHAL:  Charity Davis, that is Dr. Davis the

14    DNA expert, of which we gave notice last night.  They have had

15    the exhibits and 3500 for weeks if not months with no

16    objections, but this is the person we reshuffled.

17             THE COURT:  Mr. Weitzman is saying, yeah, but you had

18    50 witnesses on the list.  But I take it you are constantly

19    narrowing that down?

20             MR. WEITZMAN:  We have been --

21             THE COURT:  Just a moment -- constantly narrowing that

22    down as we move forward.

23             MR. RICHENTHAL:  Yes.  So, for example, a couple days

24    ago by e-mail Mr. Weitzman asked me if we still intended to

25    call Ambassador Jonathan Cohen.  I advised them we had not made

O645men2

1  a final decision and we will make that decision this week.  We

2  are happy to answer the defense's inquiries.  We don't get very

3  many of them of that nature.

4          I do want to flag we still have the exhibit objection

5  with respect to Ms. Frenzilli.  That's not this witness, that

6  is the next witness.

7          THE COURT:  Have I been told what that objection is

8  yet?

9          MR. RICHENTHAL:  It is DX 136.

10         THE COURT:  Is that what we started to do earlier this

11 morning?

12         MR. RICHENTHAL:  Yes, your Honor.

13         THE COURT:  I'm not going to handle it now.

14         MR. WEITZMAN:  Your Honor, we have not received a

15 single narrowing.  I asked about Ambassador Cohen they still

16 haven't --

17         THE COURT:  All right, enough.  Enough.  But the idea

18 that the senator is disadvantaged because the government has

19 seven or eight prosecutors and there are only two associates

20 sitting at the defense table with the two lawyers is certainly

21 not credible in light of all of the notices of appearance I

22 have seen on the record and the authorizations for attorneys.

23 We have numerous attorneys and paralegals and technical people

24 to bring in equipment here.

25         Again, the bottom line is everyone is well

O645men2

1    represented.

2              Jury entering.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O645men2                    Williams-Thompson - Direct

1                 (Jury present)

2                 THE COURT:  Please be seated in the courtroom.

3                 Call your next witness, government.

4                 MS. POMERANTZ:  The government calls Terrie

5     Williams-Thompson.

6     TERRIE WILLIAMS-THOPMSON,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9                 THE COURT:  Good morning, Ms. Williams-Thompson.

10    Welcome.

11                THE WITNESS:  Good morning.

12                THE COURT:  Your witness.

13    DIRECT EXAMINATION

14    BY MS. POMERANTZ:

15    Q.  Good morning.

16    A.  Good morning.

17    Q.  What is your educational background?

18    A.  I have some college.

19    Q.  Where do you work?

20    A.  Currently work for the Federal Bureau of Investigation,

21    Washington field office.

22    Q.  The FBI?

23    A.  Yes, ma'am.

24    Q.  What is your title at the FBI?

25    A.  Investigative specialist.

1   Q.   How long have you been an investigative specialist with the

2   FBI?

3   A.   Approximately 18 years.

4   Q.   Approximately when did you start working at the FBI?

5   A.   July 2003.

6   Q.   What was your job when you started working at the FBI?

7   A.   I started as a secretary.

8   Q.   When you said you are an investigative specialist,

9   generally, what are your duties and responsibilities as an

10  investigative specialist?

11  A.   I conduct surveillance.

12  Q.   What does that mean, to conduct surveillance?

13  A.   I follow the subject and develop a pattern of life of them,

14  and whatever we get we send to the case agent.

15  Q.   Now, you mentioned a pattern of life.  What is a pattern of

16  life?

17  A.   Pretty much like where do they work, what time do they

18  leave in the morning, what time they come back, how fast they

19  drive, how slow they drive, who are their associates.  Just

20  little everyday things about that individual.

21  Q.   In general terms, how do you dress when you do

22  surveillance?

23  A.   Normally I wear capris or jeans, tennis shoes, and a shirt.

24  But it all depends on where we are going to be surveilling at.

25  We have to dress the part.

1    Q.   What do you mean by that?

2    A.   So, for instance, if we are working a subject that goes to

3    a college campus, we are going to look like a college student

4    as well; t-shirt, jeans, backpack, laptop, the whole nine

5    yards.

6    Q.   When you say that you are going to try to look like a

7    college student if you are on a college campus, why is that?

8    A.   Because you need to blend in with your surroundings.

9    Q.   What do you mean by blending in?

10   A.   Well, if everyone else is wearing jeans, shirt, have a

11   backpack, you need to look the same.

12   Q.   Why is that?

13   A.   To keep people from staring at you and wondering who you

14   are.

15   Q.   Is it difficult to blend in when you where doing

16   surveillance?

17   A.   Yes, ma'am.

18   Q.   Approximately how long have you been doing surveillance?

19   A.   18 years.

20   Q.   Have you received training to do surveillance work with the

21   FBI?

22   A.   Yes, I have.

23   Q.   Without telling us the specific details that may compromise

24   sensitive training techniques, what kind of training have you

25   received?

1    A.  We received training as far as driving practicals, foot
2    practicals.  We also had to learn photography, learn how to --
3    the basics on how to conduct a subject without being seen.
4    Q.  You mentioned foot practicals.  What are foot practicals?
5    A.  Foot practicals; that is when you are actually conducting
6    surveillance on an individual on foot.
7    Q.  What are driving practicals?
8    A.  Pretty much the same thing but you are in a car.
9    Q.  You also mentioned photographs.  Without telling specific
10   details that might compromise sensitive techniques, what kind
11   of training did you receive on photographs?
12   A.  As far as with the photographs we would learn to, the basis
13   on, like, the apertures, F-stops and stuff like that.  How to
14   take clear identifiable photos and different ways to make sure
15   you are still being discreet where people don't see you.
16   Q.  Generally, from what types of cases or investigations do
17   you do surveillance?
18   A.  I do a variety such as criminal, counter-terrorism,
19   counter-intelligence, public corruption.  We do them all.
20   Q.  In what cities or areas?
21   A.  Typically where I am at now, I am in the Washington, D.C.
22   area, so it would be like Northern Virginia, parts of Maryland,
23   Washington, D.C.  There will be times where I will be sent out
24   to another state and I have to conduct surveillance in another
25   state.

1   Q.  When you do surveillance, apart from the surveillance, are

2   you otherwise usually involved in the underlying case or

3   investigation?

4   A.  No, I am not.

5   Q.  Generally, what types of locations do you surveil?

6   A.  All locations.  It can be a golf course, it can be a

7   restaurant, it can be a school, it can be a church.

8   Q.  Are you essentially following a subject?

9   A.  Yes, ma'am.

10  Q.  Generally, how do you prepare to do surveillance?

11  A.  Sometimes we really can't prepare.

12  Q.  What do you mean by that?

13  A.  Because no surveillance is the same.  We never know what is

14  going to happen, it is not predictable at all so you just have

15  to go with the flow.  You know your basics and stick to your

16  basics and just go from there.

17  Q.  Do you work in shifts?

18  A.  Yes, I do.

19  Q.  What are your typical shifts?

20  A.  We do alternate shifts.  One week it will be 6:00 a.m. to

21  2:00 p.m. and the following week 2:00 p.m. to 10:00 p.m.

22  Q.  Directing your attention to May 21, 2019, what was your

23  assignment that day?

24  A.  I remember we were originally switched -- we were

25  originally supposed to work a different case and we were called

O645men2                    Williams-Thompson - Direct

1    off of it to go to our office to be briefed on a new case.

2    Q.  What shift were you working on May 21st, 2019?

3    A.  I was working a 2:00 p.m. to 10:00 p.m. shift.

4    Q.  On that date did you work alone or with a team?

5    A.  I work as a team.

6    Q.  Is that true generally when you do surveillance, that you

7    work in a team rather than alone?

8    A.  Yes, ma'am.  Always.

9    Q.  Why is that?

10   A.  Because we need to keep it fresh, keep from being seen, and

11   that is usually the reason why.  So, you know, keep a fresh

12   look all the time.

13   Q.  Are you familiar with what's known as an eye?

14   A.  Yes, ma'am.

15   Q.  What is an eye?

16   A.  The eye is the person who actually has a direct either on

17   the subject or the vehicle.

18   Q.  Why does working in a team rather than alone, how if at

19   all -- withdrawn.

20            How, if at all, does working in a team rather than

21   alone, impact the eye?

22   A.  Well, one, the eye don't move.  The eye only makes the

23   callouts.  So when the subject goes mobile, then the rest of

24   the team will go in pursuit while the eye unit stayed there

25   until the subject is cleared.

O645men2                          Williams-Thompson - Direct

1    Q.  You mentioned callouts.  What is that?

2    A.  It means, hey, subject on the move.

3    Q.  About how many people were on your team in May 2019?

4    A.  It was approximately between seven to eight people on my

5    team.

6    Q.  What were you specifically assigned to do on May 21st,

7    2019?

8    A.  We were assigned to work a subject from New York that came

9    into our area of responsibility at a particular location.

10   Q.  You mentioned a subject.  What do you mean by subject?

11   A.  The person who we had the case file on.

12   Q.  Had you done surveillance of this subject that you were

13   surveilling on May 21st, 2019, before?

14   A.  No, ma'am.

15   Q.  Did you know the subject's name at the time?

16   A.  No, I did not.

17   Q.  Sitting here today, do you remember who the subject was?

18   A.  No, I do not.

19   Q.  Now, you said that you were assigned to do surveillance at

20   a particular location.  What location was that?

21   A.  Morton's.

22   Q.  What is Morton's?

23   A.  It's a high-end steak restaurant.

24   Q.  Where is the Morton's you went to on May 21, 2019, located?

25   A.  Washington, D.C.

1    MS. POMERANTZ:  Ms. Wechsler, could we please display

2    what is in evidence as Government Exhibit 2B-6?

3    Q.  Ms. Williams-Thompson, what is this?

4    A.  That is the entry to the restaurant.

5    MS. POMERANTZ:  You can pull that down.

6    Q.  Had you done surveillance of the subject before?

7    A.  No, I have not.

8    Q.  How did you know who to look for at Morton's?

9    A.  Because when we went to the office when we were briefed, we

10   were given a photograph of the subject, along with his vehicle

11   and tag number.

12   Q.  Was the subject a man or a woman?

13   A.  Man.

14   Q.  Did you know who, if anyone, he would be meeting with at

15   Morton's?

16   A.  No, I did not.

17   Q.  What was the goal of surveillance at Morton's?

18   A.  Identify the unsub.

19   Q.  When you say unsub, who do you mean?

20   A.  It is the unidentified subject.

21   Q.  Is that right, Ms. Williams-Thompson, prior to doing the

22   surveillance at Morton's, that you had been briefed on the

23   subject?

24   MR. FEE:  Objection as to relevance of this, your

25   Honor.  She is here to testify about surveillance.

O645men2                          Williams-Thompson - Direct

1          THE COURT:  I will allow it.  The question is what she

2     was briefed on in connection with the surveillance.

3          The jury will disregard my comments.

4          Ask your question.

5     BY MS. POMERANTZ:

6     Q.  Were you briefed on the subject prior to conducting the

7     surveillance?

8     A.  Yes, we was.

9     Q.  What, if anything, did you know about the investigation

10    into the subject?

11    A.  The only thing that I knew was that the subject was coming

12    to our AOR, which is the Area Of Responsibility, and he was to

13    be meeting with an unknown person.

14    Q.  You testified that you were assigned to do surveillance at

15    Morton's.

16    A.  Correct.

17    Q.  Who, if anyone, were you doing surveillance with at

18    Morton's?

19    A.  My partner at the time, Damein Ragland.

20    Q.  Who was Damein Ragland?

21    A.  He was my teammate.

22    Q.  Where did Damein Ragland work at the time?

23    A.  He was also an investigative specialist of the FBI.

24    Q.  Are you familiar with the term "cover story"?

25    A.  Yes, ma'am.

O645men2                        Williams-Thompson - Direct

1    Q.    What is a cover story?

2    A.    Cover story is a believable story that you are going to use

3    to keep from being identified as who you are.

4    Q.    Did you and Damein Ragland have a cover story on May 21,

5    2019?

6    A.    Yes, we did.

7    Q.    What was your cover story?

8    A.    We were going to pose as a married couple on a date.

9    Q.    Why were you posing as a married couple out on a date?

10   A.    It looked natural.

11   Q.    When you found out you were going to Morton's Steakhouse to

12   do surveillance what, if any steps, did you take with respect

13   to your clothing?

14   A.    We had -- because Morton's is a high-end restaurant, we

15   made sure we had dressed the part, like I had on a black dress.

16   Q.    How did you get to Morton's?

17   A.    I drove my government-issued vehicle.

18   Q.    Did you go directly to the restaurant?

19   A.    I did, but I parked on the outskirts of the restaurant.

20   Q.    When you parked on the outskirts, what happened next?

21   A.    I sat there until the subject arrived.

22   Q.    Then after the subject arrived, what did you do next?

23   A.    My team leader, she pulled up next to me and I hopped out

24   of my vehicle, got into the back seat of hers, and my partner

25   was already in the back because she posed as if she was an Uber

1    driver.

2    Q.   Where did she drive you and your partner?

3    A.   She drove us to the main entrance of the restaurant.

4    Q.   Once you got dropped off at Morton's, what did you do?

5    A.   We went into the building, went up the escalator I believe

6    onto the second floor, and then we immediately started looking

7    four the subject.

8    Q.   How did you know who to look for?

9    A.   I had already seen a picture, and the eye unit had gave a

10   description prior to me going in so I knew what the subject was

11   wearing.  We just didn't know where the subject was at.

12   Q.   Did you locate the subject?

13   A.   I did.

14   Q.   Was the subject alone or with other people?

15   A.   He was with other people.

16   Q.   Where were they?

17   A.   They were on the patio side of Morton's.

18   Q.   Were they seated at a table in the patio area or standing

19   when you observed them?

20   A.   They were seated.

21   Q.   Where did you and Damein Ragland sit?

22   A.   We ended up getting a table that was pretty close to the

23   subject table.

24   Q.   About how far from the people you were surveilling were you

25   and Damein Ragland?

1   A.  About two arm's lengths away.

2   Q.  You mentioned that the people you were surveilling were

3   sitting at the table on the patio.  Can you describe the patio?

4   A.  It was a big open area, glass walls.  There was plenty of

5   tables to sit, approximately maybe 40 people there, I guess.

6           THE COURT:  When you say two arm's length, is that

7   distance shorter or longer than the distance between you and

8   the court reporter in front of you, or the same?

9           THE WITNESS:  It is actually a little more closer like

10  how you and I are now.

11          THE COURT:  It is a little closer than you and I are.

12          THE WITNESS:  Approximately the same amount of

13  distance.

14          THE COURT:  Thank you.

15          THE WITNESS:  Yes, sir.

16  BY MS. POMERANTZ:

17  Q.  Were there other people near your table and the subject's

18  table on the patio?

19  A.  No.  There was other people, a couple other people in the

20  restaurant, but they were on the other end of the patio.

21  Q.  So who was closer, you and Damein Ragland or the other

22  people?

23  A.  Me and Damein Ragland.

24  Q.  When you and Damein Ragland were sitting at the table, did

25  you refer to each other by your actual names or something else?

1   A.  No; code name.

2   Q.  Why not use your actual names?

3   A.  We never use our true names to keep from -- we try not to

4   mix, get our true identity noticed out there or mentioned out

5   there in public when we are working.

6   Q.  Did you tell anyone at Morton's you were with the FBI?

7   A.  No, ma'am.

8   Q.  Why not?

9   A.  Because we do not want that to get out there at all.

10  Q.  Why don't you want that to get out there?

11  A.  Because we don't want to blow our cover.  We need to make

12  sure that if there is going to be an act done, we do not need

13  them to know the FBI is there because then it won't be

14  committed.

15  Q.  Approximately how long did you do surveillance of the

16  table?

17  A.  Approximately a couple of hours.

18  Q.  How did you conduct surveillance of the people sitting at

19  the table on the patio?

20  A.  Well, we dined, just like them.  You know?  You want to

21  eat.

22  Q.  Did you eat while you were at Morton's?

23  A.  I sure did.  It was good, too.

24  Q.  Apart from eating -- and let me ask, why did you eat?

25  A.  Because if you didn't eat, they're going to be like, this

O645men2                    Williams-Thompson - Direct

1    is for paying customers only.  You are going to have to go.

2    So, yeah, that is part of blending in.  You eat?  I'm gonna

3    eat.

4              THE COURT:  I hope the FBI paid for your meal.

5              THE WITNESS:  Oh yes, sir, they did.

6              THE COURT:  All right.

7    BY MS. POMERANTZ:

8    Q.  Apart from eating, what else did you do while conducting

9    surveillance?

10   A.  Well, our goal was to find out who the subject was meeting

11   with and to get pictures.

12   Q.  Did you take handwritten notes?

13   A.  Yes, ma'am -- no.  No, no, no.  Not handwritten notes.  No.

14   Q.  And why not?

15   A.  Because it would have been obvious to have a notepad and

16   pen out there.  And it is also kind of dark, it is a dark

17   setting as well.

18   Q.  Did you make any type of record at the time?

19   A.  I did.

20   Q.  What kind of record?

21   A.  I used my government-issued cell phone.

22   Q.  Is that for text messages?

23   A.  Yes, ma'am.

24   Q.  Were your text messages intended to be a transcript of what

25   you heard or pieces of what you heard?

O645men2                    Williams-Thompson - Direct

1    A.  Pieces.

2    Q.  Did either you or -- you mentioned photographs as well; is

3    that correct?

4    A.  That's correct.

5    Q.  Who took the photographs while conducting surveillance?

6    A.  Damein Ragland.

7    Q.  What did Damein Ragland use to take photographs while

8    conducting surveillance?

9    A.  He used his government-issued cellular phone.

10           MS. POMERANTZ:  Ms. Wechsler, can we please pull up

11   for just the witness what has been marked for identification as

12   Government's Exhibits 1G-6A through 6N?  I'm going to ask you

13   to scroll through them so that Ms. Williams-Thompson can review

14   them.

15   Q.  Ms. Williams-Thompson, do you recognize those?

16   A.  Yes, I do.

17   Q.  What are they?

18   A.  These are photos that were taken at Morton's.

19   Q.  Do these exhibits fairly and accurately depict what you saw

20   when you were doing surveillance at Morton's Steakhouse on

21   May 21, 2019?

22   A.  Yes, ma'am.

23           MS. POMERANTZ:  The government offers Government's

24   Exhibits 1G-6A through 1G-6N.

25           THE COURT:  Admitted without objection.

1      (Government's Exhibits 1G-6A through 1G-6N received in

2  evidence)

3      MS. POMERANTZ:  If we can publish those for the jury,

4  pull up Government Exhibit 1G-6A.  Let's move to Government

5  Exhibit 1G-6B?

6  BY MS. POMERANTZ:

7  Q.  Ms. Williams-Thompson, what are we seeing here?

8  A.  We are seeing the subject, along with two other gentlemen

9  that came down from New York with him, and unsub female and

10  unsub male.

11  Q.  How many women were at the table you were surveilling?

12  A.  One.

13  Q.  And who is sitting next to the woman?

14  A.  The unsub man, Mr. Menendez.

15  Q.  To be clear, was Robert Menendez the subject you were

16  assigned to surveil?

17  A.  No, ma'am.

18  Q.  So you were assigned to surveil a different subject who

19  happened to eat dinner with Robert Menendez at Morton's?

20  A.  That's correct.

21  Q.  Sitting here today, do you know the names of other people

22  who were at the dinner you surveilled?

23  A.  No, ma'am.

24  Q.  Let's turn to Government Exhibit 1G-6C; what are we seeing

25  here?

O645men2                    Williams-Thompson - Direct

1   A.   We are seeing Mr. Menendez sitting at the table along with

2   another gentleman.

3   Q.   Who is on the right?

4   A.   That is me.

5   Q.   What is redacted here?

6   A.   My face.

7   Q.   Are you typically in surveillance photographs?

8   A.   No.

9   Q.   What do you recall about how you ended up in this

10  photograph?

11  A.   Well, Damein, we had to try to get a frontal shot of the

12  unknown person that the subject was meeting with, so in order

13  for him to do that he had to act as if he was taking a picture

14  of me like, oh, let me take a picture of my wife.  Blah, blah,

15  blah.  And here we go.

16  Q.   Let's turn to Government Exhibit 1G-6D, 1G-6E, and let's go

17  to 1G-6F; what are we seeing here?

18  A.   You are still seeing me in the corner along with the unsub

19  female with Mr. Menendez' jacket over her, along with

20  Mr. Menendez.

21  Q.   Government Exhibit 1G-6G; what are we seeing here?

22  A.   We are seeing Mr. Menendez pouring a bottle of wine.

23  Q.   Let's go to Government Exhibit 1G-6H.  What are we seeing

24  here?

25  A.   It looks like he just finished pouring a bottle of wine.

O645men2                    Williams-Thompson - Direct

1   Q.  Government Exhibit 1G-6I; what are we seeing here?

2   A.  He was pouring a bottle of wine to one of the gentlemen on

3   the end.

4   Q.  What did you observe the group with Menendez doing at their

5   table?

6   A.  They were eating, they were talking, they were laughing,

7   they were smoking.

8   Q.  You said they were smoking.  What were they smoking?

9   A.  I believe I seen cigarettes, cigars as well.

10  Q.  Did you also observe -- withdrawn.

11          You said that they were pouring wine.

12  A.  Yes.

13  Q.  Is that correct?

14  A.  Yes.

15  Q.  Based on your observations, how did the people at Menendez'

16  table appear to be getting along?

17  A.  They appeared to be getting along just fine.

18  Q.  What do you mean by that?

19  A.  Based on the laughter that I would hear made me think that

20  they were getting along.

21  Q.  You testified that Damein Ragland took surveillance

22  photographs while you were at Morton's.  Did either you or

23  Damein Ragland record video while you were conducting

24  surveillance?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O645men2                     Williams-Thompson - Direct

1   Q.  I'm sorry, before we do that, let's also publish Government

2   Exhibit 1G-6L.  And let's go to 1G-6N.  What are we seeing

3   here?

4   A.  We are seeing the group in a conversation, bottle of wine

5   on the table.

6          MS. POMERANTZ:  We can take that down.

7   Q.  Did either you or Damein Ragland record video while you

8   were conducting surveillance?

9   A.  Yes; Damein Ragland did.

10  Q.  Without telling us specific details that might compromise

11  sensitive techniques, how did Damein Ragland record video while

12  you were doing surveillance?

13  A.  We actually had a concealment device.

14  Q.  I'm sorry?

15  A.  We had a concealment device.

16  Q.  What is a concealment device?

17  A.  It is a device that does video that might look like

18  something ordinary such as it could be glasses, it can be a

19  tie, it can be key fob.  Something that is ordinary.

20          MS. POMERANTZ:  Ms. Wechsler, would you please pull

21  up, for just the witness, what has been marked for

22  identification as Government Exhibit 1G-4A?

23  Q.  Did you review the exhibit marked as Government Exhibit

24  1G-4A before testifying today?

25  A.  Yes, I have.

O645men2                    Williams-Thompson - Direct

1   Q.  What is it?

2   A.  It is a video of the dinner service.

3   Q.  Does it fairly and accurately depict what you saw that

4   night?

5   A.  Yes, it does.

6           MS. POMERANTZ:  The government offers Government

7   Exhibit 1G-4A.

8           MR. FEE:  No objection.

9           THE COURT:  Pardon me?

10          MR. FEE:  No objection.

11          THE COURT:  Admitted, without objection.

12          (Government's Exhibit 1G-4A received in evidence)

13  BY MS. POMERANTZ:

14  Q.  By the way, Ms. Williams-Thompson, does the video have

15  sound?

16  A.  No, it does not.

17  Q.  Does surveillance video typically record sound in your

18  experience?

19  A.  No, it does not.

20  Q.  Why is that?

21  A.  I'm not sure exactly why, but we don't have no sound on any

22  videos that we take.

23  Q.  Is that a policy for this surveillance in particular or

24  generally true for surveillance?

25  A.  Generally true for surveillance.

O645men2                    Williams-Thompson - Direct

1   Q.  I want to play portions of this video and ask you questions

2   about it?

3   A.  OK.

4           MS. POMERANTZ:  Ms. Wechsler, can you please play the

5   first 45 seconds of the video?  And I'm sorry, we can publish

6   that for the jury.

7           (Video played)

8   Q.  Ms. Williams-Thompson, what did we see in this clip?

9   A.  We see them laughing.

10  Q.  Where is Robert Menendez?

11  A.  He is sitting directly across from the gentleman in the

12  white shirt.

13  Q.  Where is the woman?

14  A.  She is to the left of the guy in the white shirt.

15          MS. POMERANTZ:  Ms. Wechsler, can we go to the 9:40

16  time stamp and play that until 11 minutes and 15 seconds,

17  please?

18          (video played)

19  Q.  Ms. Williams-Thompson, what do we see in this clip?

20  A.  We see them still more laughter and smoking.

21  Q.  You also see them talking to each other?

22  A.  Yes.

23  Q.  And where is Robert Menendez?

24  A.  Still sitting across from the gentleman with the cigarette

25  and the white shirt.

1    Q.  Where is the woman?

2    A.  To the left of him.

3    Q.  Did there come a time when the woman left the table?

4    A.  Yes.

5    Q.  What, if anything, did you do when she left the table?

6    A.  Approximately 30 seconds later after she exited the patio,

7    I got up and went to go see where she went.

8    Q.  Why did you do that?

9    A.  Any time -- you have to try to keep the unsubs in pocket.

10   Q.  What do you mean by that?

11   A.  Meaning that because they're an unknown, you need to know

12   where they're going, where they're at, what they are going to

13   do, if anything, to relay to the team.

14   Q.  What did you find out?

15   A.  She just went to the restroom.

16   Q.  Now, you testified you were sitting at a table two arm's

17   lengths from the subject.  Did you hear anything that the

18   people at the table said?

19   A.  I would hear bits and pieces.

20   Q.  In what language were they speaking?

21   A.  English.

22   Q.  About how much of the conversation could you hear?

23   A.  Not a lot.

24   Q.  About how noisy was the patio area?

25   A.  It was very quiet.

1    Q.  If you were two arm's length away and it was very quiet,

2    why couldn't you hear everything?

3    A.  Because the table did speak low for the most part.

4            THE COURT:  I take it -- well, I don't want to

5    characterize.  Low in a conversational voice, nonetheless.

6            THE WITNESS:  It was a low volume; yes, sir.

7            THE COURT:  It is not as if they were whispering.

8            THE WITNESS:  I want to say it was -- it almost

9    sounded like, of like a whispering but not like where you can't

10   hear, not like that, no, but it was a little bit louder than a

11   whisper.

12           THE COURT:  OK.  Thank you.

13           THE WITNESS:  Thank you.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O643MEN3                        Williams-Thompson - Direct

1   Q.  Did the volume change over the course of the surveillance?

2   A.  Yes, ma'am.  Towards the end of the surveillance, when the

3   more alcohol that they had, it seemed like the volume elevated

4   just a little bit more.

5   Q.  What, if anything, did you hear the woman at the table ask?

6   A.  She asked "What else can the love of my life do for you?"

7   Q.  About how long into the meal did you hear the woman ask

8   "What else can the love of my life do for you?"

9   A.  That was towards the end of the dinner service.

10  Q.  Were you looking at the woman when she asked "What else can

11  the love of my life do for you?"

12  A.  No, I do not keep a constant look on my subject or anyone

13  else.  It's just periodic.

14  Q.  Were you able to hear any response to the woman's question?

15  A.  No, I don't recall.

16  Q.  Had you been able to hear what was said right before she

17  asked the question?

18  A.  No, ma'am.

19  Q.  Did there come a time the group you were surveilling left

20  the patio area?

21  A.  Yes.

22  Q.  Who left the patio first, you and Damein Ragland or the

23  group?

24  A.  The group.

25  Q.  Did that include Robert Menendez?

O643MEN3                          Williams-Thompson - Cross

1    A.  Yes, it did.

2              THE COURT:  Did the group leave as a group?

3              THE WITNESS:  Yes, sir, they did.

4    Q.  When did you and Damein Ragland leave?

5    A.  We left after we received the text message saying it was

6    all clear.

7    Q.  When you say after finding out it was all clear, what does

8    that mean?

9    A.  Means my supervisor say, hey, come on out, you good.  The

10   subjects had already left the area.

11   Q.  Other than conducting surveillance on May 21, 2019, did you

12   have any involvement in this investigation?

13   A.  No.

14             MS. POMERANTZ:  May I have one moment, your Honor?

15             No further questions.

16             THE COURT:  Thank you.  Mr. Fee, any cross.

17             MR. FEE:  Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MR. FEE:

20   Q.  Hi, Ms. Williams-Thompson.

21   A.  Hello.

22   Q.  Do you want me to call you Investigator, Agent?

23   A.  I'm not an agent, sir.

24   Q.  It's very nice to have you here.

25   A.  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O643MEN3                    Williams-Thompson - Cross

1    Q.  You testified initially about something you said, pattern

2    of life.  And that's what you try to establish for the subject,

3    the folks you are surveilling?

4    A.  Yes, sir.

5    Q.  Can you tell me what goes into establishing a pattern of

6    life typically, please.

7    A.  Typically, it's you just following them around, and usually

8    the amount of times you follow the subject, you start seeing

9    how it's repetitious.  That's what I would call a pattern of

10   life.

11   Q.  They go to the gym, they go to 7-Eleven?

12   A.  Yeah, they usually have like punctual.

13   Q.  Or not punctual?

14   A.  Sometimes punctual, sometimes they're not.  But usually

15   it's the same thing.  Like they go to gym every Tuesday.  But,

16   okay, we don't see this person, we know they're going to be at

17   the gym, and usually they are.

18   Q.  You didn't do that on Senator Menendez -- I'm Senator

19   Menendez's lawyer.  You didn't do that on Senator Menendez?

20   A.  No, sir.

21   Q.  Because he wasn't the subject?

22   A.  He was not the subject.

23   Q.  So the prosecutor walked you through, you get this

24   assignment, you are at the restaurant, you show up and you find

25   Senator Menendez having dinner with these folks?

O643MEN3                    Williams-Thompson - Cross

1   A.  Negative.

2   Q.  You correct me, please.

3   A.  When we, when the subject arrive, they went into the

4   restaurant first.  Then myself and Damein Ragland went in,

5   found the subject, and it was just the subject and two other

6   guys that was there at the table.  Mr. Menendez and the unsub

7   female did not come in until later.

8   Q.  Unsub means again what?

9   A.  Unknown subject.

10  Q.  Thank you.  So they come in and then you are seated with

11  your back to them you said?

12  A.  Negative.

13  Q.  Correct me again, please.

14  A.  I'm actually to the side.  The gentleman in the white

15  shirt, his back was facing us.  But I was to the -- I don't

16  know if you see the video, the gentleman that was sitting at

17  the end of the table, I was directly to his left.  I was

18  actually facing the patio door.

19  Q.  So your kind of like profile is to that the gentleman who

20  is sitting on the end, your profile is pointing in the same

21  direction?

22  A.  I would have to turn my head to the right.

23  Q.  To face the judge, okay.  So you could look over relatively

24  easily to see the table?

25  A.  Correct.

1    Q.  You just had to turn your head to the right?

2    A.  Yes, sir.

3    Q.  Like a quarter turn?

4    A.  Pretty much slight.

5    Q.  Slight turn.  But you said you didn't want to do that too

6    much, because it would be obvious you were watching them?

7    A.  That is correct.

8    Q.  And the reason you don't want to be obvious is you

9    sometimes are surveilling people that are concerned about

10   surveillance, right?

11   A.  That is correct.

12   Q.  And could you tell us what are typically the signs that a

13   subject is concerned or aware of surveillance generally?

14   A.  Sometimes they might, you know, be -- sometimes they

15   usually be angled a certain way where they can see everybody

16   that comes in themselves.  They will be watching a lot as well.

17   Sometimes they use like glasses or like glass window or

18   something also to look to see who else is coming in, who may be

19   looking at them.  That's why we just, if you down, we down.  We

20   going to act like we are on a date together.

21   Q.  Outside the FBI, what you would call shady behavior,

22   something off?

23            MS. POMERANTZ:  Objection.

24            THE COURT:  Sustained.

25   Q.  Putting aside my language.  You did not observe that night

1    anything that suggested to you that Senator Menendez or the

2    others in that group were aware of surveillance.  Fair to say?

3    A.  That's correct.

4    Q.  You did not observe anything about that group that

5    suggested to you they were trying to avoid being observed,

6    correct?

7    A.  That's correct.

8    Q.  Nothing at all that suggested to you they were concerned

9    about, say, someone eavesdropping?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  I'll allow it.  Did you see anything that

12   indicated they were concerned about being eavesdropped upon?

13            THE WITNESS:  No, sir.

14   Q.  In fact, you were able to overhear some parts of the

15   conversation you testified, right?

16   A.  That is correct.

17   Q.  And you talked about how they seemed to be friendly, right?

18   A.  Yes.

19   Q.  And having a lively conversation, relatively?

20   A.  Yes.

21   Q.  Were you aware of the identity of the man whose back was to

22   you?

23   A.  No.

24   Q.  Have you learned since who that person is?

25   A.  No.

O643MEN3                    Williams-Thompson - Cross

1   Q.  That night, let me ask generally.  Generally, when there is

2   a surveillance team or teams, how do you all stay in touch

3   during the surveillance?

4   A.  Text messaging or we use our actual radios.

5   Q.  What does the radio look like?  Is it like a walkie-talkie?

6   A.  We do have some that look like that, but we have car

7   radios.

8   Q.  Do you have any, like, disguised radios or they all look

9   like radios?

10  A.  We don't have those anymore.

11  Q.  Fair to say though like in a setting like this where you're

12  relatively close to the subject, you can't use a radio?

13  A.  That's correct.

14  Q.  So, in this situation, and on that night in fact, you used

15  your government issued cell phone to communicate?

16  A.  That is correct.

17  Q.  Generally, what sorts of things do you aim to communicate

18  to your team during the course of a surveillance?

19  A.  We would like, if we have hearsay, we would type that in.

20  Like this is what I'm overhearing.  We would let them know,

21  alert the teams outside, hey, they getting up.  They're paying

22  for the meal.  They about to come out.  Just to alert.

23  Q.  Got it.  And why is it important to alert the team to

24  things like hearsay or they're paying for their bill?

25          MS. POMERANTZ:  Objection.  Form.

O643MEN3                      Williams-Thompson - Cross

1          THE COURT:  Sustained.

2          When you use the term "hearsay," what did you mean?

3          THE WITNESS:  Overhear.  I overheard.

4          THE COURT:  You have to talk into the mic.

5          THE WITNESS:  I'm sorry.

6          More so like I overheard bits and pieces of what was

7   being said during the dinner service.

8          THE COURT:  So you mean it quite literally, it's you

9   heard someone say something.  That's your use of hearsay.  Is

10  that correct?

11         THE WITNESS:  That is correct.

12  Q.  What is an overhear; how about that?

13  A.  It is bits and pieces that I actually heard someone say.

14  Q.  So, in our conversation here, what you described as hearsay

15  is also known as an overhear?

16  A.  I might have used the wrong word.  But overheard.

17  Q.  Before you entered the restaurant when you were posing as

18  Mrs. Ragland, or before that, were you on the radio with your

19  team?

20  A.  No, I wasn't on the radio with my team.  I just sat there,

21  because I wasn't setting up.  I was waiting to deploy.

22  Q.  How were you both, and during the meal, how were you

23  keeping informed of the surveillance team's activities and the

24  information being gathered by others?

25  A.  Well, you talking about before the meal?  I sat in a car

1  until it was time to deploy.

2  Q.  And then what about during the meal.  How did you keep

3  informed of what was going on with the team?

4  A.  I don't know what was going on with the rest of the teams

5  unless they put it in text.

6  Q.  So there was a text thread, like a group chat?

7  A.  Yes, sir.

8  Q.  Who was on that?

9          THE COURT:  During the meal?

10         THE WITNESS:  During the meal, yes.

11  Q.  Do you remember who was involved in that group chat other

12  than yourself?

13  A.  Usually just my team.

14  Q.  The team, and the team is everyone involved?

15  A.  My assigned team.

16  Q.  Explain to me what you mean.

17  A.  The people that was assigned to the team.  I was on what's

18  called Oscar Team.  My team leader, my ATC, and five or six

19  other people.

20  Q.  And there was more than one team at Morton's that night?

21  A.  I believe there was, yes.

22  Q.  So your recollection is your team was on a running text

23  chain, but the other team was not?

24  A.  That's correct.

25  Q.  And the overhears that you heard that night, you put them

1    in that text chain?

2    A.  What I could remember and I could hear, yes.

3    Q.  Sometimes you put it in and sometimes you didn't?

4    A.  It's possible.

5    Q.  Understood.  You were asked a question about sensitive

6    techniques on direct, Ms. Williams-Thompson.  Do you remember

7    that?

8    A.  Sensitive techniques?

9    Q.  Sensitive techniques, yes.  Do you remember that phrase

10   coming up with the prosecutor?

11   A.  No.

12   Q.  Don't worry about it.  Let me ask you this.  Did you have

13   to use any sensitive techniques while you were in the

14   restaurant observing this group?

15           MS. POMERANTZ:  Objection.

16           THE COURT:  Sustained.  Let's establish what you mean

17   or how she understands it is.

18   A.  Are you talking about a concealment device?

19   Q.  I don't know what I'm talking about.

20           What is a sensitive technique?

21           THE COURT:  The jury can listen to that statement.

22           MR. FEE:  They know.  They know.

23           THE COURT:  For the record, I am not being serious.

24   The jury is to disregard all comments of the attorneys.

25   Proceed.

1    Q.  What are sensitive techniques you would use in a situation

2    where you're in a dining room?

3              MS. POMERANTZ:  Objection.

4              THE COURT:  Let's establish what that term means.

5    Q.  What does that, in your work as a surveillance specialist,

6    what does that term mean, Ms. Williams-Thompson?

7              THE COURT:  If anything.  Have you heard that term

8    before?

9              THE WITNESS:  No.

10             THE COURT:  No?  All right.

11   Q.  You mentioned regarding a device.

12   A.  Yes.

13   Q.  So tell me about that device.

14             MS. POMERANTZ:  Objection, your Honor.  We were

15   specific --

16             THE COURT:  Just a moment.  Be specific in your

17   question.  You said tell me about that device.

18   Q.  What was the recording device you used during the dinner at

19   Morton's?

20             MS. POMERANTZ:  May I briefly be heard at sidebar?  I

21   want to raise one issue very, very briefly, your Honor.

22             THE COURT:  I really dislike sidebars.  One short

23   issue.

24             (Continued on next page)

25

O643MEN3                    Williams-Thompson - Cross

1                    (At the sidebar)

2              THE COURT:  Your comment was too good for me to pass

3    up.

4              MR. FEE:  I agree.  You knocked it out of the park.

5              MS. POMERANTZ:  I did not want to have to ask for a

6    sidebar.  I just wanted to, we specifically went to pains to

7    not ask about the specific techniques, the techniques that were

8    used because they are sensitive techniques they use.  So I

9    tried to flag for her without revealing those techniques, those

10   are techniques that the FBI continue to use.  So we were trying

11   not to get into all the details.

12             THE COURT:  What do you want from her?

13             MR. FEE:  Two things.  Number 1, you need to file a

14   motion in advance to limit testimony, I've done it myself

15   dozens of times.  I want to establish, because they keep using

16   this term sensitive techniques eight times.  There were no

17   sensitive techniques it is suggesting to the jury.  If she's

18   questioned about this on direct, you can't just stand up and

19   say this is so sensitive the jury can't be heard.  There are

20   motions that would need to be filed.

21             THE COURT:  Forget the motions for the moment.  What

22   has she said about sensitive techniques?

23             MR. FEE:  Nothing.  She said she's not familiar with

24   them.

25             THE COURT:  What are you going to ask her?

1          MR. FEE:  I want to ask her the device she used.  What

2     it is.

3          MR. RICHENTHAL:  That is extraordinarily

4     inappropriate.  What Ms. Pomerantz said was, without telling me

5     about sensitive techniques, what did you do.  She said I used a

6     concealment device to record.  That is incredibly inappropriate

7     to talk about in open court and we purposely did not ask that

8     question.

9          MR. FEE:  May I?

10          THE COURT:  This sidebar is obviously on the public

11     record.

12          MR. FEE:  What is inappropriate is to eight times in

13     front of the jury refer to sensitive techniques that were used

14     at the surveillance.  They cannot limit us from inquiring into

15     this.

16          THE COURT:  Is there something about the particular

17     device that was used that's sensitive here in terms of what the

18     public can hear and not hear?

19          MR. RICHENTHAL:  It's so sensitive we have not asked

20     what it looks like itself.  We do not know.  What Ms. Pomerantz

21     said was the opposite of what Mr. Fee is representing.  She

22     said every single time, without telling me anything sensitive,

23     what did you do.  In other words, not eliciting the sensitive

24     techniques.  Mr. Fee's statement that she keeps eliciting, it

25     is the opposite.  We went to extraordinary lengths to have her

1   not say anything about this.  We literally don't know ourselves

2   where this device was or what it looks like.

3          MR. FEE:  Two things.  Number 1, the obvious inference

4   they have created this morning is saying there were sensitive

5   techniques they had to avoid testifying about.

6          THE COURT:  That doesn't make the sensitive techniques

7   relevant.

8          MR. FEE:  It does make it relevant.  She just

9   acknowledged she is unaware of what that term means.

10  Mr. Richenthal's proffer is not correct.  This is a recording

11  device the FBI uses in every surveillance.  There has been no

12  motion filed.

13         THE COURT:  What are you asking?

14         MR. FEE:  I want to know what she used.

15         THE COURT:  Just a moment.  What are you going to ask

16  her about this recording device?  Its location?  What it looks

17  like?

18         MR. FEE:  I want to know where it was, and if it can

19  record audio.  Period.

20         THE COURT:  Why don't you ask if she had a recording

21  device and can it record audio and leave it at that.

22         MR. FEE:  Your Honor, the other thing, this should not

23  be done in front of the jury.  If --

24         THE COURT:  What should not be done?

25         MR. FEE:  Phrasing questions which they have done

O643MEN3                        Williams-Thompson - Cross

1    repeatedly without going into sensitive techniques and then

2    asking the question.  It is hugely inappropriate.  Because it

3    is telling the jury there are sensitive techniques used here

4    and it is not the case.

5            THE COURT:  Fair enough.  I understand the inference.

6    With this witness just establish that she had a recording

7    device and what else did you want to know?

8            MR. FEE:  Does it record audio.  Her partner had it,

9    not her.

10           (Continued on next page)

```
 1                    (In open court)
 2     BY MR. FEE:
 3     Q.  Hi.
 4     A.  Hello.
 5     Q.  Did you and your partner have a recording device at
 6     Morton's on that night?
 7     A.  Yes, sir.
 8     Q.  Who had it?
 9     A.  Damein.
10     Q.  Did it record video?
11     A.  Yes, it did.
12     Q.  Did it record audio?
13     A.  No, it did not.
14     Q.  I think your testimony was that the policy is that there is
15     no audio recorded in these sorts of surveillances.  Is that
16     correct?
17     A.  That is correct.
18            MS. POMERANTZ:  Objection.
19            THE COURT:  I'll allow it.
20     Q.  Why?
21     A.  It came from headquarters.  They said no audio.
22     Q.  So you would agree that on Morton's on this night, because
23     there was no audio, the only record of which you are aware of
24     what was said that night had to come from you and Damein,
25     right?
```

1              MS. POMERANTZ:  Objection.

2              THE COURT:   Sustained as phrased.

3   Q.  Well, to your knowledge, Ms. Williams-Thompson, did anyone

4   else on the FBI surveillance teams, other than you, hear or

5   record the statements made by the diners?

6   A.  It was just myself and Damein.

7   Q.  You had a government issued cell phone there?

8   A.  Yes, sir.

9   Q.  Did Damein have a government issued cell phone?

10  A.  Yes.

11  Q.  Those are iPhones?

12  A.  No.

13  Q.  What are they?

14  A.  I don't remember what the phone was during that time.

15  Q.  Was it a smart phone?

16  A.  Yes.

17  Q.  So the government issued cell phone you had could record

18  video and audio, right?

19  A.  Yes, it could.

20  Q.  You did not use it that night to the record video and

21  audio?

22  A.  No, we did not.

23  Q.  It's just your memory and Mr. Ragland's memory?

24              MS. POMERANTZ:  Objection.

25              THE COURT:  Sustained.

O643MEN3                         Williams-Thompson - Cross

1    Q.  Did you see Mr. Ragland use his cell phone to record
2    anything that night?
3    A.  No, I did not.
4    Q.  Yours was functional.  It worked that night, right?
5    A.  Yes.
6    Q.  And again, you're doing this surveillance work, but you
7    testified you are not a part of the investigation in this case,
8    right?
9    A.  That is correct.
10   Q.  So, when you were doing the surveillance, you had no idea
11   if any of this was important to the case, correct?
12           MS. POMERANTZ:  Objection.
13           THE COURT:  I'll allow it.
14   A.  No, we never know how important anything is.  We just
15   gather intel and send it out.
16   Q.  You get the information and share it with others?
17   A.  That's correct.
18   Q.  But there are some occasions, perhaps in your career, where
19   you've actually observed something that you would describe as
20   suspicious or unlawful, correct?
21           MS. POMERANTZ:  Objection.
22           THE COURT:  Sustained.
23   Q.  Well, have you observed suspicious behavior on surveillance
24   teams before?
25           MS. POMERANTZ:  Objection.

O643MEN3                    Williams-Thompson - Cross

1           THE COURT:  I'll allow that.
2    A.   What can be suspicious to me may not be suspicious to the
3    CA, so I don't know.
4           THE COURT:  What's the CA?
5           THE WITNESS:  The case agent, I'm sorry.
6    Q.   In your view, what would constitute suspicious behavior on
7    a surveillance?
8           MS. POMERANTZ:  Objection.
9           THE COURT:  I'll allow it.
10   A.   It can be like the way they driving, not taking logical
11   route, they are doing their steps, meaning they will go down
12   one street, keep making turns, like they're doing
13   countersurveillance route.  That would be considered suspicious
14   for us.
15   Q.   Perhaps another example, if you actually saw somebody, you
16   know, passing contraband to one another, like a weapon or drugs
17   or something, that would be suspicious?
18           MS. POMERANTZ:  Objection.
19           THE COURT:  I'll allow that.
20   A.   That's not my line of work right there, but I guess I can
21   put, like, make a notation of it.
22   Q.   Got it.  Fair to say you didn't see anything like that that
23   you just talked about at this dinner at Morton's in May?
24           MS. POMERANTZ:  Objection.  Vague.
25           THE COURT:  I'll allow that.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O643MEN3                      Williams-Thompson - Cross

1    A.  No, I did not.

2              MR. FEE:  Let's put up -- actually, may I approach and

3    show some photos, your Honor?

4              THE COURT:  Yes.

5    Q.  Show some items.

6              I am going to show you DX 148, 149, 150, 151, and then

7    you have this one.  Please tell me when you have had a chance

8    to look at those.

9    A.  Yes, I have.

10   Q.  What are those generally?

11   A.  It's a restaurant.

12   Q.  Are they photos of the Morton's that you surveilled in May

13   of 2019?

14   A.  Well, I can say for 148 and 149, this is the inside of the

15   restaurant which we were not at.  So I could not speak for

16   that.

17   Q.  It is a part of the restaurant where you did not enter, 148

18   and 149?

19   A.  It could be.

20   Q.  You don't know?

21   A.  I just don't.

22   Q.  What about the others?

23   A.  150, 150 and 151 resembles what the patio looked like.

24             THE COURT:  Are these in evidence?

25             MR. FEE:  They're not.  I'm about to offer them.  I'm

O643MEN3                    Williams-Thompson - Cross

1   trying to understand her view of them.

2   A.  The last, like I said, 150 and 151, it resembles the patio

3   but I can't say for certain it really is.

4   Q.  Understood.  You didn't take those photos, right?

5   A.  No, I did not.

6   Q.  Would you agree that 150 and 151 are fairly accurate

7   depictions of the patio?

8           MS. POMERANTZ:  Objection.

9           THE COURT:  Can you say?

10          THE WITNESS:  I can't say for sure.

11          THE COURT:  All right.

12  Q.  Let's move on.  Let's put up government what's in evidence

13  as Government Exhibit 1G-6D.  Please.

14          You said this is when you're seated, you have the

15  black box?

16  A.  Yes.

17  Q.  You said there were about 40 people inside the restaurant?

18  A.  40, no, I did not.

19  Q.  Tell me how many people do you think were in there.

20  A.  I said I could see possibly up to 40 people.  There was

21  only a couple other people in there.

22  Q.  So, you and Mr. Ragland is two.  There's -- help me out.

23          THE COURT:  No, I'm sorry.  I don't understand.  You

24  say there were only a couple of other people in there; is that

25  correct?

1          THE WITNESS:  That's correct.  On the other side that

2     was not part of the dinner service.

3          THE COURT:  Then possibly up to 40 people were part of

4     the dinner service?

5          THE WITNESS:  Negative.  I would say it looks like the

6     patio can seat up to 40.

7          THE COURT:  Can seat.  The capacity of the patio you

8     thought may be up to 40 people.

9          THE WITNESS:  That is correct.

10          THE COURT:  There were only a few people there.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Now I understand.  Thank you.

13          THE WITNESS:  No worries.

14          MR. FEE:  Thank you, your Honor.

15     Q.  Ms. Williams-Thompson, what you are saying is it wasn't

16     crowded, that restaurant?

17     A.  That's correct.

18     Q.  And so, it was a relatively empty restaurant.  The group

19     that you're surveilling is sitting on the patio?

20     A.  That's correct.

21     Q.  You get a table that is about as far away as you are from

22     the judge?

23     A.  That is correct.

24     Q.  I want to ask, if this was a group that was concerned about

25     surveillance, would that have been your choice to sit so close?

1      MS. POMERANTZ:  Objection.

2      THE COURT:  Sustained.

3   Q.  Why did you sit so close?

4   A.  Because we needed to get video and photos.

5   Q.  But not audio.

6   A.  What?

7   Q.  Not audio?

8   A.  Not audio.

9      MS. POMERANTZ:  Objection.

10      THE COURT:  I'll allow it.

11  Q.  So, they're seated on a patio, this group.  Right?

12  A.  That's correct.

13  Q.  And if you look, there is the gentleman seated with his

14  right hand up in 1G-6D.  Do you see that gentleman?

15  A.  I do.

16  Q.  Behind him is actually a window that's open to the street,

17  right?

18  A.  It's not open to the street.  No.

19  Q.  So you don't believe that window to be open to the street?

20  A.  No.  I mean, it's facing the street.  But, we up high and

21  it's like, I believe this is a glass wall.

22  Q.  So let me ask you a few more detailed questions.

23      THE COURT:  When you were asking questions, sir, did

24  you mean to ask whether the window was open?

25      MR. FEE:  I'll clarify.

1   Q.  Ms. Williams-Thompson, I'm circling the far wall.  And

2   would you agree you can see glass there, right?

3   A.  That's correct.

4   Q.  I am going to circle this wall.  And you see how there's

5   this sign that says Morton's?

6   A.  Yes, I do.

7   Q.  And below it has that writing Morton's, and then above it,

8   that area is actually open to the street, correct?

9   A.  I don't remember.

10  Q.  You don't remember.  Okay.  But you see, would you agree

11  that you see the glass on the far wall?

12  A.  I do.

13  Q.  And you do not see the glass on the wall to the man's back.

14  Correct?

15  A.  Correct.

16  Q.  And then I'm circling here.  This is like a tarp.

17          THE COURT:  I'm confused.  I'm sorry.  On the right

18  there where it says I guess Morton's, do you see that -- circle

19  that, sir, if you would.  What's above it?  Are you saying that

20  that is not glass?

21          THE WITNESS:  It could be or it couldn't be.  I know

22  that, you know, it was hard for me to see on the other side if

23  it really was glass, because it was like clear.

24          THE COURT:  Thank you.

25  Q.  So, your testimony is you don't actually remember that

O643MEN3                    Williams-Thompson - Cross

1   night observing whether there was glass in that area, correct?

2   A.   That is correct.

3   Q.   I'm asking about this photo that you talked about with the

4   prosecutor.  Sitting here today, do you see glass there or not?

5   A.   In this picture it does not look like there is glass.

6   Q.   So, fair to say that if there was an open window to the

7   street, and that's Connecticut Avenue running behind them?

8   A.   I don't know.

9   Q.   If there is an open window to the street, it would render

10  it or it would make it harder to overhear conversations,

11  correct?

12  A.   Possibility.

13  Q.   Harder than if it was just an enclosed room with not that

14  many people in it; fair to say?

15  A.   Possible.

16  Q.   Possibly?  Got it.

17         Can we put up quickly Government's Exhibit 1G-6A.  Can

18  we zoom if in on the top third, please.

19         Would you agree that you can still see sunlight in

20  this photo, Ms. Williams-Thompson?

21  A.   It's possible.

22  Q.   Let me ask, do you see sunlight in this photo?

23  A.   It looks like you can see a streetlight on.

24  Q.   You are not sure if it was a streetlight or sunlight?

25  A.   That's right.

O643MEN3                        Williams-Thompson - Cross

1    Q.  Would you agree the sky does not appear dark?

2    A.  It does not appear dark.

3          THE COURT:  Can you see from this photo whether it's

4    nighttime or not?

5          THE WITNESS:  Not in the photo, no.  It doesn't look

6    like it's in the photo, but I know it was the evening.

7    Q.  Perhaps the sun went down during the course of the meal.

8    Is that your recollection?

9    A.  Yes.

10   Q.  In your experience, do folks trying to avoid detection or

11   surveillance have a meal on the patio with glass walls in the

12   daylight?

13         MS. POMERANTZ:  Objection.

14         THE COURT:  Sustained.

15         You've already said to your recollection they did not

16   appear to be avoiding surveillance, correct?

17         THE WITNESS:  That is correct, sir.

18         THE COURT:  Move forward.

19   Q.  Let's put up Government Exhibit's 1G-6G.  This is you

20   testified Senator Menendez pouring wine?

21   A.  Yes.

22   Q.  And I want to ask, we can leave this up, but let me ask,

23   you said you overheard the woman say "what else can the love of

24   my life do for you."

25   A.  That's correct.

O643MEN3                    Williams-Thompson - Cross

1    Q.  Those are the words?

2            And you didn't, you weren't looking at the woman when

3    she said that, right?

4    A.  That's correct.

5    Q.  So you don't know to whom she said it?

6    A.  Say what?

7    Q.  You don't know the person to whom she was directing that

8    comment?

9    A.  That's correct.  I do not know who.

10   Q.  You didn't hear her words before that comment, right?

11   A.  That's correct.

12   Q.  Nor did you hear the words of anyone else before that

13   comment?

14   A.  I don't recall.

15   Q.  I won't make you do the whole thing, but certainly you

16   didn't hear after that comment any responses or additional

17   comments from her?

18   A.  That's correct.  I didn't hear anything.

19   Q.  Got it.  So just those words, sort of detached from

20   context; fair to say?

21           MS. POMERANTZ:  Objection.

22           THE COURT:  Sustained.

23   Q.  You heard those words detached from any other conversation,

24   correct?

25           MS. POMERANTZ:  Objection.

O643MEN3                    Williams-Thompson - Cross

1          THE COURT:  You didn't hear any other conversation,

2     right.

3          THE WITNESS:  From her?

4          THE COURT:  Yes.

5          THE WITNESS:  No.

6     Q.  You didn't actually, you also weren't observing that group

7     when you heard those words, right?

8     A.  Was I observing the group?

9     Q.  Were your eyes actually on the group?

10    A.  No, my eyes was not directly on them, no.

11    Q.  So you see him pouring wine here.  Do you know if she said

12    that after he poured wine for somebody else?

13    A.  I don't remember.

14    Q.  Did he pass food or bread and then she said it?

15    A.  I don't recall.

16    Q.  You mentioned that you follow -- we can put that down.

17         You mentioned you followed the woman, the blonde

18    haired woman you said to the bathroom?

19    A.  Eventually.

20    Q.  Eventually?

21    A.  Yeah, I didn't know where she went initially.

22    Q.  Got it.  You didn't know anything about her.  You got to

23    make sure she's not leaving restaurant and going somewhere

24    else?

25    A.  Correct.

1   Q.  You actually followed her into the bathroom, right?

2   A.  I didn't follow her into the bathroom.  I found her in the

3   bathroom.

4   Q.  So you tell me what happened when she got up.

5   A.  When she got up, she exited the patio and went, looked like

6   she was going towards the entrance to where the dinner service,

7   the inner restaurant is.  So I got up and went and I didn't see

8   her.  So I went to the bathroom because it was right there, and

9   that's where I seen her at.

10  Q.  Did you observe anything she did or didn't do?  Like did

11  she leave anything in the bathroom?

12  A.  No, she did not.

13  Q.  Were you concerned she was going to leave something in the

14  bathroom?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Sustained.

17  Q.  Why did you follow her there into the bathroom?

18  A.  That's --

19  Q.  You said that's where you found her.  But in any event, so

20  your observation is there was nothing unusual after the fact

21  about her bathroom trip?

22          MS. POMERANTZ:  Objection.

23          THE COURT:  I'll allow it.

24  A.  There was nothing unusual.

25  Q.  So far as --

1          THE COURT:  The lady went to the bathroom.

2          MR. FEE:  That's the point.  Thank you, your Honor.

3          MS. POMERANTZ:  Objection to commentary.

4          THE COURT:  Yes.  The jury knows to disregard.

5   Q.  You did not observe -- let me use regular words.  You

6   didn't see Senator Menendez ever again outside of that dinner

7   and today in this courtroom, correct?

8   A.  That's correct.

9   Q.  Did anyone on the team advise you that Senator Menendez

10  goes to Morton's hundreds of times over the course of a year or

11  two?

12         MS. POMERANTZ:  Objection.

13         THE COURT:  Sustained as phrased.

14  Q.  Are you aware of whether Senator Menendez meets other

15  diplomats at Morton's?

16         MS. POMERANTZ:  Objection.

17         THE COURT:  Are you aware of any other time that

18  Senator Menendez was at Morton's?

19         THE WITNESS:  No, sir.  I only worked this one time.

20  Q.  Last subject.  The words you overheard about the love of my

21  life.  You did not write those in the text chain with your

22  surveillance team, correct?

23  A.  Did you see it in the text?

24         THE COURT:  Do you remember whether or not you wrote

25  "what else can the love of my life do for you" in the text

O643MEN3                    Williams-Thompson - Cross

1    chain that night?  Do you remember?

2                THE WITNESS:  I actually believe that I did.  But I

3    know that I made sure the log writer knew about it.

4                THE COURT:  The log writer knew about it.

5                THE WITNESS:  That's correct.

6    Q.  So your recollection is that you did text it on that chain

7    with your team, those words?

8    A.  I definitely believe I relayed it to them, yes.

9    Q.  I want to make sure I understand what you are trying to

10   say.  You relayed it in text or you relayed it in some other

11   way to the best of your recollection?

12   A.  That's correct.

13   Q.  Which way?  Text or some other way?

14               THE COURT:  Do you know whether you relayed it in

15   text?

16               THE WITNESS:  I made sure it was definitely on the

17   log.  So verbally most likely I did tell.

18   Q.  So, I don't want to mischaracterize.  Fair to say you are

19   not exactly sure how it was conveyed to the team, but you

20   believe you conveyed it?

21   A.  Yes, sir.

22   Q.  If not in text, you are saying you did it verbally.  Tell

23   me how that works.

24   A.  I tell the log writer, hey, this is what I heard.

25   Q.  But you don't tell her during the dinner, right?

1    A.  No.

2    Q.  Because you couldn't.  It would be obvious.

3    A.  That's correct.

4    Q.  So walk me through how that would work.  You are having the

5    dinner.  At some point you finish the dinner.

6    A.  Yes.

7    Q.  And then you said you got cleared to leave because the

8    other folks had left?

9    A.  Hmm-hmm.

10   Q.  The subjects had left?

11   A.  Yes.

12   Q.  And then you leave?

13   A.  Yes.

14   Q.  Then walk me through to when you believe you would have

15   conveyed the "love of my life" comment to the log writer?

16   A.  I'm not sure exactly when the time frame was.  But it was

17   when the log had to be written.

18   Q.  Just to be clear, the log writer is a member of the

19   surveillance team?

20   A.  That is correct.

21   Q.  That makes notes?

22   A.  Yes.

23   Q.  Tell me what their job is.

24   A.  They take the note, they write their own notes and they

25   would transfer the notes onto the 1054, and it would have the

1  routes and everything on there.  It would have like a summary

2  and the observations.

3  Q.  Understood.  I am going to show you what's been marked for

4  identification as 3549-003.  And it's double sided.  You might

5  have to flip it over.

6  A.  Thank you.

7  Q.  Again just look at that, take your time, and let me know

8  when you're done.

9  A.  Okay.

10          (Pause)

11  A.  Okay.

12  Q.  So the question is, does that document I just showed you

13  refresh your recollection, does it give you an independent new

14  memory of whether or not you wrote in your text chain with your

15  team that night the "love of my life" comment, the overhear.

16  A.  It did not say it at all.

17  Q.  So my question is does it refresh your recollection as to

18  whether it's in there.

19  A.  Vaguely, yes, it do.

20  Q.  And what is your memory now as to whether you wrote in that

21  text chain the "love of my life" comment?

22  A.  It doesn't say.

23  Q.  Okay.

24          MR. FEE:  Your Honor, we would offer what's been

25  marked as 3549-003 call it DX 3549-003 not for the truth.

1           MS. POMERANTZ:  No basis.

2           MR. FEE:  It can be established the basis.  Not for

3    the truth.

4           THE COURT:  No, sir.  Objection sustained.

5           MR. FEE:  No further questions.  Thank you.

6           THE COURT:  Thank you.

7           Mr. Lustberg, anything, sir?

8           MR. LUSTBERG:  Very briefly.

9    CROSS-EXAMINATION

10   BY MR. LUSTBERG:

11   Q.  Ms. Williams-Thompson, when you were at the Morton's

12   Steakhouse that night, you observed that table next to you and

13   they appeared to be getting along very well, correct?

14   A.  Yes, sir.

15   Q.  There was a lot of laughter, right?

16   A.  Yes, sir.

17   Q.  And they were drinking alcohol and smoking cigars and

18   cigarettes, correct?

19   A.  Yes, sir.

20   Q.  And they were eating the good food there, as you called it,

21   at Morton's Steakhouse, right?

22   A.  Yes, sir.

23   Q.  And when you were there, you were also eating the food at

24   Morton's Steakhouse, right?

25   A.  Yes, sir.

O643MEN3                     Williams-Thompson - Cross

1    Q.   There came a time when your partner Mr. Ragland decided to
2    take a picture, right?
3    A.   Right.
4    Q.   And that was done in a way so that -- and the reason you
5    did that -- strike that.
6           That was done in a way so it was clear you were
7    appearing you were taking a picture of each other?
8    A.   Him taking a picture of me.
9    Q.   That would be a normal thing so it wouldn't stick out as
10   something extraordinary, right?
11   A.   Yes.
12   Q.   How long about were you, did you do that surveillance at
13   Morton's Steakhouse that evening?
14   A.   We were there for at least a good approximately couple
15   hours.
16   Q.   Certainly long enough so when you started it was light, but
17   by the time you finished, it was dark, right?
18   A.   I'm not quite sure how light it was that night.
19   Q.   But the entire time you were in that public patio with the
20   glass wall, right?
21   A.   Correct.
22   Q.   Just one more question, which is back to the quote which
23   was "What else can the love of my life do for you."  You're
24   sure the language was "what else," right?
25   A.   Yes, sir.

O643MEN3                         Williams-Thompson

1   Q.  And do you know what the "else" referred to?

2   A.  No, I do not.

3              MR. LUSTBERG:  That's all I have, your Honor.

4              THE COURT:  Thank you, sir.

5              MR. DE CASTRO:  No questions.

6              THE COURT:  Any redirect?

7              MS. POMERANTZ:  Yes, briefly, your Honor.

8   REDIRECT EXAMINATION

9   BY MS. POMERANTZ:

10  Q.  Was the patio on the first floor or a higher floor?

11  A.  It was on a higher floor.  It was same level as the main

12  restaurant.

13  Q.  Do you recall being asked whether the open window made it

14  difficult to hear conversation during this same surveillance?

15  A.  I recall.

16  Q.  Do you recall being asked about whether there was any

17  recording of the statement you heard on May 21, 2019?

18  A.  Yes.

19  Q.  Did you and your team document what you heard in any sort

20  of report or log?

21  A.  Yes.

22  Q.  Did someone create a surveillance log of the surveillance

23  done on May 21, 2019?

24  A.  Yes, ma'am.

25  Q.  Does the surveillance log include statements that you

1   conveyed so the statements could be included in this log?

2   A.  Yes, they do.

3   Q.  Did you review the surveillance log from May 21, 2019, to

4   make sure it was accurate?

5   A.  Yes, I did.

6   Q.  Did you sign off on it?

7   A.  Yes, I did.

8           MS. POMERANTZ:  Can we pull up for just the witness

9   3549-001R.

10  Q.  Do you recognize this?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It's a 1054.

14  Q.  Sorry?

15  A.  That is our log.

16  Q.  That's the log?

17  A.  Official log document.

18  Q.  Is that called an F.D. 1055?

19  A.  Yes.  1055, yes, ma'am.  I'm sorry.

20  Q.  Is this a true and accurate copy of the surveillance log of

21  the surveillance that was done on May 21, 2019?

22  A.  Yes, it is.

23          MS. POMERANTZ:  The government offers 3549-001R.

24          MR. FEE:  Can I do a brief colloquy?

25          THE COURT:  Yes.

O643MEN3                          Williams-Thompson

1    BY MR. FEE:

2    Q.  This report was actually dated May 29 of 2019.  Is that

3    correct?

4    A.  That is correct.

5    Q.  You didn't write this report?

6    A.  No, I did not.

7    Q.  The surveillance occurred eight days earlier on May 21?

8    A.  That's correct.

9    Q.  Sitting here today, do you actually remember when you

10   communicated to the writer of this May 29 report the comment

11   about "the love of my life"?

12   A.  It had to be, it was definitely before May 29.

13   Q.  Before May 29.  But beyond that, your memory is not good?

14   A.  Exactly.

15   Q.  Do you remember sitting here today exactly how you

16   communicated the "love of my life" comment to the writer of

17   this May 29 report?

18   A.  No, I do not.

19             MR. FEE:  We would object.

20             THE COURT:  You're offering it?

21             MS. POMERANTZ:  Yes, your Honor.

22             THE COURT:  I think it fits squarely within

23   801(d)(1)(B)(ii) as we discussed at the sidebar.  Admitted.

24             (Government's Exhibit 3549-001R received in evidence)

25             MS. POMERANTZ:  Ms. Wechsler, can we pull that up for

O643MEN3                        Williams-Thompson

1   the jury.

2   Q.  Directing your attention to the top left.  Is that where it

3   says F.D. 1055?

4   A.  Yes, it do.

5   Q.  And directing your attention to the top where it says

6   "title."  Do you see where it says surveillance May 21, 2019?

7   A.  Yes, I do.

8   Q.  Now, to remind the jury, have you ever known the names of

9   people who were at this dinner with Robert Menendez?

10  A.  No.

11  Q.  Now let's go to page 3.  Directing your attention to 8:12.

12          MR. FEE:  Your Honor, I would object.  She was not,

13  there was no issue raised about an account relating to the

14  subject.  There is a single page of this document that fits

15  within the rule.

16          THE COURT:  I think that's right.  Stick to the

17  purpose of the specific admission that I referenced.

18          MS. POMERANTZ:  Absolutely.  Apologies.

19  Q.  Let's stay on this page and directing your attention to

20  where it says "The following topics and statements were

21  overheard throughout dinner."  Do you see that?

22  A.  Yes, I do.

23  Q.  Let's go to the next page.  I want to direct your attention

24  to that line.  Can you please explain what does UF mean?

25  A.  Unknown female.

O643MEN3                         Williams-Thompson

1    Q.  Can you please read this sentence.

2    A.  "UF said, 'What else can the love of my life do for you.'"

3    Q.  This is a report from -- let's go to the first page.  This

4    is a report from May 2019?

5    A.  Yes, ma'am.

6    Q.  Now, we can take that down.

7         Do you have any doubt that at Morton's on May 21,

8    2019, you heard the woman at the table say "What else can the

9    love of my life do for you?"

10        MR. FEE:  Bolster.

11        THE COURT:  Sustained.

12   Q.  Did you hear the woman at Morton's say much apart from

13   "What else can the love of my life do for you?"

14   A.  No, she was actually quiet.

15        THE COURT:  When you say quiet, do you mean speaking

16   in a soft voice or do you mean she didn't say much?

17        THE WITNESS:  Other than hearing her laugh during

18   dinner service, I didn't hear her speak at all until that

19   statement.

20        THE COURT:  All right.

21   Q.  Why do you remember it?

22        MR. FEE:  Objection.

23        THE COURT:  Sustained.

24   Q.  Have you ever read any text messages between Robert

25   Menendez and Nadine Menendez?

1          MR. FEE:  Objection.  Scope.

2          THE COURT:  Sustained.

3  Q.  Do you know who the other witnesses are in this case?

4  A.  No, I do not.

5  Q.  Other than conducting surveillance on May 21, 2019, did you

6  have any involvement in this investigation?

7  A.  No, ma'am.

8          MS. POMERANTZ:  No further questions.

9          THE COURT:  Thank you.

10         MR. FEE:  Your Honor, I'm sorry.  I have one question

11  just to make the record of a document we offered that I forgot.

12  Can I just pose it.

13         THE COURT:  Go ahead.

14  RECROSS EXAMINATION

15  BY MR. FEE:

16  Q.  The document I handed you that was marked 3549-003.

17  A.  Yes.

18  Q.  Do you recognize that to be the text chain between you and

19  your surveillance team on May 21?

20         MS. POMERANTZ:  Objection, your Honor.

21         THE COURT:  I'll allow it.

22  A.  Yes, it does look like it came from the evening in

23  question.

24  Q.  And you see the last four digits of the cell number you

25  were using that night reflected there, correct?

O643MEN3                    Williams-Thompson - Recross

1   A.  Yes.

2           MR. FEE:  Thank you, your Honor.

3           THE COURT:  Thank you.  You are excused.  You may step

4   down.

5           THE WITNESS:  Thank you, sir.

6           (Witness excused)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O643MEN3

1          THE COURT:  Rather than have another witness, ladies

2    and gentlemen, why don't we break for lunch.  It's 10 to 1.

3    Please be back by 10 to 2.  Thank you.

4          (Jury excused)

5          THE COURT:  First I'd like to correct one of my

6    statements.  Earlier in our discussion, Mr. Weitzman, I said

7    that I thought that there were scores of attorneys who had been

8    admitted on this case.  I was incorrect.  My deputy informs me

9    that Mr. Fee, Mr. Weitzman, and Mr. Luskin are the three

10   attorneys from Paul Hastings who have filed appearances in this

11   case.

12         In regard to cell phones, though, originally on

13   April 4 and then on May 28, I signed orders permitting the team

14   of seven attorneys from Paul Hastings to bring in 21 cell

15   phones, 21 iPads, 21 laptops.  Seven attorneys, those attorneys

16   all have permission to use wi-fi, and a variety of laptops and

17   other equipment.  But I was incorrect to say that there were

18   scores of attorneys who had filed appearances.  Only three

19   have.  So, I'm correcting the record in that regard.

20         Now let's go to is it DX 136.  There is an evidentiary

21   issue the parties have.

22         MR. WEITZMAN:  Yes, your Honor.  I have a copy of a

23   redacted version of DX 136 that I'd like to hand up to the

24   Court.

25         THE COURT:  Go ahead.

O643MEN3

1          MR. WEITZMAN:  Just to set the stage.

2          THE COURT:  What is this?

3          MR. WEITZMAN:  Yes. The next witness is Special Agent

4    Frenzilli and she's going to testify about a search that she

5    conducted pursuant to a search warrant of a safe deposit box

6    that was co-owned by Nadine Arslanian and her father.  In that

7    safe deposit box she seized, the FBI seized envelopes filled

8    with cash, there was also jewelry, there were also passports.

9    These are the expired and canceled passports that were seized

10   that your Honor will notice it's of Nadine's family, it does

11   not --

12         THE COURT:  I can't notice that.  I just see pictures.

13         MR. WEITZMAN:  I will identify them, but it's members

14   of Nadine's family, and it's her two children, Sabine and

15   Andre.  It does not include a photo of Senator Menendez.  These

16   are canceled passports.  And your Honor may recall that when

17   the government introduced hundreds of photos of their search of

18   Nadine's home, it also included photos of her family members.

19   The point is --

20         THE COURT:  You mean on bureaus and things like that?

21         MR. WEITZMAN:  Correct.  Exactly.  We'd like to

22   introduce this for fairly obvious reasons, which is this was

23   not Senator Menendez's safe deposit box from which cash was

24   seized.

25         THE COURT:  You will have established that.  Is that

O643MEN3

1    correct?

2              MR. WEITZMAN:  Correct.

3              THE COURT:  You said it was in the name of Nadine and

4    her father.

5              MR. WEITZMAN:  But she also keeps her valuables, not

6    his valuables there.  And that's an important thing to

7    identify.

8              THE COURT:  I see.  What you want to adduce from the

9    fact that these, you're telling me are Nadine's family, is the

10   fact that she used this safe deposit for her stuff, not his

11   stuff.

12             MR. WEITZMAN:  Correct, your Honor.  The government

13   has said we should redact PII, personal identifying

14   information, and we have done so.  They've also insisted we

15   redact photographs, and they are now proposing to put in the

16   same exhibit, meaning they believe it has relevance, but

17   redacting these photos of her children.

18             I think it looks rather comical given that the names

19   are already in the record in e-mails, and photos, some of them

20   include photos of family members, we would exclude the photos

21   that are on the passport.  And that's the only issue that's

22   before your Honor.

23             THE COURT:  What's the issue?  Let me hear,

24   Mr. Weitzman, what's the issue?

25             MR. WEITZMAN:  The government is fine with introducing

O643MEN3

1    these passports but they want us to blackout the photos of all

2    the children, which they're now adults.  They're not children.

3            THE COURT:  Your objection is to blacking out two of

4    the various photos I see here.

5            MR. WEITZMAN:  No, I think there are five photos.  All

6    of them except for Nadine's photos.  They want to keep Nadine's

7    photos on the two right-hand images of passports and then all

8    the others they want blacked out.

9            THE COURT:  And normally that's PII, personal

10   identifying information.

11           MR. WEITZMAN:  I don't think photos are.  There has

12   been tons of photos of people.  They put up everything.

13           THE COURT:  Children, I'm focusing on children.

14           MR. WEITZMAN:  They're not children at this point.

15   They don't look anything like this.  They put in photos of

16   children during the search.

17           THE COURT:  So, I'll hear from the government.  But

18   why do you want the kids' pictures?  I understand they're not

19   kids now.

20           MR. WEITZMAN:  Well, because the jury can't recognize

21   these, it's not an issue of recognition, but a very odd thing

22   to introduce a totally blacked out passport and it's our

23   proof --

24           THE COURT:  That's fair enough, but go ahead.

25           MR. WEITZMAN:  This is our proof.  It has relevant

O643MEN3

1    value.  The government seems to concede it has relevant value

2    since they want to put it in.  We think pictures say a thousand

3    words.  The jury should see this.

4            THE COURT:  I understand.  Let me hear from the

5    government.  It seems to me the issue -- I'll hear from you.

6    But the issue of not having children's photos is one of

7    privacy, and it sounds like the entity that should be concerned

8    about that in theory is not.  So what's the issue, if they want

9    to put pictures of children in the public record, it seems to

10   me that it's their right to waive it.

11           MR. RICHENTHAL:  I don't disagree as to privacy.  It's

12   relevance and 403.  The children are not children.  The jury

13   doesn't know this.  We'll have picture of cute children.  As

14   lovely as cute children are, that's not relevant to this case.

15   The jury has seen all kinds of redacted documents including the

16   document Ms. Pomerantz just offered.  The jury has been given

17   instruction about redactions.  We think it is not appropriate

18   to have photographs of children, especially when they aren't

19   children, put in front of the jury.

20           There is no conceivable purpose.  It's plainly

21   designed to engender sympathy.  That's not a proper purpose.

22   We have a version of this exhibit that is 100 percent identical

23   and simply places small boxes over the children's faces.

24   Because that is not relevant and may engender sympathy, which

25   is not appropriate for the jury to be considering.

O643MEN3

```
1              MR. WEITZMAN:  Your Honor, they've redacted --

2              THE COURT:  What are you going to do in terms of

3    arguing sympathy here?  You are not going to argue she has

4    young children I take it.

5              MR. WEITZMAN:  Absolutely not.  And we'll stipulate

6    these are all adults.  We can do it orally in front of the

7    jury.  These are not children.

8              The other thing is, your Honor, I think it's one thing

9    for the jury to see this.  I think the jury should see it.  If

10   they're concerned about privacy, this is a redacted version

11   that can be made available to the public.  We've done that with

12   other instances here.  So we can deal with all these issues.

13   But it makes them look like they're -- first of all, their

14   names aren't there.

15             THE COURT:  I have the idea, sir.

16             MR. RICHENTHAL:  Two small points.  Just a formal

17   matter.  They're not Mr. Menendez's children so I am actually

18   not sure Mr. Menendez's counsel can speak for the privacy

19   interests.  I would have to research it.  I don't know the

20   answer.  But they're not his children.

21             More importantly, the jury will be told by our own

22   witness that Mr. Menendez's possessions are not there.  We have

23   no objection to this exhibit for the purpose of showing, if

24   they wish that Mr. Menendez purportedly had nothing do with the

25   safe deposit box.
```

O643MEN3

1          Our objection is very limited.  It is just that the

2     jury doesn't have to see pictures of cute children for that

3     purpose.  Their pictures are not relevant.

4          THE COURT:  All right.  I understand.

5          MR. WEITZMAN:  If I could just make two points.  The

6     first is, Nadine's not a defendant here so there is no effort

7     to engender sympathy for Nadine.

8          THE COURT:  You don't have to make the two points.

9          MR. WEITZMAN:  The second is --

10         THE COURT:  I said you don't have to make the two

11    points.

12         MR. WEITZMAN:  Thank you, your Honor.

13         THE COURT:  I'm not going to exclude it.  I think it

14    is a little strange the defense is allowing pictures of

15    children in.  But nonetheless, I'll let it in.  I don't see it

16    as a 403 issue.  And somewhere along the line the jury has to

17    be told that everyone here is an adult now.

18         MR. FEE:  I would like to resubmit the application to

19    admit 3549-003.  It is pure impeachment, non-hearsay, there is

20    nothing prejudicial about it.

21         THE COURT:  That's your log and it does not have the

22    comment.

23         MR. FEE:  It's an impeachment exhibit.

24         MR. RICHENTHAL:  I'm sorry.  That's just wrong as a

25    matter of law.  The witness testified the statement isn't

O643MEN3

1      there.  She's not impeached by showing a document showing the

2      statement isn't there.  This is basic rules of evidence.  It is

3      inadmissible hearsay.  If it were a prior inconsistent

4      statement, it could be introduced without the assertion of fact

5      for that purpose.  It's literally not inconsistent.  She said

6      it's not there.

7              MR. FEE:  He's conflating two things.  We are not

8      offering for its truth so you don't need to worry about the

9      hearsay exception.  For inconsistent statements, my

10     recollection is that she said it wasn't there in a way that is

11     not truly in the record in an appropriate manner.

12             THE COURT:  What does that mean?

13             MR. FEE:  I showed it to her to refresh her

14     recollection.

15             THE COURT:  And she said it's not there.

16             MR. FEE:  She said it's not there.  The thing in the

17     record --

18             THE COURT:  So you have it in the record.

19             MR. FEE:  I don't though, your Honor.

20             THE COURT:  Let me finish.

21             MR. FEE:  Yes, sir.

22             THE COURT:  It seems to me you have it in the record

23     that it's not there.  The reason I say that is my recollection

24     is at least is she said it's not there.

25             MR. FEE:  Your Honor, the thing I showed her is not

O643MEN3

1    described as the text log until separately.  If the government

2    will not object to us arguing in summation that she saw the log

3    and that she affirmed that her statement was not there, then we

4    can drop this.  The issue is that.  They're going to object if

5    we try to make that argument if this document is not in

6    evidence.

7            MR. RICHENTHAL:  I can't predict a future objection.

8    What I can say is the record speaks for itself.  The witness

9    was crystal clear, in fact she was asked more than once whether

10   the statement was in her text chain, which Mr. Fee just

11   misstated is a text log, and the witness said it's not.

12           So if Mr. Fee wants to stand up in summation and say

13   it's not in the text chain, obviously that's supported by the

14   record.  I don't know what he's going to say beyond that, so I

15   can't speak to objections.

16           THE COURT:  I am adhering to my prior ruling.  Thank

17   you.

18           MR. RICHENTHAL:  Can I make one separate issue.

19           THE COURT:  Depends about how much time you want for

20   lunch.  Go ahead.

21           MR. RICHENTHAL:  A couple of times your Honor

22   sustained objections on the ground of bolstering on redirect.

23           THE COURT:  Yes.

24           MR. RICHENTHAL:  Our understanding of the law, and we

25   obviously could be wrong, is that we're not permitted to

O643MEN3

1    bolster unless and until a witness is attacked on a relevant

2    ground.  What Ms. Pomerantz was trying to do was rehabilitate

3    Ms. Williams-Thompson as to this statement after being

4    repeatedly suggested in cross-examination it didn't really

5    happen.

6            THE COURT:  I understand.

7            MR. FEE:  That's the inappropriate method to do that.

8    It is not a proper question to say are you super sure you

9    remember those words.  They can walk through details, they can

10   cover the same subjects in an appropriate way.  That is a

11   flatly inappropriate way to do that.

12           THE COURT:  There is not an issue I need to decide at

13   this moment.  My decision on that text chain stays the same.

14           MR. MONTELEONI:  Your Honor, with many apologies.  We

15   may get to Special Agent Rachel Graves this afternoon and if

16   so --

17           THE COURT:  Is that the chart?

18           MR. MONTELEONI:  Yes, and some of those exhibits

19   subject to objections are among the first ones we would be

20   presents.

21           THE COURT:  All right.  I can deal with most of those

22   at this time.  Not all of them.  We'll see when this witness

23   takes the stand.  If so, we'll take a break, we'll handle the

24   remaining ones.

25           MR. MONTELEONI:  Thank you.

O643MEN3

 1              MS. GHOSH:  May I put one statement on the record.  I

 2    wanted to put on the record that parties agreed previously to

 3    substitute a new version of a stipulation which is Government

 4    Exhibit 1437 which is in evidence to correct two typos.  The

 5    government has already provided the Court with a revised

 6    exhibit earlier.  And we are not now putting this on the

 7    record.

 8              THE COURT:  The record will show what you've said.

 9    Thank you.  2 o'clock.

10              (Recess)

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O645men4

```
 1                    A F T E R N O O N   S E S S I O N

 2                              2:10 p.m.

 3            THE COURT:  The jury is here.

 4       Good afternoon.

 5            THE WITNESS:  Good afternoon.

 6            THE COURT:  Jury entering.  Rise for the jury.

 7            (Jury present)

 8            THE COURT:  You may be seated in the courtroom.

 9       Good afternoon, ladies and gentlemen of the jury.

10       Government, call your next witness.

11            MS. GHOSH:  Thank you, your Honor.  The government

12  calls Special Agent Anna Frenzilli.

13            THE DEPUTY CLERK:  Please stand and raise your right

14  hand.

15  ANNA FRENZILLI,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18            THE DEPUTY CLERK:  Please state your name and spell

19  your last name for the record.

20            THE WITNESS:  Anna Frenzilli.  My last name is spelled

21  F-R-E-N-Z-I-L-L-I.

22            THE COURT:  Good afternoon, Ms. Frenzilli, and

23  welcome.

24            Your witness.

25            MS. GHOSH:  Thank you, your Honor.
```

O645men4                        Frenzilli - Direct

1   DIRECT EXAMINATION

2   BY MS. GHOSH:

3   Q.  Where do you work?

4   A.  The Federal Bureau of Investigation.

5   Q.  What is your title?

6   A.  Special Agent.

7   Q.  How long have you been a Special Agent with the FBI?

8   A.  Three years.

9   Q.  What are some of your duties and responsibilities as a

10  special agent?

11  A.  My primary responsibility is to conduct investigations into

12  federal criminal offenses.

13  Q.  Have you participated in the execution of search warrants

14  before?

15  A.  Yes.

16  Q.  I would like to direct your attention to June 16, 2022.

17  What was your assignment that day?

18  A.  To execute a search warrant at a Chase Bank branch in

19  Englewood, New Jersey.

20  Q.  What, if any role did you have, in the investigation that

21  led up to that June 16, 2022 search?

22  A.  I had no role prior to the search.

23  Q.  After the search, did you have any other role in the

24  investigation?

25  A.  Yes.  I assisted with the execution of additional digital

O645men4                         Frenzilli - Direct

1    search warrants.

2    Q.  Did you have any involvement beyond that?

3    A.  No.

4    Q.  What exactly were you searching on June 16, 2022?

5    A.  It was a safe deposit box.

6    Q.  Do you recall where the safe deposit box was?

7    A.  Yes.  The Chase Bank was located at 50 Grand Avenue in

8    Englewood, New Jersey, and the box was at that branch.

9             MS. GHOSH:  At this point I would like to read from a

10   stipulation that is in evidence as Government Exhibit 1405.

11   Reading from paragraph 1:  The documents marked for

12   identification as the following government's exhibits consist

13   of true and correct copies of account information, statements,

14   and other bank records from the following financial

15   institutions.

16             And turning to page 2, next to JP Morgan Chase Bank

17   there is an entry for an account ending in 2109 next to the

18   name Nadine Menendez, and also the Government Exhibit 5F-2401.

19             Turning to page 34 of that stipulation, it states that

20   the documents marked for identification as the aforementioned

21   government's exhibits are true and correct copies of records

22   for the financial institutions listed above, and are records of

23   regularly conducted activity, created and maintained by such

24   financial institutions, that were made at or near the time of

25   their creation by, or from information transmitted by, a person

O645men4                          Frenzilli - Direct

1    with knowledge of the matters set forth in the records, and

2    were kept in the course of regularly conducted activity.

3              The government offers Government Exhibit 5F-2401.

4              THE COURT:  Admitted without objection.

5              (Government's Exhibit 5F-2401 received in evidence)

6              MS. GHOSH:  Ms. Wechsler, can we publish 5F-2401 and

7    go to page 7?  I'm sorry, the prior page.  Thank you.

8    Q.  Special Agent Frenzilli, do you see the account number

9    listed on this document?

10   A.  Yes.

11   Q.  What are the last four digits?

12   A.  2109.

13   Q.  Do you see customer name listed?

14   A.  Yes.

15   Q.  What customer name is listed?

16   A.  Nadine Arslanian.

17   Q.  Do you see a box number listed on this document?

18   A.  Yes.

19   Q.  What box number is that?

20   A.  13.

21   Q.  And what is the box location?

22   A.  Englewood.

23             MS. GHOSH:  Thank you.  You can take that down.

24   Ms. Wechsler, could you please pull up, for just the witness,

25   what has been marked for identification as Government Exhibit

O645men4                        Frenzilli - Direct

1    1D, as in dog, 105?

2    Q.  Special Agent Frenzilli, do you recognize what is on your

3    screen?

4    A.  Yes.

5    Q.  And generally, what is it?

6    A.  It's the exterior of a safe deposit box that I searched.

7    Q.  Does this Exhibit 1D-105 fairly and accurately depict the

8    front of the safe deposit box you searched on June 16, 2022?

9    A.  Yes.

10          MS. GHOSH:  The government offers Government Exhibit

11   1D-105.

12          THE COURT:  Admitted without objection.

13          (Government's Exhibit 1D-105 received in evidence)

14          MS. GHOSH:  Ms. Wechsler, could you please publish

15   this for the jury?

16   BY MS. GHOSH:

17   Q.  Special agent, what specific safe deposit box did you

18   search on June 16, 2022?

19   A.  Box no. 13.

20   Q.  What part of the box does this photo show?

21   A.  The exterior.  It needs to be unlocked in order to get into

22   the box.

23   Q.  Was the box locked or unlocked when you first arrived at

24   the bank?

25   A.  It was locked.

O645men4                      Frenzilli - Direct

1   Q.  What authority did the FBI have to search that safe deposit

2   box?

3   A.  A search warrant.

4         MS. GHOSH:  Ms. Wechsler, if you could take that photo

5   down and just put up for the witness what has been marked for

6   identification as Government Exhibit 1D-107?

7   Q.  Special Agent Frenzilli, do you recognize this?

8   A.  Yes.

9   Q.  What does this show, generally?

10  A.  That's a safe deposit box itself, located behind the door

11  that was just pictured.

12  Q.  Is this a fair and accurate depiction of the safe deposit

13  box that you searched on June 16, 2022?

14  A.  Yes.

15        MS. GHOSH:  The government offers 1D-107 into

16  evidence.

17        THE COURT:  Admitted without objection.

18        (Government's Exhibit 1D-107 received in evidence)

19        MS. GHOSH:  Ms. Wechsler, can you please publish that

20  for the jury?

21  BY MS. GHOSH:

22  Q.  Special Agent Frenzilli, how did you get access to this

23  inner box?

24  A.  With the assistance of a bank employee and a locksmith that

25  was contracted by the bank.

O645men4                          Frenzilli - Direct

1   Q.  And what did the locksmith do?

2   A.  He opened the box with brute force.

3   Q.  How many FBI agents participated in the search of this safe

4   deposit box?

5   A.  Including myself, there were two agents.

6   Q.  What were the roles of the -- you said there were two

7   agents including yourself?

8   A.  Yes.

9   Q.  Were there any other FBI personnel present?

10  A.  Yes.

11  Q.  Who else assisted you?

12  A.  One FBI photographer.

13           MS. GHOSH:  Ms. Wechsler, could you please pull up for

14  just the witness what has been marked for identification as

15  Government's Exhibits 1D-132, 133, and 134 and show them to the

16  witness?

17           THE COURT:  Would you go back to the exhibit that was

18  just up?

19           MS. GHOSH:  That was 1D-107.

20           THE COURT:  Agent, I believe you testified that is a

21  picture of the safe deposit box itself inside what the bank

22  had, the area the bank had; correct?

23           THE WITNESS:  Yes.

24           THE COURT:  And so, is it that box that we see, the

25  thing we see in the picture, that the locksmith opened by brute

1    force?

2              THE WITNESS:  No.  So the exterior that had no. 13 on

3    it, that was what was pried open, that was locked.  The box

4    that you see pictured here was not locked.

5              THE COURT:  All right.  So it was the -- go back to

6    the exterior shot, please.

7              MS. GHOSH:  1D-105.

8              THE COURT:  It is this, no. 13, that the locksmith

9    opened by brute force; is that correct?

10             THE WITNESS:  Yes.

11             THE COURT:  What did you mean when you said "brute

12   force"?

13             THE WITNESS:  He used locksmith tools.

14             THE COURT:  All right.  Go ahead.  Sorry.

15             THE WITNESS:  Yes; in order to pry open the box.

16   There was no key on the premises that day so it had to be

17   opened by force.

18             THE COURT:  That's what I am trying to understand.

19   Was it as if he picked the lock with some locksmith tool or he

20   used a sledgehammer to break the door, or something in between?

21             THE WITNESS:  I honestly can't say or recall what

22   tools he used.

23             THE COURT:  Was the door left in essentially the same

24   condition as we see in this picture?  If you recall.

25             THE WITNESS:  I don't recall.  I would have to review

1    photos.  I believe we have photos.

2              THE COURT:  My question is, if you can recall as you

3    sit here now.

4              THE WITNESS:  No.

5              THE COURT:  All right.  Proceed.

6              MS. GHOSH:  Ms. Wechsler can you please show just the

7    witness Government's Exhibits 1D-132, 133, and 134?

8    BY MS. GHOSH:

9    Q.  Special Agent Frenzilli, do you recognize these?

10   A.  Yes.

11   Q.  Generally, what are they?

12   A.  They are photos of items that were found inside the box.

13   Q.  Do these photographs fairly and accurately depict some of

14   the contents of the safe deposit box you searched on June 16,

15   2022?

16   A.  Yes.

17             MS. GHOSH:  Government offers Government's

18   Exhibits 1D-132, 133, and 134.

19             THE COURT:  Admitted, without objection.

20             (Government's Exhibits 1D-132, 1D-133, 1D-134 received

21   in evidence)

22             THE COURT:  Agent, is this the entirety of the

23   content?

24             THE WITNESS:  No.

25             MS. GHOSH:  Ms. Wechsler, could we please publish,

O645men4                         Frenzilli - Direct

1    side by side, Government's Exhibits 1D-132 and 133?

2    BY MS. GHOSH:

3    Q.   Special Agent Frenzilli, what are we seeing here?

4    A.   There are 10 envelopes.  You can see in one photo one side

5    of the envelopes, and then in the other photo the other side

6    then turned over.

7    Q.   So just to be clear, the same 10 envelopes in each photo?

8    A.   Yes.

9    Q.   Now, were there other items besides these envelopes that

10   you found in the safe deposit box?

11   A.   Yes.

12   Q.   What sort of items?

13   A.   Passports, jewelry.

14   Q.   You mentioned passports.  Were any of the passports in the

15   name "Robert Menendez"?

16   A.   No.

17   Q.   Looking at the envelopes in Government Exhibit 1D-132, what

18   kind were most of these envelopes?

19   A.   They were from banks.

20   Q.   And if we could zoom in on the bottom row of 1D-132,

21   starting with the bottom row of envelopes, could you identify

22   for the jury the banks listed on these envelopes?

23   A.   TD Bank and Chase Bank.

24            MS. GHOSH:  Ms. Wechsler, could you zoom in on the two

25   TD Bank envelopes in the bottom row or the three middle

O645men4                        Frenzilli - Direct

1    envelopes in the bottom row?  Thank you.

2    Q.  Special Agent Frenzilli, what was written on the flap of

3    the two TD Bank envelopes?

4    A.  "$10,000".

5    Q.  If we zoom out of that and now focus on the top row of

6    envelopes, could you please identify the banks listed on the

7    top row?

8    A.  Mariner's Bank, Chase Bank, and PNC Bank.

9            MS. GHOSH:  Ms. Wechsler, if you could please put up

10   Government Exhibit 1D-133 and zoom in on the middle envelope in

11   the top row?

12   Q.  Special Agent Frenzilli, is this the aback of that

13   Mariner's Bank envelope?

14   A.  Yes.

15   Q.  What do you see written on the back of that envelope?

16   A.  "$10,000".

17   Q.  What was inside these envelopes that we have seen in

18   Exhibits 1D-132 and 1D-133?

19   A.  U.S. currency or cash.

20           MS. GHOSH:  Ms. Wechsler, can you please publish

21   1D-134 for the jury?

22   Q.  Special Agent Frenzilli, what are we looking at here?

23   A.  The contents of all 10 envelopes.

24   Q.  Looking first at the blank white envelope in the top left,

25   if we could zoom in on that, what denomination of cash do you

O645men4                          Frenzilli - Direct

1    see in that envelope?

2    A.  It looks to be mostly $20 bills.

3    Q.  If we zoom out of that and look at the one underneath, the

4    Chase Bank envelope, what denomination is this bill in that

5    envelope?

6    A.  $100 bills.

7          MS. GHOSH:  If we can come out of that and now zoom in

8    on the two TD Bank envelopes that had "$10,000" written on

9    them?  If you want to just zoom in on the bottom three

10   envelopes here, Ms. Wechsler?  Thank you.

11   Q.  What denomination is visible in the TD Bank envelopes with

12   the "$10,000" written on them?

13   A.  $100 bills.

14   Q.  How much money was found in each of those two TD Bank

15   envelopes?

16   A.  Each contained $10,000.

17          MS. GHOSH:  We can zoom out of that and now look at

18   the Mariner's Bank envelope in the top row with "$10,000"

19   written on it.

20   Q.  What denomination do you see in that envelope?

21   A.  $100 bills.

22   Q.  And how much money was found in that Mariner's Bank

23   envelope?

24   A.  Again, $10,000.

25   Q.  If we zoom out of that, what denomination do you see in the

O645men4                         Frenzilli - Direct

1   five other envelopes that we haven't looked at, specifically?

2   A.   $100 bills.

3   Q.   Did we just walk through every photograph that the FBI took

4   on the day of the search or just some?

5   A.   Just some.

6   Q.   What did the FBI search team do with these envelopes and

7   cash?

8   A.   They were seized and entered into FBI evidence.

9   Q.   How much cash was seized from the safe deposit box?

10  A.   Just under $80,000.

11          MS. GHOSH:  Your Honor, I would like to hand up to the

12  witness a physical exhibit which is marked for identification

13  as Government Exhibit 13.

14          THE COURT:  Yes.

15  Q.   Special Agent Frenzilli, do you recognize Government

16  Exhibit 13?

17  A.   Yes.

18  Q.   What is it?

19  A.   It's the cash that was sized from the bank.

20          MS. GHOSH:  The government offers Government Exhibit

21  13.

22          THE COURT:  Admitted without objection.

23          (Government's Exhibit 13 received in evidence)

24          MS. GHOSH:  Your Honor, may I publish it to the jury?

25          THE COURT:  Yes.  Just walk in front of the jury and

1    show it to them.

2                MS. GHOSH:   I would now like to read a paragraph from

3    a stipulation that is in evidence, it is Government Exhibit

4    1437.   Paragraph 2A states that the item marked for

5    identification as Government Exhibit 13 consists of the items

6    currently logged in the Evidence Management System under 1B

7    Number 1B13, that is $79,760 in cash seized from the safe

8    deposit box.   The item marked for identification as Government

9    Exhibit 94 consists of the items currently logged in the

10   Evidence Management System under 1B Number 1B94, that is 10

11   envelopes found with the cash marked as Government Exhibit 13.

12   The items contained in Government's Exhibits 13 and 94 were

13   initially logged in the Evidence Management System together

14   under 1B number 1B13.

15               The government offers Government Exhibit 94 into

16   evidence.

17               THE COURT:   Admitted.

18               (Government's Exhibit 94 received in evidence)

19   BY MS. GHOSH:

20   Q.   Special Agent Frenzilli, what happened to the envelopes --

21   excuse me.

22               What happened to the envelopes and the cash after they

23   were seized on June 16, 2022?

24   A.   They were entered into to FBI evidence.

25   Q.   And at some point, as you read in the stipulation, are you

O645men4                          Frenzilli - Cross

1  aware that they were separated?

2  A.   Yes.

3  Q.   What happened to the envelopes after they were separated

4  from the cash?

5  A.   They were separated and made to be another separate

6  evidence item, and then they were sent to the FBI lab in

7  Quantico, Virginia, for forensic testing.

8            MS. GHOSH:   Just one moment, your Honor?

9            (Counsel conferring)

10           MS. GHOSH:   No further questions.

11           THE COURT:   Thank you.

12           Mr. Fee, anything?

13           MR. WEITZMAN:   Mr. Weitzman.

14           THE COURT:   I'm sorry, Mr. Weitzman.  I was looking

15  down.  I apologize, sir.

16           MR. WEITZMAN:   We look similar.

17  CROSS-EXAMINATION

18  BY MR. WEITZMAN:

19  Q.   Good afternoon, Agent Frenzilli.  How are you?

20  A.   Good afternoon.

21  Q.   You are one of two agents that executed this search on the

22  safe deposit box, correct?

23  A.   Yes.

24  Q.   And the other agent was Special Agent Katrina Laperuta,

25  correct?

1   A.  Correct.

2   Q.  The search was done on June 16, 2022, right?

3   A.  Yes.

4   Q.  And you took entry photos or a photographer took both entry

5   and exit photos in connection with that search; right?

6   A.  Yes.

7   Q.  And do you recall the photographer's name?

8   A.  I believe his name is Matthew Cain.

9   Q.  And how long did the search last?

10  A.  I couldn't give -- it lasted several hours.  I don't know

11  the exact time.

12  Q.  Just so I understand, why does it last several hours?  What

13  occurs?

14  A.  So, when we arrived at the bank we had to wait for a

15  locksmith, and then taking photos and going through the box

16  methodically takes time.

17  Q.  And you have to wait for a locksmith because the bank

18  doesn't have a copy of the key to enter the safe deposit box;

19  is that correct?

20  A.  That was my understanding the day of the search.

21  Q.  And the safe deposit box is at a JP Morgan Chase Bank in

22  Englewood; right?

23  A.  Yes.

24  Q.  And it is in a secure room; is that correct?

25  A.  In a vault.

O645men4                         Frenzilli - Cross

1   Q.  It is in a vault.

2           MR. WEITZMAN:  Can we put up GX- 1D-105?

3   Q.  Is this a picture of the room in which the safe deposit box

4   was located?

5   A.  Yes.

6   Q.  And is this the vault or is this a room in the vault?

7   A.  So this is -- when you walk in, I guess it is a room that

8   contains multiple boxes like this, all of which are locked.

9   Q.  Is this the door to the room that contains the safe deposit

10  box?

11  A.  That knob, yes.

12  Q.  And is that a locked door to that safe deposit box room?

13  Do you recall?

14  A.  I don't recall.

15  Q.  But you are saying this room contains safe deposit boxes is

16  in a bigger vault in the bank?

17  A.  Yes.

18  Q.  And no one has, other than with the assistance of bank

19  personnel, no one can walk into that vault; correct?

20          MS. GHOSH:  Objection.

21          THE COURT:  Sustained as to form.

22  Q.  From what you can tell are people able to walk into the

23  vault room on their own without permission?

24  A.  I would have to ask a bank employee how to get access.  The

25  day of the search the only way that I was allowed to go in

O645men4                     Frenzilli - Cross

1    there was with a bank employee.

2    Q.  It appeared to you to be in a secure area of the bank;

3    right?

4    A.  Yes.

5    Q.  And in order to get into the vault, is it one of these big

6    vaults with these like ship-turning things, like handles that

7    need to turn?

8              MS. GHOSH:  Objection.

9              THE COURT:  I will allow it.  Ship-turning thing.

10   Everybody knows what a ship-turning thing is.

11             Go ahead.

12             THE WITNESS:  I don't recall.

13   BY MR. WEITZMAN:

14   Q.  In any event, this safe deposit box no. 13 wasn't

15   accessible to the public; correct?

16             MS. GHOSH:  Objection.

17             THE COURT:  Sustained.

18             MR. WEITZMAN:  Can we put up GX- 5F-2401?

19   Q.  I think this is an exhibit that you were shown in direct;

20   is that correct?

21             MR. WEITZMAN:  If you can go to page 4 of the

22   document?

23   Q.  Were you shown this document?

24   A.  Yes.

25   Q.  And you highlighted the customer name Nadine Arslanian;

O645men4                        Frenzilli - Cross

1    correct, box 13, Englewood?

2    A.  Yes.

3           MR. WEITZMAN:  Can we turn to the last page of this

4    document?

5    Q.  You weren't shown this part of the document but do you know

6    what this is?

7           MS. GHOSH:  Objection.

8           THE COURT:  The jury will disregard the comment.

9           Do you know what this document is?

10          THE WITNESS:  No.

11   BY MR. WEITZMAN:

12   Q.  The top of the document says Safe Deposit Contract Card.

13   Do you see that?

14   A.  Yes.

15   Q.  And then it refers on the left to box no. 13; correct?

16   A.  I see that it says box no. 13, yes.

17   Q.  That's the same number box that you searched; right?

18   A.  Yes.

19   Q.  You see that it says in the middle on the first row, it

20   says date rented:  May 18, 2016.  Correct?

21   A.  Yes, I see that.

22   Q.  And under lessee/tenant information it has two names, the

23   first one is Nadine Arslanian, and the second one is Garbis

24   Tabourian?

25   A.  Yes.

O645men4                          Frenzilli - Cross

1    Q.  Do you know who Garbis Tabourian is?

2    A.  Do I not.

3    Q.  You weren't told that Garbis Tabourian is Nadine's father?

4            THE COURT:  Sustained.

5    Q.  In any event, based on this document there appear to be two

6    lessees, correct, Nadine and Garbis Tabourian?

7    A.  The document shows two lessees, yes.

8    Q.  And the safe deposit was leased as of May 18, 2016.  Are

9    you aware when May 18, 2016 is in relation to when the senator

10   started dating Nadine?

11           MS. GHOSH:  Objection.

12           THE COURT:  Sustained.

13   Q.  Do you know when the senator starting dating --

14           THE COURT:  Sustained.

15   Q.  Agent Frenzilli, you said you were involved in certain

16   electronic communications review; is that correct?

17   A.  Yes.

18   Q.  Based on your review of electronic communications in this

19   case, do you know when Nadine and Senator Menendez started

20   communicating?

21           THE COURT:  I will allow that, based on her review.

22   A.  No, I do not.

23   Q.  In any event, are you familiar with the rules surrounding

24   safe deposit boxes?

25   A.  No.

1   Q.  Do you know whether people other than the lessees of the

2   boxes are permitted access to the box?

3              MS. GHOSH:  Objection.

4              THE COURT:  I will allow that, although she said she

5   doesn't know the rules.  Go ahead.

6              THE WITNESS:  Can you restate the question?

7   Q.  Do you know whether people other than the lessees on the

8   box are permitted access to the safe deposit box?

9   A.  I'm not aware of the specific rules, no.

10             MR. WEITZMAN:  If you can turn to page 2 of this

11  document?

12  Q.  Do you see the top of the document says Safe Deposit Box

13  History?

14  A.  Yes.

15  Q.  And then the first line says:  May 18, 2016, box open.

16  Correct?

17  A.  Yes.

18  Q.  That's the same date we just saw on the contract, right?

19  A.  Yes.

20             MR. WEITZMAN:  And if you can do side by side page 2

21  and page 3 of this document and blow up that bottom portion?

22  Q.  So starting on page 3, the second one of these, you see

23  that it says:  February 27, 2021, 1:18 p.m.?

24  A.  Yes.

25  Q.  And it says underneath that:  Customer:  Nadine Arslanian.

O645men4                         Frenzilli - Cross

1    Do you see that?

2    A.  Yes.

3    Q.  And then it says:  Customer Access.  Correct?

4    A.  Yes.

5    Q.  And then it says:  No guest.  Right?

6    A.  That's what it says, yes.

7    Q.  And then the next entry says:  March 26, 2021 at 4:52 p.m.,

8    customer access, no guest.  Right?

9    A.  That's what it says, yes.

10   Q.  And the next after that is June 25, 2021, customer access,

11   no guest.  Right?

12   A.  Yes.

13   Q.  Again, the customer listed here is Nadine Arslanian; right?

14   A.  Yes.

15   Q.  And then on the left side of the screen there are several

16   more entries in August 2021, November 2021, and February,

17   March, and April 2022.  Do you see those?

18   A.  Yes.

19   Q.  Each time says customer access with the customer listed as

20   Nadine Arslanian; right?

21   A.  Yes.

22   Q.  And each time it says no guest; correct?

23   A.  That's what it says, yes.

24   Q.  Do you understand, based on your review of this record,

25   that JP Morgan Chase does not have any record of Senator

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O645men4                          Frenzilli - Cross

 1    Menendez opening this box or --

 2              THE COURT:  Sustained.

 3    Q.  Did you interview anybody from JP Morgan Chase about the

 4    safe deposit box history?

 5              MS. GHOSH:  Objection, your Honor.

 6              THE COURT:  I will allow it.

 7              THE WITNESS:  I did not.

 8    Q.  When you executed the search warrant, you didn't talk to

 9    them about who entered or exited that safe deposit box; is that

10    correct?

11    A.  I did not interview anybody related to the box on the day

12    of the search.

13    Q.  Or speak to anybody about the box other than to find out

14    who has had entry or exit from that box; correct?

15              MS. GHOSH:  Objection.

16              THE COURT:  Sustained as phrased.

17    Q.  Did you speak to --

18              THE COURT:  I take it the only people -- perhaps I

19    shouldn't take it, but did you speak to people in the bank in

20    order to gain access to the box?

21              THE WITNESS:  Yes.

22              THE COURT:  Did you speak to them for any other

23    purpose?

24              THE WITNESS:  No.

25    BY MR. WEITZMAN:

O645men4                          Frenzilli - Cross

1   Q.  Now, from your review of this record -- let me withdraw

2   that.

3               Were you shown this complete document before your

4   testimony today?

5               THE COURT:  Sustained.

6   Q.  Were you shown this document that I just showed you before

7   your testimony today?

8               MS. GHOSH:  Objection.

9               THE COURT:  Sustained.

10  Q.  Have you seen this before today?

11              MS. GHOSH:  Objection.

12              THE COURT:  Sustained.

13              MR. WEITZMAN:  I'm sorry, your Honor.  Basis?

14              THE COURT:  Go ahead.  Move on.  No, that's fair.

15              Have you seen this before it was shown to you today?

16              THE WITNESS:  No.

17              THE COURT:  All right move on.

18              MR. WEITZMAN:  Thank you, your Honor.

19              THE COURT:  Of course.

20  BY MR. WEITZMAN:

21  Q.  Let's talk about some of the items you found in the safety

22  deposit box.  When you executed the search you had an FBI

23  photographer you said, right?

24  A.  Yes.

25  Q.  And you said his name was Matthew Cain, correct?

O645men4                    Frenzilli - Cross

1   A.  Yes.

2   Q.  And the photographer took photos of all the items you found

3   in the box or just some of them?

4   A.  I would have to review the photos.  I believe -- I don't

5   know.

6   Q.  Well, some of the items he took envelopes filled with cash?

7   A.  Yes.

8           MR. WEITZMAN:  Let's put up GX- 1D-132.

9   Q.  You testified about this photo, correct?

10  A.  Yes.

11  Q.  Is let's blow up the one on the left, it says -- do you see

12  that, it says a name on top?

13  A.  Yes.

14  Q.  Does that appear to be the name Nadine to you?

15  A.  Yes.

16          MR. WEITZMAN:  And then if you can put up GX- 1D-133

17  and can you blow up the top left folder?

18  Q.  Do you see a name on that envelope?

19  A.  Yes.

20  Q.  And that says Nadine as well; right?

21  A.  Yes.

22  Q.  And then also the bottom left envelope?  It is a bit upside

23  down but do you see a name there?

24  A.  Yes.

25  Q.  Does that appear to be the name "Nadine" to you?

O645men4                          Frenzilli - Cross

1   A.  Yes.

2   Q.  In your review of all the envelopes and the photographs,

3   did you see the name "Bob" on any envelopes?

4   A.  Not that I can recall.

5   Q.  Did you see the name "Menendez" on any envelopes?

6   A.  Not that I can recall.

7   Q.  At this point you are aware that these envelopes were sent

8   to the FBI laboratory in Quantico for fingerprint, DNA, or

9   other forensic testing?

10  A.  Yes.

11  Q.  Are you aware that no fingerprints or DNA of Bob Menendez

12  was found on these envelopes?

13          MS. GHOSH:  Objection.

14          THE COURT:  Sustained as phrased.

15  Q.  Have you been advised of the results of the laboratory

16  results associated with these envelopes?

17          MS. GHOSH:  Objection.

18          THE COURT:  I will allow it.

19          THE WITNESS:  No.

20  BY MR. WEITZMAN:

21  Q.  Now, in addition to envelopes there were certain other

22  items found in the safe deposit box like passports, expired

23  passports; correct?

24  A.  There were passports.

25          MR. WEITZMAN:  Can we put up DX 136, just for the

O645men4                    Frenzilli - Cross

1   witness?

2   Q.   Now there are some black boxes, do not concern yourself

3   with that.   Does this appear to be one of the photographs,

4   taken by the photographer, of items found in the safe deposit

5   box?

6   A.   Yes.

7              MR. WEITZMAN:   We offer DX 136.

8              THE COURT:   Admitted without objection.

9              (Defendant's Exhibit 136 received in evidence)

10             MR. WEITZMAN:   Can we publish that?

11             THE COURT:   Yes.   And these documents, ladies and

12  gentlemen, there are redactions.   You have seen redactions

13  before.   It just means things that have no relevance to this

14  action have been blacked out.

15             MR. WEITZMAN:   Can we just zoom in on the top set of

16  passports?

17  BY MR. WEITZMAN:

18  Q.   Now, on the left do you see the name "Sabine Arslanian" on

19  the left passport?

20  A.   Yes.

21  Q.   Are you aware that Sabine is an adult?   This is an old --

22             MS. GHOSH:   Objection.

23             MR. WEITZMAN:   I thought, your Honor, we had an

24  instruction to stipulate to this.

25             THE COURT:   It is an objection as to form.

O645men4                          Frenzilli - Cross

1    BY MR. WEITZMAN:

2    Q.  Do you know whether Sabine is an adult today?

3    A.  I don't know anything about Sabine.

4    Q.  Do you recognize these as cancelled or expired passports?

5    Do you see it "cancelled" on the two ones --

6              THE COURT:  Do you recognize these as cancelled or

7    expired passports?  Yes or no.

8              THE WITNESS:  I see that two say "cancelled".

9    BY MR. WEITZMAN:

10   Q.  Do you see in the middle, the second one on the left is for

11   André?  Do you see the name André as a second name?  André

12   Arslanian?

13   A.  André is one of the names, yes.

14   Q.  Great.  Can we go to the bottom ones?  Again, these are a

15   bit unclear but do you recognize these as passports of Sabine

16   and André Arslanian as well as Nadine Arslanian?

17             MS. GHOSH:  Objection.

18   Q.  Do you see those names on the passports?

19   A.  I see the name Nadine Arslanian, the same name for André

20   Arslanian above, and I can't read the left most.

21   Q.  You didn't find any passports for Bob Menendez in the safe

22   deposit box, right?

23   A.  No.

24             MR. WEITZMAN:  And if we can put up DX 132 and we can

25   just do split screens for the witness only, 132, 133, 134, and

O645men4                         Frenzilli - Cross

1    135.

2    Q.  Do you recognize DX 132 and 133 as photographs taken of

3    items found in the safe deposit box?

4    A.  Yes.

5            MR. WEITZMAN:  Can we put up 134 and 135?

6    Q.  Do you recognize DX 134 and 135 as additional photos of

7    items that were found in the safe deposit box?

8    A.  Yes.

9            MR. WEITZMAN:  We offer DX 132, 133, 134, and 135.

10           THE COURT:  Admitted, without objection.

11           (Defendant's Exhibits 132, 133, 134, and 135 received

12   in evidence)

13           MR. WEITZMAN:  If we can put up DX 132 and 133 first

14   and we can publish that to the jury.

15   Q.  What do you recognize these photos to be, Agent?

16   A.  Photos of jewelry that were found within the safe deposit

17   box.

18   Q.  And just generally speaking, do you recognize these items

19   as womens jewelry?

20           MS. GHOSH:  Objection.

21           THE COURT:  Sustained.

22   Q.  Do you see any mens jewelry in these photographs?

23           THE COURT:  Same objection.

24           MR. WEITZMAN:  Can you zoom in on the top left of 132?

25   Q.  Do you see gold coins in that photo?

O645men4                        Frenzilli - Cross

1    A.  Yes.

2    Q.  And then if you can zoom in do you see earrings in the

3    photo?

4    A.  Yes.

5    Q.  Pearl earrings and diamond earrings, correct?

6    A.  I see earrings, yes.

7    Q.  Do you see additional earrings on the bottom left under the

8    Tiffany bag, right?

9    A.  Yes.

10   Q.  Do you see rings on the bottom right?  Maybe those are

11   brooches.  I don't know what they are.

12   A.  Some sort of jewelry.

13            MR. WEITZMAN:  Can we keep on scanning through the

14   photos?  Go to the right please, Mr. Kelly?

15   Q.  Do you see a pearl necklace of some sort?

16   A.  Yes.

17            THE COURT:  It is jewelry, correct?  You are seeing

18   jewelry?

19            THE WITNESS:  Yes.

20            THE COURT:  Next.

21            MR. WEITZMAN:  Can we scroll down, Mr. Kelly?

22   Q.  More necklaces, correct?

23   A.  Yes.

24            MR. WEITZMAN:  Scroll to the left?

25   Q.  Do you see a woman's watch there?

O645men4                          Frenzilli - Cross

1          MS. GHOSH:  Objection.

2          THE COURT:  Sustained.

3   Q.  Do you recognize that watch, Agent?

4   A.  I recognize it as a watch found in the safe deposit box.

5   Q.  OK.

6          MR. WEITZMAN:  If we can now go to DX 133.

7   Q.  Again this is jewelry including necklaces, correct, that

8   you found in -- and watches, and other items that you found in

9   the safe deposit box?

10  A.  Yes, all items found within the safe deposit box.

11         MR. WEITZMAN:  And 134 and 135, let's publish those.

12  Q.  More jewelry that you found in the safe deposit box, right?

13  Necklaces, watches, pearls, so on; correct?

14  A.  Yes.

15  Q.  Do you know when this jewelry was put in the box?

16  A.  No.

17  Q.  You don't know if it was when it was opened in 2016 or a

18  later date; right?

19         THE COURT:  Sustained.  She said she doesn't know.

20  Q.  Do you know when any of the cash was put in the box?

21  A.  No.

22  Q.  So just to -- I am almost done but the last few questions.

23  Did you find any item in the box, in the safe deposit box that

24  had Bob's name on it or "Nadine Arslanian" on it?

25  A.  Not that I can recall.

O645men4                      Frenzilli - Cross

1    Q.  Did you find any item in the box that is in any way linked

2    to Bob or Senator Menendez from your observation?

3              MS. GHOSH:  Objection.

4              THE COURT:  Sustained.

5    Q.  You didn't find his passport, right?

6              MS. GHOSH:  Asked and answered.

7              THE COURT:  Asked and answered.

8    BY MR. WEITZMAN:

9    Q.  And no other documents linked to Senator Menendez?

10             THE COURT:  Sustained.  Don't use the word "linked".

11             Did you find his name on anything?

12             THE WITNESS:  Not that I can recall.  It would have

13   been photographed had we found something of that nature.

14             MR. WEITZMAN:  Thank you.  One moment?

15             (Counsel conferring)

16             MR. WEITZMAN:  Thank you very much, Agent Frenzilli.

17             MR. LUSTBERG:  No questions, your Honor.

18             MR. DE CASTRO:  No questions.

19             THE COURT:  Any redirect?

20             MS. GHOSH:  No, your Honor.

21             THE COURT:  You are excused.  You may step down,

22   Agent.

23             (Witness excused)

24             THE COURT:  Next witness for the government, please.

25             MS. GHOSH:  The government calls Dr. Charity Davis.

1          THE DEPUTY CLERK:  Please raise your right hand.

2    CHARITY DAVIS,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5          THE DEPUTY CLERK:  Please state your full name and

6    spell your last name for the record.

7          THE WITNESS:  Charity Davis.  D-A-V-I-S.

8          THE COURT:  Good afternoon, Ms. Davis.  Welcome.

9          THE WITNESS:  Thank you.

10         THE COURT:  Speak loudly, slowly, and clearly into the

11   microphone.

12         Your witness, Ms. Ghosh.

13         MS. GHOSH:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MS. GHOSH:

16   Q.  Dr. Davis, where do you currently work?

17   A.  I am employed as a forensic DNA examiner in the DNA

18   Casework Unit at the FBI laboratory in Quantico, Virginia.

19   Q.  What does the DNA Casework Unit do?

20   A.  We process evidence for the presence of serology and DNA.

21   Q.  What are your duties and responsibilities as a forensic

22   examiner in the DNA Casework Unit at Quantico?

23   A.  As a forensic examiner I manage a case.  So when a case is

24   assigned to me, I will read the incoming communication and

25   determine what items of evidence need to be examined and what

O645men4                          Davis - Direct

1    tests need to be performed.  A biologist will then perform

2    those tests for me and get the results back to me.  I will

3    interpret the results and summarize my findings in a report and

4    testify, as needed.  I liken this to a doctor's office.  So,

5    when you go to the doctor, a doctor will examine you, determine

6    what tests need to be performed, and a technician will then

7    perform those tests and give those results back to the doctor

8    who will interpret those results for you.

9    Q.  For how long have you worked as a forensic examiner in the

10   DNA Casework Unit?

11   A.  Almost 16 years now.

12   Q.  What did you do before you began working at the FBI lab?

13   A.  Prior to working at the FBI laboratory I held a similar

14   position for almost four years at the Georgia Bureau of

15   Investigation, Division of Forensic Sciences, in the Forensic

16   Biology Section.

17   Q.  Can you please tell the jury about your education in the

18   field of DNA testing?

19   A.  I have a bachelors of science in chemistry with a

20   specialization in biochemistry from the University of West

21   Florida, in Pensacola, Florida, and I have a Ph.D in the

22   Program of Genetics and Molecular Biology from Emory University

23   in Atlanta, Georgia.

24   Q.  Please describe any ongoing education and training that you

25   have received in the field of DNA testing.

1    A.   From both the Georgia Bureau of Investigation and from the

2    FBI laboratory, prior to beginning casework I was required to

3    undergo training, which involved literature review, lectures,

4    written exams, oral exams, practical exams, and moot court

5    exercises.   I am also required to have eight hours of

6    continuing education in -- specifically in DNA.

7    Q.   Have you given lectures or done any teaching in the field

8    of DNA testing?

9    A.   Yes, I have.   I have twice presented at a forensic serology

10   and forensic DNA lecture and a child abuse work shop that was

11   hosted by The Children's Healthcare of Atlanta in Atlanta,

12   Georgia, and I have presented a forensic DNA lecture for the

13   evidence response team for the FBI.   I have also presented a

14   forensic serology and forensic DNA lecture for the Ithaca

15   Police Department.   I have also presented a forensic DNA

16   lecture for the evidence response team for the Denver field

17   office.

18   Q.   Is the FBI laboratory accredited to perform DNA testing?

19   A.   Yes, we are.

20   Q.   What institution has accredited the FBI laboratory?

21   A.   The FBI laboratory is accredited by ANAB, which stands for

22   the American National Standards Institution National

23   Accreditation Board, and also the FBI -- the data and casework

24   unit has to follow additional standards called the Quality

25   Assurance Standards.

O645men4                        Davis - Direct

1   Q.   What does it mean for a lab to be accredited?

2   A.   What it means is that the laboratory follows standards set

3   out by the ANAB, and we must follow all of these standards, and

4   the DNA Casework Unit has to follow additional standards set

5   forth by the quality assurance standards since we are a

6   forensic DNA testing laboratory.

7   Q.   Is the FBI lab audited in connection with that

8   accreditation process?

9   A.   Yes, we are.  For ANAB, that auditing occurs every four

10  years with surveillance visits that occur yearly; and for the

11  Quality Assurance Standards, the DNA Casework Unit is audited

12  yearly.

13  Q.   Do you personally undergo any reviews or evaluations on a

14  regular basis?

15  A.   Yes.  All of my cases, prior to a report being issued, must

16  undergo a technical review which is to make certain that the

17  science is technically sound, and that is performed by another

18  qualified DNA examiner.

19  Q.   Do you receive any testing as part of your ongoing

20  evaluations?

21  A.   I'm not certain I understand that question.

22  Q.   Sorry.  Let me ask it a different way.  Are you familiar

23  with the phrase "proficiency test"?

24  A.   Yes.  A proficiency test is a test that comes into the DNA

25  Casework Unit from an outside provider and we treat that the

1    same as we would casework, and then we will send our results

2    back to that outside provider and it is compared to other

3    agencies to verify that we are all getting the same results and

4    I am proficiency tested twice a year.

5    Q.  Have you ever failed a proficiency test?

6    A.  No, I have not.

7    Q.  Around how many DNA cases have you handled in your career?

8    A.  Thousands.

9    Q.  Have you reviewed DNA analyses performed by others in the

10   lab during your career?

11   A.  Yes, I have.

12   Q.  Have you testified in court as an expert about DNA analyses

13   that you have conducted?

14   A.  Yes, I have.

15   Q.  Approximately how many times?

16   A.  Approximately a hundred.

17          MS. GHOSH:  Your Honor, the government offers

18   Dr. Davis as an expert in the field of DNA analysis.

19          MR. FEE:  No objection.

20          MR. DE CASTRO:  No objection.

21          THE COURT:  Without objection, this witness is an

22   expert in the field of DNA analysis.

23          Ladies and gentlemen, it is very simple.  All that

24   means is I am now permitting the parties to ask this witness

25   opinion questions.  Everybody else is just straight facts but

1    an expert, once designated as an expert by the judge, is

2    allowed to answer opinion questions in regard to opinions in

3    his or her area of expertise, and here the asserted area of

4    expertise is DNA testing.  That's all that means.

5             Proceed.

6    BY MS. GHOSH:

7    Q.  Dr. Davis, at a high level, what was your involvement in

8    this case?

9    A.  Evidence was submitted to the DNA casework unit and I had

10   that evidence tested for the presence of DNA.

11   Q.  Other than conducting DNA analysis, did you have any other

12   involvement in this investigation or prosecution?

13   A.  No.

14   Q.  Let's take a step back and talk about DNA.  What is DNA?

15   A.  DNA stands for deoxyribonucleic acid.  It is the genetic

16   components found in your cells.  It has information for what

17   color hair you are going to have, what color eyes you are going

18   to have.  It is found in virtually every cell in your body and

19   it is the same in those cells.  So the DNA in your blood is the

20   same as DNA in your skin.  You have two copies of DNA.  You get

21   one copy of --

22             THE COURT:  Because we have court reporters taking

23   every word down and we have interpreters, it is important that

24   you go a little more slowly so that they can take down exactly

25   what is said.

O645men4                          Davis - Direct

1           THE WITNESS:  Yes, your Honor.

2           THE COURT:  Thank you.

3           THE WITNESS:  You have two copies of DNA.  You get one

4    copy of DNA from your mom, and one copy of DNA from your dad.

5    DNA typically doesn't change over time, it remains the same

6    throughout your life, and with the exception of identical

7    twins, everyone's DNA is unique.

8    Q.  Can a person leave DNA behind on an object?

9    A.  Yes, they can.

10   Q.  What are some of the sources of DNA that a person can leave

11   behind?

12   A.  There are several sources of DNA that can be left behind.

13   For example, in a sexual assault you can have seminal fluid, so

14   on a vaginal swab we can look for semen.  And other instances

15   blood can be left behind so you can get DNA from blood.  There

16   can also be skin cells left behind.  So say, for example, on

17   your clothing, we can detect DNA from clothing on an envelope.

18   If an envelope is considered to be moisture activated there is

19   a potential that the DNA could have been licked.  And so, we

20   will -- we can test that envelope for the presence of any skin

21   cells that may have been left behind on that envelope.

22   Q.  Is saliva a bodily fluid that contains DNA?

23   A.  Saliva, in and of itself, does not contain DNA.  What does

24   contain DNA in the saliva is the skin cells in the saliva.

25   Q.  How does a person leave skin cells behind?

O645men4                         Davis - Direct

1    A.   There is numerous ways that an individual can leave skin

2    cells behind on an item.   For example, you can leave skin cells

3    behind if you touch an item, especially if the item is rough.

4    If an item is rough and you are scraping it against your skin,

5    you will leave skin cells behind.   On your clothing, you are

6    rubbing your skin against your clothing, that can leave skin

7    cells behind.   If you are wearing a mask and you talk, saliva

8    droplets that contain skin cells can be deposited on a mask.

9          So, there are numerous ways that skin cells can be

10   left behind on an item.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O643MEN5                           Davis - Direct

1   Q.   Is a detectable amount of DNA always left behind on every

2   object a person touches?

3   A.   No.

4   Q.   Why not?

5   A.   There's numerous, again, reasons why I may not be able to

6   detect DNA on an item.  It could be that the individual may not

7   have touched the item, so DNA wouldn't be detected.  It could

8   be that I don't have, I'm not sampling the correct area of the

9   item, so I'm not picking up those skin cells.  And it could be

10  that there is just not enough skin cells there in order for me

11  to detect the DNA on that item of evidence.

12  Q.   Does DNA on objects sometimes degrade over time?

13  A.   It can.  If the DNA, for example, is left outside.

14  Sunlight will degrade DNA and that is one way for DNA to be

15  degraded.  Another way is if an item is cleaned, for example,

16  with bleach, bleach will degrade DNA.

17  Q.   Can DNA on an exposed surface of an object be wiped away?

18  A.   It can, if the item is, again, washed, for example, with

19  bleach.

20  Q.   Are you familiar with the term DNA profile?

21  A.   Yes.

22  Q.   What is a DNA profile?

23  A.   More than 99 percent of your DNA is the same amongst

24  individuals.  It's what makes us human.  It give us two arms,

25  two legs.  Only about .3 to .5 percent of your DNA differs

amongst individuals and makes you unique.  And of that .3 to

.5 percent of DNA that differs amongst individuals, as a

forensic DNA examiner, I'm only interested in a very, very

small fraction of that very small fraction that differs amongst

individuals.  In fact, I'm only interested in 21 locations on

your DNA that are highly variable between individuals.  And

those vary by length.  They're called short tandem repeats or

STRs.

Q.  When you are looking at those 21 locations, what is it that

you are looking for that differs?

A.  What I'm looking for is the length variations.  And you can

think of those as boxcars on a train.  And I'm counting how

many of those boxcars differ between the individuals.  And so

if you look at one location, each person may have the same

number of boxcars at that one location.  But as you start

looking at all the different locations that make up the 21

locations and make up your entire DNA profile, at that point,

you start seeing the uniqueness of the individual.

        And again, that's uniqueness except for identical

twins, they would have the same DNA profile

Q.  Would you expect more than one person to have the same DNA

profile at all of those 21 locations?

A.  Not except for identical twins.  Identical twins you would

expect to have the same profile at all 21 locations.

Q.  Is it possible to compare DNA from two sources to determine

O643MEN5                          Davis - Direct

1    whether the DNA came from the same contributing individual?

2    A.  Yes.  I can compare an item of evidence to a known

3    reference sample.  And a known reference sample would be the

4    swabbing of somebody's inside of their mouth which is called a

5    buccal sample.  Or taking somebody's blood and using their

6    blood as a known reference sample.

7    Q.  When you make that comparison between DNA from a piece of

8    evidence and a known reference sample such as from a buccal

9    swab, what are the possible results of that comparison?

10   A.  The possible results are that there can be an exclusion,

11   which means that the known reference sample is not the same as

12   the DNA from the item of evidence, which means that the person

13   who donated their known reference sample could not be a

14   potential contributor to the DNA from the item of evidence.

15   There can also be not enough DNA from the item of evidence, so,

16   I just don't know if the known reference sample could have

17   contributed to the DNA from the item of evidence.  There can

18   also be that the DNA from the item of evidence is the same or

19   matches the DNA from the known reference sample.  At that

20   point, that is a match or an inclusion, and I need to calculate

21   what's called a likelihood ratio.

22   Q.  What is a likelihood ratio?

23   A.  A likelihood ratio is comparing two questions.  The

24   probability of the DNA of the item of evidence, if the person

25   of interest is a contributor, dividing it by the probability of

1    the DNA of the item of evidence if an unknown person is a

2    contributor and seeing which one of those two questions is

3    heavier.  Is it the probability of the DNA of the item of

4    evidence, if the person of interest is a contributor, is that

5    one heavier?  Or is it the probability of the DNA of the item

6    of evidence if an unknown person is a contributor, is that

7    question heavier?

8    Q.  If you find DNA on an object, can you determine when the

9    DNA was left behind?

10   A.  No.  I cannot determine the age of the DNA.

11   Q.  I'd like to turn now to DNA testing generally.  What kinds

12   of materials does the FBI lab receive for DNA testing?

13   A.  Essentially anything you can imagine.  We get in guns,

14   knives, masks, clothing, screwdrivers, pieces of carpet.  If

15   you can imagine it, we've probably received it.

16   Q.  Could you please describe the process that items of

17   evidence go through when they're received at the FBI laboratory

18   for testing.

19   A.  When an item of evidence comes into the FBI laboratory,

20   they first comes into the evidence management unit, and the

21   evidence management unit will give the case a unique laboratory

22   number, and each item of evidence will receive its own unique

23   laboratory number, and its own unique bar code.  And that bar

24   code will follow that item of evidence throughout the

25   laboratory, so it can track it on a chain of custody via that

1    bar code.  And it will be tracked in our laboratory information

2    management system, our LIMs system.  And the evidence

3    management unit will inventory the case to make certain that

4    the laboratory has received all of the evidence the lab should

5    have received, and will then route the evidence to the units as

6    appropriate.

7              In the DNA casework unit, when the evidence comes up

8    to the DNA casework unit, the DNA casework unit has our own

9    mini evidence management unit that we call our case

10   administration group.  The case administration group will

11   inventory all the evidence that comes into the DNA casework

12   unit, to verify that the DNA casework unit has received all the

13   evidence that we should have received.  The case administration

14   group will then place our evidence into a locked storage vault

15   until it's ready to be examined by the biologists.

16   Q.  At what point are you assigned a case?

17   A.  I'm assigned a case once our casework program manager

18   assigned it to me.  All cases come into the DNA casework unit

19   and they are randomly assigned to qualified examiners.

20   Q.  What are the first steps you take on a case?

21   A.  I will review the incoming communication and other

22   communications in the case, and I will determine what items of

23   evidence need to be examined, and what exams need to be

24   performed.

25   Q.  What do you base that assessment on?

1   A.   That is based on what items I deem to be -- will give me

2   best chance to either identify serology, if needed, or to get a

3   DNA profile.

4   Q.   What kinds of tests did you have biologists perform in this

5   case?

6   A.   I had the biologist perform tests on envelopes and also

7   known reference samples once they were submitted, and there was

8   also a fabric bag.

9   Q.   You said that the biologists performed the tests that you

10  ordered.   How often are you physically in the lab with the

11  biologists?

12  A.   It depends.   If there is -- if the biologist has a

13  question, they will call me, and usually at that point in time

14  I will go back into the lab in order to address that question.

15  The biologists follow standard operating procedures that they

16  are trained to.   And any time there comes a decision point, as

17  the qualified examiner, I'm the one answering those questions

18  and making all of those decisions.

19  Q.   Do the biologists make any decisions on their own?

20  A.   No.

21  Q.   You mentioned that you'll go over when you receive

22  questions.   Approximately how often is that?

23  A.   That can be upwards of once a day, sometimes more.   It

24  depends on what the circumstances are, and what their questions

25  are.

O643MEN5                          Davis - Direct

1    Q.  When you're at the lab, do you observe biologists

2    performing the various tests necessary for DNA extraction?

3    A.  Yes, because when I'm over there, there are other

4    biologists in the suites.  There are typically four biologists,

5    there can be four biologists in a suite.  So when I'm

6    addressing my biologist, talking to that biologist about the

7    case, there will be potentially another biologist nearby

8    performing exams on another case.

9    Q.  Are you familiar with the standard operating procedures

10   that govern how the biologists should carry out the tests that

11   you order?

12   A.  Yes.  When I was in training, I was shadowed the

13   biologists.  That was part of my training.  I am also trained

14   to those standard operating procedures as well as a forensic

15   examiner, and I'm expected to know those standard operating

16   procedures in order to do my job as a forensic examiner.

17   Q.  Do the biologists conduct any analysis of the test results?

18   A.  No.  That is my job as an examiner.

19   Q.  What happens when an item is ready to be examined by a

20   biologist in the DNA unit?

21   A.  When it's ready to be examined, the biologists will go to

22   the storage vault and they will retrieve it from the storage

23   vault and place it into their custody so it's on the chain of

24   custody.  And they will take it back to their work space.  The

25   biologists will then clean their work space and they will place

O643MEN5                          Davis - Direct

1    down brown butcher paper and they will be taking

2    contemporaneous notes into the computer, so that way I will

3    know what the primary packaging of the item of evidence looks

4    like, what the item of evidence itself looks like when they

5    open the packaging, and they will also take pictures of the

6    item of evidence as well.

7    Q.  What protective equipment, if any, is used by the

8    biologists during this testing?

9    A.  They will wear masks and gloves and also laboratory coats.

10   Q.  If an object is going to be tested for DNA, what happens

11   next?

12   A.  What happens next will depend on the item of evidence.  But

13   what the biologists will do is they will take a sampling from

14   the item of evidence per the standard operating procedure.

15   Q.  What is the standard operating procedure for collecting

16   evidence from an envelope?

17   A.  From an envelope, if the envelope is already open, they

18   will proceed with the collection.  If the envelope is still

19   closed, they will steam the flap open.  The collection involves

20   taking a sterile swab, which is a Q-tip with only cotton at one

21   end, and they will moisten it with sterile water.  They will

22   then take this sterile swab and collect from the glue portion

23   of the envelope flap, and the corresponding area of the

24   envelope.

25   Q.  Is that done for all envelopes that are tested?

1    A.   Yes.

2    Q.   Once you have a sample on a Q-tip for testing, what's the

3    next step in the process, the testing for DNA?

4    A.   The next step is to remove the cotton portion of the swap

5    and to place it into a tube, and this tube will be bar coded.

6    And we bar code all of our tubes because in the DNA casework

7    unit, we are fairly automated.  A lot of instruments do our

8    processing.  And the bar code helps us track these tubes

9    throughout our processing, because the biologists can scan the

10   tubes into the computer to track it throughout the processing.

11   And then the biologists, the collection biologist will then

12   place these tubes into a refrigerator so that the next step can

13   then proceed when it's ready.

14   Q.   What is that next step?

15   A.   The next step is called extraction.  And this is when

16   chemicals are added to this tube to break open the cells.  And

17   then the biologists will place this tube that contains DNA and

18   cellular material onto an instrument, and the instrument will

19   clean up the DNA.  And what that means is the instrument's

20   going to remove that cellular material so that at the end of

21   the process, what's left in a bar coded tube will just be clean

22   purified DNA that can go on through the remainder of the

23   process.

24   Q.   What is the next step after extraction?

25   A.   After extraction is quantification.  And this is to

O643MEN5                          Davis - Direct

1    determine how much DNA is in this item of evidence.  And the

2    biologist will place this bar coded tube onto an instrument

3    that will then take out a small sample, and it will then place

4    it again onto an instrument, and the results will come back to

5    me as the examiner.  So that way I can make any determinations

6    for the following step which is amplification.

7    Q.  Why is quantification done on the sample?

8    A.  To determine how much DNA is present in an item of

9    evidence.  And that is because in that tube is the entire piece

10   of DNA.  So that's all of the DNA, including the DNA that makes

11   us human.  So that's the DNA that gives us two arms, two legs.

12   And I'm only interested in those 21 unique locations that makes

13   you you.  That makes individuals unique.  So because of that, I

14   need to determine how much DNA is in that sample, so I can

15   specifically amplify a select amount.

16   Q.  You mentioned that the next step is amplification.  Can you

17   explain that step.

18   A.  Amplification is the copying step of those 21 specific

19   locations on the DNA that are unique to individuals.  They vary

20   based on size.

21        You can think of this as a molecular Xerox machine

22   where we're copying 21 specific pages out of a book millions of

23   times.  To do this, the biologists takes that bar coded tube,

24   places it on yet another instrument, and it's going to do that

25   copying step.  And then they're going to take that copied DNA,

1    place it on yet another instrument, and it's going to separate

2    that copied DNA based on size, so that way I can generate the

3    DNA profile.

4    Q.   You mentioned placing the sample on instruments.  Is that a

5    machine?

6    A.   Yes.

7    Q.   What happens after amplification?

8    A.   The biologists will place it onto an instrument that will

9    separate the DNA based on size, and I can then generate the DNA

10   profile.

11   Q.   Are you familiar with the phrase suitable for comparison?

12   A.   Yes.

13   Q.   What does that mean in the context of DNA profiles?

14   A.   For DNA profiles, that means that DNA was -- a DNA profile

15   was obtained.  As opposed to no DNA being detected in a sample.

16   And that a mixture was obtained that did not contain five or

17   more mixtures.  Because in the DNA casework unit, if a mixture

18   is obtained that contains five or more individuals, it is

19   deemed unsuitable for comparison purposes.

20   Q.   At what point in the process do you determine whether there

21   is a DNA profile suitable for comparison?

22   A.   During my interpretation process.

23   Q.   During the automated processes that you described, are

24   there safeguards to ensure that those tests work properly?

25   A.   Yes.  During the extraction process there is a reagent

O643MEN5                    Davis - Direct

1    link.  And so, no DNA should be in that sample.  If DNA is

2    detected in that sample, I cannot use those results and need to

3    go back to the collection and re-extract those samples.

4           During the amplification or copying step, there is a

5    positive control and a negative control.  For the positive

6    control, I know what that DNA profile should be.  If I do not

7    get that DNA profile, I cannot use those results.  There's also

8    a negative control that should have no DNA in that sample.  If

9    there is DNA in that sample, again, I cannot use those results

10   and would need to go back and re-amplify those samples or

11   recopy those samples.

12   Q.  Dr. Davis, have you interpreted the results of DNA tests on

13   any evidence in this case?

14   A.  Yes.

15   Q.  Did you prepare any lab reports in connection with your

16   work on this case?

17   A.  Yes.

18   Q.  What is a lab report?

19   A.  A lab report is a summary of my findings.

20   Q.  Are lab reports prepared and maintained in the ordinary

21   course of the FBI lab's business?

22   A.  Yes.

23   Q.  Are those reports made at or near the time of the events

24   recorded in the reports?

25   A.  Yes.

1  Q.  Are they kept in the course of regularly conducted activity

2  by the FBI lab?

3  A.  Yes.

4  Q.  Is maintaining those reports a regular practice of that

5  activity?

6  A.  Yes.

7        MS. GHOSH:  Mr. Florczyk, can you please show just the

8  witness what's been marked for identification as Government

9  Exhibits 16B as in boy, 1, 3, and 4.

10 Q.  Just generally, Dr. Davis, do you recognize these

11 documents?

12 A.  Yes, I do.  Those are the laboratory reports that I issued

13 in this case.

14       MS. GHOSH:  The government offers 16B-1, 16B-3 and

15 16B-4.

16       THE COURT:  Hearing no objection, admitted under

17 803(6).

18       (Government's Exhibit 16B-1, 16B-3, 16B-4 received in

19 evidence)

20       MS. GHOSH:  We can take those down now, thank you.

21 Q.  Dr. Davis, what types of evidence were tested for the

22 presence of DNA in this case?

23 A.  There were envelopes, a fabric bag, and also known samples

24 from Mr. Daibes and Mr. Pilot.

25 Q.  Were all of the envelopes received by the FBI laboratory in

1  this case tested by the DNA unit or some?

2  A.  There were only some, the ones that were indicated to be

3  moisture activated.

4  Q.  What is the alternative to a moisture activated envelope?

5  A.  The alternative is a self-adhesive envelope, and that would

6  be an envelope that instead of being moisture activated which

7  would imply that someone may have licked the envelope to seal

8  it, self-adhesive envelope would be one that would imply that

9  it would be taped closed.  And so, there would be an

10 expectation that DNA would not be potentially obtained from

11 that item of evidence.

12 Q.  Who made the selection of which envelopes to test for DNA?

13 A.  I did.

14 Q.  In this case, how many items of evidence did you test for

15 the presence of DNA?

16 A.  Nine items of evidence, and the two reference samples.

17 Q.  Were you able to successfully extract DNA suitable for

18 comparison from all nine pieces of evidence?

19 A.  No.

20 Q.  How many were you not able to extract any DNA suitable for

21 comparison from?

22 A.  Three.

23 Q.  Are you familiar with the phrase suitable for limited

24 comparison?

25 A.  Yes.  What suitable for limited comparison means is that

 1   out of those 21 locations, again, you expect that you would

 2   have at least two pieces of DNA at each location, because one

 3   piece of DNA from mom, one piece of DNA from dad, and that

 4   would be at all 21 locations.  And for limited DNA comparisons,

 5   what that tells me is I have one piece of DNA, at a single DNA

 6   location.

 7   Q.  You said that three item you tested did not have DNA

 8   suitable for comparison.  Of the six remaining items, did you

 9   obtain any DNA profiles that were only suitable for limited

10   comparison?

11   A.  Yes.  There was one.

12   Q.  Which item number was the one that was suitable for limited

13   comparison?

14   A.  Your Honor, may I refresh my memory?

15   Q.  We can pull up one of your lab reports in evidence.  If we

16   can pull up --

17   A.  The January 11 report.

18   Q.  16B-1.  Please.  If we go to page 2.

19   A.  Yes.  It was item 79.

20   Q.  That was suitable for limited comparison?

21   A.  Yes.

22   Q.  From the five remaining items, were you able to obtain DNA

23   profiles that were suitable for comparison?

24   A.  Yes.

25   Q.  Which item numbers were those?

O643MEN5                        Davis - Direct

1  A.  They were items 26, 99, 27, 58, and 46.

2          MS. GHOSH:  Mr. Florczyk, can we please show the

3  witness what's been marked for identification as the following

4  Government Exhibits, all of which start with the prefix 16B.

5  16B-26, 16B-27, 16B-34, 16B-42, 16B-46, 16B-58, 16B-79, 16B-81,

6  and 16B-99.

7  Q.  Dr. Davis, do you generally recognize those exhibits that

8  you just saw briefly?

9  A.  Yes, I do.  I recognize them based on the unique laboratory

10 number of 2022-01547 and also the laboratory numbers.

11 Q.  Generally, what are those items that we just looked at

12 briefly?

13 A.  Those were items that were tested in the DNA casework unit

14 for DNA.

15 Q.  Do those exhibits that we just looked at fairly and

16 accurately depict the nine objects that were tested by the lab

17 in this case?

18 A.  Not all nine, but they were the ones that were suitable for

19 comparison purposes.

20         MS. GHOSH:  The government offers the exhibits that I

21 read earlier.

22         THE COURT:  Admitted without objection.

23         (Government's Exhibits 16B-26, 16B-27, 16B-34, 16B-42,

24 16B-46, 16B-58, 16B-79, 16B-81, 16B-99 received in evidence)

25 Q.  I'd like to discuss just a few of those right now.  Could

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   we first publish Government Exhibit 16B-26.

2              What are we looking at here, Dr. Davis?

3   A.  That is an envelope that was tested for DNA.

4   Q.  What lab item number is this?

5   A.  Item 26.

6   Q.  Does an item maintain the same lab item number throughout

7   any units it goes through at the FBI lab?

8   A.  Yes, it does.  So that way it will maintain the chain of

9   custody throughout the laboratory.

10  Q.  So in other words, if this item 26 were tested for

11  fingerprints, for example, at the FBI lab, would it also be

12  item number 26 in that unit?

13  A.  Yes.

14             MS. GHOSH:  Mr. Florczyk, can we please put this side

15  by side with Government Exhibit 16B-1.

16  Q.  Is 16B-1 one of your lab reports?

17  A.  Yes, it is.

18  Q.  On page 1 of your report, could you please read the

19  description next to item 26.

20  A.  "Envelope beginning Fred A. Daibes from safe on floor in

21  room C at 41 Jane Drive."

22  Q.  Just to be clear, did you write these descriptions or were

23  they provided to you?

24  A.  They were provided.

25  Q.  Are you familiar with 1B numbers?

O643MEN5                          Davis - Direct

1    A.   Yes.

2    Q.   Generally, what are 1B numbers?

3    A.   They are the evidence identifiers that are from the field.

4    Q.   What do you mean by the field?

5    A.   They are from the contributor, so in this case it would be

6    the New York Field Office.

7    Q.   Of the FBI?

8    A.   Correct.

9    Q.   What is the 1B number for item 26 which is the envelope you

10   see in 16B-26?

11   A.   1B-79.

12            MS. GHOSH:  We can take down 16B-26, Mr. Florczyk, and

13   please publish 16B-99.

14   Q.   Dr. Davis, what is this item?

15   A.   It's item 99.  It's an envelope that was tested for the

16   presence of DNA.

17   Q.   On page 1 of 16B-1, your lab report, could you please read

18   the description next to item 99.

19   A.   "Envelope with flap beginning Mariner's Bank from 50 Grand

20   Avenue, box number 13."

21   Q.   What 1B number was assigned to lab item 99 the envelope we

22   see in Government Exhibit 16B-99?

23   A.   1B-94.

24   Q.   Were both of the envelopes we just looked at in Government

25   Exhibit 16B-26 and 16B-99 tested for DNA?

O643MEN5                          Davis - Direct

1   A.  Yes, they were.

2   Q.  What areas on them were swabbed and tested for the presence

3   of DNA?

4   A.  The flap and the corresponding area of the envelope.

5   Q.  Why were those areas swabbed?

6   A.  Because the envelope was moisture activated, so that was

7   the area that would have the best chance of obtaining DNA.

8   Q.  Were items 26 and 99 some of the envelopes on which you

9   found profiles that were suitable for comparison?

10  A.  Yes.

11  Q.  Starting with item 26, shown in Exhibit 16B-26, if we could

12  put that one back up.  How many profiles did you find on item

13  26?

14  A.  One male profile.

15  Q.  And if we can put up 99 side by side.  In Exhibit 16B-99,

16  how many DNA profiles did you find on this envelope?

17  A.  It was one male profile from item 99.

18          MS. GHOSH:  That's okay, Mr. Florczyk.

19  Q.  Dr. Davis, when you identify DNA profiles on evidence, do

20  you sometimes enter those profiles into any databases for

21  comparison?

22  A.  Yes, if they meet certain criteria, they can be entered

23  into a database.

24  Q.  What are the possible results when you do so?

25  A.  The possible results are that the sample may not hit or may

1    not match to another sample in the database, in which case that

2    sample will just remain searching and remain in the database.

3    Or there could be a hit or match with another sample on the

4    database, in which case there will be a report issued to let

5    the contributor or agent know that there is a match and that

6    this is an investigative lead that needs to be followed up on.

7    Q.  How many samples are in the database?

8    A.  Currently, there are approximately I believe over

9    21 million samples.

10   Q.  If you obtain a match to the database, do you rely on that

11   match or do you take further steps to confirm the possible

12   match?

13   A.  That match from the database cannot be used.  It's only for

14   an investigative lead and additional samples need to come in to

15   the DNA casework unit so that match can be confirmed.

16   Q.  In this case, did a DNA profile from any of the items of

17   evidence have a preliminary match to anyone in the database?

18   A.  Yes, item 26 did.

19   Q.  Who did that match to?

20   A.  Mr. Daibes.

21   Q.  When there is a preliminary database match for an item of

22   evidence, what steps need to be taken to confirm the DNA match?

23   A.  A known reference sample from that individual needs to be

24   collected, and sent in to the DNA casework unit so that a

25   comparison to all the items of evidence in the case can be

O643MEN5                         Davis - Direct

1   performed.

2   Q.  In this case, did you compare any of the DNA profiles from

3   the evidence against any known reference samples?

4   A.  Yes.  These items of evidence were compared to Mr. Daibes

5   and Mr. Pilot.

6            MS. GHOSH:  At this point I am going to read from a

7   stipulation that is not yet in evidence which is marked for

8   identification as 1441.  Paragraph 4 and 5.  Which says that:

9            The parties agree that the item designated by the

10  Federal Bureau of Investigation with identification

11  number 1B-143, and which was designated upon receipt by the FBI

12  laboratory in Quantico, Virginia as laboratory item number 107,

13  contains two buccal cheek swabs of obtained from Fred Daibes.

14           The item designated by the FBI with identification

15  number 1B-144, and which was designated upon receipt by the FBI

16  laboratory in Quantico, Virginia as laboratory item number 108,

17  contains two buccal cheek swabs obtained from Johnathan Pilot.

18           Government offers Government Exhibit 1441.

19           THE COURT:  Admitted without objection.

20           (Government's Exhibit 1441 received in evidence)

21  Q.  Dr. Davis, who give who gave you the reference samples that

22  you mentioned a moment ago?

23  A.  Agents from the New York Field Office from the FBI.

24  Q.  Did you choose which reference samples to receive?

25  A.  No, I did not.

O643MEN5                          Davis - Direct

1   Q.   When you receive a known reference sample, what form is it

2   in?

3   A.   It's in the form of the buccal swabs which is the swapping

4   from the inside of the mouth which is essentially just a Q-tip.

5   Q.   When you --

6           THE COURT:   It is a Q-tip that I take it is swabbed

7   inside the mouth.

8           THE WITNESS:   Yes, your Honor.

9           THE COURT:   Okay.

10  Q.   Do you receive the DNA profile itself with the known

11  reference sample or is that something you need to determine?

12  A.   We need to perform the testing in order to generate the DNA

13  profile.   We do not receive the DNA profile from that

14  individual.

15  Q.   Are there any differences in how you extract DNA from a

16  known reference sample compared to extracting DNA found on

17  evidence?

18  A.   No, there is not.

19  Q.   Was the extraction of the DNA from the known reference

20  sample done at the same time as the samples obtained from the

21  evidence or a different time?

22  A.   A different time.

23  Q.   In other words, when the known reference samples were

24  undergoing the automated procedures that you described earlier,

25  were the evidence DNA samples in the same machine at the same

1    time?

2    A.  No, they were not.

3    Q.  When did you test the reference samples in comparison to

4    the evidence samples?

5    A.  Approximately a year later.

6    Q.  Earlier, you mentioned various controls that are in place

7    when extracting DNA.  Were those controls also in place during

8    the extraction of the known reference sample DNA?

9    A.  Yes, they were.

10   Q.  What, if anything, did those controls reveal during the

11   extraction of the known reference samples?

12   A.  During the extraction of the known reference samples, one

13   of the controls for the known reference samples did fail.  It

14   was during the amplification process.  The positive control did

15   not work.  And because of that, during that first

16   amplification, none of the data could be used.  And so, the

17   known reference samples had to be go back and be re-amplified

18   or recopied, in order for any of that data to be used.

19           And we needed to determine in the DNA casework unit

20   essentially what happened.  What caused that control to fail.

21   And we performed what we call a corrective action plan.  So,

22   that goes into looking at various reasons as to why that

23   failed.  And one of the things that came out of that was that

24   it was noticed that the lid for that instrument didn't fully

25   close.  Well, why didn't it fully close.  It was noticed that

1     the instrument was placed on a high shelf, and some of the

2     biologists couldn't notice that the lid wasn't fully closed.

3     So, we needed to move that instrument down.

4              So, that's one of the corrective actions that we

5     placed was to move the instrument down so the biologists could

6     see whether or not the lid was fully closed and sealed.  So

7     that's one of the things that we do to make certain that all of

8     our data meets our quality, is when an issue happens, what can

9     we do to improve our processes.  And that's what happened in

10    this case.

11    Q.  How did you learn that the positive control did not work in

12    that instance?

13    A.  By running the positive control and it did not give the

14    expected results.  Because it did not give the expected

15    results, we could not be certain that any of the data that

16    correlated to those positive controls would also meet our

17    quality standards.  Therefore, none of that data could be used

18    and had to be redone.

19             THE COURT:  Why don't you find a logical place for me

20    to give the jury its midafternoon break, Ms. Ghosh.

21             MS. GHOSH:  If I could have two or three questions.

22             THE COURT:  Okay.

23    Q.  Is that essentially the purpose of the positive control

24    that you described earlier?

25    A.  Yes, it is.

O643MEN5                        Davis - Direct

1    Q.  Notifying you if something goes wrong?

2    A.  Yes.

3    Q.  And as a result, what happened to the data that had been

4    run when the positive control failed?

5    A.  It was not used.

6    Q.  Was the DNA from the known reference samples then rerun?

7    A.  Yes, it was.

8    Q.  Were there any issues during the second re-amplification or

9    the extraction?

10   A.  It was the re-amplification or recopying step.  No, there

11   were no issues.

12   Q.  Were there any issues during the extractions of the

13   evidence samples in this case?

14   A.  No.

15            MS. GHOSH:  Your Honor, this would be a good time for

16   a break.

17            THE COURT:  Ladies and gentlemen, 10 minutes.

18            (Jury excused)

19            (Continued on next page)

20

21

22

23

24

25

O643MEN5                        Davis - Direct

1              THE COURT:  Approximately how much longer do you

2    believe you have, Ms. Ghosh?

3              MS. GHOSH:  Less than 15 minutes, your Honor.

4              THE COURT:  Thank you.  10 minutes.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O643MEN5                          Davis - Direct

1              (Jury present)

2              THE COURT:  You may continue with your direct

3    examination of this witness.

4              MS. GHOSH:  Thank you, your Honor.

5    BY MS. GHOSH:

6    Q.  Dr. Davis, before the break, I put up for you a series of

7    nine photos that are now in evidence.  I'd like to go through

8    those briefly and then I'll ask you if those were all nine of

9    the items that you tested for DNA in this case.

10             If we can put up for everyone, please, 16B-26, 16B-27,

11   16B-34, 16B-42, 16B-46, 16B-58, 16B-79, 16B-81, and 16B-99.

12             Dr. Davis, you testified earlier you tested nine items

13   of evidence in this case.  Are these photos of these nine

14   items?

15   A.  Yes, they are.

16   Q.  Before the break we were talking about testing the known

17   reference samples from Fred Daibes and Johnathan Pilot.  Were

18   you able to identify DNA profiles from the Fred Daibes and

19   Johnathan Pilot known reference samples?

20   A.  Yes, I was able to generate DNA profiles from those two

21

22

23

24

25

O645men6                          Davis - Direct

1    BY MS. GHOSH:   (continuing)

2    Q.  Did you compare those known DNA profiles to the profiles

3    that were suitable for comparison from the evidence in this

4    case?

5    A.  Yes.

6    Q.  Starting with Johnathan Pilot, did you compare the

7    Johnathan Pilot known reference sample to the five profiles you

8    mentioned earlier were suitable for comparison?

9    A.  Yes, I did.

10   Q.  And, generally, what were the results?

11   A.  They were exclusions or limited support for exclusions and

12   there were likelihood ratios that were calculated for those

13   that were limited support for exclusions.

14   Q.  What does limited support for exclusion mean?

15   A.  That means that they leaned towards limited support for

16   exclusion.  So, when I calculated a likelihood ratio it was

17   weighing those two questions which is the probability of the

18   DNA, the item of evidence if the person of interest is a

19   potential contributor versus the probability of the DNA of the

20   item of evidence if an unknown person is a potential

21   contributor.  And for limited support for exclusion it means

22   that the question of the probability of the DNA of the item of

23   evidence of an unknown individual is a potential contributor is

24   heavier.  And again, for limited support for exclusion, there

25   are likelihood ratios that are calculated for that to give a

O645men6                           Davis - Direct

1   number and a weight to that and if you would like I can give

2   those numbers.

3   Q.  I'm going to ask you a different question.  For the

4   Johnathan Pilot known reference sample that you extracted the

5   DNA profile from, did that sample match any of the items of

6   evidence?

7   A.  No, it did not match any of those items of evidence.

8   Q.  Turning to Fred Daibes, did you compare his DNA profile to

9   the profiles from the case evidence?

10  A.  Yes, I did.

11          MS. GHOSH:  I would like to put up Government Exhibit

12  16B-27.  Thank you, Mr. Florczy.

13  Q.  Dr. Davis, what was the result when you compared Daibes'

14  DNA to the DNA found on this envelope in item 27?

15  A.  Mr. Daibes was excluded.

16  Q.  And what type of DNA was on item 27?

17  A.  It was a single female DNA.

18          MS. GHOSH:  I would like to now show Government

19  Exhibit 16B-46.

20  Q.  Dr. Davis, what was the result when you compared Daibes'

21  DNA to the DNA found on this envelope, item 46?

22  A.  Can I refresh my memory on this item?

23  Q.  Yes.

24          MS. GHOSH:  If we could put up, side by side,

25  Government Exhibit 16B-4, I believe.

O645men6                        Davis - Direct

1   A.  It is the April 3 report.

2           MS. GHOSH:  16B-4; and if you can go to page 2,

3   please?

4   A.  That does not have the results for Mr. Daibes.

5           MS. GHOSH:  I apologize.  16B-3, Mr. Florczy.  If you

6   could go to the bottom half of page 2 and zoom in on item 46,

7   please?  All the way down to the bottom, please.  Thank you.

8   Q.  What was the result of comparing Daibes' DNA to the DNA on

9   item 46?

10  A.  The DNA results from item 46 was interpreted as originating

11  from three individuals, and the DNA results from item 46 are 56

12  times more likely if three unknown individuals are contributors

13  than if Mr. Daibes and two unknown contributors are

14  individuals.  And this provides limited support for exclusion.

15          MS. GHOSH:  If we could scroll down slightly,

16  Mr. Florczy, to item 58 in there?  We have to go to the top of

17  the next page and zoom in on that, and can we also put up

18  16B-58?

19  Q.  What was the result when you compared Daibes' DNA to the

20  DNA found on this bag, item 58?

21  A.  A mixture of male and female DNA was obtained and it was

22  interpreted as originating from three individuals.  The DNA

23  results obtained from item 58 are two times more likely if

24  three unknown, unrelated individuals are contributors, than if

25  Mr. Daibes and two unknown unrelated individuals are

O645men6                        Davis - Direct

1  contributors.  This provides limited support for exclusion.

2              MS. GHOSH:  If we could scroll down to item 79 which

3  is just under that, and we will keep the lab report from 16B-3,

4  you don't need to pull up the photo.

5  Q.  What was the result when you compared Daibes' DNA to the

6  DNA found on item 79?

7  A.  Item 79 contained DNA from one male individual and this was

8  suitable for limited comparisons, and the DNA results from item

9  79 are two times more likely if Daibes is a contributor than if

10  an unknown, unrelated individual is a contributor.  This

11  provides limited support for inclusion.

12              MS. GHOSH:  Mr. Florczy can we now pull up 16B-99 next

13  to 16B-3, the report we were just looking at?  Thank you.  If

14  we could go to page 3 of the report 16B-3?

15  Q.  Dr. Davis, focus using now on item 99, which you described

16  as the Mariner's Bank envelope from box 13, what was your

17  conclusion comparing item 99's -- the DNA profile from item 99

18  to Fred Daibes' DNA?

19  A.  Male DNA was obtained from item 99 and it was interpreted

20  from originating from one individual.  The DNA results from

21  item 99 are 3 octillion times more likely if Mr. Daibes is a

22  contributor than if an unknown, unrelated individual is a

23  contributor.

24  Q.  And what conclusion do you draw from this?

25  A.  That provides very strong support for inclusion.

O645men6                              Davis - Direct

1   Q.  You said that this is 3 octillion.  Can you put that figure

2   in context, please?

3   A.  An octillion contains 27 zeroes.

4   Q.  Dr. Davis, approximately how many people are on the planet?

5   A.  Approximately 8 billion.

6              THE COURT:  8 what?

7              THE WITNESS:  Billion.

8              THE COURT:  Billion with a B?

9              THE WITNESS:  With a B.

10             THE COURT:  All right.

11  BY MS. GHOSH:

12  Q.  How many zeros does billion have after it?

13  A.  Nine.

14             MS. GHOSH:  Mr. Florczy, could we please go to 16B-26

15  and keep up 16D-3 on the side of that at page 2?

16  Q.  Focusing on item 26, which is described as the envelope

17  from the safe, what conclusions did you reach from comparing

18  the DNA profile found on item 26 to Fred Daibes'?

19  A.  Male DNA was obtained from item 26 and it was interpreted

20  as originating from one individual.  The DNA results from Item

21  26 are 10 octillion times more likely if Mr. Daibes is a

22  contributor than if an unknown, unrelated individual is a

23  contributor.  This provides very strong support for inclusion.

24  Q.  And are you able to put 10 octillion in context?

25  A.  An octillion contains 27 zeros.

1          MS. GHOSH:  Just one moment, please, your Honor?

2          (Counsel conferring)

3          MS. GHOSH:  No further questions, your Honor.

4          THE COURT:  Thank you.  Any cross?

5          MR. AGATA:  Yes.

6          THE COURT:  Sir, go ahead.

7    CROSS-EXAMINATION

8    BY MR. AGATA:

9    Q.  Good afternoon, Dr. Davis.  I am Seth Agata.  I am one of

10   the counsels for Fred Daibes who is right over there.  Let me

11   review some of your testimony, please.  You are given evidence

12   by field agents to analyze; is that correct?

13   A.  It is submitted to the FBI laboratory and then I determine

14   what items of evidence to process.

15   Q.  And so you determine which items will be the subject of the

16   DNA analysis in this case, correct?

17   A.  Correct.

18   Q.  And you determine that you would only analyze out of all

19   the evidence that was collected, envelopes; is that correct?

20   A.  The moisture-activated envelopes and the fabric bag.

21   Q.  And your job is to determine if DNA can be recovered from

22   those items that would be, I think you would describe it as

23   scientifically and statistically suitable for comparison as

24   reference sample?

25   A.  I determine that -- I generate the DNA profile and if there

O645men6                              Davis - Cross

1    is a DNA profile that is suitable for comparison, which means a

2    DNA profile is generated, and that it is not a mixture of five

3    or more individuals, then it is compared to a known reference

4    sample.

5    Q.  So from the items that were collected from the searches

6    that were conducted and the items that you selected for DNA

7    analysis, you determined that there were two items that were

8    statistically had, to use the language from the report, very

9    strong support that the DNA you recovered and analyzed was

10   transferred by Mr. Daibes to those objects; is that correct?

11   A.   From the items that were tested there were two items that

12   matched Mr. Daibes' DNA profile with the likelihood ratios that

13   were provided and they provided very strong support for

14   inclusion.

15   Q.  And those items were the items that have been marked as

16   actually lab exhibits 26 -- lab items no. 99 and I think

17   IB 79 -- IB 79 and 94?  Excuse me.  IB 26 and IB 99; is that

18   correct?

19   A.   It was items 26 and item 99.

20   Q.  And the conclusions that your report reached was that

21   Mr. Daibes was the source of the DNA that you recovered from

22   those items; is that correct?

23   A.   Per Department of Justice policy I'm not allowed to say

24   that he is the source.  What I can say is with the likelihood

25   ratios provided that Mr. Daibes matched the DNA on the items of

1   evidence, and for item 26 the likelihood ratio is 10 octillion,

2   and that provides very strong support for inclusion, and for

3   item 99 the likelihood ratio is 3 octillion, and that provides

4   very strong support for inclusion.

5   Q.  And so that's the limitations, you would say, of the report

6   that you produced and the result of your analysis?

7   A.  Correct.

8   Q.  And so, the analysis that you conducted on each -- and I

9   will keep them together -- each of the two items, opened

10  envelopes and you received them open, didn't you?

11  A.  I would need to refer to my case notes in order to verify

12  whether those particular envelopes were received into the DNA

13  casework unit opened or not.  I do not recall.

14  Q.  There are certain things, though, that correct me if I am

15  wrong, you cannot conclude based on what you told us.  Your

16  report does not tell us where that DNA was transferred to those

17  items?

18           THE COURT:  You mean where it was?

19           MR. AGATA:  Located, your Honor, and what the

20  environment was.

21           THE COURT:  Where it came from before being on the

22  envelope.

23           MR. AGATA:  That's correct, your Honor?

24           THE COURT:  OK.

25  A.  No, I cannot tell you where it was prior to being on the

O645men6                          Davis - Cross

1    flap and the corresponding area of the envelope.

2    Q.  And it can't tell you the circumstances how it got on the

3    envelope, to put it simply; correct?

4    A.  No.

5    Q.  And most importantly, it cannot tell you when it was put on

6    the envelope?

7    A.  No.  I cannot date DNA.

8    Q.  And as you said, DNA can't be dated?

9    A.  Correct.

10            MR. AGATA:  No further questions, your Honor?

11            THE COURT:  Thank you.

12            Anyone else from the defense?

13            MR. FEE:  Yes.

14            THE COURT:  Yes, Mr. Fee.

15            MR. FEE:  Yes.

16   CROSS-EXAMINATION

17   BY MR. FEE:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  You testified about the ways DNA can be applied to an item.

21   Do you remember that?

22   A.  Yes.

23   Q.  And I just want to make sure I understand.  So it can be

24   skin cells and saliva?

25   A.  Those are two ways.  Again, there also can be blood and

1    semen.  Those are additional ways that DNA can be placed on an

2    item of evidence.  DNA is also found in bones so we can get DNA

3    from your bones as well.

4    Q.  Got it.

5         So the one way is skin cells that are contained in

6    saliva.  That's one way?

7    A.  Correct.

8    Q.  Meaning, if you are speaking animatedly in your home and

9    you spit on something, there might be DNA on that thing;

10   correct?

11        MS. GHOSH:  Objection.

12        THE COURT:  Sustained.  Can DNA be on spit?

13        THE WITNESS:  Saliva itself does not contain DNA.

14   What is in saliva that contains DNA is the skin cells.

15   BY MR. FEE:

16   Q.  I understand.  And as an expert, having done this thousands

17   of times, is it your view that if you are speaking and some

18   spit with skin cells comes out of your mouth and falls on an

19   object in your home, you can possibly find DNA on the object;

20   correct?

21        MS. GHOSH:  Objection.

22        THE COURT:  Sustained as phrased, hypothetical,

23   "possibility of".

24        MR. FEE:  Your Honor, she is an expert.  I am putting

25   hypotheticals to an expert.

O645men6                        Davis - Cross

1          THE COURT:  Sustained.  Rephrase it.

2    Q.  You would agree that you could find DNA from saliva,

3    correct?

4    A.  Yes, from the skin cells in the saliva.

5    Q.  And one way that saliva can end up on an object is it comes

6    out of your mouth, right?

7    A.  Correct.

8          THE COURT:  I will allow that.

9    Q.  Another way you can you get DNA onto a thing is by touching

10   it; right?

11   A.  Yes.

12   Q.  And that could be a lot of different objects that you touch

13   and you find DNA; right?

14         MS. GHOSH:  Objection.

15         THE COURT:  I will allow it.

16         I take it in the course of your career, Doctor, you

17   have located or the people under your supervision have located

18   DNA on a variety of things; correct?

19         THE WITNESS:  Correct.  And it does depend on what

20   type of item it is.  So, for example, an item that is smooth

21   isn't necessarily going to be the best item to collect skin

22   cells from because a smooth item isn't going to give you the

23   best friction for removing skin cells so that's going to give

24   you fewer skin cells than, say, a rough item, which is going to

25   remove more skin cells and give me a better chance to detect

O645men6                         Davis - Cross

1    the DNA and generate a DNA profile.

2    BY MR. FEE:

3    Q.   Thank you.

4         So things that could have DNA on them from touching

5    are paper?  You could find DNA on that, right?

6    A.   We typically don't test paper because it tends not to give

7    us the best results, and also we don't necessarily know where

8    to test on the paper so we do need to know -- I need to know a

9    good idea of where to test on an item in order to give me the

10   most number of skin cells in order to get the DNA.

11        So say, for example, I'm testing an article of

12   clothing.  I'm not going to have the biologists swab the entire

13   piece of clothing just to get some skin cells.  What I am going

14   to target -- how the biologists target on the clothing is the

15   cuffs and the underarms because that's going to be rubbing

16   against the skin and give me the most skin cells and the best

17   chance of giving me a DNA profile.

18   Q.   So you can find DNA on clothing, correct?

19   A.   Correct.

20   Q.   Zippers?

21   A.   We won't test zippers because zippers would be smooth and

22   they would be more apt to give a partial DNA profile and so

23   those are actually, if we are trying to get DNA from that and

24   we are trying to find something, that would actually be better

25   for latent prints than it would be for DNA just because of the

O645men6                            Davis - Cross

1   texture of that zipper.

2            THE COURT:  What is a latent print?

3            THE WITNESS:  A latent print would be -- I'm sorry --

4   a fingerprint, so that would actually go to a different unit:

5   BY MR. FEE:

6   Q.  Cuffs of clothing.  Armpits, you said?

7   A.  And collars.

8   Q.  Collars.  Pants?

9   A.  For pants it would be, for example, if there is blood

10  stains on pants, the waistband of pants would be tested.

11  Q.  Like a button?

12  A.  No.  Buttons would not be tested just because, again, it is

13  going to be a small area, those are typically smooth.  Smooth

14  items are not the best for collection of DNA.

15  Q.  What about sweat, sweat into clothing?

16  A.  Sweat itself, again, does not contain DNA because what

17  contains DNA and sweat is going to be the skin cells.  So, if

18  you are looking for sweat in clothing, you are looking for the

19  areas that are going to be rubbing against the skin.

20  Q.  Got it.  So that's a yes on clothing.  Just so we are clear

21  you can find DNA on clothing; correct?

22           MS. GHOSH:  Objection.

23           THE COURT:  No.  The question is are you able to find

24  DNA on clothing.

25           THE WITNESS:  Yes.

O645men6                              Davis - Cross

1   Q.   You are able to find it -- you said it was not optimal but

2   you are able to find it on paper sometimes; right?

3   A.   In the DNA Casework Unit we do not test paper.

4   Q.   Understand, but you are an expert in the field and you

5   understand that you can obtain DNA from paper sometimes,

6   correct?

7                THE COURT:   Is it possible?

8                THE WITNESS:   It is possible, but however the DNA

9   Casework Unit does not test paper, that would be sent to

10  another unit who would have a better chance of obtaining better

11  results than the DNA Casework Unit would obtain.

12  Q.   But it is fair to say that the FBI's DNA Casework Unit does

13  not determine the scope of the scientific literature on the

14  extraction of DNA evidence, correct?

15               THE COURT:   I will allow that.

16  A.   No.   However, again, the DNA casework unit does not test

17  paper and would not accept paper for processing for DNA.

18  Q.   But you agree it is also possible to obtain DNA from cash,

19  correct?

20  A.   Yes.   Again, however cash is paper and we would not accept

21  that into the DNA casework unit as it does not meet our case

22  acceptance policy.

23  Q.   So the FBI wouldn't test it but it is possible to find DNA

24  from cash, correct?

25  A.   It would against our case acceptance policy and, as such,

O645men6                         Davis - Cross

1    we would not test it.

2    Q.   But you would agree that it is possible to obtain DNA from

3    cash, correct?

4    A.   I would not know where to make the collection and therefore

5    it would be better suited for another unit to process it so I

6    would not damage the evidence and their potential processing.

7    So while it is possible, I would not test it because it would

8    be better suited for another unit to do that processing.

9              THE COURT:   No.   If I understand you correctly,

10   Doctor, I think you are saying that your unit does not test

11   cash because cash is paper and your unit does not test paper

12   for DNA.   Am I correct so far?

13             THE WITNESS:   That is correct.

14             THE COURT:   The question is slightly different.   You

15   have a Ph.D in DNA analysis; correct?

16             THE WITNESS:   My Ph.D is in genetics and molecular

17   biology.

18             THE COURT:   I'm sorry.   You have great experience in

19   DNA analysis; correct?

20             THE WITNESS:   Yes.

21             THE COURT:   OK.   So I think Mr. Fee's question is not

22   whether your unit tests cash and paper for DNA but, rather,

23   does the science permit cash and paper to be tested for DNA.

24   Not whether your unit does it or not, it is a separate

25   question, and I am clearly not an expert so I don't know what

O645men6                          Davis - Cross

1    the answer is.  Answer it if you can.

2              THE WITNESS:  It could be tested.

3    BY MR. FEE:

4    Q.  A duffel bag, a cloth duffel bag where somebody is holding

5    a cloth handle of that bag, in your opinion, as an expert,

6    could you extract DNA from the handle of the duffel bag?

7    A.  It could potentially be tested.

8    Q.  Potentially.  Well -- I'm sorry.

9              Potentially tested and potentially obtained DNA from

10   such an item, correct?

11   A.  Potentially, yes.

12   Q.  You can't say for sure because it is a hypothetical, fair

13   to say?

14   A.  Correct.

15   Q.  Got it.

16             If you have a cut, a paper cut, a larger cut and you

17   touch something and some blood gets onto an item, that is one

18   way DNA may be applied to anything; right?

19   A.  Yes.  If blood is transferred to an item of evidence that

20   is one way to transfer DNA onto an item of evidence.

21   Q.  Is blood on paper, clothing, any item that could absorb

22   blood could be tested and DNA extracted from it, correct?

23   A.  Yes.  Blood contains DNA.

24   Q.  And you would agree, as an expert in the field, generally,

25   that the more a person touches an item the greater likelihood

O645men6                              Davis - Cross

1   that his or her DNA will be left there; correct?

2   A.  Yes.  That is the expectation depending on how well a

3   person deposits their skin cells on an item.  There are certain

4   caveats to that.

5           THE COURT:  And is that, in turn, dependent on the

6   smoothness or roughness of the surface?

7           THE WITNESS:  Yes.  That would also play a factor

8   because, again, if it is smooth, it is going to leave less skin

9   cells behind.

10  Q.  So if a person lives in the same place, day in, day out,

11  touches the same items day in, day out, those items are more

12  likely to have that person's DNA; correct?

13          MS. GHOSH:  Objection.

14          THE COURT:  I will allow it.

15  A.  There is an expectation for an individual, in their own

16  home, for their DNA to be found on those items.

17  Q.  And conversely, if a person visits a residence once or more

18  than once but not every day, there would, in general, be a

19  lower likelihood that they would leave their DNA on items in

20  that residence, fair to say?

21          MS. GHOSH:  Objection.

22          THE COURT:  Sustained as phrased.

23  Q.  Well, the last thing you said, the opposite of that would

24  be true, too; right?

25          MS. GHOSH:  Objection.

O645men6                          Davis - Cross

1              THE COURT:  I will allow it.

2   A.  I would have no way of knowing without testing the item of

3   evidence.

4   Q.  I am asking for your opinion as an expert in the field.  I

5   know you can't say for sure because we are making this up.

6   A.  I literally would have no idea without testing the item of

7   evidence because I don't know whether that individual is

8   touching the item, whether they are going in and whether they

9   happen to be really good at depositing their skin cells in the

10  place.  I don't know without testing the item.

11  Q.  So let me ask you your view as an expert.  In general, in

12  terms of probability, the less a person touches an item the

13  lower a probability they would leave their DNA there, correct?

14             MS. GHOSH:  Objection.

15             THE COURT:  I will allow it.

16  A.  Again, it would depend on how well they leave skin cells

17  behind.  You would have the expectation that if it is a rough

18  surface and they only touch it once, that perhaps the person

19  who owns it would leave more skin cells behind.  But I wouldn't

20  know without testing and doing comparisons to know reference

21  samples.

22  Q.  I understand you are unable to say with certainty --

23             THE COURT:  She's answered it, sir.

24             MR. FEE:  Thank you, your Honor.

25             THE COURT:  You have asked it a number of times.

O645men6                          Davis - Cross

1              MR. FEE:  I will move on.

2    Q.  You mentioned bleach during your direct testimony.  Do you

3    remember that?

4    A.  Yes.

5    Q.  Why did you talk about bleach?  What is the relevance of

6    that to the work you do?

7    A.  Because biologists will clean the --

8              MR. FEE:  I'm sorry.  Did you want to rule on an

9    objection?

10             THE COURT:  I don't think there is an objection.

11             MR. FEE:  I'm sorry.  My apologies.

12             THE COURT:  Ms. Ghosh stood up and sat down.

13   A.  Because biologists will clean their work station with

14   bleach in order to remove any possibility of DNA from their

15   work stations prior to opening a new item of evidence.

16   Q.  And I think -- well, let me just ask it.  The let's assume

17   DNA is deposited on an item:  Skin cell, blood, whatever.  Can

18   it then be removed by cleaning the item, in your experience?

19   A.  There is that potential that if somebody were, for example,

20   if they had a knife and they were trying to clean it, they

21   might clean it with bleach and that could potentially remove

22   DNA.  We would still test it in order to see if we could obtain

23   a DNA profile but it could potentially remove the DNA.

24   Q.  Just to take your example, if that person cleaned the

25   bloody knife with Ivory soap and water, would it be less likely

O645men6                          Davis - Cross

1   to remove the DNA than if that person used bleach?

2   A.   Not necessarily, because Ivory soap is actually detergent

3   and detergents actually are used to break open the cells and

4   that could break open the cells in order to remove cellular

5   material as well.  Bleach happens to be better but there could

6   be that potential of removing the DNA that way, too.

7   Q.   Good to know.

8            So I want to talk about a little bit more about what

9   you actually tested here.  So to go up the ladder, you had two

10  DNA matches -- or I know you can't say match.  You had two DNA

11  results that you deemed, under your lab's standards, as having

12  super duper support for inclusion, correct?

13            MS. GHOSH:  Objection.

14            THE COURT:  Yes.  That you had had very strong support

15  for inclusion, correct?

16            THE WITNESS:  Correct.

17            MR. FEE:  Thank you, your Honor.

18  Q.   That's two?

19  A.   Yes; items 26 and 99.

20  Q.   And then you said you tested nine items; is that right?

21  A.   Nine items total, yes.

22  Q.   Nine items total.  So two were the reference samples,

23  right, the extra cheek swabs?

24  A.   Those were in addition to the nine items tested.

25  Q.   Got it.  So when you say nine items you mean nine things

O645men6                          Davis - Cross

 1    provided -- nine items of evidence provided to you by the case
 2    agents; is that correct?
 3              MS. GHOSH:  Objection.
 4    A.  Yes.
 5              THE COURT:  I will allow it.
 6    A.  Yes.  Those were the items that were submitted to the
 7    laboratory and that I then determined needed to be processed
 8    for DNA.
 9    Q.  So the set of things you got, you received, that you then
10    had to make a judgment call about what I test, what I don't
11    test, how big was that set?
12    A.  I don't recall.
13    Q.  Was it more than a hundred?
14    A.  I don't recall.
15    Q.  Do you have any frame of reference is this was it more than
16    nine?
17    A.  I can refer to my case file and tell you but it was more
18    than nine.
19    Q.  Do you have your case file in that binder in front of you?
20    A.  Yes, I do.
21    Q.  Please.
22    A.  The FBI laboratory received 101 items.  Not all of those
23    came up to the casework unit.
24              THE COURT:  Do you know how many came up to the DNA
25    case unit?  You may, you may not.

O645men6                        Davis - Cross

1            THE WITNESS:  16 items came up to the DNA Casework

2     Unit, and also the two reference samples.

3     BY MR. FEE:

4     Q.  Got it.  So a hundred-something came to the lab?

5     A.  101.

6     Q.  101; but then to your part of the lab, the DNA Casework

7     Unit, the set of things you had to decide to test or not, was

8     16; correct?

9     A.  Correct.

10           THE COURT:  I'm sorry.  I thought it was 16 plus the

11    two you did test.

12           THE WITNESS:  It was 16 evidence items and then the

13    two reference samples.

14           THE COURT:  Thank you.

15    Q.  So 101 minus 16 is 85, let's hope.  Who decided, if you

16    know, that the 85 items shouldn't go to the DNA casework unit?

17           MS. GHOSH:  Objection.

18           THE COURT:  Do you know how it was determined to

19    select 16 items to send to your unit?

20           THE WITNESS:  The evidence management unit will route

21    the evidence and then they will determine what items of

22    evidence come up to the units.  However, I end up reviewing all

23    the items of evidence that come into the laboratory and I can

24    determine that an item of evidence that did not come into the

25    DNA Casework Unit, that it needs to be examined.  So,

O645men6                          Davis - Cross

1   ultimately, I do end up determining which items of evidence

2   need to be examined.  So, ultimately, even if it did not come

3   into the DNA Casework Unit, I make the decision of what items

4   of evidence need to be examined in my case.

5   BY MR. FEE:

6   Q.  So you made all the decisions about what to test and what

7   not to test in this case; is that right?

8              MS. GHOSH:  Objection.

9              MR. FEE:  I am just trying to understand, your Honor.

10             THE COURT:  Yes.

11             You ultimately made the decisions; correct?

12             THE WITNESS:  That is correct.

13             THE COURT:  OK.

14  BY MR. FEE:

15  Q.  Did you talk to the case agents, the FBI agents leading the

16  investigation here in the course of making those decisions?

17  A.  I don't recall.

18  Q.  Have you ever spoken to the FBI case agents in this case?

19  A.  Yes, I have.

20  Q.  Have you talked to them about the substance of the case?

21  A.  I recall having pretrial conferences.  I recall discussing

22  that I needed known reference samples to be submitted and I

23  recall requesting those to be submitted as soon as possible to

24  the laboratory for comparison purposes.  And then I recall

25  speaking to the case agent in order to schedule testimony, as

1    well as with an AUSA.

2              THE COURT:  When you say to schedule testimony, you

3    mean when you are going to be testifying?

4              THE WITNESS:  Yes, your Honor.

5              THE COURT:  OK.

6    BY MR. FEE:

7    Q.  So the bottom line is you ended up testing six envelopes

8    and one bag -- one cloth bag?

9              MS. GHOSH:  Objection.

10             THE COURT:  Are those the only items -- did you test

11   six envelopes and one cloth bag?

12             THE WITNESS:  It was nine items of evidence, so I

13   believe it was eight envelopes and a cloth bag, not six

14   envelopes, and then the two reference samples.

15   Q.  I'm sorry.  Thank you.

16             Generally, the reason you didn't test more of the 101

17   is you concluded you were not likely to get usable DNA off

18   those items?

19   A.  I determined the envelopes were what needed to be tested

20   for DNA and would give the best chance of obtaining a DNA

21   profile without impeding other units' processing.

22   Q.  What do you mean other units' processing?

23   A.  It wouldn't damage their processing.

24   Q.  So you concluded you did not need to test any of the

25   clothes, the cash, or any other items than those nine that were

O645men6                          Davis - Cross

1   presented to the lab?

2              MS. GHOSH:  Objection.

3              THE COURT:  Sustained.  That is not what the testimony

4   was.

5   BY MR. FEE:

6   Q.  Tell me, when you say you concluded the envelopes needed to

7   be tested, what do you mean "needed"?

8   A.  That they would give a best chance of obtaining a DNA

9   profile.

10  Q.  Did the case agents make suggestions to you about what

11  should be tested?

12  A.  I do not recall, but normally when I make my

13  determinations, I make my determinations prior to discussing

14  anything with the case agent.

15  Q.  So it is possible that you did have a discussion with a

16  case agent that suggested to you what to test and what not to

17  test?

18  A.  I do not recall but that is not normally how I proceed.

19  Q.  But you cannot say in this case that it was not the manner

20  in which you proceeded.  Is that fair?

21  A.  I do not recall.

22             MR. FEE:  Let's put up what is in evidence as

23  Government Exhibit 16B-26.

24  Q.  Now, Dr. Davis, your lab report indicates you were told by

25  the FBI that this was found in something called Room C.  Do you

O645men6                          Davis - Cross

 1  remember that?  This item?

 2  A.  May I refer to my report?

 3  Q.  Of course.

 4  A.  Yes, it was identified to me as coming from a safe on floor

 5  in Room C at 41 Jane Drive.

 6  Q.  Safe on floor of Room C at 41 Jane Drive.  This is one of

 7  the items for which you got a sample that you found that had

 8  very strong support for inclusion, correct?

 9  A.  That is correct.

10          MR. FEE:  Let's put up what is in evidence as

11  Government Exhibit 1F-1019, please, Mr. Kelly.

12  Q.  So you see C there, Dr. Davis?

13  A.  Yes.

14  Q.  Do you see a closet here?

15  A.  Yes.

16          MS. GHOSH:  Objection.

17          THE COURT:  That's all right.  Do you see a closet?

18          THE WITNESS:  Yes.

19  Q.  Your testimony is you didn't test any of the clothes in

20  this picture or any clothes at all from 41 Jane Drive, is that

21  fair to say?

22          MS. GHOSH:  Objection.

23          THE COURT:  Did you test any clothes?  Of the items

24  you tested, were there any clothes you tested?

25          THE WITNESS:  No.  The items tested were the envelopes

O645men6                          Davis - Cross

 1   and a fabric bag.

 2   BY MR. FEE:

 3   Q.   By the way there were some envelopes recovered from 41 Jane

 4   that you did not test, right?

 5   A.   I believe those were envelopes that were self-adhesive and

 6   were not moisture-activated.

 7   Q.   So, again, you didn't think there was a good enough chance

 8   that you would get DNA from those envelopes?

 9            MS. GHOSH:  Objection.

10            THE COURT:  Why did you not test those items with

11   self-adhesive aspects?

12            THE WITNESS:  The thought of testing only envelopes

13   that are moisture-activated is because it is thought that

14   envelopes that are moisture-activated would be licked, and so

15   by being licked there would be a good chance of there being

16   DNA.  With self-adhesive envelopes, those are where the

17   expectation would be the envelope would be taped down with glue

18   and so there would be no expectation of being able to obtain a

19   useable DNA profile.

20   Q.   No expectation?

21   A.   There would be -- from the flap and the corresponding area

22   of the flap you would want to have an expectation of somebody's

23   DNA being in those areas because they wouldn't have licked that

24   area.

25   Q.   I'm sorry.  Like zero expectation?  I am just trying to

O645men6                          Davis - Cross

1    understand your testimony.

2              MS. GHOSH:  Objection.

3              THE COURT:  I will allow it.

4    A.  I wouldn't have an expectation with a self-adhesive that

5    somebody is going to lick an area that you are going to tape

6    down, and so when we are swabbing that area I wouldn't have an

7    expectation of being able to detect DNA from that area.

8    Q.  You agree it is technically possible to detect DNA from a

9    self-adhesive envelope; correct?

10   A.  While it is possible, since it is self-adhesive and I

11   wouldn't have an expectation somebody would lick an area that

12   is taped and would be glued down since it is self-adhesive, I

13   wouldn't have an expectation of being able to obtain DNA from a

14   self-adhesive envelope.

15             MR. FEE:  Let's put up, side by side, Government

16   Exhibit 16B-26, and then on the other side Government Exhibit

17   1F-1020.  Can you zoom in on 1020, please, Mr. Kelly?

18   Q.  Can you see the black rectangular object in this

19   photograph, Dr. Davis?  Do you see this object that I am

20   circling?

21   A.  Now I can.

22   Q.  Got it.

23             Were you ever shown a picture of the safe from which

24   16B-26 was recovered?

25             MS. GHOSH:  Objection.

O645men6                           Davis - Cross

1          THE COURT:  Were you ever shown something that looked
2     like that object, ma'am?
3          THE WITNESS:  No, no.  I never would have been.
4     Q.  Just so I am clear, you did not recover Senator Menendez'
5     DNA from 16B-26, this envelope?
6     A.  I did not have a known reference sample from Mr. Menendez
7     to do any comparisons.
8     Q.  You compared everything to the CODIS database?
9          MS. GHOSH:  Objection.
10         THE COURT:  Let's find out.
11    A.  I put two samples into the CODIS, which is the combined DNA
12    index system.  However, I do not know which individuals are in
13    that system so I have no idea whether or not Mr. Menendez was
14    compared.
15    Q.  You are aware that anyone charged with a federal crime has
16    their cheek swabbed and their DNA entered into the CODIS
17    database including Senator Menendez, correct?
18         MS. GHOSH:  Objection.
19         THE COURT:  Are you aware that individuals accused of
20    federal crime have their cheeks swabbed and the resulting DNA
21    put into this database?  Yes or no.
22         THE WITNESS:  Can I give further reference with this
23    answer?  Because it is not just a yes or no answer and I
24    would --
25         THE COURT:  Just a moment.

1          Would you want to follow up?

2          MR. FEE:  Yes, please, for reference.

3  A.  The answer is yes, I do know that those individuals would

4  have their sample collected.  However, I also know in my job as

5  a CODIS program manager at the DNA Casework Unit that these

6  laboratories that enter these samples are backlogged, and

7  because they are backlogged I don't know whether a sample that

8  is collected because an individual is arrested or if their

9  sample is actually entered into the combined DNA index system.

10  And so, because of that, I can't tell you whether Mr. Menendez

11  was actually compared to these items and would have matched.

12  And also, only two items met the quality in order to get into

13  CODIS and, therefore, those are the only two items that would

14  have been compared and could have possibly have matched.

15  Q.  Here is my narrow question.  You are aware that anyone

16  arrested by federal authorities when they are charged with a

17  crime is swabbed for DNA and that DNA is submitted to the CODIS

18  database?

19          THE COURT:  Asked and answered.

20          MR. FEE:  I don't think it has been, your Honor.  That

21  was a long couple of paragraphs.  I would like to have clarity

22  for this for the record.

23          THE COURT:  I think she said she couldn't answer it

24  yes or no and she then -- and I looked to you as to whether or

25  not you wanted her to proceed and you said yes.

O645men6                          Davis - Cross

1            MR. FEE:  Your Honor, I think it is worth breaking her

2    answer down into a smaller two parts, if I may.

3            THE COURT:  Go ahead.  Let's hear it.

4    BY MR. FEE:

5    Q.  You understand that anyone charged with a federal crime is

6    swabbed for DNA and that is then submitted -- I'm not asking

7    about processing times -- that is then submitted to the CODIS

8    database, correct?

9            THE COURT:  I will allow that.

10           Do you understand that to be the case?

11           THE WITNESS:  Yes.

12   Q.  You don't believe that the FBI simply failed to test these

13   samples against Senator Menendez' DNA, do you?

14           THE COURT:  Sustained.  Please.

15   Q.  In any event, you did not obtain any match between this

16   item or any of the other 101 items with Senator Menendez;

17   correct?

18           MS. GHOSH:  Objection.

19           THE COURT:  Sustained as phrased; that's correct.

20           MR. FEE:  I'm sorry?  Basis.

21           THE COURT:  I sustained as phrased, the way it was

22   phrased.

23           MR. FEE:  OK.

24   Q.  Were any of the 101 items --

25           THE COURT:  She is not comparing things to specific

1    people.  Go ahead.

2    Q.  Did your work on this case indicate to you that Senator

3    Menendez was a potential or a likely or a definite match for

4    any of the items submitted to the FBI lab?

5              MS. GHOSH:  Objection.

6              THE COURT:  I will allow it.

7    A.  I did not have a known reference sample for Mr. Menendez to

8    compare to the items so I don't know.

9    Q.  Do you know how the FBI obtains reference samples?

10   A.  They are submitted from the contributors.

11   Q.  Do you know how they get the contributor to give the

12   sample, based on your experience in this work?

13             MS. GHOSH:  Objection.

14   A.  The contributors --

15             THE COURT:  Just a moment.  I will allow it?

16   A.  The contributors supply the reference samples into the

17   laboratory.

18   Q.  And the FBI just asks the person to give their sample?

19             MS. GHOSH:  Objection.

20             THE COURT:  Rephrase it.

21             MR. FEE:  Sure.

22   Q.  Do you know how the FBI -- because you run one of these

23   labs -- do you know how the FBI --

24             MS. GHOSH:  Objection.

25             THE COURT:  No.  Let me hear the question.

O645men6                         Davis - Cross

1   Q.  Do you know how the FBI goes about getting an individual to

2   submit to a swab of their cheek?

3            THE COURT:  I will allow it.

4            Do you know how the FBI obtains these samples?

5            THE WITNESS:  Which samples?  Just a known reference

6   sample?  Or --

7   Q.  A reference sample, the things that you used to compare

8   Daibes and Pilot.

9   A.  I'm not entirely certain because that is performed by the

10  contributors from, for example, from the FBI field offices,

11  from the New York field offices, and they come in to the

12  laboratory for comparison purposes.

13  Q.  And fair to say that you sometimes request that the case

14  agents go get reference samples from another person; right?

15  A.  If we have -- we would do that.  I provided an

16  investigative lead when item 26 hit in CODIS because there was

17  a match to an individual in CODIS but, again, there were only

18  two items that met the criteria to be in CODIS and so I did

19  request that sample.  However, for example, I did not request

20  Mr. Pilot's known reference sample.  That was submitted to the

21  DNA Casework Unit but was not submitted at my request.

22  Q.  And fair to say that you never provided an investigative

23  lead that referenced Senator Menendez in your work on this

24  case, correct?

25  A.  That is correct.

1          MR. FEE:  You can put these down, Mr. Kelly.

2   Q.  The second item for which you found a result with

3   compelling support for inclusion was obtained or taken from a

4   safe deposit box, not 41 Jane Drive; correct?

5   A.  Can I refer to my notes?

6   Q.  Yes, please.

7   A.  It says box no. 13.  I don't know whether that's a safety

8   deposit box or not.

9   Q.  And it does not indicate 41 Jane Drive?

10  A.  No, it does not.  It says from 50 Grand Avenue.

11  Q.  And then you also, among the items you actually tested were

12  two items found in something called Room Q, correct, from

13  41 Jane Drive?  Please refer, if you need.

14  A.  Yes.

15          MR. FEE:  Can we put up Government Exhibit 1F-1092,

16  please?

17  Q.  Has anyone ever shown you a photograph of what is described

18  as Room Q, Dr. Davis?

19          MS. GHOSH:  Objection.  Relevance.  Scope.

20          THE COURT:  I will allow it.

21  Q.  Has anyone ever shown you a photograph of what has been

22  described as --

23          THE COURT:  Has anyone shown you a photograph that

24  said on it Room Q or Q?

25  A.  No.  None of the crime scene photos were ever shown to me.

O645men6                     Davis - Cross

1    Q.  It is not typically a part of your work that you review the

2    photos of the locations from which the items are recovered?

3    A.  No, that is not typical.

4    Q.  In any event, the items, the two items you tested that came

5    from Room Q did not yield any testable DNA; correct?

6              MS. GHOSH:  Objection.

7              THE COURT:  I take it she doesn't know what came from

8    Room Q.

9              MR. FEE:  Your Honor, she does.  It is in her notes.

10             MS. GHOSH:  Objection.

11             MR. FEE:  I'm not sure what the basis is.

12             THE COURT:  Scope?  Is that the basis.

13             MS. GHOSH:  No, your Honor.  Mr. Fee has misstated her

14   prior testimony.  I would also object to the scope.

15             MR. FEE:  Your Honor, she testified about this --

16             THE COURT:  Just a moment, just a moment.  Let's have

17   a quick side bar.

18             (Continued next page)

19

20

21

22

23

24

25

O645men6                          Davis - Cross

1           (At side bar)

2           MS. GHOSH:  Your Honor, the witness previously

3    testified that the notes that I had her read, the description

4    of the two items were provided by somebody else and she didn't

5    write them.  Mr. Fee is assuming that she knows what that

6    information is as opposed to reading a line that is in her

7    report.

8           MR. FEE:  I'm just going to ask her what she knows

9    about the items in Room Q.

10          THE COURT:  Slower.  That she knows what?

11          MR. FEE:  She testified on direct about two items that

12   were taken from Room Q -- she said this on direct -- and then

13   tested.  I just want to focus three questions on what the

14   results of the testing were for the items taken from Room Q.

15   That's it.

16          MS. GHOSH:  That is assuming that they were in fact

17   taken from Room Q but she has no way of knowing.

18          THE COURT:  Then say that was said that the report

19   said --

20          MR. FEE:  Thank you.

21          THE COURT:  Just a moment.

22          MR. FEE:  Yes.

23          THE COURT:  I'm glad we are at side bar because I

24   didn't want to say this in open court and I am sorry to say it.

25   Sir, I think from time to time in the answers, when answers are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O645men6                          Davis - Cross

1    given, you seem to be smirking at the response.  The government

2    can't see that because they're not turned around to you.  So,

3    game face.  Just watch that.

4                   MR. FEE:  Yes, your Honor.

5                   THE COURT:  OK.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O645men6                          Davis - Cross

1                 (In open court)

2                 MR. FEE:  If I may, your Honor?

3                 THE COURT:  Yes, sir.

4       BY MR. FEE:

5       Q.   You testified about two items that were described as being

6       taken from Room Q at 41 Jane; correct?

7       A.   Correct.

8       Q.   And what were the results of your lab's work on the two

9       items taken from Room Q?

10      A.   May I refer to my notes?

11      Q.   Yes.

12                MS. GHOSH:  I would object to the last question which

13      assumes a fact.

14                THE COURT:  I understand.  I am going to allow it.

15      A.   Item 81 was, indicated that no DNA was obtained, so no

16      comparisons could be performed; and item 79 indicated that male

17      DNA was obtained and it was interpreted as originating from one

18      individual and was suitable for limited comparison purposes.

19                THE COURT:  And I take it, ma'am, Doctor, that you

20      don't know that it was taken from Room Q?  You just know that

21      you read something that said it was taken from Room Q; is that

22      correct?

23                THE WITNESS:  That is correct, your Honor.

24                THE COURT:  OK.

25      BY MR. FEE:

O645men6                         Davis - Cross

1    Q.  Just so there is no lack of clarity, the case file for you

2    and your team's work in this matter does not indicate that

3    Senator Menendez was a likely or possible match for any of the

4    item you have talked about here today; correct?

5            MS. GHOSH:  Objection.

6            THE COURT:  Sustained.

7    Q.  Well, I want to clarify that the item you said came from

8    Room Q and related a male sample?  Was that what you said?

9    A.  Item 79 had male DNA and it was interpreted as originating

10   from one individual and was suitable for limited comparison

11   purposes, and again that means that there was one piece of DNA

12   that was present at one location.

13   Q.  And your case file related to that item does not contain

14   the name "Robert Menendez," correct?

15           THE COURT:  I will allow it.

16   A.  I did not have a known reference sample for Mr. Menendez to

17   perform a comparison to item 79.

18   Q.  So my question is your case file related to that item does

19   not contain the name "Robert Menendez"?

20           THE COURT:  Sustained.  She's apparently answered it

21   to the best of her ability.

22           MR. FEE:  No further questions, your Honor.

23           THE COURT:  Thank you.  It is 5:00.  This is a good

24   time to break, ladies and gentlemen.

25           You heard a lot of testimony today, I think it was a

O645men6                          Davis - Redirect

1    productive day from that standpoint.

2              MS. GHOSH:  Your Honor, may I just ask two questions

3    on redirect so Dr. Davis can be excused?

4              THE COURT:  Oh, of course.

5              MS. GHOSH:  Thank you.

6              THE COURT:  Have we gone through everyone though?

7              MR. LUSTBERG:  No questions here.

8              THE COURT:  No questions on behalf of Mr. Hana, for

9    Mr. Daibes?

10             MR. AGATA:  We will see what her redirect is like?

11             MS. GHOSH:  Thank you, your Honor.

12             THE COURT:  Thank you.  I appreciate that.  It will

13   save the witness' time, it will save the jury's time, and save

14   the Court's time.

15   REDIRECT EXAMINATION

16   BY MS. GHOSH:

17   Q.  Dr. Davis, do you recall being asked questions during

18   cross-examination about whether certain objects could be tested

19   for DNA like a zipper or paper and you said something to the

20   effect that they may be better sent to a different unit?

21   A.  Yes.

22   Q.  To be clear, are you referring to a different DNA unit at

23   the lab or units that do different types of forensic testing?

24   A.  They are units that do different types of testing.

25   Q.  Do you recall being asked questions about speaking with the

O645MEN6

1    case agent?

2    A.  Yes.

3    Q.  Who made the assessment as to which items of evidence to

4    test in this case, you or the case agent?

5    A.  I did.

6              MS. GHOSH:  No further questions.

7              MR. AGATA:  We are finished, your Honor?

8              THE COURT:  Thank you.  You are excused.  You may step

9    down, Doctor.

10              THE WITNESS:  Thank you.

11              (Witness excused)

12              THE COURT:  And thank you for bringing that that to my

13    attention, Ms. Ghosh.

14              Ladies and gentlemen, tomorrow morning we will move on

15    to another witness.  As I was saying, I think today was a

16    productive day from the standpoint of you heard a great deal of

17    testimony.  Tomorrow we will have 9:30 to 5:00, a full day of

18    testimony as well.  Keep an open mind, don't discuss this case

19    among yourselves or with anyone else, and don't read any of the

20    publicity or listen to publicity if there is any such

21    publicity.

22              Enjoy the evening.  See you tomorrow.  If you are here

23    at 9:30, we are here at 9:30.

24              (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O645MEN6

1          (Jury not present)

2          THE COURT:  You may be seated.  The Court is prepared

3    to go through ECF 433, which is the chart and the objection to

4    the chart.  Do the parties want a few minutes to refresh

5    themselves or are you ready to go?

6          MR. FEE:  We are ready, your Honor.

7          THE COURT:  We are ready?  OK.  Let's go.  433, I am

8    going to use 433 and the accompanying chart, which is Exhibit

9    A, which I think is -- is it 1305?  Is that what it is?

10         MR. MONTELEONI:  1303, your Honor.

11         THE COURT:  OK.  1303.  I think the most logical thing

12   is to go through the exhibits on 433, unless anyone thinks

13   there is a more efficient way to do it.

14         Turning to page 3 of ECF 433, communications between

15   Andy Aslanian, who I take it is attorney 1, and Ms. Lopez, who

16   I take it is detective 1, is the first objection, lines, we are

17   dealing with 2, 3, 4, and so forth?

18         MR. FEE:  Yes, your Honor.

19         THE COURT:  Government, defense, I take it, why don't

20   you tell me what your objection is.

21         (Continued on next page)

22

23

24

25

O643MEN7

1          MR. FEE:  Your Honor, the core of this they've

2     announced he is an unindicted co-conspirator.  One, we don't

3     think there has been any basis to conclude that.  But I think

4     the more fundamental issue is this.  They are using an

5     attorney's engagement with authorities and accusing him of, due

6     to those acts, participating in a charged criminal conspiracy.

7     We think there is a 403 problem piled on top of the fact that

8     there has been no basis for anyone to conclude that

9     Mr. Aslanian is a co-conspirator.

10          THE COURT:  Let's look at what is under *Bourjaily* that

11    if there is anything that says he's a co-conspirator.

12    Government?

13          MR. MONTELEONI:  Well, yes, your Honor, I mean, I'm

14    happy to go through that, though I do think that almost none of

15    this is for the truth and I think that that basis for admission

16    really disposes of all of this.

17          There's very few assertions here.  There is a number

18    of acts such as a request for an interview, a denial of a

19    request for an interview, and a number of discussions about

20    that, all of those are requests, demands, statements of future

21    intent.  So while we do think that certainly the Court could

22    conclude conditionally, as is often the practice in this

23    district, or unconditionally, that the co-conspirator exception

24    applies, we don't think you need get to that.

25          THE COURT:  Fair enough.  Talk to me, say a little

O643MEN7

1  further then.  We won't deal with the *Bourjaily* issue right

2  now.  But, what are you offering this for then?  It seems to me

3  you've got so many things here where he's clearly, I mean, in

4  my view, the jury will reach its own view, he's just delaying

5  things, delaying things, nothing's happening.  When can we

6  meet.  It looks like it goes on for considerably longer than a

7  year if I understand it correctly.

8             But what's the relevance of all that?

9             MR. MONTELEONI:  It's actually critical to this entire

10 chart.  This is the investigative activity that Jose Uribe is

11 bribing the Menendezes to derail.  It is to kill and stop this

12 investigation.  The attempts by Detective Lopez to interview

13 the investigative subject, and Andy Aslanian as --

14            THE COURT:  This has to do with the New Jersey

15 Attorney General issue.

16            MR. MONTELEONI:  Yes, exactly.  This entire chart

17 relates to that.  And in many ways, these attempts and Andy

18 Aslanian's delays of this is the spine of this entire

19 chronology.

20            THE COURT:  Mr. Fee, the position of the defense is

21 it's not for the truth of the matter asserted.  But it's really

22 to show what Aslanian was doing in terms of attempting to delay

23 the investigation, and later on there are time frames that are

24 tightly coordinated or show things that are happening and then

25 Menendez does something in response to it.  That's their point.

O643MEN7

1          MR. FEE:  Two points.  One, these initial entries,

2     there is no evidence that there is a criminal conspiracy taking

3     place as of January 30, 2018.  So this is just the sort of

4     endless government bucket of context evidence and we don't

5     think it's appropriate.  I know they want to have it to tell

6     the story, but we think there still needs to be an evidentiary

7     basis to be putting things into evidence before the jury.

8          THE COURT:  The conspiracy is from at least in or

9     about 2018 up to including 2023.

10          MR. FEE:  That's the indictment, but this is the time

11     when they have to make that showing.  You can see from this

12     chart the only thing that's happening in January and February

13     is routine engagement between an attorney and the government.

14     The state government.

15          THE COURT:  No, I disagree.  It's background.  It's

16     going to come in.  It shows how these people are introduced to

17     it and what he's doing.  Again, up to the jury, but it seems to

18     me there is a basis for them to conclude he's delaying things.

19     And it's not offered for the truth.  I am going to allow it.

20     And that, unless you want to tell me otherwise, Mr. Fee, does

21     handle the lines that are on page 3, 2, 3, 4, 37, 47, 74, 102,

22     901 and 937.

23          MR. FEE:  Yes, your Honor.

24          THE COURT:  Next.  The Barruos text messages.

25          MR. FEE:  I think it is a --

O643MEN7

1          THE COURT:  I'm on page 4.

2          MR. FEE:  -- a more severe version of the same

3     problem.  Or maybe the problem we didn't have to address with

4     Mr. Aslanian.  Which is Mr. Barruos denied to the government

5     participating in any conspiracy, namely he says I had no idea

6     that there is any sort of agreement or arrangement to effect

7     the bribe.

8          THE COURT:  What?

9          MR. FEE:  To pay a bribe.  Mr. Uribe also does not

10    characterize Barruos as a knowing co-conspirator.  So, other

11    than the government's theory, there isn't going to be evidence

12    in the record that paints him as a co-conspirator.

13         MR. MONTELEONI:  Your Honor, if I may.

14         THE COURT:  Yes.

15         MR. MONTELEONI:  So, again, there are absolutely

16    non-hearsay bases for all of these, and so the Court could

17    defer ruling on this or could make a conditional finding, but

18    this is, the evidence that Barruos knew or was --

19         THE COURT:  I take it you're not offering this stuff,

20    and again, I'm talking about the items under number 2 on

21    page 4, this is not being offered for its truth.

22         MR. MONTELEONI:  That's exactly right, your Honor.  We

23    have bank, we have financial records that show that the

24    payments were made.  Barruos saying he made the payments is not

25    our proof that he made the payments.

O643MEN7

1          It is, however, critical evidence that Uribe believed

2     that the payments were being made, which absolutely informs

3     Uribe's requests to Menendez and Nadine Menendez for official

4     acts in exchange.  So his state of mind, his being informed by

5     Barruos that Barruos made those payments is incredibly

6     relevant, even if Barruos had not in fact made the payments.

7          THE COURT:  Mr. Fee, there is a series, to the extent

8     I can understand this, there is a series of back and forth here

9     where each time, to the extent I understand it, again, Barruos

10    is texting Uribe that certain payments are made and confirming

11    that Uribe is asking and Barruos is indicating they've been

12    paid.  The government isn't offering these for the truth, but

13    simply for the effect on.

14         Why isn't that an appropriate basis for admitting them

15    here?

16         MR. FEE:  They are offering those for the truth.  I'm

17    sure they are going to argue that in fact Barruos paid it and

18    confirmed he was going to pay.  They are not going to solely

19    rely on bank records when they make that argument.

20         THE COURT:  But as to these exhibits --

21         MR. FEE:  They are not relevant if he's not a knowing

22    co-conspirator.  If they want to prove it through bank records

23    and Mr. Uribe's testimony, they should go for it.  Your Honor,

24    I would also add that in the recent filing, they have labeled

25    Barruos --

O643MEN7

1            THE COURT:  You mean in this filing?

2            MR. FEE:  A liar.  Publicly.  I don't know if the

3    government is aware of this.  But the defense was in contact

4    with that man and he's located abroad.  And I am concerned

5    about the impact it's having on him.  So I want to note that.

6            MR. MONTELEONI:  Your Honor, we used a pseudonym in

7    our public filing.  The papers are being filed under seal.  If

8    there is a concern about redaction to the transcript, I don't

9    honestly know how that is handled.

10            THE COURT:  Here it is called Associate No. 2.  Did I

11    in some way blow the man's cover by saying Barruos?  It seems

12    to me that that's throughout the underlying papers.

13            MR. MONTELEONI:  Yes.  So again, because of these

14    issues for both this and the previous summary chart, we

15    submitted the charts with our theories under seal.  And in our

16    public filings we used pseudonyms.  I think that at some point

17    obviously when we're making statements that are relevant to the

18    Court's decisions, there is a question about the First

19    Amendment right, and what can be redacted.  But we're not going

20    out there to try and label anything.  We used pseudonyms and we

21    submitted the underlying papers under seal.  So we reject that

22    suggestion that we are doing anything improper here.

23            Again what Mr. Fee said really, really misses the

24    point.  It is absolutely relevant what Uribe was told about

25    whether bribes were paid on his behalf to the Menendezes to

O643MEN7

1   explain Uribe's subsequent actions demanding official acts.

2   That could not be more relevant.

3          MR. FEE:  Your Honor, again --

4          THE COURT:  I think you've said it.

5          MR. FEE:  That's their theory, but you get it.

6          THE COURT:  I think they are relevant.  I think as

7   long as they're coming in not for the truth, they really set

8   the stage here, and they show the effect on Uribe's state of

9   mind.

10         The parties should remind me of a limiting instruction

11  that it's not for the truth of the matter asserted.

12         Given that, these are going to come in.  That's 760,

13  815, 816, 844, 845, 846, 895, 998, 1004, 1005, 1006, 1010,

14  1011, and 1100.

15         The fact that Uribe is seeking confirmation obtaining

16  confirmation of periodic payments is quite relevant.  Let's

17  move on.

18         MR. FEE:  I can narrow this, I think the next one is

19  C1 on page 6 of docket 433.

20         THE COURT:  Yes, sir.

21         MR. FEE:  So our current objection is really a 403

22  one.  It is to row 646 and the response at 647.

23         THE COURT:  Wait.  Let me just get there.  Yes, sir.

24         MR. FEE:  So, the thing the government really wants

25  here is "I'm still here."  If you see that in the government's

O643MEN7

1    letter, the first paragraph.

2                THE COURT:  Yes.

3                MR. FEE:  Yeah.  And that's fine.

4                The thing that shouldn't be in there, especially in a

5    case where there is an unrelated obstruction charge, is

6    "congrats on cleaning up your e-mails."  And then she later

7    says "under 5900 e-mails there."

8                There will not be evidence that she was deleting the

9    e-mails to which she is referring, and it leaves an impression.

10               THE COURT:  Wait.  That she's deleting the e-mails to

11   which she's referring?  I assumed from looking at this she's

12   cleaning up her inbox.

13               MR. FEE:  Given that this has no relevance, that the

14   only thing they want is "I'm still here."  I don't think

15   everyone will necessarily take it as you're just cleaning up

16   your inbox, especially because there will be --

17               THE COURT:  An obstruction.

18               MR. FEE:  There you go.

19               MR. MONTELEONI:  Your Honor.

20               THE COURT:  Just a moment.  Given the opening of

21   Senator Menendez in terms of separate lives, go ahead,

22   government, let me hear from you.

23               MR. MONTELEONI:  That is exactly what I was going to

24   say.  The defense has opened on them having separate lives, and

25   has indicated that the senator was unaware of Nadine Menendez's

O643MEN7

1    activity, including her online and electronic activity.

2            THE COURT:  I think that's right.  There was such a

3    crucial part, or as I saw it, of the opening.  That is, one

4    spouse didn't know what the other spouse was doing, they lived

5    separately, they had separate cell phone plans, they did or did

6    not have separate closets.  The separateness of their lives is

7    a pretty important part of the defense here, and you certainly

8    can prove that.  This does this shows how they were in constant

9    contact on rather quotidian issues.

10           MR. FEE:  That's a loophole through you which could

11   drive a truck.  There are 10,000 texts between them.

12           THE COURT:  I want to follow this up.  A loophole

13   through which you could drive a truck.  Maybe the fact that

14   there are 10,000 e-mails between them belies the separate

15   lives.  I don't know.  But, to say there are lots of e-mails

16   between them doesn't answer this question.

17           MR. FEE:  Let me answer that directly.  This isn't any

18   old text.  This is Senator Menendez and Nadine talking about

19   her cleaning up e-mails.  The Court agrees that this is

20   appropriate, an innocent exchange.  The government agrees that

21   they will not offer any proof that she deleted these e-mails.

22   There is no reason --

23           THE COURT:  These e-mails is what?

24           MR. FEE:  The 5900 e-mails she's referring to in this

25   text.  There is truly no reason to put this in.

O643MEN7

```
 1              THE COURT:  No.  Well, maybe we're just interpreting
 2     it differently.  I thought she was cleaning up her inbox, and
 3     after cleaning it up, she had fewer than 5900 e-mails in her
 4     inbox.  That's what I took from this.
 5              MR. FEE:  Your Honor, I would put the question to the
 6     government.  Why do you need this.  There is --
 7              THE COURT:  Fair enough.
 8              MR. FEE:  There are hundreds of other e-mails that
 9     show quotidian exchanges.
10              THE COURT:  Fair enough.  Although you're agreeing
11     that "I'm still here" is relevant because of the car.
12              MR. FEE:  Absolutely.
13              MR. MONTELEONI:  First of all, a number of pieces and,
14     obviously, what we have picked in this chart is an incredibly
15     small, it is not an over-cumulative abundance of instances of
16     him supervising, as you say, the quotidian details of her life.
17     So saying that --
18              THE COURT:  Not supervising.  They're spouses, they're
19     close, they are communicating with each other.  Did you pick up
20     the dry cleaning?  I just made that up.  Yes, no.  That's what
21     they're showing.
22              MR. MONTELEONI:  That's right.  I wasn't trying to
23     give any particular valence to this.  He is checking on what
24     she's doing electronically.  And at other time he does do
25     something that seems a little more supervisory with respect to
```

1    monitoring her location.

2            But, regardless, this particular instance is relevant

3    for two reasons.  One, it is directly about his knowledge of

4    what she's doing with her electronic devices.  That she's

5    cleaning up her e-mails is very relevant to that he knows she's

6    cleaning up her e-mails.  It is very relevant to what she

7    knows -- whether he knows what she's been texting to other

8    people.  What she's been e-mailing to other people.  And the

9    other thing is, this is direct, close involvement in what she's

10   doing on the day that she is getting the car, that he is going

11   to deny knowledge, that he has denied in his opening knowledge

12   of how she's getting it.

13           THE COURT:  Of what?

14           MR. MONTELEONI:  Of how she's paid for it.

15           THE COURT:  Yes, but Mr. Fee is saying he'll toss you

16   that one by allowing the phrase "I'm still here."  That she was

17   at the dealership.

18           MR. MONTELEONI:  He is just not aware of her physical

19   location there, though he is.  But he's also aware of what

20   she's doing with her electronic devices and accounts on the

21   very day that she is obtaining the car with money that he's

22   going to claim he didn't know where the money was from.

23           THE COURT:  I've heard enough.

24           I am going to allow it.  403 is not met because

25   there's not unfair prejudice here.  403 says the Court may

O643MEN7

1   exclude relevant evidence if its probative value is

2   substantially outweighed by a danger of unfair prejudice.

3          I think there is some prejudice here.  But the

4   probative value is not substantially outweighed by unfair

5   prejudice.  So I am going to, under the 403 test, I am going to

6   allow it in.

7          What else do we have anything on this chart?

8          MR. FEE:  Just a couple more, your Honor.  I am going

9   to withdraw a couple of the last two.  Optimistic preview.  The

10  next one on page 7 is the titled New Jersey Defendant Court

11  Filings.

12         THE COURT:  Yes.

13         MR. FEE:  So, the government summarizes here --

14         THE COURT:  Let me take a look at those.

15         MR. FEE:  It is a 403 and relevance objection.

16         THE COURT:  I've looked at 10, let me look at 78

17  again.  Mr. Fee.

18         MR. FEE:  Pretty straightforward, your Honor.  I'm not

19  really sure what the government's theory of exactly how these

20  tie into this story they want to tell.  But, the bottom line is

21  this.  It's a notice of appearance, it is a denial of a motion

22  to dismiss a criminal indictment, and it is a pretty pro forma

23  trial order.

24         THE COURT:  It may tie into what allegedly led

25  Menendez to interfere, again, according to the government, in

O643MEN7

1    the investigation.

2            MR. FEE:  Here's a small point, your Honor.  Putting

3    in the docket themselves will require us to get into whether

4    it's the lawyer, Michael Critchley, or other folks, what these

5    mean.  Because the fact is, these are really routine nearly

6    administrative entries in criminal cases in New Jersey.  I'm

7    sure the government disagrees, but that is our view.

8            THE COURT:  Again, I'll hear from the government.

9    But, it's the fact that this occurred, according to their

10   theory, that led the senator to, according to them, be

11   proactive in that investigation.

12           MR. FEE:  Exactly.  And we're --

13           THE COURT:  It doesn't matter what the true nature of

14   that.  It is the fact that it occurred.

15           MR. FEE:  Well, two things.  We're proposing a

16   moderate change here which is that we're happy to stipulate

17   that an event happened on a date.  The actual thing, the event

18   in the court, it does go to the strength of the inference the

19   government wants to draw, whether these were actually

20   meaningful events.  The theory I think is going to be --

21           THE COURT:  I think -- you go ahead.

22           MR. FEE:  You get it.  The theory will be Menendez is

23   getting something because these events are happening.  That he

24   is essentially proving the accomplishments --

25           THE COURT:  He's taking action as a result of the

O643MEN7

1    case, the investigation, motion to dismiss being denied,

2    appearance being filed, whatever it might be.

3           MR. FEE:  So --

4           THE COURT:  Maybe you can stipulate to the facts

5    occurring.  Government?

6           MR. MONTELEONI:  Your Honor, under *Old Chief*.

7           THE COURT:  I have a substantial eye roll here.

8           MR. MONTELEONI:  Under *Old Chief*.

9           THE COURT:  You don't have to stipulate.  That's your

10   point.

11          MR. MONTELEONI:  As a practical matter, it would be

12   very difficult, these are critical timeline things, just like

13   the attempts to interview the investigative subject or the

14   spine of that component of the bribe scheme, the progress of

15   the case, the fact it's moving closer to trial, the fact that

16   there was a pending motion to dismiss until late 2018, then it

17   got denied, then a trial got scheduled is critical to the

18   timing of his January 29, 2019, call to the New Jersey Attorney

19   General.  And the notice of appearance that got filed was

20   texted to Nadine for the purpose of briefing him for that call.

21   This is at the core of our evidence of this portion of it.

22          THE COURT:  Mr. Fee, do you want to respond?

23          MR. FEE:  Your Honor, everything he said, we can put

24   that in the chart without the documents themselves.  We are

25   going to have to get into these documents and the substance

O643MEN7

1    because the jury will have it.  So this seems like a very easy

2    solve to reduce prejudice at no cost.

3              THE COURT:  Under *Old Chief* they're not obligated to

4    stipulate.

5              MR. FEE:  I'm asking you to make them to stipulate.

6              THE COURT:  No, I think I am going to give them the

7    flexibility here.  It's within my discretion.  If they can tie

8    in these events to things he was doing, I think they're

9    entitled to show that.  I am going to allow it in.  It's not a

10   403 issue.

11             MR. FEE:  I want to clarify they're putting in an

12   order of a state court judge.  So is their theory now that

13   Senator Menendez somehow influenced the state court judge's

14   ruling?

15             THE COURT:  No, I don't think so.

16             MR. MONTELEONI:  No.

17             THE COURT:  Just a moment.  One by one.  Sir.

18             MR. MONTELEONI:  Sorry.  I'm sorry.  I didn't mean to

19   interrupt.  I thought my response was called for.

20             No, of course we're not suggesting that the state

21   court's judge's ruling was being influenced.  It is for the

22   fact, and I think there is going to be minimal, if any,

23   engagement with the content.  But this is how it unfolded.

24   These are the primary source documents that show what unfolded.

25   It doesn't in any way question the judge's decision making in

O643MEN7

1    issuing the order.

2              THE COURT:  I am going to allow it in.  I think that

3    handles the chart.

4              How long is the chart summary witness going to be?

5              MR. FEE:  I think, I'm sorry, your Honor.  There is

6    one more.

7              THE COURT:  All right.

8              MR. FEE:  We're going to withdraw numbers 4 and 5 in

9    the government's letter.

10             THE COURT:  Text messages between, all right.  I see

11   it.

12             MR. FEE:  Those two.  The one we are not going to

13   withdraw is number 3.

14             THE COURT:  I didn't do that either.  Just let me see

15   it.

16             MR. FEE:  Yes.

17             MR. MONTELEONI:  Your Honor, I can provide a little

18   bit of factual information, just for the benefit of counsel,

19   too.

20             This is a claim, insurance claim file that reflects a

21   claim based on the accident that led Nadine Menendez to need a

22   new car.  And what I understand defense counsel was objecting

23   to was portions of a police report and associated photographs

24   that reveal that the nature of that accident involved striking

25   a pedestrian.

O643MEN7

```
 1                THE COURT:  None of that is coming in.

 2                MR. MONTELEONI:  We've redacted that.  We haven't

 3      sought to offer that.  We've redacted the police report so it

 4      shows there was an accident.  Doesn't show in any way that

 5      anyone was struck, that any other human being was involved

 6      besides the driver of the car.

 7                THE COURT:  It seems to me that the fact of the claim

 8      is pretty directly relevant to their argument that this was a

 9      reason for the senator to solicit and accept a car on Nadine's

10      behalf.

11                MR. FEE:  We're not contesting that.

12                THE COURT:  So doesn't this lay the foundation for

13      that?  Here's the claim.

14                MR. FEE:  Agreed.

15                THE COURT:  She needs a car.  And I don't want

16      anything about the details of a pedestrian being struck or I

17      don't want anything about a pedestrian being struck here.

18                MR. FEE:  So, I think there is a second category that

19      maybe Mr. Monteleoni can confirm if it's there or not.  I

20      believe the chart still has photos of the damage to the car.

21                THE COURT:  Yes.

22                MR. FEE:  Which I don't think has any relevance.

23      We're conceding the fact that the car was totaled, she needed a

24      new car, the claim is made.  That all comes in.  So one is the

25      photos.
```

O643MEN7

1        Two, I believe there's still a reference and,

2   Mr. Monteleoni, I'm happy to be corrected, that during the

3   accident not a pedestrian, but she hit a parked car.  We don't

4   think that belongs in this exhibit given the purpose for which

5   it is being offered.

6        MR. MONTELEONI:  So, your Honor, the idea that they

7   were objecting to the striking a parked car portion of it

8   doesn't seem very prejudicial.  And I had not intended to

9   redact that.

10       We did change the photos specifically so that they

11  would not suggest the type of accident that would be more

12  likely to involve a pedestrian being struck.  You can see the

13  photos that we've featured here.  And there are some other

14  photos in the underlying report that have a similar nature.  At

15  defense counsel's request, there was a photo of the damaged

16  windshield that made it clearer that something struck the

17  windshield here.  There was broken glass.  And we obviously

18  think that the damage to the car is part of alerting the jury

19  to what actually happened so they can focus on this event.  And

20  it does not in any way suggest -- we're not trying to suggest

21  about striking a pedestrian.

22       MR. FEE:  I just think the government's mistaken.

23  Row 90 has a close up of the car and its broken windshield

24  looking into the driver's seat.

25       THE COURT:  I'll strike the photos.  I don't think it

O643MEN7

1   matters one way or another.

2           MR. FEE:  We're done here.

3           THE COURT:  It's within my discretion.  I'm going to

4   strike the photos.  They don't add very much.  And to the

5   extent that anyone knows anything about this accident, I take

6   it they can be looking at those photos from the standpoint of

7   is this where a person was hit and killed, so I'll strike

8   those.

9           See everyone tomorrow at 9:30.  How long is the

10  expected testimony of Special Agent Graves?

11          MR. MONTELEONI:  I don't want to overpromise.  I think

12  it will be just over one day.  And I am going to try to make it

13  on the short side of that.  But I can't make promises.

14          THE COURT:  Do what you can to make it just under one

15  day.  9:30 a.m.

16          MR. LUSTBERG:  We just filed -- we don't have to deal

17  with it now.  We just filed a letter about how cross of Agent

18  Graves will be presented.  So, the Court can --

19          THE COURT:  You mean in regard specifically to my

20  comments on your cross?

21          MR. LUSTBERG:  Mine and Mr. Weitzman's both.

22          THE COURT:  I'll take a look at it.  If the government

23  is going to give a response, I would want to know that as well.

24          MR. MONTELEONI:  We're likely to respond tonight.

25          THE COURT:  Do you know what his submission was?

O643MEN7

1          MR. MONTELEONI:  No.  But I think -- if it's

2    consistent with the positions that he expressed previously, and

3    we think it could be helpful to set forth our view.

4          THE COURT:  Thank you.

5          MR. MONTELEONI:  Or tomorrow.

6          THE COURT:  9:30.

7          (Adjourned until June 5, 2024 at 9:30 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    CHASE HUNTER MILLS

 4   Direct By Mr. Richenthal . . . . . . . . . .2043

 5   Cross By Mr. Fee . . . . . . . . . . . . . .2061

 6   Cross By Mr. Lustberg  . . . . . . . . . . .2076

 7   Redirect By Mr. Richenthal . . . . . . . . .2079

 8   TERRIE WILLIAMS-THOPMSON

 9   Direct By Ms. Pomerantz  . . . . . . . . . .2103

10   Cross By Mr. Fee . . . . . . . . . . . . . .2127

11   Cross By Mr. Lustberg  . . . . . . . . . . .2159

12   Redirect By Ms. Pomerantz  . . . . . . . . .2161

13   Recross By Mr. Fee . . . . . . . . . . . . .2166

14   ANNA FRENZILLI

15   Direct By Ms. Ghosh  . . . . . . . . . . . .2180

16   Cross By Mr. Weitzman  . . . . . . . . . . .2193

17   CHARITY DAVIS

18   Direct By Ms. Ghosh  . . . . . . . . . . . .2211

19   Cross By Mr. Agata . . . . . . . . . . . . .2251

20   Cross By Mr. Fee . . . . . . . . . . . . . .2254

21   Redirect By Ms. Ghosh  . . . . . . . . . . .2285

22

23

24

25
```

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                         Received

 3    1G-8B through 1G-8M  . . . . . . . . . . .2053

 4    1G-5    . . . . . . . . . . . . . . . . . .2059

 5    1G-6A through 1G-6N   . . . . . . . . . . .2118

 6    1G-6A through 1G-6N   . . . . . . . . . . .2118

 7    1G-4A   . . . . . . . . . . . . . . . . . .2122

 8    3549-001R   . . . . . . . . . . . . . . . .2163

 9    5F-2401   . . . . . . . . . . . . . . . . .2182

10    1D-105   . . . . . . . . . . . . . . . . . .2183

11    1D-107   . . . . . . . . . . . . . . . . . .2184

12    1D-132, 1D-133, 1D-134  . . . . . . . . . .2187

13    13    . . . . . . . . . . . . . . . . . . .2191

14    94    . . . . . . . . . . . . . . . . . . .2192

15    16B-1, 16B-3, 16B-4   . . . . . . . . . . .2231

16    16B-26, 16B-27, 16B-34, 16B-42, 16B-46, . .2234

17          16B-58, 16B-79, 16B-81, 16B-99

18    1441    . . . . . . . . . . . . . . . . . .2239

19                    DEFENDANT EXHIBITS

20   Exhibit No.                         Received

21    136   . . . . . . . . . . . . . . . . . . .2205

22    132, 133, 134, and 135  . . . . . . . . . .2207

23

24

25
```