O6dWmen1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7              Defendants.
                                            Trial
8    ------------------------------x

9                                           New York, N.Y.
                                            June 13, 2024
10                                          9:35 a.m.

11

12   Before:

13
                    HON. SIDNEY H. STEIN,
14
                                            District Judge
15                                          -and a Jury-

16                      APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

O6dWmen1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:   ADAM FEE
      AVI WEITZMAN
      ROBERT D. LUSKIN
      RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:   LAWRENCE S. LUSTBERG
      ANNE M. COLLART
      CHRISTINA LaBRUNO
      ANDREW J. MARINO
      RICARDO SOLANO, Jr.
      ELENA CICOGNANI
      JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes



Also Present:   Marwan Abdel-Rahman
                Rodina Mikhail
                Interpreters (Arabic)

                Rachel Wechsler
                Connor Hamill
                Braden Florczyk
                Paralegal Specialists, U.S. Attorney's Office

                Justin Kelly, DOAR

1             (Trial resumed; jury not present)

2             THE COURT:  Please be seated.

3             Counsel are here and the defendants, with the

4     exception of Mr. Daibes, are here.

5             At 8:18 this morning, the Court's deputy received the

6     following email from Mr. De Castro:

7             "Good morning.

8             "The Court may recall that Mr. Daibes was exhibiting

9     some symptoms of an illness yesterday.  Prior to court

10    yesterday, Mr. Daibes felt under the weather.  He took a Covid

11    test and was negative, took over-the-counter flu medicine and

12    attended trial.  While he felt badly, he believed he could

13    proceed.  Throughout the day yesterday, his symptoms worsened.

14    To us he was visibly sicker.  You may have observed him

15    coughing quite a bit.  He consulted with a doctor

16    telephonically after court and was prescribed antibiotics, but

17    he has yet to be physically examined by a doctor.  We just

18    spoke with Mr. Daibes" -- and again, this is at 8:18 this

19    morning.

20            "We just spoke with Mr. Daibes, and he is clearly much

21    worse.  He described his throat as being extremely irritated

22    and was coughing continuously while on the call.  Because he is

23    in a hotel and has no thermometer, he could not tell us whether

24    he has a fever.  Based on our observations of him yesterday and

25    our conversation with him minutes ago, Mr. Daibes does not

O6dWmen1

1    appear healthy enough to proceed today.  Mr. Daibes is prepared

2    to go to a doctor immediately.  Please let me know how the

3    Court would like to proceed.  I'm happy to have a call or come

4    over to the courthouse if the Court needs additional

5    information."

6        Mr. De Castro asked my deputy how I'd like to proceed,

7    and I had her tell him that he should come here at 9:30 and his

8    client should see a doctor immediately.

9        Mr. De Castro, do you have an update?

10        MR de CASTRO:  Judge, I have a small update.

11        He was unable to get an appointment in the

12   neighborhood, but his primary care physician is on his way --

13   may be there now -- to the hotel to examine him.

14        THE COURT:  All right.  I don't think we have much

15   choice.  I cannot proceed without a defendant being present.  I

16   propose that we inform the jury when they come that there's

17   been an unexpected development and we can't have trial today,

18   but they should be here at 9:30 tomorrow.

19        My deputy informs me that they will be paid for today,

20   so I will tell them that.  I don't see any other avenue.

21        Let me hear from the parties.

22        Government.

23        MR. MONTELEONI:  Yes.  We have no objection to that.

24        THE COURT:  All right.

25        MR. WEITZMAN:  We agree with your Honor's assessment.

O6dWmen1

1          THE COURT:  All right.

2          MR. LUSTBERG:  As do we, Judge.

3          THE COURT:  All right.

4          I think that's what we need do.  My deputy will let me

5     know when the jurors are here.

6          There are a couple of outstanding matters that we

7     have.  Why don't the lawyers -- it will just be legal, so if

8     you wish, you can waive your clients' appearances, if they

9     wish -- come in at three today and we'll deal with the Van Wie

10    chart.  We'll deal with the Edgewater due diligence.  We'll

11    deal with Senate resolution 390, and we'll deal with J.J.

12    Gilday -- I think those are the only outstanding matters -- or

13    at least I'll deal with as many of them as we can get through.

14    Come in at 3 o'clock.

15         Let me ask Mr. Menendez's lawyers, because I've been

16    thinking about the issue of Gilday.

17         I take it, government, Gilday is the FARA registration

18    database.  Is that right?

19         MR. RICHENTHAL:  That's correct, your Honor.

20         THE COURT:  Is Mr. Menendez going to argue, or does he

21    want to maintain the ability to argue, that Mr. Menendez

22    thought Hana was a legitimate lobbyist?  Because that will

23    assist me in determining whether the FARA database is relevant

24    here.

25         MR. WEITZMAN:  We don't intend to make that argument,

O6dWmen1

1       your Honor.

2                   THE COURT:  OK.

3                   If that's true, why does the government need the

4       database?  Because I'm not sure it does.

5                   MR. RICHENTHAL:  So, I would say two things.

6                   First, I'm not sure need is the standard, but putting

7       nomenclature aside --

8                   THE COURT:  Why?

9                   MR. RICHENTHAL:  Because, your Honor, there have been

10      several statements in opening, and not just from Mr. Menendez's

11      counsel but from Mr. Hana's counsel, that the conduct here

12      was -- and I'm paraphrasing; I don't have the transcript in

13      front of me -- open, normal, consistent with lobbying; people

14      can, I believe Mr. Hana's counsel said, both in opening and

15      recross-examination people, can seek to advance the interests

16      of their home countries -- that is, the countries from which

17      they came before they arrived in the United States -- etc.,

18      etc.

19                  That is all generally true, but there's an important

20      caveat, which is if people engage in certain conduct they have

21      to register, and -- this is the key point -- the registration's

22      public.  So the fact that Mr. Hana was not registered was

23      public and could have been known or, in fact, was known to

24      Mr. Menendez.

25                  THE COURT:  Wait.  Wait.  Just let me think about

O6dWmen1

1      that.  Say it again.

2                  MR. RICHENTHAL:  The fact that Mr. Hana, and others,

3      for that matter, were not registered, could have been known or

4      was, in fact, known to Mr. Menendez and others.  We have

5      abundant evidence that Mr. Menendez -- and I'll just focus on

6      him, because that was the Court's inquiry -- knew of FARA and

7      knew of the registration requirement.  In fact, he sent two

8      letters -- one to the then-head of the national security

9      division of the United States Department of Justice and one to

10     the attorney general -- about FARA, meaning he knows if the

11     registration requirement exists and he knows it's public.  And

12     the second thing is true because the letter actually has a

13     footnote with a link to the public registration database.  So

14     if Mr. Menendez could have determined whether Mr. Hana was

15     registered, the fact that he was not bears on, at a minimum,

16     Mr. Menendez's contemporaneous knowledge and intent as to who

17     he's dealing with.

18                  Whether Mr. Weitzman affirmatively argues he was a

19     lobbyist or does not affirmatively argue, the jury may believe,

20     particularly in light of opening statements, that Mr. Menendez

21     could have believed this is all aboveboard, normal conduct.  It

22     wasn't.

23                  THE COURT:  But they said they're not going to argue

24     that he was a lobbyist.

25                  MR. RICHENTHAL:  I heard Mr. Weitzman say he won't use

O6dWmen1

1    the word "lobbyist," and I accept that in good faith.  But

2    there are other ways to make a substantially similar

3    argument -- it's aboveboard conduct, people can advocate for

4    their home countries.  Mr. Hana's counsel said that in opening

5    as well.

6         THE COURT:  But that's all true.

7         MR. RICHENTHAL:  It is all true that people can

8    permissibly lobby or advocate.  What isn't true is they can do

9    so without registering if the lobbying or advocacy concerns

10   certain types of things.  That's the point.

11        The jury would labor under a misconception that any of

12   the defendants in this case, but in particular, Mr. Menendez,

13   could have reasonably believed that, for example, having Hana

14   in a private meeting with foreign officials and advocating for

15   the interests of Egypt was totally normal.  It's anything but

16   normal, and one reason it's anything but normal is Hana didn't

17   register, and Mr. Menendez knew that, or at least reasonably

18   could be inferred by the jury to have known that.  That idea,

19   that the people that are liaising with foreign officials -- in

20   this case, Mr. Hana -- were not registered, is probative, at a

21   minimum, of Mr. Menendez's belief about who Mr. Hana was and

22   what he was doing.

23        THE COURT:  But my concern is Hana isn't charged with

24   failing to register, and I don't want any implication that in

25   some way he was unlawfully failing to register.

O6dWmen1

1          MR. RICHENTHAL:  We agree, and I think the answer for

2     that is a limiting instruction.  But I also want to expand the

3     lens beyond opening, because the jury has heard about this not

4     just in opening.

5          THE COURT:  The government shouldn't be able to argue

6     that Hana's failure to register was unlawful in any way.

7          MR. RICHENTHAL:  Correct.  But I want to expand the

8     lens, if I can.  I'm not expanding the lens to dispute the

9     premise.  The premise is right.  I'm expanding the lens for a

10    different reason.

11         Statements of lawyers are obviously not evidence.  The

12    Court's told the jury that; I expect the Court will tell the

13    jury that again.  But this issue arose in the

14    cross-examination, over our objection, with respect to

15    Mr. Paul.  Mr. Paul was asked, in sum -- I believe this is in

16    our letter on this issue -- about lobbyists and essentially can

17    they advocate for other nations.  Mr. Paul answered yes, and

18    then over our objection he was asked to elaborate by defense

19    counsel, Mr. Menendez's counsel, and he then answered there are

20    limitations.  They have to register.

21         So this is also already in the record.  The

22    registration was on redirect.  Excuse me.

23         So it's already in the record.  What isn't in the

24    record is Mr. Hana did not register.  We don't intend to argue

25    that's a crime, illegal or anything of the sort.  What we

1    intend to argue, if the Court permits it, is Mr. Menendez knew

2    of FARA.  He knew of the registration requirement.  There's a

3    public database, and none of the people who were liaising

4    between him and Egyptian officials, including his wife,

5    including Mr. Hana, including his wife's company, including

6    Mr. Daibes and including Mr. Daibes's company -- those five

7    people or entities -- were in that database.  That's what we

8    intend to argue, from which the jury, in our judgment, can

9    infer Mr. Menendez knew, or could be assumed to have known, the

10   have people with whom he was dealing were not registered

11   agents.

12           Mr. Gilday is not a lawyer.  We're not going to ask

13   him to opine on whether Mr. Hana should have registered.

14   Mr. Gilday had no involvement in this investigation, to my

15   knowledge.  I don't think he even would be capable, if so

16   inclined, to opine on this, and we would never ask him that

17   question.  He would describe the structure.  He would describe

18   the database.  He would say he searched for those individuals

19   and entities.  He did not find them listed.  And we would also

20   offer through him, although we could do it independently --

21   that is, by stipulation -- the two letters to which I refer,

22   indicating Mr. Menendez's awareness of the general structure

23   and the actual public registration.

24           THE COURT:  All right.  Thank you.

25           Mr. Fee.

O6dWmen1

1          MR. FEE:  Your Honor, two things.

2          First, to clarify, the government asked about FARA

3     registration, not the defense.  Period.  It was brought up for

4     the first time in questioning by the government.

5          THE COURT:  Of Paul.

6          MR. FEE:  Of Paul, and we didn't ask about it.

7          Second, the only reason that Mr. Gilday's testimony

8     has relevance is for the argument suggested by Mr. Richenthal,

9     which is that the senator should have known that Mr. Hana

10    should have registered and that it was suspicious that he

11    wasn't registered.

12         Let me just answer factually.  There's no evidence in

13    the record that anyone suggested to Mr. Menendez or anyone else

14    that Mr. Hana was required to register or should have

15    registered.  The prosecutor is wrong.  It is routine for

16    regular, nonregistered civilians to attend meetings with

17    senators about issues related to foreign countries.  Senator

18    Menendez, and no other senator -- we've checked -- checks FARA

19    registration for people coming to these meetings.  Period.

20         Richard Gere attended a meeting with another senator

21    the same week about issues related to Tibet.  Nobody checks.

22         THE COURT:  Issues relating to?

23         MR. FEE:  Tibet.

24         Nobody checks if anyone is registered.  There is no

25    evidence in the record about registration other than questions

1    put by the government to Mr. Paul.  The reason to do this is to

2    suggest to the jury that you can infer wrongdoing by the

3    absence of questions about Mr. Hana's registration status.

4           There are dozens of exemptions from FARA registration.

5    Dozens.  Many people come to talk about issues relating to

6    foreign countries with senators, representatives, Defense

7    Department officials, intelligence officials, who are not

8    registered.  It is a huge 403 problem that has no probative

9    value.  There is no element of any charge in this case that

10   relates one bit to FARA registration, your Honor.  The jury

11   should not hear any more about this.

12           MR. RICHENTHAL:  I need to respond to two things.

13           THE COURT:  You will, but first let me hear from

14   Mr. Lustberg.

15           You know what?  First let me discharge the jury.  Then

16   I'll hear from defense counsel.

17           MR. LUSTBERG:  Thank you.

18           THE COURT:  I think what I'll tell the jury is simply

19   that a matter has arisen within the last hour and we're unable

20   to proceed today, that they should come back tomorrow at 9:30

21   and that they will receive their normal per diem.  I think

22   that's all I need do.

23           Is there any objection to that?

24           MR. RICHENTHAL:  No, your Honor.

25           MR. FEE:  No objection.

 1          MR. LUSTBERG:  No objection.

 2          MR de CASTRO:  No objection.

 3          THE COURT:  All right.  And I'll say it's unfortunate,

 4   but we simply can't proceed.

 5          (Jury present)

 6          THE COURT:  Ladies and gentlemen of the jury, an issue

 7   has arisen within the last hour that does not enable us to

 8   proceed today, so we have to cancel today's proceeding.  You

 9   will receive the normal per diem, and you're able to go to your

10   jobs or your families and get some other things done today.

11   But unfortunately for everyone, we cannot proceed today.

12          Please be here tomorrow at 9:30.  It's a beautiful

13   day.  You can go to work or enjoy the day.

14          9:30 tomorrow.  Thank you.  It is unfortunate, but

15   there's nothing that can be done.

16          (Jury not present)

17          THE COURT:  Yes, sir.

18          MR. RICHENTHAL:  I want to make --

19          THE COURT:  No, no.  Let me hear from Mr. Hana's

20   attorney first.

21          MR. LUSTBERG:  Thank you, your Honor.

22          As the Court knows, this was my correspondence that

23   prompted this discussion, and I really agree with what Mr. Fee

24   said, that at the end of the day, this is a Rule 403 problem.

25          Mr. Paul did say, under redirect examination, that

O6dWmen1

```
 1   there's an obligation for lobbyists to register, and to now
 2   allow in testimony that Mr. Hana did not register would be
 3   highly prejudicial in a circumstance in which the offense of
 4   failure to register under FARA was not charged.  And so I know
 5   that Mr. Fee has appropriately focused on the prejudice to
 6   Senator Menendez, but from Mr. Hana's perspective, it's really,
 7   essentially putting in evidence that he violated the law, when
 8   that is simply not charged.
 9             THE COURT:  But the government's response is that
10   there will be a limiting instruction that Mr. Hana's not
11   charged with any violation of FARA.
12             MR. LUSTBERG:  And a limiting instruction is certainly
13   an alternative, but there's always questions with limiting
14   instructions as to whether you can unring that bell.  And here,
15   where the prejudice of essentially putting in uncharged
16   conduct, I respectfully submit, far outweighs the probative
17   value that the government has set forth.
18             And let me just say one last thing, Judge, and then
19   I'll sit down.
20             We did put this in our correspondence to the Court.
21             THE COURT:  That was about Mr. Paul, right?
22             MR. LUSTBERG:  The correspondence was prompted by
23   Mr. Paul's redirect examination, but there's something else
24   here that's very important, which is the question of whether
25   Mr. Hana should have registered is a complicated one.  There
```

1    are exceptions to FARA and, in particular, with regard to

2    certain types of commercial activity.  And were he charged, we

3    certainly would have had that as a defense, but the reason that

4    this is important is that, under Rule 403, it's not just a

5    matter of prejudice to the defendant.  And I would respectfully

6    submit that the prejudice of an uncharged crime is profound and

7    is risked even in the event of a curative instruction.  But in

8    addition to that, he's deprived of the opportunity to really --

9    you'd almost have to do a mini trial to put in why he should

10   not have had to register.

11            THE COURT:  But they're going to be told he's not

12   charged with violating any registration requirement.

13            MR. LUSTBERG:  I understand, your Honor, and if we're

14   starting at the base that at least there will be a curative

15   instruction, that's a good place to start.  But respectfully,

16   the Court still, even before you reach that, has to reach the

17   determination of whether the probative value of putting it in

18   outweighs the prejudice.

19            THE COURT:  Yes.

20            MR. LUSTBERG:  And here, I'm listening carefully to

21   Mr. Richenthal, and given the evidence in this case, this seems

22   very tangential to the government's theory and, on the other

23   hand, the risk is extremely profound.  I mean even with the

24   curative instruction.  Sometimes they work.  We all presume

25   they do, and that's all well and good, but why run that risk in

1    a case where that is not charged?

2            Let me just say one last thing and then I will sit

3    down, which is, there may or may not be evidence of this, but

4    in 2019, there was an investigation of Mr. Hana for violations

5    of FARA.  Nonetheless, that was not charged in this indictment

6    or at any other time.  And the only point is it was a very

7    voluntary determination that the government made not to charge

8    him, and now it feels like they're trying to back door that in.

9    And I just think the prejudice is profound.

10           THE COURT:  All right.

11           MR. LUSTBERG:  Thank you.

12           MR. RICHENTHAL:  I'm not going to comment on our

13   charging decisions.  There's also CIPA litigation in this case;

14   I'll just let that be.

15           THE COURT:  There's also what?

16           MR. RICHENTHAL:  CIPA litigation in this case.

17           THE COURT:  Oh, yes.

18           MR. RICHENTHAL:  I'm going to let that be.

19           I am going to say this.  I want to talk about the

20   record and I want to talk about Mr. Fee's argument.

21           Let's talk about the record.  This is laid out in the

22   letter that we filed.

23           What happened is as follows.  It is not that Mr.

24   Monteleoni, out of nowhere, asked Mr. Paul about registration.

25   Mr. Fee asked Mr. Paul whether it was appropriate or normal for

O6dWmen1

```
 1    individuals not affiliated with the government officially to be
 2    told about military sales.  Mr. Paul said yes.  What Mr. Paul
 3    was talking about was registered individuals, but that was
 4    entirely unclear because of the way Mr. Fee structured his
 5    cross-examination.  So Mr. Monteleoni, on redirect, asked
 6    Mr. Paul to clarify when he was talking about a pending foreign
 7    military sale and passing information about that sale not
 8    directly to the government but to an intermediary what type of
 9    person was he talking about, and Mr. Paul answered accurately,
10    registered individuals.
11         The individual in this case, unbeknownst to Mr. Paul,
12    is Mr. Hana, but the jury doesn't know he's not registered and
13    Mr. Menendez could have easily determined that.  The jury's
14    entitled to weigh the fact that he wasn't registered and got
15    this information.  That's my first point.
16         My second is -- again, on cross-examination; we're not
17    the ones doing this.  I think it was Mr. Fee, but it may have
18    been Mr. Weitzman.  I don't recall -- put on the screen an
19    email exchange between Dana Stroul, who was then a staffer on
20    Capitol Hill for Mr. Menendez, and an individual named Brett
21    O'Brien and asked a series of questions about this exchange
22    between Ms. Stroul and Mr. O'Brien.  The exchange was about
23    Egypt's interest in and knowledge of a pending foreign military
24    sale or transfer.  I don't recall which it was -- in
25    particular, Mr. Monteleoni's reminded me, the small arms ban;
```

O6dWmen1

1   that is, the ban on certain types of arms being provided to

2   Egypt.

3           What the jury didn't know is that Mr. O'Brien also was

4   registered with Egypt.  There's some complexity there.  I'm not

5   going to get into the complexity.  The database shows he

6   registered, at some point became unregistered.  I don't want to

7   oversell the proof.  Mr. O'Brien was also a registered Egyptian

8   agent.  Mr. Menendez could have determined that if he wished.

9   Ms. Stroul probably knew that.  Ms. Stroul is a very

10  sophisticated person.

11          THE COURT:  Slower.

12          MR. RICHENTHAL:  The point is simple.  The defense is

13  putting in this case this idea that this is all normal and

14  Mr. Menendez had no reason to think otherwise.  Mr. Menendez

15  could have determined, as I said, that Mr. Hana was not

16  registered.  And I want to make two related points.

17          First, the small arms ban and the information provided

18  to Mr. Hana, that's not some hypothetical, ancillary issue in

19  this case.  That is literally one of the charged actions in

20  this case.

21          And my second point is Mr. Fee's argument that this is

22  totally normal, private people attend all the time,

23  Mr. Menendez had no reason to think otherwise, I expect we're

24  going to hear that in summation.  I think it would be

25  appropriate for us to say:  You know what?  Mr. Hana wasn't

O6dWmen1

1    registered, and Mr. Menendez could have determined that in 10

2    seconds.  And ladies and gentlemen, you haven't heard anything

3    about that.  You should infer from that that he didn't know or

4    care.

5              That is not -- this is the important point -- not --

6    an argument that Mr. Hana should have registered.  No one's

7    arguing that.  It's just that he wasn't, and Mr. Menendez could

8    have known it.

9              THE COURT:  That's a very thin line.  That's the

10   problem.

11             MR. RICHENTHAL:  Respectfully, your Honor, I don't

12   think that the fact that he isn't registered is a thin line to

13   whether he should have.  The point is there are registered

14   people that are out there; that can be determined in seconds

15   publicly.  He's got in a meeting and he's giving information to

16   someone who isn't, when his staff, to use Mr. O'Brien as an

17   example, is, in fact, liaising with people who are.  That's a

18   distinction.

19             The other thing I'll say is this.  If Mr. Fee or

20   Mr. Weitzman wants to elicit from an appropriate witness that

21   senators, quote, never check -- I doubt that's true, but if

22   they want to elicit that, they can do it.  We're not blocking

23   that testimony.  In fact, we're going to be calling a staffer

24   next week.  I expect they could ask her if she checks.  So it's

25   not that the jury has no ability to understand the regularity

O6dWmen1

1    of checking, but the jury doesn't know that Mr. Hana wasn't

2    registered, and they're being told repeatedly, including on

3    cross, this is all totally normal.

4         That's the issue we're dealing with.  It's not should

5    have.  It's that he wasn't.  This was litigated before trial.

6    This was a subject of motion *in limine* practice.  We understood

7    the Court's ruling to be precisely the line between should and

8    was.  We've abided by that ruling, and we think that should

9    continue.

10         MR. FEE:  Your Honor, if I may, briefly?

11         THE COURT:  The problem is, again, the line.  You said

12   you're not going to argue that his failure to be on the

13   database is unlawful, but there is a 403 issue as to what the

14   jury is going to take away from your argument that he wasn't on

15   the database.

16         MR. FEE:  Your Honor --

17         THE COURT:  No.  Let me hear from Mr. Richenthal.

18         MR. RICHENTHAL:  I guess I just don't agree.  If no

19   one argues he should have, Mr. Gilday is not opining on whether

20   he should have, Mr. Gilday is just saying, in sum, there's a

21   public database, these five individuals and entities aren't on

22   it, it seems appropriate for us to have it in the record and be

23   able to respond to arguments it sounds like we're going to get

24   in summation.  I guess I'm not sure what the jury -- the jury

25   isn't going to be told he should have.  It's just that there

O6dWmen1

1     are people out there called lobbyists, and when a lobby

2     involves a foreign country, there's a database; he's not on it.

3          Mr. Menendez sent a letter to the then-attorney

4     general of the United States.

5          THE COURT:  Slower.

6          MR. RICHENTHAL:  Mr. Menendez sent a letter.

7          THE COURT:  No, not lower.  Slower.

8          MR. RICHENTHAL:  Mr. Menendez sent a letter to the

9     then-attorney general of the United States and also to the

10    then-head of the national security division, which included a

11    reference to the very statutory regime we're talking about and

12    a link -- literally a link -- to the same database.  We'd like

13    to be able to say he plainly knew about the database.  For

14    example, if Mr. Fee is right and other senators didn't, OK, but

15    Mr. Menendez plainly did, and ladies and gentlemen, Mr. Hana's

16    not on it.

17         That's all we want to be able to say, and in many ways

18    this is defensive.  We keep hearing these arguments from the

19    defense.  We'd like to be able to have something in the record

20    to respond to.  We can't do that once the record is closed.

21         THE COURT:  All right.

22         Mr. Fee.

23         MR. FEE:  Your Honor, he has said seven times the

24    senator could have checked for FARA registration.  This is an

25    uncharged FARA violation conspiracy.

O6dWmen1

1           THE COURT:  Yes.

2           MR. FEE:  The only probative value is to argue that he

3  should have checked and that Mr. Hana should have been on

4  there.  That is the only probative value for this evidence,

5  your Honor.

6           The system's designed so that officials meeting with

7  others do not check.  The obligation -- I've charged dozens of

8  FARA cases.  The obligation is only on the registrant or the

9  potential registrant.  The first baseman for the Red Sox

10  attended a meeting at the senator's office last month with

11  officials from the Dominican Republic.  There are many reasons

12  why you don't register.  The jury has no ability to discern any

13  of this information, which has only been presented by the

14  government.  The defense has not asked a single question about

15  registration.

16           And just to highlight this, your Honor, a limiting

17  instruction that says Mr. Hana is not charged with violating

18  FARA does not approach fixing the issue, because they will

19  still determine, as the government is arguing, that he violated

20  FARA.  The instruction would have to say, thus rendering the

21  entire line of inquiry irrelevant, Mr. Hana's not charged with

22  it, he did not violate it, there was no requirement for him to

23  register.  Because otherwise, it's a huge 403 problem.  They

24  have no ability to assess any of the information that the

25  government is attempting to inject.

O6dWmen1

 1              THE COURT:  All right.

 2              Mr. Richenthal, Mr. Fee has just expanded the limiting

 3     instruction.  What's the position of the government?

 4              MR. RICHENTHAL:  First, let me respond to the point he

 5     just made.  This is exactly why we need this.  They keep say

 6     they're not introducing registration.  I agree.  They're not.

 7              THE COURT:  Slowly, slowly.

 8              MR. RICHENTHAL:  They keep saying they're not

 9     introducing registration.  I agree, they're not.  They're

10     introducing the first part without the second part.  It's

11     incredibly misleading.  They keep putting in front of the jury,

12     through cross-examination and exhibits, the idea that this is

13     normal, the idea that Brett O'Brien was just like Wael Hana, so

14     of course a staffer spoke with Brett O'Brien.

15              Mr. O'Brien is not like Wael Hana.  Mr. O'Brien

16     literally is employed by a lobbying firm.  The entire premise

17     of this argument is to have half a loaf of bread.  If they're

18     going to put the first half in, we should be able to put the

19     second half in.  It simply is not the case they get to talk

20     about it and we don't.  And again, no one's arguing Mr. Hana

21     should have registered.  That's not what's going on here.

22              What's going on is the idea that Mr. Hana is like lots

23     of other people and the senator had no reason to think that's

24     untrue, and frankly, as Mr. Fee seems to be asking the jury to

25     infer, no ability to even determine if that's true.  And again,

1    this case is not about other senators or other people.

2    Mr. Menendez himself literally checked the database.

3            THE COURT:  You've said this.

4            MR. RICHENTHAL:  Or had a staffer do it.

5            THE COURT:  You said that.

6            MR. RICHENTHAL:  Those are the facts.

7            MR. FEE:  Your Honor, it's a long trial, so people

8    might be forgetting the record.

9            The reference to the Brett O'Brien email, the

10   government put that in.  It was on GX 1302.  We didn't offer

11   it.  We didn't admit it.  It was on the chart Mr. Monteleoni

12   questioned the agent talking about it.  We have never offered

13   any evidence about this.

14           This is the third time that he's misrepresented a

15   fact, trying to say the defense (inaudible).  I would ask the

16   Court to just do the obvious here.  This is an uncharged

17   violation that they're trying to jam into this trial.

18           THE COURT:  Yes, but assuming, as I would have to, to

19   take your position, it seems to me, that a limiting instruction

20   does not cure the issue, what do you do with the government's

21   argument that you're going to make an argument that this is

22   completely normal for Hana to be involved in these meetings?

23   You've just made that argument here -- that Hana is George

24   Clooney.

25           MR. FEE:  On Mr. Hana's behalf, thank you, first of

O6dWmen1

1   all.

2          Second of all, this is the straw man.  The Court is

3   adopting the straw man.

4          THE COURT:  No.  Answer the question.

5          MR. FEE:  I am answering the question.

6          The law does not impose an obligation on anyone in

7   Washington, D.C., before they take a meeting, to check.

8          THE COURT:  Yes.

9          MR. FEE:  Period.  No one checks, because it is not

10  the way the system works.  Even if officials did check, it's

11  shifting the burden.

12         THE COURT:  First of all, that's not in here.

13         Secondly, apparently, Menendez did check, but respond

14  to my question.  What do you do with the argument that Hana's

15  George Clooney and Hana is some third baseman?

16         MR. FEE:  Your Honor, that argument is not a feature

17  of our defense because there is no element to which it relates.

18  I don't even know if --

19         THE COURT:  So you're not going to make that argument.

20         MR. FEE:  We're going to make the argument that there

21  was nothing ominous about interacting with Mr. Hana on the face

22  of those interactions.  Full stop.  It's the government's

23  burden to prove that inference, No. 1.

24         No. 2, your Honor, again, Mr. Richenthal needs to be

25  straight with the facts.  What he's referring to are letters

O6dWmen1

1    that the senator sent about FARA legislation.  There is no

2    evidence in discovery, let alone the case, that he has ever

3    conducted a FARA check or that anyone -- Sarah Arkin, his

4    staffer -- has ever conducted a FARA check.

5            THE COURT:  I really don't think that's the issue one

6    way the other, as to who's done a FARA check or who hasn't.

7    Again, it seems to me -- let me go back -- what you're going to

8    argue is that this is just a normal operating procedure and

9    George Clooney shows up to be part of the arms dialogue in

10   Egypt.

11           MR. FEE:  No, your Honor.

12           THE COURT:  Is that the argument?

13           MR. FEE:  No, your Honor.

14           We're going to argue that there was no bribery scheme

15   and that there was no scheme to co-opt the senator as an agent

16   of Egypt.  We're going to argue the facts relevant to those

17   charges.  We're not going to mention registration.  We're not

18   going to mention FARA.  We didn't introduce any evidence of a

19   lobbyist engaging with the senator.  The government did, and we

20   asked questions about their evidence.  This is a gigantic red

21   herring, and I would ask the Court to really try to articulate

22   for its own thinking what is the government's probative use of

23   this evidence?

24           THE COURT:  All right.  Thank you.

25           Last go-round.

O6dWmen1

```
 1              MR. RICHENTHAL:  Transcript page 917, Mr. Fee to
 2    Mr. Paul, question -- we did not introduce this.  This is
 3    cross-examination:
 4    "Q. Do they ever use, do foreign countries ever use something
 5    called lobbyists or private agents or consultants to reach out
 6    on their behalf?
 7    "A. Yes, they do.
 8    "Q. Can you tell me about that, in your experience?
 9    "A. So, foreign countries may hire individuals to contact
10    Congress on their behalf, to lobby them, to pressure them on
11    issues of interest to that foreign country."
12              That's all transcript page 917.  The plain inference
13    there, in light of Mr. Paul's testimony, again, is that
14    Mr. Hana is an intermediary on foreign military sales, was just
15    like any other lobbyist.  He wasn't, and Mr. Menendez
16    himself -- I don't know what his colleagues did, but he himself
17    checked the database.
18              Also, I'm sure Mr. Fee simply misspoke.
19              THE COURT:  Mr. Fee said that, as a matter of fact,
20    that's not true.  I remember something about Mr. Menendez
21    writing a letter.  I think he was indicating somebody should
22    investigate another legislator's not having done what he should
23    have.
24              MR. RICHENTHAL:  That's correct, which is why I was
25    going to say I'm sure Mr. Fee simply misspoke.  The letters I'm
```

1    talking about are not about legislation.  They're about the

2    conduct of another person.

3            THE COURT:  Yes.  It was another senator or a

4    legislator.

5            MR. RICHENTHAL:  I believe it was a former

6    congressman, your Honor, and involved the country of Venezuela,

7    but the point is the same.

8            The bottom line, and I know we're going back and forth

9    here, like Ping-Pong, is they want the first half of the bread

10   without the second half.  They want to be able to say lobbyists

11   and private agents -- that's a direct quote from Mr. Fee's

12   cross -- totally normal, and not just totally normal in some

13   ancillary, general sense, totally normal as intermediaries to

14   foreign countries.

15           One response we may have, depending on what we hear in

16   summation, is not so.  Mr. Menendez was aware there's a

17   database, and Mr. Hana isn't on it.  So there may be lobbyists

18   and foreign agents who could have been told this information in

19   the normal course.  Mr. Hana, Mr. Menendez knew, was not such a

20   person.  That's the argument.  Nothing in what I just said used

21   the word "should" or suggests anything like should.  It's

22   simply he wasn't and one of the defendants knew it.

23           THE COURT:  OK.

24           MR. LUSTBERG:  Thank you, your Honor.

25           THE COURT:  This is the end.

O6dWmen1

1              MR. LUSTBERG:  I promise.

2              THE COURT:  You can promise.  I'm saying it.

3              Go ahead.

4              MR. LUSTBERG:  Right.

5              Your Honor, here's the truth, which is that people --

6       citizens, noncitizens, whoever -- are permitted to be heard,

7       and in some circumstances they have to register and in other

8       circumstances they don't.  This is not -- Mr. Richenthal keeps

9       saying that we're arguing that this is usual or common.  That's

10      not the point.

11             THE COURT:  That's certainly what Mr. Fee was arguing.

12             MR. LUSTBERG:  I don't believe he was.  But in any

13      event, whether he was or not, our position, your Honor, is that

14      Mr. Hana was absolutely permitted to do what he was doing, and

15      it's not that there was nothing unusual about it, it's allowed.

16      There are certain circumstances under which people are

17      required, your Honor, to register under FARA.  But it is not

18      every circumstance where someone speaks to a member of

19      Congress.  And I don't see any possible invocation other than

20      from what the government wants that Mr. Hana should have

21      registered.  That is what the jury is likely to take away from

22      putting a witness on the stand who says he's not on the list.

23      There really is no other inference other than that he should

24      have been and he should have registered.  And I just maintain

25      my concern that whatever curative instruction the Court gives

O6dWmen1

1    will be insufficient to remove the taint of an uncharged

2    violation.

3            THE COURT:  All right.  Thank you.

4            Why don't you all come back at 3 o'clock and we'll get

5    as far as we can at that time.

6            Thank you.

7            (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6D5men2

```
 1                A F T E R N O O N   S E S S I O N
 2                           3:10 p.m.
 3              THE COURT:  Please be seated.
 4              Mr. Weitzman, are you waiving your client's
 5    appearance?
 6              MR. WEITZMAN:  We are, your Honor.
 7              THE COURT:  Have you spoken to him about it?
 8              MR. WEITZMAN:  We have, your Honor, and he waives his
 9    appearance.
10              THE COURT:  Mr. Lustberg?
11              MR. LUSTBERG:  Same, your Honor.
12              THE COURT:  And Mr. de Castro?
13              MR. DE CASTRO:  We do.
14              THE COURT:  I have received a -- I asked for an update
15    from Mr. de Castro on Mr. Daibes' condition and he has given it
16    to me here and he asks that it be private, given that it
17    involves individual medical condition, so I think that that is
18    appropriate.  I will speak with the parties in the robing room
19    about this and then I will come out.
20              I see the press is here.  Just as yesterday, the press
21    asked that after I come out I tell them what I can.  All right?
22    So let's go into the robing room.  We will deal with that and
23    then we will deal with the chart in public proceeding.
24              We will do it in the jury room.
25              (The Court and deputy confer)
```

O6D5men2

1              THE COURT:  No, they still have their notebooks.  My

2   deputy is going to go in there and take out their notebooks.

3   Just wait a moment.

4              I will meet everybody in the jury room when

5   Ms. Blakely comes out.

6              (Pages 3714-3742 SEALED by order of the Court)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6dWmen3

1          THE COURT:  Please be seated.

2          After discussion with the parties concerning the

3  medical condition of Mr. Daibes, I can inform you that

4  Mr. Daibes has tested positive for COVID-19; that I'm going to

5  ask my deputy to inform the jurors that we will not have trial

6  tomorrow.  It is the expectation and the hope of the Court that

7  we'll be able to have court on Monday, given the revised Covid

8  protocols of the CDC, but that really depends upon the progress

9  of Covid and Mr. Daibes.

10          I, therefore, have called a conference call tomorrow

11  with the parties to get a medical update on the status of

12  Mr. Daibes.  That's where we stand.  No court today.  No court

13  tomorrow.  Mr. Daibes has Covid.  We'll try to have court on

14  Monday.  It depends upon the status.

15          Thank you very much.

16          MR. WEITZMAN:  Your Honor, just one other issue.

17          MR. RICHENTHAL:  May we confer briefly?

18          THE COURT:  Yes.

19          MR. WEITZMAN:  Your Honor, you'll recall a few days

20  ago, I brought up the issue that there's a defense witness who

21  is going to be unavailable starting this Monday, I believe, for

22  two weeks or so, until early July.

23          THE COURT:  Unavailable starting Monday?

24          MR. WEITZMAN:  Starting Monday, for two weeks.

25          THE COURT:  The parties were going to get back to me.

O6dWmen3

1    You were going to talk.  We didn't even know what the projected

2    end was on the case.  Mr. Uribe, I think, was still on the

3    stand at that point, and you were going to get back to me.

4            Yes, sir.

5            MR. WEITZMAN:  That's correct, your Honor.

6            We've conferred and we've reached agreement, pending

7    your Honor's consent and order, to proceed by video, I'm sorry,

8    by deposition.  We'll work out the details of how that would

9    occur, but we'll try to do that this weekend before the witness

10   leaves.  We're just asking on consent for your Honor to

11   authorize a Rule 15 deposition.

12           THE COURT:  It's on consent?

13           MR. RICHENTHAL:  It is, your Honor.

14           We need to work out the logistics -- for example, of

15   whether it will be in person or not -- but the concept of a

16   video deposition the government does not object to in these

17   circumstances.

18           THE COURT:  Actually, in criminal matters, more than

19   the concept is important.  It's exactly how that deposition

20   goes forward, what the jury can see, if he understands the

21   oath.  There are a number of procedural, I won't say hurdles

22   but requirements.  So I commend those issues to the parties.  I

23   assume they'll work it out.

24           MR. RICHENTHAL:  I have every confidence we will.  The

25   parties have not gotten to that level of granularity.  We've

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6dWmen3

1    agreed to do it.  We need to work those things out.  It may

2    happen as soon as Saturday.  We're trying to work them out

3    promptly.

4           THE COURT:  And then what about objections that are

5    lodged during the course of the deposition?

6           MR. WEITZMAN:  When I've done Rule 15 depositions in

7    the past, parties have preserved objections as if they were on

8    trial and your Honor rules, based on designations, before any

9    video deposition is shown to the jury.

10          THE COURT:  How long is the projected direct?

11          MR. WEITZMAN:  I think it would be, for me, half an

12   hour or less.

13          THE COURT:  All right.  If the parties consent, it's

14   all right with the Court.

15          MR. WEITZMAN:  Thank you, your Honor.

16          THE COURT:  All right.  Thank you.

17          (Adjourned to June 14, 2024, at 3:00 p.m.)

18

19

20

21

22

23

24

25