O6kWmen1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          23 Cr. 490 (SHS)

 5   ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
 6   and FRED DAIBES,

 7              Defendants.
                                           Trial
 8   ------------------------------x

 9                                         New York, N.Y.
                                           June 20, 2024
10                                         10:25 a.m.

11

12   Before:

13
                       HON. SIDNEY H. STEIN,
14
                                           District Judge
15                                         -and a Jury-

16                       APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division
23

24

25
```

O6kWmen1

APPEARANCES CONTINUED

PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:   ADAM FEE
        AVI WEITZMAN
        ROBERT D. LUSKIN
        RITA FISHMAN

GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:   LAWRENCE S. LUSTBERG
        ANNE M. COLLART
        CHRISTINA LaBRUNO
        ANDREW J. MARINO
        RICARDO SOLANO, Jr.
        ELENA CICOGNANI
        JESSICA L. GUARRACINO

CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes

Also Present:   Marwan Abdel-Rahman
                Rodina Mikhail
                Interpreters (Arabic)

                Rachel Wechsler
                Connor Hamill
                Braden Florczyk
                Paralegal Specialists, U.S. Attorney's Office

                Justin Kelly, DOAR

1              (Trial resumed; jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Good morning, ladies and gentlemen.  Welcome.  Let's

4    try to have a full day of testimony.  We'll go right through to

5    the summer solstice, 5 o'clock.

6              Government, call your next witness.

7              MR. MONTELEONI:  The government calls Special Agent

8    Paul Van Wie.

9              THE COURT:  Does the government have a revised 1304

10   for the Court in hard copy?  Only if you have an extra.

11    PAUL VAN WIE,

12         called as a witness by the government,

13         having been duly sworn, testified as follows:

14             THE COURT:  You may be seated, Mr. Van Wie, and

15   welcome.

16             THE WITNESS:  Thank you.

17             THE COURT:  Your witness, Mr. Monteleoni.

18   DIRECT EXAMINATION

19   BY MR. MONTELEONI:

20   Q.  Good morning.

21        Are you currently employed?

22   A.  Yes.

23   Q.  Where do you work?

24   A.  Federal Bureau of Investigation.

25   Q.  What's your title at the FBI?

O6kWmen1                    Van Wie - Direct

1   A.  Special agent.

2   Q.  How long have you been at the FBI?

3   A.  Just over four and a half years.

4   Q.  What did you do before the FBI?

5   A.  I was an attorney.

6   Q.  Now, what unit are you currently assigned to in the FBI?

7   A.  I'm on one of the public corruption squads in the New York

8   field office.

9   Q.  Have you ever heard of a senator named Robert Menendez?

10  A.  Yes.

11  Q.  Was your public corruption squad involved in an

12  investigation of Robert Menendez?

13  A.  No, not directly.

14  Q.  Was another public corruption squad at the FBI involved in

15  such an investigation?

16  A.  Yes.

17  Q.  Did you assist that squad with a few tasks in the

18  investigation?

19  A.  I did.

20  Q.  What did you do to prepare to testify today?

21  A.  I was asked to review a chart, and in doing so, I reviewed

22  each line of that chart and compared the information in there

23  to the government exhibits that were cited at the end of the

24  lines.

25  Q.  Were there a few different summary documents that you were

1    asked to review?

2    A.   There were.

3    Q.   Who drafted those summary documents?

4    A.   The U.S. Attorney's Office.

5    Q.   Did you verify that all of the information in those summary

6    documents was drawn from the source documents that you

7    reviewed?

8    A.   I did.

9    Q.   And about how many of those source documents are government

10   exhibits?

11   A.   All of them.

12   Q.   What types of government exhibits did you review to verify

13   these summary documents, generally?

14   A.   There were text messages.  There were emails, phone

15   records, among other things.

16   Q.   Collectively, about, roughly, how many pages would you say

17   the text messages were?

18   A.   Hundreds.

19   Q.   Collectively, about how many pages were the phone records?

20   A.   Thousands.

21   Q.   Who made the decision what exhibits you'd review?

22   A.   The U.S. Attorney's Office.

23   Q.   Do you believe that you've reviewed all of the documents

24   that the others in the public corruption squad gathered in

25   their investigation?

O6kWmen1                          Van Wie - Direct

1   A.  I have not.

2   Q.  Who made the decision what exhibits would be referred to in

3   the summary documents?

4   A.  The U.S. Attorney's Office.

5           MR. MONTELEONI:  At this time, your Honor, we offer

6   Government Exhibits 4F through 4F3, 4F6, 4F13, 4F14, 4F16,

7   4F17, 4F19, 4F20, 4F23 through 4F26 and 4F28 through 4F32,

8   subject to connection.

9           THE COURT:  Admitted.

10          (Government Exhibits 4F through 4F3, 4F6, 4F13, 4F14,

11  4F16, 4F17, 4F19, 4F20, 4F23-4F26 and 4F28-4F32 received in

12  evidence)

13          MR. MONTELEONI:  Now we offer the remaining exhibits

14  that are cited in Government Exhibit 1304.  We offer the

15  exhibits that are cited in Government Exhibit 1351, and we

16  offer Government Exhibits 10C3, 10J4, A132 and A132A, B216-2,

17  B216-3, B216-A and the stipulation that's Government Exhibit

18  1402.

19          THE COURT:  Admitted.

20          MR. WEITZMAN:

21          (Government Exhibits 10C3, 10J4, A132, A132A, B216-2,

22  B216-3, B216-A and 1402 received in evidence)

23          MR. WEITZMAN:  Your Honor, just one moment?

24          THE COURT:  Yes.

25          MR. WEITZMAN:  Thank you, your Honor.

O6kWmen1                        Van Wie - Direct

1              MR. MONTELEONI:  Mr. Hamill, could you please show the

2     witness the documents that are marked for identification as

3     Government Exhibits 1304 and 1351.

4     Q.  Special Agent Van Wie, do you recognize those documents?

5     A.  I do.

6     Q.  Are those summary charts that you verified?

7     A.  Yes.

8     Q.  Did you verify that all of the information in those

9     documents is drawn from the government exhibits that are cited

10    in the documents?

11    A.  Yes.

12             MR. MONTELEONI:  We offer Government Exhibit 1304 and

13    Government Exhibit 1351 in evidence.

14             THE COURT:  Admitted.

15             (Government Exhibits 1304 and 1351 received in

16    evidence)

17             MR. MONTELEONI:  Mr. Hamill, could you please publish

18    the first page of Government Exhibit 1304.

19    Q.  Special Agent Van Wie, what are we looking at here?

20    A.  This is the summary chart that was prepared by the U.S.

21    Attorney's Office that I reviewed and compared the government

22    exhibits that are cited at the end of the lines to the content

23    that is contained within each one.

24    Q.  Directing your attention to the top line, where it says

25    October 30, 2018, to May 26, 2022, does this chart list

1   everything that's recorded on the documents you reviewed as

2   happening within that date range?

3   A.  No.

4   Q.  Did you pick which events within that date range to put on

5   the chart?

6   A.  No.

7   Q.  Did you pick that date range?

8   A.  No.

9   Q.  Who did pick those things?

10  A.  The U.S. Attorney's Office.

11          MR. MONTELEONI:  Mr. Richenthal, before we get

12  started, could you please put up Government Exhibits 2A-1, 2A-2

13  and 2A-4 on the board.

14  Q.  While that's happening, Special Agent Van Wie, directing

15  your attention to line 1, what is the date listed on line 1 of

16  Government Exhibit 1304?

17  A.  October 30, 2018.

18  Q.  Directing your attention to the detail cell, you don't need

19  to read the cell itself, but could you please read just the

20  number of the government exhibit that's cited?

21  A.  "GX 1401."

22          MR. MONTELEONI:  Let's look at Government Exhibit

23  1401.

24          Mr. Hamill, can you please put up Government Exhibit

25  1401, the bottom of page 1 and the top of page 2.

1        I'll now read paragraphs 1, 1a. and 1b. of Government

2    Exhibit 1401:

3        "1.  If called to testify as a witness, a lawyer who

4    represented Fred Daibes in another matter ('Daibes's counsel')

5    would testify as follows:

6        "On or about October 30, 2018, indictment No. 18 Cr.

7    655 was filed in the United States District Court for the

8    District of New Jersey, charging Fred Daibes and another

9    defendant with an alleged fraudulent lending scheme.  This

10   indictment initiated the case captioned United States v.

11   Daibes, *et ano*, criminal No. 18-655-SDW, pending in the

12   District of New Jersey ('the Daibes DNJ prosecution') which was

13   prosecuted by the U.S. Attorney's Office for the District of

14   New Jersey; and

15       "b.  Prior to the commencement of the Daibes DNJ

16   prosecution in October 2018, Daibes's counsel gave a

17   presentation to the United States Attorney for the District of

18   New Jersey, Craig Carpenito, and First Assistant United States

19   Attorney Rachael Honig, among others, during which Daibes's

20   counsel advocated against criminal charges being brought

21   against Daibes."

22       Mr. Hamill, could you please put back up Government

23   Exhibit 1304, page 1.

24   Q.  Special Agent Van Wie, directing your attention to line 10,

25   who is this message from and to?

O6kWmen1                        Van Wie - Direct

1   A.  The message is from Michael Soliman to Robert Menendez.

2   Q.  What is the date of this message?

3   A.  December 4, 2020.

4   Q.  I'm not going to ask you to read them, but do lines 2

5   through 9 reflect other communications between Soliman and

6   Menendez earlier in 2020?

7   A.  Yes.

8   Q.  Now, in line 10, could you please read just the first word

9   in the detail cell before the quotation?

10  A.  "Signal."

11  Q.  Could you please read what's reflected here as this

12  December 4, 2020, message from Soliman to Menendez?

13  A.  "Maybe now is a good time to give Wildstein a green light

14  on that U.S. Attorney story, that you'll be the person picking

15  whoever it is in conjunction with Cory.  Just know that he will

16  mention Sellinger as a short lister and he got that on his own.

17  He also has others on the list that he's wrong about, but he

18  doesn't know that."

19  Q.  Now, let's go to line 11, which is listed as three days

20  later.  On December 7, 2020, who sends Menendez a text message

21  at 4:51 p.m.?

22  A.  Philip Sellinger.

23  Q.  Could you please read what Sellinger texts Menendez?

24  A.  "Bob, I hope all is well.  Is there a convenient time for

25  you and I to have a call to catch up?  Thanks.  Philip."

O6kWmen1                          Van Wie - Direct

1   Q.  Directing your attention to line 12, can you please read

2   what's listed as Menendez's response at 5:02 p.m. that day?

3   A.  "Absolutely.  We need to do so.  How is right now?"

4   Q.  On line 13, can you please read Sellinger's response at

5   5:03 p.m.?

6   A.  Sure.

7   Q.  Moving on to line 14, what is the date and time of the text

8   on line 14?

9   A.  December 7, 2020, at 6:40 p.m.

10  Q.  About how long is that after that last text you just read

11  between Sellinger and Menendez?

12  A.  It was about an hour and 40 minutes or so.

13  Q.  Can you please read what a Fred Turner texts Menendez at

14  6:40 p.m.?

15  A.  "Sellinger has his meeting with Booker scheduled."

16  Q.  Directing your attention to line 15, can you please read

17  what Robert Menendez is listed as texting Philip Sellinger on

18  December 10, 2020, at 5:09 p.m.?

19  A.  Quote, "Justice In Policing Act, Justice for Victims of

20  Lynching Act.  Second Look Act.  First Step Act.  Next Step

21  Act.  Break the Cycle of Violence Act, and Emergency Community

22  Supervision Act."

23  Q.  Can you please read Sellinger's response on line 16?

24  A.  "Thank you."

25          MR. MONTELEONI:  Mr. Hamill, could you please scroll

O6kWmen1                          Van Wie - Direct

1    us down to the bottom of page 1 and the top of page 2.

2    Q.  Directing your attention, Special Agent Van Wie, to lines

3    17 through 22, whose search and web activity history is

4    reflected on these lines?

5    A.  Robert Menendez.

6    Q.  Directing your attention just to line 17, what's the date

7    and time of that entry from Menendez's search history?

8    A.  It's December 11, 2020, at 3:47 p.m.

9    Q.  Could you please read that search history entry?

10   A.  "NJ u.S. Attorney."

11   Q.  I'm not going to ask you to read them all out loud, but do

12   the next few lines reflect search and web activity history

13   concerning the U.S. Attorney's Office for the District of New

14   Jersey?

15   A.  Yes.

16          MR. MONTELEONI:  You can take us to page 2 fully,

17   Mr. Hamill.  Thank you.

18   Q.  Directing your attention to line 23, can you please read

19   what Soliman is listed as writing Menendez via Signal, just the

20   first sentence of it -- on December 14, 2020, at 4:31 p.m.?

21   A.  "Carpenito made public that he's leaving via press release

22   from DOJ."

23   Q.  Directing your attention to line 30, can you please read

24   the date?

25   A.  "December 15, 2020."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen1                          Van Wie - Direct

1   Q.  And who does Menendez call at 11:54 a.m. on December 15,
2   2020, according to this line?
3   A.  Fred Daibes.
4   Q.  How long does that call last?
5   A.  One second.
6   Q.  Directing your attention to the next line, how long does
7   Daibes's call back to Menendez at 12:25 p.m. last?
8   A.  34 seconds.
9   Q.  Directing your attention to line 32, could you please read
10  the detail cell?
11  A.  "Menendez calendar," quote, "'meeting with Phil
12  Sellinger.'"
13  Q.  What is the listed date and time of the meeting with Phil
14  Sellinger?
15  A.  2:30 p.m. to 3 p.m.
16  Q.  On what date?
17  A.  December 15, 2020.
18  Q.  How does that compare to the date and time of Menendez's
19  calls with Daibes on the previous line?
20  A.  It was the same day, approximately two hours after.
21  Q.  Special Agent Van Wie, directing your attention to line 34,
22  what is the date?
23  A.  December 17, 2020.
24  Q.  How does that date compare to the date of the calendar
25  entry we just looked at in Menendez's calendar for a meeting

1   with Phil Sellinger?

2   A.  Two days later.

3   Q.  Who is the voice mail reflected in line 34 to, according to

4   the chart?

5   A.  To Robert Menendez.

6               MR. MONTELEONI:  I'd like to play the voice mail, but

7   with the Court's permission, I'd like to ask Mr. Hamill to

8   display Government Exhibit A119-A-TR as an aid to the jury.

9               THE COURT:  You may.

10              Ladies and gentlemen, you'll remember this process

11  from the week before last.  TR indicates it's not actually in

12  evidence.  It's simply an aid, or the better way for me to say

13  it is it's an aid; if what you hear is different from what's on

14  that transcript, you should follow what you hear.

15              OK.

16              MR. MONTELEONI:  Thank you.

17              Mr. Hamill, could you please put that up and could you

18  please play Government Exhibit A119-A, when you're ready.

19              (Media played)

20              THE COURT:  Now, with the permission of the parties,

21  with the consent of the parties, I'm not going to give that

22  instruction regarding the transcripts each and every time it

23  comes up.

24              Government, consent?

25              MR. MONTELEONI:  Absolutely, your Honor.

1           MR. WEITZMAN:  Yes, your Honor.

2           MR. LUSTBERG:  No objection.

3           MR de CASTRO:  Yes, your Honor.

4           THE COURT:  All right.  So we've saved some time.

5           MR. MONTELEONI:  Mr. Hamill, can you please take us

6    back to Government Exhibit 1304, page 2.

7    Q.  Now, directing your attention back to line 34, can you

8    please read the time of the voice mail from Sellinger to

9    Menendez that we just heard?

10   A.  It was 8:59 a.m.

11   Q.  Directing your attention to line 35, can you please read

12   the date and time?

13   A.  "December 17, 2020, at 10:49 a.m."

14   Q.  How does that compare to the time of the voice mail from

15   Sellinger to Menendez that we just listened to?

16   A.  It was approximately two hours later.

17   Q.  Now, according to this line, what does Menendez do at 10:49

18   a.m.?

19   A.  He calls Philip Sellinger.

20   Q.  How long does that call last?

21   A.  Three minutes.

22           MR. MONTELEONI:  Mr. Hamill, can you please put up

23   Government Exhibit 1351.

24   Q.  Special Agent Van Wie, is this another of the charts that

25   you verified?

O6kWmen1                          Van Wie - Direct

1    A.  It is.

2    Q.  So, where it says, calls between Robert Menendez numbers

3    and Sellinger's cell phone, December 15-17, 2020, up top, what

4    does that mean?

5    A.  It means this is a list of the phone calls between Robert

6    Menendez and Philip Sellinger's cell phone, or phone number,

7    between that date range.

8    Q.  So directing your attention to the entry for December 15,

9    2020, what does that mean?

10   A.  That there were no calls with the Robert Menendez phone

11   numbers identified in the government exhibit and Philip

12   Sellinger on that date.

13   Q.  And how does that date, December 15, 2020, compare to the

14   date of the meeting with Phil Sellinger in Menendez's calendar

15   that we looked at previously?

16              THE WITNESS:  Is it possible to go back to the chart?

17              MR. MONTELEONI:  Yes.

18              Mr. Hamill, please put up to one side page 2 of

19   Government Exhibit 1304.

20              THE WITNESS:  Thank you.

21   A.  It is the same day.

22   Q.  Directing your attention to --

23              MR. MONTELEONI:  You can leave that up, Mr. Hamill.

24   Thank you.

25   Q.  Directing your attention to the entry for December 16,

O6kWmen1                        Van Wie - Direct

2020, in Government Exhibit 1351, what does that mean?

A.   Again, there were no calls between the Robert Menendez

phone numbers and Philip Sellinger's phone number on that date.

Q.   Directing your attention to the entry for December 17,

2020, what does that entry mean?

A.   There were two phone calls made between Robert Menendez and

Philip Sellinger on this date.

Q.   Directing your attention to the first one, can you please

read the quoted text at the end of the line for the 8:58 a.m.

entry?

A.   Quote, "VM deposit."

Q.   Can you please read the quote at the end of the second line

at 10:49 a.m. on December 17, 2020?

A.   Quote, "incoming."

Q.   And were those the only calls that you found on this day?

A.   Yes.

Q.   So between the date of the meeting with Phil Sellinger and

these two calls that are listed here, did you find any other

calls between Menendez and Sellinger in the Sellinger cell

phone records you reviewed?

A.   No.

         MR. MONTELEONI:  All right.  You can take down

Government Exhibit 1351, Mr. Hamill.  Thank you.

Q.   So, directing your attention, Special Agent Van Wie, to

line 36, what is the date and time of that line?

O6kWmen1                          Van Wie - Direct

1  A.  December 17, 2020, at 3:58 p.m.

2  Q.  About how long is that after the call from Menendez to

3  Sellinger that we just looked at?

4  A.  Approximately five hours.

5  Q.  About how long is that after Sellinger's voice mail to

6  Menendez earlier that morning?

7  A.  Approximately seven hours or so.

8  Q.  And now, who does Menendez send a Signal message to at 3:58

9  p.m. that day, according to these documents?

10  A.  Michael Soliman.

11           MR. MONTELEONI:  Let's look briefly at these messages.

12           Mr. Hamill, could you please put up Government Exhibit

13  A113-PH4.

14  Q.  Special Agent Van Wie, directing your attention under the

15  December 17, 2020, heading in the bottom third of the page,

16  could you please read just the first blue message that the

17  screen image reflects that Menendez wrote to Soliman?

18  A.  "Please do a little checking on Salas time as superior

19  court judge and prosecutor.  Thanks."

20  Q.  Is this the same message that you just testified was sent

21  several hours after the call between Menendez and Sellinger we

22  just looked at?

23  A.  Yes.

24           MR. WEITZMAN:  Your Honor, I object.  We've already

25  gone through these documents with a witness.  I'm not

O6kWmen1                        Van Wie - Direct

1    understanding why we're doing it again.

2              MR. MONTELEONI:  Placing these in time, and I was

3    about to move off of this document.

4              THE COURT:  Mr. Weitzman is correct here.  Let's try

5    to be efficient.  Move forward.

6              MR. MONTELEONI:  All right.  Let's go back to the

7    timeline.

8              Mr. Hamill, can you please put back up Government

9    Exhibit 1304 and take us to page 3.

10   Q.  Special Agent Van Wie, directing your attention to line 41,

11   what is the date?

12   A.  December 18, 2020.

13   Q.  And can you please read just the detail cell?

14   A.  "Sellinger meeting with" quote "'CB.'"

15   Q.  Directing your attention to line 42, what is the date and

16   time?

17   A.  December 18, 2020, at 12:16 p.m.

18   Q.  How does that compare to the scheduled start time of the CB

19   meeting on Sellinger's calendar on the previous line?

20   A.  It was about 45 minutes later.

21             MR. MONTELEONI:  I'd like to play the voice mail.

22             Mr. Hamill, if you could please put up Government

23   Exhibit A119-B-TR and play Government Exhibit A119-B, when

24   you're ready.

25             (Media played)

O6kWmen1                         Van Wie - Direct

1            MR. MONTELEONI:  Let's go back to the chart.  If you

2    could put back up page 3 of Government Exhibit 1304,

3    Mr. Hamill.

4    Q.  Special Agent Van Wie, directing your attention to line 46,

5    can you please read the date?

6    A.  "December 21, 2020."

7    Q.  And about how long is that after the voice mail that we

8    just listened to?

9    A.  It's about three days.

10           MR. MONTELEONI:  Let's look at the message itself.

11           Mr. Hamill, can you please put up Government Exhibit

12   A118-1 and take us to page 3 and expand the top two texts.

13           MR. WEITZMAN:  Again, objection, your Honor.  I think

14   we've already reviewed this document with another witness.

15           MR. MONTELEONI:  We have not looked at this document.

16           THE COURT:  Just a moment.

17           I personally don't remember one way or the other.

18   Proceed.

19           MR. MONTELEONI:  Thank you.

20   Q.  Special Agent Van Wie, directing your attention to the top

21   text, can you please read what Sellinger writes to Menendez on

22   December 21, 2020?

23   A.  "Good morning, Bob.  Is there a convenient time for you to

24   catch up re my meeting with Cory?  Thanks, Philip."

25   Q.  Directing your attention to the next message in the chain,

1    what day does Menendez respond in this text message?

2    A.   December 28, 2020.

3    Q.   About how long is that after Sellinger's previous text?

4    A.   It's about one week.

5    Q.   About how long is that after Sellinger's December 18 voice

6    mail saying, I have my call with Cory that we just listened to?

7    A.   About ten days.

8    Q.   Can you please read Menendez's response on December 28?

9    A.   "Good morning.  Just called.  Let me know times when you

10   might be available today.  Thanks."

11              MR. MONTELEONI:  Let's return to the timeline.

12              Mr. Hamill, can you please put back up Government

13   Exhibit 1304, page 3.

14   Q.   Special Agent Van Wie, directing your attention to line 50,

15   can you please read the date?

16   A.   "January 5, 2021."

17   Q.   Could you please read the detail cell?

18   A.   "U.S. Attorney for District of New Jersey Craig Carpenito

19   resigns.  Rachael Honig becomes acting U.S. Attorney."

20   Q.   Directing your attention to the next line, where it

21   reflects that Soliman writes, Wildstein has been told by

22   sources that it's Suarez, what is the date of that message on

23   that line?

24   A.   January 8, 2021.

25              MR. MONTELEONI:  Now, let's go back to one of the

1    source documents that we looked at previously.

2           Mr. Hamill, could you please put back up Government

3    Exhibit 1401, page 1.  And if you could expand just paragraph 1

4    and put up page 3 on the other side so I can read paragraphs 1

5    and 1g:

6           "If called to testify as a witness, a lawyer who

7    represented Fred Daibes in another matter ('Daibes's counsel')

8    would testify as follows.

9           "g.  A list of potential candidates for the position

10   of United States Attorney for the District of New Jersey began

11   to circulate in legal industry press in or about January 2021.

12   The list included, among others, Esther Suarez, the Hudson

13   County prosecutor, and Philip R. Sellinger, a lawyer in private

14   practice.  Daibes expressed to Daibes's counsel that he thought

15   Suarez, whom he said he knew, might be preferable and more

16   amenable to a favorable resolution of his pending criminal

17   case.  Daibes informed his counsel that he preferred Suarez to

18   Sellinger because he knew her and thought she would respond

19   more favorably to his arguments.  Daibes's counsel did not

20   express to Menendez or anyone on his staff whether Daibes

21   preferred one candidate or another for the U.S. Attorney

22   position."

23           Let's return to the timeline.

24           Mr. Hamill, could you please put back up Government

25   Exhibit 1304 and take us to page 3.

O6kWmen1                          Van Wie - Direct

Q.  Special Agent Van Wie, directing your attention to line 54,

where it says, Fred also had a good idea on how to handle Phil,

could you please read just the date?

A.  "January 26, 2021."

Q.  Directing your attention to line 55, can you please read

what Sellinger writes to Menendez on January 28, 2021?

A.  "Bob, are you available for a call tomorrow afternoon?

Thanks.  Philip."

          MR. MONTELEONI:  Mr. Hamill, can you please take us to

page 4 of Government Exhibit 1304.

Q.  Directing your attention to line 59, can you please read

what Menendez texts to Sellinger on January 29, 2021, at 12:53

p.m.?

A.  "Called you.  Let me know when you're free."

Q.  Now, about how long is that after the Signal message we

just looked at on January 26, where Soliman wrote, Fred also

had a good idea on how to handle Phil?

A.  About three days later.

Q.  Skipping down to line 64, can you please read the

description of what Menendez sends to President Biden on March

23, 2021?

A.  "A letter of recommendation for Sellinger as ambassador.

Country not specified."

Q.  Directing your attention to line 65, can you please read

what Menendez texts Fred Turner on April 20, 2021?

O6kWmen1                          Van Wie - Direct

1    A.  "Hi.  Hope all is well.  Do you recall what country is Phil

2    Sellinger was looking at?"

3    Q.  Directing your attention to the next line, can you please

4    read Turner's response?

5    A.  "Give me a few minutes and I'll find his email to me, but

6    he was open to several, not just one."

7    Q.  Directing your attention to line 67, can you please read

8    just the first four lines of the text from Fred Turner to

9    Menendez?

10   A.  "Fred, below is my initial list.  I look forward to

11   chatting shortly.  Best, Philip."

12   Q.  I'm not going to ask you to read them all, but are there a

13   list of countries after that, some with asterisks?

14   A.  Yes.

15   Q.  Please read the last line starting, asterisk indicates.

16   A.  "Indicates countries I have visited."

17   Q.  Directing your attention to line 68, can you please read

18   just the description of the voice message that this line

19   reflects Sellinger leaves for Menendez at 2 p.m. on April 20,

20   2021?

21   A.  "Hey, Bob.  Philip Sellinger.  Hope all is well.  If you

22   could give me a call at your convenience, I'd appreciate it.

23   My cell you've got, and I'm free all afternoon today.  Whatever

24   time works for you.  Thanks.  Bye-bye."

25   Q.  Directing your attention to the next line, can you please

O6kWmen1                          Van Wie - Direct

1    read the text that Sellinger sends to Menendez at 2:01 p.m. on

2    April 20, 2021?

3    A.   "Hi, Bob.  Hope all is well.  Do you have a few minutes to

4    speak sometime today?  Thanks.  Philip."

5          MR. MONTELEONI:  Mr. Hamill, could you please take us

6    to page 5 of Government Exhibit 1304.

7    Q.   So, directing your attention to line 75, to Menendez's

8    message to Soliman, saying, also beginning to do a plan B just

9    in case, when did Menendez send that message?

10   A.   April 20, 2021, at 4:57 p.m.

11   Q.   When was that in comparison to Sellinger's 2:01 p.m. text

12   to Menendez saying, do you have a few minutes to speak sometime

13   today?

14   A.   That was about three hours later.

15   Q.   Directing your attention to line 77, can you please read

16   what Soliman writes to Menendez on April 29, 2021?

17   A.   "If Philip looks for guidance, can I guide him?"

18   Q.   On the next line, can you please read what's listed as

19   Menendez's reply?

20   A.   "Yes."

21   Q.   What day were these Signal messages sent?

22   A.   April 29, 2021.

23   Q.   How does that compare with the date of Menendez's message

24   to Soliman, saying, also beginning to do a plan B, just in

25   case, on line 75?

O6kWmen1                          Van Wie - Direct

1    A.  It was about nine days later.

2    Q.  Directing your attention to line 80, reflecting that

3    Soliman sends Menendez a Signal message saying, also I think if

4    you call Sellinger, you'll be comfortable with what he says,

5    what's the date and time of that message?

6    A.  May 2, 2021, at 10:17 p.m.

7    Q.  And directing your attention to line 81, what's listed as

8    Menendez's response?

9    A.  "OK.  We'll talk."

10   Q.  Directing your attention to line 83, can you please read

11   what Menendez texts to Sellinger on May 20, 2021, at 8:28 p.m.?

12   A.  "Hi, Phil.  Might you be available to play golf on Saturday

13   afternoon?  I have to check my club availability if you are."

14   Q.  And about when was that in relation to the May 2 Signal

15   message from Soliman to Menendez saying, also I think if you

16   call Sellinger, you'll be comfortable with what he says?

17   A.  It was about 18 days later.

18           MR. MONTELEONI:  Mr. Hamill, can you please put up to

19   one side Government Exhibit 10J-4.

20   Q.  Special Agent Van Wie, directing your attention to the top,

21   what year is this calendar for?

22   A.  2021.

23           MR. MONTELEONI:  Mr. Hamill, could you please expand

24   May.

25   Q.  Special Agent Van Wie, what day of the week was May 22,

1  2021?

2  A.  It was a Saturday.

3          MR. MONTELEONI:  You can take the calendar down,

4  Mr. Hamill.  Thank you.

5  Q.  Special Agent Van Wie, I'm not going to ask you to read the

6  next few texts, but directing your attention to line 87, on May

7  23, 2021, can you please read what Sellinger writes to

8  Menendez?

9  A.  "Bob, yesterday was fun.  My 60 degree wedge is missing

10  from my bag.  John may have inadvertently placed it in yours.

11  Would you ask your pro shop to check your bag?  If it is there,

12  I can make arrangements to pick it up.  Thanks.  Philip."

13  Q.  When Sellinger writes, yesterday was fun, when was that in

14  relation to Saturday, May 22, 2021?

15  A.  A day later.

16          MR. MONTELEONI:  Mr. Hamill, can you please put back

17  up Government Exhibit 1401, page 1, and expand paragraph 1 on

18  one side, and then if you could put on the other side the

19  bottom of page 3 and the top of page 4 also of the same

20  document.  And if you could expand paragraph 1i.

21          So, I'll now read paragraphs 1 and 1i:

22          "If called to testify as a witness, a lawyer

23  representing Fred Daibes in another matter ('Daibes's counsel')

24  would testify as follows:

25          "i.  Daibes's counsel and Daibes discussed Sellinger

1   in approximately late spring or early summer of 2021 after

2   Suarez's candidacy did not appear likely to be successful.

3   Daibes told Daibes's counsel that he had seen Sellinger at

4   Menendez's wedding, though he had not spoken to him and he had

5   no personal relationship with Sellinger.  Daibes's counsel told

6   Daibes that he had known Sellinger a long time and that

7   Daibes's counsel would reach out to Sellinger about Daibes's

8   case if Sellinger was appointed to be the United States

9   Attorney for the District of New Jersey."

10          Let's return to the chart.

11          Mr. Hamill, could you please put up Government Exhibit

12  1304, page 7.

13  Q.  Directing your attention to line 110, can you please read

14  what a Jason Tuber texts Menendez at 3:21 p.m. on June 30,

15  2021?

16  A.  "No red flags from WH counsel's office for Phil's

17  interview.  DOJ will circle back with the WH in the next few

18  days and, barring anything unexpected, begin the full FBI

19  background check."

20  Q.  Directing your attention to line 111, can you please read

21  what Menendez writes to Sellinger at 3:35 p.m. that day?

22  A.  "Hi.  I hear you had a good interview today."

23  Q.  Directing your attention to line 112, can you please read

24  Sellinger's response at 4:24 p.m.?

25  A.  "Hi.  Thanks for the email.  I thought it went well, but

O6kWmen1                          Van Wie - Direct

1    I'm glad to hear there was positive feedback.  Alice was very

2    helpful in my preparation."

3    Q.  Directing your attention to line 113, without reading it

4    all out again, what does Menendez send to Sellinger at 4:45

5    p.m. that day?

6    A.  Appears to be a screenshot of the text message he received

7    from Jason Tuber.

8              MR. MONTELEONI:  Mr. Hamill, could you please take us

9    a few months ahead to page 13 of Government Exhibit 1304.

10   Q.  Now, directing your attention to lines 176 and 177, whose

11   search history do they reflect?

12   A.  Robert Menendez.

13   Q.  What day were those searches run?

14   A.  October 18, 2021.

15   Q.  And about when are those searches, which are for how much

16   is one kilo of gold and how much is one kilo of gold worth, in

17   comparison to the text messages depicted right below, where

18   Nadine Menendez says she ran downstairs to get a doughnut and

19   Daibes said, he made me take the box with me, in lines 178 and

20   179?

21   A.  Around 20 or so minutes.

22   Q.  Which is 20 or so minutes before the other?

23   A.  The search history was about 20 or so minutes before the

24   text messages.

25   Q.  And now could you please note the time of that first search

O6kWmen1                          Van Wie - Direct

1    that's listed on line 176?

2    A.   11:12 a.m.

3         MR. MONTELEONI:   Mr. Hamill, could you please put up

4    Government Exhibit A132.

5    Q.   Directing your attention to the top line, Special Agent Van

6    Wie, can you please read the display name of the user that this

7    text here is from, the "from" in the party column, on the

8    "from" line on the top search --

9    A.   Bob Menendez.

10   Q.   -- top text?

11   A.   Sorry.

12        Bob Menendez.

13   Q.   Do you recognize that phone number that it is from as one

14   of the numbers associated with Robert Menendez in the

15   attribution chart, Government Exhibit 1305?

16   A.   Yes.

17   Q.   And could you please read the time of the message?

18   A.   "11:11 a.m."

19   Q.   How does that time compare to the time of the search for,

20   how much is one kilo of gold, on line 176, which you just

21   testified was 11:12 a.m.?

22   A.   One minute earlier.

23        MR. MONTELEONI:   Let's look at what's attached to this

24   text message at 11:11 a.m.

25        Mr. Hamill, could you please put up Government Exhibit

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A132-A.

2  Q.  Special Agent Van Wie, did you verify that this letter was

3  attached to the message that we just looked at?

4  A.  Yes.

5  Q.  And directing your attention to the top letterhead, whose

6  letterhead is this on?

7  A.  Robert Menendez.

8  Q.  I'm not going to ask you to read all of this, but does the

9  first sentence reflect that this is a letter of recommendation?

10  A.  Yes.

11  Q.  Directing your attention to the bottom, who signed this

12  letter of recommendation?

13  A.  Appears to be Robert Menendez.

14          MR. MONTELEONI:  All right.  Now, Mr. Hamill, could

15  you please show the witness a document that's been marked for

16  identification as Government Exhibit 1337.

17  Q.  Special Agent Van Wie, is this another document that you

18  verified?

19  A.  It is.

20  Q.  Who prepared the first draft of this document?

21  A.  The U.S. Attorney's Office.

22  Q.  Did you collect some additional content to be added to this

23  document in the process of verifying it?

24  A.  Yes.

25  Q.  Did you actually input the additional content yourself?

1    A.  No.

2    Q.  Did you verify that all of the information in the final

3    draft of this document is contained in the exhibits that are

4    cited in this document?

5    A.  Yes.

6               MR. MONTELEONI:  The government offers Government

7    Exhibit 1337.

8               THE COURT:  Admitted.

9               (Government Exhibit 1337 received in evidence)

10              MR. MONTELEONI:  Mr. Hamill, could you please publish.

11   Q.  Special Agent Van Wie, what is this?

12   A.  This is a collection of search history taken from both the

13   Bob Menendez cell phone in Government Exhibit A125 as well as

14   the Gmail account in A301.

15   Q.  So where it talks about A301, have you seen that document,

16   A301?

17   A.  I have.

18   Q.  Can you describe, what kind of document is that?

19   A.  It's a large document containing search history, dating

20   back many years.

21   Q.  We're not going to offer this document into evidence, but

22   have you reviewed it in preparation for testifying?

23   A.  I have.

24   Q.  About how far did it go back?

25   A.  Approximately 2008.

1  Q.  Now, have you looked through all of Government Exhibit

2  A301, the document marked for identification, Government

3  Exhibit A301, this long search history, for any searches for

4  gold?

5  A.  I have.

6  Q.  And did you find anything in that file that appeared to you

7  to be a search for the price of gold that does not appear in

8  what's now this final version of Government Exhibit 1337?

9  A.  No.

10  Q.  Now, what order are the searches in Government Exhibit 1337

11  in?

12  A.  It's in reverse chronological order.

13          MR. MONTELEONI:  Mr. Hamill, could you please take us

14  to page 18.

15  Q.  Special Agent Van Wie, is this the last page of the

16  document?

17  A.  It is.

18  Q.  What generally are these earliest searches listed in

19  Government Exhibit 1337 concerning?

20  A.  Various items of jewelry.

21  Q.  What's the date of these first searches?

22  A.  April 8, 2018.

23          MR. MONTELEONI:  Mr. Hamill, could you please take us

24  to page 11 of Government Exhibit 1337.

25  Q.  Directing your attention to April 5 of 2019, at 6:55:48

O6kWmen1                        Van Wie - Direct

1  p.m. UTC, what are the search terms that appear there?

2  A.  What is the spot price of gold?

3  Q.  So when you were reviewing Government Exhibit A301, that

4  whole search history file you described, did you find any other

5  searches for the price of gold itself rather than things made

6  out of gold that were earlier than this April 5, 2019, search?

7  A.  No.

8          MR. MONTELEONI:  Mr. Hamill, could you please just

9  scroll us up until we get to May 23, 2021, at 7:20:21 p.m. UTC.

10 We're still in 2019.

11         That's great, Mr. Hamill.  Thank you.

12         Special Agent -- actually, can you scroll us up a

13 little bit farther, Mr. Hamill.

14     All right.  That's good.

15 Q.  Special Agent Van Wie, directing your attention to this

16 7:20:21 p.m. UTC search on May 23, 2021, can you please read

17 those search terms at that time?

18 A.  "How much is 100G of gold worth?"

19 Q.  Now, did you find in your review of all that search history

20 file, Government Exhibit A301, any other searches for the price

21 of a specific quantity of gold that were earlier than this May

22 23, 2021, search?

23 A.  No.

24 Q.  Can you please read the search terms of the next three

25 searches in order?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen1                          Van Wie - Direct

1    A.  "One gram of gold in dollars.

2        "100 grams of gold price.

3        "One ounce of gold."

4            MR. MONTELEONI:  If we could scroll up through the

5    next few searches on May 23, 2021, and stop when we get to

6    9:48:08 p.m. UTC, Mr. Hamill.

7            OK.  That's perfect.  Thank you.

8    Q.  Special Agent Van Wie, I'm not going to ask you to read

9    through all those search terms we just scrolled through, but do

10   they generally concern gold coins?

11   A.  Yes.

12   Q.  Directing your attention to the next four sets of search

13   terms, starting at 9:48:08 p.m. UTC on May 23, 2021, could you

14   please read those four sets of search terms in order?

15   A.  "One ounce of gold.

16       "One ounce of gold in grams.

17       "One gram of gold in dollars.

18       "One gram of gold in dollars."

19           MR. MONTELEONI:  Mr. Hamill, could you please scroll

20   us up through the next few searches.

21           Stop there.  That's perfect, Mr. Hamill.

22   Q.  So, directing your attention to the 9:59:51 p.m. UTC

23   search, is that another gold coin search?

24   A.  It is.

25   Q.  And directing your attention to May 29, 2021, Special Agent

O6kWmen1                         Van Wie - Direct

1   Van Wie, can you please read the search terms there?

2   A.  "How much is an ounce of gold?"

3           MR. MONTELEONI:  Mr. Hamill, could you please take us

4   to page 3 of Government Exhibit 1337.

5   Q.  Directing your attention near the top of the page, on

6   October 18, 2021, are these the searches that we were just

7   looking at on the timeline a minute after that letter of

8   recommendation?

9   A.  Yes.

10  Q.  And about how close in time are they to those texts we

11  talked about between Nadine Menendez and Daibes about

12  doughnuts?

13          THE WITNESS:  Go back to the chart for a minute?

14          MR. MONTELEONI:  Yes.  If you could bring up the chart

15  to one side, Mr. Hamill, and take us to page 13.

16  A.  They were about 20 to 25 minutes before those text

17  messages.

18          MR. MONTELEONI:  All right.  Thank you.

19          You can take down Government Exhibit 1304, Mr. Hamill.

20  Thank you.

21  Q.  This document reflects that these search terms reference a

22  kilo of gold.  Did you see any searches in Menendez's Google

23  search history prior to October 18, 2021, referencing a kilo of

24  gold?

25  A.  No.

O6kWmen1                          Van Wie - Direct

1   Q.  Is a kilo bigger or smaller than an ounce?

2   A.  Bigger.

3   Q.  Is a kilo bigger or smaller than a hundred grams?

4   A.  Bigger.

5   Q.  Did you see any searches in Menendez's Google search

6   history prior to October 18, 2021, referencing quantities of

7   gold greater than a kilo?

8   A.  No.

9            MR. MONTELEONI:  Let's return to the timeline.

10           Mr. Hamill, please put back up Government Exhibit

11  1304, page 13.

12  Q.  All right.  Special Agent Van Wie, directing your attention

13  to line 181, can you please read the date?

14  A.  It's October 25, 2021.

15  Q.  Who is this message to?

16  A.  It's to Robert Menendez.

17           MR. MONTELEONI:  Let's look at this message to Robert

18  Menendez.

19           Mr. Hamill, can you please put up Government Exhibit

20  A111-PH1, page 1.

21  Q.  Special Agent Van Wie, directing your attention to the top,

22  above the chat, can you please read the name that's written

23  there next to the circle with the letters FD?

24  A.  "Fred Daibes."

25  Q.  Directing your attention to the date above the picture in

O6kWmen1                          Van Wie - Direct

1   the middle of the page, can you please read that date?

2   A.  "October 25, 2021."

3          MR. MONTELEONI:  Mr. Hamill, can you please take us to

4   page 3 of Government Exhibit A111-PH1.

5   Q.  Directing your attention, Special Agent Van Wie, to the

6   image on the screen, does it appear to be a photograph of

7   computer monitor?

8   A.  Yes.

9   Q.  In the photo, can you please read the large all-caps words

10  near the top next to the crown emblem?

11  A.  Border Gold.

12  Q.  And directing your attention --

13         MR. MONTELEONI:  Mr. Hamill, can you actually expand

14  the portion that seems to be a photograph of a computer

15  monitor.  Thank you.

16  Q.  Directing your attention to the image to the right on the

17  web page, under the image of the gold bar, can you please read

18  the line of gray text?

19  A.  "One kilo gold bar."

20  Q.  Directing your attention one line down, after the words "as

21  low as," can you please read the dollar figure after as low as?

22  A.  "$59,431.20."

23         MR. MONTELEONI:  Let's return to the chart.

24         Mr. Hamill, can you please take us back to page 13 of

25  Government Exhibit 1304.

O6kWmen1                          Van Wie - Direct

1    Q.  Directing your attention to line 181 on October 25, 2021,

2    what is that message we just looked at in relation to

3    Menendez's search for, how much is one kilo of gold worth?

4    A.  It was about one week later.

5    Q.  When is that in relation to Nadine Menendez's text to Fred

6    Daibes saying, I ran downstairs to get a glazed doughnut; my

7    perfect husband said he did not keep the box of doughnuts?

8    A.  It was also one week later.

9             MR. MONTELEONI:  Mr. Hamill, can you please scroll us

10   down to the top of page 14 and the bottom of 13.

11   Q.  Special Agent Van Wie, directing your attention to line

12   182, on October 25, 2021, at 12:38 p.m., who texts Fred Daibes?

13   A.  Nadine Menendez.

14   Q.  Could you please read what Nadine Menendez texts Daibes

15   then?

16   A.  "Master Fred, this very, very sick friend was so looking

17   forward to a glazed doughnut today.

18       "Sorry we missed dinner last night.  I couldn't lift my

19   head off the pillow.

20       "I told my perfect husband to meet you for dinner, but he

21   said he wanted to take care of me.

22       "Have a great week."

23   Q.  How long is it that Nadine Menendez texted saying, this

24   very, very sick friend was so looking forward to a glazed

25   doughnut today, after Daibes sent Menendez a picture of a kilo

O6kWmen1                          Van Wie - Direct

1    gold bar using Signal?

2    A.  About 20 minutes later.

3    Q.  Directing your attention to lines 183 and 184, can you

4    please read what Daibes writes to Nadine in those two 12:53

5    p.m. texts, in order?

6    A.  "He's a good man your husband.  Hope to see you soon.

7        "Next time I will bring you a doughnut."

8    Q.  Directing your attention to line 185, can you please read

9    Nadine's response at 12:56 p.m.?

10   A.  "Choukran, yes, I'm very lucky.  You are two of a kind in

11   this universe."

12       MR. MONTELEONI:  Mr. Hamill, could you please take us

13   a few months ahead to page 15 of Government Exhibit 1304.

14   Q.  Special Agent Van Wie, directing your attention to the top

15   of the page, line 192, could you please read the date of that

16   entry?

17   A.  "November 26, 2021."

18   Q.  Could you please read the detail cell for that line?

19   A.  "Daibes rejects plea offer from U.S. Attorney's Office for

20   the District of New Jersey in United States v. Daibes.  Begins

21   more focused preparations for trial in advance of jury

22   selection scheduled for on or about January 11, 2022."

23   Q.  Directing your attention to line 197, could you please read

24   the date?

25   A.  "December 10, 2021."

1  Q.  Could you please read the detail cell?

2  A.  "U.S. Attorney's Office for the District of New Jersey

3  offers Daibes another plea deal, which Daibes rejects, in or

4  about mid-December."

5  Q.  Directing your attention to line 198, whose search history

6  does this reflect?

7  A.  Robert Menendez.

8  Q.  Could you please read the search terms Menendez uses on

9  December 13, 2021?

10  A.  "Gold price today."

11          MR. MONTELEONI:  Mr. Hamill, could you please put up

12  Government Exhibit 10C-3.

13  Q.  So, Special Agent Van Wie, directing your attention under

14  the browser bar and under the top banner of the web page to the

15  small top text starting December, on the left, can you please

16  read that line?

17  A.  "Menendez, Booker" -- oh, I'm sorry.  The date?

18  Q.  Sure.  Read the date first.

19  A.  "December 7, 2021."

20  Q.  And yes, could you please read now that large bolded

21  heading right below the December 7, 2021 date?

22  A.  "Menendez, Booker applaud confirmation of Philip R.

23  Sellinger as U.S. Attorney for the District of New Jersey."

24          MR. MONTELEONI:  Mr. Hamill, could you please take us

25  back to Government Exhibit 1304 and put up page 15.

1    Q.   Directing your attention to line 199, could you please read

2    the date?

3    A.   "December 16, 2021."

4    Q.   Could you please read the detail cell?

5    A.   "Philip Sellinger sworn in as U.S. Attorney for the

6    District of New Jersey."

7    Q.   Directing your attention to line 202, can you please read

8    what Menendez sends to Soliman via Signal?

9    A.   "Did the person Phil named get disclosed?"

10   Q.   Directing your attention to line 203, can you please read

11   Soliman's response?

12   A.   "Nothing yet.  I've been searching online and haven't seen

13   any announcements."

14   Q.   Directing your attention to lines 204 through 209, whose

15   search history and web activity history is reflected there?

16   A.   Robert Menendez.

17   Q.   What is the date of the searches and web activity on these

18   lines?

19   A.   December 18, 2021.

20   Q.   On line 204, can you please read the search terms that

21   appear in Menendez's search history?

22   A.   "Philip Sellinger, U.S. Attorney."

23   Q.   Directing your attention to lines 205 to 207, I'm not going

24   to ask you to read those URLs all out, but does each of them

25   reflect that Menendez visited a web page with USAO NJ and

O6kWmen1                          Van Wie - Direct

1   either divisions or administrative division in the URL?

2   A.  Yes.

3   Q.  Directing your attention to line 208, can you please read

4   the search terms Menendez used at 8:34 p.m. that day?

5   A.  "Border Gold."

6   Q.  Directing your attention to line 209, can you please read

7   the search terms Menendez used at 8:35 p.m. that day?

8   A.  "Border Gold.  One kilo gold bar."

9   Q.  About how long was Menendez's search for Border Gold, one

10  kilo gold bar after Menendez's search for Philip Sellinger,

11  U.S. Attorney?

12  A.  A little over five hours.

13  Q.  Directing your attention to line 210, what is the date?

14  A.  December 22, 2021.

15  Q.  About how long is that after Menendez's search for Border

16  Gold one kilo gold bar?

17  A.  About four days.

18  Q.  Can you please read the description of what an Erica

19  Jackson emails to Philip Sellinger and others?

20  A.  "Formal notice that Philip Sellinger is recused from United

21  States v. Daibes, 18-cr-655 (SDW)."

22  Q.  And directing your attention -- comparing that to line 199,

23  about how long is that after Sellinger's December 16, 2021,

24  swearing in?

25  A.  That was about six days.

O6kWmen1                          Van Wie - Direct

1   Q.  Directing your attention now to line 211, can you please

2   read the date and time that's reflected here on line 211?

3   A.  "December 23, 2021, at 1:53 p.m."

4   Q.  Could you please read the detail cell?

5   A.  "Daibes trial scheduled for 1/11/22 adjourned."

6   Q.  Directing your attention to line 212, can you please read

7   what Fred Daibes texts Nadine Menendez at 9:09 p.m. that

8   evening?

9   A.  "That's great.  You both need a good relaxing night.

10  Enjoy.  How is he feeling?"

11  Q.  Directing your attention to line 213, can you please read

12  Nadine Menendez's response?

13  A.  "Better having heard the date is postponed.  He is fixated

14  on it."

15  Q.  So where Nadine Menendez writes, better having heard the

16  date is postponed, he is fixated on it, about how long was that

17  text message sent after the trial date in Daibes's criminal

18  case was adjourned?

19  A.  It was later that evening.

20        MR. MONTELEONI:  Mr. Hamill, could you please scroll

21  us down so that we're at the bottom of page 15, top of page 16.

22        That's good.  Thank you.

23  Q.  Special Agent Van Wie, directing your attention to line

24  214, can you please read Daibes's reply to Nadine Menendez at

25  9:15 p.m.?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen1                          Van Wie - Direct

1    A.  "Good.  I don't want him to be upset over it.  This is not

2    his fault.  He was amazing in all he did.  He's an amazing

3    friend and as loyal as they come.  How is the shoulder?  Is he

4    sleeping?  Let me know if I can get him a recliner.  It helped

5    me sleep."

6    Q.  Where Daibes wrote, this is not his fault, he was amazing

7    in all he did, does Daibes explain what he did?

8    A.  No.

9    Q.  Where Daibes writes, let me know if I can get him a

10   recliner, is that in the same text message where Daibes writes,

11   he was amazing in all he did?

12   A.  Yes.

13   Q.  Directing your attention to line 215, what date was that

14   text sent?

15   A.  December 25, 2021.

16   Q.  Can you please read what Daibes writes to Nadine Menendez

17   on December 25, 2021?

18   A.  "Thank you, my sister.  I'm fine.  Talk to SueSue and get

19   Bob the chair, especially for when he comes home from hospital.

20   Merry Christmas."

21   Q.  Directing your attention to line 216, can you please read

22   what Nadine Menendez writes to someone named SueSue Pellegrino?

23   A.  "The recliner's arrived.  I will get some sleep tonight,

24   and thank you very, very much again in the morning.  It moves

25   the seat all the way up so it's easy for him to get up without

O6kWmen1                          Van Wie - Direct

1    putting pressure on the right arm.  Thank you.  And if you need

2    anything dropped off so you don't have to leave the house, let

3    me know.  I will gladly do it."

4    Q.  Directing your attention to line 218, can you please read

5    what Nadine Menendez texts to Daibes on January 2 of 2022, the

6    quoted portioned?

7    A.  "Thank you, Fred.  He finally fell asleep at 6:30 a.m. to

8    noon.  We went for a very slow walk around the block, and he

9    came back and just sat in the recliner.  Thank you so much for

10   everything.  I text SueSue during the week that the reclining

11   chair has been a lifesaver.  I don't know what he would have

12   done without it."

13   Q.  Directing your attention to line 224, on January 21, 2022,

14   at 2:48 p.m., who does Menendez call?

15   A.  Philip Sellinger.

16   Q.  How long does that call last?

17   A.  34 seconds.

18   Q.  Directing your attention to line 227, at 4:51 p.m. that

19   day, who calls Menendez?

20   A.  Philip Sellinger.

21   Q.  How long does that call last?

22   A.  Four minutes and 35 seconds.

23   Q.  Directing your attention to the next line, is that another

24   short call between Sellinger and Menendez a few minutes later?

25   A.  Yes.

O6kWmen1                          Van Wie - Direct

1   Q.  Directing your attention to lines 229 to 232, whose search

2   and web activity history is reflected on these lines?

3   A.  Robert Menendez.

4   Q.  Directing your attention to line 229, what's the date and

5   time on that search activity?

6   A.  January 21, 2022, at 7:14 p.m.

7   Q.  How does that compare with the time of Menendez's calls

8   with Sellinger that afternoon?

9   A.  Approximately two hours later.

10  Q.  Could you please read the search terms Menendez entered at

11  7:14 p.m., as reflected on the chart?

12  A.  "Vikas Khanna, attorney."

13  Q.  I'm not going to ask you to read the whole URLs on the next

14  two lines, but do the next two lines reflect that Menendez

15  visited LinkedIn.com pages with Vikas Khanna in the title?

16  A.  Yes.

17  Q.  And by the way, what is LinkedIn?

18  A.  It's a professional profile website where people put their

19  work experience.

20  Q.  Directing your attention to line 233, who does Nadine

21  Menendez call on January 23, 2022?

22  A.  I'm sorry.  Could you repeat the question?

23  Q.  On line 233, who does Nadine Menendez call in this January

24  23, 2022, entry?

25  A.  Fred Daibes.

O6kWmen1                         Van Wie - Direct

1    Q.  How long does that call last?

2    A.  One minute.

3    Q.  Directing your attention to line 235, what's the date and

4    time of that call?

5    A.  January 24, 2022, at 10:05 a.m.

6    Q.  Who calls Nadine Menendez then?

7    A.  John Pilot.

8    Q.  About how long does that call last?

9    A.  34 seconds.

10   Q.  Directing your attention to line 236, who does Nadine

11   Menendez call?

12   A.  John Pilot.

13   Q.  About how long does that call last?

14   A.  35 seconds.

15           MR. MONTELEONI:  Mr. Richenthal, can you please put up

16   Government Exhibit 2A-16 on the board.

17           And while he's doing that, Mr. Hamill, could you

18   please scroll us down to the bottom of page 16, top of page 17.

19           That's great, Mr. Hamill.  Thank you.

20           THE COURT:  Why don't you find a logical breaking

21   point for me to give the jury its break.

22           MR. MONTELEONI:  Yes, your Honor.  A few more

23   questions and it will be a good point.

24           THE COURT:  Go ahead.

25   BY MR. MONTELEONI:

O6kWmen1                          Van Wie - Direct

1   Q.  Directing your attention to line 237, who does Nadine

2   Menendez text at 11:56 a.m.?

3   A.  Fred Daibes.

4   Q.  About how long is that after Nadine Menendez's call with

5   John Pilot?

6   A.  About two hours.

7   Q.  Could you please read what Nadine Menendez texts to Fred

8   Daibes about two hours after her calls with John Pilot?

9   A.  "Thank you.  Christmas in January."

10  Q.  Directing your attention to line 238, who does Menendez

11  call at 1:49 p.m. on January 24, 2022?

12  A.  Vikas Khanna.

13  Q.  About how long is that call after Nadine Menendez texted

14  Fred Daibes, thank you, Christmas in January?

15  A.  It was about two hours later.

16  Q.  How long does Menendez's call to Khanna last?

17  A.  15 seconds.

18  Q.  Directing your attention to line 241, whose search history

19  is reflected there?

20  A.  Robert Menendez.

21  Q.  Can you please read the search terms Robert Menendez used

22  on January 29, 2022, as reflected on the chart?

23  A.  "Kilo of gold price."

24  Q.  About how long is it that Menendez googles, kilo of gold

25  price, after Nadine Menendez texts Fred Daibes, thank you,

O6kWmen1                              Van Wie - Direct

1    Christmas in January?

2    A.  About five days later.

3    Q.  Directing your attention to line 242, who does Menendez

4    call on January 31, 2022, at 2:02 p.m.?

5    A.  Vikas Khanna.

6    Q.  How long is that call?

7    A.  One minute and 24 seconds.

8    Q.  Directing your attention to line 243, who does Menendez

9    call at 2:07 p.m.?

10   A.  Fred Daibes.

11   Q.  About how long is it that Menendez calls Fred Daibes after

12   calling Vikas Khanna?

13   A.  About five minutes later.

14   Q.  About how long is it that Menendez calls Fred Daibes after

15   performing a Google search for kilo of gold price?

16   A.  About two days later.

17           MR. MONTELEONI:  This is a good time for the morning

18   break.

19           THE COURT:  All right.

20           Ladies and gentlemen, midmorning break, 15 minutes.

21           (Continued on next page)

22

23

24

25

O6kWmen1                          Van Wie - Direct

 1                     (Jury not present)

 2                     THE COURT:  You may step down, sir, and out, if you

 3       would.

 4                     (Witness not present)

 5                     THE COURT:  You may be seated.

 6                     Mr. Monteleoni, I take it the documents, this chart

 7       and the underlying documents have already been admitted.  Is

 8       that correct?

 9                     MR. MONTELEONI:  Now they have, yes.

10                     THE COURT:  All right.  You've got to be more

11       efficient in the presentation here.  Look, it's your direct,

12       but it's important that everyone be efficient now.  This is the

13       18th or 19th day of trial.  There's a lot that you're getting

14       that seems to me -- again, you'll ultimately decide this -- is

15       unnecessary:  34 seconds for this call, a minute for that call.

16                     Some calls you may want the time.  Two hours after

17       that, this, that.  Again, some of it you may want.  I don't

18       want to be specific, but it's clear that you want to show that

19       there's a quick turnaround from this event to that call, but

20       not as many as you're doing.  You're focusing on too many

21       leaves, not even the trees.  The details of the recliner, the

22       fact that Sellinger puts asterisks by the countries he's

23       visited, the endless back-and-forth trying to set up meetings.

24                     Technically, you don't even have to be asking all

25       these questions.  What you want to be doing is using the

O6kWmen1                          Van Wie - Direct

1    exhibits you have in your summation.

2              Now, obviously you're not going to do that for

3    everything, so you can go through some of this, but golf bags,

4    the details of the five or six back-and-forths trying to

5    arrange a meeting, what's important to you is they had a

6    meeting and it was relatively soon after this event or that

7    event:  Hi, Phil.  Might you be available, the idea is you've

8    just got to focus on what's important here.  Take the remainder

9    of this time to pare down things.  I want you to be using

10   considerably less than the time you've projected for this

11   particular direct.  I don't want to use 611.  I want you to

12   pare down your presentation.  Use the remaining time.

13             Thank you.

14             MR. MONTELEONI:  Thank you, your Honor.

15             (Recess)

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Jury entering.

 2              (Jury present)

 3              THE COURT:  You may be seated in the courtroom and

 4   Mr. Monteleoni, you may continue with your direct examination

 5   of Mr. van Wie.

 6              MR. MONTELEONI:  Thank you.

 7         Mr. Hamill can you please put up Government Exhibit

 8   1401, span paragraph 1, and then on the other side of the

 9   screen take it to the bottom of page 5 and top of page 6.

10         So, I will now read from paragraph 1, 1q and 1r:  If

11   called to testify as a witness, the lawyer who represented Fred

12   Daibes in another matter, Daibes' counsel would testify as

13   follows:

14         q.  In our about January 2022, sometime after

15   Sellinger, as U.S. Attorney, had recused himself from the case,

16   Daibes called Daibes' counsel and used the speakerphone feature

17   of Daibes' cell phone to allow Menendez to participate in the

18   call.  During that call, which lasted approximately five

19   minutes, Menendez admonished Daibes' counsel that Daibes'

20   counsel was not being aggressive enough and that Daibes'

21   counsel should push for dismissal of the Daibes D.N.J.

22   prosecution.

23      R.  At some point prior to the January 2022 call, Daibes

24   told Daibes' counsel that Menendez thought Daibes' counsel was

25   being a wuss in his approach to the Daibes D.N.J. prosecution
```

1    and should have been pressing for a dismissal.

2             Now Mr. Hamill would you please scroll down to expand

3    paragraphs 1s and 1t?

4             S.   On or about February 10, 2022, Daibes' counsel

5    made a presentation to First Assistant U.S. Attorney Vikas

6    Khanna regarding the Daibes D.N.J. prosecution, seeking a plea

7    to a misdemeanor offense with a sentence of probation.

8    Sellinger did not participate in the presentation, as he had

9    been recused from the case.   Subsequent to this presentation,

10   the U.S. Attorney's office for the District of New Jersey

11   communicated to Daibes' counsel that it would enter into an

12   agreement pursuant to which Daibes would receive a sentence of

13   probation.   Thereafter, and continuing for several months after

14   the presentation, Daibes' counsel and the U.S. Attorney's

15   office for the District of New Jersey restarted and engaged in

16   discussions about a potential resolution of the Daibes D.N.J.

17   prosecution.

18             Let's go back to the chart, Mr. Hamill.   Can you

19   please put up Government Exhibit 1304, page 17?

20   BY MR. MARK:

21   Q.   Directing your attention to line 246, Special Agent

22   van Wie, what is the date of this e-mail?

23   A.   February 17, 2022.

24   Q.   Can you please read what a Shannon Kopplin e-mails Menendez

25   as reflected in this entry?

O6K5men2                          Van Wie - Direct

1   A.  "Thank you again for contacting the committee.  Based on

2   our discussion, I advise you amend your CY 2020 financial

3   disclosure report to include your spouse's gold bars in part 3

4   as an asset."

5   Q.  What are the initials of the phrase "calendar year"?

6   A.  CY.

7   Q.  So, when is this e-mail, saying thank you for contacting

8   the committee, in relation to Menendez' January 29, 2022 search

9   for a kilo of gold price?

10  A.  Just under three weeks.

11  Q.  When is this e-mail in relation to Menendez' October 18,

12  2021 search for how much is one kilo of gold worth?

13  A.  Several months.

14        MR. MONTELEONI:  Mr. Hamill, can we now go to page 18?

15  Q.  Directing your attention to line 252, can you please read

16  the search terms appearing in Menendez' search history on

17  March 6, 2022?

18  A.  "1 kilo of gold."

19  Q.  Directing your attention to line 253, who is the sender of

20  the e-mail listed as being sent on March 8, 2022?

21  A.  Daibes' counsel.

22  Q.  Can you please read the detail cell regarding that e-mail?

23  A.  "E-mail to the court in United States v. Daibes.  'On

24  behalf of Mr. Daibes, we are extremely close to a resolution,

25  and I am very, very optimistic that, with just a bit more time,

O6K5men2                         Van Wie - Direct

1    we can get the case resolved and be prepared for him to enter a

2    guilty plea.'"

3    Q.  Directing your attention to line 256, what is the date?

4    A.  March 21, 2022.

5    Q.  Can you please read what Nadine Menendez texts Fred Daibes

6    at 5:49 p.m. on March 21, 2022?

7    A.  "I just got off the phone with David.  He is going to see

8    if he can schedule a viewing on Saturday around 11:00 a.m.  I

9    am so excited."

10   Q.  Directing your attention to line 259, can you please read

11   the text from a David Axelrad to Nadine Menendez on March 22,

12   2022, at 11:03 a.m.?

13   A.  "Hi Nadine.  It was nice speaking to you yesterday and

14   looking forward to meeting Saturday.  I'm still coordinating

15   showings and will update you.  Safe travels.  David Axelrad."

16         MR. MONTELEONI:  Can you please take us, Mr. Hamill to

17   page 19, Government Exhibit 1304?

18   Q.  Directing your attention to line 261, can you please read

19   what David Axelrad writes to Nadine Menendez at 11:12 a.m. on

20   March 28, 2022?

21   A.  "Hi Nadine.  Have you seen 550 Summit?"

22   Q.  Directing your attention to line 262, what website does

23   David Axelrad text Nadine Menendez a link from?

24   A.  Zillow.com.

25   Q.  What is Zillow.com?

O6K5men2                          Van Wie - Direct

1    A.  It is a website that lists homes for sale as well as for

2    rent.

3    Q.  Let's look.

4           MR. MONTELEONI:  Mr. Hamill, can you please put up

5    Government Exhibit 10H-2 cited in this row?

6    Q.  Special Agent van Wie, directing your attention under the

7    pictures, can you please read the street address?

8    A.  550 Summit Street.

9    Q.  How does that number and street name compare to what David

10   Axelrad texted Nadine Menendez asking if she had seen it?

11   A.  The same.

12   Q.  And above the street address and under the photo, can you

13   please read the dollar figure listed there?

14   A.  $4,700,000.

15          MR. MONTELEONI:  Mr. Hamill, can you please take us

16   back to page 19 of Government Exhibit 1304?

17   Q.  Could you please read what David Axelrad texted Nadine

18   Menendez on line 263, March 28, 2022, at 5:50 p.m.?

19   A.  "Confirmed appointments for Saturday.  550 Summit Street,

20   Englewood Cliffs, 11:00 a.m. on 4/2.  15 Schaeffer Road,

21   Alpine, 12:00 p.m. on 4/2."

22          MR. MONTELEONI:  And Mr. Hamill, can you please take

23   us ahead, briefly, to page 21, Government Exhibit 1304?

24   Q.  Directing your attention to line 294, can you please read

25   what David Axelrad writes to Nadine Menendez on April 1, 2022?

O6K5men2                                Van Wie - Direct

1  A.  "Hi Nadine.  See you tomorrow at 11:00 a.m., 550 Summit

2  Street, Englewood Cliffs."

3  Q.  Directing your attention to line 297, can you please read

4  what Nadine Menendez writes to David Axelrad on April 5, 2022?

5  A.  "Good morning, David.  Sorry it took so long for me to say

6  thank you for everything you did this weekend and last.  I hope

7  to have an answer for you when we get back in two weeks."

8          MR. MONTELEONI:  Let's go back in time, Mr. Hamill, to

9  page 19.

10  Q.  Special Agent van Wie, directing your attention to

11  line 264, can you please read what Nadine Menendez texts Fred

12  Daibes at 9:50 a.m. on March 30, 2022?

13  A.  "Good morning, Fred.  What time woks for you today and

14  where?"

15  Q.  Directing your attention to line 265, can you please read

16  Fred Daibes' response to Nadine at 9:51 a.m.?

17  A.  "12:00 River Palm."

18  Q.  Directing your attention to line 269, can you please read

19  what Nadine writes to Fred Daibes at 1:48 p.m.?

20  A.  "Thank you, Fred."  Followed by emoticons.

21  Q.  What typeface are the words "thank you" in?

22  A.  All caps.

23  Q.  How long did Nadine Menendez send "Thank you, Fred" and

24  those emojis, after the 12:00 p.m. time that appeared in Fred

25  Daibes' message that we just looked at?

O6K5men2                          Van Wie - Direct

1    A.  About two hours.

2    Q.  Directing your attention to line 270, can you please read

3    what Nadine texts Daibes at 11:53 a.m. the next day, March 31,

4    2022?

5    A.  "Good morning, Fred.  Vasken just called me.  I'm going to

6    meet him at 2:00 p.m."

7    Q.  You just read:  Vasken just called me.

8         MR. MONTELEONI:  Mr. Hamill, can you please put up

9    Government Exhibit 1430, page 4?

10        I will now read paragraph 28:  The document marked for

11   identification as Government Exhibit 2A-29 is a true and

12   accurate photograph of Vasken Khorozian

13       Mr. Richenthal, can you please put Government Exhibit 2A-29

14   on the board?

15       Mr. Hamill, can you briefly publish Government Exhibit

16   2A-29?  Mr. Hamill, can you take us back to page 19, Government

17   Exhibit 1304?

18   Q.  Directing your attention back to line 271, can you please

19   read the message that Fred Daibes sends to Nadine Menendez

20   several minutes after she texts him that "Vasken just called me

21   message" that we just read?

22   A.  "Great."

23   Q.  Directing your attention to line 272, can you please read

24   Nadine Menendez' reply, which is also 11:56 a.m.?

25   A.  "Thank you for everything."

1          MR. MONTELEONI:  Now, Mr. Hamill, can you please take

2    us to page 20?

3    Q.  Directing your attention to line 273, can you please read

4    what Nadine Menendez texts to Robert Menendez at 2:26 p.m.?

5    A.  "I have a 2:00 p.m. meeting.  Can you please call me when

6    you have a minute?"

7    Q.  Directing your attention to line 277, who calls Nadine

8    Menendez at 1:15 p.m.?

9    A.  Robert Menendez.

10   Q.  And directing your attention to line 278 does Nadine

11   Menendez call Robert Menendez back?

12   A.  Yes.

13   Q.  Directing your attention to line 279, can you please read

14   the date and time?

15   A.  March 31, 2022 at 2:04 p.m.

16   Q.  Can you please read the first sentence of the detail cell?

17   A.  "Creation time of picture of kilogram gold bars and a one

18   ounce Asahi gold bar.  Picture found on second Nadine Menendez

19   cell phone."

20   Q.  Let's look.

21          MR. MONTELEONI:  Mr. Hamill can you please put up

22   Government Exhibit B201-1A and please rotate it 90 degrees

23   counter-clockwise?  Thank you.  Now, can you please put up to

24   the side another exhibit cited in the cell, Government Exhibit

25   3D-6?

O6K5men2                              Van Wie - Direct

1    Q.  So Special Agent van Wie, can you please read the three

2    letters in the upper left corner of the first page of

3    Government Exhibit 3D-6 from the words "gold inventory"?

4    A.  FAD.

5              MR. MONTELEONI:  Now, Mr. Hamill, can you please take

6    us to page 2, and expand from the "kilo bars" heading to the

7    bottom of the page?

8    Q.  Special Agent van Wie, can you please read the folded text

9    next to "brand" right under "kilo bars"?

10   A.  Johnson Matthew, Canada.

11             MR. MONTELEONI:  Mr. Hamill, can you please expand the

12   left most gold bar in the photo from the second Nadine Menendez

13   cell phone?

14   Q.  Special Agent van Wie, can you please read the words at the

15   top center of the bar along the top faces of the diamond shape?

16   A.  Johnson Matthew.

17   Q.  Directing your attention lower on that bar, under the words

18   "1 kilo," can you please read the number starting with G?

19   A.  G 114008.

20   Q.  Directing your attention on Government Exhibit 3D-6, the

21   FAD gold inventory document under the Johnson Matthew heading,

22   directing your attention to the fourth to last serial number

23   there, how does that compare to the serial number on the gold

24   bar that you just read?

25   A.  It is the same.

1          MR. MONTELEONI:  Mr. Hamill, can you please scroll us

2    down to page 3 of Government Exhibit 3D-6?

3    Q.  Can you please read the first brand heading on this page

4    still in the "kilo bars" section before getting to the 10oz bar

5    section?

6    A.  Royal Canadian Mint.

7          MR. MONTELEONI:  Mr. Hamill, can you expand now

8    looking at the middle gold bar in the picture from the second

9    Nadine Menendez cellphone.  Can you please expand the top

10   circular emblem on that bar first?

11   Q.  Special Agent van Wie, how do the words in the top half of

12   that circle compare to the brand name that you just read?

13   A.  They are the same.

14         MR. MONTELEONI:  And Mr. Hamill, if you could now just

15   zoom out to show the whole middle gold bar?

16   Q.  Directing your attention below the words "1 kilo gold" and

17   999.9 on the bottom of this bar that is pictured here.  Can you

18   please read the number that is printed there?

19   A.  A 002006.

20   Q.  How does that number you just read compare to the serial

21   number listed under the Royal Canadian Mint heading in the FAD

22   gold inventory?

23   A.  They are the same.

24   Q.  Let's go back to the timeline.

25         MR. MONTELEONI:  Mr. Hamill, can you please take us to

1    page 21 of Government Exhibit 1304?

2    Q.  Special Agent van Wie, directing your attention to line

3    301, what is the date?

4    A.  April 14, 2022.

5    Q.  Can you please read the detail cell?

6    A.  "Daibes and the U.S. Attorney's office for the District of

7    New Jersey entered into an agreement to resolve United States

8    v. Daibes."

9    Q.  Directing your attention back a few lines to line 298,

10   Special Agent van Wie, what is the date of that entry on 298?

11   A.  April 8, 2022.

12   Q.  On that line, who calls Robert Menendez at 3:28 p.m. on

13   April 8, 2022?

14   A.  Philip Sellinger.

15   Q.  How long does that call last?

16   A.  One minute and 52 seconds.

17   Q.  It starts at about 3:28 p.m. and lasts for one minute and

18   52 seconds; about when does it end?

19   A.  Around 3:30.

20   Q.  Directing your attention to line 299, who does Menendez

21   text at 3:32 p.m.?

22   A.  Cory Booker.

23   Q.  Can you please read what Robert Menendez texted Cory

24   Booker?

25   A.  "Hey, I just want you to know that Philip Sellinger called

1    me to speak at his investiture ceremony.  I turned him down.

2    When I see you, I will explain why.  But he has been a

3    disappointment."

4    Q.  About how long is it between when Menendez gets off the

5    phone with Sellinger and when Menendez texts that to Cory

6    Booker?

7    A.  About two minutes.

8    Q.  About how long is this call and this text message from the

9    press release titled:  Menendez/Booker applaud confirmation of

10   Philip R. Sellinger as U.S. Attorney for the District of New

11   Jersey, which you just read was on December 7 of 2021?

12   A.  About four months.

13           MR. MONTELEONI:  Mr. Hamill, could you now take us

14   back a number of pages to page 4, Government Exhibit 1304?

15   Q.  Special Agent van Wie, directing your attention to line 60,

16   could you please read the date?

17   A.  January 31, 2021.

18   Q.  So about when is this now in relation to those last entries

19   you have been looking at, from April 2022?

20   A.  It is a year earlier or so.

21   Q.  Let's look at the e-mail that is cited here.

22           MR. MONTELEONI:  Mr. Hamill, can you please put up

23   Government Exhibit 3A-8?

24   Q.  Special Agent van Wie, directing your attention first to

25   the bottom e-mail, can you please read the display name in the

O6K5men2                          Van Wie - Direct

1   "to" line?

2   A.  Kelly, Robert (Menendez).

3   Q.  And can you please read the display name in the "from"

4   line?

5   A.  "Mdoyle1031."

6   Q.  Can you please read the subject line?

7   A.  Meeting.

8   Q.  Please read the first paragraph of the body after "Rob."

9   A.  Attached are the bios for the two Qatari officials who look

10  forward to meeting with Senator Menendez.

11  Q.  Directing your attention to the top e-mail, who does Kelly

12  forward this to?

13  A.  Arkin, Sarah (foreign relations) and Lewis, Jessica,

14  (foreign relations).

15  Q.  Can you please read the body text of Robert Kelly's e-mail?

16  A.  "RM agreed to do this meeting on Tuesday at 11:00 a.m.  I'm

17  trying to track down more info."

18  Q.  What is the final name of the attachment in the forwarded

19  email to Sara Arkin and Jessica Lewis?

20  A.  Bios for Qataris.

21      MR. MONTELEONI:  Mr. Hamill, can you please take us to

22  page 2, and directing your attention under the bolded heading

23  reading:  His Excellency Sheikh Sultan Bin Jassim Bin Mohammed

24  Al Thani.  Can you please read the two paragraphs under that

25  heading?

O6K5men2                              Van Wie - Direct

1            MR. WEITZMAN:  Your Honor, I think we are supposed to

2     get an instruction at this point.

3            THE COURT:  Yes.  Absolutely.

4            Ladies and gentlemen, this is being given to you not

5     for the truth of what is set forth but simply for the fact that

6     it was said.  That's all.  It is not for the truth of what is

7     there.

8            Thank you, sir.

9     BY MR. MONTELEONI:

10    Q.  Special Agent van Wie, can you please read the two

11    paragraphs under that bolded heading?

12    A.  His Excellency Sheikh Sultan Bin Jassim Bin Mohammed

13    Al Thani is the member of the Al Thani family, ruling family in

14    Qatar.  He is the CEO and the chairman of the largest

15    construction and real estate company in Qatar, his company owns

16    many leisure holdings around the world including several Four

17    Seasons Hotels in the United States.  Sheikh Sultan Al Thani

18    serves as the advisor to his highness Emir of Qatar on Qatar's

19    investments in the United States and other matters.

20            MR. MONTELEONI:  If you can drop that expansion,

21    Mr. Hamill, and expand the paragraph under the second bolded

22    heading reading:  His Excellency Ali Al Thawadi?

23            THE COURT:  All of this information, ladies and

24    gentlemen, on this page, is not for the truth but simply for

25    the fact that it is set forth there.

O6K5men2                          Van Wie - Direct

1    Q.  So, can you please just read the one paragraph right under

2    the, His Excellency Ali Al Thawadi, heading?

3    A.  His excellency Ali Al Thawadi currently serves as chief of

4    staff to his excellently Sheikh Mohammed Bin Hamad Al Thani

5    brother and secretary to his highness the emir for investment

6    affairs.

7    Q.  Directing your attention to the diagram here, can you

8    please read what is in the top box on this diagram?

9    A.  Sheikh Tamin Bin Hamad Al Thani Emir of Qatar.

10   Q.  What is the position of Emir of Qatar?

11   A.  It is the leader of Qatar.

12   Q.  Can you please read just the non-bolded text in that left

13   most box?

14          MR. WEITZMAN:  Your Honor -- withdrawn.

15          THE COURT:  All right.

16   A.  Brother and secretary for investment affairs.

17   Q.  Where is Ali Al Thawadi on this diagram?

18   A.  In the bottom box.

19   Q.  And where is Sheikh Sultan Bin Jassim Bin Mohammed Al Thani

20   on the diagram?

21   A.  In the right-most box.

22          MR. MONTELEONI:  Mr. Hamill, can you please put up

23   Government Exhibit 1430, page 4?

24          I will now read paragraph 27:  The document marked for

25   identification as Government Exhibit 2A-28 is a true and

O6K5men2                          Van Wie - Direct

1    accurate photograph of Sultan Bin Jassim Al Thani.

2              Mr. Richenthal, can you please put Government Exhibit

3    2A-28 on the board?

4              Mr. Hamill can you please publish Government Exhibit

5    2A-28 briefly?  Mr. Hamill, please put up Government Exhibit

6    1430, page 3?

7              I will now read paragraph 17:  The document marked for

8    identification as Government Exhibit 2A-18 is a true and

9    accurate photograph of Ali Al Thawadi.

10             Mr. Richenthal, if you could please put up Government

11   Exhibit 2A-18 on the board?

12             Mr. Hamill, could you please publish Government

13   Exhibit 2A-18?  Now Mr. Hamill can you please put up Government

14   Exhibit 1401 and put up paragraph 1 and also page 2 to the side

15   of it?

16             I will now read paragraph 1d:  If called to testify as

17   a witness, a lawyer who represented Fred Daibes in another

18   matter, Daibes' counsel, would testify, as follows:

19             d.  During the pendency of the Daibes D.N.J.

20   prosecution, at Daibes' request, in order to help Daibes obtain

21   credit from particular lenders who Daibes stated were concerned

22   about the Daibes' D.N.J. prosecution, Daibes' counsel spoke to

23   lenders on several occasions.

24             Now, Mr. Hamill, can you please put back up Government

25   Exhibit 1304 and take us forward to page 5 of Government

O6K5men2                          Van Wie - Direct

1    Exhibit 1304?

2    Q.   Directing your attention to line 90, what is the date?

3    A.   June 14, 2021.

4    Q.   When is that in relation to the e-mail with the bios that

5    we were looking at in January?

6    A.   Five or six months later.

7    Q.   And when is that in relation to the discussion by Menendez

8    and Sellinger playing golf in the lines above?

9                MR. WEITZMAN:   Objection.

10               THE COURT:   Sustained.

11   Q.   Who sends a Signal message to Menendez on June 14, 2021, at

12   2:01 p.m.?

13   A.   Sheikh Sultan bin Jassim al Thani.

14   Q.   Can you please read the Signal message Sheikh Sultan sends

15   to Senator Menendez?

16   A.   "Dear Senator.   I was so pleased to speak with you briefly

17   and looking forward to seeing you in the near future.   Please

18   send me the contact details to Sultan@Heritageadvisors.co.uk.

19   Best regards, Sultan."

20   Q.   Directing your attention to the next line, please read what

21   is listed as Menendez' response at 2:05 p.m., but you can stop

22   after the name of the company.

23   A.   "Dear Sheikh al Thani.   It was a pleasure speaking with you

24   as well.   Fred Daibes, Daibes Construction."

25   Q.   Is there then contact information included in the message

O6K5men2                        Van Wie - Direct

1    after that?

2    A.   Yes.

3    Q.   Directing your attention to line 92, who does Sheikh Sultan

4    e-mail on June 15, 2021?

5    A.   Fred Daibes; and cc's Shaun Doherty.

6          MR. MONTELEONI:   Mr. Hamill, can you please put up

7    Government Exhibit D302 and expand the bottom gmail on the

8    first page?

9    Q.   Special Agent van Wie, can you please read the subject

10   line?

11   A.   Introduction.

12   Q.   Please read the cc line?

13   A.   "Shaun Doherty."

14   Q.   Can you please read the body?

15   A.   "Dear Fred.  Hope you are keeping well.  I am traveling to

16   the U.S. next week and wondered if you may be available to

17   discuss a business opportunity?  Please let me know when is

18   convenient for you to meet in New York.  I am copying Shaun

19   Doherty, CEO of Heritage Advisors Limited, who I would like to

20   introduce to you at our meeting next week and will be main

21   point of contact at our London office.  Best regards, Sultan J.

22   al Thani."

23   Q.   Directing your attention under Sultan J. al Thani, can you

24   please read the logo text?

25   A.   Heritage Advisors.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. MONTELEONI:  Mr. Hamill, can you please put up

2    Government Exhibit 1430, page 4?

3          I will now read paragraph 26:  The document marked for

4    identification as Government Exhibit 2A-27 is a true and

5    accurate photograph of Shaun Doherty.

6        Mr. Richenthal, can you please put up Government Exhibit

7    2A-27 on the board?

8        Mr. Hamill, can you please publish Government Exhibit

9    2A-27?  Mr. Hamill, please take us back to Government Exhibit

10   D302 and expand both e-mails on the first page.

11   Q.  Now in Fred Daibes' response on the top, is anyone cc'd?

12   A.  No.

13   Q.  How does that compare to the bottom e-mail?

14   A.  The bottom e-mail, Shaun Doherty is cc'd.

15   Q.  Please read the body of Fred Daibes' response.

16   A.  "It is nice to hear from you and I look forward to meeting

17   with you and Shaun next week.  I am available next week.  Here

18   is my private cellphone number:  1-201-336-2222.  Call me when

19   you arrive and we can arrange a time and date."

20   Q.  Let's return to the chart.

21          MR. MONTELEONI:  Mr. Hamill, please put back up

22   Government Exhibit 1304 and take us to page 6?

23   Q.  Directing your attention to line 93 at the top, can you

24   please read what Shaun Doherty sends to Sheikh sultan by

25   WhatsApp at 11:10 a.m.?

O6K5men2                            Van Wie - Direct

1    A.  "Hi Sheikh.  Can you talk now?"

2    Q.  Directing your attention to line 94, can you please read

3    the summary of what Doherty sends to Sheikh Sultan by WhatsApp

4    at 11:50 a.m.?

5    A.  "A link reporting on guilty plea of James Demetrakis.

6    Article states:  According to the U.S. Attorney's office,

7    Demetrakis worked with business partner Fred Daibes to evade

8    bank loan lending limits."

9    Q.  Directing your attention to line 96, can you please read

10   what Fred Daibes sends to Sheikh Sultan and others?

11   A.  "Good morning, Sultan.  Monday, the 21st would be fine.

12   How about 2:00 or 2:30 in the afternoon?  It would be nice if

13   you could come to our office Edgewater, New Jersey, right

14   across the river from you.  The developments we would be

15   talking about are in Edgewater and I would like for you to see

16   the properties.  But if that doesn't work for you, I would be

17   happy to come to NYC."

18   Q.  Directing your attention to line 97, can you please read

19   the name of the person who Sheikh Sultan forwards Fred Daibes'

20   e-mail to?

21   A.  Tareq al Saei.

22   Q.  Directing your attention to line 98, can you please read

23   the description of what Shaun Doherty sends to Heritage HQ at

24   5:36 p.m. on June 18, 2021?

25   A.  Message:  Attaching "Daibesbrothers.PDF."  It is a file

1    noting that Daibes "was formerly CEO and chairman of Mariner's

2    Bancorp, in New Jersey," and that "in October 2018, Daibes was

3    charged with misapplying bank funds and making false and

4    fraudulent entries to obtain nominee loans."  And the criminal

5    case is still active.

6              MR. MONTELEONI:  Mr. Hamill, can you please put up the

7    chain cited Government Exhibit 4F-24?

8    Q.  Special Agent van Wie, can you please read the name of the

9    chat at the top?

10   A.  Heritage HQ.

11   Q.  Directing your attention to the two messages under 18

12   June 2021, below the message with the word "Shaun" in the top

13   with Daibesbrothers.PDF, can you please read the message four

14   minutes later?

15   A.  Principals, please see attached summary.  My advice is the

16   meeting with Fred should not take place unless it's on a more

17   discrete venue.

18   Q.  Can you please read Ali al Thawadi response two minutes

19   hater?

20   A.  Maybe we can set the venue if it is needed to be discrete.

21             MR. MONTELEONI:  Mr. Hamill, take us back to

22   Government Exhibit 1304, page 6.

23   Q.  Directing your attention to line 101, can you please read

24   what Stephanie McLean e-mails to Fred Daibes and Jamela Maali

25   and others on June 20, 2021 at 5:10 a.m.?

O6K5men2                              Van Wie - Direct

1   A.  "Unfortunately, due to travel restrictions and

2   complications, the group cannot all make it to New York ahead

3   of tomorrow's meeting.  Is it possible to switch to a new

4   meeting, please?  This would be with Shaun Doherty and Andrew

5   Longmate from our London office."

6   Q.  How long is this after Shaun Doherty's message saying:  My

7   advice the meeting with Fred should not take place unless it is

8   on a more discrete venue.

9               MR. WEITZMAN:  Objection, your Honor.

10              THE COURT:  Basis?

11              MR. WEITZMAN:  Motive interrogation, based on your

12   prior instruction, your Honor.

13              THE COURT:  Just a moment.  I will allow it.

14   A.  Sorry.  Can you repeat the question?

15   Q.  Sure.  How long is this message on line 101 that we have

16   been looking at, sent after the message on line 99?

17   A.  Approximately two days.

18   Q.  Now, directing your attention to line 105, on what date

19   does Stephanie McLean send this e-mail?

20   A.  June 28, 2021.

21   Q.  Can you please read what Stephanie McLean writes on

22   June 28, 2021?

23   A.  "Following the Zoom call last week, Sheikh Sultan wondered

24   if Mr. Daibes would be available to meet in person Wednesday,

25   30th June, this week.  They can come to New Jersey as proposed

1   last time or meet in Manhattan, if that is preferable."

2   Q.  Directing your attention to line 106, who does Fred Daibes

3   text the next day, June 29, 2021, at 5:27 p.m.?

4   A.  Robert Menendez.

5   Q.  Can you please read what Fred Daibes texted Menendez?

6   A.  "Good afternoon, my brother.  The Sultan is coming over

7   tomorrow morning at 10:00."

8   Q.  Directing your attention to line 107, can you please read

9   Menendez' response at 7:03 p.m.?

10  A.  "Great.  I am give a call before my flight to Houston if

11  you'd like."

12  Q.  Directing your attention to line 108, could you please read

13  Daibes' reply two minutes later?

14  A.  "Yes, that would be great.  Thank you."

15          MR. MONTELEONI:  Mr. Hamill, can you please take us to

16  page 7?

17  Q.  Special Agent van Wie, directing your attention past these

18  Sellinger messages we looked at previously to line 114, can you

19  please read what Sheikh Sultan e-mails to Fred Daibes C C's

20  Shaun Dougherty on June 30, 2021?

21  A.  "Thank you for the opportunity to view today.  It was nice

22  to meet you and I look forward to speaking again soon as we

23  progress with our projects.  I am copying Shaun who will be the

24  main contact in our London office."

25  Q.  Directing your attention to line 115, can you please read

O6K5men2                          Van Wie - Direct

1    what Shaun Doherty e-mails Fred Daibes and Sheikh Sultan on

2    July 21, 2021?

3    A.   Following the meeting between principals, shall we arrange

4    a call on Tuesday the 6th?  It would be good to discuss the

5    specifics of the transaction and the opportunity.  Let me know

6    what time suits and I will send out the diary invite and the

7    dial-in coordinates.

8    Q.   Now, Special Agent van Wie, directing your attention to

9    line 117, can you please ride the date of that entry?

10   A.   July 24, 2021.

11   Q.   Who does Daibes send a WhatsApp message to on that date?

12   A.   Robert Menendez.

13   Q.   Let's look at the screen shot he ends.

14        MR. MONTELEONI:  Mr. Hamill, can you please put up

15   Government Exhibit A 104-A?

16   Q.   Special Agent van Wie, can you please read the display name

17   of the user who sent the top tweet in this screenshot?

18   A.   Rep. Gregory Meeks.

19   Q.   Are members of the House of Representatives referred to

20   with the title "Rep." in writing?

21   A.   Yes.

22   Q.   Can you please read representative Gregory Meeks' tweet?

23   A.   "I thank Qatar for its contribution to WFP, which will

24   provide relief to the worst humanitarian crisis in the world.

25   This is an important step in support of regional peace and

O6K5men2                    Van Wie - Direct

1   security that will save many lives.."

2           MR. MONTELEONI:  Mr. Hamill, can you take us back to

3   Government Exhibit 1304 and take us to page 7?

4   Q.  Directing your attention to the bottom line, line 118, who

5   does Daibes text on July 25, 2021?

6   A.  Ali al Thawadi.

7   Q.  Can you please read what Fred Daibes texts al Thawadi?

8   A.  "Hi Ali.  Our mutual friend will be issuing a statement on

9   Monday on the Qatar contribution."

10          MR. MONTELEONI:  Mr. Hamill, can you please put back

11  up to one side Government Exhibit 10J-4 and expand to August?

12  Q.  Special Agent van Wie, what day of the week was August 2,

13  2021?

14  A.  A Monday.

15          MR. MONTELEONI:  You can take Government Exhibit 10J-4

16  down, Mr. Hamill.  Thank you.  If you could now take us to page

17  8, Mr. Hamill?

18  Q.  Directing your attention to line 120, who does Menendez

19  send a WhatsApp message to at 3:26 p.m. on Monday, August 2,

20  2021?

21  A.  Fred Daibes.

22          MR. MONTELEONI:  Mr. Hamill, can you please put up a

23  cited exhibit Government Exhibit A104-2 and expand the top

24  text?

25  Q.  Special Agent van Wie, directing your attention to this top

O6K5men2                          Van Wie - Direct

1  text, below the paragraph starting, For immediate release, and

2  Contact, can you please read the sentence starting, Chairman

3  Menendez?

4  A.  Chairman Menendez applauds Qatari government's $100 million

5  contribution in humanitarian assistance for Yemen.

6  Q.  Does there appear to be the text of a press release below

7  that?

8  A.  Yes.

9  Q.  Now, further down in this green bubble under the lines with

10  the Participant, Delivered, and Read headings, can you please

11  read the display name on the participant heading?

12  A.  Fred Daibes.

13  Q.  Can you please read the date and time under the Read

14  heading?

15  A.  August 2, 2021, at 4:56 p.m.

16        MR. MONTELEONI:  Mr. Hamill, can you please put back

17  up Government Exhibit 1304, page 8?

18        THE COURT:  While that is being done, sir, do you

19  think you will be able to conclude by lunch?

20        MR. MONTELEONI:  I think that it is -- it could go

21  either way.  I am going to aim for that.

22        THE COURT:  Thank you.

23  BY MR. MONTELEONI:

24  Q.  So directing your attention to line 122, what does Fred

25  Daibes do at 4:58 p.m.?

O6K5men2                          Van Wie - Direct

1    A.  He forwards the full text of the press release to Ali

2    al Thawadi.

3    Q.  Is that the press release we were just looking at?

4    A.  Yes.

5    Q.  And directing your attention to line 123, what does Ali

6    al Thawadi do at 5:01 p.m. after receiving that forwarded

7    message?

8    A.  He then forwards it to Sheikh Sultan Bin Jassim al Thani.

9    Q.  And directing your attention to line 124, can you please

10   read Sheikh Sultan's response to Ali al Thawadi at 5:12 p.m. as

11   reflected on the chart?

12   A.  "At last."

13   Q.  Directing your attention to line 125, can you please read

14   Ali al Thawadi's reply also at 5:12 p.m.?

15   A.  "It's very good."

16   Q.  Directing your attention to line 127, can you please read

17   what Fred Daibes writes to Menendez at 5:43 p.m.?

18   A.  "Thank you."  And it followed by emoticons.

19   Q.  Now, directing your attention to line 133, can you please

20   read the summary of what Ali al Thawadi sends to Sheikh Sultan

21   on August at 8:55 p.m. on August 20, 2021?

22   A.  "Sending five links to articles and social media with

23   quotes "A.G. Sultzberger, the publisher of the New York Times,

24   said the company was 'deeply grateful to the government of the

25   Qatar which has been truly invaluable in getting our Afghan

1    colleagues and their families to safety.  Former Deputy
2    National Security Advisor, Matt Pottinger, discusses the future
3    of Afghanistan on Kudlow.  Members of a celebrated all-girl
4    robotics team have made it safely out of Afghanistan.  Qatar
5    officials sent the plane for the girls who are known as the
6    Afghan Dreamers.  Thank you #Qatar.  Thank you for all of the
7    support at this critical time.  #Thereforus.  Some members of
8    Afghan girls robotics team have arrived in Qatar fleeing the
9    Taliban's takeover.  They will remain in Qatar to continue
10   their education, the team says."
11   Q.  Directing your attention to line 134, can you please read
12   the summary of what Fred Daibes sends to Menendez at 9:39 to
13   9:40 a.m. the same day?
14   A.  Sending the same five links to articles and social media
15   that Ali al Thawadi sent to Sheikh Sultan bin Jassim Al Thani
16   at 8:55 a.m.
17   Q.  Directing your attention to line 135, can you please read
18   the summary of what Menendez sends to Daibes at 12:45 p.m. the
19   same day?
20   A.  He sends the full text of a press release titled:  Chairman
21   Menendez statement on Qatar's efforts to help house Afghans
22   seeking refuge in the United States, and includes the quote:  I
23   am grateful to see our friends and allies in Qatar be moral
24   exemplars by accepting Afghans ultimately seeking safe haven in
25   the U.S. after being forced to escape for their lives.

1   Q.  Directing your attention to line 136, can you please read

2   what Fred Daibes writes to Robert Menendez by WhatsApp three

3   minutes later?

4   A.  "Excellent.  How is the vacation going?"

5   Q.  Skipping down to line 138, can you please read what Robert

6   Menendez sends to Fred Daibes by WhatsApp at 12:58 p.m.?

7   A.  "Well, you might want to send them.  I am just about to

8   release."

9   Q.  Directing your attention to the next message, can you

10  please read Daibes a reply?

11  A.  "OK.  I will.  Try and have fun and not work too much.

12  Best to Nadine."

13          MR. MONTELEONI:  Mr. Hamill, can you please take us to

14  page 9?

15  Q.  Directing your attention to line 141, who does Robert

16  Menendez text on September 13, 2021?

17  A.  Cory Booker.

18  Q.  Can you please read the first part of what Menendez texts

19  to Booker on this date up until:  All or part of it?  You can

20  stop before you get to the second event.

21  A.  "Great seeing you this weekend.  Two items I hope you can

22  consider.  The first is the most important one, the Emir of

23  Qatar is holding a dinner in my honor Sunday, the 19th, at

24  7:30 p.m. at the Plaza Hotel.

25  Q.  Directing -- sorry I cut you off.  If you could read the

O6K5men2                        Van Wie - Direct

1    next sentence.

2    A.   "Would really appreciate you coming either for all or part

3    of it."

4    Q.   Directing your attention to line 144, who sends Sheikh

5    Sultan a WhatsApp message on September 18, 2021?

6    A.   Tareq al Saei.

7            MR. MONTELEONI:  And Mr. Hamill, can you please put up

8    to one side page 6 and expand line 97?

9    Q.   Special Agent van Wie, who did Sheikh Sultan forward his

10   e-mail chain with Fred Daibes to back in June 2021?

11   A.   Tareq al Saei.

12           MR. MONTELEONI:  You can take down page 6, Mr. Hamill.

13   Thank you.

14   Q.   Directing your attention to line 144, can you please read

15   what Tareq al Saei sends Sheikh Sultan on September 18, 2021 at

16   11:26 a.m.?

17   A.   "This is the address for tomorrow's dinner.  41 East 70th

18   Street.  Guests are expected to arrive at 7:15 p.m."

19   Q.   Directing your attention to the next line, can you please

20   read what al Saei texts to Sheikh Sultan one minute later via

21   WhatsApp?

22   A.   "Please send this to Fred."

23   Q.   Directing your attention to line 146, what does Sheikh

24   Sultan send to Fred Daibes at 11:41 a.m.?

25   A.   The same text regarding the address for the dinner.

O6K5men2                        Van Wie - Direct

1   Q.  Directing your attention to line 147, what does Robert

2   Menendez send to Cory Booker at 12:10 p.m. that day?

3   A.  The same text regarding the address and time for dinner.

4        MR. MONTELEONI:  Mr. Hamill, can you please take us to

5   page 10?

6   Q.  Directing your attention to line 155, whose calendar entry

7   does that line reflect?

8   A.  Robert Menendez.

9   Q.  What does that calendar entry reflect is scheduled from

10  7:30 to 8:30 p.m. on September 19, 2021?

11  A.  Qatar dinner at Plaza Hotel, 5th Avenue at Central Park

12  South, New York City, New York, 10019.

13  Q.  Directing your attention to line 159, can you please read

14  what Cory Booker texts Menendez the morning after the date of

15  that calendar entry?

16  A.  "Thank you for including me last night, Bob.  It was an

17  honor to be there and helpful.  The insights they had about

18  Afghanistan were really fascinating and illuminating.  I hope I

19  get to be your wingman for more such gatherings."

20        MR. MONTELEONI:  Mr. Hamill, can you please scroll us

21  down to the bottom of page 10, top of page 11?  That's great.

22  Thank you.

23  Q.  Special Agent van Wie, directing your attention to line 160

24  and 161, what type of files did Daibes use WhatsApp to send

25  Menendez on September 27, 2021?

1    A.  They are photographs.

2    Q.  Let's look.

3           MR. MONTELEONI:  Mr. Hamill, can you please put up

4    Government Exhibit A104-B?

5    Q.  Special Agent van Wie, does this also appear to be a

6    photograph of a computer monitor?

7    A.  Yes.

8           MR. MONTELEONI:  Mr. Hamill, can you please expand the

9    computer monitor portion of this and I think you also expand

10   the mouseover rectangle next to the pointing hand cursor.

11   Q.  Special Agent van Wie, can you please read the text of this

12   mouseover rectangle?

13   A.  Patek Philippe Aquanaut 18K yellow gold black dial mens

14   watch 5060J.

15   Q.  Directing your attention over to the right, a little bit up

16   from this mouseover rectangle on the line that starts with the

17   gray letters "checkout you pay" can you please read the dollar

18   figure after you pay?

19   A.  $29,090.

20   Q.  Let's look at the other picture.

21          MR. MONTELEONI:  Mr. Hamill, can you please put up

22   A104-C?  And if we could expand again the computer monitor

23   portion of the image?

24   Q.  What brand do all the watches pictured here appear to be?

25   A.  They appear to be Patek Philippe.

O6K5men2                          Van Wie - Direct

1   Q.  Directing your attention to the red dollar figures on the

2   top row, can you please read the dollar figures from left to

3   right?

4   A.  $23,990; $9,990; $19,990.

5           MR. MONTELEONI:  Mr. Hamill, can you please take us

6   back to the chart of page 11 of Government Exhibit 1304?

7   Q.  Directing your attention to line 162, can you please read

8   what Fred Daibes writes to Menendez on this line?

9   A.  "How about one of these?"

10  Q.  About how long did Fred Daibes write this after sending

11  these photographs of the computer monitor?

12  A.  One minute later.

13  Q.  Now, directing your attention down to line 163, whose

14  search and web activity history does that reflect?

15  A.  Robert Menendez.

16  Q.  Can you please read the description what's reflected in his

17  search and web activity history from 12:54 to 1:38 p.m. that

18  day?

19  A.  Multiple searches including "Patek Philippe," "Patek

20  Philippe most popular model", Patek Philippe Aquanaut,"

21  "Pre-owned Patek Philippe Calatrava Manual Wind 37mm

22  5196R-001," and "expo.com watches Patek Philippe" as search

23  terms, and he visited multiple websites regarding Patek

24  Philippe watches.

25  Q.  Directing your attention to line 164, what's the date of

O6K5men2                     Van Wie - Direct

1  this message?

2  A.   September 29, 2021.

3  Q.   Can you please read the URL that Daibes sends to Menendez

4  by WhatsApp?  And you can stop when you get to the question

5  mark.

6  A.   Congress.gov/bill/117th/congress/senate resolution/390.

7          MR. MONTELEONI:  Let's look at one of the citations on

8  this line, Government Exhibit 10G-1.  Mr. Hamill, can you

9  please put that up?

10 Q.   Directing your attention near the top of the page below the

11 browser search bar and favorites bar next to the internet

12 archive Wayback Machine logo to the text bar above the blue

13 seven captures language, how does what is in that text bar

14 compare to the URL that you just read?

15 A.   It is the same.

16 Q.   Directing your attention to the right of that text bar,

17 black vertical stripe with the glue and gray triangle, can you

18 please read the yellow text within that bar?

19 A.   Oct 01, 0221.

20 Q.   So when was October 1 of 2021 in comparison to the

21 September 29, 2021 date when Daibes sent the link to Menendez?

22 A.   It was about two days later.

23         MR. MONTELEONI:  If you can drop that expansion,

24 Mr. Hamill?  Thank you.

25 Q.   Down below the text bar and below the maroon bar saying

O6K5men2                          Van Wie - Direct

1   data from house for 9/30/2021 has not yet been received; on the

2   left side of the page can you please read the all caps logo?

3   A.  Congress.gov.

4   Q.  A few lines down can you please read the bolded language

5   starting S.RES.39?

6   A.  S.RES.39, a resolution expressing appreciation for the

7   State of Qatar's efforts to assist the United States during

8   Operation Allies Refuge.

9              MR. MONTELEONI:  If you can scroll us down to the

10   white rectangle?

11   Q.  Directing your attention to the white rectangle, can you

12   please read the parenthetical at the end of the sponsor line

13   after the redaction mark with the words "Senator 2"?

14   A.  Introduced 09/28/2021.

15              MR. MONTELEONI:  And we ask the Court to instruct the

16   jury that the senators with the redacted names and numbers in

17   these exhibits such as "Senator 2" are not Robert Menendez.

18              THE COURT:  That's true.

19   Q.  So one line down from that, can you please read what is

20   written on the committees line on this website?

21   A.  Senate-foreign relations.

22   Q.  One line below that, can you please read what is written on

23   the latest action line, but you can stop when you get to the

24   parentheticals at the end of the line.

25   A.  Senate, September 28, 2021.  Referred to the committee on

1    foreign relations.

2    Q.  Let's return to the timeline.

3           MR. MONTELEONI:  Mr. Hamill, can you please put up

4    Government Exhibit 1304, page 11?

5    Q.  On line 164, how long did Daibes send this link to Menendez

6    after sending him the pictures of the wristwatches and asking

7    how about one of these?

8    A.  Two days later.

9           MR. MONTELEONI:  Mr. Hamill, can you please take us to

10   page 12 of Government Exhibit 1304?

11   Q.  Directing your attention to line 165, what does Daibes send

12   Menendez on September 30, 2021?

13   A.  A photograph of Robert Menendez, Nadine Menendez, and the

14   Emir of Qatar.

15   Q.  By the way, have you visited a Qatari government website

16   showing a photograph of the Emir of Qatar?

17   A.  I have.

18   Q.  Let's take a brief look at this photo.

19          MR. MONTELEONI:  Mr. Hamill, can you please put up

20   A104-D?

21   Q.  Who is in this photo from left to right?

22   A.  Nadine Menendez, the Emir of Qatar, and Robert Menendez.

23   Q.  Let's return to the timeline.

24          MR. MONTELEONI:  If you can take us back to page 12,

25   Government Exhibit 1304, Mr. Hamill?

O6K5men2                          Van Wie - Direct

1    Q.  Directing your attention to line 166, can you please read

2    what that line reflects happens on October 8, 2021?

3    A.  Robert Menendez and Nadine Menendez, their flight to Qatar

4    scheduled departure.

5    Q.  Directing your attention to line 167, what does Menendez

6    send to Nadine Menendez on October 10?

7    A.  The same photograph of Robert Menendez, Nadine Menendez,

8    and the Emir of Qatar.

9    Q.  Directing your attention to line 16, can you please read

10   what Daibes sends to Menendez by Signal on October 16, 2021?

11   A.  "Good morning, my friend.  John, the driver, will be

12   waiting for you at the airport.  John's phone number

13   917-623-7331."

14   Q.  Directing your attention to line 171, can you please read

15   what this line reflects as Menendez and Nadine Menendez'

16   scheduled arrival time into JFK?

17   A.  3:37 p.m.

18   Q.  Directing your attention to line 173, how does that

19   scheduled arrival time compare to the time when John Pilot

20   calls Menendez, or line 172?

21   A.  The same time.

22           MR. MONTELEONI:  Mr. Hamill, can you please scroll

23   down to the bottom of page 12, top of page 13?

24   Q.  So, these two October 18, 2021 searches that we have looked

25   at, when were they in comparison to the September 29, sending

O6K5men2                          Van Wie - Direct

1  by Daibes to Menendez, the link to the Congress.gov website?

2  A.  It was about three weeks later.

3         MR. MONTELEONI:  Mr. Hamill, can you please put up all

4  of page 14, Government Exhibit 1304?

5  Q.  Directing your attention to line 188, who calls Fred Daibes

6  by WhatsApp on November 3, 2021?

7  A.  Sheikh Sultan Bin Jassim Al Thani.

8  Q.  By the way, what's a WhatsApp call?

9  A.  It's -- WhatsApp is an encrypted messaging service.  It

10 allows you to send a message but also phone calls as well.

11 Q.  Is WhatsApp the only app that can make voice calls?

12 A.  No.

13 Q.  FaceTime and Signal also have voice calls?

14 A.  Yes.

15 Q.  Do voice calls that are made by apps such as these appear

16 in the ordinary phone records that are produced by phone

17 companies?

18         MR. WEITZMAN:  Objection.  Foundation.  Beyond the

19 scope of the summary witness that they proffered.

20         THE COURT:  Sustained.

21 BY MR. MONTELEONI:

22 Q.  Have you reviewed phone records in your time at the FBI?

23 A.  I have.

24 Q.  And have you reviewed records related to voice calls from

25 third-party apps?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6K5men2                              Van Wie - Direct

 1              MR. WEITZMAN:  Your Honor, objection.

 2              THE COURT:  Sustained.

 3   Q.  Directing your attention to line 189, who does Daibes send

 4   a WhatsApp message to on November 4 of 2021?

 5   A.  Robert Menendez.

 6   Q.  How long after receiving a WhatsApp call from Sheikh Sultan

 7   does he send Menendez the WhatsApp message?

 8   A.  It was one day later.

 9   Q.  Let's look at what Daibes sent.

10              MR. MONTELEONI:  Mr. Hamill can you please put up

11   Government Exhibit A104-E?

12   Q.  Special Agent van Wie, under the top banner can you please

13   read the words under Congress.gov bill alert?

14   A.  S.Rep 390.

15   Q.  So under this large Congress.gov header, how does the first

16   sentence of text compare to the title of the Senate resolution

17   we looked at earlier?

18   A.  It is the same.

19   Q.  Directing your attention to the next paragraph, can you

20   please read the two lines from "has changes in" down to "six

21   total"?

22   A.  Has changes in co-sponsors (1 new, 6 total).

23   Q.  Beneath that line, can you please read the next two lines?

24   A.  Co-sponsor 10/26/2021 Senator-5.

25   Q.  Let's return to the chart.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O6K5men2                          Van Wie - Direct

```
 1              MR. MONTELEONI:  Mr. Hamill, can you please --
 2              MR. WEITZMAN:  Your Honor, can we get an instruction
 3    on that?
 4              THE COURT:  Yes.
 5              Senator 2 and Senator 5 are not Senator Menendez, and
 6    each time we see Senator 2 and Senator 5 they're not Senator
 7    Menendez.
 8              MR. MONTELEONI:  Mr. Hamill, can you please take us
 9    back to Government Exhibit 1304 and go to the bottom of page 13
10    and the top of page 14?  Go down a little bit farther
11    Mr. Hamill?  Thank you.  Actually, scroll down to show all of
12    page 14, Mr. Hamill.  Thank you.
13    BY MR. MONTELEONI:
14    Q.  So, when did Daibes send this Congress.gov image in
15    comparison to when Menendez searches for a 1 kilo gold bar on
16    line 191?
17    A.  Approximately 16 days later.
18              MR. MONTELEONI:  Mr. Hamill, can you please take us to
19    page 16 of Government Exhibit 1304?
20    Q.  Directing your attention to line 219, can you please read
21    what Menendez writes to Sheikh Sultan on January 4, 2022, by
22    Signal?
23    A.  "Greetings.  I understand my friend is going to visit with
24    you on the 15th of the month.  I hope that this will result in
25    the favorable and mutually beneficial agreement that you have
```

O6K5men2                           Van Wie - Direct

1   been both engaged in discussing.  I look forward to welcoming

2   you to New Jersey and wish you health, joy, and prosperity in

3   this new year.  Warmly, Bob Menendez."

4   Q.  Directing your attention to line 220, can you please read

5   what is listed as Sheikh Sultan's reply the next day?

6   A.  "Good afternoon.  Wishing you and your loved ones a happy

7   and prosperous 2022.  Yes, we are looking forward to the

8   meeting on the 15th and hope all goes well with discussions."

9            MR. MONTELEONI:  Mr. Hamill, can you please take us to

10  page 17 of Government Exhibit 1304?

11  Q.  Special Agent van Wie, directing your attention to line

12  239, can you please read -- withdrawn.

13       Directing your attention to line 247, can you please read

14  what Menendez texts to a Daniel O'Brien on February 28, 2022?

15  A.  "Just had dinner with the Qatars.  They said something

16  about a two day shoot in October in England.  What is that?"

17  Q.  Directing your attention to line 248, can you please read

18  O'Brien's response the next day?

19  A.  "Sheikh Sultan has a country home outside of London.  They

20  mentioned that they would like to invite you to spend a night

21  there and do a little hunting, not roughing it."

22           MR. MONTELEONI:  Now, Mr. Hamill, can you please take

23  us to page 20 of Government Exhibit 1304?

24  Q.  Directing your attention to line 286, can you please read

25  what Menendez texts to Nadine Menendez on March 31, 2022 at

O6K5men2                          Van Wie - Direct

1    4:02 p.m.?

2    A.  I'm sorry.  Line 286?

3    Q.  286, yes, at 4:01 p.m.  Sorry.

4    A.  "I won't get to my meeting until 7:30 p.m.  Can't imagine

5    it will end before 9:00 p.m."

6    Q.  Directing your attention to line 289, whose calendar that

7    does that reflect?

8    A.  Robert Menendez.

9    Q.  Can you please read the entry for March 31, 2022 at 7:00 to

10   8:00 p.m.?

11   A.  Qatar dinner.

12          MR. MONTELEONI:  Mr. Hamill, can you please take us to

13   page 21 of Government Exhibit 1304?

14   Q.  Directing your attention to line 292, can you please read

15   what Nadine Menendez texts to Menendez at 9:43 p.m. on March 31

16   of 2022?

17   A.  "Is it just you, Fred and the Qataris in the private room

18   this entire time?"

19   Q.  Directing your attention to line 293, can you please read

20   Menendez' response also at 9:43 p.m.?

21   A.  "Oui.  Leaving now."

22          MR. MONTELEONI:  Mr. Hamill, please scroll up to the

23   bottom top of 21, a little bit farther beyond that.  Thank you.

24   Q.  How does the date on which Nadine texts "is it just you,

25   Fred and the Qataris in a private room the entire time" compare

O6K5men2                          Van Wie - Direct

1    to the date of the photograph of the gold bars on the second

2    Nadine Menendez cell phone that we just looked at earlier?

3              MR. WEITZMAN:  Objection, your Honor.

4              THE COURT:  I will allow that.

5              THE WITNESS:  It's the same day.

6              MR. MONTELEONI:  If you can take us all the way to

7    page 21, Mr. Hamill?

8    Q.  Directing your attention to line 307, who does Menendez

9    send a Signal message to on May 6, 2022?

10   A.  Ali al Thawadi.

11   Q.  Can you please read what Menendez writes to al Thawadi?

12   A.  "Good afternoon.  Nadine's son lives in Miami and would

13   like to attend the Formula 1 race with his fiancée.  Would you

14   have any tickets available for him?  Thanks."

15   Q.  Directing your attention to line 308, can you please read

16   al Thawadi's response?

17   A.  "Hi.  Great to hear from you.  I will definitely work on it

18   and see what I can do.  I would appreciate it if you can share

19   his contact information so I can pass it along as soon as I get

20   them.  Best."

21   Q.  Directing your attention to line 309, can you please read

22   Menendez' reply?

23   A.  "Please.  I thought you all had tickets.  I don't want you

24   to go out of your way."

25   Q.  Directing your attention to line 311, can you please read

O6K5men2                          Van Wie - Direct

1    al Thawadi's message at 2:34 p.m.?

2    A.   "Tickets are available, I just need to shuffle some things

3    around and get back to you.  No worries at all."

4              MR. MONTELEONI:  Mr. Hamill, can you please take us to

5    page 22?

6    Q.   Directing your attention to line 317, whose address and

7    phone number does Menendez send to al Thawadi at 2:39 p.m.?

8    A.   André Arslanian.

9    Q.   Directing your attention to line 318, can you please read

10   al Thawadi's response to Menendez at 2:43?

11   A.   "With pleasure."

12   Q.   Directing your attention to line 320, can you please read

13   the summary of what Walid Sfier sends to André Arslanian?

14   A.   It is the forwarded message, "Ramzi just sent you two

15   Formula-1 crypto.com Miami Grand Prix tickets," and it includes

16   a link to the tickets.

17   Q.   Directing your attention to line 321, can you please read

18   what Ali al Thawadi sends to Robert Menendez through Signal?

19   A.   "Good morning.  Done, and he will be contacted today.

20   Best."

21   Q.   Directing your attention to line 323, can you please read

22   Menendez' response to al Thawadi?

23   A.   "Thank you.  He is thrilled and so is his mother."

24   Q.   Directing your attention back to line 322, whose calendar

25   entry is that?

O6K5men2                          Van Wie - Direct

1    A.  Robert Menendez.

2    Q.  Can you please read that calendar entry starting at 3:30

3    p.m. on May 7, 2022?

4    A.  Qatar.

5    Q.  Directing your attention to line 325, what does Sheikh

6    Sultan send to Ali al Thawadi later that day on May 7, 2022?

7    A.  He sends pictures of Ali al Thawadi with Sheikh Sultan bin

8    Jassim al Thani and another male, and al Thawadi with Robert

9    Menendez.

10            MR. MONTELEONI:  Your Honor, I have about five minutes

11   left.

12            THE COURT:  Go ahead.

13            MR. MONTELEONI:  OK.

14            So, Mr. Hamill, can you please take us to -- we are

15   here.

16   BY MR. MONTELEONI:

17   Q.  Directing your attention to line 330, can you please read

18   the summary of what Michael McManus e-mails to Shaun Doherty

19   copying Fred Daibes at 12:31 p.m. on May 23, 2022?

20   A.  "Here it is.  Please execute and return.  And includes an

21   attachment 'LOI FAD executed.'  The attachment is letter of

22   intent for Heritage 115 Holdings to enter a joint venture with

23   Daibes Enterprises and contribute $95 million.  The letter is

24   signed by Fred Daibes for Daibes Enterprises."

25            MR. MONTELEONI:  Mr. Hamill can you please take us to

O6K5men2                          Van Wie - Direct

1    page 23?

2    Q.  Directing your attention to line 331, can you please read

3    the summary of what Shaun Doherty sends to several people

4    including Fred Daibes?

5    A.  "The signed LOI attached for 115-145 River Road attached,

6    and the attachment is a fully signed letter of intent for

7    Heritage to make a $95 million investment with Daibes

8    Enterprises."

9    Q.  Let's look briefly.

10            MR. MONTELEONI:  Mr. Hamill, can you please put up

11   Government Exhibit 4F-17 and take us to page 3?

12   Q.  Could you please read just in the contributions paragraph?

13   A.  "The current property owner shall contribute the property

14   to the venture.  Heritage shall contribute $95 million

15   distributed to Daibes, in exchange for their respective capital

16   account credits."

17            MR. MONTELEONI:  Can you please take us to page 7 of

18   Government Exhibit 4F-17, Mr. Hamill?

19   Q.  Directing your attention to the signature blocks, who has

20   signed for Daibes Enterprises?

21   A.  Fred Daibes, managing member.

22   Q.  What is the date next to both of the signatures on the

23   signature block?

24   A.  May 23, 2022.

25            MR. MONTELEONI:  Now let's go back to the timeline one

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6K5men2                          Van Wie - Direct

1    more time.  Mr. Hamill, can you please take us back to

2    Government Exhibit 1304, page 23?

3    Q.  Directing your attention to line 332, can you please read

4    what Daibes writes to Menendez on Signal on May 26, 2022, at

5    10:48 a.m.?

6    A.  "Hey my friend.  Are you coming home tonight?"

7    Q.  Directing your attention to line 333, can you please read

8    Menendez' response at 12:33?

9    A.  "Yes.  Coming home tonight."

10   Q.  Directing your attention to line 334, can you please read

11   Daibes' reply?

12   A.  "Great.  Let's catch up when you get a chance."

13   Q.  Skipping a few lines to line 337, can you please read

14   Menendez' 2:50 p.m. message?

15   A.  "OK.  How is 7:30 tonight."

16   Q.  Directing your attention to line 338, can you please read

17   Daibes' response at 2:51 p.m.?

18   A.  "Perfect.  River Palm or do you want to go to the new

19   restaurant next to the cigar lounge?  It's officially open now,

20   up to you."

21   Q.  Skipping over line 339, can you please read what Daibes

22   writes at 3:14 p.m. on line 340?

23   A.  "OK.  See you there at 7:30."

24   Q.  Directing your attention to line 341, what does Menendez

25   write at 7:33 p.m.?

O6K5men2                          Van Wie - Direct

1   A.   "At restaurant."

2   Q.   Directing your attention to line 342, can you please read

3   the search terms that appear in Robert Menendez' search history

4   at 10:32 p.m. that night?

5   A.   1 kilo gold price.

6   Q.   About how long does the chart reflect Senator Menendez'

7   searched for "1 kilo gold price" after he wrote "at restaurant"

8   to Daibes that evening?

9   A.   About three hours later.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6kWmen3

1  Q.   About how long is the Menendez search for one kilo gold

2  price after Daibes's April 14, 2022, agreement to resolve the

3  Daibes DNJ prosecution reflected on the chart?

4  A.   A little over one month.

5  Q.   About how long did he conduct the search after the signing

6  of the May 23, 2022, letter of intent for Heritage to invest?

7  A.   Three days later.

8            MR. MONTELEONI:  No further questions.

9            THE COURT:  All right.  Thank you.

10           Ladies and gentlemen, enjoy your lunch.  Let's be back

11  at ten after two.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O6kWmen3

1           (Jury not present)

2           THE COURT:  You may step down, sir.

3           THE WITNESS:  Thank you.

4           THE COURT:  Please be seated.

5           Mr. Weitzman, do you have an estimate on cross, sir?

6           MR. WEITZMAN:  I'm still working on it.  But it's

7    going to dominate the afternoon, between two to three hours.

8           THE COURT:  OK.  Try to, since you're still working on

9    it, during lunch continue and hone it down.

10          MR. WEITZMAN:  Yes, your Honor.

11          THE COURT:  I have before me Mr. Hana's motion to

12   strike Joshua Paul's testimony on redirect at page 946 of the

13   transcript and to strike J. J. Gilday's proposed testimony

14   regarding FARA.  I'm gold to limit Gilday's testimony.  I'm not

15   going to let him testify to the purpose, structure or terms of

16   FARA.  FARA is the law.  It's a regulatory framework; that's

17   for me to instruct the jury on.  And in fact, the parties have,

18   in the charges on Counts Fifteen and Sixteen the references to

19   FARA that this jury needs to understand it.  It doesn't have to

20   understand all the intricacies of it.  That would be a waste of

21   the jury's time.

22          Gilday can testify only to who he is; to what the

23   database looks like, and give him a copy of the database, if

24   that's what the government proposes, so he sees the format of

25   it.  He can say those who are on it or those who are registered

O6kWmen3

 1    pursuant to FARA if, in fact, that's the case.  He can testify

 2    to the search he was asked to undertake and the results of that

 3    search.  That's it.

 4          Let me go back and make sure it's clear:  Who he is;

 5    what the database looks like; the fact that -- again, if it's

 6    true -- those who have registered pursuant to FARA are listed

 7    on it.  I take it he can also testify to how one manipulates

 8    the database, if that's relevant.  He can testify to what he

 9    was asked to do in terms of the search and the result of that

10    search.  He can't provide an overview of FARA or its purposes

11    or terms or respond to any questions about the charges or

12    actions of anyone in this action.  That's No. 1.

13          Two, I'll instruct the jury that Hana is not charged

14    in the indictment with violating FARA; that is, he's not

15    charged with having acted as an unregistered agent of a foreign

16    government.  The parties should talk to each other and propose

17    a limiting instruction.  You gave me two proposed limiting

18    instructions.  Get together and give me a joint one, to the

19    extent you can.  I assume you'll be able to do it, and you'll

20    tell me when you want me to give that limiting instruction.

21          Third, I'm striking the excerpt of Joshua Paul's

22    redirect on page 946 from lines 11 to the top of page 947, line

23    2.  Those are the two questions and the two answers that the

24    motion was about.

25          I'm doing this pursuant to Rule 403 and the finding

O6kWmen3

1   that the low probative value of that information is

2   substantially outweighed by the danger of unfair prejudice,

3   confusing the issues, misleading the jury and undue delay that

4   would result from a mini trial on the intricacies of FARA.

5          That's my decision on that pending motion.

6          I'll see everybody at 2:10.

7          Thank you.

8          MR. RICHENTHAL:  One quick question?

9          THE COURT:  Yes.

10         MR. RICHENTHAL:  I think this is implicit in what your

11  Honor just said, but I take it Mr. Gilday could also testify

12  that the database is public.

13         THE COURT:  Yes.  Yes.

14         MR. RICHENTHAL:  I wanted to make sure.

15         THE COURT:  Absolutely.

16         2:10.

17         Thank you.

18         (Luncheon recess)

19

20

21

22

23

24

25

O6kWmen3

AFTERNOON SESSION

2:10 p.m.

1

2

3          (Jury not present)

4          THE COURT:  All right.  Take your places.  Put the

5   witness on the stand.  Let's finish with the crosses today.

6          MR. MONTELEONI:  Your Honor, before the witness goes

7   on, I've just spoken to defense counsel, and because we have a

8   witness who is going to be very short, Mr. Mearns, who's

9   traveled up from the South to be here today, defense counsel

10  has consented to potentially putting him on after the afternoon

11  break.

12          THE COURT:  If that's with the consent of the parties,

13  that's perfectly fine with me.

14          Do you want to put him on now?  You can put him on

15  whenever the parties want.

16          MR. WEITZMAN:  I think after the break.  Let me get an

17  hour in.

18          THE COURT:  All right.  Again, let's try to finish up

19  with Mr. Van Wie today.

20          Where is Mr. Van Wie?

21          (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              You may continue -- oh, no.  I'm sorry.  You're done

4      with the direct.

5              You may cross-examine, Mr. Weitzman.

6              MR. WEITZMAN:  Thank you, your Honor.

7      CROSS-EXAMINATION

8      BY MR. WEITZMAN:

9      Q.  Good afternoon, Agent Van Wie.

10     A.  Yes.  Good afternoon.

11     Q.  This is your first time ever being a summary witness,

12     correct?

13     A.  Yes.

14     Q.  You've been an agent in the FBI for, I think you said about

15     four and a half years?

16     A.  Yes.

17     Q.  And before then you were a lawyer, right?

18     A.  Yes.

19     Q.  Were you a practicing lawyer or just trained as a lawyer in

20     law school?

21     A.  I was a practicing lawyer.

22     Q.  OK.

23         You got instructions from the government as to what to do

24     with the exhibits upon review of them, right?

25     A.  Yes.

1   Q.  And what were the instructions you received?

2   A.  It was to verify the content in each row of the summary

3   chart and compare that to the government exhibit that it was

4   cited in that same row.

5   Q.  And before receiving a copy of the summary exhibit, did you

6   receive a copy of the government's exhibits, or did you receive

7   them at the same time?

8   A.  I believe it was the same time.  I can't recall exactly the

9   order in which I got them.

10  Q.  So you may have received the government exhibits and then

11  the summary charts or vice versa; you're not sure?

12  A.  I can't recall at this point.

13  Q.  OK.  And at some point in time early on in the process, the

14  government asked you to familiarize yourself with the

15  government exhibits, right?

16  A.  I believe so.

17  Q.  And do you recall that they specifically asked you to make

18  sure you do not interpret the exhibits?

19  A.  Don't recall.

20  Q.  OK.  You met with the government prosecutors around, in a

21  phone call on April 12, 2024.  Does that ring a bell?

22  A.  I recall around that time period.  I don't know exact, the

23  exact date, but --

24  Q.  You've been prepping for your testimony about two months,

25  right?

O6kWmen3                          Van Wie - Cross

1   A.  Yes.

2            THE COURT:  I take it you haven't been preparing for a

3   full two months.  Have you been?  I shouldn't -- let me ask you

4   this way.  Is that what you've been doing for two months?

5            THE WITNESS:  Not solely.  There --

6            THE COURT:  Well, I take it you have other

7   responsibilities at the FBI.

8            THE WITNESS:  Yes.

9            THE COURT:  OK.

10            THE WITNESS:  Yes.

11            THE COURT:  OK.

12            MR. WEITZMAN:  Can we put up 3543-002, just for the

13   witness and the Court.

14   Q.  If you would read this to yourself, and in particular, the

15   last bullet point.  Let me know when you're done.

16   A.  Yes, I've read it.

17   Q.  And putting that aside, does this refresh your recollection

18   that on a call on April 12, 2024, the SDNY prosecutors, in

19   sending you exhibits, asked you not to interpret the exhibits?

20            THE COURT:  Now, Mr. Van Wie, the way this works, and

21   the jury is familiar with this, is you said you didn't have a

22   recollection about this subject, so Mr. Weitzman is entitled to

23   put something up and to see if that refreshes your

24   recollection.  But I don't want you to necessarily assume that

25   whatever is on the screen is true.  It may be; it may not be.

O6kWmen3                           Van Wie - Cross

1    The only issue is whether or not looking at what's on the

2    screen gives you a refreshed recollection.

3              Do you now have a refreshed recollection?

4              THE WITNESS:  From that specific call, I can't recall

5    that exactly being said, but in subsequent conversations, yes.

6    BY MR. WEITZMAN:

7    Q.  OK.  And so you made sure, as best as you can, despite

8    being an agent and a lawyer, not to interpret the documents?

9    A.  That's correct.

10   Q.  OK.  And just so I understand the process, any judgment

11   calls about what gets included in the chart or excluded from

12   the chart, you weren't making those judgment calls, right?

13   A.  That's correct.

14   Q.  You relied on the prosecutors, these prosecutors here, to

15   make those judgment calls, right?

16   A.  The U.S. Attorney's Office, yes.

17             MR. WEITZMAN:  OK.  Let's go to the summary chart,

18   Government Exhibit 1304, if we can put that up, page 1.

19   Q.  This is the summary chart you spent the morning testifying

20   about.  If I can direct your attention to lines 2 and 3, those

21   are exchanges, emails between Michael Soliman and Senator

22   Menendez, correct?

23   A.  That is correct, yes.

24   Q.  And in line 2, Michael Soliman sends an email to Senator

25   Menendez regarding an article someone named David was writing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    regarding the U.S. Attorney nomination process, correct?

2    A.  Yes.

3    Q.  And in response, Senator Menendez writes, I don't know that

4    Philip is saying this to anyone because he's smarter than that.

5    Do you see that?

6    A.  Yes.

7    Q.  I know you weren't asked to interpret anything, but do you

8    have an understanding that the Philip referenced in this email

9    is Philip Sellinger?

10   A.  Well, it doesn't say Philip Sellinger.  You know, the line

11   before it does say Philip Sellinger.  So that's the only way I

12   could really, you know, verify that.

13   Q.  OK.  Fair enough.

14       And row 3 ends with that quote, right?

15   A.  Yes, that's where it ends.

16   Q.  You reviewed the underlying exhibit, Government Exhibit

17   A408, to confirm the accuracy of that entry, right?

18   A.  Yes.

19           MR. WEITZMAN:  OK.  Let's pull up Government Exhibit

20   A408.  If we can do side by side.

21   Q.  And in Government Exhibit A408, Senator Menendez has more

22   than just that line, he's smarter than that, correct?  He also

23   writes, but his name has been out there before.

24       Do you see that?

25   A.  Yes.

1    Q.  That last line isn't included in your chart, right?

2    A.  No.

3    Q.  Did you raise that with the prosecutors?

4    A.  No.

5    Q.  Have you seen documents that show that Senator Menendez was

6    planning, if he could, to nominate Mr. Sellinger as U.S.

7    Attorney in 2016?

8              MR. MONTELEONI:  Objection.

9              THE COURT:  Sustained.

10   BY MR. WEITZMAN:

11   Q.  In reviewing this chart, you reviewed hundreds of

12   government exhibits, correct?

13   A.  I'm not sure how many exhibits it is.  It's many that are

14   listed here in this chart.  I didn't count them.

15   Q.  Many, many, many exhibits, right?

16   A.  Many, yes.

17   Q.  Hundreds, if not thousands, of pages, right?

18   A.  Yes.

19   Q.  OK.  And were some of the exhibits that you reviewed --

20   some of the documents you reviewed did not make it on to this

21   chart, correct?

22             THE COURT:  Did you look at more documents than are --

23             What, the underlying documents listed on this chart;

24   is that what you're asking?

25             MR. WEITZMAN:  Correct.

1      THE COURT:  OK.  If you know.

2   A.  It's possible.

3   Q.  Do you recall reviewing a document that showed that Senator

4   Menendez was planning to nominate Mr. Sellinger for the U.S.

5   Attorney position back in 2016?

6           MR. MONTELEONI:  Objection.

7           THE COURT:  I'll allow that.

8   A.  Off the top of my head, I don't recall an exact document,

9   but if you have one, it might help refresh memory.

10  Q.  It's OK.  We can move on.

11      Now, you, in addition to Government Exhibit 1304, also

12  verified Government Exhibit 1351, correct?

13          MR. WEITZMAN:  Can we put that up on the screen.

14  A.  Yes.

15  Q.  This is calls between Senator Menendez's numbers and

16  Sellinger's cell phone over a three-day period, correct?

17  A.  Correct.

18  Q.  Did you choose the three-day period that would be

19  summarized in this exhibit?

20  A.  No.

21  Q.  The prosecutors decided which three days would be

22  summarized, correct?

23  A.  Yes.

24  Q.  OK.  And the December 17 call on this exhibit is actually

25  on the other chart, 1304, correct?  Do you recall that?

1              THE WITNESS:  If you could pull it up so I could

2      compare.

3              MR. WEITZMAN:  Yeah, let's do that.  Do side by side

4      with page 2 of exhibit 1304.  Let's put up line 35.

5              Line 35.  Thank you, Mr. Kelly.

6      Q.  So this is the 10:49 call that's already on 1304 and

7      summarized in 1351, right?

8      A.  Correct.

9      Q.  1351 doesn't reflect any connected call that 1304 -- that's

10     not on 1304, right?

11     A.  Sorry.  1351 does not reflect a call that's not on --

12     Q.  Yeah, a connection, a connected call that's not also

13     reflected on 1304.  Right?

14             THE COURT:  Can you ask it without two negatives?

15             MR. WEITZMAN:  Yes.

16             THE WITNESS:  Yeah.  Sorry.  Thank you.

17     BY MR. WEITZMAN:

18     Q.  All connections, all connected calls referenced on

19     Government Exhibit 1351 are also on Government Exhibit 1304 in

20     this precise line entry you're looking at, right?

21             THE WITNESS:  I would need to see, maybe, 30 -- line

22     33 if the 8:58 call is on there.

23             MR. WEITZMAN:  Sure.  Just go down.  Expand to line

24     33.

25     Q.  Do you see that's there?

1  A.  Correct.

2  Q.  OK.

3  A.  The -- the 8:58 voice mail does not appear on 1304, the

4  chart.

5  Q.  Do you see that there's a December 17 voice mail at 8:59

6  a.m. from Phil Sellinger to Robert Menendez?

7  A.  Yes.

8  Q.  Do you think that that's the same one as the 8:58 voice

9  mail deposit?

10        MR. MONTELEONI:  Objection.

11        THE COURT:  If he has reason to know one way or the

12  other, he can answer.

13        THE WITNESS:  If we could pull up the government

14  exhibit so I can compare that voice mail to -- to confirm, that

15  would help.

16        MR. WEITZMAN:  Sure.  Let's put up Government Exhibit

17  A119-A.

18        Oh, no.  A119, not A.  OK.

19        You know what?  Let's move on for now.

20  Q.  Fair to say that the calls that you reviewed between Phil

21  Sellinger and Bob Menendez are not limited to the December 17

22  call that we just looked at, correct?  You're aware, sir, that

23  there are many other more calls between Robert Menendez and

24  Phil Sellinger, phone calls, on the records that you reviewed?

25        THE COURT:  More than are listed in the document you

1    just showed him.

2                MR. WEITZMAN:  Correct.

3    A.  Yes, I believe there were other phone calls in the chart.

4    Q.  OK.  And are you aware that there are other phone calls

5    between Phil Sellinger and Robert Menendez that aren't even

6    listed in the chart?

7    A.  That I'm not sure of.

8                MR. WEITZMAN:  OK.  Well, let's go to -- let's go back

9    up to line 35.

10   Q.  In line 35, the underlying document that you reviewed that

11   reflected a call between Robert Menendez and Phil Sellinger is

12   GX 6B-501, correct?

13   A.  Yes.

14   Q.  So you reviewed that document to confirm the accuracy of

15   this entry, right?

16   A.  Yes.

17               MR. WEITZMAN:  OK.  Let's put up Government Exhibit

18   6B-501.  And can we go to page -- let's pause there.

19   Q.  Do you recognize this as phone records related to a phone

20   number associated with Phil Sellinger?

21   A.  Yes.

22               MR. WEITZMAN:  OK.  Let's go to page 280, and if we

23   could go to the 2:31 p.m. entry.

24   Q.  Sir, do you see an incoming call that's six minutes long on

25   December 28 at 2:31 p.m. from a phone number that ends in 8400,

1   which is associated with Senator Menendez?

2   A.  Yes.

3           MR. WEITZMAN:  OK.  Is there -- if you go to December

4   28 on your chart.  And if we could go side by side?

5           THE COURT:  You mean chart 1304.

6           MR. WEITZMAN:  1304.  And if we can put up page 3,

7   lines 48 -- 47 through 50.

8   Q.  Your chart doesn't reflect a call between Senator Menendez

9   and Phil Sellinger on December 28 here, does it?

10  A.  No.

11          MR. WEITZMAN:  OK.  And if we can go back up to the

12  Greenberg Traurig phone records.

13          THE COURT:  Just a minute.  Just a minute.

14          MR. WEITZMAN:  Yes, your Honor.

15          THE COURT:  Go ahead.  Continue.

16          MR. WEITZMAN:  If we can go back up to the Greenberg

17  Traurig phone records, which is Government Exhibit 1305, and

18  let's go to 332.  I'm sorry.  That was Government Exhibit

19  6B-501, page 332.  And let's pull up April 20 and look at the

20  5:17 p.m. entry.

21  Q.  Do you recognize the phone number ending in 4744 as one of

22  the phone numbers associated with Senator Menendez?

23  A.  Yes.

24  Q.  And based on this entry, you're aware that on April 20 at

25  5:17 p.m., there was a nine-minute call between Senator

1  Menendez and Phil Sellinger?

2           MR. MONTELEONI:  Objection.

3  BY MR. WEITZMAN:

4  Q.  Does this document reflect a nine-minute phone call between

5  the phones associated with Phil Sellinger and Senator Menendez?

6           THE COURT:  I'll allow that.

7  A.  Yes.

8           MR. WEITZMAN:  OK.  And if we can do a split screen,

9  and if we can go back to Government Exhibit 1305, and let's go

10 to page 4.  Actually, page 5, top of page 5.

11 Q.  On your chart --

12          MR. MONTELEONI:  Objection.  You said 1305.  This is

13 1304.

14          MR. WEITZMAN:  I meant 1304, for the record.  Thank

15 you, Mr. Monteleoni.

16 Q.  On April 20, 2021, there were a series of Signal messages

17 between Robert Menendez and Mike Soliman, correct?

18 A.  Correct.

19 Q.  And at 4:57 p.m., line 75, Robert Menendez tells Mike

20 Soliman, also beginning to do a plan B just in case, correct?

21 A.  Correct.

22 Q.  And you can't interpret what plan B is, right?

23 A.  No.

24 Q.  But you know that within 20 minutes, at 5:17 p.m., Senator

25 Menendez calls Phil Sellinger, correct?

1          MR. MONTELEONI:  Objection.

2          THE COURT:  Just a moment.

3   BY MR. WEITZMAN:

4   Q.  The phones of Senator Menendez and Phil Sellinger

5   communicate for nine minutes?

6          THE COURT:  Is that what's reflected in the chart

7   that's in the top here?

8          THE WITNESS:  Yes.

9   BY MR. WEITZMAN:

10  Q.  Is there a reason that your chart doesn't reflect that

11  phone call right after the plan B Signal message in line 75,

12  sir?

13  A.  I don't know.

14  Q.  Did you bring it to the government's attention, that they

15  left out this phone call that was nine minutes long?

16         MR. MONTELEONI:  Objection.

17         THE COURT:  Sustained to phrasing.

18         Did you bring it to their attention, that that call is

19  not on the chart?

20         THE WITNESS:  No.  I only verified the information

21  that was already in the chart to make sure that it was

22  accurate.

23         MR. WEITZMAN:  You can take down the phone records,

24  and let's stick with Government Exhibit 1304.

25  Q.  Now, if you go back one page, lines 37 -- two pages, excuse

1    me.  Starting in lines 37, you see there are references a

2    number of times to someone named Suarez, correct?

3    A.  Correct.

4    Q.  And do you know that -- do you understand that person,

5    based on your review of the documents, to be Esther Suarez?

6    A.  Yes, I believe it -- it becomes clear in the following

7    text.

8    Q.  OK.  The chart doesn't include any communications -- not

9    one -- between Senator Menendez and Esther Suarez, right?

10   A.  Not in the chart, no.

11   Q.  OK.  And the chart doesn't include any communications at

12   all with Ms. Suarez, right?

13   A.  Not as far as I can recall.

14   Q.  OK.  So all the references to Ms. Suarez on this chart are

15   references of what other people are saying about Ms. Suarez,

16   right?

17             MR. MONTELEONI:  Objection.

18             THE COURT:  Sustained.

19   BY MR. WEITZMAN:

20   Q.  Based on your review of the documents on this chart, are

21   you aware, based on the review of documents, that Ms. Suarez

22   was the first person that Senator Menendez recommended to the

23   White House to become U.S. Attorney in New Jersey?

24             MR. MONTELEONI:  Objection.

25             THE COURT:  Sustained.

O6kWmen3                          Van Wie - Cross

 1   BY MR. WEITZMAN:

 2   Q.  Sir, do you know who Ms. Suarez is on this chart, why she's

 3   on this chart, from your review of the documents?

 4   A.  Sorry.  Can you --

 5   Q.  Yeah.  Do you know --

 6            THE COURT:  Do you know who Ms. Suarez is?

 7            THE WITNESS:  I believe it says that she was the

 8   Hudson County prosecutor.

 9   BY MR. WEITZMAN:

10   Q.  And do you know whether she was recommended to be the U.S.

11   Attorney in New Jersey for consideration by the White House?

12            MR. MONTELEONI:  Objection.

13            THE COURT:  I'll allow it.

14   A.  I don't know.

15   Q.  This chart doesn't include any of Ms. Suarez's credentials

16   at all, right; not her bio, other than former state court

17   judge, I think you said?

18            THE COURT:  Sustained.

19   BY MR. WEITZMAN:

20   Q.  Does this chart include her credentials?

21            MR. MONTELEONI:  Objection.

22            THE COURT:  To your knowledge, does anything on this

23   chart reflect Ms. Suarez's credentials?  Yes or no, or I don't

24   know.

25            THE WITNESS:  I think it's just simply her experience,

1    I believe.

2    BY MR. WEITZMAN:

3    Q.  Did you review any documents that reflect endorsement

4    letters for Ms. Suarez?

5              MR. MONTELEONI:  Objection.

6              THE COURT:  Sustained.

7    BY MR. WEITZMAN:

8    Q.  Do you recall reviewing a White House memo as part of your

9    review of the underlying government exhibits that requested

10   certain criteria for --

11             THE COURT:  Sustained.

12             Do you remember reviewing a document from the White

13   House?

14             THE WITNESS:  I don't recall.

15             MR. WEITZMAN:  OK.  Let's go to line 54.

16   Q.  Do you see line 54 is a Signal message between Mike

17   Soliman, Fred Turner and Robert Menendez?

18   A.  Yes.

19   Q.  Did you review the underlying Signal message?

20   A.  Yes.

21             MR. WEITZMAN:  Can we go to Government Exhibit -- do a

22   side by side, Government Exhibit A114-PH.  And if you go to the

23   next page, the next page after that -- no.  The prior page.

24   Thank you.  One more before then, please.

25             There it is.

O6kWmen3                          Van Wie - Cross

1    Q.  You see that this Signal chat from Mike Soliman is quoted,

2    in part, in your entry, correct?

3    A.  Correct.

4          MR. WEITZMAN:  OK.  Now if we can go to page 6 of the

5    Signal chart, and if we can zoom in on that.  If you can scroll

6    up to the top.

7    Q.  This was in the document you reviewed that's underlying

8    this chart, correct?

9          THE WITNESS:  If I could see the full exhibit?

10          MR. WEITZMAN:  Sure.

11          Can we blow that up, Mr. Kelly, the full exhibit.

12          THE WITNESS:  Also just seeing the, I guess.

13          MR. WEITZMAN:  There we go.

14          THE WITNESS:  The top, entirety of the exhibit, just

15    so I can see the number as well?

16          MR. WEITZMAN:  Sure.  Why don't we go back to the

17    first page so that you can -- let's look at the number on the

18    bottom, the exhibit number.

19    Q.  Do you recognize that as A114-PH?

20    A.  Yes.

21    Q.  That's the document you reviewed to confirm the accuracy of

22    this chart, correct?

23          THE WITNESS:  If I could then just see the line in the

24    spreadsheet as well?

25    A.  Yes.

O6kWmen3                        Van Wie - Cross

1              MR. WEITZMAN:  OK.  And then if we could go to page 6

2       and zoom in on the memo from the top all the way to the

3       signature.

4       Q.  Sir, you recognize this as part of that exhibit that you

5       reviewed, correct?

6       A.  It is part of the exhibit, yes.

7       Q.  And it's signed by Dana Remus, the White House Counsel

8       designate, correct?

9              THE WITNESS:  If you could just raise it a little bit,

10      there's -- I can't see.

11      A.  Yes.

12             THE WITNESS:  Thank you.

13      BY MR. WEITZMAN:

14      Q.  And it's dated December 22, 2020, right?

15      A.  Yes.

16      Q.  And this is the White House memo that concerns a request

17      for highly qualified and diverse candidates for U.S. Attorney,

18      correct?

19             THE COURT:  Sustained.

20      BY MR. WEITZMAN:

21      Q.  Do you see in the first paragraph Dana Remus writes, "Today

22      I am writing to invite you to provide recommendations for

23      highly qualified and diverse candidates for U.S. Attorney"?

24      A.  Yes.

25      Q.  The chart does not include, the summary chart that you

O6kWmen3                           Van Wie - Cross

1   verified does not include any part of this White House memo,

2   correct?

3            MR. MONTELEONI:  Objection.

4            THE COURT:  I'll allow it.

5            Does the chart itself -- apart from the reference to

6   the underlying documents, does the face of the chart reflect

7   the contents of that document signed by Dana Remus?  Yes, no, I

8   don't know.

9            THE WITNESS:  No, I don't believe this has an excerpt

10  in the chart.

11  BY MR. WEITZMAN:

12  Q.  OK.  And do you recall the chart that you verified doesn't

13  have the words "diverse" or "diversity" even once appear in the

14  chart?

15           MR. MONTELEONI:  Objection.

16           THE COURT:  Sustained.

17           MR. WEITZMAN:  Let's look at rows 70 to 75.

18           Actually, hold on a second.  I'd like to shift gears

19  and talk about Mr. Daibes for a moment, if we can put the chart

20  up.

21  Q.  Now, the first, the very first row of this chart references

22  an indictment on October 30, 2018.  Do you see that?

23  A.  Yes.

24           MR. WEITZMAN:  Now let's look at line 192.

25  Q.  And this is a November 26, 2021, entry, correct?

O6kWmen3                          Van Wie - Cross

1   A.  Yes.

2   Q.  This occurs three years after the indictment deadline --

3   indictment date, is that correct?

4   A.  Yes.

5   Q.  And it states that Daibes rejects a plea offer in his case,

6   right?

7   A.  Yes.

8   Q.  And he's focusing more -- he's beginning more focused

9   preparations for trial in advance of jury selection scheduled

10  for January 11, 2022, right?

11          MR. MONTELEONI:  Objection.

12          THE COURT:  No.  I'll allow that.

13          Is that what that says.

14          THE WITNESS:  That's what that says, yes.

15  BY MR. WEITZMAN:

16  Q.  The chart doesn't include the contents of the plea offer,

17  right?

18  A.  No.

19  Q.  It doesn't say whether there were negotiations?

20  A.  No.

21  Q.  Or why Mr. Daibes rejected the plea offer, correct?

22  A.  I don't believe so, no.

23          MR. WEITZMAN:  Now, if we can take a look at line 197.

24  Q.  Less than a month, just a couple of weeks later, after that

25  November 26 rejected plea offer, the U.S. Attorney's Office in

O6kWmen3                         Van Wie - Cross

1   New Jersey offers Daibes another plea deal, correct?

2          THE COURT:  According to this chart, is that true?

3          THE WITNESS:  Yes.  That's what the chart says.

4          THE COURT:  You don't have any knowledge of that one

5   way or the other, correct?

6          THE WITNESS:  No.

7          THE COURT:  OK.

8   BY MR. WEITZMAN:

9   Q.  Again, it says in this line that Daibes rejects that in

10  mid-December, correct?

11  A.  Correct.

12  Q.  But there's no indication in the chart of what the plea

13  offer was or anything else, right?

14         MR. MONTELEONI:  Objection.  403 into history of this

15  entry.

16         THE COURT:  I'll allow that question.

17         MR. WEITZMAN:  OK.

18         THE COURT:  You can answer that question.

19         THE WITNESS:  Can you repeat the question for me,

20  please?

21         MR. WEITZMAN:  I can't, but I'll rephrase it.

22         THE COURT:  There's no indication in the chart of what

23  the plea offer was or anything else, correct?

24         THE WITNESS:  Not in this line entry, no.

25         THE COURT:  Next.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen3                    Van Wie - Cross

 1  BY MR. WEITZMAN:

 2  Q.  The next reference to a plea is line 244, and that's dated

 3  February 10, 2022, correct?  And there's a reference to a

 4  presentation that Mr. Daibes's counsel makes to Vikas Khanna,

 5  correct?

 6  A.  That's what is referred to, yes.

 7  Q.  And in the presentation, at least in this line, it says

 8  that he's seeking a plea to a misdemeanor offense with the

 9  sentence of probation.  Do you see that?

10  A.  Yes.

11          MR. WEITZMAN:  Now let's look at the cited exhibit,

12  which is Government Exhibit 1401, if we can turn to page 2,

13  paragraph b.

14  Q.  Page 2, paragraph b says, prior to the commencement of the

15  Daibes DNJ prosecution in October 2018, Daibes's counsel gave a

16  presentation to the U.S. Attorney for the District of New

17  Jersey and first assistant, among others, during which Daibes's

18  counsel advocated against criminal charges being brought

19  against Daibes.  Do you see that?

20  A.  Yes.

21  Q.  You understand that, based on this, Mr. Daibes's counsel

22  met with the former U.S. Attorney regarding a potential case

23  before the indictment, right?

24  A.  If that's what it says, yes.

25  Q.  OK.

O6kWmen3                        Van Wie - Cross

1    A.  I don't have any knowledge of that.

2    Q.  Now, again, that's not on this chart that you verified,

3    right?  Do you recall the first line entry was October 30,

4    2018, with the indictment?

5    A.  Yes.

6          MR. WEITZMAN:  OK.  So now let's go back to Government

7    Exhibit 1304, and if we can go to row 244.

8    Q.  In row 244, it states, on February 10, 2022, the U.S.

9    Attorney's Office for the District of New Jersey communicated

10   to Daibes's counsel that it would enter into an agreement

11   pursuant to which Daibes would receive a sentence of probation.

12   Do you see that?

13   A.  Yes.

14         THE COURT:  Just a moment.

15         Well, I don't know.  I just don't want there to be

16   anything misleading.  It says subsequently.

17         MR. WEITZMAN:  Correct.

18         THE COURT:  OK.

19         MR. WEITZMAN:  It's not dated February 10, correct.

20   That's the line entry.

21   Q.  You understand, sir, that based on that parenthetical, the

22   plea offer that was communicated to Daibes's counsel was that

23   he would not have to serve any imprisonment; it would be a

24   probationary sentence?

25         MR. MONTELEONI:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Do you have any understanding one way or

2   the other of that?

3          THE WITNESS:  Other than what the chart says, no

4   knowledge of that.

5   BY MR. WEITZMAN:

6   Q.  Did you review the underlying plea agreement?

7          THE COURT:  Is that 1401?  Is that what you're asking?

8          MR. MONTELEONI:  Objection.  We have a history-based

9   objection to this.

10          MR. WEITZMAN:  I'll move on, your Honor.

11          THE COURT:  Yes.

12   BY MR. WEITZMAN:

13   Q.  Now, if we can go to line 211, it states, on December 23,

14   2021, that Daibes's trial, which was scheduled for January 11,

15   2022, was adjourned.  Do you see that?

16   A.  Yes.

17   Q.  And an adjournment is a postponement, correct?

18   A.  Yes.

19          THE COURT:  Well, it's moving something from one date

20   to a later date, is that correct?

21          THE WITNESS:  That's correct.

22          THE COURT:  All right.

23   BY MR. WEITZMAN:

24   Q.  And do you recall, based on your review of the underlying

25   document, why it was postponed?

1              MR. MONTELEONI:  Objection.

2              THE COURT:  Do you have any understanding from your

3     review of the documents that you looked at why it was

4     adjourned?

5              THE WITNESS:  I don't recall seeing a reason.

6              MR. WEITZMAN:  OK.  Well, let's look at government --

7     Q.  You looked at Government Exhibit 8D-1, according to this

8     chart, is that correct?

9     A.  Yes.

10             MR. WEITZMAN:  Let's take a look at Government Exhibit

11    8D-1.  And if we can --

12    Q.  Do you recognize what this is, sir?

13    A.  Yes.

14    Q.  This is what we call a Pacer entry.  Are you familiar with

15    that?

16    A.  Not personally, no.

17    Q.  OK.  Do you recognize this as an order of the court and

18    this is the text of the order from the court?

19    A.  Yes, says text order --

20    Q.  OK.

21    A.  -- as to Fred Daibes.

22             MR. WEITZMAN:  If we can blow up the middle.

23    Q.  And it states in consideration of the existing pandemic and

24    associated safety concerns for conducting a jury trial in

25    January, the presently scheduled trial date of January 11,

1   2022, is hereby adjourned.  And then it says, two sentences

2   after that, the deadlines that have been agreed upon and those

3   set by the court are hereby suspended until further notice.  Do

4   you see that?

5   A.  Yes.

6   Q.  OK.  Is there a reason why the chart doesn't say it was

7   adjourned due to Covid?

8           THE COURT:  Sustained.

9   BY MR. WEITZMAN:

10  Q.  In any event, sir, you understand now, based on your review

11  of this, that the adjournment was due to Covid, correct?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Do you have an independent understanding,

14  apart from what this document says, as to why the trial was

15  adjourned?

16          THE WITNESS:  No.

17          MR. WEITZMAN:  Can we go to --

18          THE COURT:  But you see it says that on this document,

19  correct?

20          THE WITNESS:  The --

21          THE COURT:  It gives a reason why on the document.

22          THE WITNESS:  There is a reason, yes.

23          THE COURT:  OK.  Next.

24          MR. WEITZMAN:  If we can go to lines 211 to 213 of

25  Government Exhibit 1304.

1  Q.  So we just looked at the order, which was line 211,

2  correct?

3  A.  Yes.

4  Q.  OK.  And then there's a communication from Fred to Nadine

5  that same day approximately seven hours later, correct?  That's

6  great, you both need an good relaxing night.  Enjoy.  How is he

7  feeling, do you see that?

8  A.  Yes.

9  Q.  Just to be clear, based on your review of documents, did

10  you see any communication, email or phone call from Daibes's

11  counsel to Daibes regarding this trial adjournment?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Do you recall seeing anything that

14  indicated a call from, quote, Daibes's counsel to Daibes

15  regarding the trial adjournment?

16          THE WITNESS:  If it's not in the chart, then I

17  wouldn't have been looking for it.

18  BY MR. WEITZMAN:

19  Q.  OK.  And you didn't see -- if it's not on this chart, you

20  didn't see any phone call from Daibes to Senator Menendez

21  informing him of this trial adjournment, right?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  Is there anything on the chart, to your

24  knowledge, that reflects a phone call from Daibes to Menendez

25  informing Menendez of the trial adjournment?

O6kWmen3                          Van Wie - Cross

1          THE WITNESS:  I don't recall seeing that in the chart.

2    BY MR. WEITZMAN:

3    Q.  OK.  Same question with respect to a phone call from Daibes

4    to Nadine Menendez; anything indicating that Fred spoke to

5    Nadine other than these communications after entry of the order

6    on December 23 --

7          THE COURT:  Sustained.

8    Q.  -- 2021?

9          Does your chart indicate any phone call from Fred Daibes to

10   Nadine between 1:53 p.m. and 9:09 p.m. on December 23, 2021?

11   A.  No.

12   Q.  In your review of the underlying documents and phone

13   records, did you see any such evidence?

14   A.  If it wasn't there, I wasn't looking for it.

15   Q.  Do you have any document, based on your review of the

16   underlying documents, that reflects whether Fred Daibes knew

17   that his trial was adjourned at 9:09 p.m. on December 23?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  Sustained.

20   BY MR. WEITZMAN:

21   Q.  Now, Nadine responds, on December 23, 2021, better having

22   heard the date is postponed.  Do you know, from your review of

23   documents, what she's referring to?

24          MR. MONTELEONI:  Objection.

25          THE COURT:  I'll allow that.

O6kWmen3                          Van Wie - Cross

```
1    A.  No.

2    Q.  Do you see that it's in response to the question, how is he

3    feeling?

4              MR. MONTELEONI:  Objection.

5              THE COURT:  Sustained.

6    BY MR. WEITZMAN:

7    Q.  Do you see that it follows after Fred Daibes's question,

8    how is he feeling?  Do you see that, sir?

9    A.  It follows in the chart, but I couldn't tell you if there's

10   anything in between.

11   Q.  OK.  In your review of documents, did you learn that about

12   nine days earlier, on December 14, 2021, Senator Menendez fell

13   in the Senate and seriously injured his shoulder?

14             MR. MONTELEONI:  Objection.

15             THE COURT:  Sustained.

16             Ladies and gentlemen, you know unanswered questions

17   are not evidence.

18   BY MR. WEITZMAN:

19   Q.  Sir, do you recall reviewing documents regarding a shoulder

20   injury that Senator Menendez had?

21             THE COURT:  I'll allow that.

22   A.  I don't recall.

23   Q.  OK.  Well, you do recall seeing entries about a chair, a

24   recliner, is that correct?

25   A.  Yes.  Do you have an understanding, based on your review of
```

1   those documents, that that recliner was to help the senator

2   sleep following a shoulder surgery?

3          THE COURT:  Sustained.

4   BY MR. WEITZMAN:

5   Q.  Did you see documents --

6          THE COURT:  Do you have an understanding from the

7   documents as to what the purpose of the recliner was?  Yes, no

8   or I don't know.

9          THE WITNESS:  If I could review the chart?

10          MR. WEITZMAN:  Sure.  If we can go to the next page.

11   Q.  Do you see on line 214, there's a reference to, how is the

12   shoulder, is he sleeping, let me know if I can get him a

13   recliner, it helped me sleep.  Do you see that?

14          THE COURT:  The question is simply do you see those

15   words on line 214?

16          THE WITNESS:  Yes, I see those words.

17   BY MR. WEITZMAN:

18   Q.  Just to be clear, there's no reference on your chart to an

19   injury that the senator suffered regarding his shoulder, right?

20          MR. MONTELEONI:  Objection.

21          THE COURT:  Sustained for the reasons set forth above.

22   BY MR. WEITZMAN:

23   Q.  OK.  Do you know whether the senator, based on your review

24   of documents, had a surgery, shoulder surgery on December 31,

25   2021?

O6kWmen3                    Van Wie - Cross

 1              THE COURT:  Do you know one way or the other, sir?

 2              THE WITNESS:  No.

 3              MR. WEITZMAN:  Let's put up Government Exhibit 102-2,

 4    which this refers to.

 5              MR. MONTELEONI:  For the record, that's D102-2.

 6              MR. WEITZMAN:  D102-2.  Thank you.

 7    Q.  This is the first message we looked at earlier -- that's

 8    great, you both need a good relaxing night, enjoy, how is he

 9    feeling -- correct?

10    A.  Correct.

11    Q.  And if we can scroll down, there's the, better having heard

12    the date is postponed, he is fixated on it.  Do you see that?

13    A.  I see it, yes.

14    Q.  On your chart, that you reviewed, this follows close in

15    time to reference to the postponement of Daibes's trial, isn't

16    that correct?

17              THE WITNESS:  If we could go back to the chart?

18              MR. WEITZMAN:  Sure.

19              Can we go to lines 211 to 213.

20    A.  Yes, it was the same day.

21    Q.  Same day.

22         Sir, in your review of documents, are you aware of whether

23    the senator was looking to postpone his shoulder surgery?

24              THE COURT:  Sustained.

25    BY MR. WEITZMAN:

O6kWmen3                          Van Wie - Cross

1   Q.  Did you review documents and communications about a

2   postponement of the senator's shoulder surgery?

3            THE COURT:  I'll allow that.

4   A.  No.

5   Q.  Did you review documents and communications in reviewing --

6            THE COURT:  In other words, you're not aware of any

7   documents that you reviewed that concerned a postponement of

8   the shoulder surgery.  Is that correct?

9            THE WITNESS:  That's correct.  In reviewing for the

10  chart --

11           THE COURT:  OK.

12           THE WITNESS:  -- I don't recall seeing any documents

13  to that effect.

14           THE COURT:  OK.

15           MR. WEITZMAN:  If we can go back up to Government

16  Exhibit -- actually, withdrawn.

17  Q.  Are you aware, sir -- well, let me ask it this way.

18       In December 2021, there were still some of the Covid

19  variants, to your knowledge, correct?

20           THE COURT:  I'll allow it, if he knows.

21           Do you know that in the New York metropolitan area

22  there was Covid?  I take it there's Covid now, to your

23  knowledge, is that right?

24           THE WITNESS:  I --

25           THE COURT:  The jury knows that.

1          Go ahead.  Next question.

2     BY MR. WEITZMAN:

3     Q.  Have you seen communications in your review of the

4     underlying exhibits where the senator wanted to schedule a

5     surgery on December 31, 2021, in order to avoid exposure

6     because there would be fewer people in the hospital?

7          THE COURT:  Sustained.

8          Again, ladies and gentlemen, remember that there's no

9     evidence when there are unanswered questions.

10          Stick to the chart.

11          MR. WEITZMAN:  Can we go back to Government Exhibit

12    D102-2.  And do a split screen.  I'm sorry.  And can we put up

13    1304 as well, back to lines 211 through 215.

14          Can we put up 211 through 215.  OK.  Why don't we put

15    up 214 and 215 then and skip 213, because we did that already.

16    Q.  In line 214, Fred Daibes responds to Nadine:  Good, I don't

17    want him to be upset over it.  This is not his fault.  He was

18    amazing in all he did.  He is an amazing friend and as loyal as

19    they come.  How is the shoulder?  He is sleeping?  Let me know

20    if I can get him a recliner and help him sleep.

21          We talked about that a moment ago, right?

22    A.  Yes.

23          MR. WEITZMAN:  Can we go, in the underlying exhibit,

24    to the next message.

25    Q.  On December 25, 2021, Nadine Menendez responds:  Merry

O6kWmen3                          Van Wie - Cross

1    Christmas.  Just drove to the Armenian church down the street

2    in Tenafly and prayed.  I hope you feel better very soon.

3        Do you see that?

4    A.  Yes.

5    Q.  That message is not on your chart, right?

6    A.  I don't believe so, no.

7    Q.  OK.  And in your review of documents on this chart,

8    underlying this chart, did you see documents that Mr. Daibes

9    himself was suffering from Covid at this very time frame?

10            MR. MONTELEONI:  Objection.

11            THE COURT:  Sustained.

12   BY MR. WEITZMAN:

13   Q.  Sir, did you see any documents about Mr. Daibes suffering

14   from Covid in or about December 2021, based on your review of

15   the underlying communications?

16            THE COURT:  I will allow that.

17   A.  I don't believe so.

18   Q.  OK.  Did you see messages about the senator trying to help

19   Mr. Daibes get into a particular hospital?

20            THE COURT:  Sustained.

21   BY MR. WEITZMAN:

22   Q.  Daibes responds, if you go to the next message in the

23   government exhibit, Daibes responds, is in your exhibit, and it

24   says:  Thank you, my sister.  I'm fine.  Talk to SueSue and get

25   Bob the chair especially when he comes home from hospital.

O6kWmen3                        Van Wie - Cross

1    Merry Christmas.

2         Do you see that?

3    A.  Yes.

4    Q.  Does this reflect your recollection that you did see

5    messages about Bob being in the hospital?

6              MR. MONTELEONI:  Objection.

7              THE COURT:  Does it?  Yes, no or I don't know.

8    A.  I don't know if he was in the hospital at this moment or if

9    he ever went in.

10   Q.  OK.  Fair enough.  Do you know who SueSue is?

11   A.  No.

12   Q.  If we can go to row 216, the very next row in Government

13   Exhibit 1304, Nadine Menendez says:  The recliner arrived,

14   correct.  I will get some sleep tonight and thank you very,

15   very much again in the morning.  It moves the seat all the way

16   up so it's easy for him to get up without putting pressure on

17   the right arm.  Thank you.  If you need anything dropped off so

18   you don't have to leave the house, let me know, I will gladly

19   do it.

20        Do you see that?

21   A.  Yes.

22              (Continued on next page)

23

24

25

O6K5men4                          van Wie - Cross

1   BY MR. WEITZMAN:   (Continuing)
2   Q.  Do you see the reference to Suesue not having to leave the
3   house.  Do you see that?
4          MR. MONTELEONI:  Objection.
5          THE COURT:  Sustained.
6          You see it says:  So you don't have to leave the
7   house.  Do you see that?
8   A.  Yes.
9   Q.  Are you aware, sir, that during the pandemic, when people
10  had COVID, they were quarantining in 2021?
11         THE COURT:  Sustained.  Stick to the chart, sir.
12  Q.  Now, Nadine references the chair arriving; correct?
13         THE COURT:  What's your question.
14         MR. WEITZMAN:  Yes.  Can you put up Government Exhibit
15  B226, which is a different exhibit than the one we were looking
16  at?
17  Q.  Sir, this is a text chain between Nadine and someone named
18  Suesue.  Do you recall reviewing this?
19  A.  Yes.
20         MR. WEITZMAN:  And if you can link that in, Mr. Kelly?
21  Let's focus on the first page on this message, it is page 49 of
22  the document.
23  Q.  Second message says:  Choukran the recliner has arrived.
24  Do you see that?
25  A.  Yes.

O6K5men4                         van Wie - Cross

1   Q.  Now this is the only message that is included on your

2   chart, sent or received by Suesue.  Do you recall that?

3   A.  I believe that's accurate.

4           MR. WEITZMAN:  If we can go to page 51.

5   Q.  Top message from Nadine, Nadine tells Suesue:  You are an

6   Angel.  Bob has been sleeping through the night every night

7   because of your chair.  It made a hundred percent difference

8   thank you so much, Habibti.

9   A.  I see the text message, yes.

10  Q.  That message isn't on your chart, right?

11          THE COURT:  Is that a question?

12          MR. WEITZMAN:  Yes.

13          THE COURT:  Is that text message on your chart, sir?

14          THE WITNESS:  I would have to look at December 31st to

15  verify.

16          MR. WEITZMAN:  Let's put up the chart and show them

17  December 31st.

18  A.  Yes, that's correct.

19  Q.  Now let's look at the next two messages in this chain from

20  Suesue to Nadine, the first message says:  Happy New Year

21  Habibdi.  My pleasure.

22          And the next message on the chain says:  That chair

23  has saved so many people in our family.

24          Do you see that?

25  A.  Yes.

1  Q.  Again, these messages were not included on your chart -- we

2  can scroll from January 1st, 2022 -- correct?

3  A.  That's correct.

4  Q.  Based on your review of these messages, do you have an

5  understanding that Suesue sent over a used recliner?

6          MR. MONTELEONI:  Objection.

7          THE COURT:  Based on the chart are you able to say

8  that?

9          THE WITNESS:  No.

10 BY MR. WEITZMAN:

11 Q.  Did you review any records showing when the recliner was

12 purchased?

13 A.  No.

14 Q.  We can just put up the chart.

15     We have been talking some about the Daibes case, I would

16 like to also talk about the real estate entries regarding the

17 Heritage Advisors.  Do you recall the chart and those entries?

18          MR. MONTELEONI:  Objection.

19 Q.  Sir, do you know what Heritage Advisors is?

20 A.  Only from reading the chart, yes.

21 Q.  What is your understanding, based on your review of the

22 chart?

23          MR. MONTELEONI:  Objection.

24          THE COURT:  I will allow it, if he has an

25 understanding.

O6K5men4                          van Wie - Cross

1            THE WITNESS:  That they entered into an agreement with

2   Fred Daibes to make an investment.

3   BY MR. WEITZMAN:

4   Q.  And, do you understand the relationship based on the

5   documents you reviewed between Heritage Advisors and a man

6   named Sheikh al Thani?

7            MR. MARK:  Objection.

8            THE COURT:  I will allow it if he has an understanding

9   from the documents.  He may know or he may not.  He may have an

10  understanding, he may not.

11           THE WITNESS:  I would have to review some of those

12  documents to see what they say.

13           THE COURT:  I take it any such understanding would be

14  simply from the documents; correct?

15           THE WITNESS:  Yes.

16           THE COURT:  You have no other reason to know anything

17  about them; is that correct?

18           THE WITNESS:  That's correct.

19  BY MR. WEITZMAN:

20  Q.  Do you recognize the name al Thani as part of the royal

21  family in Qatar?  Have you heard that name before?

22           THE COURT:  Well, those are two questions.

23           MR. WEITZMAN:  Fair enough.

24  Q.  Have you heard that the royal family in Qatar has the name

25  al Thani?

O6K5men4                         van Wie - Cross

1  A.  I would have to review the source documents to verify.

2  Q.  But you don't have any independent knowledge of any of

3  that; right?

4  A.  No.

5  Q.  And you don't know how large the al Thani family is in

6  Qatar?

7          MR. MONTELEONI:  Objection.

8          THE COURT:  Sustained.

9  Q.  Based on your knowledge.

10         THE COURT:  Is there anything in the documents

11  indicating the size of the Al Thani family in Qatar?

12         THE WITNESS:  No.

13  BY MR. WEITZMAN:

14  Q.  As part of your work preparing for this summary chart, did

15  the government provide you any notes of an interview that they

16  conducted of --

17         MR. MONTELEONI:  Objection.

18         MR. WEITZMAN:  I didn't finish my question.

19         THE COURT:  Yes.

20  Q.  Of a man shamed Shaun Doherty?

21         THE COURT:  Sustained.

22  Q.  Sir, when you testified, began your testimony, you were

23  asked whether you had any involvement in investigating Senator

24  Menendez.  Do you recall that?

25  A.  Yes.

O6K5men4                          van Wie - Cross

1    Q.  You said that you helped the squad, and I quote, with a few

2    tasks in the investigation.  Do you recall that?

3    A.  I don't believe those are my words but I did adopt them,

4    yes.  I said yes.

5    Q.  Right.  He asked you:  Did you help the squad with a few

6    tasks and investigations?  And you said yes.

7                THE COURT:  Mr. Weitzman is referring to

8    Mr. Monteleoni.

9                MR. WEITZMAN:  Yes.  Sorry.  He, as in Mr. Monteleoni.

10               What tasks did you help the FBI squad during the

11   investigation?

12               MR. MONTELEONI:  Objection.

13               THE COURT:  I will allow it.

14               THE WITNESS:  I assisted on two interviews of two

15   individuals.

16   BY MR. WEITZMAN:

17   Q.  Do you recall who those interviews were with?

18   A.  One, his last name was Critchley.

19   Q.  OK.

20   A.  And another I believe was Khorozian.

21   Q.  Say the second name?

22   A.  Khorozian.

23   Q.  Khorozian.

24       You did not participate in an interview of Shaun Doherty,

25   correct?

O6K5men4                         van Wie - Cross

1           MR. MONTELEONI:  Objection.

2           THE COURT:  Are you objecting?

3           MR. MONTELEONI:  Yes.

4           THE COURT:  Sustained.

5   Q.  Did you participate in any interview of counsel for Sheikh

6   al Thani?

7           MR. MONTELEONI:  Objection.

8           THE COURT:  Sustained.

9   Q.  Did anybody tell you while you were assisting the FBI squad

10  that was investigating Senator Menendez that there were other

11  interviews of individuals in this case?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14  Q.  Were you informed at any point as to the identity of others

15  who were interviewed by the FBI and the U.S. Attorney's office

16  in this investigation?

17          MR. MONTELEONI:  Objection.

18          THE COURT:  Sustained.

19  Q.  Now if we can go to row 99 on the chart?  This is a message

20  that was included dated June 18, 2021, in which Shaun Doherty

21  says:  My advice is the meeting with Fred should not take place

22  unless it is on a more discrete venue.

23      Do you see that?

24  A.  Yes.

25  Q.  Now this is a Heritage employee Shaun Doherty.  Do you have

1    that understanding?

2              MR. MONTELEONI:  Objection.

3              THE COURT:  Do you know who Shaun Doherty is from the

4    document?

5              THE WITNESS:  From the documents, I believe he is

6    associated with Heritage Advisors.

7    Q.  From the documents that you see his title is chief

8    operating officer of Heritage?

9    A.  I don't recall that specifically.

10   Q.  And that message, this message about having a discrete

11   venue is on June 18, 2021?; correct?

12   A.  That's correct.

13   Q.  Let's go to row 114.

14        On June 30th, Sheikh al Thani e-mails Fred Daibes with a cc

15   to Shaun Doherty; correct?

16   A.  That's correct.

17   Q.  And he says:  Thank you for the opportunity to view today.

18   It was nice to meet you and I look forward to speaking again

19   soon as we progress with our projects.  I am copying Shaun who

20   will be main contact in our London office.

21        June 30th is about 12 days after that June 18 message,

22   right?  Less than two weeks?

23   A.  Yes.

24   Q.  And you have seen no documents, sir, suggesting that the

25   meeting, any meeting between al Thani and Fred Daibes, was in a

1   discrete venue, did you?

2              MR. MONTELEONI:  Objection.

3              THE COURT:  Sustained.

4   Q.  Did you see documents as to where the location of the

5   meeting between Sheikh al Thani and Mr. Daibes was?

6   A.  I don't recall.

7   Q.  Let's look at the cited document here, Government Exhibit D

8   308.  Would you look at the top e-mail and do you recognize

9   Sultan al Thani to be Sheikh al Thani, the same individual I

10  referred to?

11  A.  Yes.

12  Q.  In the top e-mail from Fred Daibes to Sultan al Thani he

13  says:  Thank you for coming to visit.  It was truly a pleasure

14  to get to spend time with you and show you around Edgewater.

15      Do you see that?

16  A.  I see that, yes.

17  Q.  Do you know where Edgewater is?

18  A.  I know there is one in New Jersey.

19  Q.  Any idea, based on reviewing these messages, where they --

20  whether they met in a discrete venue in Edgewater?

21             MR. MONTELEONI:  Objection.

22             THE COURT:  Sustained.

23  Q.  Let's go back to Government Exhibit 1304 and if we can go

24  to row 188.  Now, this shows a November 3, 2021 WhatsApp call

25  that lasted three minutes and five seconds between Sheikh

O6K5men4                                van Wie - Cross

1    al Thani and Fred Daibes; correct?

2    A.   Correct.

3    Q.   And it cites the Government Exhibit D209; correct?

4    A.   That's correct.

5    Q.   You looked at that document?

6    A.   Yes.

7           MR. WEITZMAN:   Can we put that document up, just in a

8    side by side for him?

9    Q.   This is the log on which you relied for that communication;

10   is that correct?

11   A.   Yes.

12   Q.   I will come back to this in a moment.

13         Now I would like to go to 1304, lines 164, 165.  Do you see

14   line 164 involves a forward or a WhatsApp message from Fred

15   Daibes dated September 29, 2021?

16   A.   Yes.

17   Q.   And he sends to Senator Menendez the title from the

18   Congress.gov website of a resolution expressing appreciation

19   for the State of Qatar, correct?

20   A.   That's correct.

21   Q.   Just to be clear, that resolution, based on your review of

22   the document, was not sponsored by Senator Menendez; correct?

23         THE COURT:   Sustained.

24   Q.   Sir, if we look at the document can -- we zoom in on the

25   Congress.gov website?

1              MR. MONTELEONI:  Your Honor, can we have a side bar if
2      we are going into this territory?
3              MR. RICHENTHAL:  Yes.
4              THE COURT:  How much longer do you have, sir?
5              MR. WEITZMAN:  I'm going to have considerably a lot
6      longer, your Honor.  I'm happy to take this up after.
7              THE COURT:  All right.
8              MR. WEITZMAN:  Why don't we put that down.  If we can
9      still go to the entry but I will deal with the website in a
10     moment.
11             Go back to that entry?
12     BY MR. WEITZMAN:
13     Q.  The title of the resolution is:  A resolution expressing
14     appreciation for the State of Qatar's efforts to assist the
15     United States during Operation allies Refuge.
16             Do you see that?
17     A.  Yes.
18     Q.  And are you aware from your review of the documents that
19     Operation Allies Refuge was America's effort to get Allies out
20     of Afghanistan after the United States left Afghanistan?
21             MR. MONTELEONI:  Objection.
22             THE COURT:  Sustained.
23     Q.  Sir, do you know what Operation Allies Refuge is, based on
24     your review of the documents?
25     A.  No.

1    Q.  Do you know if it had anything to do with Afghanistan?

2            MR. MONTELEONI:  Objection.

3            THE COURT:  Do you know anything about what that

4    operation was?

5            THE WITNESS:  No.

6    Q.  Do you know anything about why this resolution was

7    sponsored -- forget why the resolution -- what the resolution

8    says about the reasons why the sponsors, whomever they were,

9    were appreciating the State of Qatar's efforts?

10           MR. MONTELEONI:  Objection.

11           THE COURT:  Do you know anything about what the

12   resolution says, sir?  Yes or no.

13           THE WITNESS:  No.  I only read for the purposes of

14   verifying for accuracy of the chart.

15   Q.  And you do see that on -- you do see that it references

16   Senator 2 in the Congress.gov website?

17   A.  If you can blow it up a little larger?

18   Q.  Yes.  Do you see that?

19   A.  Yes.

20   Q.  And you were in court when the judge instructed that

21   Senator 2 is not Senator Menendez, correct?

22   A.  Yes, I recall that.

23           MR. WEITZMAN:  Now, if we turn to row 120 -- or, can

24   we stay on that?

25   Q.  By the way, did you see any communication, any exchange

1    from Fred Daibes to Robert Menendez explaining why he forwarded

2    this to Robert Menendez?

3             MR. MONTELEONI:  Objection?

4             THE COURT:  In the document.

5             MR. WEITZMAN:  In the document.

6             THE COURT:  Do you see anything in the documents in

7    that regard?

8             THE WITNESS:  I don't recall seeing that.

9    BY MR. WEITZMAN:

10   Q.  And was there any content, any words from Fred Daibes to

11   Robert Menendez other than the words, the WhatsApp with the

12   Congress.gov website?

13            MR. MONTELEONI:  Objection.

14            THE COURT:  I'm not sure I understand.

15   Q.  This message, did it contain anything else other than

16   what's reflected here on this line?

17   A.  I would have to look at the exhibit to verify that.

18            MR. WEITZMAN:  Can we go to Government Exhibit A104-4

19   and go to the top?  Sorry that's the wrong exhibit, next page.

20   Another assist.  Thank you, Mr. Monteleoni.

21   Q.  Let's go to the bottom.  He just forwards the title of the

22   Senate resolution with no commentary.  Is that fair to say,

23   sir?

24            MR. MONTELEONI:  Objection, and rule of completeness

25   with the upper text.

O6K5men4                          van Wie - Cross

1            THE COURT:  Deal with it.

2    Q.  There is no commentary sir, right?

3    A.  On this one I see only a link.

4    Q.  Let's go to the message above.  Again, another message from

5    Fred Daibes, you don't see any commentary from Fred Daibes

6    about this; correct?

7    A.  Correct.  I just see just a link.

8    Q.  And if you zoom out let's go up one page so that it is next

9    in time, you don't see any response from Senator Menendez to

10   those two messages; correct?

11           MR. MONTELEONI:  Objection to time frame of what is on

12   the screen.

13   Q.  Well, let's look at the two messages again with the Senate

14   resolution.  Do you see any response from Senator Menendez to

15   either of the messages from Fred Daibes?

16   A.  It looks like these are sent at the same time.

17   Q.  Do you see any response from Senator Menendez to those

18   messages, whenever they were sent?

19   A.  To these two messages?

20   Q.  Correct?

21   A.  I would have to see below because they were both sent at

22   10:16:55.

23           MR. WEITZMAN:  Let's go below then.  Can you zoom out,

24   go below, let's go above?

25   A.  Between the 10:16 and 10:17 there were no other messages.

O6K5men4                         van Wie - Cross

1   Q.  Thank you, sir.

2              MR. MONTELEONI:  Objection to the date that is on

3   these messages, these are chronologically --

4   Q.  Go to the next one.  This is it, this is the last page.

5   Anything -- you don't see any response; correct?  There is no

6   response to anything on the Chart either, right?

7              MR. MONTELEONI:  Objection.

8   Q.  Let's put up Government Exhibit 1304, can we go to line

9   164?  This is the message, let's go to the next line, 165, you

10  don't see a response from Senator Menendez to Fred in response

11  to the Senate resolution, correct?

12             MR. MONTELEONI:  Objection.

13             THE COURT:  Do you, on the chart, see a response to

14  the message sent by Daibes to Menendez?

15             THE WITNESS:  There is no response on the chart.

16  BY MR. WEITZMAN:

17  Q.  Now I would like to talk about some of the press releases

18  that are on the chart, let's turn to row 120 on Government

19  Exhibit 1304.  Do you see that Senator Menendez, on August 2,

20  2021, at 3:26 p.m., sent full text of press release with title:

21  Chairman Menendez applauds Qatari's government's $100 million

22  contribution for humanitarian assistance for Yemen.  He sends

23  that to Fred Daibes.

24  A.  Yes.

25  Q.  Let's look at the press release, Government Exhibit.

<pre>
 1   A104-2 -- I'm sorry, that's not the release.  We don't need to
 2   pull up Government Exhibit A104, that's a WhatsApp
 3   .Do you look at this press release
 4              THE COURT:  Did you look at GX A104-2?
 5   A.  I looked at that exhibit.
 6   Q.  That exhibit doesn't include the press release, right?
 7              MR. MONTELEONI:  Objection.
 8   Q.  Let's put up Government Exhibit A104-2.  Do you see, if we
 9   zoom in, do you see it copies the press release?  I see it.
10   Correct?
11              MR. MONTELEONI:  Objection.
12              THE COURT:  No.  Can you say whether or not that is
13   the press release of what is on the screen?
14              THE WITNESS:  I don't know if that is the full press
15   release.  I only review what was necessary to verify the
16   accuracy of the line that references this exhibit.
17   BY MR. WEITZMAN:
18   Q.  Do you see the first paragraph states:  U.S. Senator Bob
19   Menendez D.N.J., chairman of the Senate Foreign Relations
20   Committee, released the following statement expressing support
21   for the Qatari government's recent contribution of an
22   additional $100 million towards humanitarian operations in
23   Yemen to help alleviate the humanitarian crisis in the country.
24   A.  Yes.
25   Q.  Do you see that?
</pre>

1        Now, if we go back to the chart on row 117, Government

2   Exhibit 1304, 117, you would agree with me -- actually, let me

3   withdraw that.

4        On July 24, this is one week before that August 2, press

5   release -- sorry -- this is a screenshot of Representative

6   Meeks tweeting a thank you to Qatar.  Do you see that?

7   A.  Yes.

8   Q.  And in the screen shots of that tweet, Congressman Meeks

9   thanks Qatar for its contribution to "provide relief for the

10  worst humanitarian crisis in the world."

11       Do you see that?

12  A.  Yes.

13  Q.  Fair to say that Senator Menendez wasn't the only one who

14  was commenting about Qatar's hundred million donation?

15              MR. MONTELEONI:  Objection.

16              THE COURT:  Sustained.

17  Q.  Do you know who Congressman Meeks is, sir?

18  A.  No.

19  Q.  Are you aware, based on your review of the documents, that

20  he was the chairman of the House Foreign Affairs Committee?

21              MR. MONTELEONI:  Objection.

22              THE COURT:  If he doesn't know who he is.  But can you

23  answer that, sir?

24              THE WITNESS:  I don't know.

25              THE COURT:  Why don't you find a logical time to break

O6K5men4                          van Wie - Cross

1    and I will give the jury its mid-afternoon break, sir.

2              MR. WEITZMAN:  This is a good time.

3              THE COURT:  Ladies and gentlemen, 15 minutes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6K5men4                          van Wie - Cross

 1                  (Jury not present)

 2                  THE COURT:  You may step down, sir.

 3                  MR. WEITZMAN:  I think there was a question that I was

 4       about to ask.

 5                  THE COURT:  I thought we are done with 390.

 6                  MR. WEITZMAN:  I'm not sure we are done.  There is a

 7       question that I would like to ask but they have an issue.

 8                  THE COURT:  What is it?

 9                  MR. WEITZMAN:  The question, your Honor, would be:

10       Based on the documents you reviewed, you have not seen any

11       documents reflecting any involvement by Robert Menendez in the

12       drafting, editing, or sponsorship of this resolution?

13                  THE COURT:  Sustained.

14                  (Recess)

15                  THE COURT:  I will inform the Jury that with the

16       consent of the parties, we are taking a witness out of order

17       still on the government's case.

18                  MR. RICHENTHAL:  Yes, your Honor.

19                  THE COURT:  How long is direct going to be.

20                  MR. RICHENTHAL:  10 minutes, maybe 15.

21                  THE COURT:  Do we know if there is going to be any

22       cross?

23                  MR. WEITZMAN:  Yes, your Honor.  Probably no longer

24       than that.  Hopefully shorter.

25                  MR. LUSTBERG:  Nothing from us.

O6K5men4                           van Wie - Cross

1           MR. DE CASTRO:  Nothing.

2           THE COURT:  Let's keep it short.

3           How much longer do you have, Mr. Weitzman?  Not on

4      this witness.

5           MR. WEITZMAN:  I am guessing we will not conclude

6      today but I will do my best.

7           THE COURT:  Will we come close?

8           MR. WEITZMAN:  Yes.

9           THE COURT:  And there is a possibility, right?

10          MR. WEITZMAN:  Yes.

11          THE COURT:  Good.  I am trying to make sure everybody

12     stays efficient.  You can understand that.

13          MR. WEITZMAN:  I can, and I could.

14          THE COURT:  The jury is maybe getting a bit weary.

15     Certainly all of you are.

16          Jury entering.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O6K5men4                         van Wie - Cross

1             (Jury present)

2             THE COURT:  You may be seated.

3             Ladies and gentlemen of the jury, you can see

4    Mr. Van Wie is not on the stand.  That would be an amazing

5    transformation.

6             What I am going to tell you is not unusual.  For

7    scheduling purposes, because of the availability of witnesses,

8    the parties have agreed that this witness can be taken out of

9    turn.  He is a witness still on the government's case but we

10   are going to interrupt Mr. Van Wie's testimony for rather short

11   testimony by this witness, and then we will go back to

12   Mr. Van Wie.  It is simply a matter of trying to expedite

13   things and for the convenience of the witnesses and the

14   parties.

15             Sir, if you would rise, my deputy will address you.

16             THE DEPUTY CLERK:  Please raise your right hand.

17   GEOFFREY MEARNS,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20             THE DEPUTY CLERK:  Please state your full name and

21   spell your name for the record.

22             THE WITNESS:  My name is Geoffrey Mearns.

23   G-O-E-F-F-R-E-Y, M-E-A-R-N-S.

24             THE COURT:  Good afternoon, Mr. Mearns.  If you would

25   please speak loudly, slowly, and clearly into the microphone.

1             Your witness, Mr. Richenthal.

2    DIRECT EXAMINATION

3    BY MR. RICHENTHAL:

4    Q.  Good afternoon, Mr. Mearns.

5    A.  Good afternoon.

6    Q.  What is your educational background?

7    A.  I have my bachelors from University of Virginia.

8    Q.  Where do you work?

9    A.  I work at the United States Attorney's Office for the

10   Southern District of New York.

11   Q.  For approximately how long have you worked there?

12   A.  About three and a half years.

13   Q.  What is your current role?

14   A.  My current title is Special Assistant to the United States

15   Attorney.

16   Q.  What is that, in short?

17   A.  It's essentially a fancy way of saying I'm the U.S.

18   Attorney's assistant.

19   Q.  What, if anything, did you do before that in the U.S.

20   Attorney's office?

21   A.  I was a paralegal for about two and a half years.

22   Q.  Directing your attention to September 11, 2023, were you

23   asked to assist with a presentation to be given to federal

24   prosecutors in the U.S. Attorney's office by then counsel to

25   Robert Menendez?

O6K5men4                          Mearns - Direct

1    A.  Yes.

2    Q.  What were you asked to do?

3    A.  I was asked to sit in on the meeting and help set up some

4    tech.

5    Q.  Was this meeting --

6              THE COURT:  Some tech.  What's some tech?

7              THE WITNESS:  I set up a PowerPoint on the projector

8    screen so that everybody could see it.

9              THE COURT:  "Tech" is technical; is that is it?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.

12   BY MR. RICHENTHAL:

13   Q.  Was this presentation before or after charges were brought

14   in this matter?

15   A.  It was before.

16   Q.  I think you said a PowerPoint?

17   A.  Yes.

18   Q.  For anyone who may not know, what is a PowerPoint?

19   A.  It is essentially a presentation, a slide deck.

20   Q.  What, specifically, were you asked to do with this

21   presentation or slide deck?

22   A.  I remember that the associate for Senator Menendez' team,

23   his computer wasn't working at the time, so they had me use my

24   computer; I plugged it in and projected onto the screen.

25             THE COURT:  You mean Senator Menendez's former

1    counsel's team?

2                THE WITNESS:  Yes.

3    Q.  How did you receive this presentation in order to put it on

4    your computer and project it on the screen?

5    A.  They sent it to me via e-mail.

6    Q.  Without identifying people by names, who attended the

7    presentation, to the best of your memory?

8    A.  The prosecution team at our office, as well as the

9    executive staff of our office, as well as Senator Menendez'

10   former defense team.

11   Q.  What is the executive staff?

12   A.  It's the United States Attorney, his deputy, and the chief

13   of our criminal division.

14               MR. RICHENTHAL:  If we will put on the screen just for

15   the witness, counsel and judge what's been marked for

16   identification as Government Exhibit 4A-3.

17   Q.  Do you recognize this?

18   A.  I do.

19   Q.  What is this?

20   A.  This is an excerpt of that PowerPoint presentation that

21   they sent me.

22   Q.  You say an excerpt meaning this is not the complete

23   presentation?

24   A.  It's not.

25   Q.  Did you determine what parts would make it into this

O6K5men4                          Mearns - Direct

1    exhibit?

2    A.  I did not.

3    Q.  Have you reviewed this exhibit before testifying this

4    afternoon?

5    A.  I did.

6    Q.  Are any parts blacked out or redacted?

7    A.  Yes.

8    Q.  Did you determine which parts would be blacked out or

9    redacted?

10   A.  I did not.

11            MR. RICHENTHAL:  The government offers Government

12   Exhibit 4A-3.

13            THE COURT:  Hearing no objection.

14            MR. WEITZMAN:  Your Honor, one moment?

15            (Counsel conferring)

16            MR. WEITZMAN:  Thank you, your Honor.

17            MR. RICHENTHAL:  The government offers 4A-3.

18            THE COURT:  Hearing no objection, admitted.

19            (Government's Exhibit 4A-3 received in evidence)

20            MR. RICHENTHAL:  If you can put that on the jury's

21   screen, please?

22   BY MR. RICHENTHAL:

23   Q.  Mr. Mearns is that up on your screen?

24   A.  Yes.

25   Q.  Is this the cover of the presentation?

1    A.  Yes.

2    Q.  Could you read it, please?

3    A.  It says:  Presentation to U.S. Attorney's office, Southern

4    District of New York, September 11, 2023.

5            THE COURT:  Well, it also says above that:  Senator

6    Robert Menendez.  Is that correct, sir?

7    A.  Yes.

8    Q.  Let's now turn to the second page, that is the first page

9    in the exhibit after the cover page.  Do you see that,

10   Mr. Mearns?

11   A.  I do.

12   Q.  Do you see what appears to be an asterisk next to several

13   items on this page?

14   A.  I do.

15   Q.  And are there words after the asterisk at the bottom of the

16   page?

17   A.  Yes.

18   Q.  Could you read what is after the asterisk at the bottom of

19   the page, please?

20   A.  Yes.  Indicates the senator was not aware of item until

21   this investigation began.

22           MR. RICHENTHAL:  Let's now turn to the next page and

23   if we can blow that up as well?  Thank you.

24   Q.  Is there an asterisk on this page?

25   A.  Yes.

O6K5men4                        Mearns - Direct

1    Q.  Does it refer to an item on the page?

2    A.  Yes.

3    Q.  What item?  Could you read it, please?

4    A.  Yes.  It refers to an item dated 4/20/19 through 12/2023,

5    monthly car payments to Ray Catena Motors.

6    Q.  At the bottom of the page does the asterisk say what it

7    refers to?

8    A.  Yes.

9    Q.  Could you read that, please?

10   A.  Indicates the senator was not aware of item until this

11   investigation began.

12            MR. RICHENTHAL:  Can you go to the next page, please,

13   and blow it up?

14   Q.  Could you read the second to last line beginning

15   December 2022?

16   A.  Sure.

17       December 2022.  The senator leams [sic] of mortgage payment

18   made by Hana.

19            THE COURT:  You believe that says "leans"?

20            MR. RICHENTHAL:  Can we blow that up, if it is

21   possible?

22            THE COURT:  Well, it looks like it says "leams".  Go

23   ahead.

24   Q.  That's what it says.  We can go back out.

25       Can you read the next line?

1   A.  After learning of the payment, senator gives Nadine funds

2   to repay the full amount.

3   Q.  And could you read the final bullet on the page?

4   A.  December 22, 2022, Nadine writes check to in trust for Wael

5   Hana in the amount of $23,568.54 for full payment of Wael Hana

6   loan.

7           MR. RICHENTHAL:  Can we go to the next page and blow

8   that up as well?  Thank you.

9   Q.  Mr. Mearns, could you do the same thing, that is could you

10  read the second to last bullet and then the last bullet?

11  A.  Yes.  December 2022, the senator leams [sic] of car

12  payments made by Uribe.  After learning of the payments,

13  senator gives Nadine funds to repay the full amount.

14  Q.  And could you now read the last bullet, please?

15  A.  December 23, 2022, Nadine writes a check to José Uribe in

16  the amount of $21,000 for personal loan.

17  Q.  Mr. Mearns, I have asked you to read certain parts of this

18  presentation and there are other parts I have not asked you to

19  read.  With respect to whether you have read or not read any

20  parts of the presentation that is in the exhibit, do you have

21  any personal knowledge of the accuracy, or lack thereof, of the

22  statements in this presentation?

23  A.  I do not.

24  Q.  Apart from setting up any meetings that may have been

25  requested by the U.S. Attorney, did you have any role in the

O6K5men4                          Mearns - Cross

1   investigation or prosecution of this case?

2   A.  I did not.

3           MR. RICHENTHAL:  No further questions.

4           THE COURT:  Thank you.

5           Is there any cross-examination?  Mr. Weitzman.

6   CROSS-EXAMINATION

7   BY MR. WEITZMAN:

8   Q.  Good afternoon, Mr. Mearns.

9   A.  Good afternoon.

10  Q.  So we are talking about the September 11 meeting; is that

11  correct?

12  A.  Yes.

13  Q.  And you say that it was attended by the prosecution team

14  and the executive team; correct?

15  A.  Yes.

16  Q.  There were -- do you recall that there were 10 federal

17  prosecutors there?

18  A.  That sounds right.

19  Q.  And in addition, the U.S. Attorney Damian Williams was

20  there; right?

21  A.  Yes.

22  Q.  His chief counsel was there, right?

23  A.  Yes.

24  Q.  His deputy U.S. Attorney was there?

25  A.  Yes.

1    Q.   The chief of the criminal division was there?

2    A.   Yes.

3    Q.   The head of the public corruption unit were there?

4    A.   Yes.

5    Q.   And then all the prosecutors you see here from the Southern

6    District of New York?

7                THE COURT:   The people at the first table.

8                MR. WEITZMAN:   From the Southern District of New York,

9    correct.

10   A.   I don't believe all of them, I think the first four there.

11   Q.   And then on the defense side, former counsel to Senator

12   Menendez was present with a couple of colleagues; is that

13   right?

14   A.   Yes.

15   Q.   Do you recall that the meeting lasted about an hour and a

16   half or two hours?

17   A.   That sounds right.

18   Q.   Senator Menendez wasn't there, right?

19   A.   No.

20   Q.   Just his legal team, right?

21   A.   That's right.

22   Q.   Now, are you aware that there was a prior meeting between

23   Senator Menendez' legal team and the government?

24                MR. RICHENTHAL:   Objection.   Scope, 401, 403 and

25   potentially calls for hearsay, your Honor.

1          THE COURT:  Scope.  I'll sustain it on scope.

2    BY MR. WEITZMAN:

3    Q.  Did you attend a prior meeting -- I'm not going to ask

4    about the contents.

5          MR. RICHENTHAL:  Same objections, minus hearsay.

6          MR. WEITZMAN:  Just whether he attended, not anything

7    further, your Honor.

8          THE COURT:  Go ahead.

9    Q.  Did you attend the prior meeting?

10   A.  I did not.

11         MR. RICHENTHAL:  Question assumes a fact.

12         THE COURT:  Did you attend a prior meeting.

13         THE WITNESS:  No, I did not.

14   BY MR. WEITZMAN:

15   Q.  Now, do you recall that the prosecutors who attended, one

16   or more of them had note pads and were taking notes?

17         MR. RICHENTHAL:  Objection, your Honor.

18         THE COURT:  I will allow it.

19         THE WITNESS:  I think so, yeah.

20   Q.  You saw many prosecutors taking notes?  How many?

21         MR. RICHENTHAL:  Objection; 401, 403, and scope.

22         THE COURT:  I will allow it.

23         Do you know how many were taking notes?

24         THE WITNESS:  I don't remember.  I don't think every

25   single person was taking notes, but.

O6K5men4                        Mearns - Cross

1   Q.  Was there one person in particular who was asked for or

2   assigned to be the principal notetaker for that meeting?

3            MR. RICHENTHAL:  Same objection.

4   Q.  To your knowledge.

5            THE COURT:  I will allow it, if he knows.

6   A.  I don't recall.

7   Q.  Do you recall whether Mr. Monteleoni was taking a lot of

8   notes?

9            MR. RICHENTHAL:  Objection, your Honor.

10           THE COURT:  Yes.  Let's move on.

11           MR. WEITZMAN:   Thank you.

12  BY MR. WEITZMAN:

13  Q.  Did you review any notes from that meeting of the contents

14  of the meeting?

15  A.  No.

16  Q.  Do you recall, though, that Damein Williams opened the

17  meeting, made introductions, greeted everybody?

18  A.  Yes.

19  Q.  You recall that he said he's not made any decisions,

20  prosecutorial decisions yet?

21           THE COURT:  Sustained.

22  Q.  Do you recall what he said?

23           THE COURT:  Sustained.

24  Q.  The Government Exhibit 4A-3 is it a four or five-page

25  excerpt; is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  I think that's right.  Five, maybe six.

2    Q.  Do you recall how long the PowerPoint was that was

3    presented?

4              MR. RICHENTHAL:  Objection.

5              THE COURT:  I will allow it.

6              How many pages, is that what you are asking?

7              MR. WEITZMAN:  Yes.

8              THE COURT:  Do you recall how many pages?

9    A.  I don't remember, no.

10   Q.  You did receive a copy of the full PowerPoint, right?

11   A.  Yes.

12   Q.  I'm going to ask to refresh your recollection with what's

13   been marked as Defendant's Exhibit 2100.  Let me present it to

14   counsel.

15             THE COURT:  Just so you know, sir, the jury knows

16   this, Mr. Weitzman can show you anything at all to assist in

17   refreshing your recollection.  The issue is not what's on

18   whatever he is going to show that would, whether it may or may

19   not be true.  The only issue is whether looking at that

20   document gives you a refreshed recollection in regard to how

21   many pages the full presentation was.  It will either assist

22   you or it won't.  So, does looking at whatever it is he is

23   showing you -- is this what you want him to see, sir.

24             MR. WEITZMAN:  I'm going to scroll through the page,

25   your Honor.

1            THE COURT:  OK.

2            MR. WEITZMAN:  If we can scroll through the pages,

3    Mr. Kelly?  Just so that you can recognize what this is, sir,

4    keep scrolling quickly all the way to the end.  That's it.

5            THE COURT:  Does that refresh your recollection in

6    regards to how many pages the presentation was?

7            THE WITNESS:  Yes.

8    BY MR. WEITZMAN:

9    Q.  How many page was the presentation?

10   A.  It was 44 pages.

11   Q.  Do you recall that the presentation covered a range of

12   topics beyond the four pages that you testified about on

13   direct?

14           MR. RICHENTHAL:  Scope.

15           THE COURT:  Sustained.

16   Q.  Sir, do you recall that there were other topics besides --

17   I'm not asking what the topics were -- other topics besides the

18   ones referenced in the four pages?

19           THE COURT:  Sustained.

20   Q.  Sir, do you recall that the -- did you take notes during

21   this presentation?

22   A.  I did not.

23   Q.  Did you pay attention during the presentation?

24   A.  Yes.

25   Q.  Was one of the reasons you were paying attention because

1    you were assisting the U.S. Attorney's office with potential

2    press issues?

3                MR. RICHENTHAL:  Objection.

4                THE COURT:  Sustained.

5    Q.  Why were you paying attention during the meeting?

6                MR. RICHENTHAL:  Objection.

7                THE COURT:  I will allow it.

8                THE WITNESS:  I was paying attention for two primary

9    reasons:  One to make sure that the presentation was working,

10   if they needed me to fix anything; and the second was personal

11   interest by, you know, I'm young and the point of doing my job,

12   like one of the benefits of my job is learning about how the

13   office works.

14   BY MR. WEITZMAN:

15   Q.  Were you paying attention, in part, because you would be

16   involved in planning for the future including a press

17   conference?

18                THE COURT:  Sustained.

19   Q.  Did you know that there was a plan for a press conference

20   at that meeting?

21                THE COURT:  Sustained.

22   Q.  In a meeting on June 19, 2024, did you tell the government

23   that you were helping plan for a press conference?

24                THE COURT:  Sustained.

25   Q.  Do you recall, as you were paying attention to the lawyer

1   who represented Senator Menendez at the time, was he doing the

2   principal speaking during the presentation?

3   A.   Yes.

4   Q.   Now, as to the four pages that you testified about, do you

5   recall what he said during those four pages?

6             THE COURT:  Sustained.

7   Q.   Do you recall whether he was reading the PowerPoint or

8   extemporizing?

9             MR. RICHENTHAL:  Objection, including vague.  Same

10  objections as before, plus vague.

11            THE COURT:  Sustained.

12            MR. WEITZMAN:  Your Honor, can we have a brief side

13  bar?

14            THE COURT:  No.  We have been over the scope on this

15  previously.

16            MR. WEITZMAN:  This is the scope, this is the four

17  pages, your Honor.  I'm asking about the very four pages that

18  they had him testify about.

19            THE COURT:  Proceed.

20  BY MR. WEITZMAN:

21  Q.   Do you recall whether the lawyers --

22            THE COURT:  You know what?  I will allow this.

23            MR. WEITZMAN:  OK.  Thank you, your Honor.

24            THE COURT:  Do you recall whether Senator Menendez'

25  former lawyer was simply reading what was on the screen or was

 1    he speaking words that weren't on the screen?

 2              THE WITNESS:  He wasn't just reading the PowerPoint,

 3    so additional things.

 4    BY MR. WEITZMAN:

 5    Q.  Do you recall whether he was reading from a script or

 6    extemporizing?

 7              MR. RICHENTHAL:  Objection.

 8              THE COURT:  Sustained.

 9    Q.  Do you recall whether he was reading from a script?

10    A.  I don't.

11    Q.  Do you know whether he had notes?  Do you recall whether he

12    had notes?

13              MR. RICHENTHAL:  Objection.

14              THE COURT:  I will allow it.

15    A.  I don't know.  I think he may have -- someone may have had

16    a computer but I'm not exactly sure.

17    Q.  When he was speaking, was he speaking in an animated,

18    impassioned way?

19              THE COURT:  Like this?  No.  Sustained.

20    Q.  Did he mention that he was still reviewing documents and

21    evidence?

22              THE COURT:  Sustained.

23    Q.  Do you recall that whether he said the following words, in

24    sum or substance, Senator Menendez asked me to tell you X?

25              THE COURT:  Sustained.

1   Q.  Is it correct to say that when he was discussing the four

2   pages or so that you testified about on direct, he never said

3   that he is relaying a message from Senator Menendez?

4            THE COURT:  Sustained.

5   Q.  At no point in time during his presentation regarding these

6   four pages, or anything else, did the lawyer ask that this

7   presentation be provided to the grand jury?

8            THE COURT:  Sustained.

9            MR. WEITZMAN:  Your Honor, I'm sorry.  Can we have a

10  side bar, please?

11           THE COURT:  Yes.

12           (Continued next page)

 1              (At sidebar)

 2              MR. WEITZMAN:  Your Honor, the government's charge is

 3    obstruction of justice.

 4              THE COURT:  Yes.

 5              MR. WEITZMAN:  They put in this document, and as an

 6    element of the charge, they need to prove that there was a

 7    corrupt intent by Senator Menendez to disrupt or obstruct a

 8    grand jury investigation.  Whether or not there was any

 9    intention for this to go before the grand jury -- and I

10    understand they did not -- is part of our defense.

11              Under *United States v. Schwarz*, we're entitled to

12    defend whether there was any statement as to whether this was

13    intended to go to the grand jury.  I don't understand how we

14    can deprived of that ability to defend.  Nor can we be deprived

15    of the ability to ask him about what he recalls being said.  He

16    says he paid attention during those pages of the presentation.

17    Frankly, I think we should be permitted to go beyond that,

18    because the context of the entire presentation is what's

19    relevant, which is did they have a corrupt intent, or were they

20    disclosing information to the government that was truthful.

21    Whether they made an error here or there isn't the point, and

22    so we have to put all of this in context.  And they proffered a

23    witness who has some recollection of events, but we're being

24    deprived of the ability to inquire.

25              THE COURT:  What is it that you want to ask him?

O6kWmen5                    Mearns - Cross

1          MR. WEITZMAN:  I want to ask him about what he recalls

2   Abbe Lowell, the lawyer, saying on those pages.  I want to ask

3   him whether there was any statement about whether this should

4   go in front of the grand jury, or was he trying to influence

5   the prosecutor's decisions.

6          Influencing a prosecutor's decision is not an

7   obstruction of justice, under *United States v. Schwarz*.  It has

8   to obstruct the grand jury investigation.

9          MR. RICHENTHAL:  As your Honor knows, we are agents of

10  the grand jury.  The grand jury is the investigating body and

11  the charging body in this case in particular.  There's a whole

12  set of procedures and rules that govern that, none of which the

13  jury knows.  Mr. Mearns simply presented what the presentation

14  says.  If no more evidence comes in, I expect that Mr.

15  Weitzman, Mr. Fee or one of their colleagues may say in

16  summation, ladies and gentlemen, there's an absence of evidence

17  the presentation influenced the grand jury.  If that's an

18  appropriate argument, then make it.  That's entirely separate

19  from suggesting somehow Mr. Lowell, who obviously knew there

20  was a grand jury proceeding, didn't understand that the

21  statements he made to the entire leadership of the U.S.

22  Attorney's Office might influence decisions about what we --

23          THE COURT:  Slower, slower.

24          MR. RICHENTHAL:  There's a difference between arguing

25  about the absence of evidence and attempting to suggest that if

1    Mr. Lowell did not say affirmatively is this going to the grand

2    jury that somehow that means it wasn't.  I think everyone

3    standing here understands Abbe Lowell understood at the time

4    the presentation to the entire senior leadership of the U.S.

5    Attorney's Office as to whether to seek an indictment of a

6    sitting senator would be obtained via a grand jury.

7              MR. WEITZMAN:  Your Honor, the Second Circuit, in

8    *United States v. Schwarz,* which is the Abner Louima case,

9    reversed convictions on this very issue because information

10   provided by the police officer, one of the police officers to

11   the investigating prosecutors and officials, was there was no

12   evidence that he knew it was going to go before the grand jury.

13   We're entitled to inquire as to whether there were statements

14   about whether this was intended to go before the grand jury --

15             THE COURT:  Well, I would have liked a heads-up on

16   this and would have liked the *Schwarz* case that you're

17   referring me to.

18             MR. RICHENTHAL:  I can also respond briefly that it is

19   correct that there needs to be knowledge or an intent to

20   influence the grand jury, at least in this context, but I'm not

21   talking about that as a legal matter.  I'm talking about

22   whether the jury should be allowed to speculate that if Mr.

23   Lowell did not affirmatively say that, that that somehow bears

24   on that.  Everyone here understands the grand jury process,

25   understands the role of defense counsel making a presentation.

O6kWmen5                          Mearns - Cross

1          There's a 403 problem with what Mr. Weitzman is

2    attempting to suggest.

3          THE COURT:  What's the 403 problem?

4          MR. RICHENTHAL:  Your Honor, if the idea is that

5    absent a lawyer saying affirmatively to the entire leadership

6    of the U.S. Attorney's Office, which is on the verge of making

7    a decision whether to seek an indictment, are you going to put

8    this in front of the grand jury, it means that there's no

9    intent by the client, that would require us, I think, to

10   explain to the petit jury -- that is, this jury -- all of that

11   process; that is, indictments are before the grand jury.

12         THE COURT:  Sir, I think that's right.  I think the

13   presence or absence of what Lowell said -- in other words,

14   whether he said are you going to present this to the grand

15   jury, as I understand the process, he's unlikely to do that

16   because he, as Mr. Richenthal says, he knows what the procedure

17   is, but I think it would be unfair for you to argue, assuming

18   he didn't say that, to this jury that there was no intent to

19   pass it on to the grand jury.

20         MR. WEITZMAN:  I'm not sure I agree with that.

21         THE COURT:  That simply wouldn't be true, correct?

22   Just because he didn't say are you going to send this to the

23   grand jury when, in fact, he knows what the procedure is

24   doesn't suggest that there was a lack of intent by the

25   government to send it to the grand jury.

O6kWmen5                          Mearns - Cross

1          MR. WEITZMAN:  Well, they can elicit from any witness,

2     they can show what's been put before the grand jury.  I suspect

3     this was not put before the grand jury.

4          The way this works is we try, defense lawyers try to

5     influence the prosecutor's decisions, not the grand jury's

6     decisions.  And so that's what this is.

7          THE COURT:  That's true.

8          MR. WEITZMAN:  They have the burden to show that there

9     was a corrupt intent to influence and interfere and obstruct

10    the grand jury process, which is not what was happening here.

11    The grand jury wasn't in the room.  No FBI agents were in the

12    room.

13          THE COURT:  But how does whether Lowell said, do you

14    intend to put this before the grand jury or not, impact on

15    that?

16          MR. WEITZMAN:  Because it shows whether there was an

17    intention to obstruct the grand jury.  He wasn't submitting

18    this to put it before the grand jury.

19          THE COURT:  Wait.  Bit by bit.

20          OK.  Go ahead.  He wasn't.  That's right.  He was

21    submitting it to influence the U.S. Attorney.

22          MR. WEITZMAN:  Correct.

23          THE COURT:  Go ahead.

24          MR. WEITZMAN:  And the U.S. Attorney could believe or

25    disbelieve it, but it's not being obstructionist.  That was my

O6kWmen5                        Mearns - Cross

1    point.

2            THE COURT:  But you can make that argument to this

3    jury.

4            MR. WEITZMAN:  Not without the factual record that Mr.

5    Lowell never asked to send these documents to the grand jury.

6            THE COURT:  I'm sorry.

7            MR. RICHENTHAL:  I was just going to say Mr. Weitzman

8    just elided something that's critical here.  We don't have to

9    present the false statements to the grand jury to make out an

10   obstruction case.  The charge is to endeavor to obstruct the

11   grand jury investigation.  It was self-evident that a

12   presentation to the senior leadership of the United States

13   Attorney's Office --

14           THE COURT:  Slow down.

15           MR. RICHENTHAL:  It was self-evident that a

16   presentation to the senior leadership of the United States

17   Attorney's Office specifically regarding whether to seek an

18   indictment of the person the lawyer is representing is an

19   effort to influence the outcome of the grand jury process.

20   Mr. Weitzman is entitled --

21           THE COURT:  All right.  That's a legal argument that

22   you can make to this jury.

23           Go ahead.

24           MR. RICHENTHAL:  Yes, sir.

25           And Mr. Weitzman could argue the opposite; that is,

1    ladies and gentlemen, there's insufficient evidence of that

2    because the lawyer did not say affirmatively please share this

3    with the grand jury.

4                THE COURT:  There's no evidence that he said that,

5    correct?

6                MR. RICHENTHAL:  Correct.  The absence of evidence,

7    that is.

8                What we're dealing with now is not the legal issue of

9    what is or is not a permissible argument.  What we're dealing

10   with now is will the jury be aided -- that is, if relevant --

11   or not sufficiently aided under Rule 403 by the question

12   Mr. Weitzman wants to ask.  Our position is that question the

13   lay jury will misapprehend the meaning and understanding of

14   because it does not understand that we, as the United States

15   Attorney's Office, act for the grand jury.  We gather evidence

16   for the grand jury.  We literally can only indict through the

17   grand jury, and if the presentation to influence our decision

18   whether to go to the grand jury, when to go to the grand jury,

19   what to seek from the grand jury is the presentation we're

20   talking about.  But all of those factors, which the lawyers

21   here know, the jury does not know.  And I don't think

22   Mr. Mearns necessarily knows, and it's not an appropriate line

23   of examination to suggest to the petit jury that because

24   there's an absence of that statement by Abbe David Lowell, who

25   absolutely understood everything I just said, the petit jury

O6kWmen5                          Mearns - Cross

1    should conclude this was not intended to influence that

2    process.

3          MR. WEITZMAN:  Your Honor, two points.

4          The first is use of the words that it's "self-evident"

5    that there was an intention, that Abbe Lowell did intend, those

6    are factual determinations not for Mr. Richenthal to make but

7    for the jury to make.  And he's agreeing that we can make the

8    argument about the absence of evidence, but saying that I

9    somehow cannot highlight the factual issue through a witness

10   who can confirm the absence of evidence, that's inconsistent.

11   If I can argue it to the jury, I should be permitted to elicit

12   that testimony, that factual statement, from the same witness.

13   They can't just say it's a strict liability offense,

14   self-evident there was an effort to obstruct the grand jury.

15         THE COURT:  What's the question you want to ask him?

16         MR. WEITZMAN:  There's a series of questions.  I'd

17   like to ask him about what was said during this presentation.

18   The fact that there's a PowerPoint doesn't mean that it was

19   said.  Either the witness recalls what was said or he doesn't

20   recall, and if he doesn't recall what was said, we have our

21   arguments as to whether this was actually articulated, or maybe

22   Abbe Lowell said something entirely inconsistent or corrected

23   something that was wrong in the PowerPoint.

24         How do they get past the hurdle here?  How am I

25   deprived of inquiring from a witness who was a percipient

1    witness to the very presentation that they are saying is an

2    obstruction of justice as to what was actually said to the

3    prosecutors?  I'm being deprived of due process rights to

4    present a defense on the very obstruction charge that they're

5    pursuing.

6         MR. RICHENTHAL:  I think the hyperbole is neither

7    helpful nor warranted.  There are many ways in which Mr.

8    Weitzman, if he wishes, could seek to present what he's talking

9    about, although I think there's a hearsay problem with a

10   substantial portion of it, if not all of it.  The key way is he

11   could call Mr. Lowell.  This is beyond the scope, at a minimum,

12   but in addition to beyond the scope, there's a hearsay problem.

13   There's a rule of completeness problem.

14        We submitted a letter to your Honor on this very

15   point.  The defense didn't respond to the letter.  They didn't

16   submit an alternative presentation.  They didn't submit this

17   theory to you.  There are multiple things Mr. Weitzman is

18   raising that are all legally and factually wrong.  The point he

19   started with is whether he can argue about whether Mr. Lowell

20   made a statement about the grand jury.  The point I was making

21   is the record, if Mr. Mearns will leave the stand, would be,

22   you, ladies and gentlemen of the petit jury, did not hear any

23   such statement, and therefore, you should fail to find that the

24   government has proven an intent to obstruct the grand jury

25   investigation.  He can make the argument right now.

O6kWmen5                         Mearns - Cross

1          What I'm talking about is whether eliciting that

2     statement games the jury's comprehension sufficiently to

3     survive Rule 403.  Our position is it does not, because there

4     are a series of factors and processes involving presentations

5     like this, which the jury does not understand.

6          THE COURT:  What is your hearsay point?

7          MR. RICHENTHAL:  My hearsay point as to what Mr.

8     Lowell said beyond these statements is very simple, and it's in

9     our letter.  They're not entitled to put in, in any way, any

10    out-of-court statement for the truth of the assertion.  There

11    is a limited exception to that, called the rule of

12    completeness.  It is extraordinarily limited.  It requires that

13    the material that otherwise would be barred is essential to

14    make the material that was presented comprehensible.

15         It requires that the material that would otherwise be

16    barred be essential to make the material that was admitted

17    comprehensible, and the cases were cited in the letter we

18    submitted to the Court.

19         The defense did not attempt in any way, writing or

20    orally, to present an alternative version of this presentation.

21    So at the last minute, they now want to ask Mr. Mearns other

22    subjects.  They presumably believe those subjects are helpful

23    to their client, or they wouldn't be asking about them.  They

24    are not permitted to elicit out-of-court statements to prove

25    the truth of those subjects.

O6kWmen5                           Mearns - Cross

1             Also, I want to make a very fundamental point.

2    Mr. Mearns has -- and this is not disputed -- presented a

3    written document given to the United States Attorney's Office.

4    They want to shift to a different issue, the oral statements

5    outside the written document.  We have not elicited anything --

6    literally not one word -- about the oral statements outside the

7    written document.  We could; it's not hearsay as to us.  We

8    have not done so, so at a minimum, it's beyond the scope.

9    They're not deprived of anything.  They can call someone if

10   they wish, but they have a hearsay problem.

11            MR. WEITZMAN:  Your Honor, two things:

12            The first is I'm not offering the statements for the

13   truth of the matter asserted.  I'm offering them for state of

14   mind.

15            The second thing is at a certain point in time, the

16   answer to our confrontation clause rights is not you can't

17   confront the witness who's here, you're forced to call your own

18   witness.  That's not the way it works in criminal law.  We

19   can't be forced to call any witnesses.  We're entitled to

20   confront the government's witnesses.

21            THE COURT:  Yes, right.  That's correct.

22            MR. RICHENTHAL:  Your Honor, may I respond to that?

23            THE COURT:  No.

24            What I'm going to do is, first of all, do you have a

25   citation on the Louima case?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. WEITZMAN:  I will get it for you, your Honor.

2          THE COURT:  OK.

3          MR. WEITZMAN:  I apologize.

4          THE COURT:  All right.  I'm going to sustain the

5    objection on 403 grounds, that it's starting to enter into an

6    area that will be confusing to this jury, and the probative

7    value is not substantially outweighed by the danger of delay

8    and confusing this jury and, in fact, misleading it.  It's also

9    indeed beyond the scope.  I'm going to read that case.  That's

10   my decision.

11          Thank you.

12          Given that, how much longer do you have?

13          MR. WEITZMAN:  Well, I think that there's a second

14   part, which is can I inquire about his recollection of what was

15   said by Mr. Lowell when presenting these slides?  If he has no

16   recollection, he has no recollection.

17          MR. RICHENTHAL:  So, as Mr. Weitzman knows, and did

18   not just say, he understands Mr. Mearns's recollection because

19   he was given 3500 on this very matter.  That aside, that is

20   beyond the scope of his direct.  It is hearsay.  It does not

21   fall within the rule of completeness.  Again, he was not asked

22   literally even one word, at least by me, what was said orally.

23          THE COURT:  It is beyond the scope, but go ahead.

24          MR. WEITZMAN:  Your Honor, he was asked if he attended

25   the meeting.  He was asked if he listened.  He said that he did

O6kWmen5                          Mearns - Cross

1    listen.

2          Let me explain what I think could happen here, your

3    Honor.  The percipient witnesses to this meeting are witnesses

4    to a supposed obstruction.  Whether it means I call Damian

5    Williams or I call Mr. Mearns back, I'm entitled to ask

6    witnesses, not just who they want me to call, Abbe Lowell.  I'm

7    entitled to ask witnesses what was said, and if that's the U.S.

8    Attorney, then it's going to be the U.S. Attorney or it will be

9    Paul Monteleoni, who has copious notes.

10          THE COURT:  No, but what was said.  What was said,

11    don't you have a hearsay problem?

12          MR. WEITZMAN:  No, I'm not offering it for the truth.

13    I'm not offering it for the truth.  I'm offering it as to

14    whether there was a corrupt intent to obstruct justice.  That's

15    a state of mind.  So if Mr. Monteleoni has 20 pages of notes,

16    is he going to be my witness?

17          MR. RICHENTHAL:  I'm happy to respond to that as well.

18          Your Honor, again, they have multiple ways.  He has

19    just named some new ways to seek, if they wish, to attempt,

20    from some witness, to elicit what was said.  That's a separate

21    matter.  It's the hearsay problem.  There might be a *Touhy*

22    problem, all kinds of issues.

23          THE COURT:  What he's saying is it's not for the

24    truth; it's simply for the fact that it was said.

25          MR. RICHENTHAL:  Well, what he's trying to do is

1    elicit other statements in a meeting that the witness has not

2    testified about.  At a minimum, again, it's beyond the scope.

3    And while I suppose, if it were true, that they're not offering

4    it for the truth within the hearsay, it still wouldn't be

5    appropriate for this jury to hear.  Then the jury would have to

6    hear, what else what said in the presentation, opening more and

7    more and more.

8            THE COURT:  You have my ruling.  It's on 403 grounds.

9    I've already stated it for the record.  I'll take a look at

10   that case.

11           MR. WEITZMAN:  OK.  Your Honor, I'm going to make my

12   record.  I think that we're being deprived of the ability to

13   defend this charge as a result.

14           THE COURT:  I understand, and I'll take a look at that

15   case.

16           MR. WEITZMAN:  Thank you, your Honor.

17           MR. RICHENTHAL:  Can I make one more point --

18           THE COURT:  Yes.

19           MR. RICHENTHAL:  -- on that point?

20           THE COURT:  Mr. Weitzman.

21           Mr. Fee.

22           MR. RICHENTHAL:  I wanted to make a point in light of

23   this continued hyperbole.

24           THE COURT:  Well --

25           MR. RICHENTHAL:  OK.

O6kWmen5                        Mearns - Cross

1          THE COURT:  Go ahead.  Try to keep it on the straight
2     and narrow.
3          MR. RICHENTHAL:  There was a reference to state of
4     mind.
5          THE COURT:  Mr. Fee is the expert at hyperbole, not
6     Mr. Weitzman.
7          MR. RICHENTHAL:  The reference to the state of mind
8     that Mr. Weitzman just talked about, he was talking about Mr.
9     Lowell's state of mind.  Mr. Lowell is not accused of having an
10    obstructive state of mind.  Mr. Menendez is accused of having
11    an obstructive state of mind.  So if the purpose of this is to
12    figure out whether Mr. Lowell had an obstructive state of mind,
13    that's also improper.  The question is quite simple here.
14         THE COURT:  That, I take it, is irrelevant.
15         MR. RICHENTHAL:  In our judgment, whether Mr. Lowell
16    had an obstructive state of mind, we're not accusing him.
17         THE COURT:  He's not charged with anything.
18         MR. RICHENTHAL:  No, sir.  In fact, I think we've even
19    said publicly, it's not for this jury, we don't believe that
20    Mr. Lowell did anything improper.  Mr. Lowell was being an
21    advocate.  That was his job.
22         So there's another 403 problem, which is they now seem
23    to be suggesting they want to have an inference to the jury if
24    Mr. Lowell didn't have an obstructive state of mind, then
25    Mr. Menendez didn't have an obstructive state of mind.  That

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen5                         Mearns - Cross

1    introduces a whole other problem, which is the duty of lawyers

2    as zealous advocates for their clients, that Mr. Lowell was not

3    there as an objective arbiter of fact.  He wasn't there as

4    simply someone to present his view.  He was there -- he said

5    this in the meeting -- as an advocate; that is, to convince the

6    U.S. Attorney's Office to take or not take certain steps.

7    That's appropriate.  It's an incredibly important role in our

8    system, but this jury doesn't understand how those

9    presentations work.  So again, we have another 403 problem if

10   they're trying to explore Mr. Lowell's state of mind.

11              THE COURT:  All right.

12              MR. WEITZMAN:  Your Honor --

13              THE COURT:  I think everyone has stated their record.

14              MR. WEITZMAN:  Yes.

15              THE COURT:  I would have appreciated, though, a

16   heads-up on this, including with the case, because clearly,

17   your cross is not going to be what their direct was, or less,

18   and I think you've certainly intimated that.  I really would

19   have appreciated having advance notice that this would be an

20   issue.

21              MR. WEITZMAN:  I understand, your Honor.  I actually

22   am surprised that they won't let me -- they've objected to some

23   of these inquiries about the very pages that they're putting in

24   evidence.  I would have thought that that is fair game, so I

25   didn't think that I needed to ask.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen5                    Mearns - Cross

1           THE COURT:  Let's go back.

2           Do you have the ECF number on the letter?

3           MR. RICHENTHAL:  Not off the top of my head, but I can

4    pull it.

5           THE COURT:  OK.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may continue.

3              MR. RICHENTHAL:  Could we have a minute?

4              THE COURT:  Oh, yes.

5    BY MR. WEITZMAN:

6    Q.  Mr. Mearns, I apologize.  I don't even remember where we

7    left off.

8              MR. RICHENTHAL:  Your Honor, I'm sorry to do this.

9    Can we continue the sidebar briefly?  I need to make a record

10   before this witness continues.  I'm not doing this for

11   pleasure.

12             THE COURT:  Sidebar.

13             I apologize, ladies and gentlemen.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O6kWmen5                          Mearns - Cross

1            (At sidebar)

2            THE COURT:  What was that?  All of them.

3            MR. FEE:  All of them, I'm old.

4            MR. RICHENTHAL:  I appreciate your Honor's indulgence

5       and patience.  I just wanted to make the following record.

6            While we don't think it's required, in an abundance of

7       caution to try to narrow these issues, I just advised

8       Mr. Weitzman at the podium if he wishes to ask Mr. Mearns

9       whether Mr. Mearns recalls Mr. Lowell making statements orally

10      that are inconsistent with the written statements that have

11      been introduced into evidence, we would not object to that

12      limited question.  Mr. Weitzman declined to take me up on that

13      opportunity and simply said he's going to continue to examine

14      the witness.  I just wanted to say we have made, we said we

15      would not object to that limited question, but we do not think

16      it's legally required.

17           THE COURT:  All right.

18           What do you have left?  Everyone's made their record.

19      What's left here?

20           MR. WEITZMAN:  No.  I think the issue is they realize

21      that they just went a bit too far in getting a ruling that

22      deprives me of an opportunity to inquire as to what was orally

23      said, and now they want to pigeonhole me to a single question,

24      even though they're acknowledging that there is some relevance.

25      This is not a fair way to confront witnesses who are putting in

1    evidence against your client.

2              MR. RICHENTHAL:  I can respond to that.

3              The word "confrontation" has been used multiple times.

4    There's a lot of case law on what confrontation means.

5    Mr. Mearns can be confronted about everything he said.  That's

6    not what we're talking about.

7              What we're talking about is can Mr. Mearns be --

8              THE COURT:  He doesn't have to confront Mearns.

9              MR. RICHENTHAL:  Correct, but my point is he has the

10   ability to do so.  He's here.  Mr. Mearns testified.  We're

11   talking about something beyond the scope of direct.  We're not

12   talking about confrontation.

13             What we're talking about is an evidentiary question.

14   I do not believe -- we do not believe that it is legally

15   required for the defense to be able to inquire about oral

16   statements separate from written statements.  They're separate

17   in time.  They're separate in scope.  They're separate matters.

18   But to try to moot or narrow issues -- I'm sure the Court knows

19   this -- we sometimes don't object to things we find

20   objectionable.  We try to think of a question that would let

21   the defense elicit whether, in fact, Mr. Lowell made oral

22   statements inconsistent with the written ones.  And that's the

23   key issue that's joined here: are the written statements, to

24   use Mr. Weitzman's words, in context or were they not?  Yes or

25   no.

1           Mr. Mearns, I think, may have a memory of that.  I

2     will tell the Court I think his memory is not helpful to Mr.

3     Menendez, but Mr. Mearns can give his memory under oath right

4     now.  What we're resisting is going beyond that issue, to other

5     things and other statements.  That's totally improper.

6           We're trying to give the defense an opportunity,

7     although we don't think it's required, to ask what I think they

8     want to ask, did Mr. Lowell say something inconsistent with the

9     writing?

10          I will represent to the Court I think Mr. Mearns is

11    going to say no, but if Mr. Weitzman wants to ask the question,

12    he can ask the question.  We will not object to that question.

13    The broader inquiry, this goes well beyond direct, problematic

14    hearsay issues and problematic 403 issues.

15          THE COURT:  OK.  Everyone's made their record.

16          Where are you going?

17          MR. WEITZMAN:  I don't know that I'm going to ask that

18    question, because I should not let the prosecution dictate what

19    question I ask.

20          THE COURT:  I understand.

21          MR. WEITZMAN:  I'm going to have just two or three

22    more questions.  I don't even know what they are.

23          THE COURT:  What are they?

24          MR. WEITZMAN:  They're going to be does he have a

25    specific recollection of whether Mr. Lowell was reciting what's

O6kWmen5                        Mearns - Cross

1    on the PowerPoint or what he said on those pages.  That's it.

2              THE COURT:  OK.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Mr. Weitzman.

3              MR. WEITZMAN:  Yes.

4    Q.  Just to go back a bit, four pages from a 44-page

5    presentation correct; that's what you're testifying about --

6    A.  Yes.

7    Q.  -- Government Exhibit 483.

8         Do you have a specific recollection of what the former

9    counsel for Mr. Menendez said to the government on each of

10   these four pages?

11   A.  I do not.

12   Q.  The only thing, the only testimony you have to offer is the

13   PowerPoint, the words that are on the PowerPoint that are being

14   presented by the government, right?

15   A.  I don't know what you mean by what I have to offer.

16   Q.  OK.  You don't have a recollection of whether Mr. Lowell

17   recited the words in the excerpt or said other words; you don't

18   have a recollection one way or another, do you?

19   A.  I mean he certainly referenced the words on the page and

20   then said other things --

21   Q.  OK.

22   A.  -- as well.

23   Q.  And you don't recall what those other things are?

24   A.  No.

25              MR. WEITZMAN:  Nothing further, your Honor.

```
 1              THE COURT:  All right.

 2   BY MR. RICHENTHAL:

 3   Q.  Mr. Mearns --

 4              THE COURT:  Wait.  Wait.

 5              MR. RICHENTHAL:  Oh, I'm sorry.

 6              THE COURT:  We have other lawyers here.

 7              MR. LUSTBERG:  No questions, your Honor.

 8              MR de CASTRO:  No questions, your Honor.

 9              MR. RICHENTHAL:  I thought they'd already said that.

10   My apologies.

11   REDIRECT EXAMINATION

12   BY MR. RICHENTHAL:

13   Q.  Mr. Mearns, do you recall being asked just now about

14   whether Mr. Lowell said other things?

15   A.  Yes.

16   Q.  With respect to the factual statements on the pages that

17   you talked about, do you recall Mr. Lowell saying anything

18   inconsistent factually --

19              MR. WEITZMAN:  Objection, your Honor.

20   BY MR. RICHENTHAL:

21   Q.  -- with those statements?

22              THE COURT:  Just a moment.  Sustained.

23   BY MR. RICHENTHAL:

24   Q.  Do you recall Mr. Lowell making statements regarding the

25   factual statements -- let me try that better.
```

1        Do you recall Mr. Lowell saying anything about the factual

2    statements on those pages?

3    A.  I mean I remember him referencing those statements and

4    making those statements.

5    Q.  You remember him making those statements?

6    A.  Yes.

7    Q.  Do you remember him making those statements and saying they

8    were not true?

9            MR. WEITZMAN:  Objection, your Honor.

10           THE COURT:  Sustained.

11   BY MR. RICHENTHAL:

12   Q.  You said you remember him referencing those statements?

13   A.  Yes.

14   Q.  Do you remember him saying they were true or false?

15           MR. WEITZMAN:  Objection.

16           THE COURT:  Sustained.

17   BY MR. RICHENTHAL:

18   Q.  Do you remember him saying whether they were accurate or

19   inaccurate?

20           MR. WEITZMAN:  Objection.

21           THE COURT:  Sustained.

22           MR. RICHENTHAL:  No further questions.

23           THE COURT:  All right.  You may step down, sir.

24   You're excused.

25           (Witness excused)

1        THE COURT:  Ladies and gentlemen, we'll now have

2   Mr. Van Wie back, if the government will have Mr. Van Wie come

3   in.

4    PAUL VAN WIE, resumed.

5        THE COURT:  Mr. Weitzman, you may continue with your

6   cross-examination of Mr. Van Wie.

7        MR. WEITZMAN:  Yes.  Thank you, your Honor.

8   CROSS-EXAMINATION CONTINUED

9   BY MR. WEITZMAN:

10  Q.  Sir, the chart that is in evidence as Government Exhibit

11  1304 includes references to WhatsApp calls between Mr. Daibes

12  and Mr. Al Thani.  Do you recall that?

13  A.  If we could just --

14       MR. WEITZMAN:  Sure.  Go to Government Exhibit 1304,

15  row 188.

16  Q.  Do you see that there's a reference to a November 3, 2021,

17  WhatsApp call?

18  A.  Yes.

19  Q.  Now, in this version of Government Exhibit 1304, there's a

20  citation to Government Exhibit D209.  Do you see that?

21  A.  Yes.

22  Q.  Do you recall that there was a prior version of this chart

23  that referenced Government Exhibit D203?

24  A.  I don't recall the exact citation.

25            (Indiscernible overlap)

1    Q.  Sorry.  Apologies.

2    A.  I don't recall the exact citation, but there were multiple

3    versions as they were being edited.

4            MR. WEITZMAN:  Let's put up Government Exhibit D203

5    and see if you recognize the document.

6    Q.  Just looking at this document, are you able to recognize

7    whether this is a document you reviewed?

8    A.  Just looking at it, I can't recall.  There were so many,

9    I --

10   Q.  OK.

11   A.  I can't off the top of my head.

12           MR. WEITZMAN:  Let's put up Defense Exhibit 2035,

13   which is another version of Government Exhibit 1304, and if we

14   can go to row 188.  This is for the witness only, row 188,

15   November 3, 2021.

16   Q.  If you would take a look at that --

17           THE COURT:  You're asking to look at 188 not on 1304

18   but on 2035, Defense Exhibit 2035?

19           MR. WEITZMAN:  Yes.

20           THE COURT:  OK.

21   BY MR. WEITZMAN:

22   Q.  Does this refresh your recollection that an earlier version

23   of the chart that you reviewed cited Government Exhibit D203

24   for this WhatsApp call?

25   A.  I can't recall exactly.  Again, there were so many lines

O6kWmen5                        Van Wie - Cross

1    and versions as we were editing.  I can't recall right now

2    exactly which version this was or if I -- I believe there was a

3    version, actually, I did review.

4                MR. WEITZMAN:  Can we put up Government Exhibit D203,

5    in any event.  We offer Government Exhibit D203.  It may be in

6    evidence.  We offer Government Exhibit D203.

7                MR. MONTELEONI:  No objection.

8                THE COURT:  Admitted.

9                (Government Exhibit D203 received in evidence)

10   BY MR. WEITZMAN:

11   Q.  Sir, this document is a 19-page extraction report showing

12   WhatsApp calls between Sheikh Al Thani and Daibes.  Do you

13   recognize that it references Al Thani and Daibes?

14   A.  Yes.

15   Q.  And the first call on this page is July 3, 2021, from

16   Daibes to Al Thani, correct?

17   A.  It appears so, yes.

18   Q.  It's actually what's called UTC time, right?

19   A.  Yes.

20   Q.  And do you recognize that as sometimes four or five hours

21   ahead, depending on the time of year?

22   A.  Correct.

23   Q.  So the call is actually late at night on July 2, Eastern

24   time, right?

25   A.  Yes, I believe so.

1  Q.  And the next call is from Daibes to Mr. Al Thani, 15

2  minutes or so later, is that correct?

3  A.  It appears that the previous call was 2 o'clock and some

4  change.

5  Q.  OK.

6  A.  Yes.

7  Q.  If you scroll through these pages, there's a series of

8  calls, one after another after another, many calls between

9  Sheikh Al Thani and Mr. Daibes; do you see that as we're

10 scrolling through the pages?

11 A.  Yes.

12 Q.  Would it surprise you to learn that this exhibit reflects

13 106 calls or missed calls between the two of them?

14         MR. MONTELEONI:  Objection.

15         THE COURT:  Rephrase it.

16 BY MR. WEITZMAN:

17 Q.  Are you aware, sir -- we can count them, but are you aware

18 that there are over a hundred calls or missed calls between

19 Fred Daibes and Sheikh Al Thani?

20         MR. MONTELEONI:  Objection.

21         THE COURT:  I'll allow that.

22         Do you know that?

23         THE WITNESS:  No.

24 BY MR. WEITZMAN:

25 Q.  OK.  Would you agree with me that the chart, Defense

O6kWmen5                    Van Wie - Cross

1  Exhibit -- Government Exhibit 1304 does not reflect the number

2  of calls that are reflected in Government Exhibit -- sorry --

3           THE COURT:  Defense Exhibit.

4           MR. WEITZMAN:  Defense?  No.  This one is Government

5  Exhibit D203.

6           THE COURT:  Go ahead.

7  BY MR. WEITZMAN:

8  Q.  Would you agree with me that all the calls in D203 are not

9  reflected in your summary chart?

10  A.  I think that's accurate.  It doesn't reflect every single

11  call.

12  Q.  OK.  Now, the chart does include a few images of watches.

13  Do you recall that?

14  A.  Yes.

15           MR. WEITZMAN:  Can we put up lines 160 and 161.  We

16  can do a shared screen.  There we go.  I want to focus on these

17  two images.

18  Q.  These are messages from Fred Daibes at 10:16 a.m. with two

19  pictures of watches, correct?

20  A.  Yes -- of computer monitors with watches on them.

21           MR. WEITZMAN:  Correct.

22           Mr. Kelly, can you do both pages without excerpting

23  these two entries.

24  Q.  You didn't see in your review of the documents Mr. Menendez

25  respond to either of these messages, correct?

O6kWmen5                          Van Wie - Cross

1    A.  I'd have to scroll down a little bit on the chart to see if

2    it's on here.  Again, I only verified the information that was

3    in this chart.

4          MR. WEITZMAN:  Let's scroll down.

5    A.  According to this chart, I don't see any messages in here.

6    Q.  OK.  And the message from Mr. Daibes to Mr. Menendez at

7    10:17 a.m. is, how about one of these, correct?

8    A.  Yes.

9    Q.  And again, no response from Senator Menendez to Mr. Daibes,

10   right?

11         MR. MONTELEONI:  Objection.

12   A.  No.

13         THE COURT:  Is there any on -- all right.  You've

14   answered.

15   BY MR. WEITZMAN:

16   Q.  Not on this chart?

17   A.  Not on this chart, no.

18   Q.  And you've not seen any documents in your review of the

19   underlying documents regarding this chart that indicates

20   whether Mr. Daibes bought either of these watches, right?

21   A.  Again, if it's not an item on this chart, then I wouldn't

22   have seen it to review it.

23   Q.  OK.  So nothing on this chart indicates that Mr. Daibes

24   bought either of these watches, right?

25         MR. MONTELEONI:  Objection.

1          THE COURT:  There's nothing on the chart one way or

2     the other in that regard, is that correct?

3          THE WITNESS:  Not that I'm aware of, no.

4          THE COURT:  All right.

5     BY MR. WEITZMAN:

6     Q.  In connection with the work that you did assisting the FBI

7     team with this investigation, are you aware that there was a

8     search of Senator Menendez's home?

9     A.  Yes.

10    Q.  And are you aware that no Patek Phillipe watch was found in

11    Senator Menendez's home?

12         THE COURT:  Sustained.

13         Do you know?

14    BY MR. WEITZMAN:

15    Q.  Do you know?

16         THE COURT:  Do you know what was found in Senator

17    Menendez's home as a result of the search?

18         MR. MONTELEONI:  I was not privy to that information,

19    no.

20    BY MR. WEITZMAN:

21    Q.  You've not seen any documents in your review of the

22    documents supporting this chart that indicates that any Patek

23    Phillipe watch was found in Senator Menendez's home, correct?

24         THE COURT:  Sustained as argumentative.

25         Have you seen any documents in your review of

1  documents setting forth what, if anything, was found in Senator

2  Menendez's home as a result of the search?

3              THE WITNESS:  No.  I was not given any documents to

4  review.

5  BY MR. WEITZMAN:

6  Q.  In your review of documents and assisting the FBI in the

7  limited ways you did in this case, have you seen documents that

8  show that Will Hana and Fred Daibes are collectors of fine,

9  luxury watches?

10             THE COURT:  Sustained.

11             Did you see -- have you seen any documents that

12  reflect whether or not Mr. Hana or Mr. Daibes collect fine

13  watches?

14             THE WITNESS:  No, I was not given any documents with

15  that information.

16             THE COURT:  One way or the other, correct?

17             THE WITNESS:  One way or the other, no.

18             THE COURT:  All right.

19  BY MR. WEITZMAN:

20  Q.  Now, we were talking a bit about some press statements from

21  Senator Menendez before the break.  Do you recall that?

22  A.  Yes.

23  Q.  And we were talking about -- I think it was called the

24  Qatar's assistance in helping house Afghans seeking refuge

25  after the fall of Kabul.  Do you recall that?

O6kWmen5                        Van Wie - Cross

1            THE COURT:  I'm not quite sure that's it.

2            MR. WEITZMAN:  OK.  Your Honor, you're right.

3   Q.  It was called operation something or other, but it was

4   Afghanis fleeing from Afghanistan.  Do you recall that?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  Why don't you give him the name of it.

7   BY MR. WEITZMAN:

8   Q.  Operation Allies Refuge.

9   A.  That sounds familiar, yes.

10  Q.  OK.  But you don't recall, you don't know what that is,

11  sir?

12  A.  No.

13  Q.  OK.  There were other statements that Senator Menendez

14  issued regarding Qatar.  Do you recall that?

15           MR. MONTELEONI:  Objection.

16           MR. WEITZMAN:  They are on your chart, I should say.

17           THE WITNESS:  If we could take a look --

18           MR. WEITZMAN:  Yes.

19           THE WITNESS:  -- to refresh my recollection?

20           MR. WEITZMAN:  Let me give you the page reference.

21           THE COURT:  Do you know whether or not there were

22  other statements that Senator Menendez issued regarding Qatar,

23  and you've said on the chart, that is --

24           MR. WEITZMAN:  Row 135.

25  Q.  This is an August 20, 2021, press release titled Senator

1   Menendez's statement on Qatar's efforts to help house Afghans

2   seeking refuge in the United States and includes the quote, I

3   am grateful to see our friends and allies in Qatar be moral

4   exemplars by accepting Afghans ultimately seeking safe haven in

5   the U.S. after being forced to escape for their lives.  Do you

6   see that?

7   A.  Yes, I do.

8   Q.  Now, have you reviewed press releases and tweets from other

9   politicians who made similar statements to what Chairman

10  Menendez was making here?

11          THE COURT:  Do you recall seeing any such statements

12  by other senators?  Yes or no.

13          THE WITNESS:  Other senators?  I don't believe --

14  BY MR. WEITZMAN:

15  Q.  What about congressman?

16  A.  I believe -- I'm sorry.  I believe in the chart there was

17  one from Representative Meeks.

18  Q.  OK.  Do you recall seeing -- do you recall seeing in your

19  review of the underlying documents statements from the

20  secretary of defense or secretary of state to the same effect?

21          MR. MONTELEONI:  Objection.

22          THE COURT:  I'll allow it.

23          Do you recall seeing any such document?

24          THE WITNESS:  I don't recall.

25  BY MR. WEITZMAN:

1  Q.  What about members of the National Safety Council; do you

2  recall seeing that?

3            MR. MONTELEONI:  Objection.

4            THE COURT:  Overruled.

5  A.  I don't recall.

6  Q.  Do you recall seeing in your review of underlying documents

7  that many politicians, secretary of defense and others, were

8  traveling to Qatar around this time to thank them?

9            THE COURT:  Sustained as to form.

10  BY MR. WEITZMAN:

11  Q.  If you go to line 248 of this chart, this was a March 1,

12  2022, text message about Sheikh Sultan having a country home

13  outside of London and inviting you -- addressed to Senator

14  Menendez -- to spend a night there and do a little hunting.  Do

15  you recall seeing that?

16  A.  Yes, I see that.

17            THE COURT:  Take a look at 248.  Do you see 248?

18            THE WITNESS:  Yes, I see that.

19            THE COURT:  Next.

20  BY MR. WEITZMAN:

21  Q.  As part of your involvement in reviewing the underlying

22  records, did you get access to Senator Menendez's travel logs,

23  communications and calendar entries?

24            THE COURT:  Sustained.

25  BY MR. WEITZMAN:

1   Q.  Did you get access --

2              THE COURT:  No.  Don't use access.  Were you shown.

3   BY MR. WEITZMAN:

4   Q.  Were you shown, sir, some of Senator Menendez's email

5   communications?

6              THE COURT:  You mean in general, was he shown email

7   communications from Senator Menendez?

8              MR. WEITZMAN:  Yes.

9   A.  If they're referenced in this chart, I did.

10  Q.  OK.  And did you see any calendar entries for Senator

11  Menendez?

12  A.  If they're referenced in this chart, I did.

13  Q.  What about travel logs?

14  A.  If they're -- I believe there was two entries in here

15  regarding Nadine Menendez and his travel to Qatar, I believe.

16  It was a departure date and arrival date.

17  Q.  Fair to see you've seen no documents that suggest or show

18  that Senator Menendez traveled to Sheikh Sultan's country home

19  outside of London?

20             THE COURT:  Sustained.

21             MR. MONTELEONI:  Objection.

22             THE COURT:  Sustained.  Argumentative.

23  BY MR. WEITZMAN:

24  Q.  Sir, have you seen any records as to whether or not Senator

25  Menendez traveled to Sheikh Sultan Al Thani's country home

```
 1   outside of London in response to this invitation?

 2               THE COURT:  I'll allow it.

 3               Have you seen it one way or the other?

 4               THE WITNESS:  No.

 5               MR. WEITZMAN:  Now, let's turn to lines 322 through

 6   325.  Can we zoom in on those.

 7   Q.  In line 323, there's a calendar entry that says Qatar,

 8   right; you testified about that?

 9   A.  Yes.

10   Q.  Then line 325 there's a picture of two individuals, right?

11   A.  Yes.

12   Q.  And the one on the left is the man named Ali Al Thawadi,

13   right?

14   A.  Yes.

15   Q.  And the one on the right is Senator Menendez, right?

16   A.  Right.

17   Q.  The description says, WhatsApp sends pictures of Ali Al

18   Thawadi with Sheikh Sultan bin Jassam Al Thani and another

19   male, and then it says and Ali Al Thawadi with Robert Menendez.

20   Fair to say there are two pictures that are sent in this

21   WhatsApp exchange, correct?

22   A.  It appears so.

23               THE COURT:  Do you see where it says sends pictures?

24               THE WITNESS:  Yes.

25               THE COURT:  Do you conclude from that that the
```

1   reference was to more than one picture?

2          THE WITNESS:  It appears so.  It would be helpful if I

3   could see source documents to see if it --

4          MR. WEITZMAN:  Let's do that.

5   Q.  This line, though, only excerpts one photo, right?

6   A.  That's correct, one photo.

7          MR. WEITZMAN:  Let's put up the second photo,

8   Government Exhibit 4F-23, and can we look at the photos.  This

9   is -- let's go to the next photo.

10          THE COURT:  Are there two photos?  OK.

11   BY MR. WEITZMAN:

12   Q.  This is the photo that's actually excerpted in the chart,

13   right?

14   A.  That's correct, yes.

15   Q.  There's another photo attached, which we can -- I think

16   there's a different photo.

17          THE COURT:  Wait.  Were those two separate photos or

18   just a duplicate?

19          MR. WEITZMAN:  That's just a duplicate on the screen.

20   Q.  There's the image on the right --

21          MR. WEITZMAN:  Can we just zoom in on that one,

22   Mr. Kelly.

23   Q.  -- and the person on the left is Ali Al Thawadi.  Do you

24   recognize that?

25   A.  Yes.

1  Q.  Do you recognize the person on the right is Mr. Al Thani?

2  Do you recognize that?

3  A.  I would have to see the exhibit that depicts his name with

4  the photo.  I can't tell you off the top of my head.

5  Q.  OK.  What about the person in the middle; you described him

6  in the chart as an unknown male?

7          MR. MONTELEONI:  Objection.

8          THE COURT:  Wait.

9          Sir, can you identify the person on the right as

10  Sheikh Sultan bin Jassam Al Thani?

11          THE WITNESS:  I saw his photo earlier.  It's hard to

12  keep the names straight.

13          THE COURT:  All right.  I don't want to put words in

14  your mouth.  You're not sure one way or the other?

15          THE WITNESS:  That's correct.  If I could see the

16  exhibit that I was shown earlier --

17  BY MR. WEITZMAN:

18  Q.  I'd like to focus on the person in the middle.  He was

19  described in the chart as an unknown male?

20          MR. MONTELEONI:  Objection.

21          THE COURT:  Yes.  Sustained.  Because he's uncertain

22  about the person on the right.  Why don't you establish who

23  that is and then we can --

24          MR. WEITZMAN:  Do we have the government's chart?

25          THE COURT:  Or I think there's a picture.  Why don't

1    you just show the jury the picture.

2              MR. WEITZMAN:  I don't know the exhibit number, your

3    Honor.

4              THE COURT:  Yes.

5              MR. WEITZMAN:  But I'm happy to hold up the chart.

6              THE COURT:  Show it to the witness.

7    BY MR. WEITZMAN:

8    Q.  Sir, does this look like the man in the photo --

9    A.  Yes.

10   Q.  -- pointing to Government Exhibit 2A-28?

11   A.  Yes.

12             THE COURT:  All right.  Is that the man on the right?

13             THE WITNESS:  It is, yes.

14             THE COURT:  Do you know who the man in the middle is?

15             THE WITNESS:  No.

16             THE COURT:  OK.

17   BY MR. WEITZMAN:

18   Q.  The man in the middle, in the chart, is described as an

19   unidentified or unknown male, correct?

20             MR. MONTELEONI:  Objection.

21             THE COURT:  Yes.  Sustained.

22             Are you talking about line 325, where it describes him

23   as and another male?

24             MR. WEITZMAN:  And another male.

25   Q.  It doesn't identify him is my point, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6kWmen5                          Van Wie - Cross

1   A.   That is correct.

2   Q.   OK.  Do you know who this man in the middle is?

3   A.   No.

4   Q.   Have you ever heard of a man named Jac Nasser?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  I'll allow it.

7            Have you ever heard of Jac Nasser?

8            THE WITNESS:  No.

9   BY MR. WEITZMAN:

10  Q.   Do you know that there's a man named Jac Nasser who's

11  the --

12           THE COURT:  He's never heard of Jac Nasser, sir.

13           MR. WEITZMAN:  OK.  Let's put up Defense Exhibit 2047

14  for identification for the witness alone.  Split screen, yes,

15  please.

16  Q.   Is the individual for identification in Defense Exhibit

17  2047 the same individual you see in the middle of these two

18  individuals, Al Thawadi and Al Thani, based on your visual

19  identification?

20           MR. MONTELEONI:  Scope.  Nonimpeachment.  Relevance.

21  403.

22           THE COURT:  I'll allow it.

23           Are you able to say whether or not that's the same

24  man?

25           THE WITNESS:  They look similar.  I couldn't tell you

1  if they're the same person, though.

2  BY MR. WEITZMAN:

3  Q.  You're having difficulty making that identification?

4           MR. MONTELEONI:  Objection.

5           THE COURT:  Yes.  Sustained.  He said:  They look

6  similar.  I couldn't tell you if they're the same person,

7  though.

8  BY MR. WEITZMAN:

9  Q.  Sir, do you know that there is a Jac Nasser who is the

10  president, CEO, on the board of directors of Ford Motor

11  Company?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14  BY MR. WEITZMAN:

15  Q.  Is there a reason, sir, why -- let me withdraw that.

16     Does the FBI have face recognition software?

17          MR. MONTELEONI:  Objection.

18          THE COURT:  Sustained.  Beyond the scope.

19  BY MR. WEITZMAN:

20  Q.  Sir, did you ask the prosecutors as you were verifying the

21  chart who's the man in the middle of the second photo?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  I'll allow that.

24  A.  No.

25  Q.  Do you know how large -- how many business people were

1    involved in this meeting where the photo of Senator Menendez

2    and Mr. Al Thawadi was taken?

3              THE COURT:  You're talking about the photo in line

4    325.

5              MR. WEITZMAN:  325, correct.

6              MR. MONTELEONI:  Objection.

7              THE COURT:  I'll allow it.

8    A.  No.

9    Q.  Fair to say, though, based on your review of the two photos

10   we've now looked at, there were people other than Senator

11   Menendez and Mr. Al Thawadi and Al Thani present at that lunch,

12   based on your review of those two photos?

13             MR. MONTELEONI:  Objection.

14             THE COURT:  I'll allow it.

15             Look at those two photos.  Can you tell that there

16   were more than those people there, from looking at those

17   photos, those two photos?

18             MR. WEITZMAN:  Mr. Kelly, the two photos.

19             THE WITNESS:  I have to assume that they were taken at

20   the same time.  I'm not sure.  Just counting the people that

21   were in these two photos, there's five people.

22   BY MR. WEITZMAN:

23   Q.  OK.  You don't know how many people were at whatever event

24   these photos concern, correct?

25             MR. MONTELEONI:  Assumption of evidence.

1          THE COURT:  Event or events.

2          MR. WEITZMAN:  Correct.

3          THE COURT:  Let's move on.

4          MR. WEITZMAN:  Event or events.

5   Q.  If you turn to lines 331, and if we can just put up line,

6   just the chart with line 331, there's a reference to a May 23

7   email that involves a signed LOI.  Do you see that?

8   A.  Yes.

9   Q.  Do you know what an LOI is?

10  A.  Letter of intent --

11  Q.  OK.

12  A.  -- as it says later on.

13  Q.  And the underlying document is Government Exhibit 4F-17,

14  right?

15  A.  Yes.

16          MR. WEITZMAN:  Let's pull up Government Exhibit 4F-17.

17          Now, if we can turn to the next page and then continue

18  to the next page after that.

19  Q.  This is the letter of intent for the joint venture

20  development in Edgewater, New Jersey, right?

21  A.  Yes.

22  Q.  And you checked this document to confirm the accuracy of

23  the entry in the chart in line 331, right?

24  A.  If I could go back to that line, but I believe it was to

25  verify that the quoted material matched, yes.

O6kWmen5                           Van Wie - Cross

1              MR. WEITZMAN:  OK.  Go back to the letter of intent,

2       please.

3       Q.  Do you understand that this is a letter -- in the first

4       line, this letter of intent outlines the terms and conditions

5       upon which Heritage 115 Holdings LLC is prepared to enter into

6       a joint venture with Daibes Enterprises, correct?

7       A.  That's what it says, yes.

8       Q.  You would agree with me that the letter of intent, based on

9       this document, is not the final agreement; there's something

10      called a joint venture agreement, correct?

11             THE COURT:  Are you able to say one way or the other

12      based on what was just read to you?

13             THE WITNESS:  No.

14             MR. WEITZMAN:  OK.  If we can scroll down.  Let's look

15      at contributions.

16      Q.  Line 331 references a $95 million contribution.  Do you

17      recall that; and that's where this is from, this line, right?

18      A.  I'm sorry.  The line in 1304?

19      Q.  Correct.

20      A.  If we can go back to that, please?  Sorry.

21      Q.  There's a reference there, $95 million investment, correct?

22      A.  Yes.

23      Q.  And Daibes Enterprises, and that's on this line,

24      contributions, right?

25      A.  It's -- I believe it's a summary of kind of what was in the

O6kWmen5                          Van Wie - Cross

1    document itself.  I'm not sure if it's from this specific line.

2              MR. WEITZMAN:  OK.  If we can go back into the

3    document, the letter of intent, and zoom in on the property

4    equity line.

5    Q.  It says that the equity valuation of the property (the

6    property value) as of the closing is anticipated to be

7    approximately $190 million free and clear of all indebtedness.

8    Do you see that?

9    A.  Yes.

10   Q.  The $95 million investment, that's one half of $190

11   million, which is the property value, right?

12   A.  It is one half of $190 million.

13   Q.  OK.  Do you know whether -- have you seen documents as to

14   whether Heritage actually made a $95 million investment?

15   A.  No.

16   Q.  OK.  Now, you read this letter of intent in confirming the

17   accuracy of the line entry?

18   A.  I read that the -- the line entry was accurate as it

19   pertained to the source documents.

20             MR. WEITZMAN:  Can we turn to page 4.  Keep going.

21   There's a section I'm not finding at the moment.

22   Q.  Oh.  In the bottom, where it says letter of intent, it

23   says, notwithstanding anything in this LOI to the contrary

24   except the paragraphs entitled exclusivity, broker indemnity

25   and confidentiality, it is understood and agreed that neither

```
 1  Heritage nor Daibes shall have any binding obligation or
 2  liability in connection with the transaction described herein
 3  until such time, if ever, as the JV agreement has been
 4  unconditionally executed and delivered by both parties.  Do you
 5  see that?
 6  A.  Yes.
 7  Q.  Do you understand the acronym JV agreement to refer to
 8  joint venture agreement?
 9          MR. MONTELEONI:  Objection.
10          THE COURT:  Do you have an understanding in that
11  regard one way or the other?  Or let me ask it directly.  Do
12  you know what JV stands for?
13          THE WITNESS:  If it's defined above, I could give you
14  the answer.  But otherwise, I would have to assume.
15          MR. WEITZMAN:  OK.  Let's go back a few pages.
16  Q.  Do you see it says, JV agreement, upon execution of this
17  LOI, Heritage and Daibes shall promptly and in good faith
18  negotiate a mutually acceptable Delaware limited liability
19  company operating agreement titled JV agreement?
20  A.  I see that, yes.
21  Q.  OK.  So do you have an understanding now that the JV
22  agreement is referencing a different agreement, an operating
23  agreement for the entity?
24          THE COURT:  The LOI that he has in front of him.
25          MR. WEITZMAN:  Correct.
```

O6kWmen5                        Van Wie - Cross

1          THE COURT:  OK.  Do you know, sir, one way or the

2   other?

3          THE WITNESS:  I can only tell you from reading the

4   document that it refers to a -- an operating agreement.

5          MR. WEITZMAN:  OK.  And going back to your chart and

6   if we can go to that line where it references the LOI, which is

7   lines 331 -- no.  I'm sorry.  Zoom the whole thing out.  And if

8   you can go to the next page too.  OK.

9   Q.  Nothing -- there are no entries after the May 23, 2022,

10  execution of the letter of intent that indicate whether a joint

11  venture agreement was signed, right?

12  A.  Not on the chart, no.

13  Q.  Or whether it was negotiated, right?

14  A.  Not on the chart, no.

15  Q.  And the letter of intent, based on what you just read,

16  that's a nonbinding letter of intent; you saw those words?

17         MR. MONTELEONI:  Objection.

18         THE COURT:  Did you see the words "nonbinding letter

19  of intent"?

20         THE WITNESS:  I saw the words.  I don't know the

21  context or how to interpret them, but they appear in the

22  document.

23  BY MR. WEITZMAN:

24  Q.  OK.  Fair to say that the chart doesn't tell the rest of

25  the story as to what happened after the letter of intent,

O6kWmen5                          Van Wie - Cross

1     right?

2                THE COURT:  Sustained.

3                MR. WEITZMAN:  Your Honor, I've reached, I think, the

4     5 o'clock hour.  I have some more to do, though, and it's going

5     to be considerably more.

6                THE COURT:  Considerably more.

7                MR. WEITZMAN:  Half an hour, 40 minutes.

8                THE COURT:  Half an hour.  All right.

9                Ladies and gentlemen, let's end for the day.  You have

10    had a full day of testimony, except for that sidebar, and those

11    things happen periodically.  Enjoy the rest of the day.  We are

12    not going to have court tomorrow because several of you have

13    graduations to attend.  Enjoy the graduations.  Enjoy the

14    weekend.

15               Please all be here on Monday at 9:30.  We can't begin

16    until all of you are here.  I can't restate that often enough.

17               Enjoy the weekend.  Keep an open mind.  You have not

18    heard all the testimony.  Don't discuss this case amongst

19    yourselves or with anyone else.  Don't read, listen to or watch

20    any news or social media that may be involved in this case.

21               See you Monday at 9:30.  Enjoy the weekend.  And

22    everyone appreciates your attention, truly.

23               (Continued on next page)

24

25

O6kWmen5

1              (Jury not present)

2              THE COURT:  Please be seated.

3              You may step down, Mr. Van Wie.

4              (Witness not present)

5              THE COURT:  We'll pick it up again on Monday at 9:30.

6    We're behind the projected schedule already, approximately a

7    half hour of continued cross, and we've got the other two

8    lawyers to do cross if they have any.

9              I take it Monday will be Copeland, Corizon, Hana.

10   Anyone else?

11             MR. MONTELEONI:  Your Honor, we think that in light of

12   where we are with the schedule, we actually have to put a

13   different witness earlier because of travel issues.  So we

14   think our next witness, after Special Agent Van Wie finishes,

15   will be Sarah Arkin.  And after that, I think that we'll look

16   at the order, but it will likely be among those individuals you

17   just listed.

18             THE COURT:  All right.  And we may be able to get

19   somebody else in.  I take it Arkin's not going to be that long.

20   She's the staffer, No. 1, right?

21             MR. MONTELEONI:  She's one of the staffers that you

22   previously considered motions regarding.  We think that her

23   testimony is going to be reasonably substantial, and we also

24   anticipate that defense counsel is likely to have

25   substantial --

O6kWmen5

1          THE COURT:  What's she going to be testifying to?

2     Other than, with the limitations that it was going to be

3     substantial, what's she going to testify to?

4          MR. MONTELEONI:  There's not going to be substantial

5     testimony that implicates the speech or debate clause.

6          THE COURT:  Well, that's what I was asking.  I assume

7     there's going to be none.

8          MR. MONTELEONI:  Right.  Exactly, but she was involved

9     in the planning of the trip that eventually became a

10    congressional delegation, and a number of events happened on

11    the way to that.  She had some particularly important

12    conversations with Senator Menendez about his posture relating

13    to Egypt, and she witnessed certain events and -- involving

14    Menendez's activities, not speech or debate activities but

15    relevant ones on the Senate Foreign Relations Committee.

16         THE COURT:  Mr. Weitzman.

17         MR. WEITZMAN:  I'm not sure what he's referring to,

18    somewhat ambiguously, about Senator Menendez's posture relating

19    to Egypt.  But several conversations with Sarah Arkin, who was

20    a staffer on SFRC, and his posture related to Egypt concerns.

21    His holds and his positions, his official position, those

22    background conversations, education, and the back-and-forth

23    between SFRC staffer and Senator Menendez would be speech and

24    debate.

25         THE COURT:  Wait just a moment.  The background?

O6kWmen5

 1              MR. WEITZMAN:  The conversations where he's doing fact

 2    investigation, getting information from a staffer about his

 3    legislative activities, which includes his holds, I don't know

 4    whether that's what they're talking about, but to the extent

 5    that is --

 6              THE COURT:  All right.  Let's find out.

 7              MR. RICHENTHAL:  We've talked with the defense at

 8    length about this.  We're happy to do it again.  Ms. Arkin is

 9    expected to testify about conversations with Mr. Menendez

10    regarding his work as a senator, but not holds, not

11    legislation.  We're steering far clear of that.  We've made

12    very clear to the defense --

13              THE COURT:  Not releasing of holds.

14              MR. RICHENTHAL:  Sorry, your Honor?

15              THE COURT:  Not release of holds and not placing of

16    holds.

17              MR. RICHENTHAL:  Neither, no.  Neither releasing or

18    placing.

19              THE COURT:  Nor what else?

20              I'm sorry.  I spoke over you.  Not holds, not release

21    of holds, not what else?

22              MR. RICHENTHAL:  What I said was not approving or

23    disapproving them either.  We're not talking about his

24    positions on holds, but there were all kinds of conversations

25    regarding his meetings with foreign officials, his public

O6kWmen5

1    statements with respect to Egypt in particular, whether

2    declining to make public statements with respect to Egypt in

3    particular.  Those are all long understood to be fair game that

4    we've talked to the defense at length about.  We're not

5    retreading ground.  We're not touching holds.

6            THE COURT:  All right.  If there are going to be

7    issues, I want them teed up to me before 9:30 on Monday.

8            MR. WEITZMAN:  Yes, and any conversations about

9    legislation as well.  So, for instance, Eastern Mediterranean

10   act, whatever the name was, of that one as well as Senate

11   resolution 390 and Qatar.  I think her conversations with

12   Senator Menendez about those matters are not fair game.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6K5men6

1          MR. RICHENTHAL:  So we need to distinguish between

2   conversations on a subject matter, like Egypt, and

3   conversations about Acts, like laws.

4          THE COURT:  Wait.  Let's talk about Eastern

5   Mediterranean and S 390.  Are you going to be asking her about

6   those?

7          MR. RICHENTHAL:  We are going to ask Ms. Arkin what

8   she understands the Eastern Mediterranean Gas Forum to be.

9          THE COURT:  That's all right.

10          MR. RICHENTHAL:  This is obviously subject of

11   potential legislation.  We are not asking Mr. Menendez'

12   position on legislation.

13          THE COURT:  You can ask her what the gas forum is.

14          MR. RICHENTHAL:  And also it places it in context,

15   that is, that there were a number of countries on the Eastern

16   Mediterranean or that had interest in the Eastern Mediterranean

17   that might benefit from this thing called the Eastern

18   Mediterranean gas forum.  We are not asking her to opine on

19   Mr. Menendez' position on the bill, what he did on the bill.

20   Nothing of the sort.

21          THE COURT:  Mr. Weitzman, it seems to me that that is

22   all OK.

23          MR. WEITZMAN:  I will tell you, we have not discussed

24   Sara Arkin's testimony, to my knowledge.  So we have seen 3500.

25   Some of that 3500 goes into legislative activity in the state.

O6K5men6

1          THE COURT:  You have the day off tomorrow.

2          MR. WEITZMAN:  Yes.

3          THE COURT:  Talk to each other tonight or tomorrow.

4     If there are any issues, I need to know about them.  So what

5     Mr. Richenthal has said so far, sounds to me like fair game.

6          MR. MARK:  Your Honor, just for the record, I actually

7     had an hour-and-a-half-long conversation with Mr. Weitzman,

8     that's what led to our letter that was focused on staffer one

9     and the particular evidentiary rulings that your Honor issued.

10    Obviously, we can talk with Mr. Weitzman again about this, but

11    that was, as we detailed in our letter, that was an hour and a

12    half long conversation that we had related to staffer 1 who is

13    Sara Arkin.

14         MR. WEITZMAN:  Your Honor?

15         THE COURT:  Yes, don't have to debate that.

16         MR. WEITZMAN:  I don't want to let a misimpression.  I

17    wasn't suggesting that we had never spoken about the exhibits,

18    that was a conversation about her exhibits and I agree with

19    that.  I'm not casting aspersions, your Honor.  I'm really not.

20    I thought they were saying since then, but.

21         THE COURT:  No.  But my impression, sir, was, indeed,

22    you had not talked about Arkin with them.  So that is just my

23    impression.  There are no aspersions one way or the other.

24    Everyone is being a lawyer here.

25         What I want you to do is talk to each other tomorrow.

O6K5men6

```
 1    If there are any evidentiary issues, because I really don't
 2    like the side bars and I think I should have been teed up,
 3    notified that there was going to be an issue so that we
 4    wouldn't have a lengthy side bar in front of this jury, but let
 5    me know if there are going to be any issues.  It sounds like so
 6    far there shouldn't be, OK, and I have ruled on Arkin already.
 7              Fine.  What I want, it seems to me, that we have got
 8    to do whatever we can to be as efficient as we can so we can
 9    catch up to the projections consistent with everybody's ability
10    and the rate to examine and cross-examine.  It seems to me,
11    government, you should be in a position now where you can give
12    a true witness list to the defense and defense, it seems to me,
13    defense can give a true witness list to the government and that
14    should take place tomorrow.  The defense needs some time,
15    obviously, to review and react to whatever the government is
16    saying is a genuine witness list.
17              Mr. Monteleoni.
18              MR. MONTELEONI:  Yes, your Honor.
19              We did do that yesterday.  Actually, we got a jump on
20    the schedule that your Honor indicated and as a result of that
21    we understand in our conversations with defense counsel today,
22    that they will get us their true witness list tonight.  And we
23    think --
24              THE COURT:  Better yet.
25              MR. MONTELEONI:  But I do want to tee up one thing for
```

O6K5men6

 1    your Honor.  Because of the number of witnesses for whom I

 2    think that we had asked for a proffer about the subject matter

 3    of their statements --

 4              THE COURT:  It's time for proffers, yes.  Go ahead.

 5              MR. MONTELEONI:  We haven't gotten them yet.

 6              THE COURT:  I want proffers on the defense witnesses.

 7    Go ahead.

 8              MR. MONTELEONI:  Yes.  We absolutely do.  It is

 9    possible, we are having -- we are scheduling discussions with

10    defense about this, that there will be -- that there will still

11    be issues after we have those discussions with the defense that

12    are going to result in a motion by us to preclude certain areas

13    of testimony.  We are trying to narrow, trying to schedule it,

14    proffers will definitely help that process, but I think that it

15    is quite plausible that there will be remaining issues.

16              THE COURT:  If there are, there are.  But I want you

17    to have as complete discussions as possible and then make the

18    motion.

19              Sir?

20              MR. FEE:  I just wanted to check if their estimate is

21    still sometime Wednesday or Thursday?  I would note because

22    they're --

23              THE COURT:  Estimate for what, sir?

24              MR. FEE:  For when they're going to rest.  The

25    shortened list, the list that is supposed to be shortened, has

O6K5men6

1    13 witnesses remaining, which sounds longer than Wednesday.

2            THE COURT:  It does sound longer and the estimate we

3    gave -- I mean, on which we based the statement to the jury

4    that we expect to have this case to be in the hands of the jury

5    for their consideration by the end of the week of July 8 was

6    based on the estimate of the government closing on June 25,

7    which is Tuesday.

8            MR. MONTELEONI:  Yes, your Honor.  Let me say this.

9    We have been beating all of our internal estimates for our

10   testimony.  We estimated to the Court that Special Agent

11   van Wie's testimony --

12           THE COURT:  Three hours, I was watching.

13           MR. MONTELEONI:  Three or four hours, it was two hours

14   and 23 minutes.

15           THE COURT:  No, the estimate was two to thee hours and

16   you basically hit the three-hour mark; yes.

17           MR. MONTELEONI:  Your Honor, I think in the letter we

18   said three to four hours.  Then yesterday I said please

19   don't -- or Tuesday I said please don't told me to this but I

20   think it will be under three.  It was two hours and 23.

21           THE COURT:  We don't have to debate that.  Everybody

22   need be as efficient as possible.

23           Do you think you will be resting on June 25?

24           MR. MONTELEONI:  I think that the 25th is unlikely but

25   I think that perhaps the next day.  It really is going to

O6K5men6

1    depend a lot on the length of cross.  Every day after we see

2    how the day is shaped up, we sit down and we honestly talk

3    about is there any way we can shorten this stuff.  We are going

4    to do that again today.

5         THE COURT:  All right.  And I need the defense to be

6    doing it as well.  Presumably you are doing that.

7         MR. FEE:  Yes, your Honor.

8         THE COURT:  OK.  And then we can talk -- so, the

9    government will give its witness list tonight to the

10   government, a real witness list.  I really would like to see

11   the real government list fewer than what you say it was,

12   Mr. Fee, 13.

13        MR. FEE:  13.

14        THE COURT:  It really should be fewer if we are going

15   to hit our marks vis-à-vis this jury.  And then, when

16   appropriate, you will tee up any motions about preclusion for

17   the defense witnesses.  I want proffers to be made for the

18   defense witnesses to the government, immediately, and then on

19   Monday we will discuss whether or not I should revise our

20   estimate to this jury.

21        Enjoy the next three days.  Enjoy the longest day of

22   the year.  I will see everybody on Monday at 9:30.  Thank you.

23        (Adjourned to June 24, 2024, at 9:30 a.m.)

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    PAUL VAN WIE

 4   Direct By Mr. Monteleoni . . . . . . . . . .4111

 5   Cross By Mr. Weitzman  . . . . . . . . . . .4214

 6   GEOFFREY MEARNS

 7   Direct By Mr. Richenthal . . . . . . . . . .4270

 8   Cross By Mr. Weitzman  . . . . . . . . . . .4277

 9   Redirect By Mr. Richenthal . . . . . . . . .4310

10    PAUL VAN WIE

11   Cross By Mr. Weitzman  . . . . . . . . . . .4312

12                      GOVERNMENT EXHIBITS

13   Exhibit No.                               Received

14    4F through 4F3, 4F6, 4F13, 4F14, 4F16,  . . .4114

15            4F17, 4F19, 4F20, 4F23-4F26

16            and 4F28-4F32

17   10C3, 10J4, A132, A132A, B216-2,  . . . . .4114

18            B216-3, B216-A and 1402

19   1304 and 1351  . . . . . . . . . . . . . . .4115

20   1337    . . . . . . . . . . . . . . . . . .4140

21   4A-3    . . . . . . . . . . . . . . . . . .4273

22   D203    . . . . . . . . . . . . . . . . . .4314

23

24

25
```