O6O5men1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7              Defendants.
                                         Trial
8    ------------------------------x

9                                        New York, N.Y.
                                         June 24, 2024
10                                       9:50 a.m.

11

12   Before:

13                   HON. SIDNEY H. STEIN,

14                                       District Judge
15                                       -and a Jury-

16                   APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

O6O5men1

                        APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:  Marwan Abdel-Rahman
               Bachar Alhalabi
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

O6O5men1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Good morning.  Please be seated in the

3     courtroom.

4                    We are missing one juror.  She texted my deputy and

5     she hopes to be here by 10:15.  I understand the government has

6     some issues.

7                    MR. MARK:  We do, your Honor.  I think they largely

8     relate to the witness who is on cross-examination, Paul

9     van Wie, and my colleague Paul Monteleoni was going to handle

10    that.

11                    THE COURT:  I didn't mean to call you before your

12    whole team was here.  Let's wait until he comes.

13                    How long is the cross expected, Mr. Weitzman?

14                    MR. WEITZMAN:  I think it is going to be another hour.

15                    THE COURT:  And then the next witness is?

16                    MR. WEITZMAN:  Sara Arkin.

17                    THE COURT:  Sara Arkin.  We have some issues on that

18    as well.

19                    MR. WEITZMAN:  Correct.

20                    THE COURT:  Somebody should get Mr. Monteleoni.

21                    MR. WEITZMAN:  I'm happy to give your Honor a preview.

22                    THE COURT:  Go ahead.

23                    MR. WEITZMAN:  Directing you to line 133 of the

24    government's chart, there is a link to five articles and videos

25    and Tweets that were forwarded in 133 from Ali al Thawadi to

O6O5men1

```
 1    al Thani, and then in line 134 Fred Daibes forwards the same
 2    five links to Senator Menendez.  We just want to put the links
 3    in evidence, with the underlying articles and portions of the
 4    videos rather than the entire videos.  They are the actual
 5    image links that were sent to Senator Menendez.
 6              THE COURT:  I'm sorry.  I don't understand.  Say it
 7    again.
 8              MR. WEITZMAN:  They are the actual links of what was
 9    sent to Senator Menendez so you will see --
10              THE COURT:  What are the actual links?
11              MR. WEITZMAN:  The exhibits we want to put in
12    evidence.
13              THE COURT:  That are not in evidence in this chart?
14              MR. WEITZMAN:  Right.  If you click on the underlying
15    document --
16              THE COURT:  You know what?  Let me read 133 and 134.
17              MR. WEITZMAN:  Yes.
18              (Pause)
19              THE COURT:  OK, so al Thawadi, he sends to the Sultan,
20    links to articles praising Qatar in some way.  Daibes then
21    sends those same links to Menendez and you want to put in the
22    information that's in the links.
23              MR. WEITZMAN:  Correct, your Honor.  One of them is
24    partially already quoted in 133 with the quote from A.G.
25    Sulzberger, the publisher of the New York Times, that's
```

O6O5men1

1   directly from the article and I'm now looking at the article --

2          THE COURT:  I understand.

3          Mr. Monteleoni, this question is Mr. Weitzman wants to

4   put in the articles that are the subject of the five links sent

5   from al Thawadi to the Sheikh Sultan and then from Daibes to

6   Menendez in 133 and 134.

7          MR. MONTELEONI:  Yes, and I apologize, your Honor, for

8   my tardiness.

9          THE COURT:  That's all right.  There is one juror who

10  said she hopes to be here by 10:15.  We don't have a full jury

11  yet.

12         Go ahead.

13         MR. MONTELEONI:  Understood, your Honor.

14         So there are four different of these exhibits that

15  correspond to the five links.  One of those we don't have an

16  objection to, it is a Tweet, I suppose an X post you could call

17  it now, that is very similar to the portion that actually was

18  linked.  Then there is --

19         THE COURT:  If you are sending a link, what is the

20  objection to the government putting in what's underneath those

21  links?

22         MR. MONTELEONI:  So, first of all, there is a bit of a

23  technical scope objection because this witness is not someone

24  who, as the Court knows, is testifying about what happened, he

25  is just testifying about what documents he reviewed and he

O6O5men1

1    didn't actually review these underlying things so we didn't

2    verify this.

3            THE COURT:  I understand.  Next.

4            MR. MONTELEONI:  There is also a 403 issue with the

5    three we are objecting to.  These are descriptions, in a very

6    charged fashion, of a frankly alarming situation that was

7    happening in the fall of Kabul and Afghanistan.  One is a news

8    article which has one tiny quote that was in the links that the

9    agent reviewed and then a bunch of facts on the ground about

10   the rather disorderly evacuation of Kabul.  Then the other two

11   are actually videos.  I understand the defense wishes to use,

12   in each case, about a minute of it.  One is I think extremely

13   403 issues, there is a bunch of b-roll of gunmen at the airport

14   of sort of chaotic scenes of people climbing onto airplanes,

15   and the other is a human interest story about sympathetic sort

16   of young female roboticists, the girls robotics team from

17   Afghanistan, who were evacuated to Qatar.  We certainly don't

18   have an objection to those facts and the fact that that was

19   communicated to Menendez coming into evidence, but we don't

20   think that actually just sort of showing these news reels of

21   what was going on is the best way of doing it, certainly not

22   with this witness.  We think that to really understand what the

23   Senator received and what the situation was, we think it would

24   be more appropriate to cross-examine Sara Arkin who was on the

25   staff at the time period and can talk intelligently about the

O6O5men1

```
 1    issues rather than just bring in the documents.

 2              So that is the basis of our objection.

 3              THE COURT:  You mean bring in the -- not the document

 4    but it is the tape or whatever.

 5              MR. MONTELEONI:  Yes, bring in the actual news

 6    reporting that is described.

 7              MR. WEITZMAN:  Your Honor, if I may, I can play one of

 8    the recordings and you will see that -- I don't think there is

 9    anything 403 about it.

10              THE COURT:  What is the purpose of playing -- do you

11    intend to play the recording?

12              MR. WEITZMAN:  Yes.  One is 45 seconds.

13              THE COURT:  Is that a yes or a no?

14              MR. WEITZMAN:  Yes, one is 45 seconds and the other is

15    about 53 seconds.

16              THE COURT:  And you intend to do it with van Wie?

17              MR. WEITZMAN:  I would not question van Wie, I would

18    just play them.

19              THE COURT:  What is the purpose of playing them for

20    the jury?

21              MR. WEITZMAN:  Because the inference that the

22    government is asking the jury to draw is that the senator

23    proposed or released a press release as a favor to Fred Daibes.

24    That is what they will argue to the jury.

25              THE COURT:  OK.
```

O6O5men1

1         MR. WEITZMAN:  We want to show that this was a proper

2    press release, that the links themselves justified the press

3    release.  It gives an alternative explanation.

4         THE COURT:  Let me see.

5         MR. WEITZMAN:  If we can put up DX 2110-3B?

6         (Video played)

7         MR. WEITZMAN:  That's the extent of the video, your

8    Honor.

9         THE COURT:  What is the other one?

10        MR. WEITZMAN:  The other one is 2110-2B, and we offer

11   from 1:58 to 2:45 of that video.

12        (video played)

13        MR. WEITZMAN:  So, your Honor, these are links that

14   are already in evidence.

15        THE COURT:  I understand.  I'm going to allow them.

16   I'm not going to exclude them under 403.

17        What else?  Anything else?

18        MR. RICHENTHAL:  We have a related issue to Qatar that

19   we anticipate may come up on the cross-examination of

20   Ms. Arkin.  I think since the Court has now engaged in a

21   colloquy on Qatar, it might be useful to take that up as well.

22        THE COURT:  Go ahead.

23        MR. RICHENTHAL:  So the defense has marked a press

24   conference, that is, the transcript of press conference with

25   Secretary Blinken, Secretary Austin, and Qatari officials that

O6O5men1

1    took place in late September 2021.  My understanding is that

2    they intend to offer at least four pages of the transcript in

3    connection with Ms. Arkin's testimony.  There are multiple

4    problems here that are related to what Mr. Monteleoni talked

5    about but actually also have additional issues so let me talk

6    about the additional issues.

7            This press conference took place in late September, as

8    I said.

9            THE COURT:  September of what year?

10           MR. RICHENTHAL:  2021.

11           THE COURT:  Yes.

12           MR. RICHENTHAL:  Mr. Menendez issued two press

13    releases with respect to Qatar, those are the press releases to

14    which Mr. Weitzman just referred, in August of 2021.  So, by

15    definition, a press conference that hadn't yet taken place

16    could not have affected his mental state a month earlier.  In

17    addition, the press conference, because it is a press

18    conference, gets into all kinds of issues that are not part of

19    the press release like terrorism in Iran, for example.  The

20    press release is much more closely tied to the dreamers, that

21    is the issue the Court just engaged with, and the withdrawal

22    from Afghanistan.  But the Court doesn't need to go there

23    because the temporal connection is missing.  Again, the press

24    conference is a month after the press release.

25           THE COURT:  Just a moment.  What is it that you are

O6O5men1

| 1 | objecting to?

| 2 | MR. RICHENTHAL:  Introducing the press conference

| 3 | which took place several weeks after the press releases.

| 4 | THE COURT:  When is the press release and what does it

| 5 | relate to?

| 6 | MR. RICHENTHAL:  Mr. Menendez, or his office, issued

| 7 | two he press releases in August.  Those press releases

| 8 | concerned Qatar.  Roughly a month later, Secretary Blinken and

| 9 | Secretary Austin met with Qatari officials and held a press

| 10 | conference.  Mr. Menendez, to our knowledge, had no

| 11 | relationship to that press conference.  Many things were said

| 12 | at that press conference.  Many of those things have nothing to

| 13 | do with Mr. Menendez' press releases.  But, in any event, if

| 14 | the purpose of this, as Mr. Weitzman I think was just talking

| 15 | about for the links, is to somehow suggest that Mr. Menendez'

| 16 | press releases were informed by what other people said about

| 17 | Qatar, they obviously could not have been informed by what

| 18 | other people said a month or two months later.

| 19 | THE COURT:  The question is what is the purpose of the

| 20 | defense bringing the press conference.

| 21 | MR. RICHENTHAL:  Yes, and I want to be clear.

| 22 | Ms. Arkin is going to testify.  If the defense wants to ask

| 23 | Ms. Arkin about the press releases Mr. Menendez issued with

| 24 | respect to Qatar and what Mr. Menendez and his staff were

| 25 | talking about at the time relevant to those press releases, we

O6O5men1

 1    would have no objection to that subject being explored on

 2    cross.  We are not trying to block the subject, but the press

 3    conference, four to eight weeks later --

 4              THE COURT:  I understand.

 5              MR. WEITZMAN:  Your Honor, you will recall, first of

 6    all it is not four to eight weeks later, it is actually right

 7    in the heart of Senate Resolution 390.

 8              Senate Resolution 390, there was a co-sponsorship on

 9    the government's chart dated November 4, 2021, that's two

10    months after this press conference between, that involves

11    Secretary Antony Blinken and Defense Secretary Lloyd Austin

12    thanking the Qataris for all their assistance in connection

13    with Operation Allies Refuge.  The point being, your Honor,

14    that at the exact time that Congress is about to pass a

15    resolution or consider a resolution thanking the Qataris, the

16    administration is doing the same.  The relevance, your Honor,

17    is, you will recall that on lines 124 to 126 the government put

18    in the communications between Sheikh al Thani and

19    Mr. Al Thawadi about how a press release from the senator is,

20    quote, very good, and at last.

21              Everybody in the administration and lots of people in

22    Congress were thanking the Qataris at this precise time frame

23    in late 2021, and the notion that Senator Menendez is doing so

24    either aberrationally or inconsistently with the administration

25    is important for us to --

O6O5men1

1            THE COURT:  I'm going to let it in but only put in the

2     press conference only as it relates to Qatar, not extraneous

3     matters.

4            MR. WEITZMAN:  I told them which pages --

5            THE COURT:  You have my direction.

6            MR. WEITZMAN:  Thank you, your Honor.

7            MR. RICHENTHAL:  I want to note something and this is

8     important.

9            Mr. Menendez' press releases are in August.  The press

10    conference is in September.  The resolution Mr. Weitzman is

11    talking about is after that, we don't deny that, but

12    Mr. Menendez didn't co-sponsor it.  That is exactly the

13    inference that they've not wanted the jury to draw.  So I think

14    the Court needs to understand the chronology here because this

15    is now even more confusing.  He can't have been influenced with

16    press releases for a press conference that hasn't happened.

17           THE COURT:  Wait just a moment.  OK.  Go ahead.

18           MR. RICHENTHAL:  So he issues press releases in

19    August, he and Mr. Menendez.  The secretaries have a press

20    conference in September.  So obviously Mr. Menendez' press

21    releases cannot have been influenced by that which did not yet

22    occur.  There is the resolution Mr. Weitzman just spoke about.

23    The resolution was pending later, that is true, but the

24    co-sponsorship to which Mr. Weitzman just referred is not

25    Mr. Menendez.  And as the Court knows, we are not allowed to

O6O5men1

1    talk about what Mr. Menendez actually did for the resolution.

2            So, this is incredibly confusing.  It now seems they

3    want to offer a press conference to suggest that Mr. Menendez

4    had a good reason to take action on a resolution that they've

5    blocked us from talking about other than that it existed.  And

6    the lines which Mr. Weitzman just pointed was 124 or so --

7            THE COURT:  It is the internal -- there has been

8    debate, a lot of debate about the internal Qatari transfers.

9            MR. RICHENTHAL:  Correct, but the lines that

10   Mr. Weitzman just talked about, 124 and 126.

11           THE COURT:  Yes.

12           MR. RICHENTHAL:  -- those, again, are in August.

13   They're before the press conference.  So it seems to me the

14   only thing that is chronologically tied together is the pending

15   resolution and the press conference.  But again, we're not

16   allowed to talk about what Mr. Menendez actually did for the

17   resolution so it is unclear to me exactly what they want to

18   suggest to the jury.

19           I would also note the four pages they have marked have

20   lots of subjects in them about Qatar that are not part of the

21   press releases, like terrorism in Iran.  The press releases --

22           THE COURT:  But that's not about Qatar.

23           MR. RICHENTHAL:  Well, it is a press conference with

24   Qatar and they're taking can Qatar help with Iran.  There is a

25   lot of back and forth in this press conference.  It is about

O6O5men1

1    Qatar in the sense that it is part of the back and forth with

2    the press with the Qataris, but my point is now the jury is

3    exposed to press conference on a host of subjects about Qatar,

4    after the press releases Mr. Menendez issued on different

5    subjects involving Qatar.  It is not clear to me what the jury

6    is supposed to do that.  If the answer, Mr. Weitzman is now

7    giving, is infer something about the resolution, which is

8    later, that creates a different problem because we are not

9    allowed to talk about what Mr. Menendez did with the resolution

10   and the co- sponsorship to which he just referred is a

11   different senator.

12           MR. WEITZMAN:  Your Honor, let me make a few points.

13           The government has repeatedly taken from one time in

14   the chronology, to another time, to a subsequent time, and said

15   you can infer from all of that that the senator knows how

16   important these press releases are to the Qataris.  You can

17   infer, jumping from one time to another, under the government's

18   theory, you can also infer in the defense theory that Senator

19   Menendez is fully aware about how pleased the administration is

20   with Qatar.  And this provides not only an alternative but the

21   true reason why Senator Menendez issues these press releases.

22   Now Senate Resolution 390 shouldn't have been in this case to

23   begin with because it is a speech and debate problem.  They put

24   it in.  Now we need to explain that Senate Resolution 390,

25   which Fred Daibes forwards to Senator Menendez, is not

O6O5men1

```
 1    aberrational, it is entirely consistent with the

 2    administration's posture towards Qatar and there is nothing

 3    about what oh what Senator Menendez did that is influenced by

 4    Formula-1 tickets or by Fred Daibes.

 5              THE COURT:  That will be for the jury.

 6              MR. WEITZMAN:  Correct.

 7              THE COURT:  I'm going to let it in.  It is close

 8    enough in time that I'm going to let it in.

 9              Now, there are other matters that concern me; ECF 478

10    concerning the proffers.  Have there been any forward movement

11    of the parties since ECF 478 and the sealed appendix that was

12    given to me?

13              MR. RICHENTHAL:  We have not received any further

14    information.

15              THE COURT:  Defense, those proffers are entirely

16    unacceptable.

17              Sit down.  Sit down, sir.

18              The shell game is over.  It is time for the defense to

19    set forth the areas to make a genuine proffer of what the two

20    dozen witnesses for the defense, are going to testify to.

21              It is my obligation to move this trial forward in an

22    efficient manner.  This is the start of I think the seventh

23    week of this trial.  If there are going to be two dozen

24    witnesses for the defense, despite what the defense is saying,

25    I find it very hard to believe that that will all be done in a
```

O6O5men1

```
1   week.  I must have teed up evidentiary issues that will enable
2   me to handle the issues outside of the hearing of the jury so
3   this case can go forward in an efficient manner.  If the
4   government is unable to know what the subject matter that these
5   witnesses are going to testify to is, there will be constant
6   interruptions where we have outside of the hearing of the jury,
7   extended evidentiary issues.  I'm not going to have that.  To
8   say, as you do consistently:  "The subject matter is as
9   detailed in the 3500 material"  "The subject matter is as set
10  forth in the deposition."  That is unacceptable at this point.
11  Gamesmanship is over.  The government needs to know the subject
12  matters so that the parties can tee up for me evidentiary
13  issues.  I want the defense to submit a much more detailed
14  proffer and if you can, cut down the number of defense
15  witnesses as well.
16           That's my direction.
17           MR. FEE:  Your Honor, just to make the record and
18  preview, we will give more detail, but to be clear, nearly all
19  of those witnesses have been interviewed by the government at
20  length.  We have not even spoken to some of them.
21           THE COURT:  Sir, you have my ruling.  Sit down.
22           I understand your submission.  This jury is here.
23  Let's bring the jury in.
24           I am glad you are going to be giving more detailed
25  proffers, I am directing it.  I certainly don't want to end up
```

O6O5men1

1    barring defense witnesses.

2              MR. FEE:  Your Honor, my only point is they will

3    continue to reference 3500 because these the information we

4    have.  So I just want you to be aware of that if the government

5    comes back.

6              THE COURT:  Sir, you are to tell them the subject

7    matters that your witnesses are going to testify to so that the

8    parties can tee up evidentiary issues for me.  I don't think I

9    could be clearer.

10             Am I understood?

11             MR. FEE:  Yes, your Honor.

12             THE COURT:  That's the right answer.  Thank you.

13   Really, gamesmanship is over.  It is too late.

14             Put the witness on the stand.

15             (Witness resumes the stand)

16             MR. WEITZMAN:  Is there a reason for the lecturn?

17             THE COURT:  The parties ask that it be put there, sir,

18   yes, I can hear you.

19             MR. WEITZMAN:  Thank you, your Honor.

20             THE COURT:  If the parties want it taken down, I will

21   do it.  I am told it takes a couple of hours because wires are

22   involved.  I don't know and I don't care.  But if the parties

23   request, I will take into consideration.

24             MR. WEITZMAN:  We will discuss it with the government,

25   your Honor.

O6O5men1

1          THE COURT:  Yes.

2          MR. WEITZMAN:  Thank you, your Honor.

3          THE COURT:  Jury entering.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6O5men1                         Van Wie - Cross

1           (Jury present)

2           THE COURT:  You may be seated in the courtroom.

3           Good morning, ladies and gentlemen.  We will now

4    continue with the cross-examination of Mr. Van Wie.

5           Mr. Van Wie, I remind you, you remain under oath.  You

6    understand that; correct, sir?

7           THE WITNESS:  Yes, your Honor.

8    PAUL VAN WIE, resumed.

9           THE COURT:  Your witness to continue and conclude the

10   cross-examination, Mr. Weitzman.

11          MR. WEITZMAN:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. WEITZMAN:

14   Q.  Good morning, Agent Van Wie.

15   A.  Good morning.

16   Q.  When we last left off on Thursday, we had been discussing a

17   letter of intent, row 331 on Government Exhibit 1304.

18          Can we put that up?

19      You will recall that the letter of intent was a non-binding

20   letter of intent; is that correct, Agent van Wie?

21          MR. MONTELEONI:  Objection.

22          THE COURT:  Did you testify that the letter of intent

23   was a non-binding letter of intent?

24          THE WITNESS:  I don't recall at this point.

25          THE COURT:  All right.

O6O5men1                         Van Wie - Cross

1    BY MR. WEITZMAN:

2    Q.  Do you recall testifying that it referenced what is called

3    a JV agreement?

4    A.  Yes, I recall that being in the language of the document.

5    Q.  And you are aware that "JV" is a commonly used acronym for

6    joint venture?

7    A.  I don't know one way or the other.

8    Q.  OK.  You recall that the letter of intent was signed on

9    May 23rd, 2022?  Is that the date here?

10   A.  If you can make that a little bit larger in the document

11   attachment?

12   Q.  I think if you look at the date on the left, do you see

13   May 3, 2022?

14   A.  Yes; and the chart says May 23, 2022.

15            MR. WEITZMAN:  Can we go to line 92 of this chart?

16   Q.  Line 92 is a June 15, 2021 e-mail from Sheikh al Thani to

17   Fred Daibes.  Do you see that?

18   A.  Yes.

19   Q.  And do you recall that this is the first outreach from

20   Sheikh al Thani to Fred Daibes on the chart?

21   A.  Off the top of my head I don't know.

22   Q.  Fair to say that the May 28, 2022 letter of intent is about

23   more than 11 months after this outreach from Sheikh al Thani to

24   Fred Daibes?

25   A.  Yes, it is later in time.

O6O5men1                                   Van Wie - Cross

1    Q.   Eleven months later, correct?

2    A.   Yes.

3           MR. WEITZMAN:   Now, if we can go to row 219 of the

4    chart?

5    Q.   This is a January 4, 2022 Signal message from Senator

6    Menendez to Sheikh al Thani; correct?

7    A.   Yes.

8    Q.   And if you can highlight the third and fourth sentences it

9    says:   I hope that this will result in the favorable and

10   mutually beneficial agreement that you have been both engaged

11   in discussing.   I look forward to welcoming you to New Jersey

12   and wish you health, joy, and prosperity in this new year.

13          Do you see that?

14   A.   Yes.

15   Q.   This is a new year's greeting on January 4; correct?

16          MR. MONTELEONI:   Objection.

17          THE COURT:   I will allow it.

18          THE WITNESS:   It does say wish you health, joy, and

19   prosperity in this new year.

20   Q.   And Senator Menendez is looking forward to welcoming Sheikh

21   al Thani in New Jersey, correct?

22          MR. MONTELEONI:   Objection.

23          THE COURT:   I will allow it.

24          Does he communicate that?

25          THE WITNESS:   It says --

O6O5men1                            Van Wie - Cross

1       THE COURT:  What does he say?

2       THE WITNESS:  It says:  I look forward to welcoming

3   you to New Jersey.

4   BY MR. WEITZMAN:

5   Q.  From your review of the documents to prepare and review

6   this chart, do you understand that Daibes' company, the

7   investment that Sheikh al Thani was looking to make, was based

8   in New Jersey?  Is that correct?

9       THE COURT:  Do you know if Daibes' company was based

10  in New Jersey?  Yes, no, I don't know.

11      THE WITNESS:  I would need to see the documents that

12  would reference that.

13  Q.  Do you recall that the letter of intent referenced

14  Edgewater?

15  A.  Again, if I could take a look at the letter of intent.

16  Q.  Do you recall the communication where Fred Daibes and

17  Sheikh al Thani talk about their meeting in Edgewater that is

18  on this chart?

19  A.  Again, if you could refer me to the line.

20  Q.  In any event, you do see that the senator says that this

21  would be a mutually beneficial agreement; correct?

22  A.  Yes.

23  Q.  And you understand that Senator Menendez represents New

24  Jersey; correct?

25  A.  Yes.

O6O5men1                         Van Wie - Cross

1   Q.  Mutually beneficial to New Jersey and to Heritage; correct?

2            MR. MONTELEONI:  Objection.

3            THE COURT:  Sustained.

4   Q.  Let's turn to --

5            THE COURT:  Move on.

6   Q.  Let's turn to row 154 and 155 of this chart.  There is a

7   reference here to a Qatar dinner at the Plaza Hotel.  Do you

8   see that?

9   A.  Yes.

10  Q.  Your chart doesn't include the list of attendees at the

11  Qatar dinner; is that correct?

12  A.  I recall there being a dedicated list for that.

13  Q.  Do you have, based on your review of the documents

14  underlying this chart, any knowledge of any other Congressman

15  or senators who were either invited or attended this dinner?

16           MR. MONTELEONI:  Objection.

17           THE COURT:  Do you have any understanding of who was

18  invited and who attended the meeting, the dinner?

19           THE WITNESS:  If it is not on this chart then I do

20  not.

21  BY MR. WEITZMAN:

22  Q.  Based on your review of the chart, do you recall any

23  communications about other attendees?

24  A.  I would need to review the chart.

25  Q.  Let's turn to row 159, just a few rows below that.  Do you

1   see the name Cory Booker?

2   A.  Yes.

3   Q.  Do you have an understanding that Cory Booker is a Senator

4   in New Jersey?

5   A.  Yes.

6   Q.  And Cory Booker, on September 20, writes to Senator

7   Menendez:  Thank you for including me last night, Bob.  It was

8   an honor to be there, and helpful.  The insights they had about

9   Afghanistan were really fascinating and illuminating.  I hope I

10  get to be your wingman for such gatherings?

11          THE COURT:  For more such gatherings.

12  Q.  For more such gatherings.

13          Thank you, your Honor.

14      Do you see that, sir?

15  A.  Yes.

16  Q.  Fair to say that Senator Booker is communicating about the

17  dinner that is the subject matter of the lines we just looked

18  at, 154 and 155?

19          MR. MONTELEONI:  Objection.

20          THE COURT:  Are you able to say that that reference to

21  "including me last night" was to the dinner?  Yes, no, I don't

22  know.

23          THE WITNESS:  I don't know one way or the other.  I

24  would have to assume based on the documents.

25  BY MR. WEITZMAN:

1   Q.   OK.

2   A.   But I don't know one way or the other.

3   Q.   And based on the documents you can't tell what he is

4   referring to?

5          MR. MONTELEONI:  Objection.

6          THE COURT:  I will allow it.

7          THE WITNESS:  Again, you would have to assume or

8   infer.

9   BY MR. WEITZMAN:

10  Q.   Are you capable of making inferences?

11         THE COURT:  Sustained.

12  Q.   As to the document?

13         THE COURT:  Sustained.  Let's move on.

14  Q.   Did you review documents that reflect that Senator Coons of

15  Delaware also attended this dinner?

16         MR. MONTELEONI:  Objection.

17         THE COURT:  I will allow it.

18         Did you see a document that Coons attended the dinner?

19         THE WITNESS:  I don't recall.

20  Q.   What about seeing any documents showing that Representative

21  Meeks attended this dinner as well?

22         THE COURT:  Did you see any documents that anyone else

23  attended the dinner?

24         THE WITNESS:  I don't recall seeing any documents with

25  that.

1    Q.   In any event, you did review the underlying exhibit,

2    Government Exhibit A204-1; right?

3    A.   Yes.

4            MR. WEITZMAN:   Let's put Government Exhibit A 204-1 up

5    and turn to page 2, highlight the last two entries.

6    Q.   The top text message is the message from Senator Booker to

7    Senator Menendez that is on your chart; correct?

8    A.   Yes.

9    Q.   The bottom message is not on the chart; isn't that correct?

10   A.   I don't recall seeing that on the chart.

11   Q.   Let's read it into the record.   Senator Menendez responds

12   to Cory Booker on September 20, one minute after receiving Cory

13   Booker's text message at 9:57 a.m. -- I'm sorry, am I --

14           MR. MONTELEONI:   Look at the previous entry.

15           MR. WEITZMAN:   Hold on a second.

16           (Counsel conferring)

17           MR. WEITZMAN:   I am told it is 12 minutes after, I

18   see, it is 12 minutes, if you look at the bottom, 9:45 a.m.

19           THE COURT:   Let's move on.   Let's move on.

20   BY MR. WEITZMAN:

21   Q.   Cory, thank you for coming in the midst of what I know was

22   a packed schedule.   I think these opportunities provide

23   insights that you can't get at a hearing so I'm glad you are

24   able to be there for that part of the discussion.   The latter

25   part of the dinner went through a whole tour of the entire

O6O5men1                         Van Wie - Cross

1   region, very fascinating in terms of their point of view.  You

2   are a good partner.  Thanks.

3        Did I read that correctly?

4   A.  Yes.

5   Q.  And if we go back to the government exhibit, lines 159;

6   this is 1304, lines 159 and 160, your chart does not include

7   Senator Menendez' response; correct?

8   A.  Correct.

9   Q.  Now, just to be clear, that wasn't your decision; right?

10            THE COURT:  We have been through this.  Next.

11            MR. WEITZMAN:  If we can go to line 141 of Government

12  Exhibit 1304?

13  Q.  Just to orient the chronology, on September 13 at

14  2:04 p.m., this is the text message where Senator Menendez

15  invites Cory Booker to the dinner; am I correct?

16  A.  Yes.

17  Q.  And there is actually an invitation to two different events

18  in this text message; correct?

19  A.  Yes.

20  Q.  And the second event, and I will quote, he says:  The

21  second event is the following day in New York.  We are hosting

22  a round table for the president of the Dominican Republic at

23  the Blackstone Group at 11:00 a.m. in New York.  Let me know if

24  you can attend either of them.  Thanks.

25            Did I read that correctly?

O6O5men1                          Van Wie - Cross

1    A.  Yes.

2    Q.  Are you aware that the Blackstone Group is a private

3    financial firm here in New York?

4            MR. MONTELEONI:  Objection.

5            THE COURT:  Do you know what the Blackstone Group is,

6    sir?  Yes?  No?

7    A.  I have heard of them, yes.

8    Q.  Are they a private financial institution?

9    A.  I believe so, yes.

10   Q.  They're not a governmental entity, to your knowledge?

11   A.  To my knowledge I don't know one way or the other.

12   Q.  You don't know one way or the other whether they're a

13   governmental entity is your testimony?

14           MR. MONTELEONI:  Objection.

15   A.  I don't know if they work with governments in that respect.

16   Q.  Fair enough.  I understand.  Other than maybe being engaged

17   by governmental entities, they're a private institution; right?

18   A.  I believe so, yes.

19   Q.  So, based on this document it appears that there was a

20   round table being hosted with senators, the president of the

21   Dominican Republic and private individuals; correct?

22           MR. MONTELEONI:  Objection.

23           THE COURT:  I will allow it.

24   A.  I'm sorry.  Can you repeat the question of who the

25   attendees were.

O6O5men1                          Van Wie - Cross

1    Q.  Based on your review of this document, it appears that

2    there was a round table being hosted involving senators, the

3    president of the Dominican Republic, and private individuals;

4    correct?

5    A.  I couldn't tell you who would be in attendance there one

6    way or the other based on this, just that the president of the

7    Dominican Republic would be present and I'm --

8    Q.  With senators; correct?  Cory Booker was invited?  Do you

9    see that?

10   A.  I'm not sure if he was the only senator invited or if he

11   actually attended so I couldn't tell you who actually was there

12   or was invited.

13   Q.  I'm not asking who was there.  I'm saying that the round

14   table that was being hosted, according to this document,

15   involved one or more senators, the president of the Dominican

16   Republic, at a private institution with private individuals;

17   correct?

18            MR. MONTELEONI:  Speaks for itself.

19            THE COURT:  Do you know whether private individuals

20   attended the round table?  Yes?  No?

21            THE WITNESS:  No.

22   BY MR. WEITZMAN:

23   Q.  If we can turn to 1304, line 264 to 269, these are a series

24   of March 30, 2022 text messages between Nadine Menendez and

25   Fred Daibes.  Do you see that?

1   A.  Yes.

2   Q.  And in the first one from Nadine to Fred at 9:50 a.m. she

3   writes:  Good morning, Fred.  What time works for you today and

4   where?

5           To which he responds:  12:00 River Palm.  Do you see

6   that?

7   A.  Yes.

8   Q.  Do you have an understanding that this references some sort

9   of meeting, maybe a lunchtime meeting of some sort, between

10  Fred and Nadine?

11  A.  It appears so, yes.

12  Q.  And from your review of documents underlying this chart,

13  you didn't see any reference to Senator Menendez attending this

14  meeting between Nadine and Fred Daibes; correct?

15  A.  I don't recall.

16  Q.  Have you reviewed any documents indicating where Senator

17  Menendez was located on March 30, 2022?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  I will allow it.

20          Do you remember reviewing any documents showing where

21  Menendez was on March 30, 2022?  Yes, no, or I don't know.

22              THE WITNESS:  I don't know.  I would have to review

23  more documents to answer that.

24  BY MR. WEITZMAN:

25  Q.  Do you know what day of the week March 30th, 2022 was?

O6O5men1                          Van Wie - Cross

1    A.  No.

2              MR. WEITZMAN:  Can you put up Defendant's Exhibit 2119

3    just for the witness and Court, and if you can highlight the

4    third box on the right?

5    Q.  Does this refresh your recollection that March 30, 2022,

6    was a Wednesday?

7    A.  Yes.

8              MR. WEITZMAN:  You can put that down.

9    Q.  As part of your review of documents underlying chart did

10   you review Senator Menendez' official calendar?

11   A.  Only where it was referenced in the chart.

12   Q.  Do you know whether Senator Menendez was in D.C. or

13   traveling to D.C. at this time on March 30, 2022?

14             THE COURT:  Do you know where Senator Menendez was on

15   March 30, 2022?  Yes or no.

16             THE WITNESS:  I don't recall if it is on the chart.

17             MR. WEITZMAN:  Why don't we put up rows 270 to 273?

18   Thank you.

19   Q.  In 270, Nadine e-mails -- I'm sorry -- texts Fred Daibes

20   the following day on March 31, 2022; correct?

21   A.  Yes, she texts Fred Daibes.

22   Q.  This is the day after they were communicating about that

23   lunch appointment; correct?

24   A.  Yes.

25   Q.  And she says:  Good morning, Fred.  Vasken just called me.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6O5men1                          Van Wie - Cross

1    I'm going to meet him at 2:00 p.m.

2        Do you see that?

3    A.  Yes.

4    Q.  Now, approximately 30 minutes later she texts Senator

5    Menendez, correct, in line 273?

6    A.  Yes.

7    Q.  In that line she says:  I have a 2:00 p.m. meeting.  Can

8    you please call me when you have a minute?

9        Do you see that?

10   A.  Yes.

11   Q.  That text message and underlying document that you

12   reviewed, she doesn't mention to Senator Menendez the name

13   "Vasken", correct?

14   A.  No, the name does not appear in that text message.

15             MR. WEITZMAN:  Let's go to row 279, a few rows beneath

16   that.  There is a March 31 -- keep that up, Mr. Kelly.

17   Q.  On March 31, 2022, at 2:04 p.m., there was a creation time

18   of a picture that appears to be on Nadine Menendez' cell phone;

19   correct?

20   A.  Yes.

21   Q.  And the creation time, based on your review of the

22   metadata, is four minutes after that meeting that she said

23   she's going to at 2:00 p.m.; correct?

24   A.  Yes.  It was created at 2:04 p.m. on March 31, 2022.

25   Q.  Did you review the metadata to confirm this 2:04 p.m. time?

1   A.  Yes.

2   Q.  Just explain to the jury what metadata is, metadata is

3   information that is embedded in the image that tells some

4   information about its creation; correct?

5   A.  Yes.

6   Q.  So it says created at 2:04 p.m., for example?

7   A.  Correct.

8   Q.  But it doesn't indicate where it was taken; correct?

9   A.  Sometimes.

10  Q.  Do you know whether this image, the metadata of this image

11  indicated where it was taken?

12  A.  I would have to look at it again to tell you.

13  Q.  Nothing on the chart indicates where this image was taken;

14  correct?

15  A.  Correct.

16  Q.  And you don't know who took this image using that cell

17  phone; correct?

18  A.  Correct.

19  Q.  You don't know also who else was present when the image was

20  taken using, looking at the metadata of the cell phone;

21  correct?

22  A.  Correct.

23  Q.  Based on your review of the documents underlying this

24  chart, however, you didn't see any evidence that this image was

25  sent to Senator Menendez, did you?

O6O5men1                          Van Wie - Cross

 1                MR. MONTELEONI:  Objection.

 2                THE COURT:  Do you know who this image was sent to, if

 3     anyone?

 4                THE WITNESS:  At what point in time?

 5     BY MR. WEITZMAN:

 6     Q.  At or about March 31; that day, the next day, the day

 7     after?

 8     A.  If we could scroll up and down the chart it will be there.

 9     Q.  Sure.

10     A.  My knowledge of whether it was sent would be based on what

11     is in the chart.

12     Q.  Fair enough.

13                MR. WEITZMAN:  Can we just scroll to the next page?

14     Q.  Now we are already in May.  Do you see anything on the

15     chart indicating that that image was sent via e-mail, text

16     message, or otherwise, to Senator Menendez?

17     A.  Based on the information I was provided for the chart I

18     don't see that, no.

19                MR. WEITZMAN:  If you can scroll back to the image of

20     the gold?

21     Q.  Based on your review of the documents, do you know whether

22     the image that was taken with her cell phone was an image of

23     gold that she possessed or that someone else possessed?

24                MR. MONTELEONI:  Objection.

25                THE COURT:  Sustained.

O6O5men1                          Van Wie - Cross

1   Q.  Do you know whose gold this was, sir?

2           MR. MONTELEONI:  Objection.

3           THE COURT:  I will allow it.

4           Do you know who owns that gold?

5           THE WITNESS:  No.

6   Q.  Do you know from your review of any documents as to why

7   Nadine took a picture of this gold?

8   A.  No.

9   Q.  Now, on lines 249 -- we can go back a page, two pages,

10  please.

11          Lines 249 to 251, there wasn't testimony in your

12  direct about these lines; am I correct?

13  A.  I don't believe so.

14  Q.  Let's just explain what this is.  These are text messages

15  on March 4 from Nadine Menendez to Fred Daibes; correct?

16  A.  Yes.

17  Q.  And in the first one she sends a text of a business card

18  with handwriting on it and the text has -- the business card is

19  one for Bvlgari.  Do you see that?

20  A.  Yes.

21  Q.  And then in the left image it says a number and then it

22  says:  Red perforated large bag.

23          Do you see that?

24  A.  Yes.

25  Q.  And then in line 251 she sends a picture of handbag

O6O5men1                          Van Wie - Cross

1   apparently in store?

2   A.  Yes.

3   Q.  And you see that is a red leather handbag?

4   A.  Yes.

5   Q.  Let's look at the cited document.  Before we do that, fair

6   to say Senator Menendez isn't on these communications?

7   A.  Correct.

8   Q.  Now let's go to D 102-5 page 1, that's the text message

9   that's quoted in the chart:  I sent you the front of the card

10  by mistake.  It's a red bag with the snake buckle.  And then

11  the next message on the next page and that's the image that she

12  sends that is in your chart; correct?

13  A.  Correct.

14  Q.  Now, the next message isn't, doesn't -- I should say your

15  chart doesn't include the subsequent messages between Nadine

16  and Fred; correct?

17         MR. WEITZMAN:  We can put up the chart to refresh your

18  recollection, 1304, split screen, lines 249 to 251, and if we

19  can scroll the whole page, go down a bit further.  And if you

20  can do a half screen with the DX D 102-5 page 2?

21  Q.  After Nadine sends this picture of the handbag she writes

22  to Fred Daibes on March 7, 2022, the following.  It says:  For

23  the most stunning flower arrangement I have seen and I love

24  flowers.  Thank you, Fred.  The bouquet was so heavy that the

25  man had to put it on the table himself.  Thank you so much,

O6O5men1                          Van Wie - Cross

1   Fred.

2        And then Fred Daibes responds on March 7, 2022:  My

3   pleasure.  Happy birthday, my dear.  Enjoy your day.

4        Correct?

5   A.  Yes.

6             MR. WEITZMAN:  And if we can scroll to GX 1304 and go

7   to the next page, and if you can zoom in on line 260 with the

8   photo?  Can you make that a bit larger, the photo?  Actually,

9   let's zoom in on the whole line.  Excuse me.

10  Q.  On line 260, March 23rd, which is the a few weeks after

11  these messages about Nadine's birthday, Nadine sends a message

12  to Fred Daibes:  Thank you for my anaconda serpent bag.  The

13  first lady loved it.  It already made its appearance at the

14  White House.  LOL.  And then she attaches a photograph.

15       Does that appear to be the bag that she sent a picture of

16  to Fred Daibes?

17  A.  If appears to be, yes.

18  Q.  Have you seen any documents in your review of this chart

19  that reflect that Daibes purchased this snake handbag as a

20  birthday gift for Nadine?

21            MR. MONTELEONI:  Objection.

22            THE COURT:  Sustained.

23  Q.  From your review of documents to prepare this chart, have

24  you seen any documents showing whether Senator Menendez had

25  knowledge of this handbag from Fred Daibes to Nadine?

1         MR. MONTELEONI:  Objection.

2         THE COURT:  Is there any document that you have

3    reviewed -- rephrase it.

4    Q.  Have you seen any documents in your review of documents

5    underlying this chart where Nadine Menendez communicates with

6    Senator Menendez regarding this handbag?

7    A.  I would have to refer to the chart to see if there are any

8    communications around this time.

9    Q.  Fair to say if it is not on the chart you haven't seen

10   those types of documents?

11   A.  Correct.  I have only seen the documents associated with

12   the chart.

13        MR. WEITZMAN:  If we can go to row 261 of Government

14   Exhibit 1304, the next line, on March 28 -- and you can do a

15   couple lines, if you would, Mr. Kelly, 261 to 263.  Thank you.

16   Q.  On March 28 there are text messages from a man named David

17   Axelrad to Nadine Menendez; correct?

18   A.  Correct.

19   Q.  And do you have an understanding that Axelrad is a real

20   estate broker?

21        THE COURT:  Do you know who David Axelrad is?

22        THE WITNESS:  No.

23   Q.  He does send real estate listings to Nadine; correct?

24   A.  Correct.  He tested her a Zillow listing.

25   Q.  And then on March 28, on line 263 he says:  Confirmed

Van Wie - Cross

1   appointments for Saturday.  Correct?

2   A.  Correct.

3   Q.  Now, again, can you infer whether he is a real estate

4   broker based on that?

5           MR. MONTELEONI:  Objection.

6           THE COURT:  I will allow it.

7           THE WITNESS:  No.

8   BY MR. WEITZMAN:

9   Q.  He sends -- or the chart says that David Axelrad sent

10  Nadine Menendez a link to a property at 550 Summit; correct?

11  A.  Yes.

12  Q.  And based on the Zillow entry it appears to be listed for

13  sale at $4.7 million; correct?

14  A.  Yes.

15  Q.  Are you familiar with the website Zillow?

16  A.  Yes.

17  Q.  It is a common website where people use it to learn more

18  about real estate listings; right?

19  A.  Yes.

20  Q.  Have you previously used it?

21  A.  I have.

22  Q.  Are you aware, from your experiences on Zillow, that Zillow

23  is often used as escapist fantasy by people?

24          MR. MONTELEONI:  Objection.

25          THE COURT:  Sustained.  The record will show the jury

O6O5men1                           Van Wie - Cross

1   is laughing.

2   BY MR. WEITZMAN:

3   Q.  Have you ever used it for that purpose?

4           MR. MONTELEONI:  Objection.

5           THE COURT:  Sustained.  I don't know what "escapist

6   fantasy" is and I don't want to know.

7   Q.  There are other words I will not utter in court but

8   dreaming, we can say dreaming, right?

9           MR. WEITZMAN:  Let's go to line 302.

10  Q.  Line 302 has another house at 51 Chestnut Ridge that David

11  Axelrad sends to Nadine Menendez; correct?

12  A.  Correct.

13  Q.  And do you recall the price of this house?

14  A.  Not off the top of my head, no.

15          MR. WEITZMAN:  We can go to GX 10H-3.

16  Q.  This document, you reviewed this document; correct?

17  A.  Correct.

18  Q.  That was listed at similar $5.45 million, collect?

19  A.  Yes.

20  Q.  More expensive than the last one?

21  A.  Yes.

22          MR. WEITZMAN:  We can go back to the chart, please.

23  Q.  Have you seen any communications on this chart where David

24  Axelrad communicates with Senator Menendez?

25  A.  On this chart?  I don't recall that now.

O6O5men1                          Van Wie - Cross

1    Q.  No evidence they texted; correct?

2    A.  On this chart?  No.

3    Q.  Do you have any documents that you reviewed in connection

4    with the creation of this chart that they ever spoke?

5            THE COURT:  That Axelrad and Senator Menendez ever

6    spoke?

7            MR. WEITZMAN:  Correct, your Honor.

8            THE COURT:  Do you, sir?

9            THE WITNESS:  In preparing for this chart I don't

10   recall seeing that, no.

11   BY MR. WEITZMAN:

12   Q.  Or any communications regarding a meeting between David

13   Axelrad and Senator Menendez?

14   A.  Again, according to this chart I don't recall seeing that.

15   Q.  From your review of this chart, do you have any

16   understanding as to why David Axelrad sent Nadine these

17   listings?

18   A.  No.

19   Q.  Do you know whether she was looking to buy a home or value

20   her own home?

21           MR. MONTELEONI:  Objection.

22           THE COURT:  Sustained.

23           Do you know what the purpose of Nadine communicating

24   with Axelrad was?

25           THE WITNESS:  No.

O6O5men1                          Van Wie - Cross

1    Q.  You didn't see any documents where Nadine put in a bid for

2    a home to buy any of these homes, right?

3    A.  If it doesn't appear in the chart I wouldn't have been

4    given access to that document, no.

5    Q.  If she had been put in a bid to buy a $5.5 million home you

6    would remember that from your review of the documents; right?

7                THE COURT:  Sustained.

8                MR. WEITZMAN:  Can we go back to lines 263?

9    Q.  Now, this chart references that you reviewed Government

10   Exhibit B234-3 to review this communication between David

11   Axelrad and Nadine Menendez.

12        Do you see that?

13   A.  Yes.

14   Q.  Now, on a prior version of this chart -- actually,

15   withdrawn.

16        Do you recall that you were provided draft charts

17   before this chart that had other exhibits?

18   A.  There were other charts.  I'm not sure which exhibits

19   appeared where.

20   Q.  Do you recall that in connection with this specific entry

21   on March 28, 2022, you reviewed Government Exhibit B234, in its

22   entirety, without the dash three?

23   A.  I don't recall.

24                MR. WEITZMAN:  Can we put up Defendant's Exhibit 2035

25   just for the witness and the Court, and turn to page 28, and if

O6O5men1                          Van Wie - Cross

1    we can put up the 5:50 p.m. entry?

2    Q.  Sir, just read this to yourself.  Does this refresh your

3    recollection that one of the exhibits you reviewed to confirm

4    the accuracy of this entry was Government Exhibit B234?

5    A.  Yes.

6              MR. WEITZMAN:  We can take that out, and now can we

7    put up Government Exhibit B234, just for the witness and the

8    Court?

9    Q.  Do you see this is Government Exhibit B234?

10   A.  Yes.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6oWmen2                        Van Wie - Cross

1          MR. WEITZMAN:  We offer Government Exhibit B234.

2          MR. MONTELEONI:  Objection.

3          THE COURT:  Can I see it?  I need it expanded for me.

4          MR. WEITZMAN:  Can we expand?

5          This has some of the entries, your Honor, that are on

6     the chart.

7          MR. MONTELEONI:  Your Honor, there's actually a scope

8     issue here, based on prior discussions with counsel, but on

9     reflection, we don't object to the document going into

10    evidence.

11         THE COURT:  All right.  Admitted.

12         (Government Exhibit B234 received in evidence)

13         MR. WEITZMAN:  Can we turn to page 14 of this

14    document, please.  Now, if you would highlight the middle.

15    Q.  This is the entry that was on your chart as line 263,

16    correct, confirming the appointments for Saturday for Nadine?

17    A.  Yes.

18         MR. WEITZMAN:  OK.  I'd like to now turn to page 8 of

19    the document and highlight the last paragraph.

20    Q.  That top paragraph, this is also an entry on March 28,

21    2022, correct, same day?  Correct, sir?

22    A.  It is, yes.

23    Q.  OK.  And in this entry, Nadine writes:  We have been

24    working with an architect on plans.  We do not want to keep

25    paying for plans, surveys, zoning, etc., if we are going to buy

O6oWmen2                          Van Wie - Cross

1   an already existing home.  Once the costs accumulate, it would

2   not make sense for us not to build.

3       Do you see that?

4   A.  I see that, yes.

5   Q.  OK.  And again, do you have any understanding from your

6   review of the documents what she's referring to when she's

7   referring to hiring or paying for an architect on plans?

8   A.  No.  So, I -- because this did not appear in the chart,

9   this was not a text message I reviewed.  I reviewed only the

10  text message that appeared in the chart.

11  Q.  But this was in the document that you were given to review,

12  correct?

13  A.  Yes, this was in the larger document that that was taken

14  from.

15      MR. WEITZMAN:  OK.  Can we now go to pages 22 and 23

16  of this document, and highlight the bottom two entries.  Yeah,

17  that's the one.  Thank you.

18  Q.  On page 22, David Axelrad writes:  Hi Nadine.  I know

19  you're away but have a home that's special and it's under $3

20  million.  The catch is it's in Old Tappan.  It's really

21  special.

22      That's a message dated April 17, 2022, correct?

23  A.  I believe it's April --

24  Q.  I'm sorry.  April 8?

25  A.  April 8, 2022.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6oWmen2                        Van Wie - Cross

1   Q.  Correct.  So a couple of, or a week after the March 28

2   messages that are on your chart, correct?

3   A.  Yes, approximately.

4   Q.  OK.  And then in the next message, on April 8, David

5   Axelrad writes:  The taxes on the home are $43,000 annually and

6   the seller's asking 2.6 million.  See the tour below for you to

7   walk through the house.

8        Do you see that?

9   A.  Yes.

10  Q.  This house, the one that's $2.6 million, didn't make it on

11  to your chart, correct?

12  A.  No.

13  Q.  And again, that wasn't your decision, right?

14  A.  Right.

15  Q.  Now, go to the next message.  If you scroll down to page

16  24, to Nadine's response, Nadine writes:  Hi, David.  We are at

17  the airport in Alaska.  The house is nice but the taxes are

18  outrageous.  If you can schedule it for Friday to view?

19  Anything else in Englewood Cliffs or Alpine.

20       Do you see that?

21  A.  Yes.

22  Q.  And in this message, she wants to see more homes, correct?

23            MR. MONTELEONI:  Objection.

24            THE COURT:  Sustained.

25  BY MR. WEITZMAN:

O6oWmen2                          Van Wie - Cross

1    Q.  In this message, she indicates that the taxes are

2    outrageous on that $2.6 million home, correct?

3    A.  I believe she's referring to that, but she doesn't specify

4    which house she's referring to.

5    Q.  Again, did you see any documents that Nadine bought another

6    home?

7    A.  No.

8    Q.  Or put a bid on another home?

9    A.  No.

10   Q.  OK.  And have you seen any documents that Senator Menendez

11   saw any of these homes?

12            MR. MONTELEONI:  Objection.

13            THE COURT:  I'll allow it.  Is there anything in the

14   documents you saw that indicated that Senator Menendez saw the

15   homes that are referenced in the documents?

16            THE WITNESS:  I don't believe anything I reviewed, no.

17   BY MR. WEITZMAN:

18   Q.  OK.  Do you see any documents indicating what the value of

19   Nadine's home in Englewood Cliffs was?

20            THE COURT:  Did you see any documents indicating the

21   value of 41 Jane Drive?

22            THE WITNESS:  I don't recall seeing that, no.

23   BY MR. WEITZMAN:

24   Q.  Well, are you aware that it was valued on Zillow at $1.3

25   million?

O6oWmen2                          Van Wie - Cross

```
 1              MR. MONTELEONI:  Objection.

 2              THE COURT:  Sustained.

 3   BY MR. WEITZMAN:

 4   Q.  You reviewed as part of your testimony here Google searches

 5   that Senator Menendez -- that were conducted on Senator

 6   Menendez's cell phone, correct?

 7   A.  Correct.

 8   Q.  And that was a document titled Government Exhibit A301,

 9   correct?

10   A.  Correct.

11              MR. WEITZMAN:  If we can put up Government Exhibit

12   A301 for the witness and the Court only, and if we can turn to

13   page 315 of that document.

14   Q.  Sir, on February 21, 2022, Senator Menendez's Google

15   indicates that it searched for the Zillow value of 41 Jane

16   Drive, Englewood Cliffs, New Jersey, correct?

17              MR. MONTELEONI:  Objection.

18              MR. WEITZMAN:  Actually, let me lay the foundation,

19   your Honor.

20              Can we go out just to this page?

21   Q.  Sir, this is Government Exhibit A301, page 315.  This

22   reflects true and accurate searches conducted on the Senator

23   Menendez Google account for February 21, 2022, is that correct?

24   A.  Could you actually go to page 1 so I could just verify the

25   exhibit?
```

O6oWmen2                         Van Wie - Cross

1                MR. WEITZMAN:  Correct.  Yes.

2                MR. MONTELEONI:  Objection to all of this.  This is

3      well beyond the scope.

4                MR. WEITZMAN:  Your Honor, they have a chart of Google

5      searches from Senator Menendez.

6                THE COURT:  I'm going to allow it.  Go ahead.

7                MR. WEITZMAN:  This is an unstamped version.

8      Apologies.

9                THE COURT:  Show him page 1.

10               MR. WEITZMAN:  This is page 1 -- oh, this is not page

11     1.  Can we go to page 1.

12               I think it's still unstamped, your Honor.  Let me

13     confer with the government.

14               Your Honor, the parties, I believe, stipulate that

15     this is Government Exhibit A301, and we would offer page 315,

16     if Mr. Kelly can go to page 315.  And we would just offer this

17     one page, your Honor.  And we can title it Defense Exhibit

18     A301-A.

19               MR. MONTELEONI:  We don't object to just this one

20     page, but this is the recurring issue that we've been bringing

21     up a number of times, your Honor.

22               THE COURT:  Scope.

23               MR. MONTELEONI:  Scope and notice.  We're doing this

24     on the fly.  On this page, we're fine.

25               THE COURT:  Admitted.

O6oWmen2                          Van Wie - Cross

1                  (Defendant's Exhibit A301-A, page 315, received in

2       evidence)

3                  MR. WEITZMAN:  Thank you, your Honor.

4                  We can publish this page as DX A301-A.

5       BY MR. WEITZMAN:

6       Q.  Sir, on February 21, 2022, there were searches on Senator

7       Menendez's Google account for 41 Jane Drive specific to the

8       Zillow account.  Do you see that?

9       A.  Yes.

10                 MR. WEITZMAN:  OK.  And can we now put up Defense

11      Exhibit 2108 for the witness and the Court.

12      Q.  Do you recognize this to be the Zillow link for 41 Jane

13      Drive, Englewood Cliffs, New Jersey?

14                 MR. MONTELEONI:  Objection.

15                 THE COURT:  I'll allow it.

16      A.  I don't know one way or the other.  I couldn't verify

17      it's -- where it's from, just looking at it.

18      Q.  You don't see the Zillow logo?

19      A.  I see that, yeah.

20      Q.  Do you see the Zillow HTTPS website on the top?

21      A.  I do.

22                 MR. WEITZMAN:  The defense offers Defense Exhibit

23      2108.

24                 MR. MONTELEONI:  Objection.

25                 THE COURT:  Basis.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6oWmen2                      Van Wie - Cross

1            MR. MONTELEONI:  He has indicated he does not know

2    what it is.  Also, time frame, relevance.

3            THE COURT:  Well, time frame, that's correct.  Time

4    frame I agree with.

5            MR. WEITZMAN:  Your Honor, it's the same time frame

6    as --

7            THE COURT:  I don't see that here.  How do I know

8    that?

9            MR. WEITZMAN:  The time frame of this document, you

10   mean?

11           THE COURT:  Yes.

12           MR. WEITZMAN:  OK.  We'll put that down.

13           I'd like to go back to Government Exhibit 1304.

14   Q.  Fair to say, Agent Van Wie, you don't know how much money

15   Nadine Menendez might receive if she were to sell her home,

16   correct?

17           THE COURT:  Sustained.

18           MR. WEITZMAN:  If we can go to lines 118 through 120.

19   Thank you.

20   Q.  On line 118, Fred Daibes texted Ali Al Thawadi:  Hi, Ali.

21   Our mutual friend will be issuing a statement on Monday to the

22   Qatar contribution, correct?

23   A.  Correct.

24   Q.  You didn't see any text message before this July 25, 2001,

25   text message from Senator Menendez to Fred Daibes indicating

O6oWmen2                              Van Wie - Cross

```
1    that he'd be issuing such a statement, correct?
2    A.  On the chart, how far back are you asking me to look for
3    what --
4    Q.  This chart is all of July, right, 2021; on the chart?
5    A.  Correct, between lines 115 and 118 there's no text messages
6    from Robert Menendez to Fred Daibes.
7    Q.  And there's no record on this chart of a phone call from
8    Senator Menendez to Fred Daibes either, right?
9    A.  On this chart, no.
10   Q.  Based on your review of the documents, do you have any
11   basis, any understanding of how Fred Daibes received
12   information or the basis for his statement in line 118 about a
13   statement on Monday?
14          THE COURT:  Sustained.
15          MR. MONTELEONI:  Objection.
16   BY MR. WEITZMAN:
17   Q.  Do you know?  Do you know -- does the document that you
18   reviewed, did it provide an explanation for how Fred Daibes
19   supposedly learned this information?
20   A.  Are you referring to 3D-1?
21   Q.  Correct.
22   A.  If I could look at it, I could give you the answer.
23          MR. WEITZMAN:  OK.  Let's go to Government Exhibit
24   3D-1.  And if we can go to July 25.
25          Next page.  Next page.  Next.
```

1   Q.  The bottom message on the prior page, do you see it says:

2   Hi, Ali, our mutual friend will be issuing a statement?

3   A.  Yes.

4          MR. WEITZMAN:  Just take that, zoom out, Mr. Kelly.

5   Q.  Anything in this text exchange that explains how -- the

6   basis for Fred's knowledge or supposed knowledge of this?

7   A.  Actually, I wouldn't have even read above there if it

8   wasn't on the chart.

9   Q.  OK.

10  A.  So I couldn't answer that.

11  Q.  OK.  Are you aware that July 25, 2021, was a Sunday?

12  A.  I would need to refresh my recollection on that date.

13         MR. WEITZMAN:  OK.  Could we put up Defense Exhibit

14  2109 for the Court and the witness.

15  Q.  Does this refresh your recollection that July 25, 2021, is

16  a Sunday?

17  A.  Yes.

18  Q.  OK.  And it is a Sunday, correct?

19  A.  Yes.

20         MR. WEITZMAN:  OK.  We can go back to Government

21  Exhibit 1304, and back to lines 118 to 120.

22  Q.  So, in line 118, on Sunday, July 25, Fred Daibes says that

23  our mutual friend is issuing a statement on Monday, correct?

24  A.  Correct, yes.

25  Q.  Monday would be July 26, correct?

O6oWmen2                              Van Wie - Cross

1    A.  Correct.  Well, I'm not sure which Monday he's referring

2    to, but the next day is a Monday after Sunday.

3    Q.  OK.  Are you aware that August 2 is not a Monday either?

4    A.  I'm not aware.

5    Q.  OK.

6    A.  I'd have to take a look.

7              MR. WEITZMAN:  I'm sorry.  August 2 is a Monday.

8    Excuse me.  I didn't mean to add the "not."

9    Q.  Did you see any documents where Senator Menendez

10   communicated with Ali Al Thawadi about press releases over text

11   message?

12   A.  I'm sorry.  Could you repeat the question?

13   Q.  Yes.  Did you see any documents where Senator Menendez

14   communicates with Ali Al Thawadi about press releases?

15   A.  Only if it was in this chart.

16   Q.  OK.  And you don't recall anything in the chart like that,

17   right?

18   A.  Without looking through the entire chart right now, I

19   couldn't tell you.

20   Q.  OK.  Do you know whether the senator's press releases are

21   considered classified information?

22             MR. MONTELEONI:  Objection.

23             THE COURT:  Sustained.

24   BY MR. WEITZMAN:

25   Q.  If you turn from rows 120 to 127, on line 120, Senator

O6oWmen2                        Van Wie - Cross

1   Menendez sends Fred Daibes a copy of a press release, correct?

2   A.  Correct.

3   Q.  And it concerns Qatar's $100 million humanitarian

4   contribution to Yemen, right?

5   A.  Yes.

6   Q.  Now, are you aware, sir, based on your review the documents

7   that by August 2, lots of other public officials have already

8   issued press releases thanking Qatar?

9           THE COURT:  Sustained.

10          MR. WEITZMAN:  Well, can we go to line 117.

11  Q.  Sir, this is in your chart, right?

12  A.  It is, yes.

13  Q.  This is July 24, 2021, right?

14  A.  Yes.

15  Q.  So that's nine days before August 2, right --

16  A.  Approximately, yes.

17  Q.  -- or thereabouts?

18      And in this line, Representative Meeks writes:  I thank

19  Qatar for its contribution to WFP, which will provide relief to

20  the worst humanitarian crisis in the world.  This is an

21  important step in support of regional peace and security that

22  will save many lives.

23      Do you see that?

24  A.  Yes.

25          MR. WEITZMAN:  If we can blow that WhatsApp or that

1    tweet up, the whole thing.

2    Q.  And do you see that Representative Meeks is himself

3    responding to a tweet issued by a man named David Beasley?

4    A.  It appears so, yes.

5    Q.  And David Beasley uses the Twitter exchange WFPChief,

6    correct?

7    A.  Yes.

8    Q.  And do you know that David Beasley is the former governor

9    of South Carolina?

10            MR. MONTELEONI:  Objection.

11            THE COURT:  Do you know who David Beasley is?

12            THE WITNESS:  No.

13   BY MR. WEITZMAN:

14   Q.  Do you know that he's the executive director of the World

15   Food Program?

16            MR. MONTELEONI:  Objection.

17            THE COURT:  He just said he doesn't know who Beasley

18   is.  Next question.

19   BY MR. WEITZMAN:

20   Q.  Do you know what WFP is?

21   A.  No.

22   Q.  Do you recognize the acronym for World Food Program to be

23   WFP?

24            MR. MONTELEONI:  Objection.

25   A.  It could be.  I don't know what -- I'm not familiar with

O6oWmen2                          Van Wie - Cross

1   that program.

2   Q.  OK.  And David Beasley at WPFChief writes:  Great news,

3   hashtag Qatar just announced a $100M contribution for

4   humanitarian support in hashtag Yemen @Tamin bin Hamad.  Thank

5   you so much!  This donation from the people of Qatar will save

6   millions of lives and reinforce the opportunity for regional

7   peace and security @MBA_Al Thani?

8       Do you see that?

9   A.  Yes.

10  Q.  Are you aware that after this announcement on Twitter there

11  were multiple other senators who similarly issued thank yous

12  and press releases thanking Qatar for this contribution?

13          MR. MONTELEONI:  Objection.

14          THE COURT:  Sustained.

15          Stick to the chart, sir.

16  BY MR. WEITZMAN:

17  Q.  Sir, do you know whether senators were meeting with Qatar

18  to get this donation?

19          MR. MONTELEONI:  Objection.

20          THE COURT:  Do you have any idea?

21          THE WITNESS:  No.

22          MR. WEITZMAN:  Now, if we go back to Government

23  Exhibit 1304, line 124, just 124 through 127 -- 128.  Thank

24  you.

25  Q.  In line 127, Fred Daibes says to Senator Menendez, thank

O6oWmen2                          Van Wie - Cross

1    you.  Do you see that?

2    A.  Yes.

3    Q.  And that's after Senator Menendez forwarded to Fred Daibes

4    a copy of a press release, correct?

5    A.  It was later in time, yes.

6    Q.  Yes.  Line 120 has the press release forward, correct?

7    A.  Yes.

8    Q.  And those are the same day, just a couple hours later,

9    right?  Line 120 --

10   A.  120 --

11   Q.  Sorry.  I didn't mean to talk over you.

12        Line 120 is at 3:26 p.m.?

13   A.  Correct.

14   Q.  Fred Daibes says thank you at 5:43 p.m., correct?

15   A.  Correct.

16   Q.  Now, based on your review of the documents, is it possible

17   to know whether, is it possible to understand whether Fred

18   Daibes is thanking Senator Menendez for forwarding the press

19   release or issuing the press release?

20        THE COURT:  Sustained.

21   BY MR. WEITZMAN:

22   Q.  Do you know what Fred Daibes is thanking Senator Menendez

23   for, sir, based on your review of the documents?

24   A.  No.

25        MR. WEITZMAN:  If we scroll down to line 133 and 134,

O6oWmen2                          Van Wie - Cross

1    and highlight those two entries.

2    Q.  In 133, Ali Al Thawadi sends to Sheikh Al Thani a series of

3    five links to articles and social media, correct?

4    A.  Correct.

5    Q.  And those links are quoted and referenced in this chart,

6    correct?

7    A.  Correct.

8    Q.  And then on August 20, 2021, Fred Daibes sends Senator

9    Menendez those same five links, correct?

10   A.  Correct.

11           MR. WEITZMAN:  Can we go to Government Exhibit A104-3.

12   And if we can scroll to the bottom one, the bottom entry on

13   this first page.

14   Q.  This is one of the links that Fred Daibes sends to Senator

15   Menendez, correct?

16   A.  If you could just, I guess, zoom out and --

17   Q.  Sure.

18   A.  -- show more of the exhibit, if possible.

19           That's the only page?

20           MR. WEITZMAN:  We can go to the next page.  Can we go

21   to the next page, Mr. Kelly?

22   Q.  There's a series of forwards here of the links, correct?

23   A.  Uh-huh, correct.

24   Q.  OK.  None of the forwards of the links indicate that they

25   originated with Ali Al Thawadi or Sheikh Al Thani, correct?

O6oWmen2                          Van Wie - Cross

1                   MR. MONTELEONI:  Objection.

2                   THE COURT:  Can you tell where they originated, sir?

3        Yes or no.

4                   THE WITNESS:  No.  I only verified that they were, in

5        fact, forwarded based on the messages.

6                   MR. WEITZMAN:  OK.  Let's go to the first page.

7        Q.  And the first link is a New York Times article, correct?

8        A.  Correct, yes.

9                   MR. WEITZMAN:  OK.  And can we put up Defense Exhibit

10       2110-1 for the witness and the Court.

11                  This is that New York Times article.  We offer it at

12       this point, your Honor.

13                  MR. MONTELEONI:  No objection.

14                  THE COURT:  Admitted.

15                  (Defendant's Exhibit 2110-1 received in evidence)

16                  MR. WEITZMAN:  Can we publish that for the jury.

17                  On August 19, 2021, The New York Times published an

18       article titled "How News Organizations Got Afghan Colleagues

19       out of Kabul."  It says, "The evacuation of those who worked

20       for outlets like The New York Times and The Washington Post

21       came after global rescue efforts stretching from the Pentagon

22       to Qatar."

23                  This is in evidence.  I won't read the entire

24       document, your Honor.

25                  THE COURT:  No, don't.  As a matter of fact, I'm not

O6oWmen2                          Van Wie - Cross

 1    sure you need to read any of it.  Very small segments, sir.

 2    The jury has it before it.  It's not for the truth anyway.

 3              MR. WEITZMAN:  Correct.

 4              THE COURT:  Go ahead.

 5              MR. WEITZMAN:  Page 3 of the document, and if we can

 6    turn to the middle paragraph:

 7              "On Tuesday, 13 people from The Washington Post --"

 8              THE COURT:  You can read that to yourselves, ladies

 9    and gentlemen.

10              MR. WEITZMAN:  Thank you, your Honor.

11              THE COURT:  Next question.

12              MR. WEITZMAN:  If we can also put up the last

13    paragraph on that page, and then I'll move on, your Honor.

14              THE COURT:  Read that, ladies and gentlemen.

15              Next question, sir.

16              MR. WEITZMAN:  Yes, your Honor.

17              If we can go back to Government Exhibit A104-3, page

18    2.

19    Q.  Now, there's a number of videos that are also forwarded

20    from Fred Daibes to Senator Menendez, correct?  Do you see

21    that?

22    A.  It looks like -- yeah, it says video.FoxBusiness.com.

23    Q.  One video from Fox Business, and then the next one from CBS

24    This Morning, correct?

25    A.  Not sure if that's a video or not.

O6oWmen2                          Van Wie - Cross

1            MR. WEITZMAN:  OK.  Fair enough.  If we can put up

2    Defense Exhibit 2110-2B.

3            Your Honor, we would offer 2110-2B, only the portion

4    from one minute and 38 seconds to two minutes and 45 seconds.

5            THE COURT:  Admitted.

6            (Defendant's Exhibit 2110-2B, 1:38 to 2:45, received

7    in evidence)

8            MR. MONTELEONI:  Subject to a limiting instruction

9    again.

10           THE COURT:  It's not for the truth, ladies and

11   gentlemen, simply for the fact that it was said.

12           MR. WEITZMAN:  If we can tee that up and play it,

13   Mr. Kelly.

14           (Media played)

15           MR. WEITZMAN:  Thank you.  And we would also offer

16   Defense Exhibit 2110-3B, which was the other video, your Honor.

17           MR. MONTELEONI:  Similarly, no objection, with the

18   instruction.

19           THE COURT:  Same instruction, ladies and gentlemen.

20   It's not for the truth.

21           (Media played)

22           (Defendant's Exhibit 2110-3B received in evidence)

23           MR. WEITZMAN:  And then, finally, the final link is

24   Defense Exhibit 2110-5, and we would offer that, your Honor.

25           MR. MONTELEONI:  No objection.

O6oWmen2                         Van Wie - Cross

1            THE COURT:  Admitted.

2            (Defendant's Exhibit 2110-5 received in evidence)

3            MR. WEITZMAN:  This is an X post on The New York Times

4    X website:  "Some members of an Afghan girls robotics team have

5    arrived in Qatar fleeing the Taliban's takeover.  They will

6    remain in Qatar to continue their education, the team says."

7            If we can now return back to Government Exhibit 1304,

8    line 135.

9    Q.  On August 20, 2021, Senator Menendez sends Fred Daibes a

10   press release titled, "Chairman Menendez statement on Qatar's

11   efforts to help house Afghans seeking refuge in the United

12   States."

13           Do you see that?

14   A.  Yes.

15           MR. WEITZMAN:  And if we can go to line 165 -- I'm

16   sorry.  That's line 164, prior page.

17   Q.  On September 29, 2021, at 10:16 a.m., Fred Daibes sends

18   Senator Menendez a WhatsApp with a link to a bill pending in

19   Congress titled, "A resolution expressing appreciation for the

20   state of Qatar's efforts to assist the United States during

21   Operation Allies Refuge."

22           Do you see that?

23   A.  Yes.

24   Q.  And again, that's, if you zoom in, that's listed as being

25   sponsored by a different senator than Senator Menendez,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6oWmen2                              Van Wie - Cross

1    correct, Senator 2?

2    A.  Yes, Senator 2.

3            MR. WEITZMAN:  OK.  Thank you.  If we can go to lines

4    178 to 185.  178 to -- yeah, 178 to 181 for now.

5    Q.  Do you recall these messages about glazed doughnuts, sir?

6    A.  Yes.

7    Q.  OK.  Did you have any conversations with the prosecutors

8    about the meaning of this phrase "glazed doughnuts"?

9    A.  No.

10   Q.  From your review of documents, have you seen any references

11   to glazed doughnuts serving as a code word for gold bars?

12           MR. MONTELEONI:  Objection.

13           THE COURT:  Sustained.

14   BY MR. WEITZMAN:

15   Q.  As an FBI agent reviewing these emails, sir, you'd agree

16   with me that this would be the dumbest set of code words to use

17   for gold bars?

18           MR. MONTELEONI:  Objection.

19           THE COURT:  Sustained.

20   BY MR. WEITZMAN:

21   Q.  Take line 178.  Nadine says:  I ran downstairs to get a

22   glazed doughnut and my perfect husband said he did not keep the

23   box of doughnuts.  Next time I will take a doughnut in the very

24   beginning.  Have a great day.

25           Do you see that?

O6oWmen2                      Van Wie - Cross

1   A.  Yes.

2   Q.  And then Fred continues -- Fred responds, says:  He made me

3   take the box with me.  Correct?

4   A.  Correct.

5   Q.  Is it your view that either glazed doughnut or the box is a

6   reference to a gold bar?

7            THE COURT:  Sustained.

8   BY MR. WEITZMAN:

9   Q.  Did you have a discussion with the prosecutors as to

10  whether it is the glazed doughnut or the box, in their view,

11  that's a gold bar?

12           MR. MONTELEONI:  Objection.

13           THE COURT:  Sustained.

14  BY MR. WEITZMAN:

15  Q.  OK.  And then Nadine responds --

16           THE COURT:  You didn't, I take it -- well, let me ask

17  it this way.  Did you have any discussion with the government

18  about glazed doughnuts constituting a code word for gold bars?

19           THE WITNESS:  No.

20  BY MR. WEITZMAN:

21  Q.  Nadine responds:  He said I -- Nadine, presumably -- would

22  eat them and then be upset with him for letting me eat them.

23  He's most probably correct.  But I wouldn't have had just one.

24  Right?

25  A.  Or I would have had just one.

O6oWmen2                              Van Wie - Cross

1    Q.  I would have had just one.  Correct.  Thank you.

2         Again, you don't know what the reference to -- you're not

3    saying that the reference to eating a gold bar is a reference

4    to, like, selling a gold bar or anything like that?

5              THE COURT:  Sustained.  Sustained.  Move on.

6    BY MR. WEITZMAN:

7    Q.  One week later, on October 25, Fred sends a website showing

8    the price of a gold bar, correct?

9    A.  Correct, yes.

10   Q.  And that's publicly available information from the website

11   about the price of a gold bar, right?

12   A.  I'm not familiar with that website.

13             MR. WEITZMAN:  OK.  Can we zoom in on the website.

14             THE COURT:  Do you know, sir, if the price of gold --

15   you may know; I don't know.  Is the price of gold publicly

16   available at any given point in time?  If you know.

17             THE WITNESS:  I -- I've never -- I don't know.

18             THE COURT:  OK.

19             MR. WEITZMAN:  Can we go to the next message?

20             THE COURT:  You've never googled the price of gold?

21             THE WITNESS:  No.

22             THE COURT:  Next question.

23   BY MR. WEITZMAN:

24   Q.  And then on line 182, Nadine says:  Master Fred, this very,

25   very sick friend was so looking forward to a glazed doughnut

O6oWmen2                    Van Wie - Cross

1    today.

2        Do you see that?

3    A.  Yes.

4    Q.  And again, you don't know, you're not suggesting that she's

5    referring to a gold bar here, right?

6            THE COURT:  Sustained.  The man has no understanding

7    about that.

8    BY MR. WEITZMAN:

9    Q.  Have you seen documents that confirm that Nadine Menendez

10   was sick on this date, sir?

11           MR. MONTELEONI:  Objection.

12           THE COURT:  I'll allow it.

13           Do you know whether or not Nadine was sick on that

14   day?

15           THE WITNESS:  Outside of what's in this chart, I don't

16   have any context for anything else that was happening.

17   BY MR. WEITZMAN:

18   Q.  OK.  I'd like to turn your attention to Government Exhibit

19   1337.

20           MR. WEITZMAN:  Can we put that up, Mr. Kelly.

21   Q.  This is the exhibit that was created of selected search and

22   web activity history on Senator Menendez's Google account,

23   correct?

24   A.  Yes.  Cell phone and Google account.

25   Q.  OK.  Did you create this chart, or did the prosecutors

O6oWmen2                          Van Wie - Cross

1   create this chart?

2   A.  The prosecutors.

3   Q.  Did you suggest entries to include in here, or did they

4   provide you the entries to include?

5   A.  Combined.  I found some as well.

6   Q.  OK.  And how did you find those entries?

7   A.  Just doing batch searches through the source document.

8   Q.  And what kind of words did you search for?

9   A.  Gold and jewelry.

10  Q.  Any others?

11  A.  Off top of my head, I don't recall.  But it was things

12  related to  gold and jewelry.

13  Q.  And just so we understand, the source of these Google

14  searches is from two separate potential devices; one is a cell

15  phone and the other is, like, just a Gmail account that can be

16  on, like, a laptop, for example, right?

17          MR. MONTELEONI:  Objection.

18          THE COURT:  If he knows.

19  A.  All I know is that it's a Gmail account.  I don't know

20  where the source document actually came from.

21  Q.  But one also says Menendez cell phone, correct?

22  A.  Correct.

23  Q.  125?

24  A.  Right.

25  Q.  One can search Google on one's cell phone, right; you're

O6oWmen2                          Van Wie - Cross

```
 1   aware of that?

 2   A.  Yes.

 3   Q.  And the source document for this exhibit that you created

 4   was Government Exhibit A301, right?

 5   A.  Sorry?

 6   Q.  Government Exhibit A301, right?

 7   A.  Yes.  This document is from that source.

 8   Q.  OK.  Government Exhibit A301, I think, you said was a very

 9   large document that contains thousands of Google searches,

10   right?

11   A.  Right.

12   Q.  And are you aware that it's a 3,000-page-long document?

13   A.  I don't know how many pages it was.  I just knew it was

14   very long.

15   Q.  This document, Government Exhibit 1337, is an 18-page

16   document, right?

17   A.  Right.

18   Q.  OK.  Now, Government Exhibit A301 and 1337 only indicates

19   that Senator Menendez's Google account was involved in the

20   searches, right?

21           MR. MONTELEONI:  Objection.

22           MR. WEITZMAN:  Let me rephrase.

23   Q.  It indicates that a Google account conducted the search but

24   doesn't indicate who was using the Google account at the time,

25   correct?
```

O6oWmen2                         Van Wie - Cross

1    A.  Correct.  Doesn't say who was entering and searching.

2    Q.  For example, if someone else is using Senator Menendez's

3    phone, they could use Google to do a search and the document,

4    A301 and 1337, wouldn't indicate who actually did the search,

5    right?

6    A.  Yes.  These documents only show where these searches were

7    from.

8           THE COURT:  They don't show, the documents don't state

9    whose fingers were typing on the cell phone or the computer,

10   correct?

11          THE WITNESS:  As far as I know, I -- I don't think so.

12   Yes.

13          MR. WEITZMAN:  Can we go to Government Exhibit A301,

14   and if we can go to page 648 and 649.

15          We offer Government Exhibit A301, pages 648 and 649.

16   Let me just lay the groundwork.

17   Q.  Sir, these are searches conducted on October 25, 2021,

18   using the Senator Menendez Google account, correct?

19   A.  So, actually, it doesn't specify the exhibit that it is

20   sourced from.  I believe in the government exhibit it does

21   reference the source document for each search.

22          MR. WEITZMAN:  I think the government stipulates that

23   A301 is this document in front of us.

24          MR. MONTELEONI:  So, we stipulate that this is

25   Government Exhibit A301.  We do object, again, to the

1   introduction of these beyond-the-scope entries, again with no

2   notice.  This could go on forever.

3           THE COURT:  Lack of notice is a substantial issue.

4           How much longer do you have?

5           MR. WEITZMAN:  I have ten minutes on this document,

6   your Honor.

7           THE COURT:  No, no.  How much longer do you have?

8   It's 11:30.

9           MR. WEITZMAN:  Probably 10, 15 minutes, not much

10   longer, your Honor.  I'm just going to offer pages from their

11   document, from their exhibit.

12           THE COURT:  No.  I understand, but there's this notice

13   issue.

14           Is there objection to these two pages?

15           MR. MONTELEONI:  Yes, because it also goes to the

16   scope.  He didn't look at these pages.  He's testified about

17   what he looked at and what he didn't.  This is for the defense

18   case, if they want.

19           THE COURT:  Are you going to introduce a series of

20   these, sir?

21           MR. WEITZMAN:  I'll just introduce and publish and

22   won't ask the questions.

23           THE COURT:  All right.

24           MR. WEITZMAN:  Pages 648 and 649 we would offer as DX

25   A301-1.

1            THE COURT:  Objection?

2            MR. MONTELEONI:  Yes, your Honor.

3            THE COURT:  Overruled.

4            (Defendant's Exhibit A301-1, pps. 648-649, received in

5    evidence)

6            MR. WEITZMAN:  OK.  And we can just publish that.

7    Q.  Just one question, sir.  Does this reflect searches on the

8    Google account for Sephora in D.C., correct?

9    A.  Yes.

10           MR. WEITZMAN:  And now can we also go to Government

11   Exhibit A301, pages 7 through 10.  And if we can do side by

12   side.  And if we can show all four of those documents, seven

13   through ten, and just scroll through them.

14   Q.  And sir, these are searches on June 13, 2022, correct?

15   A.  Yes.

16           MR. WEITZMAN:  We offer these four pages as Defense

17   Exhibit A301-2.

18           MR. MONTELEONI:  Same objection.

19           THE COURT:  Same ruling.  Admitted.

20           (Defendant's Exhibit A301-2, pps. 7-10, received in

21   evidence)

22           MR. WEITZMAN:  If we can publish starting with DX

23   A301-2, starting with page 10 of the government exhibit.  And

24   the top entry, just highlight that one, best ten hair salons in

25   Washington, D.C.

1          Go to the next page, page 9.  The top email, the top

2   search says where to get a blow dry near me.

3          Let's go to the next page.  And then, again, middle

4   one says 10 best blow dry bars in Washington, D.C.

5   Q.  Do you see that?  Again, sir, you don't know whether the

6   searches on the Senator Menendez Google account are his

7   searches, someone else's, or if he's doing it for someone else,

8   correct?

9   A.  I don't know.

10  Q.  OK.  Senator Menendez doesn't look like a blow dry bar guy,

11  right?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Yes.  Sustained.  Move on.

14          MR. WEITZMAN:  Go to Government Exhibit A301, page

15  1135, these are entries dated March 13, 2021.  We'd offer this

16  as Defense Exhibit A301-3.

17          MR. MONTELEONI:  Same objection.

18          THE COURT:  Admitted.

19          (Defendant's Exhibit A301-3, page 1135, received in

20  evidence)

21          MR. WEITZMAN:  If we can publish that.

22  Q.  Do you see a March 13 entry for how do you say cake in

23  Spanish?

24          Do you see that, sir?

25  A.  Yes.  Sorry.  I didn't know it was a question.  Yes.

1          MR. WEITZMAN:  Then if we go to page 2540 of

2    Government Exhibit A301.  This is a July 14 search.  We offer

3    as Defense Exhibit A301-4.

4          THE COURT:  Same objection, same ruling.

5          MR. MONTELEONI:  Yes.

6          (Defendant's Exhibit A301-4, page 2540, received in

7    evidence)

8    BY MR. WEITZMAN:

9    Q.  Do you see it says, on the bottom, July 14, 2018, how do

10   you say girlfriend in Spanish?

11   A.  Yes.

12         MR. WEITZMAN:  Then if we can go to pages 1152 and

13   1153 of Government Exhibit A301.  These are searches on

14   February 26 and February 27 -- or February 26 and February 27

15   UTC time.  We'd offer these two pages as Government Exhibit

16   A301-5.

17         MR. MONTELEONI:  Objection.

18         THE COURT:  Same ruling.

19         (Defendant's Exhibit A301-5, pps. 1152-1153, received

20   in evidence)

21         MR. WEITZMAN:  OK.  Publish those.

22   Q.  On February 27, 2021, the Google account search for how do

23   you say turkey in Spanish, then the Google account search for

24   how do you say sandwich in Spanish, and then later, search for

25   how do you say tomato in Spanish.  Do you see that?

O6oWmen2                          Van Wie - Cross

1    A.  Yes.

2             MR. WEITZMAN:  Now I'd like to go to government -- I'd

3    like to go to Government Exhibit 1337 for a moment, back to

4    your exhibit.

5    Q.  Now, on April 5, April 5, 2019, if we can go to page 11,

6    there's a reference on April 5 for what is the spot price of

7    gold.  Do you see that?

8    A.  Yes.

9    Q.  Do you know what a commodity spot price is?

10   A.  No.

11   Q.  Do you know the difference between a spot price and a

12   futures price?

13   A.  No.

14   Q.  Are you aware, based on your review of Government Exhibit

15   A301, that the senator ran searches for the prices of other

16   commodities, not just gold?

17            MR. MONTELEONI:  Objection.

18            THE COURT:  Based on your search, can you say that one

19   way or the other?

20            THE WITNESS:  No.

21            MR. WEITZMAN:  Can we go to Government Exhibit A301,

22   and page 231, please.

23            We offer -- these are searches conducted on March 20,

24   2022, and we offer this as Defense Exhibit A301-6.

25            MR. MONTELEONI:  Objection.

```
 1              THE COURT:  Let me see it.
 2   BY MR. WEITZMAN:
 3   Q.  And sir, do you see that on March 20, 2022, the Menendez
 4   Google account searched for the price of oil today and the
 5   Brent crude oil price today?  Do you see that?
 6   A.  Yes.
 7   Q.  And do you know Brent crude refers to a commodity index?
 8   A.  No.
 9   Q.  OK.  And then --
10              MR. MONTELEONI:  Sorry.  Is this document in?  Has
11   there been a ruling on my objection?  I apologize.
12              MR. WEITZMAN:  I thought there was, your Honor.  You
13   said proceed.
14              THE COURT:  Do you have any more on this?
15              MR. WEITZMAN:  Just a couple more pages, and that's
16   it.
17              THE COURT:  I'll admit it.
18              (Defendant's Exhibit A301-6, page 231, received in
19   evidence)
20              MR. WEITZMAN:  If you can go to Government Exhibit
21   1337.
22   Q.  There are, on page 9 and 10, do you see that there are
23   entries in Senator Menendez's Google account for the deepest
24   gold mine in the world on May 24, 2020, and then there's a
25   search for Mponeng gold mining.  Do you see that?
```

O6oWmen2                          Van Wie - Cross

1   A.  Yes.

2   Q.  And you don't know why those searches were conducted of a

3   gold mine, right?

4   A.  No.

5   Q.  If you go to page 8 of this document, you found a number of

6   searches for the value of gold coins.  Do you see that?

7   A.  I don't recall if it was myself or the U.S. Attorney's

8   Office that found those specific searches, but they do appear

9   in this chart.

10  Q.  Fair enough.  The chart reflects the 1904 Edward gold coin

11  value and 1908 Edward gold coin value, 1978 Leopold the second

12  gold coin value, many searches --

13          THE COURT:  1878.

14          MR. WEITZMAN:  1878.  Thank you, your Honor.

15  Q.  -- many searches in the Senator Menendez Google account for

16  the value of particular coins, correct?

17  A.  Correct.

18  Q.  From your review of -- and there are many more than just

19  these on this page, right; you saw them?

20          MR. MONTELEONI:  Objection.

21  BY MR. WEITZMAN:

22  Q.  -- page 7, the next page?

23  A.  Yes.

24  Q.  Based on your review of the documents underlying Government

25  Exhibit 1304, do you know whether senator -- whether Nadine

O6oWmen2                          Van Wie - Cross

1    Menendez had vintage, old, antique gold coins from her family?

2             MR. MONTELEONI:  Objection.

3             THE COURT:  Based on your review of the documents, can

4    you say one way or the other?  Yes or no.

5             THE WITNESS:  No.

6    BY MR. WEITZMAN:

7    Q.   Do you know whether Nadine, based on your review of the

8    documents, was selling gold coins at or around this time?

9    A.   No.

10   Q.   Now, the earliest date on your chart for searches relating

11   to the price of gold coins --

12            MR. WEITZMAN:  Can we continue to put up Government

13   Exhibit 1337 and go to page 8.

14   Q.   -- the earliest date on your chart for searches relating to

15   either the price of gold coins or value of certain coins is

16   this May 23 entry, is that correct, 2021?

17   A.   I'd have to just scroll through quick to verify.

18   Q.   OK.  Let's just go to the next pages so that he can confirm

19   that.

20   A.   And what was your question regarding?

21   Q.   Yes.  The first entry on your chart reflecting a search of,

22   for instance, vintage coins, is this May 23, 2021, entry?

23   A.   That I'd have to definitely go back through to confirm.

24            MR. WEITZMAN:  OK.  Let's go to Government Exhibit

25   A301 and page 1809 in particular.

O6oWmen2                          Van Wie - Cross

1          And these are searches on October 10, 2019, from the

2     Senator Menendez Google account.  We offer this as Defense

3     Exhibit A301-7, and I believe this is the last one, your Honor.

4               MR. MONTELEONI:  No objection to this one.

5               THE COURT:  Admitted.

6               (Defendant's Exhibit A301-7, page 1809, received in

7     evidence)

8     BY MR. WEITZMAN:

9     Q.  On October 10, 2019, the Senator Menendez Google account

10    does a search for the 1971 quarter value, and then this one

11    vintage coin from the '70s is worth a ton of money now.

12         Do you see that?

13    A.  Yeah.  I see the account visited the site for the vintage

14    coin and searched for a 1971 quarter value.

15    Q.  And by the way, these two searches are not on your chart

16    under Government Exhibit 1337, right?

17    A.  I don't believe so, no.

18              MR. WEITZMAN:  OK.  Now, if we can turn to Government

19    Exhibit 1337.  Should be five minutes, your Honor.

20    Q.  If you turn to page 11 -- I'm sorry, page 9.  There's a

21    number of searches for the value or worth of certain weights of

22    gold, correct, on May 23, 2021?  There's one that says how much

23    a hundred grams of gold worth, another one says one gram of

24    gold in dollars.  Do you see that?

25    A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6oWmen2                        Van Wie - Cross

1   Q.  And these searches weren't included on Government Exhibit

2   1304, right?

3           MR. MONTELEONI:  Objection.

4           MR. WEITZMAN:  Let's put up Government Exhibit 1304.

5           MR. MONTELEONI:  I misunderstood the question.

6   Withdrawn.

7           MR. WEITZMAN:  Can we put up Government Exhibit 1304,

8   side by side.  I'm sorry, Mr. Kelly.  And if you can go to May

9   23, line 241 -- I'm sorry.  Line -- go to May 23, 2021, if you

10  can.  Just scroll up.  Can you scroll up on 1304, Mr. Kelly.

11  Just to go to May 23, 2021.  There we go.

12  Q.  Sir, the searches for one gram of gold in dollars and one

13  gram of gold worth aren't included on your chart for May 23,

14  2021, correct?

15          THE COURT:  It's a hundred grams of gold worth.

16          MR. WEITZMAN:  Yes, your Honor.  I misspoke.  Thank

17  you.

18  A.  That's correct, yes.

19  Q.  OK.  Now, you do have a search on your chart, in line 241,

20  for one kilo of gold price --

21          MR. WEITZMAN:  If we can go to, and just zoom in on

22  line 241.

23  Q.  -- and that occurs on January 29, 2022, correct?

24  A.  Correct, yes.

25          MR. WEITZMAN:  Now, if you can just put up Government

O6oWmen2                          Van Wie - Cross

1   Exhibit 1304, Mr. Kelly.

2   Q.  Now, you see that just a few lines after that search, on

3   February 17, 2022, there's an exchange between Shannon Kopplin

4   and Senator Menendez.  Do you see that?

5   A.  Yes.

6   Q.  And that occurs on February 17, 2022, correct?

7   A.  Correct.

8   Q.  And in it, she says:  Thank you again for contacting the

9   committee.  Based on our discussion, I advise you amend your CY

10  2020 financial disclosure report to include your spouse's gold

11  bars in part 3 as an asset.

12       Do you see that?

13  A.  Yes.

14       MR. WEITZMAN:  Now, can we put up the underlying

15  document, Government Exhibit 8K-1, and let's turn to page 1 and

16  2.  And we can just put up Government Exhibit 8K-1, Mr. Kelly.

17  Q.  Now, the email that you quote is on February 17, it's at

18  the bottom of page 1, correct?

19  A.  Yes.

20       MR. WEITZMAN:  OK.  Now can we go to page 2, just side

21  by side.

22  Q.  And in her email, it's not quoted in your chart, but she

23  also makes recommendations in paragraph 5.  She says:  I

24  recommend you include the following information.

25       Do you see that?

1          MR. MONTELEONI:  Objection.

2          THE COURT:  Do you see the words "I recommend you

3    include the following information" on that document?  Yes or

4    no.

5          THE WITNESS:  I do, yes.

6    BY MR. WEITZMAN:

7    Q.  And she says description -- asset name:  Gold bullion;

8    description:  Gold bars; owner:  Spouse.  And then she says,

9    value:  Report the combined value of the gold bars by selecting

10   the appropriate category.

11        Do you see that?

12   A.  Yes.

13   Q.  Based on your review of this document, fair to say that

14   Senator Menendez had to identify the value of the gold bars in

15   connection with his amended disclosures?

16          MR. MONTELEONI:  Objection.

17          THE COURT:  Sustained.

18          MR. WEITZMAN:  If we can turn to line 252 of

19   Government Exhibit 1304, and let's do a side by side.

20   Q.  On March 6 of 2022, Senator Menendez did a search for one

21   kilo of gold.

22        Do you see that?  I'm sorry it's so small.

23   A.  Yes.

24          MR. WEITZMAN:  Now can we put up Government Exhibit

25   1337, page 1.  And if we can highlight the March 7 entries

O6oWmen2                              Van Wie - Cross

1  right after or with the one kilo of gold, March -- there we go.

2  Q.  Do you see, sir, that three minutes after searching for one

3  kilo of gold Senator Menendez's phone searches the Senate

4  Ethics Committee executive director?

5     Do you see that?

6  A.  Yes.

7  Q.  And that's within three minutes of the search of kilo of

8  gold, right?

9  A.  Yes.

10 Q.  That's not included on your summary chart, 1304, correct?

11 A.  Don't believe so, no.

12 Q.  OK.  And do you know whether Shannon Kopplin works at the

13 Senate Ethics Committee?

14         MR. MONTELEONI:  Objection.

15         THE COURT:  Sustained.

16 BY MR. WEITZMAN:

17 Q.  Do you know where Shannon Kopplin works, sir?

18 A.  No.

19         MR. WEITZMAN:  One moment, your Honor?

20         Nothing further.  Thank you.

21         THE COURT:  How long is redirect?

22         Oh, I'm sorry.  How long, sir?

23         MR de CASTRO:  Ten minutes.  Ten minutes, maybe.

24         THE COURT:  All right.  Let's take a break, ladies and

25 gentlemen.  15 minutes.    (Continued on next page)

O6oWmen2                          Van Wie - Cross

1                    (Jury not present)

2                    THE COURT:  You may step down, sir.

3                    (Witness not present)

4                    THE COURT:  15 minutes.

5                    (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6O5men3                          Van Wie - Cross

1                  THE COURT:  Put the witness on the stand, bring the

2       jury in.

3                  Mr. Lustberg, do you have questions of this witness?

4                  MR. LUSTBERG:  No, your Honor.

5                  THE COURT:  10 minutes, Mr. de Castro?

6                  MR. DE CASTRO:  If not less, your Honor.

7                  THE COURT:  What is the redirect estimate?

8                  MR. MONTELEONI:  10 minutes.

9                  THE COURT:  Jury entering.

10                 (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6O5men3                              Van Wie - Cross

1              (Jury present)

2              THE COURT:  You may be seated.

3              Your witness, sir.

4    CROSS-EXAMINATION

5    BY MR. DE CASTRO:

6    Q.  Good afternoon, Mr. Van Wie.

7    A.  Good afternoon.

8    Q.  My name is Cesar de Castro.  I represent Fred Daibes and I

9    just have a few questions for you.  OK?

10   A.  Yes.

11             MR. DE CASTRO:  Mr. Kelly could you start by putting

12   up Government Exhibit 1304.

13   Q.  Agent van Wie, I direct your attention to line 30 of

14   Government Exhibit 1304?  This is a call from December 15,

15   2020, at 11:54 a.m., from Robert Menendez to Fred Daibes;

16   correct?

17   A.  Correct.

18   Q.  And if we go back, if we look at also line 31, that is a

19   call that is 34 seconds long and that is from Fred Daibes to

20   Senator Menendez; correct?

21   A.  Correct.

22   Q.  From the records you reviewed, you can't tell the jury what

23   was discussed on that call; right?

24   A.  Right.

25   Q.  And you have no idea what Mr. Daibes said on it that call?

O6O5men3                        Van Wie - Cross

1    A.  Right.

2    Q.  And you have no idea what Mr. Menendez said on that call?

3    A.  Right.

4    Q.  Turning to line 106, which is page 6 of Government Exhibit

5    1304, this is a text message on June 29, 2021 at 5:27 p.m.;

6    right?

7    A.  Yes.

8    Q.  And it is a text message from Fred Daibes to Bob Menendez;

9    correct?

10   A.  Correct.

11   Q.  And from your review of messages, you understand,

12   obviously, that Robert Menendez is a United States senator?

13   A.  Correct.

14   Q.  In fact, he is the senior senator from New Jersey; am I

15   right?

16   A.  I am aware he is a senator from New Jersey.

17   Q.  In this text message between Mr. Daibes and Senator

18   Menendez, Mr. Daibes refers to him as "my brother," right?

19   A.  Yes.

20   Q.  And would you agree with me that Mr. Daibes is using "my

21   brother," based on your review of all of these documents, as a

22   term of endearment?

23            MR. MONTELEONI:  Objection.

24            THE COURT:  Can you state how that term is being used

25   by Mr. Daibes?  Yes or no.

1           THE WITNESS:  No.

2   BY MR. DE CASTRO:

3   Q.  Directing your attention to line 130 of Government Exhibit

4   1304 which is on page 8, do you see this is another text

5   message from Mr. Daibes to Senator Menendez?

6   A.  Yes.

7   Q.  That is on August 14 of 2021 at 7:16 p.m.; correct?

8   A.  Correct.

9   Q.  And again you see there that Mr. Daibes is referring to

10  Mr. Menendez as "my brother," correct?

11  A.  Correct.

12          MR. DE CASTRO:  Now, if we can turn to line 213 of

13  Government Exhibit 1304 which is page 15, Mr. Kelly?

14  Q.  Now, this here is a text message from Nadine Menendez to

15  Fred Daibes on December 23, 2021 at 9:11 p.m.; correct?

16  A.  Yes?

17  Q.  This is the message I think that we saw last week I think

18  which says:  Better having heard the date is postponed.  He is

19  fixated on it.

20          Do you see that?

21  A.  Yes.

22  Q.  Now, line 213, I think we saw last week, also comes from,

23  it says on the chart, Government Exhibit D102-2; correct?

24  A.  Correct.

25          MR. DE CASTRO:  Can we pull that up, Mr. Kelly,

1    D102-2?

2    Q.  What we see on this page bears the message from -- the

3    bottom message is the message we just saw in the chart; right?

4    A.  Right.

5    Q.  The message before that is a message from Mr. Daibes to

6    Nadine Menendez; correct?

7    A.  Correct.

8    Q.  And this message does not appear on the chart; am I right?

9    A.  I have to go back and take a look.

10    Q.  Sure.

11         MR. DE CASTRO:  Do you want to put up Government

12    Exhibit 1304 line 213?  You can leave it.

13    Q.  It is on the chart, am I right?

14    A.  I have to go to the next.  Oh, sorry.  September 23rd, yes.

15    Q.  So 212 and 213 are the two messages we just saw; right?

16    A.  Right.

17         MR. DE CASTRO:  Now can we go back to Government

18    Exhibit D102-2?  Now if we can go to the next page?  There on

19    the next page if we can blow up both of these messages?

20    Q.  Do you see that Mr. Daibes is texting Nadine Menendez and

21    here he refers to -- well, let me just read:  This is not his

22    fault.  He was amazing in all he did.  He is an amazing friend.

23    Do you see that?

24    A.  Yes.

25    Q.  As loyal as they come; right?

1   A.  Yes.

2   Q.  Now, there are a couple more messages in the chain that

3   were not included, I'm not going to read the next of them

4   because I think Mr. Weitzman covered it.  This is that Merry

5   Christmas at the church praying message, right?  In blue?

6   A.  Right.

7   Q.  That's not on the chart; correct?

8   A.  I would have to confirm.

9   Q.  OK, let's take a quick look at that area of the chart and

10  then I will ask you a couple more questions about a couple

11  more.  Do you see Government Exhibit 1304 on your screen?

12  A.  Yes.

13  Q.  So have a quick look and I can ask you some questions going

14  back to D102-2.  Tell us when you are ready.

15  A.  I'm ready.

16          MR. DE CASTRO:  Next page, Mr. Kelly?

17  Q.  So this message in blue regarding the church, that one is

18  not on the chart; correct?

19  A.  Correct.

20          MR. DE CASTRO:  Going to the next page, this is

21  where -- can you blow all three of those up, Mr. Kelly?

22  Q.  On the top of the page you see a message from Mr. Daibes to

23  Nadine saying:  Thank you, my sister.  I'm fine.

24      Right?

25  A.  Yes.

O6O5men3                          Van Wie - Cross

1    Q.  Now, I think we covered this and then there is some

2    conversation about a chair and a recliner; right?

3    A.  Yes, it refers to a chair.

4    Q.  Now, the next message is from Nadine to Fred Daibes is not

5    on your chart; right?

6    A.  No.  I don't believe so.

7    Q.  And it says, from Nadine to Mr. Daibes:  Good morning.  I

8    hope you're feeling perfect again.  I dropped off the best tres

9    leches Bob and I have ever eaten.  I hope you enjoy it.

10            Do you see that?

11   A.  Yes.

12   Q.  You see Mr. Daibes responds:  Good morning.  Sounds great.

13   Going to get it now.  Thank you.

14   A.  Yes.

15   Q.  Now, if we could turn to line 218 of Government Exhibit

16   1304, this is a message from, on January 2, 2022 at 5:46 p.m.

17   from Nadine Menendez to Mr. Daibes; correct?

18   A.  Correct.

19   Q.  This is more messaging, a little bit about this recliner or

20   chair; am I right?

21   A.  Yes.

22   Q.  This comes from DX 102-3, right?

23   A.  Yes.

24            MR. DE CASTRO:  Can we put up Government Exhibit

25   D102-3?

O6O5men3                        Van Wie - Cross

1   Q.  And the message that was on the chart we see there in blue;

2   right?

3   A.  Yes.

4   Q.  Now, of course only a portion of that was included on the

5   chart; right?  It is a pretty long message.

6   A.  I would have to compare them but I believe it was an

7   excerpt.

8          MR. DE CASTRO:  Maybe we can put them both up,

9   Government Exhibit 1304 and D102-3, split screen, we are at

10  line 218, page 6.  Mr. Kelly, can you pull down the message on

11  the top?  You can leave 102-3, just don't zoom in, and I want

12  to focus on the message before the one, side by side, please,

13  Mr. Kelly.  Are we on D102-3?  So the message before that blue

14  one, Mr. Kelly.

15  Q.  This is a message from Mr. Daibes to Nadine Menendez prior

16  to the message on your chart; correct?

17  A.  I am trying to do a UTC conversion in my head.

18          MR. DE CASTRO:  If you want to zoom out, Mr. Kelly, on

19  the message?

20  Q.  On D102-3 you can see the --

21  A.  Yes.

22  Q.  And that top message, it is from Mr. Daibes to Nadine

23  Menendez saying:  Hey, calling to check on you guys to see if

24  you need anything.  Right?

25  A.  Right.  Yes.

O6O5men3                          Van Wie - Cross

1   Q.  And then the message below that from Mr. Daibes says:

2   Thank you, Nadine.  Hope he feels better.  Let me know if you

3   need anything.  Right?

4   A.  Yes.

5           MR. DE CASTRO:  Let's go to lines 43, 44, and 45 of

6   Government Exhibit 1304.  You don't have to zoom it, Mr. Kelly.

7   Q.  You can see that OK, right?

8   A.  Yes.

9   Q.  These are three references to calls between Mr. Menendez

10  and Mr. Daibes; right?

11  A.  On December 19.

12  Q.  On December 19 of 2020?

13  A.  Yes.

14  Q.  Now, line 43 is a two-second call on December 19 at

15  8:03 p.m.; correct?

16  A.  Yes.

17  Q.  Line 44 is a three-second call on December 19 at 8:16 p.m.;

18  right?

19  A.  Yes.

20  Q.  And then 45 is a one-minute 45-second call at 10:07 p.m.

21  that same night; right?

22  A.  Yes.

23  Q.  Now, these three entries come right after line 42; correct?

24  A.  Yes.

25  Q.  And line 42 is a voicemail from Philip Sellinger to Robert

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Menendez regarding his call with Cory; right?

2  A.  Yes.

3  Q.  That voicemail was the day before, lines 43, 44, and 45;

4  right?

5  A.  Yes.

6  Q.  Now, do you know if there is a reason why there was not a

7  break or a separation included there to make it clear that

8  these are days apart?

9          MR. MONTELEONI:  Objection.

10          THE COURT:  Sustained.

11  Q.  The call that connected, line 45, was about two minutes;

12  right?

13  A.  Yes.

14  Q.  You have no idea what they spoke about?

15  A.  No.

16  Q.  And when they spoke, whatever they said, Mr. Sellinger had

17  not told Senator Menendez yet about his meeting with Cory;

18  right?

19          MR. MONTELEONI:  Objection.

20          THE COURT:  Do you know?

21          THE WITNESS:  I'm sorry.  Can you repeat the question?

22  Q.  Sure.  When they spoke, Mr. Sellinger had not told Senator

23  Menendez yet about his meeting with Cory?

24          THE COURT:  Are you able to say that?

25          THE WITNESS:  I'm not sure what the content of their

O6O5men3                          Van Wie - Cross

 1   conversations were relating to that.

 2   Q.  If you look at the next line, line 46, Philip Sellinger is

 3   texting Robert Menendez:  Good morning, Bob.  Is there a

 4   convenient time for you to catch up regarding my meeting with

 5   Cory?  Thanks, Philip.

 6            Do you see that?

 7   A.  Yes.

 8   Q.  So fair to say they had not spoken about his meeting with

 9   Cory yet?

10            MR. MONTELEONI:  Objection.

11            THE COURT:  I will allow it.

12            Do you know whether or not?

13            THE WITNESS:  I don't.  The universe of my information

14   is this chart, so whatever the chart says regarding

15   communications is all I am aware of.

16   Q.  OK.

17   A.  Anything outside of that I'm not privy to.

18   Q.  But you do see those words on the chart on line 46?

19   A.  Yes.

20            THE COURT:  Yes, next.  See those words.  Next.

21   Q.  Turning to line 223, page 16 of Government Exhibit 1304,

22   this is a call from Nadine Menendez to Fred Daibes on

23   January 21 of 2022 at 1:38 p.m.

24            Do you see that?

25   A.  Yes.

O6O5men3                          Van Wie - Cross

1   Q.  And that call was about two minutes and 52 seconds; right?

2   A.  Yes.

3   Q.  And it is three days after Mr. Daibes returns from London;

4   is that right?

5   A.  Yes, according to the chart.

6   Q.  Do you have any idea what they spoke about?

7   A.  No.

8   Q.  Do you have any idea why this particular entry was included

9   in the chart?

10  A.  No.

11  Q.  Now let's turn to line 119 on page 8 of Government Exhibit

12  1304.  Line 119 refers to an e-mail from Ross Friedman to Shaun

13  Doherty; correct?

14  A.  Yes.

15  Q.  And it is on July 26 of 2021 at 2:59 p.m.; correct?

16  A.  Yes.

17  Q.  Now, it comes from Government Exhibit 4F-28; right?

18  A.  Yes.

19          MR. DE CASTRO:  Can we take a look for a moment at

20  Government Exhibit 4F-28?

21  Q.  Now, the subject of this exchange is 339 River

22  Road-valuation; correct?

23  A.  Correct.

24          MR. DE CASTRO:  Can we scroll down to the attachment,

25  Mr. Kelly?

1   Q.  Here at the bottom you see there is an attachment for

2   July 26, 2021 letter or correspondence to Mr. Doherty; correct?

3   A.  Yes.

4   Q.  And Mr. Doherty appears to be from Heritage Advisors

5   Limited; correct?

6   A.  Yes, that is in his header.

7   Q.  And his header also has that he is in London, England;

8   right?

9   A.  Yes.

10  Q.  And it is from Ross Friedman who is the senior vice

11  president -- upper right corner -- from JLL; right?

12  A.  Yes.

13  Q.  And the "re" line or the subject is valuation and advisory

14  services for the property:  339 River Road, Edgewater, New

15  Jersey, 07020; correct?

16  A.  Yes.

17  Q.  Now, below this there is a purpose, I think there is -- it

18  says purpose and it says market value; right?

19  A.  Yes.

20  Q.  And the intended use is due diligence; correct?

21  A.  Yes.

22  Q.  And the delivery date is four weeks from receiving an

23  engagement letter; right?

24  A.  Yes.

25  Q.  Now, going back to Government Exhibit 1304, line 245, the

O6O5men3                          Van Wie - Cross

1   chart makes reference to an e-mail from Robert Ivanhoe to

2   Andrew Longmate and Shaun Doherty; correct?

3   A.  Yes.

4   Q.  Looks like February 11, 2022 at 8:08 in the morning; right?

5   A.  Yes.

6   Q.  Can we look at Government Exhibit -- excuse me, that comes

7   from Government Exhibit 4F-31; right?

8   A.  Yes.

9           MR. DE CASTRO:  Let's pull up Government Exhibit

10  4F-31.

11  Q.  Now, the subject of Government Exhibit 4F-31, it is an

12  e-mail, and it is a forward, it says:  Daibes Enterprises,

13  Edgewater, New Jersey.  Correct?

14  A.  Correct.

15  Q.  Now if we go now to the middle message from Mr. Raissi to

16  Mr. Ivanhoe, you see here it says:  Finally, I found the

17  financial model.  Land was valued at $200 million.  Check it

18  out and let me know if the contemplated assumptions were valid.

19  Still awaiting from former colleague to send me the pitch deck.

20  Keep you posted.

21          Do you see that?

22  A.  Yes.

23  Q.  Now, if you scroll down there was an attachment to this

24  e-mail, there is attachment that has what appears to be a pitch

25  deck; am I right?

1    A.  I'm not sure.

2    Q.  There is an attachment, it says, Cover Page, 115 River

3    Road, Edgewater, New Jersey, residential development.

4        Do you see that?

5    A.  I see that.

6    Q.  The next page has, this one is pretty small but if we blow

7    it up it is a summary of key assumptions.  Do you see that?

8    A.  Yes.

9    Q.  And so, if you zoom out -- well yes, if you zoom out,

10   Mr. Kelly, there is a lot of figures on that page, I'm not

11   going to go through all of those.

12            THE COURT:  Are there a lot of figures on that page?

13            THE WITNESS:  There are, yes.

14            MR. DE CASTRO:  Just so the jury can see, can we zoom

15   on the gray box on the right?  Then if we go to the next page?

16   Q.  The next page has an area of it that has rental revenue;

17   right?

18   A.  It appears so, yes.

19            MR. DE CASTRO:  Mr. Kelly, can you do the whole rental

20   revenue section across to the right including the headers and

21   all the way down?  Thank you.

22   Q.  Here it seems to be a sort of spreadsheet indicating rental

23   revenues and other topics; right?

24   A.  I have to review it.  I didn't review this as part of the

25   summary chart.

O6O5men3                          Van Wie - Cross

1    Q.  But it is attached to 4F-31 which you did review; right?

2    A.  Yes, the portion that was excerpted into the summary chart

3    I did review, yes.

4    Q.  And so here you see a chart that has years across the top;

5    right?

6    A.  There are, yes.

7    Q.  It goes from year 0 to year 10 and has a totals field;

8    right?

9    A.  Yes.

10   Q.  And then there is a section here that talks about -- I'm

11   sorry.  Withdrawn.

12       It goes from year 1 appears to be 2018, and year 10 is

13   2027; right?

14   A.  Yes.

15   Q.  And so here the one section I have highlighted here is

16   rental revenues for the particular years; right?

17   A.  It appears so, yes.

18   Q.  You see there is a yellow line there that says net

19   operating income; right?

20   A.  It says that, yes.

21   Q.  And by year 10 -- I'm sorry.  By totals it says somewhere

22   in the neighborhood of $300 million, right?

23   A.  Yes.

24           MR. DE CASTRO:  I'm not going to go through any more

25   of this, Mr. Kelly, you can zoom out and just scroll down

O6O5men3                          Van Wie - Cross

1   through the attachment.

2   Q.  Do you see there is just more detailed figures; right?

3            MR. DE CASTRO:  If you can zoom in, Mr. Kelly?

4   A.  Yes, it appears so.

5   Q.  Now I know --

6            MR. DE CASTRO:  We can put that down, Mr. Kelly.

7   Thank you.

8   Q.  Directing your attention to line 331 of Government Exhibit

9   1304, this is the letter, the LOI that you discussed on direct

10  and cross-examination; right?

11  A.  Yes.

12           MR. DE CASTRO:  Now, if we could just put up

13  Government Exhibit 4F-17 and scroll down to the attached letter

14  of intent?

15  Q.  I know certain sections were covered, I'm not going to go

16  over that again, but this is the letter of intent that we

17  looked at on cross-examination; right?

18  A.  It is, yes.

19  Q.  Let's look at the section that is the proposed project,

20  this was the venture or single purpose entity created

21  specifically for the project, will develop a project consisting

22  of approximately 2,200 apartment units.

23       Do you see that?

24  A.  Yes.

25           MR. DE CASTRO:  Mr. Kelly, can you pull out from that?

O6O5men3                           Van Wie - Cross

1    Thank you.

2    Q.  And property equity, that section, do you see that the

3    valuation of the property, the property value as of the closing

4    is anticipated to be approximately $190 million, free and clear

5    of all indebtedness?

6         Do you see that?

7    A.  Yes, it says that.

8    Q.  And the last piece, so this and the last page of it you saw

9    that this was signed on May 23rd of 2022; right?

10   A.  Yes.

11   Q.  And from line 91 and 92 of Government Exhibit 1304 we saw

12   that there was an introduction from Sheikh Sultan to

13   Mr. Daibes, they were e-mailing introducing themselves?

14             MR. MONTELEONI:  Objection.

15             THE COURT:  Can you tell if that was the purpose of

16   the e-mail at 91 and 92?

17             THE WITNESS:  I would say no.

18   Q.  In 91 Mr. Menendez is providing Mr. Daibes' contact

19   information; correct?

20   A.  Yes.

21   Q.  Including his e-mail; right?

22   A.  Yes.

23   Q.  And then in 92 do you see Sheikh Sultan was e-mailing Fred

24   Daibes; right?

25   A.  Yes.

O6O5men3                          Van Wie - Redirect

1   Q.  And that's in around June 15 of 2021; right?

2   A.  Yes.

3   Q.  And that's about 11 months from when the letter of intent

4   was signed in May of 2022?

5   A.  Yes.

6           MR. DE CASTRO:  Nothing further, Judge.

7           THE COURT:  Thank you.

8           Any redirect?

9           MR. MONTELEONI:  Briefly, your Honor.  Yes.

10  REDIRECT EXAMINATION

11  BY MR. MONTELEONI:

12  Q.  Good afternoon, Special Agent van Wie.  Do you remember on

13  cross-examination being asked questions about the realtor David

14  Axelrad?

15  A.  Yes.

16  Q.  Do you remember being asked about whether you had seen

17  documents that reflected that there was direct contact between

18  Robert Menendez and David Axelrad?

19  A.  Yes.

20          MR. MONTELEONI:  Mr. Hamill, could you please put up

21  Government Exhibit B234 and take us to page 5?  Mr. Hamill, can

22  you please expand the top blue text.

23  Q.  Special Agent van Wie, can you please read the text of this

24  message that is from David Axelrad to Nadine Menendez?

25  A.  Nice meeting you and your husband today.  Looking forward

O6O5men3                         Van Wie - Redirect

1    to seeing Schaeffer.

2               MR. MONTELEONI:  Mr. Hamill, can you please take us to

3    page 36 and can you please expand the bottom two texts on this

4    page?

5    Q.  Special Agent van Wie, can you please read the first two

6    lines of the top green message from Nadine Menendez to David

7    Axelrad?

8    A.  "Saddle River is the house if left up to me.  I have not

9    been able to speak to Bob at all.  Maybe seeing Virginia Court

10   will finalize saddle river for us."

11   Q.  Now, can you please read the blue text that David Axelrad

12   responds to Nadine Menendez below?

13   A.  "Hi, and yes.  I can see if either of those times are

14   available for the seller of Virginia Court.  Maybe tomorrow

15   morning is better, to give Bob a chance to catch his breath."

16              MR. MONTELEONI:  Can you please take us to page 37,

17   Mr. Hamill?

18   Q.  Can you please read the top green text from Nadine

19   Menendez?

20   A.  "If you can get it, 4:30 we might be able to make the offer

21   for Saddle River tomorrow.  Tomorrow morning has to be before

22   10:00 and next weekend we are not here."

23              MR. MONTELEONI:  Mr. Hamill, can you please take us to

24   page 39, and can you please read the blue text from David

25   Axelrad to Nadine Menendez?

O6O5men3                          Van Wie - Redirect

1    A.  "Good morning.  I'll be there in 9 min."

2    Q.  Can you please read the green text at the bottom from

3    Nadine Menendez to David Axelrad?

4    A.  "We are here."

5            MR. MONTELEONI:  Mr. Hamill, can you please take us to

6    page 40?

7    Q.  Just directing your attention to the last green text, can

8    you please read that green text from Nadine Menendez to David

9    Axelrad?

10   A.  "Bob had a 10:00 a.m. that he postponed till 10:30.  So we

11   have been here in case one of you got here early."

12   Q.  Special Agent van Wie, do you remember being asked

13   questions about who was using Menendez' phone or his search,

14   his Google search history?

15   A.  Yes.

16   Q.  Do you remember being shown some portions of the Google

17   search history about blow drying, where to get a blow dry?

18   A.  Yes.

19           MR. MONTELEONI:  Mr. Hamill, can you please put up

20   what is in evidence as Government Exhibit 1302 and take us to

21   page 87?

22   Q.  Special Agent van Wie, directing your attention to line

23   1157, who is sending information in line 1157 about a hair

24   salon?

25   A.  Robert Menendez.

O6O5men3                          Van Wie - Redirect

1    Q.  Who is Robert Menendez sending information about a hair

2    salon to?

3    A.  Nadine Menendez.

4    Q.  Do you remember being asked questions about who was using

5    Menendez' phone to make searches?

6    A.  Yes.

7              MR. MONTELEONI:  Mr. Hamill, can you please put up

8    Government Exhibit 1304 and take us to page 13?

9    Q.  Now, directing your attention to lines 176 and 177, the

10   searches for "how much is 1 kilo of gold" and "how much is 1

11   kilo of gold worth" on October 18, 2021, can you please read

12   the time that is listed for those searches?

13   A.  11:12 a.m.

14             MR. MONTELEONI:  Mr. Hamill, can you please put up to

15   one side Government Exhibit A132?

16   Q.  Directing your attention to the top line, if you could

17   expand the top line in Government Exhibit A132, can you please

18   read the time on October 18, 2021 of the text that was sent

19   from Robert Menendez' cell phone?

20   A.  11:11 a.m.

21   Q.  How does that time compare to the searches for how much is

22   1 kilo of gold, and how much is 1 kilo of gold worth, from

23   Menendez' cell phone as reflected in Government Exhibit 1304?

24   A.  It was one minute earlier.

25             MR. MONTELEONI:  And let's look again at the

O6O5men3                          Van Wie - Recross

1   attachment to this message, Mr. Hamill if you could put up in

2   place of A132, A132-A.

3   Q.  Special Agent van Wie, whose signature appears on the

4   letter of recommendation that was texted from Robert Menendez'

5   cell phone one minute before that cell phone searched for how

6   much is 1 kilo of gold and how much is 1 kilo of gold worth?

7   A.  It appears to be signed by Robert Menendez.

8   Q.  Do you remember being asked questions about a February 17,

9   2022 e-mail from a Shannon Kopplin regarding a committee and

10  disclosures of gold?

11  A.  Yes.

12  Q.  How long is that February 17, 2022 e-mail from Shannon

13  Kopplin about disclosures of gold, after this October 18, 2021

14  searches from the Robert Menendez cell phone for how much is

15  one kilo of gold and how much is 1 kilo of gold worth?

16  A.  About four months, I would say.

17          MR. MONTELEONI:  No further questions.

18          MR. WEITZMAN:  Your Honor, just brief recross.

19          THE COURT:  Go ahead.  Let's see.

20          MR. WEITZMAN:  Can you put up Government Exhibit 1302

21  page 87 which is witness testified to?

22  RECROSS EXAMINATION

23  BY MR. MONTELEONI:

24  Q.  Sir, you testified about this October 20th, 2020 entry in

25  line 1155 and 1156 -- I'm sorry, 1154 and 1155 about a hair

O6O5men3                                Van Wie - Recross

1    salon.  Do you see that?

2    A.   Yes.

3    Q.   And then you saw at 1157 there is a reference by Senator

4    Menendez to Drybar Penn Quarter; correct?

5    A.   Correct.

6    Q.   Again, that's October 20, 2020; correct?

7    A.   Correct.

8    Q.   Now, can we go to Government Exhibit A301 and page 8, which

9    has been admitted as Defendant's Exhibit A301-2.

10        The search conducted on Senator Menendez' Google account

11   for 10 best blow dry bars in Washington, D.C., that was

12   June 13, 2022; correct?

13   A.   Yes.  It appears so.

14   Q.   So more than 18 months after the entry that's on Government

15   Exhibit 1302; correct?

16   A.   Yes.

17             MR. WEITZMAN:  No further questions.

18             THE COURT:  Thank you.  You are excused, sir.  You may

19   step down.

20             (Witness excused)

21             THE COURT:  Next witness for the government.

22             MR. RICHENTHAL:  The government calls Sarah Arkin.

23   SARAH ARKIN,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1          THE COURT:  State your full name and spell your last

2     name for the record, please.

3          THE WITNESS:  Sarah Arkin.  A-R-K-I-N.

4          THE COURT:  Please proceed.

5          Welcome, Ms. Arkin.  Good afternoon.

6          Your witness, Mr. Richenthal.

7     DIRECT EXAMINATION

8     BY MR. RICHENTHAL:

9     Q.  Good afternoon, Ms. Arkin.

10    A.  Hi.

11    Q.  Are you currently employed?

12    A.  Yes.

13    Q.  Where are you employed?

14    A.  The Senate Foreign Relations Committee.

15    Q.  What, in short, is the Senate Foreign Relations Committee?

16    A.  It is the committee in the Senate responsible for oversight

17    of the State Department, U.S. Agency for International

18    Development, a variety of other smaller agencies related to

19    U.S. foreign policy, with the responsibility of confirming

20    nominations, ratifying treaties, setting agenda for hearings,

21    briefings, pushing legislation to resolutions, and efforts of

22    the Senate.

23    Q.  Is that committee sometimes known as the SFRC?

24    A.  Yes.

25    Q.  Or just the foreign relations committee?

O6O5men3                         Arkin - Direct

1   A.  Yes.

2   Q.  What is your current position with the SFRC?

3   A.  Senior professional staff.

4   Q.  For how long have you worked for the SFRC?

5   A.  Six years and change.

6   Q.  What is your educational background?

7   A.  I have a Bachelors Degree in international relations and

8   Spanish from Tufts University, and a Masters in government from

9   Georgetown University.

10  Q.  Have you ever worked for an individual member of Congress?

11  A.  Yes.

12  Q.  What was your first job working for an individual member of

13  Congress?

14  A.  I worked for Debbie Wasserman Schultz in the House of

15  Representatives.

16  Q.  Approximately when did you work for Mr. Wasserman Schultz?

17  A.  2013 to 2016.

18  Q.  I think you said this, but was she in the House of

19  Representatives or the United States Senate?

20  A.  House of Representatives.

21  Q.  Where did you go work after you went for Ms. Wasserman

22  Schultz?

23  A.  For Senator Menendez.

24  Q.  Approximately when did you start working for Senator

25  Menendez?

O6O5men3                          Arkin - Direct

1     A.  September 2016.

2     Q.  How did that come about?

3     A.  A friend had interviewed for his foreign policy advisor

4     position and suggested I interview for that position.  And I

5     did.

6     Q.  With respect to the Senate, are you familiar with the term

7     personal office?

8     A.  Yes.

9     Q.  What is a personal office?

10    A.  Every senator has a personal office where they have a staff

11    responsible for executing their policy and legislative agenda,

12    administrative staff, communication staff.

13    Q.  Did you work in Mr. Menendez' personal Senate office when

14    you first started working for him?

15    A.  Yes.

16    Q.  What was your job when you first started working for him?

17    A.  Foreign policy advisor.

18    Q.  What was that, in sum?

19    A.  I was responsible for preparing him, advising him, and

20    executing activity on behalf of his work as a member of the

21    foreign relations committee including writing briefing

22    materials, preparing him for meetings with Executive Branch

23    officials, foreign government officials, any other officials

24    who would be or constituents or anybody who would be involved

25    in foreign policy.  Writing legislation, drafting letters, etc.

1  Q.  Did there come a time when you left Mr. Menendez' personal

2  office?

3  A.  Yes.

4  Q.  Where did you go next?

5  A.  I went to the Senate Foreign Relations Committee

6  professional staff.

7  Q.  How did it come about that you went from Mr. Menendez'

8  personal office to the SFRC?

9  A.  He returned to be the ranking member of the committee and,

10  as such, had an entire professional staff of foreign policy

11  advisors and my job effectively disappeared in the personal

12  office.

13  Q.  Just to be clear, when you say --

14        THE COURT:  Your job in the personal office

15  disappeared.

16        THE WITNESS:  It effectively.

17  Q.  Just to be clear, Ms. Arkin, when you say "he", you are

18  referring to Senator Menendez?

19  A.  Yes.

20  Q.  Approximately when did Mr. Menendez become ranking member

21  of the SFRC?

22  A.  March 2018.

23  Q.  How, if at all, did your position change when you moved

24  from his personal office to the SFRC?

25  A.  As a member of the foreign relations committee professional

O6O5men3                          Arkin - Direct

1    staff there is a large staff with more specialized experience

2    across different geographic areas, different functional areas

3    of foreign policy.  I had been the policy deputy staff director

4    so I had more of a managing editor role reviewing statements,

5    helping set up hearings with our majority colleagues, and also

6    took over a more specific functional policy portfolio in the

7    beginning of the public diplomacy undersecretariat.

8              THE COURT:  Am I correct that you joined the SFRC

9    staff from Senator Menendez' personal staff in or about March

10   of 2018?

11             THE WITNESS:  Yes.

12   BY MR. RICHENTHAL:

13   Q.  I think you just used the phrase "majority colleagues."

14   Did I hear that correctly?

15   A.  Yes.

16   Q.  Can you explain what you mean by that?

17   A.  Depending on which party, the democratic or republican

18   party has the more members elected to the Senate, the majority

19   party has the more members, the minority party has fewer

20   members.  When Senator Menendez returned to the committee in

21   2018 democrats were in the minority.

22   Q.  What was your initial position on the SFRC or title?

23   A.  Policy director.  Later became deputy staff director.

24   Q.  For approximately how long did you serve as a policy

25   director?

1  A.  A few months.  I can't remember exactly when the title

2  changed but duties were largely the same.

3  Q.  And thereafter you were deputy staff director?

4  A.  Yes.

5  Q.  For approximately how long did you serve in that position?

6  A.  Until about October 2023.

7  Q.  From approximately 2018 until fall 2023, to whom did you

8  report while you worked at the SFRC?

9  A.  To the two different staff directors and to Senator

10  Menendez.

11  Q.  Who were the staff directors?

12  A.  Jessica Lewis and Damian Murphy.

13  Q.  What, generally, were your duties and responsibilities for

14  the time period you worked for the SFRC?

15  A.  They varied a little bit.  I think I just described the

16  policy and deputy staff director responsibilities, and then

17  later I also picked up what we would call a regional portfolio.

18  I handled three different regional portfolios over my tenure at

19  SFRC.

20  Q.  In the context of your work at the SFRC, what is a regional

21  portfolio or regional policy portfolio?

22  A.  We -- the SFRC breaks down its staff largely the same way

23  the state department organizes itself geographically so we

24  have, for example, the Middle East bureau at the State

25  Department which is called Near Eastern Affairs.  The Senate

O6O5men3                              Arkin - Direct

1   Foreign Relations Committee has a team on the Middle East and

2   North Africa.  Similarly, they have an East Asia and affairs

3   bureau, we have a team on East Asia.  There is a bureau of

4   international organizations we have a team that does

5   international organizations and refugees.

6            THE COURT:  What team were you on?

7            THE WITNESS:  I was on the Middle East and North

8   Africa team, and then I moved to the Europe team, and the

9   Western hemisphere team subsequently.

10  BY MR. RICHENTHAL:

11  Q.  Focusing on your team in the Middle East or North Africa

12  team, did that include the countries, among others Egypt and

13  Qatar?

14  A.  Yes.

15           THE COURT:  What years were you on the Middle East and

16  North Africa team?

17           THE WITNESS:  From about November 2018 through

18  March 2022.

19  Q.  Who was responsible for that region policy portfolio prior

20  to you?

21  A.  Dana Stroul.

22  Q.  Now, you testified a few minutes ago that Mr. Menendez

23  became ranking member of the SFRC in approximately March 2018;

24  is that right?

25  A.  Yes.

O6O5men3                          Arkin - Direct

1   Q.  Did there come a time when he became chair of the SFRC?

2   A.  Yes.

3   Q.  Approximately when was that?

4   A.  January 2021.

5   Q.  Did he serve in that position until approximately September

6   of 2023?

7   A.  Yes.

8   Q.  Focusing on the chair of the SFRC, what are the principal

9   responsibilities of that role?

10  A.  The chair, in concurrence with the ranking member, usually

11  on SFRC, sets the agenda for the committee including the

12  hearings that the committee will have, the nominations it will

13  consider, treaties it will ratify, what legislation to move

14  through the committee.

15  Q.  You just used the word "concurrence."  What do you mean by

16  that?

17  A.  The Senate Foreign Relations Committee, unlike many others

18  in the Senate, mostly historically has worked with the

19  concurrent -- the chair proposes an agenda and the ranking

20  member agrees to that.  Whether or not they agree on the

21  substance which is the supported piece of legislation or

22  nomination, they agree on the agenda that moves forward.

23  Q.  I think you just used "historically".  You mean as required

24  or practice?

25  A.  Practice.

1    Q.   How do the duties and responsibilities tend to compare from

2    the chair and the ranking member?

3    A.   The chair sets the agenda and proposes legislation or

4    nominations to move forward and the ranking member agrees or

5    does not.

6    Q.   In your experience, what influence, if any, does the chair

7    of the ranking member of the SFRC have in the Executive Branch?

8    A.   It can have quite a lot depending on the issue and

9    depending on the way the chair or ranking member chooses to use

10    it.

11    Q.   What do you mean by that?

12    A.   The chair sets the agenda for which nominations can move

13    forward, for example, which is very important for the Executive

14    Branch; ratifying treaties, moving legislation that necessarily

15    impacts the Executive Branch.  They also set hearings.  They

16    can also -- they approve spending that the state department

17    USAID and other agencies want to move forward.  They approve

18    arms sales.  So it is an important role when you have the

19    influence.

20          MR. WEITZMAN:  Your Honor, objection.  401, 403, as

21    well as the topic that we discussed earlier.

22          THE COURT:  I will allow that.

23    BY MR. RICHENTHAL:

24    Q.   Ms. Arkin, I think this is the second time you said USAID,

25    what is USAID?

1    A.  U.S. Agency for International Development.

2    Q.  What is that, in short?

3    A.  It is an agency that executes foreign aid and development

4    programs; agriculture, health, economic development, across the

5    world.

6    Q.  In your time working with the SFRC, did you ever have any

7    responsibilities with what is known as Senate resolution?

8    A.  Yes.

9    Q.  Without discussing any particular resolution, can you

10   explain the responsibilities you had with respect to

11   resolutions?

12            MR. WEITZMAN:  Objection, your Honor.  This goes to

13   the topic when she is acting as agent.

14            THE COURT:  I will allow her to explain

15   responsibilities she had with respect to resolutions.

16   BY MR. RICHENTHAL:

17   Q.  Ms. Arkin, just for clarity I am going to ask you a series

18   of questions about resolutions.  I am not asking about any

19   particular resolution, I am just asking in general what you did

20   and what the resolution process is.  OK?  So none of my

21   questions are designed to elicit answers of any particular

22   resolution.  All right?

23   A.  OK.

24   Q.  Let's just go back.  What responsibilities did you have

25   with respect to resolutions?

O6O5men3                          Arkin - Direct

1   A.  Sometimes I drafted resolutions.  Other times as the

2   relevant -- the policy staffer, I would look at resolutions

3   from other members and advise the chair or ranking member on

4   their substance.  I would consult with those other offices to

5   help get them in shape to move forward on a legislative

6   business meeting to move them through the committee.

7   Q.  What, in general, is a Senate resolution?

8   A.  Expression of sentiment of the Senate.

9   Q.  Could that sentiment be with respect to the actions of a

10  particular foreign country?

11  A.  Yes.

12  Q.  Could it be whether the actions are, in a sense, viewed to

13  be good or bad?

14          MR. WEITZMAN:  Objection.

15          THE COURT:  I will allow that.

16  A.  Yes.

17  Q.  In your experience how, if at all, is a Senate resolution

18  relevant to the United States' relationship with a foreign

19  country?

20          MR. WEITZMAN:  Objection, your Honor.  Can we have a

21  brief side bar on this?  I apologize, your Honor.  Maybe we can

22  move on and then do it at a break?

23          THE COURT:  Move on.

24  BY MR. RICHENTHAL:

25  Q.  We will come back to that.

O6O5men3                          Arkin - Direct

1      In your time working with Senator Menendez on the SFRC, did

2      you come to learn whether he attended any meetings with foreign

3      government officials?

4      A.  Yes.

5      Q.  Did he?

6      A.  Yes.

7      Q.  I am not asking about particular meetings as of yet but, in

8      general, how did you come to learn whether he met with foreign

9      officials?

10     A.  I was often responsible for preparing the briefing

11     materials and attending those meetings and staffing them.

12     Q.  Taking those things one at a time, when you say briefing

13     materials, what do you mean?

14     A.  Meetings -- any meeting he was having, staff would prepare

15     a memo that included background information about the country,

16     the bilateral relationship, background information about the

17     person with whom he was meeting, any relevant legislation,

18     pending arms sales or funding that the Executive Branch was

19     proposing or that Congress was considering, relevant news

20     articles, making sure he was well prepared with the latest

21     talking points and other background.

22     Q.  I think you said he would attend the meeting or staff the

23     meeting?

24     A.  Yes.

25     Q.  Taking those one at a time, what kind of meetings would you

O6O5men3                        Arkin - Direct

1  personally attend?

2  A.  I guess those are actually really the same thing.  Most

3  meetings with foreign government officials, meetings with

4  senior Executive Branch officials.  Any meeting, really, in the

5  foreign policy space as it related to my policy portfolio on

6  the committee or any meeting in foreign policy space in the

7  personal office.

8  Q.  You said the policy portfolio.  You mean the regional

9  policy portfolio?

10  A.  Yes.

11  Q.  Now, you mentioned briefing materials and you described

12  them a bit.  What was the purpose of apparent briefing

13  materials?

14  A.  To make sure the senator had the most up-to-date

15  information and was prepared.  Any senator has myriad things

16  going on at any given time so that's why they have staff, to

17  help keep them up to speed on a specific issue for which staff

18  was responsible.

19  Q.  In the context of your work at the SFRC, are you familiar

20  with the phrase "bilateral relationship"?

21  A.  Yes.

22  Q.  What is a bilateral relationship?

23  A.  At the most basic level, it is the relationship between two

24  governments of different countries.  You could have different

25  definitions but that would be the most basic.

O6O5men3                          Arkin - Direct

1   Q.  Now, in the course of preparing briefing materials, what
2   did you do with them?  Literally, what did you do after you
3   prepared them?
4   A.  Sometimes either sent them directly to the senator or to
5   his scheduler and operations manager Rob Kelly.
6   Q.  Did you ever see Mr. Menendez reviewing briefing materials
7   that you provided?
8   A.  Yes.
9   Q.  Did you ever ask him questions about briefing materials
10  that you provided?
11  A.  Yes.
12  Q.  Now, what was your role before or after meetings you were
13  not able to attend but nevertheless fell within the regional
14  policy portfolio?
15  A.  To get a readout of the meetings, to understand if there
16  were any follow-up actions or items.
17  Q.  Let's take that one at a time.  What is a readout?
18  A.  The senator or -- let's say it was a phone call that
19  somebody else was able to connect with, would provide a summary
20  of the conversation and any action items could include
21  following up on a specific question, checking in with the State
22  Department or other foreign policy agency to get more
23  information or I don't know.  Could be other things, just any
24  follow up items.
25  Q.  Was a readout typically oral, writing, some other form?

1    A.  Usually oral.

2    Q.  And I think you said action items.  Is that typically oral,

3    in writing, some other form?

4    A.  Usually oral, sometimes in writing or other forms.

5    Q.  Now, with respect to action items, is that similar to what

6    is known as a do-out?

7    A.  Yes.

8    Q.  What phrase is most commonly used among staff for action

9    items?

10   A.  Do-outs.

11   Q.  Do-outs?

12   A.  Yes.  Both.

13   Q.  Both do-outs and action items?

14   A.  Yes.

15   Q.  Based on your experience at the SFRC, did you expect to be

16   aware of meetings that Mr. Menendez had with respect to

17   countries in the regional policy portfolio?

18   A.  Yes.

19   Q.  Why?

20   A.  That's the part -- critical part of my job is preparing him

21   for those meetings, knowing who he is meeting with, and

22   preparing him, understanding what those meetings were about and

23   how he was getting information and who he was talking to.

24   Q.  Now you just used the word "meetings."  In your answer,

25   what kind of meetings did you have in mind?

1    A.  Sorry.  You said meetings.

2    Q.  Withdrawn.  Let me ask it a different way.

3        When you say "meetings," do you mean formal meetings in the

4    Senate, meetings somewhere else?  All of the above?  Just

5    expand what you mean by meetings.

6    A.  Yes.  I would generally expect to know if he was meeting

7    with foreign government officials, having official meetings or

8    meeting with foreign government officials or interacting with

9    them in any kind of formal way.

10   Q.  Would that include a meeting over a meal?

11   A.  Depending on the context.

12   Q.  What do you mean by that?

13   A.  If he is having a one-on-one dinner with a senior foreign

14   government official I would expect to know.  If he is out at an

15   embassy or something having a big dinner with a lot of people I

16   might be aware of it but not necessarily exactly who he was

17   meeting or who he was having dinner with.

18   Q.  Now I want to go back to the readouts for a second.

19   Typically, approximately how long after a meeting would you get

20   a readout?

21   A.  I try to get it as soon as possible.  Sometimes that wasn't

22   always possible.

23   Q.  Why did you try to get it as soon as possible.

24   A.  When one's memory is freshest.

25   Q.  From whom would you typically get a readout following a

1   meeting?

2   A.  I would try to get it from the senator.  If he was in New

3   Jersey with Jersey staff I would try to get it from staff, or

4   if Rob or somebody else had connected a call I would try to get

5   it from Rob.

6   Q.  What, if anything, did you do --

7            THE COURT:  Did you try to get the readout -- did you

8   have a preference in terms of readouts?  In other words did you

9   try to get a readout first from the senator?

10           THE WITNESS:  If I could, yes.

11           THE COURT:  And otherwise, who would you get a readout

12  from?  What type of person?

13           THE WITNESS:  So for phone calls, for example it is

14  more than likely Rob might have been connected to a phone, Rob

15  Kelly.  So I would receive a call from Rob if he was having a

16  meeting in New Jersey and I knew the staff member that was

17  staffing that particular meeting, I would get in touch with

18  that staff member.

19           THE COURT:  I understand that for a meeting, and I

20  don't want to put words in your mouth.  I assume what you are

21  saying is if you couldn't get a readout from the senator and it

22  was a meeting, you would get a readout from a staff member who

23  was present at that meeting; is that correct?

24           THE WITNESS:  Yes.

25           THE COURT:  But what about phone calls, if it is just

O6O5men3                         Arkin - Direct

1    the senator and somebody else on the other end, how do you get

2    a readout?

3              THE WITNESS:  I would ask the senator.

4              THE COURT:  All right.  Thank you.

5              MR. RICHENTHAL:  Your Honor, it is approximately 1:03,

6    I am about to move from the general to the specific.  Would the

7    Court like me to keep going?

8              THE COURT:  No, let's break for lunch.

9              Please be back, ladies and gentlemen, at 2:00 p.m.

10   Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6O5men3                         Arkin - Direct

1              (Jury not present)

2              THE COURT:   The witness has just indicated to me that

3     she would make one addition to that statement so let's do that

4     when the jury comes back.   All right?

5              You are excused.   You may step down and I will see you

6     in an hour.

7              (Witness not present)

8              THE COURT:   This is another example that I would have

9     appreciated knowing about the issues far enough in advance so

10    they could be handled both expeditiously and in a conscientious

11    manner.

12             Based on the correspondence over the weekend, it looks

13    like there were discussions, back in early June, of this

14    witness.   There is really absolutely no reason why I should be

15    getting letters about this weekend and important speech or

16    debate issues involving her prospective testimony over the

17    weekend starting, if I remember exact oh correctly it is either

18    Friday night or sometime on Saturday.   The party have got to do

19    better in teeing these things up in advance.

20             Now, Mr. Weitzman, I didn't understand your objection

21    as the witness was giving basic background information.   How is

22    anything she said impinging on speech and debate?   Unless that

23    wasn't your objection.

24             MR. WEITZMAN:   It is my objection, which is if it

25    doesn't impinge on speech and debate it seems to me to be

1   totally irrelevant to the case and here is the issue, your

2   Honor.

3           THE COURT:  But in part, sir, the fact of the matter

4   is all discussions that this staffer had concerning Egypt are

5   not, do not implicate speech or debate.

6           MR. WEITZMAN:  Correct, your Honor.

7           THE COURT:  It seems to me what your argument is is

8   anything having to do with Egypt is speech or debate.  Now we

9   are all agreed on, I think on the basic concepts, that is,

10  communications that the senator had with staff about specific

11  legislation about votes, about committee meetings, about

12  placing your lifting holds, that's core legislative acts, and

13  that impinges on speech and debate but it is not any

14  conversation regarding Egypt.  We all know the language about

15  not making legislature super citizens.  The case that you are

16  citing to me from the recent case from the D.C. Circuit, which

17  did not arise in the context of an ongoing trial, if I remember

18  correctly, really talks about the context of the conversation

19  so I am going to have to understand the context of the

20  communications here that we are talking about.  But I don't

21  believe anything to date, sir, has impinged on speech and

22  debate.

23          Now, tell me why you think I am wrong.

24          MR. WEITZMAN:  So, your Honor, the question and

25  answers from the government during Ms. Arkin's direct elicited

1    that the chairman, and during large parts of this time period

2    Senator Menendez was the chairman, has the power to approve aid

3    and that was at line -- I don't know what page this, is so

4    apologies -- but I see here the quote is:  They approve arms

5    sales so it is an important role when you have the influence.

6    And then subsequently there were a series of questions about a

7    Senate resolution.

8              THE COURT:  And she described what a Senate resolution

9    is, it is the sense of the Senate I think she said.  It is an

10    expression of sentiment.  All of that is just absolutely

11    general questions and answers.  You just can't press speech or

12    debate as far as you want.  I am receptive to the argument of

13    speech and debate and protections the constitution gives it but

14    not when you go this far.  You are undercutting your arguments.

15              MR. WEITZMAN:  Your Honor, I think the objections I

16    raised were different than the ones raised in the letter, just

17    to distinguish the two.  The speech and debate objection about

18    setting up this framework which is what the government is

19    attempting to do where Senate resolutions can't be advanced

20    other than by the chairman.  That, I believe, is what they're

21    intending, where they're intending to go and this was not in

22    the 3500 which is why we haven't raised it.  But the only

23    relevance I can imagine is a line from Ms. Arkin that would

24    suggest that it takes the chairman's OK to advance a Senate

25    resolution to the full floor of Congress.  If that is what they

O6O5men3                          Arkin - Direct

1   intend to elicit that is, I think, squarely prohibited under

2   speech and debate and contrary to their representations and

3   your Honor's ruling about the scope of what they can do with

4   respect to Senate resolution 390.

5               (Continued on next page)

O6oWmen4

1          MR. RICHENTHAL:  Your Honor --

2          THE COURT:  Just a moment.  Just a moment.

3          MR. WEITZMAN:  The only record in the case about a

4     resolution is the Qatar resolution.

5          THE COURT:  Right.  390, I understand, in which,

6     Graham was the sponsor, and Menendez moved it out of committee.

7          MR. WEITZMAN:  Well, there's no evidence of that, and

8     the government --

9          THE COURT:  Wait.  No evidence of what?

10          MR. WEITZMAN:  That Senator Menendez moved it out of

11     committee.

12          THE COURT:  I see.

13          MR. WEITZMAN:  And the government has said they do not

14     plan to elicit that, because that would be speech or debate.

15          THE COURT:  Fine.

16          MR. WEITZMAN:  I believe what they're attempting to do

17     is set up a duties and responsibilities framework that leaves

18     that inevitable conclusion with the jury, which is the end run

19     around the speech and debate objection, if they intend to do

20     that.  Now, again, they haven't told -- we had a call

21     yesterday.  They didn't tell me that they were going to do

22     that, so I don't know where they're going with this, but I

23     don't know why they would elicit any testimony from her about

24     Senate resolutions.

25          MR. RICHENTHAL:  Your Honor, this has literally been

O6oWmen4

1    approved for decades.  If Mr. Weitzman were right --

2            THE COURT:  Wait.  What has been approved for decades?

3            MR. RICHENTHAL:  That the government can elicit the

4    structure and power generally with respect to a United States

5    senator.

6            THE COURT:  I don't have any problem with that.

7            Go ahead.  Make your record.  Mr. Weitzman is off base

8    on that.  Go ahead.

9            MR. RICHENTHAL:  His objection's preserved multiple

10   times, but it's without merit.  The jury is entitled to

11   understand the power Mr. Menendez had for which he is alleged

12   to have received bribes.  I'm not going to ask her how he used

13   that power in a historical sense.  We know that's off limits.

14   I think the Court probably noticed how incredibly careful we're

15   being, even to tell the witness now I'm not asking you about

16   particular resolutions.  Mr. Weitzman's not allowed to deprive

17   the jury of the knowledge that the chairman has a role.

18           THE COURT:  All right.  You don't have to go on.  This

19   was basic setting of the framework, but now you're about to

20   move on to specifics.  Where are you going to go?

21           MR. RICHENTHAL:  I'd like to set the framework.

22           THE COURT:  You can continue to do that.

23           Go ahead.

24           MR. RICHENTHAL:  Having returned to the framework, I

25   was then going to move, as I said, on the record from the

O6oWmen4

1   general to the specific.

2           In moving from the general to the specific, I was

3   going to move from meetings generally with foreign officials,

4   which we have established through her, to meetings with

5   Egyptian officials.  Now, let's be clear, the defense has also

6   objected to that.  They jumped up, on my count, at least four

7   times.  That objection's also preserved.  The Court ruled on it

8   months ago.  We talked to Mr. Weitzman about it for hours.

9   It's covered in 3500 material.  The Court could not have been

10  more clear both in its ruling and orally we're allowed to

11  elicit he had meetings with foreign and we're allowed to elicit

12  what the officials asked for in the charged time period.

13  That's where we're going to go next; that she attended

14  meetings, she understood from those meetings what Egyptian

15  officials wants from the Senate.  We're not asking about

16  specific sales or goals at all.  It's crystal clear, in

17  general, what are their policy goals, what do they want.  And

18  then we're going to move forward in time.

19          This is something the defense has known we intended to

20  do -- I am not exaggerating -- for months.  They object every

21  time.  They only need to do it once to preserve.  We should

22  move forward with the trial.

23          MR. WEITZMAN:  Your Honor, I'm sorry.  I don't have an

24  understanding whether they intend in the general to elicit that

25  a Senate resolution cannot be advanced to the full Senate

O6oWmen4

1    through the SFRC committee without the chairman's approval.  If

2    they do plan to elicit that, I think that that is a violation.

3         MR. RICHENTHAL:  We were planning to elicit that in

4    general, just like a senator has to vote for a piece of

5    legislation to become the law.  But the resolution, we've

6    offered no evidence and don't intend to as to where it was,

7    that it advanced at all.  This was actually the subject of a

8    lot of back-and-forth with the Court.  We have never ever

9    sought to introduce evidence about where it was.  Our evidence,

10   as the Court no doubt recalls, is that Mr. Daibes referred to

11   it in the context of offering items of value to Mr. Menendez.

12   That's what we've always done.

13        The defense, on the contrary, keeps trying to

14   introduce evidence of what actually happened, that it was

15   actually a different senator.  We've never done that.  We don't

16   intend to do that.

17        MR. WEITZMAN:  Your Honor, if they don't intend to

18   elicit or leave the misimpression about what happens with 390,

19   the testimony can have no relevance.  Why even elicit that the

20   chairman has to approve something going from the committee to

21   the full Senate other than to leave an impression with the jury

22   that when Fred Daibes is sending the message about Senate

23   resolution 390 to the chairman of the SFRC he's asking him to

24   do something that's within his power.

25        THE COURT:  I understand.

O6oWmen4

| | |
|---|---|
| 1 | MR. WEITZMAN:  That's precisely what's prohibited. |
| 2 | THE COURT:  I understand. |
| 3 | MR. RICHENTHAL:  A good portion of what was just said |
| 4 | is right.  He is asking to do something within his power in |
| 5 | return for money.  That's a crime, and under *Brewster* and |
| 6 | decades of case law, we can introduce evidence that person A |
| 7 | offered an item of value to a public official for the public |
| 8 | official to take action on a matter before him.  Literally the |
| 9 | word "pending" is in *Brewster*.  It's in lots of other cases. |
| 10 | That's perfectly proper. |
| 11 | What we cannot do is introduce evidence that the |
| 12 | official actually took legislative activity, but that person A |
| 13 | paid him to do so with the "so" being legislative activity, of |
| 14 | course we can introduce that.  If we couldn't introduce that -- |
| 15 | THE COURT:  Wait.  Wait just a moment. |
| 16 | Go ahead. |
| 17 | MR. RICHENTHAL:  If we couldn't introduce evidence |
| 18 | that a person offered a public official money to take action on |
| 19 | a matter pending before the public official -- |
| 20 | THE COURT:  That you can introduce. |
| 21 | MR. RICHENTHAL:  Exactly.  And that's the point.  The |
| 22 | chairman has certain powers.  That's the context of this case. |
| 23 | This is relevant to the resolution. |
| 24 | At a time that matters, Mr. Daibes indicates to |
| 25 | Mr. Menendez there's a particular matter Mr. Daibes has an |

O6oWmen4

1  interest in, and in and around the same time, Mr. Daibes

2  indicates he will pay for action on that matter.  Now,

3  Mr. Weitzman disagrees.  That's fine.  That's why we're having

4  a trial.  But nothing in what I just said -- nothing in what I

5  just said -- indicates that Mr. Menendez ever acted on what

6  Mr. Daibes wanted and that's the line the Supreme Court has

7  drawn, and that's the line we're being incredibly careful to

8  toe.

9           THE COURT:  I think we've heard it.

10          MR. WEITZMAN:  Yes, your Honor.  I understand your

11  Honor's ruling.

12          On our letter with respect to Egypt, your Honor, if I

13  may address that briefly?

14          THE COURT:  Yes.

15          MR. WEITZMAN:  So, we anticipate --

16          THE COURT:  Wait.  You're talking about a separate

17  letter from the Arkin letter?

18          MR. WEITZMAN:  No.  I'm talking about the Arkin

19  letter --

20          THE COURT:  Yes.

21          MR. WEITZMAN:  -- which was not related to Qatar but

22  related to Egypt.

23          THE COURT:  Got it.  Yes.  Let me just get it.

24          You're talking about 476?

25          MR. WEITZMAN:  Correct, your Honor.

O6oWmen4

1              THE COURT:  OK.

2              MR. WEITZMAN:  So, based on our conversation with the

3    government yesterday, we do expect that the government is going

4    to attempt to elicit from Ms. Arkin testimony that there was a

5    change --

6              THE COURT:  Yes.

7              MR. WEITZMAN:  -- to the senator's approach with

8    respect to Egypt.

9              THE COURT:  Yes.

10             MR. WEITZMAN:  As your Honor noted when discussing one

11   of the cases we cited, context is important.  The context of

12   that discussion, as we understand it, concerned a press release

13   that --

14             THE COURT:  Press releases are fair game and you, in

15   fact, say you want to introduce some.

16             MR. WEITZMAN:  Correct, your Honor.

17             THE COURT:  OK.

18             MR. WEITZMAN:  But let me explain the context.

19             THE COURT:  OK.

20             MR. WEITZMAN:  A press release that Sarah Arkin

21   proposed that Senator Menendez release, and his discussion goes

22   beyond that, though.  His discussion with Ms. Arkin --

23             THE COURT:  If I understand the reference, there's a

24   discussion where she's proposing a press release, and allegedly

25   he says my position on Egypt has changed and he disapproves the

O6oWmen4

1    press release, which seems to me certainly is right.

2            MR. WEITZMAN:  What actually happens is he revises the

3    press release.

4            THE COURT:  OK.

5            MR. WEITZMAN:  And then they issue a revised press

6    release that's a bit toned down.

7            THE COURT:  Seems to me that's quite appropriate for

8    questioning.

9            MR. WEITZMAN:  But here's the issue, your Honor.

10            THE COURT:  Wait.  First me, then you.

11            It seems to me that the context, which, again, is my

12    focus on these things, is it's concerning a press release.

13    Fair game vis-à-vis speech and debate.

14            MR. WEITZMAN:  Your Honor, the issue is that these

15    discussions never just concern a press release.  When the

16    senator talks to her about this, he's discussing an entire

17    approach of how to deal with Egypt.

18            THE COURT:  OK.

19            MR. WEITZMAN:  He discusses not just the press release

20    but what to do with arms, and so I don't think those two can be

21    divorced in the context of this conversation between the

22    senator and his staffer.  Every -- I mean this discussion in

23    particular concerns an approach to dealing with Egypt with

24    carrots and sticks and approving arms or not approving arms.

25    And so I actually think context is very important, and I think

O6oWmen4

 1    we should hear from Sarah Arkin for five minutes or ten minutes

 2    in a voir dire outside the presence of the jury to understand

 3    that context before the government should be permitted to

 4    elicit that testimony.

 5            MR. RICHENTHAL:  This is wildly improper and

 6    incredibly belated.  This could have been brought to us months

 7    ago.  I spent hours on the phone with Mr. Weitzman yesterday,

 8    as did Mr. Mark.  We went through everything she was going to

 9    say on this matter.  Everything.  We directed them to specific

10    3500, produced weeks ago, on this matter.  We told them, as we

11    put in writing to this Court, she will not talk about

12    legislation or arms in that conversation.  It is totally

13    improper and belated and disrupting this trial for them, time

14    and again, to say things that are not factually correct.

15    They're not entitled to two bites at the apple.

16            THE COURT:  Slow down.

17            MR. RICHENTHAL:  Ms. Arkin will say that the senator

18    declined to sign the press release and say he's going to change

19    his approach to Egypt to be more private and less public.

20    Ms. Arkin will not say -- I'll say it again, Ms. Arkin will not

21    say -- that the senator mentioned particular arms sales or

22    legislation or even came close to doing so.  It isn't going to

23    be what she'd say.  He's known this for months.

24            This is totally improper.  It is belated.  They don't

25    get to hear the testimony twice.  We're not asking what they

O6oWmen4

1    think we can't ask.

2         THE COURT:  Well, just a moment.  The concept of a

3    voir dire is certainly an acceptable one.  In this context,

4    though, it does seem to me with the representation that she's

5    not going to be talking about arms and no question will elicit

6    anything about arms, I'm going to allow it to proceed.

7         But once again, putting that aside, Mr. Weitzman, I

8    do -- it's more than a sense that the defense has been

9    sandbagging the government consistently in waiting until beyond

10   the last minute to raise these issues.  I don't remember

11   exactly what it was, but I think the first time this was raised

12   was on June 1.  It's now late June.  This really should have

13   been worked out far in advance of this moment.

14        I think I've laid down the guidelines.  You have the

15   statement that there's not going to be any testimony about

16   arms.  Let's proceed on that basis.

17        2 o'clock.  Thank you.

18        (Luncheon recess)

19

20

21

22

23

24

25

O6oWmen4

<pre>
 1                       AFTERNOON SESSION

 2                           2:00 p.m.

 3           (Jury not present)

 4           MR. MARK:  Your Honor, there was one thing we wanted

 5   to note for the record before we start.

 6           MR. RICHENTHAL:  Very quickly, your Honor.  I think I

 7   said this before we broke, but the conversation kind of took a

 8   turn.  There will be mention of arms.  I think the Court knows

 9   this.  In fact, when I move from the general to specific,

10   Ms. Arkin is going to testify about meetings she had and what

11   Egyptian officials said.  That's distinct from the

12   change-in-approach conversation we're talking about.  I believe

13   I made this comment before lunch.  The reason I'm saying it now

14   is I want the record to be clear.  Ms. Arkin is going to use

15   word "arms" at some point and military aid at some point, but

16   not with respect to that conversation.  Mr. Weitzman is aware

17   of this.  I think he objects and his objection's preserved, but

18   I just want to be as clear as possible about where I'm going.

19           THE COURT:  In what context is arms going to come up?

20           MR. RICHENTHAL:  I think that it will next come up

21   when I ask Ms. Arkin to shift, as I said, from the fact that

22   she had meetings with officials generally to saying she had

23   meetings with Egyptian officials in particular.  And my

24   intention was to ask her, consistent with the Court's ruling

25   and prior back-and-forth, what were the goals they expressed in
</pre>

O6oWmen4

1    those meetings; that is, what did they want from the United

2    States?

3              THE COURT:  The Egyptians.

4              MR. RICHENTHAL:  Correct, your Honor.

5              THE COURT:  That's fine.

6              MR. RICHENTHAL:  And that's why I wanted to flag that.

7         I also think that your Honor referenced the defense's

8    letter over the weekend, which was docket 476.  We did respond

9    to that.  It was docket 479; I don't think I put the document

10   number on the record.

11             THE COURT:  I have it.

12             MR. RICHENTHAL:  Thank you, your Honor.

13             MR. WEITZMAN:  Your Honor, we understand that our

14   prior objection to discussion of what occurs in that meeting

15   with the Egyptians has been overruled and that our objection is

16   preserved.

17             THE COURT:  Correct.

18             MR. WEITZMAN:  Thank you, your Honor.

19             THE COURT:  Correct on both accounts.

20             Put the witness on the stand.

21             (Continued on next page)

22

23

24

25

1              (Jury present)

2              THE COURT:  You may be seated in the courtroom.

3              You may continue with your direct examination of

4    Ms. Arkin.

5    BY MR. RICHENTHAL:

6    Q.  Welcome back, Ms. Arkin.

7         I think that before we broke, I had asked you about

8    readouts you got from meetings or phone calls, and I believe

9    you said I occasionally got a readout from Senator Menendez

10   himself.  Is that right?

11   A.  Yes.

12   Q.  I think you also said you may have gotten them from

13   Mr. Kelly.  Is that right?

14   A.  Yes.

15   Q.  Did you also get readouts from anyone else?

16   A.  Yes.  Sometimes the staff director was more likely to be

17   with the senator more frequently, so I would ask the staff

18   director.  The staff director would get a readout -- I would

19   get a readout from the staff director or ask the staff director

20   to get one from the senator and give one to me.

21             THE COURT:  Now, there's been discussion about

22   readouts.  As I understand it, a readout is simply somebody

23   telling you what happened at an event or a call.

24             THE WITNESS:  Yes.

25             THE COURT:  OK.

1          THE WITNESS:  Yes.  As well as any do-outs or action

2     on items that were the result of that meeting or conversation.

3          THE COURT:  Now, just before we broke, I think you

4     said you wanted to add something to an answer.  That was so

5     long ago, I'm not quite sure I remember, but if you remember,

6     why don't you say whatever it is you wanted to tell this jury.

7          THE WITNESS:  The addition was that sometimes I would

8     get a secondhand readout from the staff director if I wasn't --

9     didn't see the senator or the staff director was able to see

10    the senator or get the readout more frequently.

11    BY MR. RICHENTHAL:

12    Q.  And for clarity, Ms. Arkin, when you say the staff

13    director, who are you talking about in the time period that

14    we've been talking about?

15    A.  Mostly Damian Murphy but also Jessica Lewis.

16    Q.  What were their respective positions?

17    A.  Staff director, subsequent staff director.

18    Q.  In approximately what time period with respect to

19    Mr. Murphy and with respect to Ms. Lewis?

20    A.  Jessica Lewis, when I started through about September or

21    so, fall of 2021.  And Damian began around the same time.

22    Q.  Now, I want to go back briefly to a subject I asked you

23    about and we shifted for a moment; namely, Senate resolutions.

24    I believe I asked you whether a Senate resolution can express a

25    position on the action of a foreign nation or nations?

1    A.  Yes.

2    Q.  Can it do so?

3    A.  Yes.

4    Q.  In your experience, how, if at all, can a Senate resolution

5    relate to the United States's relationship with a foreign

6    nation?

7    A.  Sometimes --

8              MR. WEITZMAN:  Objection.

9              THE COURT:  Sustained as to form.  Rephrase it.

10   BY MR. RICHENTHAL:

11   Q.  Ms. Arkin, in your experience in the Senate, did you come

12   to an understanding of the relationship, if any, between a

13   Senate resolution and the United States's relationship with a

14   foreign country?

15   A.  Yes.

16   Q.  What was the understanding you came to?

17             MR. WEITZMAN:  Objection, your Honor.

18             THE COURT:  I'll allow it.

19             MR. WEITZMAN:  Too general.

20             THE COURT:  Pardon me?

21             MR. WEITZMAN:  Too general.

22             THE COURT:  Let's see if she can answer.

23   A.  It depends on the country and it depends on the resolution.

24   Some countries care very deeply about congressional support, so

25   sentiments from the Senate or the Congress jointly are very

O6oWmen4                          Arkin - Direct

important.  Other countries don't care.  But they can have a --

they can have an impact.  Some countries don't like to be

criticized.  Some countries like to be praised.  Some countries

don't care, but they certainly can have an impact.

Q.  Now I want to ask you a few more questions about the

process for a resolution, and as I said prior to the lunch

break, I'm not asking about any particular one; I'm asking in

general simply how the process worked.  OK?

     What is the process in general for the Senate to pass a

resolution relating to the action or actions of a foreign

country?

A.  Any senator can introduce a resolution with any number of

other senators or alone.  A resolution gets introduced -- if

it's related to foreign policy, the Senate parliamentarian

makes a determination and refers it to the Senate Foreign

Relations Committee.  The Senate Foreign Relations Committee

then will take it up, will call it a markup, we will put it on

a business meeting where other senators can offer amendments,

vote on the amendments, vote on the resolution itself.  And

then if it passes the Senate Foreign Relations Committee, it

goes to the full Senate for consideration.  And then there are

a couple of different ways a full Senate can consider a

resolution.

Q.  What role, if any, does the chair ranking member have in

the process you described?

1    A.   The chair will propose the agenda, so a chair would have to

2    propose a resolution be considered on a business meeting; the

3    ranking member would concur.

4    Q.   And when you say concur, this is the concurrence you

5    referred to prior to the lunch break?

6    A.   Yes, would have to agree in almost all circumstances.

7    Q.   Ms. Arkin, is it would have to agree or historically does

8    agree; can you just explain what you mean?

9    A.   Practice.  By practice, the ranking member would agree to

10   the legislation that's being marked up, in practice, except

11   where in a number of circumstances.

12   Q.   I think you also just used the phrase or, I guess, title

13   Senate parliamentarian.

14   A.   Yes.

15   Q.   In general, what is the Senate parliamentarian?

16   A.   Oh, that is a definition beyond my full scope of knowledge.

17   One of their jobs is to, once a piece of legislation is

18   introduced, to decide to which committee it would get referred,

19   which committee would take the first action on it.

20   Q.   Now I want to shift from resolutions to meetings.  OK?

21       Now, before the lunch break I had asked you whether you

22   attended meetings with foreign officials during your work on

23   the SFRC.  I want to ask you about a particular set.

24       Focusing for a moment on the country of Egypt, during your

25   time working on the SFRC, did you attend any meetings with

O6oWmen4                          Arkin - Direct

1   Egyptian government officials?

2   A.  Yes.

3   Q.  On one occasion or more than one occasion?

4   A.  More than one occasion.

5   Q.  Did you attend the meetings that were also attended by

6   Senator Menendez?

7   A.  Yes.

8   Q.  During one or more of these meetings, did Egyptian

9   government officials communicate policy positions or

10  preferences they hoped with respect to the United States?

11  A.  Yes.

12  Q.  In general, what were their policy preferences or goals as

13  communicated to you in these meetings?

14  A.  Egyptian government, in almost all meetings, if not all

15  meetings, wanted the full amount of its authorized and

16  appropriated military financing without any preconditions.

17  They wanted continued support from the United States for

18  counterterrorism operations and, later in my tenure, were

19  either for the United States to get more involved in helping

20  solve a water resource crisis around the construction of a dam

21  in Ethiopia.

22  Q.  I want to take those one at a time.  And again I'm not

23  asking you about particular legislation or acts.  I'm asking in

24  general what particular policy goals they communicated.  OK?

25       First, I think you said that they conveyed they were

O6oWmen4                          Arkin - Direct

1    interested in military aid without conditions.  Is that what

2    you said?

3    A.  Yes.

4    Q.  Can you explain what you mean by that, please?

5    A.  Egypt is historically the second largest recipient of

6    foreign military financing, which is one mechanism of foreign

7    military support.  Effectively -- well, in the form of the

8    United States provides another country foreign military

9    financing, which they then use largely to purchase U.S.

10   equipment or other matériel and resources, and following the

11   Arab Spring and a number of different changes in leadership,

12   certain senators and members of Congress successfully sought to

13   put restrictions on some of that funding related to Egypt's

14   human rights abuses and other concerns about democracy and

15   civil society and political and civil rights in Egypt.

16   Q.  You just used the phrase Arab Spring.  For anyone who might

17   not know, what was the Arab Spring?

18   A.  In 2010, 2011, a number of citizens across the Arab world

19   sought major democratic reforms in their government.  Egypt was

20   a hot point for a lot of protests and, yeah, mass protests and

21   desires for change in government resulted in a change of

22   government and democratic elections in Egypt.

23   Q.  With respect to military sales, again, without asking about

24   a particular one, you said Egyptians conveyed an interest in

25   having that be done without conditions.  What do you mean

O6oWmen4                          Arkin - Direct

1   without conditions?

2   A.  So, certain senators and members of Congress, in the annual

3   appropriations process, had put restrictions on various

4   amounts, various chunks of that dollar amount of funding that

5   went to Egypt based on whether or not the executive branch

6   could certify certain conditions on human rights and democratic

7   and political and civil rights, treatment of U.S. citizens and

8   other conditions on the full release of those funds.

9   Q.  Now, in the period of approximately 2018 into 2022, in the

10  meetings you attended with Egyptian officials, how frequently

11  was this issue -- that is, military financing or sales without

12  conditions -- raised by those officials?

13  A.  Almost all, if not all.

14  Q.  Almost all, if not all, meetings?

15  A.  Yeah, almost all, if not all, of the meetings.

16  Q.  Now, I think you said that Egyptian officials mentioned a

17  different issue at some point later in time?

18  A.  Yes, the construction of the Grand Ethiopian Renaissance

19  Dam that Ethiopia was undertaking was going to impact water

20  flow up the Nile to Egypt, and Egypt was very concerned about

21  the distribution of water, the equitable distribution as a

22  result of Ethiopian efforts to fill the dam.

23  Q.  Just pause for a second.  You called it the Grand Ethiopian

24  Renaissance Dam?

25  A.  Yes.

O6oWmen4                        Arkin - Direct

1   Q.  Was that sometimes known by the acronym G-E-R-D, or GERD?

2   A.  Yes.

3   Q.  I'm going to call it GERD.

4       In the meetings you attended, what, if anything, did

5   Egyptian officials say they wanted from the United States with

6   respect to GERD?

7   A.  They wanted more active U.S. involvement to help facilitate

8   negotiations and dialogue between the governments of Egypt,

9   Ethiopia and Sudan to help find a solution to what they saw as

10  a problem of distribution of water.

11  Q.  And was this something that Egyptian officials raised once

12  or more than once?

13  A.  More than once.

14          MR. RICHENTHAL:  I now want to shift from meetings

15  generally to a specific period of time.  I want to focus your

16  attention on March 2018.  OK?

17          Ms. Wechsler, can we put on the screen what's in

18  evidence as Government Exhibit 3A-1.

19  Q.  Ms. Arkin, is that on your screen?

20  A.  Yes.

21  Q.  Do you recognize this email?

22  A.  Yes.

23  Q.  Who is it from and who is it to?

24  A.  It's from me to Dana Stroul, with a cc to Rob Kelly.

25  Q.  You mentioned before the break who Ms. Stroul was.  Can you

1    just remind us again, please?

2    A.  She was my predecessor on the Middle East portfolio.  She

3    was senior professional staff on the Middle East and North

4    Africa portfolio.

5    Q.  Who was Mr. Kelly?

6    A.  He was the scheduler or operations director deputy --

7    deputy chief of staff at various points.

8    Q.  For whom?

9    A.  For Senator Menendez.

10   Q.  Now, what's the subject line of this email?

11   A.  RM.

12   Q.  Who did you understand that to refer to?

13   A.  Robert Menendez.

14   Q.  What's the date of the email?

15   A.  March 7, 2018.

16   Q.  In this time period -- that is, early March of 2018 -- what

17   was your role or position?

18   A.  I was in transition between the personal office and the

19   committee staff.

20   Q.  What regional policy portfolio, if any, did Ms. Stroul have

21   at the time?

22   A.  Middle East and North Africa portfolio.

23   Q.  Did that include Egypt?

24   A.  Yes.

25   Q.  By the way, Mr. Kelly, what role, if any, did he have with

1    respect to the senator's schedule?

2    A.  He was in charge of the senator's schedule.

3    Q.  The email says:  Wrote this and handed it to Rob.  First,

4    who is Rob?

5    A.  Rob Kelly.

6    Q.  And then you wrote, thoughts, question mark?

7    A.  Yes.

8    Q.  Why did you write that?

9    A.  Because it was an unusual -- it was an unusual piece of --

10   it was an unusual item.

11   Q.  When you say this, Ms. Arkin, what are you referring to?

12   A.  The -- it was an invitation.  It was a handwritten

13   invitation for, for a meeting for the Egyptian defense *attaché*.

14   Q.  Are you referring to the attachment to the email?

15   A.  Yes.

16           MR. RICHENTHAL:  Ms. Wechsler, can we go to the

17   attachment.

18   Q.  Is that what you're talking about, Ms. Arkin?

19   A.  Yes.

20   Q.  Now, is this, like, a Word file, a photograph?  What is

21   this?

22   A.  I think it's a photograph of a note, of a handwritten note.

23   Q.  Is this the note that you were just talking about?

24   A.  Yes.

25   Q.  If we could just focus your attention on the handwriting,

O6oWmen4                          Arkin - Direct

1    do you recognize the handwriting on this document?

2    A.   Yes.

3    Q.   Who do you recognize it as?

4    A.   Senator Menendez.

5    Q.   Now, at the time you received this, what did you understand

6    it to be, in sum?

7    A.   I wasn't totally sure.  It seemed like an invitation for

8    the defense *attaché* to come to a meeting.

9            MR. RICHENTHAL:  Now, I want to go back or just to the

10   top, actually, Ms. Wechsler.  Can you zoom in on the email, the

11   address line.

12   Q.   Do you see the top there, Ms. Arkin?

13   A.   Yes.

14   Q.   Could you read it, please?

15   A.   "Dear Major General Shawky."

16           MR. RICHENTHAL:  Now, if we go back to the email

17   itself.

18   Q.   Now, at the time you received this, what, if anything, did

19   Mr. Kelly say to you about it?

20   A.   I think he handed it to me and said, what do you make of

21   this, or something to that effect.

22   Q.   Why did you then forward it to Ms. Stroul?

23   A.   Because it was related to Egypt and to the senior staffer

24   responsible for Egypt.

25           MR. RICHENTHAL:  Now let's go back to the attachment,

O6oWmen4                          Arkin - Direct

1   if we could.

2   Q.  During your time in the SFRC, how many times other times

3   did you receive a handwritten invitation inviting someone to a

4   meeting?

5   A.  No other times.

6   Q.  During your time in the SFRC, did you develop an

7   understanding as to how Senator Menendez's meetings with

8   foreign officials were typically scheduled?

9   A.  Yes.

10  Q.  How were they typically scheduled?

11  A.  Typically, a foreign embassy or visiting delegation would

12  reach out to me, the appropriate staffer or sometimes Rob

13  directly or sometimes both of us, and request a meeting and

14  then staff would make a recommendation about the meeting, send

15  it to the senator.  He would approve or not, and then Rob would

16  make the schedule work, or not.

17  Q.  With respect to that process, was an actual invitation

18  typically or always generated?

19  A.  No.

20  Q.  Focusing again on the document itself -- I think you read

21  it a moment ago, what did you understand major general or,

22  here, MAJ GEN, to be?

23  A.  I didn't, which is why I asked Dana.

24  Q.  What did this invitation list as the date for the meeting?

25  A.  March 13 at 4 p.m.

O6oWmen4                      Arkin - Direct

1   Q.   And again, March 13 of what year, Ms. Arkin?

2   A.   2018, I guess.

3        MR. RICHENTHAL:  If I could now direct your attention

4   to the bottom half.  Maybe, Ms. Wechsler, you could zoom in on

5   the bottom half of the document.

6   Q.   Now, do you see a part of the document here that appears to

7   address a different individual?

8   A.   Yes.

9   Q.   Who does it appear to address?

10  A.   Dear Mr. Hana.

11  Q.   Do you know who Mr. Hana was?

12  A.   No.

13       MR. RICHENTHAL:  You can zoom back out.

14       And can we go to the top now.

15  Q.   Do you see what appears to be an email address?

16  A.   Yes.

17       MR. RICHENTHAL:  If we could, Ms. Wechsler.  Thanks.

18  Q.   A little hard to make out, but can you tell what the email

19  address is?

20  A.   Egyptian defense at something.

21  Q.   What did you understand this email address to be at the

22  time?

23  A.   I don't think I focused on it.

24       MR. RICHENTHAL:  Zoom back out, please.

25  Q.   And you said that the invitation listed a meeting on March

1    13.  Is that right?

2    A.  Yes.

3    Q.  Did such a meeting, in fact, take place?

4    A.  Yes.

5    Q.  Did you attend?

6    A.  Yes.

7    Q.  Why did you attend?

8    A.  We were in the transition between him going from being

9    the -- not the ranking member to the ranking member, and I was

10   kind of staffing all meetings at that point.

11   Q.  What officials, if any, from Egypt do you recall attending

12   this meeting?

13   A.  The defense *attaché*.

14   Q.  What do you mean by defense *attaché*?

15   A.  A defense *attaché* is a senior uniformed or civilian

16   military officer, usually placed at a foreign embassy that --

17   who is the lead responsible, lead person responsible for

18   civil-military relations between a country, between different

19   countries.  So in this case, United States and Egypt have a

20   huge military relationship.  So he would be the lead, the

21   person in charge of that Egyptian -- the Egyptians actually

22   have a separate defense *attaché* office, but it's usually --

23   it's connected with the embassy.

24   Q.  And when you say the embassy, are you referring to the

25   Egyptian embassy to the United States?

O6oWmen4                        Arkin - Direct

1   A.  Yes.

2   Q.  Now, in the context of this meeting, who was the defense

3   *attaché*?

4   A.  Major General Shawky.

5   Q.  I think you said that you attended the meeting during this

6   transition period?

7   A.  Yes.

8   Q.  Did anyone else from Mr. Menendez's staff or the SFRC staff

9   attend the meeting?

10  A.  No.

11  Q.  Why are you the only staffer who attended the meetings?

12  A.  I'm not sure.

13  Q.  Where did the meeting take place?

14  A.  In his office.

15  Q.  When you say his office, Ms. Arkin, who do you mean?

16  A.  I'm sorry.  The senator's office.

17  Q.  In Washington, D.C.?

18  A.  Yes.

19  Q.  Now, during this meeting, what requests, if any, did the

20  Egyptian defense *attaché* make?

21  A.  I think it was the standard -- the standard talking points

22  of military, unconditional military aid, continued

23  counterterrorism cooperation and good relations between the

24  United States, not being critical, not being so openly critical

25  of Egypt's human rights, concerns about Egypt's human rights.

O6oWmen4                          Arkin - Direct

1    Q.  Now, with respect to human rights, what do you recall, if

2    anything, Mr. Menendez raised in the meeting?

3    A.  Mr. Menendez raised concerns about human rights.  He raised

4    concerns about general political and civil rights in Egypt.  He

5    raised concerns about case 173, which was a case the Egyptian

6    government had brought against a variety of NG --

7    nongovernmental organizations, some of which were Egyptian,

8    some of which were American, some of which received United

9    States funding, and expressed the importance of human rights,

10   that Egypt respecting human rights and respecting civil and

11   political rights.

12   Q.  You just used the phrase or, I guess, words

13   "nongovernmental organization"?

14   A.  Yes.

15   Q.  What's a nongovernmental organization?

16   A.  Any organization that is not affiliated with a government

17   formed to advocate for a specific purpose.  In this particular

18   case, many of the organizations that were targeted were for the

19   advancement of free speech and political rights and civil

20   rights, individual rights and economic rights.

21   Q.  Is a nongovernmental organization sometimes also known as

22   an NGO?

23   A.  Yes.

24   Q.  Now, apart from you, the senator and Major General Shawky,

25   who do you recall, if anyone, attending this meeting on March

O6oWmen4                          Arkin - Direct

1   1318, 2018?

2   A.   There are a number of other people.  The only person I

3   could identify or was identified to me was Nadine.

4   Q.   Who was Nadine?

5   A.   The senator's girlfriend.

6            MR. RICHENTHAL:  Now, Ms. Wechsler, could you put on

7   everyone's screen Government Exhibit C102-A, already in

8   evidence.

9   Q.   Ms. Arkin, do you recognize this photograph?

10  A.   Yes.

11  Q.   What is this a photograph of?

12  A.   That meeting -- this meeting.

13  Q.   Where was the photograph taken, if you can tell?

14  A.   In the senator's office in D.C.

15  Q.   Now, I think you began to answer this, but now that the

16  photograph's on the screen, whom do you recognize in the

17  photograph itself?

18  A.   The defense *attaché* and Nadine.

19  Q.   Could you point them out either by describing what they're

20  wearing or actually marking them on your screen?

21  A.   Nadine is the only woman in the photo.

22       The defense *attaché* is on the senator's other side.

23  Q.   That's on the senator's left?

24  A.   Left, yeah.

25  Q.   Now, had you ever met Nadine before this meeting with the

O6oWmen4                          Arkin - Direct

1    Egyptian defense *attaché*?

2    A.  No.

3    Q.  Now, you said that you attended the meeting, is that right?

4    A.  Yes.

5    Q.  Why were you not in the photograph?

6    A.  I think I took the photograph.

7    Q.  Now, turning back to the meeting for a moment, do you

8    recall Nadine participating at all during the course of the

9    meeting?

10   A.  No.

11   Q.  Did she translate anything during the meeting?

12   A.  I don't think so.

13   Q.  Apart from Mr. Menendez, Nadine and the Egyptian defense

14   *attaché*, what did you understand the other roles of the people

15   in the meeting to be?

16   A.  I didn't understand who they were.  I assumed they were

17   part of the Egyptian embassy or part of the defense *attaché*'s

18   team in some way.

19   Q.  Now, if I could direct your attention to the individual on

20   the far left of the photograph, do you see that man?

21   A.  Yes.

22   Q.  At the time did you know who he was?

23   A.  No.

24   Q.  At the time did either Mr. Menendez or Nadine introduce

25   that person to you?

1    A.  I don't -- not to my memory, no.

2           THE COURT:  Did they introduce anybody to you at that

3    meeting?

4           THE WITNESS:  No.

5           THE COURT:  I take it -- well, I won't.

6           Next question.

7    BY MR. RICHENTHAL:

8    Q.  How common, if at all, was it for you to be introduced to

9    people in a meeting that the senator had with foreign

10   officials?

11   A.  Not very.

12   Q.  Now, let me shift from the meeting to -- back to something

13   more general for a moment.

14       In your time working with Mr. Menendez, first in the

15   personal office and then on the SFRC, were you familiar

16   generally with his public position with respect to Egypt and

17   the United States's relationship with Egypt?

18   A.  Yes.

19   Q.  How did you come to be familiar with his public position

20   with respect to the Egypt and the United States's relationship

21   with Egypt?

22   A.  It was part of my job to understand his position before

23   coming in or going into a meeting and, in drafting statements

24   or letters or legislation, used that public position to help

25   inform those efforts and communicate them to the Egyptian

1    embassy and other people as well.

2    Q.  Now, sticking with public statements -- for example, press

3    releases or letters -- during the time that you worked with

4    Mr. Menendez, what was your role in drafting or facilitating

5    the drafting of those kinds of public statements?

6    A.  I would often draft them or work with my team to draft many

7    of those statements.

8    Q.  Now, I said it could include press releases or letters.  Is

9    that right?

10   A.  Yes.

11   Q.  Could you explain what letters means in this context?

12   A.  Usually a letter -- one tool of a senator's, in this case

13   the Senate Foreign Relations Committee is writing letters to

14   the executive branch or to foreign governments expressing their

15   preferences, concerns, priorities or objectives in regards to

16   U.S. policy towards a foreign country or in regards to a policy

17   that a country should be taking.

18   Q.  Now, prior to the time period of this meeting -- so

19   mid-March 2018 -- could you summarize your understanding of

20   Mr. Menendez's public position with respect to Egypt?

21   A.  Yes.

22           MR. WEITZMAN:  Objection.

23           THE COURT:  I'll allow it.

24   A.  The United States and Egypt have a very important

25   relationship, given Egypt's geographic location, its

1    geopolitical role in the Middle East and for U.S. foreign

2    policy its location on the Suez Canal.  It's a very important

3    strategic relationship and also one where the senator had been

4    critical of the concerns about Egypt's human rights conditions,

5    human rights conditions in Egypt and the government's treatment

6    of all of its citizens fairly and equitably and protection of

7    civil and political rights, and he had concerns about ensuring

8    democratic processes and individual and political civil rights.

9    Q.  For anyone who may not know, I think in your answer you

10    said Suez Canal?

11    A.  Yes.

12    Q.  What's the Suez Canal?

13    A.  It's an important passageway that Egypt controls that a

14    huge amount of international commerce, including oil and

15    energy, goes through and the United States has preferential,

16    Egypt gives the United States preferential access to the canal.

17    Q.  Going forward in time -- so this is now after approximately

18    mid-March 2018 -- did there come a time working on the SFRC for

19    Mr. Menendez when he discussed with you a change in approach

20    with respect to Egypt?

21    A.  Yes.

22    Q.  Approximately when did you have that conversation with him?

23    A.  I think it was in the spring of 2019.

24    Q.  And this is after the meeting you testified about a few

25    minutes ago?

1    A.  Yes.

2    Q.  Approximately how long was this conversation; that is, the

3    conversation you were referring to in 2019?

4    A.  Just a couple minutes.

5    Q.  Who brought up the idea for a change in approach with

6    respect to Egypt?

7    A.  He did.

8    Q.  He is Senator Menendez?

9    A.  He is Senator Menendez.

10   Q.  What did he say to you about a change in approach with

11   respect to Egypt?

12   A.  I had, I think, been pitching a letter, a public letter to

13   send in advance of President Sisi's visit, a letter to send to

14   Secretary Pompeo criticizing President Sisi for a variety of

15   the things, including some constitutional -- proposed

16   constitutional changes and others, and the senator said, you

17   know, you've been sending me this letter, but you know, we've

18   been criticizing Egypt, we've been going after them for so long

19   on human rights, have been really out there publicly

20   criticizing them, and it hasn't really changed anything on the

21   ground.  I also have a lot of Coptic -- Coptic -- Coptic

22   Christians in New Jersey who really like President Sisi and

23   like what he's doing, so I wanted to take a different tactic.

24   I want to try to engage privately and engage more specifically

25   and do more quiet engagement and criticism on a lot of these

1    issues.

2    Q.  Just to pause for a moment -- I probably should've asked

3    you this earlier -- who is Mr. Sisi, President Sisi?

4    A.  The president of Egypt.

5    Q.  And I think you said Coptic Christians or Cops.  What are

6    Coptic Christians or Cops in the context of this conversation?

7    A.  It's a small sect of Christians in Egypt.  It's about 10

8    percent of the population, maybe -- Coptic Christians mostly

9    being in Egypt or diaspora Egyptians.

10   Q.  Did you take the senator's comments about a change in

11   approach as an instruction or directive to you?

12   A.  Yeah.  Yes.

13   Q.  To do what?  Change doing what?  Excuse me.

14   A.  To be a little less publicly critical and do more private

15   and quiet engagement on particular concerns.

16   Q.  Now, after this conversation, without referencing any

17   specific actions, did you notice whether Mr. Menendez generally

18   changed his approach with respect to Egypt?

19   A.  Yes.  He continued to raise human rights concerns and

20   pressure -- in private meetings he continued to raise concerns

21   about human rights, about treatments of American citizens and

22   individual rights.  There were fewer public statements

23   specifically singling Egypt out on human rights concerns,

24   although shortly thereafter, he did join a number of other

25   senators in a public letter criticizing Egypt, shortly after

O6oWmen4                          Arkin - Direct

1   this conversation.

2   Q.  I'll turn to that letter in a moment.  Just first, you

3   testified before the lunch break about how meetings with

4   foreign officials were generally handled?

5   A.  Yes.

6   Q.  And you would typically receive a readout after such

7   meetings?

8   A.  Yes.

9   Q.  After this conversation with Mr. Menendez, did you learn of

10  meetings he had had with Egyptian officials for which you did

11  not receive a readout?

12  A.  Yes.

13  Q.  How did you learn of them?

14  A.  There was one incident where there was an email exchange

15  where it referenced a meeting that I wasn't aware of.

16      There was another conversation I had with him where he told

17  me something was going to happen, and I think the only way he

18  would have known that is by talking to an Egyptian official.

19      Those are two that come to mind.

20  Q.  Again, to --

21  A.  And another -- and another instance.

22          THE COURT:  Would you receive a readout any time

23  Senator Menendez talked to a foreign official?

24          THE WITNESS:  No.

25  BY MR. RICHENTHAL:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  The times that you just referenced, are those times when

2  you would have expected to receive a readout?

3  A.  Maybe one of them, yes, where there was a specific meeting

4  referenced.  Other times I just became aware that he had had

5  conversations with Egyptian officials.

6  Q.  I had asked about readouts.  What about briefings; did you

7  learn that Mr. Menendez had meetings with foreign officials for

8  which you were not asked to produce briefing materials?

9  A.  Yes.

10  Q.  Once or more than once?

11  A.  Once that comes to mind, and then again, I don't -- some --

12  I know he was having conversations.  I don't know what the

13  extent of the conversation or the formality level of the

14  conversations were.

15  Q.  How, if at all, did the fact that you didn't always ask --

16  you were not always asked for briefing or not always received a

17  readout affect your ability to do your job?

18  A.  Made it a little bit more difficult because I didn't know

19  exactly who he was talking to or what information he had or

20  didn't have or who he might want to meet or where information

21  was coming from.

22        MR. RICHENTHAL:  Now, Ms. Wechsler, can you put on the

23  screen what's in evidence as 8F-1.

24  Q.  Do you recognize this, Ms. Arkin?

25  A.  Yes.

1   Q.  What did this email concern?

2   A.  The draft letter that I just referenced.

3   Q.  When you say the draft letter, are you referring to the

4   letter prior to the conversation you had with Mr. Menendez in

5   2019?

6   A.  Yes.

7   Q.  Did you help prepare this letter?

8   A.  Yes.

9   Q.  Now, before preparing this actual letter, had you drafted

10  similar letters for Mr. Menendez in the past?

11  A.  Yes.

12  Q.  Was this intended to be a private letter or a public

13  letter?

14  A.  A public letter.

15  Q.  Who was it intended to be signed by?

16  A.  Senator Menendez.

17  Q.  Now, the email's dated March 26, 2019?

18  A.  Yes.

19  Q.  Did you draft the letter before or after the conversation

20  you referenced about a change in approach?

21  A.  Before.

22  Q.  Did Mr. Menendez sign this letter?

23  A.  No.

24          MR. RICHENTHAL:  Ms. Wechsler, could we now put on the

25  screen but just for Ms. Arkin, the parties and the Court what's

1    been marked as Government Exhibit 8F-35.

2               Actually, before I ask you about that -- I'm sorry,

3    Ms. Arkin, could we go back to the draft, the prior exhibit.

4    Apologies.

5    Q.   In general, what was the purpose of this letter -- that is,

6    the letter that was not signed?

7    A.   To express concern and somewhere between concern and

8    criticism of President Sisi's actions to propose amendments to

9    the Egyptian Constitution that would have helped him stay in

10   power and then also take a small dig at Secretary Pompeo.

11   Q.   Who was Secretary Pompeo at the time?

12   A.   Secretary of state.

13              MR. RICHENTHAL:  OK.  Let's go forward now to 8F-35,

14   again just for the witness, the parties and the Court, please.

15   Q.   Ms. Arkin, do you recognize this?

16   A.   Yes.

17   Q.   What is this?

18   A.   This a letter criticizing -- this is a letter to Secretary

19   Pompeo around the same time.

20              MR. RICHENTHAL:  The government offers 8F35.

21              THE COURT:  Admitted.

22              (Government Exhibit 8F-35 received in evidence)

23   BY MR. RICHENTHAL:

24   Q.   Is that now on your screen?  I guess it was on your screen.

25              Who participated in the drafting of this letter?

1    A.  Myself, my team and some other congressional offices, other

2    Senate offices.

3    Q.  Now, to be clear, is this the same letter you had drafted

4    before your conversation with Mr. Menendez or a different

5    letter?

6    A.  It's a different letter.

7    Q.  This is after?

8    A.  Yes.

9    Q.  What is the date of this letter?

10   A.  April 8, 2019.

11   Q.  Why did you assist in drafting this letter?

12   A.  I -- I believe I had had conversations with other offices

13   and other staff who also wanted to do -- who wanted to do

14   something publicly in advance of President Sisi's visit to the

15   United States, and so there were a lot of other offices

16   involved in -- given the senator's record and history on Egypt,

17   felt that it was important that he, he continue to take a

18   leadership role on the issue.

19   Q.  Now, at this time, April 8, 2019, who was the chair of the

20   SFRC?

21   A.  Jim Risch.

22   Q.  Did Senator Risch sign the letter?

23   A.  Yes.

24          MR. RICHENTHAL:  Ms. Wechsler, we actually scroll to

25   the signatures, please.

O6oWmen4                        Arkin - Direct

1   Q.  Are those the signatures of the senators who signed the

2   letter?

3   A.  Yes.

4   Q.  Approximately how many senators signed the letter?

5   A.  I think there are about 15, if I recall.  Maybe more.

6           MR. RICHENTHAL:  Keep going, Ms. Wechsler.

7   Q.  Is that the second page of the signatures?

8   A.  Yes.

9           MR. RICHENTHAL:  Could we just go back to the first

10  page of the signatures.

11  Q.  Was Senator Menendez among those who signed the letter?

12  A.  Yes, he was the first signer.

13  Q.  In your experience working with Mr. Menendez, were the

14  criteria for the signing of a letter the same or different when

15  he was not the sole signer?

16  A.  I'm not sure I understand the question.

17          MR. RICHENTHAL:  I'll ask it a different way.

18  Q.  In your experience working with Mr. Menendez, were the

19  criteria for whether he signed the letter the same or different

20  if he was not the only person who was being asked to sign?

21          MR. WEITZMAN:  Objection.

22          THE COURT:  Sustained.

23  BY MR. RICHENTHAL:

24  Q.  How, if at all, in your experience working with

25  Mr. Menendez, did the number of signers on a letter affect

```
 1    Mr. Menendez's willingness to sign a letter?
 2              MR. WEITZMAN:  Objection.
 3              THE COURT:  I'll allow it.
 4    A.  Yes, it was a factor, certainly a factor if we could get
 5    other senators, if we could especially get a bipartisan group
 6    of senators to sign the letter; it was important.
 7    Q.  Why, in your experience, was that a factor or important?
 8              MR. WEITZMAN:  Objection.
 9              THE COURT:  I'll allow it.
10              MR. WEITZMAN:  Calls for speculation.
11              THE COURT:  She may know.
12              MR. RICHENTHAL:  I'm happy to lay a foundation, your
13    Honor.
14              THE COURT:  All right.
15    BY MR. RICHENTHAL:
16    Q.  Ms. Arkin, in your time working with Senator Menendez --
17    first, the personal office and then the SFRC -- did you have
18    the opportunity to speak with him about letters that he would
19    be the only signatory on?
20    A.  Yes.
21    Q.  Did you have the opportunity to speak with him about
22    letters for which he would not be the only signatory on?
23    A.  Yes.
24    Q.  Based on those conversations, did you come to an
25    understanding as to why, as you said, it was a factor whether
```

1  he'd be the only signatory?

2  A.  Yes.  We liked to think that, as much as we can, making

3  politics end at the water's edge is a more, more forceful

4  signal and message that we can send to foreign governments when

5  we get bipartisan support for issues, so to the extent possible

6  we always try to get bipartisan support for any efforts.

7        THE COURT:  What did you mean when you said, as much

8  as we can, making politics end at the water's edge is a more

9  forceful signal?

10        THE WITNESS:  When the United States can, in foreign

11  policy -- or I guess really in any policy, but I'll stick to

12  what I know, which is in foreign policy, if you can show

13  bipartisan and wide support for a particular policy position

14  regardless of what it is, it's more forceful and it sends a

15  stronger signal rather than one individual or one party being

16  for a particular policy or not.

17        THE COURT:  Thank you.

18  BY MR. RICHENTHAL:

19  Q.  Based on your experience then, was the fact that a letter

20  was proposed to be signed by more than one senator make it more

21  likely, less likely or the same that Senator Menendez would be

22  likely to sign?

23        MR. WEITZMAN:  Objection.

24        THE COURT:  Sustained.

25  BY MR. RICHENTHAL:

1   Q.  Did you have an understanding, based on your conversation

2   with Senator Menendez, as to the degree to which the likelihood

3   of other senators signing influenced his decision to sign a

4   letter?

5   A.  Yeah, usually it was an indicator or an indicator of doing

6   so.

7            THE COURT:  In other words, if I understand you -- and

8   again, I don't want to put words in your mouth -- are you

9   saying that the more senators who would sign on the more likely

10  it was that Senator Menendez would also sign on?

11           THE WITNESS:  I would say case-specific, but in

12  general, yes.

13           THE COURT:  All right.  Case-specific.

14           THE WITNESS:  Yeah.

15           THE COURT:  Fine.

16  BY MR. RICHENTHAL:

17  Q.  Now, a few minutes ago you looked at an email dated March

18  26, 2019; that was your draft letter?

19  A.  Yes.

20  Q.  And this is a signed letter, April 8, 2019, is that right?

21  A.  Yes.

22  Q.  With respect to human rights, how did these two letters

23  compare?

24           MR. WEITZMAN:  Objection.  Vague.

25           THE COURT:  I'll allow it.

O6oWmen4                           Arkin - Direct

1   A.  This letter includes one paragraph on human rights.  The

2   previous -- the proposed letter was, it almost exclusively

3   focused on human rights and democratic governance.

4        This letter also has concerns about American citizens and

5   purchase of Russian decoys, which I think the other letter

6   might have too, but I don't remember.

7   Q.  Which letter had more discussion of human rights?

8   A.  The previous one, the one I proposed.

9        MR. RICHENTHAL:  You can take that down, Ms. Wechsler.

10  Q.  Shifting from letters back to the GERD -- that is, the

11  dam -- for a moment, during your time in the SFRC, what, if

12  anything, specifically did Egypt hope to get from the United

13  States government with respect to the GERD?

14  A.  They wanted more active involvement and participation in

15  facilitating negotiations and dialogue between the governments

16  of Ethiopia, Sudan and Egypt on finding a -- an approach to

17  filling the dam and releasing the water.

18  Q.  And I should have actually put a time frame on my question.

19  Was that the case from at least 2019 forward?

20  A.  Probably somewhere around that time.

21       MR. RICHENTHAL:  Ms. Wechsler, can you now put on

22  Ms. Arkin's screen, the parties' screen and the Court's screen

23  what's marked for identification as Government Exhibit 8F-34,

24  please.

25  Q.  Is that on your screen, Ms. Arkin?

1   A.  Yes.

2   Q.  Do you recognize this document?

3   A.  Yes.

4   Q.  Without describing it as of yet, what is it, in short?

5   A.  It's a cover letter from someone at the Egyptian embassy to

6   the senator.

7   Q.  Did you receive this document while you were working at the

8   SFRC?

9   A.  Yes.

10          MR. RICHENTHAL:  The government offers 8F-34.

11          THE COURT:  Admitted.

12          (Government Exhibit 8F-34 received in evidence)

13          MR. RICHENTHAL:  Ms. Wechsler, could we now publish

14   that, please.

15   Q.  Now, Ms. Arkin, you said it's from, I think, someone at the

16   embassy of Egypt.  Is that right?

17   A.  Yes.

18   Q.  Are you referring to the top of the letter, essentially the

19   letterhead?

20   A.  No.  I was referring to the signature line.

21          MR. RICHENTHAL:  Ms. Wechsler, can we zoom on the

22   signature line.

23          Now zoom in on the letterhead.

24   Q.  Do you see where it says Arab Republic of Egypt?

25   A.  Yes.

O6oWmen4                          Arkin - Direct

1    Q.  What is the Arab Republic of Egypt?

2    A.  The formal name for Egypt.

3              MR. RICHENTHAL:  Zoom back out now to the letter.

4    Q.  Now, do you see where the letter says:  Please find

5    attached the documents that General Abbas Kamel promised to

6    provide you during your meeting with him in New York related to

7    the development of the Sinai and the facts regarding the

8    Ethiopian Renaissance Dam?

9    A.  Yes.

10   Q.  Now, first, during your time at the SFRC, did you come to

11   understand who General Abbas Kamel was?

12   A.  Yes.

13   Q.  Who was Mr. Kamel, Abbas Kamel?

14   A.  The head of the Egyptian directorate of intelligence

15   services.

16   Q.  What is the directorate of the Egyptian intelligence

17   services?

18   A.  The head of the EGIS.  I can't remember the exact

19   translation of the acronym, but general intelligence services

20   responsible for intelligence, surveillance, collection,

21   cooperation, internally in Egypt, externally outside of Egypt,

22   but also has a heavy hand in many parts of the Egyptian

23   economy, controls some media outlets.  It's quite omnipresent

24   throughout Egypt.

25   Q.  And I think you might have used the acronym EGIS, is that

1    right?

2    A.  Yes.

3    Q.  Is that EGIS?

4    A.  Yes.

5    Q.  Is that an abbreviation used to describe the Egyptian

6    directorate of intelligence?

7    A.  Yes.

8    Q.  Now, as of your time at the SFRC, approximately how long

9    had Mr. Kamel or General Kamel been the head of EGIS?

10   A.  I think the whole time.

11   Q.  Now, looking back at the letter for a moment, the letter

12   says, promised to provide you during your meeting with him in

13   New York.  Do you see that?

14   A.  Yes.

15   Q.  Did you participate in any meeting between Mr. Menendez and

16   General Kamel in New York?

17   A.  No.

18   Q.  Did you know whether such a meeting occurred at the time

19   you saw this letter?

20   A.  No.

21   Q.  At the time you saw this letter, had you received a readout

22   from any such meeting?

23   A.  No.

24   Q.  Now, based on your time at the SFRC, would this be the type

25   of meeting for which you would expect there to be a readout?

```
 1    A.  Yes.

 2    Q.  Why?

 3    A.  The head of a foreign government agency, I would have

 4    expected to be aware of it or get a readout.

 5    Q.  Now could you look at the bottom -- that is, the individual

 6    and the title --

 7            MR. RICHENTHAL:  Please blow that up, Ms. Wechsler.

 8    Q.  -- do you see where it says Ahmed Helmy?

 9    A.  Yes.

10    Q.  Did you ever deal with an Ahmed Helmy at the embassy of

11    Egypt in Washington, D.C.?

12    A.  No.

13    Q.  Did you ever meet an Ahmed Helmy connected to the embassy

14    of Egypt in Washington, D.C.?

15    A.  I don't think so.

16    Q.  Did you deal with anyone else connected with the Egyptian

17    embassy in Washington, D.C., between 2018 and 2022?

18    A.  Yes.

19    Q.  Who?

20    A.  There were two people I dealt with.  They were the

21    congressional -- congressional point people at the embassy, in

22    sequence.

23    Q.  What do you mean by congressional point people at the

24    embassy?

25    A.  Most embassies have an officer whose primary responsibility
```

1    is to engage with Congress.

2    Q.  Do you recall the names of the congressional people or

3    liaisons that you're referring to at the Egyptian embassy?

4    A.  Yes.  Tamin Kalah and Karim Saad.

5    Q.  And did they serve in that position at the same time or at

6    different times?

7    A.  Sequentially.

8    Q.  Who was first and who was second?

9    A.  Right at this moment, I honestly can't remember.

10            MR. RICHENTHAL:  Let's shift gears to some other

11   documents then.

12            Ms. Wechsler, can you put on Ms. Arkin's screen, the

13   parties' screen and the Court's screen what's been marked for

14   identification as Government Exhibits 8F-24, 8F-26, 8F-29 and

15   8F-32.

16   Q.  Ms. Arkin, I'm going to ask Ms. Wechsler to scroll through

17   them one at a time.  Just look up when you're done.

18   A.  OK.

19   Q.  Do you recognize these documents?

20   A.  Yes.

21   Q.  In general, what do they concern?

22   A.  Getting engaged on the Grand Ethiopian Renaissance Dam.

23   Q.  That is, the GERD?

24   A.  Yes.

25            MR. RICHENTHAL:  The government offers those four

1   exhibits, 8F-24, 8F-26, 8F-29 and 8F-32.

2            THE COURT:  Admitted.

3            (Government Exhibits 8F-24, 8F-26, 8F-29 and 8F-32

4   received in evidence)

5            MR. RICHENTHAL:  Ms. Wechsler, let's start with the

6   first, 8F-24, and put on everyone's screen, please.

7   Q.  Ms. Arkin, is this an email?

8   A.  Yes.

9   Q.  From whom and to whom?

10  A.  From Rob Kelly to me and Fred Turner.

11  Q.  Let's pause for a second.  Who was Mr. Turner?

12  A.  I believe the chief of staff at the time.

13  Q.  What's the date of this email?

14  A.  April 8, 2020.

15  Q.  Now, you were looking at the top email, is that right?

16  A.  Yes.

17  Q.  Does this forward an email beneath it?

18  A.  Yes.

19  Q.  From whom and to whom?

20  A.  From Ahmed Helmy to Rob Kelly.

21  Q.  What's the date of the email from Mr. Helmy?

22  A.  April 8, 2020.

23  Q.  What is the subject line of Mr. Helmy's email to Mr. Kelly?

24  A.  The Egyptian point of view regarding Grand Ethiopian

25  Renaissance Dam, GERD.

O6oWmen4                          Arkin - Direct

Q.  Now, I want to direct your attention to the middle of the

email.  See where it starts, referring?

A.  Yes.

Q.  Referring to my meeting with his excellency Senator

Menendez on March 18, 2020, please find enclosed a letter and a

report regarding "GERD," which the senator asked for.  Do you

see that?

A.  Yes.

Q.  Now, before you received this email on April 8, 2020, were

you aware of any meeting that Senator Menendez had with Ahmed

Helmy?

A.  I don't think so, no.

Q.  Before you received this email, had you received a readout

from any meetings Senator Menendez had with Ahmed Helmy?

A.  Not that I recall.

Q.  Based on your time working at the SFRC, would you have

expected to receive a readout?

A.  Probably at least to be aware of a meeting.

Q.  Now, did this email have an attachment; that is, the email

you received?

A.  Yes.

Q.  What was the title of that attachment?

A.  GERD.

Q.  That's the same dam that you testified about?

A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. RICHENTHAL:  Ms. Wechsler, can you publish for

2     everyone now 8F-32.

3     Q.  Ms. Arkin, is this an email chain that continues from the

4     email that I just showed you?

5     A.  Yes.

6     Q.  That is, a further exchange between you and Mr. Kelly?

7     A.  Yes.

8          MR. RICHENTHAL:  Let's go down to the bottom of the

9     email, if we could, Ms. Wechsler.

10    Q.  What did you say to Mr. Kelly on April 18, 2020, after you

11    received this forward?

12    A.  What meeting on the 18th...

13    Q.  Why did you ask that?

14    A.  Because I was not aware of a meeting on the 18th.

15    Q.  And what did you mean, if anything, by dot, dot, dot?

16    A.  I would like an explanation of what this meeting was.

17    Q.  Why did you want an explanation?

18    A.  Because he was meeting with someone at the Egyptian

19    embassy, and I would have assumed that I would have either

20    prepared a briefing material or at least been aware of the

21    meeting.

22         MR. RICHENTHAL:  Go back up on the email.

23    Q.  How did Mr. Kelly respond?

24    A.  Can you call me in 20 minutes?

25    Q.  And how did you respond?

O6oWmen4                        Arkin - Direct

1    A.  Yep, but then I didn't apparently.

2    Q.  I'm sorry, Ms. Arkin?

3    A.  But then I didn't apparently call him in 20 minutes.

4    Q.  What makes you say that?

5    A.  Because I noted that I did not put it in my calendar and

6    did not call him.

7    Q.  In your time working at the SFRC, did you come to learn

8    whether Mr. Menendez had any other meetings with Mr. Helmy,

9    other than the one that was referenced in the email I showed

10   you a few minutes ago?

11   A.  I don't think so.

12   Q.  If he had, would you have expected to be told about them?

13          MR. WEITZMAN:  Objection.

14          THE COURT:  Sustained.

15   BY MR. RICHENTHAL:

16   Q.  If Mr. Menendez had had other meetings with Ahmed Helmy in

17   this time period, the spring of 2020, would you have expected

18   to receive a readout from those meetings?

19          MR. WEITZMAN:  Objection.

20          THE COURT:  Same ruling.

21          In the normal course, did you expect to receive

22   readouts of meetings the senator had with foreign officials?

23   Yes or no.

24          THE WITNESS:  Yes.

25   BY MR. RICHENTHAL:

1  Q.  Did that include Mr. Helmy, given the title on the letter

2  that I showed you a few minutes ago?

3  A.  I'm not exactly sure -- or I wasn't sure at the time who he

4  was or what he is, but given it's official from the embassy and

5  he referenced a meeting I would have expected to be aware of

6  that meeting.

7          MR. RICHENTHAL:  Ms. Wechsler, can you now put on

8  everyone's screen 8F-26, please.

9  Q.  Ms. Arkin, what's the date of this email?

10  A.  April 8, 2020.

11  Q.  From whom and to whom?

12  A.  From Senator Menendez to me.

13  Q.  How does the date on this email compare to the email I just

14  showed you?

15          MR. RICHENTHAL:  Ms. Wechsler, you can put it back on

16  the screen.

17  Q.  How do the dates on the two emails compare, Ms. Arkin?

18  A.  They're the same.

19  Q.  Are they also the same date of the email Mr. Helmy sent to

20  Mr. Kelly?

21  A.  Yes.

22  Q.  Now, could you read --

23          MR. RICHENTHAL:  You can just keep 8F-26 on the

24  screen, Ms. Wechsler.

25  Q.  Could you read what Senator Menendez said to you on April

1   8, 2020, in this email, 8F-26?

2   A.  Can we see if we can get the State Department engaged in

3   order to avoid a conflict here?  Thanks.

4   Q.  Does this contain an attachment?

5   A.  Yes.

6   Q.  What was the title of the attachment?

7   A.  GERD.

8           MR. RICHENTHAL:  Could we put the prior exhibit,

9   8F-24, back on the screen briefly.

10  Q.  How did the titles of the two attachments in these emails

11  compare?

12  A.  They're the same.

13          MR. RICHENTHAL:  Ms. Wechsler, can you now show the

14  beginning of the two attachments, the 8F-24 attachment and the

15  8F-26 attachment.

16          Thank you, Ms. Wechsler.

17  Q.  Now, Ms. Arkin, to go back to 8F-26 -- that is, the email

18  from Senator Menendez to you -- for a moment --

19  A.  Yes.

20          MR. RICHENTHAL:  Ms. Wechsler, can you scroll back up

21  on 8F-26.

22  Q.  -- what did you understand Senator Menendez to be asking

23  you to do?

24  A.  To reach out to the State Department and get them engaged

25  in order to avoid potential conflict between Egypt and Ethiopia

O6oWmen4                          Arkin - Direct

1    and Sudan.

2    Q.   When you say the State Department, what do you mean?

3    A.   The Department of State.

4    Q.   The U.S. Department of State?

5    A.   U.S. Department of State, yes.

6    Q.   Had you already been in touch with the State Department

7    regarding the GERD at the time of this email to you on April 8,

8    2020?

9    A.   Yes.

10   Q.   Why?

11   A.   We had heard from the Egyptians quite a lot.  The -- we had

12   heard from the State Department.  This was a serious concern

13   for the Egyptians.  It was a serious concern for regional water

14   security, and also working with our Africa team, this was just

15   a major, major flash point and crisis point.  Water resource

16   management is critically important.  The State Department was

17   trying to get involved, but for some reason, the Treasury

18   Department had been tasked with leading.  The Treasury

19   Department doesn't have the right people or the expertise.  The

20   State Department was being cut out of negotiations.  It was --

21   it was a little bit of a mess, but we had received -- had

22   talked quite a bit to the State Department about it.

23          MR. RICHENTHAL:  Ms. Wechsler, you can keep up 8F-26,

24   please.

25   Q.   What, if anything, did you do after you received this email

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6oWmen4                         Arkin - Direct

1   from Mr. Menendez asking you to get the State Department

2   engaged?

3   A.   I think I probably reached out to the State Department and

4   then worked with our Africa team to draft a letter from the

5   senator expressing his desire for the State Department to get

6   more involved in facilitating the -- facilitating the

7   discussion and negotiation.

8   Q.   When you say our Africa team, what are you referring to?

9   A.   We have a team within the SFRC staff that handles Africa.

10           MR. RICHENTHAL:  Ms. Wechsler, can you put on

11  everyone's screen what's in evidence as Government Exhibit

12  8F-5, and if we could just blow up the top.

13           Thank you, Ms. Wechsler.

14  Q.   Do you recognize this, Ms. Arkin?

15  A.   Yes.

16  Q.   What is this?

17  A.   It's an email from me to Karim Saad at the embassy.

18  Q.   Who did you understand Mr. Saad to be?

19  A.   He was at the time the congressional point person.

20  Q.   Is this the role you referred to a few minutes ago?

21  A.   Yes.

22  Q.   Why did you send this email to Mr. Saad?

23  A.   I had been speaking with him a lot about the GERD.  He had

24  been expressing the same position, that Egypt wanted the United

25  States to be more involved in these discussions and

1    negotiations, and I wanted him to know the senator was taking

2    an active role in encouraging that.

3    Q.  What was the date of this email?

4    A.  April 28, 2020.

5    Q.  What, if anything, did it attach?

6    A.  A letter that the senator wrote to Secretary Mnuchin and

7    Pompeo.

8    Q.  I think you said earlier who Secretary Pompeo was.  Who was

9    Secretary Mnuchin?

10   A.  Secretary of Treasury.

11   Q.  What, in short, did this letter concern?

12   A.  I think encouraging the United States to play a more active

13   facilitating role and also to ensure that the State Department

14   was in the lead on diplomatic efforts.

15   Q.  How, if at all, did this letter compare with what Egyptian

16   officials had asked you in meetings that you were in regarding

17   the GERD?

18   A.  It was -- sorry.  What do you mean?

19   Q.  How, if at all, did this letter compare with what Egypt

20   wanted from the United States in meetings you attended

21   regarding the GERD?

22   A.  It was pretty similar, pretty close to what they wanted.

23       MR. RICHENTHAL:  Changing subjects, you can take that

24   down.  Can we publish what's already in evidence for everyone

25   as Government Exhibit 3D-2, please.

1          THE COURT:  I take it sometimes around this period the

2   senator took policy positions that were consistent with what

3   Egypt wanted and sometimes did not.  Is that true?

4          THE WITNESS:  I think there was more specifics on that

5   kind of --

6          THE COURT:  Fair enough.

7   BY MR. RICHENTHAL:

8   Q.  Did it vary by issue?

9   A.  It varied by issue.

10  Q.  Is 3D-2 now up on the screen, Ms. Arkin?

11  A.  Yes.

12  Q.  Now, is this an email?  Does it appear to be an email?

13  A.  Yes.  Sorry.

14  Q.  From whom and to whom?

15  A.  From Fred Daibes to Fred Daibes to FAD SEC.  I don't know

16  what FAD is.

17  Q.  Does it appear to have an attachment?

18  A.  Yes.

19  Q.  It says S1102?

20  A.  Yes.

21  Q.  Now, based on your experience working in Congress, what

22  does this kind of format -- that is, a letter and a number --

23  typically signify?

24  A.  A Senate bill.

25         MR. RICHENTHAL:  Can you scroll down, Ms. Wechsler,

1    just to -- we can stop there.

2    Q.  Are you familiar with the term or phrase "informal copy"

3    with respect to a Senate bill?

4    A.  Yes.

5    Q.  What, in short, is an informal copy?

6    A.  A copy that, maybe, offices are using for circulation

7    amongst themselves or among staff but doesn't have the fancy

8    heading and print of the Government Printing Office on it.

9    Q.  Does this appear to be an informal copy?

10   A.  Yes.

11   Q.  Could you read what section 1 states?

12   A.  "This act may be cited as the Eastern Mediterranean

13   Security and Energy Partnership Act of 2019."

14          MR. RICHENTHAL:  Ms. Wechsler, can you go back out and

15   then go down to the next section, section 2, please.

16   Q.  Do you see where it says Congress makes the following

17   findings?

18   A.  Yes.

19   Q.  Do you see subsection 8?

20   A.  Yes.

21   Q.  Could you read it, please?

22   A.  "The recent discovery of what may be the region's largest

23   natural gas deal off the Egyptian coast and the newest

24   discovery of natural gas off the coast of Cyprus could

25   represent a significant and positive development for the

O6oWmen4                          Arkin - Direct

1   Eastern Mediterranean and the Middle East, enhancing the

2   region's strategic energy, is significant."

3   Q.  Just to pause for a second.  It says Egyptian coast?

4   A.  Yes.

5   Q.  What coastline, if any, does Egypt have?

6   A.  The north coastline on the Mediterranean.  I guess on the

7   Sinai, but this refers to the north coastline on the

8   Mediterranean.

9            THE COURT:  The north coast of Egypt.

10           THE WITNESS:  Yes.

11           THE COURT:  Are you saying the north coast of Egypt is

12  on the Mediterranean?

13           THE WITNESS:  Yes.

14           THE COURT:  OK.

15           THE WITNESS:  Sorry.

16  BY MR. RICHENTHAL:

17  Q.  And you also just said the Sinai?

18  A.  Yes.

19  Q.  For anyone who may not know, what's the Sinai?

20  A.  It's the peninsula that goes through, off the Arabian

21  Gulf -- Arabian Gulf.  I'm not sure what we're calling it these

22  days, but yes, on the other side of Egypt, but this is its sea

23  coastline that's referred to in this resolution.

24           MR. RICHENTHAL:  Ms. Wechsler, can we go to page 9,

25  please.

1    Q.  Do you see a reference at the bottom of the page, beneath

2    section 10, to the Eastern Mediterranean Natural Gas Forum?

3    A.  Yes.

4    Q.  Did you come to learn what that was during your time at the

5    SFRC?

6    A.  Yes.

7    Q.  What was that?

8    A.  A forum for countries that had maritime borders on the

9    eastern part of the Mediterranean Sea to discuss and

10   collaborate, cooperate and deconflict on natural gas

11   extraction, refinement and export.

12   Q.  And I think you just said this, but what role, if any, did

13   Egypt have with respect to the Eastern Mediterranean -- that

14   is, that area -- and this forum?

15   A.  It was a member of the forum.

16   Q.  How, if at all, did Egypt stand to benefit from the

17   existence of the forum?

18   A.  Uh --

19            MR. WEITZMAN:  Objection.

20            THE COURT:  Sustained as phrased.

21   BY MR. RICHENTHAL:

22   Q.  Did you come to an understanding, based on your

23   conversations with Egyptian officials and others in the SFRC,

24   as to whether Egypt would benefit from the Eastern

25   Mediterranean Natural Gas Forum?

O6oWmen4                     Arkin - Direct

1   A.  As a member country, it potentially could stand to benefit

2   as other member countries could.

3          MR. RICHENTHAL:  If we can back to page 1, if we

4   could, Ms. Wechsler -- that is, the email, please.

5   Q.  I asked you a few minutes ago about the top of the email,

6   if you could look beneath it --

7   A.  Yes.

8   Q.  -- does it appear that Mr. Daibes had forwarded another

9   email?

10  A.  Yes.

11  Q.  On the same date -- that is, Tuesday, September 17, 2019 --

12  or a different date?

13  A.  Same date.

14  Q.  Now, if I could direct your attention to an email address

15  following Robert Menendez, do you see that?

16  A.  Yes.

17  Q.  Was that his work address or a different address?

18  A.  Personal email address.

19  Q.  Now, you've mentioned Mr. Daibes a couple times.  At the

20  time did you know who Mr. Daibes was?

21  A.  I don't think I mentioned Mr. Daibes.

22  Q.  I'm sorry.  I just meant in the email address.

23  A.  OK.

24  Q.  Let me back up.  I asked you who sent the email.  I think

25  you said Fred Daibes?

O6oWmen4                          Arkin - Direct

1   A.  Yes.

2   Q.  Other than reading the name Fred Daibes, did you know who

3   Fred Daibes was?

4   A.  No.

5            MR. RICHENTHAL:  We can take that down, Ms. Wechsler.

6   Q.  Now, switching from Mr. Daibes to another name, during your

7   time in the SFRC, were you familiar with an individual named

8   Mai Abdelmaguid?

9   A.  Yes.

10  Q.  Had you ever met Ms. Abdelmaguid?

11  A.  I think, yes, once or twice.

12  Q.  Approximately when?

13  A.  June of 2021, the one time I remember.  Maybe another time.

14  Q.  How did you come to meet her in approximately June of 2021?

15  A.  She was an intelligence, Egyptian intelligence author --

16  officer stationed at the embassy, and she came to a meeting

17  with head of Egyptian intelligence.

18  Q.  That is, General Kamel?

19  A.  Yes.

20  Q.  Where was that meeting held?

21  A.  In the Senate Foreign Relations Committee room in the

22  Capitol, U.S. Capitol.

23  Q.  What is the Senate Foreign Relations Committee room?

24  A.  It's an official reception meeting room where members of

25  the Senate Foreign Relations Committee host visiting

1   dignitaries.

2   Q.  Did Senator Menendez attend --

3   A.  Among -- among other things.

4   Q.  I didn't mean to cut you off.

5   A.  Yeah.  Sorry.  It's not the only thing.

6   Q.  Did Senator Menendez attend the meeting in June 2021 with

7   General Kamel and Ms. Abdelmaguid?

8   A.  Yes.

9   Q.  Did other senators attend the meeting in June 2021?

10  A.  Yes.

11  Q.  I think you said Ms. Abdelmaguid was, to your knowledge, an

12  intelligence officer?

13  A.  Yes.

14  Q.  What did you mean by that?

15  A.  She was part of the Egyptian intelligence service stationed

16  at the embassy in the United States, presumably liaising with

17  our own intelligence community and other activities.

18          MR. RICHENTHAL:  Ms. Wechsler, could you now put on

19  Ms. Arkin's screen, the parties' screen and the Court's screen

20  what's been marked for identification as Government Exhibit

21  8F-7.

22  Q.  Do you recognize that, Ms. Arkin?

23  A.  Yes.

24  Q.  Without getting into the details at this time, what, in

25  short, is this?

1   A.  It's an email from me to the senator with a memo -- a

2   meeting memo for that meeting in June 2021.

3   Q.  That's the meeting you just talked about?

4   A.  Yes.

5           MR. RICHENTHAL:  The government offers 8F-7.

6           THE COURT:  Admitted.

7           (Government Exhibit 8F-7 received in evidence)

8           MR. RICHENTHAL:  Can we put that on everyone's screen,

9   please.

10  Q.  Ms. Arkin, can you just orient us to this -- that is,

11  without reading all of it -- could you describe, in short, what

12  we're looking at?

13  A.  It's an email from me to the senator.  I sent a memo to him

14  in which I referenced a story from Yahoo, a Yahoo News story

15  about Kamel's alleged role in the murder of Jamal Khashoggi, so

16  I was updating the memo and then including that news story as

17  well.

18  Q.  Let me just pause for a second.  Who was Mr. Khashoggi?

19  A.  He was a Saudi dissident, legal permanent resident of the

20  United States, and a columnist for The Washington Post who the

21  Saudi government abducted and killed in their consulate in

22  Istanbul.

23  Q.  What, if anything, did this article say about Egypt's

24  alleged role in that murder?

25  A.  That Egypt had played a role.  I can't remember the

O6oWmen4                          Arkin - Direct

1    specifics at this moment, but I think specifically that they

2    had provided the dose of lethal injection or destabilizing

3    agent that knocked out Khashoggi.

4              MR. WEITZMAN:  Objection.  Hearsay.  Could we get an

5    instruction, your Honor?

6              MR. RICHENTHAL:  Not offered for the truth, your

7    Honor.

8              THE COURT:  Objection overruled.  It's not for the

9    truth but simply for --

10             This was in the article, you believe?

11             THE WITNESS:  Yes.

12             THE COURT:  Simply for the fact that it was said in

13   that article.  Nothing more.

14   BY MR. RICHENTHAL:

15   Q.  And to be clear, Ms. Arkin, you sent this article to, among

16   others, Senator Menendez?

17   A.  Yes.

18   Q.  Is he, in fact, the person on the "to" line of this email?

19   A.  Yes.

20             MR. RICHENTHAL:  Now, Ms. Wechsler, can you pull up

21   side by side a different exhibit that is already in evidence,

22   Government Exhibit B213-4.  And can you highlight the file name

23   in one of the messages, please.  I'm sorry.  Ms. Wechsler, I

24   think you have to go to page 2.  And I believe it's the last

25   one on the right.

O6oWmen4                          Arkin - Direct

1                You can stop there.

2   Q.  Ms. Arkin, are you able to see on your screen what I'm

3   referring to as the file name or title on the message on the

4   right?

5   A.  Yes.

6   Q.  Could you read it?

7   A.  "Title, Yahoo story about Abbas Kamel Khashoggi."

8   Q.  Does it appear to be a particular type of document?

9   A.  Dot docx.

10  Q.  Docx?

11  A.  Yes.

12  Q.  Could you now look back at the attachment to the email you

13  sent, and could you read that?

14  A.  "Yahoo story Abbas Kamel Khashoggi.docx."

15  Q.  How do they compare?

16  A.  They're the same.

17  Q.  Looking back again at the message on the right, do you see

18  how this appears to be from Nadine Menendez to Mai Abdelmaguid?

19  A.  Yes.

20  Q.  Were you aware of this message between Ms. Menendez and

21  Ms. Abdelmaguid at the time you attended the meeting in June

22  2021?

23  A.  No.

24  Q.  Were you aware of any communications between Nadine

25  Menendez and Ms. Abdelmaguid?

1   A.  No.

2   Q.  Were you aware of any communications between Ms. Menendez

3   and Ms. Abdelmaguid at any time prior to September of 2023?

4   A.  No.

5   Q.  Now, a few minutes ago I think you referenced that

6   Ms. Abdelmaguid attended a June 2021 meeting.  Is that right?

7   A.  Yes.

8   Q.  Did Mr. Menendez ever tell you whether he attended meetings

9   with Ms. Abdelmaguid other than the June 2021 meeting?

10  A.  No.

11  Q.  I think you also testified that General Kamel attended the

12  June 2021 meeting.  Is that right?

13  A.  Yes.

14  Q.  Now, around the same time period -- that is, June 2021 --

15  were you aware of any dinners between Senator Menendez and

16  General Kamel?

17  A.  Not to my recollection, no.

18  Q.  Given who Mr. Kamel was, would you have expected to be

19  advised if such a dinner occurred?

20  A.  Yes.

21  Q.  Why?

22  A.  Head of -- head of a foreign government agency,

23  intelligence service agency, I would expect to know.

24          MR. RICHENTHAL:  Now, Ms. Wechsler, can we go to a

25  different document.  Put up for Ms. Arkin, the parties and the

1    Court only what's been marked for identification as Government

2    Exhibit 8F-33, please.

3    Q.  Ms. Arkin, is that on your screen?

4    A.  Yes.

5    Q.  Without describing it in detail, do you recognize this?

6    A.  Yes.

7    Q.  What is this?

8    A.  It was a letter that came to me after the -- or came to me

9    to be delivered to the senator after that meeting in June.

10   Q.  After the meeting in June, meaning the June 2021 meeting

11   you testified about?

12   A.  Yes.

13              MR. RICHENTHAL:  The government offers 8F-33.

14              THE COURT:  Admitted.

15              (Government Exhibit 8F-33 received in evidence)

16              MR. RICHENTHAL:  Publish that for everyone,

17   Ms. Wechsler.

18   Q.  Now, Ms. Arkin, we'll get into some of this in a moment,

19   but first, who is this letter from and who is it to?

20   A.  I can't see who it's from.  I think it's from Abbas Kamel.

21              MR. RICHENTHAL:  Let's scroll to the end,

22   Ms. Wechsler.

23   A.  Yes, it's from Abbas Kamel.

24   Q.  Are you looking at the lower right?

25   A.  Yes.

1    Q.  Do you see what's listed beneath his name, chief of GIS?

2    A.  Yes.

3    Q.  What did you understand GIS to mean?

4    A.  General intelligence services.

5    Q.  Is that the same as EGIS?

6    A.  Yes.

7            THE COURT:  EGIS is, I take it, just an acronym for

8    Egyptian general intelligence service.

9            THE WITNESS:  Yes, and also the Arabic words and

10   English words don't necessarily translate to, correspond, so,

11   yes.

12   BY MR. RICHENTHAL:

13   Q.  I think you said a moment ago this letter was addressed to

14   Senator Menendez?

15   A.  Yes.

16   Q.  How is he addressed; that is, literally what words were

17   used?

18   A.  Dear Bob.

19   Q.  What is the date of this letter?

20   A.  June 30, 2021.

21   Q.  Now, was this before or after the meeting with General

22   Abbas Kamel that you attended?

23   A.  After.

24   Q.  During your time at the SFRC, did you come to see other

25   letters from foreign officials to Senator Menendez?

O6oWmen4                          Arkin - Direct

1    A.  Yes.

2    Q.  How common or uncommon was it for them to address him as

3    Bob?

4             MR. WEITZMAN:  Objection.

5             THE COURT:  I'll allow it.

6             In the letters you saw, how common was it to address

7    Senator Menendez as Bob?

8             THE WITNESS:  Not very.

9    BY MR. RICHENTHAL:

10   Q.  If I could now direct your attention to the first paragraph

11   of the letter, do you see Mr. Kamel wrote:  First, I would like

12   to express my pleasure and gratitude for meeting with you once

13   again, as I admire your character and appreciate your wisdom

14   and knowledge.

15        Do you see that?

16   A.  Yes.

17   Q.  Now, in the next sentence, he wrote:  Practically, I

18   appreciate your attitude as a sincere friend to Egypt, who

19   recognizes the vital and influential role played by Egypt in

20   the Middle East and believes in the significance of the

21   Egyptian/U.S. strategic relations?

22   A.  Yes.

23            MR. RICHENTHAL:  Go back out for a second.

24   Q.  Now, scrolling down a bit, in the email -- excuse me, in

25   the letter, do you see a reference in the second paragraph to a

O6oWmen4                         Arkin - Direct

1   meeting with members of U.S. Senate foreign relations?

2   A.  Yes.

3   Q.  What do you understand that reference to be?

4   A.  I think the -- we -- the -- we had hosted -- Senator

5   Menendez had hosted Kamel for a meeting with other members of

6   the foreign relations committee.

7   Q.  Is this the meeting you testified about a few minutes ago?

8   A.  Yes.

9   Q.  In the, I think you called it the Senate Foreign Relations

10  Committee room?

11  A.  Yes.

12  Q.  And beneath that, it says as promised during the meeting

13  and then some information's provided.  Do you see that?

14  A.  Yes.

15  Q.  What do you understand this to be?

16  A.  Senator Menendez raised a case of a -- I'm sorry.  I want

17  to be careful about the identity of the person.

18  Q.  Without giving details about the person's name or

19  identifying him or her, in general, can you describe what you

20  understand this to be a reference to?

21  A.  Yes.  He had raised concerns about an Egyptian American

22  or -- I can't remember if he was a citizen or a legal permanent

23  resident, he had connections to New Jersey, who had been

24  detained in Egypt and had not had due process or was being held

25  in bad conditions, and the senator raised concerns about that

1    to him and asked that he look into the case and get him home,

2    basically.

3          MR. RICHENTHAL:  Ms. Wechsler, can you now scroll to

4    the next page, please.

5          THE COURT:  The "him" is this detained U.S. citizen --

6          THE WITNESS:  Yes, yes.

7          THE COURT:  -- from New Jersey, you said?

8          THE WITNESS:  Yes.  I can't remember if he was from

9    New Jersey or his parents were constituents.  There was

10   connection there, and I can't remember if he was a citizen or a

11   legal permanent resident, but yes, that's the person to whom I

12   was referring.

13   BY MR. RICHENTHAL:

14   Q.  Ms. Arkin, now on your screen is the second page of the

15   letter.  Do you see that?

16   A.  Yes.

17   Q.  Following the paragraph about this person, what subject did

18   General Kamel raise in his letter?

19          MR. RICHENTHAL:  Ms. Wechsler, you can zoom in.

20   A.  The GERD.

21   Q.  And again, that's the dam that you testified about?

22   A.  Yes.

23          MR. RICHENTHAL:  Could we go back out, please.

24   Q.  Now, I want to direct your attention to the second-to-last

25   paragraph.  See where it says lastly?

1   A.  Yes.

2   Q.  It says, lastly, I repeat my personal invitation to you and

3   your dear wife to pay a visit to Egypt and enjoy our various

4   tourist sites.  Do you see that?

5   A.  Yes.

6           MR. RICHENTHAL:  Go back out, Ms. Wechsler.

7           You can take that down.

8   Q.  Now, changing subjects for a moment, I think you testified

9   earlier that your regional policy portfolio included a country

10  known as Qatar, or Qatar?

11  A.  Yes.

12  Q.  Approximately when was your policy portfolio one that

13  included the country of Qatar?

14  A.  The same time frame.  So November-ish of 2018 through March

15  2022.

16  Q.  So for anyone who may not know, where is Qatar located?

17  A.  It's in the Middle East.  Yup.

18  Q.  How large a country is Qatar?

19  A.  Very small.

20  Q.  Is it bigger or smaller than Egypt?

21  A.  Much smaller.

22  Q.  Much smaller geographically?

23  A.  And population wise.

24  Q.  Did you attend any meetings with Qatari government

25  officials during your time in the SFRC?

O6oWmen4                          Arkin - Direct

1    A.  Yes.

2    Q.  Did you also attend any meetings with Qatari officials

3    during the time working for Mr. Menendez prior to your time at

4    the SFRC?

5    A.  I don't remember.  I don't think so.

6    Q.  Sticking then with your time at the SFRC, did you come to

7    learn generally about the Qatar-U.S. relationship?

8    A.  Yes.

9    Q.  Based on your understanding, what was the nature of the

10   relationship between Qatar and other countries in the Middle

11   East in 2017?

12   A.  It was not good.  The rest of the Gulf Cooperation Council,

13   which is Saudi Arabia, other countries on the main gulf had

14   effectively decided to excommunicate Qatar from the

15   organization and stop diplomatic and other relations because of

16   Qatar's alleged support for terrorism and relations with Iran

17   and other countries.

18               (Continued on next page)

19

20

21

22

23

24

25

O6O5men5                          Arkin - Direct

1   BY MR. RICHENTHAL:   (continuing)

2   Q.  Let me apologize, Ms. Arkin.  I think I said 2017, I meant

3   early 2021.

4   A.  I'm sorry.  Yes.  Well, that is what I under -- yeah.

5   Q.  Let me ask it again.  Was the answer you just gave with

6   respect to 2021 or as I think I inadvertently misspoke, 2017?

7   A.  That was more -- well, 20 -- yes, that's the 2017, 2018,

8   2019 time frame.

9   Q.  Did that relationship continue into 2021?  2020, 2021?

10  A.  I can't remember exactly but the rift, it was referred to,

11  was starting to heal, I believe.

12  Q.  Let me ask you about that shift which is what I meant to

13  ask.  Between 2017 and 2021 you said the rift was beginning to

14  heal?

15  A.  Yes.

16  Q.  What did you mean by that?

17  A.  So e diplomatically referred to this as the gulf rift, and

18  then subsequently diplomatic behavior and calculations were

19  changing and the United States, in 2021, was trying to help --

20  well, the policy position was that the United States national

21  security interest was better served with a strong and united

22  Gulf Cooperation Council and cooperation from all the gulf

23  countries rather than this rift.

24  Q.  What was the Gulf Cooperation Council?

25  A.  A regional body comprised of all the countries on the

1    European gulf.

2    Q.   Focusing in this time period in which I think you said the

3    rift was healing, that is 2021 or so, what was the United

4    States' relationship with Qatar?

5    A.   Very strong.

6    Q.   Can you expand by what you mean about that?

7    A.   The United States and Qatar have a very important military

8    relationship.  United States uses, is one if not the biggest

9    air base there which was critically important for operations in

10   Iraq and Afghanistan.  Qatar had also hosted leaders of various

11   terrorist organizations but helped facilitate discussions and

12   negotiations for the United States.  And then, later in 2021,

13   Qatar helped, was very helpful in facilitating -- or not

14   facilitating but helping with the evacuation of refugees from

15   Afghanistan and operations related to the Afghanistan

16   withdrawal.

17   Q.   When you refer to the Afghanistan withdrawal, what are you

18   referring so?

19   A.   The decision to withdraw U.S. troops from Afghanistan in

20   August 2021.

21   Q.   Shifting from the U.S. relationship with Qatar, generally,

22   to needing to meet with Qatari officials, focusing on 2021 and

23   2022.  Based on the meetings you attended, what did Qatari

24   officials say, if anything, about their view of U.S.-Qatar

25   relations?

1   A.  Can you say that again?

2   Q.  In 2021 and 0222, did you attend meetings with Qatari

3   officials?

4   A.  Yes.

5   Q.  What, if anything, did they say about the their view of

6   U.S.-Qatar relations?

7   A.  They're very important.

8            MR. WEITZMAN:  Objection.  Can we get a specific

9   meeting or time frame?  More particularized?

10           THE COURT:  Yes.  Proceed.

11  Q.  In 2021, did you attend meetings with Qatari officials?

12  A.  I don't remember the dates.

13  Q.  In approximately 2021 --

14  A.  Yes.

15  Q.  -- did you meet with Qatari officials.

16  A.  Yes.

17  Q.  One time or more than one time?

18  A.  I remember one meeting, but I also had meetings with Qatari

19  government officials, conversations.

20  Q.  Based on meetings you had in approximately 2021, what, if

21  anything, did Qatari officials say about their views of

22  U.S.-Qatar relations?

23  A.  They're very important, critically important.  The United

24  States was a very important partner for Qatar.

25  Q.  What, if anything, based on the same meetings, did you

O6O5men5                              Arkin - Direct

1   understand Qatar's goals were for the development of the

2   U.S.-Qatar relationship?

3            MR. WEITZMAN:  Objection.

4            THE COURT:  Was there an objection?

5            MR. WEITZMAN:  There was.  I have no objection to her

6   relaying what Qatar asked.

7            THE COURT:  Fine.

8            MR. WEITZMAN:  Just rephrase.

9            THE COURT:  Fine.

10  BY MR. RICHENTHAL:

11  Q.  What, if anything, did Qatari officials say about, looking

12  forward, what they wanted the U.S.-Qatar relationship to be?

13  A.  To continue to be a strong relationship based on those

14  shared priorities that they had in terms of security and

15  regional security, maritime security, and counter-terrorism.

16  Q.  You just said maritime security; what is that?

17  A.  Security of the sea.  Caribbean gulf and various straits

18  and canals around the region.

19           MR. RICHENTHAL:  Your Honor, it is just after 2:30.  I

20  am going to shift --

21           THE COURT:  3:30.

22           MR. RICHENTHAL:  Excuse me, 3:30.  I am going to shift

23  from this topic to some documents.  It might be a good time for

24  a break or would you like me to keep going.

25           THE COURT:  Keep going for 15 more minutes.

1            Is that all right, ladies and gentlemen?  Get as much

2    in as we can.

3            MR. RICHENTHAL:  Ms. Wechsler, can we put on

4    Ms. Arkin's screen, the parties and the Court's screen, what

5    has been marked marketed as Government Exhibit 3A-8?

6    BY MR. RICHENTHAL:

7    Q.  Do you recognize this, Ms. Arkin?

8    A.  Yes.

9    Q.  What is this?

10   A.  It is a e-mail from Robb to me and Jessica.

11   Q.  Concerning what, in sum?

12   A.  A meeting with two Qatari officials.

13           MR. RICHENTHAL:  The government offers 3A-8.

14           THE COURT:  Admitted.

15           (Government's Exhibit 3A-8 received in evidence)

16           MR. RICHENTHAL:  Can you put that on the jury's

17   screen, Ms. Wechsler?

18   BY MR. RICHENTHAL:

19   Q.  To orient ourselves, Ms. Arkin, and looking at the top of

20   the e-mail, from whom is this email and to whom is this email?

21   A.  It is from Rob Kelly to me and Jessica Lewis.

22   Q.  What is the date of the e-mail?

23   A.  January 31st, 2021.

24   Q.  What was Ms. Lewis' role?

25   A.  She was the staff director.

1   Q.  The staff director for what?

2   A.  The Senate Foreign Relations Committee.

3   Q.  Let's start at the top of the e-mail, if we could.

4   Mr. Kelly wrote:  RM agreed to do this meeting on Tuesday at

5   11:00 am.  I'm trying to track down more info.

6   A.  Yes.

7   Q.  First, who is RM?

8   A.  Robert Menendez.

9   Q.  Do you see beneath that top e-mail another e-mail?

10  A.  Yes.

11  Q.  Does this appear to be what the top e-mail was forwarding?

12  A.  Yes.

13  Q.  These emails from MDoyle1031; is that correct?

14  A.  Yes.

15  Q.  To Mr. Kelly?

16  A.  Yes.

17  Q.  Can you read the first sentence beneath "Rob"?

18  A.  Attached are the bios for the two Qatari officials who look

19  forward to meeting with Senator Menendez.  In terms of the

20  attendees on Monday, the two Qatari officials will be

21  accompanied by Sasha Boljanovic former ambassador Vladimir

22  Petrovic, and myself.  If COVID protocols require a smaller

23  group, just let me know and I'll reduce our numbers.  Thanks so

24  much.

25  Q.  What is your understanding as to why this e-mail referred

O6O5men5                          Arkin - Direct

1   to COVID protocols?

2   A.  We were still in COVID times.

3   Q.  This is early 2021?

4   A.  Yes.

5              MR. RICHENTHAL:  If I can ask, Ms. Wechsler, to go to

6   the next page, please?

7   Q.  Did you see this page, Ms. Arkin?

8   A.  Yes.

9   Q.  Does this list the two Qatari officials referenced in the

10  prior page?

11  A.  Yes.

12  Q.  Could you read each of their names?

13  A.  Sheikh Sultan Bin Jassim bin Mohammed al Thani and Ali

14  al Thawadi.

15  Q.  How, if at all, did these biographies describe the roles

16  these two different Qatari officials?

17             MR. WEITZMAN:  Objection.  Not for the truth, your

18  Honor.

19             THE COURT:  Sustained.

20             MR. RICHENTHAL:  That's correct, your Honor.

21             THE COURT:  Not for the truth; just the fact that it

22  was said but it is not that it is true or not.

23             Proceed.

24  BY MR. RICHENTHAL:

25  Q.  Ms. Arkin, how, if at all, did these two bios describe the

1   roles of these two individual Qataris?

2   A.   The first is the CEO and the chairman of the largest

3   construction and real estate company in Qatar, who holds many

4   leisure holdings around the world including several Four

5   Seasons Hotels around the United States and he is an advisor to

6   his highness, the Emir of Qatar and Qatar's investments in

7   United States, and other matters.

8   Q.   Just pause there.  What was your understanding what the

9   Emir of Qatar is?

10  A.   Effectively the head of state.

11  Q.   And if I could direct your attention back to the first

12  sentence of the biography?

13  A.   Yes.

14  Q.   Does it say whether Mr. al Thani is a member of the ruling

15  family in Qatar?

16  A.   Yes.  He is.

17  Q.   Now if we look at the second bio, what role, if any, does

18  it say that Mr. Al Thawadi had with respect to Qatar?

19  A.   Chief of staff to his Excellency Sheikh Mohammed bin Hamad

20  al Thani, brother and secretary to his highness, the amir for

21  investment affairs.

22  Q.   Do you see how amire is spelled with an A as-in-apple in

23  the first file, and E as-in-Edward in the second?

24  A.   Yes.

25  Q.   Do you understand that to be the same person or different

1    person?

2    A.   Same person.

3    Q.   Can you please scroll down in the e-mail, please, to what

4    is beneath the bio, please?

5         Do you see what appears on this page?

6    A.   Yes.

7    Q.   Are you familiar with the phrase org chart or

8    organizational chart?

9    A.   Yes.

10   Q.   Is that what this appears to be?

11   A.   Yes.

12   Q.   Who is at the top?

13   A.   Sheikh Tamim bin Hamad Al Thani, the Emir of Qatar.

14   Q.   And where are the two men whose biographies were in the

15   email?

16   A.   Below him.

17            MR. RICHENTHAL:  If you can take that back out?  You

18   can take that down.

19   Q.   Ms. Wechsler, will put on your screen three other documents

20   marked as Government Exhibits 8F-23, 8F-27 and 8F-30.  And

21   again I'm going to ask Ms. Wechsler to scroll through them one

22   at a time and look up when you are done.

23        Do you recognize this, Ms. Arkin?

24   A.   Yes.

25   Q.   In general, what are these three documents?

1    A.  E-mails between me and Senator Menendez and our

2    communications director.

3    Q.  Concerning what, in short?

4    A.  A statement thanking Qatar for their actions allowing us to

5    take Afghan refugees.

6            MR. RICHENTHAL:  The government offers 8F-23, 8F-27

7    and 8F-30.

8            THE COURT:  Admitted without objection.

9            (Government's Exhibits 8F-23, 8F-27, 8F-30 received in

10   evidence)

11           MR. RICHENTHAL:  Let's start with 8F-27, Ms. Wechsler,

12   and we can zoom in.

13   BY MR. RICHENTHAL:

14   Q.  Ms. Arkin, is this an e-mail?

15   A.  Yes.

16   Q.  Usual questions; from whom and to whom?

17   A.  From the senator to me and our communications director.

18   Q.  That is Mr. Pachon?

19   A.  Yes.

20   Q.  What is the date of this e-mail?

21   A.  Friday, August 20.

22   Q.  Of what year?

23   A.  2021.

24   Q.  Could you read what Mr. Menendez wrote?

25   A.  We should put out a statement thanking Qatar for their

1  actions in allowing us to take Afghanistan refugees to the base

2  and what they did with the Afghan dreamers.

3  Q.  What, if any understanding did you have, who the Afghan

4  dreamers were?

5  A.  I am not the Afghanistan person or Afghanistan expert.  I'm

6  not sure.

7  Q.  Let me back up earlier then.  Do you see the reference to

8  Afghanistan refugees?

9  A.  Yes.

10  Q.  What did you understand Afghanistan refugees to refer to?

11  A.  There were a huge number of refugees, people trying to flee

12  Afghanistan -- well, quite consistently -- but especially in

13  the wake of the withdrawal of the U.S. forces from Afghanistan.

14  Q.  Is this the withdrawal you mentioned a few minutes ago?

15  A.  Yes.

16  Q.  Again, what time period is this e-mail?

17  A.  August 2021.

18  Q.  Was Qatar the only country that was assisting with respect

19  to Afghanistan refugees at this time in the summer of 2021?

20  A.  No.

21  Q.  Prior to this -- let me back up a second.

22      What did you understand Senator Menendez to be asking be

23  done here?

24  A.  To put out a public statement thanking Qatar.

25  Q.  Thanking Qatar with respect to what?

O6O5men5                              Arkin - Direct

1   A.  Their help and facilitation in receiving Afghan refugees in

2   Qatar.

3   Q.  Now, a question ago you said that Qatar was not the only

4   country receiving refugees; is that right?

5   A.  Yes.

6   Q.  Prior to receiving this e-mail, were you involved with

7   planning for a public statement thanking other countries, too?

8   A.  Yes.  I believe the SFRC staff was working on putting a

9   statement out.

10  Q.  A statement out thanking just Qatar or other countries?

11  A.  Other countries as well.

12          MR. RICHENTHAL:  Now, if we can go to the next

13  exhibit, 8F-30, please?  And again can we zoom in?

14  Q.  Now starting at the bottom, is this part of the exhibit the

15  same e-mail that you just talked about?

16  A.  Yes.

17  Q.  Directing your attention above that, do you see a response

18  to Senator Menendez?

19  A.  Yes.

20  Q.  What did you say?

21  A.  "Will do, sir.  We are working on gathering all countries

22  who are assisting.  Would you like to do a Qatar statement and

23  a more broad statement that includes all countries?"

24  Q.  What did you mean by:  We are working on gathering all

25  countries who are assisting?

 1   A.  Most of the staff was, we were trying to get details about

 2   all of the countries who were helping facilitate refugees or

 3   security arrangements or flights out of Afghanistan.

 4   Q.  Was this with respect to the statement thanking a broader

 5   set of countries?

 6   A.  Yes.

 7   Q.  How, if at all, did Mr. Menendez respond?

 8   A.  "Yes, both."

 9   Q.  What did you understand him to be saying?

10   A.  Yes, put out a statement specifically thanking Qatar, and a

11   more broad statement that includes all the countries who were

12   participating in the refugee efforts.

13   Q.  Two statements; one just Qatar?

14   A.  Yes.

15   Q.  One everyone?

16   A.  Yes.

17           MR. RICHENTHAL:  Can we go to the next exhibit now,

18   8F-23, please?

19   Q.  Starting with the bottom where it says "sir," do you see

20   that, Ms. Arkin?

21   A.  Yes.

22   Q.  What is this?

23   A.  An e-mail from Juan to the senator.

24   Q.  E-mail containing what?

25   A.  A draft statement thanking Qatar on its efforts to help

1   house Afghan refugees seeking refuge in the United States.

2   Q.  How did Senator Menendez respond to the draft statement?

3   A.  "OK."

4   Q.  What did Mr. Pachon say in return?

5   A.  "Going out shortly."

6   Q.  What did you understand "going out" to mean?

7   A.  It was going to be publicly released.

8   Q.  Was this statement the same day as Mr. Menendez requested

9   the statement go out thanking Qatar?

10  A.  Yes.

11  Q.  You testified a few minutes ago that you have been working

12  on a statement thanking other countries; is that right?

13  A.  I think from the e-mail chain I remember we were -- I mean

14  the whole team was in overdrive.  We were trying to get as much

15  information as we could about every countries' efforts in

16  support.

17  Q.  In aid of a statement thanking those countries?

18  A.  I think, yes, working on a statement is what the e-mail

19  implies, working on a statement to thank those countries or to

20  acknowledge them and put something out publicly.

21  Q.  Now, the statement with respect to Qatar went out; is that

22  correct?

23  A.  Yes.

24  Q.  And that was public?

25  A.  Yes.

O6O5men5                          Arkin - Direct

1   Q.  To your knowledge, did the statement thanking other

2   countries go out?

3   A.  I don't think on that day or in that same time frame, no.

4   Q.  Prior to testifying, did you have an opportunity to look at

5   the website to see whether a statement thanking other countries

6   went out?

7   A.  Yes.

8   Q.  Did it?

9   A.  No.

10  Q.  Do you know why?

11  A.  No.

12          MR. RICHENTHAL:  It might be a good time to break,

13  your Honor.

14          THE COURT:  All right, ladies and gentlemen.  Let's

15  take 15 minutes, please.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O6O5men5                        Arkin - Direct

1              (Jury not present)

2              THE COURT:  You may step down, Ms. Arkin.

3              (Witness not present)

4              THE COURT:  How much longer do you have,

5    Mr. Richenthal?

6              MR. RICHENTHAL:  I think probably 30 minutes but I'm

7    trying to move as fast as I can.  I would like to do it under

8    that.

9              THE COURT:  Do everything you can.  15 minutes.

10             (Recess)

11             THE COURT:  Get the witness on the stand.

12             30 minutes, Mr. Richenthal?

13             MR. RICHENTHAL:  Yes, your Honor.

14             (Witness present)

15             THE COURT:  Jury entering.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O6O5men5                           Arkin - Direct

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Please conclude your examination, sir.

4    BY MR. RICHENTHAL:

5    Q.  Welcome back, Ms. Arkin.  Are you familiar with the term

6    "congressional delegation"?

7    A.  Yes.

8    Q.  What is a congressional delegation?

9    A.  When members of Congress travel to a foreign country.

10   Q.  Is that sometimes known as a CODEL?

11   A.  Yes.

12   Q.  In your time working with members in Congress, have you

13   played any role in preparing for CODELs?

14   A.  Yes.

15   Q.  Was that something you did during your time with the SFRC

16   as well?

17   A.  Yes.

18   Q.  In general, what kinds of things did you do in helping to

19   prepare for CODELs?

20   A.  Depending on the CODEL, if it was CODEL to a region that I

21   covered; proposing an itinerary, working with the state

22   department on developing suggestions for meetings and

23   itineraries, liaising with our state department and our embassy

24   overseas on logistics, meetings, arrangements, priorities, and

25   then preparing briefing materials including bios of people with

1  whom a member would be meeting with, background memos, things

2  like that.

3  Q.  Directing your attention to fall 2021, what if any CODEL

4  did Mr. Menendez take?

5  A.  He took a CODEL to Egypt and Qatar.

6  Q.  Who decided that Egypt and Qatar would be the two countries

7  on this CODEL with Mr. Menendez?

8  A.  He did.

9  Q.  Prior to this time, prior to fall 2021, had you ever

10  recommended that Mr. Menendez take a CODEL to Egypt?

11  A.  Yes, I had.

12  Q.  Approximately how many times?

13  A.  It had been an ongoing recommendation for a couple of years

14  pre-COVID, certainly.

15  Q.  What was the basis for your ongoing recommendation?

16  A.  I had suggested that he make a trip to Israel and Egypt

17  given their respective bilateral relationship -- significant

18  bilateral relationships with the United States and the

19  importance of geopolitical and geographic location of both

20  countries.

21  Q.  Had you recommended that he go to Qatar?

22  A.  No.

23  Q.  Why not?

24  A.  It just wasn't at the top of the priority list.

25  Q.  What role, if any, did you have in planning a CODEL to

O6O5men5                        Arkin - Direct

1    Egypt and Qatar?

2    A.   Initially I took -- I had a leading role in planning the

3    CODEL because of a series of events.  Damian Murphy on our team

4    took over as the lead staffer for the CODEL.

5    Q.   At the time, what was Mr. Murphy's role in the Senate

6    Foreign Relations Committee?

7    A.   He had just become staff director.

8    Q.   Other than Mr. Murphy, who, if anyone, did you assist in

9    planning the CODEL?

10   A.   With Rob Kelly, with the Senator's input, and the U.S.

11   embassy -- the state department and the U.S. embassy in Cairo.

12   Q.   To whom did Mr. Murphy report at the time that he assisted

13   in the CODEL?

14   A.   Senator Menendez.

15   Q.   To whom did Mr. Kelly report at the time he assisted with

16   the CODEL?

17   A.   Senator Menendez.

18           MR. RICHENTHAL:  Ms. Wechsler, can you show on

19   Ms. Arkin's screen, the Court's screen and parties' screen,

20   what has been marked for identification 8F-22, please?

21   Q.   Ms. Arkin, do you recognize that document?

22   A.   Yes.

23   Q.   Without describing it in detail, what is it?

24   A.   Text messages between me and Damein.

25   Q.   Concerning what subject?

1    A.   The CODEL.

2    Q.   This is the CODEL in fall 2021?

3    A.   Yes.

4            MR. RICHENTHAL:   The government offers 8F-22.

5            THE COURT:   Admitted.

6            (Government's Exhibit 8F-22 received in evidence)

7            MR. RICHENTHAL:   Can we now put on everyone's screen,

8    including the jury, 8F-22, Ms. Wechsler?

9    BY MR. RICHENTHAL:

10   Q.   So, first, is this a photograph of text messages?

11   A.   Yes.

12   Q.   From whose phone?

13   A.   My phone.

14   Q.   Just to orient ourselves, on which side of the phone are

15   your texts?

16   A.   The right side.

17   Q.   And whose texts are on the left side of the phone?

18   A.   Damian's.

19   Q.   And by Damian do you mean Mr. Murphy?

20   A.   Yes.

21   Q.   Directing your attention to the top of the text chain, do

22   you see a date there, September 27, 2021?

23   A.   Yes.

24   Q.   The first message says:   Do we have dates set for the

25   CODEL?

1    A.  Yes.

2    Q.  What was being asked here?

3    A.  If we had set dates for the CODEL.

4    Q.  That is dates to travel to Egypt and Qatar?

5    A.  Yes.

6    Q.  How did you respond?

7    A.  "No, and it is stressing me out a bit.  State hasn't" -- I

8    think it is a typo, I think it should be -- "State hasn't seen

9    the notification come through.  I just called."

10   Q.  And by "state" did you mean the U.S. State Department?

11   A.  Yes.

12   Q.  What did you mean by notification?

13   A.  When we set up travels through the foreign relations

14   committee we go through our travel and protocol officer, it

15   goes through the state department's travel system, and they

16   send out notification to posts?

17           THE COURT:  When you say to a post, what do you mean?

18           THE WITNESS:  I'm sorry.  U.S. embassies abroad.

19   Embassies or consulates we refer to as posts.

20   Q.  Now, Mr. Murphy responds:  Roughly though, what are we

21   thinking?

22           To which you write:  9-17?

23   A.  October 9 through 17.

24   Q.  What are those dates?

25   A.  The dates of the proposed CODEL.

1    Q.  October 9 through October 17, 2021?

2    A.  Yes.

3    Q.  Continuing below do you see later the same day?

4    A.  Yes.

5    Q.  It says:  Egypt EMB contact Abdel Maguid.  And there

6    appears to be a phone number.

7        Do you see that?

8    A.  Yes.

9    Q.  What did you understand Mr. Murphy to be sharing with you

10   in that text message?

11   A.  Earlier in the day he had said that RM -- the senator had

12   given him the name of somebody at the Egypt embassy he wanted

13   me to be in touch with to plan the CODEL.

14   Q.  When you said he wanted you to be in touch with, who is the

15   "he" in that sentence?

16   A.  The senator wanted me to be in touch with to plan the

17   CODEL.

18   Q.  By Egyptian embassy, do you the embassy in Washington,

19   D.C.?

20   A.  Yes.

21   Q.  Do you recognize the area code 202?

22   A.  Yes.

23   Q.  What is that area code?

24   A.  Washington, D.C.

25   Q.  What, specifically, did you understand the request from

1    Senator Menendez to be with respect to this person and this

2    phone number?

3    A.   It was second-hand so I just understood that he wanted me

4    to be in touch with this person to plan the CODEL or to

5    coordinate on the CODEL.

6             THE COURT:  I take it you would need somebody on the

7    Egyptian side when planning the Congressional Delegation to

8    Egypt; right?

9             THE WITNESS:  Not necessarily.

10             THE COURT:  All right.

11   BY MR. RICHENTHAL:

12   Q.   Would you explain what you mean?

13   A.   The Senate Foreign Relations Committee plans our trips

14   through U.S. embassies and the U.S. posts and consulates

15   abroad.  We generally will let our contacts know at the foreign

16   embassy that we are coming but the embassy handles setting up

17   the meetings and meeting requests.  If we are running into

18   trouble getting a meeting or something then we will go back to

19   the embassy and see if they can help move things along, but the

20   planning goes through the state department.

21             THE COURT:  When you say the embassy, who are you

22   referring to?

23             THE WITNESS:  I'm sorry.  I said it a couple of times.

24   Which?  Our embassy, the U.S. embassy or consulate.

25             THE COURT:  So when planning, why don't you say in

1   your own words what you mean.

2              THE WITNESS:  So we will tell the state department

3   that the senator or a group of senators is planning a trip.

4   The state department will send a notification out to the

5   relevant U.S. embassy or U.S. consulate, and that embassy or

6   consulate will take the lead, they'll designate a person to be

7   the control officer for the trip and that person will be the

8   primary point person for setting up meetings, making hotel

9   arrangements travel arrangements, restaurants.  And if we, in

10  all of this planning, are running into not getting meetings or

11  questions or logistics, we will certainly be in touch with the

12  foreign government embassy in the United States but they're not

13  responsible for planning the trip.

14             THE COURT:  Thank you.

15  BY MR. RICHENTHAL:

16  Q.  Ms. Arkin, do you see that your response to Mr. Murphy's

17  message was "hm"?

18  A.  Yes.

19  Q.  Is the answer you just gave to the judge why you went "hm"?

20  A.  In part, yes; and also, I didn't know who it was.

21  Q.  So let's take them one at a time.  So putting aside if you

22  knew who this was, why did you respond to "hm" to Mr. Murphy's

23  request that you connect with this person at the Egyptian

24  embassy?

25  A.  Mostly because of what I just described.  We would go

O6O5men5                        Arkin - Direct

1    through our U.S. embassy to plan the trip and I also didn't

2    know who this person was so didn't know why this would be the

3    person who I should be reaching out to.

4    Q.  Ms. Wechsler, can we please scroll down?

5         Now, I have been asking you about the message on

6    September 27, 2021.

7    A.  Yes.

8    Q.  The rest of the chain continues on September 28.  Do you

9    see that?

10   A.  Yes.

11   Q.  Before we get to that, what if anything did you do after

12   Mr. Murphy provided this name and phone number to you?

13   A.  I reached out to my main point of contact at the embassy to

14   ask who -- what I read is a first and last name Abdel Maguid.

15   Q.  When you say your contact at the embassy, you mean the

16   Egyptian embassy?

17   A.  Yes.

18   Q.  Was this one of the Congressional liaison folks you

19   mentioned before the break?

20   A.  Yes.

21   Q.  What, if anything, did they tell you?

22   A.  They didn't know who Abdel Maguid was.

23   Q.  Just to be clear, Ms. Arkin, you understood this name to be

24   first name Abdel?

25   A.  Right.  Or Abdel.

O6O5men5                          Arkin - Direct

1   Q.  First name Abdel?

2   A.  Yes.

3   Q.  And last name?

4   A.  Maguid.

5   Q.  Now, at the time you received this text message why, if at

6   all, did you think this referred to Mai Abdelmaguid?

7   A.  She wasn't somebody I engaged with regularly.  It just

8   didn't occur to me.

9   Q.  In your time at the SFRC working on CODELs, how many times,

10  if at all, were you asked to help arrange one directly with a

11  foreign embassy?

12  A.  No other times.

13  Q.  Now, I think you said this in response to the judge's

14  question, I think you used the word "control officer"?

15  A.  Yes.

16  Q.  Can you explain what a control officer is?

17  A.  It is the person -- the ambassador or consul general will

18  assign a U.S. diplomat to be the point person in charge of

19  setting up the CODEL.

20  Q.  In your experience the point person, this control officer,

21  where is that person physically typically located?

22  A.  In the country where the members are traveling.

23  Q.  Just to use this as an example, with respect to the trip to

24  Egypt and Qatar, where would the control officer offices be

25  located?

O6O5men5                      Arkin - Direct

1   A.   In Doha and Cairo.

2   Q.   You used the word Doha.  For anyone who doesn't know, what

3   is Doha?

4   A.   The capital of Qatar.

5   Q.   And what is Cairo?

6   A.   Capital of Egypt.

7   Q.   When you say the person located in Doha or Cairo, was this

8   a U.S. official or foreign official?

9   A.   U.S. diplomat.

10  Q.   With what part of the United States government.

11  A.   The State Department.

12  Q.   Now, with respect to this CODE1 that is Egypt and Qatar,

13  did the state department in fact assign a control officer?

14  A.   Yes.

15  Q.   We can go back to the text message for a moment.  I see you

16  wrote:  So my guy at the embassy isn't aware of anyone with

17  that name but is going to try to run it down.

18       Do you see that?

19  A.   Yes.

20  Q.   What did you mean by that?

21  A.   He wasn't aware of anybody by that name but said he would

22  try to figure out who it was.

23            THE COURT:  What name?

24  A.   Abdel Maguid.

25  Q.   Do you see the rest of the exchange here beginning:  Also

O6O5men5                          Arkin - Direct

1   pushed for a meeting with Sisi?

2   A.  Yes.

3   Q.  First for a moment, who is Sisi?

4   A.  President Sisi.

5   Q.  That's the El Sisi you mentioned I think earlier this

6   afternoon?

7   A.  Yes.

8   Q.  And you see the rest of the exchange.  I punted.  That's

9   weird.  So on and so forth?

10  A.  Yes.

11  Q.  Can you summarize what is going on in this part of the

12  exchange with Mr. Murphy?

13  A.  So my contact at the embassy, knowing that the senator was

14  going, like I said, we let the embassy know that he was going

15  to be traveling.  The Egyptian government, the embassy was

16  pushing for him to have a meeting with President Sisi.  I had

17  sent the senator a possible itinerary, a possible meeting he

18  could have in Egypt including a meeting with Sisi.  I hadn't

19  heard back from him yet on what meetings he wanted to do and

20  didn't want to do so I punted and I think I just said something

21  like, oh, we are still working out the itinerary, duly noted.

22  And I think "I'm that's weird" should probably be "um, that's

23  weird" probably at the embassy.  It is not that big.  We trying

24  to figure out who it is she has a 202 number --

25          THE COURT:  Slower, please.  The interpreters need

1   time.

2           THE WITNESS:  We were trying to figure out who the

3   person was.  I didn't want to call the person until I could

4   actually figure out who it was and identify the person and why

5   that person, in particular, would be the one that the senator

6   wanted me to reach out to.  And then that's the rest of the

7   text messages.

8   Q.  Just to go back for a moment.  I think you said somethin

9   like they were pushing for a meeting with Sisi?

10  A.  Yes.

11  Q.  Who is the "they" in that sentence Ms. Arkin?

12  A.  My point of contact at the Egyptian embassy really wanted

13  the senator to have a meeting with President Sisi.

14  Q.  Why did you "punt" on that request?

15  A.  Because I was waiting for the senator to give me guidance

16  on what meetings he did want to have.  I had offered a meeting

17  with President Sisi as one option, laid out reasons to do it or

18  not to do it, and I was waiting for his guidance.

19          THE COURT:  You had offered the senator?

20          THE WITNESS:  Yes.

21          THE COURT:  All right.

22  BY MR. RICHENTHAL:

23  Q.  Now, just pause on the messages for a second.  Were you

24  planning to attend this CODEL?

25  A.  Initially I was planning to attend the CODEL.  Somewhere in

O6O5men5                    Arkin - Direct

1    the planning process I had a medical issue, I had to have a

2    medical procedure so I told the senator I needed to have the

3    medical procedure and that I wasn't going to be able to go on

4    the trip.  He said fine.  But then, the way the dates were

5    shaking out, I was planning to skip the Qatar portion which was

6    in the beginning and then join for the Egypt portion but then I

7    didn't end up going.

8    Q.  You did not end up going?

9    A.  I did not end up going.

10   Q.  How did it come about that you did not end up going?

11   A.  Damian called me one night and said that he had just heard

12   from the senator, the senator was very upset because the

13   senator had heard that I told the embassy that under no

14   circumstances would he meet with President Sisi and this had

15   very much upset the government and it was a big kerfuffle and

16   he didn't want me to go on the trip anymore.

17            THE COURT:  What embassy?

18            THE WITNESS:  I'm sorry.  He heard from the Egyptian

19   embassy that I had told -- that I had said under no

20   circumstances would he, the senator, meet with President Sisi.

21   This had very much upset the Egyptians, they were upset, and

22   the senator was subsequently upset and didn't want me to come

23   on the trip.

24   BY MR. RICHENTHAL:

25   Q.  Just to be clear, this is Mr. Murphy conveying to you what

1    Senator Menendez said to him?

2    A.  Yes.

3    Q.  Now, the statement that you had allegedly said didn't want

4    the Senator meeting with El Sisi.  Was that true?

5    A.  No.

6    Q.  We can go back to the text message for a moment and if we

7    can scroll down?  Let's pause there.  You see it says:  OK we

8    have a control officer?

9    A.  Yes.

10   Q.  Is that the control officer you testified about a few

11   minutes ago?

12   A.  Yes.

13   Q.  Let's keep going.  And keep going?  Stop there actually

14   scroll up just for the date on that, that part.  This is

15   Friday, October 1, 7:59 p.m.?

16   A.  Yes.

17   Q.  Do you see that, Ms. Arkin?

18   A.  Yes.

19   Q.  Do you see that Mr. Murphy wrote:  I wasn't able to get him

20   but sent a text?

21   A.  Yes.

22   Q.  Who did you understand "him" to be?

23   A.  Senator Menendez.

24   Q.  And what did you understand Mr. Murphy to be saying to you?

25   A.  I talked to Damian.  I explained that this didn't make any

1  sense and I wanted to figure out where it came from and if he

2  could call the senator back.  Damian said that he didn't get

3  him but did send him a text message.

4  Q.  Do you see where you wrote:  I mean, it just doesn't even

5  make sense.

6  A.  Yes.

7  Q.  What is the "it" in that message, Ms. Arkin?

8  A.  That I would have told somebody at the Egyptian embassy

9  that the senator wouldn't meet with Sisi, or that somebody from

10 the Egyptian embassy would have been talking to Senator

11 Menendez about the trip.  It just didn't make sense.

12 Q.  How did Mr. Murphy respond?

13 A.  "Agreed."

14 Q.  And what did you write back?

15 A.  "I was 1, specifically waiting for guidance, or I was

16 waiting for guidance specifically on this; and 2, I'm not an

17 idiot, so even if it were true, I obviously wouldn't have

18 phrased anything that way."

19 Q.  Let's take those one at a time.

20      So first, 1, waiting for guidance specifically on this.

21 What did that refer to?

22 A.  Whether or not he would do a meeting with President Sisi.

23 Q.  And 2, I'm not an idiot so even if it were true, I

24 obviously wouldn't have phrased anything that way.

25      What were you saying to Mr. Murphy?

1  A.  If the senator had decided not to meet with President Sisi

2  I would not have said something like, under no circumstances

3  will the senator not meet with the president of a country

4  that's an important strategic partner for the United States.

5  Q.  If that had been true, what would you have said?

6  A.  I would have been a bit more diplomatic in my approach.

7  Q.  Why?

8  A.  Because Egypt is an important strategic partner for the

9  United States.

10  Q.  Can we go down on the text messages?

11      How did Mr. Murphy respond to your two points?

12  A.  "I know.  I said as much."

13          MR. RICHENTHAL:  Let's go down one further if we

14  could, Ms. Wechsler?  Let's stop there.

15  Q.  Do you see Mr. Murphy's first message on the next page,

16  Ms. Arkin?

17  A.  Yes.

18  Q.  Would you read it, please?

19  A.  "All of this Egypt stuff is very weird.  I've never seen

20  anything like it.  Let's see if I can talk to him about it

21  again over the weekend and get him to a better place."

22  Q.  What did you understand Mr. Murphy to be saying?

23  A.  It was just another series of -- it was weird.  It was

24  weird, like why he had asked us to reach out to somebody we

25  didn't know at the Egyptian embassy, that he was hearing from

O6O5men5                          Arkin - Direct

1   Egyptian officials of making up lies about staff.  It was

2   weird.

3   Q.  I think you just used the word "series."

4   A.  Yes.

5   Q.  What did you mean by series?

6   A.  There was the fact that he had wanted us to reach out to

7   somebody at the Egyptian embassy that I didn't know, that we

8   didn't know.  Nadine had also had a lot of opinions about what

9   she wanted to do on the trip, mostly tourist things and

10  vacation things but was very involved in the planning or trying

11  to be involved in the planning.  It was -- it was weird.

12  Q.  Now, prior to this date, October 1 of 2021, had

13  Mr. Menendez ever expressed any concern to you about your job

14  performance?

15  A.  No.

16  Q.  Prior to this date that is October 1, 2021, had Mr. Murphy

17  ever conveyed to you that Mr. Menendez was upset with your job

18  performance?

19  A.  No.

20          MR. WEITZMAN:  Objection.

21          THE COURT:  She's already answered.

22  Q.  Prior to this date, that is October 1, 2021, had Mr. Kelly

23  ever conveyed to you that Mr. Menendez was upset with your job

24  performance?

25  A.  No.

1      MR. WEITZMAN:  Objection.

2      THE COURT:  I will allow it.

3  Q.  What, if anything, did you do with respect to Mr. Menendez

4  after this text exchange with Mr. Murphy on October 1, 2021?

5  A.  Well, as you can see, I sat and stewed a little bit about

6  it and then I think early the next week I went and talked to

7  him about it.

8      THE COURT:  Who is him?

9      THE WITNESS:  I'm sorry.  Went and talked to the

10 senator about it.

11 Q.  And did you in fact talk to the senator about it?

12 A.  Yes.

13 Q.  Where?

14 A.  In his office.

15 Q.  That s the Senate office?

16 A.  Yes.

17 Q.  What did you say to him and what did he say to you?

18 A.  I said I understand that you have heard that I said this,

19 that you would under no circumstances meet with President Sisi.

20 I'm not sure where you heard that or why but that is absolutely

21 not true.  If you will recall, you have I think an e-mail or a

22 memo from me specifically asking whether or not you want to

23 have this meeting and I was waiting to hear back from you.  And

24 he said, well, two people at the embassy, including the

25 ambassador, said that you said this.  And I said I don't even

O6O5men5                          Arkin - Direct

1    talk to the ambassador so I don't know why you heard this.  If

2    you don't want me to go on the trip, that's fine, I won't go on

3    the trip, but I need you to understand that this is not true.

4    Someone is lying to you, it is not me, and I need to know that

5    you have confidence in me doing my job going forward and he

6    said absolutely.  Of course.  And I left.

7    Q.  Had you in fact told anyone at the Egyptian embassy that

8    Senator Menendez would not meet with President el-Sisi?

9    A.  No.

10   Q.  Had you told anyone at the SFRC that Senator Menendez would

11   not meet with President El Sisi?

12   A.  No.

13   Q.  Did you go on the trip after this conversation?

14   A.  No.

15   Q.  In your time working with Senator Menendez prior to this

16   trip, how many CODELs have you been involved in planning that

17   you did not actually attend?

18   A.  There was one other one.

19   Q.  Which one?

20   A.  When I first started with him he was taking a trip to

21   Cyprus that was already in train and I came on halfway through

22   the planning process and the chief of staff was already

23   planning on going so I didn't go.

24            THE COURT:  How many CODELs did you help plan?

25            THE WITNESS:  That was the one in my space that I

1    helped plan and then there are others -- there are others that

2    I planned that involved meetings with other officials in my

3    region.  But it would be standard for me to go on the CODEL to

4    the trip to my region although I had skipped it previously for

5    a medical issue.

6    BY MR. RICHENTHAL:

7    Q.  Other than the trip that you said was halfway planned

8    already --

9    A.  Yes.

10   Q.  -- how many CODELs were you involved in that you planned to

11   go on and did not end up going?

12   A.  No others.

13   Q.  Just this one?

14   A.  Just this one.

15   Q.  To go back a moment, in this text exchange you talked about

16   a portion referred to be Abdel Maguid.  Do you recall that?

17   A.  Yes.

18   Q.  I asked you whether you thought at the time might be

19   Ms. Abdel Maguid.  Do you recall that?

20   A.  Yes.

21   Q.  In your conversation with Senator Menendez about this

22   CODEL, did he ever tell you whether he had spoken with Mai

23   Abdelmaguid about the CODEL?

24   A.  Not to my recollection.

25            MR. RICHENTHAL:  Ms. Wechsler, if we can go back to

O6O5men5                         Arkin - Direct

1   page 1, B213-6, and Ms. Wechsler could you zoom in on the

2   middle message, please?

3   Q.  Ms. Arkin, can you see on the left the message that I have

4   been asking you questions about and you see a different message

5   on the right?

6   A.  Yes.

7   Q.  Are you on the message on the right that is part of this

8   conversation?

9   A.  No.

10  Q.  Do you see the message on the right appears to be from Mai

11  Abdelmaguid to Nadine Menendez?

12  A.  Yes.

13  Q.  Do you see it appears to be September 29, 2021?

14  A.  Yes.

15  Q.  That is during the back and forth that you have been

16  talking about.  Do you see that?

17  A.  Yes.

18  Q.  What is the phone number next to the name Mai Abdelmaguid?

19  A.  202-215-7290.

20  Q.  How does that compare to the phone number you were given

21  two days prior for Abdel Maguid?

22  A.  It's the same.

23         MR. RICHENTHAL:  No further questions.

24         THE COURT:  Mr. Weitzman, any questions of this

25  witness, sir?

O6O5men5                         Arkin - Cross

1          MR. WEITZMAN:  Yes, your Honor.  Just one moment.

2          THE COURT:  Of course.

3    CROSS-EXAMINATION

4    BY MR. WEITZMAN:

5    Q.  Good afternoon, Ms. Arkin.

6    A.  Hi.

7    Q.  You are generally familiar with the role of the SFRC;

8    correct?

9    A.  Yes.

10   Q.  And the role of the SFRC is embodied in a document as well;

11   correct?

12   A.  Yes.

13   Q.  There is a jurisdictional document that describes what the

14   SFRC jurisdiction is; right?

15   A.  Yes.

16          MR. WEITZMAN:  Can we put up Defendant's Exhibit 552

17   for the witness and the parties only, and the Court.

18   Q.  Do you is recognize this document?

19   A.  Yes.

20          MR. WEITZMAN:  And if we can go to the next page?  And

21   the next page after that?

22   Q.  Do you recognize this to be the jurisdiction of the

23   Committee on Foreign Relations, United States Senate, and on

24   page 1 it is dated March 2021?

25   A.  Yes.

1          MR. WEITZMAN:  We offer Defendant's Exhibit 552.

2          MR. RICHENTHAL:  One quick voir dire question, your

3  Honor?

4          THE COURT:  Yes.

5          MR. RICHENTHAL:  Or two.  Excuse me.

6  VOIR DIRE EXAMINATION

7  BY MR. RICHENTHAL:

8  Q.  Ms. Arkin, are you a lawyer?

9  A.  No.

10 Q.  When you use the word "jurisdiction" do you mean it in

11 legal sense?

12 A.  No, I mean it in the Senate sense of what comes through the

13 Senate Foreign Relations Committee.

14         MR. RICHENTHAL:  No objection.

15         THE COURT:  What was that, sir?

16         MR. RICHENTHAL:  No objection.

17         THE COURT:  Admitted without objection.

18         (Defendant's Exhibit 552 received in evidence)

19         MR. WEITZMAN:  If we can publish that?

20 BY MR. WEITZMAN:

21 Q.  This is the March 2021 document titled Membership and

22 Jurisdiction of Subcommittees, Committee on Foreign Relations

23 United States Senate; correct?

24 A.  Yes.

25 Q.  That's the reference to the SFRC, correct?

O6O5men5                          Arkin - Cross

1   A.  Yes.

2   Q.  And if we can go to the next page and this was in effect

3   when Senator Menendez was the chairman of the SFRC; correct?

4   A.  Yes.

5   Q.  And if we can go to the next page after that, if you look

6   at the top of the document it says:  In accordance with Senate

7   rule, the jurisdiction of the committee shall extend to all

8   proposed legislation, messages, petitions, memorials and other

9   matters relating to the following subjects.  If I may highlight

10  a few of them?  No. 3 is diplomatic service; right?

11  A.  Yes.

12  Q.  No. 4 is foreign economic, military, technical, and

13  humanitarian assistance; right?

14  A.  Yes.

15  Q.  No. 8 says international conferences and congresses?

16  A.  Yes.

17  Q.  And no. 12 says measures to foster commercial intercourse

18  with foreign nations and to safeguard American business

19  interests abroad;  Right?

20  A.  Yes.

21  Q.  No. 16 says:  Relations of the United States with foreign

22  nations generally; right?

23  A.  Yes.

24  Q.  It's a pretty expansive jurisdiction of the SFRC with

25  respect to the role of the United States with foreign nations;

O6O5men5                         Arkin - Cross

1    right?

2    A.   Yes.

3    Q.   But the SFRC isn't boundless or unlimited jurisdiction;

4    right?

5    A.   It is not.

6    Q.   The SFRC, for example, doesn't have jurisdiction over the

7    vetting of judicial nominees; right?

8    A.   No.

9    Q.   Or the approval of judicial nominees; right?

10   A.   No.

11   Q.   And it doesn't oversee, for example, agriculture or the

12   Farm Bill; correct?

13   A.   There are parts of I believe the Farm Bill and agriculture

14   that actually do because there is U.S. Department of

15   Agriculture Foreign Service and pieces of U.S. aid that I think

16   actually do fall under the Farm Bill.  But in general, no.

17   Q.   So portions of the Farm Bill may --

18   A.   I think.

19   Q.   -- come through for comment by the SFRC but otherwise the

20   Farm Bill is before the Agriculture Department; correct?

21   A.   Yes.

22   Q.   And the Senate Agriculture Committee; right?

23   A.   I'm not an expert but I just technically do think there are

24   pieces of that particular --

25   Q.   Yes --

O6O5men5                         Arkin - Cross

1          THE COURT:  Wait.  I'm sorry.  You are talking over

2    each other.  You are not an expert.

3    A.  I'm --

4          THE COURT:  Just a moment -- but you do think there

5    are pieces of that?

6          THE WITNESS:  I'm not an expert on the Farm Bill or

7    the agriculture committee but there are pieces, I believe, of

8    other pieces of legislation in that that fall under specific

9    programs through U.S. AID and the Treasury Department, for

10   example.

11   BY MR. WEITZMAN:

12   Q.  So to the extent there is something that's relevant to

13   foreign commerce with foreign nations, that may have some

14   involvement of SFRC, but the Farm Bill, as a whole, goes to the

15   agriculture committee; correct?

16         MR. RICHENTHAL:  Asked and answered and misstates.

17         THE COURT:  Sustained.

18   Q.  You would agree with me that as part of its jurisdiction,

19   the Senate can pursue its own foreign policy agenda; right?

20   A.  Yes.

21   Q.  And that agenda need not coincide with the agenda of the

22   Executive Branch; right?

23   A.  Correct.

24   Q.  By Executive Branch you understand I am referring to the

25   president of the United States; right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6O5men5                          Arkin - Cross

1    A.  Yes.

2              THE COURT:  And the State Department.

3              MR. WEITZMAN:  And state department.  Just getting

4    there.  Thank you, your Honor.

5    Q.  It is a form of diplomacy that the Senate, SFRC and

6    senators on the SFRC, can engage in; right?

7              MR. RICHENTHAL:  Objection.  Vague.

8              THE COURT:  I will allow it.

9              THE WITNESS:  Yes.

10   Q.  And in fact members of Congress, especially those who are

11   on the SFRC, often engage in diplomatic efforts on behalf of

12   the United States; right?

13   A.  Yes.

14   Q.  They meet and form relationships with foreign officials?

15   A.  Yes, although not necessarily on behalf of the United

16   States.  They're doing it on behalf of themselves as senators

17   or on behalf of the committees which they're representing, or

18   efforts, but they're not -- they are not members of the

19   Executive Branch so they're not necessarily undertaking these

20   efforts on behalf of the United States, per se.

21   Q.  Fair enough.  They advocate for particular policy

22   objectives.  They, as in congressmen on the SFRC and its house

23   counterpart?

24   A.  What do you mean, specifically?

25   Q.  So let me rephrase that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6O5men5                          Arkin - Cross

 1          A senator, like Senator Menendez, can have his own policy

 2     objectives separate -- foreign policy objectives separate and

 3     apart from the policy objectives of the Executive Branch;

 4     right?

 5     A.   Yes.

 6     Q.   And so, for example, it could be that a republican senator,

 7     meeting with a foreign official, might express different views

 8     from a democratic secretary of state or vice versa, right?

 9     A.   Yes.

10     Q.   But sometimes members of Congress can advocate in ways that

11     are consistent with the goals of the Executive Branch as well;

12     right?

13     A.   Yes.

14     Q.   All of this, the policy objectives, the ways, the tactics

15     that senators implement their policy objectives, that's part

16     and parcel of doing one's job on the SFRC; correct?

17               MR. RICHENTHAL:   Objection.

18               THE COURT:   Sustained as to form.

19     Q.   The tactics a senator uses to advance his or her policy

20     objectives on the SFRC, that's part of doing one's job pursuing

21     policy objectives; correct?

22               MR. RICHENTHAL:   Same objection.

23               THE COURT:   Be more specific.   Tighten it up.

24     Q.   A senator on the SFRC can advocate for a particular policy

25     objective; correct?

O6O5men5                          Arkin - Cross

1   A.  Yes.

2   Q.  And in choosing to advocate for the policy objective, they

3   can choose the tactics they use to advance that objective?  Do

4   you understand that?

5   A.  Yes.

6   Q.  Sometimes the tactics might involve being hard-nosed or

7   aggressive with a foreign counterpart; right?

8   A.  Yes.

9   Q.  And sometimes it might be being more polite, accommodating,

10  or using persuasion; correct?

11  A.  Depends on the context and the country and the senator.

12  Q.  Fair to say that every senator or various senators have

13  different ways of advancing their policy objective; right?

14  A.  Yeah.  Again, it depends -- yes depends on the senator,

15  depends on the issue.

16  Q.  The current chairman of the Senate Foreign Relations

17  Committee doesn't employ the same tactics that Senator Menendez

18  necessarily employed with respect to each country's policy,

19  their policy objectives with respect to each country; correct?

20          MR. RICHENTHAL:  Objection.  Multiple grounds.

21          THE COURT:  Sustained.

22  Q.  Who is the current chairman of the Senate Foreign Relations

23  Committee?

24          MR. RICHENTHAL:  Objection.

25          THE COURT:  I will allow it.

O6O5men5                          Arkin - Cross

1    A.  Ben Cardin.

2    Q.  And does Ben Cardin use the same tactics that you came to

3    learn Senator Menendez used with respect to, for example, Cuba?

4              MR. RICHENTHAL:  Objection; vague, relevance, 403.

5              THE COURT:  Different senators approach the same

6    problem in different ways; correct?

7              THE WITNESS:  Yes.

8              MR. WEITZMAN:  Thank you, your Honor.  Better way of

9    asking it.

10   BY MR. WEITZMAN:

11   Q.  Now, you testified about Senator Menendez and his positions

12   with respect to Egypt in direct examination.  Do you recall

13   that?

14   A.  Yes.

15   Q.  And you have interacted with Senator Menendez regarding

16   Egypt for many years while you were working with him; correct?

17   A.  Yes.

18   Q.  Starting in what year did you start discussing Senator

19   Menendez' positions with respect to Egypt?

20   A.  I don't specifically remember, but I started working for

21   him in 2016.

22   Q.  Between 2016 and 2018, for example, would you agree with me

23   that Senator Menendez was a staunch critic of Egypt's human

24   rights record?

25   A.  Yes.

1   Q.  And would you agree with me that Senator Menendez remained

2   a critic of Egypt's human rights record after 2018 through

3   2023?

4           MR. RICHENTHAL:  Objection.  Vague.  Two questions

5   compared together, different verbiage.

6   Q.  Do you agree with me that he was a critic of Egypt after

7   2018?

8           THE COURT:  In regard to human rights?

9   Q.  With respect to human rights.

10  A.  Well, what do you mean critic specifically?

11  Q.  Well, let me ask you, did Senator Menendez raise the issue

12  of Egyptian human rights after 2018 in his discussions with

13  you?

14  A.  Yes.  We had conversations about Egypt that involved

15  concerns about human rights.

16  Q.  He continued to have issues with Egypt's human rights

17  record for years after 2018; correct?

18          MR. RICHENTHAL:  Objection, vague.  Asking the witness

19  to opine.

20          THE COURT:  I will allow it.  I will allow it.

21  A.  Yes, he did continue to raise concerns about Egyptian human

22  rights with Egyptian officials.

23  Q.  Is it fair to say that in his discussions with you about

24  Egypt, he consistently raised issues and concerns he had about

25  Egypt's approach to human rights?

1  A.  I don't know.  I don't recall having detailed conversations

2  on that.  I mean, it came up, yes, but I know that he raised

3  them or I raised them.  I don't know.

4  Q.  In 2019, 2020, 2021 you had conversations with Senator

5  Menendez in which he raised concerns about Egypt's human rights

6  record; isn't that correct?

7  A.  We had conversations but I put information into memos.  I

8  don't remember extensive conversations about Egypt's human

9  rights records.

10  Q.  Let's put up Government Exhibit 8F-35 which is in evidence.

11     This was a letter you testified about, correct?

12  A.  Yes.

13  Q.  Now in this letter, which you recall Senator Menendez

14  signed?

15  A.  Yes.

16  Q.  The letter starts:  The United States and Egypt have shared

17  a strategic partnership for more than four decades; right?

18  A.  Yes.

19  Q.  As you prepare for Egyptian President Abdel Fattah

20  El Sisi's trip this month, it is critical to stress that our

21  partnerships are stronger and more sustainable when rooted in

22  shared values, including democratic governance, political and

23  economic freedom, and fundamental human rights for all

24  citizens.  We are writing to encourage you to discuss three

25  pressing --

1          THE COURT:  To address.  You just misspoke.

2   Q.  To address three pressing issues -- correct, sorry, thank

3   you -- concerning developments with President Sisi.

4          Then, if you can scroll down there are three issues raised

5   in this letter.  The first is the unjust attention of at least

6   a dozen Americans; correct?

7   A.  Yes.

8   Q.  The second is a concern about Egypt's reported purchase of

9   20 Russian Sukhoi SU-35s correct?

10  A.  Yes.

11  Q.  What is a Sukhoi  SU-35?

12  A.  It is a fighter aircraft.

13  Q.  And was this an important issue for Congressmen, that Egypt

14  was purchasing this -- was this an important issue in this

15  letter, that Egypt was purchasing this from Russia?

16          MR. RICHENTHAL:  The objection is he asking her to

17  opine on what unnamed congressmen thought.

18          THE COURT:  Oh.

19          MR. WEITZMAN:  I will rephrase.

20  BY MR. WEITZMAN:

21  Q.  Did you have an opinion as to whether this purchase of 20

22  Russian Sukhois by Egypt was good for American relations with

23  Egypt or bad?

24  A.  Do I have an opinion?

25  Q.  Yes.

O6O5men5                          Arkin - Cross

1   A.  It was bad.

2   Q.  Why is it bad?

3   A.  We would like Egypt to be purchasing American weapons.

4   Q.  Was there anything in particular about purchasing them from

5   Russia that was of concern?

6   A.  Yes.  Congress had recently passed -- or actually I lost

7   track of the years but Congress had passed a law called @cats

8   accounting -- I can't remember the acronym right now, but

9   regardless it would have put punitive restrictions on countries

10  that purchased large amounts of -- that purchased big systems

11  from Russia, big military systems from Russia.

12  Q.  And is it fair to say --

13  A.  Countering America's Adversaries Through Sanctions Act.

14  That is what it stands for.

15  Q.  Is it it fair to say that the United States would also

16  prefer that Egypt not develop stronger diplomatic relations

17  with Russia given the role of the United States and Russia at

18  the time?

19  A.  Yes.

20  Q.  By the way, that CAATSA language, that was something that

21  Senator Menendez -- let me withdraw that for the moment.

22      Third, it says we have serious concerns about the erosion

23  of political and human rights; correct?

24  A.  Yes.

25  Q.  And then it continues to outline some of those concerns?

1   A.  Yes.

2   Q.  Then we can go to the next page.  And then it continues and

3   talks about how there is bipartisan support in Congress for

4   security partnership with Egypt, and furthermore, the Egyptian

5   government should be commended it for its adherence to the

6   peace treaty with Israel, its role in broken cease fires

7   between and Israel and Hamas, and its provision of military

8   privileges to the United States, as well as its commitment to

9   economic and regional energy reforms that are vital to Egypt's

10  long-term economic health.  Correct?

11  A.  Yes.

12  Q.  Now this was sent to Secretary of State Mike Pompeo in

13  advance of President el-Sisi's arrival in the United States;

14  right?

15  A.  Yes.

16  Q.  And that arrival was in April 2019; right?

17  A.  Yes.

18  Q.  And President El Sisi met with President Trump and

19  Secretary Mike Pompeo; right?

20  A.  Yes.

21  Q.  President El Sisi did not meet with Senator Menendez in

22  April 2019; correct?

23  A.  No.

24  Q.  You helped draft this letter; right?

25  A.  I believe so, yes, with other offices.

O6O5men5                           Arkin - Cross

1          MR. WEITZMAN:  Can we put up Defendant's Exhibit 486

2     for identification and if we can zoom in on the photo and the

3     caption underneath it?  Actually you can zoom out.

4     Q.  Do you recognize this as U.S. embassy and Egypt news

5     release regarding President Trump's meeting with President

6     El Sisi?

7     A.  Yes.

8          MR. WEITZMAN:  We offer Defendant's Exhibit 486, not

9     for the truth of the matter asserted.

10         MR. RICHENTHAL:  401 and 403.

11         THE COURT:  Let me see it?  Blow it up.

12         THE COURT:  Sustained.

13         MR. WEITZMAN:  If we can zoom in on the photo?

14         MR. WEITZMAN:  Your Honor, we offer Defendant's

15    Exhibit 486A as just the image that is on the screen.

16         MR. RICHENTHAL:  Same objection.  The witness has said

17    this occurred.  The photo is not necessary.

18         THE COURT:  I will allow it.  We get to see a picture

19    of the president and -- two presidents.

20         (Defendant's Exhibit 486A received in evidence)

21         MR. WEITZMAN:  Can we publish that?

22         THE COURT:  Yes.

23    BY MR. WEITZMAN:

24    Q.  Ms. Arkin, do you recognize this to be a photo of the

25    meeting or a meeting between President Trump and President

O6O5men5                         Arkin - Cross

1    El Sisi?

2    A.  Yes.

3    Q.  Again, Senator Menendez didn't meet with El Sisi during

4    this meeting in the United States?

5            MR. RICHENTHAL:  Objection.

6            THE COURT:  Sustained.  You have already established

7    that.  Let's move.

8            MR. WEITZMAN:  Yes, your Honor.

9    BY MR. WEITZMAN:

10   Q.  In addition, there were meetings between Mike Pompeo and

11   El Sisi; correct?

12   A.  I believe so.

13           MR. WEITZMAN:  Can we put up Government Exhibit 484

14   just for the witness?  And if we can zoom in on the photo?

15   Q.  Do you recognize this as a picture that depicts Mike Pompeo

16   and President El Sisi?

17   A.  Yes.

18           MR. WEITZMAN:  We offer Defendant's Exhibit 484A?

19           MR. RICHENTHAL:  Same objection, plus lack of notice.

20           THE COURT:  I will sustain it at this point.  You have

21   the other one in.  Clearly non-impeachment.

22           MR. WEITZMAN:  Your Honor, we gave this to the

23   government but never mind.

24           THE COURT:  Let's move on.

25           MR. RICHENTHAL:  We can cover that in a break, your

O6O5men5                          Arkin - Cross

1   Honor.

2           THE COURT:  Move on.

3   BY MR. WEITZMAN:

4   Q.  Fair to say that the letter that is Government Exhibit

5   8F-35, if we can put that up on the screen, does describe,

6   quote unquote, in the third paragraph, serious concerns about

7   the erosion of political and human rights in Egypt?

8   A.  Yes.

9   Q.  Now, this isn't the only time that Senator Menendez wrote a

10  letter about the erosion of political and human rights in

11  Egypt; right?

12  A.  The only time that he wrote a letter about it?

13  Q.  Or issued press release about it.

14          MR. RICHENTHAL:  Time frame.

15          THE COURT:  He asked any time.

16          THE WITNESS:  No, it is not the only time.

17          MR. WEITZMAN:  Can we put up Defendant's Exhibit 434

18  just for the witness?  And if you can zoom in on the top?

19  BY MR. WEITZMAN:

20  Q.  Do you recognize this as a March 7, 2018 press release from

21  Senator Menendez and others?

22  A.  Yes.

23          MR. WEITZMAN:  We offer Defendant's Exhibit 434.

24          MR. RICHENTHAL:  No objection, with the appropriate

25  limiting instruction.

O6O5men5                          Arkin - Cross

1          THE COURT:  Admitted, and it is not for the truth of

2    the matter asserted, simply for the fact that it was said.

3          (Defendant's Exhibit 434 received in evidence)

4          MR. WEITZMAN:  May we publish that?

5          THE COURT:  Yes.

6    BY MR. WEITZMAN:

7    Q.  This is a March 7, 2018 press release titled Menendez,

8    Booker bipartisan colleagues urge Secretary Tillerson to

9    reaffirm U.S. commitment to democracy, human rights in Egypt.

10   And it reads:  U.S. senators Bob Menendez --

11         THE COURT:  No, you don't have to read the whole

12   thing.  Ladies and gentlemen, what do you want to direct their

13   attention to here?

14         MR. WEITZMAN:  Thank you, your Honor.  Can we scroll

15   down, Mr. Kelly, to the letter, Dear Secretary Tillerson, and

16   put it on the screen?

17   Q.  Do you see in the third paragraph it talks about Egypt

18   remaining a critical strategic partner of the United States?

19   A.  Yes.

20   Q.  And then you see in the two paragraphs below that it talks

21   about issues surrounding elections in Egypt and other human

22   rights issues in Egypt?

23   A.  Yes.

24   Q.  It says:  We also welcome your assessment as to the broader

25   human rights situation in Egypt including the rights of

O6O5men5                          Arkin - Cross

1   Egyptians to freedom of association, peaceful assembly, and

2   expression?

3   A.  Yes.

4   Q.  And moreover, we hope to better understand your

5   department's posture towards Egypt's elections such as whether

6   a statement on the electoral process will be issued following

7   the elections.

8   A.  Yes.

9           MR. WEITZMAN:  If you can just zoom back out, I want

10  to go back up to the top letter.

11  Q.  In the third paragraph at the last sentence it says:

12  Unfortunately, the current policies of the Egyptian government

13  are chilling civil society targeting non-violent political

14  opposition and further exacerbating concerns regarding the

15  judicial process and rule of law.

16      Do you see that?

17  A.  Yes.

18  Q.  This is some of the same criticism we saw in the 2019

19  letter; right?

20          MR. RICHENTHAL:  Objection; characterization, vague.

21          THE COURT:  I will allow it.

22          THE WITNESS:  I think they're similar, not exactly the

23  same.

24  BY MR. WEITZMAN:

25  Q.  Fair enough.  Now, you testified about a draft letter that

1   you drafted around March 2019; correct?

2   A.  Yes.

3   Q.  Now, the draft letter that you drafted used much stronger

4   language than the letter we saw in April 2019; right?

5   A.  Yes.

6           MR. WEITZMAN:  Let's put up Government Exhibit 8F-1,

7   which is in evidence, and if you would go to the next page?

8   Keep on going?

9   Q.  This is the draft letter you testified about on direct;

10  right?

11  A.  Yes.

12  Q.  Now, you testified that part of -- let me withdraw.

13          Senator Menendez didn't want to sign this letter; right?

14          THE COURT:  The draft 8F-1?

15          MR. WEITZMAN:  Correct.

16          THE COURT:  Did Senator Menendez wish to sign 8F-1?

17          THE WITNESS:  No.

18  BY MR. WEITZMAN:

19  Q.  Fair to say that the language in 8F-1 was much harsher than

20  the language in the final bipartisan letter that Senator

21  Menendez did sign?

22  A.  Yes, it was more specific, a bit harsher -- it was more

23  specific.

24          THE COURT:  What?  Your draft was more specific than

25  the final letter?

O6O5men5                          Arkin - Cross

 1              THE WITNESS:  Yes.  It was more specific and a bit
 2    harsher, yes.
 3    BY MR. WEITZMAN:
 4    Q.  One of the things it said -- well, it starts with, instead
 5    of expressing support for the strong bilateral relationship it
 6    starts with a criticism of Egypt; right?
 7    A.  Yes.
 8    Q.  And that is just a difference in approach between the way
 9    you saw the situation and the way Senator Menendez saw the
10    situation; correct?
11              MR. RICHENTHAL:  Objection.
12              THE COURT:  Sustained.
13    Q.  You have written letters --
14              THE COURT:  He preferred the way it ultimately came
15    out, correct.
16              THE WITNESS:  He signed the letter that ultimately
17    came out.
18              THE COURT:  Fair enough.
19    BY MR. WEITZMAN:
20    Q.  When you provided him letters prior to this, there were
21    other letters he didn't want to sign that you had drafted;
22    right?
23              MR. RICHENTHAL:  Objection.
24              THE COURT:  Sustained.
25              Were there drafts -- I take it was part of your job

 1    duties to draft letters for the Senator; correct?

 2              THE WITNESS:  Yes.

 3              THE COURT:  And from time to time did he tell you to

 4    go back to the drawing board and change the draft?

 5              THE WITNESS:  Yes, there were times where he made

 6    edits or slight changes.

 7              THE COURT:  All right.

 8    BY MR. WEITZMAN:

 9    Q.  Sometimes he would change the tone of the letter; right?

10    A.  I can't think of anything specific.

11              THE COURT:  Was it his habit, if there was a --

12    "habit" is the wrong word.

13              Normally, would he give a draft back to you and tell

14    you to change it or would he actually wordsmith your draft or

15    did it vary?

16              THE WITNESS:  It varied.

17    BY MR. WEITZMAN:

18    Q.  Sometimes he would line edit your drafts, right?

19    A.  Sometimes.

20    Q.  To put it in his voice?

21    A.  Well, anything that I drafted was ostensibly to be in his

22    voice.

23    Q.  Correct.  And he wanted -- he would exercise his own

24    independent judgment, he didn't want to just defer to you on

25    the drafting; right?

O6O5men5                        Arkin - Cross

1           MR. RICHENTHAL:  Objection to what he wanted.

2           THE COURT:  Sustained as phrased.

3           Who had the last word on any particular draft, the

4   senator or you?

5           THE WITNESS:  The senator.

6           THE COURT:  OK.

7   BY MR. WEITZMAN:

8   Q.  You had said in direct that this letter also took a dig at

9   Secretary Pompeo, right?

10  A.  Yes.

11  Q.  And again, that's a judgment call a senator needs to make

12  as to whether to take a dig at the Secretary of State; right?

13          MR. RICHENTHAL:  Objection to form.

14          THE COURT:  I will allow it.

15          THE WITNESS:  Yes.

16  Q.  Fair to say he didn't want to take a dig at Secretary

17  Pompeo in this letter?

18          THE COURT:  Sustained.

19  Q.  Would you agree with me that the letter you drafted would

20  not have been signed by 15 bipartisan senators?

21          THE COURT:  Sustained.

22  Q.  Did you expect your letter to get signed, as drafted, by

23  bipartisan senators, or was it only for Senator Menendez to

24  review and sign?

25          MR. RICHENTHAL:  Compound.  Vague.

O6O5men5                          Arkin - Cross

 1              THE COURT:  Tighten it.

 2  Q.  Did you present this letter to Senator Menendez for his

 3  signature?  Or review and final signature, eventually?

 4  A.  Did I?

 5  Q.  Yes.

 6  A.  Yes.

 7  Q.  Did you present it to any other senators?

 8  A.  No, I would have waited for him to sign off on it first.

 9  Q.  Were you anticipating that this type of letter would get

10  signoff in a bipartisan way from other senators?

11              MR. RICHENTHAL:  Same objection.

12              THE COURT:  Did you have an expectation as to whether

13  this letter would receive support from other senators?  Did you

14  have an expectation one way or the other?

15  A.  I don't think we got that far, but if you are getting

16  multiple members to sign on to a letter it always involves some

17  negotiations, it is not often the case that you present

18  something and every member agrees on something, so it is a

19  jumping off point for negotiations in some way.

20  Q.  The tone might have to change to get other senators to

21  support it; right?

22  A.  As you say in the final version of the letter that went

23  out, yes.

24  Q.  If you would turn to the next page of this document?  In

25  fact, in your letter you said as the first bullet point that

1  El Sisi should keep his pledge to leave office at the end of

2  his second term in 2022; correct?

3  A.  Yes.

4  Q.  You would agree with me that the decision of a senator to

5  insist that a foreign leader leave office is a big deal; right?

6          MR. RICHENTHAL:  Objection.

7          THE COURT:  Sustained as phrased.

8          You are talking about independent of this language?

9  Are you just asking a separate question?

10          MR. WEITZMAN:  Separate question.

11          THE COURT:  OK.  Go ahead.  Ask it.

12  BY MR. WEITZMAN:

13  Q.  You agree with me that the decision of whether --

14          THE COURT:  Having nothing to do with this letter.  Go

15  ahead.

16  Q.  -- the decision of Congress or a senator to tell a foreign

17  leader to leave office would be a big deal?

18          MR. RICHENTHAL:  Objection.

19          THE COURT:  I will allow it.

20          Does any member of Congress tell a foreign leader to

21  leave office?

22          THE WITNESS:  Well, that's not what this is

23  suggesting.  It is suggesting that he keep a pledge to leave

24  office which is different than calling for a foreign leader to

25  step down.

1  Q.  What about the decision of a senator to tell a foreign

2  leader to keep his pledge to leave office?  Have you seen

3  Senator Menendez issue that type of statement before with any

4  foreign leader?

5  A.  I can't think of that specific off the top of my head but

6  calling on foreign leaders to do things is pretty standard

7  fare.

8  Q.  This isn't standard fare, to tell a foreign leader to keep

9  their pledge to leave office.  Isn't that fair Ms. Arkin?

10           MR. RICHENTHAL:  Argument.

11           THE COURT:  Is it fair to say, to tell a foreign

12  leader to keep their pledge to leave office is not standard

13  fare?

14           THE WITNESS:  I think it just depends on what the

15  relationship with the country is, the types of leaders you are

16  dealing with, the types of tactics.

17           THE COURT:  It depends.

18           THE WITNESS:  It depends.

19           THE COURT:  OK.

20  BY MR. WEITZMAN:

21  Q.  One of the things that Senator Menendez told you when you

22  presented this letter to him was that he wants to change his

23  tactics with respect to Egypt somewhat; correct?

24  A.  Yes.

25  Q.  He said that he had a lot of Coptic Christian constituents

O6O5men5                          Arkin - Cross

1    in Egypt who were supportive of President El Sisi, right?

2    A.  Yes.

3    Q.  And in fact, the reason they're supportive of President

4    El Sisi is because President El Sisi is secular in his approach

5    to government?

6            THE COURT:  Did he say that to you?

7            THE WITNESS:  He did not.

8            THE COURT:  All right.

9    Q.  Do you have an understanding as to why Coptic Christians in

10   the United States and in New Jersey were supportive of

11   President El Sisi?

12           MR. RICHENTHAL:  Objection.  Personal knowledge, 401,

13   403.

14           THE COURT:  We will see if she has any understanding.

15           THE WITNESS:  Yes.  I mean, I think it probably varies

16   from person to person.  I don't think there is a generalized

17   approach but given the previous government had been

18   representatives of the Muslim Brotherhood which traditionally

19   had a more complicated relationship with the Coptic community

20   and other religious minorities, many people with whom I spoke

21   in the Coptic community were supportive of Sisi's not being a

22   member of the Muslim Brotherhood.

23   Q.  And so you understand that there is a large Coptic

24   Christian community in New Jersey?

25   A.  Yes.

O6O5men5                            Arkin - Cross

1    Q.  And Senator Menendez told you that; right?

2    A.  Yes.  I was aware of it.

3    Q.  And in fact are you aware that there is -- that he has met

4    with Bishop David of the Coptic Christian Bishop in New Jersey?

5             MR. RICHENTHAL:  Assumes a fact.

6             THE COURT:  Let's see.

7             Do you know whether or not the Senator met with Bishop

8    David the Coptic Christian bishop in New Jersey?

9    A.  I don't remember the name but I know he had meetings with

10   leaders of the Coptic community in New Jersey.

11   Q.  And one of the things that Senator Menendez said to you

12   when he asked for a revised draft was he didn't think that the

13   public approach where Senator Menendez humiliated or criticized

14   publicly, harshly, Egypt, was working in improving human rights

15   in Egypt?

16            MR. RICHENTHAL:  Objection; form.

17            THE COURT:  Sustained.  Just make it specific.

18   Q.  Senator Menendez told you that he didn't think the public

19   approach being critical of Egypt was improving human rights; is

20   that correct?

21   A.  Yes.

22   Q.  And what he said he wanted to do was critique them more in

23   private so as to improve human rights in a different tactic;

24   right?

25   A.  Yes.

1  Q.  Fair to say that he wasn't articulating to you a change in

2  policy but just a change in tactics?

3              MR. RICHENTHAL:  Objection to form.

4              THE COURT:  If you can answer that I will allow it.

5              THE WITNESS:  Yeah, I don't know that I would phrase

6  it that way.

7  Q.  Well, you used the term "quiet engagement"; right?

8  A.  Yes.

9  Q.  He wanted to approach Egypt with quiet engagement rather

10  than public engagement; is that fair to say?

11              MR. RICHENTHAL:  Objection to wanted.

12              THE COURT:  I will allow it.  I didn't mean to speak

13  over you, sir.  What did you say?

14              MR. RICHENTHAL:  The question asked Ms. Arkin what the

15  senator wanted rather than what he said.

16              MR. WEITZMAN:  I am happy to -- .

17              THE COURT:  Ask it what he said.

18  Q.  In sum and substance eh articulated to you, he said to you

19  that he wanted to approach Egypt with quiet engagement; right?

20  A.  Yes, on -- yes, he wanted to try the approach of more quiet

21  engagement, less publicity.

22  Q.  And distinct and in contrast to public engagement; correct?

23  A.  Yes.

24  Q.  But he was still -- he articulated to you he was still

25  committed to human rights improvements in Egypt; right?

O6O5men5                          Arkin - Cross

1   A.  I don't think he said it that way but he did continue to

2   raise human rights concerns directly with Egyptian officials in

3   meetings in which I was present.

4   Q.  Now, the draft that you included -- I'm sorry, the letter

5   that you drafted that's in front of us, by the way, that didn't

6   raise any of the Russian Sukhoi airplane purchase issues right?

7   A.  No, I don't think so.

8              THE COURT:  Why don't you finish with this letter,

9   sir.

10             MR. WEITZMAN:  I have, your Honor.

11             THE COURT:  All right.

12             MR. WEITZMAN:  This is a good time to break.

13             THE COURT:  Ladies and gentlemen, you have heard a lot

14  of testimony today.  We are making progress, slow, but

15  progress.  Enjoy the evening.  Keep an open mind, you haven't

16  heard all of the testimony, all of the evidence.  We will see

17  you tomorrow at 9:30.  Please all be here at 9:30.  We can't

18  begin unless you are all are here.  Enjoy the evening.

19             (Continued on next page)

20

21

22

23

24

25

O6O5men5                          Arkin - Cross

1              (Jury not present)

2              THE COURT:  You may step down Ms. Arkin.

3              (Witness not present)

4              THE COURT:  How much longer do you think you have,

5    sir?

6              MR. WEITZMAN:  Quite some time, your Honor.

7              THE COURT:  What is your estimate?  We need to keep

8    this moving.  The jury is getting anxious.

9              MR. WEITZMAN:  Yes, your Honor.  If I can have a

10   moment?

11             THE COURT:  Yes.  Of course.

12             MR. WEITZMAN:  I expect it will be at least two hours,

13   your Honor.

14             THE COURT:  Let's call it two hours.  Anxious isn't

15   the word, they seem to be a little antsy.  I don't think the

16   word is anxious.

17             9:30 tomorrow.  Thank you.

18             MR. WEITZMAN:  Thank you, your Honor.

19             (Adjourned to June 25, 2024 at 9:30 a.m.)

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   PAUL VAN WIE

 4   Cross By Mr. Weitzman . . . . . . . . . . .4366

 5   Cross By Mr. De Castro . . . . . . . . . . .4433

 6   Redirect By Mr. Monteleoni . . . . . . . . .4450

 7   Recross By Mr. Monteleoni  . . . . . . . . .4454

 8   SARAH ARKIN

 9   Direct By Mr. Richenthal . . . . . . . . . .4456

10   Cross By Mr. Weitzman  . . . . . . . . . . .4594

11                    GOVERNMENT EXHIBITS

12   Exhibit No.                              Received

13    8F-35   . . . . . . . . . . . . . . . . .4517

14    8F-34   . . . . . . . . . . . . . . . . .4524

15    8F-24, 8F-26, 8F-29 and 8F-32  . . . . . .4529

16    8F-7   . . . . . . . . . . . . . . . . . .4545

17    8F-33   . . . . . . . . . . . . . . . . .4549

18    3A-8   . . . . . . . . . . . . . . . . . .4560

19    8F-23, 8F-27, 8F-30  . . . . . . . . . . .4565

20    8F-22  . . . . . . . . . . . . . . . . . .4575

21                     DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    A301-A, page 315,  . . . . . . . . . . . .4397

24    2110-1   . . . . . . . . . . . . . . . . .4407

25    2110-2B, 1:38 to 2:45,   . . . . . . . . .4409
```

1    2110-3B    . . . . . . . . . . . . . . . .4409

2    2110-5    . . . . . . . . . . . . . . . .4410

3    A301-1, pps. 648-649,    . . . . . . . . . .4419

4    A301-2, pps. 7-10,    . . . . . . . . . .4419

5    A301-3, page 1135,    . . . . . . . . . .4420

6    A301-4, page 2540,    . . . . . . . . . .4421

7    A301-5, pps. 1152-1153,    . . . . . . . . .4421

8    A301-6, page 231,    . . . . . . . . . . .4423

9    A301-7, page 1809,    . . . . . . . . . .4426

10   552    . . . . . . . . . . . . . . . .4595

11   486A    . . . . . . . . . . . . . . . .4608

12   434    . . . . . . . . . . . . . . . .4611

13

14

15

16

17

18

19

20

21

22

23

24

25