O6rWmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                      23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7                   Defendants.
                                            Trial
8   ------------------------------x

9                                           New York, N.Y.
                                            June 27, 2024
10                                          9:45 a.m.

11

12  Before:

13

14                      HON. SIDNEY H. STEIN,

15                                          District Judge
                                            -and a Jury-

16                          APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

O6rWmen1

1

2                              APPEARANCES CONTINUED

3

   PAUL HASTINGS LLP
4          Attorneys for Defendant Menendez
   BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9  GIBBONS, P.C.
          Attorneys for Defendant Hana
10  BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15  CESAR DE CASTRO
    SETH H. AGATA
16  SHANNON M. McMANUS
          Attorneys for Defendant Daibes

17

18

    Also Present:  Marwan Abdel-Rahman
19                 Rodina Mikhail
                   Interpreters (Arabic)

20

                   Rachel Wechsler
21                 Connor Hamill
                   Braden Florczyk
22                 Paralegal Specialists, U.S. Attorney's Office

23                 Justin Kelly, DOAR

24

25

O6rWmen1

1          (Trial resumed; jury not present)

2          THE COURT:  All right.  All the jurors are here.  I'll

3    read the stipulation that the parties have agreed to at the

4    very beginning.

5          MR. MONTELEONI:  Your Honor, the document-related

6    objections that we had had pending last night, we worked out

7    all of those, but then we found that, due to a

8    miscommunication, there were objections to five more documents.

9    That can be done at any break.

10         THE COURT:  Try to get it straight, gentlemen.  I was

11   told last night that there were objections.  We've talked about

12   it several times, because I wanted to get the necessary timing

13   down.  And then this morning I was informed that those were

14   taken care of, so I didn't come up to the courtroom until the

15   jury was here.  Everybody should try to get it straight.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

```
1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Good morning, ladies and gentlemen.

4              Call your next witness, government.

5              MR. MONTELEONI:  We understood --

6              THE COURT:  Oh, I'm sorry.  There's a stipulation.  My

7    error.

8              Ladies and gentlemen, the parties have arrived at a

9    stipulation, and as you know, those are agreed-upon facts -- or

10   it could be agreed-upon testimony -- but the parties have

11   agreed to whatever it is, and you must consider that as I

12   stated.  The parties have agreed upon this instruction.  I said

13   it's a stipulation; it's really an instruction to you.

14             Ladies and gentlemen of the jury, you may recall that

15   there was certain testimony regarding whether a private company

16   or person who might represent the interests of a foreign

17   government may have an obligation to register with the U.S.

18   government under the Foreign Agents Registration Act, which is

19   referred to sometimes as FARA -- Foreign Agents Registration

20   Act.

21             I am striking that testimony.  What I mean by striking

22   the testimony of a witness is that you must completely

23   disregard it and cannot consider it in any way in your

24   deliberations.

25             Also, the interpretation of FARA is a legal matter,
```

O6rWmen1

```
 1   and as you know, the law is a matter for me, the Court, to
 2   instruct you on, which I will do only if it is relevant to the
 3   counts that were actually charged in this case.  And I will do
 4   that at the end of the trial.
 5           With regard to the stipulation read to you by the
 6   government at the end of the day yesterday, stating that
 7   certain individuals were not found in the public FARA database,
 8   I want to remind you Mr. Hana is not charged with violating
 9   FARA by having failed to register with the U.S. government as
10   an agent of Egypt.
11           That is my instruction to you at this time.
12           Government, call your next witness.
13           MR. MONTELEONI:  Prior to that, we have a very few
14   amount of additional documents and stipulations to offer.
15           THE COURT:  Proceed.
16           MR. MONTELEONI:  The government offers the stipulation
17   that's Government Exhibit 1448.
18           THE COURT:  Admitted.
19           (Government Exhibit 1448 received in evidence)
20           MR. MONTELEONI:  Ms. Wechsler, could you please
21   publish:
22           "If called to testify as a witness, an individual who
23   had worked with the Egyptian government, would testify as
24   follows:
25           "A.  In or about June 2019, an Egyptian government
```

official said that Wael Hana had ruined him and he hoped for

revenge.

"B.   In or about January 2020, certain officials in

the Egyptian government said that they were trying to distance

themselves from Hana and instructed some of their assets in the

U.S. and Egypt to discontinue any association with him.

"In or about February 2020, certain officials in the

Egyptian government said that they directed at least one

individual to cease contact with Hana and made comments that

suggested one member of Egyptian intelligence was reprimanded

for his close relationship with Hana.  At least one senior

Egyptian government official said he did not want Hana coming

to the Egyptian consulate in New York or government-sponsored

events.

"In or about March 2021, certain Egyptian officials

discussed their belief that Hana was not trustworthy or

reliable, citing their understanding that Hana had previously

been involved in an insurance scam and that he had been

pocketing money.

"In or about mid-August 2022, when Hana was in Egypt,

an Egyptian government official said that he was tracking

Hana's location."

Now, the government offers several documents pursuant

to stipulation.

Pursuant to Government Exhibit 1435, the government

O6rWmen1

offers Government Exhibits A133; A409; A410; A411; C106-1;

C107-B, not for the truth; C107-BT, not for the truth; C302,

not for the truth; C421; C422; C426; B117.

The government offers, pursuant to Government Exhibit

1427, Government Exhibit 4G-5.

Pursuant to Government Exhibit 1405, it offers

5A-5001A, 5V-1, 5V-2, 5G-102-1.

The government offers Government Exhibit 1453.

The government offers Government Exhibits 9A-101

through 9A-109, 9A-201 through 9A-211, 9B-101 through 9B-106,

9B-201 through 9B-213, 9B-301 through 9B-309, 9D-101 through

9D-112 and 9F-101 through 9F-110, which are authenticated by a

stipulation, which is Government Exhibit 1440.

The government offers Government Exhibit 1440 as well.

THE COURT:  All right.  Admitted.

(Government Exhibits A133; A409; A410; A411; C106-1;

C107-B, not for the truth; C107-BT, not for the truth; C302,

not for the truth; C421; C422; C426; B117; 4G-5; 5A-5001A;

5V-1; 5V-2; 5G-102-1; 9A-101 through 9A-109; 9A-201 through

9A-211; 9B-101 through 9B-106; 9B-201 through 9B-213; 9B-301

through 9B-309; 9D-101 through 9D-112 and 9F-101 through 9F-110

received in evidence)

THE COURT:  Are you offering the stipulations

themselves?

MR. MONTELEONI:  Yes, certain of those exhibit numbers

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6rWmen1

1  were for stipulations.

2          THE COURT:  All of those are admitted.

3          (Government Exhibits 1435, 1427, 1405, 1453 and 1440

4  received in evidence)

5          MR. MONTELEONI:  Thank you, your Honor.

6          Just a couple more.

7          The government offers 9G-1 through 9G-12, which are

8  authenticated by a stipulation, which is 1462.  The government

9  offers 1462 at well.

10          THE COURT:  Admitted.

11          (Government Exhibits 9G-1 through 9G-12 and1462

12  received in evidence)

13          MR. MONTELEONI:  And finally, the government offers

14  Government Exhibit 1465, a stipulation, as well.

15          THE COURT:  Admitted.

16          (Government Exhibit 1465 received in evidence)

17          MR. MONTELEONI:  Ms. Wechsler, could you please

18  publish Government Exhibit 1465:

19          "From on or about November 72018, through at least on

20  or about the date of the indictment in this matter, Fred

21  Daibes, the defendant, was released on an appearance bond in

22  United States v. Daibes, et ano, criminal No. 18-655-SDW,

23  pending in the District of New Jersey (the 'Daibes DNJ

24  prosecution')."

25          THE COURT:  Anything else?

1          MR. MONTELEONI:  Not at this time.

2          THE COURT:  All right.

3          Ladies and gentlemen, you heard stipulations regarding

4    testimony, as I told you if a witness were called, that witness

5    would say.  You saw stipulations regarding admissions of

6    documents, so those documents are now in evidence.  And you

7    also saw that I gave you an instruction of law.  I had earlier

8    called it a stipulation; it wasn't.  It's an instruction of

9    law.

10         Government, now call your next witness.

11         MR. RICHENTHAL:  The government calls Shannon Kopplin.

12   SHANNON KOPPLIN,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15         THE COURT:  Good morning, Ms. Kopplin, and welcome.

16         THE WITNESS:  Good morning.

17         THE COURT:  Your witness, Mr. Richenthal.

18   DIRECT EXAMINATION

19   BY MR. RICHENTHAL:

20   Q.  Good morning, Ms. Kopplin.

21   A.  Good morning.

22   Q.  What is your educational background?

23   A.  I have an undergraduate degree from the University of

24   California, Davis.  I have a J.D. law degree from Santa Clara

25   University School of Law, and I have a master's of law from

O6rWmen1                          Kopplin - Direct

1    Georgetown University Law also.

2    Q.  Are you a lawyer, Ms. Kopplin?

3    A.  I am.

4    Q.  For approximately how long have you been a lawyer?

5    A.  Just short of 30 years.

6    Q.  Where do you work?

7    A.  I work for the U.S. Senate Select Committee On Ethics.

8    Q.  I'll ask you some more detailed questions in a moment, but

9    in sum, what is the Senate Select Committee on Ethics?

10   A.  So, the Select Committee on Ethics is one of the Senate's

11   20-some permanent committees.  So the Senate -- highly complex,

12   high-volume business -- divides its responsibility amongst

13   committees.  So you have senators who are assigned to specific

14   committees for areas of jurisdiction.  So you have things like

15   armed services, veterans affairs, foreign relations.  We're the

16   committee on ethics that deals with the oversight for the

17   Senate committees' ethical conduct.

18   Q.  What is your title on the Senate Select Committee on

19   Ethics?

20   A.  I'm the chief counsel and staff director.

21   Q.  What is your role, in sum?

22   A.  So, as the chief counsel, I advise the six members of the

23   ethics committee.  I am also the staff director, which, not to

24   sound facetious, I direct the other 16 members of our staff in

25   managing their workload and scheduling training events and that

O6rWmen1                    Kopplin - Direct

1   sort of thing.

2   Q.  What position, if any, did you hold Senate Select Committee

3   on Ethics prior to your current position?

4   A.  I was hired as the deputy chief counsel, but immediately

5   upon assuming that position, the chief counsel/staff director

6   left on military orders.  And so I was the acting staff

7   director/chief counsel since I arrived at the committee.

8   Q.  Approximately when did you arrive at the committee?

9   A.  September of 2020.

10  Q.  What did you do before you arrived?

11  A.  I was an active duty navy officer.

12  Q.  Doing what, Ms. Kopplin?

13  A.  I was a judge advocate.

14  Q.  For anyone who may not know, what is a judge advocate?

15  A.  So, judge advocate, or JAG, so I was a uniformed military

16  attorney.  My primary practice areas there were the law of

17  armed conflicts, rules of engagement, maritime boundaries, U.S.

18  treaty application and government ethics.

19  Q.  Let's go back now to the Senate Select Committee on Ethics.

20      First, is that sometimes just known as the ethics

21  committee?

22  A.  Yes.

23          MR. RICHENTHAL:  I might refer to it that way this

24  morning, if that's OK with you.

25  Q.  Who serves on the ethics committee?

O6rWmen1                    Kopplin - Direct

1   A.  So, there are six senators that serve on the ethics

2   committee.  There are three Democrats, three Republican.  It's

3   a unique committee on the Hill in that it, by design, is a

4   bipartisan structure like that.

5   Q.  What do you mean by, it is a bipartisan structure like

6   that?  Just explain what you mean, please.

7   A.  Sure.  So, six members on the committee -- three from the

8   Democratic party, three from the Republican party -- means that

9   any action that we take, by definition, you have to have a

10  bipartisan, meaning people from both parties agree on what

11  action the committee's going to have to take.

12      By our procedural rules, our chairman, who right now is a

13  member of the majority party, a Democrat, and our vice

14  chairman, a member of the minority party, who's a Republican,

15  they have to agree on that action before we do anything as a

16  committee.

17          THE COURT:  I think you said there were six members.

18  Is that correct?

19          THE WITNESS:  That's correct.

20          THE COURT:  Three Republicans and three Democrats.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  And when you say members -- I don't need

23  the names at this point, but who are the members?

24          THE WITNESS:  Senators.

25          THE COURT:  Thank you.

O6rWmen1                              Kopplin - Direct

1    BY MR. RICHENTHAL:

2    Q.  How are those senators selected to serve as members of the

3    ethics committee?

4    A.  Senators are selected by their party leadership, so the

5    Senate majority leader selects what members are going to be on

6    all the committees, including the ethics committee, and the

7    minority leader, for the minority party, selects the three

8    Republican members who are going to serve on all the

9    committees, including the ethics committee.

10   Q.  I think you said you also have the title or role of staff

11   director?

12   A.  Yes.

13   Q.  What type of staff does the Senate Ethics Committee have?

14   A.  So, we have a 17-member staff --

15          THE COURT:  Ms. Kopplin, we have a reporter and we

16   have interpreters, so you're going to have to slow down because

17   they need to do their job.

18          THE WITNESS:  I'm sorry, sir.

19          THE COURT:  That's all right.

20          THE WITNESS:  Could you repeat the question?

21          THE COURT:  That's for Mr. Richenthal also, both of

22   you.

23          MR. RICHENTHAL:  Most definitely.

24   Q.  I think you said that you also have the title or role of

25   staff director.  Is that right?

O6rWmen1                    Kopplin - Direct

1   A.  That's correct.

2   Q.  What types of staff does the ethics committee have?

3   A.  So, we have 17 total staff; that's me plus 16 others.  Of

4   those 16, eight are attorneys and eight are legal support

5   staff.

6   Q.  Without going through the roles one by one, in general,

7   what kinds of things does the staff do?

8   A.  So, primarily, the ethics committee's responsibility

9   overwhelmingly is advice and training for the Senate community.

10  Q.  Advice or training on what types of things?

11  A.  On all types of ethical questions under the Senate rules

12  and under applicable federal law.  So that's going to include

13  taking gifts, when can someone go on travel?  When can a

14  senator immediate with a lobbyist?  What receptions or other

15  events can a senator or a Senate staff attend?  It also

16  includes financial disclosure.

17  Q.  Now, you've mentioned training and financial disclosure.

18  Let me just step back for a moment.

19      What are the principal areas of work of the ethics

20  committee?

21  A.  So, there's three principal areas I lead as the staff

22  director.  The first is advice and training.  The second is

23  managing the financial disclosure program for the Senate

24  community.  And the third is inquiry and investigation of

25  complaints of misconduct.

1   Q.  Now, the first you mentioned is advice.  Let's just start

2   with that.

3       What do you mean in this context by advice?

4   A.  So, advice is you have a member of the Senate community --

5   and to give you a context, that's close to 2,000 people, so 100

6   senators and then all their staff, both those in Washington,

7   D.C., and the staff that are in their state offices.

8       So they will call us for advice on all those topics and

9   many more that we have discussed.  To give you an idea of the

10  scope, by law, the ethics committee has to publish an annual

11  report on January 31 of each year.  For 2023, we answered over

12  12,000 calls or emails for advice from the Senate community.

13           THE COURT:  When you say, again, the Senate community,

14  that's senators and the senators' staff.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  All right.

17  BY MR. RICHENTHAL:

18  Q.  I think you said this, but just for clarity, does that

19  include senators' staff just in Washington, D.C., or elsewhere

20  as well?

21  A.  No.  It's Washington, D.C., and their personal offices in

22  their states.

23  Q.  Now, I think you said that advice had been given over email

24  or the phone.  Is that right?

25  A.  That's correct.

1    Q.  Is advice also given in person?

2    A.  Yes.

3    Q.  Is there a cost to solicitor or get advice?

4    A.  No.

5    Q.  Is the advice public?

6    A.  No.  It's confidential.

7    Q.  Are the questions to get advice public?

8    A.  No.

9    Q.  Now, I think the second area you mentioned is training.  Is

10   that right?

11   A.  That's correct.

12   Q.  To just expand a bit, in general, what kinds of training

13   does the ethics committee offer or provide?

14   A.  Well, there's a federal law that requires that anyone who

15   works for the Senate receives ethical training, receives

16   training in the ethical rules that apply to them specifically,

17   within 60 days of taking a job with the U.S. Senate.  So that's

18   all of the staff there.  It also includes all of the senators.

19       In addition to those trainings that we provide, we offer a

20   myriad of other trainings on a whole host of topics -- so, for

21   instance, this year, particularly on campaign activity and what

22   would be permissible overlap between campaign activity and your

23   official office.

24       We also offer training on financial disclosure.

25   Q.  Approximately how often are trainings given?

O6rWmen1                    Kopplin - Direct

```
 1   A.  Multiple times per month and by request of a Senate office.
 2   Q.  What do you mean by, by request of a Senate office?
 3   A.  So, oftentimes we will get either a senator or a member of
 4   the senator's staff call us and say we think our staff needs
 5   training on whatever the discrete topic area is.  Sometimes
 6   it's because they think that people have forgotten what the
 7   rules are.  Sometimes, and most usually, it's because they've
 8   hired a bunch of staff, and the new people need some more
 9   training on specific rule areas.
10   Q.  Now, are some or all training materials also made
11   available?
12   A.  Yes.  So, there are some training materials that we make
13   available internally, meaning you have to log --
14        THE COURT:  Ms. Kopplin, again, I'm going to ask you
15   to slow down.
16        THE WITNESS:  Sorry.
17   A.  There are some training materials that are made available
18   internally, meaning that you would have to be on the Senate's
19   IT system and be able to log in to that to get those training
20   materials.  But there are also a great deal of training
21   materials that are publicly available.
22   Q.  Publicly available where?
23   A.  On our website, or they're available when you walk into the
24   Senate office.
25   Q.  Let's just start with the website for a second.  When you
```

O6rWmen1                         Kopplin - Direct

1    say our website, whose website?

2    A.  The ethic committee's website.

3    Q.  Is that part of the greater Senate's website?

4    A.  Yes, it is.

5    Q.  Now, I think you'd also mentioned the preliminary inquiry

6    on complaints.  Is that right?

7    A.  That's correct.

8    Q.  In general, without talking about a particular case, what

9    is a preliminary inquiry on a complaint?

10   A.  So, pursuant to the Senate's procedural rules, which I know

11   are different from the executive branch and from the House of

12   Representatives, the Senate will accept any complaint in

13   writing.  So we get them from any source.  Sometimes it's

14   media.  Sometimes it's a constituent.  Sometimes it's another

15   member of the Senate community.  But if anything is received in

16   our office in writing that alleges misconduct of the senator or

17   a member of the Senate staff, we will do an inquiry to see if

18   those allegations have any evidence to prove them.

19   Q.  And when you say an inquiry -- and again, I'm not asking

20   about any particular case -- what do you mean by that?

21   A.  It depends on the scope of the complaint what the scope of

22   the inquiry would be.  So it can be anything from looking at

23   publicly available information -- so, an example, the

24   senator -- or the allegation is the senator posted something on

25   their official website that is improper.  We would go to that

O6rWmen1                    Kopplin - Direct

1  official website, look at the evidence and see if it was

2  improper under our rules, or not.  All the way up to a large

3  investigation, where the committee, like all other committees

4  at the Senate, has subpoena power and can request documents,

5  can interview witnesses, etc.

6  Q.  Who handles a preliminary inquiry; that is, who does the

7  work in the example that you just used?

8  A.  Our staff.  So it's me and the 16 other ethics committee

9  staff.

10  Q.  Is the work of a preliminary inquiry public?

11  A.  It is not.

12         MR. WEITZMAN:  Your Honor, 401, 403 at some point.

13         THE COURT:  All right.  I understand.

14         MR. RICHENTHAL:  One or two more questions in this

15  area.

16  Q.  Again, without talking about any particular case, what, if

17  anything, can be the result of a preliminary inquiry?

18  A.  Well, the preliminary inquiry -- again, this is our

19  procedural rules.  It can go anything from dismissal, because

20  there is no evidence to support the complaint, to the ethics

21  committee's recommendation to the full Senate that a member be

22  censured or expelled from the Senate.  So that is the range of

23  actions that could happen.

24  Q.  Final questions here.

25         You used the word "censured."  What is a censure?

O6rWmen1                          Kopplin - Direct

1  A.  A censure is a public rebuke, a public statement of

2  admonition saying that there was a finding of misconduct and

3  that the senator's actions were inappropriate.  And that would

4  be voted on by the full Senate, not just the ethics committee.

5  Q.  Now, I think the last area you mentioned was financial

6  disclosures.  Is that right?

7  A.  That's correct.

8  Q.  I'm going to ask you some specific questions, but first, in

9  general, in this context, what is a financial disclosure?

10  A.  So, by law, many government officials, to include all of

11  the senators, have to disclose their financial interests

12  publicly at least once per year while they hold office.

13  Q.  We'll go through some documents, but what kinds of things

14  do the Senate financial disclosures cover?

15  A.  So, Senate financial disclosure, similar to all other

16  branches of government, requires disclosure of sources of

17  income; your financial assets; any financial transactions;

18  liabilities, meaning, you know, loans that you owe; gifts that

19  you have received over a certain dollar amount; travel

20  reimbursements; and any agreements or arrangements you have

21  with a company, with an organization, with a prior employer.

22  Q.  Now, who has to file these disclosures?

23  A.  So, all senators have to file financial disclosure as well

24  as all employees who are paid over a certain salary amount.

25  Q.  And when you say all employees, all employees of what?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6rWmen1                    Kopplin - Direct

1    A.  Of the Senate.

2    Q.  Roughly speaking, how many people in a given year have to

3    file these disclosures?

4    A.  Roughly speaking, about 1,400 people in the Senate have to

5    file financial disclosure.

6    Q.  So that's 100 senators plus approximately 1,300 other

7    people?

8    A.  Yes.

9    Q.  And are those generally staffers?  Without being specific,

10   in general, what kinds of jobs do those people have, the other

11   people who have to file a financial disclosure?

12   A.  So, I'm a financial disclosure filer, so it's any senior

13   staff member.  The salary threshold is anyone whose rate of pay

14   is over $147,649 per year has to file financial disclosure.

15   Q.  Now, I've asked you about who has to file disclosures.  How

16   about when; when must disclosures be filed?

17   A.  So, the regular reports are filed, one, with the new-filer

18   report, within 30 days of taking your Senate job.  And then

19   after you filed your new-filer report, you have to file on or

20   before May 15 of each year.  There are extensions that can be

21   granted.  And then you file what we call a termination report,

22   which has to be filed 30 days after you leave your Senate job.

23   Q.  Now, if a disclosure's due on or before May 15 of each

24   year, for what period of time does that disclosure cover?

25   A.  It covers the preceding calendar year.  So the way I

O6rWmen1                    Kopplin - Direct

explain it to new Senate members is it's like income taxes.  So
you will file in May, but it covers the prior calendar year.
So for 2024, May 2024, that report covered calendar year 2023,
January 1 through December 31 of 2023.
Q.  Now, we've talked about the who and the when.  Let's talk
about the what.
     How are the disclosure forms filled out; literally, what's
the process?
A.  Well, the -- there's two.  There are some people who still
insist on filing on paper, and we will allow that.  There's
seven of them, and I'm trying to convince them to come over to
the other side, which is an electronic platform for the Senate
community.  It is called EFD, for electronic financial
disclosure.
Q.  Apart from the seven, for those who fill out the form
electronically, in general, can you describe the process?
A.  So, you -- when you get your Senate job or you're sworn in
as a senator, you will apply for an account with EFD.  We
approve your account.  We verify things like email, phone
number, office, salary, etc.  And then that is the system that
generates notices on when your reports are due.
Q.  Now, speaking of reports for senators themselves, what, if
anything, ensures that the senator himself or herself actually
authorizes a given financial disclosure?
A.  I'm sorry.  Could you say that again?

O6rWmen1                        Kopplin - Direct

1    Q.  Sticking with senators' own financial disclosures, what, if

2    anything, ensures that the senator himself or herself

3    authorizes the disclosure?

4    A.  Well, when you file your form electronically, there's a

5    button that you click that is per -- it says I am submitting

6    this form, and the information contained on the form is true

7    and correct, to the best of my knowledge.  So it's a personal,

8    first person filing.

9    Q.  Now, you said that the disclosure are due on or before May

10   15 of each year?

11   A.  Yes.

12   Q.  After a disclosure's filed, may it be amended or revised?

13   A.  Yes.

14   Q.  How?

15   A.  So, there's an amendment process on the electronic

16   financial disclosure system.

17   Q.  Can you explain, in general, what that involved?

18   A.  Certainly.  So, you would log in to your account and it

19   would show you your most recent report, and then there is a

20   large button that says make amendments, and you would click on

21   that button and it would generate a form for you to amend that

22   report.

23   Q.  And if a report is amended, is that also then filed in the

24   same manner that you talked about with respect to the prior

25   report; that is, the nonamended report?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Yes.

2    Q.   Through the same electronic system?

3    A.   Yes.  And both would be on the public record.

4    Q.   Just to be clear, when you say both would be on the public

5    record, what do you mean?

6    A.   So, when a senator files their financial disclosure report,

7    as soon as they hit the submit button in the electronic

8    program, it is immediately uploaded to the Senate office of

9    public records, which means anybody can Google it.

10   Q.   Anybody can Google it, meaning it's on the internet?

11   A.   Yes.

12   Q.   Now, is there a penalty for amending a disclosure?

13   A.   No.

14   Q.   Separate from the disclosure forms or reports you talked

15   about, are you familiar with something called a periodic

16   transactions report or periodic transaction report?

17   A.   Yes, sir.

18   Q.   What is that?

19   A.   So, periodic transaction report is a report that is

20   required under a different federal law for specific

21   transactions -- so a purchase or a sale of specific types of

22   securities.  And by that I mean individual stocks, individual

23   commodities, future options, things of that nature.  So if

24   someone only holds mutual funds, that is never going to require

25   a periodic transaction report.

1        If you hold individual stocks -- to give an example, you
2   know, Google, Starbucks, whatever -- if you purchase or sell
3   those during the reporting period, you actually have to file a
4   periodic report within 30 days of making that purchase or sale.
5        The whole financial disclosure system is intended to
6   provide public transparency so that constituents can see the
7   financial interests of their legislators.  So that's why
8   these -- the individual stocks require a periodic report.
9   Q.  Now, shifting back to the annual disclosures and away from
10  periodic reports for the moment, are there any kind of
11  instructions as to how a given annual disclosure should be
12  filled out?
13  A.  Yes, sir.
14  Q.  In what form are those instructions?
15  A.  So, the instructions are both electronic and hard copy.
16  Q.  How frequently, if at all, do the instructions change?
17  A.  The instructions are updated every year.
18  Q.  Are the annual changes generally large or small?
19  A.  Small.
20  Q.  Can you give an example of a typical annual change?
21  A.  So, the law has not changed in this area in a substantial
22  period of time.  So the instructions changed to make them more
23  user-friendly.  So, for instance, in the last two years, we've
24  added a color-coded frequently asked questions box sort of
25  thing.

1      If we start to see a lot of questions in one particular

2  area, we will add it on.  So, an example is, under assets, we

3  had to add cryptocurrency fairly recently to explain how you

4  would disclose cryptocurrency.

5  Q.  Ms. Kopplin, for anyone who may not know, what is

6  cryptocurrency?

7  A.  I don't know.  I mean it's --

8  Q.  Where may the annual instructions be found?

9  A.  So, they are found both on the committee's website, and

10  then since this is for the Senate community, there's hard

11  copies of the instructions in the office.

12  Q.  Let's just take that one at a time.  When you say the

13  website, what website?

14  A.  So it's ethics.senate.gov.  It's part of the Senate's

15  domain.

16  Q.  Are the instructions public?

17  A.  They are.

18  Q.  Now, I think you said they're also in hard copy in the

19  office?

20  A.  They are.

21  Q.  What office?

22  A.  So, the ethics committee office is 220 Senate Hart

23  Building.  Everyone knows where we are.

24  Q.  Hart, as in H-A-R-T?

25  A.  Correct.

O6rWmen1                    Kopplin - Direct

1    Q.  Now, in addition to the instructions being on the website

2    and then in hard copy, is the Senate community advised annually

3    as to where instructions may be found or that instructions

4    exist at all?

5    A.  Yes, sir.

6    Q.  How so?

7    A.  Multiple ways.  So, the primary way is the -- there is a --

8    a email distribution from all the offices to other offices for

9    information just like this.  So practically what happens is the

10   deputy staff director in our office sends an email to a

11   distribution list of all the Senate administrative directors --

12   so essentially, the office managers for all the Senate

13   offices -- saying:  Hey, it's filing season again.  Here's

14   where you find the EFD link, you know, to the actual, you know,

15   program to log in, and here's a link to the instructions and

16   then contact information for the office.  And sometimes we

17   include the dates for our training events for brand-new filers,

18   people who've never done it before.

19   Q.  Now, I think you said that this email's sent to

20   administrative directors of each Senate office?

21   A.  Yes, sir.

22   Q.  What is an administrative director of a Senate office?

23   A.  It's like an office manager, is probably the best analogue.

24   Q.  Now, I think you said the email also contains a link to the

25   EFD system?

1    A.  Yes.

2    Q.  And again, Ms. Kopplin, that's the system to actually fill

3    out and file the form?

4    A.  That's correct.

5    Q.  Are you familiar with that system?

6    A.  Very.

7    Q.  How?

8    A.  Well, I'm responsible for it.  It's part of my job.

9    Q.  Do you also have to log in to it yourself?

10   A.  I do.

11   Q.  Now, when logging in to fill out and file the annual

12   disclosure, is there a reference to the same instructions?

13   A.  There is.

14   Q.  Could you describe what you mean by that?

15   A.  So, when you log in to the EFD system as a filer, as

16   someone who's going to prepare the report, there is some

17   writing up at the top, and part of it is that the forms are

18   meant to be completed with the instructions.  I think -- I

19   cannot remember, but I think it gives you either the phone

20   number or the email address for the ethics office.

21   Q.  Now, you referenced a few minutes ago if people have

22   questions you give advice.  Can the questions include how to

23   fill out the form?

24   A.  Absolutely.  And so we release the filing forms for May in

25   middle March every year.  That's -- that's what our cycle is.

O6rWmen1                    Kopplin - Direct

1   The concept is if you're already preparing your income tax

2   filing, then you have all the documents together to be able to

3   file this as well, and so that's kind of how the dates get set.

4   And so between the middle of March and that May 15 filing date,

5   our office resembles, like, an accounting firm.  There's, like,

6   constant questions on financial disclosure and what the

7   requirements are.

8   Q.  Do these questions come in person, on the phone, email,

9   some other way?

10  A.  All of it.

11  Q.  Is there a penalty for asking questions?

12  A.  Absolutely not.  Highly encouraged.

13  Q.  Now, the advice given in response, is it public?

14  A.  No.

15          THE COURT:  And I think you said the questions are not

16  public either.  Is that correct?

17          THE WITNESS:  That's correct, sir.

18  BY MR. RICHENTHAL:

19  Q.  Shifting gears just for one moment, are you familiar with

20  something known as the Senate ethics manual?

21  A.  I am.

22  Q.  What is the Senate ethics manual?

23  A.  So, the Senate ethics manual is a fairly large text,

24  probably an inch and a half thick, and it is intended to

25  consolidate all of the federal law, Senate rules, other

O6rWmen1                         Kopplin - Direct

1    standards of conduct that apply to senators and to Senate

2    staff.  And it also includes, you know, historically what the

3    committee, the ethics committee's interpretation and

4    application of those rules are.  It gives practical examples,

5    gives all the references in one place.  If there's any lawyers

6    in the room, it's a horn book, is what it is.

7    Q.  For those who are not lawyers, what is a horn book?

8    A.  Well, it's a text that, you know, that summarizes and

9    consolidates in hopefully closer to layman's terms what the law

10   is and how you would apply it.  So it gives practical examples,

11   is the best use of the Senate ethics manual for the Senate

12   community.

13   Q.  Is the Senate ethics manual itself public?

14   A.  It is.

15   Q.  Where may it be found?

16   A.  It's also found on our website, which is a public website.

17   Q.  And are there also hard copies in the office in Hart?

18   A.  Yes.

19   Q.  How, if at all, is the Senate ethics manual itself or a

20   link to it shared with the Senate community?

21   A.  Well, the link to the entire manual exists in perpetuity on

22   the website.  But if someone asks a specific question, either

23   somebody from the Senate community or a reporter, because this

24   is publicly available document, we will link to the specific

25   pages to help guide the person to what they need to be able to

1    answer their question.

2              MR. RICHENTHAL:  Ms. Wechsler, can you put on

3    Ms. Kopplin's screen, the Court's screen and the lawyers'

4    screens what has been marked for identification as GX 10I-1A,

5    as in apple.

6              Just scroll through the couple pages for Ms. Kopplin,

7    please.

8    Q.  Ms. Kopplin, do you recognize that document?

9    A.  I do.

10   Q.  What is it?

11   A.  It's a redacted version of the Senate ethics manual.

12             MR. RICHENTHAL:  The government offers 10I-1A.

13             MR. WEITZMAN:  Your Honor, may I have a voir dire?

14             THE COURT:  Yes.

15   VOIR DIRE EXAMINATION

16   BY MR. WEITZMAN:

17   Q.  Hi, Ms. Kopplin.

18       The instruction, the Senate ethics manual, you said that

19   it's about an inch and a half thick?

20   A.  Yes, sir.

21   Q.  I'm going to hand you the full Senate ethics manual.  Can

22   you just confirm that this is the document you're referring to?

23   It's marked Government Exhibit 10I-1.

24   A.  This isn't the format that I'm used to, but yes, this looks

25   like a complete copy of the Senate ethics manual.

1  Q.  And this Senate ethics manual is over 500 pages, right?

2  A.  Yes, sir.

3  Q.  Just a couple of questions.

4      You said it's available online?

5  A.  Yes, sir.

6  Q.  When someone views it, is there a certification requirement

7  to confirm that they viewed it?

8          MR. RICHENTHAL:  Your Honor, this is beyond the scope

9  of voir dire for admissibility.

10          THE COURT:  I'll allow that.

11  A.  Is there a certification that you viewed it?  No, sir,

12  there's not.

13  Q.  Is there any way to track who's viewed it or downloaded it?

14  A.  No, sir.

15          MR. RICHENTHAL:  Objection.

16          THE COURT:  I'll allow it.

17  BY MR. WEITZMAN:

18  Q.  And do you know whether Senator Menendez personally ever

19  received a copy or viewed a copy of the Senate ethics manual

20  that's 572 pages long?

21  A.  I do not.

22          MR. WEITZMAN:  No objection, your Honor.

23          MR. RICHENTHAL:  Is it admitted, your Honor?

24          THE COURT:  Admitted.

25          (Government Exhibit 10I-1A received in evidence)

O6rWmen1                         Kopplin - Direct

1    BY MR. RICHENTHAL:

2    Q.  Ms. Kopplin, I think Mr. Weitzman said it was 500-something

3    pages long.

4         Did you choose what excerpts are in this exhibit?

5    A.  No, sir.

6    Q.  By the way, is this the operative version from 2018 to

7    2023?

8    A.  Yes.

9    Q.  Operative meaning it covered at least that time period?

10   A.  Yes.

11        THE COURT:  Now, I gather you no longer hand out hard

12   copies of the manual to each senator.  Is that correct?

13        THE WITNESS:  No, sir, it's not.  We do to each new

14   senator.  The presumption is that each sitting senator already

15   has a copy.  Their office certainly has a copy.

16        THE COURT:  All right.  Thank you.

17   BY MR. RICHENTHAL:

18   Q.  Before I asked Ms. Wechsler to put a particular page on the

19   screen, why did you say their office already has a copy?

20   A.  Because that's our practice, is to make certain that every

21   office has a copy of this, a hard copy of this manual.

22   Q.  Why?

23   A.  Because it's the most user-friendly document that we have.

24   We're already receiving 12,000 calls for advice.  Our hope is

25   that the manual will help offices answer some of the questions

1    themselves with the practical examples that are in the manual.

2    Q.  Now, approximately how long have you worked for the ethics

3    committee again?

4    A.  Four years.

5    Q.  Based on that experience, do you have an understanding as

6    to whether the Senate ethics manual is generally known in the

7    Senate community?

8    A.  I do.

9            MR. WEITZMAN:  Objection.

10           THE COURT:  I'll allow that.

11   BY MR. RICHENTHAL:

12   Q.  What is your understanding, Ms. Kopplin?

13           THE COURT:  What is it based on?  I'm sorry.  Let's

14   have your understanding first.

15           Go ahead.

16   A.  That it's widely known within the Senate community.

17   Q.  And why do you say that?

18   A.  Because it's referenced in many of the phone calls that I

19   have and the emails that I receive from Senate staff of, I've

20   looked in the ethics manual, I can't find the answer to my

21   question, etc.

22   Q.  By the way, if an office wants another copy of the ethics

23   manual, are they able to get one?

24   A.  Of course.

25   Q.  How?

1    A.  They ask.

2    Q.  Has that ever happened?

3    A.  It has happened.  Most of your junior staffers want the

4    electronic version, but we still have it old school for the

5    people who want it that way.

6            MR. RICHENTHAL:  One more question just in light of

7    Mr. Weitzman's questions.

8            MR. WEITZMAN:  Objection, your Honor.

9            THE COURT:  Sustained.

10           The jury knows to disregard the comments of the

11   lawyers.

12           Go ahead.

13           MR. RICHENTHAL:  One more question.

14   Q.  The office of the Senate Ethics Committee, it's in Hart?

15   A.  That's correct.

16   Q.  It's H-A-R-T?

17   A.  Yes.

18   Q.  Where is Mr. Menendez's office?

19   A.  In the Senate Hart office building.

20   Q.  Is that the same building?

21   A.  He's on the fifth floor.  We're on the second.

22   Q.  Is it three floors apart?

23   A.  Yes.

24           MR. RICHENTHAL:  Ms. Wechsler, can we go to page 86 of

25   the manual.

O6rWmen1                    Kopplin - Direct

 1  Q.  Is that on your screen, Ms. Kopplin?

 2  A.  It is.

 3  Q.  Could you read what the sentence at the bottom?

 4       MR. RICHENTHAL:  Ms. Wechsler, maybe we can zoom in.

 5  A.  "Regardless of compensation, a public official may not act

 6  as an agent or attorney for a foreign principal required to

 7  register under the Foreign Agents Registration Act of 1938, as

 8  amended; that is, generally, those individuals engaged in

 9  lobbying, political, or propaganda activities on behalf of

10  foreign governments or political parties."  And it cites to a

11  footnote.

12       MR. RICHENTHAL:  Thank you.  You can take that down,

13  Ms. Wechsler.

14  Q.  Now, I've asked you a few questions about the ethics

15  committee website.  I think you said it's part of the greater

16  Senate website?

17  A.  Yes.

18       MR. RICHENTHAL:  I just have another website question

19  or two, and then I'm going to shift topics.  OK?

20  Q.  Does the Senate website include who sits on different

21  Senate committees?

22  A.  It does.

23  Q.  Does it include the status of pending or proposed

24  legislation?

25  A.  Some do.

O6rWmen1                          Kopplin - Direct

1    Q.  What do you mean by some do?

2    A.  Well, each website -- or excuse me.  Each committee website

3    is controlled by that committee's staff.  So some of them

4    choose to put that on there, some of them do not.

5            MR. RICHENTHAL:  Let's go back now to financial

6    disclosures.  I'm going to ask Ms. Wechsler to put on your

7    screen Government Exhibits 10E-1 through 10E-12.  And for your

8    convenience, Ms. Kopplin, I think you also have a binder in

9    front of you with the same documents.  You're welcome to use

10   either the binder or the screen, whatever you prefer.

11           You can scroll through, Ms. Wechsler, the first page

12   of each.

13   Q.  I think we've now gone through all of those; do you see

14   those, Ms. Kopplin?

15   A.  I do.

16   Q.  Now, prior to testifying today, did you also review these

17   exhibits?

18   A.  I did.

19   Q.  What are these, in sum?

20   A.  Well, the first set of documents were financial disclosure

21   reports for Senator Menendez, and then there were a series of

22   documents that were our financial disclosure instructions for

23   the same years.

24   Q.  And are those years 2018 through 2022?

25   A.  That's correct.

O6rWmen1                          Kopplin - Direct

1              MR. RICHENTHAL:  The government offers 10E-1 through

2     10E-12.

3              THE COURT:  Admitted.

4              MR. WEITZMAN:  Your Honor, I have a voir dire on the

5     instructions, on the financial instructions that she testified

6     to.

7              THE COURT:  All right.  Go ahead.

8     VOIR DIRE EXAMINATION

9     BY MR. WEITZMAN:

10    Q.  On the instructions, like the instruction manual, are those

11    available online?

12    A.  Yes, sir.

13    Q.  And is there any system that the Senate ethics office

14    employs to ensure or track who gets -- who's reviewed those?

15    A.  No, sir.

16             MR. RICHENTHAL:  Your Honor, this is cross.

17             THE COURT:  It is, just as it was before.  That's

18    correct.  It's cross.  It's not voir dire.

19             MR. RICHENTHAL:  May I proceed?

20             MR. WEITZMAN:  One more question.

21             THE COURT:  Go ahead.

22    BY MR. WEITZMAN:

23    Q.  Do you email the instructions to every senator?

24             MR. RICHENTHAL:  Same objection.

25             THE COURT:  I'll allow that.

1    A.  We do not.

2              MR. WEITZMAN:  No objection, your Honor.

3              THE COURT:  All right.

4              (Government Exhibits 10E-1 through 10E-12 received in

5    evidence)

6              MR. RICHENTHAL:  May I proceed, your Honor?

7              THE COURT:  Yes.  Mr. Weitzman has had part of his

8    cross.

9              Proceed.

10             MR. RICHENTHAL:  And just for clarity of the record,

11   your Honor, I think you admitted these exhibits.  Is that

12   correct?

13             THE COURT:  I am admitting them, yes.

14             MR. RICHENTHAL:  Now, let's start with 10E-2.

15   Ms. Wechsler, could we put that on everyone's screen, please.

16   Q.  For what year is this disclosure, Ms. Kopplin?

17   A.  2018.

18   Q.  And just to orient ourselves, because the first one's on

19   the screen, where are you looking to answer that question?

20   A.  In the upper left-hand corner.

21   Q.  For whom is this disclosure?

22   A.  Senator Menendez.

23   Q.  And again, just to orient, where are you looking to answer

24   that question?

25   A.  The upper left-hand corner of the first page of this form.

1    Q.  And do you see beneath what's highlighted now, it says

2    filed 5/14, 2019, with the "at" symbol and 4:49 p.m.?  Do you

3    see that?

4    A.  Yes, sir.

5    Q.  What is that?

6    A.  That is the day and time that Senator Menendez filed this

7    report.

8    Q.  You said filed.  Do you mean electronically or in hard

9    copy?

10   A.  Electronically.

11   Q.  Now, do you see beneath that where it says, the following

12   statements were checked before filing?

13   A.  Yes.

14   Q.  Now, the two statements beneath that, they have little

15   boxes with check marks.  Is that right?

16   A.  That's correct.

17   Q.  They're also slightly colored or gray?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  It means that the filer -- in this case, Senator

21   Menendez -- checked those boxes before hitting the submit

22   button.

23   Q.  Now, could you read the first statement, beginning I

24   certify?

25   A.  "I certify that the statements I have made on this form are

O6rWmen1                      Kopplin - Direct

1   true, complete and correct to the best of my knowledge and

2   belief."

3   Q.  Could you now read the second statement, beginning I

4   understand?

5   A.  "I understand that reports cannot be edited once filed.  To

6   make corrections, I will submit an electronic amendment to this

7   report."

8   Q.  Now, the reference here to amendment, is that the process

9   you testified about a few minutes ago, about amending a

10  disclosure once filed?

11  A.  Yes, sir.

12  Q.  Now, beneath these two sentences, do you see another

13  sentence beneath the line?

14  A.  I do.

15  Q.  Now, do you see the box to its left?

16  A.  Yes.

17  Q.  There's no check mark, and it's white.  Do you see that?

18  A.  I do.

19  Q.  What does that mean?

20  A.  It means that box was not checked by the filer.

21  Q.  Now, I'm going to go through a few of these documents one

22  at a time, but since this is the first, in general, is the

23  format and organization of this disclosure form consistent or

24  inconsistent with how disclosure forms looked between at least

25  2017 and 2023?

O6rWmen1                        Kopplin - Direct

1   A.  It is consistent.

2   Q.  Let's now look down at part 2.  It says, earned income in

3   bold.  Then it says, did you or your spouse have reportable

4   earned income or noninvestment income?  Do you see that?

5   A.  I do.

6   Q.  And to the right, also in bold, it says no.  Do you see

7   that?

8   A.  I do.

9   Q.  Now, let's just back up for one moment.

10      What does the word "reportable" mean here?

11  A.  Reportable means you are required to list it on this public

12  report.

13  Q.  Now, if someone wanted to know what reportable meant, where

14  would the person look?

15  A.  Instructions, or they would call the committee staff.

16  Q.  Now, the sentence itself -- that is, the "did you" -- it

17  doesn't appear to be bold.  Do you see that?

18  A.  I do.

19  Q.  But the word "no" to the right is bold.  Do you see that?

20  A.  I do.

21  Q.  Could you explain the distinction between the sentence and

22  the word to the right?

23  A.  Yes.  So, what you're looking at here is the printable

24  version of the report that was filed.  When the filer -- in

25  this case, Senator Menendez -- when the filer was actually

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    inputting this into the system, there was a dropdown menu where

2    you could choose yes or no.  Whatever was selected by Senator

3    Menendez as the filer is what appears in bold.  So the question

4    is the, did you have reportable earned income?  The answer

5    selected by the filer is in bold -- in this case, no.

6    Q.  In case someone doesn't know, in this context, what's a

7    dropdown menu?

8    A.  It's where you're going through an online form and you

9    click on a box and it already has options there for you, and

10   you just click on the option you want rather than typing it in

11   yourself.

12   Q.  So one option is no?

13   A.  Correct.

14   Q.  Is there an option yes?

15   A.  There is.

16   Q.  Now, you said that the word "reportable" refers to the

17   instructions.  Is that correct?

18   A.  That's correct.

19          MR. RICHENTHAL:  Ms. Wechsler, can you put on --

20          THE COURT:  Do you mean that -- and I don't want to

21   put words in your mouth.  Are you saying that the word

22   "reportable" is defined in the instructions?

23          THE WITNESS:  Yes, your Honor.

24          THE COURT:  All right.

25          MR. RICHENTHAL:  Ms. Wechsler, can you now put on the

O6rWmen1                    Kopplin - Direct

1   screen -- it's in evidence; you can put it on everyone's

2   screen -- 10E-12, please.

3   Q.  Ms. Kopplin, what is this document?

4   A.  That is a -- the title page of the financial disclosure

5   instructions for calendar year 2018 from our office.

6   Q.  Now, is that for the same year for the disclosure form that

7   I just showed you?

8   A.  It is.

9   Q.  Could I direct your attention to the lower left, please?

10  A.  Yes.

11  Q.  Do you see where it says, issued March 2019?

12  A.  Yes.

13  Q.  How does that relate to the date of the disclosure itself?

14  A.  So, in March of 2019, as I said, the committee approved

15  this set of instructions, meaning the chairman and the vice

16  chairman, two senators, read through these instructions,

17  approved them, and then issued means they approved them.  And

18  at that point we put them out both electronically and in hard

19  copy for people to be able to file their reports.  So again,

20  you're filing a report in May of 2019 that covers calendar year

21  January 1 to December 31, 2018, just like income taxes.

22          THE COURT:  Just a moment.

23          Yes.  Proceed.

24  BY MR. RICHENTHAL:

25  Q.  So the instructions come out approximately March of each

O6rWmen1                        Kopplin - Direct

1   year?

2   A.  Correct.

3   Q.  And the disclosure is due in approximately May of each

4   year?

5   A.  Correct.

6   Q.  It's a roughly two-month period in between?

7   A.  Yes.

8         MR. RICHENTHAL:  Ms. Wechsler, could we go to page 2.

9   Q.  What is this, Ms. Kopplin?

10  A.  That's the table of contents for the financial disclosure

11  instructions we were discussing.

12  Q.  Now, we'll go through, or could go through, more than one

13  of these, but in general, are the instructions that we're

14  seeing on the screen formatted and with the table of contents

15  in a way that's consistent or inconsistent with what you're

16  looking at between at least 2017 and 2023?

17  A.  They are consistent.

18        MR. RICHENTHAL:  If I could now ask Ms. Wechsler to go

19  to page 3, please.

20  Q.  Is this another page of the table of contents?

21  A.  Yes, sir.

22  Q.  Now, a few minutes ago I asked you about part 2 of the

23  disclosure form regarding income.  Do you recall that?

24  A.  I do.

25  Q.  Is there a matching reference here in the table of

O6rWmen1                          Kopplin - Direct

1    contents?

2    A.   There is.

3    Q.   Could you just describe it, please?

4    A.   So, part 2, the header, reads earned and noninvestment

5    income, with a citation to the page, and then three subheadings

6    under that -- general instructions, ensuring consistency

7    throughout your report and outside earned income limit.

8              MR. RICHENTHAL:  Ms. Wechsler, are you able to put

9    back on the screen 10E-5 while keeping this table of contents

10   on the screen?

11   Q.   Are those both on your screen, Ms. Kopplin?

12   A.   They are.

13   Q.   Now the table of contents says, part 2, earned and

14   noninvestment income.  Do you see that?

15   A.   I do.

16   Q.   And the form says, part 2, earned and noninvestment income.

17   Do you see that?

18   A.   I do.

19   Q.   Do they match?

20   A.   They do.

21   Q.   Why?

22   A.   They were designed to match.

23   Q.   Why were they designed to match?

24   A.   Well, we're actually trying to make it easier for the filer

25   to be able to comply with the law.

1          MR. RICHENTHAL:  Now let's go back to the table of

2     contents, 10E-12, for the record; I think we're on page 3.

3     Q.  On what page does the section for earned and noninvestment

4     income begin, according to the table of contents?

5     A.  12.

6          MR. MONTELEONI:  The page again, for the record, I'm

7     referring to 10E-12.

8     A.  12.

9          MR. RICHENTHAL:  Could you go to that page,

10    Ms. Wechsler.

11    Q.  Do you see now where it says, part 2, earned income and

12    noninvestment income?

13    A.  I do.

14    Q.  And again, is that the same title used in the table of

15    contents?

16    A.  Yes, sir.

17    Q.  And on the form?

18    A.  Yes.

19    Q.  All right.  Do you see where it says general instructions?

20    A.  Yes.

21    Q.  Could you read -- actually, before we get there, let me

22    just pause for a moment.

23         Do you see beneath where it says earned income and

24    noninvestment income reporting individuals for this part?  Do

25    you see that?

1    A.  I do.

2    Q.  And then it says you and your spouse --

3    A.  Yes.

4    Q.  Do you see that?

5        In the context of a disclosure who is the you and who is

6    your spouse?

7    A.  You refers to the filer, so in this context, Senator

8    Menendez, and your spouse includes the spouse of a required

9    filer.

10   Q.  Now, does spouse mean legally married spouse, live-in

11   relationship, something else?  In this context, what does it

12   mean?

13   A.  We use the legally married definition.

14   Q.  We're going to go through a few different sections, but are

15   some reporting obligations for the senator and his or her

16   spouse and some are just for the senator?

17   A.  Yes.

18   Q.  It varies by what part we're looking at?

19   A.  Correct.

20   Q.  And if one wanted to determine whether a given part was for

21   the senator or the senator and his or her spouse, where would

22   one look?

23   A.  There's three locations you could look.  The instructions

24   always reference it for each part.  The form itself references

25   it for each part.  And then the underlying federal law explains

O6rWmen1                         Kopplin - Direct

1    which part requires spouse reporting.

2        There are also some sections that require reporting for

3    dependent children.

4    Q.  That was my next question.

5        In the context of those parts, what is a dependent child?

6    A.  We define it as a child that you are claiming on your

7    income taxes.  So they can be over the age of 18, as long as

8    you're financially responsible for them.

9    Q.  Now, you said that one of the three places where one could

10   determine whether a reporting obligation includes one's spouse

11   is the form itself.  Is that right?

12   A.  Yes.

13           MR. RICHENTHAL:  Ms. Wechsler, could we go back to

14   10E-5, also part 2, please.  Could you highlight or just zoom

15   in on the part 2.

16   Q.  Where in what's on your screen are you referring to when

17   you say it indicates on the form that, for example, this

18   particular obligation refers to both the individual and his or

19   her spouse?

20   A.  So, the sentence immediately below the bolded part 2 reads,

21   did you or your spouse have reportable earned income?

22           MR. RICHENTHAL:  You can take that back down.  Thank

23   you, Ms. Wechsler.

24           Let's go back to the instruction.  We're on page 12,

25   marked at the bottom, of 10E-12.  Ms. Wechsler, could you put

1    back up 10E-12, page 12, which I think is page 15 of the

2    document, indicated as page 12 at the bottom.

3            We may be having a technical issue, Ms. Kopplin.

4            All right.  Page 12 of the document, which I think is

5    page 15 of the literal document.

6    Q.  Is that back up on your screen?  Ms. Kopplin, is that back

7    up on your screen?

8    A.  It is.

9    Q.  OK.  And this is part 2, again, earned income and

10   noninvestment income?

11   A.  Yes, sir.

12   Q.  If I could now direct your attention to the general

13   instructions.  Now, these are general instructions for what?

14   A.  For completing part 2 of the financial disclosure form.

15   Q.  Could you read the first sentence, please?

16   A.  "Report the source, type, and actual amount of

17   noninvestment and earned income aggregating $200 or more from

18   any one source."

19   Q.  Just to pause for a second, for anyone who may not know,

20   what does aggregating mean?

21   A.  All together.

22   Q.  Could you read the next sentence, please?

23   A.  "Include the name and location of each source of income."

24   Q.  And the sentence after that?

25   A.  "For your spouse, you are only required to report sources

O6rWmen1                    Kopplin - Direct

1   of noninvestment and earned income aggregating $1,000 or more

2   from any one source."

3   Q.  What does that mean?

4   A.  So, from an income source for the filer, you have to report

5   the exact dollar amount of income you received.  For your

6   spouse, you only need to report the source of the income if it

7   was greater than a thousand dollars.

8       So if my husband worked at the D.C. airport, it would say

9   D.C. airport, greater than $1,000, but it wouldn't give his

10  exact salary amount.

11  Q.  Do you see now a few paragraphs below it gives an example?

12  A.  Yes.

13  Q.  Is that an example of what you were just talking about with

14  respect to the spouse's income?

15  A.  Yes.

16          MR. RICHENTHAL:  Let's now look beneath this section

17  to part 3, if we could, Ms. Wechsler.

18  Q.  And this refers to assets and unearned income sources.  Do

19  you see that?

20  A.  I do.

21  Q.  Now, to whom is this obligation; that is, the reporting

22  individuals here are who?

23  A.  So, this is obligation refers to the filer, the filer's

24  spouse and any dependent children.

25  Q.  And is this the reference or a reference to dependent

O6rWmen1                         Kopplin - Direct

1  children, as you gave a few minutes ago?

2  A.  It is.

3  Q.  Could you read the first sentence under general

4  instructions?

5  A.  "Report any interest in property held in a trade or

6  business or for investment or the production of income."

7  Q.  And could you now read the second sentence, please?

8  A.  "You must provide a description of your, your spouse's and

9  your dependent children's assets and sources of unearned

10 income."

11             MR. RICHENTHAL:  Now, let me just pause for a moment.

12 Q.  Does the Senate Ethics Committee --

13             MR. RICHENTHAL:  Well, actually, let's go back to

14 10E-5, if we could.  And if we go to corresponding part, so

15 this would be part 3, assets.  It begins on the bottom of the

16 first page and goes on to the second page.  You can just leave

17 them both on the screen.

18             Thank you, Ms. Wechsler.

19 Q.  Is this the matching part of the form itself?

20 A.  It is.  This form is for a different year than these

21 instructions cover, but they would be -- the instructions would

22 not have changed.

23 Q.  That's all I'm asking, in general.

24 A.  Yes.

25 Q.  Now, just using this as an example, does the Senate Ethics

O6rWmen1                          Kopplin - Direct

1    Committee vet or verify the information that's put on a

2    financial disclosure form?

3    A.  No.  No.  If we already are keeping a record of something,

4    like a gift that was approved by the ethics committee, then we

5    would check that.  But we do not verify assets.

6    Q.  Let me just give an example.  So, here, it says Senate

7    federal credit union, lists some other information.  Do you see

8    that?

9    A.  I do.

10   Q.  Does the Senate Ethics Committee ensure that what is

11   written there is accurate?

12   A.  No.

13   Q.  Does it ensure that what's written there is complete?

14   A.  No.

15   Q.  Now, is that true for all of the answers on the form?

16   A.  Yes.

17   Q.  In other words, if I were to ask you, for example, the same

18   question for part 2, income, would you have the same answer?

19   A.  Yes.

20   Q.  Who, if anyone, does the Senate Ethics Committee,

21   therefore, rely upon for the accuracy of the answers on the

22   form?

23   A.  Each individual filer, and that's why you check the

24   certification box saying that the information is correct.

25   Q.  Who, if anyone, does the Senate Ethics Committee rely upon

O6rWmen1                          Kopplin - Direct

1   for the completeness of what's on the form?

2   A.  The individual filer.

3   Q.  I'll go back to the forms in a moment, but earlier in your

4   testimony, you referenced the ability of people to ask

5   questions of the ethics committee?

6   A.  Yes.

7   Q.  Now, if the question includes a statement about what a

8   member does or does not have, what process, if any, does the

9   Senate Ethics Committee undertake to verify the accuracy of the

10  statement?

11  A.  We don't.  We accept the assertion of the person asking the

12  question.

13  Q.  What process, if any, does the ethics committee undertake

14  to verify the completeness of the statement?

15  A.  We don't.  We rely on the assertion of the individual

16  filer.

17  Q.  And again, before we go back to the forms for a second,

18  does the fact that something is on a form necessarily mean it

19  was lawful for the person to have the item?

20  A.  No.  And in fact, that statement is included in the

21  instructions.

22  Q.  What statement, Ms. Kopplin?

23  A.  That just because you've reported it on the form doesn't

24  mean it was acceptable to receive it or have it.  Specifically,

25  it's in the gifts section.

O6rWmen1                        Kopplin - Direct

1   Q.  When you say the gifts section, you're referring to the

2   gifts section of the instructions?

3   A.  I am.

4           MR. RICHENTHAL:  Now, if we could go back to 10E-5,

5   Ms. Wechsler, and if we could scroll down to part 5, please.

6   Q.  So first, just as we scroll, are these other assets that

7   Mr. Menendez listed under part 3?

8   A.  Yes, sir.

9           MR. RICHENTHAL:  Please go back out, Ms. Wechsler.  I

10  apologize.  You can pause there.  I'm just going to use one as

11  an example to orient ourselves.

12  Q.  Do you see No. 2?

13  A.  I do.

14  Q.  M&T Bank?

15  A.  Yes.

16  Q.  Now, I'm going to call that the first column or column 1.

17  OK?

18  A.  OK.

19  Q.  Do you see column 2 says bank deposit?

20  A.  Yes, sir.

21  Q.  Column 3 says self?

22  A.  Yes.

23  Q.  Then there's a dollar range?

24  A.  Yes.

25  Q.  So just taking those three, who puts the information in

1   this particular asset as a bank deposit?

2   A.  The filer does.

3   Q.  Who puts the information that as self?

4   A.  The filer.

5   Q.  Who puts the range in?

6   A.  The filer.

7   Q.  Is that true if I were to go through, which I won't, every

8   line here?

9   A.  Yes.

10          MR. RICHENTHAL:  Could we go back to part 5,

11  Ms. Wechsler.  Let's stop there for a second.

12  Q.  You referenced a minute or two gifts -- excuse me.  You

13  referenced a minute or two ago gifts?

14  A.  I did.

15  Q.  Is this the gifts section of the report?

16  A.  Yes, sir.

17  Q.  Could you read what's written under gifts; that is, the

18  sentence beginning, did you?

19  A.  "Did you, your spouse or dependent child receive any

20  reportable gift during the reporting period?"  And then in bold

21  it says yes.

22          (Continued on next page)

23

24

25

1   BY MR. RICHENTHAL:   (Continuing)

2   Q.  Now again, just using the line as an example, do you see

3   line 1 has a date?

4   A.  Yes.

5   Q.  And it says cell?

6   A.  Yes.

7   Q.  And there is more information to the right?

8   A.  Yes.

9   Q.  For each of those indications, what I will call columns

10  again, who puts that information in?

11  A.  The filer.

12           MR. RICHENTHAL:  Now let's go from the disclosure

13  document instructions, 10E-12, and if we can put up on the

14  screen page 3.

15  Q.  I am going to ask you a couple questions about gifts.  Are

16  gifts listed on the instructions?

17  A.  Yes.

18  Q.  That is what is on your screen right now?

19  A.  Yes.

20  Q.  What page does that indicate?

21  A.  21.

22           MR. RICHENTHAL:  Can we go to page 21, Ms. Wechsler?

23  Q.  Is the gift section now on your screen?

24  A.  Yes.

25  Q.  Now, do you see under part 5 gifts it again says:

O6R5men2                          Kopplin - Direct

1   Reporting individuals for this part.

2   A.  Yes.

3   Q.  And after that it says:  You, your spouse, and your

4   dependent children.

5       Do you see that?

6   A.  Yes, sir.

7   Q.  Now, beneath that do you see the sentence beginning:  A

8   gift, with the word gift in quotation marks?

9   A.  Yes.

10  Q.  Could you read that, please?

11  A.  "A gift means any payment forbearance, advance, rendering

12  or deposit of money, or anything of value, unless consideration

13  of equal or greater value is received by the donor."

14  Q.  Would you read the next two sentences, please?

15  A.  "The term 'gift' includes but is not limited to, tangible

16  items, gratuities, discounts, services, training,

17  transportation, lodging, meals, or entertainment.  Generally,

18  this reporting requirement does not apply to gifts received by

19  your spouse or dependent children if the gift was given to him

20  or her totally independent of his or her relationship to you

21  and given without your knowledge or acquiescence."

22  Q.  Now, do you see beneath that it says:  General

23  Instructions?

24  A.  Yes.

25  Q.  Can you read the first sentence, please?

1  A.  "Report all gifts received by you, your spouse, or your

2  dependent children from any one source during the reporting

3  period that aggregated more than $390 in value."

4  Q.  And again, what does "aggregated" mean in the context of

5  the instructions?

6  A.  All together.

7        MR. RICHENTHAL:  Can we scroll down a bit,

8  Ms. Wechsler?

9  Q.  Do you see the next section says:  Exclusions?

10  A.  Yes.

11  Q.  We won't go through all of them but in the context of a

12  disclosure, what is an exclusion?

13  A.  It is something that falls in the general category, so in

14  this case gifts, but is excluded from being reportable, meaning

15  if it meets one of these definitions it does not have to be

16  reported on the form.

17  Q.  Now if I can direct your attention to the second line, do

18  you see where it says:  Gifts received from relatives?

19  Relatives is in quotations.

20  A.  Yes.

21  Q.  Do you see now there is an open parentheses, it says (see

22  p. 11, supra)?

23  A.  Yes.

24  Q.  What does "supra" mean?

25  A.  It is a lawyer word for above in the same document.

1  Q.  What is "p 11"?

2  A.  Page 11.

3  Q.  What is on page 11?

4  A.  The definition of relatives.

5          MR. RICHENTHAL:  Can we go there, Ms. Wechsler?

6  Q.  Are you referring to the section that says relative?

7  A.  Yes, I am.

8          MR. RICHENTHAL:  We can go back out, Ms. Wechsler, and

9  go back to the page we were on, page 21.  Now, I would like to

10  go back to the form itself, so 10E-5, we were on part 5, I

11  would like to now go to part 7, two or three pages.

12  Q.  Is part 7 now on your screen Ms. Kopplin?

13  A.  Yes.

14  Q.  What is this part about?

15  A.  Liabilities.

16  Q.  And what is the first sentence under part 7, liabilities?

17  A.  "Did you, your spouse, or dependent child have a reportable

18  liability worth more than $10,000 at any time?"  And the answer

19  on this form is "yes."

20  Q.  So first, again, does this refer to just the member or the

21  member, spouse or dependent child?

22  A.  It refers to the filer in this case, Senator Menendez, the

23  spouse, and any dependent child.

24  Q.  Is the word "reportable" there again?

25  A.  Yes.

1    Q.  And now, looking beneath those lines, did Senator Menendez

2    indicate he had such reportable liabilities?

3    A.  He did.

4    Q.  What did he indicate?

5    A.  He said yes, that he had reportable liabilities.

6    Q.  And again, column 2 is selected by the Ethics Committee or

7    selected by the filer?

8    A.  By the filer.

9    Q.  What about column 3, the type of liability?

10   A.  It is selected by the filer.

11   Q.  Now, did the instructions also have instructions this part,

12   part 7, Liabilities?

13   A.  Yes.

14         MR. RICHENTHAL:  If we can go back to instructions,

15   10E-12, page 3, table of contents?

16   Q.  Do you see the reference to liabilities here?

17   A.  I do.

18   Q.  Starting on page 23?

19   A.  Yes.

20         MR. RICHENTHAL:  Ms. Wechsler, can we now go to

21   page 23?

22   Q.  Do you see the general instructions here?

23   A.  Yes.

24   Q.  Can you read the first sentence, please?

25   A.  "Reporting individuals for this part:  You, your spouse,

O6R5men2                        Kopplin - Direct

1   and your dependent children."

2   Q.  Does that match the form?

3   A.  It does.

4   Q.  Could you read the first sentence under general

5   instructions?

6   A.  "Identify and provide the category of amount for each

7   liability which you, your spouse, or your dependent child owed

8   to any creditor that exceeded $10,000 at any time during the

9   reporting period, unless that liability is a revolving charge

10  account, for example, a credit card."

11  Q.  What is a revolving charge account?

12  A.  So it's a type of charge account that's -- it is usually a

13  credit card so you have a personal contract with a company to

14  be able to owe a certain amount of money for a given interest

15  rate.

16  Q.  What makes it revolving?  Can you explain what that word

17  means?

18  A.  It changes.

19  Q.  Now, if I could direct your attention to the third

20  paragraph, do you see a sentence that contains bolded words

21  that begins:  For liabilities?

22  A.  I do.

23  Q.  Could you read that sentence, please?

24  A.  "For liabilities other than revolving charge account,

25  report the highest amount owed during the reporting period, not

O6R5men2                          Kopplin - Direct

1    the amount owed at the end of the period."

2    Q.  What does that mean?

3    A.  It means if you have a loan balance throughout the

4    reporting period, the calendar year, you report the highest

5    amount you owed during that calendar year and not when you paid

6    it down by December 31st of that calendar year.

7    Q.  Would you read the next steps?

8    A.  "If the liability was satisfied, i.e., repaid in full

9    during the reporting period, you may note that on the report,

10   if you wish."

11   Q.  What does that mean?

12   A.  So, if you had a loan and you repaid it during that

13   calendar year, you would still report the highest amount you

14   owed during the year but there is a way on the report you can

15   put a comment that anyone who looks at your report would see

16   that says you paid off the balance of your loan during the

17   year.

18   Q.  Did you give an example of how this would work with respect

19   to, say, a loan for a car?

20   A.  Sure.

21        So, assuming you have a loan of more than $10,000 for

22   a car and you owed, say, $15,000 in January and you had a car

23   payment of $500 a month, then that loan would have just

24   decreased by -- and now I am making myself do public math --

25   $6,000 by the end of the calendar year, you would report the

O6R5men2                          Kopplin - Direct

1   $15,000 loan amount and not at the end of the year.  If you

2   were lucky and you paid off that $15,000 loan in the middle of

3   the calendar year, you would still report the $15,000, but then

4   you could put a note in there that everyone would see that says

5   I paid off my car loan in June of the year.

6   Q.  In short, if you take on a liability you have to report the

7   maximum amount?

8   A.  Correct.

9   Q.  Regardless of when it is paid back?

10  A.  Correct.

11  Q.  Or how much is paid back?

12  A.  Correct.

13          THE COURT:  The maximum amount during that calendar

14  year for which the filing is made?

15          THE WITNESS:  Yes, sir.

16          MR. RICHENTHAL:  You can scroll down again,

17  Ms. Wechsler, to the next page.

18  Q.  This is page 24.  Do you see exclusions here?

19  A.  I do.

20  Q.  Do you see the first exclusion named:  Personal Liability?

21  A.  Yes.

22  Q.  Can you read that, please?

23  A.  "A personal liability owed to a spouse or dependent child,

24  or to a parent, brother, sister, or child of you, your spouse,

25  or your dependent children."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  What does that mean?

2   A.  It means that if you are giving or receiving a loan between

3   your family members, you do not have to report that on your

4   form.

5   Q.  So just to use the same example of car loan, what car loan

6   would not have to be reported to fall within this exclusion?

7   A.  So not hypothetically, if I gave my son a loan to buy a

8   car, I do not have to report that as a filer because he is my

9   son.

10  Q.  Now what if the loan was not between family members?

11  A.  Then it has to be reported.

12          MR. RICHENTHAL:  Now, if we can scroll down a little

13  further, please?

14  Q.  Do you see where it says:  Exemption test?

15  A.  Yes, sir.

16  Q.  What is the exemption test?

17  A.  The exemption test is explained in the underlying federal

18  law here and it gives three parts that if you fulfill three

19  parts of this test for an asset or liability for your spouse or

20  dependent child, you do not have to report it.  It is

21  exceedingly rare that anyone meets this exemption test for

22  asset or liability.

23  Q.  Now, if you see that it says after that:  See p 10 supra?

24  A.  Yes.

25  Q.  Does that mean on page 10 the exemption test is defined?

1    A.   Is explained, yes.

2    Q.   Can you read the next sentence beginning:  If you omit?

3    A.   If you omit any such liabilities, you must indicate the

4    omission by checking the appropriate box on the review and file

5    report section of your eFD report.

6    Q.   What does that mean?

7    A.   So earlier I discussed at those three boxes at the first

8    page of every report, that third box is what this refers to,

9    you would have to check that box.

10   Q.   In the disclosure forms that have now been introduced into

11   evidence, did Senator Menendez ever check that box?

12   A.   No, sir.

13   Q.   Can you read the next sentence, please:  You must contact?

14   A.   You must contact the committee prior to checking the box

15   and filing your report.

16   Q.   Why is that?

17   A.   Because it's extraordinarily rare that someone can meet

18   this exemption test and so there would be a problem with your

19   report if you tried to assert that you were entitled to that

20   exemption and didn't have to report something when in fact you

21   did.

22   Q.   How often has the ethics committee approved this exemption

23   between, say, 2018 and 2023?

24   A.   Never.

25   Q.   How often in the past 10 years, so 2014 to 2024 --

O6R5men2                        Kopplin - Direct

1    A.  Never.

2    Q.  -- has the ethics committee -- let me just complete the

3    question.

4    A.  Sorry.

5    Q.  My apologies.

6        How often in the past 10 years, so from 2014 to 2024, has

7    the ethics committee approved this exemption?

8    A.  Between 2014 and present the ethics committee has never

9    approved the use of this exemption.

10           MR. RICHENTHAL:  Let's back out, Ms. Wechsler.  Can we

11   go to the next disclosure form, the next numbered exhibit --

12   excuse me next disclosure form, 10E-3?

13   Q.  For what year is this disclosure, Ms. Kopplin?

14   A.  2019.

15   Q.  And when was it filed?

16   A.  It was filed on August 5, 2020, at 12:56 p.m.

17   Q.  Now, if this is for 2019, what calendar year does it cover?

18   A.  So it's for 2019, January 1 through December 31, 2019.

19           MR. RICHENTHAL:  Can we go to part 5, please?  Just

20   because -- there.  Thank you, Ms. Wechsler.

21   Q.  Did Mr. Menendez report any gifts for calendar year 2019?

22   A.  He did not.

23           MR. RICHENTHAL:  Can we go to part 7?

24   Q.  Did he report any liabilities for 2019?

25   A.  He did.

1    Q.  How many?

2    A.  One.

3    Q.  For himself or his spouse?

4    A.  For himself.  He was not married in 2019.

5         MR. RICHENTHAL:  Now let's go to the next year, 2020,

6    10E-5.

7    Q.  Is this the disclosure for calendar year 2020?

8    A.  Yes, it is.

9    Q.  Filed in 2021?

10   A.  Correct.

11   Q.  And when was this one filed?

12   A.  It was filed on May 17, 2021, which was the appropriate

13   filing deadline that year because the 15th fell on a weekend.

14        MR. RICHENTHAL:  Can we go down to part 5 again?

15   Q.  Is this the gifts part?

16   A.  Yes, sir.

17   Q.  Now, did Senator Menendez report any gifts?

18   A.  He did.

19   Q.  Are you saying that because of the "yes" following the

20   sentence?

21   A.  Yes.

22   Q.  Now, beneath that are the gifts he reported?

23   A.  Yes.

24   Q.  So lines 1 through 11?

25   A.  Yes.

1   Q.  Under the gift line, do you see where it says "checked per"

2   and then it continues for each of these lines?

3   A.  Yes.

4   Q.  Do each of these refer to a wedding?

5   A.  Yes.

6   Q.  Can we go to the next page, page 4 of the form, there is

7   two more gifts that are listed on the form?

8   A.  Yes.

9   Q.  Does the final one, which is line 12, also refer to a

10  wedding?

11  A.  Yes, it does.

12  Q.  For this year did all the gifts refer to a wedding?

13  A.  They did.

14  Q.  Let's look now at liabilities, part 7 up on your screen.

15  Do you see that?

16  A.  I do.

17  Q.  Now, I think I showed this before but just to pause, are

18  any liabilities listed for this year?

19  A.  Yes.

20  Q.  Are they for Senator Menendez or his spouse?

21  A.  For his spouse.

22  Q.  What liabilities are listed for his spouse in part 7 for

23  calendar year 2020?

24  A.  Two mortgages for his spouse.

25  Q.  Now, do you see where it says:  Creditor?

1    A.  I do.

2    Q.  What is a creditor?

3    A.  The person or the organization you owe the money to.

4    Q.  Are any individual people listed here?

5    A.  Yes.

6    Q.  I need to be more precise.  Under creditor, do you see any

7    individual human names?

8    A.  I do.

9    Q.  Where?

10   A.  In the first line.

11   Q.  Where does it say that?

12   A.  Under creditor it says Mr. Cooper of Cleveland, Ohio.

13   Q.  Are you familiar with whether Mr. Cooper is a person or a

14   business?

15   A.  I am not, actually.

16   Q.  And do you see beneath that it says:  Select Portfolio

17   Servicing?

18   A.  Yes.

19   Q.  Now other than those two creditors, are any other creditors

20   listed under "Liabilities" for 2020?

21   A.  No.

22           MR. RICHENTHAL:  Can we go back up to gifts for a

23   second?

24   Q.  Now, do you see that lines 1 through 12, which I think you

25   said reference a wedding, each of them refers to a Senate

1    ethics approval?

2    A.   Yes.

3    Q.   Do you see that?

4    A.   Yes, sir.

5    Q.   And they also contain the word "waiver."  Do you see that?

6    A.   I do, sir.

7    Q.   What does that mean?

8    A.   So, when senators or Senate staff get married, there is a

9    process where we approve all the gifts under a general waiver

10   if they were given because of your wedding.  Otherwise, it

11   would be somewhat overwhelming.  So it is a requirement that a

12   senator or Senate staff report a gift valued more than $250

13   that is not received from a relative.  So, if you can imagine a

14   large wedding, you know, there would be dozens, if not a

15   hundred and in some of these instances so we give a general

16   wedding waiver that any gift given to you at your wedding is

17   going to fall under this exception and this is how we tell

18   people to report it.

19   Q.   Now, you if look back at the first column you see it says:

20   Date?

21   A.   I do.

22   Q.   It says October 3, 2021?

23   A.   I do.

24        MR. RICHENTHAL:  Can we go back to the beginning of

25   the form, please?

1    Q.   Now this was filed on May 17, 2021?

2    A.   It was.

3              MR. RICHENTHAL:   Can we go back now to the gifts line?

4    Q.   October 3, 2021 is after May 17, 2021 -- excuse me.

5              October 3, 2021 is after May 17, 2021?

6    A.   Yes.

7    Q.   What is your understanding of what the date in the first

8    column here is?

9    A.   It is a scribner's error, it should read October 3, 2020,

10   which we know is the date of Senator Menendez' wedding.

11             MR. RICHENTHAL:   Now if we can go back to part 7?

12             THE COURT:   Are you ending with the wedding waiver?

13             MR. RICHENTHAL:   I was going to shift topics in a

14   moment.

15             THE COURT:   Let me ask, go to the wedding waiver.  I'm

16   not quite sure I understood what you said when you said it

17   would be overwhelming.  What did you mean?

18             THE WITNESS:   Well, there is almost 2,000 Senate

19   staff, many of them are quite young, and so we have dozens of

20   weddings happening at any one time.  To approve each gift from

21   a non-relative over $250 for all of those Senate staffers when

22   we know the context of receiving a gift at a wedding usually

23   does not have a conflict of interest, we give a blanket waiver

24   for those rather than processing them each individually.

25             THE COURT:   What does the waiver do?

1          THE WITNESS:  The waiver allows you to just say you

2     are having a wedding and you are going to receive gifts at the

3     wedding without asking each individual gift be approved

4     separately.

5          THE COURT:  Does each individual gift over a certain

6     amount have to be listed?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What is the amount?

9          THE WITNESS:  It varies by year.  In 2020, the dollar

10    amount was any gift received over $415.

11         THE COURT:  So if I understand you, and again I am not

12    trying to put words in your mouth, the wedding waiver just

13    means that the filer does not have to seek approval of the gift

14    but the filer still must -- is required to list the gift?

15         THE WITNESS:  That's correct, your Honor.

16         THE COURT:  Now I understand.  Thank you.

17    BY MR. RICHENTHAL:

18    Q.  In other words, it is not a disclosure waiver is that

19    right?

20    A.  That's correct.

21    Q.  If I could direct your attention now to line 9, and by line

22    9 I mean part 5, Gifts.  Who gave this gift, according to this

23    disclosure?

24    A.  Philip and Barbara Sellinger of Morristown, New Jersey.

25    Q.  And now line 11?

O6R5men2                          Kopplin - Direct

 1  A.  That gift was given by Donald Scarinci, if I am pronouncing
 2  that correctly, of Allendale, New Jersey.
 3          MR. RICHENTHAL:  We can go back out.
 4  Q.  Now each of these lines refers to a waiver.  Is that all
 5  the same waiver, that is, the wedding waiver that you mentioned
 6  a few minutes ago?
 7  A.  Yes.
 8  Q.  Between 2018 and 2023 did Senator Menendez receive any
 9  other waivers?
10  A.  No.
11          MR. RICHENTHAL:  We can go back out.
12  Q.  Now, this form is for calendar year 2020; is that right?
13  A.  That's correct.
14  Q.  Did there come a time when the disclosure for Senator
15  Menendez for calendar year 2020 was amended?
16  A.  Yes, sir.
17  Q.  And by amended I mean revised?
18  A.  Correct.
19  Q.  How did that come about?
20  A.  Senator Menendez called me and asked if he needed to amend
21  his 2020 report.
22  Q.  Let me just pause for a second.  Approximately when did he
23  call you?
24  A.  February of 2022, so this was in the context of him
25  preparing his report covering calendar year 2021.

1    Q.   Prior to receiving a call from Senator Menendez, did you

2    receive a call from anyone else advising you you were going to

3    receive a call from Senator Menendez?

4    A.   I did.

5    Q.   From whom?

6    A.   From the chief of staff for the chairman of the Ethics

7    Committee.

8    Q.   Just take that one at a time.  In the context of the

9    Senate, what is a chief of staff?

10   A.   So the chief of staff -- it is kind of what it sounds like,

11   it is your primary executive assistant that is running the

12   day-to-day operations of your office and it is your principal

13   advisor.

14   Q.   Now, without naming the other senator, what did this chief

15   of staff tell you in telling you to expect a call from Senator

16   Menendez?

17   A.   That Senator Menendez had spoken to the other senator and

18   asked if he needed to amend a report.  The senator -- my

19   boss -- had advised him to contact me directly.

20   Q.   I would like to pause for a second.  You said the senator,

21   my boss.  Without naming the person, why are you referring to

22   that senator as your boss?

23   A.   Because he is the chairman of the ethics committee.

24   Q.   Just to be clear, Ms. Kopplin, when you say chairman of the

25   ethics committee, you are referring to at this time in February

1   of 2022?

2   A.   Correct.

3           THE COURT:  And it was a senator I take it?

4           THE WITNESS:  Yes, sir.

5   BY MR. RICHENTHAL:

6   Q.   Now, what did you understand the call you were going to

7   receive from Senator Menendez to be about?

8   A.   A financial disclosure question.

9   Q.   A financial disclosure question concerning what?

10  A.   Whether he had to amend a prior report.

11  Q.   With respect to a particular type of item?

12  A.   To an asset.

13  Q.   What type of asset?

14  A.   At the time I was told it was gold bullion.

15  Q.   Did you in fact get a call from Senator Menendez?

16  A.   I did.

17  Q.   The same day or a different day?

18  A.   It was within an hour.

19  Q.   I'm sorry.  Within an hour of what?

20  A.   Of receiving the first phone call from the chief of staff.

21  Q.   What did you understand Senator Menendez, based on your

22  conversation with the chief of staff, to want to know from you?

23  A.   Senator Menendez told me that his spouse had an asset, gold

24  bullion, and he wanted to know what the reporting requirement

25  was for it.

O6R5men2                          Kopplin - Direct

1   Q.  Now, just to pause for a second.  From your conversation
2   with Senator Menendez, did you understand this was an asset he
3   had known of for some time or an asset he had only recently
4   learned of?
5   A.  My impression was that he had recently learned of it.
6   Q.  Now, that is your impression from the conversation with
7   Senator Menendez; is that right?
8   A.  That's correct.
9   Q.  Did you have the same understanding from your conversation
10  with the chief of staff?
11  A.  Yes.
12  Q.  Now, did Senator Menendez provide any documentation that he
13  had only recently learned of this asset?
14  A.  No.
15  Q.  Did the chief of staff provide any documentation that
16  Senator Menendez had only recently learned of this asset?
17  A.  No.
18  Q.  Do you have any reason to know at the time one way or
19  another whether he had only recently learned of this asset?
20  A.  No.
21  Q.  Did you make any attempt to verify the time whether he had
22  only recently learned of this asset?
23  A.  No.
24  Q.  Why not?
25  A.  Not my job.  I mean, I'm relying on the assertion of the

1   information I'm getting from the filer.

2   Q.  Now, in this conversation, in February --

3        THE COURT:  If I understand you correctly, you

4   never -- no.  Withdrawn.

5        Proceed.

6   Q.  In this conversation in February of 2022, in response to

7   Senator Menendez telling you about this asset, what, if

8   anything, did you say to him?

9   A.  I advised him that he did need to amend his 2020 financial

10  disclosure report.

11  Q.  Why is that?

12  A.  Because the information I received from Senator Menendez

13  was that his spouse had owned the gold bullion during their --

14  she entered the marriage with the gold bullion, so between

15  October 3, 2020 and December 31st, 2020 she owned it, which

16  means it had to be reported on that 2020 report.

17  Q.  Now, when you say she owned it, do you have personal

18  knowledge of that or are you conveying what Senator Menendez

19  conveyed to you?

20  A.  I am conveying what Senator Menendez explained to me, or at

21  least my understanding of it.

22  Q.  In words or substance?

23  A.  Yes.

24  Q.  Do you recall the exact words, by the way, that he used?

25  A.  No.

O6R5men2                          Kopplin - Direct

1  Q.  Now, in the same conversation, what else, if anything, came

2  up?

3  A.  We discussed his wife's LLC and what the reporting

4  requirement would be for that, and that was for the report he

5  was preparing currently for calendar year 2021.

6  Q.  So let's take that one at a time.  So the asset was about

7  calendar year 2020; is that right?

8  A.  That's correct.

9  Q.  And your understanding was that that was because he had

10  been married in calendar year 2020?

11  A.  Yes.

12  Q.  Now, the LLC was about calendar year 2021; is that right?

13  A.  That's correct.

14  Q.  And your understanding was that he was asking you about the

15  LLC as well?

16  A.  Yes.

17  Q.  Now let's just go with this for a moment.  So first --

18  everyone may not know -- what is an LLC?

19  A.  A limited liability corporation.

20  Q.  And what, specifically, do you recall Senator Menendez

21  asking you about an LLC of his wife?

22  A.  So his wife had a limited liability corporation, it was a

23  consulting business, and he needed to know how to properly

24  disclose that on his report; which part to put it in and what

25  information was required.

1    Q.   I think you said it was a consulting business?

2    A.   Yes.

3    Q.   And again, Ms. Kopplin, do you have personal knowledge

4    whether it was a consulting business or are you saying what he

5    said to you?

6    A.   I am explaining what Senator Menendez explained to me.

7    Q.   What, if anything, did he tell you about the consulting

8    business?

9    A.   So I asked him a series of questions that I would ask

10   anyone asking about how to report an LLC, which is does the LLC

11   own any -- do they have an office building, do they own

12   equipment, are there employees, are there invoices, that sort

13   of thing, to which he answered "no" to all of those questions,

14   that this was -- she had no employee, she had no office

15   building, and was working out of their home.  And that was how

16   I was able to give him advice on how to disclose it properly.

17   Q.   Do you recall him saying who else, if anyone, did work for

18   this company?

19   A.   I recall him saying she had no employees or independent

20   contractors.

21   Q.   And I think you said you recall him saying that she worked

22   out of the home; is that right?

23   A.   Yes.

24   Q.   Do you recall him referencing where in the home?

25   A.   Yes.  I asked him the question of is there an office lease

1  or an office building owned, and his response was no, no, this

2  is something that she does out of our dining room.

3  Q.  Now, after this conversation, did you provide Senator

4  Menendez with any written advice?

5  A.  I did.

6  Q.  Was it consistent or inconsistent with what you told him on

7  the phone?

8  A.  It was consistent.

9        MR. RICHENTHAL:  Ms. Wechsler, would you now put on

10  the screen what's been marked Government Exhibit 8A-1.

11  Q.  Do you recognize this, Ms. Kopplin?

12  A.  I do.

13  Q.  What is it?

14  A.  It is an e-mail exchange I had with Senator Menendez.

15  Q.  Is this an e-mail exchange on one or more topics you just

16  testified about with your conversation with him in February of

17  2022?

18  A.  Yes, sir.

19        MR. RICHENTHAL:  The government offers 8A-1.

20        THE COURT:  Admitted, without objection.

21        (Government's Exhibit 8A-1 received in evidence)

22        MR. RICHENTHAL:  Can you put that on everyone's

23  screen, Ms. Wechsler?

24  BY MR. RICHENTHAL:

25  Q.  Now let me just start with the bottom here.  Do you see on

O6R5men2                        Kopplin - Direct

1   page 1, February 17, 2022, 4:53 p.m., you wrote an e-mail to

2   Senator Menendez?

3   A.   I do.

4   Q.   Now is that date, February 17, 2022, to the best of your

5   memory, the date either on or about Senator Menendez and you

6   had the conversation on the phone that you just testified

7   about?

8   A.   That was almost immediately following my discussion with

9   Senator Menendez on the phone.

10  Q.   Now you see you wrote:  Senator, thank you again for

11  contacting the committee.  Do you see that?

12  A.   I do.

13  Q.   Now you referenced, "based on our discussion."  Is that the

14  phone discussion?

15  A.   Yes.

16  Q.   Then you wrote:  I advise you amend your CY 2020 financial

17  disclosure report to include your spouse's gold bars in part 3

18  as an asset.

19       Do you see that?

20  A.   I do.

21  Q.   Let me just pause there for a second.  What is CY?

22  A.   Calendar year.

23  Q.   And the reference to spouse's gold bars, that is a

24  reference to what?

25  A.   The conversation I had with Senator Menendez.

1    Q.  Now again, Ms. Kopplin, did you know at the time, one way

2    or another, whether the gold bars were in fact of his spouse?

3    A.  No.

4    Q.  Now below that there is a bolded line, it says:  Steps to

5    complete the amendment.  What is that referring to?

6    A.  I listed the very specific practical steps that Senator

7    Menendez would have to go through in our electronic platform to

8    be able to complete this amendment.

9    Q.  Do you see the reference under part 1 "eFD"?

10   A.  Yes, sir.

11   Q.  What is eFD?

12   A.  Electronic Financial Disclosure.  That's the name of our

13   platform.

14   Q.  Now, you see next to it it says "HERE"?

15   A.  Yes, sir.

16   Q.  It is capitalized?

17   A.  Yes.

18   Q.  Appears to be underlined?

19   A.  Yes.

20   Q.  What was that?

21   A.  It was a hyperlink to eFD, so all he would have to do is

22   click on it and get to the eFD system.  I was trying to make it

23   easy for the senator.

24   Q.  Now, is this the same system that references instructions

25   when someone logs in?

1    A.  Yes.

2            MR. RICHENTHAL:  If we can go down, please, to the

3    next page, Ms. Wechsler?  Stop there.

4    Q.  Now, do you see the reference in line 4 to assets quote?

5    A.  Yes.

6    Q.  Assets are part 3 of your report?

7    A.  Yes.

8    Q.  What are you explaining to Senator Menendez about how to

9    list the gold?

10   A.  These are very practical, step-by-step directions on what

11   to click on within the eFD system to be able to amend the

12   report, specifically to add the additional asset that had not

13   been previously disclosed.

14   Q.  Beneath that line 5 you wrote:  I recommend you include the

15   following information.

16       Do you see that?

17   A.  I do.

18   Q.  And the second line is gold bullion, the third line is gold

19   bars?

20   A.  Yes.

21   Q.  How, if at all, did you know that the gold was in the form

22   of bars?

23   A.  Senator Menendez told me.

24   Q.  Now, do you see the next line:  Owner of:  Spouse.  How, if

25   at all, did you understand that the gold belonged to his

O6R5men2                          Kopplin - Direct

1   spouse?

2   A.   That's what Senator Menendez told me.

3   Q.   The next line:  Value.  Do you see where it says report the

4   combined value of the gold bars by selecting the appropriate

5   category?

6   A.   Yes.

7   Q.   What does that refer to?

8   A.   So, the assets are only required to be reported in value

9   ranges.  Again, it is a dropdown menu where you have choices of

10  what range your assets fall in, so specifically here my advice

11  was you don't report the gold bars individually.  If you have

12  six it is the total value of all of the gold bars that you own,

13  just pick from the dropdown menu what the value category should

14  be.

15  Q.   Now, in the answer you just gave you reference "six."  Did

16  Senator Menendez tell you how many gold bars he was talking

17  about?

18  A.   No.  That was just my example.

19  Q.   Now, do you see the last bullet after 5 -- excuse me, under

20  5, it says there is an option at a public comment to explain

21  the asset if that is helpful to you.

22  A.   Yes.

23  Q.   What do you mean by that?  Excuse me, what did you mean by

24  that?

25  A.   So, there is an option for everything on the report to add

1    what we call a public comment, which is room to explain how you

2    got the asset, anything about the asset.  So when we talked

3    about the car loan before you could say I paid off this loan in

4    the middle of the calendar year.  Sometimes when an asset is

5    inherited, people want to explain that they inherited it within

6    the calendar year.  So that was an option to provide additional

7    explanation if the senator wanted to.  It is absolutely not

8    required.

9    Q.  Now, going from that option up to two more lines in the

10   bullet list, can you see the line:  Income type and income

11   amount?

12   A.  Yes.

13   Q.  What did you mean by specify the types of income; assuming

14   no income, select none.

15   A.  So, any asset that you hold for investment, some of them

16   have income, capital gains income, and some of them you are not

17   receiving any income.  So, for instance, an asset held in an

18   IRA, if you are not taking a distribution from your IRA your

19   income would be none.

20   Q.  Why did you include the line about income type and income

21   amount in this e-mail to Senator Menendez?

22   A.  Because this was an asset that I assumed they were going to

23   hold for some period of time and I was trying to provide

24   comprehensive advice on what he was going to need to do with

25   the asset reporting going forward.

O6R5men2                        Kopplin - Direct

Q.  Now, if you can look at the next line, the next paragraph,
6, do you see where you wrote:  If you would like us to review
your report before submitting for accuracy, please click the
box.

        And then you explain how to do that.  Why did you
write that?

A.  There is an option in the system where you can allow the
staff to review your report confidentially before you hit
submit.  For a senator, as soon as they hit the submit button
it becomes publicly available, and so many of them would prefer
that we look at it and make any corrections that would be
helpful or any additional recommendations before they make it a
public record.  It avoids having to have a second amended, in
some instances.

Q.  In the context of what you are talking about when you say
corrections, do you mean information the ethics committee has
itself or information provided to the ethics committee by the
senator?

A.  Could be either.

Q.  And if it is information the ethics committee has itself,
what type of information would that be?

A.  So a great example is if we have record that a senator had
a book contract approved during the calendar year but I'm not
seeing the book contract reported within the draft report, we
are going to reach out to them and ask why it wasn't reported;

O6R5men2                          Kopplin - Direct

1    was it an administrative record?  Or is the contract now no

2    longer in existence?

3    Q.  You referred to a record.  Did the Senate ethics committee

4    have a record of Senator Menendez or his spouse having gold

5    bars or gold bullion?

6    A.  No.

7    Q.  You said this conversation took place in February 2022; is

8    that right?

9    A.  That's correct.

10   Q.  And you understood from the conversation he had recently

11   learned of the gold bars or gold bullion; is that right?

12   A.  That's my understanding.

13   Q.  What is the relationship between when a member of Congress

14   learns of an asset and the obligation to disclose the asset?

15   A.  So if it is -- if the asset should have been reported in a

16   prior year then it's as soon as possible you need to amend your

17   report to make that asset reported publicly.

18   Q.  Now, this conversation took place in 2022; is that right?

19   A.  Correct.

20   Q.  What year did you understand Senator Menendez to be saying

21   his spouse had come into possession of this asset?

22   A.  I don't know when she came into possession of the asset but

23   they were married and therefore he had a reporting obligation

24   as of October of 2020.

25   Q.  In other words, he marries his spouse in October 2020.

1    A.   That's correct.

2    Q.   But in February 2022 he is indicating he recently learned

3    of asset of the spouse?

4    A.   That was my impression.

5            THE COURT:  Mr. Richenthal, why don't you find a

6    logical time to break.

7            MR. RICHENTHAL:  If I could have a couple more

8    minutes, your Honor?

9            THE COURT:  Please.

10           MR. RICHENTHAL:  Can we scroll down, Ms. Wechsler?

11   Q.   Paragraph 7, I want to ask you about this final section of

12   the e-mail.  Now, this section you entitled Future Reporting.

13   Do you see that?

14   A.   I do.

15   Q.   Now, the reference here begins for CY 2021, that is,

16   calendar year 2021?

17   A.   Yes.

18   Q.   You wrote for your CY 2021 report (due May 16, 20222), it

19   looks like there is an extra 2 --

20   A.   Sorry.

21   Q.   No apology needed -- you will list the asset exactly as you

22   amended it for your CY 2020 report?

23   A.   Correct.

24   Q.   What does that mean?

25   A.   That means that there were no changes so however he was

1  going to report it, specifically the asset type, the value

2  category, that would be the same in the 2021 report that he was

3  working on at the time he called.

4  Q.  Now when you say there were no changes, did you have

5  personal knowledge of changes or, again, you are going with

6  what he told you?

7  A.  I am going on the senator's assertion.

8  Q.  Now, if I can direct your attention to the next two

9  paragraphs and then we will break?  First you wrote:  If your

10  wife sells the gold bars during CY 2022 (or any year in the

11  future), there is no requirement for a periodic transaction

12  report.

13      What did that mean?

14  A.  We talked about periodic transaction reports earlier and

15  that they are required for security so individual stocks,

16  commodities, etc.  I wanted to make certain Senator Menendez

17  knew that a periodic transaction report was not required for

18  the sale of gold bullion.  To my knowledge, Senator Menendez

19  has never had to file a periodic transaction report.

20  Q.  Now, the next sentence read:  You will need to disclose the

21  sale on part 4B of the annual report covering the year of the

22  sale.  If the income generated from the sale is greater than

23  $200, you will also need to report the income in part 3 for

24  that report.

25      What did that mean?

1    A.   So, if the gold bars were sold and there was a capital

2    gain, meaning from the time that she owned them to the time

3    that she sold them there was a gain in the value of the asset,

4    that would have to be reported in that income, so that was the

5    discussion in the prior part of the e-mail on, for 2020, you

6    are going to check none.  But if she sold them, there could be

7    capital gain income that would have to be reported.

8    Q.   In other words, the gold bullion is an asset?

9    A.   Yes.

10   Q.   The sale of it could generate income?

11   A.   Yes.

12   Q.   Assets have to be reported?

13   A.   Yes.

14   Q.   Income has to be reported?

15   A.   Income from those assets, yes.

16   Q.   Now finally, and by finally I mean before we break, you

17   wrote:  Should your wife use the proceeds of the sale of the

18   gold bars to repay a mortgage, you will still report the

19   highest amount owed on the mortgage in the reporting period in

20   the next annual report.

21        Do you see that?

22   A.   I do.

23   Q.   Now, first, what did you mean by:  You will still report

24   the highest amount owed on the mortgage?

25   A.   So, as we discussed earlier, you report the highest amount

O6R5men2                          Kopplin - Direct

1    of any liability owed during the reporting period even if you

2    pay off that loan during the reporting period.

3    Q.  When you see the reference in giving that advice to "should

4    your wife use the proceeds of the sale of the gold bars to

5    repay a mortgage"?

6    A.  Yes.

7    Q.  Is that a typical piece of advice you give when you are

8    asked about an asset?

9    A.  No.  This is very specific.

10   Q.  Do you remember Senator Menendez saying something about his

11   wife using proceeds to pay a mortgage?

12   A.  I don't.  It's been a long time since I had had this

13   conversation with him but I do not remember that part of the

14   conversation.

15   Q.  Sitting here today, why do you believe you wrote:  Should

16   your wife use the proceeds of the sale of gold bars to repay a

17   mortgage?

18               MR. WEITZMAN:  Objection.

19               THE COURT:  Sustained.

20   Q.  Ms. Kopplin, do you have a habit or practice in how you

21   give advice when senators inquire about assets?

22   A.  I do.

23   Q.  What is your habit or practice?

24   A.  I try to be comprehensive in how they're going to manage

25   reporting of the asset going forward in an effort to be

1    respectful of a senator's time.

2    Q.  And in doing that, do you have general advice you give when

3    someone inquires about an asset?

4    A.  I do.

5    Q.  What types of advice fall under that category?

6    A.  Future reporting, whether a periodic transaction report is

7    required and the types of things that they do do with the

8    asset, improve it if it is real property, sell it.  All those

9    sorts of things.

10   Q.  Now that type of advice, is that the rest of the e-mail?

11   A.  So the first two paragraphs are definitely what I consider

12   trying to be comprehensive in my advice to Senator Menendez.

13           THE COURT:  When you say the first two paragraphs, do

14   you mean the last two paragraphs that are on the screen?

15           THE WITNESS:  No, sir.  I mean, the first two

16   paragraphs inform the subheading Future Reporting.

17           THE COURT:  All right.  Thank you.

18           THE WITNESS:  Yes, sir.

19   BY MR. RICHENTHAL:

20   Q.  Now, beyond the general advice, do you also give specific

21   advice depending on what you were told?

22   A.  Yes.

23   Q.  The reference here to repaying a mortgage, does that fall

24   in the general advice category or the specific advice category?

25   A.  It is very specific.

1    Q.   Now, based on your practice of how you give senators

2    advice, do you have an understanding of whether you wrote this

3    because you generally write this or you wrote this because he

4    said something to you about it?

5    A.   I give specific advice to a specific question.  That's my

6    practice.

7    Q.   So sitting here today, do you believe you wrote this

8    because he said something to you or because it was part of your

9    general advice?

10   A.   It was not part of general advice.  My impression is that I

11   had to have been asked a specific question to give that

12   specific kind of advice.

13            THE COURT:  And I take it you have no recollection of

14   that, any such conversation?

15            THE WITNESS:  That's correct, your Honor.

16            THE COURT:  All right.

17   BY MR. RICHENTHAL:

18   Q.   Now, finally you wrote:  I hope this information is helpful

19   for you.  Please do not hesitate to contact me again if you

20   have additional questions (or if eFD is being difficult).

21   A.   Yes, sir.

22   Q.   What did you mean by that?

23   A.   I wanted to encourage Senator Menendez to contact me if he

24   had any other questions about the report.  I wanted it to be a

25   positive interaction between the two of us.  It was the first

O6R5men2                         Kopplin - Direct

1    time I had ever had a substantive conversation with Senator

2    Menendez.  And then eFD, like any other electronic system,

3    sometimes it does not work the way you want it to and I didn't

4    want anyone to be frustrated by that, I didn't want to waste

5    the senator's time.

6                MR. RICHENTHAL:  This might be a good time for a

7    break, your Honor.

8                THE COURT:  Ladies and gentlemen, 15 minutes.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6R5men2                        Kopplin - Direct

1              (Jury not present)

2              THE COURT:  You may step down, Ms. Kopplin.

3              (Witness not present)

4              THE COURT:  How much longer do you have, sir?

5              MR. RICHENTHAL:  Not much, your Honor.  Maybe 20

6     minutes.

7              THE COURT:  Thank you.  15 minutes.

8              (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Bring the jury in.

2         (Jury present)

3    THE COURT:  You may be seated in the courtroom.

4    Mr. Richenthal, you may continue and conclude your

5    direct examination of Ms. Kopplin.

6    MR. RICHENTHAL:  Welcome back, Ms. Kopplin.

7    THE WITNESS:  Thank you.

8    MR. RICHENTHAL:  Could we put back on the screen

9    Government Exhibit 8K-1, Ms. Wechsler.

10   Q.  When we had left off, I had asked you questions about the

11   email that you sent on February 17, 2022, to Senator Menendez.

12        MR. RICHENTHAL:  Could I ask Ms. Wechsler now to

13   scroll up to the middle of the document.

14        Thank you, Ms. Wechsler.

15   Q.  Ms. Kopplin, on the middle of your screen here, is that

16   Senator Menendez's response to your email?

17   A.  Yes.

18   Q.  And when did he respond?

19   A.  On March 6 of 2022.

20   Q.  What did he say?

21   A.  He said he was getting ready to amend his reports, said he

22   did not get married until October 7, 2020, and did he need to

23   amend the 2020 report even though it's past the filing period

24   in 2020.

25   Q.  How did you respond?

O6rWmen3                         Kopplin - Direct

1    A.  That, unfortunately for him, he still had to amend the

2    reports, because, again, like income tax, whatever the status

3    is on December 31 of the reporting year, that's what you

4    report.  So if she owned -- if Mrs. Menendez owned the gold

5    bars after they were married, then he would have to amend the

6    2020 report and list them as an asset.

7    Q.  And to be clear, when you say if Ms. Menendez owned the

8    gold bars after they were married, are you referring to

9    calendar year 2020?

10   A.  Correct.

11   Q.  If I could direct your attention to the (inaudible)

12   following your advice that indeed he needs to amend, do you see

13   where you wrote, please tell me if we were incorrect on the

14   date your spouse acquired the asset or if you need help to

15   amend your prior report?  Do you see that?

16   A.  I do.

17   Q.  Now by, date your spouse acquired the asset, are you

18   referring to a date in 2020 or before?

19   A.  No.  What I meant was if she had acquired the asset from

20   January 1, 2021, forward, then he wouldn't need to amend the

21   2020 report; he would just have to report it on his 2021

22   report.

23   Q.  Can you explain what you mean by that?

24   A.  Yes.  So, if she owned the asset when they were married --

25   so in October of 2020 -- then it would have to be reported on

O6rWmen3                          Kopplin - Direct

1    the report that covers 2020, which means he'd have to amend

2    that report.  If, however, she had received the gold bars in,

3    let's say, January of 2021, then his 2020 report was fine.  And

4    he was still preparing his report covering calendar year 2021,

5    so there was nothing to amend.  He would be on time and he

6    would just report it as an asset beginning in 2021.

7    Q.  Was it your understanding then that the gold bars he was

8    talking about had been acquired prior to 2021?

9    A.  Yes.

10   Q.  And was that understanding based on what he told you?

11   A.  Yes.

12   Q.  And again, Ms. Kopplin, did you have personal knowledge one

13   way or another as to whether that was true or false?

14   A.  No, did not.

15   Q.  Did you have personal knowledge one way or another whether

16   that was accurate or inaccurate?

17   A.  No.

18   Q.  Now, if he had told you instead that gold had been acquired

19   in 2021 rather than prior to or during 2020, what would you

20   have told him was his responsibility with respect to amending?

21   A.  That he would not have to amend.

22   Q.  But would he still have to report it?

23   A.  Yes.

24   Q.  In a different report?

25   A.  Yes.

1    Q.   Which report?

2    A.   The report that covers calendar year 2021.

3    Q.   Now, did Senator Menendez inform you that, in fact, the

4    gold was acquired any later than 2020 in response to your

5    email?

6    A.   No.

7    Q.   Did he instead amend the 2020 report?

8    A.   He amended the 2020 report.

9            MR. RICHENTHAL:  Could we go to Government Exhibit

10   10E-4.

11   Q.   While our technical problems are hopefully resolved, one

12   more question.

13       What advice, if any, did you give Senator Menendez about

14   how to value the gold?

15   A.   I didn't.

16           THE COURT:  Can you go on to something else while

17   that's loading, or doing whatever it's doing?

18           MR. RICHENTHAL:  I can ask the questions without the

19   documents, but it's probably going to be far less clear, your

20   Honor.

21           THE COURT:  All right.  Let's wait a moment.

22           MR. RICHENTHAL:  I'm sorry, Ms. Kopplin.

23           THE COURT:  There we are.

24           MR. RICHENTHAL:  There we are.

25   Q.   Ms. Kopplin, is Government Exhibit 10E-4 on your screen?

O6rWmen3                           Kopplin - Direct

1    A.  Yes.

2    Q.  Is this the amended 2020 disclosure?

3    A.  Yes.

4    Q.  And what, if anything, on the report itself indicates to

5    you that it's an amendment and not the original?

6    A.  So, in the upper left-hand corner of the first page, it

7    says annual report for calendar 2020, and then parenthetically

8    it says amendment 1.

9               MR. RICHENTHAL:  Ms. Wechsler, can we go to part 3.

10   Q.  Do you see that, Ms. Kopplin?

11   A.  I do.

12   Q.  Now, before the break, I asked you some questions about

13   assets.  I want to direct your attention now --

14              MR. RICHENTHAL:  If we could scroll, Ms. Wechsler, a

15   little further please.

16   Q.  -- do you see line 11?

17   A.  Yes, I do.

18   Q.  It says gold bullion.  Description, gold bars, etc.?

19   A.  Yes.

20   Q.  Now, was this an addition in the amended report?

21   A.  Yes.

22   Q.  Who does it say, according to the amended report, owned

23   this asset?

24   A.  The spouse, Mrs.  Menendez.

25   Q.  And again, who put that information in, the ethics

O6rWmen3                                Kopplin - Direct

1   committee or Senator Menendez?

2   A.   Senator Menendez.

3   Q.   What does the report indicate is the value of the gold

4   bars?

5   A.   So, again, values are reported in ranges, and the value

6   selected was $100,001 to $250,000 in total value.

7   Q.   And again, who selects the range, the ethics committee or

8   the filer?

9   A.   The filer.  So in this case, Senator Menendez.

10          MR. RICHENTHAL:  Now, if we could go up to gifts,

11  please -- I'm sorry.  Down to gifts.  Part 5.

12          Pause there.

13  Q.   Now, do you see the gifts section?

14  A.   Yes.

15          MR. RICHENTHAL:  Could we go down, please.  And keep

16  scrolling a little further, Ms. Wechsler.  Thank you.

17  Q.   Do you see these gifts, Ms. Kopplin?

18  A.   I do.

19  Q.   How, if at all, did this change between the original

20  disclosure and the amended disclosure?

21  A.   It did not.

22          MR. RICHENTHAL:  Could we go now to liabilities, part

23  7.

24  Q.   Do you see that, Ms. Kopplin?

25  A.   I do.

1    Q.  How, if at all, did this change between the original

2    disclosure and the amended disclosure?

3    A.  There is no change.

4    Q.  Was the only change the listing of the gold bars under

5    assets?

6    A.  Yes.

7            MR. RICHENTHAL:  Scroll back up to the top; that is,

8    the first page.

9    Q.  And again, when was this filed?

10   A.  It was filed on March 16 of 2022, at 1:23 p.m.

11           MR. RICHENTHAL:  Now, let's go to the following year;

12   that is, the disclosure for 2021.  Ms. Wechsler, can you put on

13   the screen 10E-6.

14   Q.  Is this the disclosure for calendar year 2021?

15   A.  Yes, it is.

16   Q.  When was this filed?

17   A.  It was filed on May 12 of 2022 at 10:02 a.m.

18           MR. RICHENTHAL:  Could we just go back for one moment

19   to the prior year.

20   Q.  And the prior year -- that is, the amendment -- is filed on

21   March 16, is that right?

22   A.  Yes.

23   Q.  And the report for the calendar year, 2021, is filed on May

24   12?

25   A.  Yes.

1          MR. RICHENTHAL:  OK.  Let's go to calendar year 2021,

2    filed May 12, 2022.

3    Q.  So this covers calendar year 2021, filed in 2022, is that

4    right?

5    A.  That's correct.

6    Q.  Now, if I could direct your attention to the earned and

7    noninvestment income section, part 2, does Senator Menendez

8    disclose any earned or noninvestment income with respect to his

9    spouse?

10   A.  He did.

11   Q.  Could you look at line 3?

12   A.  Yes.

13   Q.  Who does it say paid that earned or noninvestment income?

14   A.  Strategic International Business Consultants, in Englewood

15   Cliffs, New Jersey.

16   Q.  Did you understand this to be the consulting company to

17   which he referred in your conversation?

18   A.  His spouse's LLC, yes.

19   Q.  Do you see the amount paid?

20   A.  I do.

21   Q.  What is the amount paid?

22   A.  For spouses, there's only one option and that's greater

23   than a thousand dollars.  And that is what is reported.

24   Q.  Again, who reported that this was self-employment income,

25   who reported the name of the company and who reported the

O6rWmen3                          Kopplin - Direct

1    amount?

2    A.  Senator Menendez.

3    Q.  What, if any, personal knowledge did you have as to whether

4    that was accurate?

5    A.  None.

6    Q.  What, if any, personal knowledge did you have as to whether

7    that was complete?

8    A.  None.

9    Q.  What, if any, personal knowledge did you have about what,

10   if anything, his spouse had done to get this income?

11   A.  None.

12   Q.  By the way, was this income reported --

13          THE COURT:  Slow down, sir.

14   BY MR. RICHENTHAL:

15   Q.  Was this income reported in the prior year's disclosure?

16   A.  It was not.

17          MR. RICHENTHAL:  If we go down now to assets, part 3.

18   Stop at line 10.

19   Q.  Do you see line 10?

20   A.  I do.

21   Q.  Now, does this, again, indicate gold bullion in the form of

22   gold bars?

23   A.  It does.

24   Q.  Does it indicate that the owner is spouse?

25   A.  Yes.

1  Q.  And does it indicate a range?

2  A.  Yes.

3  Q.  What's the range?

4  A.  Same range as the prior report, $100,001 to $250,000 total

5  value.

6          MR. RICHENTHAL:  Could we go down to transactions,

7  part 4.

8  Q.  Does Senator Menendez report any transactions for calendar

9  year 2021?

10  A.  He did not.

11  Q.  And finally, gifts?

12  A.  No gifts.

13  Q.  How about liabilities?

14  A.  Yes.

15  Q.  Is that under part 7, those two right there?

16  A.  Yes.

17  Q.  Other than the liability to Mr. Cooper and Select Portfolio

18  Servicing, did he list any liabilities for calendar year 2021?

19  A.  No.

20  Q.  Are these the same liabilities reported in the prior year

21  as well?

22  A.  Yes.

23          MR. RICHENTHAL:  Let's now go to the next year; that's

24  Government Exhibit 10E-7.

25  Q.  Is this the disclosure for calendar year 2022?

O6rWmen3                         Kopplin - Direct

1    A.  Yes, sir.

2    Q.  When was this filed?

3    A.  It was filed on June 26, 2023, at 7:31 p.m.

4    Q.  Could we go down again to the same categories I've asked

5    you about a few times.  First we'll start at part 2; that is

6    income.

7         Is it on your screen?

8    A.  Yes.

9    Q.  Again, does Senator Menendez report any income with respect

10   to a company called Strategic International Business

11   Consultants?

12   A.  Yes.

13   Q.  What income?

14   A.  Spouse income of greater than $1,000.

15   Q.  Are you looking at line 3 on your screen for the calendar

16   year 2022 disclosure?

17   A.  I am.

18        MR. RICHENTHAL:  Can we go down now to assets.

19   Q.  Do you see there Senator Menendez reported that indeed he

20   or his spouse or dependent child own assets?

21   A.  Yes.

22        MR. RICHENTHAL:  Keep going, please.  Keep going.

23   Thank you, Ms. Wechsler.

24   Q.  Again, looking on line 11, did he report gold bullion in

25   the form of gold bars?

1    A.  Yes.

2    Q.  Owned by spouse?

3    A.  Yes.

4    Q.  And what range of money?

5    A.  Same range, $100,001 to $250,000 total value.

6            MR. RICHENTHAL:  If we could go down now to

7    transactions.  Stop there.

8    Q.  Do you see part B -- excuse me, 4B, transactions?

9    A.  I do.

10   Q.  What transactions, if any, did Senator Menendez report had

11   taken place in calendar year 2022?

12   A.  Four separate transactions where his spouse did a partial

13   sale of gold bullion.

14   Q.  In what months, according to the report?

15   A.  According to the report, there are two transactions, two

16   sales, in April of 2022 and two sales in June of 2022.

17   Q.  Now, do you see the column that says amount?

18   A.  I do.

19   Q.  Are those specific amounts or ranges?

20   A.  Again, it's ranges.

21   Q.  Why is that?

22   A.  That's what the law requires.

23   Q.  And what range was reported for each of these four sales?

24   A.  Between $50,001 and $100,000 for each sale.

25   Q.  I believe you said that the transactions were partial --

O6rWmen3                          Kopplin - Direct

1    the sales, excuse me, were partial?

2    A.  Yes.

3    Q.  What led you to say that?

4    A.  Two things.  The first is that they're listed in this

5    column as a partial sale, meaning they still own part of the

6    asset.

7         And then the other was the conversation between his staff

8    and our staff.

9    Q.  So let's take those one at a time.  I'll ask about the

10   conversation in a moment.

11        First, referring to the report, where on the report are you

12   looking that indicates to you the sale was partial?

13   A.  So, I'm looking at what I would call the fourth column,

14   transaction type.

15            MR. RICHENTHAL:  Highlight that, Ms. Wechsler.

16   Q.  Now again, Ms. Kopplin, what knowledge, if any, did you

17   have at the time as to whether the sales, if they took place,

18   were partial?

19   A.  Only the assertion of the filer.

20            MR. RICHENTHAL:  Let's go down now to gifts, quickly,

21   part 5.

22   Q.  Did Senator Menendez report any gifts for himself, his

23   spouse or dependent child for calendar year 2022?

24   A.  No, sir.

25            MR. RICHENTHAL:  Go down do liabilities.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Did Senator Menendez report any liabilities for himself,

2    his spouse or dependent child in calendar year 2022?

3    A.  He did.

4    Q.  Are they the two on your screen now?

5    A.  Yes.

6    Q.  Now, other than liability for Mr. Cooper and Select

7    Portfolio Servicing, did he report any?

8    A.  No.

9    Q.  Are these the same liabilities he reported in the prior

10   years that I've shown you?

11   A.  With the exception of the dollar amount of line item 1

12   changed by a value category, they are the same liabilities.

13   Q.  And what do you mean by the value category changed; could

14   you explain?

15   A.  Yes.  So again, you get a selection of value ranges for

16   each of these.  In prior reports, he had selected $100,001 to

17   $250,000 for that 1999 mortgage.  On this report he's reporting

18   between $50,001 and $100,000 total, highest amount owed on the

19   mortgage, which suggests to us that he -- they were paying down

20   the mortgage.  It's pretty common.

21   Q.  I'm sorry.  When you say it's pretty common, what's the

22   "it" in the sentence?  What's pretty common?

23   A.  Things change in value category based on paying down the

24   liability.

25   Q.  Did he report a liability here with respect to a car loan?

O6rWmen3                           Kopplin - Direct

```
 1    A.  He did not.

 2    Q.  Did he report a liability on the prior year with respect to

 3    a car loan?

 4    A.  No.

 5    Q.  In any of the reports that I've shown you, did he report a

 6    liability with respect to a car loan?

 7    A.  He did not.

 8    Q.  Now, I want to ask you a couple questions about the gold

 9    bars, and then I'll turn to the conversation you referred to a

10    couple minutes ago.

11         In any of the reports I've shown you, did Senator Menendez

12    indicate that he or his spouse had acquired gold after 2020?

13    A.  No.

14    Q.  In any of the reports I've shown you, did Senator Menendez

15    indicate he'd received any gifts after 2020?

16    A.  No.

17    Q.  In any of the reports I've shown you, did Senator Menendez

18    indicate any liabilities concerning an automobile?

19    A.  No.

20    Q.  Now, you mentioned a moment ago a conversation I think you

21    said staff had?

22    A.  Yes.

23    Q.  Before I get to that, I just want to ask you a couple

24    questions about your own conversations.  OK?

25         Other than the conversation that you testified about in
```

1    February 2022, between 2018 and 2023, did you ever speak or

2    email with Senator Menendez about gold bars?

3    A.  No.

4    Q.  Or gold bullion?

5    A.  No, sir.

6    Q.  Or gold in any form?

7    A.  No, sir.

8    Q.  In the same time period -- that is, 2018 and 2023 -- did

9    you ever speak or email with Senator Menendez about gifts?

10   A.  No, sir.

11   Q.  Same time period, did you ever speak or email with Senator

12   Menendez about cash?

13   A.  No, sir.

14   Q.  Same time period, did you ever speak or email with Senator

15   Menendez about a loan for a car?

16   A.  No, sir.

17   Q.  Now, are members of Congress able to designate someone on

18   their staff to assist with the filing of disclosure reports?

19   A.  Yes.

20   Q.  What is that person or persons known as in the context of

21   disclosure reports?

22   A.  We refer to them as a filing assistant.

23   Q.  What, in this context, is a filing assistant?

24   A.  It's someone the senator designates to talk to committee

25   staff and help them prepare their report.  So it can be anyone

O6rWmen3                          Kopplin - Direct

1    from an attorney from an outside firm to a member of their own

2    staff.  In some cases we have senators' spouses who are

3    actually preparing it.

4    Q.  What is the role or authority of the person you're talking

5    about; that is, the filing assistant?

6    A.  The authority they have is that they can speak to committee

7    staff and we can discuss confidential information regarding

8    that senator's report.

9    Q.  Now, is the filing assistant authorized to file a

10   disclosure report without showing it to the senator?

11   A.  Well, they're authorized to do whatever the senator tells

12   them they can do, but the attestation, that certification

13   statement that we talked about, that holds the individual

14   filer -- in this case, the senator -- responsible for the truth

15   and accuracy of their report.

16   Q.  Now, in the time period that I've been asking about -- that

17   is, 2018 to 2023 -- did Senator Menendez have a filing

18   assistant he designated with respect to the ethics committee?

19   A.  He did.

20   Q.  Who was that?

21   A.  Rob Kelly.

22   Q.  Who did you understand Mr. Kelly to be?

23   A.  Rob Kelly is a senior member of the Senator Menendez's

24   staff in his Washington, D.C., office.

25   Q.  Now, in the same time period, 2018 to 2023, did you

1    personally ever speak with Mr. Kelly about gold bars, cash or

2    gifts?

3    A.   No.

4    Q.   Does the Senate Ethics Committee maintain a system that

5    tracks conversations with a member or the member's filing

6    assistant regarding disclosures?

7    A.   We did.

8    Q.   Prior to testifying today, did you have an opportunity to

9    review that system?

10   A.   I did.

11          THE COURT:  Slow down, sir.

12   BY MR. RICHENTHAL:

13   Q.   Did you indicate whether anyone on the staff in that same

14   period spoke with Mr. Kelly; that is, between 2018 and 2023?

15   A.   Yes.

16   Q.   Did it indicate whether anyone spoke with him about gold

17   bars?

18   A.   Yes.

19   Q.   On what subject, and approximately when?

20   A.   In 2023 -- so, in preparation of the calendar year 2022

21   report -- there was questions asked and answered regarding how

22   to report the sale of gold bullion.

23   Q.   Now, when you said how to report the sale of gold bullion,

24   are these the sales that I showed you in the 2022 report a few

25   minutes ago?

1   A.  Presumably.

2   Q.  You say presumably.  Why do you say that, Ms. Kopplin?

3   A.  Well, because, again, we have no direct knowledge.  We're

4   going out -- off of what the senator or his filing assistant

5   are telling us.

6   Q.  Now, to go back to the conversations with Mr. Kelly, from

7   your review of the system, were these conversations related to

8   when Senator Menendez learned of gold or how to report sales of

9   gold?

10  A.  How to report the sale of the gold.

11  Q.  Based on your review of the system, did any conversation

12  take place between 2018 and 2023 other than what you've

13  testified about regarding when Senator Menendez learned of

14  gold?

15  A.  No.  No other conversation.

16  Q.  Other than the conversation you testified about, did the

17  system indicate any conversation regarding when his spouse came

18  into possession of gold?

19  A.  No, sir.

20  Q.  Now, based on your review of the same system, did any

21  conversations between 2018 and 2023 concern cash other than in

22  the form of wedding gifts?

23  A.  No.

24  Q.  Any conversation in the same time period concerning a loan

25  for a car?

O6rWmen3                          Kopplin - Cross

1    A.  No.

2                MR. RICHENTHAL:  No further questions.

3                THE COURT:  All right.  Thank you.

4                Cross-examination, sir.

5                MR. WEITZMAN:  Yes, your Honor.

6    CROSS-EXAMINATION

7    BY MR. WEITZMAN:

8    Q.  Good afternoon, Ms. Kopplin.

9    A.  Good afternoon, sir.

10   Q.  I want to go back to some of the basics that you discussed

11   in your direct examination.  I think you said that all senators

12   and all senior staff or all staff members of the Senate above a

13   certain dollar threshold in income need to make annual

14   financial disclosures.  Right?

15   A.  That's correct.

16   Q.  And there's a form that gets filled out; for most senators

17   and staff it would be an online form except for the seven who

18   refuse, right?

19   A.  That's correct.

20   Q.  And when you fill out the online form, is there a log-in

21   page?

22   A.  There is.

23   Q.  OK.  And does it have, like, a biometric log-in, where it

24   tests who is doing the log-in through fingerprint or anything

25   else?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6rWmen3                         Kopplin - Cross

1    A.  No, sir.

2    Q.  OK.  Is there a security question?

3    A.  No.

4    Q.  You just need to know, like, the username and the password?

5    A.  Username and password.

6    Q.  And you said there's a filing assistant, and in Senator

7    Menendez's case, it was Rob Kelly, right?

8    A.  That's correct.

9    Q.  You understand who Rob Kelly is?

10   A.  I do.

11   Q.  He's the senator's deputy chief of staff, right?

12   A.  Yes.

13   Q.  And he's been with the senator 15, 20 years; do you know?

14   A.  I think he came with him from the House, so it may even be

15   longer than that.

16   Q.  You know the senator's been in the Senate since 2006,

17   right?

18   A.  Of course.

19   Q.  So it's been -- how many years is that?

20   A.  19.

21   Q.  OK.  Thank you.

22       And you understand that Mr. Kelly is the person who does

23   the filings for the senator's annual filings; do you have that

24   understanding from your conversations with him?

25            MR. RICHENTHAL:  Objection.

1              THE COURT:  Just a moment.

2              Yes.  Rephrase it.

3   BY MR. WEITZMAN:

4   Q.  From your conversations with Rob Kelly, do you have an

5   understanding that as the filing assistant Rob Kelly

6   electronically files the forms involved in the annual

7   disclosures?

8   A.  I don't have that understanding.

9   Q.  But you'd agree with me that in the Senate many of the

10  senators have their filing assistants actually electronically

11  file the forms?

12             THE COURT:  Do you know whether or not many of the

13  senators have their filing assistants actually electronically

14  file the annual form?

15             THE WITNESS:  No, sir.

16  BY MR. WEITZMAN:

17  Q.  OK.  Do you know the average age of the senators in the

18  Senate?

19             THE COURT:  Sustained.

20  BY MR. WEITZMAN:

21  Q.  Do you know who the oldest senator is in the Senate?

22             MR. RICHENTHAL:  Objection.

23             THE COURT:  Sustained.

24  BY MR. WEITZMAN:

25  Q.  Do you know how old Senator Menendez is?

O6rWmen3                        Kopplin - Cross

1          THE COURT:  I'll allow that.

2    A.  70.

3    Q.  Do you know how old Chuck Grassley is?

4          MR. RICHENTHAL:  Objection, your Honor.

5          THE COURT:  Sustained.

6          Move forward, sir.

7    BY MR. WEITZMAN:

8    Q.  Fair to say that when you were communicating with the

9    senator's staff regarding filings, other than the one call you

10   had or the couple calls you described with Senator Menendez,

11   most of your communications or your staff's communications with

12   Senator Menendez were through his staff, is that correct?

13   A.  That's correct.

14   Q.  In fact, is it true that -- prior to this call in 2022, had

15   you ever spoken to Senator Menendez?

16   A.  No, sir, I had not.

17   Q.  So the disclosure deadline each year is May 15 unless that

18   falls on a weekend, right?

19   A.  Yes, or an extension is approved.

20   Q.  And extensions, are those routinely approved?

21   A.  Yes.

22   Q.  OK.  And if an extension is approved, how long is the

23   extension for?

24   A.  The maximum by law is 90 days.

25   Q.  OK.  I think you testified that senators are supposed to

1    disclose their assets, correct?

2    A.   Correct.

3    Q.   And that's a defined term in the manual and the

4    instructions, right?

5    A.   The manual and the instructions, which rely on the

6    underlying statute.

7    Q.   And then they have to disclose their spouse's assets as

8    well?

9    A.   Correct.

10   Q.   But that only applies to legally married spouses, right?

11   A.   That's correct.

12   Q.   If you're living with your fiancée, for example, you

13   wouldn't have to disclose your fiancée's assets, right?

14   A.   That's correct.

15   Q.   And if you're living with a girlfriend or boyfriend, you

16   wouldn't have to disclose that person's asset, right?

17   A.   That's correct.

18   Q.   And as far as disclosures of other relatives' asset, other

19   than dependent children, a senator has no obligation to

20   disclose assets of other relatives, correct?

21   A.   That's correct.

22   Q.   So a mother-in-law or a father-in-law, no disclosure

23   obligation, right?

24   A.   No disclosure obligation.

25   Q.   And no disclosure obligation for your own parents, right?

O6rWmen3                              Kopplin - Cross

1   A.  That's correct.

2   Q.  Now, Senator Menendez has two children; you know that,

3   right?

4   A.  I do.

5   Q.  But they're not dependent children, right?

6   A.  That's correct.

7   Q.  They're in their 40s; you know that?

8   A.  One of them's in Congress, so yes.

9   Q.  He's in the House, correct?

10  A.  Yes.

11  Q.  Now, to be sure, the financial disclosure -- I'm sorry.

12      To be sure, the definition of an asset does not actually

13  include cash, right?

14  A.  That's correct.

15  Q.  And it also doesn't expressly include physical commodities,

16  like gold, right?

17  A.  So -- an asset held for investment is defined, falls within

18  the definition of an asset.

19  Q.  Correct.  The asset definition includes, quote, collectible

20  items held for resale or investment, right?

21  A.  Well, that's part of it, yes.  But the full -- anything

22  held for investment is defined as an asset.

23  Q.  OK.  And if it's held like -- for instance, jewelry, would

24  that include, would that be an asset?

25  A.  No.

O6rWmen3                      Kopplin - Cross

1    Q.  So anything that is noninvestment but yet may have

2    sentimental value or jewelry, that wouldn't be an asset that

3    has to be disclosed, right?

4    A.  So, something in the nature of personal jewelry would not

5    be disclosed as an asset.

6    Q.  And as far as cash goes, there may be times when a senator

7    has to disclose or someone has to disclose a cash gift, right?

8    A.  Correct.

9    Q.  That's if, let's say, the senator were to receive a cash

10   gift in excess of $10,000, right?

11   A.  No.

12   Q.  OK.  What's the dollar amount?

13   A.  So, the dollar amount for a gift that has to be approved by

14   the committee is $250 if it's from a nonrelative.

15   Q.  OK.  Fair enough.  Got it.

16       But if it's cash that's withdrawn from your bank account,

17   from income that you've already disclosed, you wouldn't have to

18   disclose the withdrawal of that cash, right?

19   A.  That's correct.

20   Q.  That's not considered a reportable event, withdrawing cash

21   from a bank account and storing your own cash, right?

22   A.  That's correct.

23   Q.  So if a senator, over the course of a year, withdraws, say,

24   $10,000 from his own bank account in which he has income that

25   has been disclosed, that would not have to be disclosed on any

O6rWmen3                         Kopplin - Cross

 1  form to the public or to the Senate, right?

 2  A.  It would not have to be disclosed to the Senate.  That's

 3  correct.

 4  Q.  OK.  Now, I think you've mentioned the ethics committee

 5  doesn't have a process for verifying values in disclosures,

 6  right?

 7  A.  Right.  We're not auditors.

 8  Q.  Right.  It doesn't review the senator's bank records,

 9  right?

10  A.  That's correct.

11  Q.  Or mortgage documents, right?

12  A.  Correct.

13  Q.  Or stock portfolios?

14  A.  Correct.

15  Q.  By the way, do you know if the senator has stock

16  portfolios?

17          MR. RICHENTHAL:  Objection.

18          THE COURT:  I'll allow it.

19  A.  I do.  The senator does not own individual securities.

20  Q.  And is it fair to say that there are a lot of senators who

21  do own individual securities?

22  A.  Yes.

23          MR. RICHENTHAL:  Objection.

24  BY MR. WEITZMAN:

25  Q.  But Senator Menendez does not?

O6rWmen3                          Kopplin - Cross

1  A.  That's correct.

2  Q.  Now, because you don't verify the details, like, by getting

3  documents, like bank records or mortgage documents or stock

4  portfolios, you don't ask senators to corroborate their

5  statements on the forms, right, through documents?

6  A.  That's correct.

7  Q.  So when you were asked on direct did Senator Menendez show

8  you documents to confirm certain statements he made, that's not

9  an obligation he has, right?

10  A.  That's correct.

11  Q.  And it's not something you asked for, right?

12  A.  Correct.

13  Q.  And I guess this goes without saying:  The Senate Ethics

14  Committee doesn't have, like, investigators who go out to

15  people's homes and check their assets, their safes and so on,

16  right?

17  A.  Of course not.

18  Q.  Now, you did mention gifts have to be disclosed over a

19  certain amount, 400-something dollars, is that correct?

20  A.  Yes.

21  Q.  For weddings?

22  A.  To be clear, there's two thresholds.

23  Q.  OK.

24  A.  A gift received from a nonrelative greater than $250 has to

25  be approved by the committee.

O6rWmen3                              Kopplin - Cross

1          The disclosure requirement is a higher threshold.  You only

2    disclose gifts that are greater than -- for calendar year 2022,

3    it would have been $415.

4    Q.  Gifts from relative, however, need not be disclosed, is

5    that right?

6    A.  That's correct.

7    Q.  And is that at any dollar threshold?

8    A.  Yes, that's correct.

9    Q.  And what about inheritances; do those have to be disclosed

10   immediately?

11   A.  So, if you receive an inheritance, then it would go on your

12   next annual reports, covering the year that you received the

13   inheritance.

14         There is an exception to that, and that's that if you

15   inherited individual stocks that require a periodic transaction

16   report, then you may have to submit a periodic transaction

17   report once you're in control of those.

18   Q.  OK.  Fair to say there's some complexity to the disclosure

19   based on the asset, what the asset is, when you acquire it,

20   what amount it's in, what the value is; this isn't simple

21   stuff, right?

22             MR. RICHENTHAL:  Compound and argument.

23             THE COURT:  I'll allow it.

24             Do you consider the reporting requirements simple

25   stuff?

1              THE WITNESS:  No, but I don't consider it complex

2    either.

3              THE COURT:  All right.

4              THE WITNESS:  So, it's technical.  It's much easier

5    than doing your income taxes, and it's very easy to do year to

6    year.  The first report -- we always tell people the first

7    report's the hardest.

8    BY MR. WEITZMAN:

9    Q.  By the way, do you know if Senator Menendez does his own

10   income taxes or has an accountant who does it for him?

11   A.  I do not know.

12   Q.  Do you do your own income taxes?

13   A.  I do.

14             THE COURT:  Sustained.

15             MR. RICHENTHAL:  Objection.

16             THE COURT:  Ms. Kopplin, when there's an objection,

17   you need to wait, give me an opportunity to think about it and

18   to rule.  So if you see Mr. Richenthal stand up, wait.

19   BY MR. WEITZMAN:

20   Q.  While you say it's not complex and it's technical, there

21   are lawyers who devote much of their time dealing with these

22   Senate disclosure and ethics rules, right?

23             MR. RICHENTHAL:  Objection.

24             THE COURT:  Are you aware of lawyers who devote much

25   of their time to these disclosure requirements?

O6rWmen3                        Kopplin - Cross

1           THE WITNESS:  Well, we have --

2           THE COURT:  Apart from your staff members.

3           THE WITNESS:  Apart from staff members?

4           THE COURT:  Yes.

5           THE WITNESS:  No, I'm not aware.

6           THE COURT:  All right.

7   BY MR. WEITZMAN:

8   Q.  You're aware that senators seek and obtain advice, legal

9   advice, from outside lawyers regarding disclosure obligations?

10          MR. RICHENTHAL:  401, 403, no advice-of-counsel

11  defense.

12          MR. WEITZMAN:  I'm not asking what the advice is.

13          THE COURT:  Just a moment.  I will allow it.

14  A.  Could you repeat the question, sir?

15  Q.  Yes.

16      Are you aware that senators obtain advice from outside

17  lawyers to discuss their disclosure obligations on these Senate

18  forms?

19  A.  Yes.

20  Q.  OK.  And some of those outside lawyers will actually

21  contact your office to discuss that very issue, right?

22  A.  Many of them are designated as filing assistants.

23  Q.  Correct.

24      And you interact with those types of lawyers to discuss the

25  meaning of the instructions and the manuals on a fairly routine

O6rWmen3                    Kopplin - Cross

```
1   basis, right?

2               THE COURT:  I'll allow it.

3   A.  Yes.

4   Q.  Sometimes you even have to debate with them about what

5   these disclosure obligations are; is that fair?

6               MR. RICHENTHAL:  Objection.

7               THE COURT:  Sustained.

8   BY MR. WEITZMAN:

9   Q.  Now, you testified that you're required to provide, by law,

10  a briefing to all new senators within -- was it 60 days?

11  A.  Yes, sir.

12  Q.  OK.  When was that law passed?

13  A.  2012.  So it predates Senator Menendez entering Senate

14  office.

15  Q.  Postdates.

16  A.  Correct.  Sorry.  He predates the law.

17  Q.  Correct.  So in 2006, when he joined the Senate, there was

18  no obligation to provide him a briefing regarding his filing

19  obligations, right?

20  A.  That's correct, sir.

21  Q.  And in fact, you have no record that he ever received such

22  a briefing, isn't that correct?

23              THE COURT:  Do you have records when anyone receives

24  briefing?

25              THE WITNESS:  Yes.
```

```
 1              THE COURT:  All right.
 2   BY MR. WEITZMAN:
 3   Q.  And you have no record that Senator Menendez ever received
 4   a briefing about these filing obligations, right?
 5   A.  That's fair.
 6   Q.  You do offer internal trainings, you said?
 7   A.  Yes.
 8   Q.  Just generally, do you take attendance at those internal
 9   trainings?
10   A.  No.
11   Q.  No sign-in sheets?
12   A.  No.
13   Q.  And would you agree with me that typically it is the
14   senator's staff or the filing assistants who attend those
15   trainings?
16   A.  Well, just by proportion of how many filers.  So I've got
17   1,300 staffers and 100 senators, so yes, that's a fair
18   statement.  It's overwhelmingly staff.
19   Q.  Do you recall Senator Menendez ever attending a training?
20   A.  I do not.
21   Q.  You've said that your office fields -- is it 12,000 calls a
22   year?
23   A.  That's correct.  Well, in 2023, that's correct.
24   Q.  Was it higher or lower in prior years?
25   A.  Covid made it lower because there was less Senate travel.
```

1  Q.  OK.  That's a very active docket for you and your staff,

2  right?

3  A.  Yes.

4  Q.  And you have, did you say nine lawyers on your staff,

5  including yourself?

6  A.  Yes.

7  Q.  And then you have other staff members?

8  A.  Correct.

9  Q.  Phone's ringing off the hook?

10  A.  Yes.

11  Q.  OK.  Lots of questions about these instructions, the

12  manual, the filing obligations, right?

13          MR. RICHENTHAL:  Objection.

14          THE COURT:  Sustained.

15          I take it if the phone is ringing off the hook, it's

16  from the March, April, May period; is that what you testified

17  to?

18          THE WITNESS:  I mean we get a constant stream of

19  questions on all topics.  If they're asking specifically about

20  financial disclosure, that would be primarily between March and

21  May.

22          THE COURT:  All right.

23  BY MR. WEITZMAN:

24  Q.  Back to the training topic, are trainings available online

25  as well as opposed to in person?

O6rWmen3                         Kopplin - Cross

1    A.  Yes.

2    Q.  Is that, like, a video, or is it a questionnaire?  How do

3    you do that?

4    A.  No.  It's synchronous learning, so we actually have people

5    giving a presentation that you have a link to and can attend.

6    Q.  Again, do you take attendance at those?

7    A.  We do not.

8    Q.  You're able to track, but you don't?

9    A.  Correct.

10   Q.  So again, you don't know if Senator Menendez or anybody

11   from his staff took such a training?

12   A.  I do.  I could.  I mean I could find that out.  So Senator

13   Menendez has not.

14   Q.  OK.

15   A.  But members of his staff have.

16   Q.  Rob Kelly?

17   A.  I believe so, but I'm not entirely certain.

18           THE COURT:  Are there other members?

19           THE WITNESS:  Yes.

20           And I should make it clear that it's not clear if

21   they're attending for their own personal filing responsibility

22   or on behalf of the senator.

23           MR. WEITZMAN:  That's a good clarification.  Thank

24   you.

25           Could we put up Government Exhibit 10E-2.

1    Q.  This was the first annual report you discussed in your

2    direct.  Do you recall that?

3    A.  Yes, sir.

4    Q.  And this is dated May 14, 2019, and covers calendar year

5    2018?

6    A.  That's correct.

7    Q.  I just want to understand the verbiage.

8        You said multiple times with this and every other report

9    that the filer was Senator Menendez.  Do you recall that?

10   A.  Yes.

11   Q.  Now, by that you mean that this is the form under his name,

12   correct?

13   A.  Well, yes, in part, but I also mean it was his filing

14   responsibility.

15   Q.  Correct.  But you don't mean, I take it, that you know he's

16   the one who filed the form, meaning worked on the computer, did

17   the dropdown menus, pressed all the buttons?

18   A.  Yes, that's correct.

19   Q.  You don't have any idea who actually did any of that?

20   A.  That's correct.

21           THE COURT:  Can the certification that you testified

22   to be made by the filing assistant?

23           THE WITNESS:  It could.

24           THE COURT:  OK.

25   BY MR. WEITZMAN:

1  Q.  Because it's just clicking a box, right?

2  A.  Yes.

3  Q.  And there's no requirement of a signature, right?

4  A.  That's correct.

5  Q.  There is no requirement of a certification that the person

6  who actually clicked the box is the senator or the filer,

7  right?

8  A.  That's correct.

9  Q.  Now, the certification at the top of this form, it states,

10  I certify that the statements I have made on this form are

11  true, complete and correct, to the best of my knowledge and

12  belief.

13      What does that mean, to the best of my knowledge and

14  belief?

15  A.  It means its plain language meaning.  It means that's the

16  best information you have.  You're not willfully or

17  intentionally hiding something.

18  Q.  So if, for example, a spouse does not reveal, does not

19  disclose an asset to a senator or a filer, that certification

20  would still be true, correct?

21          MR. RICHENTHAL:  Objection.

22          THE COURT:  Sustained.

23  BY MR. WEITZMAN:

24  Q.  You'd agree with me that one has to have knowledge of a

25  particular asset in order to disclose it?

O6rWmen3                        Kopplin - Cross

1           THE COURT:  I'll allow that.

2    A.  Yes.

3    Q.  And if one lacks knowledge, then they can only certify what

4    they know, right?

5    A.  Yes.

6    Q.  Are you aware -- actually, let me withdraw that.

7        You've testified that Senator Menendez amended his calendar

8    year 2020 financial disclosure statement, correct?

9    A.  Yes.

10   Q.  And that was to include gold owned by his spouse, correct?

11           MR. RICHENTHAL:  Objection.

12           MR. WEITZMAN:  Per the form.

13           THE COURT:  Just a moment.  What's the objection?

14           MR. RICHENTHAL:  Assumes a fact as to who owned it.

15           THE COURT:  I'll allow the question.

16   A.  Could you repeat the question, sir?

17   Q.  The amendment was to disclose what was described as gold

18   owned by his spouse, right?

19   A.  That's correct.

20   Q.  Before we discuss the circumstances surrounding that, I'd

21   like to talk about amendments generally.  OK?

22       All public disclosures in these financial disclosures can

23   be amended to correct inaccuracies or omissions, right?

24   A.  Yes, sir.

25   Q.  And in fact, it's not an uncommon thing for senators or

O6rWmen3                              Kopplin - Cross

1    their staff to make such amendments, right?

2    A.   That's correct.

3    Q.   It's actually encouraged if someone discovers an error or

4    omission, right?

5    A.   Very much so.

6              THE COURT:   I take it it's required.

7              THE WITNESS:   Yes.

8    BY MR. WEITZMAN:

9    Q.   And there's no obligation to consult with you or your

10   office before filing an amendment, right?

11   A.   That's correct.

12   Q.   But Senator Menendez did consult with you, right?

13   A.   Yes.

14   Q.   And he even consulted with the chair of the ethics

15   committee, right?

16             MR. RICHENTHAL:   Objection.   Characterizes a

17   conversation not in evidence.

18   BY MR. WEITZMAN:

19   Q.   Did you have an understanding that he consulted with the

20   chair of the ethics committee?

21             MR. RICHENTHAL:   Objection.

22             THE COURT:   Do you have an understanding that he

23   called the chair, that he called or emailed the chair in regard

24   to these obligations?

25             THE WITNESS:   Your Honor, I have an understanding that

O6rWmen3                          Kopplin - Cross

1    he spoke to him directly, Senator Menendez and the chair of the

2    ethics committee.

3              THE COURT:  But you don't know what they spoke about,

4    I take it.

5              THE WITNESS:  That's correct.

6              THE COURT:  All right.

7    BY MR. WEITZMAN:

8    Q.  In fact, I'll get to this a bit later, but you actually

9    witnessed them speaking on the floor of the Senate when it was

10   happening, right?

11   A.  On television, yes.

12   Q.  Yes.  OK.  We're going to talk about that in a moment.  I

13   just want to get through a couple preliminaries.

14        There's no penalty for amendments, right?

15   A.  No, sir.

16   Q.  And in fact, as you said, the goal of disclosure is public

17   transparency, right?

18   A.  Yes.

19   Q.  And when you amend a disclosure, when you're a senator,

20   like Senator Menendez, it becomes immediately available to the

21   public, right?

22   A.  Yes.

23   Q.  It's online within -- what is it, seconds, minutes,

24   whatever it is?

25   A.  We'd like to say minutes, but it's always hours, at worst.

1   Q.  OK.  By the way, do you know or do you recall that the

2   senator's amending of his 2020 disclosures resulted in some

3   good amount of press about his ownership or his spouse's

4   ownership of gold bullion?

5           MR. RICHENTHAL:  Objection.

6           THE COURT:  To your knowledge, were there press

7   reports in regard to that filing?

8           THE WITNESS:  Yes.

9   BY MR. WEITZMAN:

10  Q.  By the way, let's talk about gold bullion for a second.  Is

11  that like the weirdest thing you've ever seen, you've ever

12  heard any senator disclose as an asset?

13          THE COURT:  Sustained.

14          Are you aware that any other senator has disclosed

15  gold bullion on his or her financial disclosure report?

16          THE WITNESS:  I am not aware.

17          THE COURT:  I'm sorry.  You're not aware whether or

18  not they have, or you're not aware of any such filing?

19          THE WITNESS:  I am not aware of any other senator

20  disclosing gold bullion.

21          THE COURT:  All right.

22  BY MR. WEITZMAN:

23  Q.  Do you know of senators disclosing other commodities?

24  A.  Yes.

25  Q.  What other commodities?

O6rWmen3                          Kopplin - Cross

1   A.  Silver coins come to mind, but there are many other

2   commodities as well.  Usually in the agricultural sector, all

3   the senators that come from agricultural states, a lot of them

4   are ranchers and farmers themselves, and they hold commodities.

5   Q.  Livestock, for example?

6   A.  Yes.

7   Q.  Farms, right?

8   A.  Yes.

9   Q.  Any disclosures of oil holdings?

10  A.  Of course.

11  Q.  Texas senators?

12  A.  You could look it up, but there are many.

13  Q.  So while you haven't heard of gold bullion before, you have

14  heard of coins?

15  A.  Yes.

16  Q.  And you've heard of other commodities being disclosed?

17              THE COURT:  I needed that last phrase.

18              MR. WEITZMAN:  Yes.

19  Q.  I think you said in mid-February Senator Menendez contacted

20  you regarding some assets he had recently learned his spouse

21  had, right?

22  A.  Yes.

23              THE COURT:  February of '22, correct?

24              THE WITNESS:  Yes.

25  BY MR. WEITZMAN:

1    Q.  And you had said that you had gotten a heads-up from the

2    chairman of the ethics committee's chief of staff, correct?

3    A.  Correct.

4    Q.  By the way, the chairman of the ethics committee, that's a

5    publicly known individual, right?

6    A.  Yes.

7    Q.  It's disclosed who the chair is?

8    A.  Yes.

9    Q.  It's not a secret, right?

10   A.  No, of course not.

11   Q.  It's Chris Coons?

12   A.  Yes.

13   Q.  It's the senator from Delaware?

14   A.  Yes.

15   Q.  And so you saw Senator Menendez speak to Chris Coons on the

16   Senate floor live when it happened, right?

17   A.  Yes.

18   Q.  And then you got a call very soon thereafter from Chris

19   Coons, Senator Coons's chief of staff saying Senator Menendez

20   needs to talk to you about some gold bullion, or words to that

21   effect, right?

22   A.  That's a fair characterization.

23   Q.  OK.  And the chief of staff, in fact, told you that Senator

24   Menendez had a call with, had spoken to Chris Coons and had

25   told Chris Coons that Senator Menendez had just learned of the

1    gold bullion and wanted to know what to do, right?

2              MR. RICHENTHAL:  Objection.  Double hearsay.

3              THE COURT:  Yes.

4    BY MR. WEITZMAN:

5    Q.  What did the chief of staff tell you Senator Menendez

6    discussed with Chris Coons?

7              MR. RICHENTHAL:  Same objection.

8              THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  In any event, very soon, within an hour of the call from

11   Senator Coons's chief of staff, Senator Menendez personally

12   called you?

13   A.  Yes.

14   Q.  And is it fair to say that he was -- how would you

15   characterize his tone?  Was he eager to get an answer to his

16   questions?

17             MR. RICHENTHAL:  Objection.

18             THE COURT:  Sustained.  Was he calm?

19             THE WITNESS:  Yes.

20             THE COURT:  He didn't sound angry.

21             THE WITNESS:  No.  He was very professional.

22             THE COURT:  All right.

23             Business-like.

24             THE WITNESS:  Yes.  He was actually quite charming.

25             MR. WEITZMAN:  I wish I had a witty come back for

O6rWmen3                         Kopplin - Cross

1    that?

2            THE COURT:  You're not Mr. Khorozian.

3            MR. WEITZMAN:  I'm not Mr. Khorozian.  I'm not even

4    Mr. Fee.

5    Q.  In any event, Senator Menendez charmingly called you, and

6    he told you that he had recently learned of some gold bullion

7    that his wife had, right?

8    A.  That was my recollection.

9    Q.  And did he tell you that she had it, that it was family

10   gold?

11   A.  No.

12   Q.  Did he tell you how his wife had this gold?

13   A.  No.

14   Q.  Did he mention anything about an inheritance or anything of

15   the sort?

16   A.  No.

17   Q.  OK.  Did he mention anything about it being a parental

18   gift?

19   A.  No.

20   Q.  Did you at any point in time learn that it was a parental

21   gift --

22           MR. RICHENTHAL:  Objection.

23   Q.  -- to his wife?

24           MR. RICHENTHAL:  Time frame.  Assumes a fact.  Basis.

25           THE COURT:  Sustained.

O6rWmen3                        Kopplin - Cross

 1              MR. WEITZMAN:  On time frame?

 2              THE COURT:  Let's start with that.

 3   BY MR. WEITZMAN:

 4   Q.  OK.  Did there come a time in February '22 when you learned

 5   that this was a parental gift to Nadine?

 6              THE COURT:  Did Senator Menendez say to you that it

 7   was a gift from Nadine's mother or father?

 8              THE WITNESS:  I don't remember, but I would have

 9   remembered that, so no.

10   BY MR. WEITZMAN:

11   Q.  Now, at the time that you had this conversation, you'd

12   agree with me you didn't think there was anything out of the

13   ordinary about it, right?

14   A.  Not at all.

15   Q.  And his question to you was, essentially:  My wedding was

16   in October 2020; does this have to go in an amended 2020 form,

17   or do I wait and file it in my 2021 disclosure?  Is that right?

18              MR. RICHENTHAL:  Objection.

19              THE COURT:  I'll allow that.

20              Is that what he asked you, in words or substance?

21              THE WITNESS:  In substance.

22              THE COURT:  Do you remember the words?

23              THE WITNESS:  He asked what the disclosure requirement

24   was for this gold bullion asset that his spouse owned.  We got

25   into the distinction between 2020 and 2021 in our email

O6rWmen3                          Kopplin - Cross

1  exchange.

2  BY MR. WEITZMAN:

3  Q.  And at that time you already knew that he got married in

4  October 2020, right?

5  A.  Yes.

6  Q.  If he, for example, had been married in January of 2021, he

7  wouldn't have had to have disclosed the gold bullion in an

8  amended 2020 form, right?

9            MR. RICHENTHAL:  Objection.

10            THE COURT:  I'll allow it.

11  A.  Correct.  So, if the gold bullion was not acquired until

12  2021 or he had just learned of it in 2021, then -- that it was

13  acquired in 2021, then it would go on a 2021 report.  But if it

14  was owned in 2020, during the period that they were married --

15  so October to December -- then he would have to disclose it.

16            THE COURT:  On the 2020 report.

17            THE WITNESS:  Correct.  He would have to amend that

18  2020 report.

19  BY MR. WEITZMAN:

20  Q.  And you asked him, you recall asking him, whether verbally

21  or in email, did Nadine have this in 2020, or did she get it

22  after January 1, 2021, right?

23  A.  Yes.  I would have -- I asked him that, because that was

24  the distinguishing factor of whether he had to amend the 2020

25  report or just wait to file it with his 2021 report.

O6rWmen3                              Kopplin - Cross

1   Q.  And he told you, no, no, she had it when we got married,

2   right?

3   A.  Yes.

4   Q.  You advised Senator Menendez that he would have to disclose

5   not just the existence of the gold bullion but also its value,

6   right?

7   A.  Yes.

8   Q.  And did he tell you that he needed to do some research to

9   figure out the value of a kilo of gold?

10  A.  No.

11  Q.  Did he tell you what the value of a kilo of gold was on

12  that call?

13  A.  No.

14  Q.  Did you know what the value was?

15  A.  No.

16  Q.  And do you know whether there's ways on Google to look up

17  the price of gold, like the stock price?

18          MR. RICHENTHAL:  Objection.

19          THE COURT:  Sustained.

20  BY MR. WEITZMAN:

21  Q.  Have you ever looked up the price of gold on Google?

22          THE COURT:  Sustained.

23          MR. WEITZMAN:  Can we put up Government Exhibit 8K-1.

24  Q.  This is the email, at the bottom of page 1, the February 17

25  email that you sent to the senator, right?

O6rWmen3                    Kopplin - Cross

1    A.  Yes.

2    Q.  And what I'd like -- you thanked him for contacting the

3    committee, right?

4    A.  Yes.

5    Q.  And then, on page 2, you made the recommendation as to what

6    to disclose, right?

7    A.  Correct.

8              MR. WEITZMAN:  I'd like to put side by side your

9    recommendation and the actual disclosure, which was Government

10   Exhibit 10E-4.  So if we can zoom in on the left side, on

11   paragraph 5, all the bullet points.  Great.

12   Q.  Now, again, the communication you had with the senator was

13   February 17, 2022, right?

14   A.  Correct.

15   Q.  And within a month he makes the disclosure, right?

16   A.  Correct.

17   Q.  There were some drafts that went back and forth he asked

18   you or his office asked you to review, right?

19   A.  I don't recall that.

20             MR. WEITZMAN:  OK.  We'll get to that.

21             Now, if you can go to the disclosure on page 4, and if

22   we can do that side by side.  And if you look at, let's blow up

23   No. 11.

24   Q.  That's the gold bullion, right?

25   A.  Yes.

1    Q.  By the way, do you recall whether Senator Menendez called

2    it bullion or bar?

3    A.  I don't.

4    Q.  OK.  You say:  I recommend you include the following

5    information in your email -- asset type, precious metal; asset

6    name, gold bullions -- gold bullion, right?

7    A.  Yes.

8    Q.  And in fact, he disclosed exactly as you recommended, gold

9    bullion, right?

10   A.  Yes.

11   Q.  And then it says description, gold bars, right?

12   A.  Yes.

13   Q.  And he disclosed gold bars, right?

14   A.  Yes.

15   Q.  And then it says owner, spouse; that was your

16   recommendation?

17   A.  Yes.

18   Q.  And he disclosed spouse, right?

19   A.  Correct.

20   Q.  And then it says value, report the combined value of gold

21   bars by selecting the appropriate category, correct?

22   A.  Correct.

23   Q.  And then he had to value it somehow?

24   A.  Yes.

25   Q.  And the disclosure was it's between $100,001 and $250,000,

O6rWmen3                         Kopplin - Cross

1   right?

2   A.  Correct.

3   Q.  And then you recommended, on income type, that he select

4   none, right?

5   A.  Assuming there was no income.

6   Q.  And how would there be income on a gold bar, by the way?

7   A.  If the value went up and he had a sale of that, then there

8   would be a capital gain, presumably.

9   Q.  OK.  So other than by a sale of the gold bar, there is no

10  income in possessing the gold bar, right?

11  A.  That's correct.

12  Q.  OK.  And then, again, it says income amount, there's an

13  option for none, which is what he filled out and you

14  recommended, right?

15  A.  Correct.

16      It's also important to note each one of these categories --

17  so the italicized words in my email, those are dropdown menus

18  that we discussed before on the form.  And so I am recommending

19  what he would select based on the conversation we had.

20  Q.  Thank you.

21      And I didn't highlight, but the asset type, the first one

22  says precious metal, personal property, and that's what he did,

23  he said -- he used that asset type, as you recommended?

24  A.  That's correct.

25  Q.  Fair to say Senator Menendez's filing follows your

1    instructions word for word?

2    A.  Yes.

3    Q.  Based on the information he gave you, right?

4    A.  Yes.

5            MR. WEITZMAN:  Now, can we put up Defense Exhibit 1853

6    for the witness only and the Court.

7    Q.  Do you recognize this as an email on the bottom between you

8    and Rob Kelly?

9    A.  I do.

10   Q.  And it doesn't have a date on it, but do you see that the

11   top one is dated March 16, 2022?

12   A.  I do.

13           MR. WEITZMAN:  We offer Defense Exhibit 1853.

14           THE COURT:  Admitted, without objection.

15           MR. RICHENTHAL:  With the standard limiting

16   instruction, your Honor.

17           THE COURT:  Not for the truth.

18           MR. RICHENTHAL:  Yes.

19           (Defendant's Exhibit 1853 received in evidence)

20           MR. WEITZMAN:  Let's focus in on the bottom email for

21   Ms. Kopplin.

22   Q.  It says:  Rob, we reviewed the draft amendment, and it

23   looks great.

24       Is it fair to say that Mr. Kelly, as the filing assistant,

25   provided you a draft of the amended '22 disclosure?

1    A.  Yes.

2    Q.  And you were commenting on it, right?

3    A.  Yes.

4    Q.  And then it says:  We do offer one suggestion that may help

5    the senator avoid any misinterpretation of his report if the

6    media picks it up.  Specifically, the senator may want to

7    consider revising how acquired to previously held and delete

8    the comment that the asset was a parental gift.  Do you see

9    that?

10   A.  I do.

11   Q.  Does this refresh your recollection that at some point in

12   time you were informed, via email or conversation, that the

13   gold was a parental gift to Nadine?

14   A.  Vaguely.  I'm not trying to be difficult.  It was just a

15   long time ago.

16   Q.  Fair enough.

17       And then it says:  As drafted, it could be interpreted that

18   is was gifts in 2020, and our understanding was that his spouse

19   held them for some time prior to their marriage.  Do you see

20   that?

21   A.  I do.

22   Q.  Does this mean that Senator Menendez told you not only that

23   she had it at the time of her marriage, but that he's informed

24   she had it for some time prior to her marriage?

25       MR. RICHENTHAL:  Objection to form.

O6rWmen3                         Kopplin - Cross

1           THE COURT:  I'll allow it.

2    A.  I don't remember that part of our conversation.  So it

3    could have been facts I got from Senator Menendez or from Rob

4    Kelly.

5    Q.  OK.  One or the other told you that this had been some

6    long-held gold for, longer than 2020 held gold by Nadine,

7    right?

8    A.  Yes.  That is the impression I have from rereading this

9    email.

10   Q.  OK.  And then if you just go to the top of the email, and

11   you see Rob Kelly forwards it to Senator Menendez with the

12   title "update from ethics."  Do you see that?

13   A.  Yes.

14   Q.  Now, is it fair to say that there's no obligation to file

15   periodic reports with respect to gold?

16   A.  That's correct.

17   Q.  Because periodic reports are typically for securities,

18   right?

19   A.  Yes.

20   Q.  And Senator Menendez, as we established, didn't have to

21   file those types of reports because he didn't hold securities,

22   right?

23   A.  That's correct.

24           THE COURT:  I thought your testimony was he didn't

25   hold individual securities.

1              THE WITNESS:  That's correct.  He did not hold

2    securities that trigger a periodic transaction report

3    requirement.

4    BY MR. WEITZMAN:

5    Q.  These conversations occurred in -- they started in February

6    '22, correct?

7    A.  That's correct.

8    Q.  That's -- I think your math is better than mine -- four

9    months before June 2022?

10   A.  Yes.

11   Q.  You've reviewed the indictment in this case?

12   A.  Yes.

13   Q.  You've reviewed transcripts of testimony in this case?

14   A.  No.

15   Q.  No.  OK.  But just the indictment, right?

16   A.  Yes.

17   Q.  Are you aware that there was a search conducted of the

18   senator's home in June 2022?

19              THE COURT:  Sustained.

20   BY MR. WEITZMAN:

21   Q.  Did you discuss -- did the senator reach out to you and

22   discuss the fact that there was a search of his home in June

23   2022?

24   A.  No.

25   Q.  But you would agree with me that February 2022 is before

1    June '22?

2    A.  Yes.

3           THE COURT:  We've established that.

4    BY MR. WEITZMAN:

5    Q.  And is it correct to say that the press attention that the

6    amended disclosure got, if you recall, occurred before June

7    2022?

8           MR. RICHENTHAL:  Objection.

9           THE COURT:  I'll allow that.

10          The news articles that you said there were about the

11   amended disclosure, were they, if you know, before June 2022?

12          THE WITNESS:  Yes, they were.

13   BY MR. WEITZMAN:

14   Q.  In the same call that you had with the senator about the

15   gold bullion, did he also ask you about his wife's LLC company?

16   A.  He did.

17   Q.  And do you recall the name of the LLC company?

18   A.  I know it now, but I can't remember if he told me during

19   that conversation or just explained it was an LLC for her

20   consultancy business.

21   Q.  OK.  He mentioned the LLC for a consultancy business in

22   that call in February 2022, correct?

23   A.  Correct.

24   Q.  And his question to you was whether he now needs to

25   disclose any income that she earned as a result of that

O6rWmen3                           Kopplin - Cross

1    company, right?

2    A.  The question was how to disclose it at all, because it

3    could be disclosed both as an income or as an asset.

4    Q.  So there was no question in his mind from your -- let me

5    rephrase it.

6        The question wasn't whether to disclose but how to

7    disclose, is that correct?

8    A.  That's what I recall, yeah.

9    Q.  And does the name Strategic International Business

10   Consultants LLC ring a bell?

11   A.  Yes.

12   Q.  And was that the LLC company that the senator discussed

13   with you?

14   A.  I don't remember if he discussed a specific name.

15   Q.  OK.

16   A.  I do know that it was Mrs. Menendez's LLC.

17   Q.  You guys keep notes of conversations with or inquiries from

18   staff and senators, right?

19   A.  Yes.

20   Q.  And have you reviewed any notes in preparation for your

21   testimony?

22   A.  Yes.

23   Q.  And do you recall that the senator asked about the

24   disclosure and he was actually advised that he need not make a

25   disclosure regarding the LLC.  Is that correct?

O6rWmen3                          Kopplin - Cross

1              MR. RICHENTHAL:  Objection.  Misstates.

2              THE COURT:  I'm not quite sure what you're asking.

3     Are you asking about a conversation?

4     BY MR. WEITZMAN:

5     Q.  Do you recall that in June 2022, the senator made an

6     inquiry and he was told that he need not disclose -- he's not

7     required to disclose the LLC on part 3?

8     A.  Yes.

9     Q.  And what did that mean?

10    A.  So, part 2 -- if you look at the forms, part 2 references

11    income.  Part 3 references assets.  So the question at issue

12    with Mrs. Menendez's LLC was whether it had to be reported in

13    both part 2 and part 3.  She had income greater than a thousand

14    dollars, so it had to be reported in part 2, which he did.

15         Then I asked him some questions to determine if the LLC was

16    also an asset that his spouse held, and I determined it was not

17    an asset, didn't have -- you know, didn't own anything making

18    it an asset that also had to be reported in part 3.

19    Q.  And when you disclose income of a spouse, the only option

20    is either less than a thousand or more than a thousand dollars,

21    is that right?

22    A.  There's no option for less than a thousand.  You just don't

23    disclose it.

24    Q.  OK.  And so whether she earned 10,000, 30,000 or more

25    dollars, the disclosure, the only disclosure the senator has to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    make or can make is that she earned more than $1,000, right?

2              MR. RICHENTHAL:  Objection.  Compound.

3              THE COURT:  I'll allow it.

4    A.  That's correct.

5              MR. WEITZMAN:  Your Honor, I'm moving on to a --

6              THE COURT:  New area?  Let's give the jury its break.

7              Ladies and gentlemen, let's take lunch.  One hour.  Be

8    back at five after two.

9              Thank you.  The evidence is coming in apace.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6rWmen3

```
 1                 (Jury not present)
 2                 THE COURT:  You may step down, Ms. Kopplin.
 3                 (Witness not present)
 4                 THE COURT:  One hour.  Thank you.
 5                 MR. RICHENTHAL:  Your Honor, this doesn't concern this
 6      witness, so I'm happy to start.
 7                 THE COURT:  You may be seated in the courtroom.
 8                 MR. RICHENTHAL:  Mr. Menendez's team has informed us
 9      that they now object to two exhibits that we had -- excuse me,
10      five exhibits that we had intended to offer while Mr. Gilday
11      was on the stand.  As the Court is aware, the desire to call
12      Mr. Gilday's been mooted by a stipulation.
13                 THE COURT:  Yes.
14                 MR. RICHENTHAL:  But the exhibits are still relevant.
15      We just learned of this objection.  I'm happy to take it up
16      with the Court now, sometime later.  We obviously would like to
17      move these exhibits in before we rest.  And it's not for
18      Ms. Kopplin.  I just wanted to advise the Court.
19                 THE COURT:  All right.  Thank you.
20                 I was also told by Mr. Monteleoni that there were
21      going to be government motions in regard to defense witnesses.
22      How many, if you know, and when am I going to get those
23      motions; that is, today or tomorrow?
24                 MR. RICHENTHAL:  I'm going to let Mr. Mark handle that
25      one, your Honor.
```

O6rWmen3

1           THE COURT:  All right.

2           MR. RICHENTHAL:  Because he's taking the lead.

3           THE COURT:  Sure.

4           MR. MARK:  Yes, your Honor.

5           We've been conferring actively with defense counsel on

6    their case.  Mr. Hana was one of the first defense counsel to

7    actively confer, and we submitted a motion here to their

8    defense witnesses yesterday.

9           (Continued on next page)

1          THE COURT:  Yes.

2          MR. MARK:  We got proffers obviously much later from

3   Mr. Menendez' counsel so we have been actively working and are

4   about to file over the lunch break a motion that is geared

5   towards their first two witnesses.  After those first two

6   witnesses we understand that they intend to introduce certain

7   summary charts.  Those summary charts are incredibly

8   voluminous, there are lots and lots of exhibits to that.

9          THE COURT:  Have you seen summary chart like that

10  before in this case?

11         MR. MARK:  We have, and we gave significant notice,

12  weeks and weeks of notice, on those draft charts.  We only

13  received draft charts of those on Monday.  We immediately

14  reviewed those yesterday morning, we wrote a long e-mail to

15  them raising certain issues both to the form of those charts,

16  that they're pretty much argumentative, and there are others

17  issues with them as well as to substance, laying out a number

18  of different categories we have objections to.  We have said

19  that we would like to confer and are willing to confer on those

20  before we go to the Court.  We have not yet had an opportunity

21  to confer with defense counsel.

22         THE COURT:  Do that today.

23         MR. MARK:  That will be our plan.  And then we will,

24  promptly after conferring on the issues, hopefully we can

25  narrow them, we will raise them with the Court.

1                And I will note the challenge of this is we were

2      looking at charts that we received on Monday which had

3      thousands of rows.  We are obviously working, just as defense

4      counsel did with our charts.  We then now just got, earlier

5      today, new versions of all of those charts which we are going

6      to have to comb through.  I point out that there is a lot to

7      do, we are working through all hours, but there might be a

8      number of issues that we are going to have to get teed up.

9                THE COURT:  Let's get them teed up.

10               Now, I assume, Mr. Weitzman, if you have revised the

11     charts and there are hundreds of entries you can, in some way,

12     let the other side know what the revisions were so they don't

13     have to go line by line.

14               MR. WEITZMAN:  We will make sure to do that.  Can I

15     just make two quick points?

16               THE COURT:  Go ahead.

17               MR. WEITZMAN:  The first is there are, like a thousand

18     rows.  Most of them are the government's rows.  What we did is

19     we took the government's charts and we just interlineated, in a

20     separate column, in a separate row, our additions.  And so it's

21     clearly --

22               THE COURT:  Wait, wait, wait.  You used the same row

23     in the underlying exhibit.  You just added from the underlying

24     exhibit the portion that you wanted to add.  Is that it?

25               MR. WEITZMAN:  And added additional exhibits.

1          THE COURT:  Well, that's different.

2          MR. WEITZMAN:  I agree, but it is not thousands of

3    rows, your Honor.  The thousands of rows are their rows.  In

4    any event --

5          THE COURT:  We don't have to debate that.  All right?

6          MR. WEITZMAN:  You know, I get it.  I get it.

7          But to put some context on what Mr. Richenthal was

8    discussing, one of the concerns we had about the 700

9    exhibits -- and I mentioned this yesterday -- is we haven't

10   even had an opportunity to review all of the exhibits, it was

11   just too voluminous with everything we have done.  They moved

12   in five exhibits that are specific exhibits that we raised

13   objections to in front of your Honor at transcript 3706 through

14   3709.  we discussed it with your Honor that we were objecting

15   to the letters that Senator Menendez wrote objecting or

16   noticing, requesting an investigation of a former

17   congressman --

18         THE COURT:  I remember.

19         MR. WEITZMAN:  -- for FARA violations.

20         THE COURT:  I remember.

21         MR. WEITZMAN:  This was among the 700 that they moved

22   in, we just didn't even know.  So now I raised it with

23   Mr. Monteleoni this morning.  He graciously agreed that there

24   was confusion.  I'm not suggesting anything improper.  This is

25   why I didn't think this process was the right process.  That

1    said, we can tee up the issue for your Honor at any point.

2              THE COURT:  Do it.  I can only say sooner than later.

3    We have these motions today, tomorrow, that's it.

4              MR. WEITZMAN:  We are not planning to put in a writing

5    submission on the FARA letters, we are just happy to argue it

6    before your Honor.

7              THE COURT:  Fine.  Fine.

8              MR. LUSTBERG:  Your Honor --

9              MR. MONTELEONI:  I apologize for the multiple

10   attorneys standing up.

11             Yes, I mean Mr. Weitzman is right that there was some

12   confusion that when we disclosed to them the exhibits that we

13   intended to offer in a large group they did review them and get

14   back to us with a number of objections.  These weren't among

15   them and I didn't connect up their previous objections which I

16   didn't know were still outstanding after the stipulation.

17   Regardless, those exhibits did not make it in yet.  There is

18   five exhibits, we can address them now, if you want, or at

19   another break today.  We are still hoping to rest today.

20   It's --

21             THE COURT:  I didn't realize that.  Fine.  We will

22   take them up at the end of the day.

23             You are planning on resting by the end of the day?

24             MR. MONTELEONI:  We hope.  We hope so, yes.

25             THE COURT:  Well, obviously don't rest until these

1    extant issues are handled.

2              MR. RICHENTHAL:  Exactly.

3              MR. MONTELEONI:  Exactly.

4              And also, your Honor, I apologize for the Court not

5    realizing that we had these additional exhibits this morning.

6    I actually didn't realize that we had told --

7              THE COURT:  Let's get beyond that and deal with the

8    substance of the objections.  I'm not going do it now, I want

9    everybody to get lunch, but at the end of the day then if you

10   haven't rested, we will handle these.  If you are going to

11   rest, let me know that you want to tee these things up.  We

12   will send the jury out, I will deal with them, then you will be

13   able to rest.  It really depends upon whether you are able to

14   rest by the end of the day.

15             MR. MONTELEONI:  Yes.  That is what we are going to

16   try to do.

17             THE COURT:  Thank you.

18             MR. WEITZMAN:  Thank you, your Honor.

19             THE COURT:  One hour.

20             (Luncheon recess)

21             (Continued on next page)

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                           2:10 p.m.

3         THE COURT:  Let's bring the jury in.

4         We can put the witness on the stand.

5         Mr. Weitzman, what is your estimate, sir?

6         MR. WEITZMAN:  20 minutes.

7         (Witness present)

8         THE COURT:  Jury entering.

9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  You may be seated.

 3              MR. RICHENTHAL:  Either at this time or at the time

 4    cross-examination finishes, may we have a very brief side bar?

 5              THE COURT:  Go ahead, sir.

 6              Yes.

 7              Go ahead.

 8              MR. WEITZMAN:  Yes, your Honor.

 9    BY MR. WEITZMAN:

10    Q.  I think we discussed on direct Senator Menendez was

11    required to disclose wedding gifts that he and his wife

12    received over a certain dollar value?

13    A.  Yes.

14    Q.  And the value was $415; right?

15    A.  Would have to disclose that, yes.

16              MR. WEITZMAN:  Can we put up the disclosure which is

17    Government Exhibit 10E 5?

18    Q.  This is the annual report for calendar year 2020; correct?

19    A.  Correct.

20    Q.  And it was filed on May 17, 2021?

21    A.  Yes.

22    Q.  And if you turn to page 3 there are a series of disclosures

23    here, wedding gifts over $415?

24    A.  That's correct.

25    Q.  To be sure if someone gave $250 or $300, that wouldn't have

1    to be on this form; right?

2    A.   It would require a committee approval but it would not have

3    to be on the form.

4    Q.   You identify a couple names you like Philip Sellinger.   Do

5    you see that there?

6    A.   Yes.

7    Q.   Do you see the name in line 4, Balpreet Grewal?

8    A.   I do.

9    Q.   Do you know the name Gurbir Grewal, by any chance?

10            MR. RICHENTHAL:   Objection.

11            THE COURT:   I will allow the question.

12            THE WITNESS:   Can you repeat the question?

13   BY MR. WEITZMAN:

14   Q.   Do you know the name Gurbir Grewal?

15   A.   I do.

16   Q.   He is the head of the enforcement division with SEC?

17   A.   Yes.

18   Q.   Former New Jersey Attorney General, right?

19   A.   Yes.

20   Q.   Do you know if Balpreet Grewal is his cousin?

21   A.   Yes.

22   Q.   And there is Donald Scarinci.   Can we go to the next page?

23   There is another name here; right?

24   A.   Yes.

25   Q.   The wedding was in October 2020?

1   A.  Correct.

2   Q.  There is the typo that you talked about, right?

3   A.  Yes.

4   Q.  And it was a COVID wedding October 2020; right?

5           MR. RICHENTHAL:  Objection.

6   A.  Yes.

7           THE COURT:  Sustained.

8           When you said "yes" to that question, what did that

9   question mean to you.

10          THE WITNESS:  The United States was going through

11  COVID restrictions in October of 2020.

12          THE COURT:  All right.

13          MR. WEITZMAN:  That's what I meant.

14  BY MR. WEITZMAN:

15  Q.  And am I correct that the senator's disclosures were timely

16  filed with respect to these wedding gifts?

17  A.  Yes.

18  Q.  Now, did the senator or his staff talk to you about filing

19  or disclosing these wedding gifts?

20  A.  There was a process where the senator requested the wedding

21  waiver.

22  Q.  Correct.  And in that process when he was requesting the

23  wedding waiver, did the senator inform you or your office that

24  he needed to get the list of wedding gifts from his wife?

25          MR. RICHENTHAL:  Objection.

O6R5men4                          Kopplin - Cross

1          THE COURT:  Did Senator Menendez say that to you in

2    words or substance at any time?

3          THE WITNESS:  No, your Honor.  That predates my time

4    with the committee.

5    BY MR. WEITZMAN:

6    Q.  OK.  Thank you.  At any point in time did the senator tell

7    you that he needed to get a list of assets that his wife has?

8    A.  I don't recall that.

9    Q.  Now if, for example -- well, let me reframe it a bit

10   different.  Am I correct that not all gifts to a spouse need to

11   be disclosed?

12   A.  Yes.

13   Q.  Putting aside dollar value, even gifts above $415 don't

14   always need to be disclosed; right?

15         THE COURT:  To a spouse?

16   Q.  To a spouse, yes, above $415.

17         THE COURT:  To or from a spouse?

18   Q.  Let me ask it again.

19         Even gifts to a spouse of a senator above the value of

20   $415 need not necessarily be disclosed; right?

21   A.  That's correct.

22   Q.  And the circumstance where such gifts need not be disclosed

23   is when it is a gift to a spouse unrelated or independent of

24   the relationship to the senator; right?

25   A.  Yes.

1   Q.  And if the senator doesn't know about it; right?

2   A.  Yes.

3   Q.  And so, if the senator doesn't know or acquiesce in the

4   gift, he need not disclose it so long as it is independent of

5   the relationship with the senator; right?

6   A.  Yes.  You are quoting Senate Rule 35.

7   Q.  Fair enough.  Thank you.

8       So, is it fair to say that any gifts that Nadine received

9   while they were married above $415 that are personal gifts to

10  her, independent of the senator and the senator doesn't have

11  knowledge of them, need not be disclosed on a disclosure form?

12              MR. RICHENTHAL:  Objection.

13              THE COURT:  I will allow it.

14  A.  That's fair.

15  Q.  And on top of that, let's say there are birthday gifts

16  given to Nadine before they're married when she's his

17  girlfriend.  Those never need to be disclosed; right?

18  A.  That's correct.

19  Q.  And if there is a birthday gift to a fiancée before they're

20  married, those never need to be disclosed either; right?

21  A.  Yes, a gift to Nadine Menendez before they were married

22  does not need to be disclosed by the senator.

23  Q.  Nadine Arslanian at the time; correct?

24  A.  Yes.

25  Q.  And so, if Nadine Arslanian receives an engagement gift or

1    a birthday gift for that matter, those don't need to be

2    disclosed either; right?

3    A.   If they are only to her, no knowledge by the senator;

4    that's correct.

5    Q.   Let me break it down, though.  If they're engaged and it is

6    only to her, it need not be disclosed at all whether there is

7    knowledge or not at the time of the gift; right?

8    A.   Only to her, that's correct.

9    Q.   If the gift is when they're married and it is only to her,

10   so like a wedding gift or something else only to her, then if a

11   senator doesn't know about it he doesn't have to disclose it;

12   right?

13   A.   That's fair.

14            THE COURT:  Well, I take it if he doesn't know about

15   it he can't disclose it; right?

16            THE WITNESS:  Right.  That's why I said it is fair.

17            THE COURT:  You can't disclose what you don't know,

18   correct?  Ms. Kopplin, correct?

19            THE WITNESS:  Yes.

20   BY MR. WEITZMAN:

21   Q.   And so, just to take it one step further, if Nadine got a

22   gift while they were married but told the senator that she paid

23   for it herself, that too wouldn't have to be disclosed because

24   the senator would be unaware of the gift?

25            THE COURT:  Sustained.

1   Q.  What about dinners?  Let's say that someone wines and dines

2   a senator.  What is the dollar value that requires disclosure?

3   A.  $250.

4   Q.  Now, if it is an expensive dinner and the senator pays for

5   his part of the meal in cash, reimburses whoever is paying for

6   it by credit card, you wouldn't have a disclosure obligation at

7   that point in time; correct?

8   A.  That's correct.

9   Q.  So as long as it is reimbursed in cash or some other way

10  there is no disclosure obligation?

11  A.  That's correct.

12  Q.  Now, you talked a bit about loans in your direct.  Do you

13  recall that?

14  A.  I do.

15  Q.  That was, I guess part 7 of the financial disclosure?

16  A.  Yes, sir.

17  Q.  You guys get 1,200 calls a year, right?

18  A.  12,000.

19  Q.  Sorry, 12,000 calls a year.

20      To your knowledge, do some of those calls concern

21  disclosure obligations with respect to loans?

22  A.  Yes.

23  Q.  And is it fair to say that some people are confused about

24  whether loans have to be reported if they are repaid before the

25  end of the calendar year?

O6R5men4                          Kopplin - Cross

1              THE COURT:  Sustained.

2   Q.  Have you ever received a call from a senator or a filing

3   assistant about whether loans have to be disclosed if repaid

4   before the end of the calendar year?

5   A.  Yes.

6   Q.  Have you received one or more than one call like that?

7   A.  More than one.

8              THE COURT:  What is your answer to the question:  Does

9   a loan have to be disclosed if repaid before the end of the

10  year?

11             THE WITNESS:  Yes.

12             So, if you had a loan during any part of the calendar

13  year, you report the highest amount that was owed during that

14  calendar year, for a personal loan, a mortgage, that type of

15  thing.  If this is a revolving charge account, you do not.

16  Q.  If it is a spousal loan you have a disclosure obligation so

17  long as you are aware of the loan; right?

18  A.  Yes.

19  Q.  And if you are not aware you can't disclose it; right?

20  A.  Yes.

21             THE COURT:  Same point as before.  You can't disclose

22  something you don't know about; right?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  I think that is a given, Mr. Weitzman.

25             MR. WEITZMAN:  Thank you, your Honor.

 1   BY MR. WEITZMAN:

 2   Q.  Do you know whether the senator disclosed his spouse's car

 3   loan to the U.S. Attorney's office in 2022?

 4           MR. RICHENTHAL:  Objection.

 5           THE COURT:  Do you know whether the senator informed

 6   the United States Attorney's office in 2022 that his spouse had

 7   incurred a car loan?  Yes or no.

 8           THE WITNESS:  No, I do not know.

 9           MR. WEITZMAN:  I'm sorry.  I put the wrong year in

10   there.  I meant 2023.

11           THE COURT:  Is your answer the same?

12           THE WITNESS:  Same answer.

13   BY MR. WEITZMAN:

14   Q.  Now, I think you went through a few more financial

15   disclosures of the senator.

16           Let's put up 10E-7.

17           This is the annual report for 2022; correct?

18   A.  Yes, sir.

19   Q.  Do you know why it is filed on June 26, 2023?

20   A.  He had requested an extension that year to complete his

21   filing.

22   Q.  And he got it; right?

23   A.  Of course.

24   Q.  And this one continues to report regarding the gold bullion

25   on page 4; right?

O6R5men4                         Kopplin - Cross

1    A.  Yes, sir.

2    Q.  And then it also, in Section 4(b), next page, discloses

3    sales for what are called here partial sales of gold bullion;

4    correct?

5    A.  That's correct.

6    Q.  What does that mean in the context of gold bullion, that it

7    says "partial"?  Do you have any idea how that could be

8    partial?

9    A.  Yes, that there is still gold bullion owned by the senator

10   or his spouse in this case.

11   Q.  So it is not as to the single bar.  If there is a bar

12   referenced it is not that there is a partial ownership interest

13   still in that bar, it is that there is other gold bullion?

14   A.  Correct.

15   Q.  By the way, you told Senator Menendez in a prior e-mail

16   that if his wife sold these gold bars he would have to disclose

17   they in section part 4(b); right?

18   A.  Yes.

19   Q.  And that's exactly what he does here, right?

20   A.  Yes.

21   Q.  And there are four sales; correct?

22   A.  Yes.

23   Q.  They are dated in the transaction date April 7 and 8, and

24   then again June 14, 2022 and June 16, 2022; right?

25   A.  Yes.

O6R5men4                          Kopplin - Cross

1   Q.  And each sale is listed as having a value between $50,000

2   and $100,000 or so; correct?

3   A.  Yes.

4           MR. WEITZMAN:  Can we do a split screen, just so that

5   we can confirm other documents that are in evidence?  Can we

6   put up on the right side Government Exhibit 5A-5001A?

7   Q.  Do you see this check to Nadine Menendez?

8   A.  Yes.

9   Q.  And it is dated April 7, 2022 and it is for the amount of

10  $60,808?

11  A.  Yes.

12  Q.  Assuming that is all accurate, what you see on the check,

13  that is what he disclosed in line 1; correct?

14  A.  That's correct.

15          MR. WEITZMAN:  Can we do on the right Government

16  Exhibit 5A-5001B?

17  Q.  And again that is an April 8, 2022 check to Nadine Menendez

18  from Avital Gold and Platinum; correct, in the amount of

19  $60,000 or so?

20  A.  Yes, sir.

21  Q.  And again that lines up with row 2 of the disclosure;

22  right?

23  A.  Yes.

24  Q.  Now let's put up Government Exhibit 5A-5001C, and that's a

25  June 14, 2022 sale to Avital Gold in the amount of $58,000 or

1    so dollars; right?

2    A.  Yes.

3    Q.  That lines up with line 3; correct?

4    A.  Yes.

5    Q.  And then if we put up Government Exhibit 5I-603A, and

6    that's a June 16, 2022 check in the amount of $58,000-plus from

7    Avital Gold to Nadine Menendez; correct?

8    A.  That's correct.

9    Q.  And that lines up with line 4 of this disclosure?

10   A.  That's correct.

11   Q.  If a senator makes a mistake in a disclosure -- actually,

12   let me withdraw that.

13       You said that part of your duties as -- chief counsel, is

14   that the title?

15   A.  Yes.

16   Q.  Chief counsel is oversight of enforcement and

17   investigations; right?

18   A.  Yes.

19   Q.  And that there are certain remedies or things that you all

20   can do as part of that enforcement responsibility; right?

21   A.  Yes.

22   Q.  If a senator makes a mistake in his disclosure, you guys

23   have the ability to censure a senator civilly or in the Senate

24   to deal with that mistake; right?

25              MR. RICHENTHAL:  Objection.

O6R5men4                          Kopplin - Cross

1              THE COURT:  Just a moment.  I will allow it.

2      A.  By "you guys" you are referring to the whole body of the

3      U.S. Senate?

4      Q.  Yes.

5      A.  Yes.

6              THE COURT:  I take, it based on your prior testimony,

7      the Senate has a variety of options in regard to how to address

8      a mistake, an error in the filings; is that correct?

9              THE WITNESS:  Yes.  What I would say is if it was a

10     mistake, you would not be discussing disciplinary action.  If

11     the mistake was found to be intentional, then there is a range

12     of opening that do include censure.

13             THE COURT:  Thank you.

14             MR. WEITZMAN:  Thank you, Ms. Kopplin.

15             MR. LUSTBERG:  No questions, your Honor.

16             THE COURT:  Mr. de Castro?

17             MR. DE CASTRO:  No questions.  Thank you.

18             THE COURT:  Any redirect?

19             MR. RICHENTHAL:  Can we have the brief side bar now,

20     your Honor?

21             THE COURT:  Oh yes.  Thank you.

22             (Continued next page)

23

24

25

O6R5men4                      Kopplin - Cross

1          (At side bar)

2          MR. RICHENTHAL:  We think that Mr. Weitzman's

3   continued suggestion that the senator had no idea what these

4   forms were about, no idea what the rules were, etc., has opened

5   the door to a redacted version of the admonishment letter from

6   2018, or in the alternative, a stipulation that he was advised

7   of the gift rule in 2018.

8          I wanted to do this before he finished his cross.

9          THE COURT:  Yes.

10         MR. WEITZMAN:  First of all, I previewed yesterday or

11  maybe the day before, and your Honor made very clear that that

12  wouldn't come into evidence.  I don't think I opened the door.

13         THE COURT:  Well, that is the question.

14         MR. WEITZMAN:  The questions I asked were whether she

15  has any evidence that any of the instructions or the manual

16  were provided to the senator and she has no such evidence.

17  It's an accurate statement of fact and it doesn't change

18  whether he has been admonished or not.  I also asked whether

19  she knows who actually does the filing, and she doesn't know.

20  And it could be Rob Kelly, and I assure you --

21         THE COURT:  You mean who pushes the button.

22         MR. WEITZMAN:  Who pushes the button.

23         THE COURT:  It is not for me, I don't think that went

24  anywhere.  I don't know.  That's up to the jury.

25         MR. WEITZMAN:  Right.  That also doesn't open the door

to an admonishment.  The admonishment, that is a 404(b) issue

that they never even disclosed.

          MR. RICHENTHAL:  It is not another fact, your Honor,

so it is not 404(b), although we did give notice I think months

ago.  The question is whether the jurors have now been left

with a misimpression regarding the senator's knowledge, in

particular, as to the rules regarding gifts.

          On or about April 26, 2018, the senator was publicly

admonished including, by the way, by Senator Coons, the very

senator with whom he spoke, about gifts and the failure to

disclose gifts.  Now we have prepared a redacted version of

that letter.  I understand the defense may have objections to

portions of it.  I can't speak to that.  We sent that to them

yesterday.  But I just want to say we think that either a

redacted version -- the version we prepared or a different

redacted version -- or stipulation is appropriate so that the

jury is not left with the misimpression that the senator was

not advised, in particular, about failure to disclose gifts and

the Senate rules concerning gifts.

          MR. WEITZMAN:  Your Honor, I would like to say I don't

think I asked a single question about the senator's knowledge.

          THE COURT:  I'm going to deny.  I don't think the door

has been opened.  I am denying the government's request.

          MR. RICHENTHAL:  Your Honor, I would just like a

little leeway on redirect just to explore that area.

1           THE COURT:  How?

2           MR. RICHENTHAL:  No, not the admonishment.  By "that

3    area" I mean the area of his knowlege as to the instructions

4    and the rules.  I think I probably have enough leeway in light

5    of the cross anyway.

6           THE COURT:  Just set forth a few of the questions.

7           MR. RICHENTHAL:  Your Honor, all I meant -- sorry.  I

8    shouldn't have said "this area" because that suggests the

9    admonishment.  I am not touching the admonishment, I am not

10   using that word, that is not what I intended.

11          What I mean is I would like to ask perhaps one or two

12   more questions than the Court might otherwise permit in the

13   interest of efficiency about the senator's knowledge of the

14   rules and the senator's knowledge of the form, not the

15   admonishment.

16          THE COURT:  Formulate it now, if you can, so I can

17   hear.

18          MR. RICHENTHAL:  *So, Ms. Kopplin, in a given e-mail,*

19   *do you see reference there to my report?  Yes, I see the*

20   *reference to my report.  Is that the reference to the senator's*

21   *report or is that the reference to Mr. Kelly's report?*  Things

22   of this nature.  Honestly, I think I would be able to ask those

23   questions anyway because the cross went to that.

24          THE COURT:  That sort of thing --

25          MR. RICHENTHAL:  I am not touching the admonishment.

O6R5men4                         Kopplin - Cross

1    I just wanted to put on the record I may have to ask one or two

2    questions more than I would otherwise ask to explore the bases

3    for the view that we have that the senator was aware of his

4    filing obligation.  I'm not touching the admonishment and

5    didn't mean to suggest otherwise.

6                THE COURT:  I will take it as it comes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2                    MR. RICHENTHAL:  If it is OK with the Court, I would

3       like to proceed from here.

4                    THE COURT:  Yes.  Of course.

5       REDIRECT EXAMINATION

6       BY MR. RICHENTHAL:

7       Q.  Ms. Kopplin, do you recall being asked questions about

8       whether other senators have engaged lawyers in conversations

9       about disclosures?

10      A.  Yes.

11      Q.  Is Senator Menendez himself a lawyer?

12      A.  Yes.

13      Q.  Do you recall being asked questions about Senator Menendez'

14      awareness of how to fill out a financial disclosure form?

15      A.  Yes.

16      Q.  Now, again, approximately how long has Mr. Menendez been a

17      senator?

18      A.  2006.

19      Q.  Has the disclosure requirement been in place since at least

20      2006?

21      A.  Yes, sir.

22      Q.  Do you recall being asked questions about --

23                   THE COURT:  I take it, do you know whether or not he

24      has filed annual financial forms, that reported form, annually,

25      since 2006.

 1          THE WITNESS:  Yes, sir, I do, and he has.

 2          THE COURT:  All right.

 3   BY MR. RICHENTHAL:

 4   Q.  Now, do you recall being asked questions about whether

 5   maybe Mr. Kelly and not Mr. Menendez reviewed or filed

 6   Mr. Menendez' disclosures?

 7   A.  Yes.

 8   Q.  Do you recall being asked multiple questions on that

 9   subject?

10   A.  Yes.

11          MR. RICHENTHAL:  Can we call up again Government

12   Exhibit 8K-1, please?

13   Q.  Is that on your screen, Ms. Kopplin?

14   A.  It is.

15   Q.  Do you see the e-mail here to you on March 6, 2022?

16   A.  Yes.

17   Q.  Do you see that someone wrote:  I am getting ready to amend

18   my report.

19   A.  Yes.

20   Q.  Who wrote this sentence that includes the words "my

21   report."?

22   A.  Senator Menendez.

23   Q.  Is Mr. Kelly even on this e-mail?

24   A.  He is not.

25          MR. RICHENTHAL:  Can we now call up Defendant's

 1   Exhibit 1853?

 2           THE COURT:  It is in evidence, I take it?

 3           MR. RICHENTHAL:  Yes, it is in evidence, your Honor.

 4   Q.  Can we go to the e-mail that you sent Mr. Kelly?  Do you

 5   see where you wrote, Ms. Kopplin:  If any of the underlying

 6   facts are incorrect, just tell me.

 7   A.  Yes.

 8   Q.  From who did you "the underlying facts"?

 9   A.  Senator Menendez.

10   Q.  To whom did Mr. Kelly forward this e-mail in which you said

11   that to Mr. Kelly?

12   A.  Senator Menendez.

13           MR. RICHENTHAL:  Can we go to the top, please?

14   Q.  Do you recall being asked questions, more than one, about

15   whether cash had to be reported as an asset?

16   A.  Yes, sir.

17   Q.  If a senator receives cash from a non-relative of, say,

18   more than $1,000, does that have to be disclosed as a gift for

19   his income?

20   A.  If he received it as a gift it would have to be reported as

21   a gift.

22   Q.  What if he received it as income?

23   A.  Then it would have to be reported as income.

24   Q.  What year would it have to be disclosed as either income or

25   a gift?

1    A.  The year it was received or earned.

2    Q.  Now, if the Senator's spouse received, say, more than

3    $1,000 in cash, not independent of the senator, would that have

4    to be disclosed as either a gift or income?

5    A.  Yes.

6    Q.  In what year?

7    A.  In the year it was received or earned.

8    Q.  Now, do you recall being asked about jewelry?

9    A.  Yes.

10   Q.  Regardless of the form of jewelry, if a senator receives

11   jewelry from a non-relative of worth more than, say, $1,000

12   again, would that have to be reported as either a gift or

13   income?

14   A.  As a gift, yes.

15   Q.  For what year?

16   A.  For the year it was received.

17   Q.  Now the same question for the senator's spouse.  If that

18   jewelry was not provided independent of the senator, would it

19   have to be reported as a gift?

20   A.  Yes.

21   Q.  For what year?

22   A.  The year it was received.

23   Q.  Would any of the answers you just gave about jewelry change

24   if it wasn't jewelry, it was just gold?

25   A.  No.

1            MR. RICHENTHAL:  Now, sticking with gifts for a

2     moment, Ms. Wechsler, can you put up Government Exhibit 10E-9

3     in evidence, the instruction forms for the years we talked

4     about, and can we go to PDF page 26 which is page 23 of the

5     instructions?  Can we blow up, that is zoom in, the general

6     instructions, please?

7     Q.  Can I now direct your attention to where it says "note" and

8     it is bolded?

9     A.  Yes.

10    Q.  Can you read the first sentence?

11    A.  Disclosure of a gift does not authorize its acceptance.

12    Q.  What does that mean?

13    A.  I discussed this briefly earlier.  It means just because

14    you have disclosed the gift doesn't mean that it is acceptable

15    under the Senate rules that govern whether you could have

16    actually accepted the gift.

17            MR. RICHENTHAL:  You can take that down, Ms. Wechsler.

18    Q.  Sticking with gifts for a moment, do you recall being asked

19    hypothetical questions about whether Ms. Menendez received

20    engagement gifts?

21    A.  Yes.

22    Q.  And whether those might have to be disclosed?

23    A.  Yes.

24    Q.  Now, if a gift is not just to the fiancée it is in fact to

25    the fiancée and the future husband, would that have to be

1    disclosed?

2    A.   Yes, which is what my hesitation was, because usually an

3    engagement or a wedding grift is addressed to the couple.

4    Q.   Can you explain what you mean by that was the source of

5    your hesitation?

6    A.   Well, the question was if a gift was given to Senator

7    Menendez' spouse, then fiancée, independent of him.  But given

8    its nature as an engagement gift, most people write the

9    engagement gift to both the bride and the groom or the brides

10   or the grooms.

11   Q.   Are you familiar with the word "divisible"?

12   A.   Yes.

13   Q.   Does that have a meaning in the context of gifts for Senate

14   disclosures?

15   A.   No.  Not really.

16   Q.   What does the word divisible mean to you?

17   A.   It means it can be divided up between the parties.

18   Q.   Now, in the context of gifts and disclosures, what if a

19   gift can't be divided?

20   A.   Then you report the entire gift.

21   Q.   If, for example, a gift was to two people, you can't

22   readily determine what percentage was to one person and what

23   percentage was to another; does the senator have to disclose

24   it?

25   A.   Our advice would always be to err on the side of

1    disclosure, especially in the context of an engagement or a

2    wedding gift.

3    Q.  I have asked you some questions about gifts, let me just

4    switch to something else.  If a senator or senator's wife was

5    loaned money for a car, again, say more than $1,000, would that

6    have to be disclosed as a liability?

7    A.  It would have to be disclosed as a liability.  It may also

8    have to be looked at as a gift depending on the terms of the

9    loan.

10   Q.  Could it in fact have to be disclosed as both?

11   A.  Yes.

12   Q.  Now, for what year, if there was a disclosure requirement,

13   would with this loan have to be disclosed?

14   A.  The year that they took the loan, that they assumed

15   responsibility for the loan.

16   Q.  Would it matter if it were paid back in part during the

17   year?

18   A.  No.

19   Q.  Would it matter if it were paid back entirely in the year?

20   A.  No.

21   Q.  Now, I asked you about a loan for a car.  What if the loan

22   was for a home.  Would your answers change?

23   A.  No.

24   Q.  Still have to be disclosed as either a liability or a gift?

25   A.  Definitely as a liability and likely also as a gift

O6R5men4                        Kopplin - Redirect

1    depending on the terms of the loan.  And specifically what I

2    mean is if you get more favorable terms on a loan than you

3    would from a financial institution like a bank, that part of it

4    is considered a gift and we would look at it separately.

5    Q.  Now, same question asked about the car.  What if the

6    mortgage loan was paid back in part during the year.  Still

7    have to be disclosed?

8    A.  You disclose the highest amount during that year.

9    Q.  What if it was paid back entirely in the year?

10   A.  You disclose the highest amount of during that year.

11           THE COURT:  Highest amount owed during that year?

12           THE WITNESS:  Yes, sir.

13   Q.  Now, in the disclosures we looked at, did Senator Menendez

14   ever disclose a car loan?

15   A.  No, sir.

16           MR. WEITZMAN:  Objection.  Scope.

17           THE COURT:  I will allow that.

18   Q.  Did he ever disclose a mortgage other than the Mr. Cooper

19   and Select Portfolio?

20   A.  For what year?

21   Q.  Any of the years I showed you.

22   A.  Yes.  He disclosed a mortgage in 2018 and 2019.

23   Q.  Was that the Mr. Cooper and the Select Portfolio?

24   A.  No, sir.  It was for a mortgage on a residence he owed.

25   Q.  I see.  A mortgage he owned.  What about one his spouse

1    owned?

2    A.   So he disclosed that in 2020, 2021, and 2022.

3    Q.   And he disclosed it for Mr. Cooper; is that right?

4    A.   Yes.

5    Q.   And Select Portfolio?

6    A.   Yes.

7    Q.   Anyone else?

8    A.   No.

9    Q.   Ever in that time period?

10   A.   No.

11              MR. RICHENTHAL:  No further questions.

12              THE COURT:  Thank you.

13              MR. WEITZMAN:  Just one?

14              THE COURT:  Go ahead, sir.

15   RECROSS EXAMINATION

16   BY MR. WEITZMAN:

17   Q.   You were talking about engagement gifts and wedding gifts

18   and how they're usually given to a couple?

19   A.   Yes, sir.

20   Q.   You have heard of bridal shower gifts?

21   A.   Yes.

22   Q.   Those are usually given to the bride?

23   A.   Yes.

24   Q.   Before she gets married, right?

25   A.   Yes.

1           MR. WEITZMAN:  No further questions.

2           THE COURT:  You are excused, Ms. Kopplin.  Thank you.

3   You may step down.

4               (Witness excused)

5           THE COURT:  Next witness for the government, please.

6           MR. MONTELEONI:  The government calls Special Agent

7   Elisabeth Wheeler.

8           THE DEPUTY CLERK:  Raise your right hand.

9   ELISABETH WHEELER,

10      called as a witness by the Government,

11      having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  Please state your full name and

13  spell your name for the record.

14          THE WITNESS:  Elisabeth Wheeler.  E-L-I-S-A-B-E-T-H

15  W-H-E-E-L-E-R.

16          THE COURT:  Good afternoon, Ms. Wheeler, welcome.

17  Please move the microphone down towards your face, it is a

18  directional mic.  Thank you.

19          Your witness, Mr. Monteleoni.

20          MR. MONTELEONI:  Thank you, your Honor.

21  DIRECT EXAMINATION

22  BY MR. MONTELEONI:

23  Q.  Good afternoon.  Are you currently employed?

24  A.  Yes.

25  Q.  Where do you work?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OR5men4                     Wheeler - Direct

1  A.  The Federal Bureau of Investigation, also known as the FBI.

2  Q.  What is your title at the FBI?

3  A.  Special agent.

4  Q.  How long have you been with the FBI?

5  A.  Approximately 12 years.

6  Q.  What unit are you currently assigned to at the FBI?

7  A.  I'm assigned to a unit called the Cellular Analysis Survey

8  Team, also known as CAST.

9  Q.  For how long have you been on the Cellular Analysis Survey

10 Team or CAST?

11 A.  Approximately a year and a half.

12 Q.  What did you do at the FBI before joining CAST?

13 A.  I was assigned, for 11 years, to the FBI New York field

14 offices violent crime task force.  That task force, that squad

15 was composed of 12 FBI agents and NYPD detectives, and we

16 investigated reactive violent crime in the five boroughs of New

17 York City, primarily bank robberies, armored car robberies,

18 fugitives, kidnappings, extortions.  Those types of

19 investigations.

20 Q.  What did you do before becoming an FBI agent?

21 A.  I was an intelligence analyst with a unit called the High

22 Intensity Drug Trafficking Area Initiative.  Also, the acronym

23 for that is HIDTA.  It is a program run out of the White House

24 that puts members of retired law enforcement and other

25 intelligence analysts in various intelligence centers across

1   the country to assist local police departments with their

2   investigations.

3   Q.  And when you use intelligence in the sense in which you

4   were an intelligence analyst, what does that refer to?

5   A.  Intelligence in the sense of assisting with, primarily,

6   criminal investigations.

7   Q.  What were some of your duties and responsibilities as an

8   intelligence analyst for the High Intensity Drug Trafficking

9   Area Initiative?

10  A.  I looked at local trends in the area, primarily anything

11  involving drugs, patterns and trends that we were seeing

12  locally, and across the country, and also assisting local law

13  enforcement officers with investigative checks and leads to

14  assist with their criminal investigations.

15  Q.  Now, directing your attention to your time in the FBI's

16  CAST unit, the current assignment, during that time as a CAST

17  agent have you worked on criminal investigations?

18  A.  Yes.

19          The CAST unit is composed of approximately 80 FBI

20  agents and task force officers across the country, and we are

21  tasked with analyzing historical call detail records maintained

22  by the cellular telephone companies to determine approximate

23  locations of phones both historically and prospectively.  So,

24  if we are looking in the past at a phone we are able to look at

25  those records and determine the phone's approximate location,

1    and if we are out actively searching for someone, we would use

2    the current phone records on a prospective basis to track that

3    person.  We are also trained to teach other members of law

4    enforcement to do the same thing.  Since there are only 80 of

5    us, we want to train our fellow agent, officers, detectives,

6    investigators, to be able to analyze records from the phone

7    companies.  And, we also provide expert testimony.

8    Q.  So, you mentioned analyzing historical call detail records

9    for location information.  Is that type of data also referred

10   to as cell site location data?

11   A.  Yes.

12   Q.  At a high level, what is cell site location data?

13   A.  So any time our phones make or receive a phone call or text

14   message or use the internet, a record is generated with a phone

15   company and those are the records that we are trained to

16   analyze and use to determine the approximate location of the

17   device used at the time of that transaction.

18   Q.  And when you say "transaction," do you mean the connection

19   of the phone to the cellular network to transmit data, make a

20   phone call, send a text message, that type of thing?

21   A.  Yes.

22   Q.  Now, is the type of analysis that you are trained to

23   perform as a CAST agent, is that method of analysis reliable?

24   A.  Yes.

25   Q.  Is it used for purposes besides law enforcement?

1    A.   Yes.  It is used by the phone companies themselves when

2    they're looking at their network and laying out enhancements,

3    upgrades, improvements to determine where their customers'

4    needs are.  It is also used -- it was used at the start of

5    COVID for all of those COVID maps that we saw.  And it is also

6    used when a hiker for example hikers go missing.  And then, in

7    CAST, we use it and validate our methodology on a weekly basis,

8    daily basis at times, when we regularly find missing children

9    and fugitives, which we do more than once a week.

10   Q.   Now I want to talk a little bit more about your background

11   in analyzing this type of historical location information.  Did

12   you receive specialized training to become a CAST agent?

13   A.   Yes.

14   Q.   Can you please describe the training that you received to

15   become a CAST agent?

16   A.   Yes.

17        So, the training to become a certified member of the

18   CAST unit is approximately 250 hours.  It starts with two or

19   three days of a basic class in which we are introduced to

20   records from the various phone companies -- AT&T, Verizon,

21   T-Mobile.  We are taught to look at them, interpret them, map

22   them, and begin to understand those records.  After that is a

23   week-long advanced class in which we again look at these

24   records from these phone companies.  This time we create maps

25   and present those maps to our colleagues.  After that is a

week-long field training exercise.  The field training exercise

is a little bit different than the previous two classes in that

every morning and every afternoon we are presented with a new

scenario, a scenario that was previously worked by a member of

the CAST unit in real-time.  So, for example, we will be told

that, simulating as if we were in a command post, and we are

told the parents of an 11-year-old girl woke up this morning to

find that she wasn't in her bedroom.  The last time they saw

her was when she went to bed the previous evening.  This

morning she's not there and her phone is on her bed.  So you

need to help us locate this missing girl.  So, we request

database checks, we request records, and conduct a logical

investigation to determine the location of the missing girl and

we then present our findings and maps to our colleagues as if

they were about to go out and look for this missing girl.

We are graded on each exercise in the morning and

afternoon, and if our grades are high enough, we are invited to

attend a four-week long certification course.  The first week

of the certification course consists of a week of radio

frequency theory instruction from professors from the Florida

Institute of Technology.  It is basically a semester's worth of

material that they present to us in a week.  At the conclusion

of that week we have to pass a lengthy test.  We are then, we

bring in members from AT&T, Verizon and T-Mobile, the companies

themselves.  They bring in people from their custodians of

1    records group, so the people that work as custodians of records

2    come in and talk to us about the records, how to request them,

3    any nuances in the records, that type of thing.  And then, they

4    also bring in engineers.  So we then receive instruction from

5    the engineers from the companies about how they lay out their

6    networks and all of the different subtleties in the laying out

7    of the cellular network.

8        Then we receive instruction from a company called

9    Gladiator.  Gladiator provides the CAST unit with the mapping

10   software we use for our products and also with the scanners

11   that we use when we are doing network surveys which is

12   determining the exact footprint of the cell site at a given

13   moment in time.

14       Finally, we are given one last practical scenario and we

15   have to work that scenario similar to what we did at the field

16   training exercise, from its inception to the conclusion.

17   However, this time, instead of presenting on our findings and

18   maps to our colleagues, we instead present it in a moot court

19   setting.  And if we pass that moot court and all of the other

20   prior exams, then we become certified members of the CAST unit.

21   Q.  So, when you become a certified member of the CAST unit,

22   does that certification last forever or are you required to do

23   anything to maintain your certification or to get recertified?

24   A.  Yes.  There are various requirements that we have to meet

25   throughout the year in terms of the number of analyses we do,

1   the number of records we look at, the number of classes we

2   teach because, again, teaching tool with law enforcement is a

3   major component of our program.  And we also have to attend an

4   annual recertification conference in which we again bring in

5   members of T-Mobile, AT&T, and Verizon, we talk to our

6   professors again from the Florida Institute of Technology, we

7   are trained on any new developments.  We also bring in members

8   of companies like Google and Apple and Meta to learn more about

9   how our work can be impacted by these third -- these social

10  media companies, phone companies, that also provide hardware

11  and operating systems.  And then we also meet as a group to

12  discuss best practices, new techniques that we can use in

13  analyzing records, and other best practices.

14  Q.  What is the approximate date of your most recent

15  recertification?

16  A.  March of this year.

17  Q.  Now, I want to talk a bit more about the methodology that

18  you use as a CAST agent.  Has the CAST methodology for

19  historical location information analysis been tested and

20  verified?

21  A.  Yes.  Again, we, as a unit, test it and verify it on a near

22  daily basis.  I think last week there were three minors located

23  using this technology and 11 fugitives apprehended using the

24  same technology.

25  Q.  Now, can this technology determine the exact location of a

1    phone?

2    A.   No.

3    Q.   Have you nonetheless used this methodology yourself to

4    locate missing persons or fugitives?

5    A.   Yes.

6    Q.   About how many times in your case?

7    A.   It is hard to say exactly.  A dozen, two dozen, three

8    dozen.

9    Q.   Have you, yourself, ever used historical location

10   information analysis in this methodology to rule out subjects

11   of investigations?

12   A.   Yes.  I have and members of the CAST unit have also used

13   the same methodology to exonerate persons who had previously

14   been convicted.

15   Q.   And, by the way, so you testified that before you were in

16   CAST you were on the violent crimes task force.  Did you

17   analyze this kind of location information in that position as

18   well?

19   A.   Yes.  Almost every case I worked on the violent crime task

20   force required some type of cell phone analysis.

21   Q.   You testified that before you were in the FBI you were an

22   intelligence analyst with HIDTA, the High Intensity Drug

23   Trafficking Area Initiative.  Did you analyze cell phone

24   location information in that position?

25   A.   I did.

1  Q.  About how many historical location information analyses did

2  you say you conducted over the course of your career?

3  A.  Hundreds.

4  Q.  Have you testified in court on previous occasions?

5  A.  Yes.

6  Q.  On any of those occasions, were you qualified by a court as

7  an expert in the field of historical location information

8  analysis?

9  A.  Yes.

10  Q.  About how many times have you provided expert testimony in

11  that field?

12  A.  Nine.

13        MR. MONTELEONI:  At this time, pursuant to Federal

14  Rule of Evidence 702, the government offers Special Agent

15  Wheeler as an expert in the field of historical location

16  information analysis.

17        MR. FEE:  No objection.

18        THE COURT:  I grant that motion.

19        Ladies and gentlemen, all that means is that this

20  witness can answer opinion questions in regard to historical

21  location information analysis.  My granting a motion to declare

22  an expert means nothing more and nothing less.  She can be

23  asked opinion questions in the area of her expertise.

24        Proceed.

25        MR. MONTELEONI:  Thank you, your Honor.

1    BY MR. MONTELEONI:

2    Q.  Special Agent Wheeler, did you examine historical call

3    detail records in connection with this case?

4    A.  Yes.

5    Q.  After reviewing those records, did you form any expert

6    opinions?

7    A.  Yes.

8    Q.  How, if at all, do you document your opinions?

9    A.  So, after uploading the original records from the phone

10   company into my mapping software and drilling down on certain

11   dates, times and locations, I take screenshots of those maps

12   and I embed those screen shots of maps into a PowerPoint

13   presentation that contains additional information, and I then

14   complete that PowerPoint and that is what reflects my opinions.

15   Q.  When you say that you uploaded the location information

16   into your mapping software, does that refer to the software

17   provided by the Gladiator company?

18   A.  Yes.

19   Q.  Now, what, if any additional review, did the report that

20   you just described undergo after you completed it?

21   A.  So prior to testifying in court, as a member of the CAST

22   unit, it is required that we submit our reports to another

23   member of the CAST unit for peer review.  When we conduct a

24   peer review, you take the original record from the phone

25   company and the report and you go through and look at each --

1    every item that is reflected in the report in the original

2    records to ensure that what is in the original records is

3    accurately depicted in the maps.

4            MR. MONTELEONI:  Mr. Hamill, can you please show just

5    the witness, the parties, and the Court the document that has

6    been marked for identification as Government Exhibit 16C-2?

7    Q.  Special Agent Wheeler, do you recognize this document?

8    A.  Yes.

9    Q.  Did you review this prior to testifying?

10   A.  Yes.

11   Q.  What is this?

12   A.  This is my report.

13   Q.  Does the report that you drafted fairly and accurately

14   reflect your opinions in this case?

15   A.  Yes.

16   Q.  Now this particular exhibit, Government Exhibit 16C-2, does

17   this include, in addition to your report, excerpts from other

18   government's exhibits in this case?

19   A.  Yes.

20   Q.  Do you examine each of these excerpts to compare the times

21   that were noted in the excerpts to the times noted in the

22   report?

23   A.  Yes.

24           MR. MONTELEONI:  The government offers Government

25   Exhibit 16C-2.

1           THE COURT:  Admitted, without objection.

2           (Government's Exhibit 16C-2 received in evidence)

3           MR. MONTELEONI:  Mr. Hamill if you could publish just

4    the first page of Government Exhibit 16C-2?

5    BY MR. MONTELEONI:

6    Q.  Special Agent Wheeler, let's start with the basics.  How do

7    cellphones work?

8    A.  So, our phones are essentially radios, similar to the

9    walkie-talkies used as kids.  The difference is walkie-talkies

10   speak directly to each other, walkie-talkie to walkie-talkie

11   and, as such, they generally need to be fairly close to each

12   other in order to communicate.  However, cellphones do not

13   speak directly to other cellphones.  Cellphones speak to other

14   cellphones through intermediaries which are called cell sites.

15   These cell sites are constantly emitting radio frequency and

16   they cover our Earth so that we have continuous cellular

17   coverage as we move from one location to another.

18          Any time that a phone uses one of these cell sites, a

19   record is generated with the phone company and those are the

20   records that we are trained to analyze to determine the phone's

21   approximate location at the time that it made a text, made a

22   phone call or sent a text message or used data services to

23   access, for example, the internet.

24          (Continued on next page)

25

1          MR. MONTELEONI:  Mr. Hamill, could you please take us

2    to page 3, Government Exhibit 16C-2.

3    Q.  Special Agent Wheeler, you mentioned cell sites.  What is a

4    cell site?

5    A.  So, cell sites are the structures that I just talked about,

6    those intermediaries that cover Earth.  Traditionally, they

7    were very much like the image here on the left side of the

8    screen, a big tall tower, sometimes triangular, that had lots

9    of antennas off the top.

10         Here, in New York City, we don't really see these.  We see

11    these more alongside of a highway or more suburban and rural

12    areas, because these are very large structures that require a

13    lot of physical space.  Also, they're not quite tall enough

14    here in New York City -- right -- due to the number of

15    skyscrapers in Manhattan and the other boroughs.

16         So, this -- however, even though it's not used so much in

17    New York City, it's -- what we talk about here is it

18    illustrates how this is a traditional macro cell site which has

19    antennas angled in various directions.  This is called a

20    sectorized cell site, and what a sectorized cell site does is

21    those antennas emit radio frequency in a particular direction,

22    so customers in that direction, in that area, are able to use

23    that cell site.  In order to use a cell site, your phone must

24    be located within the coverage area of that cell site.

25         Before we talk about the coverage areas, these sectors that

O6rWmen5                          Wheeler - Direct

1    we want to talk about, those are reflected in the records with

2    an azimuth.  An azimuth is a center point of that sector.  So

3    if we were to think about being in this courtroom today, and

4    all of a sudden, the lights were to go off and I were to have a

5    flashlight and shine it at the wall, the center point, where

6    I'm pointing, that would be the azimuth.  And that is where the

7    light would be the brightest.

8        However, radio frequency, similar to light, we know that

9    the flashlight is not going to shine and illuminate only the

10   wall where I'm pointing.  There will be light that will diffuse

11   away from the center of my flashlight and illuminate other

12   parts of the courtroom.  That is the same for sectors on cell

13   sites.  So the radio frequency will diffuse and provide

14   coverage to a given area.

15       Now, the coverage area of these cell sites, it can be, in

16   urban areas, much smaller than it would be in more rural areas,

17   and that is because the cell phone companies and their

18   engineers create and lay out the network based on population

19   density.  So where you have more people you have more cell

20   sites, and therefore, the coverage area of those cell sites

21   becomes smaller.  And that is because the engineers set the

22   network up to assure that there is overlapping coverage between

23   the cell sites so that I can move from, let's say, the Bronx

24   into Queens without having to drop my phone call.  And so you

25   have that overlapping coverage, but they don't want too much

O6rWmen5                          Wheeler - Direct

1    overlapping coverage.

2         The example I usually use is a sprinkler system, like a

3    really big lawn or a golf course or something.  In order to

4    keep the lawn alive and watered, the sprinklers will provide

5    slight overlapping coverage to ensure that there are no parts

6    of the grass that aren't being watered.  So that would be the

7    equivalent of ensuring that I can move from one point to

8    another without dropping coverage.  However, if those two

9    sprinklers are providing so much overlap in coverage, they

10   would be drowning out the grass, which would also kill the

11   grass.

12        Now, in the example of radio frequency, that is

13   interference.  When you have that much radio frequency on top

14   of each other, that creates interference.  So the engineers

15   carefully lay out the network to ensure there's slight

16   overlapping coverage but not too much overlapping coverage.

17             THE COURT:  Ma'am, you used the words or phrase "drop

18   the call" and "drop the coverage."  What did you mean?

19             THE WITNESS:  So, if we were, for example, in an area

20   that didn't have coverage, similar to -- there's a spot on the

21   FDR, for example, when you're driving north from this area and

22   going past StuyTown, there's a part of the FDR where Verizon

23   just does not have cell phone coverage.  And so if I'm on the

24   phone -- not speaking on the phone but on Bluetooth -- and all

25   of a sudden, that call just drops, that means that I've lost

1    the connection to the network; my phone can no longer connect

2    to the network.

3           That doesn't happen too often because if that happens

4    frequently, I would probably start to say maybe Verizon isn't

5    the best provider for me.  Maybe if I lived, for example, in

6    this area, I may consider switching to another provider.  So

7    the phone company's bottom line is retaining its customer base

8    and ensuring there's overlapping coverage so that our phone

9    calls can continue without disconnecting as we move from one

10   place to another.

11          THE COURT:  Thank you.

12   BY MR. MONTELEONI:

13   Q.  So, you mentioned a number of things that I want to go over

14   in more detail, but first, I want to talk a little bit more

15   about the different types of cell sites.  So you've

16   described -- the image on the left, I believe you described it

17   as a tower that you referred to as a macro cell site?

18   A.  Yes.

19   Q.  What does the term "macro" distinguish it from?

20   A.  The opposite would be a micro cell site.  So, as I alluded

21   to, the cell sites on the left, these very large cell site

22   towers that require a lot of space -- they're not very

23   prevalent in New York City, the five boroughs.  What we tend to

24   see are also macro cell sites, but instead of being on the top

25   of tall poles, they're mounted on top of existing structures

and buildings.  So if you look at a lot of tall buildings in the city, you'll see antennas on the corners facing different directions.  Those are also macro cell sites.

However, due to the nature of New York City and its buildings, the cell companies use a lot of micro cell sites, which boost coverage in a smaller area.  An example of this is the image on the right.  You have two red boxes with red dotted lines.  The box towards the center bottom of the screen, that depicts the antenna of this particular -- the radio of this particular cell site.  And the box on the top, that is the actual antenna for that cell site.  And as you can see in this image here, it's mounted on top of an existing, you know, street lamp, traffic light pole.  So these micro cell sites or distributed antenna systems, sometimes they provide sectorized but they often provide 360-degree coverage to boost coverage in a small area.

An easy way to understand it is if I'm standing just west of the Empire State Building and the closest cell site to me is on the other side of the Empire State Building, the Empire State Building is going to block that cell site signal to my phone.  So my phone may reach further, to a cell site that's further away to get coverage because the closest cell site to me is blocked by a very tall building.  Because ideally, our phones want to connect, and the engineers want to ensure that our phones are connecting to the closest cell site so that

O6rWmen5                    Wheeler - Direct

1    we're not jumping over other cell sites and causing

2    interference in the network.  However, that's not always

3    possible -- again, using the example of the Empire State

4    Building, and there are a lot of other factors that would

5    impact coverage.  So, for example, not just tall buildings --

6            THE COURT:  Agent Wheeler, I'm going to ask you to

7    slow down.

8            THE WITNESS:  OK.

9            THE COURT:  We have a reporter and we have

10   interpreters.

11           THE WITNESS:  Oh.

12   A.  So, in addition to large buildings impacting coverage,

13   other things, such as topography -- hills, valleys,

14   mountains -- and bodies of water all impact coverage.  All of

15   this is taken into account by the engineers when they lay out

16   the network.  The ultimate goal is our phones will connect to

17   the closest cell site which provides the best signal.  However,

18   the best signal may not always be the closest cell site --

19   again, thinking about the Empire State Building or other

20   features, such as topography.

21   Q.  And directing your attention to this expanded image of what

22   I believe you called a micro cell site that's on the right in

23   slide 3 of Government Exhibit 16C-2, is this one of the cell

24   sites that you analyzed in connection with preparing your

25   report in this case?

1   A.   Yes.

2   Q.   What's the meaning of the letters at the bottom that say

3   CID 116784 (AT&T)?

4   A.   So, CID stands for cell ID -- it's an abbreviation -- for

5   the unique number AT&T has given this particular cell site on

6   its network.  So this is a site we will see later in my report

7   located in Manhattan at the corner the Madison Avenue and East

8   71st Street, and the number assigned to it by AT&T is 116784.

9           MR. MONTELEONI:  If we could drop that expansion,

10  Mr. Hamill, and then focus on the middle of the cell site

11  that's depicted here on page 3 of Government Exhibit 16C-2.

12  Q.   Special Agent Wheeler, what does this image depict?

13  A.   This is another macro cell site, which provides sectorized

14  coverage, but instead of having the antennas almost in a

15  triangular direction, all of the antennas are concealed within

16  this one single structure.  So they're all inside, and it

17  provides sectorized coverage; it just looks different than the

18  traditional macro cell site.

19       This is also a cell site that appears frequently in my

20  report.  It is located in New Jersey, and it's on the AT&T

21  network assigned cell ID 812175.

22          MR. MONTELEONI:  All right.  You can drop that

23  expansion, Mr. Hamill.  Thank you.

24  Q.   So you talked about a coverage area.  In order to get

25  service, does a cell phone always have to connect to a cell

O6rWmen5                      Wheeler - Direct

1    site for which it is in the coverage area?

2    A.  Yes.  You cannot connect to a cell site if you don't fall

3    within the coverage area of that cell site.

4    Q.  Now, you've also testified about circumstances where

5    something like the Empire State Building being in the way might

6    mean that a phone would not connect to the closest cell site

7    within the coverage area.  Is something like a big obstruction,

8    like a building being in the way, the only type of factor that

9    would cause this?

10   A.  No.

11   Q.  Before we get to other factors, as a general matter, do

12   cell phones usually connect to cell sites in which they are in

13   close proximity?

14   A.  Yes.

15   Q.  Now, what are some of the other factors besides something

16   like the Empire State Building that affect which cell site has

17   the best signal?

18   A.  So, building materials, concrete, glass.  Those all impact

19   coverage.

20       Bodies of water carry a cell signal much further than a

21   landmass would.  And again, valleys and hills and other tall

22   topography also impacts coverage.

23           MR. MONTELEONI:  All right.  So, you mentioned

24   something about the directionality of cell signals and the

25   azimuth.  I want to talk about that a little more.

1          Mr. Hamill, could you please take us to page 4.

2     Q.  Special Agent Wheeler, what are we looking at here?

3     A.  On the right side of the screen is a bird's-eye view of a

4     traditional macro cell site, the type we saw on the previous

5     slide on the left-hand side.

6          The blue lines and the blue shaded area are what you are

7     going to see in my report to indicate the cell site and sector

8     used.  So, what we have and what you're not seeing here that

9     you will see in my report is where those two blue arms meet,

10    there will be a dot and that dot is a cell site itself.

11         Now, in the center here, you have an arrow that, in this

12    image, is facing due north or zero degrees or 12:00 if you

13    think of it like a clock.  That is the azimuth or the center

14    point.  So the shaded area, this blue shaded area here, between

15    those two arms, indicates the directionality of this particular

16    sector.  It is a way to visually demonstrate which direction

17    the particular sector used is facing.  It does not at all imply

18    the coverage area of that sector but instead the

19    directionality.

20         So radio frequency -- again, like the flashlight example --

21    the cell signal does not end exactly where those two straight

22    arms are.  It could go on either side of those arms.  It could

23    not extend all the way to the arms.  That is not what this

24    image is meant to depict.  What we depict in our reports is the

25    location of a cell site and the directionality of that sector.

O6rWmen5                          Wheeler - Direct

1          THE COURT:  But you're showing, I take it, an
2    amplitude of 180 degrees, is that right?
3          THE WITNESS:  Yes.
4          THE COURT:  Why do you do that?  What's the purpose of
5    having 180 degrees when you say that the coverage may be less,
6    it may be more?
7          THE WITNESS:  Yes.  So, it's actually -- I'm sorry,
8    not 180.  It's 120 degrees.
9          THE COURT:  I'm sorry.  120 degrees.
10          THE WITNESS:  No, no.
11          So what we do, because traditionally, the sectors each
12    spanned approximately 120 degrees, or if you think of it like a
13    clock, four hours.
14          THE COURT:  Is that the average or the normal exposure
15    of each cell site, 120 degrees?
16          THE WITNESS:  Generally, yes.  It depends on -- on
17    each individual cell site, and the only way to measure the
18    actual footprint of the cell site is to drive test that cell
19    site, which cannot be done with any accuracy after the fact.
20          So if we -- if we are looking at a cell site soon
21    enough -- let's say a couple of months -- to the time in
22    question, we can get the coverage area at that point in time of
23    the cell site.  But looking at it years later, the coverage
24    area is going to be different than it was at the time.
25          THE COURT:  Thank you.

1    BY MR. MONTELEONI:

2    Q.  Now, understanding the qualifications you just said about

3    the directionality, do traditional sectorized cell sites that

4    are set up, or the cell towers, rather, that are set up by

5    phone companies typically arrange their cell sites in three

6    120-degree arcs, essentially, to cover the whole 360 degrees?

7    A.  Yes.  That was what was traditionally done and remains

8    common practice.

9    Q.  Can a phone connect to a sector of a cell site like this if

10   it's not in the shaded arc depicted here?

11   A.  Yes.

12   Q.  So here, the shaded arc is pointed to the north.  Could a

13   phone that's to the east or west that's nonetheless -- that's

14   out of the shaded arc, could it connect to that north-facing

15   sector in this diagram?

16   A.  Yes.

17          MR. MONTELEONI:  Mr. Hamill, could you please take us

18   to page 5.

19   Q.  Special Agent Wheeler, what are we looking at here, on

20   slide 5 of Government Exhibit 16C-2?

21   A.  This is an overview of AT&T's network in April of 2019 in

22   the metropolitan New York and New Jersey area.

23       Also on this map are three flags.  One is yellow with a

24   white house, and the other two are blue with white writing.

25   Those flags correlate to addresses provided to me by the U.S.

O6rWmen5                          Wheeler - Direct

1   Attorney's Office and are places that you will see in the

2   substantive slides in my report.

3          THE COURT:  Can you circle those flags.

4          It wasn't working the other day either.  All right.

5   Thank you.

6          MR. MONTELEONI:  For the benefit of the transcript, I

7   believe you highlighted a yellow-orange house icon near the top

8   center of the map depicted here.  You also highlighted a blue

9   icon with the letters RP around the center of the map.

10  Q.  Is there a third location a little bit farther down?

11  A.  Yes, towards the bottom center of the map is another blue

12  flag with the white No. 9.

13  Q.  Now, there's also, in addition to those flags, there's a

14  number of blue dots on this map.  What do those dots represent?

15  A.  Each dot is one of AT&T's cell sites in April 2019.

16  Q.  And about how dense is this concentration of cell sites in

17  the New York-New Jersey area?

18  A.  So, you can see that parts of New York City have such a

19  density of cell sites you can't see the underlying land.  As

20  you move north, east and west, the cell sites spread out and

21  become further apart.

22  Q.  Understanding that it's not all as dense as the midtown

23  area at the bottom center of the map, overall, about how dense

24  is the surrounding area of the New York-New Jersey metropolitan

25  area?

1    A.  It's still one of the densest networks in the country, even

2    in more suburban parts of New York City.

3    Q.  What, if any, impact does that density of cell sites have

4    on the precision of the location data that you were able to

5    obtain from the historical call detail records?

6    A.  So, the cell site coverage areas in such a dense network

7    tend to be much smaller.  Again, the goal is to have slight

8    overlapping coverage but not so much so that it creates

9    interference.  So when we look at the surrounding network,

10   we're able to understand that the density or a more dense

11   network results in much smaller coverage areas.

12          MR. MONTELEONI:  Mr. Hamill, could you please put up

13   page 6 of Government Exhibit 16C-2.

14   Q.  Special Agent Wheeler, what is shown on this slide?

15   A.  So, on this slide I have the phone numbers and addresses

16   provided to me by the United States Attorney's Office in

17   conjunction with this case.

18          On the top left box are the four phone numbers whose

19   records I analyzed in creating maps.

20          Highlighted in red is the AT&T phone number (201) 290-8400

21   associated with Robert Menendez.

22          Highlighted in black is AT&T phone number (201) 315-2629

23   associated with Fred Daibes.

24          Highlighted in blue is the AT&T phone number (516) 395-1745

25   associated with Nadine Menendez.

O6rWmen5                          Wheeler - Direct

1            And highlighted in orange is the AT&T telephone number

2      (646) 675-1648 associated with Fernando Barruos.

3            In the box to the right that is all black and white, those

4      are three phone numbers that I used as reference in this report

5      but whose records I did not map.  So you will see those names

6      and numbers referenced in my call-out boxes, but you -- I did

7      not map those particular records.

8            So telephone number (201) 681-3520 is associated with José

9      Uribe.  Telephone number (551) 574-4550 is associated with Will

10     Hana.  And phone number (917) 623-7331 is associated with John

11     Pilot.

12     Q.  Why are the lines for the phones that are mapped in the

13     report in the box on the left color coded in the ways that the

14     ones in the box on the right for the nonmapped phones are not?

15     A.  So, in my substantive slides, which we will be seeing

16     shortly, every time a cell site is mapped, the cell site --

17     those two arms in the shaded area -- will be in the color

18     associated with this chart here as will the call-out box, which

19     describes the activity that occurred at that cell site.

20           So whenever you see a red cell site and a red call-out box,

21     that will correspond to the phone of Robert Menendez.  If it's

22     black that will correspond to the phone of Fred Daibes.  If

23     it's blue that will correspond to the phone of Nadine Menendez.

24     And if it's orange that will correspond to the phone of

25     Fernando Barruos.

1    Q.  Now, directing your attention to the associated name column

2    in each of the left and right phone number boxes, for the

3    purpose of your testimony today, I'm going to refer to those

4    phones by their associated names.  Are you comfortable with

5    that?

6    A.  Yes.

7    Q.  What are the locations in this bottom box?

8    A.  These are the three locations that are depicted in my

9    report.  We saw these locations flagged on the previous slide,

10   the geographic overview.  And if we start with the top line

11   here, the blue flag with the white No. 9 corresponds to the

12   Rothschild mansion at 41 East 70th Street in New York, New

13   York.  The blue flag with the white RP writing corresponds to

14   the River Palm Terrace restaurant located at 1416 River Road in

15   Edgewater, New Jersey.  And the yellow flag with the white

16   house corresponds to the Menendez residence at 41 Jane Drive in

17   Englewood Cliffs, New Jersey.

18              MR. MONTELEONI:  Mr. Hamill, could you please take us

19   now to slide 7.

20   Q.  Special Agent Wheeler, what are we looking at here?

21   A.  This is the first of my substantive slides, my maps.  And

22   this shows activity of Robert and Nadine Menendez's phones on

23   April 6 of 2019 between 9 and 11:54 p.m.

24   Q.  Now, one line down from that date and time notation at the

25   top, where it says voice, SMS and data activity, and then the

O6rWmen5                      Wheeler - Direct

number of the Menendez cell phone in red and the number of the
Nadine Menendez cell phone in blue, what does that line mean?
A.   Yes.  So I -- in this particular slide I looked at voice
activity, which is phone calls; SMS activity, which is text
messages; and data activity, which is internet usage.  So you
know, searching the internet, looking at the news, receiving
information from an app, like if you were looking at the
Weather Channel or Skype or something, any of those would use
data services.
          THE COURT:  Do you know what SMS stands for?  SMS is
text, is that it?
          THE WITNESS:  Yes.
          THE COURT:  What does it stand for?
          THE WITNESS:  Short message service.
          THE COURT:  Thank you.
BY MR. MONTELEONI:
Q.   Now, directing your attention to the map, near the bottom
center of the map, there's a large red shaded arc and then four
arms protruding that end with red portions.  Can you describe
what that diagram depicts down the bottom center of the map?
A.   Yeah.  So, that is one single cell site used by both Nadine
and Robert Menendez's phones.  However, both phones use two
sectors on that cell site, which explains why instead of having
two arms we have four arms.  Those two sectors overlapped in
their coverage areas.  And for visual clarity -- not indicative

1    of coverage area, but for visual clarity -- the red arc is

2    slightly larger than the blue so that you can see that both

3    phones used that particular cell site and sector.  Because if

4    they were the same size, you wouldn't really be able to see any

5    red; the blue would just look a little bit more purple.

6    Q.  Directing your attention to the box next to those two arcs,

7    so first, in the white portion of that box, what does it mean

8    where it says CID 812123?

9    A.  Yes.  So, that is the identifier for the cell site -- so

10   AT&T cell site 812123.  And then I have 20 degrees and 300

11   degrees, which that is the directionality, or the azimuth, of

12   those two sectors used by those two phones.

13   Q.  Directing your attention to the red portion of that same

14   box, what does it mean that in the red portion it says 9:10 to

15   11:10 p.m., multiple data sessions?

16   A.  Yes.  So, the red call-out box indicates that Robert

17   Menendez's phone used this cell site and these sectors for

18   multiple data sessions between 9:10 and 11:10 p.m.

19   Q.  In your opinion, is the data that you reviewed consistent

20   with the Menendez cell phone being in the vicinity of this

21   lower cell site indicated on the map between 9:10 and 11:10

22   p.m. on April 6, 2019?

23   A.  Yes.

24   Q.  Directing your attention to the blue portion of that same

25   box, what does it mean where it says 9 to 11:10 p.m., two

1    calls, 14 SMS, multiple data sessions?

2    A.  Yes.  So, this call-out box indicates that Nadine

3    Menendez's phone used this cell site and these sectors for two

4    phone calls, 14 text messages and multiple data sessions

5    between 9 o'clock and 11:10 p.m., to include 12 texts with Will

6    Hana's number and two calls to Uribe.

7    Q.  Now, when you say texts, are you referring to SMS, or short

8    message service messages?

9    A.  Yes.

10   Q.  Can you tell from looking at phone records when a user

11   sends a particular SMS message?

12   A.  Yes.

13   Q.  Do iPhones have the ability to send text-based messages

14   that are not SMS messages?

15   A.  Yes.

16   Q.  What other types of text messages can they send?

17   A.  So, two iPhones can send what is called an iMessage which

18   does not use the traditional cellular network but instead is

19   transmitted through the cellular network as data.  And so those

20   iMessages we cannot isolate the way we can a traditional text

21   message between, let's say, an iPhone and a Samsung Galaxy.

22   Q.  What can you tell about how many iMessages a user sends or

23   when they send them just from looking at the historical call

24   detail records?

25   A.  We can't.

O6rWmen5                              Wheeler - Direct

1   Q.  Are other apps that allow the sending of text messages

2   using these data sessions?

3   A.  Yes.  Any application that you can send messages on --

4   WhatsApp, Skype, Telegram, Signal, all of those would be

5   transmitted through data sessions as opposed to a traditional

6   SMS that would be reflected in the call detail records.

7   Q.  For all of these that are transmitted through data

8   sessions, what can you tell about when such messages are sent

9   or how many from the call detail records alone?

10  A.  We can't.

11  Q.  Do many of these apps also allow voice calls, by the way?

12  A.  They do.

13  Q.  And what can we tell about how many voice calls a user

14  makes through apps like these just from historical call detail

15  records or when those voice calls were made?

16  A.  We can't.

17  Q.  Now, so still in the blue portion of the box, directing

18  your attention to that portion, is the data that you reviewed

19  consistent with the Nadine Menendez cell phone being in the

20  vicinity of this lower cell site on the page from 9 to 11:10

21  p.m. on April 6 of 2019?

22  A.  Yes.

23  Q.  Now, directing your attention a little bit up the page to

24  around the center of the map, what does it mean where it says,

25  in a blue box, 11:12 p.m. data session handover?

1    A.  So, AT&T is unique in that they provide us not only with

2    the starting cell site for a data session, because AT&T data

3    sessions can last up to 60 minutes.  So instead of providing us

4    just with the cell site used at the start of that data session,

5    they provide us with what is called handovers.  And the

6    handovers show any other cell site used for the duration of

7    that data session, which could last up to 60 minutes.  So in

8    this case, at 11:12 p.m., the Nadine Menendez cell site -- cell

9    phone used a cell site further north of the one that she had

10   been, her phone had been using.  This one was cell site 812175,

11   which is located just at the southeast of the Menendez

12   residence.  And the particular sector used faces south

13   southwest, and the handover is denoted the same way as a

14   regular cell site and sector, but instead of having the shaded

15   arc, you just have the arc outlined to show that it was a

16   handover as opposed to the start of a new data session.

17   Q.  In the context of this particular handover that you have

18   depicted on the map, in your opinion, is that consistent with

19   the Nadine Menendez cell phone traveling physically in

20   approximately that time frame?

21   A.  Yes.

22   Q.  What direction is it consistent with the cell phone

23   traveling?

24   A.  North.

25   Q.  And by the way, you mentioned that this upper cell site

O6rWmen5                        Wheeler - Direct

1   that the handover was to is No. 812175.  Is that one of the

2   ones that was depicted in the slide that we saw previously?

3   A.  Yes.  I think it was slide 3 that showed those three

4   visuals of cell sites.  This was the cell site in the center,

5   that tall pole with the singular cylinder at the top.

6           MR. MONTELEONI:  Mr. Hamill, can we please just put up

7   slide 3 for a moment.

8   Q.  And now that central image is an image of the cell site

9   that that data session handover connects the Nadine Menendez

10  cell phone to in slide 7, is that right?

11  A.  Yes.

12          MR. MONTELEONI:  All right.  You can take down slide

13  3, Mr. Hamill.  Thank you.

14  Q.  Directing your attention now, Special Agent Wheeler, to the

15  big red upward-facing arc at the top center of the page, what

16  does that arc mean?

17  A.  The red arc indicates that Robert Menendez's phone used

18  cell site 812175 with an azimuth of 30 degrees, or facing the

19  northeast, for multiple data sessions between 11:14 and 11:54

20  p.m.

21  Q.  And what does the blue portion of that same call-out box

22  mean?

23  A.  That Nadine Menendez's phone used the same cell site and

24  sector as Robert Menendez's phone at -- for data sessions that

25  began at 11:13 and 11:21 p.m.

1   Q.  And directing your attention to the little yellow home

2   icon, a little bit above that cell site, what does that

3   represent?

4   A.  That is the Menendez residence at 41 Jane Drive in

5   Englewood Cliffs, New Jersey.

6   Q.  Is the data that you reviewed, in your opinion, consistent

7   with the Menendez cell phone and the Nadine Menendez cell phone

8   being in the vicinity of 41 Jane Drive starting at

9   approximately 11:13 p.m. that evening?

10  A.  Yes.

11  Q.  Directing your attention to the excerpt, below the portion

12  you prepared, directing your attention, first, to row 694,

13  reflecting that Nadine Arslanian texted José Uribe -- Bob and I

14  are going home, my house, if you want, come by any dime, he

15  just finished his big G, at 11:11 p.m. -- when is that text

16  message in comparison to the time period during which you

17  testified that the data is consistent with the Menendez cell

18  phone and the Nadine Menendez cell phone being in the vicinity,

19  first of that lower cell site?

20  A.  It's one minute after the last connection of Nadine's phone

21  to the lower cell site.

22  Q.  When is that text message in comparison to the time period

23  during which the data's consistent with the Menendez cell phone

24  and the Nadine Menendez cell phone being in the vicinity of 41

25  Jane Drive?

O6rWmen5                          Wheeler - Direct

1  A.  It is approximately one minute before Nadine Menendez's

2  phone uses the cell site just southeast of the Menendez

3  residence.

4  Q.  What's the data consistent with the Nadine Menendez cell

5  phone doing at the time when that text message was sent?

6  A.  It's consistent with Nadine Menendez's phone traveling.

7  Q.  In what direction?

8  A.  North.

9           MR. MONTELEONI:  Mr. Hamill, could you please take us

10  to slide 8.

11  Q.  Special Agent Wheeler, what is the date of this slide?

12  A.  May 3, 2019.

13  Q.  What is the time of this slide?

14  A.  12:31 to 12:53 p.m.

15  Q.  Whose phone number is depicted on the map in this slide?

16  A.  Fernando Barruos.

17  Q.  What does the orange box next to the shaded arc in this map

18  mean?

19  A.  So, this orange call-out box indicates that the cell site

20  located on the corner of Morris Park Avenue and White Plains

21  Road in the Bronx was used by Barruos's phone for four phone

22  calls between 12:31 and 12:53 p.m. on May 3 of 2019.

23  Q.  Now, what does the green area on the map that's to the left

24  of the cell site that the Barruos phone connected to represent?

25  A.  That's the Bronx Zoo.

1    Q.  Is the data, in your opinion, consistent with the Barruos

2    cell phone being in the Bronx from the 12:31 to 12:53 p.m. time

3    frame?

4    A.  Yes.

5    Q.  Directing your attention to the excerpted text messages at

6    the bottom between Fernando Barruos and José Uribe in which

7    Barruos writes what's translated as, LOL that's called power,

8    and Uribe writes, call and pay this using the Barruos account,

9    I don't want to use anything with my name on it, and writes

10   then send the money orders, when were those text messages sent

11   in relation to the time period during which you just testified

12   data is consistent with the Barruos cell phone being in the

13   Bronx?

14   A.  It was during the time.

15          MR. MONTELEONI:  Mr. Hamill, can you please take us to

16   slide 9.

17   Q.  Special Agent Wheeler, what's the date and time on this

18   slide?

19   A.  It's the same day, just later on in the afternoon, so

20   between 2:47 and 3:19 p.m. on May 3 of 2019.

21   Q.  Where is the cell site that's depicted on the map here

22   located?

23   A.  Also in the Bronx, just east of the Bronx Zoo.

24   Q.  What does the orange call-out box next to the shaded arc

25   mean here?

1  A.  The call-out box shows that Barruos's phone used this cell

2  site just east of the Bronx Zoo for four calls with Uribe

3  between 2:47 and 3:19 p.m.

4  Q.  In your opinion, is the data that you reviewed consistent

5  with the Barruos cell phone being in the Bronx from the 2:47 to

6  3:19 p.m. time frame?

7  A.  Yes.

8  Q.  Is it consistent with the cell phone being in the Bronx

9  during these calls with Uribe that are reflected in the orange

10  box?

11  A.  Yes.

12  Q.  And directing your attention to the excerpt, do the first

13  two lines show some of those calls between the Barruos cell

14  phone and the Uribe cell phone that are reflected in the orange

15  box on the map?

16  A.  Yes.

17  Q.  Directing your attention to the last line of the excerpt,

18  where José Uribe texts Nadine Arslanian, please call me, I need

19  some information to make the payment, when is that text message

20  sent in relation to the time frame during which you just

21  testified that the data's consistent with the Barruos cell

22  phone being in the Bronx and engaging in several calls with

23  Uribe's cell phone?

24  A.  It was sent within the time frame.

25          MR. MONTELEONI:  Mr. Hamill, can you please take us to

1    slide 10.

2    Q.   Special Agent Wheeler, what's the date on this slide?

3    A.   May 4 of 2019.

4    Q.   How does that compare to the date on the slide we just

5    looked at?

6    A.   It was the next day.

7    Q.   What's the time period of this slide?

8    A.   10:23 to 10:29 p.m.

9    Q.   Please explain what's depicted on this slide.

10   A.   Yes.  These are two cell sites used by Barruos's phone --

11   one at 10:23, one at 10:29 -- for two outgoing calls.  Both

12   cell sites are located just east of the Bronx River Parkway in

13   the Bronx.

14   Q.   In your opinion, is the data that you reviewed consistent

15   with the Barruos cell phone being in the Bronx in the 10:23 to

16   10:29 p.m. time frame on May 4, 2019?

17   A.   Yes.

18   Q.   Directing your attention to the excerpt on the bottom of

19   the page, on line 804, the top line, in which José Uribe sends

20   a message to Fernando Barruos saying what's translated as, it's

21   a little late, the number is 1548, how does the time of that

22   message compare to the time frame during which the data's

23   consistent with the Barruos cell phone being in the Bronx?

24   A.   It's during the time frame.

25               THE COURT:  Mr. Monteleoni, why don't you find a

1    logical time for me to give the jury its midafternoon break.

2              MR. MONTELEONI:  This is the most logical time of all.

3              THE COURT:  All right.

4              Ladies and gentlemen, why don't you just take ten

5    minutes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6rWmen5                         Wheeler - Direct

1              (Jury not present)

2              THE COURT:  You may step down, Agent.

3              (Witness not present)

4              THE COURT:  Ten minutes.

5              MR. FEE:  Your Honor, the government just filed

6    something publicly.  We need a sidebar.

7              THE COURT:  Sidebar.

8              (At sidebar)

9              THE COURT:  What's the issue?

10             MR. FEE:  Your Honor, the government just filed a

11   letter publicly that recites and actually quotes from proffers

12   we have made about the anticipated testimony of the sisters of

13   Robert Menendez and Nadine Arslanian, respectively.  They each

14   only have one sister.

15             If you recall, every 302, every description of

16   government witness testimony, every reference to a name, even

17   the existence of a confidential source, was filed in redacted

18   form.  We are very concerned, given the press scrutiny, that

19   this will have a chilling effect on these witnesses and others,

20   and we ask that this be as quickly as possible taken off the

21   public docket.

22             THE COURT:  All right.  I understand.

23             MR. MARK:  Your Honor, briefly, the individuals

24   referenced are anonymized as consistent with how the parties

25   have generally referred to these matters.  The content that is

O6rWmen5                          Wheeler - Direct

1   referred to in the proffers was not protected by the protective

2   order in this case, and we had a meet-and-confer last night

3   with defense counsel where we talked with them, that we

4   anticipated we might file such a letter, and they never raised

5   any request for anything to be redacted.  In this circumstance,

6   we think that request is misplaced.

7            THE COURT:  Was it discussed, sir?

8            MR. FEE:  Your Honor, I think it goes without saying

9   in this case, given all the nonpublic filings about witness

10  statements, including many that are not protected --

11           THE COURT:  Sir, was it discussed yesterday?

12           MR. FEE:  It was not discussed that they would file

13  this publicly, your Honor.  Absolutely not.  And I would just

14  say they're not anonymized.  Each of these people only have one

15  sister.

16           THE COURT:  All right.  Right now, let's take it down

17  and we'll figure out -- that may get its own press scrutiny.

18           MR. FEE:  We would prefer that.

19           THE COURT:  Right now, let's take it down.

20           MR. FEE:  We would prefer that, your Honor.

21           MR. MARK:  We can't.  We cannot take that down.

22           MR. FEE:  The clerk's office can.

23           MR. MARK:  But obviously we have no objection to the

24  Court making a request to the clerk's office to take it down.

25           THE COURT:  They will figure it out.

O6rWmen5                              Wheeler - Direct

1              Direct the clerk of court to take down document 486.

2              MR. LUSTBERG:  Judge, while we're here, the government

3    filed a similar motion about our witnesses.  I just wanted to

4    let you know we expect to have a response in to you by

5    tomorrow.

6              THE COURT:  I'm going to go through what I have and

7    the responses I need.

8              MR. LUSTBERG:  Got it.

9              THE COURT:  What document number are you talking

10   about?

11             MR. LUSTBERG:  I don't remember what their document

12   number is.

13             THE COURT:  We'll go through it shortly.  And at the

14   end of the day, we'll go into the robing room and I'll deliver

15   my opinion on the subpoena.

16             Does the defense witness list include Lewin?  Does it

17   include Krieger?  I'm sorry.  No.  Lewin.

18             MR. FEE:  Yes.

19             THE COURT:  OK.

20             (Recess)

21

22

23

24

25

O6R5men6                           Wheeler - Direct

1       THE COURT:  Bring in the jury.

2       Put the witness on the stand.

3       Jury entering.

4       (Jury present)

5       THE COURT:  Please be seated in the courtroom.

6       You may continue Mr. Monteleoni.

7       MR. MONTELEONI:  Thank you, your Honor.

8  BY MR. MONTELEONI:

9  Q.  Before we return to your report, Special Agent Wheeler, I

10 want to go back to something that a colleague of mine pointed

11 out might not have come across as clearly in the transcript.

12 When I asked you how many times you provided expert testimony

13 in other cases, did you say "none" or "nine"?

14 A.  The number nine.

15 Q.  Thank you.

16      MR. MONTELEONI:  Mr. Hamill, can you please put up

17 Government Exhibit 16C-2, slide 12?

18 Q.  Special Agent Wheeler, what is the date and time of this

19 slide?

20 A.  June 4 of 2019, at 12:11 a.m.

21 Q.  What is depicted here?

22 A.  This is a cell site used by Fernando Barruos' phone at

23 12:11 a.m. when it received a call from Uribe using a cell site

24 located just east of the Bronx Zoo.

25 Q.  Is the data that you reviewed, in your opinion, consistent

1    with the Barruos cellphone being in the Bronx during this

2    12:11 a.m. call from the Uribe cellphone?

3    A.  Yes.

4    Q.  Directing your attention to the excerpt at the bottom of

5    the page, how does the time of the first text listed there on

6    line 842 compare to the time of the call during which you

7    testified that the data is consistent with the Barruos

8    cellphone being in the Bronx?

9    A.  One minute before the call.

10            MR. MONTELEONI:  Mr. Hamill, can you please take us to

11   slide 13?

12   Q.  Special Agent Wheeler, what is the date and time of this

13   slide?

14   A.  8:43 p.m. on September 5 of 2019.

15   Q.  Whose phone activity is depicted here?

16   A.  Nadine Menendez.

17   Q.  Can you please explain what the blue box in the middle of

18   the map reflects?

19   A.  Yes.  That is a callout box indicating that at 8:43 p.m.,

20   Nadine Menendez' phone sent a text message to José Uribe's

21   using a cell site located in Manhattan.

22   Q.  Is that the cell site that is depicted here visually?

23   A.  Yes.

24   Q.  What part of Manhattan is this cell site located in?

25   A.  The Upper West Side.

1    Q.   What does the blue portion of the map reflect?

2    A.   That is the Hudson River.

3    Q.   Now, is the data that you reviewed consistent with the

4    conclusion, in your opinion, that the Nadine Menendez cellphone

5    sent an SMS text message, to José Uribe, that was transmitted

6    through a cell site that was physically located in Manhattan?

7    A.   Yes.

8    Q.   Does that mean that the Nadine Menendez cellphone was,

9    itself, located in Manhattan when it sent that message?

10   A.   Not necessarily.  In this case, the cell site is located

11   immediately adjacent to the Hudson River, which carries cell

12   signal further than it would across land.  And when people are

13   located along the river, we often will see cell sites used on

14   either side of the river.

15   Q.   Have you reviewed other records related to her location on

16   that day?

17   A.   Yes.

18   Q.   Where does it appear Nadine Menendez was most likely at,

19   around the time this message was sent?

20   A.   Most likely in New Jersey.

21   Q.   Directing your attention to the excerpt below, directing

22   your attention to the second listed text on row 11 in which

23   Nadine Arslanian writes to José Uribe:  *No, we will have cigars*

24   *and I have grand mariner but no beer.  41 Jane Drive, Englewood*

25   *Cliffs.  I will text you when we are on our way.  Should be by*

*9:30 p.m.   Thank you for making it.*  How does the date, time,

sender and recipient of that excerpted text compare to the text

that you just testified the data is consistent with the

conclusion was transmitted through the Manhattan cell site?

A.   It is the same date, time, sender, and recipient, as

depicted on my map.

          MR. MONTELEONI:   Mr. Hamill, can you please take us to

slide 14?

Q.   Special Agent Wheeler, what is the date and time of this

slide?

A.   September 6, 2019.

Q.   How does that compare to the -- sorry -- at what time?

A.   2:03 p.m.

Q.   How does that date compare to the date of the previous

slide?

A.   This is the next day.

Q.   So what is depicted on this slide at 2:03 p.m.?

A.   This slide depicts the Robert Menendez and Nadine Menendez

phones using two separate cell sites; Robert Menendez' phone

using one in New Jersey and Nadine Menendez' phone using one in

Manhattan when Robert Menendez' phone calls Nadine Menendez'

phone.

Q.   Now, there are two different boxes and two different cell

sites.  Do those depict the same call or different calls?

A.   It is the same call.  We are seeing both the sender and the

1    recipient.

2    Q.  So, directing your attention to the blue callout box

3    corresponding with Nadine Menendez, where is the cell site that

4    that corresponds to located?

5    A.  In Manhattan.

6    Q.  What part of Manhattan?

7    A.  It is just south of the George Washington Bridge, north of

8    Harlem.

9    Q.  Is the data that you reviewed consistent with the

10   conclusion that in this call from Robert Menendez, the Nadine

11   Menendez cellphone connected to a cell site in Manhattan for

12   that call?

13   A.  Yes.

14   Q.  Does that mean that Nadine Menendez cellphone was

15   physically in Manhattan?

16   A.  No.  Again, on this date, looking at the totality of the

17   records, it appeared more consistent with Nadine Menendez'

18   phone being in New Jersey but, again, somewhere along the river

19   where the cell site signal was carried across the river.

20   Q.  Now, directing your attention to the excerpts below,

21   directing your attention to the call on line 1044, how does the

22   date, time, caller, and calling party of that listed call

23   compare to the call that the data is consistent with the

24   conclusion was transmitted through this cell site in Manhattan?

25   A.  It is the same date, time, sender, and receiver of the

1    phone call depicted on my map.

2            MR. MONTELEONI:  Mr. Hamill, can you please take us to

3    slide 15?

4    Q.  Special Agent Wheeler, what is the date and time on this

5    slide?

6    A.  This is 7:36 to 9:37 p.m. on September 19 of 2021.

7    Q.  What is depicted on this slide?

8    A.  These are the cell sites used by Robert Menendez', Nadine

9    Menendez', and Fred Daibes' phones during this time period for

10   both voice, text, and data activity.

11   Q.  So what do the black boxes reflect?

12   A.  Those reflect callout boxes corresponding to Fred Daibes'

13   phone activity.

14   Q.  Directing your attention to the blue tag with the no. 9 on

15   it, what is the address of that location?

16   A.  41 East 70th Street, New York, New York.

17   Q.  And what neighborhood is that in?

18   A.  The Upper East Side.

19   Q.  What is that green area on the map?

20   A.  Central Park.

21   Q.  In your opinion, is the data you reviewed consistent with

22   the conclusion that the Daibes cellphone was in the vicinity of

23   41 East 70th Street from 7:38 to 9:37 p.m. on September 19,

24   2021?

25   A.  Yes.

1    Q.   What does the blue portion of the right-most box mean?

2    A.   The blue callout box highlights an incoming text in

3    multiple data sessions that Nadine Menendez' phone had while

4    using cell site 112480 to the southeast of the blue flag with

5    the no. 9.

6    Q.   In your opinion, is the data you reviewed consistent with

7    the conclusion that the Nadine Menendez cellphone was in the

8    vicinity of 41 East 70th Street in Manhattan, from 7:43 to

9    9:35 p.m., on September 19, 2021?

10   A.   Yes.

11   Q.   What does the red portion of the box mean?

12   A.   The red callout box highlights multiple data sessions that

13   Robert Menendez' phone used the same cell site to the southeast

14   of the blue flag with the white no. 9.

15   Q.   Is the data that you reviewed consistent with the

16   conclusion that the Menendez cellphone was in the vicinity of

17   41 70th Street from 7:59 to 8:59 p.m.?

18   A.   Yes.

19   Q.   Directing your attention to the excerpt below, does the

20   scheduled date and time of the dinner listed in that line

21   compare to the time period in which the data is consistent with

22   the Menendez' cellphone, the Nadine Menendez' cellphone and the

23   Daibes' cellphone being in the vicinity of 41 East 70th Street?

24   A.   Yes.

25   Q.   How does the time of the dinner compare to the time in

O6R5men6                          Wheeler - Direct

1   which the data is consistent with being there?

2   A.   The time of the dinner indicates 7:15 p.m., and the cell

3   sites used by the Nadine and Robert Menendez phones and Fred

4   Daibes phones, begins at approximately 7:38, 7:43 and 7:59.

5          MR. MONTELEONI:   Mr. Hamill, can you please take us to

6   slide 16?

7   Q.   Special Agent Wheeler, what is the date and time on this

8   slide?

9   A.   This is activity between 4:20 and 6:20 p.m. on October 17

10  of 2021.

11  Q.   And generally, what is depicted here?

12  A.   This is SMS and data activity for Robert and Nadine

13  Menendez' phones during this time period.

14  Q.   Now, directing your attention to the bottom callout boxes

15  on the map, is the data that you reviewed consistent with the

16  conclusion that the Menendez cellphone and the Nadine Menendez

17  cellphone were in the vicinity of each other, I guess starting

18  at approximately 4:20 p.m. that day?

19  A.   Yes.

20  Q.   Is it consistent with the conclusion that those two

21  cellphones were in the vicinity of each other from

22  approximately 4:20 to approximately 6:20 p.m. that day?

23  A.   Yes.

24  Q.   Now, where is it consistent with the conclusion that they

25  were at the beginning of that 4:20 to 6:20 p.m. period?

1    A.  In the vicinity of JFK International Airport, just north of

2    the airport itself.

3    Q.  Where is it consistent with the conclusion that they were

4    at the end of the period?

5    A.  The Menendez residence in Englewood Cliffs, New Jersey.

6    Q.  What boroughs is the data consistent with the conclusion

7    that they passed through during that period?

8    A.  Queens, the Bronx, and Manhattan.

9    Q.  Directing your attention to the second cell site from the

10   top, the one that is near the Hudson River on the map, which

11   bridge over the Hudson River is it closest to?

12   A.  The George Washington.

13   Q.  Directing your attention to the excerpt, directing your

14   attention to line 175, about when is the call on that line from

15   Robert Menendez to John Pilot with respect to the start of this

16   4:20 p.m. to 6:20 p.m. time frame?

17   A.  Just over 15 minutes before.

18           MR. MONTELEONI:  Mr. Hamill, can you please take us to

19   slide 17?

20   Q.  Special Agent Wheeler, what is the date and time depicted

21   on this slide?

22   A.  This depicts 10:06 to 11:15 a.m. on October 18 of 2021.

23   Q.  Directing your attention to the red portion of the callout

24   box, what does that depict?

25   A.  The red callout box indicates voice SMS and data activity

O6R5men6                      Wheeler - Direct

1    of Robert Menendez' phone between 10:06 and 11:15 a.m. using

2    multiple sectors of the cell site immediately to the southeast

3    of the Menendez residence.

4    Q.   Is the data that you reviewed consistent with the

5    conclusion that the Menendez cellphone was in the vicinity of

6    41 Jane Drive from 10:06 a.m. to 11:15 a.m. on October 18,

7    2021?

8    A.   Yes.

9    Q.   What does the blue portion of the callout box depict?

10   A.   The blue callout box depicts voice and data activity on

11   Nadine Menendez' phone between 10:20 and 11:15 a.m. using

12   multiple sectors of the cell site located immediately

13   south-southeast of the Menendez residence.

14   Q.   Is the data reviewed consistent, in your opinion, with the

15   conclusion that the Nadine Menendez cellphone was in the

16   vicinity of 41 Jane Drive from 10:20 a.m. to 11:15 a.m.?

17   A.   Yes.

18   Q.   What does the black portion of the callout box depict?

19   A.   The black callout box indicates data activity of the Fred

20   Daibes phone, between 10:29 and 11:03, using the cell site

21   immediately south-southeast of the Menendez residence.

22   Q.   In your opinion, is the data that you reviewed consistent

23   with the conclusion that the Fred Daibes cellphone was in the

24   vicinity of 41 Jane Drive from 10:29 a.m. to 11:03 a.m.?

25   A.   Yes.

O6R5men6                          Wheeler - Direct

1   Q.  Where is it consistent with the conclusion that the

2   Menendez and the Nadine Menendez cellphones were in the

3   vicinity of during that time?

4   A.  The Menendez residence.

5   Q.  41 Jane Drive?

6   A.  Yes.

7   Q.  What does the note in the bottom right corner of the slide

8   depict?

9   A.  That after 11:03, the Daibes phone's records indicate that

10  the Daibes phone moved south, away from the Menendez residence.

11  Q.  Directing your attention to the excerpt below on line 1254

12  reflecting that the terms "how much is 1 kilo of gold worth"

13  appearing in Menendez' Safari search history, when is that

14  entry in relation to the time period when the data is

15  consistent with the Daibes cellphone being in the vicinity of

16  41 Jane Drive?

17  A.  Approximately nine minutes later.

18          MR. MONTELEONI:  Mr. Hamill, can you please take us to

19  slide 18?

20  Q.  Special Agent Wheeler, what is the date and time of this

21  slide?

22  A.  March 30th, 2022, between 12:31 and 1:01 p.m.

23  Q.  What does this slide depict?

24  A.  Voice and data activity for Nadine Menendez' and Fred

25  Daibes' phones.

O6R5men6                        Wheeler - Direct

1    Q.   What does the blue tag saying "RP" on it represent?

2    A.   The River Palm Terrace Restaurant located at 1416 River

3    Road in Edgewater, New Jersey.

4    Q.   What does the black portion of the callout box mean?

5    A.   The black callout box highlights activity of Fred Daibes'

6    phone at this cell site between 12:31 and 1:01 p.m. for voice

7    activity and data session activity.  And again, this cell site,

8    in particular, the reason there is a circle on this cell site

9    as opposed to the two sector arms with the shaded sector, this

10   is because this particular cell site was omni-directional and

11   provided coverage in a 360-degree circle.  So, the circle here

12   does not indicate the coverage area of the cell site but,

13   instead, highlights the fact that the cell signal from the cell

14   site was broadcast in a 360-degree direction.

15   Q.   Is the data that you reviewed consistent, in your opinion,

16   with the conclusion that the Daibes cellphone was in the

17   vicinity of the River Palm at or about 12:31 to 1:01 p.m. on

18   March 30th of 2022?

19   A.   Yes.

20   Q.   What does the blue portion of the callout box mean?

21   A.   The blue callout box highlights a data session that began

22   on Nadine Menendez' phone at 12:53 p.m., using the same cell

23   site used by Fred Daibes' between 12:31 and 1:01 p.m.

24   Q.   Is the data reviewed consistent, in your opinion, with the

25   conclusion that the Nadine Menendez cellphone was also in the

1   vicinity of the River Palm at about 12:53 p.m.?

2   A.  Yes.

3   Q.  Where is the data consistent with the conclusion that the

4   Daibes cellphone was in the vicinity of at the time?

5   A.  The River Palm Terrace Restaurant.

6   Q.  Directing your attention to the excerpts and directing your

7   attention to line 269, where Nadine Menendez texts Fred Daibes

8   "Thank you, Fred" and some emojis; when is that text in

9   relation to the time period where the data was consistent with

10  the Nadine Menendez cellphone and the Daibes cellphone both

11  being in the vicinity of the River Palm?

12  A.  Just over 45 minutes later.

13         MR. MONTELEONI:  Mr. Hamill, can you please take us to

14  slide 19?

15  Q.  Special Agent Wheeler, what is the date and time of this

16  slide?

17  A.  May 26 of 2022, between 8:18 and 10:27 p.m.

18  Q.  Directing your attention first to the bottom portion of the

19  map and the bottom callout box there, what is depicted in the

20  black portion of the bottom callout box?

21  A.  The black callout box indicates activity on Fred Daibes'

22  phone at cell site 812133, for calls and text messages between

23  8:21 and 10:22 p.m.

24  Q.  What is depicted in the red portion of that box?

25  A.  The red callout box highlights an incoming text and a data

1    session on Robert Menendez' phone at the same cell site sector

2    used by Fred Daibes' phone.  The incoming text is at 8:18 p.m.

3    and the data session begins at 9:29 p.m.

4    Q.  Is the data that you reviewed consistent, in your opinion,

5    with the conclusion that the Menendez cellphone and the Daibes

6    cellphone were in the vicinity of each other between,

7    approximately, 8:21 and 9:29 p.m., on May 26, 2022?

8    A.  Yes.

9    Q.  Directing your attention to the upper red box, what does

10   that depict?

11   A.  That depicts the cell site used by Robert Menendez' phone

12   to begin a data session at 10:27 p.m., and this is the same

13   cell site we have been seeing located immediately

14   south-southeast of the Menendez residence.

15   Q.  Is the data consistent, in your opinion, with the

16   conclusion that the Menendez cellphone was in the vicinity of

17   41 Jane Drive at approximately 10:27 p.m.?

18   A.  Yes.

19   Q.  Directing your attention to the excerpt on line 342 where

20   it reflects the search terms "1 kilo gold price" appear in

21   Menendez' search history, when is that in relation to the time

22   period during which the data is consistent with the Menendez

23   cellphone being in the vicinity of 41 Jane Drive?

24   A.  It is approximately five minutes after the start of the

25   data session.

1  Q.  When is this entry an excerpt in relation to the time

2  period during which the data is consistent with the Menendez

3  cellphone being in the vicinity of the Daibes cellphone?

4  A.  Approximately one hour after.

5          MR. MONTELEONI:  No further questions.

6          THE COURT:  Sir.

7  CROSS-EXAMINATION

8  BY MR. FEE:

9  Q.  Hi, Agent Wheeler.

10  A.  Good afternoon.

11  Q.  Good afternoon.

12      I believe you testified that cell site data is not always

13  perfectly accurate.  Fair to say?

14  A.  No.

15          THE COURT:  I'm sorry.  No, meaning that's not fair to

16  say, or it is not always perfectly accurate?

17          THE WITNESS:  I never said it was not perfectly

18  accurate.  I didn't talk about accuracy.

19  Q.  Why didn't you talk about accuracy?

20  A.  Because the phone records are accurate.

21  Q.  OK.  What about cell site location data?  When a cell site

22  data indicates a user in a particular location based on cell

23  site activity, is that always perfectly accurate?

24  A.  Yes.  So the process, when a transaction is made, the cell

25  site that processed that transaction, whether it was a call or

O6R5men6                          Wheeler - Cross

1   a text message, essentially stamps the record with its unique

2   identifier that gets sent to the company.  Those are the

3   records that we obtain and are then certified, and those are

4   the ones that we analyze when we create our maps.

5   Q.  Can you tell where a human being is located based on cell

6   site data?

7   A.  We can tell approximately where the human being is if the

8   human being is the one holding the cellphone.

9          THE COURT:  When you say approximately, is there a

10  range within which you can say it is accurate?

11         THE WITNESS:  No.  Again, it is going to depend on the

12  cell network in that particular area.  If it is in an urban

13  area where the coverage area of those cell sites are smaller,

14  we can better approximate where the phone is.  If it is a rural

15  area where cell sites have much larger coverage areas, then it

16  is a greater area where we would be approximating the phones.

17         THE COURT:  What if it is a suburban area?

18         THE WITNESS:  It would be somewhere in the middle.  It

19  would be smaller than a rural area, larger than an urban area.

20  BY MR. FEE:

21  Q.  And in some cases on which you worked, the precision of

22  locating the user of a phone can be very significant; correct?

23         MR. MONTELEONI:  Objection.

24         THE COURT:  Sustained.  I'm not sure what you mean,

25  sir.

O6R5men6                          Wheeler - Cross

1   Q.  For example, if you are trying to isolate a missing person

2   by tracking the phone using cell site data, it is really

3   important to be as accurate as you can be, technology allowing.

4   Right?

5   A.  Yes.

6   Q.  Do you work on any cases where locations are not in

7   dispute?

8              MR. MONTELEONI:  Objection.

9              THE COURT:  I will allow it.

10             THE WITNESS:  What locations by locations in dispute?

11  What do you mean?

12  Q.  Like meaning your work is designed to locate, as best as

13  the technology and your expertise allows, the user of cell

14  phones; correct?

15             THE COURT:  The location of cellphone users?

16             MR. FEE:  Thank you.

17  A.  Yes, generally the devices themselves, and with the devices

18  you usually find a person.

19  Q.  Right, there is a human attached to the device, yeah.

20      But that's what the focus of your work is, locating the

21  devices in question; correct?

22  A.  Generally.  Yes.

23  Q.  And in some cases you would consider yourself to be a part

24  of the investigative team.  Fair to say?

25  A.  In exigent circumstances, generally yes.  We are often, as

O6R5men6                          Wheeler - Cross

 1   members of the CAST unit, called to command posts where we are

 2   sitting with the other individuals trying to locate somebody

 3   and we will be discussing with those other investigators all of

 4   the information coming in and trying to use our expertise to

 5   help whatever that situation is.

 6              THE COURT:  For a missing person, for example, or a

 7   kidnapped person?

 8              THE WITNESS:  Yes.

 9              THE COURT:  Is that correct?

10              THE WITNESS:  Yes.

11              THE COURT:  Or perhaps a perpetrator?  Bank robber?

12              THE WITNESS:  Generally we don't set up command posts

13   for bank robbers, but for example, like a mass shooter when

14   command posts are set up because there has been a mass shooting

15   incident and the subject is still at large then, yes, that is

16   another example in which we are called in to a command post.

17              THE COURT:  As part of an investigative team.  Is that

18   what you are saying?

19              THE WITNESS:  Yes.

20              THE COURT:  All right.

21   BY MR. FEE:

22   Q.  Just to clarify the distinction here.  Where you are

23   working with an investigative team they are actually feeding

24   you information about why you need to locate a particular

25   device; correct?

O6R5men6                          Wheeler - Cross

1      MR. MONTELEONI:  Objection.

2      THE COURT:  Sustained.

3  Q.  You do work on cases where you are given information about

4  the device in question in terms of its investigative

5  importance; correct?

6      MR. MONTELEONI:  Objection.

7      THE COURT:  If you understand it you may answer.

8      THE WITNESS:  Generally, the only time I am given

9  details about a case, apart from just the records and some

10  locations and dates and times of interest, is in a proactive

11  setting where I am trying to assist in locating somebody who is

12  actively being sought after.  On a historical basis, I am

13  generally not provided with many details about the case.

14  BY MR. FEE:

15  Q.  And you considered the testimony here today focusing on

16  historical device location data.  Fair to say?

17  A.  Yes.

18  Q.  Were you given any details about the reasons to focus on

19  these particular dates and devices in connection with your

20  testimony here?

21      MR. MONTELEONI:  Objection.

22      THE COURT:  I will allow it.

23  A.  No.

24  Q.  How did you decide which dates and devices to put in the

25  slide presentation we just reviewed?

1    A.  I was asked to look for certain devices in certain

2    locations on certain dates.

3    Q.  By the prosecutors?

4    A.  Yes.

5           MR. FEE:  Let's put up page 6, please.

6    Q.  And so, you were told to map these four phone numbers:  One

7    for Robert Menendez, one for Fred Daibes, one for, listed here

8    Nadine Menendez, and another for Fernando Barruos; correct?

9    A.  No.

10   Q.  Correct me.  What did I get wrong?

11   A.  I was asked to look at these phones and other phones on

12   certain dates and times.

13   Q.  Did you map phones that are not reflected in the box that

14   is titled Phones Mapped in Report?

15   A.  Not in my report, no.

16   Q.  In other work you did on this case that did not end up in

17   the final report you mapped other phones and other dates;

18   correct?

19   A.  I don't believe any of the other phones factored in or

20   appeared in the maps on the dates and times that I mapped.

21   Q.  Got it.  Got it.

22      So, did you or did you not ever map cell location data

23   associated with the José Uribe phone ending in 3520?

24   A.  I was given records for that phone.  They did not

25   ultimately end up in the report.

1    Q.  Got it.

2          And the folks who decided what ended up in the ultimate

3    report was not you, it was the prosecutor; right?

4    A.  Not exactly.  I created the maps based on the times and

5    locations of interest and then based on their case needs, which

6    I was not privy to, certain maps were put into the final

7    product.

8    Q.  So that sounds like the prosecutors decided what slides

9    went in the final product; is that right?

10          MR. MONTELEONI:  Objection.

11          THE COURT:  I will allow that.

12          Did the prosecutors decide which slides to put in your

13   report?

14          THE WITNESS:  Yes and no.  I created the maps and

15   there were certain dates that I was told were no longer

16   relevant.

17   BY MR. FEE:

18   Q.  You would agree, that in this report we just reviewed,

19   there is not a slide that reflects the device location of the

20   José Uribe phone?

21   A.  No.

22          THE COURT:  Wait.  I'm sorry.  No meaning you would

23   not agree?

24          THE WITNESS:  There is no map in my product that

25   depicts José Uribe's phone.

1            THE COURT:  All right.  Thank you.

2  BY MR. FEE:

3  Q.  Did you write the associated names in this little box

4  Phones Mapped in Report Associated Names?

5  A.  Yes, I did.

6  Q.  Why did you write "N. Menendez"?

7  A.  That is the name.

8  Q.  Who gave you that name?

9  A.  I believe it was the prosecutors.

10           MR. FEE:  Can we just flip forward through some of the

11  slides?  Stop there.

12  Q.  Are you aware that that name was the wrong name for most of

13  the dates in the slide deck?

14           MR. MONTELEONI:  Objection.

15           THE COURT:  Sustained.

16  Q.  OK, we will get the name here in the little rows.  The

17  prosecutors put those rows on the slides?

18  A.  Yes.  Anything that has the yellow government exhibit stamp

19  on the bottom is data that was not part of my original report

20  but was added to it to create a new exhibit.

21  Q.  Got it.

22      Did you see this report with the government rows, the

23  prosecutor rows inserted into it before you took the stand here

24  today?

25  A.  Yes.

1    Q.  So did you see the name here "Nadine Arslanian"?

2    A.  Yes.

3    Q.  Do you know if that is the same person that you are

4    describing as Nadine Menendez?

5    A.  I believe it is, yes.

6    Q.  Do you know when her name shifted from Nadine Arslanian to

7    Nadine Menendez?

8    A.  I do not.

9    Q.  Gotcha.

10        Did the prosecutors tell you that before, say,

11   October 2020, she should be referred to as Nadine Arslanian, to

12   be accurate?

13   A.  No.

14   Q.  But you do want to be accurate in all the work you do, I am

15   sure.

16   A.  Yes.

17            MR. FEE:  Let's put that down, the blowup, and go back

18   to page 6.

19            THE COURT:  As far as you know -- well, is it your

20   belief this is the same person?

21            THE WITNESS:  Yes.

22            THE COURT:  All right.

23   BY MR. FEE:

24   Q.  Got it.

25        In locations mapped in the report, where did you get the

O6R5men6                        Wheeler - Cross

1    names of Rothschild Mansion?

2    A.   When you Google that address, it comes up.

3    Q.   Ah.  Are you the one who put that name in this part of the

4    slide deck?

5    A.   Yes.

6    Q.   Do you know, do you have any understanding as to the

7    significance of that address, 41 East 70 Street, in the

8    investigation here?

9              MR. MONTELEONI:  Objection.

10             THE COURT:  Do you have any understanding as to why

11   that location is set forth there?

12             THE WITNESS:  No.

13   Q.   The house symbol, the third one says Menendez residence, 41

14   Jane Drive, similar to the names, who told you to describe that

15   as the Menendez residence?

16   A.   I was told that was the Menendez residence by the

17   prosecutors.

18   Q.   Did you Google that address as you did the Rothschild

19   Mansion?

20   A.   No.

21   Q.   Did you ever look at the actual name of the owner of 41

22   Jane Drive in any of the stuff you were given in connection

23   with your work on this case?

24   A.   I did not.

25   Q.   Do you know if it is accurately described as owned by a

O6R5men6                          Wheeler - Cross

1  person named Menendez?

2              MR. MONTELEONI:  Objection.

3              THE COURT:  Sustained.

4  Q.  Let's go to page 7 of your 1303.

5       April 6, 2019, you testified about this slide?

6  A.  I did.

7  Q.  On the bottom, the prosecutor read these text messages

8  between Nadine Arslanian and José Uribe where Nadine says:  *Bob*

9  *and I are going ho my house.  If you want, come by any dime.*

10 *He just finished his meeting.*

11      Who did you map on this slide?

12 A.  This is Nadine and Robert Menendez' phones.

13 Q.  And Senator Menendez is blue and Nadine is red; is that

14 right?

15 A.  No.

16 Q.  You tell me.

17 A.  So Nadine Menendez is blue and Robert Menendez is red.

18 Q.  I had a 50/50 chance.  I failed.

19      Do you know if José Uribe actually came over to 41 Jane

20 Drive on April 6, 2019?

21 A.  No.

22 Q.  If I were to tell you that he didn't come over that night,

23 what would that indicate to you about the purpose of this

24 mapping?

25             MR. MONTELEONI:  Objection.

1          THE COURT:  Sustained.

2          MR. FEE:  Let's drop that down.  Let's look at page 8.

3   Q.  Who are you mapping here?

4   A.  This is a phone belonging to Fernando Barruos.

5   Q.  And again, I assume you were not given any information

6   about Mr. Barruos' role in this case?

7   A.  No.

8   Q.  And let's go to the next slide.  You are mapping again

9   Mr. Barruos?

10  A.  Yes.

11  Q.  And he is by the Bronx Zoo and Planet Fitness still?

12  A.  That is the cell site used, yes.

13  Q.  His phone.

14  A.  Yes.

15  Q.  The phone assigned to Barruos.

16          MR. FEE:  Let's go to the next page.

17  Q.  Again, mapping Barruos?

18  A.  Yes.

19          MR. FEE:  Next page?

20  Q.  Again, mapping Barruos, yes?  Did you say yes?

21  A.  Yes.

22  Q.  Next page, again mapping Barruos; correct?

23  A.  Page 12, yes.

24  Q.  Thank you.  So pages 8, 9, 10, 11, 12 mapped the device

25  associated with Fernando Barruos and no one else; right?

1    A.  Can we go back and look at each one to make sure those page

2    numbers are correct?

3            MR. FEE:  Yes.  Mr. Kelly, just back up all the way to

4    8 one at a time?

5    A.  OK.  OK.  OK.  OK.  Yes, page 8 through 12.

6    Q.  And you have him in the Bronx for each of those slides?

7    A.  Yes.

8    Q.  Or, excuse me, the device associated with him is in the

9    Bronx for each of those slides?

10   A.  Yes.

11   Q.  Were you given any information indicating whether

12   Mr. Barruos or Mr. Uribe, on the dates mapped in 8, 9, 10, 11,

13   and 12, told Robert Menendez where they were?

14           MR. MONTELEONI:  Objection.

15           THE COURT:  Sustained.

16   Q.  Well, in any of the slides that were created with you and

17   the government for presentation here today, do you see any

18   texts indicating that Barruos or Uribe share their location

19   with Senator Menendez?  And we can review the slides again, if

20   you want to look.

21   A.  Well, I was the one that created the slides, they weren't

22   created by myself and the government.  So, I created these

23   slides and I did not see or was not privy to any of the text

24   messages exchanged in this investigation before I created my

25   report, my finalized report.  And the text messages that are

 1  here on the report with the Government Exhibit 1303 stickers,

 2  those I saw only after the fact when my report was then

 3  finalized.

 4  Q.  So how should I refer to this thing with the government

 5  rows?  I don't want to confuse you on this slide.

 6  A.  So it would just be my report and then the addition of

 7  Exhibit 1303 came after my report was submitted.

 8  Q.  But you have reviewed this once the prosecutors put on

 9  those text messages, correct?

10  A.  I believe I saw it last week.

11  Q.  So let's just look.  On slide 12 of Exhibit 1303, do you

12  see anything there indicating Uribe or Barruos shared their

13  location with Senator Menendez?

14          THE COURT:  You mean looking in the text portion?

15          MR. FEE:  Yes, your Honor.  Yes, your Honor.

16          THE COURT:  All right.

17  A.  Did you want to start with slide 8 or are we starting with

18  slide 12?

19  Q.  Let's start with slide 12, just to save time.

20  A.  No, these are not text messages involving Robert Menendez.

21  Q.  Thank you.

22          Let's go to page 11.  Same question, Agent Wheeler.

23  A.  No.

24  Q.  Page 10; same question.

25  A.  No.

O6R5men6                          Wheeler - Cross

1    Q.   Page 8.

2    A.   No.

3    Q.   I'm sorry.  Page 9.  Thank you.  And then page 8, the last

4    one; same question?

5    A.   No.

6    Q.   Let's go to page 13.  So, I believe -- let me just

7    understand how this -- what is reflected in the portion of the

8    report you prepared on this page, Agent Wheeler?  So these two

9    lines are supposed to reflect the approximate location of the

10   device at issue; is that correct?

11               MR. MONTELEONI:   Objection.

12   Q.   Tell me what this is supposed to indicate.

13   A.   So you have two sector arms that meet and intersect at the

14   cell site that was used.  The shaded area indicates the

15   directionality of the sector, quite different from the

16   approximate coverage area.

17   Q.   OK.  So if I were to ask you, this is a Senator Menendez

18   phone?

19   A.   No.

20   Q.   Whose phone is this?

21   A.   This is Nadine's.

22   Q.   Thank God you are here.

23        If I were to ask you what does this image tell me about the

24   location of Nadine's phone as of 8:43 p.m. on September 5,

25   2019, what would you tell me?

1    A.   That Nadine Menendez' cellphone used a cell site and was

2    located within the coverage area of this particular cell site

3    located just east of Riverside Drive at approximately West 80th

4    Street.

5    Q.   You are showing me what the tower is covering at the time

6    her device connects to that tower?

7    A.   No.

8    Q.   Tell me what I got wrong there.

9    A.   I am showing you the directionality of that particular

10   sector.  So, that sector faced northeast.

11   Q.   And what you can tell from this image about the location of

12   the phone is what?

13   A.   That it used that cell site and that sector.

14   Q.   Well, a slightly different question.  What can you tell, if

15   anything, about the location of the phone based on this image

16   and the data associated with it?

17   A.   That it was located within the coverage area of this cell

18   site.  Now, in looking in totality at the records and all the

19   other records from that day, and having examined many sets of

20   cell sites when somebody that we have located has been located

21   along a river, we see cell sites bouncing back and forth across

22   the river in time periods that are completely incongruous with

23   actually being able to travel from one side of the river to the

24   other during that time period.

25   Q.   So you made this slide with the image we see here depicting

1    a portion of the Upper West Side of Manhattan?

2    A.  Yes.

3    Q.  But your testimony, as you just said, is that you think

4    Nadine's phone is actually in New Jersey at this time and the

5    entire day; is that right?

6    A.  I didn't say the entire day.

7    Q.  OK.

8    A.  But in looking at the records for that day, at this

9    particular time period, the totality of the records appears

10   more consistent with Nadine's phone being in New Jersey than in

11   New York.

12   Q.  So your expert opinion is that she is likely -- that phone

13   is likely in New Jersey at the time depicted in this image?

14   A.  Yes.

15   Q.  So why make this image?

16            MR. MONTELEONI:  Objection.

17            THE COURT:  Sustained.

18   Q.  Did you tell the prosecutors before they prepared this part

19   of the deck that you actually believed Nadine's phone was in

20   Jersey on this date?

21            MR. MONTELEONI:  Objection.

22            THE COURT:  Sustained.

23   Q.  Did you discuss with the prosecutors before you testified

24   here today where you thought Nadine actually was?

25            MR. MONTELEONI:  Objection.

O6R5men6                          Wheeler - Cross

1              THE COURT:  I will allow it.

2   A.  Yes.

3   Q.  And was there any indication as to whether you would still

4   present this slide given your opinion about the location of

5   Nadine's phone at this time?

6   A.  The location of the device at the time, I don't know what

7   the importance of that is.  I don't know if it is important one

8   way or another, if it is even important, or if it is important

9   if it is in one place or the other.  I was asked to map this

10  particular time and so I mapped this particular transaction.

11  Q.  Would you agree that if we didn't have you here to explain

12  what your actual opinion was, that this image would

13  potentially, to a layperson like me, be misleading?

14              MR. MONTELEONI:  Objection.

15              THE COURT:  Sustained.

16  Q.  Do you think this image can be fairly interpreted without

17  your analysis?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  Sustained as to form.

20  Q.  Did you have any concerns about how this particular slide

21  would be interpreted by folks who aren't experts?

22              MR. MONTELEONI:  Objection.

23              THE COURT:  Sustained.

24              MR. FEE:  Let's go to page 14.

25  BY MR. FEE:

1  Q.  So, I believe your testimony on direct, correct me if I am

2  wrong, was similar for the blue cell site area hit in Manhattan

3  in this slide; is that fair?

4  A.  Could you repeat your question?

5  Q.  No, because that would be embarrassing.

6        Tell me, is this Nadine's phone in blue?

7  A.  Yes.

8  Q.  Tell me where you think she was, in your expert opinion, at

9  the time depicted in the slide September 6, 2019, 2:03 p.m.?

10  A.  Looking at the totality of the records in this time period,

11  it appears more consistent that Nadine's phone was in New

12  Jersey than in New York at this particular time.

13  Q.  So again, any idea why the prosecutors asked you to present

14  a slide showing her phone with a dot and some lines in

15  Manhattan?

16              MR. MONTELEONI:  Objection.

17              THE COURT:  Sustained.

18  Q.  Did you discuss with the prosecutors the purpose of this

19  slide?

20              MR. MONTELEONI:  Objection.

21              THE COURT:  I will allow it, just as I did before.

22              THE WITNESS:  No.  I very rarely ask prosecutors the

23  why.

24  Q.  Why not?

25              MR. MONTELEONI:  Objection.

1    THE COURT:  Sustained to that.

2  Q.  Can I ask you when you told the prosecutors that you

3  actually didn't think these people were in Manhattan?

4    MR. MONTELEONI:  Objection.

5    THE COURT:  Sustained.

6  Q.  Let's go to page 16.  Did you map any location, any devices

7  in Washington, D.C.?

8  A.  I had records that included locations in Washington, D.C.

9  I looked at those, yes.

10  Q.  But none of them ended up in the final presentation; is

11  that fair to say?

12  A.  Yes, that is fair to say.

13    MR. FEE:  Let's look at 18, actually.  I'm sorry,

14  Mr. Kelly.

15  Q.  So you are here showing the devices used by Mr. Daibes and

16  Ms. Menendez by this time, on March 30 of 2022; is that fair to

17  say?

18  A.  March 30th, 2022.

19  Q.  Yes.  I'm sorry.  Not 2002.

20    Are you aware that Senator Menendez was in Washington, D.C.

21  on that day, just from your work on the cell phones?  Just from

22  your work on the cell phones, do you know where he was on that

23  day?

24    MR. MONTELEONI:  Objection.

25    THE COURT:  I will allow it if she knows.

1           THE WITNESS:  I would have to pull up the records.

2           This particular case there were over 1 million lines

3   of transactions so my recall of where various phones were on

4   times that don't appear on my maps is not great.

5   BY MR. FEE:

6   Q.   Understood.  Just from your recall, I won't ask specifics,

7   but you do recall mapping Senator Menendez' cellphone in

8   Washington, D.C. a significant amount of time; correct?

9           MR. MONTELEONI:  Objection.

10          THE COURT:  Did you map his cellphone in Washington,

11  D.C.?

12          THE WITNESS:  Yes.  There were dates that I did.  I

13  couldn't say it was significant number of dates.

14  Q.   Because you mapped only the dates the prosecutors asked

15  you?

16  A.   Yes.  I was given a lengthy list, for at least CAST work a

17  lot of locations, a lot of dates, much more than we normally

18  map for trials.

19  Q.   Much more than you normally map but you have 19 pages of

20  slides?

21          THE COURT:  Do you have 19 pages of slides?

22  A.   I technically have 20.

23  Q.   Sorry.  You have 20 pages of slides.  Where is most of the

24  work?

25          MR. MONTELEONI:  Objection.

1    Q.  You said more work than normal.  Is it reflected in the

2    sides you presented to this jury?

3    A.  Typically trial reports are shorter than this.

4    Q.  So there is a lot of work that for whatever reason, didn't

5    end up being presented to the jury?

6              MR. MONTELEONI:  Objection.

7              THE COURT:  Sustained.

8              MR. FEE:  I'm sorry.  Sustained?

9              THE COURT:  Sustained.

10             Did you do work that is not reflected in these slides?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.

13   BY MR. FEE:

14   Q.  You are aware that Senator Menendez is a United States

15   senator?

16   A.  Yes.

17   Q.  And you know that the Senate meets in Washington, D.C.?

18   A.  Yes.

19   Q.  And that he spends time in Washington, D.C. for that job?

20             MR. MONTELEONI:  Objection.

21             THE COURT:  I think it is self-evident but I will

22   allow the witness to answer.

23             THE WITNESS:  I don't know what percentage of time

24   senators spend in Washington versus their home constituencies.

25   Q.  With this phone data you are able to map the percentage of

```
 1   time he spends in D.C. versus New Jersey or New York; aren't
 2   you?
 3                THE COURT:  Sustained.
 4                MR. MONTELEONI:  Argumentative.
 5   Q.  Do you think you are able to map the percentage of time his
 6   phone is in D.C. versus New York?
 7   A.  Yes.  With the records you can do that.
 8   Q.  And you have the records, right?
 9   A.  Yes.
10   Q.  But this, the presentation you made here, does not reflect
11   anyone located in D.C. on any of these dates; correct?
12   A.  That is correct.
13                MR. FEE:  Page 16, please.
14   Q.  Were you given by the prosecutors, as a starting point for
15   this slide on October 17, the information that Bob and
16   Nadine -- Senator Menendez and Nadine -- were arriving at JFK?
17   A.  I don't remember if it was a time period I was given that
18   began at 4:20.  I would have to look at, you know, to see what
19   the initial request for this particular date was but I believe
20   it was the time period.
21   Q.  Fair to say that, in your expert opinion, this map reflects
22   a couple driving from or traveling from John F. Kennedy Airport
23   to the place you have identified as the Menendez residence;
24   correct?
25                MR. MONTELEONI:  Objection.
```

1    THE COURT:  I will allow it.

2    Are you able to say that based on this information?

3    THE WITNESS:  Yes.

4  Q.  Are you aware if there is any dispute in this case about

5  whether you need to drive through Manhattan to get to New

6  Jersey from JFK?

7    MR. MONTELEONI:  Objection.

8    THE COURT:  Sustained.

9    I take it you are not aware of disputes in this case?

10   THE WITNESS:  I am not.

11   MR. FEE:  Page 19 and then I will be done.  One

12 second, your Honor?  Mr. Weitzman is whispering to me.

13   (Counsel conferring)

14 Q.  This reflects the locations of the device used by Senator

15 Menendez and Fred Daibes; correct?

16 A.  Yes.

17 Q.  On May 22 of 2022?

18 A.  May 26 of 2022.

19 Q.  May 26 of 2022.  Thank you.

20   You see in the rows inserted by the prosecutors on the

21 bottom, Senator Menendez tells Fred Daibes -- or sends a

22 message that states:  Signal:  At restaurant.  Do you see that?

23 Above the "1 kilo gold price"?

24 A.  Can you repeat your question?

25 Q.  Sure.  Do you see in the text message there or the message

1   there from Menendez to Daibes it said the words "at

2   restaurant"?

3   A.  Yes.

4   Q.  Are before you were asked if you saw here "1 kilo gold

5   price" by the prosecutor?

6   A.  Yes.  In the subsequent one.

7   Q.  Where are you given any information about whether Senator

8   Menendez was responding to an ethics question during this

9   period of time --

10          MR. MONTELEONI:  Objection.

11  Q.  -- about the value of gold?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14          MR. FEE:  Let's put that down.  No, you can keep that

15  up, that page, please, page 19.

16  Q.  So I believe you testified on direct that your opinion was

17  these two phones were in the same place for some period of

18  time?

19  A.  They used the same cell site and sector, yes.

20  Q.  Got it.  Got it.

21      During what period of time were those two phones using the

22  same cell site sector?

23  A.  Approximately 8:21 to 9:29 p.m. on May 26 of 2022.

24  Q.  Would you agree that could be dinner time for some folks?

25  A.  Yes.

1    Q.  Do you know if -- well, in your experience mapping the

2    locations of devices, do you tend to find long-term friends'

3    devices in the same location frequently?

4                MR. MONTELEONI:  Objection.

5                THE COURT:  Sustained.

6                MR. FEE:  Your Honor, no further questions.

7                THE COURT:  Thank you.

8                Mr. Lustberg?

9                MR. LUSTBERG:  Ms. Collart has a couple of questions.

10               THE COURT:  All right.  Thank you.

11               MS. COLLART:  Your Honor, given the time, do you want

12   me to start?

13               THE COURT:  Yes.  How long do you think you have?

14               MS. COLLART:  Less than 10 minutes.

15               THE COURT:  Let's do it.  Ladies and gentlemen of the

16   jury, OK?  All right.

17   CROSS-EXAMINATION

18   BY MS. COLLART:

19   Q.  My name is Anne Collart, I represent Mr. Hana.  I just want

20   to ask you about one page of your report.

21               And Mr. Kelly, if we can put up GX 16C-2 and turn to

22   page 7?

23        So this covered the time period between 9 and 11:54 p.m. on

24   April 6, 2019, correct?

25   A.  Yes.

O6R5men6                     Wheeler - Cross

1    Q.  And your testimony earlier was that based on the handover

2    and the data sessions, these red and blue sectors indicate that

3    the senator and Nadine are traveling north towards 41 Jane

4    Drive; right?

5    A.  Yes.  That is consistent with the records.

6    Q.  And it is also consistent with the text messages below

7    where I think in Government Exhibit 1303 she texts to José

8    Uribe to come over any time after she drops Mr. Hana off;

9    correct?

10           MR. MONTELEONI:  Objection.

11           THE COURT:  Do you see that the first line, line 694,

12   Agent?  Do you see that?

13           THE WITNESS:  Yes, I do.

14           THE COURT:  Go ahead.  Ask your question.

15   BY MS. COLLART:

16   Q.  So this is the only page of the report that references

17   Mr. Hana; correct?

18           MR. MONTELEONI:  Objection.

19   Q.  On that report?

20           THE COURT:  No, I will allow it.

21   A.  No, I believe I would have to look at all the other pages

22   but there may be other conversations in which I have called out

23   communications between one of the four mapped phones and

24   Mr. Hana but I would have to look at all the pages.

25           MS. COLLART:  Mr. Kelly, could you quickly scroll

1    through those for Agent Wheeler?

2    A.  A little slower.

3    Q.  That's my fault.

4    A.  OK.  OK.  OK.  OK.  OK.  OK.  OK.  OK.  OK.  OK.  OK, yes,

5    that is the only slide that Mr. Hana's name appears in my

6    report.

7    Q.  Thank you for confirming.

8         MS. COLLART:  Can we go back to page 7?

9    Q.  On the bottom blue box here where Mr. Hana's name is it

10   says 12 SMS messages; right?

11   A.  Yes.

12   Q.  So I just want to be clear that by including his name here,

13   you are not actually saying anything about his location;

14   correct?

15   A.  That is correct.

16   Q.  But based on the fact that there are 12 messages here, you

17   could say something about his location if you had the data;

18   right?

19         MR. MONTELEONI:  Objection.

20         THE COURT:  Rephrase.

21   Q.  But would you, if you were given his phone records,

22   including these 12 messages, be able to map his location?

23   A.  Yes.

24   Q.  And if I understand your testimony from before the break

25   earlier today, even if you didn't have those text messages,

 1    could you map his location anyway?

 2                MR. MONTELEONI:  Objection.

 3                THE COURT:  I will allow it if she can answer.

 4    Q.  I can rephrase.

 5    A.  Yes.

 6    Q.  So I think you testified that any time you have a phone and

 7    it's connecting to cell towers in their range you get data from

 8    that; right?

 9    A.  So any time our phones make or receive a phone call, or in

10    this case a text message sent over the cellular network, not an

11    iMessage not a Signal message, not a Telegram, WhatsApp, a

12    record is generated with the phone company.  And depending on

13    the provider, we can get the location of that text message.

14    Now, for example, T-Mobile, Verizon, don't always provide us

15    with locations for text messages.  AT&T does.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

O6rWmen7

1    BY MS. COLLART:

2    Q.  OK.  So if you had that data for Mr. Hana, you could map

3    his location?

4    A.  It would depend on his provider.

5    Q.  Do you know his provider?

6    A.  I don't remember.  Again, there was a very voluminous

7    amount of records in this case, so I would have to look at the

8    original records.

9               MS. COLLART:  OK.  We won't do that.  Thank you.

10              Nothing further, your Honor.

11              THE COURT:  Thank you.

12              Mr. De Castro, anything?

13              MR de CASTRO:  Not from us.

14              THE COURT:  All right?

15              Any redirect?

16              MR. MONTELEONI:  No, your Honor.

17              THE COURT:  All right.  You are excused, Agent.  You

18   may step down.  Thank you.

19              (Witness excused)

20              THE COURT:  Ladies and gentlemen, thank you for the

21   full day of testimony.  Again, we continue so far to be

22   relatively on track.

23              Tomorrow we'll go until 1:30.  What I'll do is I'll

24   give you a 15-minute break around 11:30 or so, so you may want

25   to bring apples or oranges or a sandwich or something if we're

O6rWmen7

1    going to go until 1:30.

2              Tomorrow, 9:30 to 1:30.  That will be almost a full

3    day of testimony.  Enjoy the rest of the day.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6rWmen7

1                    (Jury not present)

2                    THE COURT:  Government, is the next witness your last

3     witness?

4                    MR. MONTELEONI:  Yes, your Honor.

5                    THE COURT:  How long will the direct take?

6                    MS. GHOSH:  Not longer than an hour and a half, your

7     Honor.

8                    THE COURT:  All right.  Thank you.

9                    Then the government plans on resting after we deal

10    with some evidentiary issues?

11                   MR. MONTELEONI:  Yes, your Honor, but I do have an

12    application to make in light of the cross-examination, if you

13    have a moment.

14                   THE COURT:  Yes.

15                   You may be seated in the courtroom.

16                   MR. MONTELEONI:  I think that really it's appropriate

17    for another instruction on investigative techniques given the

18    repeated, persistent attempts by defense counsel to suggest

19    that there's something wrong with the government asking

20    witnesses to analyze certain things and not, you know,

21    analyzing other things in particular, not conducting particular

22    investigative techniques.  And I want to highlight both that

23    this is a persistent issue, but in this case it actually ended

24    up being extremely misleading because, first of all, not all

25    the records that were sought were available for the correct

O6rWmen7

1    date ranges, but obviously -- first of all, the jury shouldn't

2    have to worry about this, but it's almost impossible to prove

3    the negative, marking every record as an exhibit, and showing

4    that we actually didn't have location information for Uribe for

5    the relevant dates.  But also the suggestion that there was

6    something misleading about mapping the fact that a cell tower

7    went across the river into Manhattan is very unfair because, in

8    fact, I told the witness to check the hypothesis that the cell

9    phone was in New Jersey and asked her to do additional work to

10   confirm that and then brought it out on direct testimony.  And

11   to suggest in a way that I can't rebut without getting into my

12   own conversations with the witness, which is totally improper,

13   to suggest that there's something misleading about it, I think

14   it's inappropriate, and I think that another instruction on

15   this point is appropriate, especially where the defense is

16   disputing venue and to try to make it seem like we're making a

17   to-do out of nothing and feeding the witness something that's

18   improper is really --

19        THE COURT:  I understand your point.  It's not unusual

20   for me to hear testimony about the cell site signals pinging

21   off towers across the river.  I've heard that a number of

22   times.

23        MR. MONTELEONI:  Yes, your Honor, but I just think

24   that the repeated focus on things we should have done is

25   unfair.

O6rWmen7

1        THE COURT:  I understand.  I understand.

2        MR. FEE:  Your Honor, the purpose of the cross

3    generally is to point out the lack of evidence.

4        Can I say specifically here we are disputing venue.  A

5    person in New Jersey whose cell phone hits on a tower in New

6    York does not supply venue.  This jury, I imagine, is not

7    familiar with cell-site location mapping.  We have to point

8    out -- they put on two slides where there's, like, a dot and a

9    triangle and the name of our client in Manhattan, where the

10   witness clarifies, we don't think that person's in Manhattan.

11       THE COURT:  She didn't quite say that.  This witness

12   was very precise.

13       MR. FEE:  Very precise.

14       THE COURT:  Much more precise than the normal

15   cell-site expert.  It's obviously for the jury, but I was

16   impressed with her precision.

17       She didn't say that.  She said given the totality of

18   all the evidence the likelihood is that she would be in New

19   Jersey.  That's correct.

20       MR. FEE:  That's right.

21       We think it is very, very fair and, frankly, necessary

22   on cross to highlight the fact.

23       THE COURT:  I don't dispute that.  By the same token,

24   I don't think there's anything to be lost by repeating the

25   instruction that I will, in fact, give them and that everyone

O6rWmen7

```
 1  knows, that investigative techniques are not their concern.

 2            Take five minutes, and then I'll see the lawyers in

 3  the robing room.

 4            MR. WEITZMAN:  Your Honor, I have my own application

 5  to make.

 6            THE COURT:  Yes, sir.

 7            MR. WEITZMAN:  Apologies.

 8            THE COURT:  They made one.  You get to make one.

 9            MR. WEITZMAN:  It follows up on the instruction you

10  already gave to the jury about how Will Hana is not charged

11  with FARA violations.

12            THE COURT:  Yes.

13            MR. WEITZMAN:  I think an appropriate instruction in

14  light of Ms. Kopplin's testimony is that Senator Menendez is

15  not charged with violating or lies on his financial

16  disclosures.  There is a crime that the government could have

17  charged with respect to that.  It's, frankly, what Senator

18  Menendez had been charged with in New Jersey.  The government

19  chose not to charge that crime here, and I think the jury

20  should be instructed in the same way the jury was instructed

21  about Mr. Hana.

22            MR. RICHENTHAL:  We did charge the crime here.  It's

23  called honest services fraud.  We intend to argue that those

24  were material omissions and lies, so it would be false to say

25  it's not charged.  If Mr. Weitzman is referring to a different
```

O6rWmen7

1    charge over which we did not have venue, I agree.  We did not

2    bring charges over which we did not have venue.

3            MR. WEITZMAN:  The honest services fraud charge is not

4    about lies on these ethics forms.  They will use the ethics

5    form as evidence of consciousness of guilt, which is very

6    different than charging the lies as a violation of law.

7            THE COURT:  Wait just a moment.

8            Go ahead, sir.

9            MR. RICHENTHAL:  I would respectfully request your

10   Honor look at the requests to charge.  I'm not even sure the

11   parties disagree on this.  It is common -- I think it's even

12   uniform that in honest services fraud cases the government

13   points to lies and omissions on forms as one of the methods for

14   either lying or concealing bribes.  That occurred in the

15   Sheldon Silver matter.  It occurred, I believe, in the Sampson

16   matter.  We also cited it in our motions *in limine*.  I can't

17   think of an honest services fraud case, to my knowledge, which

18   didn't.

19           THE COURT:  All right.  Just take a look at the

20   proposed charges, and when we go back into the robing room, you

21   can give me the number of each of the charges that are

22   included.

23           All right.  Five minutes to refresh yourselves.

24           MS. COLLART:  Your Honor, my apologies.  In case we're

25   not on the record back in the robing room, your deputy asked me

O6rWmen7

```
 1        to put on the record our request for a letter.

 2                   THE COURT:  Oh, yes, please.  Let's put that on the

 3        record.

 4                   Go ahead.

 5                   MS. COLLART:  We have at least one defense witness who

 6        is still located overseas and has applied for a visa but has

 7        been told that there is a lengthy delay, into 2025, to even

 8        obtain an appointment.  I've been working with Ms. Clark to try

 9        and seek an expedited review of that, very helpfully, very

10        collaboratively, and we've been advised that they're requesting

11        a letter from the Court to request that and to advise that

12        there's a pending trial where his testimony is required.

13                   THE COURT:  All right.  I gather, because you wrote an

14        email to my deputy, which I'll read, that came in today during

15        the lunch break.  This was to my deputy from Ms. Collart:

16                   As discussed, below is the information related to our

17        request that the Court issue a letter requesting expedited

18        consideration of a visa application.

19                   Can I set forth the individual's name?

20                   MS. COLLART:  I think that's fine, your Honor.

21                   THE COURT:  The individual's name is Ibrahim Ezzat

22        Ibrahim Hussein Abdalla.

23                   We request that the letter convey that the witness is

24        needed to give testimony in a pending trial and that the

25        testimony could be needed as early as Monday.  Accordingly,
```

O6rWmen7

1    expedited consideration of the visa application would be

2    considered.

3              Ms. Clark, with my sincere gratitude -- and this is

4    with Ms. Collart's sincere gratitude -- is trying to identify

5    to whom the letter should be addressed, and we will follow up

6    once we have that information.  I can also put this on the

7    record at the end of the day if the Court would like, but I

8    wanted to make the above available to you now, as you'd

9    requested.

10             Please let me know -- and that's to my deputy.  Please

11   let me know if you need anything further.  Many thanks for your

12   help with this.

13             All right.  I assume there's no objection from the

14   parties.

15             MR. MARK:  The government has no objection to that

16   letter without being prejudiced to our motion that's pending to

17   preclude this witness's testimony.  But obviously the

18   government wants to make sure that that witness is available

19   and doesn't prejudge the Court's ruling.

20             THE COURT:  And I haven't had a response to that

21   motion, right, yet?

22             MS. COLLART:  That's correct, your Honor.

23             THE COURT:  OK.

24             MS. COLLART:  We're anticipating filing that tomorrow.

25             THE COURT:  All right.

O6rWmen7

1          Do we know who this letter should go to?

2          MS. CLARK:  Your Honor, I think part of the issue is

3     that the individuals are in New Delhi.  We're working

4     diligently to determine who it should be sent to.

5          THE COURT:  When you get that name and that address,

6     file it with the Court, and then I'll get the letter out.

7     Thank you.

8          The letter will be addressed to whomever it should be

9     addressed to, and I will say I am currently presiding over the

10    trial of United States v. Robert Menendez*, et al.*, 23 Cr. 490,

11    in the United States District Court for the Southern District

12    of New York.  I've been informed by one of the parties that --

13    I'll set forth his name -- is needed to give testimony on

14    behalf of that party and that testimony could be needed as

15    early as Monday.  Accordingly, I would appreciate it if you can

16    give expedited consideration to Mr. Abdalla's visa application.

17    Very truly yours, and I'll sign it.  All right?

18          Thank you.  Five minutes.  I'll see everyone in the

19    robing room.

20          MR. FEE:  Your Honor, I'm sorry.  Can we release our

21    clients?

22          THE COURT:  Of course.  We're going to be handling

23    legal matters only.

24          MR. RICHENTHAL:  We have two other matters.  I'm not

25    saying the clients have to remain.

O6rWmen7

1            THE COURT:  I assume they're legal matters.

2            MR. RICHENTHAL:  Yes, and they're not about the robing

3   room issue.

4            THE COURT:  All right.  Then we'll do it later.

5            (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6rWmen7redacted

1          (In the robing room)

2          THE COURT:  Robert Menendez issued a subpoena, dated

3    April 18, 2024, pursuant to Fed. R. Cr. P. 17(c) to the law

4    firm of Krieger Lewin LLP to produce documents relating to its

5    prior representation of José Uribe.  In relevant part, the

6    subpoena demanded "any and all" documents internal to Krieger

7    Lewin or between Krieger Lewin and Uribe regarding statements

8    made during a July 19, 2023, proffer by counsel for Mr. Uribe

9    at Southern District of New York U.S. Attorney's Office about

10   Nadine Menendez paying Uribe back for car payments Uribe made

11   on her behalf.  (ECF 395-2.)

12          Along with Kasowitz Benson Torres LLP, the firm

13   currently representing Uribe, Krieger Lewin moved to quash the

14   subpoena on May 12, 2024.  (ECF 394.)  The parties' briefing on

15   this portion of the Krieger Lewin subpoena focused

16   substantially on whether the requested documents were protected

17   by attorney-client or work product privileges.  (ECF 394, 418,

18   419.)

19          In an order dated May 31, the Court granted the law

20   firm's motion to quash the subpoena without prejudice to

21   Menendez moving to establish a factual basis supporting

22   application of the xxxxxxxxxxxxxxxxxxxxx to the attorney-client

23   or work product privileges.  (ECF 432.)  I note that the May 31

24   order also granted, without qualification, Kasowitz Benson and

25   Krieger Lewin's motion to quash Menendez's subpoena to Kasowitz

O6rWmen7redacted

1    for documents (395-1) as well as a subpoena to Uribe to testify

2    and produce documents.  (395-3.)

3             Menendez moved to set forth the factual basis

4    supporting application of the xxxxxxxxxxxxxxxxxxxxxx by filing

5    letters under seal on June 13 and 14.  The June 14 letter

6    indicated that Menendez also intends to call Nick Lewin of

7    Krieger Lewin to testify about the same proffer to the

8    government on July 19, 2023.  Krieger Lewin's opposition letter

9    and the government's letter joining in that opposition were

10   both filed under seal on June 17.

11            With the benefit of this additional briefing and the

12   sealed conference with the parties on June 13, the Court has

13   concluded that it need not decide whether Menendez has

14   established a factual basis to support application of the

15   xxxxxxxxxxxxxxxxxxxxxx.  Instead, regardless of whether the

16   xxxxxxxxxxxxxxxxxxxxxx applies, the Rule 17 subpoena dated April

17   18, 2024, to Krieger Lewin is quashed with prejudice, and the

18   related testimony of Lewin is excluded pursuant to Rule 402 and

19   403 and requirements of relevancy, specificity and

20   admissibility set forth by the United States Supreme Court in

21   *United States v. Nixon*, 418 U.S. 683 (1974).

22            Menendez has proffered that Nick Lewin's testimony and

23   the requested documents are relevant to Menendez's defense that

24   he lacked knowledge of Uribe's payments for Nadine's car,

25   specifically evidence that "Uribe duped his lawyer into

1    believing that the car payments were a loan makes it more

2    likely that the scheme similarly duped Senator Menendez."

3    (June 14, 2024, letter, at 2.)

4            The Court disagrees.

5            First, Uribe has already testified extensively by the

6    government and then cross-examined by the defendants during the

7    trial of this action on June 7, 10, 11 and 12 and has left the

8    stand.  Uribe testified that he told Lewin that the car

9    payments were loans, and Lewin subsequently proffered that fact

10   to the government in a proffer session.  (Transcript of June

11   10, Tr. 3172-73.)  Whether Lewin himself believed Uribe's

12   story, which Uribe testified was not true, and was thereafter

13   "duped" by his client, Uribe, is not relevant to the charges in

14   this case.  Moreover, there's nothing in the record to suggest

15   that Uribe duped or attempted to dupe Menendez.  Indeed, Uribe

16   testified that he did not speak directly to Menendez whatsoever

17   about the car payments, let alone about whether those payments

18   were loans or not.  (June 11 transcript, 3176-77.)  Even if

19   Menendez were to argue to the jury that he was duped by

20   Nadine -- and he's free to do so if he chooses to assert

21   that -- the fact that Uribe allegedly duped Lewin did not make

22   it any more or less likely that Nadine duped Menendez into

23   believing that Uribe's payments for the car were loans.

24           In addition, the inquiry sought by Menendez into what

25   Lewin's belief was as to the truthfulness of his client is not

O6rWmen7redacted

an appropriate subject for questioning.  A lawyer's belief in

his client's statements -- or lack thereof -- is irrelevant to

impeaching Uribe or assisting Menendez.  It is impermissible

opinion testimony.  Even if Lewin's beliefs were an appropriate

subject of inquiry, which they are not, they would not bear on

the question of whether Menendez was duped by Nadine into

believing that Uribe's payments to Nadine were merely loans and

not payments of bribes.

Finally, any possible probative value is substantially

outweighed by the danger of confusing the issues, wasting time

and misleading the jury, under Rule 403.

To support his argument for the requested testimony of

Lewin, Menendez relies on the decision from 1984 in which the

U.S. Court of Appeals for the Second Circuit determined that a

defendant accused of knowingly importing drugs was able to

introduce evidence that his coconspirators had previously duped

other couriers into unknowingly transporting drugs.  *See United*

*States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984).

According to the Second Circuit, the evidence of the

coconspirators' common plan or scheme to dupe couriers was

admissible under Federal Rule of Evidence 404(b) because that

evidence made it less likely that the defendant himself had

knowledge.  Put another way, if coconspirators had a common

plan to not disclose to couriers that they were transporting

drugs, then it was less likely that Aboumoussallem knew he was

O6rWmen7redacted

1    transporting drugs.  But the same is not true here.  Uribe

2    lying to his lawyers about his payments to Nadine does not make

3    it any more or less likely that Menendez knew the payments were

4    bribes.  As explained above, Uribe's statements to Lewin and

5    Lewin's beliefs about them are simply not relevant to

6    Menendez's knowledge about whether the payments were bribes or

7    loans.  *Aboumoussallem* is inapposite.

8            Menendez also urges, as noted, that Lewin's testimony

9    is admissible to impeach Uribe.  Specifically, Uribe testified

10    at trial that he had "no doubt to believe that Mr. Menendez

11    knew he was making payment for the car."  But according to the

12    government's notes of Lewin's July 19, 2023, proffer, Uribe

13    "doesn't know if [Menendez] knew about the payments."  June 14

14    letter at 3.  However, this is not proper impeachment material

15    because Uribe had already testified that the July 19 proffer

16    was not truthful.  Even if it were proper impeachment material,

17    Menendez already had ample opportunity to cross-examine Uribe

18    directly.  Now that Uribe's testimony is concluded, impeaching

19    him through Lewin would be improper, pursuant to Rule 613,

20    which only permits extrinsic evidence of his prior inconsistent

21    statement if Uribe is given an opportunity to explain or deny

22    the statement.

23            In addition, additional testimony from Lewin

24    essentially repeating Uribe's testimony that the July 19

25    proffer was not truthful is needlessly cumulative under Rule

O6rWmen7redacted

403.  Moreover, the document demand in the subpoena does not

comply with Rule 17(c) or *Nixon*, as set forth in this Court's

May 31, 2024, order, the Rule 17(c) subpoena may not be a

general "fishing expedition."  *United States v.*

*Mendinueta-Ibarro*, 956 F.Supp.2d 511, 513 (S.D.N.Y. 2013).  The

party who serves the subpoena "must be able to reasonably

specify the information contained in or believed to be

contained in the documents sought rather than merely hope that

something useful will turn up."  *United States v. Louis*, 2005

WL 180855, at *5 (S.D.N.Y. Jan. 27, 2005) (quoting *United*

*States v. Sawinski*, 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14,

2000)).

        At the conference on June 13, counsel for Menendez

clearly stated he was seeking "documents we don't know about"

and he was "entitled to explore" Uribe's documents.  (June 13

Tr. 3726, 3728.)  Similarly, when asked for the relevance of

the requested documents, counsel replied, "Just hypothetically

thinking, what if José Uribe sent to Nick Lewin a document that

hasn't been produced by anybody?"  (Tr. 3726.)  It is manifest

that Menendez is engaging in a fishing expedition, making it

inappropriate under *Nixon* and Rule 17(c).  The document demand

itself also suggests that Menendez is engaged in a fishing

expedition calling for "any and all handwriting, notes,

documents, memoranda and communications" for the entire

duration of Lewin's representation of Uribe and is not limited

O6rWmen7redacted

1    to any specific Krieger Lewin attorneys or any particular

2    dates.  *See Mendinueta-Ibarro*, 956 F.Supp.2d 513.

3            Accordingly, the Court hereby quashes the Rule 17(c)

4    subpoena and excludes the related testimony of Nick Lewin.  It

5    denies Menendez's June 13 letter, filed under seal, seeking the

6    order requiring Krieger Lewin to produce documents.

7            That's the order of the Court.

8            What I propose is that this be filed publicly with the

9    exception of two very brief references to -- I guess it would

10   have to be redacted here -- xxxxxxxxxxxxxxxxxxxxx.  I mentioned

11   xxxxxxxxxxxxxxxxxxxxxx twice.  I propose that this be filed now

12   with the three references to that redacted, but otherwise

13   filed.

14           Any objection?

15           MR. LUSTBERG:  No objection.

16           MR. FEE:  None, your Honor.

17           MR. MARK:  No objection.

18           All right.  We've got some outstanding evidentiary

19   matters.  Let's take them up outside.

20           (Continued on next page)

21

22

23

24

25

O6rWmen7

```
 1                (In open court)

 2                THE COURT:  The redacted version of that transcript

 3      will be filed tonight.

 4                Let's see where we stand on outstanding matters.

 5                I have the Daibes gift-giving issue, which has been

 6      briefed, and you'll get a decision on that within the next day,

 7      if not tomorrow, then -- well, by the end of the day tomorrow

 8      or Saturday.  I'll try to do it by tomorrow.

 9                We have the sealed Gibbons letter, and I'm going to

10      get a government response tonight?  Tomorrow?

11                MR. RICHENTHAL:  Mr. Lustberg, with our consent, has

12      now filed the letter in only modestly redacted form.  I believe

13      he did that an hour or two ago.  It's now been docketed.  I

14      think your Honor's referring to the June 22 letter motion,

15      regarding --

16                THE COURT:  Let me just see.  Regarding 613(b)?

17                MR. RICHENTHAL:  Yes, your Honor.

18                THE COURT:  Yes.

19                When am I going to get a response?  Your choices are

20      tonight or tomorrow.

21                MR. RICHENTHAL:  I would choose option C, but I don't

22      think I've been given an option C.

23                THE COURT:  All right.

24                MR. RICHENTHAL:  So if we could choose tomorrow, we'll

25      take it.
```

O6rWmen7

```
1              THE COURT:  Yes.  Please.

2              I have document 485, which is objection to Hana's

3    evidence, and Mr. Lustberg has already said I'll have that

4    response tomorrow.

5              MR. LUSTBERG:  Yes, your Honor.

6              THE COURT:  All right.

7              MR. RICHENTHAL:  For clarity, your Honor, the letter

8    that Mr. Lustberg docketed, which is the letter to which I

9    think the Court's referring, has now been docketed at 486.

10             THE COURT:  No.  The one I'm referring to is docketed

11   at 485, the June 26 letter.

12             MR. MARK:  And that's the government's letter.

13             THE COURT:  Oh, I am sorry.  Thank you.  In other

14   words, Mr. Lustberg has already responded, you're telling me.

15             MR. RICHENTHAL:  The June 22 letter motion regarding

16   Federal Rule of Evidence 613(b) --

17             THE COURT:  Yes.

18             MR. RICHENTHAL:  That was originally submitted under

19   seal.

20             THE COURT:  Yes.

21             MR. RICHENTHAL:  The parties conferred regarding

22   limited redactions.

23             THE COURT:  The limited redaction document is 486.

24             MR. RICHENTHAL:  Correct.  Publicly docketed.  That's

25   been done.  I just wanted to advise the Court, and that's the
```

O6rWmen7

1    letter to which we'll be responding tomorrow.

2              THE COURT:  Now I understand.  OK.

3              MR. RICHENTHAL:  Yes.

4              Then there's the separate letter that I think Mr. Mark

5    was just talking about, which is our motion to which Mr. Hana

6    is going to respond.  I don't recall the date.  I'm sorry.

7              MR. LUSTBERG:  That's tomorrow.

8              THE COURT:  Tomorrow.  He's going to respond to 485.

9              MR. RICHENTHAL:  Yes.

10             THE COURT:  I think we understand each other, perhaps.

11   We'll see.

12             It's hard for me to know what the remaining objections

13   are.  There either are objections to the letter having to do

14   with a former congressman and FARA or there aren't.  There

15   either are or there are not objections to Mr. Menendez's

16   summary chart.  I guess let me ask.  What are the outstanding

17   evidentiary issues?  Tee them up and I'll decide them now.

18             MR. MONTELEONI:  The ones that are ripe for the Court

19   involve Mr. Menendez's FARA letters and Associated Press

20   releases.  They are five particular government exhibits, which

21   we're having our paralegal come up to show them on the screen.

22   But the paralegal's underway.  I could pass up my iPad if you

23   wanted to look through them, or we could take something else

24   first.  But that one is a definite, concrete pending issue.

25             The Menendez summary chart is a looming future issue.

O6rWmen7

1            THE COURT:  Sir, let's take it one by one.  OK?

2            MR. MONTELEONI:  Yes.

3            THE COURT:  What's the first issue you want to bring

4    to me?

5            MR. MONTELEONI:  The first issue -- there are five

6    exhibits that I'll identify for you right now.  There's 10C-2

7    and then 10D-1 through 10D-4.  Those are two letters by

8    Menendez publicly posted on the Senate Foreign Relations

9    Committee website and with accompanying press releases from the

10   Senate Foreign Relations Committee website.  Form of those

11   letters also went out as a press release on Menendez's personal

12   office website.  That's the fifth one.  But basically they are

13   two calls for the Justice Department -- first the FARA unit,

14   then a call to the Attorney General -- to investigate.

15           THE COURT:  When you say calls, you mean requests.

16           MR. MONTELEONI:  Yes, yes.  Calls to investigate, just

17   requests for investigation.

18           THE COURT:  When you say call, I think of a call.

19           MR. MONTELEONI:  I'm sorry.  We've been putting in so

20   much evidence about calls.  It's very ambiguous.  I apologize.

21           THE COURT:  Two requests.

22           MR. MONTELEONI:  Two requests that the Justice

23   Department investigate former Congressman David Rivera.

24           THE COURT:  I've seen this already.

25           MR. MONTELEONI:  Right.  So, we intend to offer them.

O6rWmen7

These are the last outstanding exhibits apart from those that
we'll go in with our last summary witness, and we understand
that the defense has essentially 403-based objections.  We that
think they're highly probative.  They, in fact, are quoted in
the indictment.  The relevance of them was quite apparent in
the indictment, and it's quite apparent here.

        Knowledge of Menendez about the Foreign Agents
Registration Act is highly at issue because he is prohibited
from taking conduct that would be encompassed by those
prohibitions, so the fact that he authorized the sending of
these letters calling upon the Justice Department to
investigate someone for violating those very same prohibitions
is highly relevant.  And we also have some evidence that's
already in the record that, in fact, he was aware of public
statements that were going out under his authority -- that's
Government Exhibit 8F-23 -- where a different press release,
not regarding this, but a different press release was run by
him, by the press director.

        And we also have defense counsel very much putting at
issue Menendez's knowledge of a number of things that we think
are highly apparent to him, like he claimed today that he
didn't know -- he claimed through cross-examination that he
didn't know factors about the financial disclosure form regime.

        THE COURT:  What does that have to do with FARA?

        MR. MONTELEONI:  Well, he's claiming that he's not

O6rWmen7

1    aware of the various provisions that are governing his conduct.

2    This brings us now to the Senate ethics manual.  The Senate

3    ethics manual actually has a reference saying that he's

4    prohibited from acting in a way that would require him to

5    register under FARA.  So by disputing his awareness of this

6    document, it's entirely fair for us to respond that he was

7    aware of these particular prohibitions.

8             THE COURT:  I see.

9             MR. MONTELEONI:  And one of the letters refers to the

10   public FARA database, so the fact that he's aware of his

11   ability to look things up in the public --

12            THE COURT:  This is a letter from him?

13            MR. MONTELEONI:  Yes.  I mean, look, I'm sure that his

14   staff was involved, but it's going out under his authority,

15   under his signature.

16            THE COURT:  Thank you.

17            Let me hear from whoever wants to speak.

18            MR. WEITZMAN:  Yes, your Honor.

19            THE COURT:  It's a 403 issue, sir?

20            MR. WEITZMAN:  It's 403.  It's multiple issues.

21            First, the senator is not charged with failing to

22   register as an agent.

23            THE COURT:  Right.

24            MR. WEITZMAN:  That's a different statute.  He's

25   charged under 18 U.S.C. Section 219.  A senator cannot register

O6rWmen7

1    as an agent of a foreign government, so they are not analogous

2    allegations.  That's the first one.

3          The second thing is when you look at the letter, the

4    reason Senator Menendez raised this is because of specific

5    allegations in a lawsuit filed against a former congressman.

6          THE COURT:  Someone should put it up.

7          MR. WEITZMAN:  Yes.  It's 10D-1.  And if you look at

8    the second paragraph on the first page --

9          I'll let you read that before I continue.

10          THE COURT:  Yes, sir.

11          MR. WEITZMAN:  -- this has nothing to do --

12          THE COURT:  Who is Rivera here?

13          MR. WEITZMAN:  He's a former congressman.  At the time

14    of the complaint or the allegations in this letter, he's no

15    longer a congressman.  The allegations in this letter do not

16    concern his conduct when he was a congressman, so they don't go

17    to the senator's knowledge or scienter or understanding of what

18    is permitted or not permitted for a congressman or a senator to

19    do.  They go to whether someone should register as a lobbyist.

20          Now, there's no allegation, there's no charge here

21    that Mr. Hana needed to register or not register; we've already

22    dealt with that.  So the fact that Senator Menendez can read a

23    lawsuit and then say, hey, shouldn't DOJ investigate whether

24    this person should have registered as a FARA agent doesn't go

25    to the Section 219 charge.

O6rWmen7

1          The third thing is there's language throughout this

2     letter that would be deeply prejudicial and improper to

3     include, and that's the legal instructions, for example, about

4     what FARA is.  That's not for the senator to tell the jury.

5     The senator could have gotten it wrong.  It's for your Honor to

6     tell the jury.  If you look at, for example, 10D-1, page 2,

7     there's all these statements in the first two full paragraphs

8     about what FARA is.

9          THE COURT:  Is that what's up now?

10          MR. WEITZMAN:  Yes.

11          THE COURT:  All right.

12          Go ahead.

13          MR. WEITZMAN:  The same is true, your Honor, of the

14     next letter, which is 10D-3.  In the second paragraph there is

15     legal discussion about what the law is, what its purpose is.

16     Obviously it would be not only unfairly prejudicial, but it

17     invades the role of the Court.  And then again, in the next

18     letter, there is --

19          THE COURT:  The first one was what, 10D-2?

20          MR. WEITZMAN:  10D-1 was the first one.

21          The second one is 10D-3.  In the next paragraph from

22     10D-3, he's quoting from a lawsuit.  Now, your Honor, I'm not

23     going to say what Senator Menendez's motivations are.  I'm sure

24     they are in good faith in doing this.  I will point out you're

25     talking about the Medura regime.  You're talking about a highly

O6rWmen7

1    contentious dispute between Republicans and Democrats about

2    Venezuela, and you're talking about former Republican

3    congressman that Senator Menendez is now complaining about.

4    There's an element of politics in this letter, not an admission

5    by senator as to a recognition of what he can or cannot do as a

6    senator, and therefore, I don't think it's probative of

7    anything.

8            The next two exhibits are just press releases about

9    these letters.  I think the letters should come out and I think

10   the press releases should as well.  They have their stipulation

11   on FARA.  They have the instruction from your Honor on FARA.

12   They have the manual on FARA.  We've never said one word to

13   this jury about whether the senator knows what FARA is or

14   doesn't know what FARA is, and we don't intend to argue that if

15   he violated FARA it's because he didn't know what it was.

16   We're not arguing footfall.  We're arguing he did not violate

17   FARA, period.

18           THE COURT:  I thought you don't need to argue that.

19   It's a 219.

20           MR. WEITZMAN:  Yes.  219 statute, correct.

21           THE COURT:  But you see, the fact that you merged 219

22   and FARA -- I know you didn't mean to do it, but that may be

23   all the more reason to give it to the jury.

24           MR. WEITZMAN:  Your Honor.  The reason I merged the

25   two is because 219 does reference FARA.

O6rWmen7

1          THE COURT:  Yes.

2          MR. WEITZMAN:  It says that Menendez, as an agent of a

3     foreign principal required to register under FARA, it's that

4     the Egyptian officials -- well, I'm sorry.  Menendez acts as an

5     agent of a foreign principal requires.

6          THE COURT:  Can you interpret 219 without interpreting

7     FARA?  No, but your argument is I'm going to tell them about

8     FARA.  Isn't that what your argument is?

9          MR. WEITZMAN:  Yes, your Honor.  Yes, your Honor.

10     Exactly.  You will give them the instruction, and whether the

11     senator or not accused someone else of needing to register

12     under FARA, which is not what 219 requires him to do, he cannot

13     register under FARA.

14          THE COURT:  Yes.  He's a public official.

15          MR. WEITZMAN:  Correct.  And so whether he's accusing

16     a former official -- again, ignore that the person's a

17     congressman, because it's not relevant to the accusation --

18     whether he's accusing a private person of violating FARA

19     doesn't make it more likely or not that he himself is aware or

20     willfully violated FARA.

21          THE COURT:  OK.  Let me hear from the government.  I

22     think everything goes together, I think.

23          MR. WEITZMAN:  Right.

24          THE COURT:  I don't know about 10C-2, but 10D-1

25     through 4 are the two letters and the two press releases, is

O6rWmen7

1         that right?

2                 MR. MONTELEONI:  We think that they raise similar

3         issues, your Honor, and it makes sense to consider them

4         similarly.  But the first thing we would say is if there's

5         something particular about the factual context in which this

6         arises, the fact of this lawsuit or anything like that, that

7         the defense thinks is prejudicial, we have no problem redacting

8         that.  That's not the point.

9                 The point is his statement of his awareness of the law

10        is absolutely relevant, and the idea that it invades the

11        province of the judge to instruct on the law is very creative.

12        That's like saying that someone charged with insider trading

13        who emails people at his firm, hey, important not to trade on

14        any inside information because that's against the law, the idea

15        that we would say oh, no, no, no, you can't get that into

16        evidence because the judge is going to instruct the jury is

17        incredibly novel.

18                THE COURT:  Wait.  I'm sorry.  I was distracted by the

19        text here.

20                (Continued on next page)

21

22

23

24

25

O6R5men8

```
1              THE COURT:  Go ahead, sir.
2              MR. MONTELEONI:  So, when someone, like Menendez,
3    whose state of mind with respect to the legality of their
4    conduct is at issue -- and here it is definitely at issue --
5    they have not stipulated to Menendez' knowledge, they have
6    disputed his awareness of evidence that we offered of Menendez'
7    knowledge of precisely these requirements, the Senate Ethics
8    manual, when someone like that makes a statement about their
9    belief of what the law is, we don't exclude that as invading
10   the province of the jury, we admit that as highly probative
11   evidence of exactly what the jury has to consider, which is
12   what they believed were the rules governing their conduct.  And
13   here, because Section 219 expressly references, incorporates,
14   who is a foreign agent required to register under FARA, that is
15   what he is prohibited from doing, is being that person.  Right?
16   Because of that, his statements and his awareness of what makes
17   someone such a person is incredibly relevant.  So his
18   statement, his awareness that FARA requires the registration of
19   agents of foreign principals like that is exactly like the
20   analogy I suggested of someone at a trading firm who e-mails to
21   a fellow trader something that shows that they're aware of the
22   insider trading laws.
23             THE COURT:  I understand.
24             Mr. Weitzman?
25             MR. WEITZMAN:  Your Honor, so the fact is Mr. Rivera,
```

O6R5men8

```
 1    in part as a result presumably of these letters, was charged by
 2    the Department of Justice with being an agent of a foreign
 3    principal.  I think we are injecting an issue here that is
 4    going to cause jurors to do research and we don't know how --
 5              THE COURT:  No, they've been instructed not to do
 6    research.
 7              MR. WEITZMAN:  I know, your Honor.
 8              THE COURT:  This would be too boring for them to
 9    research.
10              MR. WEITZMAN:  But the fact of the matter is that
11    whether the senator, based on allegations, that there was a
12    contract between -- natural written contract between Mr. Rivera
13    and a foreign entity, foreign government, essentially,
14    therefore it knows that he is also acting as an agent of a
15    foreign principal taking direction because he is ghost writing
16    a letter or doing anything of the sort as the government has
17    alleged, are apples and oranges, they're not the same thing.
18    And the fact that one can read the FARA statute, with all of
19    its exemptions and everything else, doesn't mean that there is
20    a recognition or an understanding on the senator's part as to
21    whether his actions --
22              THE COURT:  No, but the fact that he is saying here
23    FARA requires registration of agents of foreign principals
24    engaged in political activities and so forth, does indicate his
25    knowledge of FARA.  And Mr. Monteleoni's point is it is not
```

O6R5men8

 1    Menendez telling the jury what the requirements of FARA are, it

 2    is he is setting forth his understanding of FARA.

 3             MR. WEITZMAN:  Yes, but he is not setting forth the

 4    understanding of FARA that is relevant to this case which is in

 5    the next -- in that sentence he is talking about acting as a

 6    public relations counsel, publicity agent, information service

 7    employee or political consultant.  Those are not the things

 8    that Senator Menendez is accused of doing.  He could not

 9    register as a foreign agent.

10             THE COURT:  We have established that, right?

11             MR. WEITZMAN:  So the fact that he knows that others

12    might be able or maybe should register as a foreign agent

13    doesn't indicate whether he knows his prohibition and that he

14    is acting against it or lawfully.

15             MR. MONTELEONI:  Your Honor, one factual point and

16    then a legal point.

17             The factual point is that he absolutely is charged

18    with violating Section 219 --

19             THE COURT:  Yes, 219.

20             MR. MONTELEONI:  -- because, while being a public

21    official, he acted as a political consultant for or in the

22    interests of the foreign principal of Egypt because that is

23    defined as someone who informs the foreign principal of policy

24    matters, such as the piece of information he provided about the

25    U.S. embassy, about arms sales, about the human rights

1    concerns.  These are actions that fall within the political

2    consultant language, which language is incorporated to him by

3    Section 219.  And, he also describes in this letter political

4    activities more broadly.  That covers additional conduct that

5    is beyond the political consultant language so this is very

6    squarely -- this is a statement that is very squarely on point

7    to what he did.  But, the broader legal point is that it

8    doesn't have to be.  You don't usually get a defendant who

9    actually says that he is aware of the precise subsection that

10   he is then later alleged to have violated.  These things are

11   evidence not for the weight of the admissibility.  Mr. Weitzman

12   gave what sounds like a summation.  These are things he can

13   argue, counsel can argue in summation.  That doesn't mean that

14   it should come in.

15         And in paragraph 112 of the indictment, the to wit

16   clause absolutely charges him with political activities and

17   acting as a political consultant.  The fact that he says it

18   here is really on the nose but it is much more on the nose than

19   it even needs to be.

20         MR. WEITZMAN:  Your Honor?

21         THE COURT:  Last word.

22         MR. WEITZMAN:  I apologies.

23         THE COURT:  Last word I said.

24         MR. WEITZMAN:  I think, at a minimum, I think this is

25   a 403 problem.  I think they have lots in the record that they

O6R5men8

1    can use to argue the senator's knowledge.

2              THE COURT:  I really don't see there is a 403 problem

3    but you are about to, perhaps, suggest some limited redactions

4    that will make it clear.  I don't see it as 403, I do see it as

5    relevant to an argument that can be made that he understands

6    what FARA requires and it is not me instructing them.  But, go

7    ahead maybe we can redact some things.

8              MR. WEITZMAN:  I think the instructions on the law.

9    So, for example, in 10D-1, FARA was enacted to ensure that

10   American citizens have the necessary information, on page 2, to

11   make judgments about political activities of foreign

12   governments and so on.  I just think that that is, to the

13   extent it is appropriate for the jury to even hear -- and I'm

14   not sure it is -- it should be from your Honor, not from the

15   senator.  And I think same is probably true of the paragraph

16   above that, although I understand your Honor's point about the

17   definition of FARA.  I just think that the instructions and the

18   law should come in the jury instructions, not in the letter

19   from the senator.  They get everything they want just by

20   getting the referral under FARA.

21             THE COURT:  Let me hear from the government.

22             Do you see what is highlighted on the screen.

23             MR. MONTELEONI:  Your Honor, that is his

24   understanding.  His awareness and belief --

25             THE COURT:  I think that's right.  I'm going to allow

O6R5men8

1    them in.

2              What else do we have?

3              MR. RICHENTHAL:  One thing for the record, and Live

4    Note, I know is not --

5              THE COURT:  I don't think it is a 403 issue, or rather

6    under 403 I'm finding that the probative value is not

7    substantially outweighed by the dangers set forth here.

8              Go ahead.

9              MR. RICHENTHAL:  I know Live Note is not always

10   perfect.  I believe Mr. Monteleoni referred to paragraph 112 of

11   the indictment, I notice on Live Note it said 212.

12             THE COURT:  Live Note is always cleaned up by the

13   reporters, that's all right.  It concerns me sometimes when I

14   see it.

15             What is the next issue, evidentiary issue?

16             MR. MARK:  I'm not sure --

17             THE COURT:  Any issue?  It is open house time.

18             MR. MARK:  I'm not sure this is open house, given the

19   Court's prior comment, but obviously we have the letter that

20   was initially filed at docket 486 that was taken down and we

21   submitted to chambers on the first two witnesses of Menendez'

22   case.

23             THE COURT:  Yes.  Well, I have been on trial with you

24   guys, I haven't looked at it.  Yes?  Go ahead.

25             MR. MARK:  I am just noting that that will probably

O6R5men8

1     arise tomorrow when the defense case begins.  We can obviously

2     address that before court tomorrow.

3                THE COURT:  The issue raised there?  Or whether it

4     should be taken down or not?

5                MR. MARK:  No.

6                THE COURT:  The issue that is raised there, whatever

7     that may be, needs to be addressed by me before the defense

8     case?

9                MR. MARK:  Yes.

10               THE COURT:  OK.

11               MR. MARK:  The substance goes to the testimony of the

12    first two witnesses, as well as the few exhibits that we

13    understand that one of those witnesses will offer.

14               So, in particular, I think the exhibits focus on the

15    last issue in the letter that deal with Nadine Menendez and her

16    relationship with her ex-boyfriend.

17               THE COURT:  What is the relevance of Nadine Menendez'

18    relationship with her ex-boyfriend?  I know the name has come

19    up, that is Anton, and he is following her, he is not, but what

20    is the relevance here?

21               MR. MARK:  I think that's exactly our concern, that

22    there is minimal relevance, if at all.  And that what they

23    intend to offer here and intend to elicit through this witness

24    is highly inflammatory allegations relating to their

25    relationship, relating to details about their relationship

1    including potential alleged abuse, physical and mental,

2    stalking issues and the like will definitely inflame the jury

3    here, and also the particular evidence they're trying to elicit

4    is inadmissible hearsay.  These are the statements of Nadine

5    Menendez to another person for their truth, either oral

6    statements or in text messages.  So, even apart from the

7    significant 403 issues, there are real 802 issues here.

8         MR. FEE:  Your Honor, those are not offered for the

9    truth but let me explain to you the super duper relevance of

10   the ex-boyfriend's abuse of Nadine, and it is all necessary due

11   to the government's proof and it goes to the heart of the

12   inferences they're asking the jury to draw.

13        First --

14        THE COURT:  Well, I must say that is news to me,

15   because each time the abuse came in I was wondering, why in the

16   world is this -- or it was raised and nobody ever got into it

17   to any depth.  I couldn't figure out why there were references

18   to it.

19        MR. FEE:  I am glad we are having this discussion

20   before the defense case begins because it is important,

21   genuinely.

22        The government is alleging a conspiracy involving

23   Senator Menendez, Nadine, José Uribe, and the other defendants

24   here.  In the heart of that conspiracy, Nadine Menendez, then

25   Nadine Arslanian, is still involved with her ex-boyfriend and

O6R5men8

1    he is abusing her.  This is in the fall of 2018.  What happens,

2    because she is still involved in that very horrible

3    relationship, is the senator sends a series of messages to her

4    saying we are breaking up.  I want my stuff back.

5              THE COURT:  "We" meaning the senator and Nadine?

6              MR. FEE:  The senator and Nadine, in the heart of the

7    conspiracy alleged.

8              THE COURT:  I don't think I have seen that.  Have I

9    seen that?

10              MR. FEE:  We have attempted to put it in.  We will

11    have it in the defense case which is, again, why this is

12    important.  It is in the heart of the conspiracy.  It's within

13    the first --

14              THE COURT:  Well, not so far, but let me hear you.  Go

15    ahead.

16              MR. FEE:  It is in the heart of the alleged conspiracy

17    that Senator Menendez --

18              THE COURT:  You mean temporally.

19              MR. FEE:  Temporally.  Sorry, sorry.

20              THE COURT:  OK.

21              MR. FEE:  At the time they are supposed to be acting

22    together to get the senator to betray his country, he is

23    breaking up with her.  One-on-one texts, not for show, not for

24    a cover story, he is telling Nadine I'm going to cancel the

25    trip we had planned, I want the jewelry I gave you back, it is

O6R5men8

over until you can divorce yourself -- not divorce -- but
remove yourself from the relationship with that ex-boyfriend he
referenced by name.  We are done.  That happens in the fall of
2018, again in the heart, temporally -- thank you, your
Honor -- of the conspiracy.

          The next thing that happens is that Nadine reaches out
to one of our first two witnesses and says, witness, I need you
to reach out to the senator to get him back.  This witness had
never met the senator, had never communicated with him, but
sends a message to the senator explaining this saying she's
leaving that guy, she really wants you back, please take her
back.  Again, this is exactly when all -- these two people and
others, meaning Senator Menendez and Nadine, are supposed to be
working together in all of the schemes alleged.  They're
shaking their heads at the front table but it is true.  These
are when all of these communications happen.  The next thing
that happens is they get back together in January 2019 and
that's when the relationship picks up, and then going forward
from there you have heard it, your Honor.

          So that's point one, point two -- I'm not done -- your
Honor has heard at great length in the summary charts presented
by the government, if you recall, evidence about the Find My
iPhone feature going back and forth between senator and Nadine.
You have also heard at great length in those charts the
government's focusing on messages where Nadine is telling the

O6R5men8

senator, *Here is where I am going, Here is where I am, Don't worry.* And the purpose they want to offer is that, of course, Senator Menendez knew about the things Nadine was doing, knew about the money or the gold or whatever she was doing because look how closely he watches her. The reason -- and we have proof that we will offer -- is he was watching her and tracking her is because of this abusive relationship.

She is talking about, there is about a five-month period where you see these texts between them about Find My iPhone and all of that. The reason that she starts to do that is because after she leaves the ex-boyfriend and starts dating the senator, or tells the ex-boyfriend she is dating the senator, the ex-boyfriend gets worse. He follows her -- this is Nadine reporting it to our first witness and others -- he is hanging outside my house, he got into my Apple iPhone -- I'm going to talk about that as my third and final point -- she thought he cut the internet to her house and there is a series of messages about that. We are not saying any of this is true, we are saying this explains the conduct of the two people. He was desperately worried. And if you recall, your Honor, the last point on this --

THE COURT: Wait. Explains the conduct as to why the senator was tracking her?

MR. FEE: I wouldn't say he was tracking her, why they often -- I actually don't think it was all that often, the

O6R5men8

government has made it seem often, why they are often saying,
*Here is where I am, here is my Find My iPhone feature, Nadine.*
*It is not working, how does it work.*  This is exactly the
period where she has finally extricated herself from that
former boyfriend who, by the way --

THE COURT:  I will hear the rest of what you want to
say to me but let me ask the government, what use are you -- I
do remember the Find My iPhone feature.  It seems to me if you
are going to argue that the Find My iPhone and where are you,
and so forth, is proof that they were closely together, it
seems to me it is appropriate for me to let the jury hear that
that really wasn't the reason, the reason was she was under
some physical threat.  By the same token, introducing the
abusive ex-boyfriend here is highly prejudicial, it seems to
me.

So, what use are you going to make of the texts back
and forth about Find My iPhone?

MR. MARK:  I think, your Honor, I think we will make
some use of it but minimal use of it.

THE COURT:  Go ahead.  What is the use you are going
to make of it?  You can talk to each other.

MR. MARK:  Let me let, since Mr. Monteleoni is going
to be most particularly discussing the use that we are going to
use it, I will let him respond to that and then I will respond
further to your Honor's point.

O6R5men8

1          THE COURT:  I really don't like being two-teamed.  Do

2   Go ahead Mr. Monteleoni.

3          MR. MONTELEONI:  I apologize, your Honor.  This is

4   very closely tied to the charts that are, as you know, very

5   near and dear to my heart.

6          The point is not to say that because he was closely

7   supervising her that has something to do with his motivations

8   as to why, that he was close with her, that he was not close

9   with her, whether he had a good reason for watching her closely

10  and it was closely, or whether he had a bad reason for watching

11  her closely.  He still was watching her so closely that she

12  didn't have the opportunity to deceive him in the way the

13  defense is attempting to indicate.  She didn't have the

14  opportunity to live the type of separate life that defense

15  counsel has opened on.

16         THE COURT:  I know they opened on it but you have got

17  so much there.  You know, *mon amour de la vie*.  They're talking

18  to each other about nail salons and toe salons.  They're as

19  close as can be, it seems to me or at least the argument can be

20  made so I don't think you have to worry too much about the

21  separate lives.  Yes, they had separate cellphones.  Yes, he

22  was in Washington, she was in New Jersey.  That's -- you have

23  to deal with that but you have so much about this back and

24  forth.

25         MR. MONTELEONI:  But they are saying that he was not

1 aware of her actions.  And the type of monitoring that he was

2 doing, even if it was for the best reasons in the world or for

3 bad reasons, it does not matter.  She didn't have the

4 opportunity to deceive him in the ways that they are claiming

5 that she did.  He was aware of, whether for good reasons or bad

6 reasons, her movements.  He was aware of, whether for good

7 reasons or bad reasons, her activities.  This is a crucial part

8 about it.  We are not going to be arguing anything about the

9 motivation for it.  I think that we are liking to be saying to

10 the jury if he had a good reason or bad reason for monitoring

11 her, that doesn't matter, he was still monitoring her.  She

12 didn't have the opportunity to deceive him.  That's one thing.

13    Another thing is this part of the scheme --

14    THE COURT:  Shouldn't the jury know if you are

15 agreeing he is in fact monitoring her, shouldn't the jury know

16 why he is monitoring her?

17    MR. MONTELEONI:  I think that we have discussed the

18 possibility and I think that our letter suggests that the idea

19 that there is some level of fearfulness of an ex-boyfriend in

20 an abstract form that doesn't have a lot of these graphical

21 details, we are OK with.  I think that that is really -- we are

22 not sure that we would need to but we are willing to do that

23 but that is more than enough for them to make whatever

24 contextual arguments but we are not going to be saying that

25 anything about this, whether you call it monitoring, whether

O6R5men8

you call it checking in on, whether you call it letting her

know when the location monitoring doesn't alert to her changes

in location -- whatever you call it -- the fact that that was

in place during the time period when they have to be claiming,

when they are claiming that she was deceiving him, is highly

important and highly probative.  And going beyond just the fact

that there is an ex-boyfriend, she was fearful to a degree but

not going into all of these details, the rest of it isn't

necessary, especially because -- this is critical -- during the

time period when they were breaking up from late October of

2018 to late December of 2018, where a fuller record of

messages that we don't think that the jury needs to see, makes

it very clear that that is when the breakup happens and that is

when the reconciliation happens, we are not alleging any acts

by Menendez in furtherance of the scheme.  He was aware of the

car crash during that time period and I think that his

understandable, sympathetic reaction to her car crash, you

know, happened during the time period when they were

reconciling but all of the time that we are alleging that he

engaged in communications about this, that he engaged in

meetings about this or that he reached out to the attorney

general about this or that he did anything that suggests his

participation in this happened either before or after this

breakup period.  So, it does happen between some things but it

doesn't, in any way, conflict with anything that we have put in

O6R5men8

1    our chart.

2          So ultimately, we think that what we are proposing in

3    the letter gives them what they need but keeps out this, as

4    your Honor understands, a really highly prejudicial classic 403

5    side show.

6          THE COURT:  Let me read the letter that was filed

7    during the course of the trial today.  I have been with you

8    fine ladies and gentlemen and since then.  Let me read it.

9          Mr. Fee, you can have a seat.  I am going to read the

10    letter.

11          MR. FEE:  Can I do the third issue before you read,

12    your Honor?

13          THE COURT:  Of course.

14          MR. FEE:  The other way they have opened the door and

15    walked all the way into this is you have heard testimony --

16          THE COURT:  Wait.  The second issue was the Find My

17    iPhone.  What was the first issue?

18          MR. FEE:  The first issue was just the fact that

19    they're alleging the conspiracy amongst two people who stopped

20    talking to each other for months.  If they want to stipulate

21    that there was no conspiracy during that period, OK.

22          THE COURT:  No, Mr. Fee, let's deal with --

23          MR. FEE:  I'm serious, your Honor.

24          They're suggesting a continuing and ongoing

25    conspiracy.  We are obliged to meet that theory with evidence

O6R5men8

1    that these people wanted nothing to do with each other for a

2    significant portion of the beginning of that time frame.  These

3    are the facts that we are obliged to bring out and they're

4    supported by evidence.

5           The second issue is the Find My iPhone, your Honor.  I

6    would note in response to Mr. Monteleoni, the argument that she

7    was not able to have conversations outside the purview of

8    Senator Menendez because he had the Find My iPhone feature on,

9    number one, is highly prejudicial on its own to anyone on that

10   jury especially, I would imagine, a woman; two, it doesn't make

11   sense.  Just because you have Find My iPhone on doesn't mean

12   you are monitoring --

13          THE COURT:  Wait just a moment.

14          Is the government going to argue she wasn't able to

15   have conversations without his knowing about it?

16          MR. MONTELEONI:  Not conversations but meetings.  He

17   was very aware of her movements and he was aware of some of the

18   meetings with José Uribe and others that are relevant to the

19   scheme.

20          THE COURT:  Well, he is aware simply because you think

21   the Find My iPhone was on?

22          MR. MONTELEONI:  There is several different ways of

23   proving husband awareness, some of those involve more direct

24   messages specifically about that but --

25          THE COURT:  Well, the direct messages are fine.  I

O6R5men8

1    have no problem with those.

2              MR. MONTELEONI:  But if you look at the way that the

3    Find My iPhone correspondence works, it is whenever he loses

4    the ability to see her location in real-time he lets her know.

5    He reaches out to say, *This has stopped working.*  Right?  That

6    indicates continuous awareness of her physical location.  Now,

7    obviously can someone have a phone call without you knowing

8    what is going on and Find My iPhone?  Yes.

9              THE COURT:  If you are going to make that argument

10   they're entitled to say why he is looking at her so closely,

11   that it is to protect her.

12             MR. MONTELEONI:  And I think that what we put in our

13   letter allows them to do that but there is a tremendous amount

14   of detail that I think you can perhaps imagine that is

15   incredibly prejudicial, graphic, really charged --

16             THE COURT:  I understand that.  I have some sense of

17   it from reading the material.  I think there was physical

18   activity between the two of them, he was beating her up perhaps

19   or something.

20             MR. FEE:  He put her in the hospital, your Honor.  We

21   are not putting in any of that.  We actually have limited

22   ourselves.  We are not seeking to put in hospital records --

23             THE COURT:  I'm going to read the letter.

24             MR. FEE:  Your Honor, the third point just to get it

25   out, they put in evidence of this 007 phone.  They brought it

O6R5men8

1        out I think through Agent Graves.

2                THE COURT:  Yes, they did.

3                MR. FEE:  They even put out the person who registered

4        that phone had a last name, which I won't repeat here, but it

5        is in the record.  That person is an 80ish-year-old woman who

6        is a family friend of Nadine and it's right around the time

7        that Nadine is assaulted and extricates herself from this

8        ex-boyfriend.  They give her that phone and this --

9                THE COURT:  They give who the phone?

10               MR. FEE:  They give Nadine this phone that the

11       government is referring to as a 007 phone, and this elderly

12       couple calls it the 007 phone says, Nadine, you are worried

13       about -- this is in text message -- you are worried that your

14       abusive ex-boyfriend is hacking into your phone -- she calls it

15       spoofing.  What she means is he has her Apple ID and this

16       ex-boyfriend is logging into her iPhone, so they gave her a

17       flip phone and this elderly couple calls it a 007 phone.

18       Obviously the government has put it in to suggest there is

19       something secret or covert or if 007 is a spy, she is an

20       Egyptian spy.  Whatever the inference is.

21               Again, we want to meet them with the truth which is

22       that it is a direct result of this very problematic

23       relationship that she was extricating herself from during this

24       time period.

25               MR. MONTELEONI:  I put on Rachel Graves' testimony

O6R5men8

1   about this and we took pains to actually have pulled, a few

2   days testimony, something that didn't make it into the chart

3   but I made sure to bring it in on direct a message on direct

4   where she says, right before getting the phone, I need to get a

5   new phones because I am getting all of these fake texts from

6   spoofing.

7           THE COURT:  I thought that is in.

8           MR. MONTELEONI:  Exactly.  That is in.  We brought it

9   out.  They then referred to it in cross as if we hadn't brought

10  it out.  But, the jury knows about it.  And adding in the

11  additional evidence that there was some ex-boyfriend, there was

12  some fear from that that we are OK with, that's all that they

13  need.  We did not -- the fact that the call went to this

14  special sort of special flip phone, the call that set up the

15  attorney general call, is relevant to Menendez' state of mind

16  because he doesn't usually talk to her on it because the phone

17  is sort of a relic of a bygone age in terms of technology.

18  That is relevant.  The fact that it was gotten because of a

19  fear of spoofing, that's in.

20          THE COURT:  Yes, but Mr. Fee is right.  The suggestion

21  in the jury's mind, the inference is it is like a James Bond

22  phone, not meaning high-tech or Agent K or Agent X or whoever

23  that guy is, but the technical man.

24          MR. MONTELEONI:  Q, your Honor.

25          MR. RICHENTHAL:  Q, your Honor.

O6R5men8

1          THE COURT:  Q.  Thank you.  But, rather, Egyptian

2     spies, that kind of thing.

3          MR. MONTELEONI:  I don't think that that is what we

4     attempted to adduce.  We are certainly not going to argue it.

5     We are going to argue it was a phone for secrecy -- secrecy

6     from Doug Anton -- and the fact that that is the phone that he

7     directed his call to when he decided to reach out and call the

8     attorney general says a lot about his state of mind when he was

9     setting up the call with the attorney general.  But why they

10     got the phone we have put in evidence affirmatively that, and

11     we are not going to argue anything contrary to, the idea that

12     she had a totally legitimate reason for getting the phone.  It

13     is OK, it is legal for people to get a secrecy phone, but the

14     fact that the call went to --

15          THE COURT:  It is not a secrecy phone, it is a phone

16     that they used sparingly.

17          MR. MONTELEONI:  Yes, but I think that -- I don't

18     think anyone disputes that the intent was to use it to be

19     secret from the ex-boyfriend, certainly, but then they also,

20     yes, they use it sparingly, and the fact that the call goes to

21     the non-normal phone, it is not registered in her name, that it

22     is to be used sparingly that was originally gotten for the

23     totally good reason of protecting her from a sort of figure

24     from her past is -- that's neither here nor there.  But we

25     think that bringing it out to the extent we indicated in the

O6R5men8

1  letter is all that they need to make those arguments but there

2  is a sort of a closet of horrors that this would open up.

3       THE COURT:  Let me read this letter.

4       MR. FEE:  Your Honor, I think he just conceded that

5  Doug Anton is relevant to the facts of this case.

6       THE COURT:  Well, I think the concession is there can

7  be a reference to an ex-boyfriend and the need to extricate

8  herself from the ex-boyfriend without testimony about being put

9  in the hospital and things of that nature.

10       Let me read the letter.

11       MR. FEE:  Yes, your Honor.

12       MR. MARK:  And, your Honor --

13       THE COURT:  And that seems to me correct, but I still

14  want to read the letter.

15       MR. MARK:  And your Honor --

16       THE COURT:  No.  Wait.

17       It seems to me what we can do is lay a foundation

18  where there was an ex-boyfriend, she was concerned about the

19  ex-boyfriend, that was the reason they got this phone.  If they

20  have in that it wasn't registered in her name they have it.

21  But I don't want graphic details about assaults and so forth.

22       I'm going read the letter now.  Both of you sit down.

23       MR. MARK:  Your Honor, I just wanted to try to moot an

24  issue, this is the one coming up.  The position you said I

25  think was what we tried to do in our letter, which is trying to

O6R5men8

1    thread that needle, but the summary charts are the next sort of

2    evidentiary issue that is on tap that we are going to meet with

3    defense counsel later on.   Why I am noting that is there is

4    significant text messages and communications about the

5    ex-boyfriend in the summary charts about hospitalizations --

6               THE COURT:   No, no.

7               MR. MARK:   -- and all of the like that go back to

8    2017, even.   And part of the reason that we raised this is

9    because it is such a large issue.   Obviously we hope, given

10   what defense counsel said here, is that while these were in the

11   summary charts these are sort of off the table now but I think

12   it would be helpful to narrow the issues right now.

13              THE COURT:   I'm going to read the letter, 486.

14              MR. RICHENTHAL:   Would your Honor like to hear on

15   other issues?

16              THE COURT:   No.

17              MR. RICHENTHAL:   I mean unrelated to this.

18              (Pause).

19              THE COURT:   I have read the rest of the letter.

20              There are references here the government is going to

21   supplement this letter with issues about the summary charts.

22   What is happening tomorrow?   We have another government

23   witness; correct?

24              MR. MARK:   There is one more government witness.

25              THE COURT:   How long is that on direct?

O6R5men8

1          MR. MARK:  Approximately and hour and a half.

2          THE COURT:  Yes, that is what you said earlier.

3          Do we know how long the cross is going to be?

4          MR. FEE:  It is a long summary witness so I would say

5     the equivalent, 90 minutes.

6          THE COURT:  So we are talking 9:30, 10:30, 11:30,

7     12:30 -- we are probably talking the morning.

8          MR. FEE:  Yes, your Honor.

9          THE COURT:  The point here in the two footnotes, or at

10    least twice about the government going to put in a supplement,

11    is that a written supplement or you just want to argue?

12         MR. MARK:  No, I think we are going to try to put in a

13    written supplement.  Give the number of exhibits in the summary

14    chart we think that it would be helpful for the Court to do

15    that.

16         THE COURT:  So we are not going to go to the summary

17    chart tomorrow then.

18         MR. FEE:  I understand from defense counsel they don't

19    intend to call the summary chart witness until approximately

20    Monday.

21         THE COURT:  It sounds like -- tomorrow is Friday.  We

22    are probably not going to.  At best, it sounds like the

23    government will rest.

24         MR. MARK:  I think we will rest, and that is why we

25    focused on the first two witnesses, because those were the ones

O6R5men8

1    we thought might arise this week.

2              THE COURT:  Who are going to witnesses for Senator

3    Menendez?

4              MR. FEE:  Your Honor, you mean tomorrow?

5              THE COURT:  No.  Period.

6              MR. FEE:  Period.  I think our definite category it is

7    the two people referenced in that letter.

8              THE COURT:  Wait.  The two people referenced in this

9    letter.

10             MR. FEE:  Yes; in the government's letter that you

11   just reviewed.

12             THE COURT:  They're not specific but I understand.

13   The family members.

14             MR. FEE:  Correct, your Honor.

15             THE COURT:  OK.  Go ahead.

16             MR. FEE:  We intend to put on the expert we had

17   noticed.

18             THE COURT:  Is that the Egyptian expert, the

19   historical expert.

20             MR. FEE:  That's not ours.  We have the forensic

21   accountant who has reviewed financial records relating to

22   Senator Menendez.

23             THE COURT:  OK.  And there is no dispute about that;

24   is that right?

25             MR. RICHENTHAL:  There are two issues about that,

1   unfortunately.

2          THE COURT:  How are those going to be teed up?

3          MR. RICHENTHAL:  We can talk about them orally.  I

4   don't know that it requires a letter.

5          THE COURT:  All right.

6          MR. RICHENTHAL:  Although they are partially or

7   entirely really a question of notice and timing, not a question

8   of substance.

9          THE COURT:  Let's deal with it tomorrow after the

10  trial day.

11         MR. RICHENTHAL:  That's fine.

12         THE COURT:  What else do we have?

13         MR. FEE:  We have the designations of Michael

14  Critchley's deposition.

15         THE COURT:  Hold on.  Are those all agreed to?

16         MR. FEE:  No.  We have provided yesterday our

17  designations to the government and so that's where it stands

18  right now.

19         THE COURT:  When is the government going to give back

20  the counter-designations or the objections to the designations?

21         MR. RICHENTHAL:  We got them last night.  We were in

22  court all day today.  We are not sleeping.  We are doing the

23  best we can.  We are moving as quickly as we can.  I don't know

24  we are even in a position to answer the question as to how long

25  it will take to review the defense designations.  I can tell

O6R5men8

1    you on quick review there were dozens of objections -- that is

2    not an exaggeration -- dozen of objections, on the record, to

3    the portions they want to put in.

4              THE COURT:   We have Critchley's deposition.   What else

5    do we have?

6              MR. FEE:   Then I think the last definite witness, your

7    Honor, is a summary witness who would put on these charts, and

8    this is a witness that is sort of a collective defense witness

9    in that the charts will be the charts coming from any of the

10    defendants.

11              THE COURT:   Is this the same thousand-line chart we

12    have heard about?

13              MR. FEE:   That's correct.

14              THE COURT:   When I am I going to have those teed up?

15    Or maybe we have decided that?   When is the government going to

16    put its submission in?   Have you told me that?

17              MR. MARK:   We haven't because we obviously want to

18    confer with defense counsel later this evening so we will do

19    that as soon as we can.

20              THE COURT:   I hate to do this but I think we will

21    decide, I will decide, with the parties, by 1:30 tomorrow, but

22    I think what we are looking at, gentlemen -- because this is no

23    way to run a railroad -- telling the jury not to come in on

24    Monday and using the weekend and Monday to try to iron these

25    things out.

1          Now that's not what anybody wants but this is a crazy

2     town here with all of these issues up in the air.

3          (Counsel conferring)

4          THE COURT:  Now if that is the only witnesses that we

5     are talking about for Senator Menendez, those can be handled --

6     I don't know about the summary chart witness but how long can

7     those be handled with an equal amount of cross?

8          MR. FEE:  So, your Honor, there may be one or two more

9     witnesses.  We were waiting for the government to rest because

10    they weren't yet confirmed but they would be very short, the

11    shortest.  So I would think our witnesses, putting aside the

12    summary chart.

13         THE COURT:  Apart from that, Mrs. Lincoln.

14         MR. FEE:  I got it.  I would say two days, probably

15    with the summary chart three days.

16         A day for the summary chart guy?

17         MR. LUSTBERG:  Your Honor, just to help the court out

18    a little bit on understanding the summary charts, and we have

19    been attempting to consult in particular with Ms. Clark, but

20    with the whole government team with regard to that, there are

21    four summary charts.  One of them is solely ours.  One of them

22    is not at all ours.  So I think it is basically solely Senator

23    Menendez', and two of them, which are Government's

24    Exhibits 1302 and 1303 are our interlineations of those

25    existing charts, I think it is fair to say -- and the

O6R5men8

1    government will correct me if I am wrong -- that we are still

2    talking to them about trying to decide how many of those

3    interlineations are objectionable and how that is all going to

4    work out.  My thought on the summary chart, when we have a

5    summary chart witness, I believe that that summary chart

6    witness can be short.  At least for me, and I can't speak for

7    Mr. Fee, but we were not intending to go into sort of do the

8    kind of examination that we saw during the government's case of

9    going through the whole chart.  We were just going to have the

10    witness testify as to how the chart was put together --

11        THE COURT:  No, but the government, I think what the

12    government is telling me is that they want to talk with you

13    about it but as of now they've got scores of objections.

14        MR. LUSTBERG:  I believe we have made progress already

15    in terms of those objections and I suspect we will be able to

16    make more.  I can't comment on whether we will need Monday or

17    not to finish ironing that out.

18        THE COURT:  That is what we are going to do.  We are

19    going to end about now.  Get whatever sleep you can.  The Hana

20    response to 485 is going to come in tomorrow.  The government's

21    response to 486 is going to come in tomorrow so you have got

22    plenty to do.  You are going to talk to each other to try to

23    narrow down summary chart objections.  It sounds like we will

24    get the government to rest tomorrow.  It sounds like we are not

25    going to have any time beyond that but who would be the first

O6R5men8

 1    witness be for the defense?

 2                MR. FEE:  It would be one of the family members, your

 3    Honor, likely Nadine's family member, but given how short they

 4    are, your Honor, and given the pending application, and given

 5    that we have to schedule a human being, could we just decide

 6    now to put those witnesses on next week?

 7                THE COURT:  Government?  I think realistically -- I

 8    assume there are going to be motions at the end of the

 9    government case?

10                MR. FEE:  That's right, your Honor.

11                THE COURT:  Realistically, we are not going to get

12    through.

13                Go ahead.

14                MR. RICHENTHAL:  If we can't get there, we can't get

15    there.  We would like to keep as much of the trial day as we

16    can tomorrow and as much of the trial day on Monday as we can.

17    That's why we are working so hard.  The parties are still

18    talking.  We are going to propose to talk more.  It may well be

19    because of Rule 29 motions we can't do it tomorrow.  We accept

20    that, we know you who the system works, but we ask the Court

21    not to give up Monday just yet.

22                THE COURT:  No, no, no.  I'm not giving up Monday now,

23    I was thinking of looking at it tomorrow.

24                MR. RICHENTHAL:  OK.

25                THE COURT:  And to the extent that the parties again

O6R5men8

1    can work this out, great.  But I'm not going to be pressured

2    into making decisions without due deliberation.  That is just

3    it.

4              MR. RICHENTHAL:  Of course.

5              And we are moving from substance to procedure, I just

6    want to flag two things for the completeness of the

7    conversation.

8              THE COURT:  Go ahead.

9              MR. RICHENTHAL:  So Mr. Fee just represented I think

10   that beyond the witnesses he named or described that there are

11   one or two more.  We would like to know who they are.  We still

12   have a list of somewhere between 15 and 20 Menendez witnesses

13   alone.

14             THE COURT:  OK.  They're going to let you know by

15   tomorrow.  They're going to let you know by tomorrow.

16             MR. RICHENTHAL:  Second, with respect to --

17             THE COURT:  They're going to let the Court know as

18   well.

19             MR. FEE:  Absolutely, your Honor.

20             THE COURT:  But you said that several days ago and I

21   was going to get a letter the proffers and so forth and I never

22   did.

23             MR. FEE:  We sent it to them.  I'm sorry, your Honor.

24             THE COURT:  Tomorrow.  Tomorrow you will let them and

25   me know.

O6R5men8

1              Go ahead.

2              MR. RICHENTHAL:  This is related.

3              With respect to Mr. Richardson, that is Mr. Menendez'

4    financial expert -- I'm not talking substance your Honor, just

5    talking procedure -- we have been asking for literally days for

6    the summary charts they say he is going to use.  We were told

7    two days ago we would get them yesterday.  Didn't come.  We

8    were told yesterday we would get them today.  Didn't come.

9    Tomorrow is Friday, the next business day is Monday.  We have

10   no idea the length of the charts, we don't know the nature of

11   the charts --

12             THE COURT:  Get them to them tomorrow.  What is the

13   problem?

14             MR. FEE:  We will give it tonight, your Honor.

15             THE COURT:  Give it tonight.

16             Now, if the parties want to work this out amongst

17   themselves, they can -- I will hear more argument if you wish

18   about the family members -- but the general guidelines here are

19   I'm not going to let details about being beaten up or anything

20   like that about Anton, this is not going to be Days of Our

21   Lives or some soap opera.  That is really 403, extraneous,

22   prejudicial; hospitalizations, beating up, assaults.  None of

23   that.  There can be some evidence that there was an issue with

24   a boyfriend concerning physical safety which will take care of

25   the Find My iPhone issue.  There can't be hearsay in terms of

O6R5men8

1    the -- I am going back and forth here -- in terms of the family

2    members of, you know, there can be general -- again, what the

3    defense opened on.  They fled Cuba.  He grew up in a tenement.

4    They lost their life savings.  That kind of thing.  I think

5    that also it is appropriate that he was an advocate for Latinos

6    but not to link that to specifics like Suarez or anything of

7    that nature.  There can't be evidence from the sisters about

8    what she heard from her husband -- sorry -- from -- well,

9    hearsay from what she heard from the brother or the

10   brother-in-law.  Those are general guidelines.

11           But, again, this is not going to turn into a soap

12   opera about Doug Anton.  To the extent there is an 007 phone,

13   you can put in the explanation for it.  I think you already

14   have, in terms of spoofing.

15           Those are general guidelines to the extent the parties

16   can put flesh on it tonight so much the better.  I will see

17   everyone at 9:30 tomorrow.

18           I said what I have said throughout this:  Talk to each

19   other.

20               (Adjourned to June 28, 2024, at 9:30 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    SHANNON KOPPLIN

 4   Direct By Mr. Richenthal . . . . . . . . . . 5210.

 5   Cross By Mr. Weitzman  . . . . . . . . . . .5317

 6   Redirect By Mr. Richenthal . . . . . . . . .5382

 7   Recross By Mr. Weitzman  . . . . . . . . . .5390

 8   ELISABETH WHEELER

 9   Direct By Mr. Monteleoni . . . . . . . . . .5391

10   Cross By Mr. Fee . . . . . . . . . . . . . .5448

11   Cross By Ms. Collart . . . . . . . . . . . .5473

12                       GOVERNMENT EXHIBITS

13   Exhibit No.                               Received

14    1448    . . . . . . . . . . . . . . . . .5206

15    A133; A409; A410; A411; C106-1; C107-B, . . .5208

16            not for the truth; C107-BT,

17            not for the truth; C302, not

18            for the truth; C421; C422;

19            C426; B117; 4G-5; 5A-5001A;

20            5V-1; 5V-2; 5G-102-1; 9A-101

21            through 9A-109; 9A-201 through

22            9A-211; 9B-101 through 9B-106;

23            9B-201 through 9B-213; 9B-301

24            through 9B-309; 9D-101 through

25            9D-112 and 9F-101 through
```

```
 1            9F-110

 2    1435, 1427, 1405, 1453 and 1440   . . . . . .5209

 3   s 9G-1 through 9G-12 and1462   . . . . . . . .5209

 4    1465    . . . . . . . . . . . . . . . . . .5209

 5    10I-1A    . . . . . . . . . . . . . . . . .5233

 6    10E-1 through 10E-12 . . . . . . . . . . .5240

 7    8A-1    . . . . . . . . . . . . . . . . . .5282

 8    16C-2   . . . . . . . . . . . . . . . . . .5403

 9                   DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11    1853    . . . . . . . . . . . . . . . . .5349

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```