**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ, *et al.*,

Defendants.

Criminal Action No. 23-490 (SHS)

*Document Electronically Filed*

**DEFENDANT WAEL HANA'S BRIEF ADDRESSED TO EVIDENCE IMPROPERLY PROVIDED TO THE JURY AND IN SUPPORT OF MOTION FOR A NEW TRIAL**

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 3

I.     MR. HANA DID NOT WAIVE HIS CONSTITUTIONAL RIGHT TO
CHALLENGE THE EXTRA-RECORD EVIDENCE ERRONEOUSLY
SUBMITTED BY THE GOVERNMENT TO THE JURY. ............................................. 3

     A.     The Review Process ................................................................ 4

     B.     Mr. Hana Did Not Waive His Objection To The Extra-Record Evidence. ............ 5

II.    THE ERRONEOUSLY SUBMITTED EVIDENCE PREJUDICED MR. HANA
AND DENIED HIM A FAIR TRIAL. ...................................................................... 7

     A.     Legal Standard ....................................................................... 7

     B.     The Erroneously Admitted Evidence Denied Mr. Hana A Fair Trial. .................... 8

CONCLUSION ................................................................................................................ 22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barnett v. United States*,
   870 F. Supp. 1197 (S.D.N.Y. 1994).........................................................................6

*Benjamin v. Fischer*,
   248 F. Supp. 2d 251 (S.D.N.Y. 2002).....................................................................7, 8

*Bibbins v. Dalsheim*,
   21 F.3d 13 (2d Cir. 1994) (per curiam)..................................................................14

*Eslaminia v. White*,
   136 F.3d 1234 (9th Cir. 1998) ...............................................................................7

*Farese v. United States*,
   428 F.2d 178 (5th Cir. 1970) .................................................................................7

*Loliscio v. Goord*,
   263 F.3d 178 (2d Cir. 2001)................................................................................7, 8

*Samia v. United States*,
   599 U.S. 635 (2023)..............................................................................................15

*Sullivan v. Louisiana*,
   508 U.S. 275 (1993)................................................................................................8

*In re Terrorist Bombing of U.S. Embassies in E. Afr.*,
   552 F.3d 93 (2d Cir. 2008)....................................................................................17

*United Sates v. O'Brien*,
   2017 U.S. Dist. LEXIS 83259 (E.D.N.Y. May 1, 2017) .........................................6

*United States v. Berry*,
   717 F.3d 823 (10th Cir. 2013) ..............................................................................15

*United States v. Camporeale*,
   515 F.2d 184 (2d Cir. 1975)................................................................................5, 8

*United States v. Cunningham*,
   145 F.3d 1385 (D.C. Cir. 1998) .............................................................................7

*United States v. Grammatikos*,
   633 F.2d 1013 (2d Cir. 1980)................................................................................17

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)..............................................................................8, 14

*United States v. Hansen*,
    369 F. App'x. 215 (2d Cir. 2010) ...........................................................................8

*United States v. Helstoski*,
    442 U.S. 477 (1979)................................................................................................1

*United States v. Lee*,
    573 F.3d 155 (3d Cir. 2009).................................................................................3, 5

*United States v. Olano*,
    507 U. S. 725 (1993).............................................................................................15

*United States v. Stasiv*,
    No. 19-4286, 2021 U.S. App. LEXIS 31488 (2d Cir. Oct. 20, 2021) ..................5, 6

*United States v. Walker*,
    974 F.3d 193 (2d Cir. 2020).................................................................................17

*United States v. Wiley*,
    846 F.2d 150 (2d Cir. 1988)................................................................................3, 7

*United States v. Yevakpor*,
    419 F. Supp. 2d 242 (N.D.N.Y. 2006).................................................................17

*Weeks v. Angelone*,
    528 U.S. 225 (2000)..............................................................................................15

## <u>BACKGROUND</u>

On May 24, 2024, the Court precluded from trial, based upon "the ineluctable application of United States Supreme Court precedent," all "references to prior holds on foreign military assistance and prior sign-offs" placed by Senator Menendez.  ECF No. 420 at 1 (citing *United States v. Helstoski*, 442 U.S. 477, 489 (1979)).  As a result, the Court required the Government to delete multiple lines from summary chart GX 1302:  rows 1030, 1040, 1263, 1264, 1267, and 1270; and excluded Government exhibits GX C207-8, GX D207-3, GX A120, GX 10A-6, GX A103-10, GX B207-1, and GX C602.  *Id.*

Concerned that the ruling would derail its case-in-chief, the Government sought reconsideration of the Court's order "as to communications involving third parties," with specific reference to stricken evidence involving Mr. Hana:  "row 1030 (text message from an Egyptian official to Wael Hana), row 1040 (text message from Hana to Fred Daibes), and row 1267 (text message from Nadine Menendez to Hana))."  ECF No. 421 at 1.  Indeed, the Government specifically argued that the excluded exhibits were "evidence of third-party conspirators' contemporaneous corrupt *expectation* of official acts in exchange for things of value.  As such, they are highly relevant and admissible without regard to their alleged truth."  *Id.* at 2 (emphasis in original).  Further, the Government lamented that "it is difficult to see how any gratuity charge could ever be proven if Menendez were correct that such evidence [*i.e.*, communications between third parties] is barred."  *Id.*  The Government then proposed redacted versions of the excluded exhibits that "omitt[ed] any reference to any legislative action by Menendez."  *Id.* at 3.  The Court, however, denied the Government's motion in its entirety, including with respect to the proposed redactions.  Tr. 1343:4-12.  ("Counsel, we have a pending motion for reconsideration of my order, dated May 24.  I believe it's ECF-420.  I'm adhering to my original order; that is, to the order dated May 24.").

Based upon the Court's ruling, Mr. Hana's counsel did not address the excluded evidence, and shifted their trial strategy accordingly. For example, Mr. Hana ultimately decided against introducing an expert retained to contextualize the long history of U.S. military aid to Egypt, whose testimony had been allowed by the Court. *See* Tr. 428:12-429:3. Nor, of course, did defense counsel address the excluded messages in summation; indeed, it would have been improper to do so since the messages were not in evidence. Nevertheless, and despite the Court's clear instruction that it was "adhering to [the] original order," the Government ultimately (if inadvertently) submitted to the jury those very excluded text messages.

The Government has stated that it discovered that it had done so on October 31, 2024. Certification of Lawrence Lustberg ("Lustberg Cert."), Exhibit ("Ex.") F). Two weeks later, on November 13, 2024, it notified defense counsel—and 11 minutes later, the Court—that it had uploaded nine improper exhibits containing evidence expressly precluded from trial on the laptop "provided to the jury for use in its deliberations." ECF No. 630 at 1. Meanwhile, at some as of yet undisclosed point, it wiped the laptop clean, Lustberg Cert. Ex. F, thus insulating it from forensic examination or other appropriate review. On November 18, 2025, Senator Menendez filed a letter, ECF No. 631, in which Mr. Hana joined, which, *inter alia*, requested leave to fully brief this issue and a schedule for doing so. That motion was granted, ECF No. 634, and pursuant to the schedule set by the Court, this brief follows, on behalf of Mr. Hana. For the reasons explained below, the Government's error deprived Mr. Hana of a fair trial. Under such circumstances, the only just remedy is to vacate the verdict and grant a new trial, one that is not tainted by the jury's receipt of the highly prejudicial extra-record material at issue.

<u>**ARGUMENT**</u>

I.    **MR. HANA DID NOT WAIVE HIS CONSTITUTIONAL RIGHT TO CHALLENGE THE EXTRA-RECORD EVIDENCE ERRONEOUSLY SUBMITTED BY THE GOVERNMENT TO THE JURY.**

The Government seeks to avoid meaningful review of its highly prejudicial error in submitting to the jury evidence that the Court explicitly ruled inadmissible by arguing that Defendants waived the right to challenge the impact of this extra-record material.  ECF No. 630 at 6.  Thus, in its letter notifying the Court of its error, the Government stated that "all defense teams had and took the opportunity to review the jury exhibit set, which they had for almost 48 hours." *Id.*  This statement is misleading.  In fact, as the Government well knows, the review undertaken by defense counsel was understood by everyone to encompass verifying that each exhibit number included on the Government's index of admitted exhibits was actually admitted at trial.  And this is what counsel diligently did, notifying the Government when an erroneous exhibit was included on this list.  Lustberg Cert. Ex. D.  Indeed, as is explained below, defense counsel reasonably understood that they were not reviewing every line of every single page of over 3000 exhibits submitted by the Government (some of which contained thousands of pages), ECF No. 630 at 6, to ensure that the Government uploaded accurate copies of the exhibits they actually admitted into evidence.  *See, e.g., United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009) ("[D]efense counsel is not required to inspect every exhibit at trial to ensure that documents that appear to conform to the copies provided by the Government are in fact identical.").  Because Mr. Hana did not, through this process, waive his objection (and there is no contention that he waived it through some colloquy with the Court or other process that would guarantee that any waiver was knowing and voluntary), the extra-record material is presumed prejudicial, a presumption that the Government can only rebut by bearing its burden of showing that the information was harmless.  *See United*

*States v. Wiley*, 846 F.2d 150, 157 (2d Cir. 1988) ( "[E]xtra-record information that comes to the attention of a juror is presumptively prejudicial.").

### A.    The Review Process

 On July 10, 2024 at 5:38 p.m., less than 48 hours before the case was submitted to the jury, Tr. 7168:6, the Government shared with defense counsel a folder of "All Admitted GX" exhibits via its file sharing platform.  Lustberg Cert., Ex. A.  One minute later, the Government circulated its index of admitted exhibits, specifically asking defense counsel to check if that list reflected counsel's internal list of admitted exhibits.  Lustberg Cert., Ex. B ("Counsel:  I've just uploaded to USAfx a full set of all the GX we have marked as admitted. You can see a full list of those in the attached index, on tab (2).  Let us know if this set reflects your internal versions so we can have it ready for the jurors' laptop on Thursday.").  At the same time, between the evening of July 10 and 12:11 a.m. on July 11, defense counsel prepared and reviewed its own set of Hana Exhibits and an accompanying index, both of which were to be—and were—circulated to the Government for its review and, ultimately, submitted to the jury.  Lustberg Cert., Ex. C (internal Gibbons communication attaching the Hana Exhibits index and a folder of admitted Hana Exhibits).

On the morning of July 11, Mr. Hana's defense team began its review of the Government's index of admitted exhibit numbers to determine whether it included any exhibits that were not admitted during trial.  And, in fact, there was one such exhibit:  at 11:57 p.m. on July 11, upon finishing their review of the 3,000-plus exhibit list, counsel notified the Government that there was one exhibit on the list, GX 41-4, that was not actually admitted into evidence.  Lustberg Cert., Ex. D.  At 9:12 a.m. on July 12, approximately five hours before the case was submitted to the jury, the Government confirmed that counsel was correct and stated that it would remove the erroneous exhibit "from the index and drive for the jury."  *Id.*  At 12:14 p.m., just two hours before the case was submitted to the jury, the Government sent the final indices listing the admitted exhibits on

behalf of the Government, Mr. Hana, and Senator Menendez, and asked counsel to confirm that they were correct.  Lustberg Cert., Ex. E.  The jury began deliberating at 2:10 p.m.  Tr. 7168:6 ("At 2:10 p.m., the jury retired to deliberate.").

### B.    Mr. Hana Did Not Waive His Objection To The Extra-Record Evidence.

As the process outlined above demonstrates, defense counsel's review of the admitted exhibit indices was, as all parties understood, limited to whether the Government's exhibit index included only exhibits that had in fact been admitted during trial; the Government conducted precisely the same review with regard to the defense exhibits, both parties fulfilling their responsibility "for seeing to it that only proper exhibits are sent to the jury room," *United States v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975) (cleaned up).  Indeed, it would have been difficult, if not impossible, for defense counsel to thoroughly review each page of the thousands of exhibits to confirm that the content of each accurately reflected what was actually introduced during the trial, a process that would have required significantly more time—which counsel would have requested had that been the case.  Obviously, defense did not do that, operating under the reasonable understanding that it was not seeking to confirm that every line (including every redaction) of every single page conformed to what the Government had shown to the jury and admitted into evidence at trial.  *See Lee*, 573 F.3d at 161 ("[D]efense counsel is not required to inspect every exhibit at trial to ensure that documents that appear to conform to the copies provided by the Government are in fact identical.").

The Government's cited cases, ECF No. 630 at 6, do not change the calculus, as none stand for the proposition that defense counsel is required to review, line by line, thousands of pages of exhibits to confirm they are the same version of the exhibits as were admitted at trial.  For example, *United States v. Stasiv* concerned a very limited amount of extra-record evidence—in that case, a very small universe of physical objects contained in a backpack.  No. 19-4286, 2021 U.S. App.

LEXIS 31488, at *4 (2d Cir. Oct. 20, 2021).  The Court "doubt[ed]" that the defendant was entitled

to challenge the inclusion of a receipt, which was located inside the backpack, because defense

counsel was responsible for reviewing the contents of the bag.  *Id.*  In other words, defense counsel

did not review the backpack to confirm that it included only evidence that had been admitted.  *Id.*;

*see also Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) (in dismissing

argument that the prosecutors tampered with jury evidence, the court held that petitioner waived

his right to challenge the evidence because counsel failed to object to the submission of a bag that

was not in evidence).   Conversely, here, defense counsel *did* painstakingly verify the contents of

the Government's exhibit index and, in fact, identified one improperly included exhibit that had

not actually been admitted at trial.  Lustberg Cert., Ex. D.  Both *Stasiv* and *Barnett* are, then, readily

distinguishable, including because both dealt with a small number of items of physical evidence,

as opposed to the thousands of pages of documentary evidence at issue here.

The same is true of *United Sates v. O'Brien*, upon which the Government also relies.

*O'Brien* involved review of a certified transcript of one witness's testimony, which was "entitled

to a statutory presumption of accuracy,"  that the jury had requested.  No. 13-586 (RRM), 2017

U.S. Dist. LEXIS 83259, at *41 (E.D.N.Y. May 1, 2017).   There, defense counsel reviewed the

single transcript—again, a much more practical possibility—and agreed "that it should be sent

back to the jury as transcribed."  *Id.*  Under those circumstances, the court found that defendant

waived his right to object to submission of the testimony transcript to the jury.  *Id.* at 42.  Here, by

contrast, defense counsel was not addressing the transcript of a single witness, specifically

requested by the jury (and thus obviously something to which counsel should, and always does,

inspect), but over 3000 documentary exhibits.  As explained above, defense counsel confirmed

that each of the Government's cited exhibit numbers were in fact admitted.  But counsel could not

have been expected to review, line by line, thousands of pages to confirm that each page was the same version as that shown to the jury and introduced during trial.

## II.    THE ERRONEOUSLY SUBMITTED EVIDENCE PREJUDICED MR. HANA AND DENIED HIM A FAIR TRIAL.

### A.    Legal Standard

A criminal defendant's Sixth Amendment rights are violated when a jury considers incriminating evidence that was not admitted at trial. *Loliscio v. Goord*, 263 F.3d 178, 185 (2d Cir. 2001); *see also Benjamin v. Fischer*, 248 F. Supp. 2d 251, 260 (S.D.N.Y. 2002) ("[W]hen extraneous information finds its way into the jury room, a defendant's Sixth Amendment rights have been violated because the jury has been exposed to evidence not subjected to confrontation or cross-examination.").    Indeed, courts have consistently reversed convictions under circumstances like those present here, where information that should have been redacted was provided to the jury. *See, e.g.*, *Eslaminia v. White*, 136 F.3d 1234, 1237 (9th Cir. 1998) (finding that exposure of a jury to an inadequately redacted side of a tape containing an inadmissible interview was a "serious error of constitutional dimensions," notwithstanding that the tape was introduced into evidence without restrictions); *United States v. Cunningham*, 145 F.3d 1385, 1394-97 (D.C. Cir. 1998) (holding that submission of unredacted tape to jury constituted violation of Sixth Amendment rights and merited reversal of conviction); *Farese v. United States*, 428 F.2d 178, 180 (5th Cir. 1970) (holding that error occurred when $750 in large denominations, the existence of which was unknown to the government or defense, was discovered by the jury upon examination of a freshly laundered shirt inside an attache case introduced into evidence).

Given the constitutional significance of the issue, "extra-record information that comes to the attention of a juror is presumptively prejudicial." *Wiley*, 846 F.2d at 157 (cleaned up).  This presumption can only be rebutted by a showing by the Government "that the jury's exposure to

extra-record information was harmless." *United States v. Hansen*, 369 F. App'x. 215, 216 (2d Cir. 2010); *see United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002) ("A government showing that the information is harmless will overcome this presumption.").   That is, the Government must show "beyond a reasonable doubt that this constitutional error was not harmless." *Benjamin*, 248 F. Supp. 2d at 260 (citing *Loliscio*, 263 F.3d at 185).[1]  Nor is the improper submission of evidence to the jury immune from scrutiny, as the Government claims, even when a defendant fails to timely object; even then, the Court will not deem the issue waived "unless it is shown that the evidence was so prejudicial that the defendant was denied a fair trial."  *Camporeale*, 515 F.2d at 188-189 (reversing judgment and remanding for a new trial).   Under either standard, for the reasons explained below, here the erroneously admitted evidence was so prejudicial to Mr. Hana that the jury's exposure to it denied him a fair trial; certainly, the Government cannot demonstrate beyond a reasonable doubt, as it must, that its error was harmless.

### B.    The Erroneously Admitted Evidence Denied Mr. Hana A Fair Trial.

#### 1.    The Erroneous Evidence Was Critical To The Government's Case-In-Chief.

The improper exhibits submitted to the jury directly reference billions of dollars of U.S. funding and military sales to Egypt, which aid was a principal component of the Government's conspiracy and bribery claims against Mr. Hana (including the allegation of a conspiracy to make Senator Menendez an agent of Egypt).[2]  Thus, the excluded exhibits, some of which contain text

---

[1] This is a significant hurdle for the Government to overcome: properly framed, the harmless error inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis in original).

[2] Mr. Hana does not contend that he has standing to challenge the improper exhibits as violative of the Speech or Debate Clause.  Nor does he argue that, had he been tried alone, this evidence could not have been introduced against him.  However, as explained throughout, the evidence in issue was ruled inadmissible in its entirety as to all defendants and as such was not addressed by

messages from Mr. Hana, clearly would be probative of the alleged scheme to nefariously assist Egypt. Indeed, the Government made clear, in its arguments to the Court, in support of its motion for reconsideration of the Court's May 24 Order (ECF No. 420), precisely how critical this evidence was to proving these precise charges. Specifically, the Government argued that the excluded exhibits are "evidence of third-party conspirators' contemporaneous corrupt expectation of official acts in exchange for things of value. As such, they are highly relevant and admissible without regard to their alleged truth." *Id.* at 2. Indeed, at oral argument, the Government described the exhibits as "very critical evidence in our case." Tr. 1042:1. But Mr. Hana did not, and indeed could not, rebut this inculpatory evidence because he reasonably believed that the jury would never see it. He also declined to call his retained expert witness to contextualize the long history of U.S.-Egyptian relations and the provision of military aid, which would also have rebutted the contention, uniquely explicit in these documents, that Senator Menendez was engaging in "special" or "favorable" behavior towards Egypt and its officials. Thus, Mr. Hana's complete inability to rebut critical and inculpatory evidence that he could not know would be presented to the jury rendered his trial fundamentally unfair.

For example, most obviously prejudicial are the multiple improper versions of the text message from Ahmed Helmy to Mr. Hana [the "Helmy message"]: "Director office of Egyptian affairs in state department 'Kathryn Kiser' told our DCM today [redacted] a billion $ of usaid [*sic*] to Egypt before the recess !!!! Is this true ?" ECF No. 630-7 (GX C207-8); ECF No. 630-13 (GX C207-97); ECF No. 630-17 (GX D207-3). This text message appears in three of the nine improperly admitted exhibits. ECF No. 630-7 at 1-2 (Helmy sends the Helmy message to Mr.

---

Mr. Hana at trial, including in his summation. The prejudice to Mr. Hana thus lies in the fact that he was denied the opportunity to address the inculpatory evidence, assuming that the Government would adhere to the Court's Order excluding them (ECF No. 420).

Hana);  ECF No. 630-13 at 8 (Helmy re-sends the Helmy message to Mr. Hana and adds:  "And that other thing[.]  A female employee at his office called the embassy and said that they informed the State Department to have things go well in what relates to Egypt.");  ECF No. 630-17 at 2 (Mr. Hana forwards the Helmy message to Mr. Daibes).

The only version of that text message that the jury was supposed to have seen included the words "Is this true ?" and nothing more.  In other words, the Government was prohibited from showing the jury that Mr. Helmy had texted Mr. Hana to ask about "Kathryn Kiser" communicating with an Egyptian official regarding "usaid" worth a "billion $," *i.e.*, evidence linking Senator Menendez to his actions in actually clearing billions of dollars in aid to Egypt.  But the whole of the message that actually went to the jury made it much easier for the Government to argue that the Helmy message proved that Senator Menendez released billions of dollars of military aid to Egypt as a favor to Mr. Hana and to Egyptian officials.  In fact, in one of the improperly admitted message, after Helmy re-sent the excluded message to Mr. Hana, he added:  "A female employee at his office called the embassy and said informed the State Department to have things go well in what relates to Egypt."  ECF No. 630-13 at 8.  No part of that message (neither the re-circulated Helmy message nor Helmy's commentary) was supposed to be shown to the jury.

Indeed, the Government in summation highlighted exactly that Helmy message, which was supposed to have been redacted in its entirety:

> In September, Helmy has a question for Menendez.  So he asks Hana is this true?
> Hana tries to get through to Nadine.  Then he connects with Daibes who calls
> Menendez.  Daibes reports back to Hana who gets the message back to Helmy.  All
> in less than 20 minutes.  What was Helmy asking about?  First of all, doesn't matter.
> That kind of immediate access to a U.S. senator already shows how serious
> Menendez was about his promises to be helpful to Egypt, even if in this case what
> Helmy was asking about was something minor.  ***But second of all, you know from***

> ***the evidence and your common sense what Helmy was asking about.  He was
> asking about the things that Egypt always cared about.***

Tr. 6400:13-24 (emphasis added).

The Government's argument in summation directly undermines its assertion that (1) "the
Government never referred to . . . any incorrect version of the exhibits"; (2) the exhibits "did not
relate to any matter that was in any real dispute between the parties"; and (3) "the extraneous
portions of the documents, without context or explanation, simply lacked any facial
relevance."  ECF No. 630 at 1, 7-8.   Undeniably, the Government told the jury that it knew "what
Helmy was asking about," Tr. 6400:13-24, even though the correct exhibit would have excluded
the Helmy message entirely except for "Is this true?"  The Government thus argued that Mr. Helmy
relied on Mr. Hana for inside information regarding U.S. and Egyptian relations and military
spending—"the things that Egypt always cared about"—which information included actions taken
by Senator Menendez on Egypt's behalf.  And this argument was supported by evidence that
should not have been before the jury, the profound impact of which on the case against Mr. Hana
cannot be overstated.

For their part, defense counsel did not address the Helmy message because they certainly
did not believe that the Government would submit excluded evidence to the jury.  Thus, counsel
addressed only the text message from Senator Menendez to Nadine Menendez instructing her to
"Tell Will I am going to sign off this sale to Egypt today," Tr. 6818:21-6819:3, because that was
the only text relevant to military aid that the defense believed the jury would see.  In fact, Mr.
Hana explicitly argued in post-trial briefing that this text message between the Senator and Nadine
could not support the jury's verdict because merely speaking with Nadine or Mr. Hana about the
sales is not an official act.  ECF No. 593 at 62-63.  Mr. Hana further argued that there was no
evidence in the record that Senator Menendez "signed off" on any funding or approval of military

sales.  *Id.*  But, of course, although there was no such evidence *in the record*,  the excluded portions of exhibits that were improperly submitted to the jury undermined this argument.  To the contrary, the submission included specific, damaging evidence showing that Senator Menendez did in fact "sign off" on military funding, evidence which was not contained in any other exhibit at trial.  ECF No. 630-13 at 8.  For the reasons explained in Mr. Hana's pending motions, ECF Nos. 593 and 622, without the excluded exhibits, the evidence *of record* was not sufficient to convict Mr. Hana of the § 219 or bribery counts.  But the verdict reflects a different reality, one that comports with evidence that Mr. Hana did not and could not know that the jury saw, and which, accordingly, he did not have the opportunity to address or rebut at trial, rendering its submission irreparably prejudicial.

The Government, however, asserts that this evidence was harmless because it had "asked the jury to convict on all of the Egypt counts on the basis solely of Menendez's attempts to pressure the USDA, not even relying on Egyptian aid at all."  ECF No. 630 at 7-8 (citing Tr. 6395-400).  Of course, this argument completely sidesteps the § 219 charge, which was certainly *not* premised on Senator Menendez's alleged attempts to pressure the USDA, attempts which, under the Government's theory, purportedly related to Mr. Hana's having been awarded a monopoly over the halal certification business in the United States.  GX 1302 at lines 721 to 725; Tr. 1797:1-13; *id*. 1798:21-1799:8.  Indeed, the best evidence of this was the days of testimony elicited by the Government from Joshua Paul and Sarah Arkin about military funding, none of which had anything to do with IS EG Halal or the USDA.  *See* Tr. 855:2-906:4 (Direct examination of Joshua Paul); *id.* 946:1-948:7 (Re-direct of Joshua Paul); *id*. 4456:9-4593:23 (Direct examination of Sarah Arkin).  The Government's effort to show the harmlessness of the evidence here at issue thus fails.

The Government's argument that the unadmitted evidence that went to the jury was harmless also ignores that the subject of an alleged scheme to assist Egypt, particularly in the form of military and financial aid—the crux of the excluded materials provided to the jury—was a vital aspect of the Government's summations.  Indeed, the Government referenced the approval of military sales and funding numerous times in its closing, including the following:

- "So Menendez sold the power of his office. He promised to take actions for Hana and Daibes in exchange for those bribes. He promised to approve military aid to Egypt, to provide Egypt with sensitive information about Americans stationed abroad and to help Egypt in other ways." Tr. 6368:22-6369:1.

- "So for these [bribery] counts, if Menendez promised to approve military aid to Egypt, like a foreign military sale or a grant of foreign military financing money, that's a promise of official action." Tr. 6388:17-20.

- "So, Hana and Nadine set up a meeting on July 25, 2018, between Menendez and General Shawky, that Egypt defense attache, the same Egyptian general they'd arranged the meetings with before. This meeting was part of a delegation that was making the rounds to a lot of different people in Washington asking for military aid. . . . [T]he next day, Menendez texts Nadine to tell Hana he's going to approve Egypt's tank ammunition. Nadine takes a screenshot. Screenshot of another promise of an official act." Tr. 6392:8-6393:5.

- "In April [2019], Nadine still hasn't gotten paid by Hana, but she does tell Menendez she's going to. . . . A few weeks later, Menendez takes another meeting with Ahmed Helmy. This is one of the Egyptian officials that Hana has been setting him up with. Someone you can see from the text Hana has regularly been taking orders from this Helmy.  Hana is saying the quiet part loud.  He's talking about the halal company, the company that's going to pay the Nadine in the meeting.[3]  It appears from what Nadine is telling Menendez that Helmy is actually angry at Hana for talking about the halal in the meeting, while Menendez and Helmy want to talk about issues related to military aid." Tr. 6394:7-25.

---

[3] There is nothing in the record to support this argument, advanced by the Government, that IS EG Halal Certified was created in order to fund bribes to Senator Menendez.  In fact, there was testimony to the contrary at trial, demonstrating that Mr. Hana began studies and preparations for developing his halal business long before Nadine Arslanian was in a serious relationship with—let alone married to—Senator Menendez.  *See* Tr. 2961:13-15 (Uribe: In 2018, "Will was doing some studies for his . . . meat company"); *id.* 3207:22-3208-6 (same).

In sum, these detailed references to the provision of military aid and sales—the subject of the emails that should have been, but were not, excluded—demonstrates that evidence concerning such funding was a key component of the Government's case.  Indeed, the excluded evidence supported these arguments by suggesting that (1) Senator Menendez actually approved billions of dollars' worth of aid to Egypt; and (2) he did so as a favor to Egyptians officials, as his office purported to call the State Department to make sure they treated Egypt "well."  ECF No. 630-13 at 8.  In other words, the Helmy message—which was the clearest indication that Senator Menendez engaged in special treatment on behalf of Egypt and its officials—was so prejudicial not only because it supported the Government's theory of the case but because it did so in an exhibit that the defense did not address because counsel believed it was not in evidence.

### 2.    The Government's Assertion That There Is An "Extremely Low Likelihood" that The Jury Examined The Improper Exhibits Is Baseless And Contrary To The Court's Repeated Jury Instructions.

The Government argues that "a new trial would be inappropriate because the circumstances indicate that it is extraordinarily unlikely that any juror became aware" of the improper, extra-record materials at issue.  ECF No. 630 at 6.  Under the governing caselaw, this contention is irrelevant.  Extraneous information's entrance into the jury room is analyzed under an objective test, assessing "the likelihood that the influence would affect a typical juror."  *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (per curiam).  "A trial court's post-verdict determination of extra-record prejudice must be an objective one, focusing on the information's probable effect on a hypothetical average juror."  *Greer*, 285 F.3d at 173 (cleaned up).  Thus, the court "may not inquire into the degree upon which the extra-record information was used in deliberations and the impression which jurors actually had about it."  *Id.* (cleaned up).  The Government literally ignores this jurisprudential reality.

But even if that were not the standard, the Government's argument ignores the Court's repeated and insistent instructions to the jury, which the jury is presumed to have followed, to consider "all of the evidence."  Tr. 7041, 7042, 7043, 7047, 7055, 7057, 7060, 7064, 7070, 7122, 7133, 7134; *see Samia v. United States*, 599 U.S. 635, 646 (2023) ("[O]ur legal system presumes that jurors will attend closely the particular language of [such] instructions in a criminal case and strive to understand, make sense of, and follow them." (citing *United States v. Olano*, 507 U. S. 725, 740 (1993))); *Weeks v. Angelone,* 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").  Indeed, the Government suggests that the jury did not need to view all of the exhibits "given that an accurate and properly redacted summary chart covering the subject matter of the Implicated Exhibits was admitted and included on the laptop."  ECF No. 630 at 6.  Putting aside the fact that the accuracy of the summary charts was a central dispute at trial; that the defense made their own versions of summary charts to highlight the inaccuracies of the Government's charts; and that the Government manipulated the exhibits in an argumentative fashion to tell their own version of the events, *see* ECF No. 593 at 18-29, for purposes of this discussion, the point is this: the Court explicitly instructed the jury to consider the underlying exhibits because "the underlying evidence and the weight of which [the jury] attribute to that underlying evidence is what gives value and significance to these charts."[4]  Tr. 7052:15-17.  The Government's argument

---

[4] As defense counsel argued at trial, Tr. 1109:1-14, the redactions in the summary charts invited the jury to speculate about what was missing, which is why counsel suggested that the Government delete the excluded rows on GX 1302 as opposed to applying redactions.  The Court, however, permitted the evidence to be removed by way of redactions in the summary chart.  Tr. 1109:15-21; *id*. 1110:16-18.  As a result of the redacted materials having made their way into the jury room, the jurors could have easily found out what was beneath the redactions in the summary chart, which would  naturally have been information as to which their interests would have been piqued.  But, of course, this should not have been possible and would not have been but for those unadmitted materials improperly becoming available.

thus flies in the face of the bedrock principle of our judicial system that the jury should thoughtfully and thoroughly consider all of the evidence presented. *See United States v. Berry*, 717 F.3d 823, 830 (10th Cir. 2013) (recognizing "the jury's obligation to consider all of the evidence"). The Government's argument turns this principle on its head by assuming, contrary to the law, that the jury here did not do its job. In that regard, the Government's extraordinary position that it is "extraordinarily unlikely that any juror" even looked during its deliberation casts at what the Government itself described as critical evidence, ECF No. 421 at 1, is troubling indeed, casting as it does doubt on the legitimacy of the jury's verdict, all in the name of defending its conduct here.

Nor does the fact that, as the Government argues, there were over 3,000 documents admitted into evidence render it unlikely that the jury reviewed those exhibits. *See* ECF No. 630 at 6. Of course, as set forth above, the Government cited to those exhibits—including the ones specifically at issue here—during its summation. *See, e.g.,* Tr. 6400:13-24. Moreover, those exhibits were also highlighted in the Government's summary chart, GX 1302, to which the Government devoted days of testimony, and which was the centerpiece of the Government's case. The Government's argument then relies not only on rejecting the jury ignoring the Court's instruction to consider all of the evidence, but more ironically, on the legally untenable position that the jury did not, contrary to the instructions provided to it, pay attention to the most critical evidence, some of which, as it turns out, should not have been provided to the jury.

Additionally, even though the Government makes much of the fact that the jury did not submit specific questions about information in the excluded exhibits, *see* ECF No. 630 at 6-7, it ignores the fact that the jury (which did not ask many questions at all) in fact requested a "display port cable to connect the laptop to the TV screen," Tr. 7171 at 4:5, which is precisely where the exhibits at issue resided. Is it possible that the jury did not examine these exhibits? Of course –

just as it is possible that it did.  But we will never know, and the Government's unsupported speculation that the jury did not consider the improper evidence deserves no serious consideration because, as a result of its unilateral decision to wipe the laptop clean, a forensic examination that could ascertain the answer to this question can never be done.  Nor do we know when the laptop was wiped clean, including whether it was done after the Government's discovery of its error.  The Government's speculative argument that the jurors did not review the wrongfully provided materials should therefore be dismissed.  Indeed, the Government's actions in what amounts to the spoliation of evidence while a case is in post-trial motions (and before any appeals), should not be countenanced and constitutes another basis for the relief sought here.[5]

---

[5] Spoliation is "the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020).  "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *See In re Terrorist Bombing of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).  Here, the Government was certainly on notice of its duty to preserve this evidence, which was in the Government's exclusive possession since the conclusion of trial, as post-trial motions remain pending and Defendants have yet to be sentenced, let alone afforded their right of appeal.  Most significantly, for present purposes, the missing evidence could resolve the question raised by the Government here:  whether the jury viewed the improperly loaded exhibits.  "The Second Circuit has held that sanctions may follow deliberate destruction, if the Government is unable to bear the heavy burden of demonstrating that no prejudice resulted to defendant."  *United States v. Yevakpor*, 419 F. Supp. 2d 242, 248 (N.D.N.Y. 2006) (quoting *United States v. Grammatikos*, 633 F.2d 1013, 1020 (2d Cir. 1980)).  As explained above, the submission of the improper evidence to the jury clearly prejudiced Mr. Hana, and that prejudice is only compounded by the fact that Mr. Hana cannot determine whether the jury saw such highly prejudicial evidence due to the Government's action in wiping the laptop clean.  At the very least, the Government should not be permitted to maintain its position that the jury did not view the improperly submitted exhibits because it was the Government's actions alone that led to the destruction of the only evidence that could resolve the issue.

3.     **The Government Did Not Admit "Overwhelming Evidence" With Respect To The § 219 Charge And The Bribery Charges Relating To The Alleged Scheme To Assist Egyptian Officials.**

As Mr. Hana detailed in his pending post-trial briefing, there was insufficient evidence to convict him of the bribery, honest-services fraud, and § 219 charges, including insofar as they relate to the alleged scheme to assist Egypt, ECF No. 593 at 51, 62-64, 101-125, the charges that the improper exhibits address.[6]  At trial, the Government sought to prove that Senator Menendez promised to approve certain military sales and funding as part of a scheme to secretly assist Egypt and its officials.   However, without consideration of the excluded exhibits, the Government introduced only evidence that Senator Menendez discussed military funding with third parties, which is simply not enough to show that he promised to engage in an official act.  *See* ECF No. 593 at 62-63.  The redactions, however, went specifically to the fact that he in fact *did* approve military financing, a fact that—while appropriately excluded from evidence under the Speech or Debate Clause ECF No. 420 at 1 ("[R]eferences to past legislative acts of a Member [of Congress] cannot be admitted without undermining the values protected by the Clause." (citations omitted))—supported the Government's theories with regard to proving both *quid pro quo* bribery and conspiracy, for the fact that he performed these actions served to demonstrate not only what he did but also that he agreed to do so.  In this sense, they were devastating to Mr. Hana as well, though he never had the chance to address them because he did not understand they were in evidence.  The unfairness of this procedural reality is, thus, manifest.

---

[6] For all the reasons stated in Mr. Hana's post-trial briefing, there was insufficient evidence to convict him of any of the charges.  ECF No. 593.  However, because the improper exhibits concern only the Egypt-related charges, the other aspects of Mr. Hana's post-trial motions are not reiterated here.

For example, the Government introduced evidence that Senator Menendez, Nadine, and Mr. Hana met for dinner on May 18, 2019.  GX 1302 at lines 163 to 177.  That same day, Mr. Hana messaged General Khaled Shawky:  "The ban on small arms and ammunition to Egypt has been lifted.  That means sales can begin.  That will include sniper rifles among other articles." *Id.* at 12.  Even if this message could support an inference that Senator Menendez and Mr. Hana thus spoke about military funding during the dinner—which is no more than speculation—such a dinner meeting is not, as a matter of law, sufficient to prove that Senator Menendez promised to engage in an official act (*i.e.*, signing off on the military sale), let alone to do so in exchange for something. *See Jefferson*, 289 F. Supp. 717, 736-37 (E.D. Va. 2017) (meeting with military officials in an effort to gain approval of testing certain technology was not an official act).  The redacted portions of the emails, however, make explicit that very point—that is, they demonstrate that it was Senator Menendez who, following the dinner, was involved in this legislative act, which, of course, was the very reason for their exclusion under the Speech or Debate Clause.  But once excluded, Mr. Hana had no incentive—and indeed no opportunity—to address this point, though that point may very well have resulted in his conviction.

The Government, however, argues that the evidence also established that, a few months later, Senator Menendez asked Nadine via text message to "[t]ell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 1000,000 Rounds Tank Ammunition: $99 million." GX 1302 at line 320; ECF No. 630 at 8 (citing ECF No. 611 at 11-12). Again, merely speaking with Nadine or Mr. Hana about the sales is not an official act or a promise to engage in one. *See Jefferson*, 289 F. Supp. at 736-37.  Thus, without any evidence that Senator Menendez actually signed off on anything, there was simply not enough facts in the record—other than the excluded text messages between Senator Menendez and others talking about the military

19

funding—to establish that Senator Menendez actually promised that he would approve certain military sales as part of a quid pro quo agreement, let alone that he did so.  Indeed, without consideration of, for example, the multiple iterations of the inadmissible Helmy message, ECF No. 630-7 at 1-2 (Helmy sends the message to Mr. Hana);  ECF No. 630-13 at 8 (Helmy re-sends the message to Mr. Hana)  ECF No. 630-17 at 2 (Mr. Hana forwards the Helmy message to Mr. Daibes), the more reasonable inference, based upon the properly admitted evidence, was that Mr. Hana, a native Egyptian, was interested in the bilateral relationship between the United States and Egypt, which relationship centered largely on the provision of military aid.  *See* Tr. 867:12-16 (Joshua Paul:  Egypt is the second largest recipient of foreign military financing grant money from the United States); *id.*. 867:23-868:3 (Joshua Paul:  Egypt receives approximately $1.3 billion from the United States in military funding on an annual basis); *id.* 936:25-937:4 (Joshua Paul:  Egypt has received annual funding from the United States since the 1970s).  But the Helmy message, as it went to the jury (but obviously not as it was admitted) undermined this contention by suggesting that Senator Menendez was engaging in special behavior towards Egypt and its officials, specifically facilitated by Mr. Hana's involvement and communications.

Additionally, with respect to the § 219 charge, the record clearly established that U.S. military sales to Egypt are routine and repeated topics of conversation between U.S. and Egyptian officials; Senator Menendez was not engaging in any special treatment, let alone becoming an agent of Egypt.  *See, e.g.*, Tr. 4683:22-4684:13 (Ms. Arkin testified that "the substance of the [March 2018] meeting was pretty standard for meetings with Egyptian officials," and that the Egyptian officials "advocated to Senator Menendez for the U.S. [Congress] to stop imposing conditions on foreign aid[,]" which "they had advocated for many years before 2018" as well as after); *id.* 4685:19-22 (Ms. Arkin testified that "General Shawky [] said that if the U.S. doesn't

release more aid they might have to go to other sources, like Russia . . . [which] is a consistent threat that Egypt makes" and "fairly standard"). Indeed, former State Department staffer Joshua Paul testified at length that Egypt has historically been the second largest recipient of "grant assistance funding for military financing" from the U.S. since and as a result of the Camp David Accords in 1978. *See* Tr. 867:12-16. This funding—some $1.3 billion annually, Tr. 687:23-868:3—has long been critically important to Egypt and the U.S.'s strategic, and diplomatic, relationship, as well as to the U.S.'s own national security interests. *See* Tr. 939:19-940:2; *id.* 945:15-19; *id.* 4606:15-19. This fact, among others, shows how weak was the Government's case that Senator Menendez acted under the direction or control, or at the order or request, of the Egyptian government (and Mr. Hana conspired to have him do so)—and was bribed to do so—rather than that he was throughout navigating a complex and dynamic relationship with Egypt, including as a ranking member of the Senate Foreign Relations Committee, whose role it is to foster diplomacy and foreign partnerships, to meet and communicate with foreign officials.

Given the weakness of this case, as set forth in far greater detail in Mr. Hana's post-trial motions, ECF No. 593 at 56-64, 72-75, 104-122;, the Helmy message, as provided to the jury, though not as admitted, changes everything—it was the strongest indication that the Senator actually signed off on military funding and sales, and thus made the promise alleged, purportedly in exchange for bribes.[7] Without knowing that it had to confront this evidence, Mr. Hana's defense

---

[7] As explained in prior briefing, Mr. Hana vehemently disputes that the Government presented any evidence that there were any quid pro quo bribes, as is required under the law. To the extent the Government attempted to show that the approval of the military sale was the quid with respect to Mr. Hana's payment toward Nadine's mortgage, the Government failed to present any evidence of the pro, i.e., that the mortgage payment was in exchange for the military sales. Indeed, the discussions about foreign military finances that were presented at trial took place in May and June 2018, a year before the mortgage payments were allegedly offered and accepted in 2019. As such, Mr. Hana argued that there was no evidence that the 2019 mortgage payments related back to, or more specifically, were made in exchange for, Senator Menendez's actions in 2018.

was significantly prejudiced: critical evidence that was before the jury, but which—contrary to most basic notions of justice—the defense did not know was there, was left unaddressed.  And in a case like this one, in which the evidence of a quid pro quo, and conspiracy, was so lacking, it could well have made all the difference.

## <u>CONCLUSION</u>

For the reasons provided above, because the jury was exposed to highly prejudicial, unadmitted evidence, the Court should set aside the verdict in this case and grant Mr. Hana a new trial.

Dated:  November 27, 2024                Respectfully submitted,

                                        *s/ Lawrence S. Lustberg*
                                        Lawrence S. Lustberg
                                        Ricardo Solano, Jr.
                                        Anne M. Collart
                                        Kelsey A. Ball
                                        Andrew J. Marino
                                        Christina M. LaBruno
                                        Jessica L. Guarracino
                                        Elena M. Cicognani
                                        **GIBBONS P.C.**
                                        One Gateway Center
                                        Newark, New Jersey 07102
                                        (973) 596-4500
                                        llustberg@gibbonslaw.com